UNITED STATES  DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    *        CRIMINAL ACTION

VERSUS                                      *        NO. 94-381

LEN DAVIS, ET AL                            *        SECTION "C"(4)

### ORDER AND OPINION

This ruling deals with the permissible scope of nonstatutory aggravating factors in the government's case-in-chief at the penalty phase of a capital case, and the information admissible to sustain them[1]. It also concerns the procedures for assuring the reliability of the information.

The government has given notice to defendants LEN DAVIS and PAUL HARDY of the nonstatutory aggravating factors it proposes to present if a penalty phase is reached.  It also has listed the factual allegations to support those factors.    DAVIS has moved to bar the use of nonstatutory aggravating factors in general and HARDY has moved in particular to disallow the use of information regarding unadjudicated crimes.  For the following reasons, the defendants' motions are GRANTED in part and DENIED in part.

---

[1]  This opinion does not discuss the scope of government rebuttal.  Information which may be inadmissible in the government's case-in-chief may well become admissible if the defense raises the issue in the presentation of their mitigation.

1







## The Penalty Phase in General

If either or both of these defendants are convicted as charged, the jury must pass through several stages before a death penalty can be imposed. 18 USC §3591, et seq. First, the jury must decide whether the defendant had the requisite "intent" in committing the offense. 18 USC §3591(a). If the jurors unanimously conclude beyond a reasonable doubt that the intent was established, they can move to the next stage. If they do not unanimously so decide, the deliberations are over and the death penalty cannot be imposed. Assuming the jury finds the requisite intent, it must then consider the specific statutory aggravating factors that the government has alleged and determine if at least one was proven beyond a reasonable doubt. 18 USC §3592(c); §3593(c)[1]. Again, if the jurors unanimously find one (or more) of the statutory factors so proven, they can move to the next stage. If not, the deliberations are over and the death penalty cannot be imposed. 18 USC §3593(d). Assuming again, the jurors find at least one of the statutory aggravating factors proven, they then must consider and weigh the statutory aggravating factors, plus "any other aggravating factor for which notice has been provided" against any mitigating factors and decide whether capital punishment is appropriate. 18 USC §3593(d)&(e)[3].

---

[1] In this case, the government has alleged the defendants committed the act after "substantial planning and premeditation," §3592(c)(9), and that DAVIS procured the offense by payment and HARDY committed it as consideration for pecuniary gain. §3592(c)(7)&(8).

[3] Any aggravating factor must be proven unanimously and beyond a reasonable doubt; mitigating factors need only be established by a preponderance of the evidence and unanimity is not required. §3593(c) & (d).

02132

## Nonstatutory Aggravating Factors in General

While 18 USC §3591, et seq., expressly defines both the "intent" requirement and the statutory aggravating factors necessary to allow consideration of the death penalty, the statute provides no specific guidance as to what constitutes an appropriate nonstatutory aggravating factor. For example, after specifically enumerating 15 possible statutory aggravating factors, §3592(c) simply adds in an unnumbered paragraph: "The jury...may consider whether any other aggravating factor for which notice has been given exists." Under §3593(a), the government is required to give notice of its proposed aggravating factors, but other than mentioning victim impact, no boundaries are given on the scope of the nonstatutory factors. Under §3593(c), the perimeters are likewise undefined - the jury is to hear "information" as to "any matter relevant to the sentence, including any mitigating or aggravating factor..." and the government may present "any information relevant to an aggravating factor..." Information is also admissible "regardless of its admissibility under the rules governing admission of evidence at criminal trials."

While the statute contains no specific guidelines for the nonstatutory factors, it does impose substantial responsibility and considerable discretion to the trial judge in deciding admissibility. The statute, as noted, requires that the proffered information be "relevant." Significantly, the statute also provides that even relevant information "may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." In determining relevancy, probative value and unfair

3

02133

prejudice, it is helpful to briefly review the history of capital punishment caselaw and the purpose and scope of the penalty phase in general.

<u>General Principles</u>

The penalty phase of a capital case brings into direct and seemingly irreconcilable conflict two competing themes - the constitutional requirement of channeled and guided jury discretion versus the need for the jury to have as much information regarding the offender as possible in order to impose an individualized sentence.

In 1972, in <u>Furman v. Georgia</u>[4], the United States Supreme Court struck down the death penalty laws as they then existed which had allowed the jury virtually "untrammeled discretion" to decide who could be sentenced to death[5]. The lack of standards resulted in death sentences that were "wantonly and...freakishly imposed" akin to being "struck by lightening" where only a "capriciously selected random handful" received a death sentence.[6] Such a system provided "no meaningful basis" to distinguish who should live and who should die.[7] The lack of standards to guide the jury was held to violate the Eighth and Fourteenth Amendments.

In 1976, the Supreme Court relied on the same principles in upholding a revised death penalty statute:

...(<u>Furman</u>) did recognize that the penalty of death is

---

[4]   <u>Furman v. Georgia</u>, 92 S.Ct. 2726 (1972)

[5]   92 S.Ct. 2726, 2731 (Douglas, J., concurring).

[6]   92 S.Ct. at 2762 (Stewart, J., concurring)

[7]   92 S.Ct. at 2764 (White, J., concurring)

4

different in kind from any other punishment imposed under
our system of criminal justice. Because of the
uniqueness of the death penalty, <u>Furman</u> held that it
could not be imposed under sentencing procedures that
created a substantial risk that it would be inflicted in
an arbitrary and capricious manner...

*        *        *        *

<u>Furman</u> mandates that where discretion is afforded a
sentencing body on a matter so grave as the determination
of whether a human life should be taken or spared, that
discretion must be suitably directed and limited so as to
minimize the risk of wholly arbitrary and capricious
action.

<u>Gregg v. Georgia</u>, 96 S.Ct. 2909, 2932 (1976).

On the same day as <u>Gregg</u>, the Supreme Court struck down a death

penalty statute from North Carolina, again using the same

reasoning:

...the penalty of death is qualitatively different from
a sentence of imprisonment, however long. Death, in its
finality, differs from life imprisonment more than a 100-
year prison term differs from one of only a year or two.
Because of that qualitative difference, there is a
corresponding difference in the need for reliability in
the determination that death is the appropriate
punishment in a specific case.

<u>Woodson v. North Carolina</u>, 96 S.Ct. 2978, 2991 (1976).

<u>Woodson</u> reiterated that "arbitrary and wanton jury discretion"

had to be replaced by "objective standards to guide, regularize,

and make rationally reviewable the process for imposing a sentence

of death." <u>Ibid</u>.

Some months later, the Supreme Court expressly added Due

Process, in addition to the Eighth Amendment, as a basis to

evaluate capital sentencing procedures. <u>Gardner v. Florida</u>, 97

S.Ct. 1197 (1977). After acknowledging that the death penalty is

"different" from all other punishments, requiring assurance that it

be based "on reason rather than caprice or emotion," the court

5

02135

reconcile these competing but equally valid principles by creating sequential procedural steps, similar to 18 USC §3591, et seq. Under these scenarios, even though the defendant has been convicted of a capital crime, the jury cannot impose the death penalty unless each procedural step is met and completed. With respect to the statute at issue here, the first step is for the jury to find the requisite intent; the second step is for the jury to find at least one explicit statutory aggravating factor. Only then can the jury even consider the death penalty. The intent element is specifically defined as are each of 15 statutory aggravating factors. These definitions are clearly intended to fulfill the constitutional requirement that the jury's discretion in imposing the death penalty be guided and channeled by objective standards[8]. If the jury makes those threshold findings, the jury can permissibly impose a death penalty. At that point, the jury is then to consider other information and factors, both in further aggravation or in mitigation of the penalty. This additional information is to assist the jury in making its ultimate decision. Here, the goal is to individualize the sentence as much as possible.

> Our cases indicate...that statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who

---

[8]   This court has previously ruled on certain challenged portions of the statutory structure and found them to be constitutional. Order and Reasons, Rec.Doc.172

7

will actually be sentenced to death.

Zant v. Stephens, 103 S.Ct. 2733, 2743 (1983).


Nonstatutory Aggravating Factors

Having said the above, are there then no limits on the "other" information that can be introduced at the penalty phase of a capital case?   The answer is clearly no.   The statute itself requires that any such information be "relevant."     And by relevant, it must mean sufficiently relevant to the consideration of who should live and who should die.  What might be relevant in an administrative disciplinary proceeding, or even in a sentencing hearing where the choices are between varying terms of imprisonment, is not necessarily sufficiently relevant to deciding who should be sentenced to death.    Also, a factor in weighing relevancy versus unfair prejudice is the reliability of the information.   The United States Supreme Court has made it clear that heightened reliability is required in a capital sentencing hearing, since the consequences of a death verdict are so final and severe. Lockett v. Ohio, 98 S.Ct. 2954, 2964 (1978); Ford v. Wainwright, 106 S.Ct. 2595, 2602 (1986).   Even if relevant and sufficiently reliable, the proffered information may still be excluded if its substantive probative value is outweighed by unfair prejudice, confusion of the issues or misleading the jury.  Again, this balancing has to consider the purpose of the hearing and the finality of the death sentence, if it is imposed.

In addition to these statutory restrictions,   the Eighth

8

Amendment and Due Process require procedural safeguards.  This statute is a "weighing" statute.  Once the evidence of all the aggravating and mitigating factors is in, the jury is to consider whether all of the former factors "outweigh" the latter.  §3593(e). To carefully define the statutory aggravating factors, but then allow wholesale introduction of nonstatutory aggravating information, would defeat the goal of guided and measurable jury discretion, and return us to an unconstitutional system where the death penalty is "wantonly" and "freakishly" imposed[9].  It cannot be presumed that Congress intended to create a statute that is so self-defeating, much less one that would be unconstitutional. Additionally, as noted in <u>Gregg</u>, juries have little, if any, experience with sentencing and "are unlikely to be skilled in dealing with the information they are given."  96 S.Ct. at 2934. Any guidance that can be provided - particularly in a decision so fundamental and profound as that made in a capital case - must be provided.  All of the above mandates that judicial discretion be

---

[9]   It is true that "in all but the rarest kind of capital case," the jury must be allowed to consider as a <u>mitigating</u> factor "any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers," <u>Lockett v. Ohio</u>, 98 S.Ct. 2954, 2964 (1978).  However, it is the death penalty that is "so profoundly different" from all other penalties, 98 S.Ct. at 2964, and it is the prospect of the death penalty, not a lesser sentence, that triggers all of these distinctive procedural requirements.  In <u>Lockett</u>, the Court noted the obvious "nonavailability of corrective or modifying mechanisms" for an executed death sentence.  <u>Ibid</u>. Consequently, even though virtually no limitation can be placed on proffered mitigation evidence, limitations can and should be placed on proffered aggravation evidence to assure the <u>death</u> sentence is not arbitrarily imposed.  See also <u>Gardner v. Florida</u>, 97 S.Ct. 1197, 1203-1206.

exercised and the nonstatutory factors be carefully screened. In doing so, this court must seek to fulfill the intent of Congress and at the same time construe the statute in a manner that maintains its constitutionality[10].

The statutory aggravating factors themselves provide a ready framework for determining Congressional intent and for evaluating the relevance and admissibility of the proposed nonstatutory aggravating factors. §3592. Roughly half of the statutory factors deal with circumstances of the offense which make the crime itself clearly more heinous[11]. In this case, the government has alleged that the defendants committed the act after substantial planning and premeditation and that DAVIS procured HARDY's services by payment and likewise HARDY committed the offense for pecuniary gain[12]. These allegations, if proven, unquestionably establish the killing as more culpable than a spontaneous murder for no pecuniary exchange. The other half of the statutory aggravating factors deal with the prior criminal history of the defendant, relying almost exclusively on criminal convictions of either very serious or repetitive felony offenses[13]. Each of the statutory factors was intended by Congress to be substantial enough to sustain the death

---

[10]    Defendant DAVIS challenged the legality of the nonstatutory aggravating factors as a violation of separation of powers. For the reasons stated in this opinion as well as the reasons stated in the court's prior ruling, Rec.Doc. 299, that argument is rejected.

[11]    §3592(c)(1,5.6,7,8,9,11,13 & 14)

[12]    §3592(c)(7,8 & 9)

[13]    §3592(c)(2,3,4,10,12,15)

10

penalty for a particular offender.

While the statutory factors serve the unique purpose of "circumscrib(ing) the class of persons eligible for the death penalty," 103 S.Ct. at 2743 (1983), there is no reason they should not only provide the framework of relevancy for the nonstatutory factors as well. The ultimate purpose is the same - to provide information to the jury that is <u>relevant</u> to their deciding which convicted capital offenders should be sentenced to death and which should not. If a factor would not have been severe enough, <u>ergo</u> "relevant" enough, to warrant consideration of the death penalty in the first place, then it likewise should not be a factor in tipping the scale for death in the last analysis.

### Nonstatutory Aggravating Factors - Len Davis[14]

With respect to LEN DAVIS, the government proffers five nonstatutory aggravating factors.

(a)  The first proposed aggravating factor reads as follows:

> Len Davis, at all relevant times acting as a New Orleans Police officer, displayed a pattern of behavior that posed a continuing threat to society by aiding, abetting, and counseling others in their commission of criminal acts, in violation of the public's trust and the public's right to rely on the integrity and legitimacy of the police department to serve and protect its citizens...

In support of this factor, the government cites DAVIS' alleged involvement in protecting what he thought was a major cocaine trafficking ring (a); DAVIS' awareness of crimes allegedly

---

[14]  The Notice of Non-Statutory Aggravating Factors Upon Which the Government Will Rely in Support of the Death Penalty as to both DAVIS and HARDY are attached to this opinion.

11

committed by Hardy that DAVIS failed to investigate and/or report (b,c,e); and DAVIS' alleged assistance or promise of assistance to others in the perpetration of possible future crimes (d,f,g,h,i).

The defense challenges this factor as too broad - that much of what the government proposes to introduce constitutes no more that dereliction of duty and a claim that DAVIS is simply a "lousy cop."[15]

The court agrees that the proposed factor is too broadly stated and that some of the information sought to be introduced is not relevant for the penalty phase purpose[16].

What is relevant is whether DAVIS used his position as a police officer to affirmatively participate in conduct that seriously jeopardized the health and/or safety of persons in the community. By requiring that DAVIS (1) use his position; (2) to act in some affirmative way that (3) seriously jeopardized the health and safety of other persons, this proposed nonstatutory factor reaches a level comparable to those set forth in the statute.

Turning next to the proposed information in support of this factor, the court finds that (a),(d) and (f) are admissible[17].

---

[15]    Defense Motion to Bar Use of Non-Statutory Aggravating Factors and Incorporated Memorandum, p. 3-4.

[16]    For purposes of evaluating the nonstatutory factor and the probative value of the information supporting it, the court is assuming the proof offered will be sufficient to sustain the information beyond a reasonable doubt.  The procedures for assuring that reliability are dealt with later in this opinion.

[17]    In (f), the government alleges that Hardy contacted DAVIS "so that DAVIS could supply" addresses of various persons that Hardy wished to harm.  This information is admissible assuming the government establishes that DAVIS in fact supplied

Each describes conduct in which DAVIS used his office to act in an affirmative way that seriously jeopardized the health and safety of others[18].    The remaining items of information are inadmissible. Items (b),(c) and (e) deal with passive behavior on DAVIS' part, that as a police officer, he failed to investigate or arrests person for criminal conduct of which he was made aware.    Such behavior may well constitute malfeasance in office.    Under Louisiana law, malfeasance is a relative felony carrying a maximum penalty of five years in prison. La.R.S. 14:134.    When compared to the offenses listed as statutory aggravating factors, malfeasance in office, even under the facts alleged, does not rise to that level of severity or relevancy.    Again, relevancy is determined by the purpose for which the evidence is being introduced - the purpose here is to decide whether a person should be executed or spared.  Alternatively, and for the same reasons, whatever marginal relevancy these allegations might have, their probative value is outweighed by the danger of unfair prejudice and confusion of the issues.

Items (g) and (i), which alleges threatening rhetoric on DAVIS' behalf, are also inadmissible.    Threatening words and warped

---

the addresses requested and knew what Hardy's intentions were.

[18]    One might argue that drug distribution, unlike affirmative acts of violence, does not directly jeopardize health and safety of persons.  However, a large-scale drug distribution ring does inevitably impact on health and safety through the use and addiction of users and the acts of violence associated with that volume of drug trafficking.  That reality, coupled with DAVIS' complicity, as a police officer, in protecting what he thought was such a ring, is sufficiently serious to be considered in the penalty phase.

bravado, without affirmative acts, are simply too slippery to weigh as indicators of character; too attenuated to be relevant in deciding life or death; and whatever probative value they might have is far outweighed by the danger of unfair prejudice and confusion of the issues.

Finally, item (h) is inadmissible for the reason again that it deals with words alone.   Furthermore it concerns the possible filing of a false police report, a matter that does not impact on health and safety.

(b)   The government's second proposed nonstatutory aggravating factor is that "LEN DAVIS poses a threat of future dangerousness to the lives and safety of other persons."   This particular factor has been upheld as constitutional when set forth in a statute. Jurek v. Texas, 96 S.Ct. 2950 (1976).   Clearly, then it is relevant and constitutional as a nonstatutory factor.

As support for this factor, the government proposes to use information surrounding the October, 1994, homicide of Kim Groves, the substantive offense with which DAVIS is charged.   Item (b) in fact is specifically alleged in the indictment[19].   Information admissible in the guilt phase undoubtedly may be argued and considered by the jury in the penalty phase.

(c)   The government's third proposed nonstatutory aggravating factor is DAVIS' alleged lack of remorse for the offense.   Lack of

---

[19]   Count One, Overt Act 8

14

remorse is a subjective state of mind, difficult to gage objectively since behavior and words don't necessarily correlate with internal feelings.  In a criminal context, it is particularly ambiguous since guilty persons have a constitutional right to be silent, to rest on a presumption of innocence and to require the government to prove their guilt beyond a reasonable doubt.   To allow the government to highlight an offender's "lack of remorse" undermines those safeguards.  Without passing on whether lack of remorse is _per se_ an inappropriate independent factor to consider, the court finds it inappropriate in this case.   The only information proposed to sustain the factor is DAVIS' alleged jubilation in learning that Kim Groves had been  killed.   The government does not propose to introduce evidence of continuing glee, or boastfulness, or other affirmative words or conduct that would indicate a pervading and continuing lack of remorse. Furthermore, as already noted, the allegation of lack of remorse encroaches dangerously on an offender's constitutional right to put the government to its proof.

While the government may not assert "lack of remorse" as an independent nonstatutory aggravating factor, it may argue DAVIS' alleged exultation as information probative of DAVIS' future dangerousness, the second nonstatutory factor.  This information will most certainly be introduced in the guilt phase and is therefore admissible for consideration in the penalty phase as well.   The government is cautioned however to be careful in its argument since this issue does tread so closely to constitutional

15

protections.

(4)  The government alleges as its fourth nonstatutory aggravating factor that DAVIS exhibits a "low rehabilitative potential" as evidenced by various letters of reprimand and suspension and by his involvement in protecting what he thought was a major drug trafficking ring and by his willingness to arrange the murder of witnesses against him.

The term "low rehabilitative potential" is too vague. Rehabilitative potential for what?  The only relevant issue would be DAVIS' rehabilitative potential for becoming a nonthreat to the health and safety of others.  With that limitation, it becomes the converse of future dangerousness.  It may therefore be combined with the second nonstatutory factor, but it is not appropriate as a separate freestanding factor.  Since this is a statute in which the jury is to "weigh" aggravating factors versus mitigating factors, there is always the danger that one or more jurors will weigh by counting.  Breaking out what is essential one factor into separately itemized factors is unduly prejudicial and confusing.

With respect to the information proposed to be introduced, DAVIS' involvement in the bogus cocaine trafficking operation has already been held admissible for purposes of the first factor and is likewise admissible for purposes of this combined factor. Similarly, the information cited in support of the second aggravating factor is obviously admissible if these factors are combined.

16

As for letters of reprimand and suspension, the court has not seen the documents and does not know what misconduct they allege and whether that misconduct, if proven, would fulfill the criteria of affirmative acts by DAVIS, in his capacity as an officer, which seriously jeopardized the health and safety of other persons[20].  If the government intends to pursue those allegations, it should provide to the defense and to the court the specific information intended to be used.

(5)  Finally, the fifth proposed nonstatutory aggravating factor is "victim impact."   Victim impact is expressly permitted under the statute,   §3593(a)   and   has   been   specifically   upheld   as constitutional by the U.S. Supreme Court.  Payne v. Tennessee, 111 S.Ct. 2597 (1991).  It is therefore relevant and admissible.

Nonstatutory Aggravating Factors - Paul Hardy

(1)  The first nonstatutory aggravating factor the government seeks to use against PAUL HARDY is that he, along with others, "committed or participated in additional violent acts."  HARDY's involvement in  acts  of  violence,  similar  to  those  charged,  is  certainly

---

[20]    The court also concerned with the possible hearsay use of the letters.  While §3593(c) indicates information is admissible regardless of its admissibility under the rules of evidence, the information, nevertheless, must be shown to be reliable.  If the government intends to rely on allegations of misconduct that are cited in these letters, it must establish that misconduct by  direct evidence.

17

relevant for the jury's deliberations[21].  The statutory aggravating factors themselves list various types of prior criminal conduct as information the jury may consider in deciding in the death penalty is to be imposed.  Those statutory offense factors also provide the framework for comparison.    Items (a), (b), and (c) all describe criminal conduct similar in kind to those statutory factors.  They are probative of the factor, their probative value is not outweighed by unfair prejudice, and they are therefore admissible, assuming they are reliably proven[22].

(2)   The second nonstatutory factor alleged against HARDY is that he constitutes a continuing threat of future dangerousness to the lives and safety of other persons.  The identical factor was cited against DAVIS and, for the same reasons, is relevant.

Of the supporting evidence, item (a) is admissible as it alleges a specific act of violence by HARDY against the person of another; item (c) is admissible, assuming it can be reliably shown that HARDY arranged for and intended for his weapon to be used in the described murders;  item (g) is admissible as being close enough in time and circumstance to the Groves homicide to constitute a threat that could well be carried out.  On the other hand, items (b), (d), (e) and (f) all describe threatening words alone, unaccompanied by

---

[21]   Again, procedures to determine the reliability of the information are dealt with later in this opinion.

[22]   The defense has stated that HARDY in fact has been acquitted of some of the criminal conduct alleged.  If that is correct, information regarding that particular allegation of crime is inadmissible.

18

allegations of actual violent conduct by HARDY or others at his behest. As with DAVIS, verbiage alone is of insufficient relevancy to be admissible, and whatever marginal relevance these words might have is outweighed by the danger of unfair prejudice and confusion of the issues.[23]  They are therefore inadmissible.

(3)  The third nonstatutory factor alleged against HARDY is "victim impact."  For the reasons stated in connection with DAVIS, this is a relevant factor and information is admissible to sustain it.

(4)  The fourth nonstatutory factor the government proposes to offer against HARDY is his "complete and total lack of remorse." This was also proposed to be used against DAVIS, citing much the same information in support.  For the reasons already cited with respect to DAVIS, the factor is invalid as a separate independent factor, but the supporting information can be used in connection with the second proposed factor, future dangerousness.

(5)  The fifth nonstatutory factor proposed against HARDY is his "low rehabilitative potential" as shown by his willingness to commit murder.  Again, as with DAVIS, this factor is simply the

_____

[23]  The court is aware that it is allowing evidence that DAVIS provided HARDY with information regarding the police presence in a particular area where HARDY proposed to commit acts of violence, Davis Factor #1, Item (d) but is disallowing it with respect to HARDY's threat of committing those acts, absent a showing that HARDY did in fact do so or attempt to do so. Hardy Factor #2, Item (d).  For purposes of the penalty hearing, only DAVIS should be identified in connection with this incident.

19

ⵌ ⵌ

converse of future dangerousness and may be combined with that factor but is duplicative and inappropriate standing on its own. As for the information in support, the other acts of violence committed by HARDY as set forth in the notice are admissible. With respect to the video-taped interviews of the "Hardy Boys," the court would have to review the tape to determine if it, or any portion of it, is admissible.

Reliability

Once information is determined to be probative of a relevant nonstatutory aggravating factor, and is not found to be unfairly prejudicial, it must additionally be shown to be "reliable." Reliable is synonymous with accurate.

This court has previously recognized that <u>heightened</u> reliability is required in a capital sentencing hearing because the consequences of the jury's decision are so serious and so final[24]. See also <u>Lockett v. Ohio</u>, 98 S.Ct. 2954, 2964 (1978); <u>Ford v. Wainwright</u>, 106 S.Ct. 2595, 2602 (1986); <u>United States v. Pitera</u>, 795 F.Supp. 546 (E.D.N.Y. 1992).

This need for a greater degree of reliability is particularly acute here because much of the government's "facts" consist of crimes allegedly committed by the defendants of which they have not

---

[24]   Order and Reasons, Rec. Doc. 299.  Defendant DAVIS has reiterated his argument that the statute violates due process by allowing for a reduced evidentiary standard for admissibility of evidence at the penalty phase.   For the reasons stated in this court's prior Order and Reasons and for the reasons stated here, this court does not find a reduced standard and therefore the argument is rejected.

20

in fact been convicted.

The United States Supreme Court has yet to pass on whether unadjudicated criminal conduct is admissible in the penalty phase of a capital case.    The Fifth Circuit has found such evidence admissible under the state capital punishment structure in Texas but recognized that its admission "must be watched closely and may implicate other constitutional concerns." <u>Milton v. Procunier</u>, 744 F.2d 1091, 1097 (5th Cir. 1984); <u>Williams v. Lynaugh</u>, 814 F.2d 205 (5th Cir.1987).

The argument for admission is obvious.  Proof of the commission of other acts of violence by a defendant is arguably more relevant and probative than any other type of aggravating evidence supporting imposition of the death penalty.   To withhold it from the jury creates a significant gap in the basis for their decision and paints a much rosier picture of the defendant than is true. It's noteworthy that the statute at issue here provides  that the <u>lack</u> of a "significant prior history of criminal conduct" is a factor in mitigation     §3592(a)(5).   To disallow evidence of significant unadjudicated criminal conduct could create the misleading impression that this mitigating factor applied, when in fact it did not[25].

---

[25]   An argument could be made that by restricting the statutory aggravating factors to criminal <u>convictions</u> only, Congress intended to preclude all unadjudicated criminal conduct from being considered.  However, the statutory aggravating factors serve the unique gate-keeping function of limiting the type of murderers who will be exposed to the death penalty in the first place.  Congress could reasonably conclude that the most fair, objective and reliable way to do that, in terms of a prior criminal history, is to restrict those factors to proven

hearings.  The state prosecutor must establish to the satisfaction of the trial judge that (1) the evidence of defendant's connection with the commission of the unrelated crimes is clear and convincing; (2) the proffered evidence is otherwise competent and reliable; and (3) the unrelated crimes have relevance and substantial probative value as to the defendant's character and propensities.  State v. Brooks, 541 So.2d 801 (La.1989); State v. Jackson, 608 So.2d 949 (La.1992).  An alternative standard would be that of a post-judgment motion for acquittal - viewing the evidence in the light most favorable to the government, could a reasonable jury find guilt beyond a reasonable doubt, considering the heightened reliability required.  A third possible standard is preponderance of the evidence, the standard used under the Federal Sentencing Guidelines to determine relevant conduct.  The court welcomes any memoranda from counsel as to what standard, including or exclusive of the above, should apply.

In addition, if the penalty phase is reached in this case, the court is considering bifurcating the hearing into two parts.  The first part would focus exclusively on the two findings the jury must make in order to consider the death penalty - whether the intent element was established and whether at least one statutory aggravating factor was proven.  This phase of the penalty hearing presumably would rely almost entirely upon the evidence already presented in the guilt phase and involve little, if any, additional information.  It would nonetheless insure that the jury's findings as to intent and the statutory factors would not be influenced by

24

At the same time, compelling reasons argue for exclusion, as noted by defendant HARDY in his opposition. The most fundamental is that a person is presumed innocent until proven guilty through reliable procedures, including an impartial and untainted jury. To present unadjudicated criminal conduct to a jury that has just convicted the defendant of first degree murder is anathema to those principles. Such a jury can hardly be expected to give the new information the sort of dispassionate consideration necessary for a reliable finding of guilt, regardless of how they might be instructed.

The introduction of other alleged crimes also entails a full blown adversarial hearing since the government must present evidence of each separate offense sufficient to prove the allegation beyond a reasonable doubt. This can quickly degenerate into an unmanageable and confusing series of mini-trials within the penalty phase itself. Also, actual evidence of criminal conduct is more inflaming to a jury than the dry paperwork used to establish an actual conviction. A jury therefore may give more weight to the evidence of a defendant's unadjudicated conduct than to his actual convictions. It is these concerns that have led several states to declare unadjudicated criminal conduct per se inadmissible in the penalty phase of a capital case.[26]

---

convictions of a certain severity. Once an offender has passed through that narrowing gate, however, Congress could reasonably decide that equally serious unadjudicated conduct, if reliably proven, could be considered in the overall weighing process.

[26] See Cook v. State, 369 So.2d 1251 (Ala.1978); Commonwealth v. Hoss, 283 A.2d 58 (Pa.1971); Scott v. Maryland,

Nevertheless, allowing unadjudicated crimes to be introduced in the penalty phase is a policy choice, the wisdom of which this court cannot question.   This court is persuaded that Congress did not intend a per se rule excluding such information; had they so intended, they would have said so, and nowhere in the statutory language is such an exclusion even implied.    Furthermore, the court believes that the admission of unadjudicated criminal conduct in the penalty phase is constitutional under current caselaw, assuming safeguards are in place to insure the necessary heightened reliability and offset the risk of undue prejudice, confusion of the issues and/or misleading of the jury.

In an effort to assure those safeguards, this court will hold a pretrial hearing on the admissibility of the information the government intends to introduce in support of the nonstatutory aggravating factors.  The purpose of the hearing will be twofold: first, to assess the reliability of the evidence; and secondly, to evaluate the time and complexity involved in its presentation[27].

An open issue is what standard to apply in weighing this greater degree of reliability    Several possible standards come to mind.  One is the standard imposed by the Louisiana supreme court regarding unadjudicated criminal conduct in state penalty phase

---

465 A.2d 1126 (Maryland, 1983); State v. Bartholomew, 654 P.2d 1170 (Wash.1982) and 683 P.2d 1079 (Wash.1984); State v. McCormick, 397 N.E.2d 276 (Ind.1979); State v. Bobo, 727 S.W.2d 945 (Tenn.1987).

[27]  While the court's primary concern is with unadjudicated criminal conduct, the remainder of the government's proposed presentation, such as victim impact, needs to be assessed and will be included in the hearing.

exposure to the separate and unrelated nonstatutory factors and information.   Should the jury make the two requisite threshold findings, the hearing would then continue into the presentation of the nonstatutory aggravating and mitigating information.

In consideration of the above, with respect to defendant LEN DAVIS:   (1)   Proposed nonstatutory aggravating factor #1, as reworded by the court, is relevant; items (a),(d) and (f) are admissible, if shown to be reliable; items (b),(c),(e),(g),(h) and (i) are inadmissible;  (2) Proposed nonstatutory aggravating factor #2 is relevant and items (a) and (b) are admissible, if reliabe; (3) Proposed nonstatutory aggravating factor #3 is prohibited as an independent factor but the information in support of that factor may be argued in conjunction with factor #2;   (4) Proposed nonstatutory factor #4 is too broad as worded and duplicative as an independent factor,  but may be narrowed and combined with factor #2;   any supporting letters of reprimand and suspension are themselves inadmissible if the purpose is to prove their contents; the admissibility of their contents by other means is deferred until the contents are disclosed; and finally (5) Proposed nonstatutory factor #5 is relevant and information falling within its scope is admissible.

With respect to PAUL HARDY, (1) Proposed nonstatutory aggravating factor #1 is relevant; items (a), (b), and (c) are admissible, assuming they are reliable; (2) Proposed nonstatutory

25

aggravating factor #2 is relevant; item (a) is admissible; item (c) is conditionally admissible, as set forth above;  and item (g) is admissible;  items (b),(d),(e) and (f) are inadmissible; (3) Proposed nonstatutory aggravating factor #3 is relevant and information falling within its scope is admissible;  (4) Proposed nonstatutory aggravating factor #4 is prohibited as an independent factor but the information in support of that factor may be argued in conjunction with factor #2;  (5) Proposed nonstatutory aggravating factor #5 is too broad as worded and duplicative as an independent factor, but may be narrowed and combined with factor #2.

In addition, a hearing will be held pretrial to assess the relevancy, probative value and reliability of the information of the nonstatutory aggravating factors;  and to evaluate the time and complexity involved in its presentation.

New Orleans, Louisiana, this _22_ day of January, 1996

_____
UNITED STATES DISTRICT JUDGE

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

Oct 2  4 34 PM '95

WHYTE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL DOCKET NO. 94-381 |
| v. | * | SECTION: "C" (4) |
| LEN DAVIS | * | |

\*     \*     \*

**NOTICE OF NON-STATUTORY AGGRAVATING FACTORS UPON WHICH
THE GOVERNMENT WILL RELY IN SUPPORT OF THE DEATH PENALTY**

NOW INTO COURT comes the United States, appearing by and through the undersigned government attorneys, and, pursuant to Title 18, United States Code, Sections 3592 and 3593(a)(2), notifies the Court and the defendant, Len Davis, in the above-captioned matter that in the event of the defendant's conviction for any or all of the three counts charged in the third superseding indictment, the government will seek the sentence of death, relying on the following non-statutory aggravating factors listed below.

1.   Len Davis, at all relevant times acting as a New Orleans Police officer, displayed a pattern of behavior that posed a continuing threat to society by aiding, abetting, and counseling others in their commission of criminal acts, in violation of the public's trust and the public's right to rely on the integrity and the legitimacy of the police department to serve and protect its citizens, as evidenced by one or more of the following, <u>among others</u>:

a.   From on or about January 1994 until December 1994, Len Davis actively counseled and protected whom he thought to be major cocaine traffickers in their distribution of multi-kilogram amounts of cocaine and money at various locations in the New Orleans area



FEE
PROCESS
CHARGE
INDEX
ORDER
HEARING
DOCUMENT No.

b.   On or about September 30, 1994, Len Davis became aware of the participation of Paul Hardy, aka "Cool", aka "P", in the murder of one Carlos Adams, aka "IU", aka "Ayuh", and counseled Paul Hardy that he was becoming sloppy in his perpetration of acts of violence and that Paul Hardy should consult with Len Davis before he committed future violent acts.   Len Davis took no steps to arrest Paul Hardy and the other individuals who were responsible for Carlos Adams' murder, nor did he take any steps to cause the investigation of same.

c.   On or about October 12, 1994, Len Davis was told by Paul Hardy the identity of the murderer of Shawn King and Troy Watts, who were both slain earlier on that date, and Len Davis took no steps to investigate the murders or apprehend the perpetrator, nor did he take any steps to cause the investigation of same.

d.   On or about October 20, 1994, Len Davis was apprised by Paul Hardy and Damon Causey that they were about to commit acts of violence on the "black side" of the Florida Housing Project and Len Davis, in turn, informed Hardy and Causey about any legitimate police presence in the area so that Hardy and Causey could perpetrate their violent acts without police interference.

e.   On or about October 29, 1994, Len Davis was informed by Paul Hardy that Hardy intended to shoot one Dan "Poonie" Bright and the "whole set," meaning Bright's associates, in retaliation for the earlier harassment of Paul Hardy's girlfriend.   Len Davis took no steps to discourage or prevent Paul Hardy's intended act of vengeance.

- 2 -



02158

f.    On or about November 7, 1994, Len Davis was contacted by Paul Hardy so that Davis could supply Hardy with the addresses of the mother and grandmother of Dan "Poonie" Bright, a rival of Hardy's in the Florida Housing Project, so that Hardy could commit an act of violence against either Bright or his relatives.

g.    On or about October 6, 1994, Len Davis, in a telephone conversation with Paul Hardy, told Paul Hardy that he would, in his capacity as a then-New Orleans police officer, "...get the fucking report. We'll know where they live at and every fucking thing else," in response to Paul Hardy's request to Len Davis to obtain the names of individuals who had earlier stolen Paul Hardy's Jeep Cherokee, so that Paul Hardy could retaliate.

h.    On or about October 12, 1994, Len Davis discussed with Paul Hardy the merits of having Davis file a bogus supplemental police report, which would have falsely stated, with the express purpose of helping Paul Hardy to shield his connection to said firearms, that several handguns owned by Paul Hardy were stolen from his Jeep Cherokee.

i.    On or about October 19, 1994, Len Davis, in a telephone conversation with Damon Causey, indicated Davis' willingness to keep a dying shooting victim quiet in order to protect Damon Causey, whom Len Davis then suspected of shooting said victim.

2.    Len Davis poses a threat of future dangerousness to the lives and safety of other persons, as evidenced by one or more of the following, among others:

- 3 -



02159

a.    On or about October 14, 1994, Len Davis told Paul Hardy he "still wanted that nigger," meaning that Davis wanted Paul Hardy to kill one of the persons who had made a complaint against Davis on October 12, 1994, to the New Orleans Police Internal Affairs Division.

b.    On or about October 17, 1994, Len Davis told Paul Hardy that there was no need at that time to kill the person who had complained about Davis to the New Orleans Police Internal Affairs Division, since the individual was not going to proceed with the complaint against Davis.  Davis, however, told Hardy that, if the individual later decided to pursue his complaint, it would be "rock-a-bye, baby," meaning that Davis would have Hardy kill the complainant.

3.    Len Davis displayed absolutely no remorse regarding the murder of Kim Marie Groves, and, in telephone conversations intercepted on October 13 and 14, 1994, exulted in the murder of Kim Marie Groves.

4.    Len Davis has exhibited a low rehabilitative potential by his continuing pattern of delinquent and violent behavior, evidenced by the letters of reprimand and suspension recommended by the New Orleans Police Department;  his involvement in protecting whom he thought were major cocaine traffickers, as mentioned in paragraph 1, subparagraph a, above;  and his willingness to order the murder of witnesses against him, as noted in paragraph 2, subparagraphs a and b, above.

- 4 -



5.    Victim impact, evidenced by the fact that the murder of Kim Marie Groves has created harmful emotional distress upon her adolescent children and other members of her family.

Respectfully submitted,

EDDIE J. JORDAN, JR.
UNITED STATES ATTORNEY

*Michael E. McMahon*

MICHAEL E. MCMAHON
Assistant United States Attorney
Bar Roll No:  10095
Hale Boggs Federal Building
501 Magazine Street, 8th Floor
New Orleans, Louisiana 70130
Tel:  504-589-4324

*Constantine D. Georges*

CONSTANTINE D. GEORGES
Assistant United States Attorney
Bar Roll No:  6021

**CERTIFICATE OF SERVICE**
I certify that a copy of the
foregoing has been served upon
counsel for all parties
by mailing the same to each,
properly addressed and postage
prepaid this ___2ND___ day of
___OCTOBER___,19_95_.
*Michael E. McMahon*
Assistant United States Attorney

- 5 -

02161

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

Oct 2  4 33 PM '95

_____TE

UNITED STATES OF AMERICA    *    CRIMINAL DOCKET NO. 94-381

v.    *    SECTION: "C" (4)

PAUL HARDY, aka "Cool",    *
aka "P"
                    *    *    *

## NOTICE OF NON-STATUTORY AGGRAVATING FACTORS UPON WHICH THE GOVERNMENT WILL RELY IN SUPPORT OF THE DEATH PENALTY

**NOW INTO COURT** comes the United States, appearing by and through the undersigned government attorneys, and, pursuant to Title 18, United States Code, Sections 3592 and 3593(a)(2), notifies the Court and the defendant, Paul Hardy, in the above-captioned matter that in the event of the defendant's conviction for any or all of the three counts charged in the third superseding indictment, the government will seek the sentence of death, relying on the following non-statutory aggravating factors listed below.

1.    Paul Hardy, along with others, committed or participated in additional violent acts, as evidenced by the following, <u>among others</u>:

a.    On or about April 22, 1994, at approximately 2:10 a.m., in front of 1416 S. Johnson Street, New Orleans, Louisiana, Paul Hardy had Corey Richardson murdered in order to keep him quiet after Corey Richardson, pursuant to Paul Hardy's orders, had previously murdered one Don Bright.  The victim, Mr. Richardson, was shot twice in the head and once through the neck.

b.    On or about July 29, 1989, at 2:45 a.m., in the 2600 block of Congress Street, New Orleans, Louisiana, Paul Hardy directly participated, along with others, in a shooting spree

____ FEE____
____ PROCESS____
  x  CHARGE____
____ INDEX____
____ ORDER____
____ HEARING____
DOCUMENT No.____



resulted in the death of one Michael Handy, the permanent paralysis of William Gettridge, and the wounding of several other people. Paul Hardy, along with others, also followed one of the shooting victims to the emergency room of a local hospital and shot at the victim as he was being wheeled inside the hospital for treatment.

c.    On or about September 18, 1988, at 6:21 p.m., in the 2300 block of Erato Street, New Orleans, Louisiana, Paul Hardy, riding in a 1982 Cutlass with another individual, pulled up along side of another vehicle and shot through the door of the vehicle, with an assault rifle killing the passenger, Jerome Andrews.

2.    Paul Hardy constitutes a continuing threat of future dangerousness to the lives and safety of other persons, based upon the probability that Paul Hardy would commit other criminal acts of violence that would constitute a continuing threat to society, as evidenced by one or more of the following, among others:

a.    On or about September 30, 1994, at approximately 7:45 p.m., at 2515 Alvar Street, New Orleans, Louisiana, Paul Hardy participated in the murder of Carlos Adams, aka "IU", aka "Ayuh", who died of multiple gunshot wounds.

b.    On or about October 6, 1994, Paul Hardy asked Len Davis, in his capacity as a then-New Orleans Police officer, for the "names and everything" of two individuals who had allegedly stolen Paul Hardy's Jeep Cherokee, with Paul Hardy expressly telling Len Davis that, "I'm going to kill them bitches."

c.    On or about October 12, 1994, at approximately 12:08 a.m., in the 2500 block of Mazant Street, New Orleans, Louisiana,



Shawn King and Troy Watts were murdered by multiple gunshot wounds from a .223 assault weapon and .9mm pistol by an individual known to Paul Hardy and who used Paul Hardy's .9mm pistol to commit the double murder of Messrs. King and Watts.

d.   On or about October 20, 1994, at approximately 11:00 p.m., Paul Hardy and Damon Causey planned to conduct a shooting on the "black side" of the Florida Housing Project and, in order to facilitate this violent plan, Paul Hardy and Damon Causey contacted Len Davis, a then-New Orleans police officer, in order to confirm that no legitimate police officers were patrolling the area in which Paul Hardy intended to commit his act of violence.

e.   On or about October 29, 1994, at approximately 2:59 p.m., Paul Hardy informed Len Davis he was about to "handle," meaning shoot, one "Poonie" and the "whole set", meaning other associates of "Poonie", in retaliation against Dan "Poonie" Bright and one Terrance, both of whom had earlier menaced Paul Hardy's girlfriend.

f.   On or about November 7, 1994, at approximately 3:38 p.m., Paul Hardy asked Len Davis for the addresses of the mother and grandmother of Dan "Poonie" Bright in order to plan a shooting against Bright.

g.   On or about October 14 and October 17, 1994, Paul Hardy indicated to Len Davis he would, at Davis' wish, kill the "twins", who had previously reported Len Davis to the New Orleans Police Internal Affairs Division.

3.   Victim impact, evidenced by the fact that the murder of Kim Marie Groves has created harmful emotional distress upon her



02164

F I L E   C O P Y

Notice sent to:

       Constantine D. Georges, Esq.
       Suzanne Drouet, Esq.
       Milton Paul Masinter, Esq.
       Dwight Michael Doskey, Esq.
       Daniel J. Markey Jr., Esq.
       Patrick C. McGinity, Esq.
       Henry Philip Julien Jr., Esq.