UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
************************************************************************

UNITED STATES OF AMERICA

Docket No. 94-CR-381(C)
New Orleans, Louisiana
v.                                      Monday, September 14, 2009

PAUL HARDY
************************************************************************


TRANSCRIPT OF ATKINS HEARING PROCEEDINGS
HEARD BEFORE THE HONORABLE HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE
VOLUME I


APPEARANCES:

| | |
|---|---|
| FOR THE PLAINTIFF: | UNITED STATES ATTORNEY'S OFFICE |
| | BY:  MICHAEL E. McMAHON, ESQ. |
| |     MARK A. MILLER, ESQ. |
| | 500 Poydras Street, Room HB-210 |
| | New Orleans, LA 70130 |
| | |
| FOR THE DEFENDANT: | HERBERT V. LARSON, JR., ESQ. |
| | 650 Poydras St., Suite 2105 |
| | New Orleans, LA 70130 |
| | |
| | MARILYN MICHELE FOURNET, ESQ. |
| | 715 St. Ferdinand |
| | Baton Rouge, LA 70802 |
| | |
| Official Court Reporter: | Karen A. Ibos, CCR, RPR, CRR |
| | 500 Poydras Street, Room HB-406 |
| | New Orleans, Louisiana 70130 |
| | (504) 589-7776 |



Proceedings recorded by mechanical stenography, transcript
produced by computer.

I N D E X

WITNESSES FOR THE DEFENDANT:                      PAGE/LINE:

MARK D. CUNNINGHAM

  Voir Dire Examination by Mr. Larson              8/5
  Direct Examination by Mr. Larson                 27/2

EXHIBIT INDEX

                                                  PAGE/LINE:

Defense Exhibit 20                                 25/23

<pre>
 1                   P R O C E E D I N G S

 2              (MONDAY, SEPTEMBER 14, 2009)

 3                   (MORNING SESSION)

 4

 5         THE DEPUTY CLERK:  Criminal No. 94-381(C), United States

 6    of the America v. Paul Hardy.

 7         MR. McMAHON:  Your Honor, Michael McMahon and Mark Miller

 8    for the United States.

 9         MR. LARSON:  Good morning, your Honor.  Herbert Larson

10    and Michele Fournet on behalf of Paul Hardy who is present.

11         THE COURT:  And I understand the government has some

12    issues to raise before we get started?

13         MR. MILLER:  Yes, your Honor.  We walked in the courtroom

14    yesterday and we were handed a 21-page document by defense counsel

15    regarding, I guess, the presentation to be made by Mr. Cunningham,

16    many of which is highly technical, many of which I can't read

17    because the writing is small, and it's going to take some time for

18    us to go through this.  My assumption is that they are not going to

19    call him first and that the government will have the opportunity,

20    at least overnight, to look at these documents before it's

21    presented.

22         It hardly seems fair at this point to just sort of drop

23    this on us at this point and expect us to answer it and review it

24    as the witness testifies.

25         MR. LARSON:  Your Honor, we are going to call
</pre>

```
 1    Dr. Cunningham first.  Those are nothing but demonstrative aids to

 2    his testimony.  There is nothing contained in those slides that is

 3    not also contained in all of the documents that have already been

 4    provided to the government.

 5              THE COURT:  Is Dr. Hayes here?

 6              MR. McMAHON:  Yes, your Honor.

 7              THE COURT:  And did I meet her?  Hi, good morning.

 8              Okay.  What I'd like to do is, let's go forward with

 9    Dr. Cunningham and we'll work our way through these, these slides,

10    because I can't tell myself if there's --

11              MR. MILLER:  Judge, how is the government supposed to

12    take his testimony and then also try to figure out with our expert

13    sitting here the validity of what he is saying or what he is

14    putting forth?

15              There is absolutely no reason this couldn't have been

16    given to us before.  I would say, parenthetically, having reviewed

17    I can't tell you how many volumes of testimony of Dr. Cunningham,

18    this is common tactic.  The government's always getting these

19    things dropped on the morning that he is supposed to testify.  Now,

20    the fact that it may be contained in some point in some of the

21    documents, how it's presented and how it's combined with other

22    information is important.  Given that he also is a rebuttal

23    witness, I would suspect that his testimony is more applicable

24    after the government's witness testifies.

25              MR. LARSON:  Your Honor, I am not aware of any rule that
```

```
1    requires the government to be provided with demonstrative aids in

2    advance of their being referred to in the courtroom.  And I am

3    assuming with Dr. Hayes as well is using demonstrative exhibits, we

4    haven't gotten those from the government.  It's probably because

5    they're going to give them to us when she begins her testimony.

6    There is nothing in here, your Honor, that the government has not

7    already seen in one form or another.

8              THE COURT:  Well, I'm scanning through them, and it looks

9    familiar stuff to me.  And I think we all have been reading crazy

10   through three-ring binders the last week or so.  But let's go

11   forward, and if you have a specific objection to a specific slide

12   or if you just want to make your objection global, that's fine,

13   we'll do that.  But I am looking at this and I'm seeing, at least

14   most of them, they look just like they're setting the demonstrative

15   evidence of stuff I've been reading the last week and a half.

16             MR. MILLER:  Well, at the very least, your Honor, we

17   would like him kept here until the end of the hearing so that we

18   know whether or not, you know, so we'll have -- because I am going

19   to be looking at this overnight and maybe tomorrow.

20             THE COURT:  You're talking about Dr. Cunningham being

21   here?

22             MR. MILLER:  Yes.

23             THE COURT:  I think he is planning to be here the week

24   anyway, as I understand.  Is that correct?

25             DR. MARK CUNNINGHAM:  Whatever the court's pleasure.
```

```
 1              THE COURT:  That was my understanding.  Okay.  Let's go

 2    forward.

 3              MR. McMAHON:  Your Honor, before we begin, can we move

 4    the evidence in for the record?

 5              THE COURT:  Oh, yes, please, do.  Everything that's in

 6    those three-ring binders has been submitted both for the government

 7    and the defense, if you want to be more explicit about it.

 8              MR. McMAHON:  Your Honor, just for the record, we would

 9    offer, file, and introduce into evidence Dr. Hayes' report with

10    attachments, which comprises two volumes; and in addition, your

11    Honor, the documentation, which has been provided to the defense

12    and the court, including compact discs.

13              But the listing, rather than go through them, they're

14    listed at pages 7 through 15 -- I'm sorry, 7 through 18 of

15    Dr. Hayes' report.  That's an enumeration of the various

16    documentary items.  And rather than have me go through and read

17    this, I would incorporate that, so to speak, by reference here and

18    move all of those items into evidence as well.

19              THE COURT:  I think Bench Book 3 is the disks and a whole

20    bunch of other --

21              MR. McMAHON:  Correct.  Bench Book 3 should contain

22    everything listed at pages 7 through 18 enumerated in Dr. Hayes's

23    report.

24              THE COURT:  That's admitted.

25              MS. FOURNET:  And, your Honor, on behalf of Mr. Hardy, we
```

1  have a previously-provided bench book of exhibits, Hardy Exhibits 1

2  through 18, and 18A and 18B, which were separate volumes, and we

3  have also submitted volume -- Exhibits 19 through 31, which I

4  believe are contained in a separate volume.  Some of those exhibits

5  are also, as you know, are videotapes.

6          THE COURT:  I noticed, frankly, a lot of duplication.

7          MS. FOURNET:  There was quite a bit of duplication.

8          THE COURT:  I understand.

9          MR. LARSON:  And all of those have been provided to the

10  government, your Honor.

11          THE COURT:  Okay.  Those are all admitted.

12          MR. LARSON:  Your Honor, at this time we would call as

13  our first witness Dr. Mark Cunningham.

14          MR. McMAHON:  Before that, we move for a sequestration of

15  all non-expert witnesses.

16          THE COURT:  Are there any lay witnesses here this

17  morning?  Either side, please let your lay witnesses know not to

18  come into the courtroom from this point forward.  The sequestration

19  order is granted.

20          THE DEPUTY CLERK:  Raise your right hand.

21      (WHEREUPON, MARK D. CUNNINGHAM, WAS SWORN IN AND TESTIFIED AS

22      FOLLOWS:)

23          THE DEPUTY CLERK:  Please be seated, state your name for

24  the record and spell it for us.

25          THE WITNESS:  Mark Douglas Cunningham.  Mark, M-A-R-K,

```
 1   Douglas, D-O-U-G-L-A-S, Cunningham, C-U-N-N-I-N-G-H-A-M.
 2            MR. LARSON:  May I proceed, your Honor?
 3            THE COURT:  Uh-huh.
 4                      VOIR DIRE EXAMINATION
 5   BY MR. LARSON:
 6   Q.  Dr. Cunningham, what's your occupation?
 7   A.  I'm a clinical and forensic psychologist in private practice
 8   and also an independent research scientist.
 9   Q.  And how long have you been a psychologist?
10   A.  About 31 years.
11   Q.  Could you please explain to the court what the difference
12   between a psychologist and a clinical psychologist is?
13   A.  Yes, sir.  Psychology is the science of human behavior.
14   Clinical psychology is a specialty area within the broader field of
15   psychology that focuses on the evaluation, diagnosis and treatment
16   of psychological disorders.
17   Q.  And what is a forensic psychologist?
18   A.  Forensic psychology is the application of psychological
19   research and techniques to legal issues.  It's any way that
20   psychology as a science can be helpful to some issue that's before
21   the court.  That's all the way from evaluating parenting
22   capabilities in child custody cases, psychological injuries in
23   civil cases; in criminal court, things like competency to stand
24   trial, mental state at the time of the offense, sentencing
25   determinations, mental retardation determinations such as are being
```

1   made today.

2   Q.  What does it mean to be board certified, Dr. Cunningham?

3   A.  Board certification in psychology, as well as medicine,

4   represents a standard that is above what's required for simple

5   licensure.  In clinical psychology, it reflects advanced experience

6   and capabilities; in forensic psychology, it is even a higher bar

7   and it represents the highest standards of practice and expertise.

8   Q.  And could you explain the board certification process in

9   clinical or forensic psychology to the court, please.

10  A.  Yes, I'll describe it in forensic psychology.  You have to be

11  at least five years out from your doctorate degree before you can

12  sit for the examination.  It requires extensive experience and

13  training in forensic psychology.

14          You have to demonstrate your sophistication in the field

15  through submission of two examples of your work that are heavily

16  supplemented by case law, ethical considerations, research in the

17  area.

18          That's reviewed by several board-certified forensic

19  psychologists, who evaluate whether it represents that necessary

20  sophistication in the field.  If they find that it does, you're

21  allowed to sit for an oral examination.  That oral examination

22  process at the time that I went through it, 14 years ago, involved

23  a three-hour oral exam by three board-certified forensic

24  psychologists, who could ask anything in the field that they

25  wanted.

1          I spent seven or eight months studying 30 to 40 hours a

2     week for that exam, which has a historic failure rate of 40

3     percent.  In other words, of the candidates who get to that level

4     or pass the work sample, have the experience and training and that

5     sort of thing, still at that oral exam threshold, 40 percent

6     historically have failed.

7     Q.  And so are you, in fact, board certified in any particular

8     areas?

9     A.  Yes, sir.  I am board certified in clinical psychology by the

10    American Board of Professional Psychology, and I am also board

11    certified in forensic psychology by the American Board of

12    Professional Psychology.

13    Q.  And taking those one at a time.  Approximately how many

14    board-certified clinical psychologists are there in the United

15    States?

16    A.  Between 1,200 and 1,400.

17    Q.  And does board certification in clinical psychology differ from

18    board certification in forensic psychology?

19    A.  Yes, sir, in terms of the focus of the expertise and also in

20    the rigorousness of the qualification and examination process.

21    Q.  Approximately how many board-certified forensic psychologists

22    are there in the United States?

23    A.  Approximately 270.

24    Q.  Have you served, since becoming board certified, have you

25    served as a work sample reviewer or oral examiner in the -- of the

1   psychologists who are seeking to become or those psychologists

2   seeking to become board certified in forensic psychology?

3   A.  Yes, sir, I have.  I have had both of those roles.

4   Q.  And where are you currently licensed as a psychologist?

5   A.  I am licensed as a psychologist here in Louisiana, as well as

6   Texas, Oklahoma, Arkansas, Alabama, Tennessee, South Carolina, New

7   York, Connecticut, Illinois, Indiana, Colorado, Idaho, Oregon,

8   Arizona, New Mexico.  Sixteen states, I think that I have named

9   them all.

10  Q.  Be fair to describe your practice as national in scope?

11  A.  Yes, sir, it is.

12  Q.  Have you received any recognition or awards for your research

13  activities or publications?

14  A.  Yes, sir, I have.

15  Q.  And starting with, say, 2005, what award did you receive that

16  year?

17  A.  In 2005, I was honored with the Texas Psychological Association

18  Award for outstanding contribution to science for having made an

19  outstanding contribution to the body of knowledge in psychology.

20  Q.  And how many persons received that award in a given year?

21  A.  That's an annual award that's given to a single psychologist.

22  Q.  And did you receive an additional award in 2006?

23  A.  Yes, sir.  In 2006, I was honored with the American

24  Psychological Association Award for distinguished contributions to

25  research and public policy, which recognizes important, either a

1    lifetime of contribution or a single extraordinary achievement in

2    research that informs issues that are important to legislative

3    bodies or the courts or the public as a whole that inform public

4    policy considerations in the United States.

5    Q.  And how many members are there in the American Psychological

6    Association?

7    A.  Approximately 160,000.

8    Q.  And so how many persons do they honor each year with this type

9    of award?

10   A.  There is typically a single, occasionally it's shared between

11   two people.  But typically, a single award to one psychologist

12   annually for distinguished contributions to research and public

13   policy.  There are about, oh, ten or so distinguished contribution

14   awards in different areas of psychology that are given on an annual

15   basis.  These are among the highest awards given by the American

16   Psychological Association, and typically, a single psychologist

17   each year is awarded an award in one of those ten categories.

18   Q.  Since 2006 have you received any other awards or honors?

19   A.  Yes, sir.  I was made a fellow with the American Psychological

20   Association, which is a distinction that reflects an outstanding

21   contribution to the field of psychology on a national basis.  It

22   requires nomination by your division, in my case Division 41 with

23   the APA, it requires election by the counsel of representatives of

24   the American Psychological Association.  So it's a peer-reviewed

25   very selective designation.

1   Q.  Dr. Cunningham, I would like to turn your attention to your

2   education and your training.  Could you give us a brief summary of

3   your educational background as it relates to psychology?

4   A.  Yes, sir.  I graduated with high honors from Abilene Christian

5   College with majors in psychology and mass communications.  I

6   attended graduate school at Oklahoma State University in a program

7   accredited by the American Psychological Association as a doctoral

8   training side, an accredited doctoral program.

9   Q.  What is the significance of that accreditation, does every

10  school have that accreditation?

11  A.  No, sir.  The standards for accreditation of the doctoral

12  program in clinical psychology by APA are extremely high, and as a

13  result, there are a limited number of programs who meet those

14  requirements in terms of faculty, library, practicum, ongoing

15  research, that sort of thing.  As a result, the training tends to

16  be better within those institutions and the competition for

17  entrance is greater.

18  Q.  Did you do an internship in conjunction with that educational

19  work?

20  A.  Yes, sir, I did.  I received both my master's and doctorate in

21  clinical psychology at Oklahoma State.  I did a one-year clinical

22  psychology internship at the National Naval Medical Center in

23  Bethesda, Maryland, which is the large naval hospital in suburban

24  Washington, D.C.  I was an active-duty naval officer in clinical

25  psychology intern.

1  Q.  And what did you do after your internship?

2  A.  I was assigned as a staff psychologist at the Naval Submarine

3  Medical Center in Groton, New London, Connecticut, where I was an

4  active-duty naval officer and clinical psychologist.  My assignment

5  there was an experiment by the Navy to identify whether a

6  psychologist could fill a role that had previously been occupied by

7  a psychiatrist.  And so I joined a psychiatrist in that facility,

8  previously there had been two psychiatrists, and we provided mental

9  health services for about 15,000 active-duty and about 40,000

10  family members, to the extent that we could.

11  Q.  And what were the results of that experiment there that you

12  were conducting at the naval center?

13  A.  The experiment, my assignment there was very successful.  I was

14  decorated for my professional contributions, and psychologists were

15  subsequently assigned more broadly throughout the Navy in roles

16  that had previously been occupied by psychiatrists.

17  Q.  While you were doing that, did you participate in any other

18  professional activities in conjunction with psychology while you

19  were stationed there?

20  A.  Yes, sir, I did.  I also taught part-time college courses, both

21  through extension programs that were offered on the submarine base

22  or on a ship, the submarine tender that was anchored there, and

23  also taught college classes in a community college system.  I also

24  completed a two-year part-time post doctoral program at the Yale

25  University School of Medicine.

1    Q.  And in conjunction with your post doctoral program at Yale

2    University, were you recognized in any way?

3    A.  Yes, sir, I was given the award as the outstanding trainee.

4    Q.  And when did you leave the Navy?

5    A.  In 1981.

6    Q.  And why did you leave the Navy at that time?

7    A.  I had took an academic position, a full-time academic position,

8    as an assistant professor of psychology at a small private

9    university in West Texas.

10   Q.  And did you do anything else while you were teaching at that

11   time?

12   A.  Yes, sir.  I also began a private practice in clinical

13   psychology, initially with only very infrequent forensic or

14   court-related consultations, it was primarily service delivery.

15   Q.  And since that time, has your practice evolved?

16   A.  Yes, sir.  I left that academic position after two years in

17   1983 and have been in full-time practice since that time, since

18   1983.  Steadily since that time, the proportions of my practice

19   steadily shifted, so that it was less treatment-oriented and

20   increasingly court consultation or forensic in nature.

21        I've always used my clinical capabilities in the forensic

22   consultations that I've done, but the service delivery part of that

23   steadily shrank.  By the early '90s, I was probably 25 percent

24   forensic; by 1995 or '96, was probably 40 or 50 percent forensic.

25   Q.  I'd like to specifically turn to your training and background

1  with regard to the field of mental retardation.  Could you describe

2  your training and your background as it specifically relates to

3  assessments of intelligence and mental retardation?

4  A.  Yes, sir.  Curriculum involving mental retardation was first

5  introduced in the undergraduate psychology classes that I took, and

6  was also the subject of a number of different, it was a portion of

7  a number of different classes in graduate school.  The one that

8  addressed that most specifically was a course on individual

9  intelligence testing.  And also assessment of developmental

10 disabilities.

11       I not only took that graduate class, I was subsequently

12 the teaching assistant for that class, so that I observed and

13 proctored and critiqued the administrations of the IQ test that the

14 graduate students were administering.

15 Q.  And following that?

16 A.  During the two years that I was at the -- was a full-time

17 assistant professor of psychology, I instructed a graduate course

18 in individual intelligence testing and assessment of developmental

19 disabilities.  Then I participated in continuing education in that

20 area and have also engaged in extensive self-study.  And done many

21 assessments of mental retardation in a forensic context.  Many of

22 those associated with competency to stand trial, as MR issues were

23 part of the statute, the competency to stand trial in Texas for

24 many years.  Also conducted those related to Social Security

25 determinations and then periodically in the capital arena, Atkins

1  related determinations.

2  Q.  Has that been a part of your clinical practice since you've had

3  your clinical practice, the assessment of mental retardation?

4  A.  Virtually all of the assessments of mental retardation that

5  I've participated in have had some forensic element to them, in

6  terms of either being Social Security determinations, competency to

7  stand trial or sentencing determinations.  Very infrequently have I

8  been involved determinations that did not have that kind of

9  application.

10 Q.  I'd like to turn your attention to publications that you've

11 authored in the field.  Have you ever been published?

12 A.  Yes, sir, I have.  On many occasions, in peer-reviewed

13 journals, in edited books, in case books, and in other professional

14 periodicals.

15 Q.  Approximately how many papers have you had published over the

16 years?

17 A.  Approximately 40.

18 Q.  And you mentioned peer-reviewed journal, what is a

19 peer-reviewed journal?

20 A.  Yes, sir.  About 30 of these publications are in peer-reviewed

21 journals.  Peer-reviewed journals are the primary way that

22 scientists exchange information with each other.  And the way that

23 works is, the existing literature in a given area is critiqued and

24 integrated so that professionals and other researchers have a

25 single place to go to get abreast of the field, or original

1    research is performed.

2            In either case, it is -- it's written up into kind of a

3    fancy research paper, it's submitted to the scientific journal.

4    The editor of the journal is a leading, typically

5    nationally-recognized scientist himself, and he reviews it for its

6    scholarly merit, for whether it makes important contribution to the

7    field, whether the methodology is sound.  And it also sends it out

8    to individuals who have been identified as being experts, having

9    special expertise in the arena that the paper is written in.  And

10   they also review it for its scholarly and scientific merit.

11           Now, in the leading journals, perhaps only one paper in

12   six passes that peer-review screen and ultimately is published.

13   The others are rejected.  Very typically revisions are recommended

14   to the paper that improve the scholarship of it, even if it is

15   published.

16           But when those revisions are completed, if the paper is

17   accepted, it's then published in the journal and it's said to have

18   passed peer review; in other words, it's passed that scientific

19   screen that helps elevate the credibility or reliability of the

20   ideas.

21   Q.  And you indicated you had approximately 30 papers that have

22   gone through that peer-review process?

23   A.  Yes, sir.  Five or six of them are currently in press, which

24   means they have passed peer review recently enough that they have

25   not yet been physically published but have passed peer review.

1   Q.  Do any of those deal with mental retardation?

2   A.  Yes, sir.  There is a paper that is currently in press in the

3   *Journal of Psychiatry and Law* that does specifically address mental

4   retardation.  That paper is with Dr. Gil MacVaugh, spelled

5   M-A-C-V-A-U-G-H.  This paper is entitled "Atkins v. Virginia,

6   Implications and Recommendations for Forensic Practice."

7           In this paper, Dr. MacVaugh and I address about 25

8   recommendations for professional practice based on a discussion and

9   review of the issues that are associated with those 25 areas.  This

10  is in response to a growing perception in the professional

11  community that there needs to be additional guidance given to

12  psychologists that are undertaking these evaluations so that the

13  professional and scientific standards associated with them are

14  enhanced

15  Q.  Dr. Cunningham, have you ever served as a peer reviewer for any

16  journals?

17  A.  Yes, sir, I have.  There are about a half a dozen peer-reviewed

18  journals, where I have served as an ad hoc or by request a

19  reviewer, and then I am on the editorial board of the journal

20  assessment, meaning that I am routinely sent papers from that

21  journal to provide peer review.

22  Q.  Dr. Cunningham, approximately how much time do you devote to

23  this research and publication?

24  A.  A tremendous amount of time.  Any given paper may take from

25  scores to 100, 200 or more hours to prepare.

1    Q.  Are you compensated for this in any way?

2    A.  I am not directly compensated economically.  There is no

3    royalties or remuneration that comes directly.  There is tremendous

4    personal satisfaction that I receive from that.  It's part of my

5    identity as a scientist to contribute to the field.  It is

6    something that I enjoy doing, so it's kind of a hobby and I find it

7    stimulating.

8            Ultimately, as it enhances my professional stature, there

9    may well be some indirect economic return that comes.  But at this

10   point that can be sustained by a paper every two or three years, it

11   wouldn't require six that are in press that have been submitted

12   within the last 12 or 15 months.

13   Q.  Dr. Cunningham, are psychologists required to take what is

14   known as continuing education?

15   A.  Yes, sir, they are.

16   Q.  And have you ever instructed any continuing education program?

17   A.  Yes, sir, I have.  I am part of the faculty, the teaching

18   faculty of the American Academy of Forensic Psychology, which is

19   the scholarly association of board-certified forensic

20   psychologists.

21           A primary aim of the academy is to elevate the standard

22   of practice of psychology as it comes into the courtroom, and I

23   have been asked to provide full-day workshops on capital sentencing

24   evaluations -- and have provided those on six or eight occasions

25   over the last eight or nine years in various cities around the

country, oriented toward increasing the awareness of psychologists

of the psycho-legal issues that are at stake, that are at play in

capital sentencing, the best available techniques for addressing

those and the best science for illuminating those determinations.

Q.  Of the approximately 270 or so board-certified psychologists,

how many are on this teaching faculty that you described?

A.  At any point in time about 30.

Q.  Have you provided any continuing education to prosecutors?

A.  Yes, sir.  One of the non-peer reviewed publications that I

co-authored was a piece that was published in the *Prosecutor's*

*Brief*, which is a magazine that goes to all of the district

attorneys in California; and it was informing them, discussing a

particular diagnostic category that may occur in criminal cases.

Q.  And, Dr. Cunningham, to what professional organizations do you

presently belong?

A.  I am a fellow of the American Psychological Association; I am a

fellow of the American Academy of Clinical Psychology; I am a

fellow of the American Academy of Forensic Psychology; I am a

member of the American Association on Intellectual and

Developmental Disabilities; I am listed in the National Register of

Health Service Providers in Psychology, which means that my

training was in an organized medical setting so that I am better

equipped to treat more serious psychological disorders.  I hold a

CPQ, which is a credential that is intended to validate your

training and licensing and professional standing.  I am a member of

1   the American Correctional Association, I am an adjunct member of

2   the Texas District Attorney's Association.  There may be other

3   organizations as well.

4   Q.  Obviously, Dr. Cunningham, you have given court testimony

5   before?

6   A.  Yes, sir, I have.

7   Q.  And approximately how many times have you testified, including

8   military, criminal, family or civil court proceedings?

9   A.  Over 250 times.

10  Q.  And approximately what range do those courts span, both state

11  and federal?  Is it nationwide essentially?

12  A.  Yes, sir, there are probably 35, 36 states where I have

13  testified in state or federal court.

14  Q.  And was one of the cases in which you testified United States

15  v. Shannon Shields?

16  A.  Yes, sir, it was.

17  Q.  And approximately how many times have you testified in capital

18  proceedings?

19  A.  About 135 to 140 times.

20  Q.  And how many of those have been federal capital proceedings?

21  A.  At sentencing in front of a jury, about 55.  There have been

22  three cases that come to mind where I have testified, this being

23  the third, in federal court regarding mental retardation issues.

24  There are other times that I've testified at federal habeas.

25  Q.  To your knowledge, is there any other mental health expert in

1    the United States who has testified in more federal capital cases

2    than you have?

3    A.  No, sir, there's not.

4    Q.  Have you ever been called as a witness by the prosecution in a

5    criminal case?

6    A.  Yes, sir, I have.

7    Q.  One time, several times, many times?

8    A.  Many times.  The last time -- much of that was earlier in my

9    forensic career.  The last time I was called by the prosecution in

10   a criminal case was at least three or four years ago.

11   Q.  Have you ever been called by the prosecution to testify in a

12   capital case?

13   A.  No, sir, I have not.

14   Q.  Are you personally opposed to the death penalty?

15   A.  No, sir.

16   Q.  Do you have any feelings about the death penalty?

17   A.  I do not have an advocacy position on one side of the issue or

18   the other.  I have many opinions about the reliability that this

19   action calls for, but I don't have an advocacy position about its

20   existence.

21   Q.  Is there any reason why you would not testify for the

22   prosecution if you were called by the prosecution in a capital

23   case?

24   A.  I never testify for anyone, but I would certainly be glad to

25   accept a retention by the prosecution in a capital case and would

1    be willing to be called to testify.

2    Q.  In your experience, is the prosecution typically familiar with

3    your testimony methods and the statistical data you rely on in

4    capital cases?

5    A.  Yes, sir, they are.

6    Q.  What are your fees in a typical capital case, Dr. Cunningham?

7    A.  My fee is $300 per hour in publicly-funded cases, which means

8    if the government or indigent defense organization that is

9    providing the funding.  If it's a private case, my fee is 360 an

10   hour.

11          The range of fees in any particular capital case are

12   dependent on what I'm asked to do.  In some cases, I may only be

13   asked to do a violence risk assessment and come and testify.  My

14   fee in that case might be 30 hours, 9,000, $10,000.

15          In other cases, I may be asked not only to do a risk

16   assessment and/or to evaluate the presence of any adverse

17   developmental factors in the defendant's background, in which case

18   the interview of the defendant is much longer, and I typically

19   interview many family members and review voluminous records.  It's

20   not unusual in that case for the total number of professional hours

21   to be over 100, and so the total fee associated with that might be

22   $30,000 or more.  It varies depending on the complexity of the case

23   and the availability of third parties to interview and that kind of

24   thing.

25   Q.  Do you know what your fees have been to date in this case,

1    insofar as it relates to the Atkins hearing?

2    A.  I can't give you an exact number.  I think that I am around 120

3    to 30 hours at this point, which translates to 36, $38,000.

4    Q.  How does a fee of $300 per hour compare, to your knowledge, to

5    the fees charged by other experts in this area?

6    A.  It's a little higher than is typically charged by local experts

7    in this jurisdiction.  It's at the lower end of the scale for

8    mental health experts who practice on a national basis.  There the

9    fees range from 400 to 600 an hour.

10   Q.  Dr. Cunningham, have you ever been recognized as an expert --

11   or let me put it this way:  How many times have you been recognized

12   as an expert by a tribunal, judicial tribunal?

13   A.  On all occasions when I have been called to testify, I've been

14   recognized as an expert in the clinical and/or forensic psychology.

15   Q.  Is there ever any instance when you have not been qualified as

16   an expert?

17   A.  Not qualified as an expert in clinical or forensic psychology.

18   There may be a particular issue that I am asked about that there

19   will be a ruling that that's within the province of medicine or in

20   the province of pharmacology, and so I then am not recognized to

21   address that.  But I've always been recognized as an expert in

22   clinical and/or forensic psychology.

23   Q.  Dr. Cunningham, we have previously marked as Exhibit 20 a

24   curriculum vitae, which indicates that it was updated on 8/25/09.

25   You have seen this document?

1    A.  Yes, sir, I have.

2    Q.  Does this fairly and accurately represent and reflect your

3    qualifications and your experience?

4    A.  Yes, sir, it does.

5           MR. LARSON:  Your Honor, at this time we would move to

6    have Dr. Cunningham recognized as an expert in clinical and

7    forensic psychology.

8           MR. MILLER:  Judge, I think he is going to talk about

9    mental retardation, that's sort of where the rubber meets the road,

10   and so I don't know if they've qualified him as somebody who is an

11   expert in the area of mental retardation.

12          THE COURT:  Do you want to address that?

13          MR. LARSON:  Your Honor, what he's doing is taking the

14   forensic science and applying it to the standards of mental

15   retardation.  It doesn't require him to be classified as an expert

16   in mental retardation, simply the forensic components that go into

17   the definition of mental retardation.

18          MR. MILLER:  I am not sure what that means, Judge.  He is

19   an expert or he is not.

20          THE COURT:  Well, I think I understand what it means.

21   Okay.  He is qualified as an expert in forensic and clinical

22   psychology.  As we go through the testimony, if the government has

23   a particular objection, by all mean s, I'm sure you will let me

24   know.

25          MR. MILLER:  Thank you, your Honor.

```
                            DIRECT EXAMINATION

BY MR. LARSON:

Q.  Dr. Cunningham, have you prepared a set of demonstrative

exhibits in conjunction with your testimony today?

A.  Yes, sir, I have.

          MR. LARSON:  Your Honor, at this time I would like

permission to have them displayed on the screen.

          THE COURT:  I will note the government's objection.

Again to these, I assume it's the documents that were presented

this morning.

          MR. MILLER:  Thank you, your Honor.

          THE COURT:  Go ahead.

BY MR. LARSON:

Q.  Dr. Cunningham, in conjunction with this Atkins hearing, what

specifically were you asked to do by the defense in this case?

A.  I was asked to review voluminous records, including the

intellectual assessments and other testing that was done of Paul

Hardy in 1996, as well as the report of Dr. Vicki Swanson and other

materials, to identify whether, based on my exposure to Mr. Hardy

in 1996, my review of those testing materials, my review of the

expert materials submitted by Dr. Swanson, and later by Dr. Hayes,

my opinion regarding what factors supported or did not support a

finding of his being a person with mental retardation.

Q.  And what conclusion or diagnosis did you reach in this case?

A.  It was my conclusion that he does meet diagnostic criteria and
```

1    is a person with mild mental retardation.

2    Q.  Now, you say mild mental retardation, are there different

3    levels of mental retardation?

4    A.  Yes, sir, there are.

5    Q.  And what are those levels of mental retardation?

6    A.  Those levels are:  Mild, which reflects an IQ score of

7    approximately 55 to 70; moderate, which reflects an IQ score of

8    approximately 40 to 55; severe, which represents an IQ score of

9    approximately 25 to 40; and profound, which reflects an IQ score of

10   less than 25.  Now, because of the standard error of measurement

11   and some authorities will say, for example, that mild is 50 to 55

12   to 75, or 35 to 40 to 55, that kind of thing.  In other words,

13   there is some flexibility in the specific scores that may be

14   identified.

15   Q.  I want to talk for a second on how you reached that conclusion.

16   And you placed Paul Hardy in the mildly retarded category?

17   A.  Yes, sir.  That doesn't mean that it is a mild condition, it

18   means, in terms of disability, it means as compared to other levels

19   of mental retardation, this classification is called mild.  It

20   reflects about 85 percent of the individuals that are classified as

21   mentally retarded, and so the very largest proportion of persons

22   with mental retardation will fall into that category.

23   Q.  You indicated approximately 85 percent?

24   A.  Yes, sir, that's correct.

25   Q.  Now, is there a currently-accepted definition of mental

1    retardation?

2    A.  Yes, there is.  I suppose I should say there are, there are two

3    primary definitions.

4    Q.  And who provides those definitions?

5    A.  Those definitions are provided by the DSM-IV-TR, the *Diagnostic*

6    *and Statistical Manual*, Fourth Edition, Text Revision, and also by

7    the American Association of Mental Retardation, AAMR, which has now

8    been renamed AAIDD, the American Association on Intellectual and

9    Developmental Disabilities.

10   Q.  Are those definitions similar?

11   A.  Yes, sir.  They are synonymous with the exception of a

12   difference in the second prong, which has to do with adaptive

13   behavior.  DSM-IV identifies 11 specific areas of adaptive

14   functioning and deficits need to be present in at least two of

15   those.  AAMR, by contrast, identifies, or AAIDD identifies three

16   areas of conceptual, social, and practical rather than the 11.

17        But otherwise, both of them identify an IQ score first

18   prong of approximately two standard deviations below the mean,

19   which is an IQ score of 70 or 75, when considering the standard

20   error of measurement.  Deficits in adaptive functioning, which

21   means that there isn't just a score on a test, but it is

22   accompanied by a real-world limitation in function as compared to

23   the independent functioning of unimpaired adults in the open

24   community, and that it has an onset before the age of 18.  In other

25   words, it occurs during the developmental period.

1    Q.  Let's start with the DSM-IV-Test Revision and the three prongs

2    there.  First, with regard to the IQ score below 70 or 75 with the

3    standard error of measurement, what is the scale on an IQ score?

4    A.  I'm glad to address that.  I wonder if the zoom might be

5    dialled down just a little bit because we're losing some of the

6    text on either side.

7            I'm sorry, could you repeat the question.

8    Q.  Yes.  With regard to an IQ score, what is the scale for an IQ

9    score?

10   A.  An IQ score is a standard score, which means that it has a mean

11   of 100 and a standard deviation of 15.  IQ is assumed to be

12   distributed on what's described as a normal curve.  The score then

13   is always a comparison to the rest of the group.  In other words,

14   an IQ score is never taking your brain out and weighing it;

15   instead, it's the level of intelligence that you exhibit as

16   compared to the rest of the population.

17           And as you look at this distribution of IQ scores, you

18   can think of it as being like people piled up; and so people are

19   mostly piled up here in the middle between 85, which is here, and

20   115, that includes 68 percent of the population.  So that first

21   standard deviation includes 34 percent of the population.  As you

22   get toward either side, there are fewer and fewer people piled up,

23   so that you have about 2.25, .23 percent that have an IQ score of

24   70 or below, and 2.23 who have an IQ score of 130 or above.

25   Q.  And how do we achieve this measurement of IQ, this number that

1    is up there, how is that derived?

2    A.   It's derived by developing a scale and then administering it to

3    a standardization sample under very specific conditions, and that

4    allows you, then, to scale the performance of that standardization

5    sample to identify, here is where most people score and fewer

6    people get more and more of the more difficult items correct and

7    other individuals struggle and get fewer items correct.

8         So you're norming the scale, based on giving it to a

9    large sample, that ideally is as close to the population sample as

10   possible, in terms of it's taken from different regions of the

11   United States, typically based on census data, looking at a racial

12   balance, sex balance, occupation, income, those kinds of things, so

13   that your resulting scale is as, is as representative as possible,

14   since that's the purpose of the score is preparing -- is comparing

15   a particular person to a representative group.

16   Q.   And you mentioned something earlier, the standard error of

17   measurement.  What is a standard error of measurement?

18   A.   The standard error of measurement is simply the inherent

19   inaccuracy that exists with almost every test.  It's not unlike, I

20   get on the bathroom scale and it says 170; I get off of it, I get

21   back on again, it says 172; I get off of it and get back on again

22   and it says 168.  My weight is not changing, the scale has some

23   inherent inaccuracy in it.

24        The standard error of measurement reflects that

25   inaccuracy that as results are obtained in the tests that there

1    will be some fluctuation of it that is not about differences in

2    ability or effort but simply reflects the inherent inaccuracy of

3    the scale.  It also exists on a normal curve.  So, for example, if

4    the standard error of measurement is three and you want to have a

5    95 percent probability or confidence about whether the next score

6    will actually be statistically different, then you would multiply

7    that three by 1.96, it would give you about five and a half.  So

8    you would then say, the range of scores plus minus.  Let's say the

9    observed score is 81 and we've got a standard error of measurement

10   of three on a test, then we would say, plus minus five, there's a

11   95 percent chance that the range of scores between 71 and -- or 76

12   and 86 contain the true IQ.

13   Q.  And what is the standard error of measurement on those IQ

14   tests?

15   A.  If you identify a 90 percent probability, about plus minus five

16   on a full scale score.

17   Q.  What are the most common IQ tests?

18   A.  The most common are the Wechsler scales.  The current edition

19   of that for adults is the WAIS-IV, and it's gone through a whole

20   series of evolutions that have included changes in test items and

21   also steady renorming of the test, all the way from the

22   Wechsler-Bellevue I, the Wechsler-Bellevue II, the WAIS that was

23   introduced in 1955, the WAIS-R that was standardized in about '78

24   and released in about 1981, the WAIS-III that was published in '96,

25   '97, and the WAIS-IV that came out this last year.  So there is a

1    series of those.

2           The other series of tests that are recognized are the

3    Stanford-Binet, and it is now in its fifth edition.

4    Q.  Now, when you refer to an IQ test, are we talking about this

5    sort of one big test or are there separate subtests within the

6    larger IQ tests?

7    A.  When you're talking about the Wechsler scales, and the

8    Stanford-Binet builds this in as well, there are a number of

9    different subtests or areas that are being assessed that are then

10   statistically integrated to produce a full scale IQ score.  On the

11   WAIS-R, those were integrated to produce a verbal IQ score, a

12   performance IQ score, and then a full scale IQ score.

13          And since the idea that intelligence is made up of a

14   number of different facets or subabilities, there are other tests

15   that we might describe as narrow band tests.  These are tests that

16   only sample a couple of abilities, and those may be useful as a

17   screening measure, but you would not want to rely on them

18   diagnostically, in terms of a mental retardation determination,

19   because they simply don't tap a broad enough set of abilities and,

20   as a result, don't have sufficient validity.

21   Q.  So how do you arrive at a full scale IQ score from these scores

22   on the subtests?

23   A.  The test is administered, and on the WAIS-R there would be both

24   verbal and performance subtests that are administered, those are

25   then scored, they're given according to the instructions in the

1    manual under very set conditions, and there are very specific

2    scoring criteria to identify whether the individual got that one

3    correct and also, in some cases, what time bonuses there might be

4    from the performance.

5              A table is then utilized, this is a WAIS-R manual, a

6    table is then utilized to identify, based on the age of the person

7    who took the test, what scale scores, in other words, there is --

8    the raw scores are translated to scale scores, you then go to an

9    age-based table to translate the total of those scale scores to a

10   full scale IQ score.

11   Q.  Now, in conjunction with IQ testing, I would ask you to explain

12   three separate concepts.  First, what is reliability?

13   A.  Reliability is the consistency with which results will be

14   obtained.  In other words, if you do repeated samples, what's the

15   likelihood that you will get this thing resolved.  Reliability is

16   that -- is the extent of whether those repeated dips into the well

17   are consistent or not.

18   Q.  What is variability?

19   A.  Variability is the distribution of results, it's how much

20   difference is there as you make repeated samples, how much

21   discrepancy is there in what you obtained.

22   Q.  And then what is validity?

23   A.  Validity is whether or not it measures what it is supposed to

24   measure.  In other words, let's say I decided that intelligence was

25   a function of height, and so I then measured you once a week.  That

1    would be a highly reliable measure, in that I would consistently

2    get almost exactly the same height, it would have no validity

3    whatsoever, almost no validity, because it doesn't measure

4    intelligence.  So validity is the extent to which it effectively

5    measures what is purported to be measured.

6    Q.  Dr. Cunningham, on this graph up here, what does the area in

7    red indicate?

8    A.  The area in red is the zone of potential mental retardation

9    eligibility in terms of that first prong of the diagnosis, that

10   being an IQ score of 70 or below, or 75 in consideration of the

11   standard error of measurement.

12   Q.  Now, Dr. Cunningham, to your knowledge, has Paul Hardy's IQ

13   been measured?

14   A.  Yes, sir, it has.

15   Q.  And when was that done?

16   A.  That was done in February and March of 1996.  The first time by

17   Dr. Tetlow on February the 21st, 1996, utilizing the WAIS-R, which

18   was the test that was available, the most current Wechsler scale

19   available at that time.  And then about a month later on March the

20   22nd or 23rd, he was assessed by Dr. Martell, also using the

21   WAIS-R.

22   Q.  Now, did you rely on that IQ testing?

23   A.  Yes, sir, I did.

24   Q.  Did you see any evidence that the testing process with either

25   Dr. Martell or Dr. Tetlow -- I'm sorry, the first one was

1    administered by?

2    A.   Tetlow.

3    Q.   Tetlow, excuse me -- was in any way flawed?

4    A.   There were some scoring errors that were made by Dr. Tetlow

5    that, as I looked at his scoring after those results were made

6    available to me, that I corrected.  As I recall, that resulted in a

7    change of full scale IQ score from 74 to 73.

8    Q.   Now, in the context of IQ testing --

9    A.   If I might add to that?

10   Q.   Yes.

11   A.   The IQ protocol of Dr. Martell's testing is apparently not

12   available, so I've never had the opportunity to scrutinize that

13   actual test form to recheck the scoring or the calculations that

14   were based on it.  So that one is simply unavailable to continue --

15   allow review.

16   Q.   In the context of IQ testing, what is malingering?

17   A.   Malingering is, and if we're talking about IQ, would be

18   deliberately performing poorly with a motivation to lower the

19   estimate of the IQ results that are obtained.

20   Q.   Now, did you see any evidence that Paul Hardy was malingering?

21   A.   No, sir.

22   Q.   We'll come back to malingering later.

23        What were Paul Hardy's full scale IQ scores on the two

24   tests that you examined from Tetlow and Martell?

25   A.   Dr. Tetlow, this was the February 21st, 1996, administration,

1    as I corrected the scoring, obtained a full scale IQ score of 73;

2    and Dr. Martell, testing a month later with the same instrument,

3    reported a full scale IQ score of 76.  And I've indicated where

4    those fall on this normal curve.  The dotted line reflects the

5    standard error of measurement around those scores, assuming a 90

6    percent confidence interval.

7    Q.  So with regard to the first test with the standard error of

8    measurement, Paul Hardy's full scale IQ score could have been what?

9    A.  It could have been anywhere from 69 to 77 at a 90 percent

10   confidence interval.

11   Q.  69 or 68?

12   A.  I have 69 at 90 percent confidence interval.  And so that would

13   be from right here on the 69 side up to 77 (INDICATING).

14   Q.  And with regard to the second test?

15   A.  Anywhere from a 72 to an 80.

16   Q.  Now, going back to the DSM-IV-TR definition of mental

17   retardation, what is the second prong of that definition?

18   A.  The second prong of the DSM-IV are concurrent deficits in at

19   least two areas of adaptive functioning.

20   Q.  Could you explain adaptive functioning?

21   A.  Yes, sir.  Adaptive functioning is the extent of which this

22   person can meet independently the life demands of the community, as

23   compared to an unprepared individual.  As DSM-IV would look at

24   that, that involves 11 different areas that are identified on this

25   slide:  functional academic skills, communication, self-care, home

1  living, social/interpersonal skills, use of community resources,

2  self-direction, work, leisure, health and safety.

3          And the notion, as I said earlier, that mental

4  retardation is not simply characterized by significantly subaverage

5  intellectual functioning as measured by an IQ test but is also

6  accompanied by limitations and deficits in practical functioning

7  and relating.

8  Q.  As used in this prong of the DSM-IV-TR, what does it mean for a

9  deficit to be concurrent?

10 A.  That means it exists alongside of.  That it is present at the

11 same time.

12 Q.  And that means that the two deficits that it calls for as

13 adaptive functioning exists simultaneously?

14 A.  Yes, sir.  And they exist contemporaneously with that deficit

15 in significant subaverage IQ.

16 Q.  And does it also -- well, we'll come to the third prong in a

17 second.

18          What does the -- do you recall the three areas of the

19 AAIDD, where they looked to adaptive functioning?

20 A.  Yes, sir, I do.  And they essentially are a way of grouping

21 these categories into three, and so the AAMR or AAIDD criteria

22 called for significant deficits in at least two of the three areas,

23 and those three areas are conceptual, social and practical.

24 Q.  Now, what are the sources of evidence for these deficits in

25 adaptive functioning or adaptive behavior?

1    A.   Those sources include observers of this individual in the

2    community.   They may provide information antidotally, in other

3    words, by their general recall and description.   If they have

4    sufficient recollection, then there may be standardized structured

5    interview information that's obtained, adaptive behavior scales

6    that then provide standard scores; in other words, with a mean of

7    100 and standard deviation of 15, that allows a placement of the

8    qualitative position of those deficits.

9            Records can be important, school records, employment

10   records, social service records, medical records.   Interviews of

11   the individual can provide information, although you have to take

12   care in relying on the self-report of someone who you think

13   possibly has mental retardation.   There is a tendency for persons

14   of deficient intelligence to mask, in other words, to attempt to

15   disguise their intellectual limitations.

16   Q.   Could you elaborate on masking for a second?

17   A.   Yes, sir.   It's not unlike -- I guess it's not unlike what you

18   sometimes see in older people who are losing their memory.   And

19   they then attempt to avoid displaying that that's occurring because

20   it's socially embarrassing or it causes them to feel uncomfortable,

21   and so they sluff off a question, avoid it, change the subject,

22   that sort of thing, sit more quietly, do things so that their

23   limitations are not so apparent.   Someone who is MR, or in the mild

24   MR classification, they may also avoid revealing the deficits, they

25   may claim to have capabilities that in fact they don't have.   They

1    may talk about doing things or how to do things without that

2    reflecting that they actually perform that function as they have

3    described.

4          The other caution that you have about information that's

5    gained directly from the individual is that they may have verbal

6    facility, which means they sound like they are somebody of normal

7    capability, and that verbal facility may be distracting, or may

8    not, in fact, be consistent with the underlying levels of

9    capability that they exhibit in their activities in the community.

10   Q.  Dr. Cunningham, I would like to go to the third prong of the

11   definition on the DSM-IV-TR, that's onset before age 18.

12   A.  Yes, sir.

13   Q.  What is the significance of this age?

14   A.  Mental retardation is considered to be a developmental

15   disability; in other words, that it arises during the developmental

16   period.  Now, this is a diagnosis that is independent of etiology,

17   which means that it doesn't matter what caused this limitation

18   that's observed, it may be something that was present at birth, it

19   might be the result of lead exposure in early childhood.  There

20   might have been a catastrophic head injury that occurred when the

21   person was 15.

22          Whatever the cause, if it arises during the developmental

23   period, it's identified as being mental retardation.  If it arises

24   after that age, if the same condition occurs as a result of a toxin

25   exposure or head injury at age 25, then it's not called mental

retardation.  It would be called a dementia or a cognitive disorder

not otherwise specified.  It likely could still qualify for

disability, would have the same functional expression, but would

simply not qualify for the diagnosis because it had not arisen

during the developmental period.

Q.  Now, what if someone is examined for mental retardation for the

first time after the age of 18, does this mean that they cannot be

classified as mentally retarded?

A.  No, sir.  It's not necessary that this have been diagnosed

during the developmental period, it's that it's identified as

arising during the developmental period.  Now, the distinction

would be if you're measuring somebody in an early adulthood and

you're extrapolating back whether or not this was present before

age 18, you would look to see if there had been intervening events

that could account for this.  In other words, was there a

catastrophic head injury, were there things that happened that are

between the time this person was 18 and the current date.

        If you don't have that kind of catastrophic event

occurring, there is a general presumption that the capabilities

that are being measured at age 26 are consistent or of

long-standing nature because of the general continuity of

intellectual ability over time.

        The other thing that would be done would be to interview

observers of this individual to identify whether they are reporting

deficits in function that would be consistent with somebody who has

deficient intelligence, who is in a mild mental retardation

category.

        Sometimes there are records that are available, even

apart from IQ records, that might also provide some collateral

support.  But it's not necessary that the score be obtained before

age 18.  There is, again, a presumption of some stability of

capability over time.

Q.  So if an observer were to meet somebody, say, at the age of 18

and a half, does this mean that they would still be able to provide

meaningful information regarding the onset of mental retardation?

A.  Well, yes, sir.  If you're interacting with somebody who is 18

and a half or 19 and there's been no catastrophic event that's

occurred in the preceding six to nine months, then there is, again,

a reasonable assumption that the behavior and capabilities that are

being exhibited today are not somehow markedly more deficient than

those that were available to this person six or nine months before.

        The closer in time the acquaintance of that person; in

other words, the person who has observation at age 19, that's more

contemporaneous than the person who has observation at 25 or 30.

And so sometimes as you're doing retrospective assessments, it's a

matter of trying to identify the best sources and data that you

can.

Q.  You mentioned earlier that Paul Hardy fell into the category of

mildly retarded individuals.  Can you describe for the court some

of the characteristics of the functioning of mildly retarded

1    individuals?

2    A.  Yes, sir, I can.  And I think that is a critically important, I

3    think the description is critically important because there are

4    such widespread stereotypes about what somebody who is mentally --

5    what a person with mental retardation looks like, acts like, talks

6    like.  And often those stereotypes are the ones that you should be

7    able to tell just by looking, that they look funny, that they're

8    stuporous, that they drool, that they can't talk well, that there

9    are things about them that are overtly obvious that they are a

10   person of mental retardation, and that is simply inconsistent with,

11   in fact, the presentation of someone.

12   Q.  And I believe you indicated earlier that 85 percent of the

13   mentally retarded population falls into the mild category?

14   A.  Yes, sir, that's correct.  And as we're looking at this

15   description, the other statistic that I think is important is that

16   about half of the individuals with mild mental retardation receive

17   no institutional services, they never come to the attention of

18   professionals again after they leave school.  So about half of

19   them, it isn't that they've stopped being mildly mentally retarded,

20   it's that they live in the community with sufficient independence

21   that they no longer come to the attention of institutional

22   supports.

23           But here is what's described.  This comes from the

24   editorial board of the American Psychological Association, Division

25   33, and this is in a text that was published by this division in

1    1996, and it's entitled the *Manual of Diagnosis and Professional*

2    *Practice in Mental Retardation*.  And it describes the typical

3    developmental sequence that would be observed with someone who is a

4    person with mild mental retardation.

5        And it describes in early childhood:  "People classified

6    with mild MR evidence small delays in the preschool years but often

7    are not identified until after school entry, when assessment is

8    undertaken following academic failure or emergence of behavior

9    problems.  Modest expressive language delays are evident during

10   early primary school years, with the use of 2- to 3-word sentences

11   common."

12   Q.  What is a modest expressive language delay?

13   A.  That means that it is nothing dramatic, that there are subtle

14   deficits in the child's ability to express himself or herself.

15   Q.  And would those necessarily be noticed by the community or by

16   teachers?

17   A.  Not necessarily.

18   Q.  Going on through the next page of development of somebody with

19   mild mental retardation.

20   A.  "During the later primary or elementary school years, these

21   children develop considerable expressive speaking skills, engage

22   with peers in spontaneous interactive play, and can be guided into

23   play with larger groups.

24        "During middle school, they develop complex sentence

25   structure, and their speech is clearly intelligible.  The ability

1    to use simple number concepts is also present, but practical

2    understanding of the use of money may be limited.  By adolescence,

3    normal language fluency may be evident."

4    Q.  Now, does that mean that if someone is an adolescent, that

5    necessarily just by talking to them you would be able to tell that

6    they were mentally retarded, or might you take them just as

7    normally expressive?

8    A.  This is representing that you might identify them as being

9    normally, simply normally expressive, that their presentation by

10   this age is not so overt as to catch your attention.

11   Q.  Is it unusual for people with mild mental retardation to not be

12   diagnosed as such during primary school or middle school?

13   A.  Depends on the community that they're in, the quality of what's

14   happening in their family, the quality of parental support and

15   sophistication inside the schools that they're attending, and what

16   the capabilities of that school system are, what's happening in the

17   classroom, who else are they in class with.  So it really depends

18   on the degree of attention and insight and resources that are in

19   their family or school.

20   Q.  Now, going further in the developmental process of someone with

21   mild mental retardation.

22   A.  "Reading and number skills will range from 1st to 6th grade

23   level, and social interests, community activities, and

24   self-direction will be typical of peers, albeit as affected by

25   pragmatic academic skill attainments."

1          In other words, the primary feature that's going to

2    differentiate them from their peers is that they're not doing well

3    in school; but in terms of social interest, community activity,

4    self-direction, they're not looking that much different from other

5    kids that are teens.

6    Q.  And at the bottom you have Baroff (1986) ascribed a mental age

7    range of 8 to 11 years to adults in this group.

8    A.  Yes, sir, that's also continuing to quote from Division 33.

9    This is also a useful concept.  Obviously, there are problems in

10   talking about mental age, but as a conceptual tool, as you're

11   thinking about, does this behavior -- is this something somebody

12   who is mildly -- a person with mild mental retardation could do.  A

13   simple rubric to respond to that is is this something that an 8 to

14   11 year old can do.

15         Well, he carries out some plans.  Well, can a ten year

16   old make a plan and carry it out?  He engages in social relations,

17   he engages in some degree of self-care, he has interactions, those

18   kinds of things that provides an anchoring point to help defend

19   against the stereotype of mental retardation that would point to an

20   absence of adaptive skills, as opposed to limitations in adaptive

21   skills such are exhibited by a kid who is 8 to 11 years old.

22   Q.  So one way to think of this would be just to think of somebody

23   who is 8 to 11, but they remain 8 to 11 even as they grow older?

24   A.  That's correct.  In an adult body.  Obviously, now there's

25   sexuality and a greater range of movement and those kinds of

1    things, but the quality of their conceptualizations, capabilities,

2    self-care, relationships, those things are still back in this

3    8-to-11-year-old range.

4    Q.   And they never go beyond that?

5    A.   That's correct.

6    Q.   Now, taking the development of somebody who is mildly mentally

7    retarded to the final step.

8    A.   Continuing with Division 33:  "This designation implies

9    variation in academic skills, and for a large proportion of these

10   adults, persistent low academic skill attainment limits their

11   vocational opportunities.  However, these people are generally able

12   to fulfill all expected adult roles."

13          "Consequently, their involvement in adult services and

14   participation in therapeutic activities following completion of

15   education preparation is relatively uncommon," and I described that

16   50 percent of the kids never come back to the attention of

17   professional supports after leaving school, "is often time-limited

18   or periodic, and may be associated with issues of adjustment or

19   disability conditions not closely related to MR."

20   Q.   Simply put, do people who are mildly mentally retarded live in

21   the community?

22   A.   Yes, sir.

23   Q.   And are they necessarily diagnosed as being mildly mentally

24   retarded while they're living in the community?

25   A.   They may not require continuing supports.  Most of these

1  individuals will have been identified developmentally assuming that

2  there was adequate family resources and sophistication, adequate

3  school resources and sophistication.  Once they're out in the

4  community they may not be identified casually by others as being

5  persons with mild mental retardation.

6  Q.  For purposes of contrast, what are the characteristics of

7  someone who is moderately mentally retarded?

8  A.  In the moderate range:  "By age 14, they may develop basic

9  self-care skills, undertake simple conversations, begin to read,

10  and manifest cooperative social interaction skills.  Baroff (1986)

11  ascribed a mental age of 6 to 8 years to adults in the group.  They

12  generally have functional language, although their intelligibility

13  may be poor, but reading and money, or number skills, are typically

14  not functional, and some supervision of self-care may be

15  necessary."

16  Q.  Would this be someone we would think of, I think the example

17  has been used, somebody like Lenny in *Of Mice and Men*?

18  A.  Yes, sir.

19  Q.  And how would this compare to somebody who was severely

20  mentally retarded?

21  A.  Severe mental retardation, this is this IQ range approximately

22  20 to 34.  By age 14, they may develop basic self -- I'm sorry, I

23  think that one is -- looks like I did not, in fact, identify

24  correctly the description for severe.

25          THE COURT:  It's a duplicate.

```
 1              THE WITNESS:  It's a duplicate of the moderate, so I
 2    would have to come back to you with that.
 3    BY MR. LARSON:
 4    Q.  From your recollection, how would you describe severely
 5    mentally retarded persons?
 6    A.  It is a step down from this.  Their self-care is much more
 7    limited, they're going to require close supervision and supports,
 8    not uncommonly institutional supports.
 9    Q.  Now, again, what was your source for all of these definitions
10    and descriptive terms?
11    A.  These are from Division 33 of the American Psychological
12    Association.  This is the division that's concerned with mental
13    retardation and developmental disabilities.  This is the *Manual of*
14    *Diagnosis and Professional Practice in Mental Retardation*.
15    Q.  Going back to Paul Hardy's full scale IQ scores, he would not
16    necessarily be classified as mildly mentally retarded, would he?
17    A.  His IQ score straddles the range between mild mental
18    retardation and borderline IQ, simply looking at the score
19    placement, particularly of the standard errors of measurement of
20    this first score crosses both ranges.  The second score does not
21    cross below 70 in consideration of the standard error of
22    measurement.
23    Q.  And can you portray that graphically again for us.
24    A.  (WITNESS COMPLIES.)
25    Q.  Are you familiar with something known as the Flynn Effect?
```

1    A.  Yes, sir, I am.

2    Q.  And did you find it necessary and appropriate to adjust Paul

3    Hardy's full scale IQ scores based on the Flynn Effect?

4    A.  Yes, sir, I did.

5    Q.  And why did you do that?

6    A.  I believe it is important to report the observed score, which

7    is what's here.  It's also important to recognize that an IQ score

8    is always a reference score, it's always a score that is relative

9    to the performance of the group, and it is only as useful -- it's

10   only useful to the extent that it reflects where this person is in

11   proportion to the rest of the group.

12           The Flynn Effect acknowledges what is now a

13   well-established finding that IQ scores on instruments around the

14   world have been gradually rising at the rate of about a third of a

15   point a year for a good part of this century, and as a result, if

16   there's not some acknowledgement of the Flynn Effect, if we also

17   don't talk about how it affects or potentially affects Paul Hardy's

18   scores, then the score that we're looking at is without its

19   appropriate meaning.

20   Q.  First, backing up a second.  How did the Flynn Effect get its

21   name?

22   A.  It is named for James Flynn, who was an academic and scholar

23   who has written extensively about this phenomena.

24   Q.  And what is that effect in terms of describing why we -- what

25   or how Flynn describes the effect and what is it and what do we

1    have to do in response to it?

2    A.  Well, the Flynn Effect is, again, a well-established

3    observation that IQ scores are steadily rising on IQ tests at the

4    rate of about .3, about a third of a point per year.  And what you

5    can think of with this is that this IQ curve that we're looking at

6    here is gradually drifting to the right at a third of a point a

7    year.  Now, that means that at the time the test was standardized,

8    the mean was 100, two standard deviations below the mean is 70.

9    And so when the test is standardized in 1978, your IQ score of 73,

10   let's say 73, your IQ score of 73 means that you are just above

11   that two standard deviations below the mean.

12           Now, as this curve slowly drifts to the right over the

13   intervening 18 years between 1978, when the test was standardized,

14   and 1996, when it's given to Paul Hardy, now the new mean for that

15   test if it were normed today would not be 100, it would be 105.  So

16   now that score of 73 is, in fact, more than two standard deviations

17   below the mean; because if the placement of this curve, if the mean

18   is now 105, two standard deviations below the mean is 75 --

19           MR. MILLER:  I am going to object at this point unless he

20   can establish that that is actually the procedure that's to be used

21   in individual scores, what this may happen generally in the

22   population is not relevant to what it is to the individual.  He

23   hasn't established that it's the standard practice or recognized in

24   the discipline that you apply it to individual scores.

25           We're talking about two separate concepts here:  First,

1    whether or not the Flynn Effect applies to general population; and

2    secondly, whether it applies to individuals.  I think they have to

3    establish first that's a practice that's recognized within the

4    discipline.  I guess that's a Daubert sort of objection to this.

5            MR. LARSON:  And that's precisely what I am prepared --

6            MR. MILLER:  I would like to get to that part before we

7    get to the conclusion, then, your Honor.

8            MR. LARSON:  Right, we will absolutely do that, your

9    Honor.

10           THE COURT:  All right.

11   BY MR. LARSON:

12   Q.  Now, I was just asking you to describe generally what the Flynn

13   Effect is.

14   A.  Yes, sir.

15   Q.  And that's what it is, is a shifting in the mean, the point at

16   which we described 100 on an IQ test?

17   A.  Yes, sir.  That's why IQ tests must be periodically re-normed,

18   so that they are recalibrated and again provide an accurate,

19   provide accurate information about where the observed IQ score is

20   relative to the group.

21   Q.  Now, do IQ tests themselves concur with or acknowledge the

22   Flynn Effect?

23   A.  The publishers of the intelligence tests do.  For example, in

24   the WAIS-III technical manual, this is the test that replaced the

25   WAIS-R in 1997, it describes the following:  "Updating of Norms:

1  Because there is a real phenomenon of IQ-score inflation over time,

2  norms for a test of intellectual functioning should be updated

3  regularly (Flynn 1984, 1987; Matarazzo 1972).  Data suggest that an

4  examinee's IQ score will generally be higher when outdated rather

5  than current norms are used.  The inflation rate of IQ scores is

6  about 0.3 points each year."  About a third of a point per year.

7  Q.  And what is the WAIS-III technical manual?

8  A.  That's the manual that accompanies the WAIS-III, it describes

9  the standardization and norming and psychometric properties of the

10 test so that you'll have an administration manual, that's what you

11 would use to actually administer and score the test; then you'll

12 have a technical manual that provides additional scientific and

13 psychometric information.

14 Q.  Dr. Cunningham, beyond the technical manual for the WAIS-III,

15 is the Flynn Effect recognized in the scientific community and the

16 associated scientific literature?

17 A.  Yes, sir, it is.

18 Q.  Can you describe some of the peer-reviewed journals dealing

19 with the Flynn Effect?

20 A.  Yes, sir.  These date back to 1984, they include the *Journal of*

21 *Educational Measurement*, *Psychological Bulletin.*  The *Psychological*

22 *Bulletin* is a leading peer-reviewed journal that provides

23 literature reviews that integrate and critique existing bodies of

24 scientific research in different areas of psychology.

25          *Perceptual and Motor Skills; Psychology, Public Policy,*

1 *and the Law; Psychology in Mental Retardation and Developmental*

2 *Disabilities; American Psychologist*, that's the flagship

3 peer-review journal of the American Psychological Association, a

4 book published by the American Psychological Association; and also

5 the technical manual that I was just reading from, from the

6 Psychological Corporation that published the WAIS-III.

7 Q.  Is there additional peer-reviewed studies -- are there

8 additional peer-reviewed studies or literature describing the Flynn

9 Effect and demonstrating that it's recognized in the scientific

10 community?

11 A.  Yes, sir.  This is not an exhaustive list, this is simply

12 representative.

13 Q.  Do you have any additional publications?

14 A.  Two pages that I've identified at this point.  I have some

15 other publications that talk about adjustments of scores for the

16 Flynn Effect.

17 Q.  Dr. Cunningham, has the scholarship that you've seen addressed

18 the implications of the Flynn Effect for special education

19 placement and disability determination?

20 A.  Yes, sir, it has.  For example, this study here, Kanaya,

21 Scullin and Ceci, that was published in the *American Psychologist*,

22 as it talked about the Flynn Effect it described the implications

23 for the classifications that were made of individuals, individuals

24 that were looking at special education or developmental disability

25 classification.  It also talked about the implications this has for

1    the classifications of capital offenders.  In other words, it was

2    describing the public policy implications as this was translated to

3    the individual.

4         Now, you need to understand that the nature of science is

5    in describing group data, you talk about groups and things that

6    happen in populations, that's true whether we're talking about an

7    IQ test or a drug company and we're talking about the effect of an

8    antibiotic.  It's always information that's taken on a population.

9         Clinical practice involves and pharm clinical practice

10   involves the application of group data to the specific case.  So

11   when the doctor prescribes an antibiotic for you, that's based on

12   research that's been done on a large group or population that you

13   were never a part of, and we call that good clinical practice, good

14   science, to take group data and apply it at an individual level.

15   That's what we're doing when we give somebody an IQ test.  The IQ

16   test was normed on a representative sample of a population.  We

17   give it to a particular person and say that group data is

18   applicable to the assessment of this person.

19        And so that's what's being described in these papers.

20   Flynn talks about the application of this to capital cases; Kanaya,

21   Scullin and Ceci talk about the individual application in both

22   developmental disability classifications and school settings for

23   disability determinations, such as Social Security and also for

24   capital litigation.

25   Q.  Dr. Cunningham, to your knowledge, does the Flynn Effect apply

1    to IQ scores in the borderline and the mildly mentally retarded

2    range?

3    A.  Well, that's an interesting question and one that there is some

4    literature that investigates.  In other words, the idea or the

5    question is, is the entire curve slow -- this whole distribution,

6    is all of it slowly sliding toward the right, or are some parts of

7    it moving more rapidly than other parts of it.  And more

8    specifically, down here at this range between 75, particularly

9    between 70 and 75, is that portion of the curve moving.

10          That's what we're concerned with in a capital

11   determination, is for those individuals whose scores are in the

12   question zone.  In other words, if all of the scores are below 70,

13   it doesn't matter whether you talk about the Flynn Effect or not.

14   The IQ scores clearly are below two standard deviations.

15          The only place there's any real discussion about -- that

16   matters in this arena are for those individuals whose IQ scores are

17   between 70 and 75, 76, where the presence of the Flynn Effect could

18   have life or death implications.  So that's an important question

19   for us to look at, is whether that effect applies as we look at IQ

20   scores in that lower end of the curve.

21   Q.  Are you familiar with any studies that have investigated the

22   applicability or this question of whether the Flynn Effect is

23   occurring in borderline and mild mental retardation cases?

24   A.  Yes, sir, I am.

25   Q.  And what research is that?

1    A.   Let me describe several studies that have looked at that.   The

2    first one is the study by Spitz in 1989.   Spitz did a literature

3    review of studies that compared the WAIS and the WAIS-R to identify

4    whether or not the performance on the WAIS-R, what you would expect

5    from the Flynn Effect is that IQ scores would be lower on the

6    WAIS-R since it was more recently standardized.   In other words,

7    the WAIS was standardized back in the mid-1950s, about '53, '54,

8    and the WAIS-R was standardized in 1978 or so, about 23 years

9    later.

10          Now, the studies that are summarized by Spitz gave both

11   the WAIS and the WAIS-R.   In some cases, they counterbalanced them,

12   they alternated the administration, some subjects you give first

13   the WAIS then the WAIS-R, others you give the WAIS-R first and then

14   the WAIS, that way you balance out the practice effects.   Others of

15   them gave the test concurrently.   In other words, you simply added

16   on the new questions from the WAIS-R, so that you gave them at the

17   same time.

18          Now, what you observe here is that at the lower end of

19   IQs of about 63 and below, the Flynn Effect is not demonstrated in

20   that range, that either there is no difference between them or, in

21   fact, the WAIS-R scores are even a little bit higher than the WAIS

22   scores.   Now, that may reflect that the Flynn Effect is not

23   operative at that level.   It's also possible that it reflects some

24   difference between the two tests or the extent to which they have

25   standardized at the lower ranges.   But at least it points to there

1    being a different response that these individuals are obtaining as

2    compared to individuals that have IQ scores that are higher.

3           For example, once we're in the borderline range, then

4    that effect is observed.  And if we were to graph that on a curve,

5    it looks like this.  And we're looking at this upper graph, this is

6    scanned from that article.  Here is an IQ score of 70.  The

7    performance that is between zero is no effect, and these are the

8    amount of points that are occurring from one test to the other.

9           Individuals that are in this borderline range between 70

10   and 75 or 76, they are showing evidence of the Flynn Effect.  In

11   other words, their scores, in fact, are being affected, when

12   they're in that zone of maximum interest to this proceedings.  Now,

13   in fact, when we get down here in this lower 60 range, then that --

14   there is no evidence that those scores are increasing, at least as

15   we look at going from the WAIS to the WAIS-R.

16   Q.  Is there additional academic and research support for the

17   applicability of the Flynn Effect for the group that is mildly

18   mentally retarded or borderline?

19   A.  Yes, sir.  There is another study that looks at that as well.

20   This is Spruill & Beck, which was published in 1988, and again,

21   there is a comparison of the WAIS to the WAIS-R.

22          There are two groups that are looked at.  One group on

23   their WAIS, the first test, the older test, had IQ scores between

24   55 and 69.  In other words, they are clearly in that below-70 zone

25   on the first administration and similar to the findings that Spitz

 1    summarized that we just looked at, for individuals that are in that

 2    zone below 70, they are not showing evidence of their WAIS scores

 3    being markedly higher than their WAIS-R scores, they're either

 4    equivalent or they're even slightly higher on the WAIS-R.

 5             Now, when we look at the folks in the borderline

 6    category, though, and this is where it ranges from 70 to 84, and

 7    this is where Paul Hardy's IQ scores are -- full scale IQ scores

 8    are of the 73 and 76.  Now, in fact, those scores are much lower on

 9    the WAIS-R, three and a half points on verbal IQ, seven points on

10    performance IQ, almost five points on full scale IQ.  So where

11    these individuals had scored an average of 78 and a half on the

12    WAIS, when we looked at their scores full scale on the WAIS-R, it

13    was 73.91, there was a reduction on that more current

14    standardization test when administered to them of almost five

15    points.

16    Q.  Is there additional academic support for the applicability of

17    the Flynn Effect to people in the IQ range of Paul Hardy?

18    A.  Yes, sir.  This is another study, this one by Fitzgerald, Gray

19    and Snowden.  And this time we're looking at the shift from the

20    WAIS-R to the WAIS-III.  And this is one that's particularly

21    relevant in this case because Paul Hardy was administered the

22    WAIS-R and part of the question is, what would he have obtained as

23    an IQ score had he been given a test that was more -- that was, in

24    fact, being normed at the time his assessment was being done.  And

25    in this instance, the full scale IQ scores were reduced by four

1   points.  In other words, the WAIS-R score, that testing, averaged

2   67, while on the WAIS-III they averaged 63.

3          Now, part of the relevance of this study to Paul Hardy,

4   you get additional information on when you look at the standard

5   deviation of these means.  In other words, the mean score of the

6   full scale IQ score was 67.  The standard deviation was 7.4.  In

7   other words, 68 percent of this sample had an IQ score between 74

8   1/2 and 59 1/2.  Paul Hardy's IQ, full scale IQ score, 73.  And so

9   that puts him, when he is administered by Dr. Tetlow, that first

10  administration, that puts him in this zone within one standard

11  deviation of this mean.  In other words, it increases the

12  applicability of these findings to him.  And, in fact, the study

13  reports that nine of the 45 scored between 70 and 79 when given the

14  WAIS-R.

15  Q.  Is there an additional study showing the applicability of the

16  Flynn Effect with regard to testing done on the WISC -- well, first

17  what is the WISC?

18  A.  The WISC is the child version of the Wechsler scale.  The WISC

19  is the Wechsler Intelligence Scale for Children.  It also has gone

20  through a number of evolutions.  This is the study that was

21  reported in the *American Psychologist* in 2003, the study by Kanaya,

22  Scullin and Ceci.  This was looking at whether there is movement,

23  you know, whether the Flynn Effect applies to children who are in

24  the borderline and mild MR zones.

25  Q.  Why would something that was testing children be applicable to

1   Paul Hardy?

2   A.  Because, psychometrically, if the issue is, is the low ends of

3   the curve, particularly the borderline MR end, that lower end, is

4   it responding to the Flynn Effect or not.  And so even though it's

5   looking at children instead of adults, it still is testing that

6   proposition of whether the low end of the curve is, in fact,

7   responding to the Flynn Effect as the middle position on the curve

8   is.

9           In other words, people are not disputing, yes, the new

10  mean IQ of this test is five points higher or that there's a shift

11  that's occurred, the older one -- that you're recalibrating this

12  back down on that curve.  The only discrepancy about it is, does it

13  also apply down here on the tail?  Research done on the WISC

14  informs that application to the table of the distribution.

15  Q.  Okay.

16  A.  So in this study, this first one looks at a large sample, 526,

17  whose IQ scores are in the borderline range, in this 71 to 85

18  range.  Now, when they give them two administrations of the WISC-R,

19  there's very little difference that's observed.  When you give them

20  two administrations of the WISC-III, there's no difference that's

21  observed.

22          But when you go from the WISC-R to the WISC-III, that

23  first test, the WISC-R, median difference is five points.  In other

24  words, the WISC-R overestimated the IQ score by five points as

25  compared to the current normed test.  This is looking at our zone

1    of interest in Atkins issues -- Atkins determinations, where the

2    Flynn Effect is being applied in capital cases because then you're

3    almost always talking about individuals whose observed IQ scores

4    are in this 70 to 76 range.  This is the borderline IQ individuals.

5           Now, there's another sample, this one, 217, who initially

6    scored, in other words, on the WISC-R or the first test, they

7    scored between 55 and 70.  They're down in that mild MR range.  And

8    this time, essentially, it's the same results.  If they took the

9    same test, there was no difference on the WISC-R to WISC-R.  Or if

10   they took the WISC-III and then the WISC-III, little change.  The

11   second one was just slightly higher in its score than the first

12   one.

13          But when we go from the WISC-R, the older

14   standardization, to the current standardization, the median

15   difference is six points.  In other words, they averaged 64 points

16   on the older test.  When you give them the new test, that first,

17   that older test, it overestimated their IQ score by a median

18   difference of six points.

19   Q.  Who are Kanaya, Scullin and Ceci?

20   A.  Those are scholars that were involved in this study.  It's an

21   academic reputation, their brief bios that are associated with them

22   that are part of this *American Psychologist* article, which I have

23   and I think is a part of the court's trial notebook as well.

24   Q.  Is the *American Psychologist* a peer-reviewed journal?

25   A.  Yes, sir, this is the flagship journal of the American

1    Psychological Association, it is the premiere journal.

2    Q.  What were the conclusions in that article of Kanaya, Scullin

3    and Ceci with regard to the application of the Flynn Effect in the

4    range of mildly mentally retarded and borderline individuals?

5    A.  First, clearly, the main conclusion that can be drawn from

6    these results is that caution should be used when basing important

7    financial, social, or legal decisions on an IQ score.  This

8    cautions as it is individually applied to persons.

9            Nowhere are the consequences of IQ score fluctuations due

10   to the Flynn Effect more critical than in the determination of

11   whether a death row inmate or a capital murder defendant can be

12   considered mentally retarded.

13           In other words, these scholars view their research on the

14   tail of the WISC as having application to capital death penalty

15   determinations for adults.

16           It may also be important to consider the differential

17   impact of the Flynn Effect on African Americans facing the death

18   penalty, because African Americans score, on average, around 10 to

19   15 points lower on IQ tests than whites (see Jencks and Phillips,

20   1998, for a review).  The percentage of African Americans who fall

21   in the borderline and mild MR range is higher than the percentage

22   of whites who fall within this range.  So, in other words, ignoring

23   the Flynn Effect potentially has disparate racial implications in

24   the application of the death penalty.

25   Q.  Did these authors identify any other implications with regard

1    to the Flynn Effect that you can recall?

2    A.  Only as I've described, that the data that they're describing

3    regarding the WISC, the child aspect of this, they regard, and the

4    peer reviewers obviously regard it, has clear implications for the

5    assessment and the application of the Flynn Effect to adults.

6    Q.  What does the AAIDD User's Guide with --

7              THE COURT:  Mr. Larson, I think we've been at it almost

8    an hour and 40 minutes, 45 minutes, why don't we take a break.  I

9    think we're shifting into a more individual application now, so

10   let's take about a ten-minute break and come back.

11             THE DEPUTY CLERK:  All rise.

12      (WHEREUPON, A RECESS WAS TAKEN.)

13      (OPEN COURT.)

14             THE DEPUTY CLERK:  All rise.

15             THE COURT:  Have a seat, please.

16             MR. LARSON:  May I proceed, your Honor?

17             THE COURT:  Yes.

18   BY MR. LARSON:

19   Q.  Dr. Cunningham, what does the AAIDD User's Guide --

20             THE COURT:  Hold on one second.  Have the cuffs been

21   loosened up on you, Mr. Hardy?

22             THE DEFENDANT:  Yes, your Honor.  Thank you.

23   BY MR. LARSON:

24   Q.  Dr. Cunningham, what does the AAIDD *User's Guide to Mental*

25   *Retardation* say with regard to the Flynn Effect?

1    A.  It talks about this as one of its practice recommendations.  As

2    you describe, this is the *User's Guide For Mental Retardation:*

3    *Definition, Classification, and Systems of Support*, *10th Edition*,

4    which is published by AAIDD, and had a very distinguished panel of

5    experts that authored it.

6         And it says as a practice recommendation:  "Recognize the

7    'Flynn Effect.'"  And subsequently, "In cases where a test with

8    aging norms is used, a correction for the age of the norms is

9    warranted."

10   Q.  What are aging norms?

11   A.  Aging norms means that there is an increasing distance between

12   the time the test was standardized and when it was administered.

13   And so, for example, when Mr. Hardy was given the WAIS-R, it was at

14   the very end of its life cycle.  In other words, it was given in

15   '96 and the new test came out in '97, and so it reflected, at least

16   for the WAIS-R, about as old as the norms could get before there

17   were new norms available.  So those are aging norms.

18        It's not a -- it's not either the norms are aged or not,

19   it's a continual, where those norms are becoming increasingly

20   obsolete as the distance from standardization, the years from

21   standardization increases.

22   Q.  Now, Dr. Cunningham, is there any scholarship or peer-reviewed

23   literature, academic literature, for correcting for the Flynn

24   Effect for individual IQ scores, not just groups but for

25   individuals?

1    A.  Yes, sir, there is.

2    Q.  And what is that?

3    A.  I have identified some of the studies that describe that

4    correcting of individual scores for the Flynn Effect.  Again,

5    published in leading peer-reviewed scientific outlets, including:

6    *Psychology, Public Policy, and Law; Psychology in Mental*

7    *Retardation and Developmental Disabilities*.  The first reference

8    was in 2006, the second in 2007.  The next one in 2006, *Psychology*

9    *in Mental Retardation and Developmental Disabilities*, this by

10    Greenspan, who is a recognized scholar in the area.  A second paper

11    by Greenspan as well entitled "Flynn-adjustment is a matter of

12    basic fairness:  Response to Roger B. Moore, Jr."

13    Q.  Is there additional literature?

14    A.  Yes, sir.  Kanaya, Scullin and Ceci, I've already talked about

15    their discussion.  The paper that Gil MacVaugh and I currently have

16    in press in the *Journal of Psychiatry and Law*.  Neisser in a paper

17    published by the American Psychological Association, and I've also

18    identified, previously described the AAMR User's Guide

19    recommendation.

20    Q.  And what does Flynn himself say about correcting for the Flynn

21    Effect in capital cases?

22    A.  This is from his paper entitled "Tethering the elephant,

23    Capital cases, IQ, and the Flynn Effect" that was published in 2006

24    in *Psychology, Public Policy, and Law*.  And he described:  "Failure

25    to adjust the IQ scores or the scores," he is talking about IQ

1    scores, "is to take flight from reality."  In other words, your IQ

2    score only has meaning in reference to the group.  We know that the

3    group mean is becoming increasingly distorted, and so now to report

4    this person's score as if it has the same meaning that it did when

5    the test was standardized is to take flight from reality.

6             And so he says:  "The scores should be adjusted according

7    to the general rule" (the general rule being .3 points per year)

8    since the test was standardized."

9    Q.  Have you reached your own peer-review conclusions regarding

10   correcting for the Flynn Effect in capital cases?

11   A.  Yes, sir.  That's Practice recommendation No. 6 that

12   Dr. MacVaugh and I promulgated.  And that says the following:

13   "Though recognizing that there is debate among forensic

14   practitioners regarding this issue, as well as inconsistent court

15   rulings, we believe that the Flynn Effect has gained sufficient

16   scientific acceptance that this factor should be described in

17   *Atkins* assessments and that Flynn-corrected IQ scores (including

18   the 2.34 adjustment of WAIS-III Full-Scale IQ score) should be

19   reported in addition to observed scores.  This recommendation is

20   consistent with providing the court with scientific perspectives

21   that will facilitate a more complete understanding of IQ scores."

22   Q.  Dr. Cunningham, do you follow the judicial decisions in this

23   area dealing with the Flynn Effect?

24             MR. MILLER:  Judge, I will object to him -- he may be --

25   I know he is an expert for all things, but the law is not one of

1    them.

2               MR. LARSON:  I am just asking this in regard to his

3    awareness of these judicial decisions, Judge, if these are things

4    that he would take into consideration.

5               THE COURT:  I am going to let him answer the question.

6    The weight may not be particularly meaningful, but go ahead, this

7    is a bench issue.

8    BY MR. LARSON:

9    Q.  Are you familiar with the federal court decisions in Nelson,

10   Davis and Shields?

11   A.  Yes, sir.

12   Q.  To your knowledge, did each of those courts acknowledge that it

13   would be appropriate to adjust full-scale IQ --

14               MR. MILLER:  Judge, I am going to object, really.

15               THE COURT:  He doesn't need to testify to that because

16   I've read all three decisions.

17               MR. LARSON:  I would ask the court to take judicial

18   notice of the decisions --

19               THE COURT:  I'll take judicial notice of the law.

20   BY MR. LARSON:

21   Q.  Dr. Cunningham, could you please return to the slide reflecting

22   the two administrations of the WAIS-R completed on Paul in 1996?

23   A.  Yes, sir.

24               MR. MILLER:  Judge, I don't think they've established

25   yet, other than three or four articles, and recognizing that there

1    is a disagreement in the discipline, that this is the standard

2    practice to mean all scores this way.

3              THE COURT:  Well, I don't think that's what he is saying.

4    His own conclusion said there is debate, there is recognition, all

5    he is suggesting is that the Flynn Effect adjustment should be

6    reflected so a judge can make an individual determination based on

7    all possible interpretations of the score.

8              MR. MILLER:  My understanding is before anything

9    scientific comes into a courtroom it has to be established under a

10   Daubert-type analysis, that this is, in fact, good science, and I

11   don't think that we've done that yet.

12             THE COURT:  I am comfortable.  Overruled.  Go ahead.

13   BY MR. LARSON:

14   Q.  And what are Paul Hardy's IQ scores, if you correct for the

15   Flynn Effect?

16   A.  The WAIS-R was standardized in 1978, it was administered to

17   Mr. Hardy in 1996, that's an 18-year gap between standardization

18   and administration, which, if multiplied times .3 per year, equals

19   5.4 points.  73 minus 5.4 is 67.6 or rounded off to 68.

20             If you look at the test score reported by Dr. Martell of

21   76, subtracting 5.4 from that, takes that score down to a 71, or

22   more precisely, a 70.6.

23   Q.  Now, represented graphically, where would these scores place

24   Paul Hardy with regard to the rest of the population?

25   A.  Now, the Tetlow administration is in this zone below 70, and

1    the Martell administration is right at the line at 70.6, rounded to

2    71.

3    Q.  Dr. Cunningham, are you familiar with something known as the

4    practice effect?

5    A.  Yes, sir, I am.

6    Q.  And what is that?

7    A.  The practice effect is simply the notion that with prior

8    exposure to IQ test items, some of the novelty of the test has been

9    removed.  If there's familiarity, the person might even educate

10   themselves about an option in the interim, so that the second

11   administration, if given too close to the first one, shows the

12   effects of that prior exposure.

13          That's been specifically reported and described by

14   Matarazzo and Herman regarding practice effects with the WAIS-R.

15   And in this case, the subjects were retested with the same

16   instrument two to seven weeks after the first one.  Of course,

17   Mr. Hardy was retested four weeks after.  Matarazzo and Herman

18   described practice effects averaging 3.3 points on verbal IQ, 8.4

19   on performance IQ, and 6.2 on full scale IQ.

20          In other words, the same person taking the same test two

21   to seven weeks later, with no particular motivation to do better or

22   worse, showed, on average, a significant benefit from the prior

23   exposure.

24   Q.  Is there a consensus within the scientific community as to the

25   existence of the practice effect?

A.  Yes, sir.  And for that reason, as a general matter, you would try not to re-administer the same test like a Wechsler scale within a year of the first administration.

Q.  Are you aware of any reputable scholarship that refutes or undermines the existence of a practice effect?

A.  No, sir.  As we'll see, different individuals respond in varying ways in terms of how much practice effect they display, but it is a well-established professional and scientific principle that prior exposure to IQ tests has a good potential to influence the subsequent score.

Q.  And you indicated that Paul Hardy was retested after only four weeks?

A.  That's correct.

Q.  And they used precisely the same instrument?

A.  Yes, sir.

Q.  Based on the study here by Matarazzo, would you have expected to see a greater practice effect of Paul Hardy on the second test?

A.  Yes and no.  The improvement that he shows is less than what's observed here on average, as we'll see in a minute, is within the range of what's observed.  And there's certainly the potential that individuals that are mentally deficient may not benefit quite as much as other individuals, but I don't know that that has been specifically studied very effectively.

Q.  Does the practice effect decrease as the interval between testing grows larger?

A.  Yes, sir.

Q.  Now, because of the practice effect, what can you say about Paul Hardy's second IQ score in this case?

A.  That the first administration of that test is the most reliable, well, the most valid estimate of IQ because it did not have the benefit of practice effect.  That second score, the second score of 76, given within a month has a significant potential for being inflated as a result of practice effects.

        And so for that reason, the primary diagnostic significance or clinical significance that I would attach to this second test is that the performance was as close as it was to the first administration.  And we see that across most of the subtests as well.  In other words, that there is some degree of consistency in the way that he is responding.

        Now, remember that Paul Hardy did not just receive this test, he received a whole set of tests from Dr. Tetlow and a whole set of tests from Dr. Martell.  And so if he is trying to dial down his performance, there is some additional challenge in remembering all of the tests that he's taken and how he responded and answered to them and at what point he began to miss items and in what pattern.

        And so the fact that these are as close as they are I think provides some support that the first administration reflected good effort.  But I think you have to -- there are grave -- I have grave reservations about accepting as valid a second IQ test that's

1    given within, you know, that is given a month after the first one.

2    You would never engage in that repeat testing process with an

3    anticipation that your second score was going to be reliable and

4    free from practice effects.  There's no clinical protocol that I

5    can imagine that you would engage in that, somehow thinking that

6    you wouldn't have any practice effects.

7    Q.  Dr. Cunningham, in your expert opinion, can you state to a

8    reasonable scientific certainty that with consideration of the

9    practice effect and the Flynn Effects, that Paul Hardy's IQ is

10   below 70?

11   A.  Yes, sir, I believe that it is in consideration of the Flynn

12   Effect and practice effects.

13   Q.  Did you see any need to retest Paul Hardy in this case?

14   A.  No, sir.  I viewed the tests that he took in 1973 (SIC) as

15   being, No. 1, valid, particularly if some adjustment is made in

16   light of the Flynn Effect.

17   Q.  You said 1973, you mean 1996?

18   A.  The 73 that he obtained in 1996 as first administered by

19   Dr. Tetlow.  I apologize.  That that was a valid administration.

20        It is also the measure of his intelligence that is most

21   proximate to this offense as the issue is, what was his status and

22   his respective level of moral culpability, vis-a-vis mental

23   retardation, in 1976, the most accurate determination of that is

24   made by the test that is most proximate to that conduct.

25        This also represents the testing that is closest to age

1    18, even though it is eight years or so off of that.  It still is

2    the closest to that developmental period.

3            And so I did not find reason to believe that these

4    results were unreliable in some fashion and also identified them as

5    being most proximate to the events.

6    Q.  What is the basic assumption with regard to an IQ test?

7    A.  Well, the basic assumption is that the observed, that the

8    observed scores that you obtain have clinical meaning, that they

9    have validity or value.  That's the only reason to do it.  If you

10   believed that the instrument could not give you any -- would not

11   give you an accurate reflection of this person's intellectual

12   capability as compared to the rest of the group, then there's no

13   reason to use the instrument.  Now, that doesn't mean that it's an

14   uncritical presumption, but it is to say that the test is being

15   administered in anticipation that something of value will be

16   obtained from it.

17   Q.  Have you been in cases where a defendant was retested?

18   A.  Yes, sir.

19   Q.  Was one of those Shannon Shields?

20   A.  Yes, sir.

21   Q.  And, in your opinion, how does this case differ?

22   A.  Well, what's in common with the case of Shannon Shields is, is

23   that there was a necessity of providing an IQ test that was

24   proximate to the time of the offense, and so when I saw Shannon

25   Shields and was asked to evaluate him or comment on his -- evaluate

1   whether he was a person with mental retardation, I administered an

2   IQ test, a WAIS-III to him because at that point we were a year or

3   two out from the offense, as I recall.

4            Now, he had had prior testing back in the developmental

5   period prior to age 18.  I think the last IQ test had been at about

6   age 18, except the offense was, and I am -- I apologize, I don't

7   have -- I don't recall all of the specifics, the offense was five,

8   six, seven years, maybe eight years after he was -- that last

9   administration had been done.  And so again, the issue is, was he a

10  person with mental retardation at the time of the offense, at least

11  I could understand that that would be one of the issues that would

12  be before the court's determination.

13  Q.  Could a retest have been done in this case?

14  A.  Yes, sir.  It would not be as contemporaneous, but certainly

15  his IQ could have been assessed currently.

16  Q.  Are you familiar with Dr. Hayes' objections to the retesting in

17  this case?

18  A.  Yes, sir.

19  Q.  Do you find, if you wanted to challenge the scores in this

20  case, do you find her objections to the retesting to be valid?

21  A.  I believe they are a genuine reflection of her ethical

22  concerns.  The ethical concerns that she has are not shared by all

23  professionals.  And certainly there are professionals who are

24  competent, scientifically grounded and consider themselves to be

25  ethical, who would have been willing to undertake this assessment

1    under the restrictions imposed or the memorialization, the

2    videotaping required by the court should that assessment occur.

3    Q.  So it would have been, to your knowledge, it would have been

4    possible simply to obtain someone who did not have ethical

5    objections to the retesting and perform a retest if you wanted to

6    challenge the validity of these scores?

7    A.  Oh, yes, sir.  And, in fact, that occurred.  Dr. Thompson here

8    in Louisiana provided a videotape, he allowed his administration of

9    the Wechsler scale to be videotaped.  I think that was in Nelson.

10   Q.  Are you aware of any intellectual property issues that would

11   arise from the videotaping but the sealing of that videotape of the

12   taking of a test?

13            MR. MILLER:  Judge, I think we're going beyond his area

14   of expertise.

15            MR. LARSON:  Just asking if he is aware of any because he

16   works in this field.

17            MR. MILLER:  We're going to assume that he even knows

18   what you're talking about.  We're getting into legal issues again,

19   your Honor, that I think are beyond his area of competence.

20            THE COURT:  Tell me the question again.  It sounded okay,

21   but --

22            MR. LARSON:  Are you aware of any intellectual property

23   issues that would arise from the videotaping but the sealing of the

24   taping of an IQ test?

25            THE COURT:  I think he can answer that.  Go ahead.

1           THE WITNESS:  I would not be constrained by the

2    videotaping for concern of violating intellectual property issues

3    under the restrictions proposed by this court of sealing that and

4    securing its -- any further distribution.

5    BY MR. LARSON:

6    Q.  While we're on this subject, are you aware of any ethical or

7    methodological issues that arise from the presence of a second

8    psychologist at interviews of persons who may have knowledge of

9    adaptive behavior of the person who is being evaluated?

10   A.  No, sir, no ethical issues about that.  I mean, assuming that

11   everybody is a professional and the person being interviewed is

12   aware of the presence of this other person and their role and that

13   kind of thing.  No, sir, I am not aware of ethical issues that

14   would be present from adaptive behavior interviews being observed.

15   Q.  Dr. Cunningham, I'd like to go back to the DSM-IV-TR

16   definition of the --

17   A.  Let me qualify that last answer.

18   Q.  Sure.

19   A.  Depending on who was present.  If this is another professional,

20   another psychologist, then I think it is unlikely that the adaptive

21   behavior information would be significantly effected by the

22   presence of that person.  If the additional person present is law

23   enforcement, if it's a policeman, FBI, that kind of thing, then

24   potentially the presence of somebody who is in that

25   authority-related role might have some impact on the disclosures of

```
1    the person who is providing the information.  That's not an

2    ethical --

3          Well, I guess if all parties are aware that that's the

4    case, it's not an ethical issue.  But it certainly has a greater

5    potential for impacting the quality of information that's obtained.

6    Q.  Then going back to the definition of mental retardation

7    provided by the DSM-IV-TR, right there.  In your professional

8    opinion, does Paul Hardy meet the first prong of the definition of

9    mental retardation in the DSM-IV-TR?

10   A.  Yes, sir.

11   Q.  Did you make any independent findings with regard to the other

12   two prongs of that definition?

13   A.  Well, they were independent to the extent that I undertook my

14   own review, but they were not independent in that I did not gather

15   systematic adaptive behavior information.  I didn't gather that

16   from Paul Hardy in my interviews with him, interviews with him in

17   1996, nor did I systemically inquire about that of family members

18   or third parties back in 1996.  And I haven't repeated -- I haven't

19   gone into that kind of assessment now.

20         And so any knowledge that I have about the specifics of

21   his adaptive behavior of a more detailed and systematic nature come

22   from information that is provided in the transcripts of Jill Hayes'

23   interviews and the videotapes of those and her summaries, in the

24   descriptions that are provided by Dr. Swanson, by the scoring of

25   the Vinland 2.
```

1          So I did not give any separate and independent measures

2   or interviews that would allow me to come to conclusions about

3   that.  Again, based on my review of the data, I came to my

4   conclusions from that data independently but didn't engage any

5   separate investigation.

6   Q.  Did you rely on Dr. Swanson's findings in this area?

7   A.  Yes, sir, not critically.  I reviewed those, considered them,

8   and found them to be useful.  And I also reviewed the interviews

9   and information that was gathered by Dr. Hayes.

10  Q.  Based on what Dr. Hayes had done in terms of the interviews and

11  based on what you were provided with by Dr. Swanson, did you find

12  that Paul Hardy met the second prong of the definition of mental

13  retardation given in the DSM-IV-TR?

14  A.  Yes, sir, I believe that he does.

15  Q.  And what about the third prong?

16  A.  Yes, sir, I believe that this also arose during the

17  developmental period prior to age 18.  I don't see evidence of

18  intervening events of sufficient magnitude that would result in his

19  IQ scores being, you know, markedly depressed.  And, in fact, the

20  adaptive behavior descriptions that, though antidotal in nature,

21  from his childhood are also consistent with this having been a

22  long-standing deficit for him.

23  Q.  And based on your finding that Paul Hardy meets all three

24  prongs of the definition of mental retardation in the DSM-IV-TR,

25  how do you diagnose Paul Hardy?

```
 1    A.  That he is a person with mild mental retardation.

 2              MR. LARSON:  Your Honor, if I might confer with counsel

 3    for one moment?

 4              THE COURT:  Yes.

 5    BY MR. LARSON:

 6    Q.  Dr. Cunningham, did you review the report prepared in this

 7    matter by Dr. Jill Hayes?

 8    A.  Yes, sir, I did.

 9    Q.  And did you have any disagreements with Dr. Hayes' findings and

10    conclusions?

11    A.  Yes, sir, I did.

12    Q.  And what are the areas in which you had disagreements?

13    A.  First, I find the IQ testing performed by Dr. Tetlow to be

14    valid.  I also find that the second administration was valid to the

15    extent that I believe Paul Hardy was making good effort on it.

16    Again, there are practice effect problems with that second score,

17    but I find the Tetlow administration to be valid.  Dr. Hayes does

18    not find those testing -- those test scores to be valid.

19              I find that he exhibited good effort during the

20    assessments that were made and do not see evidence of malingering.

21    Dr. Hayes identifies factors that she believes points to

22    insufficient effort and even deliberate poor performance.

23              I believe that the Flynn Effect should be described in

24    this case and is applicable to the interpretation of his individual

25    score.  Dr. Hayes finds the research to be too mixed on the lower
```

1  range of the scale to make application in that range, and I also

2  conclude from her report that she does not believe the Flynn Effect

3  should be applied on an individual basis.

4          I find that there are significant deficits in multiple

5  arenas of adaptive behavior.  Dr. Hayes does not find significant

6  adaptive deficits in any area of adaptive behavior.

7          And I also have disagreements with Dr. Hayes'

8  methodology, in terms of her interpretation of some of the

9  applicable science in this arena, and also with the nature of her

10  interviews that I found were not in their style productive of the

11  nature of information that this sort of assessment requires.

12  Q.  Dr. Cunningham, we'll begin with each of these broad

13  categories.

14          With regard to the validity of IQ testing, you indicated

15  earlier, what is the first presumption with regard to the validity

16  of prior scores?

17  A.  Well, the presumption, again, not an uncritical one, but a

18  presumption is that these results will have meaning, that's the

19  point of giving the assessment.  If the presumption is, it has no

20  meaning or you simply can't have confidence in it because of the

21  context, then there is no reason to engage in it.  So as a starting

22  place, I think that the results of IQ scores should be considered

23  to be valid unless it can be demonstrated that they are not, as

24  opposed to, they should be considered invalid until they

25  unequivocally can be proven to reflect it.

1   Q.  So is malingering something that would affect the validity of

2   an IQ score?

3   A.  Oh, absolutely.

4   Q.  And did you find any evidence, independent evidence of

5   malingering, on the part of Paul Hardy?

6   A.  No, sir.  My review of the testing and his interview behavior

7   in my own interviews with him in '96 were not consistent with

8   malingering.

9   Q.  And you are aware that Dr. Hayes found a number of inferences

10  that supported her finding of malingering?

11  A.  Yes, sir, she identifies 13, at least 13 inferences that she

12  finds that point toward malingering.

13  Q.  Of the 13 inferences that she found that support malingering,

14  how many of them did you find to be valid?

15  A.  I found that none of them were.

16  Q.  None out of the 13 she found?

17  A.  That's correct.  None of the 13 were appropriate.

18  Q.  What was --

19  A.  Or at least there are other explanations and more compelling

20  alternative hypotheses than that that factor supports malingering.

21  Q.  What was the first inference in support of her finding of

22  malingering that Dr. Hayes found?

23  A.  Her first finding was, or first inference was that the positive

24  practice effects should have been greater.  In other words, that

25  Mr. Hardy should have shown greater improvement in his WAIS-R IQ

1    score when it was given to him by Dr. Martell after having had it

2    from Dr. Tetlow the month prior.

3    Q.  In other words, he should have shown the full six points, I

4    think, as the normal practice effect instead of what he actually

5    showed?

6    A.  Yes, sir.  So the discrepancy was made, of course, that since

7    he only improved three points, from a 73 to 76, and the average

8    improvement is six points, therefore, that's an indication or an

9    inference that he was not making a good effort on these -- on the

10   second test administration.  And by association or by inference, if

11   he is trying to dial down his performance on the second one, it

12   raises concerns about his performance on the first.

13            And I would agree with that in terms of if, in fact, it

14   was demonstrated that he was malingering his performance with

15   Dr. Martell, then I also would say that raises grave reservations

16   about his performance the month prior with Dr. Tetlow.

17   Q.  And did you investigate that inference?

18   A.  Yes, sir, I did.

19   Q.  And what's your response to it?

20   A.  Well, Dr. Hayes appropriately cites Matarazzo and Herman as the

21   source of this observation that, in fact, these are the average

22   changes that occur when you test-retest between two to seven weeks.

23            Now, the rest of the story, though, is that on this

24   test-retest among individuals who have no motivation to malinger,

25   while the average improvement in full scale IQ score is six points,

1   the range among those 119 is all the way from minus 12 to plus 20.

2   Q.  What does that mean?

3   A.  Well, that means that some of these individuals rather than

4   improving scored 12 points lower the second time.  Other people

5   scored 20 points higher.

6           I mean, let's say that he had scored 15 points higher the

7   second time, then the assertion could be made, wait a minute, that

8   first administration was -- the 73 is not accurate because, look,

9   now he gets an 88.  That's 12 points more than the practice effect.

10  That shows that now he is really trying and last time he wasn't.

11          So it's critically important before you make those kind

12  of leaps about how to interpret his score as compared to the

13  average that you look at the range of changes that are demonstrated

14  by this group that has no motivation to malinger their performance.

15  They're simply subjects in this standardization.

16  Q.  And that's who was tested by Matarazzo and Herman in this

17  group?

18  A.  They're reporting this, yes, sir.

19  Q.  Were the changes on the subtests for Paul Hardy within the

20  variability range that is normally found on retesting?

21  A.  Yes, sir.  Let me -- there are two additional slides that we

22  need to look at before we get to that.  The first is, we would look

23  at the changes that he displayed.  This is simply looking at the

24  range.  Okay.  So when he improved three points from Tetlow to

25  Martell, that three points is obviously between minus 12 and plus

1   20, in terms of the range.

2           Now, if we want to identify, though, what proportion of

3   these 119 people showed the same kind of improvement that Paul

4   Hardy did, well, Matarazzo reports that in this paper.  I am not

5   sure that this one is part of the court's trial notebook, but I

6   have it with me, I can certainly copy it.  And what it reflects is

7   that in terms of changes in full scale IQ score, that -- and he

8   shows the change in three points, 27 percent of this group changed

9   their IQ score three points or less.

10          Now, that means that before we conclude that this means

11  that Paul Hardy is malingering, we need to notice that 27 percent

12  of the people who had a test-retest, they changed three points or

13  less.

14          Now, this is not unlike -- you know, I take a medicine

15  and it gives me a splitting headache and we say, well, most people

16  who take this medicine don't get a headache.  I think you're making

17  up the headache or that it has nothing to do with the medicine.

18  Only, then I look in the PDR, the *Physicians' Desk Reference*, and I

19  identify that, in fact, 27 percent reported side effects, 27

20  percent of the people who take this medication experience severe

21  headaches.  Well, that's a really important piece of data to have

22  before I make interpretations about what this headache means and

23  what relationship it has to this drug.

24          In terms of the verbal IQ change, he improved four points

25  in his verbal IQ score.  61 percent of this test-retest group that

Matarazzo studied improved their verbal IQ four points or less.

Performance IQ score, he improved three points; again, 27 percent

of the group improved three points or less.  So his test-retest

performance is certainly within a regularly-observed range in terms

of the practice effects.

Now, we can graph that in this way, and this shows where

his improvements are.  This is the graph that would reflect where

all of those practice effects were and how much they were or how

much they are is along this line, all the way from negative to

positive, this is how many people obtained those (INDICATING).  And

you see the distribution that most people have kind of a mental

range practice effect, a few people get a huge amount of benefit, a

few people go down, and the arrows reflect where he is in terms of

his practice effect on his performance, or his verbal IQ, his

performance IQ and his full scale IQ.

And what we can see here in terms of practice effects is

that he is pretty close to the middle of these distributions, at

least as we see the curves piled up there.

Q.  So what conclusions did you draw with regard to -- scientific

conclusions did you draw with regard to her inference, that first

inference in support of malingering?

A.  Well, Hayes's inference or assertion was that positive practice

effects should have been greater; that psychometric data is, that

scores may decline as well as improve on retesting, independent of

malingering agendas; that Mr. Hardy's score declines were both

1    isolated and within the observed range on the test-retest.  That's

2    looking at -- this is based on the subtest, we'll look at those in

3    a minute.  And that his scale scores, in fact, all went up on the

4    second testing.  They improved four points on verbal IQ, three

5    points on performance IQ and three points on full scale IQ.

6           The alternative hypothesis, and I think the more

7    scientifically compelling one, as we look at what change occurred

8    between the two administrations is, is that malingering cannot be

9    inferred, not a sound scientific basis for inferring malingering

10   from the absence of stronger practice effects.

11   Q.  What was Dr. Hayes' second inference in support of her finding

12   of malingering?

13   A.  The second inference was that on the WAIS-R there were two

14   subtests that went down between Tetlow and Martell.

15   Q.  How many subtests are there on the WAIS-R?

16   A.  There are 11.

17   Q.  Eleven subtests?

18   A.  Eleven subtests.  And two of those went down, and she said that

19   those are the two subtests that are most sensitive to the effect of

20   practice; in other words, those are the two subtests that should

21   have improved the most but they went down, and that points to his

22   not making a good effort the second time, that he is malingering.

23   Q.  And did you investigate that inference?

24   A.  Yes, sir, I did.  A couple of observations about that:  The

25   first is, the two subtests we're talking about here are picture

1   arrangement and object assembly.  Now, these are the two subtests

2   of the whole test that have the greatest reliability -- have the

3   lowest reliability; in other words, they're going to show the most

4   fluctuation.

5           Now, that's not based on test-retest, that's based on

6   split-half correlations.  In other words, how does half of the test

7   compare to the other half of the test?  And looking at what degree

8   of internal reliability the test has, these are the two subtests

9   that have the lowest reliability coefficients and have the highest

10  standard error of measurement associated with them.  And so, in

11  other words, we are going to expect these to have the greatest

12  variability simply as a function of error.

13          So before we decide that there is some design that's

14  occurring in that variation of IQ scores, we need to identify

15  what's the likelihood that that kind of fluctuation would happen by

16  chance alone.  Now, notice that the standard error of measurement

17  on picture arrangement is one and a half, and the standard error of

18  measurement on object assembly is 1.71.

19          Now, again, it isn't just that it's 1.5 in one direction,

20  there is a curve on either side of that score, so that variability

21  means that the score may be higher or lower.  Again, if you want a

22  95 percent likelihood, then you're going to multiply that number by

23  1.96, so that you have almost a three point variation on either

24  side of picture arrangement or 1.71 on object assembly.

25  Q.  Can you demonstrate how Paul Hardy's performance on the

1    subtests compared to what was demonstrated by Matarazzo on his

2    test-retest sample?

3    A.  Yes, sir.  Here I have identified the subtest and how much Paul

4    Hardy's score changed.  Now, of these 11 subtests -- and, by the

5    way, while I am thinking about it, when you score this test, you

6    take the raw score and you look up the scale scores, the subtest

7    scores from a single table.  Then you go to an age-based table to

8    generate your IQ scores, and I am not sure I identified that

9    clearly when I spoke before.  But these are how much those subtest

10   scores changed.

11          Now, these subtests have a mean of ten and a standard

12   deviation of three.  And so you see that these two go up, two

13   stayed the same, this one goes up by two; again, a lot of scale

14   work, the mean is ten, the standard deviation is three.  The two

15   that go down are picture arrangement and object assembly, the two

16   that are the most unreliable or have the lowest reliability

17   coefficients.

18          Now, we can do the same thing again, we can go to the

19   table that Matarazzo provides and identify what proportion of that

20   group of 117 had this amount of improvement or less; in other

21   words, they showed an equal practice effect or lower practice

22   effect than Paul Hardy did.

23          Now, on some of these, he's improving information, he

24   improved more than 83 percent, equal to or greater than 83 percent.

25   Equal to or greater than 75 percent on digit span.  Equal to or

1    greater than 63 percent on vocabulary.  The words -- it's not

2    uncommon at all for people not to move at all on that.  Arithmetic

3    51; comprehension 87; similarities 67; picture completion 97.  He

4    is improving equal to or greater than 97 percent.

5              Now, part of the sequence of -- the interpretation of

6    this, what conceivable malingering strategy has him improving far

7    more than most people do on some tests but then falling down on

8    others, as opposed to some more uniform suppression of his ability.

9              Now, it is true that among these, seven percent of that,

10   of this group of 117, seven percent lost two or lost more than

11   that.  And on object assembly, almost 11 percent lost one point or

12   more than that.  That means that what Paul Hardy displayed is

13   within the range of what was displayed by these 117, who had no

14   motivation to malinger.

15             And again, we think about our pharmacology application.

16   If I break out in hives in response to this medication and it's

17   reported that seven and a half percent of the people who take this

18   medicine have that, do we say my hives have nothing to do with this

19   because it's only observed by seven percent?  No, in fact, seven

20   percent is a pretty good side effect when we're talking about a

21   medication.

22             And so neither the pattern of these support a

23   conclusion of malingering, and when we actually look at the

24   distribution that Matarazzo provides, that Dr. Hayes cites in her

25   report, we see a very different picture, that this is not

1    definitive identification of malingering.  In fact, it's within the

2    range that's observed by non-malingers.

3    Q.  And so based on your analysis, what conclusions did you reach

4    with regard to her second inference in support of malingering?

5    A.  Well first, that picture arrangement and object assembly are

6    the least reliable of the WAIS-R subtests.  So if you're going to

7    see some kind of squirrelly results, those are the two that are

8    most prone to that; that picture arrangement and object assembly

9    associated with that have the largest standard error of

10   measurement, you know, the range of change that is going to occur

11   by chance alone; that his score declines are well within the

12   standard error of measurement of plus minus three and 95 percent

13   confidence interval for those subtests; and that similar or greater

14   picture arrangement and object assembly score test-retest declines

15   were observed in the normative sample.

16           Now, the alternative hypotheses, then, are that his

17   declines on picture arrangement and object assembly can properly

18   only be attributed to measurement error.  And that there is no

19   reasonable malingering strategy that is consistent with a pattern

20   that has him simply decline on the two least reliable subtests, the

21   two that showed the greatest variability, while showing

22   improvements on others that are equal to or greater than the

23   normative sample in many instances.

24   Q.  Can you articulate a malingering strategy that would produce

25   this?

1    A.  No, sir, I can't -- I mean, to put myself in Paul Hardy -- to

2    put myself in the head of somebody who is trying to dial down a

3    score, why would I pick those two least reliable to dial down while

4    dialling up many of them beyond the somewhat above average as

5    compared to the standardization sample?

6    Q.  Dr. Cunningham, what was the third inference in support of

7    malingering that you found from Dr. Hayes's report?

8    A.  The third inference is that on the Wechsler Memory Scale

9    Revised, one of the index scores, that being for attention and

10   concentration, that that decline from a scale score of 80, when

11   Dr. Martell gave it, to a 70 when Dr. Bianchini gave it -- there

12   were actually three assessments that were made.

13        Tetlow tested Paul Hardy using the WAIS-R, did some

14   personality testing, did a wide-range achievement test.  Then

15   Martell tested him.  Martell gave a WAIS-III, a full

16   neuropsychological battery, and also a personality test, the

17   MMPI-2.

18        Then Bianchini a couple of weeks later saw Mr. Hardy, and

19   he also gave him a full neuropsychological battery.  He did not

20   repeat the IQ testing, he relied on Tetlow's administration of the

21   WAIS-R.  But he did do a second psychoneurological battery.  What

22   that means is, is that Martell gave Paul Hardy a Wechsler Memory

23   Scale Revised, and then a couple of weeks later Bianchini also gave

24   him Wechsler Memory Scale Revised.

25        On that test, Paul Hardy's index score for attention and

1   concentration declined from a scale score of 80 to a scale score of

2   70.  Now, these scale scores are arrayed just like IQ is, so it's

3   on that standard curve with a mean of 100 and standard deviation of

4   15.  And so his score went down even though he had prior exposure

5   to those items, and she saw that as indicative or pointing to

6   malingering, since she would anticipate practice effects that would

7   cause it at the very least to stay even, if not go up.

8   Q.  Are you familiar with the Wechsler Memory Scale Revised, WMS-R?

9   A.  Yes, sir.

10  Q.  Can you talk about the reliability issues of that test?

11  A.  Yes, sir.  The issue, of course, is that any time we talk about

12  a difference between two scores being meaningful, it's critically

13  important what's the reliability of the instrument that we're

14  taking that inference from.  It's like my bathroom scale.  If that

15  scale gives widely different weights, maybe I shouldn't panic when

16  I get on and it shows that I've gained five pounds because this

17  scale does that, independent of weight.

18          So here is what we know about the Wechsler Memory Scale's

19  reliability:  The standardization sample for it is relatively

20  small, 366, and by the way, this comes from Elwood in a paper

21  published in the *Neuropsychology Review*, "The Wechsler Memory

22  Scale-Revised, Psychometric Characteristics and Clinical

23  Application."

24          The small standardization sample, 366.  The

25  standardization sample systematically excluded subjects in certain

1    ages, including the age range that Paul Hardy is in.

2    Q.  So the test has not been standardized with regard to people

3    Paul's age?

4    A.  Twenty-five to 34, that's right.  Now, there are some scholars,

5    Elwood comments, that there are some scholars who discourage using

6    the scale altogether with individuals that are in the excluded age

7    ranges.

8            Now, even beyond that, few of the Wechsler Memory

9    Scale-Revised subtests, or even the composite indexes based on

10   those, meet even minimal standards for reliability; in other words,

11   consistency of measurement.  Now, we've got an asterisk here and

12   that asterisk is, as we'll see in a minute, the

13   attention/concentration index is the most reliable of the indexes

14   that this test reports.  But more broadly, those subtests lack

15   reliability.

16           And also, that interpreting and reporting subtests and

17   composite indexes should be in light of the standard error of

18   measurement.

19   Q.  So if you take these five factors into consideration, what do

20   Paul Hardy's scores on this WMS-R actually indicate?

21   A.  If we look at the standard error of estimation, the range of

22   scores, you know, any time you have an observed score, there's

23   always a standard error around that.

24           Now, this analysis is based on the standard error of

25   estimation, which is similar to a standard error of measurement.

1    It acknowledges a statistical notion that your standard error of

2    measurement is most applicable to the specific population the test

3    was drawn from.  There may be a somewhat larger error range as you

4    go out to other samples or apply it to other individuals.  And so

5    based on that standard error of estimation, the range of scores

6    around Martell's 80 is all the way from 73 to 90.  That's the range

7    of scores.  And that if we look at Bianchini's score of 70, the

8    range around that is all the way from 64 to 81.

9            Now, look what that leaves here.  That leaves a

10   substantial area of overlap between these.  In other words, that as

11   a score of 70 is obtained by Bianchini and a score of 80 is

12   obtained by Martell, in fact, their distribution substantially

13   overlap with each other.  From a psychometric standpoint, there are

14   grave concerns in saying those scores are actually different from

15   each other, given that their standard errors of estimation overlap.

16           It's the idea -- what standard error of measurement or

17   standard error of estimation does for us is, it let's us say, we

18   assume that the variability is occurring by chance alone, unless it

19   exceeds this amount.  And what we see here is that there is a

20   substantial overlap of scores, variability, that could give us this

21   by chance alone.

22   Q.  And so what was your conclusion with regard to Dr. Hayes' third

23   inference in support of malingering?

24   A.  There's one other thing that I want to add to this that is

25   relevant as a statistical -- well, at this point, as we look at

1    this, that the psychometric observation that we would make is

2    before concluding that this is a meaningful decline, that, in fact,

3    the scores substantially overlap when you consider either the

4    standard error of measurement or the standard error of estimation.

5        Now, that standard error of estimation involves this

6    idea, and that is that there is a statistical technique that can be

7    utilized for saying, if Martell gets a score of 80, what's the

8    range that we would predict the next score is going to be if

9    somebody goes back to retest, that's called the standard error of

10   prediction.

11       And as you calculate that standard error of prediction,

12   and this time, again, a statistical correction that is based on an

13   estimated true score as opposed to the score obtained, that when

14   you do that calculation, the true score of an 80 is transposed to

15   an 82.  The standard error of prediction at a 95 percent confidence

16   interval is 14 points on either side of 82.  That's all the way

17   from a 68 to a 96.

18       So when Paul Hardy on his retesting obtains a score of

19   70, that's within this red line, that's within that standard error

20   of prediction.  Again, it's another way of identifying that, in

21   fact, from a psychometric standpoint there is not scientific

22   support for saying that an -- that the 70 is meaningfully less than

23   an 80 or that it reflects any particular motivation on the part of

24   Mr. Hardy.  That score discrepancy of nine to ten points is well

25   within the 14-point discrepancy of a 95 percent confidence

interval, that this attention/concentration index score difference

cannot be considered to be statistically different.

Q.  Are there any statistically different, statistically

significant differences between any of the index scores obtained on

the WMS-R by Dr. Martell or Dr. Bianchini?

A.  No, sir.  These are the index scores that are produced.  The

first column is Dr. -- the scores as administered by Dr. Martell,

the second is as administered by Dr. Bianchini.  All of these

changes are within that standard error of measurement from one to

the other.

        And again, we're confronted with, what conceivable

malingering strategy is there that has him going up in his score

modestly, although, again, within the standard error of

measurement, that has him going up in his score in four areas and

only down in one.  That's, again, it's the same head scratcher that

we saw back with the subtest on the WAIS of trying to identify

what's the strategy for a very selective dialling down of

performance.  And, of course, still all within the standard error

of measurement.

Q.  And so what were your ultimate conclusions with regard to the

third inference found by Dr. Hayes in support of malingering?

A.  That the attention/concentration index scores cannot be

considered to be statistically different.  That there is no

malingering pattern evident in the Wechsler Memory Scale-Revised

performance.

1  Q.  Going to Dr. Hayes' fourth inference in support of the

2  malingering.

3  A.  The fourth inference was that there was inconsistency in Paul

4  Hardy's performance in performing digit span backwards.  That's

5  where the psychologist or the person doing the testing says, I am

6  going to say some numbers, when I'm finished, I want you to say

7  them backwards; so, for example, if I say 1, 3, you would say 3, 1,

8  or 287, 782.  That there was inconsistency in how many digits he

9  could say backwards or did say backwards from one test

10  administration to another.  So that he did four digits on the

11  WAIS-R and only two digits on one of the administrations of the

12  Wechsler Memory Scale-Revised.  And Dr. Hayes found that

13  inconsistency in performance to point toward a deliberately poor

14  effort.

15  Q.  First, how many times was Paul Hardy tested for digits, on

16  digit span backwards?

17  A.  Well, in terms of his total digit span testing, the digit spans

18  are a part of both the WAIS-R and the Wechsler Memory Scale.  Now,

19  as those were administered with Dr. Tetlow, he had a digits

20  forward, that's where you say the numbers and you repeat them just

21  like you heard them, of seven; and digits backwards, he could do

22  four.  Then when tested by Dr. Martell, he did eight forward, and

23  then Dr. Martell gave him the Wechsler Memory Scale and then he

24  could do six forward.

25          And then on backwards, he did six backwards on the WAIS-R

1    and did five backwards on the Wechsler Memory Scale.

2              Then Dr. Bianchini tested him ten days or so after

3    Dr. Martell.  This time he again did eight digits forward like he

4    had done here.

5              Now, so far, all of this performance is pretty

6    consistent, it's all within the standard error of measurement.

7    Then when he is on the Wechsler Memory Scale with Dr. Bianchini, he

8    only does two digits backwards.

9    Q.  Is that the only inconsistency you found in the testing scores?

10   A.  Yes, sir.  All of the other fluctuations, in other words, there

11   is not a statistically-significant difference between eight forward

12   and six forward.  So we've got six, seven, eight going forward.

13   Those are all psychometrically equivalent.  Four, five, six going

14   backwards, those are all psychometrically equivalent.  It wouldn't

15   really be proper to say one is higher than another, all of those

16   are within that error variability.  The two is an outlier, that is,

17   beyond what you would expect to see based on the standard error of

18   measurement.

19   Q.  What is the measure of reliability for these tests?

20   A.  The level of reliability for digit span gives us about a two

21   point change for the subtest as a whole.  Not for each one of the

22   digits forward or backwards, but in the scale score for the whole

23   subtest, it's plus minus two.

24             So, for example, Martell's digit span subtest score of

25   nine, plus minus two, that's the combined, that gives you anywhere

1    from 11 to 17 total points combined going forward and backwards on

2    the WAIS-R.

3           Now, when we look at the reliability of this on the

4    Wechsler Memory Scale, the stability coefficient for that subtest

5    is .77.  That's for the whole subtest.  It would be lower for a

6    single subtest in isolation; in other words, this is for forwards

7    and backwards, your reliability coefficient is going to be lower,

8    it's already marginal; and if all we do is look at digits

9    backwards, it's going to be even lower.

10          Now, the other thing to notice here is that when we point

11   out his performance on digit span here with Bianchini, this is part

12   of that attention/concentration index.  This is part of why his

13   score went down from 80 to 70.  So we're kind of double-dipping.

14   First we talked about this as being fundamental, this is

15   fundamental to that 80-to-70 issue that we're talking about, now

16   it's being raised as its own malingering factor just looking at

17   this performance alone.  So there's a double-dipping issue that

18   we've already considered this in a sense, or at least it overlaps.

19   Q.  So the observations you can make from the data you looked at

20   with regard to the WAIS-R and the WMS-R with regard to the digit

21   span tests?

22   A.  The observations are that his digit span performance forward

23   and backwards is normal and consistent with the exception of one of

24   four performances of digits backwards.  Four times he did digit

25   backwards, this is the outlier.

1           So this is also a subtest that would be remarkably

2     sensitive to distraction or preoccupation.  In other words, if

3     somebody repeats these numbers, if you've got something else on

4     your mind for just a minute, if your concentration lags, you just

5     get two tries at three numbers.  In other words, you did two

6     numbers twice, then we go to three numbers, you miss the first one,

7     immediately we repeat three more numbers; you miss it, we're done.

8           And so if there's a concentration issue that's occurring

9     that lasts 20 seconds, that's long enough for you to produce this

10    kind of performance.

11          Now, the other question that we have is, what's the --

12    again, that's the malingering strategy that has this consistent

13    performance across all of these administrations, and then on the

14    last -- you know, here with Bianchini, we get this one subtest that

15    falls off the table.

16    Q.  What was Dr. Hayes' fifth inference in support of a finding of

17    malingering?

18    A.  The fifth finding is that his MMPI-2 response pattern was

19    inconsistent and that over-reported pathology in an effort to

20    appear more disturbed than he really is.  Now, this is -- and this

21    she is quoting from Dr. Martell, from Dr. Martell's report.

22    Dr. Martell administered the MMPI-2.  This was Martell's

23    interpretation, Dr. Martell's interpretation of the validity scale

24    pattern.  Dr. Martell's MMPI is also unavailable to review,

25    scrutinize.  He doesn't describe the T scores that gave rise to

1  this interpretation.  And so it's not available to test this.

2          In fairness, his MMPI response pattern on the

3  administrations that were given by Dr. Tetlow also reflect some

4  questions about how he is responding to this test.

5  Q.  First -- so Paul Hardy was given the MMPI twice?

6  A.  Three times.

7  Q.  Three times.

8  A.  Excuse me, three times.  There were three administrations of

9  the MMPI in February and March of 1996.

10  Q.  And what scale do you have to rely on to make the finding that

11  was made by Dr. Martell and by Dr. Hayes?

12  A.  That would be a finding that his F scale was elevated.

13  Q.  Can you explain the F scale?

14  A.  Yes, sir.  The F scale is comprised of 60 items on the MMPI

15  that were endorsed infrequently by the standardization sample.  In

16  other words, 10 percent of the standardization sample or less,

17  said, yes, that item is like me.  The MMPI is a test of 560 odd

18  items that the person bubbles in, true, this is true or mostly true

19  about me; or false, this is false or mostly false about me.  Of

20  those, 60 of those items comprised a validity scale that gives you

21  some idea of how this person is responding to the test and are they

22  responding in a way that is unusual.

23          Now, that unusual score, if somebody elevates the Scale F

24  on the MMPI, there are a number of different interpretations about

25  what that can mean.  Including one of them, that it is

1  over-reporting pathology in an attempt to appear more disturbed

2  than he is.  That's one of the interpretive possibilities.  It's

3  not the only one, but it's one of them.

4  Q.  And so what were -- with regard to the MMPI-2 testing with

5  regard to Paul Hardy, what were the F scale scores on the different

6  testings?

7  A.  On February 26th, 1996, he was given the MMPI, and he obtained

8  a T score of 92 on Scale F, that's four standard deviations above

9  the mean, that's a very elevated scale score.

10      Now, as we looked at his total profile elevation across

11  the clinical scales, that average profile elevation was 58.5.  In

12  other words, part of what we're interested in here is, as he

13  elevates Scale F, is that also elevating the clinical scales so

14  that he is appearing or is saying that he is more psychologically

15  disturbed than he is.

16      So the first time he gets the test he scores -- the F

17  scale is very elevated, average profile elevation is 58.  He gets

18  it again two days later.  This time his T score on Scale F is 76.

19  Even though his F scale has gone down significantly, the average

20  profile elevation is unchanged; in other words, it's not affecting

21  these clinical scales, it is affecting the infrequency.

22      Then we have Dr. Martell's administration on either the

23  22nd or the 23rd of March, and Dr. Martell reports this is

24  elevated, but the file data is unavailable for review.

25  Q.  Are there any, in your opinion, problems with the validity of

1    administering the MMPI-2 to Paul Hardy?

2    A.  Yes, sir, there are.

3    Q.  And what are those?

4    A.  First, that the MMPI-2 requires an 8th grade reading level to

5    comprehend the content of all of the items and respond to them

6    appropriately.  That's what the manual for administration scoring

7    describes that accompanies the MMPI-2.  So it requires an 8th grade

8    reading level.

9         When he was given the Wide Range Achievement Test-Revised

10    in February of 1996, he demonstrated a reading recognition score --

11    that's not a reading comprehension score, it's just what words he

12    can recognize -- that was equivalent to the 5th grade.

13         Then Dr. Swanson gave him a Kaufman Test of Educational

14    Achievement, Brief Form, Second Edition, in March of 2008, and he

15    demonstrated a reading comprehension grade equivalent of 6th grade,

16    one month.

17         So both, when measured in '96 for reading recognition and

18    by Dr. Swanson for reading comprehension, he doesn't have

19    sufficient reading ability to take this test.

20         Now, the inconsistency, then, that he shows in

21    responding, the elevations on Scale F, may then be associated with

22    reading or comprehension problems and/or with inattention, as he is

23    finding the material to be difficult.

24    Q.  Now, are -- so, in essence, to take the MMPI you need to be

25    able to read at an 8th grade level?

1    A.  That's correct.  Conceivably, if you were of normal

2    intelligence but simply couldn't read or were blind, it could be

3    read to you or you could get a tape-recorded administration of it.

4            But in terms of reading it and taking it himself, if he

5    does not have an 8th grade reading level, then the results of this

6    are going to significantly lose validity, and you are not going to

7    be so surprised to find elevations on Scale F.

8    Q.  Are you aware of any test that has ever been administered to

9    Paul Hardy that indicates that Paul Hardy reads at an 8th grade

10   level or above?

11   A.  Yes, sir.  There is a single test at Terre Haute in 2000, is of

12   Paul Hardy's BOP file, there is a single page printout that

13   identifies the use of an ABLE test, a reading comprehension test,

14   where he scores at a -- if I am interpreting it appropriately, that

15   he scores at a 13th grade level.  In other words, that he scores as

16   a college freshman in his reading capability.  Now, this is a score

17   that I had hoped to speak to somebody at Terre Haute about to find

18   out more about how that test is administered and under what

19   conditions.  And it's an untimed test, so it has the potential of

20   being left with the inmate to complete in his cell.  On the other

21   hand, it may be proctored by somebody who just sits and looks at

22   him the whole time he takes it.

23           But the conditions under which it is taken and what

24   materials he has and how long he was there with it would be

25   important information in understanding what to do with this very

1    different finding about his reading ability four years after the

2    administration of the WRAT, where he is at a 5th grade level and in

3    four years we've gone to college freshman and then, as Dr. Swanson

4    tests him, back down again.

5    Q.  Have you seen the scoring sheet -- are you familiar with the

6    ABLE test?

7    A.  Yes, sir.  I've not administered it, I've read about it, but I

8    have not administered the test.

9    Q.  How many different levels of the test are there?

10   A.  There are three levels of the test, depending, or -- yes, there

11   are three levels of the test, depending on the person's literacy

12   level.  I think the first one is down around the 4th grade level

13   and then they're staged up from there.

14   Q.  And you haven't seen the scoring sheet for this test?

15   A.  You know, the only thing that I have seen in Dr. Hayes'

16   material, there is a one-page sheet.

17            THE COURT:  Can tell me what volume you're in?

18            THE WITNESS:  Gee, Judge, I took my binders all apart and

19   rearranged them.  This is Bates stamped JH000054 and then there's

20   another Bates stamp that is PH00220.

21            THE COURT:  Go ahead.

22   BY MR. LARSON:

23   Q.  You indicated you didn't know how this was administered to Paul

24   Hardy.  Why would that be important?

25   A.  Well, this is an untimed test.  To administer this with the

1    least amount of inconvenience with the staff, you would drop this

2    off at his cell, he is single cell.  It's untimed, so you can come

3    back later that day --

4            MR. MILLER:  Judge, he is now speculating as to how the

5    test was given.

6            MR. LARSON:  He is an expert, Judge, he's --

7            MR. MILLER:  He may be an expert, but he is still

8    speculating, he doesn't now how it was given.

9    BY MR. LARSON:

10   Q.  Have you attempted to speak with anyone with the Bureau of

11   Prisons to find out how it was administered?

12   A.  Yes, sir.

13   Q.  Were you able to do so?

14   A.  No, sir.  I was declined.  I was told that that required a

15   letter of request from defense counsel and a release of information

16   from Paul Hardy, although that office acknowledged that a release

17   of information had not been provided when the government's expert

18   Dr. Jill Hayes spoke to them --

19           MR. MILLER:  Judge, I guess as Mr. Cunningham drones on,

20   the short answer is he didn't talk to them.  So my question is --

21   my objection --

22           THE COURT:  Stop, stop, stop.  You don't need to

23   volunteer information, and you also don't need to characterize

24   testimony.  So --

25   BY MR. LARSON:

```
 1    Q.  Did you receive an explanation as to why they wouldn't speak
 2    with you?
 3              MR. MILLER:  Objection, irrelevant, Judge.
 4              THE COURT:  That's sustained.
 5    BY MR. LARSON:
 6    Q.  Are the results on this test consistent with any other reading
 7    or achievement tests that have been administered to Paul Hardy?
 8    A.  No, sir.  Not in terms of the reading score.  And most of the
 9    other scores are higher than have been demonstrated as well.
10              Certainly, if, in fact, this does represent 13th grade,
11    then this is very inconsistent with any other assessment that's
12    been done.
13    Q.  And what is the next problem, validity problem, other than
14    being required to read at an 8th grade level, with regard to
15    administering the MMPI-2 to Paul Hardy?
16    A.  The next problem is that you have not cured the issue by simply
17    reading the test aloud to somebody who is of deficient intelligence
18    or having them listen to a tape-recorded edition of the test
19    because the test requires not just that you be able to read but
20    that you be able to conceptually understand the item content.
21              Now, what the test manual says about that is that the
22    item content must be meaningful to the subject given his or her
23    range of life experience.  A more difficult challenge for the very
24    young, the intellectually limited, the learning disabled, the
25    severely culturally deprived, or the recent immigrant to this
```

1   country for whom the meaning of many English idioms may be obscure.

2   Now, these items call for insightful self-reflection, and they make

3   the use of double negatives.  In other words, there is some

4   conceptual complexity to the item content.

5           So it's not simply a matter of, can you read the words,

6   it's also, can you understand the content and engage in that

7   process of self-reflection and sort through the more complex

8   sentence construction.

9   Q.  Are there any problems, validity problems, that relate to the

10  standardization of the MMPI-2?

11  A.  Yes, sir.  As we think about applying this to somebody who is

12  in the borderline to mild MR range, that is quite inconsistent with

13  the group that this test was standardized on.  As we look at that

14  standardization, 73 percent of the MMPI standardization had some

15  college, 73 percent.  Only 5 percent had part high school.  Now,

16  remember that any time that we use an instrument, we're using it to

17  compare a particular person's performance with the group the test

18  was standardized on.

19          So to the extent that the test is standardized on

20  individuals, 73 percent of whom have attended college, as we would

21  apply it to somebody who is in a potentially intellectually

22  deficient zone, there are grave problems with the interpretation

23  that we generate from that.  That's just based on education as a

24  proxy for intelligence.

25          Now, when we look at the meaning, some other issues here,

1    when we look at the meaning of this elevated F scale in light of

2    reading problems and standardization problems, there are a number

3    of different interpretive possibilities that extreme F scale

4    elevations can have.

5    Q.  Down at the bottom of that, you have *Manual for Administration*

6    *and Scoring*, which manual is that?

7    A.  That's the MMPI-2 manual of administration scoring that's

8    provided by the publisher.

9            Among those interpretive possibilities that are

10   identified by the manual when you see extreme F scale elevations,

11   one possibility is that the person is being uncooperative.  That

12   seems less likely here because Paul Hardy is observed to be

13   generally cooperative throughout these assessments.  Another is

14   that he is faking bad.  Another possibility is that he has marginal

15   reading capability.  Another is test resistance, and another is

16   situational stress.

17           So those, as we think about the potential interpretations

18   of this, faking bad is only one of those.  And, obviously, one that

19   needs to be made in light of reading-related issues as well as

20   intellectual status.

21   Q.  What does the MMPI itself say about using it with

22   intellectually-limited people?

23   A.  That would be from that statement that I described a moment ago

24   in terms of, that there are reservations that you have when you use

25   this with somebody who can't understand the results -- I mean,

1  can't understand the questions.  That's what I described a moment

2  ago, that their --

3  Q.  Does the manual itself say it's not to be used with the

4  intellectually limited?

5  A.  Only to the extent that I've described here, that the item

6  content must be meaningful.

7  Q.  Now, what is the problem, the validity problem, with regard to

8  the use of Scale F, jumping back forward to minorities?

9  A.  Well, again, there are some issues about how minorities respond

10  to this test that are different than Caucasian individuals.  And

11  this comes from a paper by Rogers, Sewell and Salekin in 1994, the

12  journal *Assessment*.  And that's that the usefulness of the MMPI-2

13  fake-bad indicators with minorities has not been adequately

14  investigated.  And they give an example of that.

15         For example, on the F scale, 2.7 percent of

16  Anglo-American males score above a T score of 65 on Scale F, but 10

17  percent, four times as many, African Americans males elevate Scale

18  F.  So this is a scale that also is disproportionally -- that there

19  is a -- that you need to take additional care in the interpretation

20  that you give F scale elevations when you're dealing with black

21  males based on this data from Rogers, Sewell and Salekin.

22  Q.  Have any studies indicated that the MMPI is not an appropriate

23  instrument for determining malingering?

24  A.  Yes, sir -- not for determining malingering in mental

25  retardation, and that's the issue here is whether or not this is a

1    useful discriminator for malingering in a mentally-deficient

2    population.

3              This is another practice recommendation that Dr. MacVaugh

4    and I had in this in-press paper as we reviewed the research in

5    this arena:  "The MMPI-2 is not an appropriate instrument for any

6    purpose in the assessment of persons who may be suspected to have

7    mental retardation.  If compelled by the court to administer the

8    MMPI-2," which is existed in some state statutes, "the invalidity

9    of the instrument in this context should be described, as well as

10   the ethical implications related to the misuse of psychological

11   tests."

12   Q.  Who is MacVaugh?

13   A.  MacVaugh is a clinical and forensic psychologist who works with

14   the forensic unit in the state hospital in Mississippi and is part

15   of the task force that is working to develop practice standards for

16   evaluations of mental retardation at capital sentencing with

17   Division 33, and has been active with that.  And a significant part

18   of his evaluations at the state hospital involve Atkins

19   evaluations.

20   Q.  Have any other scholars done research on the use of the MMPI-2

21   as an instrument to determine malingering in this population in

22   this context?

23   A.  Yes, sir.  First, there is no research that demonstrates that

24   the MMPI is reliable in detecting malingering in a mentally

25   retarded or borderline IQ population.  There are no studies that

1    demonstrate that the MMPI-2 is valid for an application for that

2    purpose.  Now, that's why Dr. MacVaugh and I have the conclusion

3    that we have here, that it's not appropriate for any purpose for

4    somebody who is suspected of having mental retardation.

5          Now, we are not the only ones who have come to that

6    conclusion.  Dennis Keyes in a paper in *Mental Retardation* in 2004

7    described:  "In light of the U.S. Supreme Court's ruling in Atkins

8    v. Virginia, the continued vulnerability of those who have mental

9    retardation" --

10         MR. MILLER:  Were all of these articles provided in

11   discovery that we're now relying on, because I don't think we've

12   gotten all of them?

13         MR. LARSON:  They were all part of the exhibits that's in

14   the binders.

15         MR. MILLER:  We'll go over it one by one at lunch, then,

16   because I am not quite sure that we did, your Honor.

17         THE COURT:  Okay.  Go ahead.

18         THE WITNESS:  "The continued vulnerability of those who

19   have mental retardation and are in the criminal justice system, and

20   given the clear warnings in the MMPI manual, the courts must

21   realize that using a test such as the MMPI to determine malingering

22   is an egregious error and certainly one that does not serve the

23   purpose of justice, particularly for people who have mental

24   retardation."

25         There is another paper by Greenspan that comes to a

1    similar conclusion.

2    BY MR. LARSON:

3    Q.   Who is D.W. Keyes?

4    A.   Dennis Keyes is a university professor on the East Coast, I

5    believe in Charleston, but I don't know for sure.  He is a

6    well-recognized mental retardation scholar.

7    Q.   And what were your final conclusions with regard to Dr. Hayes'

8    fifth inference in support of malingering regarding the MMPI-2?

9    A.   Well, first in terms of psychometric data and observation, the

10   MMPI-2 requires a higher reading ability than demonstrated by Paul

11   Hardy; the MMPI-2 has not been standardized on persons of low

12   intellectual ability; elevations on Scale F may be associated with

13   a number of factors other than malingering, including race; the

14   MMPI has not been validated to assess malingered mental

15   retardation.

16            And so the alternative hypothesis that I believe is more

17   supported is that elevations on Scale F cannot be reliably

18   attributed to malingering.

19            THE COURT:  It's 12:45, are you about to go to No. 6?

20            MR. LARSON:  I am about to go to No. 6, yes.

21            THE COURT:  Let's take a break for lunch.  The government

22   knows the lay of the land, so an hour is okay for you all.  There

23   are a couple of restaurants, there is one right behind the Hale

24   Boggs building right across the street in the Texaco building and

25   there's one right across Lafayette Square.

1           MR. LARSON:  We're just going to the -- we've had food

2    delivered over.

3           THE COURT:  To the attorney conference center, okay.

4           MR. LARSON:  To the attorney conference center.

5           THE COURT:  So is an hour adequate?

6           MR. LARSON:  -- until two o'clock, does that work, an

7    hour and ten minutes?

8           THE COURT:  All right.  We'll come back at two o'clock.

9    We will recess until two o'clock.

10          THE DEPUTY CLERK:  All rise.

11       (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

12

13                    P R O C E E D I N G S

14                      (AFTERNOON SESSION)

15

16       (OPEN COURT.)

17          THE DEPUTY CLERK:  All rise.

18          THE COURT:  All right.

19   BY MR. LARSON:

20   Q.  Dr. Cunningham, with regard to Dr. Hayes' inferences of support

21   of malingering, what was the sixth inference that she used to

22   draw -- to support her conclusion that Paul Hardy was malingering

23   on his two IQ tests?

24   A.  The sixth inference was that the MCMI-II, that stands for

25   Millon Clinical Multiaxial Inventory-II, which is a personality

1    test, administered in February 1996 indicated, among other

2    hypotheses, a tendency to magnify psychological difficulties.

3    Q.  What exactly is the MCMI-II, you said it was the Millon --

4    A.  Clinical Multiaxial Inventory, Second Edition.  This is a

5    personality test that the -- again, it's a self-report measure that

6    the person would read and identify the extent to which a particular

7    item applies to them as opposed to a true or false.  It requires --

8    and it's used to identify personality characteristics.  There are

9    clinical scales on it, but its value as compared to the MMPI is

10   more in terms of identifying different types of personality

11   disorders.

12   Q.  So a person takes the test and they check whether they think

13   that something agree -- they agree that this applies to them or

14   that it doesn't apply to them?

15   A.  That's correct.  But on a gradient.

16   Q.  Okay.

17   A.  Some of it doesn't apply at all, kind of applies, really

18   applies, that kind of thing.

19   Q.  It always applies, that kind of thing?

20   A.  That's right.

21   Q.  Who administered this test?

22   A.  This was administered by Dr. Tetlow.

23   Q.  And what are the problems with the validity of this test as an

24   indication of malingering that you could identify?

25   A.  Well, particularly as an indication of malingering in a

1    potential MR case with somebody of deficient intelligence, that's

2    the real issue, and the problems in that arena are, similar to the

3    MMPI, the MCMI-II also requires an 8th grade reading level, that's

4    described on page 188 of the manual.

5         There's no description of persons with mental retardation

6    in the standardization sample.  Nor is this instrument really

7    designed -- it isn't designed to be used as a malingering measure,

8    it's used to identify psychological disorders and disturbed

9    personality characteristics in a clinical sample.

10        Another problem is that blacks represented only 6.9

11   percent of the standardization sample.  In other words, there were

12   only 89 black Americans in the standardization sample, and so that

13   may be inadequate to identify different ways that these individuals

14   respond, particularly to the validity scales.

15        It also uses a rather convoluted scoring system.  The

16   MMPI is based on T scores, which have a mean of 50 and a standard

17   deviation of ten.  So the interpretation is pretty straightforward.

18   The MCMI doesn't use that, it uses something called a BR or Base

19   Rate score.

20        And so if somebody scores 75, it means this is kind of

21   descriptive of them, that characteristic; if they score an 85, it's

22   identified as really characteristic, but you don't know exactly how

23   they get to a 75 or 85.  It has to be computer scored.  And so it's

24   based on algorithms, which are the actuarial combination of

25   different items to produce a scale score, only the person

1    administering it doesn't have any knowledge of what went into it to

2    create an elevation on that scale.  And so it's kind of a black box

3    in that way, that you plug the answers in to one side and you get

4    the results out the other side, but you don't know what's happening

5    in the middle or very much about who it would apply to and why.

6    Q.  Are you aware of any research regarding the relationship

7    between scores on this test and malingering in the field of mental

8    retardation -- on mental retardation tests or IQ tests?

9    A.  To my knowledge, there is not a single study that purports that

10   the MCMI predicts malingering in the assessment of mental

11   retardation or even that it's been used to try to see if it does.

12   There is simply no research with this instrument on that issue.

13   Q.  Based on your review of these things, what conclusions did you

14   draw with regard to Dr. Hayes' sixth inference in support of

15   malingering?

16   A.  In terms of psychometric data and observations, it requires a

17   higher reading level than Hardy -- Mr. Hardy's demonstrated

18   anywhere, except at Terre Haute in 2000 on the ABLE; it's not been

19   standardized on persons of deficient intellectual ability; there is

20   no research on how this applies to malingered mental retardation;

21   and it has an obscure interpretive system that is an additional

22   challenge as we're using it off label.  And off label means with

23   somebody who is black with MR in the mix.

24   Q.  And so did you develop an alternative hypothesis for the scores

25   that Paul Hardy showed on this test?

1    A.  Yes, sir.  That his elevation on the Debasement scale, which is

2    what this interpretation would be based on, cannot be reliably

3    interpreted for Paul Hardy, and that for that reason, it has an

4    unknown association to malingered MR.  We don't know what it means

5    about him when he elevates that scale.

6    Q.  What was Dr. Hayes' seventh inference in support of

7    malingering?

8    A.  The seventh inference was that he has provided -- and I doubled

9    up on the "in" -- inconsistent histories on two occasions, in terms

10    of reporting head injuries and also in reporting his school

11    attendance.

12    Q.  And what were your findings with regard to this inference?

13    A.  In terms of observations and data, intact persons, people of

14    normal intelligence who don't have any particular agenda pretty

15    regularly provide histories with inconsistent detail.  Now, that

16    may be that they go in one time to the doctor and they give a

17    certain history and another time when they go in they remember some

18    other things that happened that they had not thought of the first

19    time or maybe they forget to mention some things, that

20    inconsistency doesn't have to have any particular agenda attached

21    to it.  That's something that happens.

22         The second point, mental deficiency presents an

23    additional challenge in providing accurate history, because, by

24    definition, we're going to expect that these individuals don't

25    bring quite as much full memory recall sorting through the files,

1  effectiveness in bringing it up on demand, that they may have

2  additional challenges in that way.

3         Now, it also depends, for example, when we talk about

4  varying reports of whether he was often absent from school.  If, as

5  the question is being asked, Paul Hardy is thinking of his

6  elementary school years, then it may be that he was in class

7  routinely.  But if we are talking about junior high or high school,

8  he wasn't.  So it also depends on, as the question is being asked,

9  what is Paul Hardy thinking, which portion of his history is he

10 addressing.  That's particularly important depending on the

11 specificity of the questions.

12        So, for example, he says, I didn't miss school very

13 often, let me break that down.  Let's start out with elementary

14 school.  Tell me about your attendance or what might cause you to

15 miss school in elementary.  Moves or things going on at home or

16 illnesses.  All right.  Now let's go to middle school.  Now tell me

17 about middle school.  Now tell me about high school.

18        Now, if in response to pretty specific probing that is

19 time focused, he gives two very different reports about whether he

20 was in class, tells one guy, I was skipping high school all the

21 time, and somebody else he said, I had perfect attendance, then

22 that is going to be meaningful for some purpose, either that he is

23 a very unreliable historian just because he is or that there is

24 some agenda going on.  But a different response to a passing

25 question about school I don't think has substantial meaning to it.

1          One of the sources of this, as I recall, about the head

2     injuries was in a jail examination, which is a setting, based on my

3     experience, where the examinations and the inquiries are often

4     pretty rapid and superficial, and the quality of history that's

5     obtained in those kind of settings is often incomplete.  So I

6     simply find there to be a number of factors that influence that

7     instability of the report.  And also don't see a clear agenda

8     again, that would drive there being some larger purpose to the

9     inconsistency.

10         So the alternative hypothesis that I think has more to

11     support it is that isolated instances of inconsistent historical

12     detail are of little diagnostic value, even for general veracity,

13     for whether this person is somebody who mostly tells the truth, and

14     have an even more remote linkage to malingering mental retardation.

15     Q.  What was Dr. Hayes' eighth inference in support of malingering?

16     A.  The eighth inference is that there was inconsistency in being

17     able to count backwards from 100 by 7s.  In other words, that he

18     told Dr. Swanson that he could not do this and he did some

19     variation of this with Dr. Hayes.

20         Now, the task is a pretty standard task as part of a

21     mental status examination, it's called serial sevens, and the task

22     is, I want you to start at 100 and subtract backwards by seven as

23     rapidly and as accurately as you can.  And so the person ideally

24     would say 93, 86, 79, 72, 65, 58, 51, 44, and so on down to zero.

25         And you're measuring and evaluating their, not just their

1    arithmetic facility but their speed of mental processing, their

2    ability to hold a number in mind while they subtract, each time

3    ending up in a different place.  In other words, it's not a

4    repeating function until you get about halfway through.

5    Q.  First -- and Dr. Hayes was comparing the performance on this

6    test with whom?

7    A.  With Dr. Swanson.  When Dr. Swanson had asked Paul Hardy to do

8    this task, her report reflects that he said that he could not and

9    so that's what she reported, that he was unable to do this.

10   Q.  First, was he actually able to perform this test with

11   Dr. Hayes?

12   A.  No, sir, not in the way that I just demonstrated.  What

13   actually happened is that he used his fingers.

14   Q.  If we could stop right there.  Is this on the video clip of

15   Dr. Hayes?

16   A.  Yes, sir.

17             MR. LARSON:  Do we have that available?

18      (WHEREUPON, THE VIDEO CLIP WAS PLAYED.)

19   BY MR. LARSON:

20   Q.  Is that, in fact, a proper way to administer that test?

21   A.  It's not serial sevens in the way that it would typically be

22   administered.  It's not that it's without diagnostic value.  In

23   other words, as you ask somebody to do this, it's giving you a lot

24   of information, first about their cooperation, that they're going

25   to try to do this with whatever mechanism they can, paper or

123

1    fingers, and so it stands for the proposition they're trying to

2    figure out how to respond and actually perform, that he requires

3    his fingers actually represents serial ones totalling in seven, not

4    that he has subtracted by sevens, so it certainly also points to

5    the concreteness of the cognitive thought processes that are

6    required in order to perform this.

7            To say that he successfully performed serial sevens like

8    this whereas -- and then point out that that represents somehow a

9    discrepancy from someone who had asked somebody to perform the

10   typical serial sevens, which is subtract backwards by seven and as

11   rapidly as you can, this, in fact, does not represent he can do it

12   for one person and he couldn't do it for another.  It represents

13   that he was allowed to do serial ones.

14           Now, the other variation is, the maximum test of this is

15   not that you keep reminding the person now subtract seven more or

16   that you were at 72.  That's part of the task, for them to keep in

17   their mind, for him to keep in his mind himself what number he is

18   on and what he's supposed to do next.

19           Now, a variation on this task, if you're trying to do

20   something besides just demonstrate that under some possible way he

21   manages to subtract backwards by seven, then you might say, let's

22   try this again.  This time fold your hands for me and do it

23   silently in your head and let's subtract backwards from 104 by six

24   and see what happens.  To see if, in fact, there is that capability

25   to actually do this as a mental process without the concrete

1    reliance.

2            Now, I would also expect this kind of performance where

3    he is counting on his fingers would either be cited by the

4    psychologist as evidence of concreteness of processing that is

5    consistent with mental retardation, number one; or to say, this guy

6    put on a real academy award performance for me because he can

7    subtract backwards and forwards and he put on this show about

8    having to use his fingers and do it one by one, serial ones, times

9    seven.

10            So it would seem to be relevant to cite for one of those

11   two propositions, but to treat it as if this is an intact mental

12   status performance of serial seven and to point out a discrepancy

13   with another examiner who expected him to do it in his head, that,

14   I think, is not a legitimate differential of what the task was.

15   Q.  What was Dr. Hayes' ninth inference in support of malingering?

16   A.  The ninth inference was the inconsistency in knowledge of state

17   political figures that Mr. Hardy displayed in terms of knowing who

18   those individuals were, you know, mayor, governor, that kind of

19   thing, when Dr. Swanson asked him, as opposed to being able to

20   detail those individuals and more when Dr. Hayes inquired about

21   that.

22   Q.  In your review of the data, what did you find?

23   A.  Well, absolutely his knowledge base of who various political

24   figures are was much better with Hayes than it was with Swanson,

25   there is no question of that.  A critical issue that was not

1    inquired about by Dr. Hayes is how did he come to be informed.  The

2    follow-up question is not -- I mean, it isn't simply enough that he

3    knows a lot more people now than he knew back here and so kind of

4    an, aha, this is a discrepancy.  Instead the issue is, what's

5    happening here, how did he come to know this.

6         And so the follow-up question is, that's interesting, how

7    did you become so politically aware?  It might be the person would

8    say, well, Dr. Swanson asked me those same questions and I made a

9    point to go back to the unit and ask other people, and I went over

10   it again and again until I could say it.  Or he might say, you

11   know, I got a new cellie and all he does is listen to political

12   talk radio and he talks about it all the time.  Or he might say,

13   I've been reading *The Nation* and, you know, I keep up with this, I

14   know all about these guys.

15        And so based on what he told you about that, then it

16   would provide you with qualitative information.  This is a critical

17   issue in the assessment of mild mental retardation because

18   individuals with mild mental retardation broadly do most of the

19   same things that people who are not mildly mentally retarded do.

20   It's a question of qualitative differences, not do they do it or

21   not.

22        And that's why it's so important to make additional

23   inquiries in each of these instances about how -- for example,

24   here, how did you come to know that?  Tell me more about that,

25   explain that to me, I don't think I understand that.  That you seek

1    additional qualitative detail that will help illuminate the nature

2    of this person's functioning and what they know and don't know.

3    Q.  Can you articulate a malingering strategy that would cause

4    somebody who was feigning mental retardation to do poorly with a

5    defense expert and do well with a government expert?

6    A.  No, sir.  I can't identify a malingering strategy that would

7    prompt that difference.

8    Q.  What was Dr. Hayes' tenth inference in support of her finding

9    of malingering?

10   A.  The tenth inference is that there was inconsistency in the

11   interpretation of proverbs as you would compare Swanson,

12   Dr. Swanson to Dr. Hayes.  In other words, with Dr. Swanson, his

13   proverb interpretation performance was poor, but with Dr. Hayes he

14   made some abstraction of what she described as proverbs.

15   Q.  When you looked closely at the data on which Dr. Hayes based

16   her conclusion or her inference that supported a finding of

17   malingering, what did you find?

18   A.  Well, there was a different standard of the task.  One of what

19   Dr. Hayes represented as a proverb I think is more properly

20   characterized as an idiom.  She asked him, well, what does it mean

21   "kick the bucket."  Well, that's really not a proverb, that doesn't

22   have a moral lesson to it or a philosophical understanding, which

23   is what proverbs represent.  This is an idiom, you know, of which

24   there are many in our culture.  If you refer to an elderly female

25   as an old bag, well, that's an idiom, it's not a proverb.  That

1       requires some minimal familiarity with it, but it's not a proverb.

2              Now, the other proverb that she offered him, which is a

3       proverb, is that "blood is thicker than water."  Now, the truth is,

4       he only partially abstracted this.  What he said was "brothers

5       gonna stick together," and that captures the notion that family

6       members have some loyalty to each other, but the blood is thicker

7       than water proverb stands for the proposition not just that

8       brothers gonna stick together, but if you're in a contest with

9       family members and you're not a blood relative, you are likely in

10      the end to come out on the losing end of this thing, that

11      ultimately, those family relationships are going to override these

12      other, you know, simply the civil or friendship relationships.

13             Now, in fact, Mr. Hardy's proverb performance has been

14      pretty consistent across administrations.  I asked him proverbs

15      when I evaluated him back in 1996, and as I recall, he was able to

16      abstract one of the three that I gave him.  When I said "don't cry

17      over spilt milk," he could describe that but he couldn't get two

18      other proverbs I asked him.

19             When Bianchini gave him proverbs as part of his

20      examination, as I recall, he may have again been able to get the

21      simplest one but was not able to adequately abstract the several

22      after that.

23             And so as we look at what Dr. Hayes is representing as an

24      inconsistency, the reality is, there is consistency in how he has

25      responded to proverbs, she has simply used, particularly in the

1    first instance, what is not properly a proverb and has made an

2    unfair comparison to the task that he was provided by Dr. Swanson.

3            Now, here is also part of what you have to be careful of

4    with things like proverbs that you just make up as part of a mental

5    status exam and that is that they're not standardized.  In other

6    words, I am offering this only to get the grossest kind of idea

7    about whether this person can abstract.  I don't have data that

8    says what percentage of people will be able to adequately abstract

9    whether blood is thicker than water.

10           Now, when I use one proverb and somebody else says

11   another, offers -- another clinician offers another proverb, and

12   they perform this one for me but they're not able to do this one

13   over here for this guy, that doesn't mean they're trying to

14   manipulate their performance.  It may well mean that those two

15   proverbs are very different in the extent of which they are known

16   in the community or in their complexity in terms of somebody being

17   able to abstract them.  So it's a faulty conclusion with

18   unstandardized data in addition.

19   Q.  What was Dr. Hayes' eleventh inference in support of her

20   finding of malingering?

21   A.  The eleventh inference was that there was inconsistency in

22   performance on the memory measures between the Wechsler Memory

23   Scale-Revised as compared to the Neurobehavioral Cognitive Status

24   Examination.

25   Q.  What is the -- and that's abbreviated NCSE?

1    A.  Yes, sir, that's correct.

2    Q.  And what is the NCSE?

3    A.  It is a structured test of cognitive functioning, it's a

4    screening test, it accesses 11 areas in a very simple way.  This is

5    part of Dr. Bianchini's evaluation.

6           Each scale has a single screening item that is considered

7    to be the most difficult.  If the person passes that, the other

8    questions on that item are not even asked.  Now, it can be

9    completed in 10 to 20 minutes, and so it's brief enough to be

10   administered bedside in a clinical setting.

11          This is a very gross screen about neurocognitive

12   functioning.  One of the items on it relates to memory, and so

13   you've got a gross screen with now a single item that you may be

14   using to compare.  Unfortunately, this test has very poor

15   specificity.

16   Q.  What does that mean?

17   A.  That means that half of the people who took it who did not have

18   anything wrong with their brain failed the test in some portion.

19   So, in other words, this is not a very good discriminator of who

20   has brain impairment and who doesn't.  The test-retest reliability

21   is not good, and it has very poor inter-rater reliability, which

22   means when you have two different people give it, two different

23   administrators, not two different patients, but when different

24   evaluators administer this, they get very different results.  And

25   so it has very poor inter-rater reliability.

1    Q.  Now, the measures of reliability down there, the Kappa, that's

2    a measure of reliability?

3    A.  Yes, sir.

4    Q.  What would perfect reliability be?

5    A.  That would be one.

6    Q.  And what would random chance be?

7    A.  Zero.

8    Q.  Zero.

9    A.  So these range from zero to one.  And on a test, a reliability

10   score of 57, .57 is poor.

11            Now, look at the double problem.  We already saw that the

12   WMS-R has real reliability problems.  Now we've got the

13   Neurocognitive Status Evaluation, its reliability problems are far

14   more grave than the Wechsler Memory Scale, and an inference is

15   being drawn that these two very unreliable instruments are,

16   particularly with the NCSE, that the difference in performance

17   between the two is meaningful in terms of inferring malingering.

18   It is -- it's an inference that ignores the reliability components

19   of these tasks and what, and again, what kind of standard error of

20   measurement you might expect to see particularly from one task to

21   the other.

22   Q.  And with regard to this eleventh inference, what were your

23   observations about the data, and finally, your conclusions from

24   those observations?

25   A.  Again, the Wechsler Memory Scale has low reliability

1    coefficients and significant standard errors of measurement,

2    estimation and prediction; the NCSE is a brief screening measure

3    broadly assessing cognitive functioning.  Its specificity and

4    inter-rater reliability are poor.

5          So the alternative and I think the more compelling

6    hypothesis than saying this points to malingering is that, when

7    comparing scores from tests that each have limited reliability and

8    which may be measuring different capabilities, not even tapping in

9    to quite the same memory functions, differences may reflect nothing

10   more than instrument imprecision rather than malingering.

11   Q.  What was Dr. Hayes' twelfth inference in support of her

12   conclusion of malingering?

13   A.  The twelfth is that the assessment of effort and malingering

14   that was done at the time of the evaluation of Mr. Hardy back in

15   1996 that was done by Dr. Bianchini and also by Dr. Martell, that

16   those malingering detection instruments had not been proven

17   effective in mentally retarded populations or had not yet been

18   evaluated with those populations.  In other words, she is saying,

19   okay, he did well on those malingering detection instruments,

20   except those had not been validated on an MR population so they

21   should not be considered.

22   Q.  Okay.  Let me back up now.  We're talking about Paul Hardy

23   malingering on two tests in 1996; am I correct?

24   A.  That's the issue, was he malingering on the examination given

25   by Tetlow and/or Dr. Martell.

1   Q.  And your testimony is that he was actually tested back then to

2   determine whether, in fact, he was malingering at that time?

3   A.  Yes, sir, he was.

4   Q.  And what was he tested with at that time?

5   A.  Well, he was tested with three measures.  Dr. Martell gave him

6   the Dot Counting Test and the Memory for Fifteen Items Test.  And

7   he gave those alongside the IQ test, that WAIS-R that he

8   administered, as well as the rest of the neuropsychological

9   battery.  And, of course, as these are being administered, the

10  evaluator doesn't announce, now I am going to give you something to

11  see if you're trying your best.  Instead, those are introduced

12  right along with the other tests and have a similar quality to

13  them.  They look like these are tests of intellectual functioning.

14  Dr. Bianchini administered the Portland Digit Recognition Test.

15          Now, it is true that these tests have generally not been

16  standardized on a mentally retarded population.  However, that has

17  no impact whatsoever on its significance in demonstrating that Paul

18  Hardy is making good effort and is not malingering, and here is

19  why:  These are tests that generally the individual is expected to

20  get almost all of them right.  They look hard but they're not.

21          So let's say that a, let's say a perfect score is a score

22  of 50, and you would really begin to wonder about this person's

23  effort if they score below 40.  Now a person who is mentally

24  retarded takes it and they get a 35.  Now you're not quite sure

25  what you have.  Did they score a 35 because they're not trying hard

1    or did they score a 35 because they're mentally retarded?  So you

2    don't know quite what meaning to take from that.

3         On the other hand, if the mentally retarded person takes

4    it and they score a 50, it shows that they're mentally retarded --

5    irregardless of mental retardation, they're trying hard, that's

6    what this test shows, they're making good effort on this test, they

7    aren't suppressing their performance.

8         And so is it -- any reservations there are about the

9    usefulness of these tests with, in looking at whether mental

10   retardation is being malingered, is not how does somebody -- is not

11   about good scores, it's about how to interpret poor scores.

12        Now, the other issue is that if, in fact, it's Dr. Hayes'

13   position that Paul Hardy is not mentally retarded, then there's no

14   reservations about using these tests at all, except that they

15   demonstrate he was making good effort, so he is not a mentally

16   retarded person as she classifies him, makes him eligible for these

17   tests without reservation on either end, a good performance or bad

18   performance, then he does well.  Somehow that's not attributed as a

19   factor that makes us back off of a malingering conclusion.

20        The other thing that is a little disconcerting is, these

21   tests are specifically designed for malingering.  There's data to

22   support their usefulness in that way.  There's even some, again,

23   it's even useful in MR except when the person does poorly.  There's

24   no data demonstrating the MMPI has any malingering value for

25   malingering, for mental retardation; there is no indication the

1    MCMI-II has any value as a malingering detection instrument of

2    mental retardation and no research.  Those tests, though, get an

3    inference pointing toward mental retardation.

4            Now the very tests that speaks specifically to

5    malingering of cognitive effort, they're set aside because we don't

6    have research on an MR population with them.

7    Q.  And what was -- so what was your ultimate conclusion with

8    regard to the use of these instruments to support a finding of

9    malingering?

10   A.  Both Dr. Bianchini and Dr. Martell described that there is no

11   evidence of malingering on the Dot Counting Test or the Memory For

12   Fifteen Items Test, that's Martell, or the Portland Digit

13   Recognition Test, that's Bianchini.  These tests appear to the

14   examinee to be measures of memory and cognitive function.  They

15   have a specific nexus to cognitive performance as opposed to the

16   personality test where it's kind of an inference.  These tests are

17   informative in MR assessments when the performance on them is good.

18   And certainly, this cognitive effort testing is far more reliable

19   than the indirect inferences you would try to draw from the MMPI-2

20   or the MCMI-II.

21           The alternative hypothesis that I think is a more

22   compelling explanation is that tests designed to measure effort all

23   showed good effort during both assessments with Paul Hardy.  This

24   performance is inconsistent with an attempt to malinger mental

25   retardation.

1  Q.  And what was Dr. Hayes' thirteenth and final inference in

2  support of malingering?

3  A.  The thirteenth inference is that malingering should be strongly

4  suspected when certain factors are present.  And that, in fact, is

5  what's described by the DSM-IV.

6  Q.  And the DSM-IV-TR tells you that you should strongly suspect

7  malingering when certain factors are present?

8  A.  Yes, sir, that's correct.

9  Q.  And what factors are those?

10  A.  Those are reflected here, four factors:  A medicolegal context,

11  marked discrepancy between claimed disability and objective

12  findings, lack of cooperation, and presence of antisocial

13  personality disorder.

14  Q.  Which of those did you find to be present in this context?

15  A.  Well, as we would look at an Atkins determination, the

16  capital-charged defendant, some of these are built-in in every

17  case.  There is always a medicolegal context in all capital MR

18  cases.  Our -- the task is to do this assessment in that context.

19          Now, there's also medicolegal context in any instance

20  that someone has, you know, they're in a car accident and they have

21  a massive head injury or they are injured in any other way.  That

22  is also a medical-legal context.  That doesn't mean that that

23  person's injuries are presumed to be fabricated, it means there is

24  an additional level of scrutiny that's brought to bear because it's

25  recognized there is some secondary gaining potential.  But this is

present in all cases that forensic medical or psychological folks
are called on to evaluate.

        The second marked discrepancy between claimed disability
and objective findings, there are some inconsistencies in
Mr. Hardy's presentation, they tend to be more minor in most
instances and no marked discrepancies.  Certainly his interview
behaviors were consistent with the testing that was done with him.

        The most significant discrepancy in the record is the
ABLE score out of Terre Haute, the reading level score, that's the
most significant discrepancy of any of the test data.

        Number three, lack of cooperation.  Mr. Hardy has been
cooperative during multiple extended assessments.  There is no
indication of lack of cooperation.

        The presence of antisocial personality disorder.  Again,
significant antisocial personality traits are going to be present
in virtually all capital defendants, and that includes capital MR
defendants.  About 75 percent of the inmates in prison qualify for
a diagnosis of antisocial personality disorder, and so that again
is kind of a given, that's sort of a starting place in doing
evaluations of inmates or of capital inmates.  It doesn't mean that
this is evidence of malingering, it means we're in a context where
there is secondary gain and an evaluation has to be made in spite
of it.

Q.  What were your ultimate conclusions with regard to this
thirteenth inference by Dr. Hayes?

1  A.  Well, of those suspicion index factors that there are not --

2  none are present beyond what you would see in any other capital MR

3  case, and that's the medical-legal context and antisocial

4  personality traits.  The other two, the lack of cooperation or the

5  marked discrepancy, those are not particularly impressive as being

6  present.

7       Now, the strong suspicion or strongly suspected is tested

8  with multiple assessments, effort testing, records review,

9  third-party interviews, that's what you do to test that skepticism.

10 And so the alternative hypothesis is, of course, that forensic

11 skepticism should be maintained in examining the data.  And that

12 the determination of whether Paul Hardy is a mentally retarded

13 person should be directed toward the data and not his status of

14 being a capital inmate particularly.

15 Q.  And so taking these 13 inferences that you identified in

16 Dr. Hayes' report as supporting the conclusion she reached that he

17 was, in fact, malingering on his IQ scores, what were your final

18 conclusions regarding those 13 taken collectively?

19 A.  Well, none of these 13 factors has stand-alone validity in

20 supporting a conclusion of malingering.

21      The combination of a number of unreliable inferences

22 doesn't gain validity with their number.  In other words, just

23 because there are 13 of them, all of which don't have stand-alone

24 reliability and may even have important data that contradicts them,

25 the presence of 13 doesn't somehow do something that they couldn't

1    do individually in their stand-alone.

2           I suppose it's, I think of it like alchemy, like trying to

3    turn straw into gold, a bunch of straw is no more productive of

4    gold than just a piece of straw or two, that the amassment of more

5    does not somehow lead to a conclusion that something must be

6    present here.

7           And there's simply inadequate data or logic to set aside

8    Paul Hardy's IQ scores for lack of effort.

9    Q.  We've talked about the inferences that, negating Dr. Hayes'

10   inferences, that she found that support malingering.  Was there any

11   positive evidence that you found that Paul Hardy was, in fact,

12   putting forth good effort when he took these two IQ tests?

13   A.  Yes, sir, there was.

14   Q.  And what was that?

15   A.  Well, his effort and whether he was malingering was directly

16   assessed, and those findings indicated good effort, that's No. 1.

17   No. 2, the testing that he -- the test scores that he obtained,

18   verbal IQ, performance IQ, full scale IQ, were broadly consistent

19   across two administrations of the WAIS-R.  In other words, he was

20   tasked with dialling in a similar performance separated by a month

21   in the midst of many, many tests that he had not had previous

22   exposure to.  That's a task of some complexity to do.

23           Additionally, his Wide Range Achievement Test scores were

24   consistent with the IQ score findings, as well as Dr. Swanson's

25   psychoeducational achievement test scores, those also dialling in

1    pretty similar to the WRAT scores that were obtained 12 or 13 years

2    before.  So there is consistency of testing as it occurs in

3    individually-administered proctored evaluations, that is, that I

4    believe is broadly consistent over time.

5    Q.  In reviewing the interview of Paul Hardy by Dr. Hayes, did you

6    find any examples of him showing good effort with regard to his

7    interview with her?

8    A.  Yes, sir.

9    Q.  And can you give us a couple of specific examples?

10   A.  That he seemed -- he spoke at length, he gave longer answers

11   than sometimes she preferred.  She asked him his kids' birthdays,

12   he told her the dates.  You know, she asked all kinds of things

13   that it would have been remarkably easy for somebody not to know.

14        She asked him about directions and easy for him to say,

15   gee, it's hard for me to find my way around, I can't tell you.

16   Instead, he starts trying to tell her.  Now, it's a disorganized,

17   convoluted story about how you go here and get off here and turn

18   here, it's very difficult to follow, but it is an effort to produce

19   data.  And all of that is speaking to a cooperative stance,

20   particularly as he is offering her more in some instances than

21   apparently he offered to Dr. Swanson.

22   Q.  Did you list some other examples?  I believe it's on page 98,

23   there -- seven, I'm sorry.

24   A.  Yes, sir.  These are not so much demonstrations of cooperation

25   in the interview process, but instead they are interview behaviors

 1    that are consistent with a presentation of mild mental retardation.

 2    In other words, it would give you some sense of consistency that

 3    what I'm seeing on the test is the same thing I am encountering as

 4    I interact with this person.

 5            One example of that is what we've already seen, counting

 6    on his fingers in performing the serial sevens and actually doing

 7    those as serial ones.  Then another instance where, as he is

 8    describing a kilogram, that he demonstrates the size of it as

 9    opposed to saying, well, it's about two and a half pounds.  That,

10    instead, it's a concrete -- this sort of concrete processing is a

11    characteristic of mental deficiency, and that's whether he's --

12    whether concrete processing in terms of his fingers or describing

13    things in terms of their physical form.

14            Even on the directions as he is giving this convoluted

15    story about how to go from his house at the Calliope projects to

16    the church, all he has to do is say, you know, you head down Martin

17    Luther King and you get to Simon Bolivar and you turn right and you

18    go about seven blocks.  It's the same way that Vance Ceaser

19    described directions, that it is street related, distance related

20    and pretty fast on the processing.

21            An interesting thing that Paul did that demonstrated this

22    kind of concrete processing is that when he's talking about the

23    game Cool Cans.  Cool Cans is a game that Paul talked to Dr. Hayes

24    about and then also Vance Ceaser talked to Dr. Hayes about it.  As

25    I understand it, you stack three cans 40 feet apart, there's a

1   batter in front of each one of them, and the idea, I think, is to

2   guard your cans by swinging the bat, and if you can knock the cans

3   down, then you get points.  Well, so Paul has a milk carton in this

4   interview and rather than just describing that, he gets the milk

5   carton to be one of the cans.  Well, that's just a little bit

6   concrete.

7        So the milk carton is still sitting there and pretty soon he

8   is telling the story about Vance finding a medallion on the

9   basketball court and Paul is asking him to give it to him.  And

10  Paul picks up the milk carton to be the medallion and acts like

11  it's being handed.

12       Now, if the milk carton is one of the Cool Cans that's just

13  a little bit concrete.  When you're picking up the milk carton to

14  be the medallion that you're passing, that is a more diagnostic

15  expression of this concrete thinking.

16  Q.  Did you find any other examples in the interview with Dr. Hayes

17  of concrete conceptualizations or responses to questions from

18  Dr. Hayes?

19  A.  Yes, sir.  This first one is concrete processing, and these are

20  some concrete conceptualizations and responses.  Dr. Hayes says,

21  "Did she" -- *she* is talking about Marie Hardy, Paul's mother --

22  "have any psychiatric problems?  Bad nerves?  Depression?"

23  Mr. Hardy said, "Yeah.  She had bad nerves."  And then he has this

24  kind of rambling digression.  Dr. Hayes said:  "You said she had

25  bad nerves, though, what do you mean?  You said worry.  Were there

1    any other --"  Paul Hardy said, "Well, the nerves was -- you know,

2    like sometimes we'll just be jumping on the sofa.  "Y'all cut that

3    out."  And like she'll just -- I don't know.  Like I guess we just

4    got on her nerves, you know."

5         Well, again, it's this concrete notion of nerves being

6    like it's irritating somebody, it's a little too much stimulation,

7    not nerves as a psychiatric condition even though she has framed

8    it, bad nerves, depression.  Even though she's given that kind of

9    psychiatric frame work for it, he is staying it a very concrete

10   level of like just getting on somebody's nerves.

11        There was another one as well.  This one Dr. Hayes says,

12   "OK.  Anybody have a history of like schizophrenia or bipolar

13   disorder?"  Mr. Hardy says, "What is schizophrenia?"  Dr. Hayes

14   says, "It's when you hear voices or see things that aren't there."

15   Mr. Hardy said:  "If they did" -- she says, "Then you didn't know

16   that?  Anybody ever have a nervous breakdown?"  Mr. Hardy says, "My

17   mom did."  Hayes says, "When was that?"  Hardy says, "I don't know

18   the date.  But I know she passed out one day and we thought she was

19   dead.  And my uncle -- I think Wayne was asking her for some ice

20   cream or something was going on.  And she was hollering like and

21   she said something.  And the next thing you know, she was out."

22        Well, Dr. Hayes is talking about a psychiatric condition

23   about -- and she reframes it in a more simplified way, even in the

24   schizophrenia or bipolar disorder, she says, like a nervous

25   breakdown, and his interpretation of that is very concrete, as if

1    that means when you pass out, that that's a nervous breakdown.

2            Now, as Dr. Hayes is providing him with these definitions

3    and breaking it down in more simple ways, she is not responding to

4    him as if he is pulling her leg like, of course you know what

5    schizophrenia is, I don't have to define this for you, was it there

6    or not.  Instead, she is breaking it down and simplifying it for

7    him as if she is responding in the interview to somebody who, in

8    fact, is not very smart.  And even when she breaks it down, he is

9    operating at a concrete level even below that.

10   Q.  Do you have other examples of responses that are consistent

11   with an IQ in the mentally retarded range?

12   A.  Yes, sir.  There was also misuse of terminology.  For example,

13   he said "food stamp dollars" in talking about getting food stamps

14   or those coupons.

15           And then another interesting one, this is when they're

16   talking about football, and he said, "We just pitch and catch."

17   Well, pitch is what you do with a baseball.  Nobody who has played

18   with baseballs and footballs says pitch a football.  You throw a

19   football, you pitch a baseball.  And so this is a misuse of

20   terminology as well, this is misuse.  There are other terms that

21   you would expect him to know that he simply doesn't.

22   Q.  Such as, did you find a lack of familiarity with other

23   terminology that Dr. Hayes was using?

24   A.  Yes, sir.  In terms of his not understanding the terminology

25   that she was using that he didn't understand, schizophrenia or

1   nervous breakdown, that when she asked him about throwing a spiral,

2   he indicated, he was not familiar with that term.  And so then she

3   described, it's when the ball spins in the air.

4          Traumatic experiences, he initially thought that

5   reflected being physically injured like in an automobile accident.

6          Again, my recollection is even though a psychological

7   frame was provided for it.

8          When she used the term whether or not about his

9   discipline, whether he was disciplined when -- that the punishment

10  didn't fit the crime.  Then she followed that up as they were

11  talking about it, the punishment you received and what you did were

12  on par, he didn't track that, either.

13         When she talked about the family business, as I recall,

14  that was in regard to Curtis being in the drug business, she

15  referred to the family business, he didn't track what that was.

16  When she used the word impulsive, he also didn't understand that.

17  When she was asking him about different drugs of abuse, he was not

18  familiar with mushrooms as an illicit drug.  He also didn't

19  understand what she was talking about when she said business

20  arrangement.

21         So there were a number of terms, and this is not an

22  exhaustive list, this was simply ones that I extracted pretty

23  quickly going through the interview transcript where he is not

24  familiar with the terminology that she is using.

25  Q.  Did you find that the nature of his responses to many of her

1    questions, was, in fact, consistent with an IQ in the mental

2    retardation range and not consistent with malingering?

3    A.  Yes, sir.  Again, you want to take care about -- AAMR talks

4    about this as well, you want to be careful not to put too much

5    emphasis on verbal behavior in the diagnosis of MR, because

6    somebody who is a person with mild mental retardation may have

7    surprisingly good verbal facility.  They can talk a good game, it's

8    just the underlying capabilities as they're put into action are not

9    there.

10           That said, as you were getting demonstrations of

11   deficiencies in processing and understandings and in terminology,

12   those then point to the validity of some of your other findings

13   that you've gotten because they're consistent with that.

14   Q.  And did you find any of those types of answers, the rambling

15   circumstantial answers?

16   A.  Yes, sir.  It also reflects some of the problems with sort of

17   linearity of thought that Mr. Hardy is able to maintain.  Hayes --

18   and how he doesn't actually respond on point in many instances.

19           Dr. Hayes says, "OK.  Anybody else that you feel like was

20   a big influence on your life and helped raise you?  It could be a

21   grandma, a grandpa, aunt, uncle, friend, neighbor."  Mr. Hardy

22   says, "Aw, you know, I had people around, but I look at it that you

23   always just going through so much."  Dr. Hayes said, "OK.  Now, I

24   just -- I may ask you questions and the answer may be no."

25   Mr. Hardy says, "All right."  Ms. Hayes, "And that's OK."  Mr Hardy

1    says, "You know, yeah, 'cause, you know, like I was telling a lot

2    of people, that, you know, the project, you know, if anybody ever

3    lived in the project, you know, it's just a bunch of people.  And

4    we might come outside together, sit on the porch or play football

5    or talk, you know, about sports.  Late at night we playing football

6    in the driveway.  Go inside.  Go to sleep.  Next day the same old

7    thing, you know, basically, you know."

8            Now, this is our question up here.  The question was,

9    anybody you felt like was a big influence on your life, and we're

10   specifying family members and potentially a friend or neighbor.

11   And the response that he is giving is not as if he is filibustering

12   or trying to control the interview by not answering but instead

13   what he understands is only kind of -- what the question to be is

14   only obliquely related to what the question is, and so he gives

15   this rambling response that isn't well connected.

16           This is evidence of -- all of these things we've been

17   talking about are evidence of conceptual difficulties and also

18   social communication problems.  In other words, these adaptive

19   behaviors are occurring right here in the interview on videotape,

20   and they're also consistent with the IQ score that has been

21   obtained.

22   Q.  And did you find any examples where Paul Hardy demonstrated

23   difficulty in understanding complex inquiries or complex tasks?

24   A.  Yes, sir.  Again, an excerpt from the interview transcript on

25   page 39.  And this is about -- this is trying to tap into a quality

1    of relationship consideration.  You know, this is a deeper, more

2    complex kind of notion.

3            Dr. Hayes says, "Are you trying to say that even though

4    y'all lived together that you still weren't close?"  And Mr. Hardy

5    says, "My brothers and sisters?"  Dr. Hayes says, "No.  The people

6    in the project."  Hardy says, "Right."  He says, "The people who

7    livid in the --"  Dr. Hayes says, "The people who lived in the

8    project?"  And Mr. Hardy says, "My family also, you know.  I'm

9    trying to explain it right, what I'm trying to say, OK.  I don't

10   wanna talk about my brothers, even though that's OK."

11           So she is trying to direct him toward talking about

12   relationships to people outside of the family, she clarifies it.

13   He's still stuck on this notion even though he asked her about my

14   brothers and sisters and she said no.  He doesn't shift off that

15   task, okay; that's not the issue, we're talking now about something

16   else.  He is still headed in the same direction to say, I really

17   don't want to talk about my brothers, that's painful to me.  She's

18   already said that's not what she is asking, and so he has

19   difficulty tracking the conversation, understanding what's being

20   asked, and then shifting gears to the actual inquiry that's at

21   hand.

22           And in this case, there is more trouble because this

23   isn't, where did you live when, this isn't, what are your kids'

24   birthday, what did you eat for breakfast.  This is calling for,

25   tell me about the quality of relationship you had with the people

1    that lived around you.  And that one he is having a real hard time

2    getting his arms around to answer specifically.

3    Q.  Did you find other examples of this?

4    A.  Yes, sir.  Here is another one from page 57.  Dr. Hayes says,

5    "OK.  Do you know anything about your growing up?  Like did your

6    mama say that you talked on time or walked on time or did she say

7    that you were slow or did she say that you were fast?  Some

8    families say, you know, once he started walking he started running,

9    you know."

10   Q.  Let me stop you right there.  What is that inquiry directed

11   toward, what information is that looking for?

12   A.  Well, it's directed toward developmental milestones.  In other

13   words, for information about whether or not he has information

14   about his own developmental milestones of, you know, crawling,

15   walking, toilet training, talking.  Not that he would remember it

16   but what he has been told about it.

17          This is a problem that we've seen routinely in Dr. Hayes'

18   interview, which is first that she asked yes or no questions and

19   that she'll ask six or seven questions at a time as opposed to, I

20   would like to talk to you about your growing up.  Tell me what you

21   understand about when you began to walk.  Tell me about what you

22   understand about when you began to talk.  Or, what do you know

23   about your early speech, your early talking as a child.

24          And just ask one question and let him answer that, as

25   opposed to a whole series of questions that are yes or no that then

1    require -- this substantially increases the challenge of the task

2    for somebody who is mentally deficient because now they have to

3    keep seven or eight queries in their mind at once and then come to

4    some conclusion.

5    Q.  And how did he respond here, what did he demonstrate by his

6    response here?

7    A.  Well, she is asking about developmental milestones and he says,

8    "Well, no.  She was -- like I said, she would work, you know, to

9    try to buy us clothes, you know."  That has nothing to do with his

10   developmental milestones.  He got your mama, so that part of the

11   question he heard, your mama, and now he responds about his mama.

12   She would work and try to buy us clothes.  Not about, what did your

13   mama tell you about your developmental milestones.

14   Q.  Do people who are mildly mentally retarded frequently lack

15   insight into the emotional experiences of others?

16   A.  And themselves as well, yes, sir.

17   Q.  Did you find any examples of that in the interview of Paul

18   Hardy?

19   A.  Yes, sir, I did.  This is from page 39.  Mr. Hardy said:  "All

20   right.  Like me and Wayne, like I say, we would fight a lot.  Aw,

21   Wayne had his little friend.  I had my friend.  OK.  And we

22   brothers, you know.  We might be outside.  Then we just come inside

23   and that's it.  We never talk about nothing.  You know what I'm

24   saying?  It's strange.  But we never did, you know.  We know we was

25   brothers.  But I can't tell you what he was going through.  He

1    can't tell you what I was going through because we never talked,

2    you know."

3          Now, in fact, well, there are two issues with this.  One

4    of them is that his historical limited intellectual capabilities

5    would be reflected in childhood by not having emotional-related

6    conversations or showing -- having curiosity or interest in the

7    inner-emotional experience of his brother.  And so if those

8    conversations are not occurring as he and Wayne -- Wayne is only a

9    year younger than he is and they're the closest of the two.  If he

10   is not having those kinds of conversations with his brother, that

11   tells you something.

12         Not even in the absence of those conversations, when you

13   live side by side with somebody, you end up knowing a great deal

14   about them and about what affects them and how they feel about

15   things and what's going on with them, whether you have a

16   conversation with them or not.  Simply living side by side and

17   going through the experiences of that household and looking into

18   their face over those years you would have a good deal of

19   information about this other person's feelings.

20         This, then, speaks to two issues:  One, that those

21   conversations were not occurring historically; and two, that he

22   doesn't have the capability to identify the feelings and reactions

23   of somebody else outside of the conversation.

24   Q.  With regard to that interview, and we talked about

25   developmental milestones and how you learn that from your family

1   members, did Paul Hardy indicate whether he actually had knowledge

2   of his own autobiographical history?

3   A.  There were some surprising gaps in that history or at least

4   gaps that, again, are consistent with this kind of mild, a person

5   with mild mental retardation.  He had no knowledge of his

6   developmental milestones as best as could be identified from

7   Dr. Hayes' inquiry.

8           As she was asking him about when various father figures,

9   stepfather figures, were present in his life, he was not able to

10  identify that with anything but the broadest of age ranges.  You

11  contrast the report that he gave about his childhood with

12  Dr. Hayes' interview of Vance Ceaser and what he described about

13  the sequence of events in his childhood and how specific it could

14  be or that many of us could, about what happened about the time we

15  were in 3rd grade or 5th grade or that kind of thing.  He couldn't

16  identify what grades he attended what elementary schools for.

17          There was also a lack of knowledge regarding immediate

18  family members, that he didn't know whether his mother had died of

19  lung cancer or breast cancer.  He didn't know how far his mother

20  went in school.  He didn't know how old he was when his mother

21  stopped seeing Percy Allen.  He was uncertain of what year his

22  siblings were born or what the differences were in their ages.

23          That's really pretty stunning, that he can't -- that he

24  doesn't have a clear recognition even of age differences between

25  the siblings, much less, you know, to be able to state what year

1    they were born.  So those are examples of knowledge gaps in his

2    fund of experience that, again, point to intellectual limitations.

3    Q.  Now, in terms of an alternative hypothesis for, or another

4    explanation for the evidence that Dr. Hayes used to support

5    malingering, what did you find with regard to his interview

6    responses that demonstrated effort on his part, to put forth his

7    best effort?

8    A.  Well, you know, that's important, particularly as we talk about

9    this knowledge.  I mean, one hypothesis would be, well, he does

10   know these things but he is playing dumb.  Well, in fact, in the

11   interview, there are a number of aspects of his self-report where

12   he is volunteering information or giving demonstrations of

13   knowledge that provide fodder to assert that he is more intelligent

14   and he is offering that up.

15          For example, discussing driving directions, even though

16   they're given in a convoluted way.  He self-reported, I did good in

17   elementary.  He self-reported that he talked girls into sex.  He

18   described diaper changes and doing that task, although that's at

19   odds with what Toni Van Buren described.

20          He responded to hypotheticals about seeking medical

21   attention for the children and what he would do if they had this

22   symptom or what he would do if they had that symptom.  Again, easy

23   to say with each one of them, I'd give them a vitamin, or to play

24   dumb.

25          He told her that he had sex when he was confined

1    pretrial, in a period of time in the Orleans Parish prison.

2              They're talking football and he specifies Peyton Manning

3    and Archie Manning.  He reported playing card games.  He did serial

4    sevens or serial ones with his fingers.  He is putting forth the

5    effort to try to accomplish the task when he could easily say, I

6    can't do that.

7              So there are a number of things that he is doing that

8    reflect the presentation or an appearance of having knowledge, that

9    it's as if when he does have that, when he can say that, then off

10   he goes.  That puts greater credibility in the gaps in his

11   knowledge, that they really are gaps because he offers up the

12   things that he knows.  It also is inconsistent with the generalized

13   strategy of malingering at this time.

14   Q.  Dr. Cunningham, taking all of the evidence that relates in any

15   way to malingering, both looking at the inferences drawn by

16   Dr. Hayes from this and the positive evidence that rebuts any

17   conclusion of malingering, what is your professional opinion as to

18   whether there is evidence that Paul Hardy was malingering when he

19   took those two IQ tests in 1996?

20   A.  I believe there is not credible evidence that he was

21   malingering as he took the two IQ tests in 1996 and that those test

22   scores should be considered to be reflective of good effort on his

23   part.  Now, they require perspective regarding the Flynn Effect and

24   practice effects, but I think effort is not a consideration in the

25   interpretation of those tests.

1    Q.  And so, you mentioned the Flynn Effect and the practice effect.

2    I would like to turn your attention to the Flynn Effect and talk

3    about Dr. Hayes' findings with regard to the Flynn Effect.

4            I believe there were eight articles cited by Dr. Hayes in

5    her review or in her discussion of the Flynn Effect.

6    A.  Yes, sir, that's correct.

7    Q.  And have you reviewed the articles cited and that were relied

8    on or discussed by Dr. Hayes?

9    A.  Yes, sir, I have.

10   Q.  And what can you tell me with regard to the eight articles

11   themselves, starting with the two assertions against correcting the

12   IQ scores for the Flynn Effect?  That would be the Hagan article

13   and Denkowski article.

14   A.  Yes, sir, that's correct.

15   Q.  And have you been able to review either of those articles or

16   both?

17   A.  I was able to review the first article, I am already familiar

18   with it.  In fact, I saw it, as I recall, while it was still in

19   press.

20           The second article, the Denkowski and Denkowski article,

21   I requested of Dr. Denkowski, have not heard back from him.  I

22   sought it through library source s, tried to get it online,

23   inquired of it of colleagues, I simply have not been able to locate

24   that paper.  But the Hagan, Drogin and Guilmette paper I am

25   familiar with.

1   Q.  What can you tell me about that paper?  Is this a research

2   paper in a -- is this a peer-reviewed research paper or is it

3   something else?

4   A.  Yes, sir.  This is in a peer-reviewed journal, where some of my

5   own publications have appeared.  This is *Professional Psychology:*

6   *Research and Practice*.  This is based on a survey that these

7   authors did of graduate training programs in psychology and also

8   board-certified school psychologists.  And they were asking these,

9   either the department heads or the school psychologists, about

10  their familiarity with the Flynn Effect and also whether they

11  taught their students to correct scores for the Flynn Effect or,

12  and I am trying to remember the exact questions, whether they

13  thought they should be.

14          Let me see if I have that paper with me.  Yes, sir, I

15  have that.

16  Q.  In looking at that article, you indicated that a survey was

17  sent out.  This was not actually an article designed to disprove

18  the validity of the Flynn Effect, was it?

19  A.  Oh, no, sir.  This is completely detached from any examination

20  of the scientific validity of the Flynn Effect.  This was a paper

21  that was exploring what the current professional endorsement is for

22  correcting or adjusting scores, IQ scores, for the Flynn Effect.

23  Q.  What did the survey show or -- first, can you tell me a little

24  bit about the background of the survey?

25  A.  Yes, sir, I can.  They initially sent this out, as I described,

to doctoral program directors of APA-approved clinical counseling

and school psychology programs.  They provided this to 358 program

directors.  Of those 358 they had 89 respondents, which means the

response rate is about 25 percent.  So of the 358 that they sent it

to, 25 percent responded, that gave them 89.

      Of those 89, and this is a rather startling finding given

the science in this area and these are program directors, of the 89

respondents, 36 percent indicated that their familiarity with the

Flynn Effect was slight or that they had no familiarity at all.

This is as much an indictment on the extent of which science is

penetrating our academic institutions, as much as anything else.

      Again, given the, essentially, lack of controversy, and

the disagreements have been published in *Psychological Bulletin*

since 1984, so we're now 25 years out from the first major

publication about this.  So 36 percent of their familiarity was

slight, 37 percent were moderately familiar, and only 27 percent or

about 22 of these individuals were very familiar.  So we've really

drilled this thing down.  We started out with 358, and of the 358

that the survey was sent to, we're down to 22 who, in fact, are

very familiar, and I would suggest are sufficiently familiar to

begin making an informed judgment about what do you do with this

when you encounter it.

Q.  Do you know any of the authors of that article?

A.  Yes, sir, I do.  I know the second author, Eric Drogin, who is

a forensic psychology colleague, and I regard him as a friend,

1   although not a close friend but somebody who I have relatively

2   routine e-mail correspondence with.

3   Q.  Did you discuss this article with him?

4   A.  Yes, sir, I did.

5   Q.  And did you discuss correcting for the Flynn Effect with him?

6   A.  Yes, sir.  I was rather surprised by their findings and so I

7   inquired of him.  Let's say you're in a capital case, you have

8   assessed this individual, you report or have access to the

9   assessment, you report the observed score and you also report the

10  Flynn-adjusted score or corrected score.  Do you have any problem

11  with that?

12          MR. MILLER:  Judge, I'm going to object.  Was this

13  conversation provided in discovery?

14          MR. LARSON:  No, Judge --

15          MR. MILLER:  See, this is important sort of stuff.

16  They're attacking another professional.  He is saying he had

17  discussions with him, these are discussions, how do we know, how

18  are we going to meet this?  This is the problem, Judge, with

19  allowing this sort of stuff to go on.

20          THE COURT:  I'm sustaining that objection.  I think it

21  was fine to give his interpretation or validity of the article

22  based on the article, but I agree with you, we can't go beyond

23  that.

24          Sustained.

25  BY MR. LARSON:

1    Q.  Going to Denkowski and Denkowski, you indicated that you were

2    not able to review that article?

3    A.  That's correct.

4    Q.  Have you been able to find an abstract of that article?

5    A.  Yes, sir.

6    Q.  And what does that abstract indicate?

7    A.  The abstract reflects that this is the critique of these

8    authors on the methodology of Dr. Flynn, particularly as he talks

9    about the psychometrics of adjusting IQ scores in mental

10   retardation cases, at least as they apply to the WAIS-III.  Now,

11   that may not be a discrepancy with adjusting all scores, but it is

12   with the WAIS-III.

13            In other words, part of the idea with the Flynn Effect

14   is, is this a phenomenon that will continue indefinitely or is

15   there a point where this slow slide to the right, this improvement

16   or inflation of IQ scores, will flatten out.  It has existed for

17   the past 60 years, and there's some evidence that it is still

18   present between the WAIS-III and the WAIS-IV.

19            It's possible that these authors would identify that as

20   not sufficiently grounded yet.  Their attack, in this case, is not

21   on all adjustment of scores, it's on adjustment of WAIS-III IQ

22   scores.  But the nature of the paper is not -- the abstract does

23   not point to the collection of data, but instead, their critique or

24   analysis of the psychometrics and calculations that James Flynn has

25   engaged in.

1  Q.  I would like to turn to the other six articles cited and relied

2  on by Dr. Hayes.  And starting with the Light and Chambers article

3  from 1958.

4  A.  Yes, sir, I have that paper.

5  Q.  And have you read that article?

6  A.  Yes, sir.

7  Q.  And what is the applicability of that research to the present

8  situation with Paul Hardy regarding the applicability of the Flynn

9  Effect?

10  A.  The application of this article is very limited because it

11  talks about the differences between the Wechsler-Bellevue II and

12  the first edition of the WAIS.  First edition of the WAIS was

13  produced in 1955, the Wechsler-Bellevue II was the test that

14  predated that.

15  Q.  So we're talking about different instruments?

16  A.  We're talking about different instruments.  The

17  Wechsler-Bellevue II is the precursor of the WAIS.  Now, part of

18  what happened, though, between the Wechsler-Bellevue II and the

19  WAIS is, with the Wechsler-Bellevue II you could get zeros on some

20  subtest scores and that, then, caused the instrument to not be

21  useful at the very low end of the scale because you had people that

22  were in a mentally retarded zone who were getting zeros on

23  subtests.

24          And so when the WAIS came along they adjusted that so

25  that there was some subtest credit that was given, which made it

1    somewhat more sensitive and provided some floor at the lower level.

2              Now, they then observed that the scores on the WAIS

3    rather than being lower than the scores on the Wechsler-Bellevue

4    were actually slightly higher.  In other words, as if they were

5    going opposite of the Flynn Effect.

6              Now, in this instance, though, that's not terribly

7    surprising because the scoring mechanism for this test has changed.

8    And that's going to distort your IQ scores, when you fundamentally

9    change the way the scale scores what credit is given to individuals

10   at that low end of the continuum.

11             And so I think that this is, this is a limited application

12   to the current situation because of those differences and because

13   we're talking about several generations of IQ score back that

14   reflect different instruments with different standardizations, even

15   apart from this issue that there was a change in increasing the

16   standardization sample, changing the standardization sample and

17   also scoring these subtests.

18   Q.  And turning, then, to the Simon and Clockton article from 1984.

19   A.  Yes, sir.

20   Q.  Have you read that article?

21   A.  Yes, sir.

22   Q.  And what is the applicability of the research in that article

23   to the situation before the court?

24   A.  Well, this one is looking at a comparison between the WAIS and

25   the WAIS-R.  In this case, the comparison is being made for

1    individuals whose IQ scores are at around 60.  That's not the zone

2    of interest in this case.  The issue is not -- it's essentially

3    irrelevant for MR classification purposes, at least whether

4    somebody is eligible to be classified as mentally retarded, if all

5    of their IQ scores are in the range of 60.  The issue is what

6    happens in the zone of interest between 70 and 75.  This test

7    doesn't provide us information about that.

8            In fact, this is one of the studies that is -- that was

9    part of that Spitz slide that I put up that provided a review of 10

10   or 12 studies that compared the WAIS with the WAIS-R, this was one

11   of those, it's just been pulled out here in Dr. Hayes' report in

12   isolation, although it was also a part of Spitz's review.

13           It's the same issue I talked about when that slide was

14   up, which is that down deeper in the MR zone at 63 and below, there

15   does not seem to be the same inflation effect, but once you move up

16   into the borderline area, then there is.

17   Q.  And so you just mentioned the Spitz article, that's the one you

18   discussed previously with the rankings on the different IQ scores?

19   A.  That's correct.

20   Q.  Now, the Spruill and Beck article, have you read that one?

21   A.  Yes, sir.

22   Q.  And what is the applicability of that article with regard to

23   Paul Hardy's situation?

24   A.  Well, that one, I described the application of that in a slide

25   earlier in my testimony.  And you'll remember that the Spruill and

1    Beck had two different distributions.  And let me simply go back a

2    bit.  This is Spruill and Beck.  Again, there are two

3    distributions, there is the zone here in the 60s, 55 to 69, where

4    the score inflation, the Flynn Effect, was not observed, but that's

5    not the zone of interest.  In the zone of interest that corresponds

6    to Mr. Hardy's score, in fact, the Flynn Effect was demonstrated

7    with an inflation of almost five points.

8    Q.  And then turning to the article by Fitzgerald, Gray and Snowden

9    in 2007, she indicates that that article does support the Flynn

10   Effect.

11   A.  Yes, sir, that's correct.  That is this paper that showed a

12   four point increase.  This one is, again, one that corresponds to

13   Mr. Hardy's IQ scores.

14   Q.  And then the -- she also cites a study by Wechsler, Colson and

15   Rayford in 2009 also stating that that supports the Flynn Effect.

16   Have you reviewed that article?

17   A.  I don't think I've seen that one.

18   Q.  Is that the manual of the WAIS --

19   A.  It's the technical manual, I have that, I've reviewed that.  I

20   didn't note that as a separate study.

21   Q.  And so the technical manual of the WAIS-R supports --

22   A.  Yes, sir.

23   Q.  -- the applicability of the Flynn, the WAIS-IV.  Okay.

24        Dr. Hayes made certain findings with regard to cognitive

25   function and estimates of Paul Hardy's intelligence.

 1   A.  Yes, sir.

 2   Q.  Are you familiar with those?

 3   A.  Yes, sir.  It's the Barona regression equation that she

 4   utilized.

 5   Q.  And can you tell me what a Barona regression equation is, or

 6   explain that?

 7   A.  Yes, sir.

 8   Q.  I think you're wanting to --

 9   A.  You want me to skip over this other section?

10   Q.  We'll come back to that in a second.

11   A.  I'm here.

12   Q.  Let me go to 114.  What is a demographically-based estimate of

13   an IQ?

14   A.  That's a way of trying to estimate IQ score based on the

15   demographic characteristics of the sample that the test was

16   standardized on.  In other words, you go back to the

17   standardization sample and you see what scores they obtained and

18   you look at characteristics about those individuals.  Demographic

19   characteristics.  Things like their age, their race, their

20   occupation, their education, their sex, urban or rural.  You look

21   at those different features of your standardization sample and

22   identify whether -- you use a regression analysis to identify what

23   contribution those different factors may make to estimating

24   somebody's IQ score.

25   Q.  And did Dr. Hayes at page 54 of her report attempt to do this

```
 1   with Paul Hardy?
 2   A.  Yes, sir.  That's correct.
 3            Now, the application of this, as the article describes,
 4   is for two purposes:  One of them is for group statistical
 5   research.  The other is to provide a mechanism for estimating
 6   pre-morbid IQ in the aftermath of a trauma-based loss of
 7   intellectual functioning.
 8   Q.  What do you mean by pre-morbid?
 9   A.  Well, let's say that we have a 30-year-old attorney whose never
10   had an IQ test.  He has a head injury, a massive head injury.  He
11   is now asserting that he is substantially less intelligent than he
12   was before.  Now we need a mechanism to try to identify how smart
13   was he before, and so this provides a very gross estimate for
14   trying to look at that.
15            Now, of course, the best way to estimate somebody's
16   intelligence is actually to give them an IQ test, not to estimate
17   it from demographic features about them.  This is what you would
18   use when there's no IQ test available for that period of time and
19   you have no choice but to try to reconstruct it, estimate it, based
20   on demographic factors.  This is a very poor substitute -- if there
21   is an IQ test that was obtained prior to the accident, you would
22   never use a Barona regression equation, you would use the IQ score
23   that was obtained at that time.
24   Q.  You indicated that there are some limitations for use of Barona
25   demographically-based estimate when you're trying to determine
```

1    mental retardation.  Can you explain those limitations?

2    A.  Yes, sir.  If you use this equation, the lowest possible full

3    scale IQ score for a 27 year old black male, scoring him at the

4    lowest of all of those demographic predictors, the lowest score

5    that you can create is 72.57.

6    Q.  In other words, it's impossible using the Barona to diagnose a

7    black male as mentally retarded?

8    A.  That's right.  Or that they're pretty -- you wouldn't diagnose

9    him with this anyway, but to even put him in the zone of

10   consideration.  The lowest possible score that can be produced is a

11   72.57.  Now, that's just the first problem.  The second problem is

12   that, of course, as with any instrument, there is a standard error

13   of estimation.

14          Now, for a full scale IQ score, as you would expect using

15   these kind of demographic variables, your standard error of

16   measurement is 12.14.  Now remember, to have a 95 percent

17   confidence interval, you would have to multiply that times 1.96,

18   that means that your 95 percent confidence interval is going to be

19   about 47 points wide.

20          Now, in other words, let's say they get a 72, your

21   confidence interval at a 95 percent extends all the way from an IQ

22   score of 99 down to an IQ score of about 45.  That with a 95

23   percent certainty we can say that his IQ score is within that

24   range.  So it's an extraordinary, as you would expect there to be,

25   tremendous error associated with using broad demographic factors.

```
 1              Now, when we look at this lowest possible IQ score, if

 2     this 27 year old had never been out of an institution in his entire

 3     life, had never gone to one day of school, had never had an

 4     intelligible conversation with any person, the lowest IQ score or

 5     estimate that could be generated for that person would be 72.

 6              Now, for that reason, what the paper says, this paper,

 7     Barona, Reynolds & Chastain, what that paper says is, in cases

 8     where the pre-morbid IQ was below 69, utilization of the formula

 9     might result in a serious overestimation.  That's what we're

10     talking about here, because your floor is set at 72.57 for a black

11     male who is 27.

12     Q.  How does one score Barona?

13     A.  Let me give you an example plugging in Mr. Hardy's data.

14     First, there is a constant of 54.96.

15     Q.  You're just spotted 54 points?

16     A.  You're spotted 55 points, you're breathing, you're spotted 55

17     points.  Now, if your age is 25 to 34, that's a multiple of four,

18     so you multiply this regression constant .46 times four, and so you

19     add 1.88 to that IQ score.

20              Now, his sex is male and so that gives you a multiple of

21     two.  Now you would think if you were female you would get a

22     multiple of three, but instead, females get a multiple of one, so

23     they're automatically 1.76 IQ points slower than the males.

24     Q.  Men are assumed to be smarter?

25     A.  Men are assumed -- the regression equation tells us that men
```

1    are 1.76 points smarter.  If you're black, we multiply that times

2    one so that's one times 4.71.

3           Education.  Now, this is an interesting one because the

4    question becomes, is this education in terms of when you were a

5    warm body in school or is this functional educational achievement

6    when you were in school?  Now, from a Barona equation standpoint,

7    it would make no sense to credit somebody with 12 years of

8    education who had been in special education that whole time and

9    maybe was illiterate in the 12th grade.  For this to be meaningful,

10   it almost certainly has to reflect actual educational achievement

11   attained as opposed to simply at what age were you a warm body in

12   school.

13          Now, Mr. Hardy tested on the WRAT at a 5th and 6th grade

14   level back in 1996, and pretty close to that as Dr. Swanson tested

15   him, and so that would result in a multiple of one.  Now, if he is

16   in 8th grade, then you're going to multiply that times two.  If he

17   is in 9th grade, 9th or 10th grade, you're going to multiply it

18   times three.  So Dr. Swanson multiplies that by a three, apparently

19   reflecting that he was enrolled in the 10th grade.  I identified,

20   based on actual functional academic capability, that he is a one,

21   so I have added 5.0 on that.

22          Now, under occupation I have identified him as an

23   unskilled laborer, unskilled laborer, farmer workers, maybe even

24   farm foreman.  The next level up from that is like a farm manager.

25   Dr. Swanson, she identifies him as a two on his occupation, I

1    identify him as a one, that's 1.89.  He is from the South, so he

2    gets the minimal addition for that, that's .59.  And so what I

3    produce as I plug Mr. Hardy's factors into this equation is 72.57,

4    which is the lowest, it's also the lowest possible score that can

5    be obtained by a black male.

6          Now, tremendous problems with this in addition to the

7    reliability ones that I've described in that because we're looking

8    at things like sex and race and even what part of the country that

9    you live in, that those may well reflect discriminate impact

10   factors that would have grave constitutional implications for this

11   kind of data to be used in consideration --

12         MR. MILLER:  Judge, I'm going to object to constitutional

13   implications.  I think we're getting way beyond his area of

14   expertise.

15         THE COURT:  I registered that it was not appropriate, but

16   I am not going to consider it, don't worry about it, because he is

17   not a legal expert.

18         MR. MILLER:  Thank you, your Honor.

19   BY MR. LARSON:

20   Q.  Dr. Cunningham, pretermit pretermitting those constitutional

21   considerations, would you say that this demographic-based estimate

22   could reliably produce, could reliably produce the statement of

23   Dr. Hayes in her report at page 54 that Mr. Hardy's intelligence

24   was estimated to fall in the low average range?

25   A.  No, sir, I don't believe that's a sound application of the

```
 1   Barona index or equation in this context.
 2   Q.  Dr. Cunningham --
 3           THE COURT:  Are you about to change subjects?
 4           MR. LARSON:  Yes.
 5           THE COURT:  Let's take a ten-minute break.
 6       (WHEREUPON, A RECESS WAS TAKEN.)
 7       (OPEN COURT.)
 8           THE DEPUTY CLERK:  All rise.
 9           THE COURT:  Have a seat, please.
10           MR. LARSON:  May I proceed?
11           THE COURT:  Sure.
12   BY MR. LARSON:
13   Q.  Dr. Cunningham, are you familiar with the section of Dr. Hayes'
14   report where she relies on school records?
15   A.  Yes, sir.
16   Q.  And would you agree with the statement of Dr. Hayes that one
17   source of information about Paul Hardy's level of cognitive
18   function is his educational records since intelligence and academic
19   performance are correlated to some degree?
20   A.  Yes, sir, I would agree with that as a general proposition,
21   that there is a correlation between education and intelligence and
22   that school records have the potential of illuminating that.
23   Again, it depends on the quality of the records.
24   Q.  And what do you know about the quality of Paul Hardy's records,
25   just looking at those records?
```

1    A.  One of the factors that caused me significant concern about his

2    school records was that, as I understand it, in the fall of 1983,

3    he dropped out of school and yet his report card for that semester

4    reflects grades in his classes for the entire semester as if he was

5    still attending.  Now, at the very least, that causes significant

6    concerns about the validity of those grades since he wasn't there

7    for that biggest part of that semester.

8            The problem that creates, though, is that it has

9    implications for more than just that semester.  If those grades had

10   been logged improperly, or even more, problematically, reported

11   improperly, it raises concerns about what the validity of the other

12   grades are that are on his report card in terms of the relationship

13   that those have to the actual work that's being done.  I guess it's

14   not unlike if your computer provides you with a whole set of output

15   that is erroneous and flawed, then what degree of confidence can

16   you put in the rest of the output that is created by that same

17   computer using the same program?

18           It has implications beyond just those flaws, it has a

19   more general skepticism.  Now, that index has increased because of

20   the information that was conveyed to me back in 1996.

21   Q.  And that information is reflected in your notes?

22   A.  Yes, sir.

23   Q.  And those notes have been turned over to the government?

24   A.  Yes, sir, about 13 years ago.

25   Q.  And again more recently?

A.  Yes, sir, there's other things.  Those notes reflect his

siblings and him talking about the teachers not caring, about

students simply being passed along independent of their

performance.

        Vance Ceaser, when interviewed by Dr. Hayes, when she

asked him about the schools, he said they were a joke.  Now, she

did not, then, inquire of him, what do you mean they were a joke,

what is it about them that was a joke, what are you talking about,

these are a joke.  That was an additional piece of data raising

concerns about what's happening here in these schools and on what

basis are grades being assigned.

Q.  To your knowledge, was a special education program available in

the Orleans Parish School Board system during the time when Paul

Hardy was attending the Orleans Parish public schools?

A.  No, sir, not organized along a special education system as we

would know it today.  That did not begin until the early 1990s.

There was a period of time in the 1950s, 1960s when students were

assigned to classes at different levels.  So that you had classes

for smarter students and for kind of average students and for

slower students.  Ultimately --

        MR. MILLER:  Your Honor, just for point of clarification

from the doctor, are we talking about Orleans Parish schools or are

we talking about schools generally?  I wasn't aware.

        MR. LARSON:  Orleans Parish.

        THE WITNESS:  Orleans Parish schools.

1          MR. MILLER:  Thank you.

2          THE WITNESS:  Here in Orleans Parish schools they were

3   assigned, the children were assigned to different ability range

4   classes.  There was subsequently concern that that was, that that

5   was having disparate impact and that they couldn't continue doing

6   that.  Some of the schools still continued to assign to different

7   ability levels, kind of surreptitiously, sort of under the radar.

8          In fact, again, Vance Ceaser alluded to that, he

9   described that in his interview with Dr. Hayes as he said that he

10  was placed -- after 1st grade, he and Paul were in separate

11  classes.  He was in a class for more advanced students and Paul was

12  in classes for slower students, that there was this separation that

13  was occurring based on ability, which is what -- although this is

14  the time period when it was now being done more surreptitiously

15  based on scores and that kind of thing as opposed to just out in

16  the clear, you are this level child and that's more the track that

17  you're going to be on from here.

18         That, then, raises questions about the equivalence of

19  grades between the students that are in Vance Ceaser's class and

20  what a B or C means in that class and what it means to pass, as

21  opposed to the students that are in the lower-ability class.

22         There's also the issue that as the teachers were faced

23  with potentially failing too much of their class, pressure would be

24  brought to bear on them that they were failing as a teacher, that

25  their jobs were in jeopardy if they had --

1        MR. MILLER:  Judge, I am going to start objecting.  We're

2   getting very speculative as to what may have been going on in

3   Orleans Parish schools.

4        THE COURT:  Sustained.

5   BY MR. LARSON:

6   Q.  Without talking in terms of social -- you're referring to

7   social promotion or promotion for purposes of maintaining academic

8   status?

9   A.  Yes, sir.

10  Q.  Now, during the course of your investigation into the

11  reliability of Orleans Parish School Board records, did you become

12  aware of any special investigation of testing irregularities in the

13  Orleans Parish school system?

14  A.  Yes, sir, I did.

15  Q.  And what was that?

16  A.  That was a special investigation that was undertaken by the

17  *Times Picayune* here in New Orleans in the mid-1990s looking at the

18  preceding five years of achievement tests of performance in the

19  Orleans Parish schools, school by school, and associated

20  irregularities with that.

21  Q.  And that investigation is described on slide 114, I believe?

22  A.  It begins on slide 109, but I can certainly go to 114.

23  Q.  If you would go to 114, please -- I'm sorry, 113.

24  A.  This is 113, is this what you're looking for?

25  Q.  No, go back earlier.

A.   This one?

Q.   There you are.

A.   This is a special investigation that was published by the *Times
Picayune* in 1997, based on data that was provided to them by the
Orleans Parish schools.  And they looked at the preceding five
years of achievement test score performance, and what they observed
is a pattern of sharp jumps and sudden drop-offs that were so
erratic as to point to a system-wide problem.  At the very least
the broad swings in performance within a given school from one year
to the next or what are called spikes by education experts
indicated a failure to maintain fair and uniform testing conditions
at the least --

     MR. MILLER:  Your Honor, I'm going to object.  We're
getting into Orleans Parish -- investigations of Orleans Parish
schools by the *Times Picayune*.

     MR. LARSON:  Your Honor, it's based on data that's a
matter of public record, it's published in the *Times Picayune*, and
it will be very quickly isolated to the schools that Mr. Hardy
attended.

     THE COURT:  I am not -- point well taken, Mr. Miller, and
I am going to let Mr. Larson go forward; but my sense of the *Times
Picayune* and reporting in general will be taken into consideration.

     MR. LARSON:  I understand, your Honor.

BY MR. LARSON:

Q.   Dr. Cunningham.

1    A.   In terms of understanding the very sharp spikes and changes

2    that occur, one possibility is that it reflects a failure to

3    maintain uniform testing conditions from one year to the next.

4    Another is that there is some sort of manipulation that is

5    occurring of those student scores.

6    Q.   And with that, if you could go back to the previous slide, with

7    regard to the CAT test, is that one of the tests that was

8    administered to Paul Hardy?

9    A.   Yes, sir, an earlier version of it, it was the CTBS, the

10    California Test of Basic Skills.  This is a California assessment,

11    California Academic Test, I believe, is what it stands for.

12    Q.   And going down to the bottom conclusion, 19 elementary schools

13    had posted gains of 50 points, what does that indicate?

14    A.   That means that they went from a national percentile, let's say

15    the national percentile in one year in the 2nd grade was 15

16    percent, the 15th percentile.  The next year the 2nd grade is at

17    the 65th percentile, or the next year in the 3rd grade, which

18    tracks that same cohort of students, you've gone from the 15th

19    percentile to the 65 percentile in one year.  Which is an

20    extraordinary evolution.

21    Q.   I believe you indicate that it's a statistical impossibility?

22    A.   Yes, sir.

23    Q.   I would like you to go to the information regarding Chester

24    Elementary School.

25    A.   Yes, sir.

1   Q.  Right here.  And what is the significance of Chester Elementary

2   School?

3   A.  Chester Elementary School is the elementary school that Paul

4   Hardy attended in his early primary school years.

5   Q.  And what do you see in this chart indicating fluctuations or

6   variations in the data from the California Achievement Test at

7   Chester Elementary School?

8   A.  Let me describe, across the top --

9            MR. MILLER:  I am going to object.  This goes beyond this

10  general *Times Picayune*.  Was Mr. Hardy actually in Chester at that

11  time?

12           MR. LARSON:  No, he wasn't.

13           MR. MILLER:  Then I object on the relevancy grounds.

14           THE COURT:  It's marginal, but I'm going to let it in.

15  Go ahead.

16           THE WITNESS:  We're looking at two different achievement

17  tests, there is the reading section, that's this first portion, and

18  then there are the math scores, then the left-hand margin is the

19  year the achievement test is occurring, and across the top is the

20  grade level that it's being administered to.

21           And let me illustrate some of the changes from one year

22  to the next.  This is looking at the 3rd grade in 1992.  The 3rd

23  grade is at the 16th percentile by national norms on the California

24  Achievement Test.  The next year, 1993, very consistent, the 13th

25  percentile.  The next year in '94 that jumps to the 62nd

1    percentile.  In other words, there is a 49 percent jump in a single

2    year in achievement tests for that grade level.

3          Another very significant dip in the other direction, in

4    '95 in the 4th grade, the average of the class is at the 53rd

5    percentile, the next year in '96 it's even better, it's at the 63rd

6    percentile, and the next year in '97 it falls to the 12th

7    percentile.

8          Now, another way of looking at this is to track this with

9    this -- to follow this across, and the math scores show a similar,

10   similar fluctuations.

11         Another way to look at this is to track potentially the

12   same students over time from kindergarten to 1st grade to 2nd grade

13   to 3rd grade, and so in 1st grade, 74 -- they're at the 74th

14   percentile in terms of their reading; the next year in 2nd grade

15   they are at the 29th; the next year in 3rd grade they're at the

16   13th; the next year in 4th grade they're at the 38th percentile,

17   tracking this same cohort across those years in school.

18         Another cohort that can be tracked, starting in '94 in

19   1st grade, 68 percentile; the next year in 2nd grade, 29th

20   percentile; the next year it jumps 22 percentiles to the 51st

21   percentile; the next year it falls 39 percentiles down to the 12th

22   percentile.

23         So there are very dramatic swings in achievement test

24   scores both in any given grade and also tracking cohorts of

25   students over time that raise grave concern about the reliability

1    of the -- and validity of the achievement testing program in the

2    Orleans Parish schools, at least during this era of the 1990 to

3    1997.

4    BY MR. LARSON:

5    Q.  As an expert faced with this information, what weight, if any,

6    would you give to records or data or test scores from the Orleans

7    Parish school system?

8    A.  The combination of the descriptions of the family members and

9    Vance Ceaser and the permanent record that has credit for grades

10   when he wasn't even in school, and some indications of scandal or

11   irregularities in achievement testing in the school system, caused

12   me to have significant reservations about what weight to give

13   either grades or achievement test scores coming out of that system.

14   Q.  Dr. Cunningham, I direct your attention to page 49 of

15   Dr. Hayes' report, the paragraph that starts "since intelligence,"

16   and Dr. Hayes makes the statement:  "Since intelligence is

17   substantially heritable and since Mr. Hardy and his siblings shared

18   the same home environment, a review of Terry Hardy's, the

19   defendant's older brother, school records is helpful in estimating

20   the defendant's level of cognitive functioning."

21           As a general proposition, is that true?

22   A.  There is a significant component of intelligence that is

23   heritable, that's true.  It is not an appropriate diagnostic

24   procedure to estimate one sibling's intelligence by investigating

25   the achievement or IQ scores of another sibling's intelligence.

1  Q.  If you were going to look at the siblings in this case, who

2  should have been looked at other than just the highest-functioning

3  member Terry Hardy?

4  A.  If you were going to do a family analysis, you would look at

5  what information there is about all of the siblings, you would also

6  seek information about Marie Hardy as well.

7        Greg Williams, I think, who Dr. Hayes interviewed,

8  described Marie Hardy as being a few cans short of a six pack.

9  There was no follow-up from Dr. Hayes about what you mean by that.

10 And subsequently, when meeting with Theresa Minor the next hour

11 that same day, who is Marie Hardy's first cousin, there was no

12 inquiry about any concerns about Marie Hardy's intellectual

13 capabilities.  So if you're going to do this, you're going to need

14 look at all of the siblings, you're going to need to look at

15 information about the parents, you're going to have a broader

16 ranging inquiry to help inform this notion of are there

17 intellectual deficits in this broader family system.

18        Now, of course, heritability, although it's a significant

19 component of intelligence, it's not the only source of mental

20 retardation.  They had different prenatal periods, where Marie

21 Hardy's nutritional support could have been quite different.  There

22 are differences in lead exposure, depending on which product --

23 which housing project they're in and whether the kid is eating

24 paint or that kind of thing.  There are many different influences

25 on the occurrence of mental retardation that makes a comparison

1    with the highest-functioning family member within that family not

2    appropriate in identifying the likelihood or the presence of mental

3    retardation in one of the other siblings.

4    Q.  Dr. Cunningham, at the outset of your testimony you identified

5    some areas where you had disagreements with Dr. Hayes, and one of

6    the areas in which you were critical of her was her interview

7    methodology.

8    A.  Yes, sir.

9    Q.  Can you elaborate on what your specific criticisms are of her

10   interview methodology?

11   A.  Yes, sir.  It was very heavy use of queries calling for a yes

12   or no answer.

13   Q.  Did you happen to count by question throughout her interviews

14   how many of them were either yes or no answers or were leading

15   questions?

16   A.  I began that process and decided to turn my energies elsewhere.

17   It is extremely heavy as you would go through that document to

18   identify the questions that are -- that call for assent.

19   Q.  Is that an appropriate interview technique for determining

20   mental retardation?

21   A.  No, sir.  It minimizes the available data because it doesn't

22   give you qualitative descriptions, it's more of a checklist

23   approach of, is this present, could you do this, which it's going

24   to be a particular problem as you're trying to identify the

25   qualitative deficits that are present in someone who suffers from

1    mild mental retardation.

2            As an interview technique, it also discourages the person

3    you're speaking to from elaborating on their answers and giving you

4    additional information that you might not otherwise get from simple

5    assents.  So Dr. Hayes is not only asking simple assents, but she

6    is also cutting him off so that she interrupts him with the next

7    question.  Sometimes a subject change.  And, as part of that, fails

8    to follow-up to ask him to elaborate on that and say more about it.

9    The effect that that can have is to minimize the

10   interview-obtaining data that might reflect greater deficiency.

11           In other words, the way to control an interview is the

12   same way you would try to control a witness, try to ask yes/no

13   questions, because once the elaborations start, who knows where

14   this may go and what information may be produced.  And so it's

15   perhaps more efficient and it certainly exerts greater control, but

16   it is then less open to what -- to wherever the data may take you.

17   Q.  With regard to the data, did you find that throughout the

18   interview and the report itself that Dr. Hayes was selective in her

19   use of data?

20   A.  Yes, sir.

21   Q.  What's the colloquial term for that?

22   A.  Cherry picking.

23   Q.  And did you find examples of that throughout her report?

24   A.  Yes, sir.  There are certainly instances where she describes --

25   in fairness, it's a very lengthy report, and there are many

1    instances where she does describe the data in support of this is

2    mixed or this person also said this.  But there are certainly

3    instances where the nature of the interview is such that it

4    constrains the data that's obtained and where the report does not,

5    in fact, reflect even the information that was in the interview.

6    Q.  What does it mean to normalize a report of a deficit?

7    A.  Normalizing means that there is a response that's made

8    afterwards that is as if this doesn't really have meaning or --

9    it's the opposite of tell me more about this, this sounds like that

10   might be something, and instead is a way of making it okay, we're

11   all like that, as if this doesn't have implication.

12   Q.  And when you talk about failure to cross reference --

13            THE COURT:  I need to jump in because I just didn't

14   understand that explanation.  Go at it again.  It may just be me.

15   BY MR. LARSON:

16   Q.  Can you give us an example of what it means to normalize a

17   report of a deficit and changing the subject?

18   A.  Yes.  And this is perhaps not the best one, but it's one I

19   turned to a few minutes ago.  This is on pages -- this is 61

20   through 64, and this is at the bottom of page 62, and this is the

21   discussion about throwing a spiral.

22            "Q. That would make a difference, you know.  So could you

23   throw a spiral?  I always had a problem with that."  Now, then he

24   says, "Throw a spiral?"  He is not familiar with it, "With the

25   football, you know, how when it goes like that, you know, in the

1  air.  A.  I thought it always do that.  No, not if you don't throw

2  it well, not if you throw it like me, if you throw it like -- if

3  you throw it like you, then it goes, you know."

4         That would be a simple example of normalizing that if the

5  football isn't thrown very well, that's no big deal.  Now, that

6  response has occurred rather than having him talk about the rules

7  of football and finding out what does he really know about the

8  sport.

9         And so there has been an inquiry, and we've talked about

10  spirals which is a motor skill, and we normalize that by saying, I

11  can't throw a spiral, but there's a failure, then, to inquiry in

12  this arena about the information that would really be dispositive

13  of, as he goes to these football games with Greg, does he really

14  appreciate what's going on on the field or not?  And unless there's

15  an inquiry about that, then we don't have the answer to that

16  question.

17         And so there are questions that are being asked and

18  exchanges that are being said that then neglect obtaining data that

19  would be meaningful.

20  Q.  And number four, what does it mean to fail to cross-reference

21  data from collateral interviews?

22  A.  The failure to cross-reference data would be like I described a

23  minute ago, when Greg said she's two cans short of a six pack, a

24  couple of cans short, and then you've got Theresa Minor in with you

25  the next hour and it's a great -- first you can ask him, what do

1    you mean by two cans short of a six pack.  Tell me about that.

2    There's not a follow-up inquiry about what does that mean.  Nor is

3    there a follow-up with Theresa Minor, who is Marie Hardy's first

4    cousin, in the next appointment, that would further inquire about

5    that.

6    Q.  What's the difference between No. 5 and No. 2, infrequent

7    follow-up queries and failure to persist in obtaining information?

8    A.  The failure to persist, that's like when, as Dr. Hayes is

9    asking Mr. Hardy about the directions from the Calliope to the

10   church and he starts to talk about it, and then they end up in a

11   discussion about where the Calliope is and what exit you would take

12   off of I-10 to get to Calliope, only there is not a persistence to

13   say, let's start over, you're at the Calliope, tell me exactly what

14   we do to go to the church.

15          Or even beyond that, I am out here at this address across

16   town, I'm over here in this zone, tell me exactly what I would do

17   to get to the Calliope.  And then just sit quietly and listen to

18   it, and if he wanders off, come back to this, tell me how to get to

19   the Calliope.  That's the persistence of as he digresses, at the

20   end of that discussion about the directions to the church he never

21   does finish telling her, and we don't really know whether he knows

22   how to get from the Calliope to that church or not.

23   Q.  And No. 6, providing the symptoms of a disorder before

24   inquiring about those symptoms.  Is there an example of this that

25   you found in the interview?

1    A.  Yes, sir, there is.

2    Q.  If I could ask, is this the specific example you found?

3        (WHEREUPON, A VIDEO CLIP WAS PLAYED.)

4    BY MR. LARSON:

5    Q.  Backing up to the follow-up, did you attempt to reconstruct the

6    directions that he was giving there?

7    A.  Yes, sir, I did.

8    Q.  Looking at a map?

9    A.  Yes, sir.

10   Q.  With the two locations?

11   A.  Yes, sir.

12   Q.  Did those directions make any sense to you?

13   A.  Not from what he described, and there are a couple of ways that

14   are very direct.  As I said, you could go straight down Martin

15   Luther King to Simon Bolivar and turn right and go five or six

16   blocks.

17          Alternatively, you could come out of the Calliope and

18   cross several streets, I think you would get to Third, and then if

19   you went down Third, all the way down, it looks like it would

20   intersect the area of the church.  But it wasn't clear that he

21   could provide an organized response in that way.

22          Now, some of the other things, if a map is to be drawn,

23   hand him the paper, have him draw the map.  Once Dr. Hayes has

24   structured where the major cross streets are she structured the

25   task.  The same with the exits coming off of the I-10.  Don't

1    suggest the exits to him, it's a function of can he generate these

2    himself.  What's the quality of the thinking that he is doing.  The

3    more structure that's being provided, naming exits, naming

4    landmarks, drawing things, the more simplified the task is, so all

5    he has to say is yes or no and then we lose qualitative data.

6              Now, we still have data from this and that is that in

7    spite of all of those prompts, verbal, talking about it, landmarks,

8    drawing it, he still had a difficult time.  So there's diagnostic

9    information there, it's diagnostic information that would have been

10   preferable to start with in a more open-ended way and then finally

11   get to what he required before he could get there and then to

12   describe the deficits that this represents in the associated

13   report.

14   Q.  With regard to providing the symptoms of the disorder, did you

15   find an example in Dr. Hayes' interview where she provided, and if

16   you could refer the court to the specific page number, where she

17   provided Paul Hardy with the specific symptoms of a disorder before

18   inquiring whether he possessed them?

19   A.  Yes, sir, give me just a moment.  Yes, sir, I have that and

20   this is on page 267.  It begins on page 267.

21   Q.  Of Dr. Hayes' interview of Paul Hardy?

22   A.  Yes, sir.

23   Q.  And, in essence, fairly summarizing her testimony starting at

24   page 267 of this transcript, what does Dr. Hayes do there?

25   A.  She is describing the symptoms of major depression en masse

1    beginning with, your mood is depressed every day or most of the day

2    for at least two weeks, and then describing how many hours a day,

3    16, 18 hours a day you're down, and then she has sadness, crying

4    spells, feel guilty, worthless, helpless, hopeless, you have

5    suicidal thoughts, problems concentrating, not enjoying things,

6    that's major depression, you may lose weight, you may gain weight,

7    you may sleep too much, you may sleep too little, it's like --

8    taking to bed and not wanting to get out, you can't do anything,

9    you can't work, you can't be with your friends, that's major

10   depression.  Have you ever been like that.

11   Q.  Is that appropriate in an interview?

12   A.  Oh, no, sir, no, sir.  The task of the clinician is not to

13   summarize the diagnostic criteria and ask somebody if they have the

14   disorder.

15   Q.  And why not?

16   A.  Well, for a couple of reasons:  One is that requires the person

17   to make graded evaluations of these clinical symptoms.  That's what

18   we do, that's what we're trained to do.  It also increases the

19   likelihood of getting a false report, that the person says yes or

20   no, only you don't know what that means.  It also increases the

21   likelihood that they may malinger the disorder because you've been

22   kind enough to completely describe it to them and orient them to it

23   in advance.

24          And so the proper way to take a symptom history about

25   depression is, tell me about your sleep, maybe some queries that

1    get more specific, how long does it take you to go off to sleep,

2    once you're asleep do you stay asleep, do you wake up early in the

3    morning, tell me about how early in the morning that you get up,

4    tell me about your appetite, tell me how food tastes to you, tell

5    me about your energy level, tell me about how you feel about

6    yourself at different times; and if you feel sad and blue, tell me

7    about that.

8              In other words, just like the doctor when you go see him

9    asks you all kinds of questions about various symptoms one at a

10   time.  He doesn't give you a list of 20 symptoms and say, that's

11   this disorder, does that sound like you, because it's simply, it

12   provides the minimal amount of information.  May increase the

13   likelihood also that the person just says no because they don't

14   appropriately evaluate it, whereas if you actually took a careful

15   clinical history you might decide, in fact, they did.

16             The nature of diagnosis is not their determination of the

17   qualitative presence of those symptoms, that's what I do, I inquire

18   about these in a way that allows me to get information about each

19   of them and to have each one illuminated and then I make a

20   diagnostic determination about whether that constitutes this

21   disorder and at what severity that disorder is present.

22             THE COURT:  Mr. Larson, it's about 20 of five and we're

23   going to have to quit at 5:30.  I hope we can finish the direct of

24   Dr. Cunningham before we recess, so I don't want to cut you short

25   or cut him short, but to the extent that we can try to have the

1    rest -- I am just looking at the slides that you have remaining.

2              MR. LARSON:  I actually only have two areas, your Honor.

3              THE COURT:  If we can finish by 5:30, that would be

4    wonderful, because we have to quit at 5:30 and we will recess until

5    tomorrow.

6              MR. LARSON:  I think we will be able to, your Honor.

7    BY MR. LARSON:

8    Q.  Dr. Cunningham, are you familiar with the decision of the Texas

9    Supreme Court and Ex Parte Briseno?

10   A.  Yes, sir.

11   Q.  And did that opinion produce what have come to be known as --

12             MR. MILLER:  Judge, I am going to object again to him

13   talking about the law.  That's for your Honor to do.

14             MR. LARSON:  He is not going to be talking about the law.

15   He is going to be talking about the specific descriptive factors

16   used in Ex Parte Briseno.

17             THE COURT:  I think Dr. Hayes used these, I believe.

18             MR. LARSON:  Well, and the government relied on

19   Briseno --

20             MR. MILLER:  Judge, we would like the lawyers to actually

21   argue that, not --

22             THE COURT:  Well, let's go forward and if it turns out

23   it's legal stuff, then I don't need to hear him, I can just

24   disregard it.  But let's go forward and move as quickly as we can.

25   BY MR. LARSON:

1    Q.  Are you familiar with the criteria that the court set forth in

2    Ex Parte Briseno for determining when somebody is mentally

3    retarded?

4    A.  Yes, sir.

5    Q.  And how many of those criteria are there?

6    A.  Seven.

7    Q.  And are you familiar with each of those?

8    A.  Yes, sir.

9    Q.  Can you state with, from a psychological, not a legal

10   perspective, from the perspective of the psychologist, what those

11   factors descriptively reflect, taking them one by one?

12   A.  Yes, sir.

13   Q.  The first factor:  "Did those who knew the defendant best

14   during the developmental stage - his family, friends, teachers,

15   employers, authorities - think he was mentally retarded at that

16   time, and, if so, act in accordance with that determination."

17          From a psychological standpoint, there are a number of

18   problems with this as it's applied to mild mental retardation.

19   First, it's dependent on the extent of information or observation

20   that different people had; it's dependent on the quality of formal

21   assessment; in other words, was this a school system, for example,

22   that did routine in-depth formal assessments of children; it's

23   dependent if we're talking about the family and friends on their

24   knowledge of what it means to have mild mental retardation; the

25   combination of a low-functioning family; in other words, if they

1    are in poverty and they have lots of problems and that in a chaotic

2    surrounding community, and if there is a general dearth of

3    assessment resources and interventions that are available at

4    school, which is the place where most of these children are going

5    to be identified if they're in that kind of family setting, as well

6    as an avoidance of "labeling," all of those things may result in a

7    person with mild mental retardation not being fully identified

8    during childhood.

9           So the notion that was it clear to everybody that this

10   person was mentally retarded is likely to be present if we're

11   talking about moderate or severe retardation.

12          MR. MILLER:  Judge, is he presuming now to take apart

13   what the Texas judges did?

14          THE COURT:  No, I mean, he is giving, I think, an expert

15   assessment of whether or not this particular standard can be

16   gleaned if someone is in the mild mental retardation range, that's

17   what I'm reading.

18          MR. LARSON:  Precisely.

19          THE COURT:  And I think he can do that.

20   BY MR. LARSON:

21   Q.  What is the second factor listed in Ex Parte Briseno?

22   A.  The second factor is:  "Has the person formulated plans and

23   carried them through or is his conduct impulsive?"  These are the

24   problems that's applied to mild mental retardation.  First,

25   planning is well within the capability of a person with mild mental

1    retardation.  In other words, it's well within the capability of a

2    child who is 8 to 11 years old to engage in plans.

3          Now, the second issue about is this conduct impulsive

4    treats impulsivity as if it is separate and distinct from or the

5    opposite of having a plan.  Now, that assumes that the impulsivity

6    is reactive in nature.

7          There are two types of impulsivity:  The first type

8    impulsivity is reactive.  That's where somebody bumps you and you

9    shove them.  Clearly that is independent of plan.  The more common

10   type of -- the reactive impulsivity is most characteristic of

11   preschool age children, people that are drunk, individuals that are

12   committed, and somebody who has a major anger problem.

13         The more common impulsivity that's seen in children ages

14   8 to 11, as well as some adults, is judgment impulsivity.  Judgment

15   impulsivity is like, I meet a woman today, we spend the next two

16   days planning our life together, and on Wednesday we get married.

17   That is a profoundly impulsive decision, even though we've spent

18   two days planning it.

19         As we would apply this to mild mental retardation, the

20   person who is mildly mentally retarded can make a plan and the

21   judgment problems they have, or the impulsivity problems they have

22   are more likely to be judgment in nature than reactive in nature.

23   Again, this is a standard that would be closer to severe and

24   moderate retardation.

25   Q.  And the third factor?

A.  The third factor:  "Does his conduct show leadership or does it show that he is led around by others?"  In this case as we would apply it to mild mental retardation, it is true that the persons who suffer from mild mental retardation are more susceptible to influence and exploitation, that's true.

Leadership, on the other hand, is a far more complex consideration, and that may involve things like is the mentally retarded person older, what's the age difference between them and the people that they may be showing leadership toward, is this person who is retarded aggressive so that that ends up producing some domination or leadership, or do they have financial resources; do they have -- if they're involved in illegal activity, drug selling and have money, then there may be other people who come to them because of the money, not because of any particular charisma or leadership that they display.

Q.  And the fourth criteria?

A.  "Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?"  Now, as we would apply this to mild mental retardation, this idea of responding to external stimuli in an irrational or inappropriate way is more characteristic of the functioning of a child less than three years old, who may dart out into the street, jump into a swimming pool, fail to attend to identifiable risks, fail to recognize cause and effect relationships.  Generally a child 8 to 11 years old is responding to external stimuli in a rational and

1    appropriate fashion.  So persons with mild mental retardation

2    routinely move about the community independently, hold employment,

3    and give other obvious indications that they're responding

4    rationally and appropriately to external stimuli.

5            And finally, as we think about responding to external

6    stimuli, mental retardation is not synonymous with psychotic.

7    Being mentally retarded doesn't mean that you're psychotic and

8    irrational and can't attend and recognize what's going on around

9    you.

10   Q.  The fifth factor?

11   A.  The fifth factor:  "Does he respond coherently, rationally, and

12   on point to oral or written questions or do his responses wander

13   from subject to subject?"  Now, as we would apply that to mild

14   mental retardation, persons with mild mental retardation are, in

15   fact, likely to respond coherently and rationally.  They are likely

16   to communicate on a more concrete level.  Their conversations may

17   also wander more as Paul's have demonstrated to do on the video.

18           But they still can respond on point, and as the Division

19   33 description of mild mental retardation illustrated, by

20   adolescence they have normal language fluency and so that means

21   they are responding on point, coherently, rationally in an oral or

22   written fashion.

23   Q.  The sixth criteria?

24   A.  The sixth one:  "Can the person hide facts or lie effectively

25   in his own or others' interests?"  We would apply this to mild

mental retardation.  This is another example where this child model
is 8 to 11 years old is useful.  Children well younger than 8
routinely attempt to cover evidence of misconduct.  Sometimes
pretty effectively and blatantly disavow it.  When we think about
that, hiding facts and lying are really pretty primitive reactions
that reflect deficits that reflect low ego strength, poor
appreciation of the evidence against them, fear of the
consequences, misplaced loyalty.

There are many reasons why someone might lie or deny that
are not associated with it reflecting a higher degree of
intellectual capability.  And so, in fact, denial is a common first
response by people with mild mental retardation when confronted
about misconduct.  And so this is not a useful discriminator as
we're looking at the mild category.  Now, as you move again to the
moderate to severe range, then this does begin to discriminate more
effectively.

Q.  And then the last criteria?

A.  The seventh one is:  "Putting aside any heinousness or
gruesomeness surrounding the capital offense, did the commission of
that offense require forethought, planning, and complex execution
of purpose?"  Well, there are two points as we would think about
that in relation to mild mental retardation is that, first, the
User's Guide, AAMR's User's Guide 2002, describes, do not use past
criminal behavior or verbal behavior to infer level of adaptive
behavior or about having mental retardation or intellectual

1    deficiency.

2          And the other aspect of this, again, as we think about

3    children, and not only children but even primates, exhibit

4    forethought, planning in complex behavior sequences.  This doesn't

5    even separate human beings from chimpanzees and is certainly not a

6    useful criteria for separating someone of intact intellectual

7    capabilities from somebody who is in the mild mental retardation

8    category.

9    Q.  So taking collectively, do the Briseno factors in effect

10   effectively exclude people who are mildly mentally retarded from

11   being classified as mentally retarded under the Briseno scheme?

12   A.  Yes, sir.  If applied as described, they would exclude almost

13   all individuals who suffer from mild mental retardation.

14   Q.  Which -- and those constitute 85 percent of --

15   A.  Of the retardation, of the total of retarded persons, and

16   virtually all capital offenders who are identified as mentally

17   retarded fall into the mild mental retardation category.

18   Q.  Dr. Cunningham, this is not the first time you have testified

19   in this trial, is it, or in conjunction with Paul Hardy's

20   proceedings?

21   A.  No, sir, I testified in 1996.

22   Q.  And what was your first contact back then with Paul Hardy's

23   defense team; do you recall?

24   A.  I believe I was contacted in the fall of 1995, late fall of

25   1995, I can retrieve that information, I don't know if off the top

1    of my head.

2    Q.  And did you ultimately testify at his trial as an expert

3    witness?

4    A.  Yes, sir, I did.

5    Q.  Have you reviewed your testimony from April 30th, 1996, in

6    conjunction with your testimony here today?

7    A.  Yes, sir, I have.

8    Q.  And that testimony, was it accurate regarding what you did in

9    '95 and '96 with regard to examining and evaluating Paul Hardy?

10   A.  Yes, sir, it accurately described my -- the steps that were

11   associated with his evaluation, the people I spoke to, the things,

12   the materials and records that I reviewed.

13   Q.  And do you recall what you concluded with regard to Paul Hardy

14   in 1996?

15   A.  I had many conclusions about him in 1996.  Are you speaking

16   about his IQ and its interpretation?

17   Q.  Well, did you -- at that time did you indicate that he possibly

18   had a brain injury; do you recall that?

19   A.  Yes, sir, I described the neuropsychological assessment that

20   Dr. -- referenced the neuropsychological assessment that

21   Dr. Bianchini had done and the evidence that Dr. Bianchini

22   testified to, that there was neuropsychological dysfunction that

23   was present.

24   Q.  At that time you also looked at his IQ scores, did you not?

25   A.  Yes, sir, I described those in my testimony.

1  Q.  And do you recall testifying at the '96 proceedings, and I

2  quote, that "these scores are probably about 15 points lower than

3  his true intellectual horsepower"?  Do you recall that?

4  A.  Yes, sir, I do.

5  Q.  And what was that statement based on?

6  A.  That statement was based on data that black Americans routinely

7  score on average, that that group of black Americans score about 15

8  points lower on full scale standardized IQ tests as compared to

9  white or Asian Americans.

10  Q.  And so when you made that statement, what population were you

11  specifically comparing Paul's IQ score to at that time?

12  A.  I was making a race-based IQ adjustment, that if the mean IQ

13  score in that black distribution is 85 and it's one standard

14  deviation down from 100, and his observed IQ score is 73, then

15  that's -- it's less than a standard deviation below the mean for

16  that group with -- as you would compare them to that group, you

17  would add 15 points to his score, so that, as compared to other

18  black Americans, he would be an IQ score of 88 rather than 73.

19  Q.  Is that something you would do today?

20  A.  No, sir.

21  Q.  And why did you do it then?

22  A.  At the time it was my interpretation of the available

23  psychological research on IQ and the effects of race or ethnicity

24  on IQ scores, that those tests either did not accurately reflect

25  their position in the population or that some adjustment needed to

1    be made in reference to the racial group that they belonged.  It

2    was an attempt to be more culturally sensitive.

3    Q.  Were you the only one who made such an adjustment or suggested

4    such an adjustment at that time?

5    A.  No, sir.  But this is -- how to interpret and what to do that

6    the observation in terms of the IQ scores, full scale IQ scores in

7    15 to 18 point differences, that is very well established.  What to

8    do with that information is scientific -- how to interpret it and

9    how to understand where it comes from is scientifically complex and

10   is a public policy issues of extraordinary implications with

11   potential for great harm.

12   Q.  Are adjustments like that being made today?

13   A.  No, sir, not in classifying somebody for eligibility with

14   mental retardation.  DSM-IV doesn't call for making a racial

15   discrimination, nor does AAMR.  So I do not regard that, at this

16   point in the understanding of the science that I have, I no longer

17   regard that as being either a sound diagnostic procedure, nor do I

18   think that it was -- it was my best understanding of the science at

19   the time, I no longer view that as having been an appropriate

20   description of Paul Hardy's intellectual capability.  It was

21   honest, but it was -- it was regretful.

22           MR. LARSON:  If I could have one moment, please, your

23   Honor?

24           THE COURT:  Yes.

25           MR. LARSON:  Your Honor, we would tender Dr. Cunningham

1    at this time.

2            THE COURT:  Okay.  We will recess until tomorrow morning

3    at nine o'clock.  Thank you all.

4            THE DEPUTY CLERK:  All rise.

5        (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED FOR THE DAY.)

6

7                            * * * * * *

8

9

10                      REPORTER'S CERTIFICATE

11

12      I, Karen A. Ibos, CCR, Official Court Reporter, United States

13    District Court, Eastern District of Louisiana, do hereby certify

14    that the foregoing is a true and correct transcript, to the best of

15    my ability and understanding, from the record of the proceedings in

16    the above-entitled and numbered matter.

17

18                        _Karen A. Ibos_

19    _____

20              Karen A. Ibos, CCR, RPR, CRR

21              Official Court Reporter

22

23

24

25