1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4

5    UNITED STATES OF AMERICA        *        Docket 94-CR-381-C
                                     *
6    versus                         *        New Orleans, Louisiana
                                     *
7    PAUL HARDY                      *        September 18, 2009
     * * * * * * * * * * * * * * * *

8

9                           VOLUME 5
               MORNING SESSION BEFORE THE BREAK
10              IN THE *ATKINS* HEARING BEFORE THE
                HONORABLE HELEN G. BERRIGAN
11              UNITED STATES DISTRICT JUDGE

12

     APPEARANCES:
13

     For the United States:      U.S. Attorney's Office
14                               BY:  MICHAEL E. MCMAHON, ESQ.
                                      MARK A. MILLER, ESQ.
15                               500 Poydras Street, Room B-210
                                 New Orleans, Louisiana 70130
16
     For Paul Hardy:             HERBERT V. LARSON JR., ESQ.
17                               650 Poydras Street, Suite 2105
                                 New Orleans, Louisiana 70130
18
     For Paul Hardy:             M. MICHELE FOURNET, ESQ.
19                               715 St. Ferdinand Street
                                 Baton Rouge, Louisiana 70802
20
     Official Court Reporter:    Toni Doyle Tusa, CCR, FCRR
21                               500 Poydras Street, B-406
                                 New Orleans, Louisiana 70130
22                               (504) 589-7778

23

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.

984

1                        **I N D E X**

2                                                        <u>PAGE</u>

3   Jill Hayes, Ph.D.

4         Direct Examination                            987

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        <u>**MORNING SESSION**</u>

2                      **(September 18, 2009)**

3          **THE DEPUTY CLERK:**  All rise.

4          **THE COURT:**  Have a seat, please.

5          **MS. FOURNET:**  We are ready to proceed, Judge, but I

6    would like to make an objection before we do proceed.

7          **THE COURT:**  Okay.  Sure.

8          **MS. FOURNET:**  We have just been handed this

9    morning -- in fact, I have not even had time to read it --

10   several 302s:  One dated September 15, 2009, one dated

11   September 17, 2009, and another one dated September 17, 2009.

12         **THE COURT:**  Okay.

13         **MS. FOURNET:**  We have also been handed a list of what

14   appears to be additional demonstrative exhibits.

15              With respect to the 302s, clearly we have never

16   been given these 302s, and we would object to any use of these

17   302s or references to them in Dr. Hayes' testimony.

18              With respect to the demonstrative exhibits, I

19   have not had time to go through those either, those having just

20   been handed to me.  Obviously, we have no problem with

21   demonstrative exhibits that incorporate information that's

22   contained either in our documents or in theirs.

23              I am looking at one that says "collateral

24   informants."  I am not recognizing some of these names:  Carrie

25   Burkes, Meredith Burt, Derek Bardell.  Because I was just

1    handed this information, I don't have time to go through it.

2    Some of them I do recognize.

3            Certainly, we would object to the 302s, and we

4    would object to any demonstrative exhibits that incorporate

5    information not previously provided to us by the government or

6    existing in our own files at this late date.  This has been a

7    theme of the complaints by the government, and it seems to me a

8    little disingenuous for them now to come along in the middle of

9    this hearing and engage in the very same kind of activity they

10   have consistently accused us of throughout this matter.

11        **THE COURT:**  Since this is a bench matter, what I

12   would like to do is have the government proceed as they wish to

13   proceed.  If it turns out there's prejudice in using any of

14   these documents, obviously the defense can let me know that.

15   Make your objection as you see something that you haven't seen

16   before because obviously I'm not as steeped in this case as you

17   all have been.  Go ahead and object as things come in.  If it

18   is something that is unexpected and you haven't seen before,

19   I'll make a note of it, and then I'll make any rulings

20   afterwards if I find there's prejudice.

21        **MR. MCMAHON:**  Your Honor, just for the record,

22   perhaps if Ms. Fournet reads Dr. Hayes' report, everything here

23   is in Dr. Hayes' report.

24        **THE COURT:**  Okay.  Reference it in the report if

25   there's an objection.

1          **MR. MCMAHON:**  Thank you.

2          **THE COURT:**  Are we ready?

3          **MR. MCMAHON:**  Yes, Your Honor.

4          (WHEREUPON **Jill Hayes, Ph.D.**, having been duly sworn,

5    testified as follows.)

6          **THE COURT:**  Dr. Hayes, you're still under oath.

7          **THE WITNESS:**  Thank you.

8                          **DIRECT EXAMINATION**

9    BY MR. MCMAHON:

10   **Q.**   Dr. Hayes, did you consult various sources in the

11   preparation of your report and your evaluation?

12   **A.**   I did.

13   **Q.**   I would like to go through, assisted by the PowerPoint,

14   and let's talk about first the people that you actually

15   interviewed and otherwise consulted.

16   **A.**   Okay.

17   **Q.**   Now, how did you identify or what was your aim in

18   consulting people and talking to people?  What did you want to

19   do?

20          **THE COURT:**  Let me just jump in.  Your PowerPoint,

21   are they numbered, by chance?

22          **MR. MCMAHON:**  No.

23          **THE COURT:**  I want to have it afterwards, obviously.

24   No problem.

25          **MR. MCMAHON:**  We will just go page by page.

1          **THE COURT:**  Okay.  Go ahead.  I'm sorry.  Go ahead.
2     **BY MR. MCMAHON:**
3     **Q.**   What was your aim in gathering resources and interviewing
4     people?
5     **A.**   The goal was to gather as much information about
6     Mr. Hardy's level of functioning in all areas and in different
7     environments.  The other aim, to consult different people, was
8     to clarify information that I had to make sure that it was
9     correct or to ensure what the information I had was saying.
10    **Q.**   Why was that important in this case?
11    **A.**   Obviously, this is a very serious issue, and so you want
12    to make sure that you have as many different sources of
13    information as possible and clarify as many different issues as
14    you possibly can.
15    **Q.**   Does the fact that this is a retrospective evaluation
16    factor in?
17    **A.**   Obviously, yes.
18    **Q.**   Why?
19    **A.**   One being that there is a large amount of error that is
20    going to be introduced when you are trying to do a
21    retrospective evaluation, especially one where you are trying
22    to look back, say, 20-some-odd years to figure out what a
23    person was doing at that time, how the person was behaving at
24    that time, what they could and couldn't do 20 years ago; the
25    same being at the time of the crime, the same being now.  So

1  you really do need to try to do as comprehensive an evaluation
2  as you possibly can.
3  Q.   Let's talk about Captain Terry Hardy.  Did you speak with
4  him?
5  A.   I did.
6  Q.   When?
7  A.   I spoke with Captain Terry Hardy on February 17, 2009.
8  Q.   Tell the Court a little bit about that encounter.
9  A.   It was difficult to set up a meeting with Captain Hardy,
10 but after multiple phone calls I was able to catch up with him
11 at the fire department headquarters.  We sat down and talked
12 for about 30 minutes.  Captain Hardy had some concerns about
13 talking with me about his brother and his brother's level of
14 functions.
15 Q.   What did you tell him?
16 A.   I told him that whatever we talked about would not be
17 confidential, that I would like to videotape the interview,
18 that he certainly did not have to speak with me.  I told him
19 what my understanding of what was going on in his brother's
20 case was, but I also suggested that he speak with Mr. Hardy's
21 defense attorneys to make sure that everything I was saying was
22 right because I'm certainly not a lawyer; that I wanted to
23 speak with him and a sister about their brother's level of
24 functioning, what they could recall about him when he was
25 younger up until now, and that certainly I wanted to address

1  all areas of Mr. Hardy's functioning in as comprehensive a way

2  as possible.

3  Q.    What did he tell you?  What did he say in response?

4  A.    Well, he asked me first if he could meet with -- him and

5  his sister could jointly interview with me, and I said

6  certainly.  Then he asked if he could speak with his brother's

7  attorneys, and I said, "Of course.  I think that's a good

8  idea."

9  Q.    At the end of that meeting, was there any understanding or

10  any arrangement made?

11  A.    It was around the time of Mardi Gras and I'm sure that

12  Captain Hardy was busy, so he asked if he could get in touch

13  with Mr. Larson and that he would get back in touch with me in

14  about a week.

15  Q.    Did he get back in touch with you?

16  A.    No, he did not.

17  Q.    Did you try to recontact him?

18  A.    I did.

19  Q.    Were you successful?

20  A.    No, I was not.

21  Q.    You also interviewed then sergeant Shannon Desroche.  Who

22  was she?

23  A.    She is a correctional officer at the St. Bernard Parish

24  jail.

25  Q.    Do you know what her job is down there?

1   **A.**   I do.  She is now the lieutenant who is in charge of the

2   medical division.  She is the person responsible for handing

3   out medications, responding to inmate requests for medical

4   care.  She is an emergency medical technician by history.

5   **Q.**   Why did you want to talk with her?

6   **A.**   For one, she has regular contact with different inmates

7   when she's passing out her medications.  She would have

8   knowledge of his sick call requests.  She would have knowledge

9   of his day-to-day behavior because for a period of time she was

10   seeing him on most days out of the week when she was passing

11   out medications during her rounds, and then she would also see

12   him at other times when she would be in the booth.

13   **Q.**   The literature speaks of possible bias on the part of

14   correctional officers.  Can you comment on that, please.

15   **A.**   Certainly.  Obviously, correctional officers tend to have

16   a pro law-enforcement slant, so obviously you have to take into

17   account the possible biases that could come into play with

18   interviewing correctional officers.  As with any other source

19   of information that you obtain, again, you try to get as much

20   information as you possibly can.  Then you, as the psychologist

21   and professional, try to decide how much weight you're going to

22   give to that information.

23   **Q.**   Would you say that paramours and, to use the

24   colloquialism*, baby mamas* have an inherent bias too?

25            **MS. FOURNET:**  I completely object.

1          **THE COURT:**  Let's not use terms like *baby mamas*.

2          **MR. MCMAHON:**  I said "colloquialism."

3          **THE COURT:**  We don't have to go into a colloquialism.

4          **MR. MCMAHON:**  I apologize.

5    BY MR. MCMAHON:

6    **Q.**    Mothers of children, do they have an inherent bias too?

7    **A.**    Of course.

8    **Q.**    Who's Ryan Laylle.

9    **A.**    He is a corporal at the St. Bernard Parish jail.  He had

10   direct contact with Mr. Hardy, did commissary, would be in the

11   booth from time to time, would also be out on the yard and

12   watch the inmates who were on the yard.

13   **Q.**    Who is Gary Adams?

14   **A.**    Gary Adams is another officer at the St. Bernard Parish

15   jail.  He was also responsible for commissary accounts and for

16   monitoring inmate behavior.

17   **Q.**    Let's go to Toni Van Buren, Greg Williams, Vance Ceaser,

18   Theresa Minor.  Take them together.  Where did you interview

19   them?

20   **A.**    At the Hale Boggs Federal Building.

21   **Q.**    That interview was videotaped?

22   **A.**    Yes, they were.

23   **Q.**    They were transcribed as well?

24   **A.**    Yes.

25   **Q.**    Whose idea was it?

1  **A.**   Mine.

2  **Q.**   Why?

3  **A.**   I believe that, especially in evaluations such as this,

4  it's necessary to be as transparent as possible with regard to

5  your methodology and your interviews and how you're conducting

6  your evaluation.

7         Of course, it's hard to open yourself up to scrutiny,

8  but I feel like in these types of situations you need to be as

9  open and honest as you possibly can so you can lay it all out

10 on the table:  Here's what I did.  Here's how I did it.  Here's

11 what the people said.

12        So whenever possible, I would like to videotape

13 and/or audiotape my interviews as I can.  Sometimes that's not

14 always possible.

15 **Q.**   Who's Faith Price?

16 **A.**   Faith Price was one of Mr. Hardy's paramours.

17 **Q.**   Did you get a chance to talk to her?

18 **A.**   I did.

19 **Q.**   Was that taped?

20 **A.**   No, it was not.

21 **Q.**   Why not?

22 **A.**   It was a very short interview, from what I can recall, and

23 Ms. Price had very little information about Mr. Hardy that she

24 could recall from the past other than some generalities.

25 **Q.**   Was she cooperative?  Did she have a good attitude?

1    A.    Not really.  She really didn't want to be interviewed.  So
2    she said that she would answer a few questions but after that
3    she needed to go back in because I think she needed to get
4    ready for work.  So, obviously, that was fine, fine with me.
5    Q.    You note that you also spoke to someone from Pearson
6    Assessments.  What is Pearson Assessments?
7    A.    Them are the publisher of the Wechsler Adult Intelligence
8    Scale Revised, otherwise known as the WAIS-R.
9    Q.    Why did you speak to someone from Pearson?
10   A.    I wanted to find out when the WAIS-R was renormed and
11   restandardized and the new measure came out, the WAIS-III
12   (Wechsler Adult Intelligence Scale III), if they had any data
13   with regard to test/retest information about people who were
14   tested with the WAIS-R and the WAIS-III to see if they had any
15   data about the alleged Flynn Effect in individuals who were
16   either borderline to mild to mentally retarded.
17          I thought it was necessary to go straight to the
18   source, so I went to the publisher and asked them if they had
19   that information because they do have that information when
20   they changed from the WAIS-III to the WAIS-IV.
21   Q.    Did you get anything from them?
22   A.    No.  They said they didn't look at that when they were
23   changing the test from the WAIS-R to the WAIS-III.
24   Q.    Who is Derek Bardell?
25   A.    Derek Bardell is, I believe, dean of students for a couple

1    of the Jefferson Parish School System schools.  He also -- let
2    me just make sure I have gotten his title right.  He is dean of
3    student services at Deckbar and John Martin alternative schools
4    in Jefferson Parish, and he was also a schoolteacher in the
5    Orleans Parish School System for approximately 10 years.
6    **Q.**    Why did you speak to him?
7    **A.**    I thought, given his background in alternative schools and
8    in the Orleans Parish School System, that he may be able to
9    shed some light on what some of the acronyms referred to in
10   Mr. Hardy's transcript are.
11   **Q.**    Was he able to shed light on those?
12   **A.**    No, not really.  He said that one of the acronyms may be
13   "read, enjoy, and discover," something like that, but that he
14   was not familiar with those acronyms.
15   **Q.**    What did Dr. Swanson suggest about that READ acronym?
16   **A.**    She had indicated it was a remedial type of class or a
17   special education -- I think remedial and that he was in
18   Title I classes.
19   **Q.**    So you were trying to run down whether the READ program
20   was remedial or not?
21   **A.**    Right.  There was another class on Mr. Hardy's
22   transcript -- it was like "BA MTH OP 1" -- and so I wanted to
23   confirm what that was.
24   **Q.**    Were you able to do that?
25   **A.**    Not with Mr. Bardell, no.

1   **Q.**   You spoke to Javetta Cooper?

2   **A.**   I did.

3   **Q.**   We will go into that in a little more detail later in your

4   testimony.

5              You spoke to Sammie Williams?

6   **A.**   I did.

7   **Q.**   Who is Stacy Stewart?

8   **A.**   Stacy Stewart is an individual who works in the

9   administrative offices in the New Orleans public school system.

10  **Q.**   What was the purpose of speaking with her?

11  **A.**   I just wanted to ensure that -- again, this is out of an

12  abundance of caution.  His elementary transcript had G's and

13  S's.  While we all probably considered that a "G" probably

14  means good and an "S" probably means satisfactory, I wanted to

15  ensure that since the key was not included on the transcript

16  page.

17  **Q.**   Who is Carrie Burkes?

18  **A.**   Carrie Burkes is another individual who works in the

19  office of student support services for the Orleans Parish

20  Public School System.

21  **Q.**   What was the purpose of speaking with her?

22  **A.**   I wanted to find out if she knew any information about

23  what the acronyms stood for and other information there.

24  **Q.**   Was she informative?

25  **A.**   I wasn't able to get in touch with her.

1    Q.    Meredith Burt?

2    A.    Meredith Burt is the assistant supervisor of education at

3    the federal correctional institute at Terre Haute.  I contacted

4    her because one of the things that I was interested in was, as

5    I reviewed Mr. Hardy's Bureau of Prisons records, there was a

6    one-page sheet which indicated what appeared to be some

7    achievement testing scores.  I wanted to discuss with her what

8    the scores actually meant:  Were they raw scores?  Were they

9    standard scores?  Were they grade equivalent scores?  So I

10   wanted to confirm with her what I thought that they were.

11   Q.    Who is Walter Barbier?

12   A.    Walter Barbier is a salesman that has worked at Audi of

13   New Orleans for a number of years.

14   Q.    Why speak with him?

15   A.    Mr. Hardy had an Audi that allegedly had a cell phone or

16   something like that that was never connected.  I called Walter

17   Barbier because I wasn't sure that a lot of cars came with cell

18   phones installed, because it was suggested that the cell phone

19   was a factory-installed cell phone.

20   Q.    Who suggested that?  Can you recall?

21   A.    I think it was Greg Williams to the best of my

22   recollection.

23   Q.    Was Mr. Barbier able to shed light on that question?

24   A.    Yes, he did.  He said, basically, that it wasn't until the

25   later '90s that the Audis came factory installed with cell

1  phones.

2  **Q.**   Did you also review various records relating to the

3  original prosecution of Hardy?

4  **A.**   I did.

5  **Q.**   Why do that?

6  **A.**   That information can be helpful to figure out what was

7  going on in and around the time of the crime, what the

8  individual that is being evaluated was doing in and around the

9  time of the crime.

10  **Q.**   In this evaluation, why was that important or why did you

11  think it was important?

12  **A.**   Well, one of the issues here to be determined is:  Was

13  Mr. Hardy mentally retarded at the time of the crime?  So the

14  best information about whether he was operating in a manner

15  that suggested low adaptive functioning and intelligence is

16  getting as much information as possible about the time

17  surrounding the crime.

18  **Q.**   So did you review any guilt phase testimony?

19  **A.**   I did.

20  **Q.**   Specify.

21  **A.**   The guilt phase testimony of Steven Jackson.

22  **Q.**   Any other records?  Any other records relating to the

23  instant crime?

24  **A.**   Certainly.  I went over available penalty phase testimony.

25  I believe it was all records from the penalty phase testimony.

1    **Q.**    These are enumerated in the slide we have.

2    **A.**    Yes.

3    **Q.**    Can you just read off the people whose respective

4    testimony you reviewed.

5    **A.**    Certainly.  Albertine Arceneaux, Javetta Cooper, Jacquetta

6    Franklin, Linda Hardy, Marie Hardy, Terry Hardy, Keith

7    Mitchell, and Toni Van Buren.

8    **Q.**    I think there was a mention -- did you also review the

9    testimony of Dorothy Robinson?

10   **A.**    I believe so.

11   **Q.**    Who was Dorothy Robinson?

12   **A.**    Dorothy Robinson was a family friend of the Hardys.  She

13   operated a small business that I think had a sandwich shop that

14   also had some computer video -- not computer, but at this time

15   video games like Pacman or Donkey Kong or something like that.

16   **Q.**    What other records?  Can you enumerate those listed on

17   this display.

18   **A.**    Yes.  I also reviewed the closing statements, the closing

19   statement by attorney Markey, and also the jury charge by the

20   Court.

21   **Q.**    What else?

22   **A.**    I reviewed the jury verdict as well as several appellate

23   decisions.

24   **Q.**    Did you also obtain school records?

25   **A.**    Yes.  Donkey Kong.

1    Q.    Were you able to obtain school records?

2    A.    Minimal, but yes.

3    Q.    Any from California?

4    A.    From the Los Angeles Unified School District related to

5    John C. Fremont High School.

6    Q.    Did Hardy attend John C. Fremont High School for a time?

7    A.    Yes.

8    Q.    Also, were you able to obtain records from the

9    Orleans Parish School System?

10   A.    Yes.

11   Q.    Now, how about various legal records from different

12   government agencies?

13   A.    Yes.  I was able to obtain some of those.

14   Q.    Let's start with the Bureau of Prisons.  Why did you want

15   to get Bureau of Prisons records?

16   A.    Obviously, Mr. Hardy's functioning in jail is not

17   necessarily equivalent to his functioning out on the street,

18   but it still could be illustrative of some of the adaptive

19   abilities a person may or may not have.  So the Bureau of

20   Prisons' records would be helpful, one, because sometimes they

21   had IQ scores when a person is initially admitted into the

22   Bureau of Prisons.  They would also likely have mental health

23   records that would have mental status evaluations included in

24   them, which they did.  Also, medical records would be available

25   from that.  Then there's also often other ancillary records

1    that are helpful as well.

2    **Q.**    Just take the next three as one entity:  The

3    Orleans Parish Criminal Sheriff's Office, the St. Bernard

4    Parish jail, and the Tangipahoa Parish jail.  Why records from

5    those institutions?

6    **A.**    Those are places that Mr. Hardy had been incarcerated

7    since the time of the crime.  Again, though a jail is not

8    equivalent to functioning on the outside world, it definitely

9    is a window into what a person can and cannot do.  Those

10   records would also include like medical requests, commissary

11   accounts, possibly telephone calls that he had made, officer

12   observations.  Any fights or disciplinary problems that a

13   person had is usually included in those as well.

14   **Q.**    You also note records from the FBI.

15   **A.**    Yes.

16   **Q.**    Let's go to next slide, please.  Explain to the Court the

17   various 302s that you reviewed.

18   **A.**    Okay.  The various 302s were from various individuals.

19   Some of them were people who had knowledge of Mr. Hardy's

20   activities prior to the crime.  Some of them were people that

21   he had bought guns from or had contact with in that manner.

22   Some were associates' family members.  Others were just various

23   302s, information that may or may not shed light on Mr. Hardy's

24   behavior in and around the time of the crime.

25   **Q.**    Just for the record, some of the 302s most noteworthy are

1  those of confidential witnesses, Paul Hardy, Joyce Francoise,

2  Pat Hebert of Elliott Small Arms, John Blair McMillans, Kenneth

3  John McMillans, Anthony Richardson, Harold Richardson, Marleen

4  Richardson, Louis Theriot, and Special Agent Michael Timko;

5  correct?

6  A.    Correct.

7  Q.    Let's go on to other records that you reviewed in

8  preparation of your evaluation.  Can we discuss the first item

9  on that display.

10  A.    The first item is just simply a receipt for property that

11  was received and returned or released or seized from a

12  videographer named Dawn Dedeaux.

13  Q.    We spoke about Ms. Dedeaux yesterday.  How about

14  surveillance notes?

15  A.    Those were included as well.

16  Q.    Did you find surveillance logs to be useful?

17  A.    Of course.

18  Q.    Why?

19  A.    It sheds light onto what Mr. Hardy was doing from day to

20  day such as was he going to the dentist, was he traveling to

21  associates' houses, was he traveling alone, was anything else

22  noteworthy in the surveillance logs.

23          When you ask for records, you quite never know what

24  is going to be received.  Until you can review them and

25  determine whether or not they are helpful, you still need to

1  get them and review them.

2  **Q.**   Other information, did you also -- back to the 302s for a

3  minute.  Did you also review 302s prepared concomitant with

4  Hardy's arrest, meaning the various items he had on his person,

5  in his wallet, things like that?

6  **A.**   Yes.

7  **Q.**   Also relative, I take it, to the execution of search

8  warrants regarding documents taken from his residence?

9  **A.**   Yes.

10  **Q.**   The tape recordings, the next item, and transcripts of

11  recordings, do those relate to the actual wiretap conversations

12  that were really the cynosure of the first trial?

13  **A.**   Yes.

14  **Q.**   You note "victim list."

15  **A.**   My understanding of the victim list, from clarifying that,

16  is that it was a list of crimes for which Mr. Hardy was

17  considered a suspect.  I believe there were a few other ones on

18  there for which Mr. Hardy was not considered a suspect as well.

19          **MR. MCMAHON:**  By the way, *cynosure* was Dianne's word

20  for the day.

21  **BY MR. MCMAHON:**

22  **Q.**   Let's go on to the last item in that display, videotapes

23  of Mr. Hardy taken by Dawn Dedeaux.  Can you just elaborate a

24  little on that item.

25  **A.**   Certainly.  There were some videotapes of Mr. Hardy, his

1    brother Wayne, another individual at one point driving around
2    town, driving by a drive-by shooting, and then talking with
3    Ms. Dedeaux in City Park.
4    **Q.**    The next item.  Did you also review Paul Hardy's criminal
5    history to the best of your ability?
6    **A.**    Yes.
7    **Q.**    Let's go on to the next.  How about medical records?  Can
8    you elaborate on those, please.
9    **A.**    Certainly.  I was able to review medical records from
10   Dr. Henry Evans, who had treated Mr. Hardy following a couple
11   of accidents that had occurred.  I was able to review
12   Charity Hospital of New Orleans records as well as medical
13   records that were contained within the Orleans Parish medical
14   department.  That was part of, I believe, Dr. Bianchini's file.
15   **Q.**    Next, let's talk about the expert files.  Were these
16   important components in your evaluation?
17   **A.**    Absolutely.
18   **Q.**    For the record -- it may not be obvious, but go ahead.
19   Why were they so important?
20   **A.**    This information, at least the first four individuals that
21   are on the slide -- which would be Dr. Tetlow, Dr. Cunningham,
22   Dr. Martell, and Dr. Bianchini -- had all seen Mr. Hardy more
23   proximal to the crime, which was in 1996.  So, obviously,
24   getting their records was going to be quite helpful.
25   **Q.**    Dr. Bianchini is a neurologist; correct?

1   A.   No, he is not.  He is a neuropsychologist.

2   Q.   A neuropsychologist.  All these "neuros" are confusing me

3   at this point.

4            Did he do testing on Mr. Hardy in 1996?

5   A.   He did.

6   Q.   Dr. Martell is a forensic psychologist?

7   A.   He is.  I'm not positive, but I believe he has also

8   training in neuropsychology.

9   Q.   Dr. Tetlow is what?

10  A.   I believe he was a psychologist who had worked within the

11  Bureau of Prisons for a number of years here in Louisiana and

12  then had been in private practice is my understanding.

13  Q.   He also tested Mr. Hardy back in '96?

14  A.   He did.

15  Q.   Did Cunningham test Hardy in '96?  Can you recall?

16  A.   I believe that he did some limited testing with him in

17  1996.

18  Q.   Of course, you reviewed Dr. Swanson's records?

19  A.   Of course.

20  Q.   Next slide, please.  We have this listed as bank and

21  account records.  Now, why review bank and account records in

22  such an evaluation?

23  A.   It seems fairly obvious that if an individual is able to

24  maintain a bank account, if an individual is able to maintain

25  credit cards and other accounts that it would be informative

1   about that person's ability to use credit cards, make
2   purchases, and carry on different activities related to
3   purchasing different things.  The Blockbuster Video is just a
4   little bit of a window into what he may have enjoyed doing,
5   which was watching movies.
6   **Q.**   Now, when we say "bank and account records," for the
7   record, these were in the name of Paul Hardy; correct?
8   **A.**   Correct.  I would also like to point out that we attempted
9   to get as much records or I asked for as many records as
10  possible related to all of these accounts, but the accounts
11  were so old we were unable to get additional information from
12  them.  I did try to get more information about his purchases,
13  other things like that, but that information was not available.
14  We simply had what was available at the time that Mr. Hardy was
15  arrested and pretty much on his person.
16  **Q.**   For the transcript, can you enumerate the records you
17  reviewed.
18  **A.**   Of course.  First NBC Bank, Blockbuster Video, Dillard's,
19  Mervyn's, Sam's Club, Structure, Macy's, and Radiofone.
20  **Q.**   The next.  How about firearm transaction records?
21  **A.**   I reviewed those as well.
22  **Q.**   How does that fit into a mental retardation evaluation?
23  **A.**   As part of obtaining a gun, one must fill out, I guess, a
24  gun application or I don't know if that -- I don't buy guns and
25  so I'm not real familiar with the process, but an application

1  that would indicate your name, where you live, what your

2  Social Security number is, have you had any mental disorders or

3  difficulties in the past, various things that one would

4  typically list on some sort of application.

5  **Q.**   The indoor shooting range, does that factor into any

6  adaptive area in any way or how would it?

7  **A.**   Based upon some of the 302s, the 302s -- which were the

8  FBI interviews -- had indicated that Mr. Hardy enjoyed -- or

9  not had enjoyed but that he attended the indoor shooting range

10 and would go there, which was corroborated by Mr. Hardy.

11 **Q.**   Did Ms. Van Buren also corroborate that?

12 **A.**   Yes.  She indicated that she had gone with him on one

13 occasion.

14 **Q.**   Next slide.  How about other government-issued documents?

15 **A.**   As part of the FBI file, I was able to obtain a copy of

16 his driver's license that was issued on June 3, 1993, a voter

17 identification card, and then another identification card

18 November 4, 1994.

19 **Q.**   All in Mr. Hardy's name?

20 **A.**   Correct.

21 **Q.**   Next.  What about Marie Hardy, Hardy's mother?

22 **A.**   Those records were provided by the defense, and thank you.

23 Those records were helpful in understanding more about

24 Mr. Hardy's background.  The Housing Authority records was able

25 to shed light on who was in the Hardy home when, what their

1   resources were, and information such as that.  Any difficulties

2   that they had while they were living in one of the housing

3   developments was also indicated.  I wouldn't say any but some,

4   what was documented.  The next thing that was provided were

5   medical records on Marie Hardy.  The third thing was also

6   psychological records from Marie Hardy.

7   Q.    Next slide, please.  Now, why get school records regarding

8   Terry Hardy?

9   A.    Those were also provided by the defense.  I was actually

10  surprised when I got them.  I was looking and thinking it must

11  have been Paul not Terry, but it was Terry.  I think we were

12  fortunate, actually, to get those because we know that IQ has a

13  large inheritable component.  It's definitely not a positive

14  one correlation, which would mean a perfect correlation, but

15  that is a significant -- or genetics are a significant amount

16  of the variance when one is looking at IQ --

17  Q.    Okay.

18  A.    -- especially siblings.  Under fraternal twins and

19  identical -- well, identical twins and fraternal twins,

20  siblings are the next most correlated family members.

21  Q.    The next slide, please.  Records related to the housing

22  developments, I believe these also were provided by the

23  defense; correct?

24  A.    They were.

25  Q.    I'll read them just for the record:  All 911 calls for

1009

1    3315 Melpomene from 1986 to 1995; records of homicides in the
2    Calliope housing development from 1985 to 1992; an NOPD crime
3    trend report for 1993 and 1995; a B.W. Cooper -- which is
4    another project -- viability report; and the Florida housing
5    development viability report again relating to the Florida
6    project.
7            Next slide.  How about criminal histories, rap
8    sheets?
9    A.    I was able to obtain some as well.
10   Q.    Regarding Toni Van Buren and Greg Williams?
11   A.    Yes.
12   Q.    No criminal histories were developed for Vance Ceaser,
13   Theresa Minor, or Javetta Cooper?
14   A.    That's correct.
15   Q.    The next slide, if we can just wrap up this area now.
16   What else?  We may have already covered some of this stuff; but
17   if we didn't, can you comment on the items enumerated here, for
18   example, handwritten papers.
19   A.    In Mr. Hardy's possession at the time of his arrest were
20   various handwritten papers.  There were business cards that had
21   writing many times on the front and on the back, Lotto tickets,
22   and then I obtained a printout from Dawn Dedeaux's Web site
23   that indicated that her videography related to Mr. Hardy and
24   his brothers was from 1988, I believe.
25   Q.    All right.  Now, Dr. Hayes, a lot has been said in the

1  last several days regarding the issue of malingering.  Now we

2  are going to go into the substance of your testimony here.  Did

3  you ever say that Hardy malingered?

4  **A.**    No, I did not.

5  **Q.**    But you do have a heading "Malingering Response Bias" in

6  your report?

7  **A.**    Of course.

8  **Q.**    What were you getting at?  What did you mean?

9  **A.**    In terms of malingering or response bias, in order to

10  determine if the data that you have are good, you obviously

11  have to look for any biases, and you obviously have to look for

12  any distortions of the data.  Because if the data that you have

13  to base your opinion on are not reliable and they are not

14  valid, then it's useless.  You're only as good as the validity

15  and the reliability of the data that you have.  So the first

16  thing you must look at and be mindful of is the possibility of

17  malingering or response bias.

18         By malingering I mean, like the DSM definition says,

19  it's the intentional production of faults or grossly

20  exaggerated symptoms for secondary gain.

21         Response bias is manipulation of the data in some way

22  due to possibly some different factor.  It could be any number

23  of things.

24  **Q.**    Did you feel Hardy was putting out or were there

25  indications that --

1          **MS. FOURNET:**  Your Honor, if I might, just as a

2    matter of courtroom etiquette, I wonder if Mr. McMahon could

3    follow Dr. Hayes' lead and refer to my client as "Mr. Hardy."

4    This is not a locker room, this is a courtroom, and I would ask

5    that he show a little --

6          **THE COURT:**  What term?  Did you call him "Hardy"?

7          **MR. MCMAHON:**  Well, just as the defense often

8    referred to Dr. Hayes as "Hayes" as well.

9          **THE COURT:**  If you are just using a last name, I have

10   no problem.  Overruled.  Go ahead.  I didn't hear anything

11   disparaging.  Go ahead.

12   **BY MR. MCMAHON:**

13   **Q.**   Back to the question.  Were this indicators that the

14   defendant was not trying, was not putting out a best effort?

15   **A.**   There were indicators that Mr. Hardy's test data was not

16   consistent.  There were indicators that his test data was

17   inconsistent.  So at times you get concerned about whether his

18   best effort, for one reason or another, was being presented

19   during the different testing occasions.

20         **THE COURT:**  Could you just clarify what test data we

21   are talking about.

22   **BY MR. MCMAHON:**

23   **Q.**   Doctor.

24   **A.**   Certainly.  There was the Dr. Martell evaluation that was,

25   I believe, March 22 and March 23 of 1996.  There was the

1012

1   Dr. Bianchini evaluations that were April 3 and April 4.

2           **THE COURT:**  I just don't know if we were returning to

3   your own evaluation or someone else's.  I just need

4   clarification whose test data we are talking about.

5   Dr. Martell, Dr. Bianchini --

6           **THE WITNESS:**  -- Dr. Tetlow, Dr. Cunningham, and

7   Dr. Swanson.

8           **THE COURT:**  All right.

9   **BY MR. MCMAHON:**

10  **Q.**   Does the *DSM* address at least a scenario or scenarios

11  where the issue of malingering should at least be considered?

12  **A.**   Yes, it does.

13  **Q.**   Actually, first, what are those factors listed in the *DSM*?

14  By "*DSM*" I am referring to the *DSM-IV-TR*; correct?

15  **A.**   The text revision, yes.

16  **Q.**   Go ahead.

17  **A.**   The factors that are outlined in the *DSM-IV-TR* are:

18          No. 1 would be a medicolegal context.  Certainly,

19  this is probably the biggest medicolegal context that ever

20  could have existed, so certainly that should be considered.

21  **Q.**   The next one.

22  **A.**   The next one:  Is there a marked discrepancy between the

23  person's claimed stress or distress and the objective findings

24  that one has?

25  **Q.**   The third condition.

1   **A.**   The third criteria -- yeah.  These are more not criteria

2   but conditions in which it should raise the suspicion that the

3   person may or may not be malingering, exaggerating, or

4   responding in a biased manner; not that they are, but that if

5   these conditions exist, you should certainly look into the

6   possibility that malingering, exaggeration, and response bias

7   existed.

8   **Q.**   What's the third?

9   **A.**   The third is lack of cooperation during the diagnostic

10  evaluation and in complying with various treatment regimens.

11  **Q.**   The fourth?

12  **A.**   Let me just clarify that.

13  **Q.**   Okay.  Go ahead.

14  **A.**   The treatment regimen, this one is more for the civil

15  side.  It's more of like if a doctor had told you to go and do

16  this and then you don't do this, then the possibility of

17  malingering, exaggeration, and response bias may be raised.

18  **Q.**   The fourth.

19  **A.**   The fourth is the possible presence of antisocial

20  personality disorder.

21  **Q.**   Could we flash that up.  Can you identify that page.

22  Where is that from?

23  **A.**   That page is from the *Diagnostic and Statistical Manual of*

24  *Mental Disorders*, Fourth Edition, the Text Revision, otherwise

25  referred to here as the *DSM-IV-TR*, page 706.

1   **Q.**   For the record, could you go down these indicators for
2   antisocial personality disorder, please.
3   **A.**   Certainly.  Obviously, in order to diagnose an individual
4   with antisocial personality disorder, there has to be a
5   pervasive pattern of these behaviors throughout a person's
6   life.  It would have to be, basically, the disregard for and
7   violation of the rights of others occurring since the age of
8   15.  We don't have information that Mr. Hardy had done that
9   prior to the age of 15, but he does meet many of the diagnostic
10  criteria for antisocial personality disorder.
11  **Q.**   What's the first one?
12  **A.**   The first one is failure to conform to social norms with
13  respect to lawful behaviors as indicated by repeatedly
14  performing acts that could get the individual arrested.
15  **Q.**   Next.
16  **A.**   The second one is deceitfulness as indicated by lying,
17  using aliases, or conning other people for pleasure for profit.
18  **Q.**   Number 3.
19  **A.**   The third one is impulsivity or failure to plan ahead.
20  **Q.**   Number 4.
21  **A.**   Number 4 is irritability and aggressiveness such as being
22  demonstrated by fights or various assaults.
23  **Q.**   Number 5.
24  **A.**   Number 5 would be reckless disregard for the safety of
25  himself or others.

1   **Q.**    Number 6.

2   **A.**    Consistent irresponsibility such as their repeated failure

3   to sustain consistent work behavior or honor financial

4   obligations.

5   **Q.**    Number 7 under A.

6   **A.**    Lack of remorse as indicated by being indifferent to or

7   rationalizing having hurt, mistreated, or stolen from another

8   person.

9   **Q.**    What is the second condition?

10   **A.**    The individual has to be at least 18 years of age.

11   **Q.**    C?

12   **A.**    C is that there has to be evidence of conduct disorder

13   with an onset before the age of 15.

14   **Q.**    D?

15   **A.**    D is the occurrence of antisocial behavior is not

16   occurring exclusively during another major mental illness like

17   schizophrenia or a manic episode.

18   **Q.**    Under subheading A, did Hardy meet any of those

19   conditions?

20   **A.**    Yes, he did.

21   **Q.**    Can you elaborate.

22   **A.**    Sure.  Mr. Hardy did have a repeated pattern of behaving

23   such that he repeatedly performed acts that were grounds for

24   his arrest.  He was a drug dealer.  So A is definitely checked

25   off.

1    B, deceitfulness, was indicated by his repeatedly

2   lying to various women and trying to lie to them for his own

3   personal pleasure.

4   **Q.**   Actually, just to make the record clear, you did say B,

5   but that's actually A(2); right?

6   **A.**   That's correct.  I'm sorry.

7   **Q.**   We are talking about heading A, so I would like you to

8   refer to the items under that by number just so the record is

9   clear.

10  **A.**   Okay.  I apologize.

11    A(3), I do not believe that he met that criteria

12  because he certainly planned ahead during the time of the

13  crime.

14    A(4), irritability and aggression as indicated by

15  repeated physical fights or assaults, Mr. Hardy certainly

16  assaulted Kim Groves.  There are indications from the records

17  that he was considered the principal suspect in other crimes,

18  though he has not been found guilty on those crimes, and so I

19  don't believe that that information can be used.  There are

20  some information in some of the other records that related to

21  having to protect his turf and he had various guns at various

22  locations, and so that suggests that that one would be or

23  there's a strong suggestion that one would be met, but again

24  that's a strong suggestion.

25    A(5) is reckless disregard for the safety of self or

1   others.  The type of the crime, the crime itself, is certainly

2   reckless disregard for the safety of others, but he had

3   consistent disregard for his own safety when he put himself

4   into the drug business, had guns at various locations, always

5   kept guns with him.  Certainly, that was for his own personal

6   protection as well as probably the protection of those around

7   him.

8   **Q.**    Did A(6) factor in in any way?

9   **A.**    No.  Best as I can tell, he and Toni Van Buren had some

10  lean times, but they were always able to honor their financial

11  obligations.  At the time of his arrest, he had a large amount

12  of money; not on him.  I think he only had about $228 on him,

13  but he had a large amount of money in his home.  There's no

14  indication to me of consistent irresponsibility.

15  **Q.**    How about A(7), the final condition under heading A?

16  **A.**    What I took from that was lack of remorse.  It's my

17  understanding that Mr. Hardy has never indicated remorse for

18  having murdered Kim Groves.

19  **Q.**    What about B?  We don't have to talk about that at length.

20  He is over the age of 18; correct?

21  **A.**    Correct.

22  **Q.**    How about conduct disorder?  Could you define that for the

23  record.

24  **A.**    Conduct disorder is a behavioral disorder that is

25  characterized as a child who has disregard for other

1018

1  individuals, may lie a great deal, may try to hurt other people

2  or animals, things like that.

3  Q.   What about the final heading there, D, the occurrence of

4  antisocial behaver?  Can you talk about that briefly.

5  A.   Certainly.  There's never been any indication that

6  Mr. Hardy suffered from schizophrenia or from bipolar disorder,

7  so evidence of D is negative.  He did not have schizophrenia or

8  a manic episode.

9  Q.   Did you find the presence of any of the *DSM* factors which

10  would prompt further inquiry or should have prompted further

11  inquiry?

12  A.   Certainly.  While he would not meet the diagnostic

13  criteria specifically for antisocial personality disorder, he

14  certainly would for adult antisocial behavior.

15  Q.   Now, at that point --

16          THE COURT:  Say that again.

17          THE WITNESS:  He would for adult antisocial behavior.

18          THE COURT:  No, the first part.  You said he would

19  not?

20          THE WITNESS:  No, because I don't have enough

21  evidence to suggest that he had conduct disorder prior to the

22  age of 15.  He didn't have a juvenile record.  I know that he

23  did get involved in drug dealing, but I don't feel like there's

24  enough information to say that as a youngster that he had a

25  conduct disorder.

1          **THE COURT:**  So you're not saying today that, in your
2    professional opinion, he has an antisocial personality
3    disorder?
4          **THE WITNESS:**  No, ma'am.
5    **BY MR. MCMAHON:**
6    **Q.**    With that determination made, what was the next step in
7    your analysis?
8    **A.**    The next step in my analysis would be to actually look and
9    see were there indications of malingering, exaggeration,
10   response bias, was the data good, or I should say were the data
11   good.  Sorry for my subject-verb agreement issue.
12   **Q.**    So you wanted to determine his intellectual functioning;
13   correct?
14   **A.**    Correct.
15   **Q.**    Then go on.  Based upon that finding, you wanted to go on
16   to examine adaptive behavior too; correct?
17   **A.**    Absolutely.
18   **Q.**    Well, let's talk a little bit regarding intellectual
19   functioning.  What was the step -- and, again, we are going
20   through your process here, so what did you want to do there?
21   **A.**    I wanted to review what available records there were with
22   regard to the different testing sessions to determine the
23   veracity of that information, that is, was it consistent, was
24   it reliable, and did the results appear valid.
25   **Q.**    Did you want to test?

1020

1  **A.**    Absolutely.

2  **Q.**    You couldn't?

3  **A.**    No.

4  **Q.**    Let's talk about that.  It's been discussed through

5  cross-examinations, but from you:  Why didn't you test Hardy?

6  **A.**    Judge Berrigan had indicated that I would need to, I

7  believe, videotape my testing.  That goes against the

8  guidelines that have been offered by the National Academy of

9  Neuropsychology, guidelines from the American Psychological

10  Association, my own personal ethics, and I think it's

11  reasonable and logical to see why that is the case.

12         We have been talking about these tests, the WAISs.

13  The first WAIS I think was done in 1955.  The WAIS-R, I

14  believe, was like around 1981, the WAIS-III 1997, and the

15  WAIS-IV is 2008.  So if you just take the time period between

16  the WAIS-III and the WAIS-IV, that's about 11 years.  These

17  tests are extremely expensive to norm and to develop.  In fact,

18  I believe the WAIS-R took many millions of dollars to develop.

19         So if these tests are available and to the public

20  domain, we know that lawyers can, will, and do coach their

21  clients on how to appear more or less impaired, depending on as

22  the case may be.  It's akin to giving law students the answers

23  to -- or, I guess, young lawyers the answers to the bar exam

24  prior to actually taking the bar exam.

25         The other thing is that there's concerns for

1    copyright laws.  There's concerns for other test security
2    issues.  So based upon the American Psychological Association,
3    the National Academy of Neuropsychology, and my own personal
4    ethics, I just could not do it.  I think similar to
5    Dr. Swanson, she said she wouldn't record.
6    Q.    Dr. Swanson also said something about best practice.  Can
7    you elaborate on that just a little bit.
8    A.    She did.  She had indicated, to the best of my
9    recollection of her testimony, that an individual should be
10   reassessed, with regard to their IQ, every three years.
11   Q.    Now, with the fact that you couldn't test, what did you
12   do?
13   A.    I did the best that I could.  I did the best that I could
14   and --
15   Q.    Did you review --
16   A.    -- what that involved was reviewing the records of the
17   various cognitive assessments that had been done over the past
18   year -- well, in 1996 as well as in 2008, 2009.
19   Q.    Dr. Tetlow tested Paul Hardy for IQ back in 1996; correct?
20   A.    That he did.
21   Q.    I believe it was on February 21, 1996?
22   A.    That's correct.
23   Q.    Dr. Martell administered an IQ test back in 1996 on
24   March 22?
25   A.    I believe so.  What he indicated in his report, I think,

1    was March 22 to March 23.  So I'm not sure what day he actually

2    did the testing, but I believe in his report he had given a

3    two-day span.

4              Also, if you don't mind, could I back up?

5    Q.   Uh-huh.

6    A.   In addition to just reviewing the testing data, there was

7    also other data from the Orleans Parish School System and the

8    Bureau of Prisons.  So I just wanted to make sure that I was

9    clear that it wasn't just that testing data but all of the

10   testing data that was available, which also included records

11   from there.

12   Q.   Were you able to find any records from the Orleans Parish

13   School System that Hardy had his IQ tested earlier in his life?

14   A.   No, I was not.

15   Q.   How about the records from the Bureau of Prisons?

16   A.   No.

17   Q.   Back to the records of other experts, did Dr. Bianchini

18   back in 1996 have any test results you could review as well?

19   A.   He did.

20   Q.   Could you describe what those were, generally, now.

21   A.   Dr. Bianchini's test results?

22   Q.   That's the question.

23   A.   Dr. Bianchini did a neuropsychological evaluation of

24   Mr. Hardy.  He looked at his mental functioning, his memory,

25   his, I believe, language, his motor skills.  It was a full

1    neuropsychological evaluation.

2    Q.    Dr. Cunningham examined or consulted with Paul Hardy back

3    in 1996 as well?

4    A.    He did.  With regard to testing, my understanding is that

5    he did a Hare Psychopathy Checklist.  I think it was the

6    revised if I recall correctly.  I believe he testified that he

7    had completed the Wide Range Achievement Test with Mr. Hardy,

8    as well, that Dr. Tetlow had started.  Then I believe I also

9    saw in the record a trauma symptom inventory as well.

10   Q.    To reiterate, he did not test Hardy for IQ in 1996 nor did

11   he test Hardy for IQ concomitant with this hearing?

12   A.    That's correct.

13   Q.    Dr. Swanson -- neither did -- I think we already alluded

14   to that.  Dr. Swanson did not test Paul Hardy either?

15   A.    No.

16   Q.    For IQ?

17   A.    No, she did not.

18   Q.    Now, what did this review tell you regarding

19   consistencies/inconsistencies in relation to Hardy's testing?

20   A.    That there were a significant number of inconsistencies.

21   Q.    Can we go into those, please.

22   A.    Certainly.  Let me give you an example.  On this one I

23   will try to explain the different tests as well as I can so you

24   have a good understanding of what's involved.

25   Q.    Uh-huh.

1    A.    So the first one that I would say -- and Dr. Cunningham

2    had alluded to this one -- was the Digit Span subtest.

3    Mr. Hardy, when he was evaluated by Dr. Tetlow and

4    Dr. Bianchini, had disparate results.  He was able to repeat a

5    four-digit number backwards with -- I can't recall which

6    evaluator, but only two with another evaluator.

7          I believe it was said that I was double dipping

8    earlier during Dr. Cunningham's testimony.  I did not use the

9    scores from the Bianchini and Martell evaluation in this one

10   bullet point as I didn't want to double dip.  So I didn't say

11   that he could recall six digits backwards; I only said he could

12   recall four, such that I was not double dipping.

13         The Digit Span subtest is one that you ask the

14   individual to repeat numbers backwards to use.  So, for

15   example, if I said, "6, 1, 9," you would say, "9, 1, 6," or

16   something like that.

17         So on one occasion Mr. Hardy was only able to repeat

18   a two-digit number backwards, on other another he was able to

19   repeat a four-digit number backwards.  But as Dr. Cunningham

20   indicated, on one occasion he was also able to repeat a

21   six-digit number backwards.  That would mean saying backwards,

22   when it's said to you, digits like this:  6, 1, 9, 4, 7, 3.

23   Mr. Hardy could do that on one occasion, but on another

24   occasion he was only able to do "1, 4" or something akin to

25   that.

1   **Q.**   Let's go to your report, page 23, the second bullet point

2   there.  Can you discuss that, please.

3   **A.**   Certainly.  As we all know now very well, Mr. Hardy was

4   administered the Wechsler Adult Intelligence Scale Revised on

5   two occasions.  On one occasion, he was tested by Dr. Tetlow

6   and the other occasion he was tested by Dr. Martell.

7           We have all discussed the issue of practice effects,

8   that is, if a person is given any sort of test again in the

9   future, that individual should be expected to get -- not any

10  time in the future.  I take that back.  At least within a

11  reasonable period of time.  Some people say one year.  Some

12  people say two years.  Something, you know, akin to that.  But

13  that a person should get better because of practice with the

14  test procedures, the test items, and just basically how you do

15  the different tests.

16          On the Wechsler Adult Intelligence Scale, the two

17  subtests that were most susceptible to practice effects

18  Mr. Hardy actually decreased on.  So, for example, his scores

19  went from, I believe, like a 7 to a 5, or something like that,

20  and that was in standard scores.  So that would be the

21  difference between like -- I believe 7 is 16th percentile.  A 5

22  would be -- I don't want to quote percentile ranks off the top

23  of my head.  I'm sorry.  I don't think I could be exactly

24  right.

25          There's a standard deviation of 3 and 10 is average.

1    So he went from a 7 to a 5, I recall, on one, similar to

2    another one.  Given that those two are the ones that are most

3    susceptible to practice, meaning that he should have gotten

4    better -- those are the ones that suggest he should have gotten

5    the most better on according to the sample of individuals in

6    the manual.  Those are the ones that he actually declined in

7    functioning on.

8    Q.   Let's talk about picture completion, how that would fit

9    into your examination of consistencies or inconsistencies.  Was

10   that in any way noteworthy to you?

11            THE COURT:  Are we in the report anywhere?

12            MR. MCMAHON:  Not specifically.  I'm in the report on

13   page 23.

14   BY MR. MCMAHON:

15   Q.   Go ahead.  Talk about picture completion, if you would.

16   A.   I guess, just to clarify, this was not an exhaustive list

17   of things that I thought indicated that.

18   Q.   By "this" you are talking about your report, right, for

19   the record?

20   A.   When I said, "Markers indicative of malingering were

21   evident in Mr. Hardy's psychological assessment rank measures.

22   For example, inconsistencies were as follows . . . "  These

23   were examples.  These were not an exhaustive list.

24            So one was picture completion.  On picture

25   completion, I believe he went up from a 4 to an 8.

1   Q.    What does that tell you?

2   A.    As evidenced by one of Dr. Cunningham's slides, from going

3   up from a 4 to a 8, his score improved more than 97 percent of

4   the population, which suggests to me that at Time 1 he actually

5   for some reason -- when I say he wasn't trying his best, I

6   don't mean that specifically.

7             There are any number of reasons that a person can

8   have disparate scores such as temperature, such as what they

9   ate that day, such as if they were having a bad day, but it

10  let's you know that this is not necessarily their best testing,

11  their best effort that could be put forward.  So that indicated

12  to me that was another check in the box of the test data is not

13  reliable.

14  Q.    Can we go to the next slide regarding what we labeled

15  "Malingering Performance."

16  A.    Certainly.

17  Q.    Dr. Hayes, now let's talk about this slide.  I see the top

18  "Trails A" is blacked out.  Why?

19  A.    I actually checked this as much as I could to make sure

20  that the table was accurate.  I found that it was not accurate

21  with regard to Trails A, so I marked it out just to be as

22  intellectually honest as possible.

23  Q.    What does this display -- explain to the Court.  What is

24  this about?

25  A.    This is a table that was taken from Dr. Dan Martell's

1   report back from 1996.  Dr. Martell had indicated that, again,

2   because of practice effects that a person should improve from

3   Testing 1 to Testing 2.  He developed a table of the various

4   measures that he gave and that Dr. Bianchini gave and whether

5   they got worse or whether they got better.

6   Q.   The left-hand column, "Name of Test," going down it, can

7   you explain to Judge Berrigan -- when I looked at it first, I

8   didn't know what it meant.  Could you explain what all these

9   things are.

10  A.   Yes.  All of these are neuropsychological assessment

11  measures.

12  Q.   They have little checkmarks.  These are the ones actually

13  we have the test to display to the Court; correct?

14  A.   Right, so that you can see what we are talking about here.

15  I think, in this situation, being able to see limited parts of

16  protocol would be helpful.

17  Q.   Who tested the first, Dr. Martell or Dr. Bianchini?

18  A.   Dr. Martell.

19  Q.   The last column, obviously I think it's pretty

20  self-explanatory, to the far right.

21  A.   I believe so.

22  Q.   Let's talk about Trails B.  Can you explain that to

23  Judge Berrigan.  What does that mean?

24  A.   Trails B refers to the second part of the test called the

25  Trail Making Test.  The first part, Trails A, is a fairly

1  simple visual-sequencing task where you draw a line from 1 to
2  2, 2 to 3, 3 to 4, and so on until you get to the end.
3  Trails B is a bit more difficult.  This requires a person to
4  shift sets; that is, you draw a line from 1 to A, A to 2, 2 to
5  B, 3 to C, C to 4, 4 to D.  On the back page of this, there are
6  many more.  This is just the sample.  So this requires a person
7  to actually shift sets, be cognitively flexible, and it's an
8  overall measure of abstracting abilities.
9  Q.   Do you have the date when Mr. Martell tested?
10  A.   I do.  I believe Martell tested on this either 3-22 or
11  3-23, I believe, of 1996.
12  Q.   Do you have the date when Dr. Bianchini administered the
13  same test?
14  A.   Thankfully, I don't have to rely on my memory for that
15  one.  It is on the Trail Making Test as 4-4-1996.
16  Q.   How did Hardy do when Dr. Martell tested him?
17  A.   When Dr. Martell tested him, he completed Trails B in 83
18  seconds.
19  Q.   When Dr. Bianchini tested him?
20  A.   He completed Trails B in 117 seconds.
21  Q.   He did worse.
22  A.   He did worse.
23  Q.   Let's go on to the second clear item, WMS-4 ATT/CON Index.
24  What does that mean?
25  A.   That refers to the Wechsler Memory Scale Revised, the

1    Attention and Concentration Index there.  What Dr. Martell is
2    referring to is that on this index, which involves three
3    different subtests, he went from an index score of 80 to an
4    index score of 70 on the second administration, which is
5    unusual.
6             Again, this is using the same metric that an IQ test
7    uses, that is, an average of 100 and a standard deviation of
8    15.  So, again, this is another check box that says this just
9    does not make sense.  The person should get better.
10            **THE COURT:**  Wait a minute.  I don't understand.  The
11   80 to 70?  Is that what we are looking at?
12            **THE WITNESS:**  Yes, ma'am.
13            **THE COURT:**  So it was done faster?
14   **BY MR. MCMAHON:**
15   **Q.**   That's not timed, is it?
16   **A.**   That's not time.  That's normed like -- it's using
17   standard scores like on IQ tests where it's an average of 100.
18            **THE COURT:**  Okay.
19            **THE WITNESS:**  So you would have expected him to have
20   gone up, not gone down.
21   **BY MR. MCMAHON:**
22   **Q.**   Do we have an overhead of that?
23   **A.**   Yes.
24   **Q.**   This is marked at the top "WMS-R, Wechsler Memory Scale
25   Revised, Record Form."  Could you assist the Court and

1    elaborate on that, please.

2    **A.**    In the middle of the page towards the right-hand side, you

3    can see "Attention and Concentration" and there's a column for

4    that.  This is comprised of three different subtests:  One is

5    Mental Control; another is Digit Span, which we have talked

6    about; and another one is Visual Memory Span, which we haven't

7    talked about.

8            Mental Control, just to explain, would be like, as

9    best as I can recall, doing a number of simple things in your

10   head like saying numbers, saying letters, doing serial 3s,

11   things like that.

12           Digit Span Forward we have talked about.  Visual

13   Memory Span is almost the same thing.  It's like a Digit Span

14   Backwards.  I actually brought something to show.  Can we do

15   show-and-tell?

16   **Q.**    Certainly.

17           **THE COURT:**  Sure.

18           **THE WITNESS:**  This is the board that you use for the

19   current Visual Memory Span.  It used to be on the WMS-R.  It

20   was probably about half of the size of this.  It had, I believe

21   it was, red-colored things or blocks.  Like if these were

22   flattened down, it would be like red or blue -- I can't recall

23   which color it was now -- areas.  It's almost like the old game

24   Simon, if you remember Simon, where you touch the things in a

25   certain order.

1    On Visual Memory Span, if you think about Digit
2  Span, but you do it visually.  Say, for example, I touch the
3  sixth block, the second block, and the first block.  On the
4  forward portion of that, you would touch them in the same
5  order.  On the reverse portion of that, you would do them in
6  the reverse order, so the first block, the second block, and
7  the sixth block.  That's Visual Memory Span.
8  **BY MR. MCMAHON:**
9  **Q.**   Okay.
10 **A.**   Again, that's an index score, so it's a combination of
11 those three subtest scores.  Mr. Hardy went down in the interim
12 of one month 10 points, not up.
13 **Q.**   We'll continue on.  We don't have actual displays, but we
14 have the Wechsler Memory Scale Revised, Digit Span Forward, and
15 actually there are two entries for DS or Digit Span Forward.
16 Could we go back.  Thank you.
17    Could you talk about now the DS Forward, the first DS
18 Forward line.  Do you need a laser pointer?
19 **A.**   It may be helpful.  I actually wish this had been retyped
20 because I'm trying to track across as well.
21    **THE COURT:**  There's some kind of way you are supposed
22 to be able to do it on the screen.
23 **BY MR. MCMAHON:**
24 **Q.**   Could you maybe isolate a line?  Can you do that?  Would
25 that help?  Would that help, Dr. Hayes?

1   **A.**   Yes.  I'm having a hard time sometimes tracking.  You

2   could even do three or four, but trying to track across the

3   whole thing is kind of hard.

4   **Q.**   Is that more helpful?

5   **A.**   Uh-huh.  It's fine.  Here he had gotten better.  On the

6   Wechsler Memory Scale, it also has a Digit Span subtest on it

7   that is almost identical to the one that's on the WAIS-R.  With

8   Dr. Martell he had a 6 and with Dr. Bianchini he had an 8, so

9   he got better.

10  **Q.**   How about the next line, another Digit Span Forward?

11  **A.**   Right.

12  **Q.**   How does that differ from the first one?

13  **A.**   It really doesn't differ.  I don't recall on the WMS-R and

14  the WAIS-R if the numbers were exactly the same or if the

15  numbers were different.  It's been a number of years since I

16  have given the WAIS-R and the WMS-R, but you can see here he

17  was not given that by Dr. Bianchini --

18  **Q.**   Let's go --

19  **A.**   -- because Dr. Bianchini did not give him a WAIS.

20  **Q.**   I'm sorry.  Let's go down to the Digit Span Backwards.

21  **A.**   That was the one that I demonstrated for the Court.  He

22  had gotten a 5 with Dr. Martell and a 2 with Dr. Bianchini.

23  So, in effect, he did worse on that.

24  **Q.**   The next one I guess we could skip because it's not

25  available.

1  **A.**   Right.  Again, Dr. Bianchini did not redo the test, so

2  that's why there's a "not applicable" there.

3  **Q.**   Okay.  Let's jump to the Hooper VOT.  What does Hooper VOT

4  mean?

5  **A.**   It stands for the Hooper Visual Organization Test.  It's

6  an older test where you are trying to look at pure perceptual

7  organization.  So you are shown different pictures that are

8  degraded, and in your mind you're supposed to put these

9  pictures back together.  Again, there's no practice effect

10  shown on this.  He had the same score.

11  **Q.**   Now, the next, we'll go down to categories.  I want to

12  actually just approach you and show -- we are going to display

13  these; correct?

14  **A.**   Correct.

15  **Q.**   We'll do these in order.

16  **A.**   Okay.

17        **MR. MCMAHON:**  Your Honor, for the record, I have just

18  shown Dr. Hayes seven pages that partly comprised the Category

19  Test, and I wanted to display them in sequence.  Are we ready?

20        **THE WITNESS:**  Certainly.  I don't want to go over

21  this in huge detail but try explain to the Court what this --

22        **THE COURT:**  We are still off the report, aren't we?

23        **THE WITNESS:**  We are referring to Dr. Bianchini.

24        **THE COURT:**  This is not in your report?

25        **THE WITNESS:**  It says, I believe, when I'm talking

1  about Dr. Martell's, to refer to Dr. Martell's report on

2  page 8.

3          THE COURT:  Your report is very, very long, and I

4  don't want to be taking copious notes if it's somewhere in your

5  report.  I'm okay if we are off the report.  I just needed to

6  know.

7  BY MR. MCMAHON:

8  Q.   Correct me if I'm wrong, but I believe on page 24,

9  Dr. Hayes, that first full bullet point discusses this testing

10 in more concise terms.

11 A.   It does.  It also says to refer to page 13 of

12 Dr. Martell's report, pages 8 to 9, for a summary of the

13 directional change in Mr. Hardy's neuropsychological testing.

14 Q.   Now, what is that there?

15 A.   These are the items from the first subtest and something

16 called the Category Test, which is another neuropsychological

17 test that's looking at abstract reasoning, your ability to

18 learn from your prior errors, concept formation, deductive

19 reasoning.  It's a very difficult test.

20 Q.   How does it work?

21 A.   The first subtest is quite easy.  I'll actually grab

22 something.  The individual is shown a card and it has the

23 numbers 1, 2, 3, and 4 on it.  Then the individual is asked to

24 look at a sheet of paper, or in this case it's a wire-bound

25 booklet, and decide which number the picture suggests to him or

1    her.

2              So, for example, Item 1 up there -- this one is a

3    really easy subtest.  That item would be correct if you

4    answered "1."  Number 2 would be 3; Number 3 would be 1;

5    Number 4 would be 4.  Then going down:  2, 4, 1, 2.

6    **Q.**   Let's go on to the next, which is Subtest II.  Could you

7    explain that test to the Court.

8    **A.**   It's the same exact instructions for the most part, but

9    what you generally tell the individual is that the subtests are

10   going to change in terms of the strategy that you have to use

11   to get the correct answers; but once you get the strategy, you

12   can continue to use that strategy to get the correct answer

13   each and every time.

14             On this subtest, again, this one is also fairly easy.

15   It's a simple counting.  So going down in order down the first

16   row, that would be:  1, 3, 1, 4, 2, 4, 1, 2, 3.

17   **Q.**   Let's go on to Subtest III.  Does this get a little

18   harder?

19   **A.**   Oh, yeah.

20   **Q.**   Explain that one.

21   **A.**   This one, again, you're trying to figure out what the

22   pattern is.  1, 2, 3, or 4 are the only answers that you can

23   give.

24             So for the first one, say, an individual uses:  Well,

25   three of them are dark.  I'll go with three.

1    That would be incorrect.  Then you give the person

2  feedback.  For the second one --

3    **MR. MCMAHON:**  Your Honor, may I interrupt just for a

4  second?  Don't feel so bad.  Mr. Miller and I both flunked that

5  last night ourselves.

6    **THE COURT:**  I just flunked it.

7  BY MR. MCMAHON:

8  Q.    Go ahead.

9  A.    The second one, maybe the person thinks:  Well, maybe it's

10  the unshaded one, so I'm going to go with one.  Incorrect.

11    Maybe the third one the person thinks:  Well, maybe

12  it's all of the ones that you add up.  I'll go with four.

13  Incorrect.

14    The answer is positional.  So, for example, the one

15  thing that's different in No. 1 is in the first position.  The

16  different object in the second one is in the third position.

17  The different object in the third one is in the fourth

18  position.  So that is how that one goes.

19    **MR. MCMAHON:**  Are we clear, Your Honor?

20  BY MR. MCMAHON:

21  Q.    Let's go on to Subtest IV.  What is this?

22  A.    If you can just highlight 1, 2, 3, and 4 first.

23  Q.    Pardon me?

24  A.    I was asking Arthur to highlight 1, 2, 3, and 4.  That's

25  fine.

1    On the left-hand, where Arthur is highlighting right

2    now, to me this one is -- it's almost a simple proportional

3    thing.  On 1, you can see that the 1 is missing, and that is at

4    the left-hand top corner, so that would be a 1.  On 2, you can

5    see that the bottom right-hand corner is missing.  You can look

6    at the one above it and see that 3 was in that position, so

7    that would be 3.

8    The third one would be 1.  The fourth one would be 4.

9    This goes against most people's natural tendency to put 1 on

10   the left, 2 on the right; and then on the row below, 3 on the

11   left and then 4 on the right.

12   If you can show the other ones now.

13   Q.   The entire one or the next test?

14   A.   No, the entire Subtest IV, because after 6 you can see

15   that the numbers are taken away.  It's still the same principle

16   that runs throughout the subtest.  So, for example, on 7, that

17   would be a 1.  On 8, that would be a 2.  18 would be a 4.  So

18   you have to use the same principle that runs throughout that to

19   get a right answer each and every time.

20   Q.   Can we go on to Subtest V.

21   A.   Yes.  In Subtest V, the goal of this one is, again, figure

22   it out:  1, 2, 3, or 4.  This one, it changed a little bit.

23   Usually, people are going to still be on the last subtest, and

24   they are going to say for that first one 4, but now you are

25   looking at fractional pieces.  So, for example, on 1, that

1   would be a 1.  2 would be a 3.  3 would be a 1.  You're looking

2   at fractional pieces, what percentage of the whole is that.

3   **Q.**   The same principle throughout?

4   **A.**   Yes.

5   **Q.**   Just as it progresses from 1 to 40?

6   **A.**   That's correct.

7   **Q.**   They get a little harder?

8   **A.**   Correct.

9   **Q.**   Can we go on to Subtest VI.

10  **A.**   Yes.  Subtest VI is also fractional pieces.  It continues

11  similar to the last subtest.

12  **Q.**   Now, finally, Subtest VII.

13  **A.**   Finally, Subtest VII is an amalgam of all of the different

14  subtests.  So you have to remember what you did in that subtest

15  and then apply it to get the right answer each and every time

16  on these.

17          **THE COURT:**  Let me just interrupt for a second.  Are

18  these part of the IQ test or are these part of some other kind

19  of test?

20          **THE WITNESS:**  These are part of the

21  neuropsychological assessment that was given by --

22          **THE COURT:**  It's not part of an IQ test?

23          **THE WITNESS:**  No, ma'am.

24  BY MR. MCMAHON:

25  **Q.**   What does that tell you, though, to elaborate or to follow

1    up on the Judge's question?

2    **A.**    This is a test of abstract reasoning.  It's a test of

3    being able to learn from your mistakes, to be able to reason

4    deductively.  I believe Mr. Hardy on this was at a T-score

5    of --

6    **Q.**    We are going to get that up, Doctor.

7    **A.**    If you're doing this about a month later, chances are

8    you're going to have a practice effect.  Mr. Hardy did not.  In

9    fact, he only went down one point.  Again, this is another

10   situation where you go, "That just doesn't make sense."

11            Any of these things in isolation you can explain

12   away, but it's when too many of them come together.  And in

13   this situation he went down from 63 errors to 64 errors.  Even

14   with that -- I mean, this is a very difficult test.  He had a

15   T-score of, I believe, 38 with Dr. Bianchini, so it would have

16   been higher with Dr. Martell or slightly higher.  I don't know

17   how much higher, but it would have been slightly higher.

18            In terms of T-scores, they have a mean of 50 and a

19   standard deviation of 10.  So in order to be two standard

20   deviations below the mean, you would have to be at a T-score of

21   30.  Mr. Hardy was at a 38 with Dr. Bianchini on that measure.

22   **Q.**    What does that mean?

23   **A.**    It means he is not two standard deviations below the mean

24   on that measure.

25   **Q.**    Can we go on to Tapping-R.

1  A.    Yes.  Finger tapping is exactly what it suggests.

2  Q.    What does the "R" mean?

3  A.    Right hand.

4  Q.    Okay.

5  A.    This is a finger-tapping board.

6  Q.    For the record, you're holding that up?

7  A.    Yes.  What you basically do is rest your palm on the

8  board, and you tap as fast as you can for 10 seconds 5 times or

9  5 to 10 times with your right hand, and the same thing with

10 your left hand, given breaks for each hand and switching and

11 things like that so that you get the best performance.  With

12 Mr. Hardy, again, he went down from an average of 47.4 taps in

13 a 10-second period to an average of 40.9 taps.

14 Q.    That's with the left.

15 A.    I'm sorry if I was reading incorrectly.  So with his right

16 hand he went down from an average of 56 taps with his right

17 hand to 54.8 taps with his left hand; again, not a big

18 difference, but another thing that just doesn't make sense.

19 Q.    With the left, quickly, you did touch on that.  You can

20 quickly wrap that up.

21 A.    47.4 to 40.9.

22 Q.    Okay.  Doing worse.  How about the Grooved Peg Right,

23 Grooved Peg Left?  What is that test about?

24 A.    This test, whereas the Finger Tapping Test was a measure

25 of gross motor speed, just your ability to tap, this is, as

1  best I can hold up, a Grooved Pegboard Test.  What you do is

2  you pick up the little pegs and you put them in the little

3  holes.  You do it with your dominant hand first and you go

4  across like this, and then you do it with your nondominant

5  hand.  It's a measure of your fine motor speed.

6           On this test, Mr. Hardy -- this is seconds.

7  Mr. Hardy went on his right hand which, I believe is his

8  dominant hand, if I recall correctly, from 60 seconds to 72

9  seconds, which is worse.  So it took him 12 more seconds to do

10  it with Dr. Bianchini than it did with Dr. Martell.

11  **Q.**   On his left hand?

12  **A.**   On his left hand, he went from 67 seconds to 80 seconds.

13  **Q.**   What is the Aphasia Screen?

14  **A.**   The Aphasia Screen Test is a gross measure of different

15  language abilities, whether a person might have problems with

16  dysarthria, with naming, different language-related functions.

17  **Q.**   Two errors out of what?  What does that mean?

18  **A.**   I don't know.  I don't have Dr. Martell's raw data, so I

19  don't know what the errors were specifically in, but here's

20  examples of some of the items like, "I want you to draw this."

21           Obviously, it's a picture of a square.  You do it

22  without lifting your pencil from the paper.  Then you ask what

23  that thing is called, and then you ask the person to spell it.

24  The same thing for the next one.  You ask the person to write

25  down on their paper what this is.  So those are examples of

1  some of the items that I just randomly flipped to.

2        I don't know specifically what Mr. Hardy's errors

3  related to with Dr. Martell's because I didn't have the benefit

4  of obtaining that data.  I asked your office to contact Martell

5  to get his raw data, but he indicated after he did a diligent

6  search he was unable to find it.

7  Q.   What about FAS, the next test?

8  A.   The FAS is actually a test that -- although it says "FAS,"

9  it actually refers to the Controlled Oral Word Association Test

10  or the COWAT.

11        What you do on this is you ask a person to tell you

12  as many different words as you can think of that begin with a

13  certainly letter in 60 seconds.  They can't say proper names.

14  They can't say the names of people, places, or numbers.  So

15  that's why it's called an FAS is because the first letter is F,

16  the second letter is A, and the third letter is S.

17        On that, he decreased from 42 words recalled across

18  the three letters to 40 words recalled across the three

19  letters.

20  Q.   What are those numbers?  What is 42 and 40?  What kind of

21  a score is that?

22  A.   That's not bad.

23  Q.   Well, elaborate.

24  A.   I don't have the norms with me, but -- I can't tell you

25  exactly what those are.  I can look at Dr. Bianchini's report

1    and tell you what he indicated.

2              THE COURT:  Dr. Hayes, while you're doing that, let

3    me just ask:  These are neuropsychological tests, correct, and

4    they are about a month apart from each other?

5              THE WITNESS:  Yes, ma'am.

6              THE COURT:  The point of your discussion here is to

7    assume that there should be a practice effect between a test

8    taken earlier and a test taken later since they are identical

9    tests?

10             THE WITNESS:  Correct.

11             THE COURT:  If there is not, in fact, an improvement,

12   which a practice effect would ordinarily have indicated, if the

13   behavior is the same or the results are the same or worse, that

14   could be indicative of not providing the best effort with the

15   second testing and, therefore, possibly be malingering?  Is

16   that the thrust of this portion of your testimony?

17             THE WITNESS:  I wouldn't go that it's not his best

18   effort because it could have been due to some other reason, but

19   it's definitely not the best that he could do.  That certainly

20   could be related to effort.  All of these things certainly

21   could be related to malingering, but malingering requires that

22   you have intention to do worse.  I don't feel like we have

23   enough evidence to infer intention, that a person is trying to

24   intentionally distort his or her findings, but I think these

25   are showing it's just that --

1    **THE COURT:** For some reason or another, the practice
2    effect, he should do better the second time around, and he
3    didn't do better, so it raises a flag?
4    **THE WITNESS:** Yes, ma'am. And, again, any one of
5    these things in isolation you would not make a big deal about,
6    but it's too many of them. That's when you get concerned.
7    **THE COURT:** When you say "too many of them," you're
8    talking about too many in these test results?
9    **THE WITNESS:** In here and in others. This was just
10   the table that Dr. Martell had.
11   **BY MR. MCMAHON:**
12   **Q.** Let's move on. You don't have to find Dr. Bianchini's
13   records. Let's kind of move on.
14   **A.** Okay.
15   **Q.** Just to follow up on what the Court --
16   **THE COURT:** I'm just trying to understand exactly
17   what -- as we get into this nitty-gritty, to use an abstract
18   idiom, the forest for the trees, I don't want to get lost.
19   **BY MR. MCMAHON:**
20   **Q.** Let's go on to the Wechsler Memory Scale Revised, the
21   indexes. Let's go to Verbal Memory. Could you quickly
22   describe that, Verbal Memory.
23   **A.** Sure. Verbal Memory refers to Mr. Hardy's ability to
24   recall stories as well as pairs of words, and he did better.
25   He initially performed in the low average range and then

1  performed in the expected direction on practice, and so he

2  performed better on that.

3  **Q.**    Visual Memory?

4  **A.**    This was the ability to recall various things such as how

5  to draw certain designs and such.  Again, he got slightly

6  better, which is in the expected direction.

7  **Q.**    General Memory?

8  **A.**    General Memory is a combination of a bunch of different

9  factors.  Again, he did better.

10 **Q.**    Attention and Concentration?

11 **A.**    We have discussed that, and that one was up at the top.

12 That was the Attention and Concentration Index referred to

13 previously.

14 **Q.**    Delayed Recall?

15 **A.**    He did better on that.  On that, he moved from the average

16 range to the average range, but still he got better.

17 **Q.**    Now, these are interesting.  CVLT/RVLT, what are those?

18 **A.**    The CVLT is a memory test as is the RVLT.  These stand for

19 the California Verbal Learning Test and the Rey Auditory Verbal

20 Learning Test.  What happens on these is an individual is read

21 a list of words and they are cautioned to listen carefully

22 because when you're through you want them to read back as many

23 of the words as they possibly can.

24 **Q.**    How many words?

25 **A.**    The CVLT has 16, I believe, and the Rey Auditory Verbal

1    Learning Test has 15.  So they are not the same test, but they
2    are quite similar.
3    **Q.**    There are 15 words, and let me get this straight.  The
4    examiner recites 15 words, and then the examinee has to recite
5    as many back as possible but not necessarily in the same order;
6    correct?
7    **A.**    No.  It's just as many as you can possibly recall.  Again,
8    the Rey has 15, but the CVLT has 16.
9              **THE COURT:**  Is it the same words?
10             **THE WITNESS:**  No, ma'am.  It's the same words for
11   each and every trial, but different words between the
12   California Verbal Learning and different words between the Rey.
13   **BY MR. MCMAHON:**
14   **Q.**    So he was given five trials?
15   **A.**    Yes.
16   **Q.**    I think the chart is self-explanatory.  In Trial 1,
17   Mr. Hardy went from 10 with Dr. Martell to 4 with
18   Dr. Bianchini?
19   **A.**    That's correct.
20   **Q.**    Trial 2 was 12 to 7?
21   **A.**    Correct.
22   **Q.**    Trial 3 was 13 to 12?
23   **A.**    Correct.
24   **Q.**    The same on Trial 4 and Trial 5?
25   **A.**    Correct.

1  **Q.**    12 and 14 respectively.  What's interference?  What's

2  that?

3  **A.**    That's when you are read a second list of words that is

4  completely different from the first list of words and you're

5  asked to recall them.  It's almost like throwing a person a

6  curve ball because you want to see if new learning is going to

7  interfere with their old learning and if old learning

8  interferes with new learning.  So you're looking at is there

9  any retrospective memory interference or any prospective memory

10 interference.  On that, Mr. Hardy had a 7 on the CVLT and a 6

11 on the Rey Auditory Verbal Learning Test.

12 **Q.**    Now, these words, I mean, the 10, 12, 13, 12, would you

13 rate that as pretty good?

14 **A.**    Yes, very good.  Just with 10 -- I don't have the old

15 CVLT, I have the new CVLT, but here are the words.  In your

16 mind, see how many you remember:  Truck, spinach, giraffe,

17 bookcase, onion, motorcycle, cabinet, zebra, subway.

18              **THE COURT:**  Okay.

19              **THE WITNESS:**  You get the idea?

20              **THE COURT:**  Uh-huh.

21              **THE WITNESS:**  Hard.  So getting 10 on the first trial

22 is not usual.  That's very good.

23 **BY MR. MCMAHON:**

24 **Q.**    How about IMM?  I take it that's Immediate Recall?

25 **A.**    Right.  Right after the interference trial, you are given

1    another -- you say, "Remember the list I read to you five

2    times?  I want you to tell me back as many of those words as

3    you can recall."

4    Q.    Hardy went from 15 to 11.

5          Finally, Delayed Recall, what's that?

6    A.    That's 30 minutes later you ask him, "Remember that list I

7    read to you five times?  Tell me as many words as you think of

8    that were on that list, the one I read to you five times."  He

9    went down from 15 words recalled to 8 words recalled on the

10   Rey.

11          THE COURT:  Yes, it's time for a break.  All right.

12          THE DEPUTY CLERK:  All rise.

13          (REPORTER'S NOTE:  The remainder of the proceedings

14   this day were transcribed by Karen Ibos.)

15                              * * *

16                          **CERTIFICATE**

17          I, Toni Doyle Tusa, CCR, FCRR, Official Court
     Reporter for the United States District Court, Eastern District
18   of Louisiana, do hereby certify that the foregoing is a true
     and correct transcript, to the best of my ability and
19   understanding, from the record of the proceedings in the
     above-entitled and numbered matter.

20

21

22                              s/ Toni Doyle Tusa
                                Toni Doyle Tusa, CCR, FCRR
23                              Official Court Reporter

24

25