```
1                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA
2   ********************************************************************
    UNITED STATES OF AMERICA
3
                                      Docket No. 94-CR-381(C)
4   v.                                New Orleans, Louisiana
                                      Monday, September 21, 2009
5
    PAUL HARDY
6   ********************************************************************

7
                  TRANSCRIPT OF ATKINS HEARING PROCEEDINGS
8           HEARD BEFORE THE HONORABLE HELEN G. BERRIGAN
                  UNITED STATES DISTRICT JUDGE
9                         VOLUME VI

10

11  APPEARANCES:

12  FOR THE PLAINTIFF:            UNITED STATES ATTORNEY'S OFFICE
                                 BY:  MICHAEL E. McMAHON, ESQ.
13                                    MARK A. MILLER, ESQ.
                                 500 Poydras Street, Room HB-210
14                               New Orleans, LA 70130

15
    FOR THE DEFENDANT:           HERBERT V. LARSON, JR., ESQ.
16                               650 Poydras St., Suite 2105
                                 New Orleans, LA 70130
17

18                               MARILYN MICHELE FOURNET, ESQ.
                                 715 St. Ferdinand
19                               Baton Rouge, LA 70802

20
    Official Court Reporter:     Karen A. Ibos, CCR, RPR, CRR
21                               500 Poydras Street, Room HB-406
                                 New Orleans, Louisiana 70130
22                               (504) 589-7776

23


24
      Proceedings recorded by mechanical stenography, transcript
25  produced by computer.
```

1                        I N D E X

2

3

4    WITNESSES FOR THE GOVERNMENT:                    PAGE/LINE:

5

6    JILL HAYES

7

8      Continued Direct Examination by Mr. McMahon    1187/11

9

10     Cross-Examination by Ms. Fournet               1208/9

11

12

13

14

15                     EXHIBIT INDEX

16

17                                                    PAGE/LINE:

18

19   Defense Exhibit 33, 34 & 35                      1230/24

20

21   Proffer No. 1                                    1308/13

22

23

24

25

<u>P R O C E E D I N G S</u>

(MONDAY, SEPTEMBER 21, 2009)

(MORNING SESSION)


     (OPEN COURT.)

          THE COURT:  Good morning.  Go Saints.

                    Dr. Hayes, you're still under oath.

          THE WITNESS:  Yes, ma'am.

          THE COURT:  Mr. McMahon, carry on.

               CONTINUED DIRECT EXAMINATION

BY MR. McMAHON:

Q.  Dr. Hayes, let's pick up from Friday.  The defendant made much

of Hardy's alleged -- at least Toni Van Buren did, of his inept

driving at least for several years after Toni Van Buren met him.

Have you seen any source of information that tends to undermine

that assertion?

A.  I've seen two.  One was the surveillance videos and then there

was another video -- not surveillance videos, excuse me, the

surveillance records, and another was the videotapes where he was

driving around the city.

Q.  What videotape is that specifically?

A.  It was the Dawn Dedeaux videotape, she was the videographer.

Q.  And according to her web site and filmography, when was that

shot?

A.  1988.

1           MR. McMAHON:  Play the video.

2        (WHEREUPON, THE VIDEO WAS PLAYED.)

3           THE WITNESS:  Mike, how much longer is this?

4           MR. McMAHON:  I think we've seen enough.

5    BY MR. McMAHON:

6    Q.  Dr. Hayes --

7           THE COURT:  Just for the record, I assume it's undisputed

8    that Mr. Hardy's the one driving the car?

9           MR. McMAHON:  Mr. Hardy is driving the car.

10          MS. FOURNET:  It is undisputed, your Honor.

11          THE COURT:  Okay.  Thanks, just wanted to make sure.

12   BY MR. McMAHON:

13   Q.  Now, have you also seen a video shot by Dawn Dedeaux of an

14   interview in City Park with her, the defendant, his brother Wayne

15   and another male?

16   A.  Yes, I have.

17   Q.  Relative to the issue we're discussing, what should the court

18   look out for with this video?  Or at least this excerpt.

19   A.  Well, there's evidence of abstract thought in that excerpt.  He

20   was also well groomed, he relates well to the other people around

21   him, he is vigilant, he is able to carry on a conversation with

22   other individuals, he is able to show that he can track in the

23   conversation, things like that.

24          MR. McMAHON:  All right.  If we can play that.

25        (WHEREUPON, THE VIDEO WAS PLAYED.)

```
 1              THE COURT:  When was this film done?
 2              MR. McMAHON:  Pardon me, your Honor?
 3              THE COURT:  When was this film done?
 4              MR. McMAHON:  1988, again, according to Dawn Dedeaux's
 5   web site.
 6          (WHEREUPON, THE VIDEO WAS PLAYED.)
 7              THE COURT:  For clarification which is which?
 8              MR. McMAHON:  That's Wayne Hardy in the New York Yankees
 9   shirt.  His brother, the defendant is wearing the Kangol cap.
10   BY MR. McMAHON:
11   Q.  Dr. Hayes, in her report Dr. Swanson states that gullibility is
12   a trademark symptom of individuals diagnosed with mental
13   retardation.  And what is gullibility?
14   A.  Gullibility is basically when someone is easily led, often
15   exploited.
16   Q.  Did you, in the sources you consulted, the interviews that you
17   conducted, did you find that Hardy was gullible, easy manipulated,
18   easily led?
19   A.  No, not at all.
20   Q.  And did you listen to a conversation that occurred on October
21   13, 1994, at 10:43 A.M.?
22              MR. McMAHON:  And just to set -- we are not going to play
23   it, your Honor, it is in the record, but can you just --
24              THE COURT:  Which conversation, October 14th at nine?
25              MR. McMAHON:  October 13 --
```

```
 1                THE COURT:  13.

 2                MR. McMAHON:  -- 1994, 10:43 P.M.

 3                THE COURT:  Okay.

 4   BY MR. McMAHON:

 5   Q.  And does that call inform the court in reference to Hardy being

 6   easily led in this case by Len Davis?

 7   A.  Yes.

 8   Q.  Relate to the court how that -- how it does.

 9   A.  It relates because, basically, Len Davis is calling Paul Hardy,

10   saying, "Why didn't you go ahead and kill Kim Groves?"  And he gets

11   upset with him and then says, basically:  "Yeah, mother fuck you,

12   I'm going to tell you," and then Len Davis comes back and says,

13   "Oh, no, just look, just listen to me, listen to me," and then they

14   get back on to what Kim Groves was saying that day, and so he

15   basically was coming back on Len Davis and saying --

16   Q.  He cursed at him?

17   A.  He cursed at him.

18   Q.  What about being generous and giving money to people?  The

19   defendant or his experts seem to suggest that's a sign of

20   gullibility.  What do you think?

21   A.  I don't think that's the case here.  I think that could be the

22   case in some situations, where if a person gives someone money in

23   certain situations it could be, but not here.  One has to realize

24   that Mr. Hardy was a drug dealer.  So giving other people money is

25   a way to assure allegiance, it's a way for people to be indebted to
```

1    you.

2    Q.  Now, let's wrap up Criteria A.  Could you go to slide two,

3    please.  And again, this is the DSM-IV-TR -- IV, not TR, IV,

4    criteria for mental retardation.  Do you feel that Hardy meets

5    Criteria A?

6    A.  No, I do not.

7    Q.  That is, he does not have significantly subaverage intellectual

8    functioning, correct?

9    A.  That's correct.

10   Q.  Let's go on to three.

11          And what did you feel, what was your conclusion about his

12   intellectual functioning?

13   A.  In my opinion, Mr. Hardy's cognitive testing results were

14   inconsistent and were not indicative of his true level of

15   functioning.  There were just too many inconsistencies.

16   Q.  Explain to the court, what is the multi-axial assessment used

17   in the DSM-IV and DSM-IV-TR, what is that?

18   A.  Sure.  Multi-axial assessment is a five-axis diagnosis system

19   that was available with the DSM-IV and has been continued into the

20   DSM-IV-TR.  What the multi-axial assessment system does is, it

21   facilitates a comprehensive evaluation and a comprehensive

22   diagnostic system such that you have attention to Axis I, which

23   would be clinical disorders that could be the focus of clinical

24   attention.  That would be things like major depressive disorders,

25   schizophrenia, schizoaffective disorder, anxiety disorders, things

1    like that.

2         Axis II would involve personality disorders and mental

3    retardation, so they both would be subsumed in that area.  Axis III

4    relates to general medical conditions, Axis IV would be any

5    psychosocial or environmental problems an individual would have,

6    and then Axis V would be a gross estimate of what the clinician

7    believes is that individual's general area of functioning at the

8    time.

9    Q.  Would you agree that the 73, the IQ, and again, Dr. Tetlow

10   found that Hardy had an IQ of 73, the testing of Dr. Martell was a

11   76, but let's use 73.  Shouldn't that 73 have triggered further

12   inquiry into mental -- now, mental retardation which is found on

13   Axis II, correct?

14   A.  Yes.

15   Q.  And, in fact, Dr. Cunningham did go into Axis II, did he not?

16   A.  He did.

17   Q.  And what did he find in Axis II?

18   A.  After, I believe he said over 16 hours of interview and

19   testing, as well as collateral interviews, that Mr. Hardy met

20   diagnostic criteria for personality disorder not otherwise

21   specified.

22   Q.  So comment on --

23        THE COURT:  Mr. McMahon, I don't see these slides in

24   the -- are they in there or not?

25        MR. McMAHON:  I'm sorry, your Honor.  Hold on, I have a

```
 1   copy for the court, hold on.  My apologies.
 2              THE COURT:  Okay.  Go ahead.
 3   BY MR. McMAHON:
 4   Q.  Did anyone in 1996, or for that matter prior to this year, ever
 5   pursue the possibility, at least before 2008, that Hardy was
 6   mentally retarded?
 7   A.  No, they did not.
 8   Q.  Slide six.
 9              Let's talk about this assertion.  What do you feel about
10   Mr. Hardy, the possibility or the opportunity to have him retested?
11   A.  The opportunity existed, and it was not undertaken by the
12   defense.
13   Q.  Next.  And again, the WAIS-IV was available during 2008,
14   correct?
15   A.  It was.  I believe it came out in the summer of 2008, at least
16   that's when I received mine.  So if he was tested in 2008 and the
17   normed data was from 2007, that would have pretty much negated the
18   Flynn Effect other than possibly .3.
19   Q.  Next.  Again, just to summarize that slide, the issue of the
20   administration of a WAIS-IV would have done what?
21   A.  It basically would have eliminated the problem that we've had
22   with practice effects.  It basically would have addressed the issue
23   of the Flynn Effect, which, as that stated is my opinion, that the
24   data is still needed to determine whether individual test scores of
25   people with borderline intellectual functioning and mild mental
```

1    retardation are applicable.  And it also could have addressed

2    issues related to the inconsistencies that were indicated in the

3    cognitive test data.

4    Q.  That wasn't done, so what do you conclude regarding, let's wrap

5    up Criterion A?

6    A.  Basically, that wasn't done, so, in my opinion, with regard to

7    Criterion A, Mr. Hardy does not meet this; that is, in my opinion,

8    there was no reliable proof to indicate that he had significantly

9    subaverage intellectual functioning, an IQ of 70 or approximately

10   70 or below in 1996 or prior to that.

11   Q.  Let's go on to Criterion B.  Now, isn't it true, Dr. Hayes,

12   that these adaptive behavior scales of which we've spoken so much

13   last week, these were not designed, were they, to measure those

14   skills in a criminal, in the criminal setting, in the criminal

15   subculture, correct?

16   A.  That's right.

17   Q.  And do we have -- we have this quote, could you discuss this,

18   this is from an article by Denkowski and Denkowski.

19          MR. McMAHON:  Your Honor, we have copies of the articles

20   for the court.

21          THE COURT:  You anticipated my question.

22          MR. McMAHON:  Yes indeed.

23   BY MR. McMAHON:

24   Q.  Go ahead.

25   A.  "No standardized instrument has ever been developed for

1    establishing the adaptive behavior of this group, that is, criminal

2    defendants."

3    Q.  And does Dr. Denkowski -- well, I think there are two

4    Dr. Denkowskis, are there not?

5    A.  That's right.

6    Q.  Do they elaborate on this?

7    A.  They do.  They say that "Existent adaptive behavior measures

8    focus on mainstream skills and treat skills that are not displayed

9    for any reason as deficits.  But for background and/or lifestyle

10   reasons, persons from the criminal socioculture do not display

11   numerous commonly-assessed skills."

12          That is, people from the criminal socio -- people from a

13   criminal subculture display different adaptive symptoms; that is,

14   if you would assess mainstream America, they wouldn't necessarily

15   look like people from the criminal subculture, they have different

16   adaptive skills and abilities.

17   Q.  And, once again, we're dealing with a retrospective analysis of

18   an individual in the criminal subculture.  What does that do to

19   error?  And Dr. Mark Tassé, who testified in the Shannon Shields

20   case, he had something to say about that, did he not?

21   A.  He did.  He indicated that there was no reliable data which

22   would indicate an error rate of adaptive behavior assessments

23   obtained retrospectively.  That is, we don't know what the error

24   rate is for these types of retrospective assessments.

25   Q.  And again, could you talk about this slide, which is another

1   quote from Dr. Tassé?

2   A.  Sure.  "At issue is the respondent's ability to correctly

3   recall from memory the assessed individual's actual performance.

4   Memory degradation is a real issue, and we do not have any solid

5   research regarding the forgetting curve regarding someone's

6   recollection of another person's adaptive behavior."

7           So what this is getting at is, basically when you look

8   back 20 to 25 years, we have no data to know how much that person's

9   memory has degraded.

10  Q.  And let's go on to the next slide.

11          Now, talk about the quantum of proof that the defendant

12  has adduced regarding Hardy's deficits in the developmental period;

13  that is, before he reached the age of 18, and for that matter, at

14  the time Kim Groves was murdered.

15  A.  In my opinion, at all three times, that is, prior to the age of

16  18, at the time of Kim Groves' murder, and currently, Mr. Hardy had

17  no significant and substantial evidence or any reliable proof that

18  suggests that he had deficits or impairments in adaptive

19  functioning.

20  Q.  What problems do you see with Toni Van Buren as the only

21  adaptive informant for the developmental period, that is, before

22  Hardy reached the age of 18?

23          THE COURT:  Hold up one second, Mike.

24          MR. McMAHON:  Yes, your Honor.

25          THE COURT:  Go ahead.

1           THE WITNESS:  There were two other informants, there were

2    Vance Ceaser as well as Theresa Minor, but Ms. Van Buren was --

3    BY MR. McMAHON:

4    Q.  Well, she was the only one who was rendered -- given an

5    adaptive scale assessment, correct?

6    A.  That's correct.

7    Q.  Go ahead.

8    A.  My problem with that is that she didn't know Mr. Hardy prior to

9    the age of 18 so that is she didn't know him during the

10   developmental period.  She had limited knowledge of his functioning

11   until he was around 20 years of age.  She had no knowledge of his

12   functioning in the areas of school or work.  External data sources

13   contradicted the information that was provided, and Ms. Van Buren

14   did not recognize these adaptive deficits at the time of the crime

15   but didn't recognize them until approximately 24 years later, when

16   she was retrospectively describing his behavior and functioning.

17   Q.  Let's go on to the next slide regarding the other interviewees

18   by the defendant.  What about Theresa Minor?

19   A.  Theresa Minor, she had limited contact with Mr. Hardy.  She

20   probably had more frequent contact with him up until around the age

21   of five but then the family moved away and they had infrequent

22   contact from there on.

23           Vance Ceaser and Mr. Hardy were reared together in the

24   project until Mr. Ceaser was in his mid teens, when I believe they

25   moved away.  But after the 1st grade, their paths started to

```
 1   diverge.  And so he also had limited contact with Mr. Hardy

 2           Greg Williams didn't know Mr. Hardy until prior to -- he

 3   didn't know him prior to Mr. Hardy turning about 22 years old.  I

 4   believe it was around 1988ish when they, when they met.

 5           Javetta Cooper-Franklin has shown herself to be an

 6   unreliable informant.  So basically --

 7   Q.  And could any of these informants be deemed unbiased or

 8   disinterested?

 9   A.  I don't believe so, no.

10   Q.  Let's go on to the next slide.

11           Now, in Dr. Swanson's report at page 24, just to

12   summarize, she indicated significant deficits prior to the age of

13   18 in which areas?

14   A.  Communication, functional academics living skills.

15   Q.  Let me stop there.  This is a direct quote from her report.  Do

16   you think that should be split?

17   A.  I think she probably meant just functional academics or

18   functional academic skills, because she has in there home living,

19   so it's probably just a typo.

20   Q.  All right.  Go ahead.

21   A.  Self-care, home living, domestic skills, social/interpersonal

22   relationships, leisure and self-direction.

23   Q.  And the primary or only source for these conclusions was Toni

24   Van Buren's VABS-II?

25   A.  That's what was indicated in her report, yes.
```

1   Q.  Next slide.

2            MS. FOURNET:  Your Honor, pardon me for interrupting,

3   Mr. McMahon.  I don't think we've been given copies of these

4   slides, and I would like to have them now.

5            THE COURT:  Is there another set?

6            MR. McMAHON:  Oh, yes.

7   BY MR. McMAHON:

8   Q.  And again, quoting from Dr. Swanson's report, "Although no

9   standard scores were obtained in the DSM-IV-TR adaptive criteria

10  areas of work" -- and again, there should be an "or" in there,

11  "work or health and safety, school" -- I'm sorry, "areas of work or

12  health and safety" -- not exactly an artfully-crafted sentence --

13  "school, prison, medical, and psychiatric records note substantial

14  limitations in these areas as well."

15           Did you find any school, prison, medical or psychiatric

16  records that noted such substantial limitations?

17  A.  I did not.

18  Q.  Next slide.  And Dr. Swanson's current opinion of Mr. Hardy's

19  adaptive behavior, "he continues to have substantial limitations"

20  in which areas?

21  A.  In functional academic skills, health, self-direction, domestic

22  skills, and work.

23  Q.  Continue.

24  A.  She opined that this occurred prior to the age of 18, that he

25  would meet the DSM-IV-TR and the AAMR Tenth Edition criteria for a

1   diagnosis of mental retardation.

2   Q.  Next slide.  Now, what records did you consult that informed

3   your own opinion regarding Mr. Hardy's adaptive functioning, both

4   before the age -- both in developmental period and currently?

5   A.  In terms of objective records, school, prison and jail records,

6   medical testimony from the 1996 trial, financial banking and other

7   transactional records, telephone calls, both in 1996 and presently

8   when he was in the jail, as well as video recordings of Mr. Hardy.

9   Q.  Next slide.  And we went over these.  Did any of those records

10  indicate substantial adaptive behavior deficits in these areas?

11  A.  No.

12  Q.  Next slide.  Was there any evidence of substantial current

13  adaptive limitations?

14  A.  No, there were not.

15  Q.  Next slide, please.

16          Now, I want to quickly, I want to let the court know, we

17  tried to go into it in more depth on Friday, but just to kind of

18  sum up, I want you to go through these adaptive areas, which

19  Dr. Swanson found to be substantially deficient, and quickly sum up

20  for the court your findings as to whether they indicate such

21  deficits in Hardy.  And let's start with communication, go ahead.

22  A.  As evidenced by the videotapes, Mr. Hardy definitely modulates

23  his voice as necessary, that's also on the audio tapes.  He has no

24  difficulty with expressing his thoughts, his feelings, his needs,

25  his desires, though the records are replete with evidence for that.

1        He does understand nonverbal cues in conversation and

2   behavior, he doesn't invade your personal space, he understands

3   what certain indirect cues mean, he comprehends information that

4   other people tell him, and he definitely follows directions.

5   Q.  Let's go on to self-care.  Go ahead.

6   A.  He has always had good personal care, as evidenced by the

7   videos, as evidenced by his personal hygiene in jail.  He regularly

8   got his hair cut at barber shops, he obtained cosmetic dental work,

9   so he's always taken care of himself from a personal hygiene and

10  self-care standpoint.

11  Q.  Let's go on to the next slide involving home living.

12        And again, could you comment on this -- again, this is a

13  quote from Denkowski.

14  A.  Sure.  What this is referring to is that Mr. Hardy was raised

15  in a family where he was not, for the most part, required to cook

16  or clean.  He then lived with women, where he again was not

17  required to cook or clean.  And one of the things that Denkowski

18  had pointed out in his article is what we referred to or alluded to

19  earlier, that is that Mr. Hardy led a criminalized life with its

20  own behavioral demands.  And so when he was required to perform

21  these various activities, he adapted and completed these home

22  living tasks when he needed to.

23  Q.  And the next slide still relates to home living.  If you could

24  just summarize that for the court, please.

25  A.  Certainly.  For non-ability reasons, Mr. Hardy had numerous

1    skills that were not displayed that are displayed in mainstream

2    peers, but his criminal lifestyle was such that those components go

3    unmeasured by mainstream-geared instruments, like using skills to

4    sell, it says rugs but it should be drugs, stalk victims, change

5    license plates to avoid arrest, hide a murder weapon, or provide

6    fabricated accounts of activities to police.  Those are things that

7    go unassessed by typical adaptive behavior assessments.

8    Q.  Let's wrap up your conclusion regarding social/interpersonal

9    skills, next slide.

10    A.  He continues to maintain regular contact with relatives, both

11    by telephone and written correspondence, as testified to by Lionel

12    Hardy.  He uses social skills to produce socially-accepted

13    responses in various social situations.  He is considered to be a

14    leader in the community, as evidenced by, I believe Keith

15    Mitchell's testimony and a couple of the audio recorded -- the

16    intercepted audio recordings back in 1994 between him and Len

17    Davis.

18    Q.  Cite one specifically.  It's on the slide, so go ahead and just

19    read it.

20    A.  The 10/12/1994 conversation between himself and Len Davis at

21    10:30 A.M., where Mr. Hardy was describing himself as a leader in

22    the community, and I believe Mr. Davis also agreed with him.

23    Q.  Did you find Hardy to be deficient in self-direction, next

24    slide?

25    A.  No, I did not.

1   Q.  Why?

2   A.  Well, this one is use of community resources.  Do you want to

3   skip forward to self-direction or go ahead and do this one?

4   Q.  I'm sorry, I did.  Go back to use of community resources, my

5   mistake.

6   A.  Okay.  Mr. Hardy was oriented, and he moved around the

7   community with no difficulty as seen by what was just going on in

8   the videotape.  He used various forms of transportation, including

9   cabs, cars, moped, walking.  He also used services that were

10  focused on knowledge and use of business sources and services and

11  resources.  For example, Meineke Muffler, Sam's Club where he

12  bought a couple of items as based on a receipt, as well as

13  different clothing stores.

14          He participated in the community without undue risk to

15  himself.  You saw in the videotape that he had a gun beneath his

16  right thigh.  He also had guns stashed around at different areas.

17  So while he was in the drug trade, he did try to minimize the risk

18  to himself and his family.

19          He also acted in ways that were socially appropriate and

20  conformed to the norm of his environment and his culture.

21  Q.  Well, he took a plane out to California, too, did he not?

22  A.  He did.

23  Q.  You mentioned walking is not a mode of transportation, did you

24  mean to say that?

25  A.  It is to me.

```
1    Q.  Why?

2    A.  If I need to get somewhere, I can walk, you know.  I walk

3    between different places and my house all the time.  So it is.

4    It's not a motorized means of transportation, but it is a way to

5    get from point A to point B in my opinion.

6    Q.  Can even profoundly retarded people walk?

7    A.  Some can.  I've never met a profoundly retarded person who

8    could go from, say, my house to a restaurant when they were told to

9    walk from your house to a restaurant.

10   Q.  Did you feel he was substantially deficient in the area of

11   self-direction, next slide?

12   A.  In my opinion, he wasn't.

13   Q.  Why?

14   A.  He has done things and said things that show that he actually

15   is trying to behave in a purposeful manner.  For instance, he has

16   been -- he describes in one phone call being inspired by religious

17   programing in Indiana, he reads his Bible, he monitors his

18   children's contact -- his children's conduct and comments on when

19   he thinks they're doing things that are good, as well as things

20   that he thinks they're doing poorly.

21        Like I said earlier, he stashed crack and guns at various

22   locations.  He attempted to bribe one of the St. Bernard Parish

23   deputies.  And following the Kim Groves' murder he asked Len Davis

24   if somebody was ratting him, so he is self-directing his behavior.

25   Q.  Let's talk about the other area of -- the next area, functional
```

1    academics.  Do you feel that he is substantially deficient in that

2    area?

3    A.  No, I do not.

4    Q.  Why not?

5    A.  He did not display any significant deficits enough for him to

6    be unable to operate in his own culture in the area of reading,

7    writing and performing math.  He can follow directions, he can

8    convey and record information in a written format, as evidenced by

9    letters from various prison and jails.

10          And as indicated in the ABAS academics -- ABAS-II book,

11   academic skills, to be functional and adaptive, must be relevant to

12   an individual's lifestyle needs, including their specific

13   responsibilities and expectations from those with who they

14   interact.

15          And when Mr. Hardy went to jail, he stepped up his

16   responsibilities and expectations with regards to things that he

17   needed, such as getting into contact with his various, with various

18   people that he wanted to get in contact with, he insured that, such

19   as obtaining appropriate medical care and relaying when he was not

20   pleased with the medical care that he was given.

21   Q.  Let's go on to the area of work.  What did you conclude in that

22   subdomain?

23   A.  This subdomain is a little bit of a -- I may differ from the

24   defense experts in this domain because I believe that while

25   Mr. Hardy's activities, selling drugs, were not a legal job, that

1  they still were a job that produced income for himself and for his

2  family.  So in my understanding, Mr. Hardy was the leader of a

3  group of individuals that dealt drugs in the projects.  It was my

4  understanding that he also worked at the Ernst Cafe for

5  approximately 800 hours --

6  Q.  And, in fact, Dr. Swanson stated in her report that his only

7  prior employment was that stint with Meals on Wheels.

8  A.  That's correct.

9  Q.  Continue.

10  A.  And also he worked for Meals on Wheels until he was arrested.

11  Q.  Let's go on to the --

12  A.  Not this arrest but another arrest.

13  Q.  Did you feel that he was deficient in the area of leisure?

14  A.  No, I did not.

15  Q.  And why?

16  A.  Mr. Hardy obtained tickets and attended concerts, he currently

17  plays basketball and various card games.  He listens to the news

18  and religious broadcasts, and I think he even listens to *Young and*

19  *the Restless*.  Went to the movies and to restaurants when he was

20  out in the community.  He enjoyed practicing shooting at a firing

21  range, and his biggest hobby, I think, though, was spending much of

22  his free time courting women.

23  Q.  And what about the area of self-help and safety, did you feel

24  he was substantially deficient in that area?

25  A.  No, I believe that he -- when in the community that he did the

best that he could to minimize the risk to himself and to his

family, as we discussed; and as evidenced by his driving, he was

able to recognize signs, he traveled safely, stopped at red lights.

He didn't use substances, according to him, and to the report

indicated in some of the prison records, and he was an advocate or

he is an advocate for his own and for other's health care needs

since he's been incarcerated.

Q.  As evidenced by the phone calls to his friends and relatives?

A.  Not only that but also the various sick call requests that were

included in the Tangipahoa, the BOP and St. Bernard Parish jail

records.

Q.  Let's wrap up.  Did anybody prior to 2008 suggest that Hardy

was mentally retard?

A.  No.  And that includes four psychologists that saw -- well, two

psychologists, two neuropsychologists, teachers, mental health

providers from BOP, nobody had ever indicated that he was mentally

retarded prior to 2008.

Q.  And finally Criterion C, onset prior to the age of 18.

A.  Taken together, it's my opinion that Mr. Hardy does not meet

the AAIDD, AAMR, or DSM-IV-TR diagnostic criteria for mild mental

retardation, or any other form of mental retardation for that

matter.

Q.  Dr. Hayes, I am finished, is there anything you would like, in

your expertise that you would like to, that perhaps you found

noteworthy that I may have neglected to go over to inform the

1    court?

2    A.  I don't believe so.

3          MR. McMAHON:  Okay.  Your Honor, I tender for cross.

4          THE COURT:  All right.

5          MS. FOURNET:  Your Honor, I need to give my paralegal a

6    chance to get up here.

7          THE COURT:  Okay.

8                    CROSS-EXAMINATION

9    BY MS. FOURNET:

10   Q.  Dr. Hayes, I would like to begin this morning by addressing a

11   little bit more completely your qualifications, if you don't mind.

12   A.  Okay.

13   Q.  I believe on direct, and correct me if I'm wrong about this,

14   you testified that you have done over the time of your career

15   approximately 80 assessments for mental retardation, did I hear you

16   correctly on that?

17   A.  Yes, probably more.

18   Q.  And of these 80 assessments, how many of these assessments have

19   been since you received your license?

20   A.  Um --

21   Q.  That is, how many of these were done without supervision and

22   not while you were a student?

23   A.  Probably 20ish.

24   Q.  Twentyish.  And of that 20, how many have been non-litigation

25   related; that is, how many have been done not in connection with a

1  competency hearing, an Atkins hearing, or other court proceeding?

2  A.  Probably ten.

3  Q.  So out of 80 assessments, 60 were given prior to when you had

4  your license, correct?

5  A.  Probably more, when I went to think about it, because I had

6  opened -- or I had worked with Dr. John Matson in a private

7  practice as well as at Feliciana, and I didn't include those as

8  well.

9  Q.  So whether it was 60 or whether it was more than 60, all but 20

10  of your assessments were done as a student, correct?

11  A.  That's correct.

12  Q.  And they weren't done independently by you, they had to have

13  been done with supervision because you were just a student and you

14  didn't have your license yet; is that correct?

15  A.  Actually -- let me revise my answer.  Because either I was a

16  student or I was -- when I was working at Feliciana Forensic, I was

17  working as a psychologist for, or as a psychological assistant for,

18  but you're still, nevertheless, you're right, you did have to work

19  under the license of another individual.

20  Q.  So you have actually performed in an unsupervised context only

21  20 mental retardation assessments, correct?

22  A.  That is correct.

23  Q.  And for half of those, 50 percent were done in connection with

24  litigation; is that correct?

25  A.  To the best of my recollection.

1  Q.  Now, you mentioned Dr. Johnny Matson in your direct testimony.

2  Is that correct?

3  A.  Yes.

4  Q.  And I gather that Dr. Matson is one of your mentors and

5  somebody that you respect; is that correct?

6  A.  I do respect him.

7  Q.  Now, you indicated that you had gone into business with him in

8  your direct testimony, but the truth is, the time that you were

9  working with Dr. Matson was prior to when you obtained your

10  license; is that correct?

11  A.  That's correct.

12  Q.  So you would have been under his supervision, you weren't

13  actually a business partner, is that correct, you were working

14  under his supervision prior to the time you got your license; is

15  that correct?

16  A.  No.  It's actually not correct.

17  Q.  Okay.

18  A.  Because when Dr. Matson, another woman that was one of my

19  peers, and I started doing this work, he referred to it as we were

20  going into business together.  Yes, I had to work under his

21  license, as I had indicated before, because at the time I was still

22  a student at LSU.  So, in essence, we were all working together but

23  he was my supervisor.

24  Q.  Well, I am not asking you how Dr. Matson referred to it, I am

25  asking you what it was.  Did you own a share of the business?

1   A.  I don't believe that we filed any business papers.

2   Q.  Dr. Hayes, I am going to have to ask you to listen to the

3   question.  Did you own a share of the business?

4   A.  There was no business entity like, I guess, an LLC or a

5   corporation, so I don't think any of us owned a share of anything.

6   Q.  All right.  He had contracts, did he not; that was his private

7   business was contracts with various facilities?

8   A.  Yes, we had contracts.

9   Q.  Was your name on the contract?

10  A.  Not that I am aware of.

11  Q.  In fact, you got paid by the hour, did you not, to work as a

12  student at a relatively low rate; am I correct in that?

13  A.  I don't recall what I was paid.

14  Q.  But certainly not a salary like Dr. Matson was paid.

15  A.  I'm sure not.

16  Q.  So you were one of, I'm sure, a series or a number of students

17  who did assessments for Dr. Matson in connection with a private

18  contract or more than one private contract, and he supervised those

19  assessments; that's correct, isn't it?

20  A.  Yes.

21  Q.  Now, you mentioned also in your direct that you did some

22  research at Feliciana; is that correct?

23  A.  That's correct.

24  Q.  And that research would be research conducted with Dr. David

25  Hale and Dr. Drew Bouvier; is that correct?

1    A.  Yes.

2    Q.  And was there any other research conducted at Feliciana

3    specifically with reference to mental retardation other than that

4    research that you conducted with Dr. Hale and Dr. Bouvier?

5    A.  There may have been later, but none that I was involved in.  So

6    I couldn't tell you.

7    Q.  Okay.  Well, I am interested strictly in what you did.

8    A.  That's the only research that I did when I was there with

9    regard to mental retardation that I can remember, except for

10   setting up like token economy systems but that wouldn't really be

11   research.

12   Q.  Now, that research was later published in a volume of the

13   journal *Applied Neuropsychology*; is that correct?

14   A.  Yes.

15   Q.  And that was a study involving approximately 39 men at

16   Feliciana; is that correct?

17   A.  I haven't reviewed the article lately, but if you say so, I

18   trust you.

19   Q.  You would agree that 39 men is a pretty small sample?

20   A.  It is.

21   Q.  And you would also agree that this is a pretty discrete

22   subpopulation; in other words, the study was limited to individuals

23   who were at Feliciana, which you described in the article as a

24   facility for the criminally insane, those individuals were people

25   who had either been declared incompetent or who had been declared

1   not guilty by reason of insanity; is that correct?

2   A.  I don't believe that anybody who is simply considered

3   incompetent was included in the sample because there would be the

4   possibility that they would return to court.  It would be people

5   who had been declared irretrievably incompetent based upon -- I

6   can't remember what court case it is here in Louisiana -- but

7   people who are not considered to be able to return to court due to

8   the difficulties that they had.

9   Q.  And I can't remember the name of the case either, but it's a

10  case that basically holds that once a person appears to not have

11  the ability to ever achieve competence, then they can be

12  essentially civilly committed to Feliciana --

13  A.  Yes.

14  Q.  -- for an indeterminate period of time; is that the case you're

15  talking about?

16  A.  Yes, ma'am.  I seem to recall right now, it might be Lockhart.

17  Q.  That's it, I recognize it, you're correct, it is the Lockhart

18  decision.

19          So we are talking about an even more discrete

20  subpopulation of a subpopulation, are we not; we are talking about

21  a group who have been declared irretrievably, as you put it,

22  incompetent, correct?

23  A.  That was one.  The other, individuals who had been identified

24  as not guilty by reason of insanity.

25  Q.  Okay.  And this was a study of malingering, was it not?

1    A.  Yes, it was.

2    Q.  And the specific focus of the study was whether the, what's

3    called the SIRS, which that's S-I-R-S, which stands for the

4    Structured Interview of Reported Symptoms, was either alone or in

5    combination with other tests, could accurately discriminate

6    malingerers in a mentally retarded population; was that not the

7    inquiry in that study?

8    A.  In a mentally retarded population that also had been involved

9    in the criminal justice system.

10   Q.  So again, we're talking about a very, very discrete

11   subpopulation, even of the mentally retarded population, are we

12   not?

13   A.  I agree.  But it is a subpopulation that I think that research

14   was needed in, because these gentlemen would be having evaluations

15   where this issue would be raised.

16   Q.  Yes, I understand that.  In fact, as I recall, and correct me

17   if I'm wrong, you began the article expressing your concern about

18   something you had read about murderers being set free based on

19   findings of incompetence or not guilty by reason of insanity.  Do

20   you recall that part of your article?

21   A.  No, I don't.  But, I'm sorry, I wrote them 15 years ago or so.

22   Q.  I understand.  Now, I have read your article fairly recently,

23   and although I am not a scientist, you can correct me if I'm wrong,

24   it was my understanding that the conclusion of the article was that

25   the SIRS interview, either alone or in combination with other

```
 1   instruments or measures, could, in fact, discriminate malingerers;

 2   is that correct?

 3   A.  It was a --

 4            MR. McMAHON:  Your Honor, again, I don't mean to

 5   interrupt, but if Ms. Fournet is questioning Dr. Hayes about an

 6   article she wrote 15 years ago, I think it will be useful to at

 7   least provide Dr. Hayes with that article so she could refresh her

 8   memory.

 9            MS. FOURNET:  I will be glad to do that, your Honor.

10   It's a little bit dog-eared and highlighted, your Honor, but.

11            THE COURT:  I assume we'll have it also?

12            MS. FOURNET:  We'll get it to you, your Honor.

13            THE COURT:  I don't need it right now, but again, just

14   like Mike, everything that is referenced, please.

15            MS. FOURNET:  May I approach the witness, your Honor?

16            THE COURT:  Dr. Swanson, do you have one that's not

17   marked up?

18   BY MS. FOURNET:

19   Q.  And just to clarify the sentence I was referring to, I'd like

20   for you to read this first highlighted sentence into the record.

21   A.  Certainly.

22   Q.  It begins with among.

23   A.  "Among persons convicted of murder it's been reported some

24   people have only been hospitalized for one day and were set free

25   without prolonged hospital confinement or jail time."
```

1  Q.  And feel free to peruse that article, but if you -- and if you

2  need to look at the end where you made your conclusions, but am I

3  correct that you determined that the answer was, yes, that this

4  particular interview was a valid device or instrument for

5  discriminating malingerers in a mentally retarded population?

6  A.  Yes.

7  Q.  That's all the questions I have about that.  If you want to

8  give me that back, we'll make copies later.

9  A.  Here you go.

10  Q.  Thank you.

11  A.  You're welcome.

12  Q.  Now, you are, of course, aware, and if you're not please tell

13  me, that in that very same journal, *Applied Neuropsychology*,

14  Dr. Karen Salekin recently criticized your research, were you aware

15  of that?

16  A.  I know that she mentioned my research.  I don't recall how

17  critical she was of it.

18  Q.  So you do not consider -- are you familiar with the particular

19  issue of *Applied Neuropsychology* I am referring to?  That would be

20  the special issue, which has been mentioned in this courtroom

21  several times, on mental retardation and the death penalty.

22          MS. FOURNET:  And, your Honor, you have copies of those

23  articles, including the one I am referring to.

24          THE COURT:  Is that the batch you gave me last week?  I

25  got it.

```
 1   BY MS. FOURNET:
 2   Q.  You do not perceive that Dr. Salekin criticized your research?
 3   A.  I don't remember what she said.
 4   Q.  You do not remember if she criticized your research or not, is
 5   what you're saying?
 6   A.  I remember her mentioning the research, I don't remember what
 7   her conclusions were regarding the research.
 8             THE COURT:  This is Dr. Stephens?
 9             MS. FOURNET:  I'm sorry, your Honor?
10             THE COURT:  This is Dr. --
11             MS. FOURNET:  Salekin, S-A-L-E-K-I-N.
12             THE COURT:  The one I have is adaptive behavior mental
13   retardation and the death penalty, is that a different --
14             MS. FOURNET:  I think that may be a stack of, isn't that
15   more than one article?  There's more than one article in that
16   stack, your Honor.  And if you don't have Dr. Salekin, I thought
17   you did.  So if you don't, we'll certainly get it to you.
18             THE COURT:  Okay.  Go ahead.
19   BY MS. FOURNET:
20   Q.  Are you -- you did read Dr. Salekin's article, Dr. Hayes?
21   A.  Yes, I did.
22   Q.  And that was in 2009, was it not?
23   A.  That's right.
24   Q.  Are you further aware of research she cited in that same
25   article by Hurley and Deal in 2006 -- and that's H-U-R-L-E-Y and
```

1   D-E-A-L -- which indicated that the SIRS is inappropriate for use

2   in the population with mental retardation; do you recall that

3   citation in the Salekin article?

4   A.  I remember the Hurley and Deal article, but I don't recall that

5   specific citation.

6   Q.  Do you recall that in the article, whether you remember the

7   specific citation or not, this is a study that also held that the

8   SIRS was an inappropriate measure of malingering in the mentally

9   retarded population?

10  A.  I don't recall.

11  Q.  Well, do you still believe that a SIRS is an appropriate

12  measure of malingering in a mentally retarded population as you

13  apparently concluded in 1998?

14  A.  I found Dr. Salekin's article.

15  Q.  Okay.

16  A.  And what I saw was her take-home message with the article that

17  myself, Dr. Hale and Dr. Bouvier had indicated, was that in our

18  article we didn't provide enough information to evaluate the

19  strength of our findings or our specificity rates.  So.

20  Q.  Does that information exist, did it ever exist?

21  A.  It probably existed at one point, but I don't think you have to

22  keep your data beyond six years, so I don't know if I've still got

23  it anywhere.

24  Q.  So basically what Dr. Salekin is saying is what you keep saying

25  about all of the information in this case, if there's no data to

1   support it; isn't that what she is saying?

2   A.  No.  She is saying that we needed more -- we needed to provide

3   more information about the sensitivity and specificity, which is

4   one of the things that I said that we needed better data on,

5   especially in the area of malingering across the board.

6   Q.  So you don't perceive that this professional disagrees with the

7   results of your research, is that what you're saying?

8   A.  I don't know that she disagrees with it, but I feel like she

9   said, that she needed more information, and I would agree with her.

10  Had I written the study again today, I would have included more

11  information regarding sensitivity and specificity.  That issue

12  really didn't start coming up until around '97.

13  Q.  So the answer is, no, you do not perceive that she is

14  disagreeing with your conclusion?

15  A.  I can't know what she does or what she doesn't think.  But I

16  think that what she's saying is, she needs more information.

17  Q.  Well, today, as we sit here today, do you still maintain that

18  this instrument is a valid instrument for assessing malingering?

19  A.  I do.

20  Q.  I'm curious about that, and we'll get to this later, but have

21  you not said on more than one occasion, including in the United

22  States v. Cole case, that there is no valid measure of malingering

23  currently in the mentally retarded population?

24  A.  I don't recall saying that.

25  Q.  While you would agree, if you said that, it would be

1  inconsistent with what you're saying right now?

2  A.  Yes.

3  Q.  Now, you belong, according to your CV, to Division 40 of the

4  APA; is that correct?

5  A.  Yes.

6  Q.  And that is what division?

7  A.  Neuropsychology.

8  Q.  Do you belong to Division 33, which is the division on

9  intellectual and developmental disabilities?

10  A.  No, I do not.

11  Q.  Do you belong to the AAIDD, the American Association of

12  Intellectual and Developmental Disabilities?

13  A.  No.

14  Q.  Did you belong to that organization under its previous name,

15  AAMR, the American Association for the Mentally Retarded?

16  A.  I am not sure.  I may have at one point, and so I don't want

17  to -- I haven't probably -- I can tell you I haven't in at least

18  ten years, if I ever did.

19  Q.  If you ever did.  I mean, Dr. Hayes, let's be candid here.

20  Your CV doesn't list it, does it?

21  A.  That's because I am not currently a member of it.

22  Q.  Well, I mean, your CV goes all the way back, and your testimony

23  has gone all the way back to undergraduate school, has it not?

24  A.  Yes.

25  Q.  And you know this is a hearing to determine whether this man

```
 1   has mental retardation?
 2   A.  Yes.
 3   Q.  And you're saying you can't remember if you ever belonged to
 4   this national organization for the mentally retarded?
 5   A.  I know that I presented at the Louisiana AAMR conference, and I
 6   am not sure if around that time I was a member of AAMR or not.  I
 7   know that I haven't been a member of AAMR for the past ten years,
 8   so I am trying to be as honest with you as possible and tell you
 9   that I don't remember.
10   Q.  So you don't remember whether you've ever belonged to this
11   organization is what you're saying?
12   A.  What I said is that I presented at the Louisiana --
13             MR. MILLER:  Judge, this has been asked and answered.
14             THE COURT:  Mr. McMahon -- oh, he's gone.
15             MR. MILLER:  Actually, we may need to approach the bench
16   in a little while, your Honor, so I am making the objection, it's
17   been asked and answered.
18             THE COURT:  Yeah, I think it has been asked and answered.
19             MS. FOURNET:  Well, it's certainly been asked, your
20   Honor, I think whether it's been answered may be debatable, but
21   I'll move on, I'll move on.
22             THE COURT:  There was an answer of sorts, go ahead.
23   BY MS. FOURNET:
24   Q.  Dr. Hayes, prior to this hearing, did you own a copy of this
25   book, this User's Guide?
```

1  A.  No.

2  Q.  As a matter of fact, this book was delivered during the course

3  of this hearing by an FBI agent, wasn't it?

4  A.  I don't think so.

5  Q.  You don't think so.  Well, when is the first time you had a

6  copy of it?

7  A.  During this hearing.

8  Q.  Well, how did it get to you?

9  A.  I ordered it.

10  Q.  And who brought it to you?

11  A.  I think my husband did.

12  Q.  Okay.  And so you had not even ordered this book prior to the

13  beginning of this hearing, correct?

14  A.  No, I had excerpts from it but I didn't own it, and I thought

15  it was a good idea to go ahead and order it.

16  Q.  In the middle of a hearing to determine whether this man can be

17  executed or not, correct?

18  A.  Yes.

19  Q.  So you did not read it prior to this hearing is what you're

20  saying?

21  A.  I read the applicable sections prior to the hearing, but I

22  didn't have the book.

23  Q.  How did you determine what were the applicable sections?

24  A.  Because I asked for the applicable sections.

25  Q.  And who did you ask for the applicable sections?

1    A.  I asked a friend of mine to copy it for me.

2    Q.  And who was this friend that you asked to determine what

3    sections of this very important book were applicable to this very

4    important testimony?

5    A.  I believe it was either one of a few people, I don't really

6    recall who sent it to me, I've been asking numerous people for

7    numerous articles.

8    Q.  So you don't recall who picked out the applicable sections?

9    A.  No, I don't.

10   Q.  And how much did that person who picked out the applicable

11   sections of this very important book know about Paul Hardy?

12   A.  Since I don't know who sent it to me, then I can't know who

13   picked out the applicable sections.

14   Q.  Well, that certainly is logical.

15           How many trainings in the administration of the Vineland

16   have you attended since you obtained your license, not while you

17   were in school, since you obtained your license?

18   A.  None that I can recall.

19   Q.  None.  What year did you get your license?

20   A.  1998.

21   Q.  So you have had the license for 11 years, and in that 11 years

22   you have not attended a single training for administering the

23   Vineland instrument to determine if someone has mental retardation;

24   is that what you're saying?

25   A.  No, I had excellent training in graduate school regarding that.

1   Q.  That wasn't the question, Dr. Hayes.  Listen to the question.

2   In 11 years since you have obtained your license, you have not

3   attended a single training on administering the Vineland?  You may

4   answer yes or no and then if you need to explain your answer.

5              MR. MILLER:  Judge, lawyers shouldn't be telling what you

6   may or may not answer.

7              THE COURT:  Overruled.  Overruled.  Go ahead.

8              THE WITNESS:  Like I said, no, I had excellent training

9   in graduate school, so I didn't feel it was necessary.

10  BY MS. FOURNET:

11  Q.  So the current version of the Vineland is the VABS-II, which

12  came out in 2008, correct?

13  A.  No, I don't believe it came out in 2008.  I thought the

14  Vineland Adaptive Behavior Scale-II came out earlier than that.

15  Q.  I'm sorry, I can't read this writing here.  2005, does that

16  sound right?

17  A.  Yes.

18  Q.  So you had your license in 2005, correct?

19  A.  Right.

20  Q.  And if the test came out in 2005, you have not had a single

21  training on this particular test regardless of what you got as a

22  student; is that correct?

23  A.  We don't have -- a group of psychologists and I tend to get

24  together and go over the different measures, it's our way to ensure

25  internal reliability, so those are the trainings that I have

1    considering that it's not substantially different in the way that

2    it is administered or scored.

3    Q.  I am going to ask the question again, and I am going to request

4    that you answer yes or no.

5            THE COURT:  She actually did.  She got to it in a

6    roundabout way.  She said that was getting together with her fellow

7    psychologists, that was the training that she had.

8    BY MS. FOURNET:

9    Q.  Dr. Hayes, I have to ask you, if you consider whether sitting

10   around with a couple of psychologists talking about an instrument

11   is equivalent to attending the formal training that the designers

12   of this instrument conduct.  You don't think those two things are

13   equivalent, do you?

14   A.  No, of course not.

15   Q.  And you haven't been to any formal trainings by the designers

16   of the Vineland, and, in particular, the 2005 version of the

17   Vineland, at all, have you?

18   A.  No, I indicated that.

19   Q.  How long ago were you hired on this case?

20   A.  Sometime during 2009.

21   Q.  Certainly you were hired before you went out and interviewed

22   Javetta Franklin for the Vineland; is that correct?

23   A.  Of course.

24   Q.  It didn't occur to you that given the high stakes in this case

25   that it might be a good idea to attend a formal training on how to

```
 1    administer this test?
 2    A.  I didn't feel it was necessary given the Vinelands that I have
 3    given previously, as well as the informal training that I had done
 4    with my colleagues in the area.
 5    Q.  Well, how many Vinelands have you given since you got your
 6    license?  Not while you were a student, but since you got your
 7    license.
 8    A.  Probably around ten because the other ones would probably be
 9    adaptive behavior assessment scales, which I actually prefer.
10    Q.  And of those ten, how many of those Vinelands were given in
11    connection with litigation like the litigation in this case?
12    A.  I am not sure what I gave in a couple of other cases, so just
13    to be -- can you repeat your question again?  Were you asking for
14    litigation or non-litigation?
15    Q.  Of the ten Vinelands you have given since you obtained your
16    license, how many of those Vinelands have been administered in
17    connection with a court case?
18    A.  I don't recall of the different court cases that I've had
19    whether I gave the Vineland or the ABAS.  I just don't.
20    Q.  So the answer is you don't know?
21    A.  I don't remember.
22    Q.  Well, let me ask the opposite question.  How many of the
23    Vinelands that you have administered since you got your license
24    were administered in a non-litigation context?
25    A.  Probably about ten.
```

1   Q.  Well, I thought you said you had administered ten altogether.

2   A.  Since I've gotten my license?  I thought I said I administered

3   about 20.

4   Q.  You said 20 mental retardation assessments, you said ten

5   Vinelands.

6   A.  Right.

7   Q.  And if I am mishearing you, please correct me, but that's what

8   I think I heard you say.

9   A.  I thought I had said that I had done 20 mental retardation

10  assessments --

11  Q.  Correct.

12  A.  -- and about ten of them included the Vineland because the

13  other ten had the ABAS.

14  Q.  Okay.  So I am correct, and I certainly don't want to misstate

15  your testimony, but I am correct that what you're saying is, you've

16  given a total of ten Vinelands since you got your license?

17  A.  That would be about right, yes.

18  Q.  Of those ten Vinelands, how many of those were administered in

19  a non-litigation context; that is, how many of those ten were

20  administered in a context that had nothing to do with a court case?

21  A.  Probably about half.

22  Q.  Probably about half.  So we're talking about five in connection

23  with litigation and five not in connection with litigation; is that

24  correct?

25  A.  That's correct.

1   Q.  Now, you are also a member of the FBI Citizens' Academy?

2   A.  I am not sure I paid my dues this year but I was.

3   Q.  And, in fact, you were secretary of that organization from 2004

4   to 2005?

5           THE COURT:  Ms. Fournet, it's almost 10:40, so we've been

6   at it over an hour and a half.  It looks like you're changing

7   topics.  Is it a good place for our break?

8           MS. FOURNET:  Yes, ma'am.

9           THE DEPUTY CLERK:  All rise.

10      (WHEREUPON, A RECESS WAS TAKEN.)

11      (OPEN COURT.)

12          THE DEPUTY CLERK:  All rise.

13          THE COURT:  Have a seat, please.

14          MS. FOURNET:  Your Honor, if I might, just a small

15   housekeeping matter.  We're not there yet, but at some point we

16   will make references during Dr. Hayes's testimony to various

17   documents that were provided to us by the government in discovery.

18   We have them numbered, because they weren't numbered when they came

19   to us, so we have assigned our own numbers to them.  And I'll have

20   to use those numbers.  We have three notebooks of those documents

21   with our numbers for the court, if you would like to have them.

22   There's nothing different in there, it's just a different numbering

23   system.

24          THE COURT:  They're exhibits that have already been

25   introduced, but they just have different identifying marks?

```
 1              MS. FOURNET:  Yes, ma'am.  They're the government
 2   discovery package, essentially some 1,600 pages, but we had to
 3   number them separately for our purposes.
 4              THE COURT:  But have they already been presented in one
 5   form to me or was it just something exchanged between you?
 6              MS. FOURNET:  No, because they were the government's
 7   documents.  They have been presented by the government, they just
 8   have, I assume, 1,600 pages went to the government that Dr. Hayes
 9   relied on, I mean went to the court?  They're just numbered for
10   ease of location.
11              THE COURT:  Yeah.  Well, all I was asking is, I have
12   three-ring binders from you all and three-ring binders from the
13   government.  I'm just asking if what you're showing is duplicative
14   in some way of what the government's already given me or if it's
15   something new?
16              MS. FOURNET:  It's a complete duplicate, it's merely
17   numbered, Judge, so when we refer to a certain document by our
18   document number you will be able to find it.
19              THE COURT:  Okay.
20              MS. FOURNET:  We're not really near the point where we're
21   going to refer to those documents, but I thought it would assist
22   the court.
23              THE COURT:  We are going to have to break at noon today
24   because I have something at noon, so we can do it at the lunch
25   break.
```

```
1              THE DEPUTY CLERK:  So you're not admitting these, they're
2    just giving these to you as additional information?
3              THE COURT:  Do you want to admit these independently?
4              MS. FOURNET:  If the government has no objection, we can
5    just submit them as -- I don't even know what our next number is.
6              THE COURT:  And I couldn't find that article that she --
7    at least I did a quick look through these -- what you gave me last
8    week and I couldn't find it, so just have your paralegal or
9    somebody keep a note of all the --
10             MS. FOURNET:  We'll make sure you get it, I certainly
11   thought we had given it to you.
12             THE COURT:  It may be somewhere, but I'd rather have two
13   copies than no copies.  And, Herb, I think you have to be gone from
14   one to three; is that correct?
15             MR. LARSON:  That's correct, your Honor; and we have
16   discussed the matter with my client, and at this time we would make
17   an on-the-record waiver of my presence during that time period.
18             THE COURT:  Mr. Hardy, are you all right with that, to
19   have Mr. Larson not here from one to three, sir?
20             THE DEFENDANT:  Yes, ma'am.
21             THE COURT:  Okay.  He says yes.
22             MS. FOURNET:  Do we have our next number?
23             THE DEPUTY CLERK:  That will be 33.
24             MS. FOURNET:  We would offer, introduce and file as Hardy
25   33, 34 and 35, three volumes, a renumbered set of the government
```

1    discovery documents, Judge, with our numbering system.

2              THE COURT:  Okay.  That's admitted.

3              MS. FOURNET:  And if I may proceed again with Dr. Hayes?

4              THE COURT:  Yes, yes.

5    BY MS. FOURNET:

6    Q.  Dr. Hayes, you mentioned earlier before the break that,

7    although you had not attended any Vineland trainings, you had sat

8    around with a group of psychologists and discussed the Vineland.

9    Is that correct?

10   A.  That's correct.

11   Q.  And who were those psychologists?

12   A.  I can't recall the individuals that would have been at that

13   training, or that meeting, the specific people who would have been

14   there at that time.

15   Q.  So you don't -- you know that you met with some psychologists

16   and you talked about the Vineland but you can't remember the names

17   of the psychologists?

18   A.  I can't tell you who would have been there that day that we

19   were discussing that, no.

20   Q.  So you said that day.  You're talking about one occasion on

21   which you discussed the Vineland?

22   A.  That's correct.

23   Q.  So there was only one of these meetings where the Vineland was

24   discussed?

25   A.  That's correct.

1    Q.  And you can't recall who was at the meeting besides yourself?

2    A.  Not on that particular day, no.

3    Q.  And where was this meeting?

4    A.  Most likely in Arizona.

5    Q.  Now, you had mentioned you're a member of the FBI Citizens'

6    Academy, and you were a secretary of that organization from 2004 to

7    2005, correct?

8    A.  Yes.

9    Q.  And you were also chairman of the Behavioral Review Panel for

10   the New Orleans Police Department; is that correct?

11   A.  Yes.

12   Q.  And in that capacity, you evaluated potential police officers;

13   is that correct?

14   A.  Yes.

15   Q.  And you evaluated officers with concerns to superiors?

16   A.  With concerns?

17   Q.  With superiors who had concerns about the particular officer.

18   A.  That's correct.

19   Q.  And you also provided psychotherapy for officers?

20   A.  From time to time.

21   Q.  And are you still on that behavioral review panel or chairman

22   of it?

23   A.  At times.  It depends on whether I am the person who is going

24   to be the chairman that day or another psychologist.

25   Q.  And is this a contract you have with the New Orleans Police

1    Department?

2    A.   No.

3    Q.   So you do not get paid for this service?

4    A.   I get paid through another individual who has a contract with

5    the police department.

6    Q.   Who would that individual be?

7    A.   Penny Drawley (PHONETIC).

8    Q.   And is she a psychologist?

9    A.   Yes, she is.

10   Q.   And you are still performing services under that contract that

11   this other individual has; is that correct?

12   A.   That's correct.

13   Q.   And you charge an hourly rate --

14   A.   Yes, I do.

15   Q.   -- for that service?  And do you have any idea approximately

16   how much you made, for instance, in 2008 with the New Orleans

17   Police Department?

18   A.   Maybe $13,000, that's a guess.  But around there it seems to

19   stick in my mind.

20   Q.   You also, according to your CV, had a funded grant for

21   developing BJA-sponsored tools for instilling and promoting and

22   maintaining professional integrity in law enforcement agencies; is

23   that correct?

24            MR. McMAHON:  I'm going to object on the grounds of

25   relevancy.  Aren't they almost predicate questions for Dr. Hayes's

1   expertise?  It just seems to be that -- it's really not germane to

2   the issue at stake.

3            THE COURT:  I think it's germane to potential bias, which

4   is where I think we're going into.  So overruled.

5            MS. FOURNET:  Thank you, your Honor.

6   BY MS. FOURNET:

7   Q.  Do you wish for me to repeat the question, Dr. Hayes?

8   A.  Would you mind?

9   Q.  No, not at all.  You also had a funded grant for developing

10  BJA-sponsored tools for instilling and promoting and maintaining

11  professional integrity in law enforcement agencies; is that

12  correct?

13  A.  Myself and others, yes.

14  Q.  And that was a $350,000 grant; is that correct?

15  A.  That's correct.

16  Q.  And do you recall how much you made off of that grant, you

17  personally?

18  A.  Probably $3,000.

19  Q.  For how many Atkins hearings have you been retained?

20  A.  For two.

21  Q.  Two, and would this be one of them?

22  A.  Let me clarify.  I've been retained in cases where there are

23  Atkins issues, but there's only been two that I've gotten to the

24  point of writing a report and testifying, just to be clear.

25  Q.  Well, let's talk about those first and then we'll talk about

1    the others.  So it would be this one and another one that you have

2    been retained and have actually written a report and either have

3    testified or anticipated testifying; is that correct?

4    A.  That's correct.

5    Q.  And would Joseph Smith be the other one?

6    A.  Yes, ma'am.

7    Q.  Now, you indicated that perhaps you had been retained but have

8    not yet written a report on perhaps some other cases for the

9    purposes of an Atkins hearing; is that correct?

10   A.  Yes and no.  Do you mind if I explain?

11   Q.  No, go right ahead.

12   A.  Oftentimes when one is retained, you start out and you have

13   kind of a referral question, like would this individual meet

14   diagnostic criteria for mild mental retardation.  And prior to

15   getting to the Atkins phase other issues come up which would

16   then -- either the charges get lowered or something else happens in

17   the case.  And so while the initial question may be, is this person

18   mildly mentally retarded, it may not get to an Atkins claim because

19   charges are reduced or something else happens in the case.

20   Q.  I follow you.  How many of those referrals have you received,

21   whether or not the case actually pled out or was otherwise disposed

22   of short of a hearing?

23   A.  Probably 15 or so.

24   Q.  And of those 15, how many were for the prosecution?

25   A.  Zero -- wait, no.  I was on the defense, I think none were for

```
 1    the prosecution.
 2    Q.  They were all for the prosecution?
 3    A.  No.  None were for the prosecution.
 4    Q.  None were for the prosecution?
 5    A.  Right.
 6    Q.  So all 15 were for the defense?
 7    A.  Correct.
 8    Q.  And all 15 were resolved either by plea or otherwise.
 9    A.  Or they're ongoing.
10    Q.  Or they're ongoing.
11         THE COURT:  Just for clarification, this is on Atkins or
12    is this competency issues also because I think you did testify to
13    this earlier?  Just Atkins or?
14         THE WITNESS:  It's the referral that you get when it's
15    like, here is my client, will you go see him, do you think he's
16    mentally retarded, does he have any psychiatric issues, what do you
17    think, and then you may get in and the person -- you think the
18    person is not competent, and so it would end after that, a person
19    was "Lockharted," or you go in and there are issues related to
20    competence to confess or competence -- not just competence to
21    confess but then sanity at the time of the crime.  And so there
22    were other intervening things that made it not get to an Atkins
23    claim because either the charge was dropped or something else
24    occurred in the case.
25         THE COURT:  Okay.
```

1    BY MS. FOURNET:

2    Q.  I'm glad that the judge interjected there, Dr. Hayes, because I

3    fear that I misunderstood your response.  You're not saying that

4    you received referrals, 15 referrals specifically related to

5    Atkins, other than the two cases you've mentioned?

6    A.  Oh, no, ma'am.

7    Q.  In fact, what I hear you say, and correct me if I'm wrong, is

8    that none of these 15 cases were actually referrals on Atkins, they

9    were much more generalized referrals; am I correct?

10    A.  That's usually the typical referral.

11    Q.  Now, how much are you charging in Mr. Hardy's case on an hourly

12    basis?

13    A.  $250 an hour.

14    Q.  And do you have an estimate of how much you have earned so far

15    on this case?

16    A.  So far, probably around $60,000.

17    Q.  And that's prior to your testimony or is that including your

18    testimony?

19    A.  I would probably say, then, around $50,000 prior to my

20    testimony, and then I haven't added up how many hours it's been

21    since I've been here.

22    Q.  Prior to Judge Berrigan in this case, has any judge in any

23    court qualified you as an expert specifically in mental

24    retardation?

25    A.  I believe so.  I don't know if that's what he said, you're an

1  expert in mental retardation or you're an expert in clinical

2  psychology or neuropsychology, but I've qualified as an expert

3  where the issue of mental retardation was at hand.

4  Q.  Let me -- and I'm sure you've done a lot of work with the

5  courts, so you know how this works.  Do you know, and I'm sure

6  you've noticed in this case, have you not, that when you qualify an

7  expert, you qualify that expert in a particular field or

8  subspecialty of that field.  Is that correct?

9  A.  Correct.

10  Q.  And I get it that you've been qualified in clinical psychology,

11  but that's not the question.  The question is, has any lawyer

12  tendered you as an expert specifically in mental retardation?

13         MR. McMAHON:  Your Honor, I am going to object, I think

14  we're getting a little far afield.

15         THE COURT:  Overruled.

16         THE WITNESS:  Again, I don't keep track of numbers of

17  actually what I've been qualified in, and that's why I try to be as

18  honest as possible and say I don't know.  But there were cases

19  where mental retardation was the issue, so I don't know.

20  BY MS. FOURNET:

21  Q.  So you don't know whether or not this was the first time you've

22  been qualified in mental retardation?

23  A.  That's correct.

24  Q.  Now, you are aware, are you not, Dr. Hayes, that this is a

25  hearing to determine whether Mr. Hardy is eligible for execution,

1   has that been explained to you?

2   A.   This is a hearing to determine if Mr. Hardy is mentally

3   retarded.   And if the judge finds that he is mentally retarded,

4   then he would be excluded from execution, that's my understanding.

5   Q.   And I'm sure you will agree with me, will you not, that this is

6   a very serious matter before the court?

7   A.   Absolutely.

8   Q.   Would you agree with that?

9   A.   Yes.

10   Q.   And you will agree, would you not, that any professional should

11   be very, very careful to give only those opinions that are

12   objective, not result driven, and consistent with the latest

13   research in the field; would you agree with that?

14   A.   To the best of his or her ability, yes.

15   Q.   And you consider that you have done that in this case; is that

16   right?

17   A.   Yes and no.   I think my opinion related to the Flynn Effect is

18   not consistent with what the research says in the field.   That's

19   why I tried to explain it in as much detail as I possibly could.

20   Q.   But you do agree that part of your task, as an expert,

21   certainly, and especially in a case where the consequences are this

22   serious, is to be completely objective and not result driven or

23   biased; would you agree with that?

24   A.   Yes.

25   Q.   And you perceive that you meet those qualifications?

1  A.  Yes.

2  Q.  And you perceived that you applied informed clinical judgment

3  to this evaluation based on your training and experience; is that

4  correct?

5  A.  Yes.

6  Q.  Now, let's -- and I think you alluded to that early in your

7  testimony with Mr. McMahon, did you not?

8  A.  Yes.

9  Q.  And here is what you say, and we've blocked out some of it, but

10  you say here:  "I believe it's necessary to be as transparent as

11  possible with regard to methodology and interviews and how you're

12  conducting your evaluation.  Of course, it's hard to open yourself

13  up to scrutiny, but I feel like in these types of situations you

14  need to be as open and honest as you possibly can and lay it out on

15  the table."  Do you remember saying that?

16  A.  Yes, I do.

17  Q.  And you perceive or consider that you have done that in this

18  case?

19  A.  Yes.

20  Q.  Now, let's talk about, first, because we went through a number

21  of exhibits on this, let's talk about some of the folks you listed

22  in your report as sources of information.

23          You listed Derrick Bardell on page 6 of your report, he

24  is a former teacher at the Orleans Parish School System; is that

25  correct?

1    A.  That's correct.

2    Q.  And you talked to him for a total of ten minutes; is that

3    correct?

4    A.  That's correct.

5    Q.  And did he know Paul Hardy?

6    A.  No, he did not.  Or, actually, I didn't ask him if he knew Paul

7    Hardy, so I take that back.

8    Q.  You didn't think maybe that was a question you should have

9    asked?

10   A.  I didn't think that honestly I should tell him what it was

11   about.  I just wanted to know if he knew the information or not.

12   Q.  You talked to Stacy Stewart, who works with the New Orleans

13   public school system, correct?

14   A.  Yes.

15   Q.  And you talked to her for about three minutes.

16   A.  That's correct.

17   Q.  She know Paul Hardy?

18   A.  I didn't ask her.

19   Q.  So, to your knowledge, she did not; you don't have any

20   information that suggests that this lady that you talked to for

21   three minutes knew Paul Hardy?

22   A.  No.

23   Q.  Because it's quite an impressive list, it goes on for pages.

24   Kerry Burkes, Office of Student Support Services in New Orleans

25   public schools, you listed her, but you didn't talk to her at all;

1   is that correct?

2   A.  That's correct.

3   Q.  You read Steve Jackson's testimony, correct?

4   A.  Yes, I did.

5   Q.  You didn't interview Steve Jackson?

6   A.  No, I didn't.

7   Q.  Albertine Arceneaux, you read her testimony but you didn't

8   interview her, did you?

9   A.  No, I did not.

10  Q.  Or Steve -- I'm sorry, or Keith Mitchell?

11  A.  That's correct.

12  Q.  By the way, you have a footnote in your report, do you not,

13  that --

14  A.  I have many.

15  Q.  -- with regard to, it would be footnote 5 at page 6, with

16  regard to the FBI's efforts to locate Ms. Robinson about whom

17  Ms. -- Dr. Swanson was cross-examined.  What does that footnote

18  indicate about Ms. Robinson?

19  A.  It indicated that the special agent that was working on the

20  case was unable to locate Ms. Robinson.  I had indicated to him

21  that Terry Hardy had told me that she had moved to Texas and that

22  they had given you guys her telephone number, but he wasn't able to

23  locate her.

24  Q.  Well, thank you for volunteering that information.

25          You interviewed Faith Price --

```
 1            MR. MILLER:  Judge, I want to object to the asides from
 2   counsel, that's about the third or fourth time we've heard these
 3   sorts of things.
 4            THE COURT:  I have not picked up any problem.
 5   BY MS. FOURNET:
 6   Q.  You interviewed Faith Price whom you describe as a "paramour,"
 7   and I'll put that in quotes, to Mr. Hardy outside of her home in
 8   New Orleans; is that correct?
 9   A.  Yes.
10   Q.  And in that same footnote, you indicate that the FBI agent,
11   Mr. Cosenza, was present for the interview of Ms. Price; is that
12   correct?
13   A.  That's correct.
14   Q.  In much the same way as an FBI agent was present for the
15   interview of Ms. Franklin; is that correct?
16   A.  Different.  He was probably like, as was indicated earlier,
17   about 100 yards away when Ms. Franklin was interviewed.  But when
18   Ms. Price was interviewed, he was closer to the house, he was
19   standing near the house.
20   Q.  So in Ms. Price's case, the agent didn't bang on her door and
21   show her a badge?
22   A.  He knocked on her door.  I don't recall if he showed her a
23   badge because I was sitting in the car.  But I did see him knock on
24   the door.
25   Q.  So he went to the door first in much the same way he went to
```

1    the door first in Ms. Franklin's case; is that correct?

2    A.  Yes.  He asked me to sit in the car until he identified that

3    the person that I was interested in interviewing was there.

4    Q.  You know, I have to ask you this, Dr. Hayes.  In your

5    other-than-an-Atkins-hearing context, do you bring law enforcement

6    officers to interview adaptive behavior witnesses?

7    A.  No, I haven't.

8    Q.  Now, you also had a stack of documents, some 1,600 pages that

9    were provided to you by the government.  Is that correct?

10   A.  I don't know how many pages it is.  I know it's a lot but I

11   never counted.

12   Q.  It's a lot.  And you got those from the government?

13   A.  I believe so.  I requested everything and then requested more.

14   Q.  And in those stack of documents, there is a special section, is

15   there not, for FBI records that you reviewed; is that correct?

16   A.  That's correct.

17   Q.  And you also reviewed some gun transaction records; is that

18   correct?

19   A.  Yes.

20   Q.  And I believe you testified on direct that with respect to

21   those gun transaction records they were relevant because the forms

22   that had to be filled out would tell you something about Paul

23   Hardy's deficits or the absence of deficits; is that correct?

24   A.  They're informative, yes.

25   Q.  Well, is that the reason they're informative?

A.  Those documents will tell you if he knows his name and address, if he has a driver's license, and then I think there's also a check box that asks for if you have any mental impairments or other infirmities.  The individual has to sign it, and I believe that the information has to be checked by the gun dealer.

Q.  And it also includes information such as height, weight, that sort of thing; is that correct?

A.  I don't remember that.

Q.  Okay.  You didn't receive any information from the FBI, did you, that would indicate whether Mr. Hardy filled those forms out himself?

A.  No, I did not.

Q.  So you don't know whether he went to purchase the guns by himself, do you?

A.  No, I do not.

Q.  And you don't know whether someone went with him and filled out the form for him, do you?

A.  No, I don't know.

Q.  You don't know whether the person that sold the gun filled out the form for him, do you?

A.  No, I do not.

Q.  You also listed in your report, and there is contained in those 1,600 documents, information from a person who is described as a CW or confidential witness, correct?

A.  I recall that.

1   Q.  And who was this confidential witness?

2   A.  I don't know.  I thought there was more than one, but --

3   Q.  Okay.  Well, for some reason in my notes here, I refer to your

4   report at page 10.

5   A.  Okay.

6   Q.  And I'm assuming there was some specific reference to this

7   confidential witness.

8   A.  It would have been included in the FBI files.

9   Q.  Whether there were one or whether there were more than one

10  confidential witnesses, did you know the names of these

11  individuals?

12          MR. MILLER:  Judge, I'm sure we are not going to start

13  announcing the names, even if she knew them, the names of

14  confidential witnesses in open court.

15          MS. FOURNET:  I am certainly not asking anyone to

16  announce names, I'm just asking her if she knew who they were.

17          THE COURT:  She asked if she knew names.  Do you know who

18  they are?

19          THE WITNESS:  No, ma'am, I don't.

20  BY MS. FOURNET:

21  Q.  And with respect to these confidential witnesses, do you have

22  any idea how long or how well this unnamed person or persons knew

23  Paul Hardy?

24  A.  I would have to re-review the confidential witness statement to

25  see if it indicated that in there, I don't recall off the top of my

1  head.

2  Q.  Okay.  So if it's not indicated in the confidential statement

3  by the --

4              MR. McMAHON:  Asked and answered --

5              THE COURT:  Overruled.  Go on.

6  BY MS. FOURNET:

7  Q.  If we read the statement by the confidential witness and it

8  does not tell how long that witness knew Mr. Hardy, then you

9  wouldn't have known how long he knew Mr. Hardy; in other words,

10  nobody supplemented the information that's on the paperwork; is

11  that correct?

12  A.  There may have been contextual cues that could have given you

13  some indication, like when I was something or something, and that

14  may not have indicated how long they actually knew each other, but

15  it may have been some contextual cues in terms of how long they

16  knew each other.

17  Q.  Well, give me a contextual clue that you recall that gave you

18  that information.

19  A.  Like I said, without re-reviewing the document, if it's the one

20  that I'm thinking of, it may be the one with the person who talks

21  about the home transactions records.  And so if they had said, you

22  know, he bought a home in August of whatever year and now it's this

23  certain amount of time, it would suggest that they had known each

24  other since that period of time.  So if the person doesn't say,

25  I've known Paul Hardy since, you know, July 26th, 1993 -- what I'm

1    trying to say is that if the person had said, he bought a house in

2    August of 1994, that would give you at least some indication of how

3    long they knew each other.

4    Q.  All right.  Let me ask you the question this way:  There is

5    nothing regarding this confidential witness or witnesses that was

6    given to you other than the paperwork; is that correct?

7    A.  That's correct.

8    Q.  In other words, nobody sat down with you and told you how long

9    these people had known Paul or in what context?

10   A.  Not that I can recall.

11   Q.  And you have no way of knowing, do you, that this witness or

12   witnesses, whether he or they had a beef with Mr. Hardy of some

13   sort, did you?

14   A.  No.  I had asked to speak to confidential witness, one of the

15   ones, but there was -- I wasn't able to for one reason or another.

16   I don't know that they can break the confidential witness protocol,

17   whatever that might be.

18   Q.  Now, Dr. Hayes, you would have to agree, would you not, that a

19   person whose very identity is a secret and about whom you know

20   little or no information cannot really be a very reliable source

21   for information on adaptive behavior because you just don't know

22   enough about that person; would you agree with that?

23   A.  I didn't follow the question.  I was trying to write down the

24   two parts.  Can you break it up for me?

25   Q.  Would you agree that a person whose identity you don't know and

1    about whom you know almost nothing is of limited, if any, value in

2    telling you about the adaptive behavior of this man?

3    A.  No.

4    Q.  You don't agree with that?

5    A.  No.

6    Q.  So you think this is a legitimate reliable source of

7    information?

8    A.  I believe that this is what this individual told the FBI agent

9    who wrote the 302 form, and so I believe that what was indicated by

10   the FBI agent was reliable based upon that agent's interview with

11   the confidential witness.

12   Q.  But you don't -- you don't know that the witness himself was

13   reliable, do you?

14   A.  No, I do not.

15   Q.  Because you never talked to the witness; in fact, you don't

16   even know who the witness is, correct?

17   A.  Like I said, I asked to talk to one of the confidential

18   witnesses and was unable to for some reason.

19            THE COURT:  Let me just jump in for some clarification.

20   Are you saying that you think the FBI agent's account is reliable,

21   or are you saying the unknown informant's information is reliable?

22            THE WITNESS:  That the FBI agent's account is reliable.

23            THE COURT:  I think she may have misunderstood the

24   question, then.  I think you were asking about the informant.

25            MS. FOURNET:  I was, and I thought I had asked enough

1    follow-up questions to clarify that.

2              THE COURT:  Okay.

3    BY MS. FOURNET:

4    Q.  But let me ask another one just to be sure.  Do you think the

5    FBI agent -- you consider that an FBI agent is going to report

6    reliably what somebody said to him, correct?

7    A.  Yes.

8    Q.  But you have no way of knowing whether the person himself was

9    reliable?

10   A.  That's correct.

11   Q.  Now, you listed also what you described as a victim list; is

12   that correct?

13   A.  That's correct.

14   Q.  Now, in those documents, that victim list is, in fact, a list

15   of documents -- a list of names of victims in cases in which

16   Mr. Hardy has been described to you as a suspect; is that correct?

17             THE COURT:  Where is this victim list?  Is it identified

18   as such in the report?

19             THE WITNESS:  Page 11.

20             THE COURT:  Page 11.  I see medical records.  The heading

21   is, FBI field -- does it start on page 10?

22             MS. FOURNET:  It's mentioned, according to my notes,

23   Judge, on pages 10 and 11.

24             THE COURT:  Okay.  I was just wondering if it was

25   specifically identified as a victim list, and it doesn't look like

1    it is.  I just need to know where we are.

2              MS. FOURNET:  It is in the section that is labeled FBI

3    records, Judge, which consists of probably about 100 pages in those

4    notebooks.  And I apologize, I don't remember the page number.

5              THE COURT:  That's all right.  I just wanted to make sure

6    I was on the right -- so we're on pages 10 and 11 of her report?

7              MS. FOURNET:  Yes, ma'am.

8              THE COURT:  That's all I needed to know.

9    BY MS. FOURNET:

10   Q.  Now, this was basically a list of names with a little bit of

11   information about the evidence but not much; is that correct?

12   A.  The best that I can recall, I haven't looked at that in a

13   while.

14   Q.  And you do not know if Mr. Hardy was convicted of all of those

15   offenses that are listed?

16   A.  I don't believe he was convicted of any.

17   Q.  And, in fact, do you know if he's even been arrested on all of

18   them?

19   A.  I do not know that.

20   Q.  Now, based on the FBI information that you were given, you know

21   very little about these other offenses other than the names of the

22   victims; is that correct?

23   A.  That's correct.

24   Q.  Now, how can a list of names contribute to an adaptive behavior

25   or cognitive deficit analysis by an expert such as yourself, if at

```
 1   all?
 2   A.  I don't think that that was just helpful.  I listed it because
 3   it was one of the documents I reviewed, so I was wanting to tell
 4   the court everything that I reviewed, including things that are
 5   pertinent and not.
 6   Q.  And I'm guessing, and tell me if I'm wrong, that there are
 7   other things on that list that also were not relevant or informed
 8   your opinion, such as the jury verdict; that couldn't have told you
 9   much about Mr. Hardy; is that correct?
10   A.  That's correct.
11   Q.  Several opinions by the Fifth Circuit.
12   A.  That was helpful, just because I wanted to kind of get an idea
13   about the background of the case and what had gone on just so that
14   I would have a good understanding of what was going on now.
15   Q.  Now, you have testified that you did not give Mr. Hardy your
16   own IQ testing because of Judge Berrigan's requirement that you
17   videotape the testing; is that correct?
18   A.  That's correct.
19   Q.  And, in fact, you have given the same reason for not giving
20   Mr. Hardy a standardized test for malingering in your testimony
21   with Mr. McMahon; is that correct?
22   A.  Yes.
23   Q.  And one of your concerns with regard to both the IQ test and
24   the malingering test was what you refer to as your personal ethics.
25   Is that correct?
```

1  A.  That's correct.

2  Q.  And I'm sure you were made aware, and if you were not, please

3  tell me, that with regard to the IQ test we were willing to seal

4  the videotape of any IQ test administered by you or anyone else to

5  Mr. Hardy into the record so it would be accessible only on court

6  order; you were made aware of that, weren't you?

7  A.  I actually did not know that.

8  Q.  You did not know that.  Well, would you have taken a different

9  view if you had known that?

10  A.  No.

11  Q.  So even if you had been made aware of it, your concern, ethical

12  concern, would have precluded you from giving an IQ test that was

13  videotaped?

14  A.  Yes.  If lawyers and other individuals have access to that

15  test, then I have concerns about it getting out into the general

16  public and then it not being able to be used anymore.  There are

17  indications to that effect in the National Academy of

18  Neuropsychology and other areas.

19  Q.  And as I understand it, you have a secondary concern with the

20  proprietary interest that the owners of the test might have; is

21  that correct?

22  A.  I haven't researched what are the proprietary copyright laws

23  with regard to all of the tests.  I know that Pearson Assessments

24  said something like, don't do this, please.

25  Q.  And, Dr. Hayes, of course you know that not all psychologists

1    share your reservations about videotaping IQ tests, and that, in

2    fact, it has been done in other cases; you're aware of that, aren't

3    you?

4    A.  Yes, I know it has been done, I just completely disagree with

5    that.

6    Q.  And you did not make an effort since you have personal

7    reservations to identify another psychologist who did not share

8    your reservations and have that psychologist give the videotaped IQ

9    test; you did not do that?

10   A.  No, I did not seek out another psychologist who would videotape

11   it.  Because again, if I did that, then what would be the

12   difference between myself giving it or another person giving it?  I

13   don't think it's right.  So if I didn't think it was right, why

14   would I get another psychologist to do it?

15   Q.  And you didn't suggest to the government that they request that

16   a different psychologist who did not share your reservations

17   videotape the IQ test?

18   A.  Not at all.

19   Q.  Because that -- you would consider that to have been your

20   responsibility even if they went out and found the psychologist; is

21   that what you're saying?

22   A.  What I'm saying is, I don't think testing should be taped for

23   the reasons that have been outlined previously.  If I go and get

24   another person who would tape the testing, then I would be just as

25   responsible.  If I encourage the government to do that, then I

1    think I would have been just as responsible.  The government could

2    have requested another psychologist to do an evaluation at that

3    point but they didn't.

4    Q.  And, in fact, you expressed concern, did you not, that it would

5    be, quote, "akin to giving young lawyers the answers to the bar

6    exam," is that what you told Mr. McMahon?

7    A.  Yes.

8    Q.  And further, you expressed concern that there would be lawyers

9    out in the audience who would go back and coach their clients to

10   fake on an IQ test; is that correct?

11   A.  That's correct.

12   Q.  And you, to quote your testimony, "We know that lawyers can,

13   will and do coach their clients on how to appear more and less

14   impaired."  Is that your view of the subject?

15   A.  Yes.

16   Q.  And I'm sure that these concerns that apply to IQ testing apply

17   to all standardized testing, correct?

18   A.  Some more than others.  There are some tests that, say, for

19   instance, if I gave a person an MMPI and I did that on tape, the

20   individual would simply be sitting there filling out yeses and

21   no's.  And so I think that there are more concerns in one area than

22   other areas.

23   Q.  So you're not -- and I understand what you're saying, I mean, I

24   think what you're saying, and correct me if I'm wrong, is

25   videotaping a person filling out an MMPI is not really going to

1    tell you anything about the test because you can't see the

2    questions and you can't see any of the internal material about the

3    test, all you see is somebody filling out a form; is that what

4    you're saying?

5    A.  That's correct.

6    Q.  But other than that situation, you certainly have personal

7    reservations, ethical reservations, proprietary reservations, about

8    displaying for the world to see, information that can be used to

9    coach clients or that could invalidate the future tests of the same

10   nature; is that correct?

11   A.  Yes.  I mean, some of the tests unfortunately are already out

12   in the general public, so if you show it to different people or in

13   classes it's not going to make as big of a difference because

14   they're already on the Internet and things like that.  And so in

15   those situations, it's not as big of a deal.

16          THE COURT:  Ms. Fournet, just for clarification, it would

17   be helpful for me to know how an IQ test is administered or how a

18   malingering test is administered.  I'm assuming it's oral in some

19   fashion, but we don't really have any evidence of that at this

20   point.

21   BY MS. FOURNET:

22   Q.  How is an IQ administered?  If you could just answer, I'll just

23   ask you globally, Dr. Hayes, and let you explain.  And then if I

24   have additional questions, or the judge, will follow-up.

25   A.  Okay.  IQ tests are administered individually.  You have a set

1    of instructions that you read each and every time, every time that

2    the person is ever given an IQ test.  And the procedures are the

3    same each and every time you ever give an IQ test such that you can

4    try to ensure that there will be as much reliability in

5    administration between assessor and assessor.

6              Say, for example, one of the tests on -- an IQ test is

7    information.  So you ask that person various questions, like who

8    wrote Faust would be one of the questions.  Another one is like

9    block design that I described the other day with, see these blocks,

10   they are all alike, and then the individual puts together the

11   blocks.  Another one is more questions called comprehension.

12             THE COURT:  It's virtually all oral with demonstrative?

13             THE WITNESS:  It's virtually all -- all oral and

14   demonstrative, for example, putting together blocks, putting pieces

15   of a story together so that they make sense, filling out different

16   types of things related to motor speed.

17             THE COURT:  What about the malingering test?

18             THE WITNESS:  It depends on the malingering test.  Many

19   of the malingering tests are oral.  For example, the Word Memory

20   Test, you would give that person words to recall and then they go

21   back and -- depending on how you give the Word Memory Test, it can

22   be oral or it can be computerized.  And you tell the person the

23   words and then you go back and ask them the words.  The same for

24   memory testing.

25             Other types of malingering tests, you show the individual

1    something to recall and then ask them to pick out ones of the --

2    which one they had seen previously from two choices.

3              THE COURT:  So that can be done in written form?

4              THE WITNESS:  Yes.  But you still have to have the

5    booklet and you have to show it to the individual such that they

6    can then pick which one they saw previously.

7              THE COURT:  Okay.  All right.

8    BY MS. FOURNET:

9    Q.  And, Dr. Hayes, with respect to the IQ test, I mean, you

10   certainly would not want to put the IQ test booklet out in the

11   public along with the answers because then lawyers could use that

12   to coach their clients; is that correct?

13   A.  For that reason and others.  It's not limited to lawyers.

14   Q.  Now, you did what you described as a show and tell in this

15   courtroom, did you not?

16   A.  That's correct.

17   Q.  And that was a show and tell of the visual memory scan test,

18   was it not?

19   A.  Which one?

20   Q.  The one with the exhibits, with the little blocks.

21   A.  Okay, that's visual memory span, not scan.

22   Q.  Span, I'm sorry, visual memory span.  You showed several

23   exhibits, didn't you?

24   A.  I did.

25   Q.  And you showed those in open court, did you not?

1    A.  Of course I did.

2    Q.  And before any number of lawyers, did you not?

3    A.  Before the lawyers that are here.

4    Q.  And, in fact, you even were quizzing us on this test and giving

5    us correct answers in some instances, weren't you?

6    A.  Not on that test.

7    Q.  Well, you're going to have to pardon me because I don't know

8    the terminology.  But on some parts of the exhibits you showed of

9    these -- these were neuropsychological tests, were they not?

10   A.  That's correct.

11   Q.  You actually showed exhibits of the test and, in some

12   instances, quizzed the judge and other members of the audience in

13   this courtroom on those exhibits, did you not?

14   A.  I did on one, that was the category test, the booklet category

15   test.

16   Q.  So you showed the exhibit, you explained how the test worked,

17   and at least in one instance you gave the answers, did you not?

18   A.  Yes, I did.

19   Q.  Now, this is a test, is it not, or a battery of tests, that is

20   used commonly in courtroom context, is it not?

21   A.  Yes, it is.

22   Q.  In fact, it's used in, not just in criminal cases, but it's

23   used in civil cases where there's been a head injury or that sort

24   of thing.  And those tests that you showed up on that screen are

25   used in court cases to determine various legal issues, are they

1   not?

2   A.  Yes.

3   Q.  And so how a person performs on that test could make a

4   difference in any number of types of litigation; is that correct?

5   A.  Between that test and others.

6   Q.  Okay.  Well, I am not -- that test and others.  This is one of

7   a number of tests like the IQ test that are used as evidence in

8   civil and criminal cases in courtrooms with lawyers; is that

9   correct?

10  A.  Yes.

11  Q.  And for some reason, you did not have the same reservations,

12  ethical, proprietary, and otherwise, about showing the actual

13  instrument, explaining how the test worked, and in at least one

14  instance giving an answer in this courtroom.

15  A.  I did not show the actual instrument on that one test.

16  Q.  Well, you showed little blocks.

17  A.  I showed part of the answer sheet.

18  Q.  Oh, okay.  Part of the answer sheet.  So you showed part of the

19  answer sheet.  Now everybody in here who was there that day knows

20  what the answer sheet looks like on this neuropsychological

21  instrument; is that correct?

22  A.  No, because I took different pieces of it and put it on

23  different slides so that I took parts of it away as well.  I also

24  took away parts of the instructions as well.

25  Q.  Let's parse then.  You didn't put the whole instrument up

1  there, but you put on the screen in a public courtroom selected

2  portions of the answer sheet to these very important

3  neuropsychological tests; is that correct?

4  A.  To one.

5  Q.  Okay.  One test.  Correct?

6          THE COURT:  I think you've made your point regarding

7  this.  We can move on.

8  BY MS. FOURNET:

9  Q.  But you weren't worried about proprietary interests or ethical

10  concerns there, is the bottom line?

11  A.  Not in that test.  The reason being because there are many

12  different versions of that test.  I also tried to take that test

13  and break it down as much as possible.  But I felt like the judge

14  needed to understand some of these different tests so that she

15  would understand what we're talking about when we say this isn't

16  consistent -- or consistent or inconsistent and why.  I didn't feel

17  like I could testify in abstract about a concept that she couldn't

18  see in front of her.

19  Q.  So, essentially, your concerns about educating the judge

20  outweigh whatever ethical concerns you might otherwise have had; is

21  that what you're saying?

22  A.  No, because there are different versions of that test, so other

23  versions could have been given.

24          THE COURT:  Move on.  Let's move on.

25  BY MS. FOURNET:

1  Q.  Dr. Hayes, you have expressed concern with the validity of

2  Dr. Tetlow's IQ testing?

3  A.  Yes.

4  Q.  Did you look at Mr. Hardy's answers on the subtest for the IQ

5  test?

6  A.  I did.

7  Q.  And I am going to refer --

8           MS. FOURNET:  Judge, and this is our numbering system,

9  JH000366, on the comprehension --

10           THE COURT:  Say it again.

11           MS. FOURNET:  JH000366.

12  BY MS. FOURNET:

13  Q.  Do you recall looking at those subtests?

14  A.  I do.

15  Q.  Do you recall some of these questions on the comprehension

16  section, what does this say, meaning strike while the iron is hot;

17  do you remember that one?

18  A.  I don't remember his response, I remember the question on the

19  IQ test.

20  Q.  Well, if I told you his response was strike when you're mad,

21  would you recall that?

22  A.  No, I wouldn't recall each and every answer.  I do recall that

23  Dr. Tetlow, I think, audio taped the WAIS, otherwise, I don't think

24  we would have typewritten results, which would again be a problem

25  with the standardization of the test because one is not supposed to

1    audiotape the test, you're supposed to write in the answers

2    contemporaneously.

3    Q.  So you think that maybe Mr. Hardy didn't really say that; is

4    that what you're saying?

5    A.  No.  I'm saying that I think he did, but I am thinking that

6    Dr. Tetlow didn't follow the standardization guidelines in that he

7    taped the test.

8    Q.  What has that got to do with the answer he gave to this

9    question, if anything?

10   A.  I don't know what he answered to the question.  You were asking

11   about my concerns about the validity of Dr. Tetlow's testing, so I

12   was trying to fully answer your question.

13   Q.  Well, I'm asking you about answers to specific questions right

14   now.

15   A.  Okay.

16   Q.  If I told you he said strike when you're mad, does that ring a

17   bell with you?

18   A.  No.

19   Q.  On the similarities test, a button, compare a button and a

20   zipper, I don't know.  Do you recall that answer?

21   A.  No.

22   Q.  Compare an egg and a seed, you can plant a seed, you can't

23   plant an egg, I don't know.  Do you recall that answer?

24   A.  No.

25   Q.  I mean, do you think that this man is so smart that he is able

1    to create and fake these types of answers; is that what you're

2    saying?

3    A.  Do I think Mr. Hardy is so smart that he is going to be able to

4    fake these answers?

5    Q.  Yes.

6    A.  It's not hard to fake I don't know.  You said when he was

7    asked, how are a button and a zipper alike, and he said I don't

8    know.  I would have pursued that further if it were me and said,

9    come on, you can get this, think about it, how are these two things

10   alike.  I don't usually leave people with I don't know if I can

11   help it.

12   Q.  Well, I mean, that was the only one of the three where he said

13   I don't know.  So let's talk about the others.  "What does this

14   saying mean, strike while the iron is hot?"  His answer, "Strike

15   when you're mad."  That's not what that means, is it?

16   A.  No.

17   Q.  So again, do you think that this man is smart enough to fake

18   that answer?

19   A.  Do I think he is smart enough to be able to downplay his mental

20   abilities, I do.

21   Q.  So you're saying you think he is smart enough to come up with

22   this particular wrong answer to that particular question so he can

23   appear more impaired than he is; is that what you're saying?

24   A.  I am not saying on a particular answer, but it is not difficult

25   for people to say I don't know to various questions.  On that

1   particular answer, I don't know if that was his best effort or if

2   it wasn't.  That's been my point all along is that his testing has

3   been inconsistent.  So I have no way of knowing if that's his best

4   effort or if it isn't.

5   Q.  Well, I mean, he would have to be pretty smart to get past I

6   don't know and to give a deliberately wrong answer, wouldn't you

7   agree with that?

8   A.  You would have to be smart to get through I don't know?

9   Q.  Instead of I don't know, to give an answer that is this

10  blatantly off the mark.

11  A.  Again, I am trying to tell you that his responses have been

12  inconsistent for one reason or another.  I am not trying to say

13  that this gentleman is malingering, but I am saying his testing is

14  inconsistent so --

15  Q.  Excuse me, go ahead, finish.

16  A.  So I don't know because there is no good genuine, valid and

17  reliable testing that's been done on him.

18  Q.  So you are not saying that he is malingering?

19  A.  No, not at all.

20  Q.  Egg, seed, you can plant a seed, you can't plant an egg, I

21  don't know.

22  A.  That's a pretty typical response, where people tell you how

23  things are different.  In fact, I am not sure if the WAIS-R manual

24  describes this, but you're supposed to say, that can be how they're

25  different, now how are they the same.  And you're supposed to query

1    them with that, and I don't know if Dr. Tetlow did that.

2    Q.  Well, it was under a heading that says similarities, so can we

3    presume that he asked him, how are these things alike?

4    A.  I can't presume that he -- I presume that he asked him how are

5    they alike, but I can't presume that Dr. Tetlow administered the

6    test properly, since, as Dr. Cunningham had indicated, there was a

7    scoring error, and as I had indicated, it appears that he audio

8    taped the entire WAIS-R.

9    Q.  So you don't know if he gave effort, didn't give effort,

10   faking, not faking, you don't know any of those things, for these

11   questions or anything else; is that what you're saying?

12   A.  What I'm saying is, his effort was inconsistent.  That the

13   tests are inconsistent between what he did at one time and what he

14   did at another time.  And the inconsistencies can be due to any

15   number of things.  It can be due to effort, it can be due to

16   malingering, it can be due to bias in responding, it could be due

17   to whether he was hungry, what temperature the room was, was there

18   a particular odor in the room at the time.  You just don't know.

19   What I'm saying is, the tests are inconsistent.

20   Q.  So in this area as in so many, many others, you don't have an

21   opinion about whether he is malingering?

22   A.  In this area, malingering refers to the intentional production

23   of false or grossly exaggerated symptoms for some sort of secondary

24   gain.  Obviously, he has some sort of secondary gain that could be

25   obtained from appearing more inferior than he really is.  But the

1    key word in that definition is intentional.  And without being

2    there, without having additional information, what I would say is

3    that, again, we don't know why there are these inconsistencies.  So

4    in my opinion at this point as I sit here and testify, I don't

5    believe he is malingering.

6    Q.  So you do not have an opinion at this point that he is

7    malingering?

8    A.  No.  In fact, in my report, I had indicated that he was

9    pleasant, that he appeared to answer all of my questions directly

10   and on point, and I also indicated in my report that the issue was

11   one of inconsistency between the test data.

12   Q.  By the way, and this is a little bit out of order, you also

13   during your testimony with Mr. McMahon, you put up a chart

14   comparing Dr. Martell's and Dr. Bianchini's testing.  Do you recall

15   that?

16   A.  Yes, I do.

17   Q.  And you pointed to various parts of that chart where the scores

18   went up when they should have gone down or went down when they

19   should have gone up, and you pointed these out as inconsistencies;

20   is that fair to say?

21   A.  Yes.

22   Q.  Now, what did you consult to determine whether those

23   differences were statistically meaningful?

24   A.  Actually, I could have gone back and gotten various T scores.

25   Dr. Bianchini listed his T scores.  So that was available to me.

1    What I was doing was trying to display what exactly what

2    Dr. Martell did was to show that the test scores went down.  The

3    only ones that I could think of that were probably statistically

4    meaningful would probably be the Trail and the California Verbal

5    Learning versus the Rey Auditory Verbal Learning in terms of how

6    many were recalled.

7           But you're getting -- I think I see where you're going,

8    and you get lost in terms of the statistics.  The issue is, he is

9    getting worse, he is getting worse, he is getting worse, when he

10   should have been getting better due to practice effect.

11   Q.  Well, and let me ask the question again.  And I really would

12   ask that you answer it not with what you could have done, should

13   have done or might have done but what you did do.

14          What did you consult -- for instance, standard error of

15   measurement, did you consult the standard error of measurement for

16   all of these tests?

17   A.  Not in the majority of them, no.

18   Q.  And did you consult anything at all to determine whether these

19   differences were statistically meaningful differences?

20   A.  No.

21   Q.  So you just put the chart up there, and if he went down a point

22   or up a point, you viewed that as inconsistent?

23   A.  Yes, it was.

24   Q.  And you are aware, are you not, Dr. Hayes, that within a

25   certain range differences up or down on test scores are

1    statistically meaningless?

2    A.  At times.  It's just when you have way too many of them in

3    combination.

4    Q.  So in your view, whether differences are statistically

5    meaningful is a function of how many tests there are that differ a

6    point or two and not whether that point or two in a particular test

7    is a statistically meaningful difference; is that what you're

8    saying?

9    A.  You'll have to reword the question because I think it was a

10   two-part and I forgot what the first part was.

11   Q.  What you're saying, if I am hearing you correctly, and correct

12   me if I'm wrong, is that when you have a certain number of

13   inconsistencies across tests regardless of the point differences in

14   an individual test, whether those differences are statistically

15   meaningful is irrelevant to the inquiry?

16   A.  What I am trying to say is, if you look at each test in

17   isolation, then not a big deal.  But when you start adding up each

18   and every inconsistency, that's when it gets to be a difficulty,

19   that's when you start to think something is just not right here.

20   And especially when you combine that with other information and

21   data that you have that would support that conclusion, then you

22   think something is just not right.

23   Q.  So there's some tipping point, where if you have enough

24   inconsistencies, it doesn't matter if it's just a point here or a

25   point there, and it doesn't matter if the difference is

1  statistically meaningful in terms of your analysis; is that what

2  you're saying?

3  A.  Certainly the amount of change is important, but you also have

4  to look at the different and the varying amounts of change that an

5  individual would have.

6  Q.  So it does become irrelevant once you have a certain number of

7  inconsistencies; that's what you're saying, isn't it?

8  A.  What I am trying to say is that if an individual has a

9  significant number of inconsistencies, that should raise the red

10  flag that possibly this test data is bad, that it's not reliable,

11  and that it calls into question whether this is an accurate

12  reflection of that individual's level of functioning, such that

13  then you would look to other sources of information to find out

14  additional data about have there been other inconsistencies.

15  Q.  And that opinion would hold regardless of whether the

16  differences are statistically meaningful?

17  A.  Yes.

18          THE COURT:  It sounds like you're about to go to

19  something else, because it's noon, I do need to break.

20          MS. FOURNET:  Yes, your Honor, this is a good breaking

21  point.

22          THE COURT:  Okay.  Let's break until 1:15.

23          THE DEPUTY CLERK:  All rise.

24      (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

25

1            P R O C E E D I N G S

2                (AFTERNOON SESSION)

3

4       (OPEN COURT.)

5            THE DEPUTY CLERK:  All rise.

6            THE COURT:  Have a seat, please.  Okay.

7            MS. FOURNET:  May I proceed, your Honor?

8            THE COURT:  Yes, please.

9   BY MS. FOURNET:

10  Q.  Dr. Hayes, with apologies I am going to digress because I had

11  intended to talk to you about those tapes early on before I got

12  into the other -- rest of the substance of your testimony.

13           THE COURT:  Push that microphone a little bit closer to

14  you.

15           MS. FOURNET:  Sure.

16  BY MS. FOURNET:

17  Q.  While they're still fresh in our minds, I would like to talk to

18  you about those videos, the Dedeaux videos, okay?

19  A.  Okay.

20  Q.  Now, mention was made of Toni Van Buren and Mr. Hardy's

21  driving.  In truth and in fact, Ms. Van Buren told you that Paul,

22  when he first learned to drive was an inept driver and drove, she

23  thought, way too slowly than was appropriate.  Is that correct?

24  A.  I don't recall exactly what she said.

25  Q.  So you don't recall that she said when he learned to drive?

1    A.  I recall she said when he learned to drive he drove slowly, but

2    I don't recall exactly what she said.

3    Q.  But in any event, for this video at the time of this video, if

4    it was 1988, Paul would have been 21, is that correct, or

5    approximately 21, 22 years old?

6    A.  If it was 1988 when it was filmed?

7    Q.  That's what was stated here.

8    A.  And in one of the other films it talks about an individual

9    that's going to be going to court in August, so we can assume that

10   he hadn't had his birthday yet at that point, so he would have been

11   about 20 years old.

12   Q.  Well, these films, as far as you know, were not made at the

13   same time, these two videos, were they?

14   A.  I don't know, but everybody was wearing short sleeves and

15   things like that, so I was assuming it was around the summertime

16   especially since the other one was shot before August of '88.

17   Q.  But I think, correct me if I'm wrong, I think in the second one

18   some mention was made by the person identified as Larry to 1988 as

19   though 1988 had come and gone.  Do you recall that?

20   A.  I thought I recalled him saying that he was having to go to

21   court in August of '88.

22   Q.  Okay.  But in any event, he would have been 20, 21, 22 years

23   old, in his 20s by the time these videos were made, correct?

24   A.  It would be, if we are unsure of the dates of the films and it

25   was '88, he wouldn't have been 22.

1   Q.  Listen to the question.  He would have been in his 20s, would

2   he not?

3   A.  Yes.  But you didn't say just in his 20s, you had said 20, 21

4   or 22, and I don't agree with the 22.

5   Q.  Okay.  But he would have been in his 20s?

6   A.  Yes.

7   Q.  Now, you said that he drove expertly in your opinion?

8   A.  I thought he drove fine.  He was able to drive with one hand,

9   he was waving, he stopped at stoplights.

10  Q.  Stopped at the stoplights, correct?

11  A.  As far as I could tell, the ones on Canal.

12  Q.  Didn't run off the road, stayed on the road, correct?

13  A.  Yes.

14  Q.  And this is what you consider expert driving?

15  A.  I don't recall using the word expert, but he drove fine to me,

16  I didn't see any difficulties with his driving.

17  Q.  So if someone said that you described him as driving expertly,

18  that would be an overstatement of what you observed on the video?

19  A.  I didn't see any errors, so if that's what I was referring to

20  in terms of expertly, but he is definitely not Mario Andretti.

21  Q.  And, in fact, would you agree that it did not appear in that

22  tape that Mr. Hardy was driving any more than a very slow speed,

23  did it?

24  A.  I didn't think he did, which was one of the things that I

25  thought was notable because he was driving based upon the

1    surroundings that he had around him, which was children and homes

2    and pedestrians, and so he was driving appropriately for the

3    conditions.

4    Q.  Well, of course, he was driving on his way to a murder scene,

5    wasn't he?

6    A.  Yes.

7    Q.  And he was driving, I think you've agreed, slowly, and you can

8    tell that from the film because you can see the outside is going by

9    very slowly, can't you?

10   A.  Either that or she slowed the film down, I don't know.

11   Q.  Well, did it look to you like it was in slow motion?

12   A.  At times, yes.

13   Q.  And, in fact, what Toni Van Buren said when she described his

14   driving was that he drove very slowly, isn't that what she said?

15   A.  That's what I recall, she said that when he was first learning.

16   Q.  Now, the voice-over on that driving video, and we'll talk about

17   that one first, almost all of the talking, if not all of it, was by

18   Wayne Hardy; is that not correct?

19   A.  On the driving video, yes.

20   Q.  And so Mr. Hardy, Paul Hardy was doing little, if any, talking;

21   is that correct?

22   A.  He was driving the car.  I believe, if I recall correctly, he

23   made a few comments, but he wasn't talking nearly as much as Wayne.

24   Q.  And, in fact, even in the second video, the one done at City

25   Park, Wayne Hardy was also doing far more talking than Paul Hardy

1  on that video as well, wasn't he?

2  A.  Yes.

3  Q.  And, in fact, he actually even interrupted Paul Hardy once or

4  twice during that interview, didn't he?

5  A.  Yes.

6  Q.  And do you recall on the first video, the driving video, Wayne

7  Hardy at one point making comments about people that messed with

8  the Hardy boys or messed with him, and saying as follows:  "You've

9  got to go if you mess with me"; do you remember him using that

10  phrase?

11  A.  I don't recall that specific phrase.

12  Q.  Do you recall Paul Hardy using that phrase in the tapes of the

13  C1 through C27 and X1 through X16, the crime tapes?

14  A.  I do.

15  Q.  And whether you recall Wayne Hardy using that particular phrase

16  or not on these videos, and they speak for themselves, you will

17  agree that Lionel Hardy testified that Wayne Hardy, after Curtis,

18  was the closest to Paul Hardy; is that correct?

19  A.  I recall that, yes.

20  Q.  And you recall getting a general impression from your various

21  interviews of not only Paul Hardy himself but of other witnesses

22  that in the case of especially Curtis, but also of Wayne, Paul

23  Hardy looked up to and even idolized his brothers; is that correct?

24  A.  His brother Curtis.

25  Q.  You don't think that's true of Wayne?

1  A.  Wayne was his little brother, so...

2  Q.  Well, I realize Wayne was younger, but he was very close to

3  Wayne, wasn't he?

4  A.  He was.  But I don't know if I would go as far as to say he

5  idolized him.  I think he did with Curtis, but I don't know that

6  that's the case with Wayne.

7  Q.  And this video, this driving video, depicts Paul driving very

8  slowly, waving and smiling on the way to a murder scene, correct?

9  A.  I would say he's driving at a rate of speed appropriate for the

10  conditions on the way to a murder scene.

11  Q.  Well, the rate was slow, wasn't it?

12  A.  Yes.

13  Q.  And he was waving and smiling, wasn't he?

14  A.  Yes.

15  Q.  On the way to a murder scene, wasn't he?

16  A.  Yes.  Or, as far as I could tell.  I don't know if she had any

17  stops in the middle, but it seemed to be on the way to the murder

18  scene.

19  Q.  Now, with regard to the second conversation, as mentioned once

20  again, Wayne Hardy was doing all of the talking, wasn't he?

21  A.  Yes -- not all of the talking.

22  Q.  Well, most of it.

23  A.  Right.

24  Q.  Pretty much dominating the conversation.

25  A.  Yes.

1   Q.  And you mentioned on your direct testimony with Mr. McMahon

2   some factors reflected on that second tape that you -- appear to

3   suggest were inconsistent with mental retardation, correct?

4   A.  You would have to refresh my memory about what you're talking

5   about.

6   Q.  Well, as I recall, and correct me if I'm wrong, he asked you to

7   list what you saw on that tape that you thought were significant

8   aspects of the tape for purposes of your evaluation.  Do you recall

9   that?

10  A.  Yes.

11  Q.  And do you recall saying that one of those -- was it Paul Hardy

12  was well groomed?

13  A.  Yes.

14  Q.  Now, that topic has come up over and over again.  And clearly,

15  Mr. Hardy is, was, and apparently always has been well groomed; is

16  that correct?

17  A.  To my knowledge.

18  Q.  And you mentioned that several times in your report that people

19  said he was neat and clean and he was well groomed and so on.  So

20  that was something you considered, wasn't it?

21  A.  Of course.

22  Q.  And do you have some notion that a person who is mildly

23  mentally retarded is incapable of grooming themselves?

24  A.  People with mild mental retardation are like all the rest of

25  us, you have strengths and weaknesses.  And so some people with

1  mild mental retardation may have difficulty with grooming, some may

2  not.

3  Q.  So the fact that Mr. Hardy was well groomed for most or all of

4  his life really does not in any way undermine Dr. Swanson and

5  Dr. Cunningham's diagnosis that this man has mental retardation,

6  does it?

7  A.  This is a factor that would indicate that that check box is no

8  problem in terms of self-care in terms of grooming.  But that is

9  one factor among many.

10  Q.  But this is a factor, I want to be clear on this because I am

11  getting confused, this is a factor to which you gave some degree of

12  weight in reaching your conclusion, as you do at the end of that

13  report, that this man does not have mental retardation; is that

14  correct?

15  A.  Of course.

16  Q.  And you consider that a legitimate factor for that

17  determination?

18  A.  One of many.

19  Q.  Okay.  Now, you also mentioned that that interview reflects

20  that Mr. Hardy, and I think I am quoting you directly, could,

21  quote, "carry on a conversation"; is that correct?

22  A.  Correct.

23  Q.  Has anybody ever suggested to you on either side that this man

24  could not carry on a conversation?

25  A.  There's been some indication that he may have difficulty with,

```
 1   to the best of my recollection, with like interrupting at
 2   inappropriate times and things like that.  But I don't believe
 3   anybody has said that he was unable to carry on a conversation.
 4   Q.  And, in fact, is it not correct, Dr. Hayes, that a mildly
 5   mentally retarded person can talk, and I don't mean just say words,
 6   but can carry on a conversation; isn't that true?
 7   A.  Generally.  There may be some people with mild mental
 8   retardation who have communication difficulties such as they can't
 9   talk, but the majority of people with mild mental retardation
10   certainly can talk.
11   Q.  So the fact that he could carry on a conversation in no way
12   suggests that he does not have mild mental retardation, does it?
13   A.  Again, that would be one factor among many that would indicate
14   that he did not have mild mental retardation.
15   Q.  So you considered the fact that he could carry on a
16   conversation as one of a number of indications that he does not
17   have mild mental retardation; is that what you just said?
18   A.  That among a multitude of others.
19   Q.  Now, you mentioned something about a restaurant, and I got kind
20   of lost there.  I heard you to say that if a profoundly or severely
21   mentally retarded person was at your house and you told that person
22   to walk to a restaurant, that person could probably do it.  Is that
23   what you said or did I misunderstand you?
24   A.  Either you misunderstood me or I misspoke.
25   Q.  Okay.
```

1   A.  I don't know of any profoundly mentally retarded person who

2   would be able to walk to a restaurant if I told them to walk to a

3   specific restaurant.

4   Q.  Well, what did you mean to say if I did misunderstand you about

5   the restaurant?

6   A.  You'll have to refresh my recollection regarding the question.

7   Q.  Well, let me just ask you this:  If we're talking about,

8   hypothetically, a few blocks from your house to a restaurant, a

9   straight shot, you live on Charters, the restaurant is down four

10  blocks on Charters from your house.  Would you expect that a mildly

11  mentally retarded person couldn't walk those four blocks and find

12  that restaurant?

13  A.  Generally, unless they have any motor delays or something like

14  that that prevents them from walking.

15  Q.  Now, at one point you and Mr. McMahon seemed to have a

16  disagreement because your answer seemed to suggest that walking was

17  using a mode of transportation.  And I think I heard you say you

18  considered that to be, in fact, using a mode of transportation; is

19  that correct?

20  A.  I think I had said that it's not a mechanized mode, but it is a

21  way to get from point A to point B.

22  Q.  So the fact that a person can pick up one foot after another

23  and walk from here to the jury box, that is a factor that you would

24  consider in determining whether he was mentally retarded to any

25  degree; is that correct?

1    A.  No.  What I was referring to was being able to walk from my

2    house to a specific restaurant and be able to do that with

3    accuracy.  It wasn't that he or she could just put one foot in

4    front of the other.

5    Q.  You mentioned, or I should say it was mentioned during that

6    interview and it hasn't played much of a role so far in this

7    proceeding, but I believe Wayne Hardy mentioned a home invasion

8    that Paul Hardy's family suffered at some point prior to this

9    interview.  Do you recall that?

10   A.  Yes, I do.

11   Q.  And you're familiar with that home invasion, aren't you?

12   A.  I am familiar with the indicating that they had a home

13   invasion.

14   Q.  Do you think they just made up this home invasion?

15   A.  No.  But I am not -- I wasn't there, so . . .

16   Q.  I understand.  Now, according to Paul Hardy, and perhaps other

17   witnesses as well, this home invasion that his family suffered was

18   a major event in their lives, correct?

19   A.  That's what they indicated.

20   Q.  And several people indicated to you, including, I believe,

21   Mr. Hardy himself, and correct me if I'm wrong, that this is when

22   Paul Hardy started buying guns after that event; is that not

23   correct?

24   A.  I believe so.

25   Q.  And, in fact, even Terry Hardy, who is now a fireman, as you

1   know, he bought a gun after that incident, didn't he?

2   A.  I do not know.

3   Q.  You discussed the gullibility, and you cited evidence in one

4   portion of the crime tapes, that is, C1 through C27 and X1 through

5   X16, where it is your position that Mr. Hardy was not gullible when

6   it came to Len Davis; is that correct?

7   A.  No.

8   Q.  Okay.  Then straighten it out for me.

9   A.  That tape is an indicator that Mr. Hardy stood up to Mr. Davis

10  and said that he was frustrated with him for getting on to him

11  about not having gone and killed Kim Groves.

12  Q.  There were other instances in those tapes, were there not,

13  where Len Davis expressed great frustration with Paul Hardy; is

14  that correct?

15  A.  Yes.

16  Q.  Because Paul Hardy was taking too long to get things done in

17  his opinion; is that correct?

18  A.  He didn't kill Kim Groves quick enough for him.

19  Q.  And he expressed that frustration to Mr. Hardy on those tapes,

20  didn't he?

21  A.  That's what I recall.

22  Q.  And he also expressed frustration at different points with

23  Mr. Hardy's inability to use a cell phone properly, didn't he?

24  A.  He did.  He had told Paul, I think, if I recall correctly, to

25  make sure you press the off button.  It kind of reminded me when I

1  don't push the off button and put my phone in my purse and it keeps

2  going.

3  Q.  So just like something you would do according to you?

4  A.  No, it just, when I read that, it kind of made me laugh because

5  I've done that several times.

6  Q.  Now, you also mentioned that Mr. Hardy's academic performance

7  was not all that bad considering the criminal subculture, I think

8  is how you put it; is that correct?

9  A.  I wasn't referring to his academic performance, I don't

10  believe, when I was talking about the criminal subculture.  I

11  thought I was referring more to the home living aspect.

12  Q.  Tell me what you meant by that and then we'll talk about the

13  criminal subculture.

14  A.  Which, that his performance --

15  Q.  The home living.

16  A.  What I am referring to is that Mr. Hardy grew up in a family

17  where it wasn't required for him to wash his clothes and cook and

18  do things like that.  And then he moved into a situation where he

19  again was not required to do that.  Indications were that if he

20  needed to do something, that he could, but that he did not

21  typically do that.

22  Q.  Didn't it occur to you, Dr. Hayes, that maybe people did things

23  for him because they perceived that he couldn't do them for

24  himself?

25  A.  That's his -- yes, and that's as good of an explanation of

1    saying that he didn't do them because someone else would do them

2    for him so why bother.

3    Q.  But you don't know which one it was, do you?

4    A.  I believe it was the latter because he was able to describe how

5    to do things, he does those things in jail, and there was no

6    indicators outside of the context of the collateral informants that

7    obviously had some bias involved that he was unable to do those

8    things.

9    Q.  Dr. Hayes, the man was 42 years old when you made these

10    observations about him in jail, wasn't he?

11    A.  I believe so.

12    Q.  And you have no way of knowing why people, when he was younger,

13    when he was 18, 19, 20 years old just automatically did things for

14    him, do you?

15    A.  I am unaware of why his mother would cook for him and clean for

16    him like she did for him and his other siblings.

17    Q.  So it could have been for the first reason you mentioned, it

18    could have been because they just perceived on either a conscious

19    or perhaps subconscious level that it was just easier to do these

20    tasks themselves than to require or teach Mr. Hardy to do them;

21    isn't that possible?

22            MR. McMAHON:  Repetitive.  Already been asked.

23            THE COURT:  Yeah.

24            MS. FOURNET:  I'll move on, your Honor.

25            THE COURT:  Okay.  Thank you.  Sustained.

```
 1   BY MS. FOURNET:
 2   Q.  Let's talk about the criminal subculture, because that's a
 3   concept that came from that Denkowski article I think you had up on
 4   the screen; is that correct?
 5   A.  Correct.
 6   Q.  And tell me what you mean by criminal subculture; how do you
 7   decide if somebody is in the criminal subculture?
 8   A.  If he or she commits criminal acts and does things that are
 9   repeatedly grounds for arrest for one reason or another.
10   Q.  And that criminal subculture is relevant to a diagnosis of
11   mental retardation for what reason?
12   A.  Because I believe that there are skills and behaviors that are
13   carried out by individuals in the criminal subculture that are not
14   carried out by the majority of population and vice versa.  For
15   example, writing an essay may be a requirement for the majority of
16   the population, but in the criminal subculture, I don't believe
17   that Mr. Hardy or other people would necessarily need to write any
18   essays.
19   Q.  So would Bernie Madoff be in the criminal subculture?
20   A.  I don't know who Bernie Madoff is.
21   Q.  Dr. Hayes, you don't know who Bernie Madoff is?
22   A.  I don't listen to the news actually at all.
23   Q.  Well, let me tell you who Bernie Madoff is and then I'll ask
24   you the question again.  Bernie Madoff was recently arrested and
25   prosecuted for a massive years-long securities fraud.  Bernie
```

1    Madoff had been selling --

2    A.  Oh, yeah.

3    Q.  -- different types of investments to individuals for investment

4    funds that, in effect, did not exist and managed to steal through

5    this process literally billions of dollars.  Is that ringing a

6    bell?

7    A.  It is, thank you.

8    Q.  Now, would Bernie Madoff be a member of the criminal

9    subculture?

10   A.  He is definitely a criminal but he is not to -- he is not in

11   the criminal subculture to which I am referring.

12   Q.  Why not?

13   A.  He is to the criminal subculture what Bill Gates is to just a

14   regular Joe out on the street.  They're apples and oranges

15   different.

16   Q.  So you're talking about people like drug dealers and people

17   like that, right?

18   A.  Drug dealers, murderers, not necessarily a planned murder but

19   more of just general every day drug dealers, drug dealers like

20   Mr. Hardy was.

21   Q.  So Mr. Hardy, who grew up in the Calliope project, grew up

22   poor, grew up without a father, he is in the criminal subculture

23   but Bernie Madoff is not; is that what you're saying?

24   A.  Yes.  I mean, like I said, I believe Bernie Madoff is

25   definitely a criminal, don't get me wrong.  But like I had said, he

1   is the equivalent of Bill Gates to a normal person.  We're not all

2   Bill Gates and not all criminals are Bernie Madoff.

3   Q.  Well, how does one qualify for the criminal subculture; does

4   one have to be arrested, does one have to be indicted, does one

5   have to be convicted?

6   A.  I would think -- in terms of criminal subculture, it would be

7   individuals who carry guns, individuals who do get arrested from

8   time to time, individuals who use exploitation of others for their

9   own gain, people who hurt other people for their own gain.

10  Q.  And are you suggesting that somehow different standards apply

11  to those people?

12  A.  I don't see what you're saying.

13  Q.  Are there different standards of adaptive behavior that apply

14  to members of this criminal subculture you're describing?

15  A.  I believe that there are different things that are required

16  from people in the criminal subculture that are not required of

17  other people, such as writing essays or using the computer, things

18  like that.

19  Q.  I am going to ask the question again, and I am going to ask for

20  a yes or no answer and then an explanation, if you wish.

21      Are you suggesting that different standards of adaptive

22  behavior apply to people from what you call the criminal

23  subculture?

24  A.  I believe that I can't answer it with a yes or no question

25  (SIC).  Certainly all people have to dress and all people have to

1    have hygiene and all people have to communicate.  But I do believe

2    that there are some skills that people in the criminal subculture

3    are required to have, that people in the majority population are

4    required to have and vice versa.  So if there are certain skills

5    that, of course, both populations would need to acquire, but then

6    there are also certain skills that those populations acquire that

7    are disparate.  I am trying to answer your question as honestly as

8    I can.

9    Q.  Let's move right along to IQ where we had left off.

10          With respect, and we'll start with the Flynn Effect.  You

11   have stated, if I understood you correctly, that you are not,

12   quote, "convinced that the Flynn Effect is applicable to

13   individuals with an IQ in Paul Hardy's IQ range"; is that correct?

14   A.  Correct.

15   Q.  And, in fact, I believe you have represented that the jury is

16   out on that.

17   A.  In my opinion.

18   Q.  And, of course, you quizzed Dr. Greenspan, Stephen Greenspan,

19   about the Flynn Effect, and he was unable, according to you, to

20   produce what you considered sufficient research to justify applying

21   the Flynn Effect to this IQ range.  Is that correct?

22   A.  That's a long question, let me first pick up quizzed.  When I

23   met with Dr. Greenspan, we had a collegial conversation about the

24   Flynn Effect because, obviously, Dr. Greenspan is one of the

25   leaders in the field and I wanted to get his input on the issue.

1    I recall him saying that it took him awhile to parse

2  through some of the research to see where Flynn was coming from in

3  some certain areas due to either repeated measures design or

4  cross-sectional designs in some of the studies.  But I was asking

5  him, can you tell me which studies, other than Kanaya, with hard

6  data indicate that the Flynn Effect holds water in people with

7  mental retardation and/or in borderline intellectual functioning.

8    And we discussed the issue with some of the prior

9  studies, I believe, that are outlined in my report.  Honestly, I

10  don't recall word for word what we talked about, but I don't know

11  that I would call it quizzed, so, I thought it was a discussion.

12  Q.  And, of course, you're aware, are you not, of Dr. Greenspan's

13  stature in the community of mental retardation experts, are you

14  not?

15  A.  Of course.

16  Q.  But he was unable to persuade you of his position that the

17  Flynn Effect is, in fact, applicable to this IQ range, correct?

18  A.  Correct.

19  Q.  And, of course, you would not want to rely on any scientific

20  principle for which the "jury is out," correct?  Of which you

21  consider the Flynn Effect one.

22  A.  I think it would depend on the principle and what my opinions

23  are in that area.

24  Q.  Oh, I see.  Well, I'm curious about, I mean, you do, you do

25  apparently take the position that the "jury is out" on the Flynn

1  Effect, don't you?

2  A.  I believe so.  Not on the Flynn Effect as a whole.  I

3  completely 100 percent agree with the Flynn Effect in the normal

4  population.  It's just in that lower range that I think the jury is

5  still out.

6  Q.  I understand that.  And because the jury is out on that

7  particular IQ range, at least according to you, you are unwilling

8  to apply the Flynn Effect to that particular IQ range, correct?

9  A.  I don't believe based upon the research that I've done that

10  it's appropriate.

11  Q.  So the answer is no.

12  A.  No.

13  Q.  Now, do you recall an exhibit that you did here in this

14  courtroom on the Terry Hardy and the Paul Hardy California CTBS

15  scores?

16  A.  Yes.

17  Q.  And do you recall that that exhibit purported to convert the

18  large city norms for Terry Hardy's scores to national norms for

19  Paul Hardy's scores?

20  A.  Was there a question?

21  Q.  Yes.  I asked if you recalled that -- do you recall --

22  A.  Oh, okay, I'm sorry.

23  Q.  -- that the exhibit purported to show the national norms for

24  Paul Hardy's scores; do you recall that?

25  A.  I indicated that it was a simple proportional formula and that

1    I had checked with two statisticians and they said that -- one said

2    that it was okay, another said that it wasn't.  So I think I

3    clearly said that the table was not without error and that this was

4    to be helpful so that one could see about where Paul Hardy's scores

5    would be.  That table, thank you for showing it because I thought

6    you were talking about the other table --

7    Q.  Wait.  This is not it, this is not it.  That's it, isn't it?

8    A.  Yes.

9    Q.  And I have opposing opinions highlighted there, don't I?

10   A.  Yes.  And I believe that I took the more conservative and said

11   don't consider this to be absolutely 100 percent accurate, that

12   this is to give you an idea of about where Paul Hardy would be.

13   Q.  What you did, if I understood your testimony correctly, is that

14   you took, you had national norms for Terry Hardy, correct?

15   A.  Correct.

16   Q.  And you devised your own simple algebraic proportional formula

17   because you did not have Paul Hardy's national norms; is that

18   correct?

19   A.  That's correct.

20   Q.  And so you used some kind of proportional formula that you

21   invented to convert Paul Hardy 's large city norms to national

22   norms; is that correct?

23   A.  I certainly didn't invent algebra.

24   Q.  Well, we all have.  But the fact remains that you called --

25   A.  I'm sorry, I didn't catch what you first said.

1  Q.  I said the fact remains that you called the people who made the

2  test, and they told you that they did not have data on the national

3  norms, correct?

4  A.  They told me that they didn't keep norms back that far and they

5  couldn't find them.

6  Q.  And then you contacted, then you contacted two statisticians,

7  did you not?

8  A.  Correct.

9  Q.  And one of them told you that you should not and could not make

10  up your own formula to convert these percentages, didn't he?

11  A.  He had said that that was not okay in the statistical realm.

12  Q.  What were these statisticians' names, by the way?

13  A.  One of them was Paul Frick, he is the director of psychology at

14  UNO, and the other one was Marsha Bennett, she is the director of

15  research for nursing at LSU School of Medicine.

16  Q.  What is Mr. Frick's position?

17  A.  Director of psychology, the psychology division, I think.

18  Q.  And Marsha Bennett is in the nursing department?

19  A.  Yes.

20  Q.  And which one told you you couldn't use the formula?

21  A.  To tell you the truth, I don't recall.

22  Q.  You don't recall which one told you not to use the formula?

23  A.  It was either Dr. Frick or Dr. Bennett, I don't remember.  One

24  of them said they thought it would be okay, that's why I put the

25  caveat in there that don't trust us, this is simply for comparison

1  purposes.

2  Q.  Well, Dr. Hayes, you specifically testified in this case when

3  you explained this formula that you devised yourself, that the jury

4  was out on whether you could use such a formula to convert these

5  norms; didn't you say that?  And I can get the transcript if I need

6  to.

7  A.  I don't know if I used those words.

8  Q.  Okay.  Well let's find it.

9         MS. FOURNET:  Judge, I have a note somewhere of a page

10  number.

11        THE WITNESS:  It may be easier if I just say I don't know

12  if I used those words, but I think the jury is still out related to

13  whether I can use a formula.  Is that okay?

14  BY MS. FOURNET:

15  Q.  Yes.  You believe the jury is out?

16  A.  I do.  I believe that his scores would be somewhere around

17  there but I can't be exact.  And so, yes.

18  Q.  So just like you believe the jury is out on the Flynn Effect,

19  right?

20  A.  I think they're apples and oranges, I think they're different

21  issues.  One is, will he fall a couple of points around this so

22  that you could say he's still in the average range, and another one

23  is related to a theoretical concept.  So I think that they're

24  different concepts.

25  Q.  Well, what -- other than talking to these two statisticians --

1    well, they're not even statisticians because one of them is in the

2    nursing department, right?

3    A.   She is the director of research for the school of nursing, she

4    is one of the deans.

5    Q.   But she is not a statistician, is she?

6    A.   I think she teaches courses on stats.

7    Q.   Is she a statistician?

8    A.   That's not her job title, she is associate dean of research.

9    Q.   How much -- what does the research say about this proportional

10   formula you used to convert these percentiles and put it on a

11   display in this courtroom?

12   A.   I don't know, that's why I asked people who knew more than me

13   in the area.

14   Q.   So even though the jury was out on this question, just like

15   it's out on the Flynn Effect, you felt it was appropriate to go

16   ahead and use this self-devised formula to inflate Paul Hardy's

17   standing on national norms and did it despite the fact that there

18   were individuals who told you it was not an appropriate thing to

19   do; is that correct?

20   A.   That's absolutely not correct.  The national norms in no way,

21   shape, or form would have inflated his scores when compared to

22   large city norms.  When compared to large city norms, his scores

23   would actually deflate when you use national norms.  That is, they

24   get less.

25   Q.   I'm going to read you your testimony on page 37 of the second

```
 1   day, and I am going to ask you if this sounds like what you said.
 2   "What I did is, I contacted some statisticians."  Well, first of
 3   all, they weren't statisticians, correct?
 4   A.  They are experts in stats, but one of them is a professor and
 5   head of psychology and the other is dean of research for nursing.
 6   Their job titles are not statisticians, that would be more like an
 7   instructor.
 8   Q.  "To find out if it would be okay to just, to use just a simple
 9   proportional formula to determine what Paul Hardy, about what Paul
10   Hardy's score was compared to his brother.  Because with Terry we
11   had both national and large city norms, but with Paul Hardy we just
12   had large city norms.  So if you think back to like Algebra I, X
13   divided by -- Paul Hardy's large city percentile equals Terry
14   Hardy's national percentile divided by Terry Hardy's large city
15   percentile to get these numbers."
16   A.  Can you read that one more time just to make sure I got the
17   formula right?
18               MR. McMAHON:  Do you have the transcript up there?
19               THE WITNESS:  No.
20               MS. FOURNET:  Yeah, we can give her -- we probably have
21   an extra page.  May I approach, your Honor?
22               THE COURT:  I don't think we need to spend too much
23   longer on this point, though.  But go ahead.
24               MS. FOURNET:  Okay, Judge.
25               THE WITNESS:  Thank you.
```

1    BY MS. FOURNET:

2    Q.  We're thinking back to Algebra 1 now and I read that sentence.

3    "So from a statistical standpoint, the two statisticians that I

4    spoke to, the jury was out; but out of an abundance of caution, I

5    would just say this is an estimate based on a proportional

6    formula."  Correct?

7    A.  Can you read that one more time?  I was still thinking about

8    your prior question about was that formula correct.

9    Q.  Do you have the transcript, the page in front of you?

10   A.  Yes.

11   Q.  "From a statistical standpoint, the two statisticians that I

12   spoke to, the jury was out; but out of an abundance of caution, I

13   would just say this is an estimate based on a proportional

14   formula."  Is that what you said?

15   A.  Yes.

16   Q.  So you think it's an abundance of caution to use a formula of

17   your own devising to get Paul Hardy's national norms --

18            MR. McMAHON:  Asked and answered.

19            THE COURT:  Last time.  Finish your question.

20            MS. FOURNET:  I'll just move on, Judge.

21            THE COURT:  Okay.

22   BY MS. FOURNET:

23   Q.  You say that with, again, with regard to the Flynn Effect, you

24   say that -- is it Dr. Matson at LSU?

25   A.  Yes.

1    Q.  And you were, I believe you were a student of Dr. Matson's, and

2    you consider him one of your mentors?

3    A.  I do.

4    Q.  And you have a great deal of respect for Dr. Matson, do you

5    not?

6    A.  I do.

7    Q.  And Dr. Matson does some publishing and some editing, does he

8    not?

9    A.  I believe so.

10   Q.  And are you familiar with this publication by Dr. Matson, and

11   this is a copy, Judge, we have the book on the way, I don't know if

12   it's arrived yet or not.  We do have some pages from it --

13            MR. McMAHON:  May I see that, Ms. Fournet?

14            MS. FOURNET:  Yes.  And one for the judge as well.  It's

15   called *Handbook of Assessment in Persons with Intellectual*

16   *Disability*.  Are you familiar with this publication?

17            THE WITNESS:  I am not sure if I've seen that one.  I

18   know I've read parts of one of his recent books.  When was that one

19   published?

20   BY MS. FOURNET:

21   Q.  It's just out, that's why we don't have the book yet, your

22   Honor.  So it's possible that you may not have seen it yet.

23   A.  Okay.

24   Q.  Just recently published.  But you do have respect for this

25   scholar, correct?

1    A.  Absolutely.

2              MS. FOURNET:  May I approach the witness, your Honor?

3              THE COURT:  Uh-huh.

4    BY MS. FOURNET:

5    Q.  I'm on page 89 of an article or a chapter in that book by

6    Barbara Tylenda.  Do you know her?

7    A.  Is it Linda --

8    Q.  T-Y-L-E-N-D-A.

9    A.  No, I don't know her.

10   Q.  I am going to ask you to read out loud what is underlined in

11   red on page 89.

12   A.  Okay.  "Evaluators always have needed to exercise care when

13   relying on an IQ to diagnose mental retardation.  Knowing the Flynn

14   Effect and awareness that the effect impacts the lower end of the

15   IQ distribution, as well as the average range of the IQ

16   distribution, dictates that evaluators who assess both presence of

17   mental retardation seriously consider the Flynn Effect in the

18   diagnostic process."

19   Q.  Now, that paragraph suggests that indeed the Flynn Effect does

20   apply to the lower end of the IQ range, doesn't it?

21   A.  It does.  But if you look up right before that it's talking

22   about the Kanaya 2003 study that was done with children.  So I am

23   not sure if this is referring to children and that they're basing

24   their opinion again on the Kanaya study.

25   Q.  Well, certainly that comment isn't limited to children, is it?

1    A.  It doesn't say whether it's limited to children or adults.

2    Q.  Okay.  Turn to page 93, please, and read that last highlighted

3    paragraph into the record.

4    A.  "As a final note, it's important for psychologists to be aware

5    of the Flynn Effect and its relevance to the diagnosis of mental

6    retardation.  Understanding of the Flynn Effect is particularly

7    relevant when a psychologist has been asked to testify as an expert

8    witness for the court and make a differential diagnosis in mental

9    retardation as opposed to learning disability or psychiatric

10   disorder.  Nowhere will a psychologist competency involving

11   intelligence testing be more transparent than when it involves

12   educating a community of fellow professionals, e.g., judges,

13   lawyers, psychiatrists, and social workers, as to the many facts

14   involved in the determination of intelligence."

15   Q.  Do you disagree with anything you just read, either of those

16   two passages?

17   A.  Again, I would need to know what they're basing their

18   information on, because I believe that there can be times when

19   researchers take things at face value -- take things face validly,

20   that is, they don't question the underlying assumptions.  And

21   sometimes when people ask these things, it promotes additional

22   development in the field.

23        So like in this situation, I've asked the question, show

24   me the data in terms of that population.  And so possibly they're

25   still relying on the Kanaya article, which is done with children.

1    I can't say what their underlying data is without reading the

2    entire article or what they considered.  I do agree that the Flynn

3    Effect should be considered.  You know, it's a real effect and I

4    don't think that I've disagreed with that.

5              In fact, I've wrestled with the situation and that's why

6    I did so much research on it.

7    Q.  Well, Dr. Hayes, those excerpts that you just read don't just

8    say it should be considered, they say it should be considered in

9    the context of mental retardation assessment, don't they, the first

10   one?

11   A.  Let me go back.  Yes.

12   Q.  And then the second one, the one at the end, the final note,

13   really encourages psychologists such as yourself to educate the

14   courts and lawyers on the Flynn Effect, doesn't it?

15   A.  Yes.  And that's what I'm trying to do to the best of my

16   ability.

17            MS. FOURNET:  May I approach, your Honor, just to get

18   my --

19            THE COURT:  Yes.

20   BY MS. FOURNET:

21   Q.  Now, apparently the person who contributed this chapter to

22   Dr. Matson's book also suffers from the same misunderstanding about

23   the Flynn Effect and its applicability --

24            MR. McMAHON:  Objection.  It's argumentative, Judge.

25            THE COURT:  Well, I think we can move on.

1          MS. FOURNET:  Okay.

2          THE COURT:  Thank you.

3          MS. FOURNET:  All right.  I'll move on, your Honor.

4     BY MS. FOURNET:

5     Q.  Now, you heard Dr. Cunningham's testimony to the effect that

6     some of the very same studies that you cited, while they don't

7     support the Flynn Effect perhaps in the lower end of the IQ range,

8     do support the Flynn Effect in the range that Mr. Hardy is in; is

9     that correct?

10    A.  It depends.  Dr. Cunningham offered testimony that Mr. Hardy's

11    IQ score could be lower because of the standard error of

12    measurement.  If Mr. Hardy's score was lower due to the standard

13    error of measurement and then Mr. Hardy's IQ score would fall into

14    the mentally retarded range, which then could increase his IQ score

15    because of the Flynn Effect.  So again, it was a bit of a mixed

16    bag.  I mean, I've reviewed the articles in my report.

17    Q.  So what you're doing is, you're subtracting the standard error

18    of measurement to get Mr. Hardy's IQ below the range in those

19    studies, is that basically what you're saying?  If you subtract

20    that five points and you put him on the lower end considering the

21    standard error of measurement, then he is just inside the range

22    where the Flynn Effect may not operate; is that what you're saying?

23    A.  That's a possibility.  But there's still not enough data that's

24    even out there on the borderline range in my opinion.  I agree with

25    Dr. Cunningham when he was saying that as the IQ score gets higher,

1  that one can be more confident, I am not sure if these were his

2  exact words so please don't quote me on that, but as an IQ score

3  gets higher, one can be more confident about the Flynn Effect being

4  applicable in that situation.

5        I also understand that there's been research that's been

6  done both ways about the Flynn Effect in borderline and in mentally

7  retarded folks, and again, I feel like more data is needed.

8  Q.  And you would agree that in terms of the Flynn Effect, your

9  position is basically an outlier position in your profession,

10  correct?

11  A.  I agree.  Somebody had to first figure out when the world

12  wasn't flat, too.

13  Q.  And that opinion, of course, is driven by your familiarity and

14  experience in mental retardation assessments and in your knowledge

15  about mental retardation; is that correct?

16  A.  Actually, that's more just of a research question, because, I

17  mean, I'm a peer reviewer for different articles, that's more of a

18  research issue.  It was more of a trying to find an answer issue.

19  That's not based upon any experience, it's based upon my knowledge

20  of research and research methodology and questioning when you can't

21  find enough information about something.

22        THE COURT:  Let's move off of the Flynn Effect if you

23  could.

24        MS. FOURNET:  You want me to move to the next topic, your

25  Honor?

```
 1            THE COURT:  Well, unless you've got -- I mean, you're

 2   getting pretty repetitive on the Flynn Effect, I think.

 3            MS. FOURNET:  Well, I would like to stay within the Flynn

 4   Effect, but I'll move on a little bit if that's okay, Judge.

 5            THE COURT:  Sure, sure.  Just do something new with it.

 6            MS. FOURNET:  Okay.

 7   BY MS. FOURNET:

 8   Q.  You're aware now, if you weren't before, are you not,

 9   Dr. Hayes, that this book, the User's Guide --

10            MR. McMAHON:  What is that, Ms. Fournet?

11   BY MS. FOURNET:

12   Q.  The one that you just got last week, this book recommends

13   recognizing the Flynn Effect, does it not?

14   A.  Yes, it does.

15   Q.  And by definition it recommends recognizing the Flynn Effect

16   because this is an organization that exclusively deals with people

17   with intellectual disabilities, including mental retardation; is

18   that correct?

19   A.  Yes, they are an advocacy group for people with mental

20   retardation.

21   Q.  And do you have some kind of philosophical problem with an

22   organization advocating for the mentally retarded?

23   A.  No, but I think that you do have to understand that it is an

24   advocacy group.

25   Q.  So you disagree with the User's Guide as well on that point?
```

1  A.  I do.  I think that more data needs to be uncovered before we

2  can be sure that it's applicable in this area.

3  Q.  Now, you relied in your discussion of the Flynn Effect as well

4  as on some of the exhibits or slides that we saw today on research

5  by Dr. Denkowski, did you not?

6  A.  Not with regard to the Flynn Effect.

7  Q.  Well, I think you cited an article by him, I believe it's

8  footnote 28 in your report, with respect to the Flynn Effect.

9       MS. FOURNET:  I believe it's page 44, your Honor,

10  footnote 28.

11       THE WITNESS:  I didn't rely on that in coming to my

12  conclusions about the Flynn Effect, I was simply trying to report

13  that some people don't agree with using the Flynn Effect.  But my

14  opinion was not based upon what Dr. Denkowski had thought.

15  BY MS. FOURNET:

16  Q.  Well, why did you put the footnote there?

17  A.  To inform who was reading the report that some people agree

18  with the Flynn Effect, some people don't.

19  Q.  Well, and certainly you relied on Dr. Denkowski's research in

20  several of the slides you did today, didn't you?

21  A.  I did.

22  Q.  And so Dr. Denkowski is somebody whose -- obviously whose

23  stature and reputation you consider good enough for you to cite him

24  in your report and put slides here for the judge to see this

25  morning relying on his research; is that correct?

1    A.  I believe that with regard to the slides that we had up today,

2    I think they're good points.  I think they're very good points and

3    they're ones that needed to be made.  In terms of including this, I

4    am trying to inform, I guess everyone at this point, that not

5    everyone agrees with the Flynn Effect.  I'm sorry, I am not aware

6    of what his stature is in the world.

7    Q.  Well, I mean, you -- you cited him, Dr. Hayes, you cited him in

8    the report, you cited him on the slides, correct?

9    A.  Yes.

10   Q.  You would not cite, one would hope and correct me if I'm wrong,

11   an expert that you didn't consider a good source, would you?

12             MR. McMAHON:  Your Honor, I object.  It's argumentative.

13             THE COURT:  Overruled, overruled.  It's okay.  Overruled.

14   BY MS. FOURNET:

15   Q.  Would you?

16   A.  Absolutely, because, generally, the majority of times that

17   academics do research it's usually going to be their graduate

18   students that are going to be doing the research with them, and so

19   usually the first authors are going to be graduate students.  And

20   so the last author is typically going to be the person whose lab

21   the information came out of.  And so just because you cite someone

22   in a report doesn't mean that you consider every single person to

23   be an expert in a certain area.

24             The thing that you're looking for is, are these things

25   published in peer-reviewed journals that have a good reputation and

1  is this good information.  I think it's good information to know

2  that not everyone agrees with the Flynn Effect.  That's why I put

3  it in the report.  I don't know Dr. Denkowski, I don't know what

4  his stature is.

5  Q.  So you feel that it is appropriate for you as an expert to cite

6  by name someone in the field who is doing research when you don't

7  know anything about this person or whether this person has any

8  expertise whatsoever in the field; is that correct?

9  A.  Yes and no.  I mean, Dr. Denkowski's article went through the

10 peer-review process and got into a very good journal, so obviously

11 the editors and publishers of the journal considered this article

12 to be worthy.  Whether he is right or not is the same issue that I

13 have with the other aspects of the Flynn Effect.

14        So I can't say about Dr. Denkowski's reputation.  I can

15 tell you that Dr. Denkowski wrote an article that the publishers of

16 the *American Journal of Forensic Psychology* thought was worthy of

17 publication.  I know that it caused some controversy and that's

18 what came from there.

19 Q.  Were you aware that in February of 2009 prior to your citation

20 of Dr. Denkowski in footnote 28 of your report and prior to the

21 showing of these exhibits in court, specifically in June of 2009, a

22 complaint was filed against him with the Texas Board of Examiners

23 of Psychologists?

24        MR. MILLER:  Objection.  I think we're getting a little

25 far afield, aren't we?

1    THE COURT:  Well, go ahead and finish the question.

2  BY MS. FOURNET:

3  Q.  Were you aware that a complaint had been filed against him?

4  A.  No.

5  Q.  And were you aware that that complaint --

6    MR. McMAHON:  Judge, that ends it, doesn't it?  She

7  doesn't know there was a complaint, then we don't get into the

8  complaint.

9    THE COURT:  I think that's right.  Sustained.

10    MS. FOURNET:  I have a certified self-proving document,

11  your Honor.

12    THE COURT:  Well, you can proffer it, but I don't think

13  you can question her about it.

14    MS. FOURNET:  I would proffer for the record a certified

15  copy with attachment of a complaint filed by Dr. Denkowski --

16    THE COURT:  About Dr. Denkowski, I assume.

17    MS. FOURNET:  I'm sorry.  Against Dr. Denkowski for

18  making scoring and mathematical errors and intentionally misusing

19  the ABAS-II in forensic assessments of three death row inmates, and

20  I would proffer that to the court at this time.

21    MR. MILLER:  Made by three death row inmates, I mean, who

22  was it made by?

23    THE COURT:  It was just a proffer.  I'm not putting it in

24  the record, it's a proffer, it --

25    MS. FOURNET:  I have the documents to support it, so I

1    will proffer the documents.

2           THE COURT:  -- can go into the record as a proffer.

3           MR. MILLER:  We would ask that, Judge, it not be

4    considered in your reaching a decision.  I mean, if it's a proffer,

5    it's a proffer, but we need a ruling as to whether or not it's in

6    the evidence.

7           THE COURT:  Let me tell you, I have been inundated with

8    so much stuff I don't have a clue at this point --

9           MR. MILLER:  I understand, Judge.

10          THE COURT:  -- what's going to be admissible or not, but

11   that's why I wanted to have it in as a proffer.

12          THE DEPUTY CLERK:  Proffer No. 1.

13   BY MS. FOURNET:

14   Q.  Do you want to retract your citation of Dr. Denkowski now --

15   A.  No.

16   Q.  -- in your report and in your exhibits?

17   A.  No.  People get complaints of malpractice all the time.  It

18   doesn't mean that the complaints of malpractice have grounds.

19   Q.  Now, you mentioned the Kanaya study, and Dr. Cunningham

20   discussed that in his testimony as well.  And as I understand it,

21   you part ways with the Kanaya study because it involved the WISC,

22   and by definition, therefore, involved children.  Is that correct?

23   A.  I think the Kanaya study is a good one.  He used a large sample

24   of kids and he did use the WISC.  What I have problems with is when

25   he generalized from the WISC to adult populations.  That's my

1    problem with it.

2    Q.  So what do you think it is that happens -- the WISC is for up

3    to 17; is that correct?

4    A.  I believe so.

5    Q.  What happens when somebody turns 17 years and one day?  The

6    Flynn Effect disappears, is that your position?

7    A.  That's not what I am trying to say at all.  What I've been

8    trying to say is, I still think there's more research that's needed

9    in that area.  It's been proven with children, but in my opinion it

10   hasn't been proven in adults.  The sample sizes are too low, and I

11   think more data is going to be needed.  And I'm sure that data is

12   going to come out, so hopefully the next time I testify I'm not

13   going to have to be saying this, it will be decided one way or the

14   other.

15   Q.  But the Kanaya study demonstrates, does it not, that the Flynn

16   Effect applies in the lower range of IQ scores, the range Paul

17   Hardy is in or in that range of capability for children, up to 17,

18   correct ?

19   A.  As best as I recall without rereading the Kanaya study.

20   Q.  And your opinion is that that's not sufficient evidence that

21   when you turn 17 years of age that Flynn Effect still applies?

22   A.  No, I mean, that's why you have the norms and everything change

23   so quickly in children is because they change developmentally.  So

24   what I'm saying, again, is, I think that in adults that we need

25   more information.

1  Q.  Do you agree with Kanaya and Chichi, and I am going to read

2  you, I guess that's how you say that name, a quote from them in the

3  *American Psychologist*, and I believe Dr. Cunningham used this as a

4  slide:  "Nowhere are the consequences of IQ score fluctuations due

5  to the Flynn Effect more critical than in the determination of

6  whether a capital murder defendant can be considered mentally

7  retarded."  Do you disagree with that?

8  A.  No, I don't disagree with that.

9  Q.  I mean, you will agree that in the context of an Atkins

10  hearing, which is a little different from most clinical contexts,

11  the difference of a point one way or the other can make a

12  difference as to whether a person is eligible to be executed or

13  not, correct?

14  A.  Yes.

15  Q.  And this is not a concern that somebody in an ordinary clinical

16  process would have or a concern Dr. Swanson would have when she

17  does assessments for these facilities, is it?

18  A.  I can't say what an ordinary person or Dr. Swanson would think.

19  Q.  Well, in most contexts, a point or two doesn't make any

20  difference to a clinician --

21          MR. McMAHON:  Your Honor, it's repetitive.

22          MS. FOURNET:  I'll move on.

23          MR. McMAHON:  Asked and answered.

24          THE COURT:  All right.

25  BY MS. FOURNET:

1    Q.  Certainly for this proceeding we want to get it right, we want

2    to get the best and most accurate scores we can; would you agree

3    with that?

4    A.  Absolutely.

5    Q.  Now, with respect to malingering, Dr. Hayes, you have avoided,

6    have you not, any opinion that Mr. Hardy is malingering; is that

7    correct?

8    A.  I do not believe that Mr. Hardy was intentionally producing

9    false or grossly exaggerated symptoms for secondary gain based upon

10   the information that I have.

11   Q.  So you have an opinion that he was not malingering?

12   A.  Yes.  I thought I had indicated that previously.

13   Q.  But yet you devoted pages and pages in a substantial portion of

14   your testimony to what you call indicators of malingering, correct?

15   A.  Absolutely.

16   Q.  But you still have an opinion that he is not doing that?

17   A.  No, you have to look at the issue of malingering in these types

18   of cases, it must be addressed, you have to put the time in with

19   that.  Obviously, this is the biggest incentive that a person would

20   have to malinger, you must do that.

21   Q.  So you looked at all of that and you formed an opinion that he

22   is not malingering?

23   A.  Not malingering, but the data are certainly inconsistent.  We

24   don't know why the data are inconsistent, but the data is certainly

25   inconsistent.  But I don't -- I did not indicate that he was

1    malingering.

2    Q.  So the data may be inconsistent, but in your opinion the data

3    is not inconsistent because he is malingering, it's inconsistent

4    for some other reason; is that correct?

5    A.  There is the possibility of malingering, but I didn't diagnose

6    it, it's a possibility among others.

7    Q.  Okay.  Well, I thought I heard you say just two or three

8    questions ago that you had formed an opinion that he was not

9    malingering; did I misunderstand that?

10   A.  I said based upon the information that I had available to me.

11   Q.  You have formed an opinion that he is not malingering?

12   A.  Correct.  But should other information become available that it

13   would indicate otherwise, then malingering would need to be

14   considered again.

15   Q.  Well, isn't that always the case with any scientific opinion,

16   Dr. Hayes?

17   A.  I agree.

18   Q.  And your opinion as of today is that this man was not

19   malingering?

20           MR. McMAHON:  Objection, that's for about the fifth time.

21           MS. FOURNET:  Well, Judge.

22           MR. McMAHON:  I mean, how many times do you have to ask

23   the question?

24           THE COURT:  I think what she said is she didn't find in

25   her opinion that he was malingering and that she presented all of

1    that evidence in order for me to make my own independent

2    assessment, is what I'm hearing, but that in her professional

3    opinion she did not find him to be malingering.

4            MS. FOURNET:  May I have a moment, your Honor?

5            THE WITNESS:  Your Honor, may I get some medication in my

6    purse that I need to take?

7            THE COURT:  Sure.

8    BY MS. FOURNET:

9    Q.  What are the other possibilities based on your review or what

10   you call these inconsistencies?

11   A.  It could be due to attentional difficulties, it could be due to

12   upset stomach, it could be due to Mr. Hardy not trying his best

13   that day, Mr. Hardy not feeling well that day, it could be any

14   number of things.  All we know is that they're inconsistent, that

15   they were not his best effort.

16   Q.  So you think they're not his best effort but you have an

17   opinion that he was not malingering?

18   A.  They are not his best effort but I don't know why.

19   Q.  You indicated in your testimony earlier that you believe that

20   Dr. Swanson or Dr. Cunningham should have given Mr. Hardy -- excuse

21   me just one minute -- Mr. Hardy a malingering test, correct?

22   A.  I think it would have been helpful, yes.

23   Q.  And you specifically mention a test called the TOMMS, the

24   T-O-M-M-S, correct?

25   A.  It's just T-O-M-M.

1    Q.  One M, okay.

2    A.  No, no, I thought you said TOMMS, it's just TOMM.

3    Q.  TOMM, okay.  The TOMM, which stands for what?

4    A.  Test of Memory Malingering.

5    Q.  And this is the instrument you thought they should have given

6    him?

7    A.  Actually, I would have done another one, but that is one that

8    is a possibility.  I would have done the Word Memory Test if it

9    were me.

10   Q.  But you suggested that the TOMM would have been appropriate in

11   your testimony, did you not, at page 13 in the second transcript?

12   A.  I believe that the TOMM would be appropriate because there's

13   data to indicate that it is helpful in determining malingering in

14   mildly mentally retarded populations, as well as in individuals

15   with dementia and other sorts of injuries.

16   Q.  Do you recall, Dr. Hayes, testifying in the case of United

17   States of America v. Glenn Cole?

18   A.  Yes.

19   Q.  But that would have been before Judge Feldman here in this

20   courthouse?

21   A.  Correct.

22   Q.  And do you --

23   A.  When was that?

24   Q.  I'm sorry?

25   A.  When was that?

```
 1   Q.  August 25th, 2004.

 2        Do you recall testifying in that case that the TOMM, Test of

 3   Memory Malingering, would not stand up to a Daubert challenge and

 4   that there's a paucity of data that the TOMM is reliable with the

 5   mentally retarded population; do you recall telling Judge Feldman

 6   that?

 7   A.  No.  It's been five years, but I don't disagree with that based

 8   upon the 2004 data.

 9   Q.  In fact, and I'll let you take a look at this.  You thought in

10   that case that it would be unethical to give the TOMM as a

11   malingering test, did you not?

12             MS. FOURNET:  Your Honor, may I approach?

13             THE COURT:  Sure.

14             MR. McMAHON:  Let me see that.

15   BY MS. FOURNET:

16   Q.  I would call your attention --

17             MS. FOURNET:  May I approach, your Honor?

18             THE COURT:  Yes.

19   BY MS. FOURNET:

20   Q.  I would call your attention to page 21, Dr. Hayes.

21   A.  (WITNESS READS DOCUMENT.)

22   Q.  And you might want to keep it because I might refer to some

23   other pages.  Do you recall that testimony now that you looked at

24   it?

25   A.  No, I don't recall, but you showed me the transcript so I
```

1    believe you.

2    Q.  Well, you thought it was unethical in that case, where you

3    testified in favor -- you testified in favor of Mr. Cole having

4    mental retardation, did you not?

5    A.  I testified that Mr. Cole was mentally retarded.

6    Q.  Yes.  And at that time, it was your opinion that the TOMM was

7    not appropriate because there was not enough date; is that correct?

8    A.  Correct.

9    Q.  And you no longer feel that way?

10   A.  No.

11   Q.  Tell me the data.

12   A.  The data that's come out since then has indicated that the TOMM

13   is useful in persons with mental retardation, especially when

14   combined with other measures of effort and with scrutinizing the

15   records as well.

16   Q.  What data?

17   A.  There is the 2007 Simon article, where performance in mentally

18   retarded forensic patients on Test of Memory Malingering was

19   included.  Even the Salekin study that you said earlier, I believe

20   that she said in her article that the inclusion of multiple

21   measures of malingering and the interpretation of all data together

22   rather than isolation provide diagnostic accuracy.

23   Q.  Let me stop you right there, though, because we are not talking

24   generically about measures of malingering.  We are talking about

25   the TOMM, we are talking about a specific instrument.  So when I

1  ask you for data, I want to make sure we're speaking the same

2  language here, I am talking about data and research on this

3  specific instrument since you testified in this case that has

4  changed your opinion.

5  A.  The one that comes to mind is the Simon 2007 article.

6  Q.  Not the Salekin article?

7  A.  The Salekin article addresses the TOMM, but it also states and

8  that's why I indicated that she suggests using multiple measures to

9  enhance diagnostic accuracy.

10  Q.  Now, you also testified, do you recall, and this would be on

11  page 41 of that transcript that you have in front of you, that

12  there are absolutely no tests that measure malingering in mental

13  retardation; do you recall that?  And take your time looking at the

14  transcript.

15  A.  I would agree with that.  I wonder if -- when we were talking

16  earlier, you mentioned the SIRS.  What I am referring to in that

17  passage is the malingering of cognitive deficit secondary to mental

18  retardation, not psychiatric deficits.

19  Q.  So you're talking about -- I'm sorry, you're going to have

20  to -- I'm getting tired.  Would you repeat what you just said?

21  A.  What I was referring to in the passage that you indicated on

22  page 41 of the transcript from the Glenn Cole case is that what I

23  am referring to is malingered cognitive deficits or malingered

24  mental retardation as opposed to malingered psychiatric deficits

25  that we had discussed earlier when you mentioned the SIRS.

1    Q.  Okay.  Well, we're not talking about psychiatric deficits here,

2    are we, we're talking about mental retardation, aren't we?

3    A.  I was trying to be clear because you had asked about that

4    earlier, and so I was trying to be clear that when I was talking

5    about this, I was talking about malingered cognitive deficits as

6    opposed to malingered psychiatric issues.

7    Q.  When you referred to the research on the TOMM, the TOMM, was

8    that research, and I'm sorry if I forgot the name, were you

9    referring to the Simon research at Arkansas State Hospital?

10    A.  I don't recall where it was.

11    Q.  But it was Mr. Simon or Dr. Simon?

12    A.  I believe so, yes.

13    Q.  And is it your recollection that there was only 21 patients in

14    that sample?

15    A.  I don't recall how many patients were in the sample.

16    Q.  Well, you will agree that 21 patients is a small number, or I

17    shouldn't say patients, subjects, 21 subjects is a very small

18    sample.

19         MR. McMAHON:  Your Honor, I am going to object.  She

20    didn't know how many patients were in the sample, so really, the

21    question --

22         THE COURT:  Well, she said she didn't recall.  She said

23    she relied on the data from that study to change her opinion, so I

24    think it's legitimate to ask questions about the study.  Go ahead.

25    BY MS. FOURNET:

1    Q.  Would you agree that 21 subjects is a very small sample?

2    A.  It is, but you also have to compare that with effect size.

3    Q.  With what?

4            THE COURT:  With what?

5            THE WITNESS:  Effect size, how big is the effect, meaning

6    how striking of a difference is there.

7            I know that some people, and I can't recall who, have

8    indicated possibly lowering the threshold of the TOMM from like a

9    45 down a little bit, but I can't recall the exact numbers that

10   they recommended or those authors.

11           Simon was just one that came to mind.

12   BY MS. FOURNET:

13   Q.  And in that same testimony in which you testified in favor of a

14   finding of mental retardation, do you recall also testifying at

15   page 19 that mildly retarded individuals can function well in

16   society and in the community with some assistance?

17   A.  Let me see if I can find that page.

18   Q.  Well, let me just ask you if you agree with that, do you agree

19   with that, if you said it?

20   A.  I believe that mildly retarded people can function in society

21   with assistance.

22   Q.  And on page 40, do you recall or do you agree with this

23   statement that you made:  "A lot of mentally retarded people, they

24   don't want people to know they're mentally retarded."

25   A.  Oh, I agree with that, absolutely.

1  Q.  And do you recall testifying or do you agree with your

2  statement in the Cole case that the way evaluators ask the

3  questions makes a difference, that is, leading questions, questions

4  that are designed to invoke social approval can affect the validity

5  of tests?

6  A.  Certainly.

7         MS. FOURNET:  May I approach, your Honor, I would like to

8  get my transcript back.

9         THE COURT:  Uh-huh.  And like everything else, anything

10  that you have referred to I would like to have a copy of.

11         MS. FOURNET:  Yes, ma'am, we will get you a copy and the

12  government.

13         THE COURT:  I mean, I have no concept of what we have and

14  what we don't have, so I really have to rely on you all.

15         MS. FOURNET:  I'm not sure I do, either, Judge, but I'm

16  trying.

17         THE COURT:  But as I mentioned, I say both sides, I'm

18  happy to have duplicates rather than nothing.

19         MR. MILLER:  Point of clarification, your Honor.  Are

20  these articles coming in as substantive evidence?  Because the

21  rules of evidence don't allow it, I thought these were all being

22  used to impeach or just to have them recognize it and say this is

23  maybe what they depended upon.  But Rule 803 doesn't allow them to

24  come in, it just allows them to be cited and read into the record,

25  but the actual articles themselves unless they're learned and

1    recognized as such don't come in.

2            THE COURT:  Well, didn't you all give us some as well,

3    Mr. Miller?

4            MR. MILLER:  Well, the ones --

5            THE COURT:  Are yours learned and theirs not?

6            MR. MILLER:  No, no, I'm not saying -- what I'm saying is

7    that now they are just sort of coming in, if somebody is saying I

8    read it, it seems to be coming into evidence.  I understand the

9    court wanting to say if Dr. Cunningham relied on these three or

10   four things it's, you know, a pretty big deal, or Dr. Swanson

11   that's a pretty big deal, or three or four, but now they're just

12   coming in by the dozens, and it seems to me at some point we're

13   going to just start getting lost; and we don't know who is writing

14   them, whether or not they are in fact learned, whether in fact they

15   are something that people rely upon.  That's what I'm saying.

16           THE COURT:  Well, I am going to be working, I hope, from

17   a rough transcript of some kind, and so my hope is that any time

18   something is referenced I can go look and see what it was that was

19   referenced.

20           And to be honest with you, at this point I can't tell you

21   how I'll evaluate it, I just want to make sure I have it.  So if

22   someone is talking about something, I know that they're not being

23   misrepresented by the lawyers, not being misrepresented by the

24   witness.  I just feel like I need to have everything I can possibly

25   get my hands on.  I need all of the help I can get, Mr. Miller.

1           MR. MILLER:  As do I, your Honor.  But there comes a

2    point where it kind of goes into overload.  Just a point of

3    clarity, thank you.

4           MS. FOURNET:  Judge, I hope you'll tell us if we referred

5    to anything you don't have, we tried to give you everything.

6           THE COURT:  I have no idea what I have.

7           MS. FOURNET:  We're overwhelmed, too.  I think both sides

8    are overwhelmed.

9           THE COURT:  I mean, I assumed that we were kind of going

10   with what had been presented in the binders and that quickly went

11   awry when we started having PowerPoints, which is fine, I mean, I

12   am happy to have -- I consider all of these PowerPoints to be very,

13   very helpful.  I just want to make sure that I have everything that

14   anybody thinks is significant enough to make mention of in this

15   court.

16          And I think all of these journals have been cited by -- I

17   don't think there is any journal that's been presented that wasn't

18   considered a reputable peer whatever.

19          I understand that, for the sake of Mr. Miller's benefit,

20   I understand just because something is published in one of these

21   peer-reviewed journals doesn't mean it's "right," or accurate, but

22   I do think you can have trends in journals that indicate a greater

23   number of people believing them, people in the field believing that

24   something is true than not true.

25          Did I give you a break, Ms. Fournet?

1        MS. FOURNET:  A better break would be sitting down.

2        THE COURT:  We've actually been at it for about another

3  hour and a half, so let's take a break.

4        THE DEPUTY CLERK:  All rise.

5      (WHEREUPON, A RECESS WAS TAKEN.)

6      (OPEN COURT.)

7        THE DEPUTY CLERK:  All rise.

8        THE COURT:  Have a seat, please.  Yes.

9        MS. FOURNET:  May I proceed, your Honor?

10        THE COURT:  Yes.

11  BY MS. FOURNET:

12  Q.  Dr. Hayes, have you had cases in the past where you have formed

13  an opinion that a person is malingering?

14  A.  Yes.

15  Q.  But not in this case, I gather?

16  A.  Correct.

17  Q.  Now, you had -- in fact, the opinion that you have in this case

18  is that he was not malingering, correct?

19  A.  Correct.

20  Q.  You had indicated a number of factors that, other than

21  malingering, which we pretty much excluded, that could account for

22  the inconsistencies in some of these scores; is that correct?

23  A.  Among others.

24  Q.  Such as fatigue, distraction, depression, hungry, that sort of

25  thing, correct?

1    A.  I didn't say depression, but that would be one thing that could

2    if a person was depressed at one time versus another time.

3    Q.  Now, first of all, before I get to those factors, if you could

4    identify for me, excluding the MMPI, which is a psychiatric

5    measure, is it not?

6    A.  Yes, psychiatric, psychological.

7    Q.  Identify an inconsistency in the scores that is statistically

8    significant, in all of these inconsistent scores you talked about

9    on the IQ test and some of these other tests, and explain to me how

10   you determine that they were not just differences but they were

11   statistically significant differences.

12   A.  I believe that I said earlier that it's not just whether a

13   score is statistically significant, and I would need for you to

14   define for me what you want me to use in terms of statistically

15   significant.

16          For example, on like on Trial 1, if you compared Trial 1

17   of the CVLT to Trial 1 of the Rey Auditory Verbal Learning test,

18   you're looking at a difference, depending on what IQ range we're

19   looking at, somewhere in the 90th percentile-ish down to the first

20   percentile on the Rey Auditory Verbal Learning test.  Do you

21   consider that significant?

22   Q.  Well, I am asking the questions here, Doctor.  I mean, my

23   understanding was that in your profession, statistically

24   significant or statistically meaningful are terms of art, are they

25   not?

1    A.  No, they're not.

2    Q.  They are not.  So there's no such thing as a statistically

3    significant difference in scores according to your view; is that

4    correct?

5    A.  Statistics refers to math, and I would consider that more

6    science than art.

7    Q.  Well, let's talk about, and I can't get too technical with this

8    because I don't have the background, but let's talk about standard

9    error of measurement.  The standard error of measurement in an IQ

10   test is plus or minus five, correct?

11   A.  Somewhere around there, some would say four or five.

12   Q.  So if someone -- and we'll forget about the practice effect for

13   a moment.  But if someone scores a score of 80 on an IQ test one

14   time, and let's, again, forget about the practice effect, let's not

15   consider that, scores, you know, a year later, six months later,

16   scores a 79.  That one point of difference is not statistically

17   significant, is it, because it's within the standard error of

18   measurement?

19   A.  You're saying if a person goes from an 80 to a 79 after one

20   year?

21   Q.  Yes.

22   A.  No, that's not statistically significantly different.

23   Q.  So there is such a concept as statistical significance?

24   A.  Of course.  And there's also the concept of effect size and

25   clinical significance as well.

1    Q.  Well, but in your profession, a point or two difference between

2    tests may or may not be statistically significant, depending on the

3    standard error of measurement and some other factors that would

4    make or not make that difference significant, correct?  I mean, you

5    don't expect somebody to score exactly the same on the same test

6    every time, do you?  We're not in a perfect world, are we?

7    A.  Okay.  That was three questions.

8    Q.  Okay.  Are we in a perfect world?

9         THE COURT:  I think they were related enough that you

10   could probably respond globally to it.

11        THE WITNESS:  We're not in a perfect world, and you do

12   not -- obviously, what score a person has is the score that's

13   expected that they would get the next time because that's the most

14   likely score.  But it's often the case that you do not get exactly

15   the same score.

16   BY MS. FOURNET:

17   Q.  And certainly if you score on a full scale IQ test, if you

18   score a 70 one time and six months later you score 100, or let's

19   say 125, you score 70, then you score 125, that's a real red flag,

20   isn't it?

21   A.  Yes.

22   Q.  And one of the reasons that's a red flag is that that

23   difference is so great it's not within the standard error of

24   measurement, it's outside the realm of -- it is a statistically

25   significant difference, correct?

1    A.  It's almost five standard deviations difference.

2    Q.  And that's statistically significant under any measure, isn't

3    it?

4    A.  I would think so.

5    Q.  When we're talking about a few points one way or the other in

6    terms of the full scale IQ, we're talking about a difference that

7    is not statistically significant?

8              THE COURT:  Okay, asked and answered, asked and answered.

9    BY MS. FOURNET:

10   Q.  I would like for you to point, because you've relied heavily on

11   all of these subtests, the subtest to the IQ tests, for instance,

12   where there is a point or two difference one way or the other, I

13   would like you to point to a difference or an inconsistency in

14   scores that would qualify as a statistically significant

15   difference.  Not just an inconsistency, but a statistically

16   significant difference.

17   A.  Okay.  I don't have all of the scores with me, but I'll try to

18   do the best that I can.

19   Q.  Okay.

20   A.  The CVLT and the Rey Auditory Verbal Learning tests are very

21   similar, but they do have different words.  That would be one that

22   because of the similarities I would say is a statistically

23   significant difference.  The standard deviation on the CVLT is

24   around 1.8 say for Trial 1 and probably it's around the same thing

25   for the Rey Auditory Verbal Learning test, and Mr. Hardy went from

1  a ten, I think, to a four, and so that's greater than two standard

2  deviations of difference, and so I would think that that would be

3  under anybody's definition statistically significant as well.

4         THE COURT:  Excuse me, Dr. Hayes, but would this chart be

5  helpful as well?

6         THE WITNESS:  Yes, yes, thank you.

7         THE COURT:  Arthur, can you put up No. 21.

8         THE WITNESS:  And you also have to understand that I

9  don't have all of the norm tables with me, which would indicate

10  what the means and the standard deviations are.

11        Trails B, that would likely be greater than one standard

12  deviation.  I think that we're looking at about, probably about a

13  difference between, just based on what I recall, probably the 5th

14  and the 15th percentile ranks on that.  Probably T scores around 42

15  to 34, I would think that, also I guess the CVLT, the Rey Auditory

16  Verbal Learning test, but on the long delay free recall, the CVLT

17  and the Rey Auditory Verbal Learning test, the 15 and the 8 are

18  different.

19        What you're probably looking at there is, Mr. Hardy was

20  probably somewhere in the 90th percentile rank there on the CVLT,

21  and with regard to the Rey Auditory Verbal Learning test he was

22  probably around the 10th percentile rank, and so I don't have the

23  norms with me.  But I would consider if you're equal to or better

24  than 90 percent of the population at one point and then you're

25  equal to or better than 10 percent of the population at another

1    point that that would be statistically significantly different.

2              So those are the biggest ones that jump out.  But again,

3    I don't have any of the norming tables with me or the standard

4    deviations or the means to be able to calculate that.

5    BY MR. FOURNET:

6    Q.  You're not suggesting that all of the differences you have on

7    this chart are necessarily statistically significant, though, are

8    you?

9    A.  No.  But the one thing you're forgetting is that there should

10   have been a practice effect.  So, in essence, to the scores that we

11   have discussed, they actually should have gotten better.  And so

12   when you're just looking at time one and time two, you're negating

13   the possibility of a practice effect.

14   Q.  Well, but, Dr. Hayes, the practice effect is also subject to

15   statistical significance, are they not -- is it not?

16   A.  In what way?

17   Q.  Well, a difference up or down that is attributable to the

18   practice effect is also subject to the issue of statistical

19   significance, is it not?

20   A.  In what way do you mean?

21   Q.  Well, you heard Dr. Cunningham testify that the subtest on the

22   IQ test that the differences where Mr. Hardy may have gone down a

23   point instead of up a point were not statistically significant; did

24   you hear that?

25   A.  Yes, but that's where I was talking about the kind of effect

1  size coming in.  When you flashed up the chart that just because

2  someone went down two, it meant that even though the standard

3  deviation for the subtest on the WAIS-R were a three, or was a

4  three, excuse me, that you're looking at him performing poorer in

5  terms of the practice effect than 80-something percent of the

6  population on one of those.  While that may not be statistically

7  significantly different, the problem is you've just got so many.

8  Q.  So if you pile up enough statistically insignificant

9  differences, then whether it's statistically significant doesn't

10  matter anymore; is that what you're saying?

11  A.  What I'm saying is, there are enough scores to where, when you

12  look at this, his data does not make sense.  There are way too

13  many, way too many.  And in this situation, not only are, on some

14  of the indicators are there likely statistically significant

15  differences, but even on the other ones, there may not be

16  statistically significant differences, but they're outside of the

17  direction that one would expect just from chance alone this many.

18  Q.  So the fact that there are a number of statistics -- the fact

19  that a number of these score differences are statistically

20  insignificant to you is not relevant to the analysis because there

21  are just too many of them.  Is that what you're saying?

22  A.  There are many of them, but then what Dr. Martell failed to do

23  was to count in the practice effect with this as well and to figure

24  out how much greater their scores should have been due to the

25  practice effect.  And so when you look at these scores, it may be

1    one point difference, but you're also looking at what should it

2    have been given the practice effect.

3            And so again, some of these scores are statistically

4    significantly different.  Like, for example, if you flip a coin,

5    you have a 50 percent chance; if you flip it twice, you have a 25

6    percent chance at two heads.  If you keep flipping it enough times,

7    it's statistically improbable that you're going to get this many

8    worse scores on time two, especially given the practice effect.

9    Q.  By the way, these scores on this chart are not standardized

10   scores, they're raw scores, are they not?

11   A.  Yes.

12   Q.  So when you're giving us these standard deviations and so on,

13   that's just your best estimate.

14   A.  Yes, I don't have the norms up here with me, and it would

15   depend on which norms you're looking at.  And so I don't have those

16   with me.

17   Q.  And did you -- when you did this chart, did you identify for

18   Judge Berrigan which differences were statistically significant and

19   which were not statistically significant?

20   A.  I didn't do the chart.

21   Q.  Well, somebody did the chart for you, correct?

22   A.  Not for me.

23   Q.  Okay.  This is Dr. Martell's chart?

24   A.  Correct.

25   Q.  When this chart was prepared for presentation in court, did you

1  identify for the government and for the judge which differences on

2  this long chart of tests were statistically significant and which

3  were not?

4  A.  No, I did not.

5  Q.  I am going to ask you this question again because I am not

6  clear on your answer.

7      Is it your position that if you have enough inconsistencies,

8  it doesn't matter whether those inconsistencies are statistically

9  significant?

10  A.  If you have enough inconsistencies, even if they're not

11  statistically significant, they may be clinically significant and

12  relevant even given the practice effect, or given the practice

13  effect, I didn't mean to say even.  And so it is significant that

14  so many go down.

15  Q.  So the answer is, yes, you do not consider it relevant as long

16  as there are enough inconsistencies whether those inconsistencies

17  are statistically significant?

18  A.  No.  I mean, look at -- there are researchers who have taken up

19  this very fact of the number of inconsistencies and things.  In

20  this situation, some of these are statistically significant and

21  some aren't.

22  Q.  And so tell me the name of a researcher who says that it does

23  not matter whether inconsistencies are statistically significant

24  enough, are statistically significant as long as there are enough

25  of them.

1    A.  I remember that Reitan -- that's R-E-I-T-A-N -- did some

2    research in this in the '90s about number of differences.  He did

3    not give the same tests that the initial four psychologists had

4    given, and so -- but he did it about the additive effects of the

5    number of different tests that change.

6    Q.  Let's talk about the subtest on the IQ test that --

7              THE COURT:  Hold on one second.

8              MS. FOURNET:  Yea, ma'am.

9              THE COURT:  Okay.  Go ahead.

10   BY MS. FOURNET:

11   Q.  Let's talk about the subtests on the IQ test that you addressed

12   in your report.  Are there any, and if so, please identify them,

13   differences as between subtests that in your view are statistically

14   significant?

15   A.  If you gave this test and -- when you're looking at statistical

16   significance on these IQ tests, what you're looking at in terms of

17   statistical significance on the subtests themselves is how much

18   does the subtest vary from one subtest to another.  And the

19   statistical significance range on that for one standard deviation

20   is three points.

21             This isn't a situation like that, you're measuring

22   Mr. Hardy at one time and then at another time.  So at that point

23   you would then have to factor in the practice effects to then

24   determine if you've got statistically significant different scores.

25   And on that I believe that he would end up, if you factored in the

1    practice effect, having a statistical difference, I believe it was

2    on either object assembly or picture completion that, if I recall

3    correctly, he was one point different on one and then two points

4    different on the other because those two are the most susceptible

5    to practice.

6    Q.  But were those differences statistically significant taking

7    into account the practice effect because that's subject to

8    statistical significance as well, isn't it?

9    A.  So you're adding on the practice effect --

10   Q.  Right.

11   A.  -- and then determining if there's a significant difference?

12   Q.  Right.  Was there a statistically significant difference taking

13   into account the practice effect on any of the subtests as between

14   the Tetlow IQ and the other IQ test; and if so, tell me what

15   subtest and why it was statistically significant?

16   A.  Okay.  As I recall, there were two, there was the picture

17   completion subtest and the object assembly subtest.  If you want me

18   to add the practice effect in, and Mr. Hardy had had, say, a seven

19   on one and then a five on another.  If you added in the practice

20   effect, which was a bit over one that would be expected to change,

21   then that would be a statistically significant difference.  But

22   again, it's not as cut and dry as you want to make it seem.  I'm

23   doing the best that I can to make it understandable.

24          But what you're looking at are two different points in

25   time, you're not comparing within a test, so you're doing like an

1    analysis of one point in time and another point in time, when what

2    is being looked at in terms of statistical significance is the

3    within-subtest design.

4           So I am trying to answer you.

5    Q.  So you believe that there are statistically significant

6    differences between the two subtests that you just mentioned, as

7    between the Tetlow test and the other IQ test, is what you're

8    saying?

9    A.  I don't have the stats in front of me, but I believe that if

10   you looked at the standard deviation of the population that did the

11   test/retest, that Mr. Hardy would fall outside of one standard

12   deviation on at least one of the subtests.

13   Q.  And according to you, if he is outside one standard deviation,

14   then it is statistically significant difference?

15   A.  What I'm telling you is that it's, again, one of those

16   situations to where if you -- you're trying to parcel out each and

17   every different thing.  You can't -- in this type of situation,

18   say, this one is not so let's throw it out.  This one is not so

19   let's throw it out.  This data indicates a trend that he is doing

20   worse.

21          The statistical significance, obviously, to some data is

22   going to be important, but the fact that he is doing worse when he

23   should be doing better is what you should be focussing on.  You're

24   losing a bit of the forest for the trees.

25          THE COURT:  I think we need to move on.

1   BY MS. FOURNET:

2   Q.  Dr. Hayes, you indicated in your report and here in court that

3   these inconsistencies across testing were not due to malingering,

4   but you listed a number of other possible factors such as fatigue

5   and so on, correct?

6   A.  It could be.

7   Q.  Now, what -- I'm sure that you have examined the test data on

8   both of those IQ tests to the extent that you have them?

9   A.  I don't have Dr. Martell's.

10  Q.  I understand that.  But you have Dr. Tetlow's, correct?

11  A.  Yes.

12  Q.  And did you see --

13           MS. FOURNET:  I wonder if we could get that off the

14  screen, your Honor.

15           THE COURT:  Okay.  Arthur, take it down.

16  BY MS. FOURNET:

17  Q.  Did you see any notations of any behavioral observations by

18  Dr. Tetlow that would suggest any of the factors you have given

19  that might furnish explanations or evidence of decreased effort,

20  and I don't mean inconsistencies in scores, if that's what you're

21  looking for?

22  A.  Do you mean that Dr. Tetlow would -- explain what you mean.

23  Q.  Well, if you're administering any instrument such as an IQ

24  test, is it true that the testers, one of the tester's

25  responsibilities is to note whether there are any extraneous

1    factors that may affect the validity of the test, such as, for

2    instance, if the person is crying or if the person appears very

3    tired, would it not be the obligation of the tester to make a note

4    so that whoever looked at the test would know that those factors

5    might be influencing the test?

6    A.  One would hope, but I can tell you that doesn't occur the

7    majority of the time.

8    Q.  And certainly it didn't occur with Dr. Tetlow, did it?

9    A.  Not that I can recall.  What I do recall is Dr. Tetlow didn't

10   follow-up on a number of times Mr. Hardy said he didn't know.

11   Q.  But there are no notations in the Tetlow material to indicate

12   that Dr. Tetlow perceived that Mr. Hardy was suffering from any of

13   the distractions or other problems that might have affected his

14   effort on the test; is that correct?

15   A.  To the best of my recall, or to the best of my recollection,

16   excuse me, it's been a long day, I don't remember that.  But I

17   don't have the test data here to be able to review it to give you a

18   definite opinion on that.

19   Q.  Would you like to look at it?

20   A.  If you would like me to see it.

21        MS. FOURNET:  If I could look at these three volumes,

22   your Honor, that we have submitted, I think I can probably find the

23   material.

24        Your Honor, for the record, this would be section EE in

25   our copies of the government discovery beginning at page JH000353.

1    May I approach the witness, your Honor?

2                THE COURT:  Yes.

3                THE WITNESS:  This is only the first page.

4                MS. FOURNET:  I'm sorry, there are no pages after that?

5                THE WITNESS:  No.  And it indicates that it's not done on

6    a standard form.

7                MS. FOURNET:  Could I look, Dr. Hayes?  I'm sorry.

8                THE WITNESS:  Sure.

9                MS. FOURNET:  There should be more there than one page.

10   And I apologize, Dr. Hayes, because there's a lot of material mixed

11   in with Dr. Tetlow's work that is not the WAIS-R.  Again, I am

12   going to cite the court to pages JH000364, 365, 366, and 367.  And

13   if I could approach.

14               THE COURT:  Could you say those numbers again.

15               MS. FOURNET:  000364, 000365, 000366, 000367.

16               THE COURT:  All right.  Go ahead.

17   BY MS. FOURNET:

18   Q.  And, Dr. Hayes, I've isolated, I think, Dr. Tetlow's WAIS-R

19   material as opposed to some other material.

20   A.  I think you gave the judge the wrong numbers.  This has

21   JH000360, I think it goes on to JH000367.

22   Q.  So you're including more pages.

23   A.  Well, I'm including --

24               MS. FOURNET:  I'm sorry, Judge, I look at all of this

25   paperwork and I don't know what goes with what, but obviously

1    Dr. Hayes does.

2            THE COURT:  As long as it's all Dr. Tetlow's, that's

3    fine.

4    BY MS. FOURNET:

5    Q.  If you would go through pages 360 to 367 and tell me where

6    Dr. Tetlow made any note that would suggest that Mr. Hardy was

7    suffering from any of the environmental or other emotional or other

8    problems that would affect his effort on the test.

9    A.  (WITNESS REVIEWS DOCUMENTS.)  Well, you've got a few problems

10   with that.  Number one, Dr. Tetlow didn't give the WAIS-R according

11   to standard instructions, in fact, he wrote in very few of his

12   responses.  As you can see per example --

13   Q.  Dr. Hayes, I don't mean to interrupt you, but I am not asking

14   for a critique of Dr. Tetlow's work.  I am asking for a very

15   specific and focused piece of information, and that is, where in

16   those documents, if anywhere, does Dr. Tetlow make any notes that

17   would suggest that Mr. Hardy was tired, that he was distracted or

18   that he had any other ongoing problem that would affect the level

19   of effort on that test?

20   A.  Not only did he not write that, but he also didn't write in

21   Mr. Hardy's responses.

22           MS. FOURNET:  Your Honor, I would ask that the witness be

23   directed to respond to the question.

24           THE COURT:  Things will move faster if -- well, two

25   things:  Things will move faster if we ask questions no more than

```
 1   two or three times the same question; and secondly, to please just
 2   answer the specific question --
 3                THE WITNESS:  Okay.
 4                THE COURT:  -- and don't elaborate on something that's
 5   not within the parameter of the question.
 6                THE WITNESS:  Okay.
 7                THE COURT:  But the answer was no?
 8                THE WITNESS:  That's right.
 9                THE COURT:  All right.  Go ahead.
10                MS. FOURNET:  May I approach, your Honor?  I'll just get
11   the notebook back.
12                THE COURT:  All right.  We are going to go till five
13   today just to let you know because I have to teach tonight.
14                MR. MILLER:  It's got to be five o'clock somewhere.
15                MS. FOURNET:  Cocktail time somewhere on the planet.
16                THE COURT:  It's five o'clock in New York almost.
17   BY MS. FOURNET:
18   Q.  Dr. Hayes, can you name one behavioral description by anyone in
19   all of the material you've reviewed that would suggest that
20   Mr. Hardy at the time of this IQ testing or any other testing had
21   any of the environmental or personal problems going on that would
22   have affected his level of effort on his testing?
23   A.  None that I can recall right now.
24   Q.  Now, we're going to move now into the area of adaptive
25   behavior, the second prong of the criteria.  Dr. Hayes, can you
```

1  give me your definition of adaptive behavior?

2  A.  Adaptive behaviors are behaviors that an individual needs to be

3  able to live independently, to communicate with others, to relate

4  to others, to live in the environment, to care for himself or

5  herself, to direct his or her own behavior.  It's basically one's

6  ability to get along in the world.

7  Q.  And when we talk about getting along in the world, we're

8  talking, are we not, about the larger world, we're not talking

9  about the ghetto?

10  A.  I would think it depends on your culture and your environment;

11  where you are able to get along depends on where you are.

12  Q.  So you have a different set of standards for adaptive behavior

13  in Calliope than you do in uptown New Orleans; is that what you're

14  saying?

15  A.  I am saying that your environment impacts who you are and

16  impacts your adaptive behaviors.  What may be adaptive in the

17  Calliope may not be adaptive in uptown.  I haven't done any studies

18  in the Calliope and compared it to uptown.

19  Q.  Well, under the definition in your profession of adaptive

20  behavior, is it appropriate to use a different standard for a

21  person who lives in the Calliope from a person who lives uptown New

22  Orleans or is adaptive behavior, in fact, something that is normed

23  on the entire population?

24  A.  That was kind of two questions.  Let me take the first one.

25  Q.  Okay.

A.  The first is that I believe that almost every book or whatever that you're looking at is saying that you have to be cognizant of culture.  The second thing is that when you look at standardized testing, that's normed on a group of individuals.  And so you have to base it on that normative group, but you're always going to have to consider culture.

Q.  Well, I'm not suggesting that you don't, but I am asking you, when you determine the level of a person's adaptive functioning, you consider his functioning, do you not, in the context of his ability to live in the world generally, not his ability to live in a discrete insular environment like a housing project; am I not correct in that?

A.  Maybe I am not understanding your question right.  You always have to consider culture.  If you're using just a standardized test, that standardized test is going to be normed on a group of people and not just individuals from the Calliope, but you always have -- you may give standardized tests, but you always have to be mindful of the person's culture.

Q.  But when it comes time to determine the person's adaptive functioning level, I understand you have to consider culture.  When it comes time to determine his level of functioning, you determine that in the context of the larger society, do you not?  Or is there a different standard for people who live in the inner city, that's what I'm trying to find out from you?

A.  If you're looking at standardized testing, then you would

1    compare that person to the larger society.

2    Q.  Well, let's put standardized testing aside for a minute.  When

3    you are considering adaptive functioning, in general, you determine

4    a person's adaptive functioning level in terms of the larger

5    society, not in terms of how he functions in the inner city; am I

6    not correct in that?

7    A.  I think it's like Dr. Swanson had said in her testimony, you

8    can't fault a person for not using a fork if he or she had always

9    been raised with chopsticks.  You have to look at the cultural

10   factors.

11   Q.  Well, are people in the Calliope raised with chopsticks as far

12   as you know?

13   A.  I have never been to the Calliope and to anyone's homes, so I

14   wouldn't know.

15           THE COURT:  Let me jump in here.  I mean, is what you're

16   saying is, as long as somebody who has lived with chopsticks knows

17   how to use chopsticks, that's what's relevant if that's what the

18   person's experience is?  If the person's experience is using a

19   knife and fork, what's relevant is how well he uses a knife and

20   fork?

21           THE WITNESS:  Right.

22           THE COURT:  So wouldn't the concept of what's adaptive

23   behavior, successful adaptive behavior essentially the same, I

24   mean, it's different utensils we're talking about, but the ultimate

25   result of can he or she function in that world or not?

```
 1            THE WITNESS:  I think that's exactly it.  You have to

 2   look and see, can that person function in his or her world.  He or

 3   she may not have been exposed to a number of different variables.

 4   And although the standardized testing says, well, even if they

 5   haven't been exposed you would give that person a zero.  I think

 6   that's the difference when you are looking between a psychologist

 7   and a psychometrist, that you have to make some decisions about

 8   what is appropriate in that situation or not, given what that

 9   person's background was.

10            THE COURT:  Okay.  Let's move out, off of the general and

11   get on into something maybe a little more specific, it might help.

12   BY MS. FOURNET:

13   Q.  There is a passage in your interview of Mr. Hardy, Dr. Hayes,

14   where you say something about street smarts versus book smarts.  Do

15   you remember that discussion?

16   A.  I believe so.

17   Q.  And you then go on to say --

18            MS. FOURNET:  And, Judge, I am going to make references

19   to pages and lines where necessary.

20            THE COURT:  Okay.

21   BY MS. FOURNET:

22   Q.  You then go on to say that street smarts is, and I am quoting

23   here, "kind of similar to what we're talking about adaptability."

24   That's page 11, lines 8 to 10.  Is it your view that street smarts

25   is an indication, what you call street smarts is a species of
```

1   adaptive behavior?

2   A.  I think what I am referring to is that an individual needs to

3   be able to get along in his or her environment, and that would be

4   street smarts.  It's like some people say, this person is book

5   smart but they're not street smart.  That would be an individual

6   who may be very well read and be able to do well functionally,

7   academically, but street smart would be would a person be able to

8   get along in his or her environment effectively.

9   Q.  So the answer is, yes, you would consider street smarts a

10  species of adaptive functioning; is that correct?

11  A.  I believe so.

12  Q.  And you tell Mr. Hardy in discussing adaptive behavior that you

13  can't compare him to, say, people from Nebraska; do you remember

14  saying that?

15  A.  I don't recall, but I am trying to pull up my transcript now

16  and I can't find it.

17  Q.  It would be page 119, lines 22 to 23.

18  A.  Yes, I said that.

19  Q.  And according to what you told Mr. Hardy, this is because

20  Mr. Hardy lived in a different set of circumstances from a farm in

21  Nebraska; is that correct?

22  A.  Of course Mr. Hardy lived differently.

23  Q.  That would be page 120, lines 4 to 6.

24  A.  He didn't, he wasn't raised on a farm in Nebraska.

25  Q.  That's correct.  And the reason you can't compare him to the

1346

1  little freckled kid on the farm in Nebraska is because he didn't
2  grow up on a farm in Nebraska, correct?
3  A.  He did not grow up on a farm in Nebraska; but if you're using
4  the national standardized testing, there may be some individuals
5  from Nebraska in that normative group.
6  Q.  So you're not saying that the standards for adaptive
7  functioning would be lower for kids in the ghetto like Paul, you're
8  not saying that?
9  A.  No.  In fact, I'm saying that they have developed different
10  skills, skills that I'm sure that I don't have as well.
11  Q.  Now, I am going to present a series of propositions to you,
12  Dr. Hayes, and I am going to ask you, and these have to do with
13  adaptive functioning.  I am going to ask you whether you agree or
14  disagree with those propositions, and I would appreciate your
15  answer, answering simply yes or no and then if you wish to explain
16  certainly you can do that.  Okay?
17  A.  I will do the best I can.
18  Q.  Here is one:  "Within an individual limitations often coexist
19  with strengths, referring to a mentally retarded -- a person with
20  mental retardation."  Do you agree or disagree with that?
21  A.  Agree.
22  Q.  "It is important in determining whether a person is or is not
23  mentally retarded not to pick and choose so as to overemphasize
24  certain characteristics in light of the assumption that limitations
25  often coexist with strengths."  Agree or disagree?

```
 1   A.  I think -- I think I agree with what you're saying, it's just a
 2   long sentence, and so I am trying to keep it all in.
 3   Q.  Would you like me to read it again?
 4   A.  Do you have a copy?
 5   Q.  I don't have a copy of the statement.  The statement is found
 6   in the case of Holiday v. Campbell, 463, F. Supp. 2d, 1324 at 1343.
 7   A.  I don't have that.
 8   Q.  And I realize you're not a lawyer.  But let me read you the
 9   statement again.
10   A.  Okay.
11   Q.  And we'll see if you agree or disagree with it.
12              "It is important in determining whether a person is or
13   is not mentally retarded not to pick and choose so as to
14   overemphasize certain characteristics in light of the assumption
15   that limitations often coexist with strengths."
16   A.  I would say I agree.  You have to look at all characteristics.
17   Q.  So you agree with that?
18   A.  Yes.
19   Q.  Here is another one:  "The assessment of adaptive functioning
20   focuses on deficits."  Agree or disagree?
21   A.  Let me just consider it for a second, if you don't mind.
22   Q.  Sure.  And just so you'll know, that's a quote from Dr. Greg
23   Olley in the case of United States v. Davis.  And if you need me to
24   read it again, I'll be happy to do it.
25   A.  No, I wrote it down, thank you.
```

1          I agree that diagnosing MR is based upon deficits, but I

2    don't think that one should ignore strengths when a person is

3    diagnosing MR because the strengths can be built upon to help the

4    person overcome some of the deficits in the future.  So I don't

5    know that I would say that it should focus solely on deficits.  I

6    think strengths are also important.

7    Q.  Okay.  Well, it doesn't say that, does it, it says --

8    A.  It said the assessment --

9    Q.  -- it says the assessment focuses on deficits; do you agree

10   with that?

11   A.  I agree with that, but with the caveat that I just said.

12   Q.  Okay.  "The best way to retroactively assess a defendant's

13   adaptive functioning is to look for consistency and convergence

14   over time."  Do you agree with that?

15   A.  Say it one more time.

16   Q.  "The best way to retroactively assess a defendant's adaptive

17   functioning is to look for consistency and convergence over time."

18   A.  I would agree.

19   Q.  Would you also agree with Dr. Gregory Olley when he says:  "A

20   perfect convergence of all sources of information is unlikely."?

21   A.  I would agree.

22   Q.  Would you further agree with the User's Guide that holds that

23   adaptive behavior and problem behavior are independent constructs

24   and not opposite poles of a continuum?

25   A.  One more time.

 1  Q.  Adaptive behavior and problem behavior are independent

 2  constructs and not opposite poles of a continuum.

 3  A.  I would agree.

 4  Q.  Dr. Hayes, were you a contributor to a book called *Principles*

 5  *and Practices of Child and Adult Psychiatry* published by the APA in

 6  2002?

 7  A.  I think I wrote the chapter on juvenile delinquency in that,

 8  does that sound about right?

 9  Q.  You certainly did, that's the right book.

10          And are you familiar with another chapter in that book

11  called "The Legal Aspects of Mental Retardation"?

12  A.  I have not read that any time soon.  The book came out in '02.

13  Q.  Certainly.

14  A.  Okay.

15  Q.  Do you recall that that particular chapter was written by

16  Dr. James C. Harris?

17  A.  I don't.  It was seven years ago, I don't recall that the

18  chapter was in there much less who wrote it.

19  Q.  Well, let me read you a passage from Dr. Harris and ask you if

20  you agree or disagree with that.

21          "Rather than a specific cause of criminal behavior,

22  mental retardation and its associated features are risk factors for

23  legal difficulty.  It is the higher rate of associated behavioral

24  and emotional problems in the mentally retarded population that is

25  a particular concern."  Do you agree with that?

1  A.  That's too long for me to take down and try to parcel out.

2  Q.  All right.  We'll move on.

3          Do you agree with Dr. Harris when he says 85 and others,

4  this has been said in this courtroom, of the mentally retarded

5  population, 85 percent fall into the mild range?

6  A.  Yes.

7  Q.  And that people in the mild range are persons who function --

8  I'm sorry, those persons who function in the mildly mentally

9  retarded range are the ones most likely to be involved in criminal

10  proceedings and still be found legally competent?

11  A.  Of course.

12  Q.  Do you agree with this statement:  Evaluators should be

13  discouraged from utilizing criminal behavior to ascertain the

14  presence of deficits in adaptive functioning?

15  A.  I disagree.

16  Q.  You disagree, okay.  So you disagree with that one.  That one,

17  by the way, was a practice recommendation No. 17, it appeared in

18  Atkins v. Virginia, "Implications and Recommendations for Forensic

19  Practice," *Journal of Psychiatry and Law*, Gilbert S. MacVaugh and

20  Mark D. Cunningham at page 42, for the record.

21          MS. FOURNET:  And, Judge, I do believe you have that

22  article.

23  BY MS. FOURNET:

24  Q.  Tell me why you disagree with that, Dr. Hayes.

25  A.  You used the -- an analogy earlier about the gentleman who did

1   the securities fraud.  Obviously, that would give you, like you've

2   said I think over the past couple of days, a few days, you said he

3   had massive years of long securities fraud.  That would obviously

4   give you information about that person's level of functioning.

5          Similar to Mr. Hardy, factors of a crime can tell you how

6   involved he was, what he was doing in and around the time of the

7   crime, how much planning went into the crime.  And so I would

8   disagree with those authors respectfully because I feel like if a

9   person plans a crime, carries out a crime, buys an extra barrel for

10  the gun such that he or she could get rid of the gun into the

11  Industrial Canal and then directs a person how to get back and then

12  calls an individual and says that it's done, I think that not

13  looking at those things would be actually a poor idea.

14  Q.  Now, you're not suggesting that Mr. Hardy was on the level of,

15  say, Bernie Madoff, are you?

16  A.  Not in the least.

17  Q.  You may well disagree with this one as well:  "Criminal

18  adaptive behavior," and I put that in quotes, "is not a concept

19  that has passed peer review or been accepted by the professional

20  and psychiatric community."  Do you agree with that?

21  A.  No.

22  Q.  Elaborate, please.

23  A.  Obviously, Dr. Denkowski's article got past peer review.  It

24  was published in the *American Journal of Forensic Psychology*.

25  Q.  So Dr. Denkowski is the source for your opinion on this issue?

1  A.  It's just the one that we've been talking about today and the

2  one that is brought up in my mind because we've been discussing it.

3  But certainly his article passed peer review.

4  Q.  And so can you think of others besides Dr. Denkowski --

5  A.  Not as I sit here today --

6  Q.  -- on whom you would rely because this is, this is, again, from

7  the MacVaugh and Cunningham article, what other besides the

8  possibly discredited Dr. Denkowski, who else are you relying on in

9  your disagreement with this?

10  A.  As I sit here right now, I can't come up with another journal

11  article to point you to.

12  Q.  Do you agree or disagree that people with mental retardation

13  are more likely to attempt to look more competent and normal than

14  they actually are?

15  A.  Are more likely than who?

16  Q.  People who do not have mental retardation.

17  A.  I think that probably both populations want to appear more

18  competent than they likely are, but I would definitely agree that

19  people with mental retardation do want to appear competent.

20  Q.  I mean, are you familiar with the term masking or the term

21  cloak of competence?

22  A.  Of course.

23  Q.  Is that a phenomenon that you believe exists in many people

24  with mental retardation?

25  A.  Yes, I do.

1    Q.  "People with mental retardation typically have a strong

2    acquiescence by is there inclination to say yes or no to authority

3    figures."  Do you agree with that?

4    A.  I do.

5    Q.  Now, you interviewed Mr. Hardy for several hours, did you not?

6    A.  Yes.

7    Q.  And you have written in the past on the SIRS.  Was what you did

8    with Mr. Hardy a SIRS interview?

9    A.  No.

10   Q.  It was not, okay.

11          THE COURT:  Ms. Fournet, can you just hold up about three

12   minutes, I just remembered a phone call that I should have made and

13   I didn't.  Let's just take like a quick five minutes.

14          THE DEPUTY CLERK:  All rise.

15     (WHEREUPON, A RECESS WAS TAKEN.)

16     (OPEN COURT.)

17          THE COURT:  Thank you very much.  I apologize for the

18   interruption.

19          MS. FOURNET:  Thank you, your Honor.  May I proceed, your

20   Honor?

21          THE COURT:  Yes.

22   BY MS. FOURNET:

23   Q.  Dr. Hayes, you would agree that the way an evaluator asks

24   questions in such an evaluation is very important; would you agree

25   with that?

1   A.  I agree.

2   Q.  And a competent evaluator is going -- and I think you addressed

3   this in the Cole testimony as well -- should avoid leading

4   questions or questions that suggest that you will give him approval

5   for a particular answer, you want to avoid those types of

6   questions, don't you?

7   A.  I agree and disagree on that.

8   Q.  Okay.  Well, tell me how you disagree.

9   A.  I disagree in that I think that it's helpful to put some of

10  those questions into an interview to see how the individual reacts.

11  Q.  Okay.  You're going to have to give me a little bit more

12  elaboration on that because I am not following you, so please

13  explain what you mean.

14  A.  If one of the things that you're interested in looking at is,

15  does the individual have an acquiescence bias, then you may want to

16  actually give a leading question with the possibility of a positive

17  answer, or suggesting a positive answer by the way that you're

18  asking the question to see if the individual would then say no.

19  You may also want to ask questions like that to see if the person

20  can track what you're asking.  So I think that asking questions in

21  that manner is actually helpful so that you can see what is their

22  level of functioning.

23  Q.  Do you recall testifying in the Cole hearing that leading

24  questions are something that an evaluator should avoid where mental

25  retardation is suspected?

1355

A.  I do think that one should avoid them in general, but I also

think that it is also helpful as part of the assessment process.

Q.  You do recall testifying in the Cole decision that leading

questions should be avoided?

A.  I believe you showed it to me earlier, I believe I saw that.

Q.  And are you saying that you've changed your mind now and you

think that leading questions should not be avoided?

A.  I am saying that I think it's also diagnostic to put other

questions in that are leading or that do have multiple parts to see

if the person can track.  Actually, I can't tell you what was in my

mind when I was thinking that in terms of the Cole when I was --

the Cole, you said the Cole decision, but when I was testifying in

the Glenn Cole case, but as I sit here today, I do think it's

helpful to put in some other questions to see if the individual can

track them.

Q.  So what research has come down since 2004 when you said leading

questions are a bad idea in this type of evaluation to convince you

that leading questions are not necessarily a bad idea in this type

of evaluation?

A.  Again, I can't point you to any research.  What I'm pointing

you to are my clinical skills and what I think would be useful as I

sit here today.

        When I answered that question, it was a different context

than right now.  In fact, if I recall right, I gave the CAST-MR,

which is the Competency Assessment to Stand Trial for people with

1   mental retardation to Mr. Cole, if I'm right, and even on that

2   instrument you have open-ended questions, but then you also have

3   closed-ended questions.  I think it's helpful.

4   Q.  So you don't agree that using open-ended questions primarily or

5   exclusively is necessarily the appropriate rule for doing this kind

6   of evaluation or this kind of examination of a client who is

7   suspected of having mental retardation?

8   A.  I don't think exclusively.

9   Q.  How about primarily?

10  A.  And I think it depends upon what's being asked and where you're

11  at at the interview.  Have you gotten enough information.

12  Q.  You don't want to give a person whom you are evaluating for

13  mental retardation choices, sort of multiple choice question, do

14  you?

15  A.  At times, yes.  In fact, the CAST-MR does just that.

16  Q.  But I'm talking about a clinical interview for determining --

17  is that what you did of Mr. Hardy, a clinical interview?

18  A.  I tried to get as much background information about him as

19  possible and then determine if he had any psychiatric deficits, as

20  well as find out information about his adaptive functioning.

21  Q.  Was it a clinical interview?

22  A.  It was a clinical interview with a bit more.

23  Q.  What was the bit more?

24  A.  The bit more was not just finding out about his background but

25  also finding out about his psychiatric history and about some areas

1    of adaptive functioning as well.

2    Q.  You found Mr. Hardy to be cooperative?

3    A.  I did.

4    Q.  And, in fact, would it be fair to say that Mr. Hardy was even a

5    little preoccupied with not doing anything wrong?  And let me just

6    give you an example of that.  He made sure he wouldn't get in

7    trouble if he called his lawyer, didn't he?

8    A.  You mean with me?

9    Q.  Yes, or with anybody.  I mean, a page -- I'm referring to page

10   13, lines 7 through 8, wasn't he concerned about getting in trouble

11   about calling Mr. Larson?

12   A.  I think he was concerned there that I would think that he was

13   not cooperating.

14   Q.  Well --

15   A.  Excuse me, it's been awhile to testify.  I think he was

16   concerned there that I would think that he was not cooperating.

17   Q.  Okay.  And that was your take on it anyway, is what you're

18   saying?

19   A.  Based upon what he had said before, because he had said that

20   you and Mr. Larson had told him to cooperate and do the best that

21   he could.  And I said, "That's fine, and if you feel like you need

22   to talk to your attorney, then please do."  And he said, "Right,

23   just, you know, that ain't going to get me in trouble, huh?"  And I

24   said, "It's your right."

25           And so I think, again, what he was referring to, based

1    upon my read, is that he was concerned that he would get in trouble

2    by calling his lawyer by possibly appearing uncooperative, so

3    that's my read on that.

4    Q.  And he told you, page 127, lines 11 to 12, and I think you've

5    mentioned this, that the lawyers had told him to answer everything

6    and just do the best he could; is that correct?

7    A.  Page 127?

8    Q.  Lines, looks like 11 through 12.

9    A.  I looked around that.  What I'm talking about right there is on

10   11 and 12, "Did you go like one, twice, 20 times"; he said, "I want

11   to say like about, probably about I want to say eight times, me,

12   Wayne and Gerald would go."

13   Q.  Okay.  I'm sorry, I made incorrect notes here.  But you

14   mentioned it earlier, so clearly you remember that he told you at

15   one point the lawyers told me to do the best I can.

16   A.  I believe he did.  I mean, I can't point you to a page or line

17   number but to the best of my recollection.

18   Q.  Well, apparently I can't either so we're even.

19        Now -- and, in fact, would you agree that he did seem to

20   be trying to do the best he could?

21   A.  I believed he was answering my questions.  I believe that he

22   was cooperative.

23   Q.  And he did appear to be doing the best he could, didn't he?

24   A.  I wasn't giving him in general testing, and so I can't look at

25   his level of effort in terms of testing, in terms of best he could.

1    But I believe that he was giving me appropriate answers, answers

2    directly on point.  I believe that he was cooperative.

3    Q.  And you didn't see any indication that he wasn't trying the

4    best he could to answer your questions, did you?

5    A.  No.

6    Q.  Now, at the beginning when you asked him if he knows what

7    mentally retarded meant, and I hope I have this right, I have page

8    8, line 18, he answered with a question, didn't he?

9    A.  He said, "I guess I'm not educated, huh, not educated enough,

10   whatever, I ain't, you know."

11   Q.  Now, at some point I believe you did explain to him what --

12   just generally in layman's language what it meant to be mentally

13   retarded, didn't you?

14   A.  I believe it was later on, but, yes.

15   Q.  At some point fairly early in the interview you explained that

16   to him?

17   A.  I don't remember when I explained it to him.

18   Q.  But you explained it to him?

19   A.  At some point, I believe so.

20   Q.  And after, much after, towards the end of the interview, and I

21   am referring to page 389, lines 10 to 21, he appeared to have

22   forgotten during the course of those several hours your

23   explanation, didn't he?

24   A.  I don't recall what I told him in terms of mental retardation.

25   But let me look on page 389.  He asked me if I could break down

1    what mentally retarded is for him.

2    Q.  And then you clearly recalled that you had told him what it

3    meant earlier because you asked him, "What did I tell you when we

4    first started out"; isn't that what you asked him?

5    A.  Yes.

6    Q.  And he said, "You talk so much," correct?

7    A.  Yes.

8    Q.  So you basically had to tell him again that it's about

9    intelligence and how good you are at doing stuff, and that's pages,

10   I believe it's -- should be 389 to 390, correct?

11   A.  Yes.

12   Q.  And then he still gives you a little bit of a concrete answer,

13   doesn't he, because when he is talking about at page 390, lines 3

14   to 4, he says, "Well, if that's it, I can't draw, I don't know how

15   to put nothing together."  Correct?

16   A.  Let me get to that part.

17   Q.  That would be page 390, lines 3 to 4.

18   A.  He does, and just one question ago, I believe that we had

19   discussed earlier what the issue was related to his case, that is,

20   related to an Atkins hearing and if he was retarded -- found

21   retarded, that he would be excluded from the death penalty.  I

22   don't know that we had gotten into earlier actually what mental

23   retardation was.  If you could refresh my memory on that, I would

24   appreciate it.

25             But also there, he does say, "Well, if that's it, well, I

1361

1  can draw it, I don't know how to put nothing together," I say

2  "Uh-Huh," and he said, "You know, but if you show me I can learn."

3  I say, "Okay."  And he says, "You know, uh, like I said, I can

4  read, but I really don't know the words, you know.  I got to look

5  it up," and then it goes on from there.

6  Q.  In fact, he quickly, after he tells you I can't draw, I don't

7  know how to put nothing together, he quickly points out that if you

8  show him he can learn, doesn't he?

9  A.  He says that right after I say uh-huh.

10  Q.  And that would be consistent, would it not, or at least

11  certainly one interpretation of that is that somebody who is a

12  little bit ashamed or embarrassment -- embarrassed about his

13  impairments in trying to show you the good side, that is, that I am

14  capable of learning, correct?

15  A.  That's one hypothesis.

16  Q.  Did you notice throughout this interview that Mr. Hardy would

17  often ask you a question -- I'm sorry, would answer a question with

18  a question?  For instance, he would say, right, huh?  He did that a

19  lot, didn't he?

20  A.  He did both with me and I believe on the interview tapes as

21  well.

22  Q.  For instance, when you asked him what season it was at the time

23  of the interview, he said, oh, it's about to be summer, right?

24  A.  That doesn't sound unlike what he would have said because he

25  did that quite frequently during the interview, but I don't recall

1  that specific line.

2  Q.  And then he would look to you to affirm that the answer was, in

3  fact, correct; correct?

4  A.  He made good eye contact throughout the interview.

5  Q.  Now, with regard to the seasons, which is something that we

6  just mentioned, when you talked to him about the seasons, he

7  indicated he only knew hot and cold, winter and summer, not spring,

8  correct?  And I'll refer you to page 379, lines 6 through 11.

9  A.  He did say that on page 379, but earlier he refers to, I asked

10  him about seasonal allergies and he said he gets them in the

11  spring.

12  Q.  But here he says, "I don't know the difference between all of

13  that, I just know winter and summer, when it get cold, when it get

14  hot, you know, I know they say spring and all of that, I don't know

15  the difference between all of that."  Isn't that what he said?

16  A.  That is exactly what he says.

17  Q.  Now, were there -- you mentioned gullibility in the discussion

18  earlier today about the tapes that we watched this morning or in

19  connection with that series of exhibits.  There were passages, were

20  there not, in your interview of Mr. Hardy where he referred to his

21  own past experiences where he was gullible or had been taken

22  advantage of or exploited by other people, didn't he?

23  A.  From what I recall, when we were discussing depression,

24  Mr. Hardy had indicated that as he sits here today, he feels like

25  individuals had taken advantage of him in the past.

1   Q.  Well, let's talk about the rent car man, do you remember the

2   rent car man?

3   A.  Do you want me to find it in the transcript?

4   Q.  Page 222, lines 5 to 6 and 8 to 11.

5   A.  (WITNESS READS DOCUMENT.)  I see the passage, what was the

6   question?

7   Q.  You recall the discussion about the rent car guy now that

8   you've looked at it?

9   A.  Yes.

10  Q.  And he told you in that discussion that this guy would have to

11  rent cars for him, and he would have to pay him and then he would

12  have to wait several hours to get the car, correct?

13  A.  He said that he might tell me he'll be there in an hour, an

14  hour might turn into three hours, you know what I'm saying?

15          THE COURT:  What page number is that again?

16          MS. FOURNET:  That's page 222, lines 5 to 6 and 8 to 11,

17  your Honor.

18          THE WITNESS:  So yes, he said he had to wait on the

19  gentleman to bring him the rental car.

20  BY MS. FOURNET:

21  Q.  And he realized, did he not, by the time you interviewed him,

22  and I am referring to page 222, lines 15 to 16, that this rent car

23  guy had just been, as he put, playing him; isn't that what he told

24  you?

25  A.  I don't know that he recalled it or he figured this out as he

1  sat there with me because he had gotten a prepaid Visa so that he

2  could get his own rental car.

3  Q.  Did he tell you at pages 222, lines 15 to 16, that the guy had

4  been playing him?

5  A.  Yes.

6  Q.  And his solution, was it not, was to go to another guy, and

7  this is the guy that told him to get the secured Visa, wasn't it?

8  A.  The other person suggested that he do that so he would be able

9  to rent a car.

10  Q.  And then he told you later in the interview, and I am referring

11  to page 253, lines 13 to 14, that he now realized, at the age of

12  42, he didn't say the age of 42, but we know he was 42 when you

13  interviewed him, that a lot of people he dealt with didn't really

14  care about him and only cared what they would get from him, that's

15  page 253, lines 13 and 14.

16  A.  Page 252?

17  Q.  253.

18  A.  Oh, okay, I'm sorry.  (WITNESS READS DOCUMENT.)  He indicated

19  that as he looks at it now and looks back that he feels like he was

20  used.

21  Q.  And then in that same passage, just a few lines down on 253,

22  lines 16 through 18, he again refers to the rental car guy, and he

23  talks about how he had to "dance to his music"; isn't that what he

24  said?

25  A.  Correct.

1    Q.  And then he told you on page 253 and 254, lines 1 to 2, that he

2    didn't have any choice, he needed the car, he couldn't rent it

3    himself, and he had to give the guy the money to rent the car,

4    correct?

5    A.  Correct.

6    Q.  He even told you at one point, and this would be pages 288 to

7    289, that now at the age of 42 and after 15 years in prison, that

8    he would only help people he didn't know, like the homeless man on

9    the street, because people he knew that he helped just tried to use

10   him.  Isn't that what he said?

11   A.  What page again?

12   Q.  288 to 289.

13   A.  (WITNESS READS DOCUMENT.)  What was the question again?

14   Q.  He told you, did he not, that now he would only help people he

15   didn't know, like the homeless man on the street, I don't know if

16   he used that particular example, but not people that he knew,

17   because when he had helped people that he knew in the past they had

18   only used him; isn't that essentially what he said?

19   A.  The page before on 288, he also is saying that he would rather

20   help someone that he didn't know because he wouldn't -- rather than

21   someone that he did because he would know then that his giving was

22   coming from his heart.

23          And then on page 289, he does say what you were referring

24   to with, I asked him, on the end of page 288, "But would you still

25   help the people that you helped," he said, "I think I would, like I

1  say, the ones I didn't know, you know what I'm saying."  And then

2  he goes on to say, "The guy that I had to pay money to get this

3  rental car, I think I wouldn't have given him shit."

4  Q.  Dr. Hayes, these descriptions of the rental car guy and these

5  expressions of regret and hurt, that in looking back, he felt he

6  had been used, those are pretty good descriptions of gullibility,

7  aren't they?

8  A.  I don't think so.

9  Q.  Oh, you don't think so.  Oh, okay, well tell me why not.

10 A.  Because he was getting something from the rental car guy.  He

11 couldn't rent a car without the rental car guy.

12 Q.  Well, but he was being taken advantage of, wasn't he?

13 A.  He could have also been taking advantage of the rental car guy.

14 Q.  But that wasn't his take on it, was it; he said, didn't he,

15 that guy had me dancing to his music and I know that now?

16 A.  He did say that.

17 Q.  And, of course, you heard stories about Curtis and others

18 exploiting him and using him, didn't you?

19 A.  I remember it said that when he was a youngster that Curtis had

20 him run drugs in the project.

21 Q.  Well, is it your position that in this interview there was no

22 evidence of gullibility on the part of Mr. Hardy?

23 A.  Mr. Hardy several times says that as he looks back now that,

24 and again, this is as he looks back now, that he feels like some of

25 the people in the past have used him for his money and that that

1    had gotten him down -- wait.

2          Let me revise that.  Because he also indicated that -- I

3    am not positive, and so let me not go further than that.

4    Q.  Well, let me ask the question again.  Are you suggesting -- and

5    please answer yes or no and then you can explain if you wish -- are

6    you suggesting that this taped interview of Mr. Hardy, which, by

7    the way, the judge is going to watch if she hasn't watched it

8    already, shows no indications of gullibility on the part of

9    Mr. Hardy?

10   A.  I wouldn't say there are none, but what I'm saying is that --

11   Q.  Okay.

12   A.  -- there is a great deal of evidence that suggests that he was

13   not gullible in the least.  And so what he is saying that he feels

14   like the rental man, the rental car man had taken advantage of him

15   could be that he was actually taking advantage of someone else's

16   Visa to be able to rent a car for him.

17   Q.  So he was exploiting the rental car man is your position?

18   A.  No, it's not my position.  I'm saying that you have to consider

19   all of the options.

20   Q.  I see.  Well, let's get back to page 287, and let's talk about

21   where he tries to explain to you in greater depth this feeling of

22   hurt that he had about people using him.  And I am referring to

23   page 287, lines 21 to 22 -- actually, it's lines 20 to 22.

24   A.  Um --

25   Q.  287.

1  A.  Yeah, he is talking again about feeling used and then says

2  later he did it from his heart, he felt good that way.

3  Q.  Well, let me ask you a question.

4        MR. McMAHON:  Your Honor, I'd ask that the witness be

5  allowed to answer the question.

6        MS. FOURNET:  Well, I hadn't asked the question.

7        THE COURT:  Well, yeah, let's have a question first.  Go

8  ahead.

9  BY MS. FOURNET:

10  Q.  He is telling you here at pages -- at lines 20 to 22, he is

11  trying to explain to you about his feelings of being used by

12  people, isn't he?

13  A.  Yes.

14  Q.  And he says at lines 20 to 22, "Yeah, you know, like I say, it

15  was -- I was being used, you know, helping people, you know, but

16  I'm talking about" -- and then there's a dash.  Now, what happens

17  there is that you interrupt him, isn't it?

18  A.  I don't know if I interrupted him or if he paused, I don't

19  know.

20  Q.  But he didn't finish his sentence, did he?

21  A.  No.

22  Q.  And what do you interrupt him with, but is that a bad trait,

23  correct?

24  A.  Correct.

25  Q.  Now, you heard Dr. Cunningham discuss normalizing behavior,

1    that is, giving a person an answer to reassure him that what may be

2    a deficit, otherwise a deficit, is actually a good quality or

3    normal; you heard that testimony?

4    A.  I recall.

5    Q.  And you interrupted him or cut him off or he wasn't allowed to

6    finish his sentence, and you gave him the option, did you not here,

7    of saying whether that's a bad trait, correct?

8    A.  I don't agree with the first part of your sentence.  Without

9    seeing the video I can't say whether I interrupted him or not.

10   Q.  But you did give him this choice of, here he could endorse your

11   position or your question, oh, yes, that's a bad trait, that's

12   really a bad trait.  Did you expect this man to agree with that?

13   A.  That being vulnerable to helping people was a bad trait?  I

14   don't understand what you're asking.

15   Q.  I'm asking you is now -- now that you've given him this option

16   of agreeing or disagreeing with this exploitation as being a bad

17   trait, did you really expect him to agree that it was a bad trait?

18   A.  I wouldn't characterize what he had said as exploitation, he

19   characterized it as helping people.  I then asked him, but is that

20   a bad trait and he asked me being used?  And I said, no, were you

21   used or were you helping people?  And he said, "Well, I did it from

22   my heart, I feel good that way, but just knowing that people really

23   didn't care about you, you know what I'm saying."

24   Q.  So he says being used as in is being used a bad trait, correct?

25   A.  I asked him, but is that a bad trait, and he said being used.

1   Q.  And then you gave him two choices.

2   A.  Yes.

3   Q.  And you let him pick, are you used or were you just helping

4   people, correct?

5   A.  Actually, when I gave him the choices, he said both, that he

6   did it from his heart but that he knew people didn't care about

7   him.

8   Q.  Let me ask you the question again.

9            MR. McMAHON:  I am going to object.  This has been gone

10  over now for the last five minutes.

11           THE COURT:  Well, and also the transcript speaks for

12  itself.

13           MS. FOURNET:  All right.  I'll move on, your Honor.

14  BY MS. FOURNET:

15  Q.  Dr. Hayes, what is the clinical benefit of giving him a good or

16  bad choice, as you did here, rather than asking an open-ended

17  question and letting him make the choice?

18  A.  In that situation, he was able to elaborate more.  I was able

19  to -- he actually tracked both possibilities, the good and the bad,

20  and then went further with that.

21  Q.  And what on earth was the purpose after he told you seven

22  different ways that he felt used by people and had even given you

23  examples, what was the purpose of offering him an alternative

24  explanation of your own design; that is, that he is just helping

25  people?

1  A.  To see if what he perceived in the past was if he had helped

2  people and if he would change his mind.

3  Q.  But then as you pointed out, even then, even in spite of that,

4  he still told you at lines 3 to 4 that he knew now that people back

5  then really didn't care him; didn't he tell you that?

6  A.  And this was 212, is that what you said?

7  Q.  288, lines 3 to 4, you just mentioned this passage yourself.

8  A.  I thought you said 212, I'm sorry.

9        He said, "But just knowing that people really didn't care

10  about you, you know what I'm saying."

11  Q.  Now -- so he agreed with you but not really; he still is taking

12  the position that people took advantage of him, isn't he?

13  A.  I think what he is saying is, he did -- when he gave people

14  things, he did it from his heart, and now as he sits and looks back

15  that he feels like people took advantage of him because he was

16  giving them money.

17  Q.  And that's a form of manipulation and exploitation, isn't it?

18  A.  It depends on if he was getting any benefit for giving them the

19  money.

20  Q.  Now, we can agree --

21        MS. FOURNET:  And, Judge, I am moving into the area of

22  the drug dealing and it's a good breaking point, or if you want me

23  to start I will be glad to start.

24        THE COURT:  No, we can break now.  How are we doing on

25  how many more days we have here?

1          MS. FOURNET:  Judge, I think in terms of my cross we are

2    probably talking about certainly not before noon, possibly into the

3    afternoon.  I hesitate to say all of tomorrow, but it's certainly a

4    possibility.  And I understand the court's concern, I'll try to

5    trim it down as much as I can.

6          THE COURT:  No, no, this is a very important hearing, I

7    am not concerned about that.  I mean, I don't want redundancies to

8    the extent that questions could be asked twice --

9          MS. FOURNET:  I understand, you've made that pretty

10   clear, Judge.

11         THE COURT:  -- instead of four times, I would appreciate

12   that.  And I probably will start being a little firmer about that.

13         MS. FOURNET:  Yes, ma'am.

14         THE COURT:  And then I think the government has, what,

15   two correctional people, two or three, is that your intention?

16         MR. McMAHON:  Three, your Honor.

17         THE COURT:  Three, okay.

18         MR. McMAHON:  They'll be --

19         THE COURT:  Brief, though; relatively brief, I assume?

20         MR. McMAHON:  Relative terms, they will be

21   like lightening.

22         THE COURT:  Lightening.  And then you don't know at this

23   point one way or the other about rebuttal.

24         MS. FOURNET:  I think it's likely that we'll have

25   rebuttal, your Honor, I don't expect it to be lengthy.

1        I do want to note for the record this witness is under

2   cross-examination as we leave today.  I think it would be

3   inappropriate for her to have any contact or discussion with the

4   prosecutors about the substance of her testimony while she is under

5   cross.

6        MR. MILLER:  I think we can absolutely talk to our

7   witnesses, especially our experts, your Honor, and there is no rule

8   that prohibits us from doing things like this.

9        MS. FOURNET:  I can say, Judge, that we've studiously

10  avoided doing that while our witness is under cross.

11       MR. MILLER:  We didn't ask, you could have done whatever

12  you wanted, we didn't ask.

13       THE COURT:  Well, put it this way:  I don't think it's

14  appropriate, I don't think I can order them not to do it, but I

15  don't think it's appropriate.  And you can certainly ask Dr. Hayes

16  tomorrow morning if they've had such conversations and probe them

17  and I'll take it into consideration in terms of her answers.

18       MS. FOURNET:  You can rest assured I will, your Honor.

19       THE COURT:  Okay.  We will recess until nine o'clock

20  tomorrow morning.

21       (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED FOR THE DAY.)

22

23                          * * * * *

24

25

```
1

2                        REPORTER'S CERTIFICATE

3

4       I, Karen A. Ibos, CCR, Official Court Reporter, United States

5    District Court, Eastern District of Louisiana, do hereby certify

6    that the foregoing is a true and correct transcript, to the best of

7    my ability and understanding, from the record of the proceedings in

8    the above-entitled and numbered matter.

9

10

11                       _____

12                       Karen A. Ibos, CCR, RPR, CRR

13                       Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```