1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA
2   ***********************************************************
    UNITED STATES OF AMERICA
3
                                   Docket No. 94-CR-381(C)
4   v.                             New Orleans, Louisiana
                                   Wednesday, September 23, 2009
5
    PAUL HARDY
6   ***********************************************************

7
           TRANSCRIPT OF ATKINS HEARING PROCEEDINGS
8      HEARD BEFORE THE HONORABLE HELEN G. BERRIGAN
              UNITED STATES DISTRICT JUDGE
9                    VOLUME VIII

10

11  APPEARANCES:

12  FOR THE PLAINTIFF:          UNITED STATES ATTORNEY'S OFFICE
                                BY:  MICHAEL E. McMAHON, ESQ.
13                                   MARK A. MILLER, ESQ.
                                500 Poydras Street, Room HB-210
14                              New Orleans, LA 70130

15
    FOR THE DEFENDANT:          HERBERT V. LARSON, JR., ESQ.
16                              650 Poydras St., Suite 2105
                                New Orleans, LA 70130
17

18                              MARILYN MICHELE FOURNET, ESQ.
                                715 St. Ferdinand
19                              Baton Rouge, LA 70802

20
    Official Court Reporter:    Karen A. Ibos, CCR, RPR, CRR
21                              500 Poydras Street, Room HB-406
                                New Orleans, Louisiana 70130
22                              (504) 589-7776

23

24
      Proceedings recorded by mechanical stenography, transcript
25  produced by computer.

1             I N D E X

2

3    WITNESSES FOR THE GOVERNMENT:                    PAGE/LINE:

4    SHANNON DESROCHE

5       Direct Examination by Mr. McMahon           1524/18

6       Cross-Examination by Mr. Larson             1550/23

7       Redirect Examination by Mr. McMahon         1557/22

8

9    RYAN LAYLLE

10      Direct Examination by Mr. McMahon           1560/1

11      Cross-Examination by Mr. Larson             1565/22

12

13   GARY ADAMS

14      Direct Examination by Mr. McMahon           1568/9

15      Cross-Examination by Mr. Larson             1575/5

16      Redirect Examination by Mr. McMahon         1577/23

17

18   REBUTTAL WITNESSES FOR THE DEFENDANT:

19   MARK D. CUNNINGHAM

20      Direct Examination by Mr. Larson            1583/7

21      Cross-Examination by Mr. Miller             1603/8

22      Redirect Examination by Mr. Larson          1629/10

23

24

25

<u>EXHIBIT INDEX</u>

|                                    | PAGE/LINE: |
|------------------------------------|------------|
| Defense Exhibits 36 & 37           | 1553/20    |
| Defense Exhibits 38 & 39           | 1554/1     |
| Government Exhibit 3               | 1633/18    |
| Government Exhibit 4               | 1634/2     |
| Government Exhibit 5               | 1634/12    |
| Study 1                            | 1634/20    |
| Study 2 & 3                        | 1634/21    |
| Study 4                            | 1634/23    |
| Study 5 & 6 (SEALED)               | 1635/1     |
| Study 7                            | 1635/3     |
| Study 8                            | 1635/4     |
| Study 9                            | 1635/10    |
| Defense Exhibit 41                 | 1635/24    |
| Defense Exhibit 42                 | 1636/2     |
| Defense Exhibit 43                 | 1636/3     |
| Defense Exhibit 40                 | 1636/7     |
| Proffer No. 1                      | 1636/15    |
| Proffer No. 2                      | 1636/16    |
| Proffer No. 3                      | 1636/18    |

```
 1                    P R O C E E D I N G S

 2              (WEDNESDAY, SEPTEMBER 23, 2009)

 3                      (MORNING SESSION)

 4

 5        (OPEN COURT.)

 6              THE COURT:  Mr. McMahon.  Ready?

 7              MR. McMAHON:  Yes, ma'am.  Your Honor, we call Lieutenant

 8    Shannon Desroche.

 9              THE DEPUTY CLERK:  Remain standing and raise your right

10    hand.

11        (WHEREUPON, SHANNON DESROCHE, WAS SWORN IN AND TESTIFIED AS

12        FOLLOWS:)

13              THE DEPUTY CLERK:  Please be seated.  State your name for

14    the record and spell it for us.

15              THE WITNESS:  Lieutenant Shannon Desroche,

16    D-E-S-R-O-C-H-E.

17                      DIRECT EXAMINATION

18    BY MR. McMAHON:

19    Q.  Lieutenant DesRoche, what is your occupation?

20    A.  I am the EMT medical supervisor over at the prison in St.

21    Bernard Parish.

22    Q.  Your rank is lieutenant?

23    A.  Yes, sir.

24    Q.  How long have you worked for the St. Bernard Parish sheriff?

25    A.  Seven and a half years.
```

1  Q.  What did you do before that, what's your background?

2  A.  I was an EMT in New Orleans in the Chalmette area.

3  Q.  And you are an EMT --

4  A.  Yes.

5  Q.  -- currently to maintain your qualifications?

6  A.  Yes, sir.  Yes, sir.

7  Q.  You mentioned medical director, could you for the record

8  explain to the court what your job is, what your role entails at

9  the St. Bernard Parish Prison?

10  A.  What I am responsible for is when the inmates come to the jail

11  they are asked a bunch of medical questions on a questionnaire form

12  when they come in.  I verify with the doctors, pharmacies, whatever

13  prisons or hospitals they've come from, to continue their medical

14  care as they're in custody with us.

15  Q.  So if they get sick or injured you're the person to whom they

16  go, correct?

17  A.  Yes.

18  Q.  If they need medications to whom do they go?

19  A.  They go to me.

20  Q.  And are you familiar with the documents, I guess they're

21  informally termed sick calls or requests for medical attention?

22  A.  Yes.

23  Q.  That's what you refer to as a sick call?

24  A.  Right.  Sick call is a form they fill out giving all of the

25  information.

```
1   Q.  Explain to the court how that process works with the sick

2   calls.

3   A.  They can either get a sick call from me or any other officer

4   that are in the control booth where the inmates are housed, and

5   they fill out the sick form, they give the date, their complaint,

6   the pharmacy, doctors, hospitals, the medications they're on, if

7   they have a problem that needs to be dealt with right then and

8   there, they write what their complaint is.  Like, for example, a

9   headache, they're requesting Tylenol for a headache.  I take those

10  forms, I put it in their medical folder, that stays with them

11  throughout their whole time with us, and I go back and I give them

12  the medication for whatever their complaint was for the day.

13          If they request to see a doctor, they get put on the

14  doctor's list; if it's an emergency, it's taken care of immediately

15  right then and there.

16  Q.  Have you received any sick calls from Hardy --

17  A.  Yes, I have.

18  Q.  -- Paul Hardy?  Have you seen him fill them out?

19  A.  Yes.

20  Q.  Does he need assistance filling them out?

21  A.  No.

22  Q.  In general, does he make himself understood --

23  A.  Yes.

24  Q.  -- by way of the sick calls?

25  A.  Right.  From what he is requesting, yes.
```

1   Q.   Does he request medicines in writing?

2   A.   Yes.

3   Q.   Does he spell them correctly?

4   A.   Yes.

5   Q.   Do the medicines he request match the particular ailment?

6   A.   The complaint, yes.

7            MR. McMAHON:  Your Honor, the court's already seen them,

8   but for the benefit of the witness I would just like to very

9   quickly go through and display the sick calls that have already

10  been offered.

11           THE COURT:  Okay.

12  BY MR. McMAHON:

13  Q.   Lieutenant Desroche, the court's already seen these, so we

14  don't have to discuss them in great detail.

15  A.   Okay.

16  Q.   By the way, you have seen Hardy write these things out?

17  A.   Yes.

18  Q.   Do you recognize his handwriting?

19  A.   Yes, I do.

20  Q.   Is that his handwriting --

21  A.   Yes, sir.

22  Q.   -- that you've seen up to this point?

23  A.   Yes.

24           THE COURT:  Does that one have a number on it?

25           MR. McMAHON:  Not an individual number, your Honor, it

```
 1    was like an in globo exhibit.
 2              THE COURT:  I can just get the date, but you say you
 3    recognize his handwriting on that one in particular?
 4              THE WITNESS:  Yes, I do.
 5              MR. McMAHON:  Should we back up, your Honor?  Because I
 6    want to get the dates on all of them.
 7              THE COURT:  Okay.
 8              MR. McMAHON:  Back up to the first one.
 9    BY MR. McMAHON:
10    Q.  Now, Lieutenant Desroche, this is dated November 29 of '06, did
11    Hardy fill that out?
12    A.  Yes, he did.
13    Q.  You recognize his handwriting on that?
14    A.  Yes, I do.
15    Q.  Next one.  August 19, '07.  Do you recognize that?
16    A.  Yes.
17    Q.  Next one.  March 23rd of '08.  What's Tolnaftate, what's that?
18    A.  It's the brand name for an anti-fungal cream for athlete's
19    foot.
20    Q.  Did he spell that correctly?
21    A.  Yes, he did.
22    Q.  Is that Paul Hardy's handwriting?
23    A.  Yes, it is.
24    Q.  Next one.  April 9 of '08.  What's Carmex?
25    A.  Carmex is for chapped lips, it comes in a little container or
```

1529

```
 1   it comes in a tube for chapped lips.
 2   Q.  Is that spelled correctly?
 3   A.  Yes, it is.
 4   Q.  And do you recognize Hardy's handwriting on that sick call?
 5   A.  Yes, sir.
 6   Q.  Next one.  Laxative medicine, is that spelled correctly?
 7   A.  Yes, sir.
 8   Q.  Next one -- by the record, that was July 29th of '08.
 9           Next one, please.
10           THE COURT:  Was that his handwriting?
11           THE WITNESS:  Yes, sir -- yes, ma'am.
12   BY MR. McMAHON:
13   Q.  October 5th of '08, is that Paul Hardy's handwriting?
14   A.  Yes, sir.
15   Q.  Anti-fungal cream.
16   A.  Right.
17   Q.  Next one.  Same question as to handwriting.
18   A.  Yes.
19   Q.  November 17, '08.  Could I get some triple antibiotic ointment.
20   Next one.
21           Lieutenant Desroche, I think I asked this, but it's been
22   a long week.  Does Mr. Hardy, have you witnessed him fill these
23   things out?
24   A.  Yes, I have.
25   Q.  Does he need assistance from other inmates?
```

1   A.  No, sir.

2   Q.  He does it himself?

3   A.  Right.

4   Q.  Do you have any problems communicating with him, making

5   yourself understood?

6   A.  Not at all.

7   Q.  Does he have any problems communicating with you?

8   A.  Not at all.

9   Q.  Let's talk about the routines at the prison.  And describe to

10  the court how the federal tier at the St. Bernard Parish jail is

11  organized.  Are the inmates, do they have to stay in their cells,

12  can they move about or what?

13  A.  They have lockdown at seven o'clock at night, and they're let

14  off of lockdown after breakfast in the morning.  So during the day

15  they can move about freely, until lunchtime feed-up, which is

16  around 12 o'clock, they have to go to their cell and then they open

17  the cells at the officer's discretion one or two at a time, to come

18  get their trays, go back to their cells, and then within a few

19  minutes after every inmate has been fed, then all of the cells open

20  and they're able to continue mingling about.

21          The only time they're locked down is for like feed-up,

22  lockdown at night, if we're fixing to conduct a shakedown for any

23  reason or if we have to go in and handle a situation that, you

24  know, could potentially escalate, we try to get them under control

25  lockdown.

Q.  Can they -- are things structured during the day; in other

words, if they want to play a game of cards or something, can they

do that whenever they want to?

A.  Yes, they can.

Q.  What about the television and the phone, are they on all the

time or are there any requirements that would trigger access to the

TV and the phone?

A.  Cleaning supplies are put into each tier early in the morning.

They know they have to clean the tier, clean their cells, clean the

common area, toilet and shower area, before the phones or TVs are

turned on.  If you finish cleaning up early in the morning, the TV

gets turned on.  The phones don't get turned on until 10:00 in the

morning.  If you haven't cleaned, the TV won't be on and the phone

won't be on until all of that is complete.

Q.  How does Paul Hardy fit into that early morning cleaning, have

you ever seen him do it?  Anything in particular you'd like to

inform the court about that?

A.  He's usually one of the first ones up cleaning.  He is very

clean, he likes to have the area -- he likes to make sure that the

area is clean so that way the TV and the phones -- you know, he

doesn't want to have to lose any of those privileges because of

somebody else not cleaning, so I think he just figures let him do

it, he does a good job of it, so, I mean, he's never had a problem

with, you know, had to tell him, no, you can't have the TV.  If the

place is dirty, he is going to clean it.

1           You know, I've seen him up early several times, made

2    comments to him, why are you the only one that has to clean,

3    everybody else gets to sleep like Sleeping Beauty, you know, he is

4    always cleaning.

5    Q.  Have you ever seen him reading?

6    A.  Yes.

7    Q.  Do you know what he's been reading?

8    A.  I'm assuming it was a Bible because it was structure -- you

9    know, looks like a Bible.  I've seen him read just regular

10   looseleaf papers, I'm assuming it's notes, you know, whatever he

11   has, letters.

12   Q.  Have you ever seen him write letters?

13   A.  I don't know if it's a letter or what exactly he is writing,

14   but I've seen him write items other than a sick call, yes.

15   Q.  Alone or with assistance?

16   A.  Alone.

17   Q.  Has he given you things to mail?

18   A.  Yes.

19   Q.  Have they been addressed properly, ZIP Codes, things like that?

20   A.  I don't inspect exactly where it's going, I didn't pay much

21   attention.  The one thing we really do is, when we take the mail

22   from the inmates, we make sure there is a stamp on it because, you

23   know, it's just senseless to walk all the way up front, drop it in

24   the mail, you know, we try and make sure that they put a stamp on

25   it because some of them forget.  But I have seen where there is a

1    return address, there is an address that it is going to, and a

2    stamp is affixed to it.

3    Q.  Can they purchase stamps at the commissary?

4    A.  Yes.

5    Q.  Have you ever seen Mr. Hardy actually helping other inmates

6    with writing things?

7    A.  I don't think I've seen him like helping them, you know, other

8    than like letters, no; but a sick call, yes.

9    Q.  You have seen him assist other --

10   A.  Right.  Like, he'll tell him what they got to write on it.  If

11   somebody comes in, whether they're illiterate or wherever, if they

12   can't write or read or whatever, I've handed a sick call to them

13   and they say, well, I can't fill this out, he has assisted them, he

14   has helped; he'll step in and say, well, this is what you have to

15   do, you have to fill this out, give it to her, and then I've

16   addressed that person's sick call.

17           As long as it's in writing, it goes in their folder and

18   it stays there.  So he has helped people when they've needed it.

19   Q.  Have you ever seen him play any kind of board games or like

20   indoor recreational activities?

21   A.  Cards and checkers is the only thing I've seen on the inside.

22   Q.  You have observed that personally?

23   A.  Yes.

24   Q.  Can he do that himself or does he have to have somebody kind of

25   show him what to do?

```
 1   A.  What I've seen, he is the dealer, from what I've seen being on
 2   the tier.
 3   Q.  Can you tell what kind of games he plays?
 4   A.  I am not familiar with card games.  It will either be between
 5   him and another guy or there will be a bunch of guys at the table,
 6   you know, and he stands like mostly at the foot of the table and he
 7   deals.
 8   Q.  Does he workout?
 9   A.  Yes.
10   Q.  Anything in particular about that that's noteworthy to you?
11   A.  They all get along.  I don't know how they do what they do, but
12   they go an hour or two straight of working out, and, I mean, it's
13   strenuous; you know, whether it's sprinting from one tier to
14   another, or using the resistance, they'll use like another inmate
15   to help them like push the legs down, so that way I guess it's
16   working abdominal muscles or whatever.  But it's like resistance,
17   and then they go to another routine and then they use cards to
18   count how many reps they are going to do or how many push-ups, sit
19   ups, whatever, based on the cards, you know, I mean.
20   Q.  Explain how that works to the court, please.
21   A.  From what I've seen is, you take a deck of cards, you put it in
22   the window.  Now, I am not on the inside so I don't exactly know
23   what the deal is, but they put a deck of cards on the windowsill
24   and whatever card they flip over, if it's a five, somebody will go
25   and they'll do like five pushes up; that guy gets up, another guy
```

```
 1   flips over a card.

 2            At first I was under the impression was to just, when the

 3   cards were all finished being flipped over, their workout is over.

 4   But then I was educated by someone that told me that it's actually

 5   when they flip it, that's the number they go and do.

 6            There's also another routine where you line up cards on

 7   the floor and you squat and you pick it up, you go to the next one

 8   and squat and pick it up, and then you come back and you do it on

 9   the other side.  So I've seen him workout with that.

10   Q.  Now, when you say somebody is helping him, is it somebody

11   showing him what to do or what --

12   A.  No, it's like a workout buddy, not like, this is how you pick

13   this up.  It's like a spotter, you know, somebody that's working --

14   for encouragement, you know, I guess, if you don't want to workout,

15   you know, you have somebody pushing you to workout, you know.

16   Q.  They don't have weights down there, do they?

17   A.  No.

18   Q.  How about outdoor recreational activities, are any available?

19   A.  They can go out in the yard and they play basketball, they can

20   run around the yard, they can workout, they can jog, they can,

21   whatever, you know, in the yard, but there is no other object out

22   there other than basketball.

23   Q.  Have you seen Hardy play basketball?

24   A.  Yes.

25   Q.  Is he able to play?
```

1   A.  Yes.

2   Q.  Anybody have to show him what to do?

3   A.  No.

4   Q.  Based upon your career, have you come into contact with people

5   who have been mentally retarded?

6   A.  Yes.

7   Q.  Is there anything that you've observed in Paul Hardy that makes

8   you feel that he has some intellectual impairment?

9   A.  No.

10          MR. LARSON:  Your Honor, I would object to this question,

11  it calls for opinion testimony and is outside the realm of opinion

12  testimony permitted of a lay witness under the Federal Rules of

13  Evidence.

14          MR. McMAHON:  Well, I think under 701, I mean, Lieutenant

15  Desroche is a veteran EMT, she's been on the streets --

16          THE COURT:  I think you can rephrase.  I wouldn't use the

17  term mentally retarded because that is a clinical term, but there

18  are lay terms that are close to it that you could try using.

19  BY MR. McMAHON:

20  Q.  What's been your impression of Mr. Hardy's intellectual acumen

21  since he's been under your supervision?

22  A.  He's intelligent.  He's -- I don't know, he communicates very

23  well with me about what he wants.  And as with anybody, when you

24  want something, you're going to try and get it as much as you can,

25  you're going to try other methods to get the end result of what you

1    want.

2          I've had arguments with him as far as, this is policy,

3    this is protocol, this is how this has to be done.  And, of course,

4    it's upsetting to him because he didn't have control to go out and

5    get the medical records I needed or whatever the situation was, he

6    couldn't actually go do it himself, so it is frustrating.

7          He's never shown me that, like if I tell him no for

8    something, it's never been, why not?  It's, okay, well, can we do

9    this this way and then it will be the end result.  Do you see what

10   I'm saying?

11         It's hard to explain, but when I'm trying to get his

12   medical records or his history, it wasn't happening fast enough,

13   the other persons weren't cooperating fast enough and that made him

14   mad, okay, and it was frustrating; but it was always, well, if you

15   don't get my records, then don't worry.  I'll get my attorney to

16   take care of it.  And that's fine, but everything goes through the

17   U.S. Marshal's and we have to ask permission to send somebody to

18   get checked out, and all those things, there is a process that has

19   to take place and it's frustrating, you know.

20         So based on the conversations that I've had with him

21   several times on the same issue, it was just aggravating him more

22   and more that he wasn't getting the end result he wanted.

23         He never not understood when I explained to him over and

24   over again.  You know, it was just, he just didn't like the answer,

25   wanted to know, who else can I talk to that can make this happen

1   for me.  And there was nobody else.  It would either be, well then

2   I'll just call the marshals.  Well, we want you to call the

3   marshals, we encourage you to call the marshals, maybe the marshals

4   can assist us in getting what we need to treat you, which would be

5   the records or the special shoes he needed, whatever it is that he

6   needed at the time.

7   Q.  So he is aware of the various options he has?

8   A.  Right.

9   Q.  Does anybody have to tell him this or is he doing this on his

10  own volition?

11  A.  No.  I mean, if he has a request, he makes no qualms about that

12  request and what he wants.  He does want to know why, you know, but

13  not in a way that it's because he doesn't understand the answer,

14  it's because he just wants to know why, it's so simple, why can't

15  it just be done like this, but there are steps you have to take,

16  and I had rank I had to go through to get what I needed for him.

17  Q.  By the way, I'm sure this is going to come up in cross, so I am

18  going to anticipate it.  Do you have anything against Hardy?

19  A.  No.

20  Q.  Do you have any beef with him or anything?

21  A.  Not at all, not at all.

22  Q.  Does he notice subtle changes in routine, if any routine or

23  anything is changed up without notice?

24  A.  Yeah.  If like we've changed the feed-up time or if we've gone

25  from the smaller food trays to the big, thicker ones that are

```
 1   supposed to hold more heat in it, he'll make little comments like
 2   that.
 3            I mean, he's made little notice of things, of me if I
 4   haven't been there and another deputy passed out the medication for
 5   me that I had premade for the inmates, if I knew I had court the
 6   next day or if I wasn't going to be there for whatever reason, he's
 7   made mention of, you know, haven't seen you in a while, where you
 8   been, you know, different things like that.
 9   Q.  So he makes small talk?
10   A.  Uh-huh, uh-huh.  He's friendly.
11   Q.  Would you classify him as a leader or a follower?
12   A.  I would say a leader.
13   Q.  Why?
14   A.  He is in control.  He's in control, he is aware of the little
15   things that nobody else really notices or even cares about.
16            If you look like you're in a bad mood or you're just not
17   having a good day, he'll make reference to it.  He won't say, well,
18   what happened, why -- he won't ask you what's wrong because he
19   knows it's really none of his business with all due respect, but at
20   the end when you finish doing what you have to do in that tier,
21   when I walk out, he would make a comment like, I hope your day gets
22   better.  You know, he shows that he is aware of what's going on.
23   The little things.
24            If he's playing cards and I happen to go in the booth,
25   the control booth where the main deputy is that watches all of
```

1540

```
 1    those tiers where they're housed, and I'm watching some other
 2    inmate because another inmate in this area has made a complaint and
 3    I want to just kind of validate and see if he is lying to me or
 4    not, and I happen to look over here and see what, you know, Hardy's
 5    tier is doing or look at the other tier or whatever, you just
 6    notice things like him playing cards, but he'll look up or he'll
 7    look over here and he'll see who is coming in, who is going out,
 8    what these guys are doing over here.  You know what I'm saying?  He
 9    is never just -- he is aware of his surroundings, he is in control
10    of what's going on around him basically.
11    Q.  How about in relation to other inmates, can you give the court
12    any example, when you say like he is in control or a leader, do you
13    have an example for the court?
14    A.  If somebody is getting out of order in the tier, if they're
15    fixing to do something that's going to cause the whole tier to
16    suffer for it, if one guy was told, you have three sheets in your
17    tier, in your cell, I want them all right now or y'all get
18    lockdown, he will make sure that that gets taken care of so that
19    way they all don't have to suffer for one person.
20              He more or less -- I don't know if he controls and tells
21    them you can't do this, you can't do that, but it's more like, this
22    is how things are supposed to be run, guys, and I am not suffering
23    for you, you know, if you're going to be the screw-up.  We all want
24    to get along in here, we all want to make sure we have TV, we have
25    phones, that we're not locked down all day, that we get to go to
```

1    yard.

2            I mean, he more or less sets a precedence of how it's

3    going to, you know what I'm saying, how it's going to be.  Like, if

4    this guy is fixing to mess up, calm down, dude, calm down, you

5    know, we're going to get lockdown, we don't want that.

6    Q.   Relate to the court the incident you described to me regarding

7    the cold food that day.

8    A.   The cold food.  I couldn't even tell you when it was, I didn't

9    write paper on it because it wasn't a big deal on me.  But he was

10   in a tier, I don't know what tier it was, but he was in one of the

11   first two cells and he came out for lunchtime to be fed.  Now, we

12   had just answered a code red call, which happened in a complete

13   opposite side of the jail, where all of the manpower had to be at

14   that side of the jail to take care of this inmate that was fighting

15   a deputy.

16           And feed-up started like 20, 30 minutes later, so the

17   food did get cold.  When he received the food, it was, this is

18   cold, I'm not eating it; well, from there everybody followed suit,

19   well, I ain't eating it either, and they just didn't even bother

20   coming out to get their food.  So from then on the federal division

21   officer, the head officer, had to go in and explain to them, look,

22   we had a problem, we had an issue we had to take care of,

23   somebody's safety, blah, blah, blah, feed-up was late, I apologize,

24   you know, and, I mean --

25   Q.   He explained to whom?

A.  They explained to the tier.  They go in and they address the

whole tier because it can escalate into a riot, it can escalate

into a one-on-one confrontation with the officer that's feeding up,

it can be anything.  So they stop everything right there, the

officer goes and explains why the food was cold.

Q.  How about his personal hygiene?

A.  He's clean.  He's clean.  He's always, you know, he doesn't

walk around in dirty, funky clothes, he never walks around

barefoot, he doesn't walk around with just socks on on the cement.

When he comes in from, you know, taking the yard call, he gets in

the shower.  He doesn't --

Q.  I'm sorry, go ahead.

A.  He makes sure he's clean.  You know, if he's sweating from just

doing whatever, he goes and wipes himself off.  I mean, he is

generally clean, you know.

Q.  Is there anything that you observed of Hardy that makes you

think he is gullible?

A.  No.

Q.  Elaborate on that for the court, please.

A.  He is not gullible.  I don't think you can fool him with

anything.  I mean, just from my experience with him for the last

few years, I've told him something that's just simple and quick so

I could get out of the tier because I have to go handle something

else or whatever, it's almost like he is thinking I am trying to

just blow him off and lie to him and give him a stupid answer why I

```
 1    can't get whatever it is he's requested, but then he will stand
 2    there and say, yeah, right, you know.  And then you want to have to
 3    explain to him, look, I really am trying to do what I have to do, I
 4    just have other things I have to get to.
 5            If somebody got shook down in one tier, most of the guys
 6    are watching what tier is getting shaken down.  We've seen him come
 7    back from yard and they assume they got shaken down as well and
 8    they didn't.  So things like that, he is in tune with, from what
 9    I've seen, that if somebody had stuff messed with in their cell, he
10    would go run in his cell and look around and see did they mess with
11    my stuff, too.  You know, they all do that, so, I mean, he is
12    definitely in tune with what's going on around him.
13    Q.  Have you seen inmates that you would describe of gullible?
14    A.  As gullible, yes.  We've had to move them out of certain tiers
15    as well.
16    Q.  But not Mr. Hardy?
17    A.  No.
18            THE COURT:  Let me jump in if I could just for a minute.
19    Could you give -- how long has Mr. Hardy been in over there that
20    you know of?
21            THE WITNESS:  Since November of '06.
22            THE COURT:  November of '06.  And you've been there since
23    November of '06 yourself?
24            THE WITNESS:  Yes, ma'am.
25            THE COURT:  I just wanted to get that on record.
```

```
 1              THE WITNESS:  I've been there since 2002.
 2              MR. McMAHON:  I was going to get to that before I closed,
 3    your Honor, but thank you.  I should have done it up front.
 4              THE COURT:  Okay.  Thank you.
 5    BY MR. McMAHON:
 6    Q.  Lieutenant Desroche, we e-mailed you some questions --
 7              MR. McMAHON:  Your Honor, I provided to the defense
 8    attorneys and the court, as I think it's Jencks, so I've turned it
 9    over.  And just to ask for your comments, and these kind of track
10    some of the questions on the Vineland.
11    BY MR. McMAHON:
12    Q.  Lieutenant Desroche, did you look at these various items and
13    then make your comments as well?
14    A.  Yes, sir, I did.
15              MR. LARSON:  Your Honor, I am going to object to this
16    format.  He can certainly ask the witness questions that relate to
17    this, but asking the witness what she said previously on some form
18    is improper.  He can simply ask questions.
19              MR. McMAHON:  All right.  I'll ask questions.
20              THE COURT:  Overruled.  I think if she verifies that
21    these were her answers, I have no problem with it.
22              MR. McMAHON:  Thank you, your Honor.
23    BY MR. McMAHON:
24    Q.  Let's go down, Lieutenant Desroche, it's, ask permission before
25    using objects belonging to or being used by another (the individual
```

1    must ask permission before attempting to use the object or wait for

2    a response) the individual asks while grabbing without waiting for

3    the others reply score was zero, that's part of the thing.  What

4    was your response to that particular item?

5    A.  He asks us for cleaning supplies.  There isn't anything else he

6    would have asked me for other than, you know, sick calls,

7    medication, just general questions, you know, are we going to yard

8    today or whatever.  You know, simple things.  But for actual

9    objects, it's only been cleaning supplies, medication.

10             THE COURT:  I think what I would like to do, Mike, just

11   because I don't want her to just read the form.  But first of all,

12   maybe look through the form to verify --

13             MR. McMAHON:  That'll be fine.

14             THE COURT:  -- to verify that these are your answers; and

15   then if you want to, if there is any particular one you want to

16   elaborate on, but let's just not read it.

17             MR. McMAHON:  That will be fine.  I understand, and I

18   would ask that this be included in the record.

19             THE COURT:  I have no problem with that, I just need her

20   to verify that these are, in fact --

21   BY MR. McMAHON:

22   Q.  Lieutenant Desroche, just follow along.  Let's just look

23   through, you've seen Mr. Hardy play a simple game.  What kind of

24   games does he play, board games?

25   A.  Checkers is the only thing I've seen.

1   Q.  Any card games?

2   A.  Yes, card games.

3   Q.  Shows good sportsmanship?

4   A.  Yeah.

5   Q.  Does he ever say he's sorry after making, like, for example, an

6   unintentional mistake or error?

7   A.  He hasn't had to apologize to me for a whole lot of things,

8   only, just in particular, if I go into the federal tier and I'm

9   passing out medication, if I am talking to another inmate and he

10  walks up and he remembers that he wanted to ask me something, oh,

11  wait, Lieu, I have to ask -- and I'll, hold on, wait until I'm

12  finished with this guy.  And then he will, he'll, I'm sorry, I'm

13  sorry.  You know, he will wait for me to finish with the other

14  inmate before he can start asking me what medicine he needs or

15  whatever it is.

16  Q.  Have you seen him listen to an informational talk for at least

17  15 minutes or a half -- and a half hour?

18  A.  Yes.

19  Q.  In what way?

20  A.  It would be whether Corporal Laylle or any of the other

21  officers have to go into the tier to explain that something is

22  changed or why they're losing TV or whatever it may be, they sit

23  there and they talk, which seems forever, but it's usually about a

24  half hour, 45 minutes.

25          And the deputies go in and they tell them what the rules

1    are, what's going on, and the inmates have an opportunity to

2    question, you know, their concerns, you know, why this, why that,

3    what happened, what's the deal, and then they come to a resolution.

4            There's been football games, there's news, there's *Young*

5    *and The Restless* in the morning, you know, things like that, movies

6    that are played at the jail.

7    Q.  Does he stay on topic or go off in tangents when you're

8    speaking to him?

9    A.  He stays on topic with me.

10           THE COURT:  Mr. McMahon, you do need to do the foundation

11   to get this in to question her that these are, in fact, her

12   answers.  I mean, just do the foundation so this can come in.

13           MR. McMAHON:  Sure.  Yes, your Honor, I will, I will.

14           THE COURT:  Okay.

15   BY MR. McMAHON:

16   Q.  And he certainly follows directions for healthcare procedures?

17   A.  Yes, he does.

18   Q.  He makes appointments for -- I mean, how does that fit in, how

19   did you respond to that?

20   A.  If he needs to see the doctor, then he sees the doctor that

21   comes to the jail.  He hasn't asked, for example, he hasn't asked

22   for mental health, he hasn't asked for dental appointments, he

23   hasn't asked for just general like MRIs or X-rays just for a

24   checkup.

25           He's asked for things that can usually be taken care of

1  right away, Tylenol, anti-fungal cream, muscle rubs, Tagamet,

2  things like that.  Just in the beginning when he got there he was

3  asking to go to the ER to be checked for the foot injury from 2003

4  that we had to wait to get the records on.  But other than that, he

5  hasn't asked for anything that we couldn't deliver pretty much.

6  Q.  He uses household products appropriately?

7  A.  Yes.  Yes.

8  Q.  You've observed him do that yourself?

9  A.  The cleaning supplies, yes.

10  Q.  Does he obey time limits, any time limits that are set?

11  A.  Well, you know, they're all going to stray because, you know,

12  you're on the phone with your family and you want to talk as long

13  as you can, but, you know, they're all gonna go over time when you

14  say it's time now, you know, come on in from yard, whatever, you

15  just want to get that one last shot, things like that, nothing --

16  Q.  I'm sorry, I didn't mean to --

17  A.  Nothing like way over that we have to have a problem with, no.

18  Q.  Does he keep an appropriate distance when you speak to him or

19  does he get in your face or is that appropriate --

20  A.  He is at a good distance, you know, I mean, he is within arm's

21  length of you.

22  Q.  Now, Lieutenant DesRoche, when did you receive these questions,

23  can you recall?

24  A.  I received them on, by the time I checked my e-mails it was on

25  a Sunday, Sunday or Monday morning early.

```
 1   Q.  And you received them by e-mail?
 2   A.  Yes, I did.
 3            THE COURT:  This past Sunday?  Which Sunday?
 4            THE WITNESS:  I want to say it was this past Sunday.
 5   BY MR. McMAHON:
 6   Q.  And they were sent over by Dr. Hayes?
 7   A.  Yes, sir.
 8   Q.  And then you read them and responded to them to the best of
 9   your ability?
10   A.  Yes, sir.
11   Q.  And then you e-mailed these things back?
12   A.  Yes, I did.
13            MR. McMAHON:  And, your Honor, I think with that
14   foundation --
15            THE COURT:  Yeah, just if you wouldn't mind just looking
16   through them to make sure --
17            THE WITNESS:  I've read them.
18            THE COURT:  Okay.
19   BY MR. McMAHON:
20   Q.  Are these all the questions that were sent over to you?
21   A.  They are.  What I did was, when she sent them to me, I put
22   it -- I copied and pasted it into a different format and I printed
23   from my own personal computer at home my own copy.  So the copies
24   y'all have is from y'all, this is printed from my computer what I
25   know I said.  So --
```

```
 1    Q.  And these are the same questions you received by way of e-mail?
 2    A.  These are the same ones, yes, it is.
 3    Q.  No additions, no omissions?
 4    A.  Nothing has been changed.
 5              THE COURT:  Same answers?
 6              THE WITNESS:  Same answers.  To the letter.  I've
 7    inspected it myself.
 8              MR. McMAHON:  Okay, fine.
 9    BY MR. McMAHON:
10    Q.  Do you know what the phrase punked means?
11    A.  Punked?
12    Q.  Punked.
13    A.  Yes.
14    Q.  What does that mean?
15    A.  Played, fooled, tricked, you know.
16    Q.  Do you ever see inmates under your supervision punked?
17    A.  All the time.
18    Q.  Paul Hardy ever been punked that you saw?
19    A.  Not to my knowledge.
20              MR. McMAHON:  I tender for cross.  Thank you, Lieutenant.
21              THE WITNESS:  You're welcome.
22                        CROSS-EXAMINATION
23    BY MR. LARSON:
24    Q.  Lieutenant DesRoche, my name is Herbert Larson.  I think
25    actually you and I have seen each other on a number of occasions,
```

1    haven't we?

2    A.  I don't recall.

3    Q.  You don't recall?

4    A.  No.

5    Q.  Lieutenant DesRoche, were you the deputy who rated Paul Hardy

6    100 out of 100 in response to Dr. Hayes's interview with you?

7    A.  Yes, I am.

8    Q.  Now, you said you have been at St. Bernard -- and that was in

9    comparison to all other inmates at St. Bernard?

10   A.  Not all of the other inmates at St. Bernard, but in -- as 50 is

11   an average on a scale, 50 to 100.

12   Q.  Fifty to 100?

13   A.  Yeah, right.  In my experience in dealing with people on a

14   daily basis.

15   Q.  You put him at 100?

16   A.  I did.

17   Q.  And you've been there seven and a half years?

18   A.  Yes, sir.

19   Q.  And while you've been there during that seven and a half years

20   you've had doctors as inmates?

21   A.  Uh-huh.

22   Q.  You've had lawyers as inmates?

23   A.  Not to my knowledge, no.

24   Q.  No lawyers?

25   A.  I have not dealt with lawyers personally.  I've dealt with

```
 1  judges, I have not dealt with lawyers.
 2  Q.  Oh, you've dealt with --
 3            THE COURT:  As inmates?
 4            THE WITNESS:  Yes, ma'am, I have.
 5  BY MR. LARSON:
 6  Q.  You've dealt with judges in prison there?
 7  A.  Yes, I have.
 8  Q.  And you've dealt with business executives and politicians who
 9  have been in jail there?
10  A.  I haven't personally dealt with politicians, they are in a
11  separate area I don't have to deal with.
12  Q.  So Paul Hardy is right up there with the judges, right?
13  A.  He is very smart.  He is very smart, and I wouldn't say that
14  the judges in my jail were -- I didn't have a chance to rate with
15  them between 50 and 100, never had to deal with them as much.
16  Q.  Now, it's not your testimony, is it, that you watched Paul
17  Hardy fill out every single sick form that was up there, is it?
18  A.  Not every sick, oh, no.
19  Q.  Okay, thank you.
20            MR. LARSON:  If I might approach, your Honor?
21            THE COURT:  Yes.
22  BY MR. LARSON:
23  Q.  I would like to show you these two forms --
24            MR. McMAHON:  May I see those, please?
25            MR. LARSON:  Oh, sure.
```

1  BY MR. LARSON:

2  Q.  Do you recognize those forms, Lieutenant DesRoche?

3  A.  Yes, I do.

4  Q.  And could you explain for the court what those are?

5  A.  The first one is the one that is, the items they can choose

6  from to buy at the commissary.

7           The second one is actually where they fill out what item

8  they want, the amount they want, their name, their account number,

9  and then submit it to the officers.

10  Q.  And to order the merchandise all they have to do is pencil in a

11  little bubble; is that correct?

12  A.  They can do that and then they can also write the description,

13  they can write it out.

14  Q.  And in response to the sick forms that people fill out --

15           THE COURT:  Mr. Larson, are you going to admit those

16  forms?

17           MR. LARSON:  Yes.  They would be Defense Exhibits, I

18  think, 34 and 35.

19           THE DEPUTY CLERK:  36 is the next one.

20           MR. LARSON:  36 and 37, I would offer those as Defense

21  Exhibits 36 and 37, your Honor.

22           THE COURT:  They're admitted.

23           MR. LARSON:  If I might approach, your Honor?

24           THE COURT:  Yes.

25  BY MR. LARSON:

1    Q.  I show you 37 and 38.  Do you recognize those?

2    A.  Yes, I do.

3    Q.  And are those -- can you describe what the tube is?

4          THE COURT:  Wait a minute, hold on a second.  36 and 37

5    were the first two, and you just said 37 and 38?

6          MR. LARSON:  That's correct, I'd offer two more.

7          THE COURT:  So it's 38 and 39 or am I math challenged,

8    arithmetic challenged?

9          MR. LARSON:  The next two exhibits.

10   BY MR. LARSON:

11   Q.  Deputy, do you recognize -- could you describe what the tube

12   is?

13   A.  The tube is the anti-fungal cream that the inmates request.

14   When the showers get a little funky, they kind of get athlete's

15   foot and this is what they use.

16   Q.  In large black letters, what is written on the front of that

17   tube?

18   A.  Tolnaftate, whatever.  It's the brand name or whatever for this

19   anti-fungal cream.

20   Q.  Tolnaftate, right?

21   A.  Tolnaftate, however you want -- different people.

22   Q.  Which was precisely what Paul Hardy had written on his form; am

23   I not correct?

24   A.  He requested it, yes.

25   Q.  And on the little packet right there, what's written across the

1   front of that?

2   A.   Triple antibiotic ointment.

3   Q.   And that's also what Paul Hardy had written on that form,

4   wasn't it?

5   A.   Correct.

6   Q.   Now, when you saw Paul Hardy reading the Bible, you said you

7   saw him reading that?

8   A.   I assume it was the Bible.

9   Q.   You assumed it was the Bible?

10  A.   Right.

11  Q.   You didn't engage in any theological discussions with

12  Mr. Hardy, did you?

13  A.   No, I wasn't in the tier.

14  Q.   And you said you saw him play card games; am I correct?

15  A.   Yes, sir.

16  Q.   Do you know what Tonk is?

17  A.   No, I don't.

18  Q.   Do you know what Pitty Pat is?

19  A.   No, I don't.

20  Q.   You don't know that they're children's games?

21  A.   I don't know, I have no idea.

22  Q.   Do you know what card games they were, in fact, playing on the

23  tier?

24  A.   I have no idea.  I am not into gambling, cards, and all of

25  that.

 1   Q.  Now, you said you have been there -- well, Paul Hardy's been

 2   there since, I think, November of '06?

 3   A.  Uh-huh.

 4   Q.  And you've observed Mr. Hardy closely?

 5   A.  Yes, I have.

 6   Q.  Can you tell me what odd or unusual physical behavior you've

 7   observed of Mr. Hardy during that three-year period?

 8   A.  I don't have any odd behavior that I've had to deal with with

 9   him.

10   Q.  You've never noticed in that three-year period of close

11   observation that Mr. Hardy has a constant tremor or rocking motion

12   whenever he is seated?

13   A.  No.

14          MR. LARSON:  Your Honor, I would like to play, this has

15   been offered as a government exhibit, it's video clip -- it's video

16   disc 2 of the interview of Paul Hardy with Jill Hayes.

17          THE COURT:  All right.

18      (WHEREUPON, THE VIDEO WAS PLAYED.)

19   BY MR. LARSON:

20   Q.  You've never noticed that rocking or tremor?

21   A.  I haven't seen him sit still a whole lot like that since he's

22   been in my custody.

23   Q.  Do you see his hands?

24   A.  I sure do.

25   Q.  You never noticed that?

1    A.  Uh-huh.

2    Q.  You have noticed it?

3    A.  No.  I see his hands right now, I have not noticed that he's,

4    you know, has a -- what is he, rocking his foot, leg, crosses -- I

5    don't know what he's doing, I can't see from waist down.

6    Q.  You don't know what that condition is called, do you?

7    A.  He's never told me he had a condition.

8    Q.  Or what causes it?

9    A.  When he is working out, when he is on yard, when he is dealing

10   cards, he is moving already, so he is not sitting down in a seated

11   position.  I haven't had the opportunity to sit there and watch him

12   like this, relaxed, with his hands, you know, like that.

13   Q.  In a seated position?

14   A.  No.  He's active, he's moving around.  But when he watches TV,

15   they usually just stand by their cells and they look up at the TV,

16   they sit down, they're messing around with something else, they're

17   watching TV, you know.  I've never been told he had a condition.

18              MR. LARSON:  No further questions, your Honor.

19              THE COURT:  All right.  Any redirect, Mr. McMahon?

20              MR. McMAHON:  Just to clarify, your Honor.

21                        REDIRECT EXAMINATION

22   BY MR. McMAHON:

23   Q.  Lieutenant DesRoche, that scale of one to 100, you're not

24   saying that Paul Hardy is the most intelligent person?

25   A.  That's not what I meant when I said on a scale of one to 100

1    that he was as smart as a judge.

2    Q.  Right.

3              MR. LARSON:  Your Honor, I would object to him leading

4    the witness on redirect.

5              THE COURT:  Yes, you've been leading quite a bit.

6              MR. McMAHON:  That was leading?

7              THE COURT:  Yes, it was.  Sustained.

8    BY MR. McMAHON:

9    Q.  When you said that you rated Paul Hardy at the highest end of

10   the scale when asked that question by Dr. Hayes, what did you mean

11   by that high rating?

12   A.  What I meant by that was not his intelligence is he's as smart

13   as a judge or a doctor, what I meant was that he is very well aware

14   of what is expected of him, he knows what procedures he has to take

15   to get whatever it is he is requesting, whether it's a grievance

16   form because he's complaining about the heat, the shower not

17   working, if he doesn't feel good, he knows which avenues to take to

18   get answers to that.

19             If he wants to talk to rank, he knows which avenues to

20   take.  He's aware of his surroundings, he knows what's going on.

21   If someone walks behind him, he is aware that somebody is behind

22   him.  He is very smart of what's going on around him, and whatever

23   involves him personally, he is aware of it.  He will not be punked

24   by anybody, he is going to know well enough when somebody is

25   playing him.

1           That's what I meant by that.  Not that his book smarts

2   were smarter than anyone and on the same level as a judge or a

3   doctor by any means.

4   Q.  You were asked on cross-examination suggesting that you did not

5   see Mr. Hardy fill out every single sick call.

6   A.  Not every one, no.

7   Q.  But have you ever seen any other inmate help him?

8   A.  No, I have not.

9   Q.  Have you seen him help others?

10  A.  I've seen him tell people, look, you have to fill this out.

11  When they, oh, I just need this, I just need that.  Well, you have

12  to fill out a sick call.  Hand them a sick call, dude, you have to

13  fill out like this, give it to her.  And he is handing it right

14  back to me for the inmate, right there at the table, right there at

15  the door.

16          MR. McMAHON:  Thank you, Lieutenant.

17          THE COURT:  All right.  You may step down.  Thank you

18  very much.

19          MR. McMAHON:  Your Honor, we call Corporal Ryan Laylle.

20      (WHEREUPON, RYAN LAYLLE, WAS SWORN IN AND TESTIFIED AS

21      FOLLOWS:)

22          THE DEPUTY CLERK:  Please be seated.  State your name for

23  the record and spell it for us.

24          THE WITNESS:  Corporal Ryan Laylle, R-Y-A-N L-A-Y-L-L-E.

25                      DIRECT EXAMINATION

1  BY MR. McMAHON:

2  Q.  Sir, by whom are you employed?

3  A.  St. Bernard Sheriff's Office.

4  Q.  What's your rank?

5  A.  Corporal in the federal division.

6  Q.  How long have you been with the St. Bernard sheriff?

7  A.  Approximately six and a half years.

8  Q.  Do you know Paul Hardy?

9  A.  Yes, I do.

10  Q.  When did you first encounter Paul Hardy?

11  A.  Approximately November of '06.

12  Q.  Is that when he arrived in the federal tier?

13  A.  Yes, sir.

14  Q.  Corporal Laylle, do you have any particular specialty, or

15  describe your job down at the St. Bernard jail.

16  A.  I am in charge of the federal division, that's -- I control all

17  of the federal inmates that come into our facility.

18  Q.  And do you run the commissary or do you oversee the running of

19  the commissary?

20  A.  I don't necessarily run it, but I basically run issuing out the

21  commissary, but I don't do the ordering or nothing like that.

22  Q.  Let me ask you.  Are you familiar with Paul Hardy and how he

23  deals with his commissary account?

24  A.  Yes, I do.

25  Q.  How would you describe his awareness of what he orders and what

1   he gets?

2   A.  He is very aware of what he orders, and if something don't come

3   in, he recognizes it.  If the balance is not correct, he'll

4   recognize it, and he will always bring it to my attention and I'll

5   fix it for him.

6   Q.  Do you deal with the actual forms?  The defense attorney just

7   showed Lieutenant DesRoche the actual, I guess they have a little

8   bubble, like a sheet they fill out to order various items?

9   A.  Yes.

10  Q.  Have you ever seen Hardy fill that sheet out?

11  A.  Personally, no, I have never witnessed him fill one out.

12  Q.  Has he ever complained to you about what he gets as a result of

13  any order?

14  A.  Yes, he has.

15  Q.  Or hasn't gotten?

16  A.  Yes, he has.

17  Q.  Can you give us an example?

18  A.  Yeah.  I can't remember exactly how long, like what day it was,

19  but we hand out commissary on Wednesday, and I am not sure if I

20  handed him the commissary, but on one occasion he -- the next day

21  it would be a Thursday, he came to me in the morning, he would come

22  to me with all of his grievances.  And he came to me Thursday

23  morning complaining that a set of earbuds that he bought from

24  commissary was damaged and he asked me if I can replace them and I

25  told him I can't.  I said, you know, you get what you get.

1    So he took it at that, and then the next day, or maybe it

2    might have been a couple of days after, he came to me again, and he

3    showed me the actual warranty information on the back of the

4    earbuds that it came in, and he read it to me and he asked me if he

5    can mail it off because it was under warranty, if it was damaged,

6    he can send it off back to the manufacturer.

7    Q.  What did you tell him?

8    A.  I told him, I said, "Well, Paul, I've never seen that happen

9    before," I said, "This is the first incident that has ever

10   happened," I said, "but you can give it a shot and see what

11   happens."

12        So he had a little letter that he wrote, so he took the

13   earbuds, he put it in an envelope and he came to me with the letter

14   and he asked if I wanted to read the letter, I just told him, I

15   said, "It doesn't really matter what the letter says," I said,

16   "just mail it off and we'll see what happens."

17        So I took the letter and before I put it in the mail bin

18   I asked my lieutenant, who actually is in charge of ordering the

19   commissary, and I asked him, I said, "Lieutenant," I said, "I've

20   never seen this happen before, but Paul Hardy is requesting to send

21   these earbuds, these damaged earbuds back to the manufacturer to

22   get another pair."  And he said he's never seen it before.  So he

23   said, "Just throw it in the bin and see what happens."

24        Well, a few days later an envelope came back for Paul

25   Hardy and a brand new set of earbuds was in the envelope.  So I

1    went back there and I gave them to Paul Hardy.  So it evidently

2    worked.  But I've never seen it in my whole time ever doing

3    commissary.

4    Q.  And he actually read the warranty to you?

5    A.  Yes.

6    Q.  Was there another incident where another, a toiletry was

7    damaged?

8    A.  Yes, there was.

9    Q.  Tell the court about that, please.

10   A.  And at this incident, I remember handing him the commissary,

11   and he took all of his commissary -- what he basically does, he

12   brings the whole entire bag to the cell and he empties the bag and

13   he'll bring me the plastic bag back.  And he came back with some

14   kind of lotion or Magic Shave, I'm not exactly too sure what it

15   was, but it was busted on the top and it was leaking out, and he

16   asked me if he can replace it, and I said absolutely.

17          So I took the lotion back, I brought it up to the

18   lieutenant, told him the situation, and what I was going to try to

19   do is replace it with another lotion, but I didn't have one, so by

20   the time next week came with commissary, he noticed that he never

21   got his lotion back, and he noticed that the money was not credited

22   back to his account.  So I said, "Okay, I am going to take care of

23   it today, Paul," I said, so I went back up there and told my

24   lieutenant once again and he put however much it was back into his

25   account, and I went back and I showed Mr. Hardy that it was back

1    into his account.

2    Q.  Did you ever see him use any type of lotions during the course

3    of the day?

4    A.  Oh, yeah.  A few days a week I see him do that.  He puts the

5    lotion on his head and on his face, or some kind of cream that he

6    always wears, you know.  He stays lotioned up.

7    Q.  Did you ever see him do that when he's playing cards or

8    anything like that during the day?

9    A.  No, not to my knowledge, no.

10   Q.  How about -- can you relate to the court -- well, what's your

11   rule or what's the rule down at the jail about the number of

12   inmates that can be in any cell at the same time?

13   A.  Well, ever since I've always been there, it was always no more

14   than three people in a cell.

15   Q.  Why?

16   A.  Security risk.  It's too many people in one confined, there's

17   only two people that belongs in a cell, so we allow one more person

18   in there, anything over that we'll break it up and we'll tell them

19   to come out and hang out into the dorm area.

20          Maybe a week ago or so, I can't remember exactly what day

21   it was, but I was walking past his tier, and it's windows, you can

22   see into the tier, you can see exactly what they're doing.  And I

23   noticed in Paul Hardy's cell they had exactly five inmates in

24   there.  So immediately I walked in there and I'm like, "What are

25   y'all doing, y'all need to break this up."  When I walked in, they

1    said, "Sarge, we're just doing -- we're having Bible study."

2              And when I walked in the cell, I could tell Paul Hardy

3    was like on the toilet area, it was the toilet or sink, and they

4    had everybody surround him, you know, like a little circle, and

5    everybody had a Bible in their hand.  So I let it go and I let them

6    continue their Bible study.  I said, "But if anything gets out of

7    hand, I am going to let the deputy know to keep an eye on y'all."

8    So.  And I let it continue.

9    Q.  Do you know how to play basketball?

10   A.  Yes, I do.

11   Q.  Have you ever seen Hardy play basketball?

12   A.  Yes, I have.

13   Q.  Can he play?

14   A.  Yes.

15   Q.  Does he know the rules?

16   A.  Yes.

17   Q.  Did anybody ever have to tell him the rules?

18   A.  No, not to my knowledge.

19              MR. McMAHON:  Thank you, Corporal.  I'll tender for

20   cross.

21                          CROSS-EXAMINATION

22   BY MR. LARSON:

23   Q.  Is it Laylle, Corporal Laylle, Corporal Laylle?

24   A.  Laylle.

25   Q.  Laylle, I'm sorry, excuse me.  Corporal Laylle, my name is Herb

1    Larson.  Corporal Laylle, you said you'd seen Paul Hardy play

2    basketball?

3    A.  Yes, I have.

4    Q.  You don't know when he learned to play basketball, do you?

5    A.  No, I haven't.

6    Q.  And you related a story about the earbuds and Mr. Hardy being

7    able to get the earbuds replaced by the manufacturer.

8    A.  Yes, sir.

9    Q.  Now, earbuds are listed on the commissary list, aren't they,

10   you can order them from the commissary there?

11   A.  Correct.

12   Q.  And filling out the commissary sheet, it's just a simple matter

13   of filling in bubbles with a pencil on the computerized form that

14   you all have?

15   A.  Correct.

16   Q.  And the inmate fills that out and can submit the sheet and

17   then, I guess a week later, a couple of days later, his commissary

18   goods are delivered.

19   A.  Right.

20   Q.  So the inmate knows what he's ordered and then the inmate gets

21   back something.  And if there's any difference, they're supposed to

22   bring it to your attention, right?

23   A.  Yes.

24   Q.  Now, with regard to the earbuds, Corporal, isn't it true that a

25   number of other inmates had, in fact, sent back defective earbuds

1    to the manufacturer before Paul?

2    A.  Absolutely not.

3    Q.  You don't know that?

4    A.  I've never seen it, and I do commissary every single week.

5    Q.  You're not aware of that?

6    A.  No.

7    Q.  Now, with regard to the Bible study.  Were you around when any

8    of the inmates were actually discussing the Bible or you just

9    walked in and saw them all there?

10   A.  I walked in and every single one of them had a Bible in their

11   hand.

12   Q.  You don't know what the content of their discussion had been?

13   A.  They said, we was having Bible study, Sarge, that's what they

14   told me.

15   Q.  But beyond that you don't know anything further?

16   A.  No, I never listened to their conversation when they were in

17   the cell.

18            MR. LARSON:  Okay.  Thank you.

19            THE COURT:  All right.  Thank you very much, sir.  You

20   may step down.

21            MR. McMAHON:  Your Honor, we call Gary Adams.

22            THE DEPUTY CLERK:  Raise your right hand.

23      (WHEREUPON, GARY ADAMS, WAS SWORN IN AND TESTIFIED AS

24       FOLLOWS:)

25            THE DEPUTY CLERK:  Please be seated.  State your name for

```
 1   the record and spell it for us.
 2          THE WITNESS:  Deputy Gary Adams, retired, St. Bernard
 3   Parish Sheriff's Office.
 4          THE COURT:  I think you're the first person that hasn't
 5   brought their own water.
 6          THE WITNESS:  Thank you, ma'am.
 7          THE COURT:  Good morning again.
 8                          DIRECT EXAMINATION
 9   BY MR. McMAHON:
10   Q.  Mr. Adams, when did you retire?
11   A.  May 1st, sir.
12   Q.  Of this year?
13   A.  Yes, sir.
14   Q.  And prior to that what did you do?
15   A.  Prior to retiring I was employed in the St. Bernard Parish
16   Correctional Facility.
17   Q.  How long did you actually work for the St. Bernard sheriff?
18   A.  Seventeen years, sir.
19   Q.  And of that 17 years, how much time did you spend as a
20   correctional officer?
21   A.  It was about a year and a half.
22   Q.  Your last year and a half?
23   A.  Yes, sir.
24   Q.  What did you do before you went on with the sheriff down there?
25   A.  Prior to working in the jail I was a road deputy, a patrol
```

1  deputy; and prior to that I was a detective in the juvenile

2  division.

3  Q.  What about before your career with the St. Bernard Parish

4  Sheriff's Office?

5  A.  I was in the military.

6  Q.  For how long?

7  A.  Twenty years, five months, five days.

8  Q.  Okay.  Do you know Paul Hardy?

9  A.  Yes, sir, I do.

10  Q.  Did you deal with Hardy on a daily basis?

11  A.  Yes, sir, I did.

12  Q.  Did you ever run the commissary?

13  A.  Yes, sir.  I would go and once the commissary came in and we

14  would distribute it out to the inmates, yes, sir.

15  Q.  Now, the judge has already seen the form, I guess, the bubble

16  form.  How did that --

17          MR. McMAHON:  Actually, your Honor, if I could show those

18  exhibits to the deputy.  Do we have --

19          THE COURT:  The defense exhibits?

20          MR. McMAHON:  May I approach, your Honor?

21          THE COURT:  Uh-huh.

22  BY MR. McMAHON:

23  Q.  Mr. Adams, I am going to show you two -- first of all, this

24  looks like a test sheet, a bubble sheet.

25  A.  Yes, sir.

1   Q.  What is that, for the record?

2   A.  This is what the inmates receive from us, and they have another

3   order sheet.

4   Q.  And is this the order sheet?

5   A.  Yes, sir, that's the order sheet.

6           MR. McMAHON:  Your Honor, for the record.

7           THE COURT:  It's Defense Exhibit 36, is it?

8   BY MR. McMAHON:

9   Q.  Mr. Adams is looking at 38 now and I am showing him 39.  What

10  is 39, Mr. Adams?

11  A.  39 is a list of items that can be purchased through the

12  commissary system at the facility.

13          THE COURT:  I am just a little confused on the numbers.

14  Kim, can you help me out?  I thought the commissary -- Mr. Adams,

15  would you hold up what you show as 38.

16          THE DEPUTY CLERK:  Yeah, I marked that 38.  It is

17  supposed to be 39.

18          THE COURT:  I had 36 and 37, and then I had 38 as fungal

19  cream and 39 was triple ointment.  Am I off base?

20          MR. LARSON:  That was my understanding, your Honor.

21          THE DEPUTY CLERK:  Okay.

22          THE COURT:  Maybe we can straighten it out later, but I

23  don't want the record to have weird things on -- what do you have

24  as the fungal cream, Kim?

25          THE DEPUTY CLERK:  36?

1          THE COURT:  Okay.  36 is the cream, 37 is the ointment,

2    and then 38 is the form, Mr. Adams?

3          THE WITNESS:  Yes, ma'am, it's the bubble form.

4          THE COURT:  The bubble form.

5          THE WITNESS:  And 39 would be the list of items.

6          THE COURT:  The list of items?

7          THE WITNESS:  Yes, ma'am.

8          THE COURT:  All right.  Thank you.

9    BY MR. McMAHON:

10   Q.  Mr. Adams, have you seen Hardy fill out the commissary request

11   form?

12   A.  Yes, sir, a number of times I have.

13   Q.  And how does the inmate -- specifically, how did he keep track

14   of what he actually ordered?

15   A.  Well, he orders from the sheet that they all have, and onto the

16   bubble sheet, and I've seen him on probably six or eight occasions

17   where he has a piece of cardboard that he writes down what he

18   ordered on that sheet, so that when he gets his commissary he can

19   check what he originally wrote down and the sheet that we give him

20   that he signs, and he checks, like a double check on his

21   commissary.

22   Q.  You've seen him do that?

23   A.  Yes, sir.

24   Q.  Anybody help him do that?

25   A.  No, sir.

1   Q.  And is he pretty -- what happens if there's any discrepancy

2   between what he has on his own handwritten grocery list and what he

3   actually gets when the order comes in?

4   A.  Well, he'll come to us and say, I'm missing, say, two bags of

5   potato chips, and then we'll look at the two forms that we have as

6   to the inventory as to what he ordered and what was sent, and we'll

7   say, okay, it wasn't in stock, or, okay, they did short you that,

8   so we would make a notation on the form that he was shorted two

9   bags, just as an example, two bags of potato chips and get with the

10  other officer who handles the commissary and say, look, Paul Hardy

11  was shorted two bags of potato chips, and he would credit Paul

12  Hardy's account with the missing items.

13          In other words, if it cost 25 cents a bag, he would go

14  back and put that money back into his account.

15  Q.  Okay.

16          MR. McMAHON:  And, your Honor, the court's already

17  seen --

18  BY MR. McMAHON:

19  Q.  Mr. Adams, you've seen the various, just the samples of the --

20  actually, just flash the commissaries up, Arthur, if you would.

21  And we're just going to go through these one at a time, Mr. Adams,

22  I think you've already seen these and the court's already seen

23  them, so we are not going to spend a whole lot of time.  This is

24  just a sample of -- and what is that, for the record, Mr. Adams?

25  A.  Okay, this is what we get back from the vendors, and what

1    happens, there's two copies, they sign a copy that we take for our

2    records and we give them a copy.

3    Q.  Who is them, the defendant?

4    A.  Inmates throughout the jail.

5    Q.  Okay.

6    A.  And what they do is, they would go through -- we tell them that

7    once we're in there, inventory your commissary because once we're

8    relieved, we can't come back and say, well, you were shorted.  But

9    this is the form, and like I said, we keep one for our file and one

10   copy goes to the individual inmate; as in the case of this one, one

11   copy would go to Paul Hardy.

12   Q.  I want to run through these, your Honor, and just recite the

13   date of the various commissary forms.  This is March 9 of this

14   year.  Go ahead, next.  March 16th, this year.  March 23rd.  Next.

15   April 6th of this year.  April the 8th.  April 13th.  April 20th.

16   April 20th continued.  Next.  April 27.  May 4, 2009.  Next.  May

17   11, 2009.  May 18, 2009.  May 26, 2009.  June 1.  June 8.

18          Deputy Adams, have you had the occasion to observe Hardy

19   in his daily activities?

20   A.  Yes, sir.

21   Q.  Would you describe him as a leader or a follower?

22   A.  I would describe him more as a leader than a follower.

23   Q.  Would you describe him as being gullible?

24   A.  No, sir.

25   Q.  Now, I am going to direct your attention to January 28th of

1    this year, and did you have an interaction with Paul Hardy that you

2    followed up, that you needed to follow up with a report?

3    A.  Yes, sir, I did.

4    Q.  Could you please relate that to the court.

5    A.  I was escorting Paul Hardy and he told me that, we were just

6    having a general conversation, and he said, "You getting pretty

7    close to retirement."  And I said, "Yes, I am."  And he said,

8    "Well, I got plenty money on the outside and I can make you a good

9    retirement."  And, you know, he said, "All you have to do is turn

10   your head."

11        And I replied to him that you didn't have enough money in

12   the whole world for me to turn my head.  And that when I got ready

13   to retire, I would take my retirement the way it was supposed to be

14   taken and get what's coming to me that I worked for and not the way

15   that he wanted to supplement my retirement.

16   Q.  Right.

17        MR. McMAHON:  And, your Honor, what's being displayed --

18   BY MR. McMAHON:

19   Q.  Deputy Adams, do you recognize what's being displayed right

20   now?

21   A.  Yes, sir, that's the report that I wrote and turned over to my

22   supervisors.

23        MR. McMAHON:  And for record identification, your Honor,

24   this is from deputy, then Deputy Adams, to Warden, Staff and

25   Security Division, it's dated February 19, 2009, regarding the

1    incident that Mr. Adams just described.  That is part of our packet

2    and part of the "already been admitted into evidence."

3                 Thank you, Mr. Adams, I tender for cross.

4                            CROSS-EXAMINATION

5    BY MR. LARSON:

6    Q.  Mr. Adams, my name is Herb Larson, I represent Paul Hardy.

7    A.  Yes, sir.

8    Q.  Mr. Adams, if I understand you correctly, you indicated that

9    Paul Hardy, when you were running commissary down there, could

10   bring discrepancies in his order to your attention; is that

11   correct?

12   A.  Yes, sir.

13   Q.  So if he ordered, I think you used the example chips, potato

14   chips, if he ordered five bags of potato chips and only got three,

15   he would tell you about that?

16   A.  Yes, sir.

17   Q.  Now, with regard to the report, if you could flash the report

18   back up on the screen for me.  I noticed that the incident occurred

19   on January 28th of '09; is that correct?

20   A.  Yes, sir.

21   Q.  And the date of that correspondence is February 19th, '09,

22   right?

23   A.  Yes, sir.

24   Q.  That's over three weeks later, right?

25   A.  Yes, sir.

1   Q.  You waited over three weeks to report that incident?

2   A.  No.  The incident was reported right away, right after it

3   happened, but due to time off, weekends and stuff like that, I

4   didn't get a chance to sit down and actually put the report to

5   paper.

6   Q.  You didn't put that down on paper because it was suggested that

7   you do so by any member of the prosecution?

8   A.  No.

9           MR. MILLER:  Your Honor, I really do object, I really do,

10  and if you have evidence of that, then put it forward; and if you

11  don't, this is no place for this.

12          THE COURT:  Overruled, overruled.  He can ask the

13  question, there is nothing wrong with the question.

14          MR. MILLER:  Well, it's suggesting that we are planting

15  evidence, Judge.  We can do that without a basis?

16          THE COURT:  He's asking -- Mr. Miller, sit down.

17          MR. LARSON:  So the answer was no --

18          THE COURT:  It is a perfectly appropriate question.  You

19  have to take the answer as it is.  Go ahead.

20  BY MR. LARSON:

21  Q.  The answer is no.

22  A.  No, nobody approached me about writing this report.  In fact,

23  at the time of the report, I didn't even know any of this was going

24  on.

25  Q.  Now, there's a woman's dormitory down at St. Bernard Parish

1   Prison, isn't there?

2   A.  Yes, sir.

3   Q.  And you had a number of discussions with Mr. Hardy about the

4   women in that dormitory, didn't you?

5   A.  I don't recall.  They always trying to peak in there to see the

6   females, and it's like, you know, if we bring a male inmate out or

7   a female inmate out, we keep the males away from the females.

8   Q.  I understand that.  Mr. Hardy never expressed his interest or

9   his desire to you to go over and visit in the female dormitory?

10   A.  All of the inmates do that, sir.

11   Q.  And Mr. Hardy did the same thing, didn't he?

12   A.  He may have said it on occasions.

13   Q.  Now, with regard to the incident on January 28th, wasn't he, in

14   fact, indicating to you that all you had to do was turn your head

15   and let him go to the female dormitory and he would make you a rich

16   man?

17   A.  No, sir.

18   Q.  That wasn't the context?

19   A.  No, sir.

20         MR. LARSON:  I have no further questions.

21         THE COURT:  All right.  Any redirect?

22                 REDIRECT EXAMINATION

23   BY MR. McMAHON:

24   Q.  Just to clarify.  On that date when he attempted to bribe you,

25   where was he going, what was the situation?

```
 1    A.  We were -- I was escorting him, if I am not mistaken, it was to

 2    visitation, that he had someone who had come to see him.  I don't

 3    remember if it was an attorney or someone from his family was

 4    coming to visit him.

 5    Q.  And just to respond to that scurrilous insinuation --

 6              MR. LARSON:  Your Honor.

 7              THE COURT:  Go ahead, ask your question.

 8    BY MR. McMAHON:

 9    Q.  Mr. Adams, we never even met until a couple of weeks ago,

10    correct?

11    A.  Correct, sir.

12    Q.  And you're the one who told us about that incident a couple of

13    weeks ago when we first met, correct?

14    A.  Yes, sir.

15              MR. McMAHON:  Thank you.

16              THE COURT:  Mr. Adams, just a clarification.  How many

17    inmates on average, and I realize average is a relative term, how

18    many do you have in the federal tier at any one time, roughly?

19              THE WITNESS:  There's seven individual cells.

20              THE COURT:  On the federal tier?

21              THE WITNESS:  In the federal tier.  And it's usually two

22    people per cell.

23              THE COURT:  And are you usually full up?

24              THE WITNESS:  Most of the time, ma'am.  Usually we have

25    one or two spaces left over.
```

1          THE COURT:  And then how many prisoners over all do you

2     have at St. Bernard at any --

3          THE WITNESS:  Usually around three, 400, somewhere around

4     in there.

5          THE COURT:  Now, this commissary, is that for the entire

6     jail or is it just for these federal tiers?

7          THE WITNESS:  It's for the entire jail, ma'am.  It's the

8     same procedure for every inmate that's presently being housed in

9     the St. Bernard facility.

10         THE COURT:  So this last year and a half or so that you

11    were working as a correctional officer, were you throughout the

12    entire facility?

13         THE WITNESS:  Yes, ma'am.

14         THE COURT:  You weren't assigned like -- is anybody

15    assigned to the federal tier or is it you all rotate in and out of

16    those various tiers?

17         THE WITNESS:  No, ma'am.  There is a division within the

18    corrections called the federal division, and I was put into the

19    federal division.  And the officers that were in the fed division,

20    their jobs are to make sure that the federal inmates have what they

21    need, to take care of any problems that they may have as to needing

22    briefing statements, sick call forms, toilet paper, toothpaste,

23    razors, you know, to shave.

24         THE COURT:  I guess what I'm trying to do is just get a

25    sense of the daily interaction.  I mean, is the federal tier -- I

1    mean, obviously, it's a particular tier.  But, for example, in your

2    experience, I mean, did you go there every day, did you go there

3    once a week?  Did you go when someone let you know that somebody

4    had a request or had a form or had a problem?  I mean, how would

5    you and the others, the other people that work at the jail, how did

6    you all interact with that federal tier and how often?

7           THE WITNESS:  Well, every day.  Probably three, four,

8    five times a day we would go back to the federal tier.  And also,

9    if one of the other officers or correction officers said or would

10   come tell us, the federal -- one of the federal guys wants to see

11   y'all or the federal guy's got a problem that y'all need to take

12   care of, then we would go back again and find out what the problem

13   was and try to take care of that problem for them.

14          THE COURT:  Okay.  Thank you.  That's all I have.  You

15   may step down?

16          MR. McMAHON:  Yes, your Honor.  Thank you, Mr. Adams.

17          Your Honor, just for the record, there is actually a

18   mistake on page 43 of Dr. Hayes's report, I just wanted to clarify

19   that, okay?

20          THE COURT:  Okay.  Go ahead.

21          MR. McMAHON:  I'll give you the page right here.

22          THE COURT:  Page 43?

23          MR. McMAHON:  It's page 43.  And it's in the section

24   where Dr. Hayes discusses articles regarding the lack of research

25   of the Flynn Effect on those with mental retardation, and she cites

```
 1   an article by a Wechsler Coalson, C-O-A-L-S-O-N, and Raiford,

 2   R-A-I-F-O-R-D.  The date in her report is 2009, it should be 2008.

 3   And the last sentence originally reads:  "They found that the

 4   WAIS-IV full scale IQ scores were 2.2 and 4.1 points higher

 5   respectively than the corresponding WAIS-III full scale IQ scores,

 6   comma, thus supporting the Flynn Effect."

 7          It should have read points lower, not higher, thus not

 8   supporting the Flynn Effect.  And that's on page 43 of Dr. Hayes's

 9   report.

10          MR. MILLER:  Before we make that change, your Honor --

11          THE COURT:  Why don't you, if you don't mind, why don't

12   you just substitute, give us a substitute page that we can just put

13   in along with the page that was originally there, because I started

14   to write all of that down but didn't get it all down.

15          MR. McMAHON:  Right.  And apparently it does support the

16   Flynn Effect.  I was misinformed.

17          THE COURT:  Yeah, Mr. Larson.

18          MR. LARSON:  Your Honor, if they're going to do that, we

19   would like something to indicate that the report was, in fact,

20   corrected at this point.

21          THE COURT:  Well, yeah, all I'm saying is to give us a

22   substitute page, not to replace the page -- well, I shouldn't say

23   substitute, give us the proposed -- I don't know how to

24   characterize it, but not to swap them out.

25          MR. LARSON:  An errata page.
```

```
 1              THE COURT:  Pardon me?

 2              MR. LARSON:  An errata page.

 3              THE COURT:  Thank you, Mr. Larson, an errata, I don't

 4    know Latin, an errata page.  Okay, give us the page corrected and

 5    then we'll put it into the books, okay?

 6              MR. McMAHON:  Appears that Mr. Larson is becoming a

 7    sesquipedalian.  That's the word for the day.

 8              Your Honor, with that, the United States rests.

 9              THE COURT:  It's 10:18.  Do you want to take a break now?

10              MR. LARSON:  Just about a five-minute break or ten-minute

11    break, your Honor, then --

12              THE COURT:  We're close enough to morning break, why

13    don't we just take morning break if you want.

14              MR. LARSON:  I don't anticipate that Dr. Cunningham will

15    take more than 20 minutes.

16              THE COURT:  Have you told Dr. Cunningham that?

17              MR. LARSON:  I have, your Honor.

18              THE COURT:  All right.  Take a break.

19              THE DEPUTY CLERK:  All rise.

20         (WHEREUPON, A RECESS WAS TAKEN.)

21         (OPEN COURT.)

22              THE DEPUTY CLERK:  All rise.

23              THE COURT:  Have a seat.  Mr. Larson.

24              MR. LARSON:  At this time we would recall Mr. Cunningham.

25         (WHEREUPON, MARK D. CUNNINGHAM, WAS SWORN IN AND TESTIFIED AS
```

1        FOLLOWS:)

2            THE DEPUTY CLERK:  Please be seated.  State your name for

3    the record, please.

4            THE WITNESS:  Mark Douglas Cunningham.  Mark, M-A-R-K,

5    Douglas, D-O-U-G-L-A-S, Cunningham, C-U-N-N-I-N-G-H-A-M.

6                        DIRECT EXAMINATION

7    BY MR. LARSON:

8    Q.  Dr. Cunningham, you've previously testified in this matter,

9    haven't you?

10   A.  Yes, sir.

11   Q.  Dr. Cunningham, in conjunction with your testimony today on

12   rebuttal, have you prepared a series of demonstrative exhibits?

13   A.  Yes, sir, I have.

14           MR. LARSON:  Your Honor, at this time I would ask

15   permission to have them displayed in the courtroom.

16           THE COURT:  All right.

17   BY MR. LARSON:

18   Q.  Dr. Cunningham, are you a member of the AAIDD?

19   A.  Yes, sir, I am.

20   Q.  And, Dr. Cunningham, have you at my request located the mission

21   statement of that organization?

22   A.  Yes, sir, I have.

23   Q.  Could you display that for the court right now?

24   A.  Yes, sir.  You'll need to trigger the overhead projector.  I've

25   projected the mission statement.

1    Q.   And where did you locate that mission statement?

2    A.   That's on the web site maintained by AAIDD.

3    Q.   And in addition to the mission statement of the organization,

4    were you able to locate the membership of which the organization is

5    comprised?

6    A.   Yes, sir, I did.

7    Q.   And what is that membership?

8    A.   That membership is 7,000 professionals from 55 countries around

9    the world.

10   Q.   And is the AAIDD responsible for the publication of any

11   journals?

12   A.   Yes, sir, they are.

13   Q.   And what are those journals?

14   A.   Those journals are two peer-reviewed journals, the *American

15   Journal on Mental Retardation* and another journal, peer-reviewed

16   journal, *Intellectual and Developmental Disabilities*.

17   Q.   In your experience as an expert in this field, are these

18   well-respected journals?

19   A.   Yes, sir, they are.

20   Q.   Dr. Cunningham, were you present in court when Dr. Hayes

21   testified regarding her opinion as to the applicability of the

22   Flynn Effect with regard to people in the IQ range of approximately

23   70 to 75?

24   A.   Yes, sir, I was.

25   Q.   Do you recall Dr. Hayes's conclusions as to the weight of, I

1    guess scholarly evidence in this area?

2    A.  Yes, sir.

3    Q.  And do you recall, can you give what you recall of those

4    conclusions right now?

5    A.  Yes, sir.  She described her perception that the jury is still

6    out on whether or not there is scientific support for the Flynn

7    Effect operating at an IQ range of 70 to 75.  She acknowledged that

8    the prevailing view of many authorities in the field, including

9    Dr. Stephen Greenspan, Dr. Greg Olley, AAIDD User's Guide, had

10   accepted that the Flynn Effect was occurring in that range.  She

11   also noted that Dr. Flynn had come to that conclusion himself but

12   that she remained unconvinced.

13   Q.  Do you recall the specific basis for her determination or her

14   opinion that the jury was still out on this question?

15   A.  Yes, sir.  She described that the existing research was based

16   on small sample sizes, No. 1, in terms of adults; and No. 2, that

17   the larger scale research provided by Kanaya and colleagues was

18   based on a sample of children, based on various renditions of the

19   Wechsler Intelligence Scale for Children, that would be given to

20   children between the ages of six and 17.

21   Q.  And that would also be known by its acronym WISC?

22   A.  WISC, yes, sir, the WISC, the WISC-R, the WISC-III.

23   Q.  In response to her testimony, did you conduct further research

24   into the question and the concerns that Dr. Hayes raised in her

25   testimony?

A.  Yes, sir, I did, both in terms of reviewing again some research
that I had already seen, seeking additional research, and also a
telephone conversation with Dr. Flynn.

Q.  And what specific, in addition to your telephone conversation
with Dr. Flynn, did you make reference to any additional articles
or research materials?

A.  Yes, sir, I did.  I had already reviewed in detail Dr. Flynn's
peer-reviewed article that appeared in *Psychology, Public Policy
and the Law* in 2006 titled "Tethering the Elephant, Capital Cases,
IQ of the Flynn Effect."

     I also then retrieved articles that were referenced in
that paper that I then reviewed.  One of those was an article by
Zimmerman and Woo-Sam, spelled W-O-O, dash, S-A-M, "A Review of
Criteria-Related Validity of the WISC-R, The First Five Years."
Additionally, another paper, this by Dr. Flynn, appearing in the
*American Journal of Mental Deficiency* in 1985 entitled "Wechsler
Intelligence Test, Do We Really Have a Criterion For Mental
Retardation?"

     A third paper by Dr. James Flynn that I believe was part
of my library that I maintain in Dallas but that I did not have
with me here in New Orleans that was retrieved.  This appearing in
*Perceptual and Motor Skills* in 1998 entitled "WAIS-III and WISC-III
IQ Gains in the United States From 1972 to 1995, How to Compensate
For Obsolete Norms."

     Then I additionally reviewed a paper that he has just

1    prepared that has not yet passed peer review that discusses the

2    application of WAIS-R IQ scores in this zone of interest.

3    Q.  You indicated that you had consulted directly with Dr. Flynn.

4    Do you recall his responses to the criticisms or to the concerns

5    raised by Dr. Hayes?

6    A.  Yes, sir, I do.

7    Q.  And what were those?

8    A.  He identified and discussed that large scale research confirms

9    the Flynn Effect in children to age 17 who were in this IQ zone of

10   interest, IQ of 70 to 85.  That includes both the research by

11   Kanaya as well as others that preceded those authors.

12         He described that he could identify no logical reason why

13   the Flynn Effect would be operative to age 17, which is the time

14   period of WISC eligibility in terms of who it is given to, and also

15   that is part of the sample that Kanaya and colleagues used.  He

16   could identify no logical reason why this phenomenon would exist at

17   age 17 and then suddenly cease to exist simply because someone had

18   moved out of the zone of eligibility for the WISC and into

19   adulthood, where they would be given some rendition of the WAIS.

20         He also pointed out, as I did in my testimony last week,

21   that all research from the WAIS forward demonstrates the Flynn

22   Effect in adults with IQ ages 70 to 75.  Now granted, those studies

23   are limited in number and have small ends, but that research has

24   consistently identified this effect in that group.

25         He described that there are problems in access -- that

1  it's much easier to access large samples of children because you

2  simply go into a school setting where you can identify many IQ

3  scores, much harder to identify adults in this borderline IQ range

4  that are out in the community, and thus this research is more

5  complicated.  Those were the primary issues that he described.

6  Q.  Do you concur in what Dr. Flynn says?

7  A.  Yes, sir, I do.  Again, as does AAIDD, as does Dr. Stephen

8  Greenspan, as does Dr. Greg Olley, as do many eminent researchers

9  and individuals who have knowledge of mental retardation in that

10  assessment.

11       THE COURT:  Mr. Larson, I assume again we're going to

12  receive copies of these articles that he says he has relied upon

13  after further review?

14       MR. LARSON:  You are, your Honor.

15  BY MR. LARSON:

16  Q.  Turning to a different area, Dr. Cunningham.  Were you present

17  when Dr. Hayes described the full scale IQ score obtained by

18  Dr. Tetlow as unreliable?

19  A.  Or as potentially unreliable.

20  Q.  First, did you find anything in Dr. Tetlow's data or his notes

21  or anything else that in your opinion rendered that score

22  unreliable or potentially unreliable?

23  A.  No, sir, but with a caveat that as I reviewed his findings back

24  in 1996, at that time I identified that he had made a scoring error

25  on one of the subtests in terms of giving credit, giving two points

1    credit for items that should have only gotten one point credit.  As

2    I recall, that was on the information subtest.

3            And also that he had continued to give credit on another

4    subtest after enough failures had occurred that you should have

5    stopped the test.  So his initial scoring was in error and a little

6    bit too high on two subtests, and so I corrected that in 1996.

7            Otherwise, his scoring, as reflected in the responses

8    that Mr. Hardy had provided and how he scored those, was reliable

9    as best I could determine.

10   Q.  Is there anything about the second IQ score obtained by

11   Dr. Martell, the government's expert, that has a bearing on the

12   reliability of the first score?

13   A.  It is notable that the score is as close as it is.  It reflects

14   modest either test-retest error or practice effects.  It's a 76

15   instead of a 73.  But it at least identifies that it's a very

16   similar score and it's a score that's accompanied by effort

17   testing, as Dr. Martell utilized the Rey 15 item test and the Dot

18   Counting Test, as I recall, to verify effort.  And so it's notable

19   in that respect.

20           Now, I don't have Dr. Martell's raw data to go through

21   and verify the scoring that he did on the WAIS-R or any of the

22   neuropsych data, but it is notable that it is in that same

23   ballpark.  And that's not an easy thing to do, to dial in a score a

24   second time in the face of good effort testing that is reasonably

25   close to that first score.

1  Q.  Dr. Cunningham, is there a manual for administering the WAIS-R?

2  A.  Yes, sir, there is.  That is provided with the test kit.

3  Q.  And does that manual describe standard procedures for

4  administering the WAIS-R test?

5  A.  Yes, sir, it does.

6  Q.  Could you show those, please?

7  A.  Yes, sir.  This is from the WAIS-R manual, page 51, and it

8  describes:  "WAIS-R examiners should be thoroughly trained in the

9  use of individually administered intelligence scales in general,

10  and, in addition, should adhere carefully to the specific

11  directions given in this manual.  The procedures described here for

12  administering and scoring the WAIS-R were those used to standardize

13  the scale, and must be followed if comparisons with the national

14  norms are to be meaningful."

15       That's a critically important issue.  The point is not,

16  as you're giving a test like this, does this person have this

17  answer somewhere deep inside or might they produce it with enough

18  hints, challenges, help, corrections, that kind of thing.  Because

19  what you're really talking about is, what did people in the

20  standardization sample, how well were they able to do this task in

21  response to very specific instructions.

22       Now, the current examiner gives those instructions

23  verbatim so that you can now measure the responses that you got

24  from the standardization sample against what you're observing here.

25  Q.  Did you hear Dr. Hayes criticize Dr. Tetlow for accepting "I

1    don't know" answers from Paul Hardy in some instances?

2    A.  Yes, sir, I did.  And also she challenged that if on the

3    similarities test the person identified a difference between the

4    two items, like an egg and a seed, that she would say, no, you're

5    not supposed to give differences, I want you to tell me how they're

6    alike.  And so both of those things, both the challenges of I don't

7    know, it was pretty aggressive, as I recall; that she said, now

8    wait a minute, you know the answer to this, what's the answer?

9    That that was the response to the I don't knows, and then I

10   described also correcting the person and challenging them, if they

11   identified a difference instead of a similarity.

12   Q.  What does the WAIS-R permit with regard to what the examiner

13   can do in response to specific questions and responses on the

14   WAIS-R?

15   A.  Well, that's detailed on page 86 of the WAIS-R manual, and it

16   describes that no probes are to be made that are not described in

17   the manual.  And so, for example, on the similarities subtest, the

18   instructions identified that you correct the first item.  In other

19   words, if they get that first item wrong or only partially right,

20   you correct it so that they get an understanding of what a full

21   two-point answer would be.  And then it says, "Give no further help

22   on this or any subsequent item."

23          However, if a response is unclear or ambiguous, say, for

24   example, if it is potentially right or could be, then you say, what

25   do you mean by that, or, tell me a little more, or make some

1    similar neutral inquiry.  Otherwise, you may not give them feedback

2    about whether their answer is correct or incorrect, and it would be

3    absolutely a break from protocol to say, no, that's a difference,

4    tell me how they're the same.

5    Q.  So are the probes that Dr. Hayes suggested that should have

6    been made permissible under the WAIS-R manual?

7    A.  No, sir.  And the manual addresses that pretty close to what

8    she was talking about, on page 134 and 135.  And it says, "Of

9    course, even a relatively concrete approach to solving the items

10   (for example, the examiner says -- examinee says, a dog and a lion

11   both have tails), that requires the subject to abstract something

12   similar about the members of the pair.  Some subjects are unable to

13   do this and may respond to each member separately rather than to

14   the pair as a whole."  And then they give an example "you see with

15   your eyes and hear with your ears."

16        Although such a response is a true statement, it is

17   scored zero since it tells how the members of the pair are

18   dissimilar rather than how they are similar.

19        Now, in the WAIS-R manual, there are specific scoring

20   criteria for each of these similar items, where it gives examples

21   of various responses that the examinee might make and ones that

22   would be scored two, or one or zero.  And then the sort of items

23   that you're allowed to ask about, like tell me more about that,

24   have a cue following them.  When you look at the manual at

25   responses that have identified dissimilarities or talking about

1    them each individually as opposed to a pair, those are not followed

2    by a cue for question.  In other words, those are not items that

3    you're allowed to query.

4    Q.  Did you find -- and skipping over the next exhibit to the one

5    after that -- did you find any indication of improper or inadequate

6    probes by Dr. Tetlow in his administration of the WAIS-R?

7    A.  No, sir, I didn't.  I found no indication of improper or

8    inadequate probes in Dr. Tetlow's administration.  As I heard

9    Dr. Hayes's testimony, I viewed that as representing

10   non-standardized assistance in providing feedback.

11           Now, in terms of the I don't knows, if you have an

12   individual who is not responding because they seem reticent or as

13   if they are afraid that they might say the wrong answer or they're

14   not cooperative in terms of responding to the test, it's

15   permissible to give gentle encouragement if it's identified as

16   being needed or even to skip a subtest and go on and come back to

17   it if you had to.

18           Now, if you study Mr. Hardy's testing protocol, what you

19   identify is that when he thinks he knows the answer or anything

20   close to it, he gives that response, even though it may be wrong.

21   So that when he says I don't know, you have much more confidence

22   that he really doesn't, maybe the one after that he makes a partial

23   response to that's incorrect.

24           So the recurrent observation when you actually look at

25   that test protocol and its answers is that he is responding if he

1    knows something in the ballpark.  And that's consistent with what

2    was demonstrated in the interview videotapes that Dr. Hayes had

3    done, that he was cooperative and was responding with information

4    even if his answer demonstrates that he didn't entirely get the

5    question.

6    Q.  Dr. Cunningham, were you present when Dr. Hayes asserted that

7    there were inconsistencies in Mr. Hardy's performance on the

8    subtests of the WAIS-R as administered by Dr. Tetlow, and then

9    subsequently by Dr. Martell?

10   A.  Yes, sir, I was.

11   Q.  What does the mathematical data reflect with regard to whether

12   the test/retest subtest ranges, whether any of them are outside the

13   90 percent range of what is observed in the normative sample used

14   to norm the WAIS-R?

15   A.  When you look at that range of subtests, on the left hand is

16   the scale, either full scale, IQ, verbal IQ, performance IQ, or the

17   specific subtests from the WAIS-R, then the center column is the

18   points of change, either improvement or reduction in scale score

19   points.

20         And then in the third column the percentage of those in

21   the normative sample that had an equal change or less, there's only

22   a single subtest that is outside of the 90 percent range; in other

23   words, the range that would capture 90 percent of the individuals

24   and the standardization and how much they changed, and that was on

25   picture completion, where his improvement was better than -- it was

1    equal to or better than 97 percent.  So there is a single subtest

2    where he over performs that's outside of that 90 percent range.

3    Q.  And he over performs on which administration of the test?

4    A.  When he repeats it with Dr. Martell, he scores four scale

5    points better than he did when he took it with Dr. Tetlow, and that

6    improvement is equal to or, you know, equal or better than 97

7    percent of the normative sample.

8    Q.  Dr. Cunningham, you were present, were you not, when Dr. Hayes

9    testified regarding the inconsistencies in Mr. Hardy's WAIS-R

10   subtest scores and the neuropsychological test scores?

11   A.  Yes, sir, I was.

12   Q.  Do you have that testimony available?

13   A.  Yes, sir, I do.  This is from page 82 of the transcript of

14   September 21st, 2009.  Dr. Hayes's answer:  "What I'm saying is, if

15   an individual has a significant number of inconsistencies, that

16   should raise the red flag that possibly this test data is bad, that

17   it's not reliable, and what it calls into question -- well, there

18   is an accurate reflection of this individual's level of

19   functioning.  And then you would look to other sources of

20   information to find out additional data about have there been other

21   inconsistencies.  Q. And that opinion would hold regardless if the

22   differences are statistically meaningful?  A. Yes."

23   Q.  Dr. Cunningham, could you explain the relationship, as you

24   understand it, between inconsistency and variation?

25   A.  Yes, sir.  Variation does not equal inconsistency.  Variation

1    or variability in performance is to be expected, and so, for

2    example, if this morning you put me on the free throw line and I

3    shot ten free throws and I hit three of them and you have me do it

4    again at ten o'clock and I hit four out of ten, and you have me

5    come back at one and I only hit two, and you have me come back at

6    three and I get seven, those are simply variations in performance,

7    and variation in performance is to be expected in almost every

8    human behavior and activity.  And it's to be expected on IQ testing

9    and also on neuropsychological assessment.  And so because a score

10   varies some is not at all unusual and that variation doesn't equal

11   inconsistency.

12          Now, it's not an inconsistency in terms of it having some

13   sort of weight about what's going on until it departs from the

14   range of expected variation.

15          Now, the range of expected variation, as you look at test

16   scores, is often set at a 90 percent range; in other words, that is

17   outside what would be obtained by 90 percent of a standardization

18   sample.  That's what we did just now when we looked at the changes

19   in his subtest scores, was there any one of those that was outside

20   the 90 percent range.

21   Q.  And you identified --

22   A.  And I identified one of those.

23          So simply because something is a variation, that's

24   expected.  Inconsistency requires -- it does require some

25   scientific measure.

1  Q.  I'm assuming that there are scholarly publications that address

2  the issue of variation?

3  A.  Yes, sir, there are.  And one of those I've made available to

4  you and will include in the court's notebook.  This is a paper by

5  Temkin, and it captures this notion that I've just described.  It

6  says:  "Repeated administrations of neuropsychological tests

7  frequently yield varying results, even if people who have not

8  experienced any true change in neurobehavioral status.  This is due

9  to less than perfect reliability of test instruments, as well as

10  practice effects, fluctuations in test-taking attitudes and other

11  factors.

12      "Moreover, these influences are or may be different for

13  different tests, for different types of people, and many questions

14  exist about how much change is significant or unusual for a

15  particular individual or test."

16      For example, under this, for different types of people,

17  there is evidence that indicates that individuals who have

18  impairments or have lower IQs may show greater variability on their

19  test responses than individuals who are in the normal or more

20  clearly in the normal zone.

21      Now, you would ask, are there techniques for measuring

22  this.  And there are four that this article by Temkin and

23  colleagues talks about.

24  Q.  I will not ask you to describe those four because that is a

25  level of mathematics that I think we don't want to explore today.

1  A.  Yes, sir.  There are statistical techniques for examining

2  whether you've got a change that is meaningful, that is beyond that

3  90 percent.

4  Q.  And is eyeballing test scores one of those statistical

5  techniques?

6  A.  No, sir.  No, sir.  Eyeballing scores for meaningful

7  differences is not a recognized scientific method.  Nor would that

8  take a psychologist or scientist to do.  Anybody could come forward

9  and say, that score is different from this score and, you know, I

10  don't understand why that is, that looks suspicious to me.  It

11  takes a scientist, then, to identify, is that, in fact, something

12  more than expected variability.

13  Q.  Dr. Cunningham, I'd like to direct your attention to the two or

14  the three tests, I guess actually, that Dr. Hayes discussed at some

15  length, the -- well, the Trails A, the Trails B and the Categories

16  tests.

17  A.  Yes, sir.  Now, I've included three of the tests that were

18  identified as being inconsistent, or least potentially.  The first

19  is Trails A.  Now, on -- in Dr. Hayes's report, Trails -- and also

20  it's taken from Dr. Martell's report -- Trails A is reported as

21  Martell -- Martell's administration Trails A takes 28 seconds; on

22  Bianchini's administration it takes 49 seconds, and so that's

23  worse.  When Dr. Hayes testified and she put that sheet up, it was

24  marked out with a felt tip, that Trails A was marked out.  I think

25  she described in the interest of intellectual honesty.

1    Actually, the problem with Trails A is that the Bianchini

2    time on Dr. Martell's report and in Dr. Hayes's report was an

3    error.  It didn't take Mr. Hardy 49 seconds when he took Trails A

4    from Dr. Bianchini, it only took him 26 seconds.  And that is on

5    Bates JH000338.  At the top of the page it identifies that, in

6    fact, this one took only 26 seconds.  So we didn't have to mark

7    that out with a heavy marker, it could have just been corrected as

8    being an error.

9    Now, of course, that's part of the problem, I don't know

10    what else Martell didn't transcribe accurately in his report.  This

11    one is not correct, and I don't know what else might be.

12    Now, as we look at Trails B and the Categories Test, I

13    did -- in fact, Temkin in this paper describes what the reliable

14    change index would be for Trails B and also for the Categories

15    Test.  In other words, the range that would -- that is beyond a 90

16    percent likely observation in the normative sample.

17    Now, Mr. Hardy, when he took Trails B the second time for

18    Dr. Bianchini, his performance was 34 points slower.  But see, the

19    90 percent reliable change index is over 35 seconds.  And so this

20    is not a meaningful or reliable degradation in performance.

21    On the Categories Test, that's the one that there was

22    some time spent in the courtroom of actually putting up the items

23    from the test and trying to figure out what the strategy is or the

24    solution for how to predict what's happening as that array changes.

25    And as Mr. Hardy took that test, he made one more error with

1  Dr. Bianchini than he had two or three weeks before with

2  Dr. Martell.  A difference of one.  The 90 percent reliable change

3  index for the Categories Test, according to the calculations of

4  Temkin, is plus minus 23.2.  Mr. Hardy has moved one point, the

5  reliable change index is 23 points on either side of the first

6  score.

7              And so to then assert this is somehow meaningful or to

8  spend a lot of time displaying this item as if you're adding weight

9  to it is completely inconsistent with what we know about the

10  test/retest consistency of that scale.

11  Q.  Dr. Cunningham, is there any cumulative effect to taking a

12  variation that is within the 90 percent range and adding it to

13  another variation within a 90 percent range and adding it to

14  another variation within a 90 percent range and that somehow all of

15  these inconsistencies add up to something meaningful?

16  A.  No, sir.

17  Q.  Dr. Cunningham, are neuropsych test scores used as a direct

18  measure of IQ in any way?

19  A.  No, sir.

20  Q.  So variations or inconsistencies in the scores don't tell us

21  anything directly about IQ, do they?

22  A.  No, sir.  Once you've ruled out malingering as an explanation,

23  then they do not speak -- any information they provide is very

24  inferential to this issue of IQ and is not part of a diagnosis of

25  mental retardation.

1    Q.  Dr. Cunningham, in your observations of Mr. Hardy, have you

2    observed any movements or physical behaviors during the time you've

3    spent with him?

4         MR. MILLER:  This goes beyond proper rebuttal, your

5    Honor.  Dr. Hayes didn't talk about shaking, nobody's talked about

6    shaking until today.

7         THE COURT:  Well, the officers were asked, one of the

8    officers were asked if they observed any kind of shaking.  So go

9    ahead.

10   BY MR. LARSON:

11   Q.  Have you observed that?

12   A.  Yes, sir, I have.

13        MR. MILLER:  All right, then I'm going to object.  If

14   he's going to start giving explanations for it, your Honor, I think

15   it's improper rebuttal.

16        THE COURT:  Well, I thought you were just going to go

17   with the observation.

18        MR. LARSON:  I was going to ask him if he knows what it

19   is, what it represents.

20        THE COURT:  Well, it sounds like it's a physical

21   infirmity, not a psychological one.

22        MR. LARSON:  Well, I wanted to ask him.

23        THE COURT:  Well, all right, probe it and we'll see.  Go

24   ahead.

25   BY MR. LARSON:

1    Q.  Have you observed it?

2    A.  Yes, sir.  It is characterized by a couple of things.  One of

3    them is a subtle rocking motion of the shoulders and head, on the

4    videotape you can also see the hands are moving.  There's also a

5    very fine almost imperceptible shaking or tremoring of the head

6    that is detectable.  I've been watching Mr. Hardy here in the

7    courtroom for the past ten days, and I detect that almost constant

8    fine motor tremor to his head.

9            MR. MILLER:  Judge, we're getting --

10           THE COURT:  Well, I've actually observed it, too, and he

11   is just putting fancier terms to lay observation.

12           MR. MILLER:  Well, I'm waiting for fancier terms to start

13   to become medical diagnosis.

14           THE COURT:  No, we're not -- he is not diagnosing, he's

15   just expressing.  Go ahead, ask your next question.

16   BY MR. LARSON:

17   Q.  Is that behavior consistent with any of the scores on any of

18   the neuropsychological tests administered to Mr. Hardy?

19           MR. MILLER:  Judge, he hasn't been qualified as a

20   neuropsychologist, and before he starts asking those, I think we

21   need to qualify him; that's a special subset and he hasn't been

22   qualified.

23           THE COURT:  He was qualified as -- I can't remember, what

24   was his --

25           MR. LARSON:  Forensic psychologist and clinical

```
 1    psychologist.
 2              THE COURT:  Well, do a foundation for this.
 3              MR. LARSON:  I'll just leave it where it is, your Honor.
 4              THE COURT:  All right.
 5              MR. LARSON:  I tender.
 6              THE COURT:  Okay.
 7                         CROSS-EXAMINATION
 8    BY MR. MILLER:
 9    Q.  Doctor, if you could, let's go through your slides, I'll
10    promise to do it sequentially, if you could just start with your
11    first one.
12    A.  Yes, sir.
13    Q.  And we'll just kind of go through cross-examination in that way
14    if we could, I think that might be the easiest.
15              Doctor, you spoke, I guess in the beginning of your
16    testimony, regarding AAMR and AAIDD.
17    A.  Yes, sir, that's correct.
18    Q.  And you indicated its mission statement as set forth there?
19    A.  Yes, sir.
20    Q.  And you are a member of that organization, correct?
21    A.  Yes, sir.
22    Q.  And as a member of that organization, I'm sure you're familiar
23    with their web site, correct?
24    A.  Yes, sir.
25    Q.  And this would be a picture of, that's the picture of its web
```

1  site, you open to that, it shows "New Aging and the End of Life

2  Webinar Series," correct?

3  A.  Yes, sir.

4  Q.  And it says, "It's professionals working to support individuals

5  with intellectual and development disabilities," correct?

6  A.  Developmental disabilities, yes, sir.

7  Q.  So the people who belong to that are people working towards a

8  specific goal, correct?

9  A.  Well, yes, sir, that have an interest --

10  Q.  Yes or no, yes or no, Doctor?  Really, because we'll be here

11  forever.

12        THE COURT:  No, no, you can answer the question yes or

13  no, and if you feel you need to explain, go ahead.

14        THE WITNESS:  Yes, sir.  Some may simply have a research

15  interest in this arena and not necessarily be working toward a

16  particular goal, but the organization itself has that goal.

17  BY MR. MILLER:

18  Q.  That's the organization's goal.  It's an advocacy organization,

19  it advocates on behalf of people with intellectual and

20  developmental disabilities, correct?

21  A.  Yes and no.  It advocates for that and also for the best

22  science and for the best treatment and the best prevention, it's

23  advocating for various goals.

24  Q.  And lots of organizations have dual purposes.  Tobacco

25  companies do research and they sell cigarettes.  Now, we all know

1    that the fact that they sell cigarettes influenced their research,

2    correct?

3    A.  Yes, sir.

4    Q.  Now, their mission statement, so we understand, it's not simply

5    that they have a mission statement, they also have certain goals,

6    correct?

7    A.  There are principles, yes, sir, to accomplish the mission.

8    Q.  And they have 13 of them, only one of which deals with

9    research, correct?

10   A.  Let me review the list again.  (WITNESS READS DOCUMENT.)  Yes,

11   sir, only one is specific to research.  The others may be informed

12   by research, but research is only addressed definitively in one.

13   Q.  And one of them is "achieving full societal inclusion,

14   advocating for equality, expanding opportunities, influencing

15   positive attitudes, promoting genuine accommodations, aiding

16   families."

17   A.  Yes, sir.

18   Q.  Again, advocacy, correct?

19   A.  Yes, sir.

20   Q.  They have position statements on that same web site, right?

21   A.  That's correct.

22   Q.  Policies related to life in the community, policies related to

23   rights.  Rights, advocacy, criminal justice, guardianship, human

24   and civil rights, inclusion, protection, self-determination.

25   Again, advocacy.

1  A.  Yes, sir, it can be termed that.  Or at least policies that

2  seek the best outcome, the best science; if that's advocacy, then,

3  yes, it could be termed that.

4  Q.  They want those things to happen, correct?  They want the best

5  for people with intellectual and developmental disabilities?

6  A.  The best science, the best care, the best diagnosis, yes, sir.

7  Q.  They have legislative goals, that's on their web site also,

8  correct?

9  A.  Yes, sir, it is.

10  Q.  Again, advocating certain legislative enactments by Congress,

11  correct?

12  A.  Yes, sir.

13  Q.  So this notion that it is purely a research organization is not

14  true?

15  A.  It is not simply a research organization.

16  Q.  It is an organization with an agenda.  And I'm not suggesting,

17  Doctor, that it's a bad agenda, I think what they do is good, but

18  it is an organization with an agenda?

19  A.  Yes, sir, as almost all organizations are.  It may be that

20  they're promoting their agenda as good science, there may be all

21  kinds of agendas, but there is an agenda that's certainly here.

22  Q.  And I think you indicated that Mr. Greenspan is a member of

23  that organization, correct?

24  A.  Yes, sir.

25  Q.  That's the same Greenspan who wrote the article about how he

1    lost all of his money to Bernie Madoff, correct?

2    A.   I am not familiar with that article.

3    Q.   If I showed it to you?  Because I think it's kind of important.

4            MR. LARSON:  Your Honor, I would object to the relevance

5    of -- I am not even sure whose being impeached or how or on what

6    subject.

7            THE COURT:  Well, let's let him proceed and see, see

8    where we are.

9            MR. MILLER:  It's just a couple of questions.

10           THE COURT:  All right.

11   BY MR. MILLER:

12   Q.   Actually, if you want it, you can keep it, it's kind of

13   interesting.

14           THE COURT:  This is Mr. Greenspan you're talking about?

15           MR. MILLER:  Yes, Stephen Greenspan.

16           THE COURT:  All right.  Go ahead.

17           Is this an article from a journal or is this something --

18           MR. MILLER:  Yes, I was going to have him, after the

19   doctor just reviewed it.

20           THE COURT:  Okay.

21           THE WITNESS:  I don't know that this is the same Stephen

22   Greenspan.  I mean, the name is obviously the same, but I am not

23   sure that this is the same Stephen Greenspan who researches

24   regarding psychology and mental retardation, that kind of thing.

25           MR. MILLER:  Just take a look at it, Doctor.

```
 1              THE COURT:  Is there anything identifying the author in

 2     it?

 3              THE WITNESS:  I'm turning back there, your Honor, I'll

 4     look at the back.  Stephen Greenspan is a psychologist who is

 5     clinical professor of psychiatry at the University of Colorado.

 6     Web site is Stephen-Greenspan.com, that would be the same

 7     Dr. Greenspan.  Thank you.

 8              THE COURT:  Go ahead.

 9     BY MR. MILLER:

10     Q.  And the article, if you could just, the title of it?

11     A.  The title of it --

12              MR. LARSON:  Your Honor, at this time I would object.

13     This is no more relevant than the Denkowski complaint was deemed to

14     be relevant.  We're impeaching a third party who is not before the

15     court.  And your Honor didn't permit it with regard to the

16     complaint against Dr. Denkowski, so I am not --

17              THE COURT:  I don't know where Mr. Miller is going with

18     this, so let me just see where he's going with it and then figure

19     out whether it has any bearing on the decision.  I don't even know

20     what the article is, something about being upset with Bernie

21     Madoff.

22              MR. MILLER:  I'll withdraw it, Judge.  Actually, Doctor,

23     keep it, you'll enjoy it.

24              THE WITNESS:  Thank you, sir.

25              THE COURT:  We're moving on?
```

```
 1              MR. MILLER:  We're moving on, your Honor.

 2              THE COURT:  The objection is moot.

 3              MR. MILLER:  For the record, it is an article by

 4    Dr. Greenspan about how he lost his fortune to Bernie Madoff.

 5              THE COURT:  Sounds very relevant.

 6              MR. MILLER:  Well, except it does go to gullibility.  I

 7    wouldn't call him a gullible man.

 8              THE COURT:  Oh, Mr. Miller, come on, we are getting

 9    raggedy now.

10              MR. MILLER:  So, fortunately, I did withdraw that line of

11    questioning, your Honor.

12    BY MR. MILLER:

13    Q.  Now, if you could move ahead.

14    A.  This one or continue?

15    Q.  Continue, if you would, No. 7, I believe.  Now, you

16    indicated --

17              MR. MILLER:  I lost my page, your Honor, just a second --

18    I'm sorry, Doctor, go back to No. 6.

19    BY MR. MILLER:

20    Q.  You would agree, would you not, that children are

21    developmentally different than adults intellectually?

22    A.  Yes, sir.

23    Q.  And they are given different tests; one are given the WISC, one

24    are given the WAIS for measuring intelligence, correct?

25    A.  Yes, sir.  The subtests are very similar.  The children's items
```

1    are a little bit easier, and obviously, they are measured against a

2    different scale in terms of standardization.

3    Q.  Now, nothing as I look up there deals with persons with IQs

4    under 70, correct?

5    A.  That's correct.  I was focused on the zone of interest.  If

6    somebody has an IQ under 70, they're going to qualify to be

7    mentally retarded with or without any consideration of the Flynn

8    Effect.

9    Q.  Now if you would go to No. 7.  You indicated there were certain

10    standard procedures that are to be used in examining or using the

11    WAIS-R test, correct?

12    A.  That's correct.

13    Q.  Now, audio taping the WAIS-R is not standard procedure, is not

14    supposed to be done; is that correct?

15    A.  No, sir, I would not agree with that.

16    Q.  Is there some provision for it in the instructions?

17    A.  No, sir.

18    Q.  So that would be something outside of the instructions?

19    A.  Audio taping would be outside of the instructions.

20    Q.  All right.  And it's something outside of the instructions of

21    which you approve?  I'm sorry, I didn't mean to turn my back on

22    you.

23    A.  Not at all.  There are situations that I think audio taping may

24    be relevant, or videotaping may be relevant.

25    Q.  So that is sort of a deviation, so to speak; you think it may

1  be appropriate in certain given circumstances, correct?

2  A.  Yes, sir.

3  Q.  Now, mistakes in scoring obviously are not standard procedure,

4  standard procedure calls for somebody to be very careful in adding

5  the numbers together, correct?

6  A.  Yes, sir.

7  Q.  Dr. Tetlow did not do that, correct?

8  A.  His addition was okay, the credit that he gave items was

9  incorrect.

10 Q.  So again, he didn't add the numbers up correctly.

11 A.  Ultimately, yes, sir.

12 Q.  Ultimately he did or ultimately he didn't?

13 A.  Ultimately he did not.

14 Q.  And the WAIS-R at that time, or I guess the WAIS-R protocol

15 called for contemporaneous writing down of the answers given by

16 individuals; is that correct?

17 A.  Yes, sir.

18 Q.  And it also called for, I guess, a standard sort of form to

19 use, correct?

20 A.  There is a standard form that you would typically write the

21 answers down in.

22 Q.  Now, Dr. Tetlow, if I could, Doc -- first off, I take it

23 there's nothing in the instructions that tells you, we're looking

24 up, I guess they tell you to put in the name, the address, the sex,

25 the age, and the race of the human being, correct?  Is that

1    correct?

2    A.  There is not -- yes, sir, that's correct.

3    Q.  Now, for something as important as an IQ test for a person

4    facing the death penalty, isn't it rather cavalier to use the term

5    human next to the word race?

6    A.  I don't know that it's cavalier, it is not responsive to the

7    identification blank.

8    Q.  And if we go down, Doctor, to Section 11.

9    A.  Yes, sir.

10   Q.  The directions call at that point for the answers that the

11   individual gives to be written down in that particular space; is

12   that correct?

13   A.  That's the typical custom, yes, sir.

14   Q.  Dr. Tetlow did not do that, correct?

15   A.  He did not write them down in the space that I was provided.

16   He provided a typed rendition of his notes.

17   Q.  Which would indicate that he recorded the testing, which would

18   be something that's not contained in the instructions; is that

19   correct?

20   A.  No, sir -- I guess yes and no.  My recollection is that it

21   reflected his writing down the answers elsewhere, identifying his

22   handwriting was not legible and then typing the notes that I was

23   provided.  It's possible that it was recorded, but I don't think

24   that it was.

25   Q.  And again, if we go to the next page, where it says

1    information, discontinue after five consecutive failures; first

2    off, we don't see five consecutive failures, do we?

3    A.   If you turn to Bates stamp JH --

4    Q.   I'm talking about on this page, Doc.

5    A.   On this page, no, sir, you don't.

6    Q.   And that's where it's supposed to be recorded, correct?

7    According to the form, which comes with the manual, correct?

8    A.   Yes, sir, according to the form.   Now, let me add, this may be

9    a section that, as I was going back and rescoring his work, that I

10   filled in with those ones to reflect what is contained in the

11   typewritten responses that he provided.

12   Q.   Wait a second.   You're filling this out now?   Is what we have

13   Dr. Tetlow's or is what we have yours and Dr. Tetlow's?

14   A.   I don't recall.   I've got two sets of notes, at least in my

15   files, that reflect what Dr. Tetlow provided, and then as I went

16   back and rescored those items and looked at how they would comport

17   with the test blanks and this writing on this form, those ones, I

18   believe, are mine.

19        You'll notice that they are different than the ones just

20   to the right over on the arithmetic test.   Those appear to be ones

21   and dashes that Dr. Tetlow would have filled in.   The information

22   subtest I believe that I was provided on this form didn't have

23   anything there, and instead what he provided was the typed account

24   of what Mr. Hardy's responses had been.

25   Q.   So we have two problems here:   First off, and he didn't fill

1   out this section at all?

2   A.  He filled out --

3   Q.  My question, Doctor, is a real simple one:  He didn't fill out

4   this section on this page?

5   A.  Let me go back and look and see if he has one that he did.

6   That looks like one that I did.

7           No, sir, I don't have a form that shows him filling in

8   that subtest.  I have, again, a typed written and scored summary at

9   Bates stamp at 364 but not this form.

10  Q.  So that would be a deviation from the normal practice, correct,

11  not filling that out?

12  A.  It would be a deviation if someone did not record exactly what

13  the person said.  Typically, you would fill that out --

14  Q.  That's all I want to know.

15          MR. LARSON:  Your Honor, he is allowed to finish.

16          MR. MILLER:  No, no, what he is doing, Judge, is, I am

17  asking a question, if they want to take it and redirect and clean

18  it up, that's fine.

19          THE COURT:  No, I would rather have it cleaned up at the

20  time because it's hard enough to follow.  So you have to answer yes

21  or no, was that a deviation from the way he was supposed to do it;

22  yes or no?

23          THE WITNESS:  It's not a deviation from the way you're

24  supposed to do it.  It's not what you would typically do.

25  Typically, you would fill out on that record form.  If you are

```
 1    writing it down on a sheet of paper, that really works the same in

 2    terms of you've made a verbatim record that you can then score.

 3               THE COURT:  So the answer would be, you wouldn't consider

 4    it a deviation?

 5               THE WITNESS:  Not a deviation from a practice that's

 6    going to affect your results.  It is -- typically, you would write

 7    down on the form.

 8               THE COURT:  All right.  Go ahead, Mr. Miller.

 9    BY MR. MILLER:

10    Q.  If you could, since you have the manual up there, could you

11    look at the manual and see what the manual says you're supposed to

12    do?

13    A.  Do you have a page number?

14    Q.  No, I'm asking you.

15    A.  That's on page 57 of the manual.

16    Q.  And it states?

17    A.  "The WAIS-R record form provides space to record and score the

18    subject's responses to the test items that summarizes selected

19    information about the correct administration of the test.  The

20    cover of the record form is used to record background data about

21    the subject and summarize the conversion of raw test scores, the CL

22    scores and IQs.

23               "While most of this information may be entered after the

24    examination is over, it is wise to record the date of the testing

25    and the subject's birth date and to compute the subject's exact age
```

1    while the subject is present.  Any discrepancy between the computed

2    age and the subject's stated age may then be resolved.  A sample

3    age computation is shown in the box below.  Note that for these

4    computations all months are assumed to have 30 days.

5            "For many of the tests, the possible range of scores for

6    each item is given at the top of the score column, while for other

7    tests all possible item scores are shown.

8            "For these latter tests, the examiner circles the

9    appropriate score for each item and then sums the circled numbers

10   to obtain the total raw score.  For all tests, the maximum total

11   raw score is given in the box for recording the subject's actual

12   total score.

13           "When administering the WAIS-R, examiner should make some

14   kind of entry, an item score, pass or fail, or the subject's actual

15   response for each item attempted in order to distinguish it from an

16   omitted item.  In order that the scoring of vocabulary

17   comprehension and similarities may be reviewed later for accuracy,

18   the examiner should record responses to these tests verbatim or at

19   the least record each significant idea expressed by the subject."

20   And it provides abbreviations.

21           So it's clearly calling for writing verbatim or

22   near-verbatim responses.  It does not specifically identify that

23   those must be reported on the record form at the time, although

24   that is the typical practice.

25   Q.  And again, as to this particular section, he did not do that

1  either, correct, Doctor?

2  A.  Yes, sir, he provides a typewritten account of the responses to

3  the vocabulary items, he is not writing them on the record blank.

4        By the way, this is not the actual record blank for the

5  test, this is like you have taken the record form, shrunk it some

6  on your copier, and then put them on a piece of paper.  So these

7  are similar, but they're shrunk down and cut and pasted as opposed

8  to using the actual record form.

9  Q.  Now, you indicated that you had -- you found no irregularities

10  with Dr. Tetlow's administration of the test, correct?

11  A.  Not other than those that I specified that, for example, that

12  he continued with items past the discontinuation level, and also

13  there was some scoring errors.

14  Q.  But again, as to what actually occurred when the testing -- as

15  to the actual administration of the test, you were not present when

16  it was given?

17  A.  That's correct.

18  Q.  As to your next slide, slide No. 9.  Now, as I understand your

19  testimony, the WAIS-R indicates or, excuse me, the manual does

20  allow for gentle encouragement, I believe was the word you used,

21  gentle encouragement, to get the answers out of persons who are

22  taking the test; is that correct?

23  A.  If they say that they don't know or that they're refusing the

24  task, then gentle encouragement.  Whether you give gentle

25  encouragement to a don't know depends in part on how responsive the

1   person is being when they have partial knowledge.

2   Q.  If you go ahead to your slide 12, please.

3   A.  Yes, sir.  (WITNESS COMPLIES.)

4   Q.  I think you talked at some length about that these changes were

5   not necessarily significant, statistically significant; is that

6   correct?

7   A.  They are -- yes, sir, that's generally correct, they're

8   observed in the standardization sample, and all but one are within

9   the 90 percent range of that sample.

10  Q.  Doctor, as to the first one that's blacked out, do you recall

11  Dr. Hayes's testimony that she took that out not out of

12  intellectual integrity or whatever term you used, but simply

13  because Dr. Bianchini had made an error on his chart?

14  A.  I recall her using the words intellectual honesty.  If she said

15  that Dr. Bianchini made an error, my recollection is that this

16  chart comes from Dr. Martell's report and that Dr. Martell

17  identified Dr. Bianchini's score as 49 seconds.  If you look at

18  Bianchini's actual raw data on Trails A, it was 26 seconds.

19  Q.  Do you understand that this is not an issue of intellectual

20  integrity, it was just simply taking an error out; you understand

21  that, do you not, Doctor?

22  A.  I don't know entirely why it was simply taken out as opposed to

23  corrected, but --

24  Q.  Doctor, given the practice effect, you would expect most, if

25  not all of these scores would rise, correct?

1   A.  No, sir.  As I described last time, earlier in my testimony

2   then, that the paper with Matarazzo and Herman reflects and as

3   these 90 percent liability index reflects, test-retest may go up or

4   down.  Practice effects are not simply positive, there are

5   test-retest effects that have a band that may go from well below to

6   a substantial improvement.

7   Q.  What is the probability, given all of these tests, in light of

8   the practice effect that he would do worse on that many of these

9   tests?

10  A.  Well, this is only a partial --

11  Q.  My answer is (SIC) --

12          MR. LARSON:  Your Honor, he is allowed to finish.

13          MR. MILLER:  No, I asked him a discrete question, we went

14  through this.

15          THE COURT:  Say the question again.

16          THE WITNESS:  I can't give you a probability.  I

17  understand the question, I can't give it to you.  This is only a

18  partial list of the tests that were actually given and in that way

19  it tends to lopside it.

20  BY MR. MILLER:

21  Q.  All things being equal, Doctor, on the Trails B test, would you

22  have thought that he would have gone up, knowing nothing else, the

23  second time he took it?

24  A.  I would not make that estimation outside of knowledge of what

25  90 percent of the reliability index.  This is not a task of

1    eyeballing, it requires an awareness of what the error range is for

2    the test.  And I would make my clinical judgments based on that

3    information regarding what we know from the statistical analysis of

4    a test-retest analysis.

5    Q.  Don't we know, Doctor, that generally when people take a test

6    the second time within three weeks they do better?

7    A.  The group as a whole does better.  The individuals vary widely.

8    Q.  This is sort of like the Flynn Effect, we're taking the general

9    and we're applying it to the individual.  I am going to ask you to

10   do the same thing here, Doctor.  Generally they go up, correct?

11   A.  You've asked me a compound question.  The two are not

12   equivalent to each other.  You can't identify what the individual

13   should do by looking at what the group has done.  That's why there

14   are specific statistical techniques that don't just look at what

15   the average has done but instead look at what the range of

16   individual performance is from one testing to the next.

17   Q.  Doctor, do you not believe in the practice effect?

18   A.  I think there can be practice effects, they are not universal.

19   Q.  The second one, Doctor, the WAIS -- the WMS-R, would you expect

20   him to do better on it the second time?

21   A.  Again, there is a reliability index that's applied, as I

22   testified last week.  That score is within that reliability index.

23   You cannot say that the second score is lower because of the error

24   range in the standard error of prediction around these two

25   administrations.  It is simply erroneous to assert that one is

1    lower than the other and not attend to the psychometrics that

2    surround these scores.

3    Q.  You would agree, some of these scores are actually wildly

4    different, aren't they, Doctor?

5    A.  Some are more discrepant than others.  Again, they're going to

6    fall in different places on that 90 percent reliability index.

7    I've been presented with no data that shows that any of these

8    scores are outside of 90 percent reliability index.

9    Q.  So we don't apply the sort of practice effect in this instance,

10   but we do apply the Flynn Effect to his IQ scores.  That's not an

11   individualized issue, Doctor, is it?

12   A.  We are applying test-retest science to this data, I am, and I

13   am applying science to the Flynn Effect application.  Now, I am not

14   eyeballing this data and I am not eyeballing the Flynn Effect, I am

15   bringing the best available psychometrics and science to bear in

16   each instance.  Now again, practice effects or test-retest effects

17   can be positive or negative, and so I am bringing that to bear.

18   Q.  If you could, Doctor, if we could move on.  Doctor, I guess the

19   next one would be, if you could move to No. 15.  Now, there -- is

20   it Dr. Temkin?

21   A.  I assume so.

22   Q.  Dr. Temkin and his colleagues, associates, indicate that there

23   will be varying results, and one of the varying results would be

24   the practice effect, correct?

25   A.  Yes, sir.

1   Q.  And we would expect that the practice effect would mean that

2   they would go up, correct?

3   A.  Again, there are fluctuations that occur in that.

4   Q.  Doctor, you're not saying that the more you practice on these

5   tests the worse you're going to do; is that what you're suggesting?

6   A.  There are people who do go down with repeated administrations.

7   This is a test-retest effect, not simply an improvement with

8   practice.  If I shoot the basketball --

9   Q.  And again, I understand that --

10          MR. LARSON:  Your Honor, he's allowed to --

11          THE COURT:  No, let's -- this has actually been covered

12   quite a bit, Mr. Miller, already.

13   BY MR. MILLER:

14   Q.  The fluctuations in test-taking attitudes, that means that

15   sometimes one makes a good effort and one result will be achieved,

16   and sometimes they will make a poor or less than good effort and it

17   will achieve a different result on the test, correct?

18   A.  That's one aspect of attitude.

19   Q.  Now, you also today testified regarding Kanaya 1, correct?

20   A.  Yes, sir.

21   Q.  And that was a study in persons between the ages of six and 17,

22   correct?

23   A.  That's correct.

24   Q.  And those persons, those individuals used the WISC test and the

25   WISC -- bear with we, WISC-R and WISC-III?

1   A.  Yes, sir, that's my recollection.

2   Q.  And the persons included in that study had IQs ranging from 55

3   to 85; is that correct?

4   A.  Yes, sir.

5   Q.  And the majority of these kids had IQ scores between 71 and 85?

6   A.  Let me turn to the paperwork.

7   Q.  Let me actually withdraw that question, I wanted to ask

8   something different.

9   A.  You have 526 who initially scored between 71 and 85.

10  Q.  Now, let me go back.  The study included IQs between a range of

11  55 and 85, correct?

12  A.  Yes, sir.

13  Q.  The majority of children with the IQs between 71 and 85 were

14  between the ages of nine and 13, correct?  If you look at Table 1,

15  which I think is on page 783.

16  A.  Table 1 does not describe --

17  Q.  Table 2, Table 2, I'm sorry, I'm calling it Kanaya, I'm sorry,

18  Table 2.

19  A.  The mean age in months was about, was about age ten, that was

20  the mean age, in the first -- one of them was -- yeah, they're

21  right around age ten in terms of the mean age.  And then there's

22  going to be a distribution on either side.

23  Q.  The majority of the kids tested -- same thing for the kids

24  between IQs 55 and 70?

25  A.  Yes, sir, that's correct.  But the mean age was about age ten

1    at the first testing.

2    Q.  Now, my understanding is they pulled the scores from

3    approximately 9,000 individuals for the years '89 through '95,

4    right, 1989 through 1985 (SIC)?

5    A.  I'm sorry, say that again.

6    Q.  The study pulled scores from almost 9,000 individuals between

7    the ages of six and 17 for the years 1989 through 1995, correct?

8    A.  That's correct.

9    Q.  And each individual had multiple IQ scores over time; is that

10   also correct?

11   A.  Yes, sir.

12   Q.  Some children were initially tested with WISC-R and were

13   retested with WISC-R.

14   A.  Yes, sir.

15   Q.  Some were initially tested with WISC-III and were retested with

16   WISC-III; is that correct?

17   A.  Yes, sir.

18   Q.  And then some were tested with WISC-R and then were retested

19   with WISC-III.

20   A.  There was WISC-R and WISC-R, WISC-R and WISC-III, and WISC-III

21   and WISC-III.  The averaging, as you said, is about age 12 at the

22   beginning and about age 14, 15, on the second testing.

23   Q.  Now, the study showed that the WISC-R to WISC-R, the scores

24   went up, correct?

25   A.  WISC-R to WISC-R there was little change.

1    Q.  But they went up a wee bit; is that a fair statement?

2    A.  They did not between 55 and 70, the median improvement was one

3    point for those with an IQ of 71 to 85.

4    Q.  And the WISC-III to WISC-III scores?

5    A.  WISC-III to WISC-III was no change for those IQ 71 to 85, and

6    one point difference for those IQ 55 to 70.

7    Q.  And WISC-R to WISC-III the scores went down, correct?

8    A.  That's correct, five points for those 71 to 85; in other words,

9    the WISC-R was five points higher than the WISC-III for those in

10   the borderline range.  And for those 55 to 70, there was, it came

11   down by six points; in other words, the WISC-R scored them six

12   points higher than the WISC-III.

13   Q.  So from what you've testified and what the study shows, the

14   amount of change varied between the 55 and 70 range and the 71 and

15   85 range?

16   A.  I don't know that it's statistically significant difference

17   that one went up a median score of five and one -- or that one went

18   down a median score of five on the WISC-III and the other one went

19   down a median score of six.  The table doesn't indicate -- yes,

20   sir, the -- well, there's not a comparison that's reported about

21   whether there is a statistically significant difference between

22   those two changes.  The changes themselves are both statistically

23   significant, but I can't tell you whether the difference between

24   them is.

25   Q.  We know it's about a 16 percent difference, doing the simple

1    math.

2    A.  Again, you can't eyeball these things --

3    Q.  I'm not eyeballing, I am just asking if there's a 16 percent

4    difference?

5    A.  It's about a 16 percent -- well, it is less than -- it's just

6    over a one percent difference in their score as you would look at

7    it in total, but as you would compare five to six, that's a 16

8    percent difference between those two numbers.

9    Q.  A 16 percent drop in your gas milage would be a big deal,

10   correct?

11   A.  Yes, sir.

12   Q.  Sixteen percent drop in your hourly rate would be a big deal,

13   wouldn't it?

14   A.  Yes, sir.

15   Q.  Now, you understand that subsequent to that Kanaya did a second

16   study, correct?

17   A.  I don't have the second study.  If it's not reported in this

18   article, I don't have the second study.

19   Q.  Well, you are aware, would you not, that she indicated that

20   further testing was necessary?

21   A.  Yes, sir.  All research studies call for further research.

22   Q.  And she indicated that they later found that the rate of

23   decrease in the Flynn Effect was greater in younger children with

24   lower IQs; you are aware of that, correct?

25   A.  Again, you'll need to direct me to a place in the article where

1   it says that.

2   Q.  As an expert in the field, you're familiar with her follow-up

3   article that was published --

4          MR. LARSON:  Your Honor, I believe he testified that he

5   hadn't seen the article.

6          MR. MILLER:  I was going to ask him about it.

7          THE COURT:  If you have it, why don't you show it to him

8   and see if he's seen it.

9          MR. MILLER:  Actually, I do, your Honor.

10         MR. LARSON:  Your Honor, if we could get a copy of it as

11  well.

12         MR. MILLER:  I am also providing one to the court.  For

13  the record, your Honor, it's an article entitled "Age Differences

14  Within Secular IQ Trends:  An Individual Growth Modeling Approach"

15  by Kanaya, Ceci and Scullin, published in *Intelligence 33*, 2005, at

16  pages 613 through 621.  We would ask that that be made a part of

17  the record.

18         THE COURT:  Okay.

19         MR. MILLER:  And, actually, this is the last part that I

20  have, question, your Honor.

21         THE WITNESS:  Would you like for me to read it?

22  BY MR. MILLER:

23  Q.  Well, I was just going to ask you some questions because she

24  does indicate that as students get older the Flynn Effect gets

25  smaller.  If you look at 618.

```
1   A.   (WITNESS READS DOCUMENT.)

2   Q.   618 through 619, I am hearing in my ear, which I think we're

3   hearing in Judge Lemelle's also.

4   A.   Yes, sir.  I've scanned those portions.  I wouldn't say that I

5   have been able to digest this or think about the implications of

6   it, but I've looked at those pages.

7   Q.   Then just a couple of questions.

8   A.   Yes, sir.

9   Q.   I take it -- excuse me.  Would it be a fair to say that you had

10  not seen that article prior to today?

11  A.   It looks vaguely familiar, but I had not -- I've not looked at

12  it here in the last couple of months.  Whether I did a year or two

13  ago, I can't remember.  Again, it looks vaguely familiar.

14  Q.   If you go to 620, and this really isn't about the research so

15  much as her statement, that she indicates, "that further research

16  could further our understanding of the relationship between age and

17  secular trends in IQ over time and potentially further our

18  knowledge regarding the potential mechanisms that are driving the

19  Flynn Effect."

20  A.   Yes, sir.

21  Q.   In effect, what Kanaya is saying is, she does not believe that

22  the last word on the Flynn Effect has been written, correct?

23  A.   That's a fair statement.

24  Q.   And that, therefore, the recommendation by Dr. Hayes that

25  further research is needed regarding the Flynn Effect in adults of
```

```
 1   low IQs does not seem so far fetched given that the person upon
 2   whom everybody has relied considers that further research is
 3   necessary, is it, Doctor?
 4   A.  No, sir, I wouldn't agree with that.
 5              MR. MILLER:  Thank you.
 6              Your Honor, I have no further questions.
 7              THE COURT:  All right.  Any redirect?
 8              MR. LARSON:  Very, very briefly, your Honor.
 9                     REDIRECT EXAMINATION
10   BY MR. LARSON:
11   Q.  Dr. Cunningham, in reviewing Dr. Tetlow's method of taking
12   notes while administering the IQ test to Mr. Hardy, is there
13   anything in the manual, the WAIS-R manual, that prohibits doing
14   what he did?
15   A.  No, sir.
16   Q.  Is there anything in what he did that is inconsistent with what
17   the manual calls for in terms of taking down your observations?
18   A.  No, sir.
19   Q.  And you indicated that further research is always called for in
20   research papers?
21   A.  Yes, sir.
22   Q.  Is that a fairly standard statement for any researcher, that
23   this is what we found but more study is necessary?
24   A.  Yes, sir.  As a peer reviewer, that's even something that you
25   recommend if it's not already part of a paper that those authors
```

1  point out how additional research might further inform this issue

2  or suggest directions for future research.

3  Q.  I would ask you to direct your attention to Dr. Flynn's latest

4  piece of research as to -- entitled "Why WAIS-R IQ Should Be

5  Adjusted in Capital Cases" that you referred to in your testimony

6  earlier today.

7  A.  Yes, sir.  I don't have a paper copy of that here with me, I

8  have only an electronic copy.  Thank you.

9  Q.  I would simply ask you to read that section starting with the

10 portion that is in boldface.

11         MR. MILLER:  Judge, if I may interject just a brief, I am

12 not sure that's been peer reviewed, and if it hasn't, then I don't

13 know that we should be putting things into the record -- we've been

14 pretty liberal about putting things in.  Maybe Dr. Cunningham can

15 correct me, but if it hasn't, given Rule 803, I am not sure it's a

16 learned treatise; as such, I don't think it should be used.

17         THE COURT:  Go ahead and proffer it.  Well, has it

18 been -- is that the one that's not been --

19         THE WITNESS:  It's not yet been peer reviewed.  It's a

20 paper that Dr. Flynn has very recently authored.  I am not sure

21 what outlet this is bound for, if it's a book chapter or if it's

22 headed for peer review.

23         THE COURT:  Go ahead and proffer it -- go ahead and read

24 it as a proffer.

25 BY MR. LARSON:

1  Q.  The first sentence starting with the portion in boldfaced type.

2  A.  "The evidence that gains occurred at all IQ levels, including

3  those with IQs below 70 from various versions of the WISC, is solid

4  all the way from 1947/48 to the present (Flynn, 2009 B, Table 4 and

5  figure AII1)."

6  Q.  That's it.  And one last question.  Mr. Miller had asked you

7  about the use of the term intellectually honest.  I show you a

8  section of the transcript in this matter.  Could you read the

9  testimony from Dr. Hayes at the very beginning.

10  A.  And there's a -- the line above it, "Trails A is shy -- is

11  blacked out, why?  A.  I actually checked it as much as I could to

12  make sure that the table was accurate.  I found that it was not

13  accurate with regard to Trails A, so I marked it out just to be as

14  intellectually honest as possible."

15          MR. LARSON:  Thank you.  I have no further questions.

16          THE COURT:  All right.  Dr. Cunningham, you may step

17  down.

18          THE WITNESS:  Thank you, ma'am.

19          THE COURT:  What we will do with respect to the studies,

20  just to give you a heads up, I know that some studies have already

21  been submitted, I guess, as part of the original submissions, but

22  we're leaving the record open because some additional studies that

23  you all have cited, we still probably don't have copies of.  We're

24  just going to call it studies in globo.  If you submit anything

25  that you haven't already submitted afterwards, just put a little

1   tag on it that that's for our studies in globo.

2              All right.  Any further witnesses?

3              MR. LARSON:  We rest, your Honor.

4              THE COURT:  We all rest.

5              THE DEPUTY CLERK:  Judge, they may want to look at the

6   exhibit lists that have never been admitted.

7              THE COURT:  Okay, why don't you all stick around, if you

8   don't mind, to --

9              THE DEPUTY CLERK:  This is everything that has been

10  admitted.  If y'all have something else then that needs to be done.

11  Do you want to take a ten-minute break unless they need to come

12  back on the record.  This is all we have, now what they kept at

13  their desk I don't know.  That is why I'm saying they need to look

14  at the list and determine what they thought was in.

15             THE COURT:  Let's take a break and have both sides take a

16  look at what Kim shows as being admitted and I can come back out

17  and do other things.

18             MR. LARSON:  Your Honor, I would also note in open court

19  and for the record that I have filed my motion for a continuance.

20             THE COURT:  At midnight last night?

21             MR. LARSON:  It was actually about eight o'clock, I

22  think, your Honor.

23             THE DEPUTY CLERK:  And I have already placed it in her

24  bucket for her signature.  Thank you, Herb.

25         (WHEREUPON, A RECESS WAS TAKEN.)

1           (OPEN COURT - DEFENDANT NOT PRESENT.)

2           THE COURT:  Okay.  Have a seat.  First of all, for the

3    record, I have got a copy of the *Diagnostic and Statistical Manual*

4    *of Mental Disorders*, Fourth Edition, DSM-IV, from the American

5    Psychiatric Association; I also have *Mental Retardation, Definition*

6    *Classification Systems of Support*, Tenth Edition, from AAMR, which

7    are on loan, I think, from the Public Defender's Office, and I will

8    be referencing them possibly in the ultimate decision.  I am

9    certainly going to reference them in the process.  And so I think

10   they are available in the quasi public domain, so I just wanted to

11   alert the parties.  I am not going to put them in the record, but I

12   am going to alert the parties that I am going to be using them.

13          The defendant, can we waive the defendant's presence for

14   this purpose?

15          MR. LARSON:  Yes, your Honor.

16          THE COURT:  All right.  Mr. McMahon.

17          MR. McMAHON:  Your Honor, we would like to offer into

18   evidence what we'll mark as G3, which is the Jencks Act materials,

19   the written responses to various Vineland items filled out by

20   Lieutenant Shannon DesRoche.

21          THE COURT:  That's G3?

22          MR. McMAHON:  G3.

23          THE COURT:  All right.  Do you have her name on there

24   somewhere?

25          MR. McMAHON:  I do.

1            THE COURT:  Okay.

2            MR. McMAHON:  G4, your Honor, is composed of the slides

3    shown during the direct examination of Dr. Hayes, including the

4    report written by then-Deputy Gary Adams, which was dated February

5    19, '09.

6            Now, included in this, your Honor, are the various

7    commissary requests of Hardy and the sick calls.  But they're

8    already in our original offer, okay, the underlying materials upon

9    which Dr. Hayes relied.  But these are the slides, the

10   demonstratives, employed by Dr. Hayes in her direct examination,

11   which is G4.

12           And G5 are actually the demonstratives which we used in

13   the continuation of Dr. Hayes's direct testimony on Monday.  So

14   they're actually two stacks, one is before the weekend, and this

15   was Monday the 21st.

16           THE COURT:  All right.

17           MR. McMAHON:  G4 and G5 respectively.

18           THE COURT:  Okay.

19           MR. McMAHON:  And, in addition, as far as studies go,

20   your Honor, S1 is Kanaya 2, which we referred to in the

21   cross-examination of Cunningham this morning.  S2 and S3, the

22   Denkowski articles, which I supplied to the court last week,

23   referenced by Dr. Hayes.  S4, an excerpt from Johnny Matson's

24   *Handbook of Assessment of Persons with Intellectual Disability.*  I

25   believe the defense offered that, I'm not sure, or used it.

1         S5, which is referenced by Dr. Hayes, regarding

2    "Regression to the Mean Phenomenon," which is an article by

3    Glenning, McDermott and Stanley, that's going to be S7.  S8 -- by

4    the way, 5 and 6, your Honor, were sealed, sealed studies.  And S8

5    is an article or a chapter by Olley from *Adaptive Behavior*

6    *Assessment System-II, Clinical Use and Interpretation,* and the

7    exact article, his assessment, "The Adaptive Behavior in Adult

8    Forensic Cases, the Use of the Adaptive Behavior Assessment

9    System-II."

10         Study 9 is a page from adaptive behaviors and skills page

11    10, I think the defense utilized -- I am not sure who actually used

12    this, we didn't.  But it certainly complements the testimony.

13         And, your Honor, this will be G whatever the next

14    sequence is, demonstrative used in the cross-examination of

15    Dr. Cunningham.

16         THE COURT:  We will leave the record open on those

17    studies for any additional studies if it turns out that we don't

18    have them.

19         All right.  Mr. Larson.  Thank you, Mr. McMahon.

20         MR. McMAHON:  You're welcome.

21         MR. LARSON:  Yes, your Honor, on behalf of Paul Hardy we

22    would offer to the court, it's sealed Exhibits 5 and 6 for the

23    record, which relate to the Vineland II manuals.  We would offer

24    Defendant's Exhibit 41, which are the demonstrative exhibits,

25    slides, from Dr. Mark Cunningham's testimony this morning; we would

1    offer Defendant's Exhibit No. 42, which were the slides offered in

2    conjunction with the direct testimony of Dr. Swanson; we would

3    offer Defense Exhibit No. 43, which were the slides used in the

4    cross-examination of Dr. Hayes and the exhibits shown to her at

5    that time.

6             Backing up just a little, I'm sorry, I'm out of order,

7    Defense Exhibit 40, which is Dr. Hayes's article which was also

8    used in the cross-examination of her.

9             THE COURT:  Was it an article or was it a deposition?

10            MR. LARSON:  It was an article, your Honor.

11            THE COURT:  Okay.  That's fine.

12            MR. LARSON:  Malingering detection.

13            THE COURT:  That's fine.

14            MR. LARSON:  Then we had three proffers, your Honor:

15    Proffer No. 1 is the certified copy of the complaint against George

16    C. Denkowski, Ph.D.; Proffer No. 2 was the vitae for Stephen

17    Greenspan referenced in our proffer yesterday; and then Proffer

18    No. 3, your Honor, was the article by James Flynn referenced by

19    Dr. Cunningham in his testimony today.

20            THE COURT:  The one that's not peer reviewed yet?

21            MR. LARSON:  That's correct, your Honor.

22            THE COURT:  Okay.  Anything else either side?

23            MR. McMAHON:  Not that I can think of.

24            MS. FOURNET:  Your Honor, if I might, the court did

25    not -- you mentioned that what we've been calling the red book, you

1    did not mention the User's Guide.

2         THE COURT:  The User's Guide, you're right.  I don't have

3    a copy of that right up here.

4         MS. FOURNET:  But you do intend -- you have one or do you

5    intend to get one?

6         THE COURT:  Yeah, we need --

7         MS. FOURNET:  I can lend you mine, Judge.  It's sort of

8    marked up and dog-eared, but I don't need it.

9         THE COURT:  Well, okay.  Yeah, I just need a User's

10   Guide, that's fine if you don't mind.  What's the title of it, it's

11   User's Guide?

12        MS. FOURNET:  It's the *AAIDD User's Guide*, and I will

13   have my paralegal drop it off at your office this afternoon.

14        THE COURT:  All right.  Anything else from Mr. McMahon or

15   the government?

16        MR. McMAHON:  No, your Honor.

17        THE COURT:  Anything else from Mr. Larson?

18        MR. LARSON:  No, your Honor.

19        THE COURT:  All right.  I think we said it was going to

20   be three weeks from when the transcript is available.

21        MR. McMAHON:  Right.

22        THE COURT:  Simultaneous memos and then a week later for

23   cross, for reply memos.

24        MR. LARSON:  Based on her estimation that we will have

25   the final transcript for November 1st, could we simply -- assuming

```
 1   that it comes at that time -- set a tentative date of November
 2   21st?
 3               THE COURT:  It's going to take that long to get a
 4   transcript?  I didn't realize it was going to be over a month to
 5   have a transcript?
 6               THE LAW CLERK:  A final transcript.
 7               THE COURT:  Is that okay with both sides?  The 20th.
 8               MR. McMAHON:  I don't think we have any choice, do we?
 9               THE COURT:  Well, you can work from a rougher transcript
10   if you want if it's available sooner.  I mean, the rougher
11   transcript can be available in ten days.  I don't know what your
12   schedules are like.
13               MR. LARSON:  I would prefer November 20th, your Honor.
14               MS. FOURNET:  And I certainly would prefer on behalf of
15   Mr. Hardy to have the official transcript rather than a rough draft
16   for briefing, it was fine for cross-examination.
17               THE COURT:  Well, that's about when we were going to have
18   the Hardy trial anyway, so I presume everybody had blocked it on
19   their calendar.
20               THE DEPUTY CLERK:  So responses are going to be due the
21   day after Thanksgiving?  Didn't you say that?
22               THE COURT:  Yes, I did say responses a week later.
23   That's what we talked about in chambers the other day was to
24   have -- well, that was when I thought it was going to be November
25   1st rather than the end of November.
```

1    MR. McMAHON:  That's fine.

2    MR. LARSON:  I would prefer not to destroy Thanksgiving

3  worrying about responding to the government's memo.

4    THE COURT:  Well, then we can back up.

5    MR. LARSON:  November 10th and then 20th, your Honor?

6    MR. McMAHON:  How about if we wait?  How about once we

7  wait until we get the final transcript version and then the court

8  can issue an order at that time.

9    THE COURT:  Okay.  All right.  And try to salvage a bit

10  of Thanksgiving.

11    MR. McMAHON:  And, of course, God forbid we interrupt a

12  holiday.

13    THE COURT:  Okay.  All right.  Think in terms of three

14  weeks and then a week thereafter, a week to ten days thereafter.

15    Okay.  All right.  That's it.

16    THE DEPUTY CLERK:  All rise.

17    THE COURT:  Thanks y'all.

18    (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

19

20    * * * * * *

21

22

23

24

25

```
 1

 2                    REPORTER'S CERTIFICATE

 3

 4      I, Karen A. Ibos, CCR, Official Court Reporter, United States

 5   District Court, Eastern District of Louisiana, do hereby certify

 6   that the foregoing is a true and correct transcript, to the best of

 7   my ability and understanding, from the record of the proceedings in

 8   the above-entitled and numbered matter.

 9

10

11

12                    Karen A. Ibos, CCR, RPR, CRR

13                    Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```