IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CASE NO. 2:94-cr-00381 |
| | * | |
| v. | * | |
| | * | SECTION "C" |
| LEN DAVIS | * | |
| | * | |

# MOTION UNDER 28 U.S.C. § 2255
# FOR COLLATERAL RELIEF, TO VACATE, SET ASIDE, OR
# CORRECT SENTENCE, AND FOR A NEW TRIAL

# THIS IS A DEATH PENALTY CASE

**TABLE OF CONTENTS**

MOTION UNDER 28 U.S.C. § 2255 FOR COLLATERAL RELIEF, TO VACATE, SET ASIDE, OR CORRECT SENTENCE, AND FOR A NEW TRIAL ........................................... 11

I.   PRELIMINARY MATTERS............................................................................... 11

    A.   Statement of Standby Counsel ...................................................................... 11

    B.   Statement Regarding Form ........................................................................... 11

    C.   Citation to the Record ................................................................................... 12

    D.   Entitlement to an Evidentiary Hearing ........................................................ 12

    E.   Other Motions ............................................................................................... 13

II.  STATEMENT OF THE CASE.......................................................................... 13

    A.   Facts ............................................................................................................. 13

    B.   Procedural History ....................................................................................... 24

III. CLAIMS FOR RELIEF ................................................................................... 34

Claim 1.   THE DEPARTMENT OF JUSTICE AND UNITED STATES ATTORNEY LABORED UNDER A CONFLICT OF INTEREST IN PROSECUTING LEN DAVIS IN VIOLATION OF HIS RIGHTS TO DUE PROCESS, A FAIR TRIAL, AND A RELIABLE DETERMINATION OF PUNISHMENT UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION ..................................... 34

    A.   As Operation Shattered Shield Progressed, the FBI Received Information from Multiple Sources that Paul Hardy Was Murdering Citizens of the Ninth Ward with Police Protection ................................................................................................................. 38

    B.   FBI Investigators Listened In to What They Believed Was a Plan to Murder Kim Groves, and Though They Later Claimed that the Import of the Conversations Was Not Discernible at the Time, That Claim Is Suspect In Light of the Information They Had Indicating that Paul Hardy Was Committing Murders and NOPD Police Were Protecting Him. ........................................................................................................................... 39

    C.   The Day After Kim Groves Was Murdered, the Shattered Shield Undercover Agent Was Enticing Len Davis to Expand Its Drug Trafficking Trade, and Convince More Cops to Participate ........................................................................................................... 42

    D.   The Department of Justice and Eastern District of Louisiana Office of the U.S. Attorney Should Have Recused Themselves From Any Prosecution of this Matter........ 45

Claim 2.     COUNSEL AT BOTH TRIALS PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE FIFTH, SIXTH,   AND EIGHTH AMENDMENTS FOR FAILING TO LITIGATE THE EQUAL PROTECTION VIOLATION THAT AROSE WHEN MR. DAVIS, AN AFRICAN-AMERICAN MAN, WAS PROSECUTED UNDER 18 U.S.C. § 241 AND 242 FOR AN OFFENSE UNRELATED ENTIRELY TO THE RACE OR GENDER OF THE VICTIM ................ 47

Claim 3. TRIAL COUNSEL AT MR. DAVIS' INITIAL TRIAL, APPELLATE COUNSEL, COUNSEL AT THE PENALTY PHASE RETRIAL AND SUBSEQUENT PENALTY PHASE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS BY FAILING TO CHALLENGE THE CONSTITUTIONALITY OF THE APPLICATION OF 18 U.S.C. §§ 241 AND 242 TO THE AFRICAN-AMERICAN DEFENDANT IN THIS CASE     .................................................................................................. 51

Claim 4.     THE PROSECUTION OF MR. DAVIS, AN AFRICAN-AMERICAN DEFENDANT, FOR A VIOLATION of 18 U.S.C. § 242, IN A CASE IN WHICH THERE IS NO INDICATION THAT THE VICTIM WAS TARGETED BECAUSE OF RACE, RELIGION, ETHNICITY, GENDER OR OTHER PROTECTED CLASS VIOLATES THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ...................................................... 54

Claim 5.     Mr. DAVIS WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR AND RELIABLE SENTENCING PROCEEDING UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS WHEN COUNSEL FAILED TO OBJECT OR MOVE FOR A MISTRIAL AS THE GOVERNMENT PRESENTED INADMISSIBLE EVIDENCE OF THE VICTIM'S DAUGHTER'S OPINIONS ABOUT THE CRIME AND HER PREFERRED PUNISHMENT ...................................................................... 56

   A.   Counsel Say Idly By as the Government Committed a Flagrant *Payne* and *Booth* Violation .................................................................................................... 57

   B.   Counsel Failed to Object to the Government's Failure to Disclose Jasmine Groves' Written Statement Before Trial............................................................................. 65

Claim 6.     MR. DAVIS SUFFERS FROM A SERIOUS MENTAL IMPAIRMENT WHICH RENDERED HIM INCOMPETENT TO STAND TRIAL IN 1995 AND PROCEED PRO SE IN 2005.............................................................................. 66

   A.   Mr. Davis's Right To Due Process And His Right To Counsel Were Violated  When He Was Allowed To Stand Trial While Incompetent In 2005......................................... 67

      1.   Facts .................................................................................................. 67

   B.   Mr. Davis Was Denied Due Process of Law During His 1996 Trial When He Was Tried And Sentenced While Incompetent........................................................................ 72

   C.   Mr. Davis Was Denied Due Process Of Law As Well As His Sixth Amendment Right To Counsel When He Was Allowed To Proceed Pro Se In His 2005 Trial .......... 80

3

D.    Mr. Davis's Right To Due Process And His Right To Counsel Were Violated  When He Was Allowed To Stand Trial While Incompetent In 2005 .......................................... 92

1.    Procedural Violation of Due Process ................................................... 92

2.    Substantive Violation of Due Process .................................................. 93

Claim 7.    COUNSEL AT THE 2005 TRIAL FAILED TO ADDRESS MR. DAVIS' COMPETENCY AFTER CLEAR WARNING SIGNS AND FAILED TO OBJECT TO THE INADEQUATE COMPETENCY EVALUATION BY DR. MANCUSO, IN VIOLATION OF MR. DAVIS' RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS .......................................................................................................... 94

A.    Counsel Turned a Blind Eye to Serious Warning Signs that Mr. Davis was Incompetent to Stand Trial and Represent Himself at the 2005 Penalty Re-Trial ............ 94

B.    Mr. Davis Was Denied The Effective Assistance Of Counsel When Counsel Failed To Object To The Inadequacy Of Dr. Mancuso's Report In 2005 .................................. 95

Claim 8.    THE GOVERNMENT VIOLATED *BRADY* AND ITS PROGENY AND MR. DAVIS' DUE PROCESS RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS .......................................................................................................... 97

A.    The Government Suppressed Information that the FBI Did Not Interpret the Wiretapped Conversations as Meaning Murder ............................................................ 100

B.    The Government Suppressed Exculpatory Evidence That FBI Agents Concluded That Mr. Davis Murdered Kim Groves *at the Latest* the Day After She Was Murdered 103

C.    The Government Suppressed Information that Sammie Williams was Not Prosecuted for Other Serious Crimes as a Result of His Cooperation ............................ 105

Claim 9.    MR. DAVIS'S RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS WERE VIOLATED BY JURY MISCONDUCT AND COUNSEL'S INEFFECTIVENESS FOR FAILING TO LITIGATE THIS ISSUE AT TRIAL AND ON DIRECT APPEAL ..................................................................................................... 108

A.    1996 Trial ...................................................................................................... 111

1.    Juror Daniel Walker ......................................................................... 111

a.    Religion as Extraneous Evidence ................................................. 111

b.    Improper Communications with Third Parties ............................. 112

c.    Conflicts Leading to Rushed Verdict/Premature Deliberations .... 113

2.    Juror Wallace Rodrigue...................................................................... 114

3. Juror John Bourgoyne ................................................................................ 115

    a. Sleeping During Proceedings ....................................................... 116

    b. Improper Communications with Court Personnel ........................ 117

    c. Implied or Actual Bias Stemming from Similar, Relevant Experience/Failure to Fully Discuss Bias During Voir Dire .................................................. 118

B. 2005 Trial ........................................................................................................ 119

1. Juror 71/7 ................................................................................................... 119

2. Juror 156/27 .............................................................................................. 120

3. Juror 68/38 ................................................................................................ 120

Claim 10. MR. DAVIS'S FIFTH, SIXTH AND EIGHTH AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS, AND AGAINST DOUBLE JEOPARDY AND CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN COUNSEL FAILED TO CHALLENGE HIS CONVICTIONS ON THE BASIS OF DOUBLE JEOPARDY IN HIS 1996 TRIAL AND APPEAL ........................................... 122

Claim 11. MR. DAVIS WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS DURING HIS 1996 TRIAL ........................................................................................................ 125

A. Counsel's Pretrial Performance was Constitutionally Inadequate and Prejudiced Mr. Davis ........................................................................................................................ 131

1. Mr. Davis Received Ineffective Assistance of Counsel During the Critical Period Prior to Death Penalty Authorization ........................................................................ 131

2. Counsel Unreasonably Failed to Challenge the Federal Jurisdictional Requirement of "Color of Law" Prior to Trial, Which Irreparably Prejudiced the Defense ................................................................................................................... 135

B. Counsel's Trial Performance was Constitutionally Inadequate and Prejudiced Mr. Davis ........................................................................................................................ 141

1. Counsel Failed to Challenge Inadmissible and Highly Prejudicial "Interpretation" Testimony ....................................................................................... 141

2. Counsel Failed to Challenge the Essential Element of "Color of Law" ........... 148

3. Counsel Failed to Challenge the Government's Forensic Evidence ................. 156

4. Counsel Committed Numerous Unprofessional Errors in Challenging the Government's Case for Guilt ........................................................................................ 162

5.    Counsel Failed to Competently Represent Mr. Davis Following the Guilt Phase and at the Penalty Phase of the First Trial ................................................................... 163

6.    Counsel Was Ineffective During Voir Dire........................................................ 165

7.    Counsel Was Ineffective On Appeal.................................................................. 169

Claim 12.    NEW EVIDENCE CASTS LIGHT ON THE GOVERNMENT'S RACIALLY DISCRIMINATORY USE OF PEREMPTORY CHALLENGES AT MR. DAVIS' FIRST TRIAL AND PROVES THAT PETITIONER'S RIGHTS TO EQUAL PROTECTION AND DUE PROCESS UNDER BATSON V. KENTUCKY WERE VIOLATED BY THE GOVERNMENT'S    EXCLUSION    OF    NUMEROUS    QUALIFIED    BLACK PROSPECTIVE JURORS ON THE BASIS OF THEIR RACE........................................ 169

*Procedural Background*................................................................................................ 171

A.    "Happenstance" Is Unlikely To Have Produced the Disproportionate Exercise Of Peremptory Challenges Against Black Jurors.................................................................. 176

B.    The Government's Race-Based Peremptory Strikes Of 79% Of Qualified Black Jurors From The Venire In Petitioner's Venire Forms Part Of A Long Established And Consistent Practice By The Government Of Striking Black Potential Jurors In The Eastern District Of Louisiana, With Far Greater Frequency That It Strikes Whites ...... 177

C.    Examination Of The Record Of Voir Dire Reveals That The Prosecution's Proffered Reasons For Striking Seven African-American Jurors Were Pre-Textual Given The Government's Failure To Strike Similarly Situated White Jurors, And Other Classic Indicia Of Pretext.................................................................................................... 181

        a.    Prospective juror Green ............................................................................... 181

        b.    Prospective juror Butler............................................................................... 183

        c.    Prospective juror Dabney ............................................................................ 186

        d.    Prospective juror F.Williams........................................................................ 190

        e.    Prospective juror Bartholomew .................................................................... 191

        f.    Prospective juror Alvis ................................................................................ 193

        g.    Prospective juror Mogilles........................................................................... 195

D.    The Compelling Evidence Of The Prosecutor's Discriminatory Intent Revealed By The Pre-Textual Nature Of The Prosecutor's Explanations Is Bolstered By Broader Patterns Of Discriminatory Practice In Jury Selection. ................................................. 197

a.    The Prosecutor Engaged In Disparate Questioning Of White And Black Prospective Jurors.................................................................................................................. 198

h.   The Prosecutor's Failure To Seek The Removal Of A Seated Juror Who, The Evening Before Selection Phase Deliberations Advised Marshals That He Was Not Sure He Could Impose The Death Penalty Provides Additional Evidence Of The Prosecutors' Discriminatory Intent In Striking African-American Jurors.............. 200

E.   Other Evidence That Race Plays A Part In The Administration Of Justice By The Government, Particularly In Capital Cases...................................................................... 201

Claim 13.   COUNSEL   PROVIDED   INEFFECTIVE   ASSISTANCE   AT   THE SELECTION PHASE OF MR. DAVIS' 2005 TRIAL BY FAILING TO INVESTIGATE AND   PRESENT   MITIGATION,   IN   VIOLATION   OF   MR.   DAVIS   RIGHTS GUARANTEED BY THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNTIED STATES CONSTITUTION........................................................................... 202

A.   Mr. Davis Endured a Childhood and Adolescence Marked By Failure and Invisibility ...................................................................................................................... 205

B.   Counsel Failed to Investigate and Present Mitigating Evidence of NOPD's Creation of a Culture Which Allowed for Kim Groves' Murder. .................................................. 208

C.   Counsel Failed to Investigate and Present Mitigating Evidence of Mr. Davis' Mental Illness. ................................................................................................................................ 212

D.   Counsel Failed to Investigate and Present Mitigating Evidence of the FBI's Complicity in Kim Groves' Murder ............................................................................... 214

Claim 14.   MR. DAVIS'S FIFTH, SIXTH AND EIGHTH AMENDMENT RIGHTS WERE VIOLATED BY COUNSEL'S FAILURE TO ADEQUATELY QUESTION THE VENIRE AND USE PEREMPTORY OR FOR-CAUSE CHALLENGES TO STRIKE BIASED OR UNQUALIFIED JURORS DURING THE VOIR DIRE FOR HIS 2005 TRIAL        ..................................................................................................................... 218

A.   The Record Demonstrates that Numerous Selected Jurors Evinced Implied or Actual Biases .................................................................................................................................. 220

B.   Counsel's Failure to Adequately Question the Venire and Use Peremptory or Cause Challenges to Strike Biased Jurors Constituted Deficient Performance......................... 226

C.   Counsel's Assistance During Voir Dire was So Minimal that it Constituted a Sixth and Eighth Amendment Violation ............................................................................... 228

D.   Counsel's Failure to Adequately Question the Venire And Use Peremptory or For-Cause Challenges to Remove Biased Jurors Led to the Impaneling of  a Biased Jury and Mr. Davis was Prejudiced as a Result............................................................................. 229

E.   Due to Counsel's Failure, the Jury was Unconstitutionally Predisposed Towards Death ................................................................................................................................... 232

Claim 15.    Mr. DAVIS' RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS WERE VIOLATED WHEN COUNSEL FAILED TO OBJECT OR MOVE FOR A MISTRIAL AT CRITICAL POINTS DURING THE 2005 PENALTY RE-TRIAL    ...................................................................................................... 233

A.    Counsel Failed to Object to Inadmissible and Prejudicial Evidence During the Eligibility Phase ........................................................................................... 233

1.    The Government Improperly Asked Steve Jackson "Who killed Kim Groves?" ...
.................................................................................................... 233

2.    The Government Improperly Elicited a Hearsay Alibi for Jimmie Jones from Norbert Zenon ......................................................................................... 235

B.    Counsel Failed to Move for a Mistrial or an Evidentiary Hearing When Mr. Davis' Right to a Fair Trial By Jury Was Violated .................................................... 236

1.    Sleeping Juror ...................................................................................... 236

2.    Jury Hearing All Sidebars ..................................................................... 237

3.    Government Closing Argument Misconduct ..................................................... 238

C.    Counsel Failed to Object to Inadmissible and Prejudicial Evidence During the Selection Phase ......................................................................................... 241

1.    Crime Scene Photos of Another Victim .......................................................... 241

2.    Testimony of James Anderson and Leon Duncan ............................................ 242

Claim 16.    COUNSEL FAILED TO PRESENT EXPERT TESTIMONY REGARDING FUTURE DANGEROUSNESS AT THE 2005 TRIAL, IN VIOLATION OF HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND A RELIABLE SENTENCING UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS .................................. 243

Claim 17.    COUNSEL'S PRESENTATION OF DR. STREED'S TESTIMONY WAS INEPT AT THE SELECTION PHASE OF THE 2005 TRIAL, AND THE CONTENT WAS NOT INFORMED OR CREDIBLE ........................................................................ 246

Claim 18.    NO FEDERAL JURISDICTION EXISTS IN MR. DAVIS'S CASE BECAUSE,  IN LIGHT OF ALL THE EVIDENCE NOW KNOWN, NO RATIONAL FACT FINDER COULD CONCLUDE BEYOND A REASONABLE DOUBT THAT MR. DAVIS WAS ACTING UNDER COLOR OF LAW ....................................................... 248

Claim 19.    THIS COURT'S FAILURE TO ENSURE THAT LEN DAVIS WAS APPOINTED COMPETENT COUNSEL DURING THE PRE-TRIAL PERIOD DENIED MR. DAVIS THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND

UNFAIRLY CONTRIBUTED TO THE AUTHORIZATION OF THIS CASE AS CAPITAL .................................................................................................... 250

    A.   Mr. Davis was Entitled to Two Attorneys Qualified to Represent a Federal Capital Defendant .................................................................................................... 251

    B.   Curklin Atkins and Milton Masinter Were Not Qualified to Represent Mr. Davis 254

Claim 20.   THE INFLUENCE OF RACE IN THE CONVICTION AND DEATH SENTENCE IMPOSED ON MR. DAVIS FOR AN OFFENSE UNDER 18 U.S.C. §§ 241 and 242 VIOLATES THE EQUAL PROTECTION CLAUSE OF THE FIFTH AMENDMENT, ALONG WITH THE SIXTH AND EIGHTH AMENDMENTS ........... 258

Claim 21.   COUNSEL AT MR. DAVIS' INITIAL AUTHORIZATION PROCEEDINGS, FIRST TRIAL AND PENALTY RE-TRIAL PROVIDED INEFFECTIVE ASSISTANCE IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS FOR FAILING TO LITIGATE THE UNCONSTITUTIONAL INFLUENCE OF RACE ON THE DEATH SENTENCE IMPOSED IN THIS CASE ...................................................... 260

Claim 22.   THE DEATH SENTENCE IMPOSED IN THIS CASE VIOLATES THE PROHIBITION ON THE INFLUENCE OF RACE IN CAPITAL SENTENCING IMPOSED BY THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS .......................... 262

Claim 23.   COUNSEL AT MR. DAVIS' INITIAL TRIAL AND PENALTY RE-TRIAL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTs BY FAILING TO REQUEST THAT THE VENIRE BE SELECTED FROM THE PARISH IN WHICH THE OFFENSE OCCURRED. .................................................................................................... 264

Claim 24.   TRIAL COUNSEL AT MR. DAVIS' INITIAL TRIAL AND PENALTY RE-TRIAL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTs BY FAILING TO CHALLENGE THE RACE-BASED DECISION TO TRANSFORM THE VENIRE FROM MAJORITY AFRICAN-AMERICAN TO MAJORITY WHITE ............................................................. 265

Claim 25.   TRIAL COUNSEL AT MR. DAVIS' INITIAL TRIAL AND PENALTY PHASE RETRIAL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTs BY FAILING TO CHALLENGE THE GRAND AND PETIT JURY VENIRE IN THIS CASE .................. 266

Claim 26.   IN A CIVIL RIGHTS PROSECUTION, THE TRANSFORMATION OF THE VENIRE FROM MAJORITY AFRICAN-AMERICAN TO MAJORITY WHITE VIOLATES THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS ............................... 267

Claim 27.   COUNSEL AT THE INITIAL TRIAL AND PENALTY RE-TRIAL WERE INEFFECTIVE FOR FAILING TO OBJECT TO THE DEATH QUALIFICATION OF THE JURY, AND THE CONCOMITANT RACIAL IMPACT OF DEATH

QUALIFICATION, IN VIOLATION OF Mr. DAVIS' FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS ............................................................................................ 271

Claim 28.    Counsel Was Ineffective at Both Trials for Failure to File a Motion to Recuse the Government from Prosecuting Mr. Davis. ................................................................. 273

Claim 29.    THE CUMULATIVE EFFECT OF THE INEFFECTIVE ASSISTANCE OF COUNSEL AND THE GOVERNMENT'S *BRADY* VIOLATIONS UNDERMINED CONFIDENCE IN THE VERDICT AND DEATH SENTENCE AT MR. DAVIS'S TRIAL ............................................................................................................................. 273

CONCLUSION AND PRAYER FOR RELIEF ...................................................................... 274

VERIFICATION ...................................................................................................................... 276

APPENDIX ............................................................................................................................... 277

CERTIFICATE OF SERVICE ................................................................................................. 278

**MOTION UNDER 28 U.S.C. § 2255 FOR COLLATERAL RELIEF, TO VACATE, SET ASIDE, OR CORRECT SENTENCE, AND FOR A NEW TRIAL**

NOW COMES defendant Len Davis, through undersigned counsel, pursuant to 28 U.S.C. § 2255, and respectfully requests that this Court grant him a new trial, vacate the judgment entered against him, or vacate his sentence. Mr. Davis states the following grounds for relief:

## I.   PRELIMINARY MATTERS

### A.  Statement of Standby Counsel

Counsel files this Motion under 28 U.S.C. § 2255 because we are ethically bound to do so. Mr. Davis does not have a right to self-representation in § 2255 proceedings, and we have been appointed by the Court to serve as standby counsel. Our decision to file is not a rash one; we have carefully considered our ethical obligations and sought advice from a nationally-recognized expert in attorney ethics, Monroe H. Freedman, Professor of Law and former Dean at Hofstra University Law School. Professor Freedman has advised us:

> Ms. Ottinger and Ms. Hudsmith are ethically required to file a 2255 motion and to seek to litigate what they conscientiously believe to be an erroneous grant of self-representation, and also to present to the Court the merits of Mr. Davis's habeas corpus claims, even though the court has ordered them, at the request of the prosecution, not to file pleadings without their client's consent.

Ex. A, Declaration of Monroe H. Freedman.

This is a capital case. If nothing is filed before March 21, 2012, Mr. Davis will be executed. We respectfully submit the following § 2255 Motion in the sincere belief that if we refrain from doing so, our inaction would be ethically reprehensible.

### B.  Statement Regarding Form

In accordance with Rule 2 of the Rules Governing Section 2255 Cases, this Petition sets forth only the facts and legal authority necessary to "specify all the grounds for relief available to the moving party." In conformity with the Rule, this Petition does not contain all the legal

arguments Mr. Davis could present to support his entitlement to relief, including those arguments, points, and authorities that would respond to any opposition to this Petition.

### C. Citation to the Record

References to prior proceedings in this case are as follows:

- Original Record on Second Appeal: "R [page number]"

This consists of the sequentially-paginated record filed during the second appeal after the 2005 sentencing.

- First Supplemental Record (filed 2/26/08): "SR [page number]"

This consists of Volumes 1-8 of pleadings, orders, and other documents; and separate transcripts from 4/12/05, 6/28/05, 6/8/05, 8/25/04, 9/28/00, 8/1/05–8/9/05, 10/26/05, 7/25/05–7/27/05, which are referred to as "SR-SV [page number]".

- Loose transcripts (predating 11/7/02): "[date] Tr. [page number]"

- Government Exhibits (2005 Trial): "G.E.-L.D. [number]" (tapes) or "G.E.-V. [number]" (videos).

- Government Exhibits (1996 Trial): "G.E. [number]"

- Defense Exhibits (2005): "D.E. [number]"

- Record of *United States v. Len Davis et al.*, No. 94-368 (E.D.La.): "Drug Trial Tr. [page number] (date)"

### D. Entitlement to an Evidentiary Hearing

Section 2255(b) provides that, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." A district court may not deny a federal prisoner an evidentiary hearing simply

because the court believes that the prisoner's allegations as stated in the § 2255 motion are untrue. *Mack v. United States*, 635 F.2d 20, 26 (1st Cir.1980). Indeed, a district court abuses its discretion if it denies an evidentiary hearing where the allegations are not conclusively refuted by the record. *United States v. Jackson*, 209 F.3d 1103, 1110 (9th Cir. 2000); *see also Fontaine v. United States*, 411 U.S. 213, 215 (1973) (reversing summary dismissal and remanding for a hearing where the "motion and the files and the records of the cases [did not] conclusively show that the petitioner is entitled to no relief"); *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992) ("A motion brought under 28 U.S.C. § 2255 can be denied without a hearing only if the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief."); *Owens v. United States*, 483 F.3d 48, 60 (1st Cir. 2007) (holding that the district court abused its discretion in denying an evidentiary hearing on § 2255 motion because the defendant's "allegations are not implausible, and because they could, if true, entitle him to relief").

### E. Other Motions

Contemporaneous with the filing of this Motion, counsel will file a *Motion for Leave to Conduct Discovery*, a *Motion to Interview Jurors*, a *Motion for Leave to File Under Seal Certain Exhibits Proffered in Support of a § 2255 Motion*, and a *Motion to Vacate Grant of* Faretta *Relief*.

## II. STATEMENT OF THE CASE

### A. Facts

*The Beginning*

A year before Len Davis was arrested in this case, New Orleans Police Department Officer Sammie Williams "shook down" drug dealer Terry Adams. Sammie Williams, as well as other Fifth District patrolmen such as Gary Washington, Henry Marshall, and Ronald Singleton, had been shaking Adams down for thousands of dollars in exchange for alleged police protection

of his drug dealing business.  R 6145; Drug Trial Tr. 577 (Sept. 11, 1996).  In December 1993, Williams threatened Adams that if he did not come up with an additional sum of money, he would be in jail on Christmas day.  Drug Trial Tr. 562 (Sept. 11, 1996).  At that point, Adams spoke with his lawyer, who advised him that he could not withstand another crack charge and that he had better do something.  Drug Trial Tr. 563 (Sept. 11, 1996).  Adams then went to the FBI to lodge a complaint against Williams, and thus began his new career of being a paid informant to the federal government.  The Government paid him $2,000 per month, plus expenses such as for car rentals, to act as an undercover agent transacting drug deals with Williams and other NOPD officers.  Drug Trial Tr. 561 (Sept. 11, 1996).

Len Davis was not involved in shaking down Terry Adams.  It was not until April 1994 that NOPD assigned Davis to be Williams' partner.  R 5786.  But shortly after Davis was assigned to work with him, Williams drew Davis into an expensive and elaborate FBI sting, known to the FBI as "Operation Shattered Shield."  On April 21, 1994, Adams introduced Williams and Davis to Juan Jackson, an undercover FBI agent.  R 6081.  Jackson was posing as a large-scale drug dealer, and Adams was supposedly bringing Jackson a sum of money at the Sheraton hotel with Williams and Davis for protection.  R 6081.  Williams and Davis were paid $1,000 each for the Sheraton job.

*The New Orleans Police Department, 1984-1994: Putting Things in Context*

Len Davis and Sammie Williams were assigned to patrol the NOPD's Fifth District in 1994.  The Fifth District encompasses the area from Elysian Fields to the Orleans/Saint Bernard parish line, from Saint Bernard Avenue to the Seventeenth Street Canal, and from the river to Gentilly and Almonaster.  In 1994, some of the city's most dangerous areas lay within its boundaries, including St. Roch, the Lower Ninth Ward, and the former Florida and Desire

housing projects.  A huge percentage of the residents lived in poverty.  With the outbreak of crack cocaine in the mid-1980s, the overall murder rate in the city rose steadily until it peaked in 1994, with 421 murders and a rate of 85 murders per 100,000 citizens. [1]  One hundred eighty-five of those murders occurred in the Fifth District.  Murder became such a common occurrence that within the NOPD, cops began to refer to street shootings as "generic homicides."

In the decade preceding 1994, the NOPD had sunk to an unprecedented low, even for a police department known for its brutality and corruption.  Upon taking office in 1986, Mayor Sidney Barthelemy appointed Warren Woodfork, who had been serving as the city's first black police chief for two years, Superintendent of Police.  Woodfork was faced with a department plagued with poor morale, low pay, outdated equipment, and racial divisions.  As Superintendent, he was reported to overlook police brutality and misconduct, which contributed to a rapid decline of police discipline in the 1990s. [2]  Under pressure due to the rising crime rate and police brutality complaints, Woodfork resigned in 1991.  Mayor Barthelemy shrugged off calls for a nationwide search for a new superintendent and appointed a family friend, Arnesta Taylor, to the post.  That year, police brutality complaints reached a six-year high. [3]  Police shot and killed an unarmed sixteen-year-old in August of 1991, provoking community outcry. [4]  A 1992 Justice Department report ranked New Orleans first in the nation for police brutality

---

[1] Charles Welford et al, *Crime in New Orleans, Analyzing Crime Trends and New Orleans' Response to Crime* (U.S. Dept. of Justice, 2011), at 5.

[2] Editorial, *Morial's Search Gets Tougher*, Gambit, June 28, 1994, p.7.

[3] Michael Pearlstein, *Complaints Against Police Near Record*, TIMES PICAYUNE, Oct. 2, 1991, at B1.

[4] *See* Walt Philbin, *Council Gets Flak on Police Review*, Times Picayune, Oct. 11, 1991, at B1.

complaints,[5] but instead of taking steps to address this problem, Taylor disputed the study and told the press he would conduct a counter-study of his own.[6]

***Operation Shattered Shield***

After Williams' and Davis' April 1994 encounter with undercover FBI Agent Jackson at the Sheraton Hotel, the FBI's "Operation Shattered Shield" began in earnest. The aim was to get as many NOPD officers involved as possible guarding buildings with supposed cocaine deals going on inside in order to make what was to become the largest bust for police corruption in NOPD's history. R 6083. Williams and Davis were placed in charge of recruiting officers to work "details" guarding the shipments, and were paid $1,500 for each officer they were able to recruit. R 6087. A May "drug protection" set-up at a Bywater warehouse netted Davis and Williams $6,000. In July, the FBI, through Agent Jackson, gave Williams a wiretapped cell phone and a bugged van. R 6097. The July set-up paid Williams and Davis $10,500, and an August set-up paid $18,000. R 6098. On October 12, 13, and 14, 1994, the FBI organized a fake drug deal at the Bywater warehouse. The Government paid Davis and Williams $16,000 on October 14. The drug storage and movement set-ups occurred once a month until November of 1994, when two were organized at an additional location, the Mardi Gras Truck Stop, so that the FBI could pull even more NOPD cops into the sting and arrest them.

Prior to getting mixed up in the FBI sting operation, Len Davis was making a salary of $18,000 per year.[7] But the FBI paid Davis and Williams at least $100,000 during the five months they were supposedly guarding warehouses for drug dealers. R 6102. Not only were

---

[5] Bruce Alpert, *Area Police Rank High in U.S. Brutality Report, N.O. Leads List; Jefferson is Third*, Times Picayune, May 20, 1992, at B1.

[6] Sheila Grissett, *Chief to Counter Brutality Report*, Times Picayune, May 21, 1992, at B1.

[7] *See* Bob Ross, *Deputies' Hopes Hinge on Passage*, Times Picayune, Oct. 14, 1993.

Williams and Davis being paid handsomely for arranging NOPD protection for supposed drug deals, but Jackson was also taking them out and entertaining them. They went to Biloxi and gambled at the casinos. Jackson took them on a "pleasure trip" to Atlanta, where they frequented strip clubs and ate at nice restaurants. R 6099. Davis was moreover placed in a position of power in the drug sting, unlike his usual role as a street cop. He was in charge of paying the hired "detail" officers as well as recruitment and management. Drug Trial Tr. 366 (Sept. 10, 1996). Midway through the sting operation—in approximately August of 1994—Davis approached undercover Agent Jackson and told him he wanted to quit the NOPD and work for the sham drug operation full-time. R 6102. Had Davis withdrawn to work as a "real" drug dealer, the FBI would have had to have halted Operation Shattered Shield, or at the very least have brought him into the fold as an informant. Jackson apparently told Davis to continue working as an NOPD officer.

### *The Wiretaps*

For some as yet unknown reason, in September 1994 the FBI stopped bugging Williams' cell phone and gave a bugged cell phone to Len Davis. Some of the monitors were not FBI agents. Rather, they were trained by an FBI agent to listen and record notes on the calls in a log. They were likewise trained to "minimize" the calls—i.e., not listen to them—when the subject matter pertained to "non-criminal" activities. An agent would then review the logs and tapes the following day. R. 933-35.

On September 30, 1994, a monitor intercepted a series of calls to and from Len Davis. She did not minimize it. Instead she took notes as Williams told Davis he had just seen someone

17

run from the scene of a murder with a gun in his hand and get into Paul Hardy's car. Davis then called Hardy, and, as the Government presented it at trial, told Hardy that he was supposed to alert Davis when he or his boys were about to commit a murder. That way Davis could make sure there were no police in the area. Hardy initially denied that he was involved in the murder, but eventually acknowledged it. G.E. 4. Carlos Adams, a nineteen-year-old, was shot and killed that day.

In the course of the next three weeks, the wiretap intercepted at least six additional series of calls to and from Davis' phone that the FBI contended implicated him, Williams, and Hardy in potential murders and possible cover-ups. The content of the calls was recorded in the log contemporaneously and reviewed by an FBI agent the following day.

### The Brutality Complaint

In October of 1994, Williams and Davis were patrolling the streets of the Fifth District and looking for a man named Dwayne LeBlanc, who had been accused of shooting a fellow officer and good friend of Davis', Officer Michael Mimms. They had information that LeBlanc was one of a set of twins, so when they saw a car with a set of twins inside, they pulled it over. It turned out that the twins in the car were not the twins they were looking for; instead, they were Nathan and Nathaniel Norwood.

The next day was October 11, 1994. Williams and Davis again encountered one of the Norwood twins. From information they had received, LeBlanc had been seen on the corner of Claiborne and Tupelo. Upon arriving at that intersection, they saw Nathan Norwood standing next to a deli talking on a pay phone. When he saw the police car, he began running. Williams jumped out of the car and chased Norwood through the neighborhood, with Davis following in the car and communicating with the police radio. When Williams ultimately caught Norwood,

18

he pistol-whipped him in the head and struck his face against a porch railing before putting him in handcuffs. Williams later testified that it was only at that point that he realized Norwood was not LeBlanc. 4/17/1996 Tr. 30

Kim Groves came upon the scene at that point and saw Norwood bloody and handcuffed, in Williams' grip. She asked what was going on with her nephew, but Williams told her to move on up the street. Angrily, she did leave the scene. 4/17/1996 Tr. 34-35

That evening, Tonga Amos, Norwood's cousin, phoned in a complaint to the NOPD's Internal Affairs Division (IAD), alleging (incorrectly) that Davis and an unknown partner had beaten her cousin and hit him in the head with a pistol. Sergeant Joseph Hebert went to the hospital where Norwood was being treated the next evening and spoke with him and his mother, who then went to be interviewed at IAD headquarters. The next night, Kim Groves accompanied the Norwoods to IAD and also gave a statement implicating Davis. At the end of the meeting, Hebert made plans with them to meet at Sharon Norwood's home in Algiers to show them a photo lineup. 4/15/1996 Tr. 114-19

On the evening of October 13, Hebert met with the Norwoods and Kim Groves in Algiers. When he showed them a lineup, they picked out Davis and Williams. Ms. Groves also told him that she had seen Davis and Williams earlier in the day, and they had followed her in their patrol car. Sgt. Hebert thought that Ms. Groves was in danger, but that she would be safe in Algiers. He left at about 9:00 p.m. 4/15/1996 Tr. 126-129

### Kim Groves is Murdered

Kim Groves subsequently returned to the Ninth Ward. At approximately 10:50 p.m., she was shot once in the left side of the head at close range, while standing at the corner of Alabo and North Villere in the Lower Ninth Ward. Witnesses variously said they saw a black Maxima

19

(Ex. B, Hebert Dailies), a dark blue Maxima (Ex. B, Hebert Dailies), a champagne Maxima, (4/17/1996 Tr. 442) or a light blue Maxima (4/17/1996 Tr. 446) driving away from the scene. Two witnesses reported seeing Kim Groves' on-again off-again boyfriend, Sylvester "Jimmie" Jones, at the scene. Ex. B, Hebert Dailies  One witness said she heard Groves scream out a name that sounded like "Jimmie" before the gunshot.  Kim Groves' children, Jasmine and Corey Groves, came out onto the scene after she was shot, and someone wrapped her head in a towel before an ambulance arrived and took her to Charity Hospital.  She was pronounced dead at 11:28 p.m.

### *The NOPD Investigation*

On the night Kim Groves was shot, Davis and Williams were working the 3:00 p.m. – 11:00 p.m. shift in the Fifth District.  But by 10:30, they had clocked out and were headed home. 4/15/1996 Tr. 71.  Len Major and Gary Washington took over for the 10:25 p.m. – 7:00 a.m. shift. 4/17/1996 Tr. 436.  Major and Washington received a code 34-S (aggravated battery by shooting) radio dispatch alerting them to a shooting at the 1300 block of Alabo Street.  They arrived at 11:01, at which point Groves was still alive and lying in the street bleeding.  She was not capable of speaking and did not say anything to police.

James Ducos, the NOPD crime lab technician on duty at the time, arrived at the scene at 12:07 a.m.  By the time he got there, the body was gone.  He took five photographs.  Homicide Detective Norbert Zenon pointed out a casing on the ground, which Ducos claimed to have then placed an orange cone over, before taking photographs.  After the photos, he placed the casing in his pocket.  He did not initial the casing. 4/15/1996 Tr. 176.

Ducos later drew a crime scene diagram, mistakenly placing the body at the corner of North Robertson and Alabo, instead of North Villere and Alabo.  He also got the hundred block wrong, placing it at the 1400 block of Alabo rather than 1300. 4/15/1996 Tr. 168-71.

On the morning of October 14, Sharon Norwood called Joseph Hebert of IAD, alerting him that Kim Groves had been murdered.  She was concerned that the shooting had something to do with the IAD complaint. Ex B, Hebert Dailies Kim Groves' aunt, Esther Washington, also contacted Hebert and said she was worried that the IAD investigation and the shooting were connected.

One NOPD officer in IAD who acted as liaison was aware of the Shattered Shield investigation, and aware that the FBI was monitoring Len Davis' cell phone.  He went to the FBI to listen to the tapes.  According to the FBI employee monitoring Davis' wiretap, and two other witnesses, the FBI became aware of what they believed to be Len Davis' involvement in Kim Groves' murder almost immediately. R.5526.  Based on conversations recorded through the wiretaps, the FBI concluded that Sammie Williams, Len Davis, and Paul Hardy were responsible for Kim Groves' murder.  According to the FBI, however, its agents did not become aware of Davis' involvement in Kim Groves' murder until a week later, October 21, 1994.

### The FBI Investigation

The day following Ms. Groves' murder, FBI undercover Agent Jackson began discussing plans with Davis and Williams to find a second location for drug storage and distribution, and recruit more NOPD cops to protect it. G.E.-V. 4.  Unbeknownst to Davis and Williams, the FBI wanted to expand Operation Shattered Shield to pull in and arrest additional NOPD officers. This second step of Operation Shattered Shield went forward with additional help from NOPD officers, recruited by Williams and Davis, from November 16-18, 1994.  Other police officers

who had been recruited earlier continued to provide "security" for the Bywater warehouse. Drug Trial Tr. 515 (Sept. 11, 1996).

During the same period that Operation Shattered Shield was expanding, on November 2, 1994, the FBI executed numerous search warrants in cars and houses tied to Paul Hardy, and seized a number of guns and ammunition.4/15/1996 Tr. 63-64.  The guns and ammunition were sent off to the FBI crime lab, along with evidence from numerous Ninth Ward murders, to be analyzed.  4/16/1996 Tr. 19-24.

It was not until December 5, 1994, that the FBI arrested Len Davis for the murder of Kim Groves.  That day, Paul Hardy and Damon Causey were also arrested, Hardy for shooting Kim Groves, and Causey for riding in the car with Hardy to shoot Ms. Groves.  All three men had been free to roam the streets of the Ninth Ward since Carlos Adams' murder, on September 30, 1994, and since Kim Groves' murder, on October 13, 1994—for over two full months.

Sammie Williams was not arrested in connection with Kim Groves' murder.  Williams was arrested two days later, December 7, 1994, and charged only in connection with the drug crimes arising out of the Shattered Shield investigation.  Steve Jackson, who the government believed drove Paul Hardy to kill Ms. Groves, was put up at the Hyatt, and the Government bought  him food and medicine while agents interviewed him over several days. 4/16/1996 Tr, 147.

### The Federal Prosecution

Mr. Davis was prosecuted in federal court for civil rights violations resulting in the death of Ms. Groves.  The Federal Government never gave the Orleans Parish District Attorney the option to prosecute the murder in state court.[8]   The Federal Government chose to prosecute Mr.

---

[8] Adam Nossiter, *Police in New Orleans: Film Noire in Real Life*, NEW YORK TIMES, Dec.19, 1994, at A14.

22

Davis for civil rights violations under statutes initially enacted during Restoration to protect African American citizens from brutality inflicted upon them with impunity by white state actors. Len Davis and Paul Hardy are the only people against whom the Federal Government has sought a death sentence for a civil rights violation.

At trial, Sammie Williams and Steve Jackson played critical roles in the Government's case. Sammie Williams acted as the expert interpreter of the taped conversations as well as testified to several alleged events which were not caught on tape. His testimony placed him with Davis the whole day Davis was purportedly discussing killing Kim Groves. Steve Jackson told the jury that he had unwittingly chauffeured Paul Hardy across the canal to shoot Ms. Groves with a gun supplied by Damon Causey, that Hardy had confessed to the murder of Kim Groves, and that Hardy had changed out the barrel of the gun while in the car on the way home. 4/16/1997 Tr. 97 et seq. None of the content of Jackson's testimony was caught on tape, and much of his story was first told to the FBI as much as eight months after his first interview. 4/16/1996 Tr. 48.

While Sammie Williams testified at length for the Government, he maintained that there was absolutely no plea deal and that he faced a life sentence. The Government did provide Williams with money for clothing and paid to fly his girlfriend out to see him in prison. 4/17/1996 Tr.73-75. The jury at the first trial was not told that Williams was in the witness protection program at the time he testified. After Williams had testified for the Government in three separate trials involving eleven defendants, the Government filed a 5K letter on his behalf, pursuant to which the district court sentenced Williams to five years in prison. R 5705. After the Government paid for Williams and his family to be relocated to California, he violated the terms of his program (R 5707) and eventually returned to Louisiana.

Williams was never prosecuted for his complicity in the murders of Carlos Adams and Kim Groves.  He was never prosecuted for pistol-whipping Nathan Norwood.  He walks the streets of New Orleans today, a free man.

## B.  Procedural History

Len Davis, Paul Hardy, and Damon Causey were indicted on December 13, 1994, for conspiracy against rights with death resulting under 18 U.S.C. § 241.  Under the newly-enacted Violent Crime Control and Law Enforcement Act, all three co-defendants were eligible for the death penalty.  Mr. Davis was already under a December 7, 1994 indictment, along with Sammie Williams, Larry Smith, Bryant Brown, Adam Dees, Carlos Rodriguez, Keith Johnson, Christopher Evans, and Sheldon Polk, for violation of the Federal Controlled Substances Act and Federal Firearms Act due to the Shattered Shield operation.  For the next three and a half months, Mr. Davis was represented by a single, unqualified attorney handling both the drug conspiracy and the civil rights charges.

On January 17, 1995, the Government obtained a superseding indictment which charged Mr. Davis, Hardy, and Causey with two additional counts: deprivation of rights under color of law, and tampering with a witness, under 18 U.S.C. §§ 2, 242, and 1512.[9]  In March of 1995, Mr. Davis' attorney, Curklin Atkins, apparently overwhelmed with the responsibility of representing a capital defendant facing multiple serious charges in two separate cases, filed a motion to determine counsel.  After a hearing, Magistrate Judge Moore found that Mr. Davis was indigent and appointed Atkins along with Milton Masinter to represent him on March 29, 1995.  Five days later, after less than ten billed hours of preparation, Atkins and Masinter made their appearance before the Death Penalty Review Committee in Washington, D.C., to present

---

[9] The indictment would ultimately be amended twice more before the first trial, on March 24 and August 10, 1995, to add additional overt acts and the element of premeditation.  *See* SR 247-50, 697-701.

24

mitigating evidence and argue that the attorney general should not authorize the death penalty in this case. The attorney general indeed opted for the death penalty in this case, and on July 31, 1995, the Government filed its notice of intent to seek the death penalty. Mr. Davis filed a disciplinary complaint against Atkins in August of 1995, and on November 27, 1995, he wrote a letter to Magistrate Judge Moore asserting that "Mr. Atkins was only interested in the money he could make off of government, not in my best interest" and that "Mr. Atkins is very much ineffective and I feel you should know the truth about what type of attorney he is." SR 1297. Magistrate Judge Moore appointed Pat Fanning to represent Mr. Davis for purposes of determining counsel, and ultimately removed Atkins and replaced him with Dwight Doskey in the death penalty case and Fanning in the drug conspiracy case. SR 1350-52.

All three co-defendants were tried jointly on the civil rights charges, although only Mr. Davis and Paul Hardy faced the death penalty. Voir dire began April 8, 1996, and opening statements were made on April 15. On April 24, 1996, the jury found Mr. Davis guilty as charged. After the verdict, Mr. Davis expressed that he wanted to absent himself for the rest of the proceedings. The Government, apparently concerned about his competency, asked for a mental status exam to be conducted. This Court appointed Dr. Robert Whitney Davis to conduct an examination of Mr. Davis. The exam lasted approximately three minutes, with Mr. Davis refusing to answer any questions and repeating the mantra "I have nothing else to say." The next day, Dr. Davis reported by speakerphone that he found Mr. Davis to be competent. Counsel for Mr. Davis had no questions.

Penalty phase began the next day, with the same jury determining sentencing for Len Davis and then Paul Hardy separately. At the eligibility phase, neither party presented any evidence and instead gave arguments to the jury. Although the Government's burden during that

phase was to prove premeditation, counsel for Mr. Davis did not object when the Government told the jury during argument that it had "already . . . found beyond a reasonable doubt that Len Davis and Paul Hardy together killed Kim Marie Groves with premeditation, that is, as a result of planning or deliberation."  4/25/96 Tr. 15.  After hearing arguments, the jury found that the Government had established substantial planning and premeditation and so the selection phase began the next day.  The Government presented two witnesses—Sammie Williams and Juan Jackson—to prove that Mr. Davis deserved the death penalty.  Between the Government and defense cases, Mr. Davis' mother and fiancée were questioned by this Court in chambers regarding their decision not to testify on Mr. Davis' behalf.  They both indicated that Mr. Davis had told them not to testify, and so they would not, and counsel indicated that they had not investigated mitigating evidence to any meaningful degree.  4/26/96 Tr. 10-12.  The defense case for life consisted of four witnesses: Ernest Boudreaux, Robert Thompson, Donald Williams, and Jerry Reed.   Boudreaux read a list of Mr. Davis' NOPD commendations to the jury, and was thoroughly impeached by the Government's cross-examination concerning Mr. Davis' history of disciplinary action.  Thompson, the owner of Flynn's bar, testified briefly that Mr. Davis was a friend and a trustworthy person.  Williams was a D.J. at Flynn's and testified that Mr. Davis was a close friend and did a lot of good things.  On cross-examination, the Government elicited testimony that Mr. Davis had fathered a child while incarcerated.  4/26/96 Tr. 117.  Reed, a defense investigator, testified that Mr. Davis' mother and fiancée were unwilling to testify. 4/26/96 Tr. 118.  The jury returned a death verdict.  4/26/96 Tr. 161.

At sentencing on November 6, 1996, Mr. Davis made a statement excoriating his trial attorneys' performance in his case:

MR DAVIS: The big travesty in the trial was my attorney, Milton "sell me out" Masinter. From day one, I mean that my attorney had audio tape conversations,

26

was not a murder, attempted to discredit a person who lied on me at IAD, which is something I have done in the past. What my attorney, Milton "sell me out" Masinter --

MR. MASINTER: I object to this.

MR. DAVIS: Like the audio tapes the way he handled it, and there is nothing personal, but Sammie "the liar" Williams, one question about the true meaning of the conversation and then moved on to what he called a cross-examination. If there was any evidence of ineffective counsel, Milton Masinter was it.

11/6/96 Tr. 4.  This Court denied Mr. Davis' request to act as his own counsel and appointed Pat Fanning and Archie Creech to represent him on appeal.

On appeal, the Fifth Circuit found that there was insufficient evidence as to the witness tampering charge, and reversed the death sentences of Davis and Hardy due to the risk that the sentences were influenced by the fact that they had been convicted of three death-eligible offenses, rather than two.  *See generally United States v. Causey*, 185 F.3d 407 (5th Cir. 1999). A majority of the panel affirmed the convictions for conspiracy against rights and deprivation of rights.  Judge Harold DeMoss issued a dissent, arguing that the conduct alleged in this case was not taken under "color of law" and accordingly the federal government lacked jurisdiction to prosecute for this offense.  *Id.* at 423 (DeMoss, J., dissenting).

Almost a year passed between the Fifth Circuit's decision and the next status conference in this case.  Immediately, Mr. Davis began asserting that he wanted to waive counsel or act as co-counsel in his case.  This Court appointed Julian Murray and Carol Kolinchak to represent Mr. Davis in the penalty re-trial, and additionally ordered a *Faretta* hearing, which was held September 22, 2000.  At the hearing, Mr. Davis launched into a rambling monologue about how he believed his case to be a "travesty" and how he would never again, as long as he lived, allow an attorney to represent him "where they are running things."  R 374-86.  He went through a barrage of complaints about his attorneys and the federal government which spanned several

27

pages of transcript. *Id..* He repeated a number of times that he planned on "exposing this system for what it is." R 385. "This is something that I have to do, I will bear my own burden. And however it comes out, if they kill me, or if I get life, that's the way God wants it to be." R 392.

The Government noticed its intent to seek the death penalty through a penalty retrial on January 30, 2001. This Court severed the sentencing hearings pursuant to a motion filed by counsel for Paul Hardy. On March 20, 2001, during a status conference, Mr. Davis told this Court that he would not offer a defense at the retrial:

> I made it clear prior to this that I wasn't planning on putting on a defense, so the government need not expect any motions or anything from us, that there will be no defense, we will not participate in voir dire, we will not participate in any cross-examination, any opening statements, we will not call any defense witnesses. This could be quick.

3/20/96 Tr. 3. He also stated that he would wear his prison garb at trial, and that he wished to move forward with a June 4, 2001, trial date.

After the March 20 hearing, the Government moved for a competency evaluation, which this Court dismissed as premature. The Government then moved ex parte for this Court to reconsider granting hybrid representation, because it would impair the Government's interests in "orderly proceedings and stable judgments." SR 2958. In response, Mr. Davis filed a motion asserting that "I do not beg for my life, and I am not afraid to die. I have already informed the Court that I do not intend to present a defense at the penalty trial, and the government has filed pleadings with the Court stating that that decision is so bizarre that it calls into question my mental competence." SR 2987.

This Court granted the Government's motion on May 16, 2001, ordering that Mr. Davis could no longer act as his own counsel and that Murray and Kolinchak were to prepare for trial as full counsel. SR 3001. Instead, counsel appealed this decision, resulting in the Fifth Circuit overturning this Court's order and reinstating Mr. Davis as co-counsel. SR 3031-34, 3121-28.

28

Judge James Dennis dissented, reasoning that "upon conviction a criminal defendant is no longer a free person; his right to autonomy begins to wane at that point, while the public interest in the fair administration of justice remains strong."  SR 3139.

Following the reversal, the Government filed another motion to determine competency, which this Court granted, appointing Dr. Sarah Deland to conduct the examination.  SR 3132.  This Court next explored the possibility of appointing an independent mitigation counsel.  8/3/01 Tr. 3 et seq.  At a status conference on the subject, Mr. Davis continued to express his desire to receive the death penalty while at the same time claiming "I'm not on a suicide mission. . . . I want to live."  *Id.* at 13.   Although this Court had explained to him over and over again that the penalty re-trial would have no effect on the underlying convictions, Mr. Davis stated, "I'm not interested in giving back the death sentence. I'm interested in giving back the convictions."  *Id.* at 18.

This Court appointed Laurie White as independent counsel to conduct a mitigation investigation on August 30, 2001.  SR 3191-3209.  In an appendix to the order, this Court attached a letter to the Fifth Circuit describing Mr. Davis' conduct as "obstreperous":

> It is worth noting that Mr. Davis' conduct has become obstreperous as well, which is an additional basis to forfeit any right he may otherwise have had to self-representation. Prior to this Court revoking his self-representation, Mr. Davis had on several occasions declared that he intends to do nothing at all at the penalty phase: voir dire no jurors, give no opening or closing statement, question no witnesses and present none. His most recent threat in this regard occurred just last week when he stated in open court that if his penalty phase did not proceed as currently scheduled in August, he would no longer participate in the proceedings at all. These are not idle threats by Mr. Davis. At his first trial, he refused to cooperate with his attorneys in developing mitigation evidence and he refused to be physically present during the sentencing hearing. A defendant who claims self-representation but refuses to cooperate in the proceedings forfeits that self-representation.

SR 3213.  After Mr. Davis appealed, the Fifth Circuit again reversed "[b]ecause Davis' right to self-representation encompasses the right to direct trial strategy."  SR 3329, 3341.  Judge Dennis

again took a contrary view: "As in an appeal, the defendant entering the sentencing phase of a capital case has already been convicted. . . . Len Davis's autonomy interests, which became less compelling after his conviction, have been further diminished by the purpose for which he seeks to act as his own attorney.  His purpose is . . . to ensure a death sentence by offering no defense at all."  SR 3363.  This Court accordingly removed Laurie White as counsel and scheduled a competency examination for Mr. Davis.  SR 3394.

Months passed without a competency evaluation.  The Government reminded this Court at a status hearing in April of 2002 that Dr. Deland had been appointed to conduct an examination but no examination had occurred.  4/23/02 Tr. 15.  This Court told the Government, "Remind me again as we get closer to [trial]."  *Id.* at 16.  Soon afterward, this Court granted a defense motion to bar the death penalty under *Ring v. Arizona*, and the case was tied up on appeals for the next two years before the Fifth Circuit ultimately reversed.  *See* SR 3590-3612, 3625.

In the weeks leading up to trial, the Government filed a memorandum arguing that there was no right to hybrid representation and that Mr. Davis should not be allowed to act as co-counsel.  SR 4130.  This Court issued an order on June 24, 2005, setting forth the guidelines for hybrid representation at trial: as to each discrete phase of trial (e.g., a single witness, opening statements, and closing arguments), Mr. Davis could elect to act as his own counsel or have one of his attorneys represent him fully.  SR 4443.  Essentially, instead of acting as true co-counsel, Mr. Davis would either be entirely represented by counsel within the meaning of the Sixth Amendment, or he would act as his own counsel with Murray and Kolinchak standing by.

Trial was set for July 5, 2005.  During a June 28 status conference, the defense asked for a continuance in order to secure the attendance of its only expert mitigation witness.  R 5326.

The defense had not sought a single continuance until that date, and indeed had opposed a Government motion to continue. *See* SR 2778-81  Mr. Davis, present at the conference via telephone, rambled off an additional list of problems with the July 5 date, including "people not responding to subpoenas," "witnesses who disappeared off the face of the planet," "an NOPD record room that's refusing to give us addresses or anything we need," and "audio tapes that are missing." R 5326-29.  This Court had to warn Mr. Davis to "speak slower" and told him that he was repeating himself.  R 5328.  Ultimately this Court ordered that jury selection would still begin July 5, and that the penalty phase itself would be pushed back two weeks.  SR 4555. During an in-chambers conference on July 30, the defense's proposed expert, Dr. Thomas Streed, was contacted by telephone.  SR-SV 238.  Dr. Streed stated that he was having knee surgery on July 18, and that he would be recovering for at least two weeks afterwards.  SR-SV 249.  He further stated that he had been given a stack of documents "a foot high" to review, and he would not be able to review them until he had recovered from surgery.  SR-SV 250.  At the conclusion of the status conference, this Court ordered that jury selection would begin July 25. SR-SV 266-67.

Mr. Davis did not participate in voir dire and allowed Murray and Kolinchak to perform all questioning and selection without his input.  Jury selection proceeded at a phenomenally quick pace.  By noon on the first day, this Court had already given all preliminary instructions to the full panel, the parties had examined sixteen jurors, and ten jurors had been qualified—four of whom ultimately ended up serving on the jury.  *See* R 6366-6469.  The defense failed to ask any meaningful questions of several jurors who were selected, including a juror who wrote on her questionnaire that her husband had been arrested and charged with battery on a police officer, a juror who stated on his questionnaire that he and a friend were stopped and verbally abused by a

police officer and had filed a complaint, and a juror who stated on her questionnaire that she was "traumatized" by police officers' treatment when she filed a report after being robbed and "could not stop crying." Jury selection was concluded by the second day, and opening statements began on August 1, 2005.

Mr. Davis gave the defense opening statement, filling fifty record pages and ending only because this Court told him he would have to wrap it up. During the eligibility phase, Mr. Davis conducted cross-examinations of two government witnesses and counsel conducted the cross-examinations of two additional government witnesses. Counsel declined to cross-examine James Ducos, asserting that "We are not prepared." R 5892. The defense case consisted of one witness examined by counsel, one witness whose testimony from the first trial was read into the record, and two witnesses examined by Mr. Davis. Counsel gave the closing argument. R 5991. The jury returned a verdict finding Mr. Davis eligible for the death penalty on August 3, 2005. R 6035.

The next morning, Mr. Davis stated that he would not be present in the courtroom and that he would allow counsel to proceed and represent him in the selection phase. R 6042. Kolinchak expressed concern at that point that Mr. Davis' actions were caused by mental illness and the fact that Dr. Streed was not qualified to make any judgment regarding competency. R 6043-44. This Court ordered a competency examination, and the trial proceeded in Mr. Davis' absence. R 6044. Dr. Mancuso briefly interviewed Mr. Davis at the courthouse and, based on Mr. Davis' self-reports, found him competent "to understand the proceedings and to assist in/or conduct his own defense" and to "understand the possible consequences of his decision to no longer be in the Courtroom and participate in the trial." SR 5274.

The Government's case at the selection phase largely mirrored its case at the first trial, with one exception. As its last witness, the Government called Jasmine Groves, Kim Groves' daughter, to the stand. R 6174. She read a letter—which had not previously been provided to defense counsel—explaining that she had initially favored life imprisonment but had since come to the conclusion that Mr. Davis should not be given the option of a life sentence:

> Len Davis, I hate you for what you've done to me. So should you or should you not be put to death? Why should you even have a choice? You did not give Kim Groves a choice to live or die. You chose for her. She did not have a chance to think about her mistakes in life. Why should you? See, she was worth more than life to me. So you see, she was more than a rock-head ho.

R 6177. During the Government's examination, she was asked to elaborate on her feelings about the appropriate penalty in this case. She responded, "I don't feel life in prison, he is not even worth it. He not worth it at all. I'm going to stop crying." R 6182. Defense counsel made no objection.

The defense case consisted of two witnesses: a police records custodian who read Mr. Davis' commendations to the jury, and Dr. Thomas Streed. Dr. Streed, apparently under the influence of pain medication and fatigue, testified that Mr. Davis had symptoms consistent with "Police Trauma Syndrome," a purported disorder not recognized by any professional mental health associations. Dr. Streed, whose Ph.D. was issued by an offshore college not accredited by the American Psychological Association, was impeached by a published decision in which a trial court had found that he lacked credibility. R 6268. The Government also elicited testimony that he had only met Mr. Davis a single time, that morning, for five minutes. R 6268.

The Government's closing arguments centered upon Jasmine Groves' victim impact testimony and her stated preference for death.

> In simple and powerful words, she [Jasmine] told you that life was too good for the defendant and she told you why. He didn't have the decency to apologize. And he doesn't care, she said. And she is right. For if the defendant thinks of Kim

33

Groves at all, it is only to ponder how he could have done this murder better. That's how he thinks of her.

. . . .

Jasmine was right. Are you going to let him celebrate again today with your verdict? Are you? I'm asking you. Because if you don't return a sentence of death, which is the only just sentence in this case, Len Davis will be celebrating again tonight.

R 6297. The jury returned a death sentence on August 9, 2005. R 6354.

After the Fifth Circuit affirmed, the United States Supreme Court denied certiorari on March 21, 2011. *United States v. Davis*, 609 F.3d 663 (5th Cir. 2010), *cert denied sub nom Davis v. United States*, 131 S.Ct. 1676 (2011). This Motion timely follows.

## III.   CLAIMS FOR RELIEF

### CLAIM 1.   THE DEPARTMENT OF JUSTICE AND UNITED STATES ATTORNEY LABORED UNDER A CONFLICT OF INTEREST IN PROSECUTING LEN DAVIS IN VIOLATION OF HIS RIGHTS TO DUE PROCESS, A FAIR TRIAL, AND A RELIABLE DETERMINATION OF PUNISHMENT UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

The Department of Justice and United States Attorney could not seek justice in this case in the impartial manner required by the Constitution. The FBI and U.S. Attorney's Office made life-and-death decisions during the course of the "Shattered Shield" operation which, if made differently, might have prevented Kim Groves' murder. There is an unacceptable risk that Len Davis' case was prosecuted in federal court in order to insulate both arms of the Government from public scrutiny of what was, at best, serious negligence and, at worst, intentional disregard of the safety and lives of Ninth Ward citizens. At the very least, once Ms. Groves was killed, the federal Government had a strong interest in shielding the acts and omissions of its agents from scrutiny and bringing its power to bear on Len Davis and Paul Hardy alone. Even if its decisions to prosecute in federal court and to seek the death penalty were not made in bad faith, the direct

34

involvement of Government agents in what preceded, occurred during, and followed the killing of Ms. Groves created an untenable conflict of interest Federal prosecutors could not seek justice in an impartial manner in this case and should have recused themselves.

All of the facts now pled in support of this claim were known at the time of both trials, with a few material exceptions that are the subject of *Brady* claims, *infra*. It is likely, however, based on what is known, that further evidence supporting the conflict is in the possession of the Government, and should have been turned over to defense prior to trial.[10] At any rate, *all* the information is known to the Government and leads to the inevitable conclusion that the conflict required recusal.

On occasion, FBI undercover investigations have themselves become criminal enterprises. For example, in the 1970s and 1980s, John Connally was a decorated FBI agent, "famed for bringing the Bureau underworld informers,"[11] who led a very distinguished career. He used mobsters James J. "Whitey" Bulger of the Bulger Winter Hill Gang, and his associate Stephen "The Rifleman" Flemmi, as "top echelon" FBI informants. At the same time, the Boston Police Department (BPD) was conducting its own investigation into Bulger Winter Hill Gang activities, and communicating with the FBI about the investigation. But the police kept getting frustrated in their efforts: their informants were murdered, or, just when police were about to move in and make arrests after conducting extensive surveillance of Bulger's drug operations, the operation would fold up and disappear. *Litif v. United States, FBI, Connally, et al.*, No. 10-1417, 10-1472, 11-2255, slip op. 2012 WL 170870 (1st Cir. Jan. 20, 2012).

---

[10] Mr. Davis files a *Motion for Discovery* simultaneously with his § 2255 Motion, seeking exculpatory evidence as well as evidence pertaining to its conflict.

[11] Fox Butterfield, *FBI Agent Linked to Mob Is Guilty of Corruption*, NEW YORK TIMES, May 29, 2002, at A14.

Journalists' and law enforcement investigations in the 1990s later revealed that "certain FBI agents allowed Bulger and Flemmi to engage in serious criminal activity…" *Id.* at *3. It ultimately emerged in court that the FBI agent had protected Bulger in his commission of serious crimes, and in exchange, continued to get valuable information about other mobsters.

The FBI's eight-month "Shattered Shield" undercover investigation was also plagued by competing allegiances and the turning of a blind eye to criminal activity. Starting in April 1994, Shattered Shield focused on drawing NOPD officers into a drug trafficking enterprise set up by the FBI, at a huge cost to the Government. It "involved more than 60 federal agents from across the country and was conducted with utmost secrecy. Real cocaine – more than 130 kilos – was used throughout the sting, as was real money, $97,000 of which was distributed to officers in payments as large as $6,000."[12] The aim was to draw out as many NOPD officers as possible who might be willing to engage in illegal drug activity.

Beginning in July 1994, the Shattered Shield investigation involved phone tapping of the NOPD officers targeted. FBI log notes indicate that numerous phone calls by Len Davis and Paul Hardy were monitored as they occurred. Given the implications of listening in to what they then alleged were the planning for and commission of criminal offenses, including Ms. Groves' murder, federal agents had (and retain) a direct interest in minimizing their awareness and even foreknowledge of these activities. This alone created an untenable conflict for the Government. At the very least, there was an appearance of impropriety when the same Government brought the full power of its prosecutorial authority to bear and sought death sentences for Mr. Davis and Mr. Hardy. Len Davis is the only man on death row for such an offense, facing execution.

---

[12] Michael Perlstein and Walt Philbin, *Nine Cops Charged in Drug Sting*, TIMES PICAYUNE, Dec. 8, 1994, at A1. Actually, a payment of $16,000 was made the day after Kim Groves was murdered.

Prosecutors cannot have "an extraneous interest in [a] case that may create 'the *appearance* of impropriety.'" *United States ex rel. SEC v. Carter*, 907 F.2d 484 (5th Cir. 1990) (quoting *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 806 (1987) (emphasis in original)). Maintaining public confidence in the integrity of the judicial system is so important that when a prosecutor has tried a case with a conflict of interest, a judgment of a conviction must be reversed without the need to show prejudice. *Young*, 481 U.S. at 809-12 (plurality opinion).

Because the United States Attorney is a representative of "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all," he or she serves the interest of justice for all as "a servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer." *Berger v. United States*, 295 U.S. 78, 88 (1935). A prosecutor is "not disinterested if he has, or is under the influence of others who have, an ax to grind against the defendant, as distinguished from appropriate interest that members of society have in bringing a defendant to justice with respect to the crime with which he is charged." *Wright v. United States*, 732 F.2d 1048, 1056 (2d Cir. 1984).

Reversal does not require a showing of actual bias. *Caperton v. Massey*, 556 U.S. 868, 129 S. Ct. 2252, 2259 (2009). A prosecutor's interest in a case violates due process if, objectively, "'under a realistic appraisal of psychological tendencies and human weakness,' the interest 'poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.'" *Id*. at 2663 (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). In some cases, the prosecutor's "conflict of interests is of such a level that a defendant's due process rights are necessarily and intolerably threatened." *New Jersey v. Imperiale*, 773 F. Supp. 747, 755 (D.N.J. 1991).

Mr. Davis' is just such a case. Federal prosecutors had an interest in shielding their agents' role—or at best the perception of their role, or their supreme negligence—in Kim Groves' death. They thus labored under a conflict in bringing federal capital charges against Mr. Davis and in the manner in which they mounted the case against him in both 1994 and 2005. He is entitled to a new trial with a conflict-free prosecuting authority.

**A. As Operation Shattered Shield Progressed, the FBI Received Information from Multiple Sources that Paul Hardy Was Murdering Citizens of the Ninth Ward with Police Protection**

Kathleen Adams, the FBI agent who investigated Kim Groves' murder, detailed the course of the intersecting investigations of Paul Hardy and Shattered Shield in an affidavit for the arrest of Len Davis, dated December 2, 1994. Ex. C, Affidavit of Kathleen Adams. She described an "undercover police corruption investigation" which commenced on March 14, 1994 as well as an investigation into Paul Hardy, who the FBI believed was involved in drug trafficking and multiple murders. The FBI got a break in the Paul Hardy investigation on **August 10, 1994**, when a violent drug trafficker pled guilty and agreed to cooperate with the FBI and US Attorney. Ex. C, at 1. As part of the plea agreement, Kevin Yancy told the Government that Paul Hardy was a "killer," and that he had "heard of HARDY being involved in numerous murders in order to protect his illegal drug trafficking turf." *Id*. at 2. Yancy also told prosecutors that NOPD officers were protecting Hardy in his trafficking and killing enterprises. He named one of the officers involved in protecting Hardy—Len Davis. *Id*. At this point, in August, law enforcement should have stopped to investigate this threat.

Although it was not contained in Agent Adams' affidavit, FBI agents intercepted conversations on **September 30, 1994** that they believed confirmed that what Kevin Yancy said was true. A wiretap monitor took contemporaneous notes of the conversation which were turned over to defense prior to the first trial. On that night Sammie Williams called Len and told him

38

"call your boy… P.H." because there had just been a "30" (murder); he heard gunfire and saw men running toward a car he knew belonged to Paul Hardy. Mr. Williams said he nearly went after them "blazing," but then realized it was Hardy. Mr. Davis reached Hardy on the phone. Hardy initially denied any involvement in the murder but then acknowledged he was responsible. Len reminded Hardy to page him when he was going to go after someone, so Len could make sure there weren't police around. G.E.-L.D. 01.

Nineteen year-old Carlos Adams was killed that night. Carlos was shot 10 times, three times in the face. The FBI was listening, and taking notes in their log on exactly what was transpiring as it happened. Ex. D, Wiretap Monitoring Log. They did nothing. The Crimestoppers anonymous tip that came in three days later, which named Paul Hardy as the killer, was stored away in an NOPD file. No one has ever been arrested or prosecuted for Carlos Adams' murder. And the FBI left Paul Hardy, Len Davis, and Sammie Williams on the streets of the Ninth Ward, to continue to make use of them in their drug sting, and to continue listening in to their activities. Had they stepped in, Len Davis would have been removed from his position, averting the danger to the citizens of New Orleans that the Government harped upon at trial.

**B. FBI Investigators Listened In to What They Believed Was a Plan to Murder Kim Groves, and Though They Later Claimed that the Import of the Conversations Was Not Discernible at the Time, That Claim Is Suspect In Light of the Information They Had Indicating that Paul Hardy Was Committing Murders and NOPD Police Were Protecting Him.**

On the night of **October 13, 1994**, Len Davis spent hours tracking down Kim Groves and, according to the Government, arranging for Paul Hardy to kill her.

The first conversation picked up on wiretaps the day Kim Groves was killed was at 5:10 p.m., when Mr. Davis said: "I could get P to come to do that ho now. And then we handle the 30." G.E.-L.D. 08. He tried to reach Mr. Hardy by pager. At 6:14 p.m., they finally talked. Mr.

39

Davis told Mr. Hardy that a woman had gone up to IAD and he had seen her in the car when she was going there.  He described her clothing in detail, and then he said, "you know what I wanna do!"  Mr. Hardy told Mr. Davis not to say anything on the phone, and they arranged to meet up soon.  G.E.-L.D. 09.

These conversations were very similar to the ones that were overheard on September 30, 1994.  They did not occur in a vacuum, but rather in the context of what the FBI had already been told about the relationship between Len Davis and Paul Hardy, and what they had already heard the night Carlos Adams was murdered.  The Government's theory at trial was that Len Davis was describing a person he wanted to kill, and that person was somehow caught up in an IAD complaint.[13]

The Government presented evidence that at 6:31 p.m., Mr. Davis told Damon Causey to relay a message to Mr. Hardy: he would page him and put in ones, and that meant to meet him by the Fifth District Station.  Mr. Davis said he would then put them in his car and take them across the canal to show them what he was talking about—the woman who made the IAD complaint earlier.  G.E.-L.D.10.

At this point, any listener knew exactly where to catch up with Len Davis and Paul Hardy.  Throughout the evening, other locations were freely furnished in phone conversations, all providing the FBI the opportunity to follow Paul Hardy.  But the FBI took no action.

At 7:07 p.m., Paul Hardy, using Mr. Davis' phone, called a woman named Erica and told her that he was "about to handle something."

---

[13] At both trials, prosecutors presented this point as indisputable.  Yet unbeknownst to the defense at the first trial, they had earlier claimed that Mr. Davis' comments to Paul Hardy were nothing more than routine police chatter.  *See* Claim 8, *infra* (Brady claim).

At 7:58, Paul Hardy spoke using Len Davis' phone to Mr. Davis, who was using Sammie Williams' phone.  Mr. Davis told Mr. Hardy that he would be going back to look for the woman he had been talking about all day.  Mr. Davis said he would be back in touch and gave Mr. Hardy a code that would help Mr. Hardy recognize that he was calling.  G.E.-L.D.11.

At 9:28 p.m., after meeting up with Hardy to retrieve his phone, Len Davis paged Mr. Hardy, who returned the call.  Mr. Davis was angry because "y'all ain't went and handled y'all business."  Mr. Davis told Mr. Hardy that he was going to pass by again and see if he saw the woman he had been discussing all day.  Mr. Hardy said he would drop off his kids and head out to the same place.  G.E.-L.D.12.

At 10:00 p.m., Len Davis began paging Paul Hardy.  As he was dialing the pager number, he said he was going to 911 the woman.  Shortly after, Hardy called, and Mr. Davis told him the lady was out there now.  Mr. Davis described her clothing in detail, and her hairstyle.  He said she was standing in the middle of the street talking to a man.  Mr. Davis said, "Get that 'ho!" Hardy responded, "All right, I'm on my way."  G.E.-L.D.13.

At 10:43 p.m., Mr. Hardy called Mr. Davis.  He said he was on his way, and Mr. Davis said he hoped the woman was still out there.  Mr. Davis again described a woman's clothing, skin color, and hair color in detail.  As he got off the phone, he said, "After it's done, go straight uptown and call me." Mr. Hardy agreed to do so.  G.E.-L.D.14.  Meanwhile, the wiretap monitor contemporaneously wrote: "UM on his way.  Len describes female's attire again – after it's done go straight uptown & call me.  Later."  Ex. D, Wiretap Monitoring Log.

In light of the conversations on September 30, 1994, when Carlos Adams was killed, it becomes difficult to believe that the FBI was ignorant about a potential murder being planned.

41

The federal agents' failure to act in the face of numerous monitored phone calls raises the troubling specter of an FBI that had made a decision not to intervene in the Ninth Ward murders.

### C. The Day After Kim Groves Was Murdered, the Shattered Shield Undercover Agent Was Enticing Len Davis to Expand Its Drug Trafficking Trade, and Convince More Cops to Participate

Kim Groves' murder, and other murders the FBI heard, came at a time when the FBI was about to expand the drug trafficking operation to other locations in the city. This expansion would allow Mr. Davis and Williams to recruit more officers into the drug trafficking operation which was the FBI's goal. Around 1:00 p.m. on October 14, 1994, the undercover agent met with Len Davis and Sammie Williams at the warehouse supposedly being used to store drugs.  The undercover agent told them that the dealer wanted to move drugs to other locations.  Mr. Davis wanted more information on the type of other locations.  The agent said they needed to be on the other side of town, and they discussed a house or apartment.  Warehouse Tapes, 10/14/94, 13:16-13:35.

As it turned out, another site was arranged, the Mardi Gras Truck Stop.  The undercover agent testified at trial that the FBI wanted to expand the operation to pull in more officers.  The original officers recruited to participate in the drug trafficking scheme remained at the warehouse.  FBI agents made a plan to move a shipment of drugs in and out of the Mardi Gras Truck Stop and recruited additional NOPD officers.

> We wanted to actually try to see just how many officers were going to be involved. And like I said, the original officers were going to be used at 420 Franklin, so anyone one else knew that didn't really know the operation was going to be using the Mardi Gras Truck Stop.

R 6101.

Meanwhile, according to a report only turned over to defense prior to Mr. Davis' second trial, on **October 21, 1995**, FBI agents discovered what they believed to be discussions between

Len Davis and Paul Hardy about killing Kim Groves.   Ex. E, FBI Wiretap Review Memorandum.

The last drug shipment for Shattered Shield occurred **between November 16th and 18th, 1994.**  This was more than a month after Ms. Groves was killed and almost a month after the Government said it determined that Mr. Davis and Hardy were responsible for her murder. Thus the FBI, an agency of the Department of Justice, left a man they believed had ordered the killing of a New Orleans citizen, and whom the Government would later say could not be restrained even within the walls of a maximum security federal prison,[14] unfettered on the street for over three more weeks to assist them in their drug operation.[15]

The motivation for doing so was undeniable. After spending hundreds of thousands of dollars on Shattered Shield, the government wanted a better pay-off, in terms of arrests.

### A.  FBI Investigators Listening to Wiretaps Overheard What They Thought Were Plans to Kill Citizens, or Murders of Citizens, But Did Not Intervene to Stop the Murders.

There were other conversations that FBI agents intercepted involving the murder of Ninth Ward citizens  which they similarly did not act on, either to prevent or to remove the purported offenders from the street to protect the public.

---

[14] See *Claim* 16, *infra*, on future dangerousness.

[15] The Government made repeated assertions to the media, after Mr. Davis was arrested, that Operation Shattered Shield was shut down to protect innocent citizens. *See* Michael Perlstein and Walt Philbin, *Cop, 2 Others Charged in Death*, TIMES PICAYUNE, Dec. 6, 1994, at A1 (investigation ended prematurely due to Kim Groves' murder).  The fact that innocent citizens had been killed during the pendency of Shattered Shield, while FBI agents monitored wiretaps, casts doubt on such assertions and underscores the conflicted position the Government found itself in here.  *See also* Lee Hancock, *New Orleans Cop Corruption Runs Deep: 9 Officers Indicted for Murder, Drug Payoffs, But Feds Fear Many More May Be Tied to Crime*, SAN FRANCISCO EXAMINER, Dec. 21, 1994, at A1 (""Because the undercover phase of the federal inquiry was halted abruptly, authorities were unable to charge as many as 20 other police officers they suspect of direct involvement in drug-protection rings, [Eddie] Jordan said").

On **October 12, 1994**, the day before Ms. Groves was murdered, the FBI intercepted a conversation between Paul Hardy and Len Davis about a man named Shawn King, who had been shot and killed the night before, along with a 16 year-old boy who was with him who wasn't the intended victim.  According to Hardy, Shawn King had been robbing people.  Hardy commented that his girlfriend's mother heard that Hardy had put the hit out on King.  Hardy denied it in the conversation.  G.E.-L.D. 6.  But the FBI believed Hardy and Causey had committed the murder.  At the preliminary hearing in the drug case, on December 12, 1994, FBI Agent McArthur testified that the wiretaps "indicated that Paul Hardy and Damon Causey were involved in the homicide."  Drug Trial Tr. 25 (Dec. 12, 1994).

On **October 14, 1994**, according to evidence the Government presented at trial, Mr. Davis was recorded still planning on going after Nathan Norwood, in retaliation for reporting him to IAD.  He purportedly decided not to hurt Norwood after he found out that the IAD report had been withdrawn.  G.E.-L.D.22.  But the FBI did not intervene at any point to protect the Norwood twins.

On **October 19, 1994**, Christopher Woods was shot on Congress Street.  Sammie Williams and Len Davis responded to the call.  Christopher Woods said the name "Damon" as he was struggling to survive.  G.E.-L.D.23.  According to prosecution witnesses, Mr. Davis contacted Hardy to make sure it wasn't a murder Hardy had committed.

On **October 20, 1994**, the FBI intercepted a string of conversations between Davis and Hardy.  According to the Government, Davis and Williams tried to help Hardy find someone he wanted to shoot.  They checked and found out other police were in the area.  They suggested Hardy commit the murder during NOPD's shift change.  G.E.-L.D.24, L.D.35, L.D.27.

All of this underscores the troubling conflict under which employees and officials of the U.S. Government labored. Police logs, FBI notes, and witness statements suggest that federal agents may have known that murders were likely to be committed yet did not act, and then did know that murders had been committed but allowed the suspected perpetrators to remain for weeks and even months not only on the street but on the New Orleans police force.[16]   Federal prosecutors had an interest in minimizing even the appearance of wrongdoing by their agents and in portraying Len Davis to the extent possible as a rogue and uncontrollable man who could not be stopped. This conflict should have precluded the U.S. Attorney's Office from prosecuting this case and from seeking the ultimately punishment against Mr. Davis.

## D. The Department of Justice and Eastern District of Louisiana Office of the U.S. Attorney Should Have Recused Themselves From Any Prosecution of this Matter.

> Between the private life of the citizen and the public glare of criminal accusation stands the prosecutor. That state official has the power to employ the full machinery of the state in scrutinizing any given individual…. [W]e must have assurance that those who would wield this power will be guided solely by their sense of public responsibility for the attainment of justice.

*Young v. United States*, 481 U.S. 787, 814 (1987).  In Mr. Davis' case, the Department of Justice and U.S. Attorney turned the spotlight away from their own actions and focused it entirely on

---

[16] The importance to the Government of shielding its agents from any cloud of wrongdoing was manifest in its statements to the press. After Mr. Davis was arrested, the Government claimed that "[t]he investigation ended prematurely after Justice Department officials were shown evidence that Davis ordered Groves' murder. At that point, a decision was made not to let Davis and the other two suspects remain on the street." Michael Perlstein and Walt Philbin, *Cop, 2 Others Charged in Death*, TIMES PICAYUNE, Dec. 6, 1994, at A1.   Yet there is evidence that that was far from the case. FBI Agent McArthur testified very differently at the preliminary hearing in the drug case. Operation Shattered Shield was shut down not because of the killing of Kim Groves but because some of the NOPD police involved in illicit drug activity began "arranging for a third party, without the knowledge of Len Davis or Sammie Williams, to rip off the warehouse or one of the drug couriers." Drug Trial Tr. 38 (Dec. 12, 1994). At that point it "became evident [to the FBI] the situation was out of control. We may have to shut it down." *Id.* at 39. The conversation that signaled to the FBI that Shattered Shield should be shut down occurred on **November 16, 1994**, one month after Kim Groves was murdered and a month and a half after Carlos Adams was murdered. It was only following the threat to agents that Shattered Shield was discontinued.

45

Mr. Davis' actions. In fact, their Shattered Shield investigation created a criminal enterprise, recruited officers into it, and, in Mr. Davis' case, gave him power that he had never before experienced. When the wiretaps from the undercover operation appeared to reveal that Paul Hardy was carrying out murders in the Ninth Ward, and even captured a recording of Hardy confessing to a murder, the government failed to halt its investigation and arrest Paul Hardy, Sammie Williams, or Len Davis. The reason for failing to do so was a desire to continue to capture more NOPD officers engaging corruption. At the very least, there is a question whether actions and omissions of federal agents played some role in the failure to prevent the murder.

The Department of Justice and United States Attorney's office had an insurmountable conflict of interest in Mr. Davis' case. Prosecutors have an ethical duty to "avoid a conflict of interest with respect to . . . official duties." They also must not allow "political, financial, business, property, or personal interests" to affect "professional judgment or obligations." ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION AND DEFENSE FUNCTION, STANDARD 3-1.3 RELATING TO THE PROSECUTION FUNCTION (3d ed. 1993). Standard 2-2 governing the selection of investigation techniques requires that the U.S. Attorney "consider, in consultation with police and other law enforcement agents involved in the investigation . . . *the risk of physical danger to law enforcement officers and others*." *Id*. The DOJ and the U.S. Attorney failed to protect the safety of citizens when it knew or should have known that there was a huge risk of physical danger. Once it made the deadly mistake, and the Government had a substantial interest in suppressing information pointing to any measure of responsibility for Ms. Groves' murder, it did not reveal its conflict, but instead focused all of its prosecutorial power against Davis and Hardy. In so doing it compromised not only professional judgment and obligations but also the reliability and fairness of those prosecutions.

This is the rare case where "a realistic appraisal of psychological tendencies and human weakness" supports the conclusion that the government had a conflict of interest that rose to the level of a due process violation. *Caperton*, 129 S. Ct. at 2263. The error was structural. *Young*, 481 U.S. at 809-12. Reversal is required.

> **CLAIM 2. COUNSEL AT BOTH TRIALS PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS FOR FAILING TO LITIGATE THE EQUAL PROTECTION VIOLATION THAT AROSE WHEN MR. DAVIS, AN AFRICAN-AMERICAN MAN, WAS PROSECUTED UNDER 18 U.S.C. § 241 AND 242 FOR AN OFFENSE UNRELATED ENTIRELY TO THE RACE OR GENDER OF THE VICTIM**

Trial counsel at Mr. Davis' initial trial and the penalty phase retrial failed to investigate, raise and litigate the equal protection violation that arose when Mr. Davis, an African-American man, was prosecuted under 18 U.S.C. § 241. The AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (reprinted at 31 HOFSTRA L. REV. 913 (2003)) (hereinafter "ABA Guidelines (2003)"), which carry the imprimatur of endorsement by the United States Supreme Court as the prevailing standards of the time, provide as a bare minimum that counsel specifically provide that counsel must "Bear[] in mind that the history of capital punishment in this country is intimately bound up with its history of race relations." *Id.* at 1053. The Guidelines offer a non-exhaustive list of actions that counsel should take to mitigate the influence of race.[17]

While attention to issues of race and equal protection are important in any capital case, such an inquiry is all the more important where the Federal Government's basis for prosecution involves an allegation of a civil rights violation. Had counsel conducted such an inquiry, counsel

---

[17] As one noted expert in effective capital representation has observed, "Litigating race in the courtroom is not always about pounding the table or making a scene – sometimes it is about making the space for honest and equitable responses." Andrea Lyon, *Naming the Dragon: Litigating Race Issues During a Death Penalty Trial*, 53 DEPAUL L. REV. 1647, 1658 (2004).

would have discovered that the only instances in which the Federal Government decided to prosecute a defendant for civil rights violations capitally arose as a result of an allegation against an African-American defendant.

Counsel would have discovered that the FBI and US Attorney made focused decision to investigate and prosecute officers in the Fifth District of the New Orleans Police Department—a district staffed primarily by African-American police officers. In doing so, the Government continued a long history of ignoring corruption and brutality perpetrated by white police officers. Had counsel effectively investigated the circumstances of race, counsel would have discovered that similarly situated white defendants received no, or exceedingly little, punishment for committing acts similar to the ones alleged against Mr. Davis. The quarter century preceding Ms. Groves' murder was replete with cases of white NOPD officers who killed black citizens, and either escaped punishment altogether, or received insultingly little punishment for their actions. The officers involved, historically, were white officers. A few examples include:

1968: Police shot and killed black teenager running from burglary two days after Martin Luther King, Jr. was assassinated. The officers were never prosecuted.

1974-75: In December 1974, police killed an 18 year-old black youth, after he allegedly pulled out a gun. Witnesses didn't see a gun.

In April 1975, a 27 year-old man was killed on Bourbon Street by a 21 year-old off-duty police officer after trying to stop several off-duty officers from harassing shoe shine boy.

In July of 1975, two black men were shot and killed by off-duty police officers. In the cases involving off-duty police officers, the officers did not identify themselves as police. No one was prosecuted and NOPD's IAD took no action against any of the officers.

1976: Police killed black man from Kansas City who was visiting New Orleans for Mardi Gras. At a parade, he fought with white man over beads. He was hit over the head with a blackjack.

1980: A police officer was shot and killed in Algiers. A week-long rampage resulted. Police had no leads on the killer, but descended on the Fischer Housing

48

Development to find the killer. A 38 year-old Fischer resident was shot and killed by police, allegedly because he had a knife. Several days later, white officers raided Fischer and shot and killed another man, claiming he was shooting at them. Simultaneously, in a different area of Algiers, officers shot and killed second man and a woman with him, saying the two pulled guns one them. Some men were taken into wooded areas and tortured. An Orleans grand jury refused to indict 13 NOPD police officers involved in the rampage. A federal grand jury returned an indictment for civil rights violations, punishable by a maximum sentence of 10 years. A federal district court judge threw out the indictments, on the basis that the government had acted overzealously. Later, several officers were reindicted. Ultimately three homicide detective were found guilty of civil rights violations and sentenced to 5 years in federal prison.

1983: Police shot and killed an 18 year-old black youth riding on the back of a motorcycle. Police claimed that the two men riding the motorcycle were shooting at them, but the gun they turned in as evidence was rusty and did not have a bullet clip. The officers involved subsequently admitted planting the gun, but still said they saw pops and flashes of light that they thought was gunfire. The officers involved were suspended and one was charged with second degree murder. An Orleans Parish jury found him guilty but his conviction was subsequently overturned on appeal.

1990: Adolph Archie was beaten to death by police officers after being arresting for murdering a police officer. Archie had been injured when taken into custody, and police made slow progress to the hospital where he was to receive medical treatment. While Archie was being transported, police officers were broadcasting death threats to Archie over police radios. The officers transporting Archie decided to bypass the hospital and take him to the police station. Archie died in police custody. No officers were ever charged.

*See* LEONARD N. MOORE, BLACK RAGE (2010); HUMAN RIGHTS WATCH, SHIELDED FROM JUSTICE: POLICE BRUTALITY AND ACCOUNTABILITY IN THE UNITED STATES (1998), *available at* http://www.columbia.edu/itc/journalism/cases/katrina/Human%20Rights%20Watch/uspohtml/us po14.htm. While certainly the prosecution of civil rights violations perpetrated by police officers is commendable, the prosecution of Mr. Davis and the black officers arrested as a result of Operation Shattered Shield are an anomaly, and Mr. Davis' sentence of death is the only one ever upheld in a prosecution of a civil rights violation resulting in death.

Prior to the second penalty phase, any effective counsel would have requested discovery concerning the Federal Government's use of 18 U.S.C. §§ 241 and 242, and the death penalty.

When making a discovery request, effective counsel would have emphasized that the Department of Justice's own decision to begin to collect and tract race based information was to remedy the appearance that race—in cases like this one—continued to influence the administration of justice and to provide reassurance to the public and the courts that race played no role in the administration of the federal death penalty:

> [I]t has been suggested that changes could be made to promote public confidence in the process's fairness and to improve its efficiency. For example, as noted above, consideration of the broader universe of potential capital cases reinforced the findings of the Sept. 12 study which tended to refute any assumption of bias against racial or ethnic minorities. However, obtaining information about this broader class of cases required an extraordinary effort because the existing review procedure does not regularly obtain information about cases in which a capital charge is factually supportable, but the U.S. Attorney office decides to charge (or accept a plea to) a noncapital crime. Hence, in the future, U.S. Attorneys will be required to submit information, including racial and ethnic data, about potential capital cases, as well as those in which a capital offense is actually being charged. This should help to maintain public confidence in the fairness of the process by making more complete racial and ethnic data available for both actual and potential federal capital cases on a continuing basis.

U.S. Dept. of Justice, *The Federal Death Penalty System: Supplementary Data, Analysis and Revised Protocols for Capital Case Review* (June 6, 2001), at 2. Because the purpose of the Department of Justice's decision to collect the data is to make "more complete racial and ethnic data available for both actual and potential federal capital cases on a continuing basis," it is certainly probable that—given the allegations of civil rights violations—this Court would have ordered limited discovery to prevent the Government from shielding review evidence that reflects bias against racial or ethnic minorities.[18]

Regardless of whether this Court finds an outright violation of Mr. Davis' equal protection rights, *see* Claim 2, *supra*, counsel was ineffective for failing to investigate and raise

---

[18] Counsel specifically requests leave of court to secure additional discovery concerning the odious influence of race on the administration of this Civil Rights prosecution.

these claims of discrimination.    Appellate counsel was also ineffective for failing to raise this claim.  It is impossible for the Government to assert that, had counsel brought this history of race based decision making to the Civil Rights Division of the Department of Justice, and the Attorney General, including the striking anomalous that the first time the federal government ever brought a capital prosecution for violating 18 U.S.C. §§ 241 and. 242, Civil Rights Violations, involved the prosecution of an African-American man, the Federal Government would not have taken the matter seriously, and re-considered the decision to prosecute both federally and capitally.[19]   Indeed, had counsel brought this information before the United States Department of Justice, there is a reasonable probability that the prosecution would not have proceeded with a capital prosecution, and the resulting conviction/death sentence would not have occurred.  Mr. Davis is entitled to a new trial, or at the least a new sentencing process absent the influence of race.

> **CLAIM 3.    TRIAL COUNSEL AT MR. DAVIS᾽   INITIAL TRIAL, APPELLATE COUNSEL, COUNSEL AT THE PENALTY PHASE RETRIAL AND SUBSEQUENT PENALTY PHASE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS BY FAILING TO CHALLENGE THE CONSTITUTIONALITY OF THE APPLICATION OF 18 U.S.C. §§ 241 AND 242 TO THE AFRICAN-AMERICAN DEFENDANT IN THIS CASE**

Given the history of the civil rights statutes, it is a perverse, cruel irony that the only man to suffer the harshest penalty allowable—death—is an African-American man.  18 U.S.C. §§ 241

---

[19] As Attorney General Holder expressed when confronted with similar—but less persuasive—evidence concerning the application of the Federal Death Penalty:

I can't help but be both personally and professionally disturbed by the numbers that we discuss today . . . no one reading this [Department of Justice] report [on race and the federal death penalty] can help but be disturbed, troubled, by this [racial and ethnic] disparity.

Eric Holder, *as quoted in* Marc Lacey & Raymond Bonner, *Reno Troubled by Death Penalty Statistics*, N.Y. TIMES, Sept. 12, 2000, at A17.

and 242 originated from Reconstruction-era legislation intended to protect the rights of newly-emancipated slaves:

> Section 241 was enacted as part of what came to be known as the Enforcement Act of 1870, 16 Stat. 140. The Act was passed on May 31, 1870, only a few months after ratification of the Fifteenth Amendment. In addition to the new § 241, it included a re-enactment of a provision of the Civil Rights Act of 1866 which is now § 242.

*United States v. Price*, 383 U.S. 787, 801-02 (1966). The enactments were the result of "much agitated criticism in the Congress and in the Nation because of the continued denial of rights to Negroes, sometimes accompanied by violent assaults." *Id.* at 802. In particular, unreconstructed states, largely Southern states, were the focus of the legislation, since those states refused to acknowledge the rights of African Americans.

> Congress had taken control of the entire governmental process in former Confederate States. It had declared the governments in 10 "unreconstructed" States to be illegal and had set up federal military administrations in their place. Congress refused to seat representatives from these States until they had adopted constitutions guaranteeing Negro suffrage, and had ratified the Fourteenth Amendment.

*Id.* at 803-04.

Sections 241 and 242 remain largely unchanged through present times. However, in 1968, coinciding with the civil rights movement, a significant debate occurred over whether the statutes should be amended to recognize that a civil rights violation only occurred where African Americans' civil rights were violated by white people. The proposed change was raised in H.R. 2516, which would have revised the statutes so that Federal courts would only have jurisdiction if there was diversity in color between the accused and the victim, with the underlying assumption being that the accused would be white, given the times, and the victim would be African American.

The bill was intended for Southern states, 114 Congr. Rec. 333 (Jan. 18, 1968) (statement of Sen. Holland),  specifically because "[i]n many places, States and local laws and criminal justice agencies have been, in every sense, unequal to the task of" providing every American with their Constitutional rights.  *Id*. at 224 (statement of Sen. Kennedy).  The enactment of the bill would "fill in the gaps in the protection we offer all our citizens, that Federal rights are to be guaranteed to people of all races and religions, not just certain ones, that American's dedication to justice and to liberty for all has not waned, and will not be permitted to wane." *Id*. (statement of Sen. Kennedy).  Senator Long supported the distinction between the races, because of the violence, murder, manslaughter, destruction of property, and riots that had occurred in the last year in Detroit, Cambridge, and Newark.  *Id*. at 330 (statement of Sen. Long).   Senator Javits expressed concern that white individuals who attacked African Americans were not receiving the same treatment under non-civil rights statutes.  Specifically, Senator Javits cited several of the most heinous incidents in which African Americans were murdered by whites and no state or federal trial resulted.  Even when state trials did occur, the trial ended in either an acquittal or a hung jury and no federal charges were ever brought.  As a result of these examples of discrimination, Senator Javits asserted that H.R. 90-2516 would "remedy the dangers and difficulties and injustices for centuries, which we are at long last seeking to expiate."  144 Congr. Rec. 533-34 (January 22, 1968) (statement of Sen. Javits).  He said that the social order of the south has been motivated by race, color, religion, or national origin and the bill was intended as a "method [] of perfecting the total civil rights package necessary to answer so many decades of injustice." *Id.* at 535-36.

Those who argued against passage of the bill claimed that it would "fragmentize[] the American people on the basis of race and…make[] jurisdiction of the Federal court depend on

whether the accused and the victim are men of different races." 114 Congr. Rec. 329 (Jan. 18, 1968) (statement of Senator Ervin). Senator Ervin argued that the law should apply to all men, regardless of the color of their skin. *Id*. at 330; *see also id*. at 387-88 (statement of Sen. Ervin); *id*. at 1157-58 (statement of Sen. McClellan). He also commented that the appropriate title of this bill should be "To give jurisdiction to the Federal courts in cases of violence where there is a diversity of color, and deny it in cases where there is no diversity of color." *Id*. at 332. Furthermore, he argued that the H.R. 2516 "violates the spirit of the equal protection because it does not protect all people similarly situated but rather makes a classification based on race." *Id*. at 390 (Senator Ervin). The bill did not pass.

It is hardly a coincidence that in the Southern state of Louisiana, Sections 241 and 242, never used to put a white person on death row, have now been used to put a black man on death row. Our substantial history of discrimination and violence against African Americans cannot be ignored, and Mr. Davis' prosecution in this case smack of discrimination on the basis of race.

> **CLAIM 4. THE PROSECUTION OF MR. DAVIS, AN AFRICAN-AMERICAN DEFENDANT, FOR A VIOLATION OF 18 U.S.C. § 242, IN A CASE IN WHICH THERE IS NO INDICATION THAT THE VICTIM WAS TARGETED BECAUSE OF RACE, RELIGION, ETHNICITY, GENDER OR OTHER PROTECTED CLASS VIOLATES THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

18 U.S.C. § 242 provides:

> Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated

sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death..

While there is dispute over whether Section 242 provides two separate causes of action, or prohibits deprivation of rights on *account* of race or alienage, numerous courts have suggested that it is limited to those instances in which a deprivation of rights occurs, under color of law on account of race.  See *Bergman v. United States*, 565 F. Supp. 1353, 1395 (W.D. Mich. 1983) ("In this case, the object of the conspiracy was a violation of 18 USC § 242: deprivation, under color of state law, of rights, privileges and immunities secured or protected by the Constitution or laws of the United States, on account of race.").[20]

---

[20] *Cf. Fuce v. United States*, 2006 U.S. Claims LEXIS 479 (Fed. Cl. Aug. 17, 2006) ("The other statutes cited by Mr. Fuce, HN918 U.S.C. §§ 242, 1506, are federal criminal statutes that, among other things, apply to willful deprivation of rights under color of law on account of alienage, color, or race, 18 U.S.C. § 242"); *Moore v. Kamikawa*, 940 F. Supp. 260, 265 (D. Haw. 1995) ("Title 18 U.S.C. § 241 makes it a crime for two or more persons to conspire to deprive another of rights secured by the Constitution or laws of the United States. Section 242 makes it a crime to deprive another of such rights, under color of law, *on account of alienage, color or race*."); Bradshaw v. Clements, 1999 U.S. Dist. LEXIS 20994 (D. Or. Nov. 24, 1999) ("Section 242 makes it a crime to deprive another of such rights, under color of law, on account of alienage, color or race."); Mills v. Poole, 2008 U.S. Dist. LEXIS 108461, 52-53 (W.D.N.Y. May 14, 2008) ("Sections 241 and 242 of Title 18 of the U.S.C. deal with the federal prosecution of civil rights violations involving a conspiracy among two or more persons to deprive another person of the free exercise of any constitutional right, on account alienage, color, or race. *See, e.g.,* 18 U.S.C. § 242 ("Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens . . .")"); *Hester v. State*, 2008 U.S. Dist. LEXIS 76577 (S.D. W. Va. Sept. 18, 2008) ("Similarly, § 242 benefits "any person" who experiences a deprivation of rights on account of alienage, color, or race. Because every person has an alienage, color, and race, it is clear that § 242 does not manifest an unmistakable focus on a discrete class of protected persons. Although neither the Supreme Court of the United States nor the Fourth Circuit have addressed this issue specifically, other courts have reached the same conclusion regarding civil claims under § 241 and § 242. *See, e.g., Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980); M*cCauley v. Computer Aid, Inc.*, 447 F. Supp. 2d 469, 477 (E.D. Pa. 2006); *Curry v. Weiford*, 389 F. Supp. 2d 704, 714 (N.D. W. Va. 2005).").

In discussing the legislative history that resulted in the creation of the act, courts have noted that the purpose was to criminal redress for deprivation of rights under color of law, *on account* of race, color, or former slavery:

> In comparing Section 1 of the Act of 1871, i.e., 42 U.S.C.A. § 1983, to Section 2 of the Civil Rights Act of April 9, 1866, 14 Stat. 27, reenacted as §§ 17, 18 of the Act of May 31, 1870, 16 Stat. 140, 144, 18 U.S.C. § 242, which provided a criminal redress for deprivation of rights under color of State law *on account of race, color, or former slavery*, Representative Samuel Shellbarger of Ohio said that "[this] section of this bill, on the same state of facts, not only provides a civil remedy for persons whose former condition may have been that of slaves, but also to all people where, under color of State law, they or any of them may be deprived of rights to which they are entitled under the Constitution by reason and virtue of their national citizenship."   .   .   .   Later, Representative Shellbarger noted rhetorically that,"if it be true that when a State by the intimidation of the authorities, or the corruption of the courts, or juries, or witnesses, cannot secure to all persons the equal protection of the laws."

*Duke v. Texas*, 327 F. Supp. 1218, 1237-39 (E.D. Tex. 1971), *rev'd on other grounds*, *Duke v. Texas*, 477 F. 2d 244 (5th Cir. 1973) (emphasis added).[21]

In this case, trial counsel were ineffective for raising the issue of whether the Government was required to prove that the deprivation of Ms. Groves' rights occurred "on account of" her race.  Appellate counsel were ineffective for failing to raise the issue, and identifying—at the very least—the ambiguity in the criminal statute.

### CLAIM 5.    MR. DAVIS WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR AND RELIABLE SENTENCING PROCEEDING

---

[21] Other courts have indicated that the United States Supreme Court in *United States v. Classic*, 313 U.S. 299 (1941), provided an alternate interpretation of 18 U.S.C. 242, extending potential punishment to two different offenses: "The one is willfully subjecting any inhabitant to the deprivation of rights secured by the Constitution; the other is willfully subjecting any inhabitant to different punishments on account of his color or race, then are prescribed for the punishment of citizens." *Hoffman v. Halden,* 268 F. 2d 280 (9th Cir. 1959) (rev'd on other grounds).  *Halden* further provides "Prior to *United States v. Classic,* there had been a tendency in the courts to look upon the Civil Rights Act as intended only to apply to class legislation or acts discriminatory towards negroes. Thus the statement appears in Mitchell v. Greenough, 9 Cir., 1983, 100 F.2d 184, 'The prohibition against 'denial of the equal protection of the law' was to prevent class legislation or action.'" *Id.*

**UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS WHEN COUNSEL FAILED TO OBJECT OR MOVE FOR A MISTRIAL AS THE GOVERNMENT PRESENTED INADMISSIBLE EVIDENCE OF THE VICTIM'S DAUGHTER'S OPINIONS ABOUT THE CRIME AND HER PREFERRED PUNISHMENT**

**A. Counsel Say Idly By as the Government Committed a Flagrant *Payne* and *Booth* Violation**

*Payne v. Tennessee*, 501 U.S. 808 (1991), and *Booth v. Maryland*, 482 U.S. 496 (1987), hold that the Eighth Amendment prohibits the prosecution from presenting testimony from the victim's family members regarding their opinions of the defendant, the crime, or especially the punishment. Any reasonably competent defense attorney in a capital case should have been well-versed in the *Payne* and *Booth* decisions, as well as the interpreting jurisprudence. Counsel for Mr. Davis, however, remained silent as the Government called the victim's daughter as a witness, who read a written letter stating: "Len Davis, I hate you . . . Why should you even have a choice [of being sentenced to life or death]? You did not give Kim Groves a choice to live or die. You chose for her. She did not have a chance to think about her mistakes in life. Why should you?" R 6177. Although this letter was not provided to the defense prior to trial, in violation of the discovery rules, counsel did not object. Then, during the Government's examination of this witness, the Government asked her why she changed her mind from wanting a life sentence to wanting a death sentence. She replied, "He is not worth [a life sentence]." R 6181. Counsel did not object or move for a mistrial. In light of the highly emotional and moving nature of the victim's daughter's testimony, this blatant failure to object to clearly inadmissible and prejudicial evidence undermines confidence in the jury's death verdict.

Just prior to trial, the Government filed a *Motion in Limine Regarding Witness Opinions Regarding Propriety of Penalty and Execution Impact Testimony*. SR 4921. The motion sought to preclude the defense from introducing evidence of the victim's family's preference for a life

57

sentence, and contained a lengthy discussion of jurisprudence disallowing the victim's family members to testify as to their preferred punishment. SR 2922-24. Attached was a letter from Attorney Mary Howell to Jim Letten and Alberto Gonzales, dated June 9, 2005. SR 4931. The letter was written on behalf of Kim Groves' family and asked that the Government discontinue its efforts to put Paul Hardy and Len Davis to death.[22] SR 4931-33. Kim Groves' parents and three children signed the letter, including her daughter Jasmine Groves. SR 4933. While the Government clearly intended to disregard the victim's family's wishes as stated in the letter, the Government also apparently was concerned that the jury might learn that the Groves family was in favor of a life sentence for Mr. Davis. The defense filed a response essentially asserting that if the Government is allowed to present victim impact evidence, the defense must be allowed to rebut it. SR 4960-61. This Court then issued an order holding that the Government could only present victim impact testimony "regarding the obvious fact that they loved Kim Groves, that she was a valuable and valued human being, and that they suffered due to her loss," if the Government agreed to allow the defense to use the letter in cross-examination. SR 4977. If the Government opted not to introduce victim impact testimony, on the other hand, the defense would not be allowed to introduce the letter. *Id.*

During the selection phase of trial, the victim's 22-year-old daughter, Jasmine Groves, was called as a Government witness and read an emotionally-moving written statement to the jury in which she expressed anger toward Mr. Davis and heartbreak over the loss of her mother.

> Were you even aware that the day before you had her killed was the day before my 13th birthday? A very happy day in my life that is worthless to me now, because who needs a birthday without a mom. You know what hurts most is that over ten years, you did not even once say sorry. How could you not be sorry? You

---

[22] It should be noted that Mr. Davis' defense team had nothing to do with the creation of this letter, and indeed had no contact with the victim's family whatsoever.

> took my whole childhood from me. But yet you had your mom to be there for you, yet my mom missed out on mine.

R 6176.

> The days you want to give up and die because it feels as there is nothing else to live for. I wanted to die so the pain can stop. Wanted to die just to see my mom again and she will hold me in her arms and then I will know everything will be all right.

R 6176-77.  At the end of the letter, she alluded to her prior position that she would favor a life

sentence, but told the jury that she had changed her mind.

> At one time I felt in my heart it would make me happy for you to sit in jail for the rest of your life. To take time to think about what you've done, how you messed up my whole life . . .
>
> . . . .
>
> Len Davis, I hate you for what you've done to me. So should you or should you not be put to death? Why should you even have a choice? You did not give Kim Groves a choice to live or die. You chose for her. She did not have a chance to think about her mistakes in life. Why should you? See, she was worth more than life to me. So you see, she was more than a rock-head ho. To me she was my mother just like your mother is still your mother, matter how people label her.

R 6176-77.

On cross-examination, defense counsel questioned Ms. Groves about the letter asking for

a life sentence for Mr. Davis.  R 6179-81.  On re-direct, AUSA McMahon asked her about a

conversation he previously had with her, in which she changed her mind about wanting a life

sentence.  She responded:

> **I don't feel life in prison, he is not even worth it. He not worth it at all.** I'm going to stop crying.
>
> Q. Do you think Len Davis is thinking about your mom?
>
> A. (WITNESS SHAKES HEAD IN THE NEGATIVE.) Been over 11 years and he not once said sorry.

R 6181.  McMahon elicited testimony from Ms. Groves that the only reason why she had

initially favored a life sentence was because she thought "it would be over, no more court, no

more nothing." R 6182.  But then, she found out (presumably McMahon had told her), "he can keep appealing and keep going through this for the rest of our life." *Id.*  This realization made her change her mind and favor death.  During closing arguments, the Government made her opinion on the appropriate punishment even more clear: "[Jasmine Groves] told you that life was too good for the defendant and she told you why." R 6315.  The Government used Ms. Groves' sentiment that Mr. Davis "doesn't care" to argue that a life sentence equals a "win" for Mr. Davis: "Jasmine Groves was right, he doesn't care. He gets life, he wins again." R 6296. Counsel lodged no objection throughout this testimony or argument.[23]

The Court's decision in *Payne* holds that the Eighth Amendment does not prohibit evidence of the victim's personal characteristics and the harm inflicted upon the victim's family; in other words, the prosecution may present evidence "offering a quick glimpse of the life which [the] defendant chose to extinguish." *Payne*, 501 U.S. at 822, 827.  However, the Court's holding in *Booth* that the Eighth Amendment prohibits three categories of "victim impact" evidence—the witness' opinions of the crime, the defendant, and the appropriate sentence—remains in force. *Payne*, 501 U.S. at 829 n.2.  In *Booth*, the victim's family members testified as to their opinions and characterizations of the crimes, testimony which remains inadmissible today.  *Booth*, 482 U.S. at 508.  The victim's son testified that his parents were "butchered like animals" and that he "doesn't think anyone should be able to do something like that and get away with it." *Id.*  The victim's daughter testified that the defendants "didn't have to kill" her parents, and that she did not believe that the defendants "could ever be rehabilitated and she doesn't want them to be able to do this again and put another family through this." *Id.*  The Court held that this testimony, as opinions and characterization of the crime and the defendants, violated the Eighth Amendment.

---

[23] By this time, Mr. Davis had absented himself and thus counsel was acting as full counsel rather than standby.

*Id.* at 509.   Pursuant to *Booth*'s prohibition on opinion testimony regarding the appropriate sentence, the Fifth Circuit reversed a death sentence where the prosecutor asked the victim's aunt about the proper penalty for the defendant, and she responded that she believed in taking "an eye for an eye."   *Rushing v. Butler*, 868 F.2d 800, 804 (5th Cir. 1989).

While the *Payne* decision overruled part of *Booth*, courts have consistently held that any evidence of the victim's family's preference for a death sentence is inadmissible and violates the Eighth Amendment.   *See*, *e.g.*, *Selsor v. Workman*, 644 F.3d 984, 1025-26 (10th Cir. 2011) (statements that family members were "in agreement with the District Attorney's Office regarding the recommendation of this case"); *Welch v. Workman*, 639 F.3d 981, 997 (10th Cir. 2011) ("Gary Welch deserves the death penalty. Give it to him, please."); *United States v. Lighty*, 616 F.3d 321, 361 (4th Cir. 2010) (prosecutor's closing argument) ("[D]o what the Hayes family asks you to do, what the Government tells you to do, in connection with the facts and the law of this case, and that is to impose the . . .death sentence."); *Fautenberry v. Mitchell*, 515 F.3d 614, 637-38 (6th Cir. 2008) (testimony that defendant "should receive the maximum possible sentence"); *Hooper v. Mullin*, 314 F.3d 1162, 1174 (10th Cir. 2002) (members of the victim's family testified that defendant "deserved to die"); *cf. United States v. Bernard*, 299 F.3d 467, 480-81 (5th Cir. 2002) (finding statements from the victim's family members characterizing the defendants and offering opinions about the nature of the crime inadmissible under *Booth*).   The Utah Supreme Court recently issued a decision analogous to this case.   In *State v. Ott*, the victim's sister testified that:

> [The defendant] does not care. He doesn't care what happened that night. He doesn't care if it was me or my sister or everybody in that house. He burned it down. He didn't help anybody out of it. . . . He didn't care who died. He didn't care who got hurt. I know his intention was to kill my dad, but instead he killed my little sister. And I don't think he deserves anything more than what she got. She can't be here today to say what she thinks. I don't think that he deserves any

61

rights. He shouldn't have any rights. He took all of hers away from her, and I don't believe that he should have any.

247 P.3d 344, 353 (Utah 2010). The victim's mother testified:

I hope you don't get out on parole because you don't deserve it. My daughter don't get to come back to me right now. I didn't get to finish with my daughter's life. I have to go home tonight without my daughter there, and I have to be alone for the rest of my life and be unhappy for the rest of my life. I hope you can think about that for the rest of your life.

*Id.* These statements echo Jasmine Groves' statement to the effect that Mr. Davis doesn't deserve a choice of whether to live or die because he didn't allow her mother such a choice. Also similar to this case, defense counsel in *Ott* did not object to this testimony. The Utah Supreme Court held that the testimony "falls squarely within the categories of evidence identified as inadmissible, in capital sentencing hearings, by *Payne* and *Booth*. Mr. Ott's counsel was objectively deficient for failing to object to the offensive evidence." *Id.* Furthermore, the court found that the admission of the evidence "undermines . . . confidence in Mr. Ott's sentence." *Id.* at 356.

This Court as well recently vacated a death sentence on grounds that the Government elicited testimony regarding the victim's family member's opinion of the defendant and the crime. In *United States v. Johnson*,[24] the victim's widow testified that:

[T]hree selfish, greedy criminals tried to take what others had earned through their hard work. You and your friends terrorized innocent bank employees and customers and killed my beloved Sidney when he and another officer tried to stop you.

. . . .

My health has suffered, and I'm alone now because of the decision made by you and your evil friends.

. . . .

---

[24] One of the AUSAs who prosecuted this case (Mark Miller) elicited this testimony in *Johnson*.

You are an evil man and your life is a disgrace.

713 F.Supp.2d 595, 621 (E.D.La. 2010).  Like in this case, the widow's testimony in *Johnson* contained characterizations of the defendant and the crime.  *Id.* at 622-23.  Jasmine Groves similarly addressed the defendant throughout her letter, characterizing for the jury what she believed about him.  *See* R 6176 ("[Y]ou did not even once say sorry."), 6177 ("I hate you for what you've done to me.").  The impermissible focus, in this case and in *Johnson*, was on the defendant and not the victim.  *See Johnson*, 713 F.Supp.2d 622-23.  But here, the testimony went further than in *Johnson*.  Here, Jasmine Groves told the jury that she had at one time favored life, but had come around to favoring death, because "[h]e is not even worth it."  R 6181.  This use of a purported victim impact witness to tell the jury that death is the appropriate punishment clearly violated the Eighth Amendment.

As the Government's only witness who had a personal relationship with the victim, Jasmine Groves' testimony was particularly compelling.  She was left orphaned by her mother's murder the day before her thirteenth birthday.  As such, there is no way that her testimony could be considered harmless.  But adding to the prejudice, the Government used Jasmine Groves' testimony in closing arguments to provide a theme that a life sentence is no punishment at all.

> **Jasmine Groves was right, he doesn't care. He gets life, he wins again.** Do you want to know something? Do you remember that almost orgasmic cry of joy when he found out that it was Kim who got hit? Do you remember that? **Jasmine was right.** Are you going to let him celebrate again today with your verdict? Are you? I'm asking you. Because **if you don't return a sentence of death, which is the only just sentence in this case, Len Davis will be celebrating again tonight.** Don't let that happen.

R 6296-97 (emphasis added).

> In simple and powerful words, **[Jasmine Groves] told you that life was too good for the defendant and she told you why.** He didn't have the decency to apologize. And he doesn't care, she said. And she is right. For if the defendant thinks of Kim Groves at all, it is only to ponder how he could have done this murder better. That's how he thinks of her.

63

. . . .

> **For Jasmine Groves, the pain will never end**, the nightmare will never go away, and the vision of her mother lying on Alabo Street bleeding from her head will be with her and will haunt her forever.

R 6315 (emphasis added).  In *Johnson*, the prosecutor argued "You know, if you want to shed a tear, cry, cry for Sidney Zaffuto. If you want to shed a tear, cry for his wife, Shirley Zaffuto. Cry for her."  713 F.Supp.2d at 625.  In this case, the prosecutor echoed the same sentiment but went further:

> For every tear that Jasmine Groves cried, sentence him to death. And for every time he called her a rockhead 'ho, sentence him to death.

R 6319.  Finally, the prosecutor made clear to the jury that Len Davis is evil and Jasmine Groves wants him dead.

> And make no mistake about it, ladies and gentlemen, Len Davis is evil and he is rotten to his core. He deserves justice and justice can only be had in this case if the death penalty is imposed.
>
> You know, as you sit there, you are not simply 12 people, you are the conscience of the community, you are the dispensers of justice in this particular case.
>
> Jasmine Groves waits for you to give her justice. The citizens of the city of New Orleans wait for you to give them justice. And justice can only be had by sentencing Len Davis to death**.**

R 6322. Four years later, the same prosecutors would make the same argument in *Johnson*— which this Court found to be prejudicial:

> Make no mistake. John Johnson is evil. Justice, justice can only be had in this case if the death penalty is imposed.
>
> As you sit there, you are not simply 12 people. You are the conscience of the community. You represent the United States. In this case, you are the dispensers of justice.
>
> Shirley Zaffuto, Linda Kelly, Terry Zaffuto, Andrew Medina, they all wait for you to give them some justice . . . Justice can only be had, only be had, by imposing a sentence of death.

*Johnson*, 713 F.Supp.2d at 626.

After hearing Jasmine Groves' testimony and these closing arguments, the jury was left with the impression that if they vote for life, evil Len Davis won't be punished at all but Jasmine Groves will. Jasmine Groves wants a death sentence, and evil Len Davis wants life. Due to Jasmine Groves' impermissible testimony and the Government's use of her preference as a theme in closing arguments, there is a grave risk that Mr. Davis' death sentence was "based on considerations that are constitutionally impermissible or totally irrelevant to the sentencing process." *See Booth*, 482 U.S. at 502. When counsel should have been at their most vigilant, they were asleep at the wheel, and allowed the Government to present this impermissible evidence and argument unchecked. Counsel's ineffective performance undermines confidence in the death verdict.

**B. Counsel Failed to Object to the Government's Failure to Disclose Jasmine Groves' Written Statement Before Trial**

The Government filed a *Notice of Non-Statutory Aggravating Factors* on September 29, 2000, stating that it would present victim impact evidence "evidenced by the fact that the murder of Kim Marie Groves has created harmful emotional distress upon her three children and other members of her family." SR 2512-15. The defense thereafter filed a *Motion for Rule 16 Discovery Related to Non-Statutory Aggravating Factors*. SR 2562. The Motion requested, among other categories, all papers or documents which are intended for use by the Government in chief at trial. SR 2563. The defense also filed a *Motion for Rule 26.2 Production of Witness Statements Related to Non-Statutory Aggravating Factors*, requesting "any witness statement that is in the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government and that relates to the subject matter concerning which the witness will testify." SR 2558. The Government's response was that it had already turned over everything discoverable to the

defense, and that if new material came to the Government's attention, it would disclose it under its continuing obligation. SR 2634-36. The Government also claimed that it would provide the defense with a list of its witnesses three days prior to trial. SR 2631.

Prior to trial, the Government disclosed that it would call Jasmine and Corey Groves as victim-impact witnesses at trial. No documents or statements which the Government intended to use in its case-in-chief to prove victim impact were turned over. Thus the defense was taken completely by surprise when Jasmine Groves took the stand and read a pre-written letter to Mr. Davis, telling him that she favored the death penalty in this case. The defense had an opportunity, however, to prevent the Government from presenting the letter or to at least ask to read the letter before it was presented so that it could object outside the jury's and witness' presence.. During the Government's direct examination of Ms. Groves, AUSA McMahon asked if she wrote a letter. R 6175. She said yes. R 6176. He asked if she had it with her. *Id.* She said yes. *Id.* He asked if she minded reading it. *Id.* It was not until that point that she began reading the letter. *Id.* The defense should have called for a sidebar immediately after McMahon mentioned a letter, and objected to the Government introducing the letter after having failed to disclose it under its discovery obligations. At minimum, the defense should have asked to see the letter before it was read to the jury and objected to the inadmissible portions. Instead, the defense sat silent as the Government presented an inadmissible and prejudicial letter which was not disclosed before trial. Due to counsel's lack of vigilance, Mr. Davis' Fifth, Sixth and Eighth Amendment rights to due process, adequate representation, and a reliable sentencing verdict were violated.

### CLAIM 6. MR. DAVIS SUFFERS FROM A SERIOUS MENTAL IMPAIRMENT WHICH RENDERED HIM INCOMPETENT TO STAND TRIAL IN 1995 AND PROCEED PRO SE IN 2005

Mr. Davis has never had a complete and competent mental health evaluation.  Because of oversights of his appointed counsel, his frequent hostility, argumentative and ultimate opposition to assistance of counsel, Mr. Davis has never been properly evaluated by a reliable mental health expert either at the request of defense counsel or by court order.  As a result, Mr. Davis has stood trial (and represented himself) without the legal capacity to do so.  In the following sections, counsel highlight Mr. Davis' severe mental health issues and plead numerous claims resulting from his mental illness, including: denial of due process of law during the 1996 trial when he was tried and sentenced while incompetent; denial of due process of law as well as Sixth Amendment right to counsel when he was allowed to represent himself; and ineffective assistance of counsel related to these claims.

**A. Mr. Davis's Right To Due Process And His Right To Counsel Were Violated  When He Was Allowed To Stand Trial While Incompetent In 2005**

**1.  Facts**

Concerns about Mr. Davis's mental health arose for his first set of trial counsel and, pursuant to their request, he was evaluated in February-March, 1996 by clinical psychologist Yvonne Hardway Osborne, Ph.D.  Even though this evaluation failed to comport with the accepted standards of evaluations in capital cases and lacks any indication that Dr. Osborne reviewed a single document related to Mr. Davis's social history, Dr. Osborne's report raised serious doubts about Mr. Davis's competency that were never addressed.  Dr. Osborne, for example, noted the following:

- The predominant characteristics of the profile were paranoia, resentment, oversensitivity, and rigidity

- Thought content was egocentric in focus and perceptions were idiosyncratic and suspicious

- [Mr. Davis] mentioned that Jesus had insisted [sic] him in his jail cell

67

- The best diagnostic impression is of a person with a paranoid personality disorder who is decompensating under the pressures of criminal charges, incarceration and pending trial.  He is intense, suspicious, self-protective and grandiose.  His strengths are his attention to detail and short-term memory.  However, his fund of knowledge, abstract reasoning and concept formation skills are not well developed.... His mental status may deteriorate with the increased stress of the trial

- The two diagnoses most commonly associated with this profile are paranoid disorder and schizophrenia

- Prognosis is generally poor.  Rapport may be difficult to establish

Ex. S-A, Report of Dr. Yvonne Osborne.

Despite having this information, counsel did nothing to further the investigation into Mr. Davis's mental health and whether he was competent to stand trial.  Mr. Davis, possibly suffering from schizophrenia and paranoia, was allowed to proceed to a capital trial.

Unfortunately for Mr. Davis, Dr. Osborne's wholly inadequate examination was the best of all of the evaluations he would have.  On April 25, 1996, after being convicted of the charges, Mr. Davis notified the Court that he would not be present for the penalty phase of the trial.  In response, the Court asked Dr. Robert Whitney Davis, from Gretna, Louisiana, to evaluate Mr. Davis.  Dr. Davis's evaluation, done in the presence of three U.S. Marshals, was perfunctory and wholly inadequate.  The clinical interview, as recorded by Dr. Davis, was a one-sided interview that lasted less than six minutes.  Dr. Davis informed Mr. Davis of the purpose of the interview and Mr. Davis explained that he was not going to participate in the penalty phase because the first phase was a travesty and he would not dignify the second phase of trial.  After Mr. Davis made clear he would say no more, Dr. Davis proceeded to ask a series of questions, all to which Mr. Davis replied "I have nothing else to say":

Q. Can you tell me what is the nature of the travesty in the first phase?

A. I have nothing else to say.

68

Q. Can you give me a little bit of your background, how old are you?

A. I have nothing else to say.

Q. Do you understand the nature and role of the judge?

A. I have nothing else to say.

Q. Do you understand the nature and role of the attorney?

A. I have nothing else to say.

Q. Can you assist your attorney in your defense?

A. I have nothing else to say.

Q. And you understand that you have a right to be present at the sentencing phase at your trial, but you also have the right to waive that?

A. I have nothing else to say.

Q. Can you give me your full name?

A. I have nothing else to say.

Q. Can you tell me anything about your early childhood?

A. I have nothing else to say.

Q. Can you tell me anything about your about your parents?

A. I have nothing else to say.

Q. Do you have any brothers and sisters?

A. I have nothing else to say.

Q. What about your school?

A. I have nothing else to say.

Q. Can you tell me anything about your education?

A. I have nothing else to say.

Q. Do you have an understanding and awareness of the nature of the trial and the judicial process?

A. I have nothing else to say.

Q. Essentially your position is that you have nothing else to say, but you feel you are competent to make this decision to waive your rights?

A. I have nothing else to say.

Dr. Davis concluded "I don't see much sense in continuing. You have made your point perfectly clear that you are interested in waiving your right to attend and you certainly seem competent and you certainly seem to respond in terms of your declared wish that you choose not to participate in this phase of your trial."

The Court relied solely on Dr. Davis's conclusion that Mr. Davis was competent to waive his appearance at the second phase of the trial. Mr. Davis was not present for the penalty phase of his 1996 trial.

After the Fifth Circuit ordered a resentencing in Mr. Davis's case, he decided that he would proceed *pro se* during his second penalty trial. During a hearing on September 1, 2000, Julian Murray and Carol Kolinchak were appointed as hybrid/co-counsel at Mr. Davis's request. R 433-34. Later that month, on September 22, 2000, a "quasi- *Faretta"* hearing was held. Even though no competency evaluation by a mental health profession was conducted, Mr. Davis was found to be competent to waive counsel and represent himself. R. 366-397.

When the jury returned a verdict finding him eligible for the death penalty, he again refused to be in the courtroom for the punishment phase. At the Government's request, the Court appointed Dr. Donna Mancuso, a psychiatrist, to evaluate him to determine his competency to stand trial. Dr. Mancuso met with Mr. Davis once, spoke to the U.S. Marshal, and reviewed the Government's charging documents in the capital case. Her evaluation was based almost solely on Mr. Davis's self-reporting (e.g. Mr. Davis denied having "racing thoughts", "grandiose ideas", "denied any history of impulsivity") and was limited to whether Mr. Davis could articulate the different roles of people and various legal jargon. Apart from the indictments, no

70

documents were provided to Dr. Mancuso and as a result, Dr. Mancuso had no medical records, no social security records, no medication records, nor any family history to inform her understanding of Mr. Davis's past or present mental disorders and mental state. As a result of this extremely limited and uninformed evaluation, Dr. Mancuso concluded that Mr. Davis was competent and he was allowed to waive his appearance at the selection phase of the trial.

It is now clear that numerous critical facts pertaining to Mr. Davis's mental condition were either ignored or overlooked. Ex. S-B Declaration of Carol Kolinchak. Mr. Davis exhibited symptoms of grandiosity, paranoid ideation, hypersexuality, impaired contextual understanding of both social and professional circumstances, rigidity, perseveration of thought and action, rigidity, impaired judgment and, occasionally, magical thinking. Ex. S-C Report of George Woods, M.D. "Mr. Davis also presented with signs of agitation which is consistent with symptoms of bipolar disorder in the African American population." *Id.*

The fact that Mr. Davis's condition has continued to deteriorate underscores that his mental illness is pervasive and long-standing. The conditions of confinement on death row in the Special Confinement Unit at Terre Haute exacerbate Mr. Davis's underlying mental illness. Mr. Davis continues to seize upon minute, inconsequential details and becomes progressively preoccupied with them in an obsessive manner. Fixations involve the trial judge's bias and court-appointed counsel's conspiracy with the trial judge.

As set forth in the attached Report of George W. Woods, M.D., Mr. Davis's symptoms are consistent with those of Bipolar Disorder. The prominent features of Bipolar Disorder are paranoia and grandiosity. These symptoms combine for a loss of conceptual understanding. This in turn decreases the ability to sequence events and understand context. Furthermore, symptoms consistent with a diagnosis of Bipolar Disorder is consistent with Dr. Osborne's 1996

71

evaluation, wherein she indicates that Mr. Davis was grandiose, rigid, paranoid, and possibly suffering from schizophrenia. Schizophrenia is commonly confused with Bipolar Disorder in African Americans because African Americans suffering from Bipolar Disorder suffer a greater degree of paranoia around their grandiosity, which often leads to a diagnosis of schizophrenia. Thus, Mr. Davis's symptoms have been ongoing throughout these proceedings and the symptoms are consistent with Bipolar Disorder.

It is likely that these mental health issues also critically diminish Mr. Davis's capacity to concentrate, strategize, communicate, formulate questions and conceive and articulate theories of his case. None of this evidence was discovered or presented to this Court.

**B. Mr. Davis Was Denied Due Process of Law During His 1996 Trial When He Was Tried And Sentenced While Incompetent**

A criminal defendant may not be tried unless he is competent. *Godinez v. Moran*, 509 U.S. 389, 396 (1993). The conviction or sentencing of a defendant who is legally incompetent at the time of the proceedings violates due process. *Pate v. Robinson*, 383 U.S. 375, 378 (1966). The two cases that set forth the Constitution's "mental competence" standard, *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam), and *Drope v. Missouri*, 420 U.S. 162 (1975), specify that the Constitution does not permit trial of an individual who lacks "mental competency." *Dusky* defines the competency standard as including both (1) "whether" the defendant has "a rational as well as factual understanding of the proceedings against him" and (2) whether the defendant "has sufficient present *ability to consult with his lawyer* with a reasonable degree of rational understanding." 362 U.S. at 402 (emphasis added; internal quotation marks omitted). *Drope* repeats that standard, stating that it "has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings

against him, *to consult with counsel, and to assist in preparing his defense* may not be subjected to a trial."  420 U.S. at 171 (emphasis added).

### 1.    Procedural Due Process Demands an Adequate Inquiry

The substantive requirement that an incompetent defendant not be tried gives rise to a corresponding procedural due process right.  *Drope, supra; Griffin v. Lockhart,* 935 F.3d 926, 929 (8th Cir. 1991).  The issue in a substantive competency claim focuses on whether the defendant was in fact incompetent to waive counsel.  The issue in a procedural due process claim is whether the court conducted an adequate hearing to determine competency.  *Id.*  Mr. Davis was denied both substantive and procedural due process at his 1996 trial.

In addition, a competency hearing is a critical event in a criminal prosecution to which the Sixth Amendment right to counsel applies.  *See United States v. Purnett,* 910 F.2d 51, 55 (2d Cir. 1990).  Thus, counsel was constitutionally obligated to investigate and present relevant evidence on the issue of Mr. Davis's competence.  *See, e.g., Galowski v. Berge,* 78 F.3d 1176 (7th Cir. 1996), *cert. denied,* 519 U.S. 878 (1996) (granting claim of ineffective assistance of counsel for failing to request a competency hearing); *McLaughlin v. Royster,* 346 F.Supp. 297 (E.D.Va.1972) (granting claim of ineffective assistance of counsel in failing to investigate client's mental state and to insist on a competency hearing).

Once doubt as to the defendant's mental capacity is raised, due process requires a "meaningful" and adequate hearing into the defendant's competency.  *Drope*, 420 U.S. at 172; *Pate*, 383 U.S. at 386.  In the Fifth Circuit, the test for meaningfulness is whether the "quantity and quality of available evidence is adequate to arrive at an assessment that could be labeled as more than mere speculation."  *Martin v. Estelle*, 583 F.2d 1373, 1375 (5th Cir. 1978) (in the context of retrospective hearing); *see also Wolfe v. Weisner*, 488 F.3d 234, 238 (4th Cir. 2007) (hearing must be "adequate to protect" the defendant's due process rights).

There was sufficient doubt about Mr. Davis's mental status that both this Court and his lawyers sought mental health evaluations. However, the Court's brief discussion of the matter, relying on the similarly brief, perfunctory and inadequate psychiatric examination of Dr. Davis conducted immediately prior, was not meaningful and was certainly not full, fair and adequate.

Competency evaluations, even in non-capital cases, commonly involve reviewing relevant background information, including both medical records and court records; interviewing the defendant, using a number of structured approaches to questioning; and, sometimes, employing "assessment instruments" and conducting further interviews, such as with the defendant's attorney. Mossman, *et al., AAPL Practice Guideline for the Forensic Psychiatric Evaluation of Competence to Stand Trial,* 35 J. AMER. ACAD. PSYCHIATRY & L. No. 4 Suppl. (2007). A psychiatric diagnosis is a standard part of the process and is "highly relevant." *Id.* at S32. "The goal is to learn whether and how mental symptoms impair competence-related abilities," bearing in mind that "[t]he relevance of even severe symptoms to the question of competence varies from case to case." *AAPL Guideline* at S31-S43. Absent accurate and comprehensive life history data, a forensic expert in a capital case is precluded from rendering a complete and reliable opinion. *See* Richard G. Dudley, Jr., and Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, 36 HOFSTRA L. REV. 963, 984 (2008) ("Until the life history investigation is complete, the mental health expert can render only a preliminary diagnosis or a differential diagnosis based on the incomplete information available to him. When life history information is incomplete, the mental health expert must request further life history investigation to gather the information necessary to reach a credible and firm diagnosis."); *See also* Douglas Liebert and David Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice,* 15:4 AM. J. FORENSIC

PSY. 43 (1994) (noting the necessity of collecting of an accurate medical, developmental, psychological and social history, gathered from multiple sources).

Such assessments attempt "to discern a defendant's capacity to make relevant decisions in a self-interested manner, or to uncover delusional thoughts or other symptoms of mental disorder that impair the capacity to *evaluate rationally* the choice that one may face."   N. POYTHRESS, R. BONNIE, J. MONAHAN, R. OTTO, S. HOGE, ADJUDICATIVE COMPETENCE: THE MACARTHUR STUDIES (2002) at 67 (emphasis added); *see also id.* at 136 (goal of evaluation process is to uncover "faulty reasoning secondary to irrational (delusional) beliefs").

### 2.    Dr. Davis's Evaluation was Far From Adequate

As an initial matter, the brevity of Dr. Davis's interview prevented him from conducting a meaningful and thorough examination of Mr. Davis's competence.  When it comes to shifting and complex mental illnesses such as those afflicting Mr. Davis, courts have recognized,

> More than three or four hours are necessary to assemble a picture of a man.  A person sometimes refuses for the first several interviews to reveal his delusional thinking, or other evidence of mental disease.

*People v. Bassett*, 69 Cal. 2d 122, 142 (Cal. 1968).  Courts have repeatedly found psychiatric examinations as cursory as Dr. Davis's "simply too short" for the purposes of formulating a diagnosis as to mental disorder or competency.  *See, e.g., Ford v. Wainwright*, 477 U.S. 399, 415 n.3 (U.S. 1986) (single interview); *Boutte v. Mudd Separators, Inc.*, 236 So.2d 906 (3d Cir. 1970) (one hour examination); *Bush v. McCollum,* 344 F.2d 672, 673 (5th Cir. 1965) (40 minute examination); *United States v. Walker*, 537 F.2d 1192, 1195 (4th Cir. 1976) (30 minute examination); *United States v. Hamilton*, 107 F. 3d 499, 503 (7th Cir. 1997) (20 minute examination); *United States v. Taylor*, 437 F.2d 371, 378 (4th Cir. 1971) (10 minute examination); *United States v. Lebron*, 76 F.3d 29 (1st Cir. 1996) (five minute examination).

75

Further, Dr. Davis failed to seek out or review any evidence of Mr. Davis's prior medical diagnoses of mental disorders, psychiatric evaluations, incarcerations and record of an abuse-filled, traumatic life, or a history of generational mental health concerns, rendering his opinion "speculative" and unreliable. *See, e.g., United States v. Cruz*, 805 F.2d 1464, 1479 (11th Cir. 1986); *Hernandez v. Ylst*, 930 F.2d 714 (9th Cir. 1991); *Taylor*, *supra,* 437 F. 2d at 378. Also missing from Dr. Davis's interview with Mr. Davis were the standard battery of psychiatric tests calibrated to detect mental illness. For these additional reasons, the examination was inadequate and unreliable. *See Hays*, 663 F. 2d at 1012-13 and n. 12-14; (examination inadequate due to, *inter alia*, unfocused questions and absence of psychological tests); *Bush v. McCollum*, 231 F.Supp. 560, 563 (D.C.Tex. 1964) (examination "limited to simple questions without the use of any kind of psychological tests" was "cursory" and inadequate to provide mental competence determination); *United States v. Mellor*, 2009 U.S. Dist LEXIS 749 (N.D. Iowa January 6, 2009).

### 3. The Scope of Inquiry at the Hearing Was Likewise Inadequate

The subsequent hearing also failed to consider all facts relevant to Mr. Davis' potential competency. The United States Supreme Court has held that for capital competency hearings, the factfinder must have before it all possible relevant information about the individual defendant whose fate it must determine. *See Ford v. Wainwright* 477 U.S. 399 (1986) (competency to be executed).

This Court's hearing failed to comport with these standards. Indeed, the full evidence as to the competency of Mr. Davis offered at the competency hearing was Dr. Davis's untested conclusion, based on a cursory interview. Psychiatric opinions require particularly close examination because they are "at best a hazardous guess however conscientious." *Ford*, supra,

76

477 U.S. at 415. Cross-examination, even by the Court, contributes to the search for truth by exposing the foundation of the expert's opinion, any history of error, any personal bias, and the degree of certainty as to the conclusions. By failing to allow or make its own inquiry into any of these areas, the Court accepted a finding of competence without any knowledge whatsoever as to whether Dr. Davis examined the full psychiatric, personal and institutional history of Mr. Davis (he did not), whether Dr. Davis asked questions particularly designed to probe Mr. Davis's competence and how Mr. Davis responded, or Dr. Davis's history of error or the degree of certainty to his conclusions.

Consequently, without such inquiry, either by trial counsel,[25] or by the Court, the Court's finding is inherently unreliable. *See Ford*, 447 U.S. at 415 ("Without some questioning of the experts concerning their technical conclusion, a factfinder simply cannot be expected to evaluate the various opinions").

Further, the sufficiency of the Court's inquiry is not salvaged even if the competency determination encompassed the impressions of trial counsel and the Court. As the Supreme Court has noted "the existence of even a severe psychiatric defect is not always apparent to laymen." *Pate,* 383 U.S. at 386. For this, among other reasons, trial counsel "are wholly unqualified to judge the competency of their clients." *Hull v. Freeman,* 932 F. 2d 159 (3d Cir. 1991), *overruled on other grounds as stated in Caswell v. Ryan*, 953 F.2d 853, 859 (3d Cir. 1992). Moreover, where, as here, the client wishes to be found competent, counsel is in a hard, if not impossible, situation:

> When the trial court seeks the opinion of a defendant's counsel regarding his or her client's competency, counsel is placed in a difficult, if not untenable situation.

---

[25] *See Ford*, 477 U.S. at 414 ("[Without adversarial examination] the factfinder loses the substantial benefit of potentially probative information. The result is a much greater likelihood of an erroneous decision.")

> If counsel privately has doubts about competency, but his or her client does not wish to contest competency, how does he or she respond to the court, and what argument should he or she offer on the issue?  Counsel certainly cannot be a witness against his or her own client.

*State v. Johnson*, 551 N.W. 2d. 742, 776 (Neb.App. 1996).

Consequently, even if their comments were considered part of the competency inquiry, trial counsel's uninformed and non-expert lay opinions fail to make the competency hearing adequate or reliable.

### 4.   Mr. Davis was Prejudiced

The mere absence of an adequate competency evaluation and hearing under the circumstances of this case provides grounds for this Court to grant relief to Mr. Davis.  *See Lokos v. Capps*, 625 F.2d 1258, 1261 (5th Cir. 1998) (petitioner need not establish that he was incompetent to stand trial to obtain relief, rather he need only establish the lack of adequate process).  However, had a competent evaluation occurred, it is highly likely that this Court would have been presented with a wealth of evidence demonstrating that Mr. Davis was suffering from a severe mental disorder which affected his competency.  A few months prior to Dr. Davis's evaluation, a defense psychologist, Dr. Osborne, evaluated Mr. Davis.  That evaluation, although not in proper form and depth, did show that Mr. Davis presented with symptoms associated with paranoid disorder and schizophrenia and showed that Mr. Davis was decompensating under the pressure of the criminal charges.  Dr. Osborne found Mr. Davis to be paranoid, grandiose, and rigid.  Mr. Davis had "extraordinary drive and energy", could not establish rapport, was argumentative, suspicious, "overreacted to social stimuli" and had "idiosyncratic perception".  Although he directly denied hallucinations, Mr. Davis reported that Jesus had visited him in his cell.  Dr. Osborne reported that Mr. Davis's prognosis was poor and his condition was getting worse under the pressure of the proceedings.

A competent mental health evaluation would also have included other readily available sources of information indicating Mr. Davis suffered from serious mental health issues. For example, one of the psychologists who evaluated Mr. Davis's fitness for police service in 1985, when Mr. Davis was 21 years old, concluded that Mr. Davis "obtains test results similar to results of persons who are seen as having problems expressing anger in an appropriate, modulated manner. They may be immature, rebellious, and non-conforming and have a history of minor difficulties with societal limits. Some tendencies to blame others for problems is suggested." *Id.* at 3. Mr. Davis scored low in the categories of "impulse control," "stability/maturity," and "probable adjustment to organization." As a result, the psychologist referred Mr. Davis for a psychiatric evaluation. *Id.* at 3.

Mr. Davis's mental state was also questioned by the Louisiana Fourth Circuit Court of Appeals in *State v. Perron*, 686 So. 2d 994 (La. App. 4th Cir. 1996). In reversing a conviction for illegal discharge of a firearm, the court reviewed Mr. Davis's testimony and found it to be "inconsistent", "incredible" and "eccentric". As the court noted, despite a lack of any injuries or property damage, Mr. Davis testified that the defendant fired into a crowd of "at least ten persons from approximately fifteen to twenty feet away." Mr. Davis ran to retrieve his weapons from his car and engaged in a firefight with the defendant who was sheltering himself in a car. According to Mr. Davis, as the car drove away, the defendant continued to exchange fire with Mr. Davis as others in the crowd began to fire weapons as well. After reviewing the record, the court found Mr. Davis's testimony "riddled with numerous eccentricities, unusual coincidences, and lack of corroboration . . ." *Id.* at 995.

A competent mental health evaluation and a full and fair hearing would have demonstrated that Mr. Davis was suffering from symptoms that prevented him from establishing

79

rapport and trust with people, particularly counsel, and because his reasoning abilities were impaired, he did not have the ability to deal with counsel with a reasonable degree of rational understanding or to assist in the preparation of his defense.   As such, Mr. Davis was not competent to stand trial in 1996, and his due process rights were violated when he was tried and convicted while mentally incompetent.

### C.  Mr. Davis Was Denied Due Process Of Law As Well As His Sixth Amendment Right To Counsel When He Was Allowed To Proceed Pro Se In His 2005 Trial

The Supreme Court made clear in *Indiana v. Edwards*, discussed *infra*, that the standard for determining competency to waive counsel is different—and more stringent—than the competency standard to stand trial or plead guilty.   At the time, Mr. Davis was allowed to represent himself at his 2005 trial, no competency evaluation had ever determined whether he was competent to go pro se.   According, to Dr. Woods, Mr. Davis's "request to waive his right to counsel at his 2005 trial very likely was the direct product of his mental illnesses." Ex. S-C Report of George Woods, M.D.   Moreover, the competency evaluation conducted by Dr. Mancuso did not adequately address Mr. Davis' symptoms, nor did it involve a cultural analysis or take into account the impact of race on the manifestation of symptoms.   Ex. S-C Report of George Woods, M.D.   In fact, Dr. Mancuso applied only the standard to determine whether he was competent to stand trial and thus failed to ask or answer the critical question:  was Mr. Davis competent to ably carry out the basic tasks necessary to present his own defense without the assistance of counsel.   Because a valid examination did not occur, this Court should grant Mr. Davis's motion for relief pursuant to § 2255.  *See Westbrook v. Arizona*  384 U.S. 150, 150 (1966) ("Although petitioner received a hearing on the issue of his competence to stand trial, there appears to have been no hearing or inquiry into the issue of his competence to waive his

constitutional right to the assistance of counsel and proceed, as he did, to conduct his own defense.").

To safeguard the fairness of trial proceedings and the dignity and autonomy of the accused, the Supreme Court in *Edwards* recognized that the minimal competency standard to stand trial, set forth in *Dusky*, is inadequate to determine competency for self representation, and declared that evaluation of a "defendant who would choose to forgo counsel at trial . . . calls for a different standard." *Edwards*, 128 S. Ct. at 2386. The Court defined a category of "borderline-competent" defendants that possess the "minimal constitutional requirement that measures a defendant's ability to stand trial" of *Dusky* but fall short of a "*higher standard* that measures mental fitness for another legal purpose." *Edwards*, 128 S. Ct. at 2385 (emphasis added). The Court recognized that self-representation without the assistance of counsel requires a different and greater capacity than merely to stand trial. *Id.* at 2386 ("Within each domain of adjudicative competence (competence to assist counsel; decisional competence) the data indicates that understanding, reasoning, and appreciation [of the charges against the defendant] are separable and somewhat independent aspects of functional legal ability.") (internal citations omitted); *Id.* at 2387. For this reason, the Supreme Court stated, "given the different capacities needed to proceed to trial without counsel, there is little reason to believe that *Dusky* alone is sufficient" (*Id.* at 2387), and quoted the American Psychiatric Association concerning how a defendant could meet *Dusky* yet fall short of the capacity to proceed *pro se*:

> Disorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the s*ignificantly expanded role required for self-representation even if he can play the lesser role of represented defendant.*

*Id.* at 2387 (emphasis added) (internal citations omitted).

Moreover, the Supreme Court recognized that application of a single, inadequate mental competence standard to the borderline-competent defendant undermines the core precepts of the right to self-representation:  the dignity and autonomy of the criminal defendant.  *Id.; Faretta*, 422 U.S. at 834 (The defendant's self-representation "choice must be honored out of that *respect for the individual* which is the lifeblood of the law.") (emphasis added) (internal citations omitted).  Use of a single mental competence standard allows the incapacitated to hurdle the low barrier of *Dusky* only to find themselves faced with obstacles entirely beyond their diminished abilities.  *See Massey*, 348 U.S. at 108 ("No trial can be fair that leaves the defense to a man who is . . . unaided by counsel, and who by reason of his mental condition, stands helpless and alone before the court."); *see also Edwards*, 128 S. Ct. at 2387 (quoting a psychiatrist observing the performance of a *pro se* defendant who passed the *Dusky* test, "[H]ow in the world can our legal system allow an insane man to defend himself?").  Respect for the individual is invariably diminished by the borderline-competent defendant's self-representation.  *Id*.  Presented before the prosecution, court and jury without the requisite mental capabilities to carry out the duties of advocacy, the incompetent defendant is subjected to a "humiliating" one-sided trial that amounts more to "spectacle" than fair proceeding.  *Id*.  The loss of power over the proceeding and outcome resulting from the diminished abilities of the borderline-competent defendant's self representation impairs the "core of the *Faretta* right," the constitutional requirement that a defendant retain "actual control over the case he chooses to present to the jury."  *See Wiggins* at 178.  Consequently, the borderline-competent defendant's self-advocacy "undercuts the most basic of the Constitution's criminal law objectives, providing a fair trial."  *Id*.  Such representation is incompatible with the concept of a just proceeding, undermines public confidence in the outcome, and cannot satisfy the mandate that "proceedings must not only be

fair, they must 'appear fair to all who observe them.'" *See Wheat v. United States,* 486 U.S. 153, 160 (1988).

For all of these reasons, the Supreme Court concluded that the competence necessary to make a knowing and intelligent waiver of counsel is different from the competence to conduct a defense. *Edwards*, 128 S.Ct. at 2386. While the Court declined to define a new standard for mental competence for self-representation, it decisively announced that the minimal *Dusky* mental competence standard used to determine fitness to stand trial is not sufficient to determine mental competency for the greater role of the self -represented defendant. *Id.*[26]

Therefore, even if Dr. Davis' or Dr. Mancuso's limited evaluations were sufficient to determine that Mr. Davis was competent to stand trial—which they were not—their evaluations have no bearing on Mr. Davis's competence to proceed *pro se* because they employed the pre-

---

[26] The Supreme Court clearly stated this principle in *Massey v. Moore*, 348 U.S. 105, 108 (1954) ("One might not be insane in the sense of being incapable of standing trial and yet lack the capacity to stand trial without benefit of counsel.") and many courts have followed the concept post-*Edwards*. *E.g.*, *Bies v. Bagley*, 535 F.3d 520, 533 (6th Cir. Aug. 5, 2008) ("[T]he law contains many similar, yet distinct, inquiries for competence – competence to stand trial, competence to waive jury trial rights, competence to represent oneself") (citing *Edwards*); *Guerrero*, 2008 WL 3457015, at *2 (Tex. App. San Antonio Aug. 13, 2008) ("The [*Edwards*] Court expressly recognized that there is a mental competency limitation on the right to self-representation, and that competence to represent oneself during trial proceedings involves a higher standard than that required for competence to stand trial."); *Chadwick v. State of Texas*, 2009 WL 151316, at *3 ("The United States Supreme Court recently rejected the argument that if a defendant is mentally competent to stand trial, he is necessarily competent to represent himself as well."); *Collier v. McDonough*, 2008 WL 4936501, at *1 (N.D.Fla. Nov. 17, 2008) ("The standards for competence to represent oneself and to go to trial at all are of course different."); *Bills v. Clark*, 2008 WL 4291325, at *5 (E.D. Cal 2008) ("The Edwards Court ... made a distinction between the level of competency required for a defendant to proceed with the assistance of counsel and to proceed *pro se*"); *Thompson v. Covenant Transport, Inc.*, 2008 WL 289351, at *5 ("[*Edwards*] dealt with the sixth amendment implications of a criminal defendant who was competent to assist counsel in his own defense, but not competent to act as his own counsel."); *State of New Jersey v. McNeil*, 2009 WL 88507, at *6 (N.J.Super.A.D. Jan. 14, 2009) ("[F]or federal constitutional purposes, a defendant may be competent to stand trial but not to represent himself."); *State of New Jersey v. McNeil*, 2009 WL 88507, at *6 (N.J.Super.A.D. Jan. 14, 2009) ("[F]or federal constitutional purposes, a defendant may be competent to stand trial but not to represent himself."); *State of Missouri v. Baumruk*, 280 S.W.3d 600, 610-11 (Mo. 2009) ("[defendant] may be sufficiently competent to stand trial but not able to elect self-representation voluntarily and intelligently."); *State of Iowa v. Jason*, 779 N.W.2d 66 (Iowa Ct. App. 2009) ("[defendant's competency to stand trial does not equate to competency to represent himself at trial in light of his diagnosis of Asperger's Syndrome.").

*Edwards* standard for competence to waive counsel. See *United States v. Ferguson*, 560 F.3d 1060 (9th Cir. 2009) (noting that psychiatric reports are of "limited value," where such reports only "considered whether Defendant was mentally competent to work with counsel" because "they considered Defendant's mental competency under the pre-*Edwards* standard"). It is likely that Mr. Davis suffers from severe mental disorders including possibly bipolar disorder and/or post-traumatic stress syndrome. These mental disorders critically diminish an individual's cognitive abilities. Ex. S-C Report of George Woods, M.D. This would detrimentally affect Mr. Davis's capacity to communicate, absorb and comprehend the Government's evidence, formulate questions and conceive and articulate affirmative theories of the case.

Therefore, even assuming he met the minimal *Dusky* formulation of mental competence to stand trial (a point that Mr. Davis in no way concedes), Mr. Davis was unable "to carry out the basic tasks needed to present his own defense without the help of counsel," *Edwards*, 128 S. Ct. at 2386, and, accordingly was incompetent to conduct his own trial proceedings.

For all of these reasons, Mr. Davis was incapable of formulating basic trial strategy because of his ineffective communication, and inability to focus on relevant facts or material discrepancies. *See, e.g.,* Ex. S-B Declaration of Carol Kolinchak; Ex. S-D Declaration of Barry Fisher. The abilities to understand and articulate the exact elements of the crimes charged and sound objections to admission of prosecution evidence (which may be unreliable or irrelevant or prejudicial); to challenge forensic evidence, including expert testimony; to define and then pursue lines of cross-examination that show genuine weaknesses in particular prosecution witnesses' testimony; to see difficulties in the prosecution's evidence and then ask the right questions of defense witnesses to identify such difficulties and to present contrary evidence; to grasp what is important to highlight, throughout trial and in closing, and then to speak so that the

essential points are actually communicated and not lost among other details—these are the abilities that a *pro se* defendant must have that go well beyond those required of a represented defendant.

A plethora of red flags, unfortunately ignored by counsel, were present in the years preceding Mr. Davis's 2005 trial indicating that Mr. Davis was not competent to represent himself at trial. Ex. S-B Declaration of Carol Kolinchak. Mr. Davis could not differentiate between insignificant and significant events. He would fixate on insignificant, irrelevant issues. Mr. Davis did not have the mental capacity to form a theory of a case. Mr. Davis insisted on attacking the eligibility phase, in hopes that he would show that he was not guilty of the crimes for which he had already been convicted. All the while, he ignored the unfavorable evidence, such as the audio tapes that would definitely be played at trial. Ex. S-B Declaration of Carol Kolinchak. Moreover, Mr. Davis was completely illogical in his theory of the case.

Further, Mr. Davis had signs of compromised intellectual functioning. Ex. S-C Report of George Woods, M.D. He could not fathom different opinions or absorb conflicting information. Mr. Davis had rigidity of thought and was unable to acknowledge that his ideas or theories were incoherent or illogical, even in light of overwhelming evidence. Ex. S-B Declaration of Carol Kolinchak. Mr. Davis prepared numerous motions to be filed by co-counsel, but those motions had to be re-written in order to be filed. Ex. S-B Declaration of Carol Kolinchak. Moreover, despite having rulings by the Court, Mr. Davis insisted on filing redundant motions in hopes that he could convince the Court that he was correct.

A review of Mr. Davis's opening statement shows a rambling monologue that lasts more than 50 pages and resulted in one juror sleeping. *See* R 5536. His cross-examination of witnesses were illogical and without aim. Prior to closing argument in the eligibility phase, Mr.

Davis warned the Court that he may no longer participate in the proceedings, and since he was in control, he would not allow Mr. Murray or Ms. Kolinchak to participate.

Mr. Davis's lack of insight and inability to understand his own grandiosity and the impact he was having on the jurors was illustrated when he repeatedly spoke of his own bad conduct, used unnecessary profanity, and generally painted himself in an extremely unfavorable light:

> Many of you will think I was mean, rude and filthy mouth. Basically I was a jerk. But we're [sic] not on a trial for being a jerk, the government has to prove beyond a reasonable doubt that I intentionally murdered or had Kim Groves murdered.

> Ladies and gentlemen, if I was on trial for being a jerk, I would plead guilty with mitigating factors and special circumstances, but I am on trial for intentionally killing someone and these tapes will not prove that Paul Hardy killed Kim Groves.

R. 5551. *See also* Ex. S-B Declaration of Carol Kolinchak; and Ex. S-C Report of George Woods, M.D.

A proper understanding of Mr. Davis's mental illness demonstrates that, what at first blush appears as stubbornness, belligerence, and argumentativeness, is actually symptomology of his underlying mental illness. Likewise, although the casual observer may have thought these behaviors were simply that of a typical pro se defendant, Mr. Davis was actually exhibiting symptoms of a possible mental illness. Ex. S-C Report of George Woods, M.D. The manifestation of these symptoms—grandiosity, paranoia, irrationality, rigidity, mental inflexibility—had a deleritious effect on Mr. Davis's behavior and how he was perceived in court.

The effects of Mr. Davis's symptoms, particularly the paranoia and grandiosity, result in a loss of conceptual understanding. Ex. S-C Report of George Woods, M.D. What this meant for Mr. Davis's attempt to represent himself was that he could not formulate a theory of defense based in reality, he could not sequence events, and he could not attack the government's case

with rational forethought.  Anything that was outside of his grandiose delusion that he was the

smartest person in the room and that the jury could overturn his prior conviction by finding him

innocent in 2005, was met with delusional resistance.  Ex. S-D Declaration of Barry Fisher.

In his opening statement, Mr. Davis displayed his fundamental misunderstanding of the

purpose of his trial, betraying his belief that the result of the resentencing would be his freedom:

> Also there will be no evidence that I violated anyone's civil rights by acting under
> the color of law, that is that I abused my authority as a police officer and that only
> made it possible –
>
> . . . .
>
> And it is the defense's position that when you hear what occurred in this case, you
> will not believe it beyond a reasonable doubt.  And you will do what's required in
> that situation, and bring it to an end.

R 5517-18.

As the Government recognized, Mr. Davis's argument was irrelevant because "acting

under color of law is not an issue in this case is not to be relitigated." R. 5517. The Court

sustained the objection, reminding Mr. Davis that the week before she had explained to him that

he could only raise his innocence claims in the selection phase of the trial.

Mr. Davis's opening statement did not only illustrate his fundamental inability to

understand the purpose of the trial, but also that his mental state prevented him from

conceptualizing and rationally dealing with legalities such as motive and sequencing events:

> First of all, the government didn't make it clear but they will acknowledge
> through their witness I was not guilty of the brutality.  I never hit anybody that
> day.  Sammie Williams was the only one that struck Nathan Norwood that day.
> Ms. Groves and the other individuals that went to the Internal Affairs will tell AD
> said they pulled up right there in the police car in front of the store, that they
> exited the vehicle while Nathan Norwood was on the phone at which time he
> would approach him, he would be struck in the head, punched in the stomach.  He
> had hit his head against the phone, would pass out.  Everything took place right
> here.

You will learn that that entire complaint was fabricated.  The entire complaint.  You will learn not one single thing said by Ms. Groves or anyone that went to Internal Affairs Division was true.  Nothing occurred in front of this store, ladies and gentlemen, not one single thing.  You will learn that Nathan Norwood was on the side of this store when he saw us, he ran, and when he was apprehended – I was in the vehicle like Mr. McMahon said.  You will learn I was not on foot.

And I radioed to my partner, Sammie Williams, that he was coming up on the side of a blue house.  This is a picture of the blue house.  This is the 1500 block of Gordon.  This the 600 block of Tupelo.  Two completely different locations.  This location, this store, completely fabricated.

. . . .

The evidence will be clear . . . ladies and gentlemen, that Ms. Groves was never a witness.  Never a witness to any brutality.

The government will acknowledge that I wasn't guilty, but it wasn't just that part of her complaint that was false.  You will learn that the entire complaint, it was fabricated.  And you will learn why it was fabricated because of the relationship that Kim Groves had with Nathan and Nathaniel Norwood who you will learn were drug dealers.

The government also told you about the original incident that occurred when we chased Nathan and Nathaniel Norwood.  Of course, he didn't tell you it was a chase.  You will learn – Mr. McMahon told you it was October the 9th or 10th.  You will learn that it was September the 16th, a month earlier.  Mr. McMahon told you that no one was arrested.  You will learn that we arrested Nathaniel Norwood for reckless operation, disregarding a stop sing [sic], no driver's license.

This happened September the 26th.  The next incident would be October 11th.  That's almost an entire moth.  For whatever, reason the government told you it was two days before, the evidence will show it wasn't.  The government will tell you no one was arrested, the evidence will show you that someone was.

The evidence shows me and Ms. Groves did exchange words September the 16th.  On October the 11th, it was Sammie Williams and Sammie Williams alone who exchanged words with Ms. Groves.  I wasn't even on the scene, the evidence will show.  When this entire thing took place, Kim Groves was gone off the scene before I even made it around the corner in the police car.  I had absolutely nothing to do, and this is what the evidence will show, with the complaint of October the 11th.

So now the question is, why does the government continue to refer to Ms. Groves as a witness?  Well, if Kim Groves wasn't a witness to a brutality complaint, what would be my motive for killing her?  We will get back to that.

. . . .

88

> Sammie Williams also contradicted their alleged motive.  The government said that Kim Groves was killed because of this complaint, this brutality complaint, which they've already acknowledged that I am not guilty of.  Sammie Williams is guilty of the complaint, not me.  The government said that that was the motive to prevent Kim Groves from making further statements to the Internal Affairs Division.  However, Sammie Williams has previously testified that he and I had no faith in AD investigations.  We didn't fit IAD and we especially had no conern about this complaint, because Sammie Williams will state that our sergeant arrived on the scene and Nathan Norwood would tell the sergeant he scratched his own nose.  So according to Sammie Williams, the government's motive doesn't make sense.

> Sammie Williams would also testify that I thought that AD investigators were very poor investigators of complaints by criminals, and I didn't get along with AD and IAD didn't get along with me; that's one thing we do acknowledge.

R. 5518-24.

Aside from his litany of symptoms of agitation, grandiosity, conspiracy theories, and compromised intellectual functioning, Mr. Davis's beliefs regarding the purpose of the second trial were catastrophic to his ability to represent himself.  Although Mr. Davis could mimic the correct terminology ("mitigate" "life rather than death") to cover his delusions, close scrutiny of the record shows evidence of his false belief that he would prove his innocence in the eligibility phase and not be punished.  Ex. S-B Declaration of Carol Kolinchak and Ex. S-D Declaration of Barry Fisher.

Even if Mr. Davis was able to parrot statutory language and state that his purpose was to prove his innocence and thereby mitigate against the death penalty, his rigidity in thought and dedication to his belief that he would be able re-try the entirety of the guilt phase and be vindicated at the eligibility phase, left him completely unable to try his case.  Mr. Davis was obsessed with vindication and could not plan or theorize other aspects of the case.  Ex. S-B Declaration of Carol Kolinchak and Ex. S-D Declaration of Barry Fisher.  He could not even begin to envision that the jury would find him "guilty" a second time, and therefore, he could not

89

create, investigate, or put on a defense to the selection phase. Mr. Davis's mental defects essentially precluded the presentation of any coherent defense during the selection phase.

On August 3, 2001, Mr. Davis stated that he, in fact, wanted to receive the death penalty:

> And it is part of my strategy that I think with a death sentence it will force the Court to take my issues a little more seriously. Because that ruling I got out of the Fifth Circuit back in '99 I consider it ridiculous. And I think if I go there with anything less than death, I will be case aside just like my appeal was on the drug case.

> So are we made to fully understand what it is I'm doing? I'm not on a suicide mission. I have a son and a daughter, Your Honor. I want to live. But at the same time the strategy that I think is necessary for my appeal issues to be taken seriously: If I'm just like a hundred thousand other black men in federal prison, I don't stand a chance on appeal. But as long as I'm in that lead group with a death sentence, that is what it all boils down to, Your Honor. If I'm guilty of civil rights violations, know what? I need to be executed. If I'm guilty of what, civil rights violations, if that's what I actually did, I had used my authority and my power to carry out the murder you all said I carried out, I do deserve it. But, see I know and anybody that know the law know that I'm not guilty of civil rights violations. If anything, I belong in State court for second-degree murder facing no more than a life sentence.

(August 3, 2001 Tr. 13-14)

This "strategy," driven by Mr. Davis's mental illnesses, makes absolutely no sense. It shows Mr. Davis's irrational thought pattern, his fundamental inability to understand the nature of the trial proceedings, and his incapability to grasp the consequences of the phases of the second trial. Mr. Davis was already convicted of violating civil rights. The only issue in the second trial was sentencing - not guilt or innocence. His conviction had already been appealed. The law of the case doctrine would preclude a further viable appeal of those issues. So, Mr. Davis's stated purpose of getting a death sentence during the second trial was illogical and irrational because the ultimate conclusion, even if all went well, was to get a life verdict after a successful appeal.

Once at trial, even after having been told the week before that the only issues at the eligibility phase was intent to kill and substantial planning and premeditation, Mr. Davis continued forward with his theory that he would be proven innocent of civil rights violations at that phase. In his opening statement, Mr. Davis stated:

> And there will be no evidence that I violated anyone's civil rights by acting under the color of law, that is that I abused my authority as a police officer and that only made it possible --

R. 5516.

> The Government objected and the Court convened a sidebar:
>
> MR. MILLER: Your honor, whether or not the defendant is acting under color of law is not an issue in this case is not to be relitigated. My understanding in as much as residual doubt is going to be offered it's whether or not he committed the murder, not technical defenses to the charge. That is not what residual doubt is about. If it's a theory at all that's --
>
> THE COURT: I assume my ruling last week, color of law, is not an issue in the first phase of this case, which is where we are now. You can raise the residual doubt issue or you can raise it as a second phase, but not in this phase. You can raise your innocence as a defense but in a separate isolated defense on color of law. Just hold that part for your opening statement in the second phase, if we get to it.
>
> MR. DAVIS: Can I comment on that? They have to prove intent; they're here to prove intent.
>
> THE COURT: Color of law is not part of intent.
>
> MR. DAVIS: They just have to prove intent.
>
> THE COURT: Intent to kill and substantial planning and premeditation. That's all they have to prove in this case. The second phase those issues come out, but not this phase.

R. 5517.

Mr. Davis's mental health impairments precluded him from rationally understanding the case. Without the ability to formulate ideas and theories based in reality, Mr. Davis could not advocate for himself at trial, and therefore, he was not competent to proceed pro se.

91

**D. Mr. Davis's Right To Due Process And His Right To Counsel Were Violated  When He Was Allowed To Stand Trial While Incompetent In 2005**

**1.   Procedural Violation of Due Process**

By the time of his 2005 trial, Mr. Davis's condition had deteriorated to a point that he was living under a constant belief that he was being persecuted by the Court, Department of Justice, and the Supreme Court.  The corollary of this paranoia was the grandiose belief that he could vindicate himself and prove his innocence during the 2005 penalty trial and would be freed after that trial.  Because he, and he alone, could understand his delusional thinking, Mr. Davis insisted on proceeding pro se.  Although the Court attempted to shield him from this disastrous decision, the Court did not order a competency evaluation or conduct a § 4241 hearing prior to the 2005 trial.  The Court had clear indication of Mr. Davis's problems with competency: he had irrational and illogical reasons for not wanting to present mitigation evidence (getting the death penalty would assist him in his appeals; he would not need mitigation because he would prevail on his innocence claim); he previously absented himself from trial when the pressure became too great; and it was clear that he was incapable of presenting a coherent defense.

Despite the indications that Mr. Davis had mental health issues that required assessment, a mental health evaluation was not performed prior to the *Faretta* hearing in 2000.  Throughout the record it is evident that this was meant to be done, but it was not done until Mr. Davis walked out of trial in 2005.  Mr. Davis, therefore, was allowed to represent himself without a proper *Faretta* hearing because of the lack of competency evaluation which was so evidently needed.

At the time of the 2000 "quasi" *Faretta* hearing ( R. 368), the Court was left to determine competency without key pieces of mental health assessments of Mr. Davis's: ability to recognize what things are relevant in complex situations and communicate those things to others; capacity to comprehend social facts; ability to project himself into hypothetical situation (such as being

92

found eligible for the death penalty); ability to anticipate his own response to possible events and determine his next course of action; ability to recognize whom to trust and establish those relationships; ability to use reason in light of rational beliefs; and ability to maintain self-control in high stress and emotional situations.

Without a reliable mental health evaluation, the Court did not have any reliable basis for determining Mr. Davis's competency and ability to knowingly and voluntarily waive his right to counsel. Accordingly, Mr. Davis's due process rights and right to counsel were violated when he was allowed to represent himself without a reliable competency mental health evaluation and court determination.

### 2.  Substantive Violation of Due Process

By the time of his 2005 trial, not only could Mr. Davis not rationally discuss his case with counsel, he refused to deal with counsel unless they agreed that he was in charge, he was the leader, and they were only his assistants. This was not the result of a well-thought out, rational decision making process. Instead, Mr. Davis was operating under the extreme paranoia ( Ex. S-B Declaration of Carol Kolinchak) that he could not trust anyone, and he alone could navigate the legal system with his best interest at heart. Furthermore, as discussed *supra*, Mr. Davis was prevented from understanding and conceptualizing the purpose of the 2005 proceedings by the combined effect of paranoia and grandiosity. Additionally, Mr. Davis could not assist in the preparation of his defense because his theory of defense was not based in reality and he insisted on avoiding facts that contradicted his theory. Ex. S-B Declaration of Carol Kolinchak. These symptoms prevented Mr. Davis from having a rational understanding of the proceedings, and he did not have the ability to consult with counsel rationally, nor could he assist in the preparation of his defense. Accordingly, Mr. Davis was not competent to stand trial.

**CLAIM 7.    COUNSEL AT THE 2005 TRIAL FAILED TO ADDRESS MR. DAVIS' COMPETENCY AFTER CLEAR WARNING SIGNS AND FAILED TO OBJECT TO THE INADEQUATE COMPETENCY EVALUATION BY DR. MANCUSO, IN VIOLATION OF MR. DAVIS' RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS**

### A. Counsel Turned a Blind Eye to Serious Warning Signs that Mr. Davis was Incompetent to Stand Trial and Represent Himself at the 2005 Penalty Re-Trial

Many signs pointed to the fact that Mr. Davis was incompetent throughout the proceedings from the appointment of co-counsel in 2000 through sentencing in 2005.[27]  Mr. Davis fixated on trivial issues and was unable to understand significant ones.  He was convinced that he would walk free if he could only get a fair trial the second time around, while in actuality the second trial would determine only whether he would be sentenced to life or death.  He insisted on attacking the 1996 jury's guilty verdicts at the eligibility phase of the 2005 trial, in hopes that he would show that he was not guilty of the crimes for which he had already been convicted.  He had rigidity of thought, manifesting signs that he was unable to understand that his theories were nonsensical in light of the evidence.  Despite this Court's rulings on several issues in this case, Mr. Davis insisted upon filing redundant and repetitive motions in the hopes that he would vindicate himself and be tried in state court.  Co-counsel ignored these and many other signs indicating Mr. Davis's incompetency to stand trial and to represent himself.  Indeed, given the opportunity to have a competency evaluation prior to trial, co-counsel unreasonably declined to request that one be done—in the presence of Mr. Davis—after Mr. Davis stated that he believed himself competent.  In effect, co-counsel unreasonably allowed their incompetent and mentally ill client to determine his own competency:

---

[27] During most of this time period, Mr. Davis was allowed to proceed with hybrid co-counsel.  "Under a hybrid form of representation, defendant and counsel act, in effect, as co-counsel, with each speaking for the defense during different phases of the trial."  3 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 11.5(g) (2011 supp.).

**THE COURT: Mr. Davis, are you competent?**

**MR. DAVIS: Competent? Yeah, I think I can go with that. I think I am competent.**

THE COURT: Mr. Murray or Ms. Kolinchak, do you have any reason to think Mr. Davis has become incompetent or is unable to understand the pros and cons of self-representation?

MR. MURRAY: No, we have no reason to believe that, Judge. Carol?

MS. KOLINCHAK: No.

THE COURT: Then we don't do a mental status exam.

R 5356 (emphasis added).

Under the American Bar Association Guidelines, and additionally as officers of the court, co-counsel had a duty to ensure that competency issues were brought to the Court's attention and properly addressed. Co-counsel, having dealt with Mr. Davis and observed first hand his obsessive and delusional theories, did nothing. There was nothing strategic about assisting a mentally ill and incompetent defendant to represent himself. This was deficient performance by counsel. Clearly, by not addressing Mr. Davis's mental health issues and competency, counsel's deficient performance prejudiced Mr. Davis. Because he was incompetent, he could not formulate a theory of the case that was based in reality. Counsel failed to conduct any social history mitigation investigation. Without a mitigation investigation within the parameters of *Wiggins*, it is undisputable that Mr. Davis was prejudiced in the selection phase. *See* Claim 13, *infra*. Counsel's failure to ascertain and remedy the fact that Mr. Davis was incompetent fell far below reasonable professional standards and prejudiced the defense. *See* Claim 6, *supra*.

**B. Mr. Davis Was Denied The Effective Assistance Of Counsel When Counsel Failed To Object To The Inadequacy Of Dr. Mancuso's Report In 2005**

By the time Dr. Mancuso evaluated Mr. Davis when he refused to participate in the selection phase of the trial, so much damage had already been done. Mr. Davis had completely

95

bungled the first phase, due to his rigidity, delusions, and faulty intellectual functioning.  But, at this critical point, counsel failed to seize on the chance to finally have a reliable mental health evaluation and competency determination made.  Instead, counsel stood idly by while Dr. Mancuso's inadequate evaluation was given credence.

It is important to note that when Mr. Davis absented himself from the court room during the selection phase, he waived his right to self-represent.  A defendant may waive the right to represent himself through subsequent conduct indicating an abandonment of the request. *See McKaskle v. Wiggins*, 465 U.S. 168, 182 (1984); *Brown v. Wainwright*, 665 F.2d 607, 611 (Former 5th Cir.1982) (en banc).  Therefore, at this point, there was no "hybrid counsel" situation—counsel were counsel.

Counsel was aware of Mr. Davis's competency issues.    Ex. S-B Declaration of Carol Kolinchak.  Counsel had a duty to ensure that the evaluation by Dr. Mancuso and the resulting report were reliable and an adequate competency determination was made.  No mental health expert can make a reliable assessment of a capital defendant's capabilities, understanding, and competency when that assessment relies solely upon the capital defendant for critical information, such as social, medical, and psychiatric history.  *See generally* Mark D. Cunningham, *A Matter of Life or Death: Special Considerations and Heightened Practice Standards in Capital Sentencing Evaluations*, 19(4) BEHAV. SCI. LAW. 473-90 (2001).  Dr. Mancuso's report lacked any historical information outside of Mr. Davis's self reports.  Dr. Mancuso visited with Mr. Davis for only a short while; she had not established a trusting relationship; she did not engage in any meaningful dialogue with Mr. Davis beyond whether he recognized various aspects of the legal system; and she failed to determine the scope of Mr. Davis' mental health impairments or what problems Mr. Davis may have been working to mask.

96

Instead of ensuring that a proper evaluation was performed, counsel did nothing.  Ex. S-B Declaration of Carol Kolinchak.  Instead, counsel accepted the evaluation and moved into a selection phase that they were woefully ill-prepared for.  Counsel's failure to ensure that the competency evaluation be properly performed, with adequate time and information, was ineffective.  The prejudice stemming from this deficient performance is severe:  Mr. Davis went through the trial for his life while incompetent, and the jury was given no idea why he was absent or why he was behaving as he was.  Mr. Davis' competency was not properly addressed by the Court and he was given the death penalty in his absence.

### CLAIM 8.   THE GOVERNMENT VIOLATED *BRADY* AND ITS PROGENY AND MR. DAVIS' DUE PROCESS RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMNETS

At the first trial in1996, the Government hit hard with the interplay of two key pieces of evidence: the testimony of Sammie Williams and the wiretap recordings of Mr. Davis.  The Government used Sammie Williams to interpret the recordings which were laced with slang, all the while maintaining that the recordings were clear as day and it was only a matter of using common sense to figure out that the conversations on the recordings involved the murder of Kim Groves.  The defense tried, albeit ineptly, to poke holes in this evidence by attacking Mr. Williams' credibility.  The defense would have succeeded in its challenge if it had critical pieces of evidence that the Government withheld prior to the 1996 trial: evidence of Mr. Williams' deals with the government and evidence that the FBI considered the conversations on the recordings to be routine and not relating to a murder.

As an integral part of the Constitution's fair trial guarantee, due process requires that the government provide the defendant with all evidence that is "favorable to the accused" and "material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  The *Brady* doctrine applies whether

or not there has been a request by the defense, and includes cases where the prosecutor is unaware of the existence of such evidence. *United States v. Agurs*, 427 U.S. 97, 110-12 (1976); *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995). The government's duty obligates the individual prosecutor to learn of any favorable evidence known to others acting on government's behalf, including the police. *Kyles*, 514 U.S. at 436-37.

The Supreme Court in *Strickler v. Greene* set forth the three elements of a *Brady* prosecutorial misconduct claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." 527 U.S. 263, 281-82 (1999). Prejudice is shown when there is a reasonable probability that, had the evidence been disclosed at trial, the result of the proceeding would have been more favorable. *Kyles v. Whitley*, 514 U.S. at 434. The Court in *Kyles* emphasized that the prejudice prong is not outcome-determinative:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Id*. at 434 (quoting *Bagley*, 473 U.S. at 678). Moreover, the materiality standard is not a sufficiency of evidence standard:

> A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict . . . One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Id*. at 434-35.

98

*Brady* applies with equal force to evidence relevant to the credibility of a key witness in the State's case against a defendant. *Giglio v. United States*, 405 U.S. 150, 154 (1972). "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the] general rule [of *Brady*]." *Id*. at 154, (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).   The nondisclosure of impeaching witness statements is especially prejudicial in cases where the jury serves as sentencer as well as factfinder, since a person may be found guilty of murder without proof that he killed or intended to kill, but may not be sentenced to death without such proof. *See Enmund v. Florida*, 458 U.S. 782 (1982).

The failure of the Government to reveal prior to the first trial the full extent of what was promised or given to, or what was understood by, key Government witness Sammie Williams constitutes a violation of Mr. Davis' due process rights.   Under *Brady* and *Giglio*, the nondisclosure by the prosecution of requested impeachment evidence of an agreement entered into or understanding reached with a key witness where the witness's credibility is at issue violates due process where the evidence is material either to guilt or punishment.  *See also Napue v. Illinois*, 360 U.S. 264 (1959) (reversing a petitioner's conviction where a prosecutor had "promised" the key testifying witness consideration in exchange for his testimony, and the witness lied about this promise before the jury).

As the Fifth Circuit has concluded, *"Giglio* and *Napue* set a clear precedent, establishing that where a key witness has received consideration or potential favors in exchange for testimony and lies about those favors, the trial is not fair." *Tassin v. Cain*, 517 F.3d at 778.  Moreover, although *Giglio* and *Napue* use the term "promise" in referring to cover up deals "they establish that the crux of a Fourteenth Amendment violation is deception," and a promise is unnecessary.

*Id.* Thus, where the witness's credibility "'was . . . an important issue in the case . . . evidence of *any understanding or agreement as to a future prosecution* would be relevant to his credibility and the jury was entitled to know of it.'" *Id.*, quoting *Giglio*, 405 U.S. at 154-55 (emphasis in original); *see also United States v. Bagley*, 473 U.S. 667, 683 (1985) (opinion of Blackmun, J., joined by O'Connor, J.) (defense counsel asked the prosecutor to disclose any inducements that had been made, and the prosecutor failed to disclose that the possibility of an award had been held out to the witness, which possibility gave the witness a direct, personal stake in the defendant's conviction and served to strengthen any incentive to testify falsely in order to secure a conviction).

## A. The Government Suppressed Information that the FBI Did Not Interpret the Wiretapped Conversations as Meaning Murder

As discussed above, the Government's 1996 case against Mr. Davis hinged on the testimony of Sammie Williams interpreting the wiretap recordings on October 13, 1994 as Mr. Davis ordering a hit on Kim Groves by Paul Hardy. The defense argued that Mr. Williams was lying and if he was not lying at trial, then the FBI was incompetent for failing to stop this murder as it unfolded and they were listening. A critical piece of information that the defense did not have during the 1996 trial was the FBI's report regarding its internal investigation into why the monitor did not catch the fact that a murder was being planned while she listened. The report states:

> It has been learned that Kim Groves was the victim of a homicide which occurred on 10/13/94. As part of an undercover scenario which was being conducted between 10/12 and 10/13/94, two Title III's were being monitored during this time period. . . . During the course of the monitoring on 10/13/94, numerous conversations were intercepted which implicate Davis and a drug dealer by the name of Paul Hardy in the murder of Groves. **The pertinence of these conversations was not determined by the individual monitoring the Title III on 10/13/94 nor were the conversations determined to be pertinent by the agent who reviewed the tape on 10/14/94.**

. . . .

> This review process has also determined that based on Davis's historical language, involvement with IAD complaints, personal references, abusive language and use of the phone to conduct police business, **Davis' activity on the evening of 10/13 could be mistaken as routine**. Given the fact that the review process the next day was focused on conversations relevant to the undercover scenario coupled with the historical factors cited above, it is understandable that the conversations and statements relative to the murder were not noted as relevant during this review.

Ex. E, FBI Wiretap Review Memorandum.

This report was not provided to the defense team until 2001 and only after stringent requests of counsel for Mr. Davis's co-defendant.  In 2000, Mr. Davis's co-defendant filed a motion for discovery and inspection pursuant to Rule 16,[28] specifically seeking any information regarding internal investigations into the wiretap recordings by the FBI. Rec. Doc. 757.  During the status conference held regarding the motion for this report, the defense articulated several reasons for the request for discovery: that the report may show the language used on the tapes was just strange conversation patterns not indicating a murder; that the conversations clearly showed that there was a murder being planned and the FBI chose to ignore it; that the FBI was negligent in stopping the murder and that gave the Government motive to seek the death penalty in order to make up for their negligence; whether this report was relied upon by the Department of Justice in deciding to seek death against Mr. Davis.   The report apparently was provided to the Court for in camera review.  In March, 2001, this Court granted the motion for discovery and inspection pursuant to Rule 16, in essence finding that the document was material since that is the only reasoning under Rule 16 applicable to this situation.  Rec. Docs. 757, 862.

---

[28] Federal Rule of Criminal Procedure 16 provides that upon the defendant's request, the Government must provide documents when: (i) the item is material to preparing the defense; (ii) the Government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant.

The elements of a *Brady* violation are glaring and undisputed by the record: the Government did not provide the wiretap investigation report to the defense prior to the 1996 trial; the report was favorable to the defense in that it supported the argument that the wiretap recordings did not clearly show a murder, but instead that the language could be construed as routine, which in turn undermined the testimony of Sammie Williams as well as the Government's theory; and the information in the report was material as indicated by the Court's grant of the Rule 16 motion and because had the report been turned over, the outcome of the trial would have been different, with trial counsel having a basis for a theory of defense and further basis for undermining the testimony of Sammie Williams.

The Government argued to the jury in 1996 that the recordings were so transparent, that "common sense" led to the conclusion that Mr. Davis was discussing the murder of Kim Groves. 4/22/96 Tr. 67. The wiretap investigation report indicates otherwise, as this report shows that the conversations were being monitored by an FBI employee who thought the October 13th. conversations were simply routine. The defense was precluded from using the Government's own words to attack their argument, because the Government withheld this vital piece of information. Had the defense had the report, the jury would have understood that the language was not so clear, but instead was historical and routine; language which Mr. Davis often used and which the monitors had become accustom. The jury would have heard that Sammie Williams' interpretation was not the only interpretation of the tapes and that would have "put the whole case in such a different light as to undermine the confidence in the verdict." *Kyles v. Whitley*, 514 U.S. at 434-35. Clearly, Mr. Davis was prejudiced by the Government's failure to provide this key evidence.

102

**B. The Government Suppressed Exculpatory Evidence That FBI Agents Concluded That Mr. Davis Murdered Kim Groves *at the Latest* the Day After She Was Murdered**

Even if the FBI did not understand the import of Mr. Davis' conversation contemporaneously, agents did listen to the tapes the next day, and at that point came to believe that Mr. Davis murdered Ms. Groves. The Government did not disclose this information to the defense at either trial. In fact, to the contrary, the Government informed the Court and counsel, on the record, and through a document turned over prior to the second trial, that FBI agents only discerned the meaning of the wiretap conversations a week after the murder. *See* 11/29/00 Tr. 26 (Government did not did not realize import of taped conversation until well after murder); Ex. E, FBI Wiretap Review Memorandum.

The timing was critical to the defense. Evidence that the FBI believed Paul Hardy had killed Kim Groves the day after the murder was exculpatory with respect to litigating the Government's conflict and constituted mitigating evidence at sentencing. Among other things it demonstrated that the Government did not believe that Len Davis was such a risk that it could not allow him to remain free and on the police force for another six weeks.

Recent investigation has revealed police witnesses who say that the FBI believed that Kim Groves had been killed by Paul Hardy the very next day following her murder, October 14, 1994. The FBI wiretap monitor assigned to Mr. Davis' phone agrees.

One of the witnesses to Williams' beating of Nathan Norwood called IAD first thing the morning after the murder, and informed an IAD officer of Ms. Groves' murder. She was concerned that Ms. Groves had been murdered in retaliation, for making the IAD complaint. The IAD officer spoke to a second officer—the liaison between IAD and Shattered Shield. (The liaison was supposed to be the only IAD officer who knew about Shattered Shield, but that was not the case in actuality.) The IAD liaison immediately went to the FBI with the information,

and listened to the wiretap tape with FBI agents.  He returned to IAD and told two officers there that Mr. Davis was captured on tape ordering Ms. Groves' murder.

The wiretap monitor has also reported that FBI agents listened to the tape and understood it to mean that Len Davis and Paul Hardy killed Kim Groves fairly immediately, certainly not a week later.

The evidence, discovered only recently through investigation, supports that the Government had a conflict of interest—it was not an uninterested party to the proceedings against Mr. Davis.  The recent statements of witnesses familiar with the FBI's actions in reviewing the tapes support the argument that the Government was so concerned with its failure to intervene to stop violent crimes that it actually falsely reported the timing and sequence of events surrounding listening to the wiretap tapes of Mr. Davis' phone conversations. It behooved the Government to claim that for a whole week after the murder, it remained ignorant of what it interpreted to be Mr. Davis' involvement in Ms. Groves' murder, because several discussions of what it alleged to be murders at trial occurred during that week.

Furthermore, equipped with evidence of the quick recognition of Mr. Davis' alleged participation in Kim Groves' murder, Mr. Davis could have argued at sentencing that the government was so concerned about its Shattered Shield investigation that it didn't intervene to stop murders—drawing into question its assertion that it did not understand the meaning of the taped conversations as they were occurring.

The suppression of favorable evidence undermines confidence in the outcome of Mr. Davis' trial, particularly with respect to sentencing.  A less conflicted prosecutor would not have had the need to suppress evidence casting the Department of Justice in an extremely unfavorable light.  A less conflicted prosecutor would not have had the need to seek the most extreme of

104

punishments in Mr. Davis' case, and may well have urged the Attorney General to seek life only, as United States Attorneys have done in all other cases of civil rights violations resulting in death. A less conflicted prosecutor would have turned over any evidence suggesting that the Government knew or should have known that its "Shattered Shield" investigation was placing New Orleans citizens in harm's way, a fact relevant to both guilt and mitigation of punishment.

**C. The Government Suppressed Information that Sammie Williams was Not Prosecuted for Other Serious Crimes as a Result of His Cooperation**

Key Government witness Sammie Williams testified on direct examination by the Government that he was indicted in federal court on conspiring to possess with intent to distribute 135 kilos of cocaine and carrying a firearm while in the commission of that felony. April 17, 1996 Tr. 294. He further testified that he understood that the drug charge carried a minimum sentence of 10 years to life and the gun charge carried a mandatory minimum sentence of 5 years consecutive to the sentence on the drug count. *Id.* at 295. According to Williams, he pleaded guilty to those charges on April 26, 1995, *without any agreement with the Government, written or otherwise*, and will be sentenced after he has "the opportunity to cooperate." *Id.* at 295-296. Williams also testified that, since pleading guilty, the Government bought him clothing, including three pairs of pants, jeans and regular shirt, and he received one two-day visit while incarcerated out-of-state from his girlfriend that was paid for by the Government, but *denied that he received anything else of value* from the Government. *Id.* at 363-364. On cross examination, Williams acknowledged that the Government told him they could give the sentencing judge a 5K letter, but did not guarantee that they would. *Id.* at 376.

Prior to the first trial, Williams advised Mr. Davis, who informed his counsel, that he would be sentenced to a term of five years for his involvement in the drug conspiracy. Williams denied, however, that he had been promised anything with regard to his sentence. In fact,

105

Williams was subsequently sentenced to five years based on his guilty pleas in connection with the drug conspiracy. Additionally, by the time of the second penalty trial, it was revealed that the Government agreed prior to the first trial to place Williams and his fiancée and son in the Witness Protection Program and agreed to consider presenting a departure motion to the sentencing judge in Williams' drug conspiracy case if Williams' cooperation was substantial. *See* 5/16/01 Tr. 16 (hearing on whether Sammie Williams had a plea deal). Additionally, by the time of the second penalty phase trial it was revealed that, in connection with her interview of Williams prior to the first trial, FBI Agent Adams assumed that Williams was cooperating pursuant to a plea agreement based on the fact that he met with her without an attorney and she was "aware of his culpability and the fact that he was willing to provide [her] with information regarding his activity to criminal and others" and had "some exposure" to the murder of Kim Groves. *Id.* at 7.

It is evident that Sammie Williams was led to believe that he would receive a five-year sentence on the drug conspiracy and would not be prosecuted for anything else despite his potential exposure for any number of crimes, including the murder of Kim Groves, and would be placed in the Witness Protection Program in connection with his cooperation against Len Davis.

Although the issue regarding whether Sammie Williams' sentencing with a government Rule 5k motion and placement in the witness protection were *Brady* violations was litigated on the second direct appeal, the facts surrounding those issues are pled herein in order to present a complete description of the circumstances surrounding the *Brady* violations in this case. Furthermore, this issue implicates the jury's finding of guilt in the first trial, as Mr. Williams testified at length during the guilt phase. Furthermore, the cumulative effect of the *Brady* violations must be considered; even if Mr. Williams' receipt of a Rule 5k motion and witness

106

protection was not alone material, these facts in connection with the following violations deprived Mr. Davis of due process under the Fifth, Sixth, and Eighth Amendments of the Constitution.

The prosecution in Mr. Davis's case suppressed exculpatory evidence relevant to Sammie Williams' plea deals and/or leniency given in cases separate and apart from the drug conspiracy and gun charge. In the trial of Leon Duncan, Mr. Williams testified that he was guilty of other crimes, specifically armed robbery and insurance fraud. With reference to the armed robbery, Mr. Williams testified that as a police officer, he forced a known drug dealer to give him money in order to avoid going to jail. He also extorted money from the drug dealer as payment for protection that Mr. Williams provided. Further, Mr. Williams testified that he and other police officers were involved in various insurance fraud schemes wherein the officers would fabricate events so that individuals could make insurance claims and collect insurance funds. Mr. Williams readily told all of this information to the Government during the hundreds of hours he spent debriefing. Mr. Williams was not charged by state or federal officials with any of these crimes. *See U.S. v. Leon Duncan*, E.D. La. Criminal Action No. 97-217, Transcript of the Proceedings May 1, 1998, pps. 116-121.

During the 1996 trial, the Government relied heavily upon Mr. Williams in establishing what the terminology of the wiretap recordings meant. It was through Mr. Williams' testimony that the Government defined the terms "30" as meaning a murder, "NAT" meaning "necessary action taken", and "rock-a-bye" also meaning murder.

The Government not only relied on Mr. Williams to explain the recordings, it also used Mr. Williams' testimony to support its argument that Mr. Davis became agitated after discovering that Kim Groves filed an IAD complaint against him and basically became obsessed

107

with having her murdered. With this agitation came the "critical" point according to the Government, and testified to by Mr. Williams:

> Then the critical point, 5:10 p.m., Len Davis has got a cellular phone and he starts beeping Paul Hardy. He is also having a conversation with Sammie Williams. When you start that beeper phone, it starts the tape running. This is an important conversation because it's not like he is speaking over the phone to somebody where everyone knows there's a possibility of those things being picked up. What's happening here is he just hit the phone. He is doing a beeper and he is talking directly to Sammie Williams. You heard what Sammie Williams said this was talking about, but you also hear the very words out of the defendant's mouth. "I can get 'P' to come do that whore now and then we handle the 30."

4/22/96 Tr. 65-66.

The defense tried to attack the Government's star witness, but the attempts to show that Mr. Williams was profiting from cooperation fell short because Mr. Williams denied having any type of agreement regarding the sentence he would receive. Information regarding Mr. Williams' immunity or plea deals regarding crimes such as armed robbery and insurance fraud would have allowed the defense to fully attack Mr. Williams' credibility. The failure to provide the information and to allow a witness to testify falsely violated the tenets of *Brady, Giglio,* and *Napue.*

The nondisclosure by the Government prior to the first trial of this additional evidence regarding the agreements or understandings reached with this key witness where Mr. Williams' credibility was a critical issue violated Mr. Davis's due process and was material both to Mr. Davis's guilt and punishment at the first trial.

### CLAIM 9. MR. DAVIS'S RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS WERE VIOLATED BY JURY MISCONDUCT AND COUNSEL'S INEFFECTIVENESS FOR FAILING TO LITIGATE THIS ISSUE AT TRIAL AND ON DIRECT APPEAL

The Sixth Amendment forbids a juror from being exposed to external influences on its deliberations and verdict. *Remmer v. United States*, 347 U.S. 227, 229 (1954). The Supreme

Court has long held that external influences on a jury, including "private communication, contact, or tampering," are presumptively prejudicial. *Id.* Mr. Davis's rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution were violated by misconduct involving the jury. Such misconduct included, but was not limited to, improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment, improper exposure to witnesses and others who claimed to have knowledge or opinions about Mr. Davis and the case, false or misleading responses of jurors on voir dire, improper biases which infected the jury's deliberations, improper exposure to the prejudicial opinions of third parties, improper communications with third parties, and improperly prejudging the guilt/innocence and penalty phases of Mr. Davis's trial. Additionally, Mr. Davis's constitutional rights were violated when jurors slept during his trial proceedings.

Mr. Davis's constitutional rights to a fair trial and to due process were violated when the jury was not properly sequestered in such a way as to avoid contact with prejudicial publicity and hostility to the defendant, and to avoid contact and communications with third parties, in contravention of the Fifth, Sixth, and Eighth Amendments to the United States Constitution.

Mr. Davis was constitutionally entitled to be tried by an impartial jury free from any extraneous influences that could subvert the fact finding process. Where jurors consult information that was not introduced during the course of the trial or that conflicts with the trial judge's instructions, the jurors become unsworn witnesses against the defendant in violation of the Fifth, Sixth and Eighth Amendments. Mr. Davis had no opportunity to confront the extraneous information to which the jurors were exposed, denying him his constitutional rights to a fair trial and due process. The introduction of such extraneous materials or evidence has

109

consistently been held to mandate a new trial. Mr. Davis should therefore be granted a new trial which can be conducted free of extraneous and prejudicial influences.

Counsel provided ineffective assistance in failing to litigate this issue in the trial court and by failing to raise it on direct appeal, to Mr. Davis's prejudice. Counsel's ineffective assistance resulted in the deprivation of Mr. Davis's rights under the Fifth, Sixth and Eighth Amendments, and relief is appropriate.[29]

At multiple points during Mr. Davis's 1996 trial, issues arose regarding jurors' contacts with outside sources, exposure to extraneous information, and their ability to serve in an attentive and unbiased manner. Trial counsel, however, neither investigated these issues nor requested that these jurors be questioned about these matters to determine whether they should be removed from the jury and replaced with alternates. The extant 1996 trial record indicates, at the very least, that three jurors may have had improper extrajudicial contacts that tainted the trial proceedings in this case. Additionally, the record evidence from the 2005 trial suggests that numerous jurors who were seated had implied or actual biases that were not fully disclosed during voir dire, and that would have prevented them from serving impartially. Furthermore, there is a reasonable likelihood that such jurors exposed other members of the jury to these biases and extraneous information about personal experiences, thus tainting the jury's deliberations.

---

[29] Competent counsel would have viewed the events that transpired with these jurors as grounds for concern and at the very least would have sought to interview these jurors. This Court offered to allow counsel to interview Juror Bourgoyne, for example, but counsel declined. There is no reasonable strategy that would have excluded at least inquiring further into the sources of bias or prejudice exhibited by these jurors, and the apparent extrajudicial contacts which took place between Government agents and the jurors. *See Rompilla v. Beard*, 545 U.S. 374, 392 (2005) (discussing counsel's failure to follow up on "red flags" alerting him to potential mitigation).

The following discussion of the record-indicia of juror misconduct is not intended to convey that these were the only instances of juror misconduct, or to otherwise limit the scope of Mr. Davis's habeas claim. Rather, the following facts merely illustrate that Mr. Davis has a good faith basis for alleging this claim in his § 2255 motion, as well for requesting discovery – including juror interviews and an evidentiary hearing – to develop additional facts in support of this claim.

### A. 1996 Trial

#### 1. Juror Daniel Walker

Juror Daniel Walker had contacts with his mother during the trial. On one occasion, when she ostensibly came to bring him clothing, she also brought him a Bible and advised him to consult it as part of his deliberations in this case. 4/15/96 Tr. 138-46. After his mother spoke with him, Juror Walker complained to FBI Agent Karen Jenkins—a Government witness—that he had problems with his job, severe work conflicts, and threatened that if he stayed on the case he would have "major problems." 4/15/96 Tr. 188-92. On its face, the trial record with respect to Juror Walker raises a number of issues that require further investigation, as these facts, if true, would form the basis of cognizable habeas claims entitling Mr. Davis to relief.

##### a. Religion as Extraneous Evidence

The record evidence establishes that Juror Walker's mother provided him with a Bible during the trial and apparently encouraged him to consult it as part of his service as a juror in Mr. Davis's case. The record, however, is silent as to Juror Walker's use of the Bible, or the extent to which he made the Bible available for use by other jurors during the trial and/or the jury's deliberations. Further inquiry into this matter is necessary, as any such use or consulting of the Bible would form the basis of a cognizable habeas claim entitling Mr. Davis to relief. *See Oliver v. Quarterman*, 541 F.3d 329, 340 (5th Cir. 2008) (holding that use of Bible constitutes external

111

influence on jury); *McNair v. Campbell*, 416 F.3d 1291, 1307-08 (11th Cir. 2005) (holding that the jury's use of the Bible was presumptively prejudicial); *Romine v. Head*, 253 F.3d 1349 (11th Cir. 2001) (death sentence reversed in habeas where religion permeated sentencing; court relies, in part, on jurors' use of Bible during deliberations in finding sentencing proceeding to be fundamentally unfair).

At the very least, the record evidence establishes that Mr. Davis is entitled to further investigation of this claim to identify whether facts exists that support a claim that the jury's deliberations were improperly influenced by its exposure to or use of a Bible. *See United States v. Lara-Ramirez*, 519 F.3d 76, 88 (1st Cir. 2008) (holding that the district court had a duty to investigate whether the Bible tainted the jury's deliberations); *Gapen v. Bobby*, 2011 WL 5166566 (S.D. Ohio October 31, 2011) (slip opinion) (in capital habeas cases, district court reverses magistrate judge's decision denying petitioner's access to jurors where jurors were alleged to have considered Biblical scripture and other religious materials during guilt and sentencing proceedings). Indeed, counsel's failure to request that the jury be questioned to determine whether it had consulted the Bible constituted deficient performance, and Mr. Davis was prejudiced as a result, because there is a reasonable likelihood that Mr. Davis was tried by a jury whose deliberations were tainted. Similarly, counsel was ineffective for failing to litigate this claim on direct appeal.

### b. Improper Communications with Third Parties

Juror Walker had extrajudicial contact with at least two different people during the course of the trial in which his service as a juror was discussed – his mother and FBI Agent Karen Jenkins, a government witness. It is axiomatic that any extrajudicial contact with a juror is presumptively prejudicial. *Remmer v. United States*, 347 U.S. at 229. The nature and extent to which the contact tainted the verdict is a factual matter which must be determined on a case-by-

case basis. *See United States v. Tucker*, 137 F.3d 1016, 1032-33 (8th Cir. 1998) (remanding for a hearing on the extent of extrajudicial contacts between a juror and the juror's husband);; *Fullwood v. Lee*, 290 F.3d 663 (4th Cir. 2002) (evidentiary hearing required in capital habeas case, following submission of affidavit obtained by defense counsel through juror interview, to determine whether juror's deliberations were influenced by her spouse's views; hearing also considered whether jury considered extraneous evidence that defendant had previously been sentenced to death for the offense by a different jury); *United States v. Maree*, 934 F.2d 196, 202 (9th Cir. 1991) (holding that there was actual prejudice where a juror was subjected to prejudicial comments about the case by her friends).

Juror Walker's extrajudicial contact was particularly pernicious in this case because it also occurred with a prosecution witness. *See Caliendo v. Warden*, 365 F.3d 691 (9th Cir. 2004) (granting habeas relief where three jurors were overheard talking to police officer, who was a prosecution witness, during recess in deliberations); *United States v. Strickland*, 935 F.2d 822 (7th Cir. 1991) (noting that juror acted improperly when he asked question of FBI agent, who was a government witness, outside courtroom).

Additionally, the record indicates that FBI Agent Kathleen Adams had contacts with the jury to an unknown extent, including bringing them drinks and "appearing to be trying to bond with the jury." 4/17/96 Tr. 500. As noted above, such contact is presumptively prejudicial, and further inquiry is necessary. Counsel's failure to request that the jury be questioned regarding its contacts with FBI Agents Jenkins and Adams constituted deficient performance, and Mr. Davis was prejudiced as a result. Similarly, counsel was prejudicially ineffective for failing to litigate this claim on direct appeal.

### c. Conflicts Leading to Rushed Verdict/Premature Deliberations

Juror Walker made comments to FBI Agent Jenkins implying that his continued service on the jury was interfering with his work obligations and was creating "major problems" for him. Such comments raise the inference that Juror Walker was laboring under a conflict of interest – i.e., that he would rush his verdict or engage in premature deliberations in order to avoid "major problems" on account of his absence from work while serving on the jury. This constituted juror misconduct, and at the very least, required further inquiry of Juror Walker to ascertain whether his work obligations were interfering with his duty to serve as a fair and impartial juror. *See Oswald v. Bertrand*, 374 F.3d 475, 480 (7th Cir. 2004) (affirming grant of new trial relief where trial court failed to conduct adequate investigation into juror misconduct after it was brought to trial court's attention, including comments by one juror that: "I will more than likely be so concerned about my work that I'd not give in trial all the attention it should receive to the point that I might just vote either way just to end it."). Moreover, counsel was ineffective for failing to investigate this issue, including failing to ask that Juror Walker be questioned, and Mr. Davis was prejudiced as a result. Similarly, appellate counsel was prejudicially ineffective for failing to raise this claim on direct appeal.

### 2. Juror Wallace Rodrigue

Juror Wallace Rodrigue was contacted by the U.S. Marshals to inform him that his wife was receiving intimidating phone calls during trial.  4/18/96 Tr. 2.  She was apparently distressed enough by these calls that the marshal felt the need to tell Juror Rodrigue about the problem. 4/18/96 Tr. 3.

The marshal's contact with Juror Rodrigue concerning his wife, and the effect that communication had on the juror, must be explored.  In such a high-profile case, where Mr. Davis stood accused of ordering the murder of a citizen, information that a juror's wife was receiving suspicious phone calls reasonably could have had a prejudicial influence on the juror's verdict.

*See United State v. Brande*, 329 F.3d 1173, 1177 (9th Cir. 2003) (remanding for hearing where juror had extrajudicial contact with court clerk and noting that "a juror is more susceptible to improper influence from a court officer than from spectators or parties to the case"). Further inquiry is also necessary to determine whether Juror Rodrigue shared this information with the other jurors, and if so, whether it had a prejudicial influence on their deliberations. *See State v. Bailey*, 97-302 (La.App. 5 Cir. 4/28/98), 713 So. 2d 588 (remanding for evidentiary hearing to determine whether jury impartiality was affected by juror telling the other jurors that his wife received call from woman with defendant's last name who asked for juror's daughter's telephone number); *United States v. Smith*, 26 F.3d 739 (7th Cir. 1994) (jurors statement to other jurors that she had visitor on night before she was excused from jury, together with another juror's expression of concern for her safety, required further inquiry by trial judge beyond merely interrogating excused juror; case remanded). Moreover, counsel was ineffective for failing to investigate this issue, including failing to ask that the jury be questioned about this occurrence, and Mr. Davis was prejudiced as a result. Similarly, appellate counsel was prejudicially ineffective for failing to raise this claim on direct appeal.

### 3.  Juror John Bourgoyne

Juror John Bourgoyne had a brother who had recently died of a crack overdose at the time that he served as a juror. 4/11/96 Tr. 80, 85, 90. During the trial, Juror Bourgoyne began to decompensate and was characterized by counsel for the government as "wigging out." 4/26/96 Tr. 3. A marshal found Juror Bourgoune in the hallway of the courthouse one day, and the juror was observed to be very upset about his brother, who had recently overdosed on crack cocaine and died, and expressed concerned that the decedent in this case, Kim Groves, would not get justice because she too was a crack addict. 4/26/96 Tr. 2. Juror Bourgoyne also stated that his

mother-in-law was ill and dying, and he was afraid that if she died during the trial, he would be unable to attend her funeral.  4/26/96 Tr. 2.

Juror Bourgoyne also told a marshal that he was up all night worrying about this trial and other personal crises, and that as a result, he was not sleeping well at night, and consequently having trouble staying awake during the trial proceedings. 4/26/96 Tr. 2. Indeed, other jurors had also indicated to a marshal that they had observed Juror Bourgoyne sleeping during the proceedings, *id.,* and even the trial court noted about Juror Bourgoyne during a bench conference: "This is the one that I was concerned about earlier, who seemed to have his eyes closed. And that is why he was told to stand up, he was told several times to stand up, he was told to stand up when he felt that he was sleepy. He says that he is okay. My inclination is to go forward and see if he stays awake, my problem is that if he has a hard time staying awake when he gets a full night's sleep on other nights, whether we are going to have a problem with someone who is not realy [sic] paying attention." *Id*. at 2-3.

### a. Sleeping During Proceedings

Sleeping during the proceedings in a capital trial proceeding is obvious misconduct warranting relief. *See Dimas-Marinez v. State*, 2011 Ark. 515, 2011 WL 6091330 *9-*11 (Ar. 2011) (reversing murder conviction and remanding for new trial where record evidence demonstrated that juror was sleeping during portions of the trial and admitted it to court personnel; "[C]ontrary to the State's position at oral argument of this matter, it is not acceptable for a juror to doze off, as long as the juror hears the 'vast majority' of the evidence."); *People v. South*, 177 A.D.2d 607, 608 (N.Y. App. Div. 1991) (new trial required where trial court failed to investigate timely allegation the juror slept through portions of the trial and jury charge; juror who has not heard all of the evidence and the court's instructions "is grossly unqualified to render a verdict"); *State v. Majid*, 914 N.E.2d 1113, 1117 (Ohio App. 2009) (in capital murder

116

case resulting in sentence of term of years, finding plain error requiring reversal of the convictions due to extensive evidence on the record that at least one of the jurors slept through numerous portions of the trial, and that it was brought to the trial court's attention during the trial: "[T]he numerous instances of jurors' sleeping deprived the defendant of his right to have 12 attentive jurors decide his fate and violated his right to due process").

Similarly, counsel's failure to object to the presence of a sleeping juror and litigate this issue at trial and on appeal constituted ineffective assistance. *See Judd v. State*, 951 So. 2d 103 (Fla. Dist. Ct. App. 2007) (Petitioner entitled to an evidentiary hearing on his claim that trial counsel was ineffective in failing to object to the presence of a sleeping juror); *Thompson v. State*, 873 So. 2d 481 (Fla. App. 2004) (Petitioner was entitled to an evidentiary hearing on his claim that trial counsel was ineffective for failing to notify the trial court that a juror was sleeping through "critical testimony").  At the very least, counsel should have moved to have the juror questioned after the juror himself admitted to sleeping during the trial, and after reports from other court personnel, and the district judge, that the juror was observed sleeping.  *See Commonwealth v. Braun*, 905 N.E.2d 124 (Mass. App. 2009) (defendant in drug case was denied a fair trial by trial court's failure to question a juror who appeared to have been sleeping through trial; contemporaneous observations from a court officer, defense counsel, and the judge himself alerted the judge that the juror might have been sleeping during the trial and instructions from the judge; by failing to conduct a voir dire, the judge prevented himself from obtaining the information necessary to a proper exercise of discretion).

### b.  Improper Communications with Court Personnel

The record indicates that Juror Bourgoyne was discussing his service as a juror with a marshal. Such extra-judicial contact is presumptively prejudicial, especially considering that it was with someone who could fairly be considered to be court personnel. *See United States v.*

117

*Brande*, 329 F.3d 1173, 1177 (9th Cir. 2003) (remanding for hearing where juror had extrajudicial contact with court clerk and noting that "a juror is more susceptible to improper influence from a court officer than from spectators or parties to the case"). Further inquiry is necessary to determine the extent of Juror Bourgoyne's conversations with this marshal, whether anything the marshal told him exerted a prejudicial influence on Juror Bourgoyne's deliberations, and whether Juror Bourgoyne shared his conversation with the other jurors. Moreover, counsel's failure to litigate this issue at trial and on direct appeal constituted prejudicially ineffective assistance of counsel.

### c. Implied or Actual Bias Stemming from Similar, Relevant Experience/Failure to Fully Discuss Bias During Voir Dire

Juror Bourgoyne's decompensation during trial and his subsequent comments sympathizing with the decedent based on the fact that his recently deceased brother was also a crack addict, and expressing his fear that the decedent would be denied justice because of her addition, potentially give rise to a claim of implied or actual bias stemming from similar, relevant experiences. That is, his brother's crack overdose appeared to compromise Juror Bourgoyne's ability to be impartial in light of the decedent's crack addiction.  If true, such bias would entitle Mr. Davis to relief.  *See Burton v. Johnson*, 948 F.2d 1150 (10th Cir. 1991) (murder conviction reversed in habeas where juror, who failed to acknowledge own sexual abuse in voir dire, discussed own experiences with other jurors as it related to evidence at trial regarding battering and abuse); *Fields v. Woodford*, 309 F.3d 1095 (9th Cir. 2002) (in kidnapping/rape case, evidentiary hearing required where counsel submitted juror affidavits stating that other juror had shared during deliberations that wife had been kidnapped and raped and perpetrator had never been found). Further inquiry into the extent to which Juror Bourgoyne's personal crises affected his verdict in this case is necessary, as well as whether

118

Juror Bourgoyne tainted the jury's deliberations by expressing his personal biases to the other members of the jury. Moreover, counsel's failure to litigate this issue at trial and on direct appeal constituted prejudicially ineffective assistance of counsel.

### B. 2005 Trial

#### 1. Juror 71/7

Juror 71/7 stated on her questionnaire that her husband, an attorney, had been arrested in 2003 and charged with, among other things, battery on a police officer. The charges were later dismissed. The juror's personal experience was one that raised an inference of a potential bias against Mr. Davis; not only was her husband involved in some sort of violent altercation with a police officer, but then her husband was apparently arrested by the police and formally charged with being the aggressor in the incident, only to have that charge be later dismissed.  In other words, there is a reasonable likelihood that the juror believed that her husband had been harassed and mistreated by the police, both in the initial encounter, and then by being arrested and charged with an offense that was so unfounded that it was dismissed. It is unclear, however, if this juror was entirely forthcoming about her potential biases, and there is a reasonable likelihood that she did not disclose her bias in order to serve on the jury.

A biased juror's presence on a jury violates the defendant's Sixth Amendment right to a fair and impartial jury. If a juror conceals information during voir dire which impacts his or her ability to serve in an impartial manner, courts may assume bias. *See United States v. Scott*, 854 F.2d 697, 699 (5th Cir. 1988) (presuming bias where juror failed to disclose that his brother worked in sheriff's office); *Green v. White*, 232 F.3d 671, 678 (9th Cir. 2000) (recognizing "implied bias" where juror lied about felony convictions).  If a situation arises during trial which causes a juror to be biased, likewise, the verdict cannot stand. *See Rushen v. Spain*, 464 U.S. 114, 121 & n.5 (1983) (stating that a juror may testify regarding mental bias to determine

whether extraneous information tainted the verdict). Moreover, counsel was prejudicially ineffective for failing to litigate this issue at trial and on direct appeal.

### 2. Juror 156/27

Juror 156/27 wrote on his questionnaire that he and a friend had previously been stopped, questioned and verbally abused by a police officer. The incident was apparently significant enough that they filed a formal complaint against the officer. Considering that Mr. Davis's case involved allegations that a citizen was murdered by a police officer after making a complaint against that officer, there is a reasonable likelihood that Juror 156/27's personal experiences would have led him to have an implied or actual bias against Mr. Davis given that Juror 156/27 was himself subjected to what he believed to be abusive conduct by a police officer. Further inquiry is warranted to determine whether Juror 156/27's potential biases prejudicially influenced his deliberations, and/or whether Juror 156/27 shared his personal experience with other jurors, thus tainting the deliberations. To the extent that counsel failed to litigate this issue at trial and on direct appeal, it constituted prejudicially ineffective assistance of counsel.

### 3. Juror 68/38

Juror 68/38 stated on her questionnaire that after being robbed at gunpoint, she went to the police station to file a report. The officers that took her report, however, were "belligerent and treated [her] like a criminal." The juror also stated that she "was traumatized in that station and could not stop crying." There is a reasonable likelihood that Juror 68/38's personal experiences would have led her to have an implied or actual bias against Mr. Davis given that Juror 68/38 was herself subjected to "belligerent" and "traumatic" conduct by a police officer. Further inquiry is warranted to determine whether Juror 68/38's potential biases prejudicially influenced her deliberations, and/or whether Juror 68/38 shared her personal experience with

other jurors, thus tainting the deliberations. To the extent that counsel failed to litigate this issue at trial and on direct appeal, it constituted prejudicially ineffective assistance of counsel.

As noted above, the discussion of the record evidence of juror misconduct from Mr. Davis's trial proceedings is not intended to suggest that this claim is limited solely to the instances of misconduct set out above. Rather, the available record evidence simply establishes that Mr. Davis has a good faith basis for alleging in his § 2255 motion that his constitutional rights were violated by juror misconduct. Such claims, by their very nature, require additional legal process and fact development, as they inherently concern conduct that was not the focus of the trial proceedings and that therefore occurred outside the scope of the extant record. As is noted in the accompanying *Motion to Interview Jurors and Memorandum in Support*, Mr. Davis respectfully submits that he is entitled to conduct post-conviction interviews with the jurors to inquire into potential juror misconduct. Additionally, Mr. Davis will be seeking an evidentiary hearing to develop facts in support of this claim. *See United States v. Sampson*, 2011 WL 5022335 (D. Mass. Oct. 20, 2011) (in capital § 2255, granting sentencing relief on claim of juror misconduct after conducting evidentiary hearing and questioning trial jurors; over the course of three hearings, district judge determined that juror failed to disclose information during voir dire that was comparable in significant ways to evidence presented at trial and which called her ability to decided the case solely on the evidence into question, and that the concealed information, if it had been disclosed during voir dire, would have resulted in her excusal for cause). Mr. Davis respectfully reserved the right to amend and/or supplement his claim based on the additional facts that may be developed as a result of any juror interviews or other discovery mechanisms, as per Federal Rule of Civil Procedure 15 (made applicable to § 2255 proceedings

by Rule 12 of the Rules Governing Section 2255 Proceedings for the United States District Courts).

### CLAIM 10.   MR. DAVIS'S FIFTH, SIXTH AND EIGHTH AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS, AND AGAINST DOUBLE JEOPARDY AND CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN COUNSEL FAILED TO CHALLENGE HIS CONVICTIONS ON THE BASIS OF DOUBLE JEOPARDY IN HIS 1996 TRIAL AND APPEAL

Mr. Davis was convicted on two counts, for violating the victim's civil rights under 18 U.S.C. § 241 (Count 2), and for conspiring with two co-defendants to do so under 18 U.S.C. § 242 (Count 1). *See Causey*, 185 F.3d at 411. The trial court's instructions on the elements of those offenses at his 1996 trial, made a substantive violation, Count 2, a lesser included offense of the conspiracy charge, Count 1, because the Court instructed the jurors that, in order to convict Mr. Davis of conspiracy, they needed to find, among other things, that the victim "died as a result of the acts" committed in furtherance of the conspiracy. As a result, Count 2 subsumed Count 1, and accordingly violated Mr. Davis's Fifth Amendment right to be free from double jeopardy: Mr. Davis could not be guilty of the conspiracy (with its "died as a result" element) unless he was also guilty of the substantive violation of Groves' civil rights.

To date, no court has reviewed the merits of this constitutional challenge, including the Fifth Circuit in Mr. Davis's appeal from his resentencing, because Mr. Davis's counsel in both his 1996 trial and his first direct appeal proceedings failed to raise the issue. The only time this issue was raised, on direct appeal from Mr. Davis's resentencing, the Fifth Circuit refused to examine the merits of the claim instead stating review was "precluded…because the claim was foreclosed when we affirmed Davis's conviction under Sections 241 and 242 in his first direct appeal." *Davis,* 609 F.3d at 697-98 (citing *Causey*, 185 F.3d at 413-16).

122

The current proceedings, pursuant to 28 U.S.C. § 2255, provide the appropriate vehicle for this Court's consideration of this meritorious claim. *See, e.g., Brown v. United States*, 34 F.3d 990, 991 (concluding that § 2255 motion raised "significant double jeopardy concerns . . . cognizable under § 2255.")    Furthermore, while an action under 28 U.S.C. § 2255 is not intended as a second direct appeal, and issues framed by the trial record and which could been, but were not, raised on direct appeal, are ordinarily considered procedurally barred, *United States v. Warner,* 23 F.3d 287, 291 (10th Cir. 1994), cause for excusing waiver exists where appellate counsel provides ineffective assistance. *Murray v. Carrier,* 477 U.S. 478 (1986).

Despite the existence of federal constitutional and Fifth Circuit law pointing to a double jeopardy violation at the time, trial counsel failed to object to the court's erroneous instructions making a substantive violation under § 241 a lesser included offense of the conspiracy charge under § 242.  Similar challenges were routinely raised by the defense bar at the time of Mr. Davis's trial and it is undeniable that trial counsel should have been aware that the court's instructions were in contravention of the then-controlling law. *See United States v. Gibson*, 820 F.2d 692, 699 (5th Cir. 1987) (citing *Blockburger v. United States*, 224 U.S. 299 (1932) and vacating the district court's judgment and sentence on basis of double jeopardy violation in connection with two robbery statutes).  In *Gibson*, the court noted that

> We emphasize that while the Government may seek a multiple-count indictment against a felon for violations of [the two sections] where a single act establishes [violation of both], the accused may not suffer two convictions or sentences on that indictment.  If, upon the trial, the District Judge is satisfied that there is sufficient proof to go to the jury on both counts, he should instruct the jury as to the elements of each offense.  Should the jury return guilty verdicts for each count, however, the District Judge should enter judgment on only one of the statutory offenses.

*Id.* at 699; *see also United States v. Davis*, *Brief of the United States As Appellee*, 2009 WL 7170932 (Jul. 1, 2009), at 207-08. Trial counsel had no strategic basis for failing to object to the instructions, and their failure constituted deficient performance that prejudiced Mr. Davis.

Had trial counsel raised an objection to the instructions on double jeopardy grounds, Mr. Davis would have been granted relief from at least one of his convictions. In addition, if trial counsel had protected Mr. Davis's double jeopardy rights against being convicted on multiplicitous counts, there is a reasonable likelihood that he would not have been sentenced to death on any counts. Trial counsel's error also violated Mr. Davis's rights to due process and against cruel and unusual punishment by unduly emphasizing the option of a death sentence to the jury based on the multiplicitous counts, and by permitting the jury to improperly double count, the sentence was arbitrary and capricious in violation of the Eighth Amendment.

In the alternative, should this Court find the claim was properly preserved at trial, Mr. Davis's appellate counsel was ineffective for failing to raise the double jeopardy challenge, in light of *Blockburger*, *Gibson*, and a subsequent case, *United States v. Sharpe*, 193 F.3d 852 (5th Cir. 1999). Because the issue was obviously meritorious, there could be no reasonable strategic basis for omitting it. The failure to raise this issue was professionally unreasonable. Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different. *Evitts v. Lucey,* 469 U.S. 387 (1985); *Eagle v. Linahan,* 279 F.3d 1283, 1301-06, 1308(11th Cir. 2002) (counsel ineffective on appeal for failing to raise error apparent on the record); *Carter v. Bowersox,* 265 F.3d 705, 709-10, 716 (8th Cir. 2001) (direct appeal counsel ineffective for failing to raise issue apparent on the record, even though not preserved or adequately preserved, under plain error standard). Moreover, the Fifth Circuit's determination that Mr. Davis's 1996 death sentence was unreliable because the jury "did not make separate

124

recommendations concerning the appropriate penalties for each count of conviction," making it "impossible to say that the jury's penalty phase recommendations of the death penalty were not influenced by the fact that Mr. Davis and Hardy had received three death eligible convictions, rather than two," *Causey*, 185 F.3d at 423, would have been similarly applicable in the context of double jeopardy challenge and makes clear that appellate counsel's error was outcome determinative.

### CLAIM 11.   MR. DAVIS WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS DURING HIS 1996 TRIAL

At Mr. Davis' first trial in 1996, at which he was convicted of the offenses serving the basis for his death sentence, he was represented by a procession of incompetents, one after the other failing in turn to investigate key evidence and present cohesive arguments to the jury. Counsel failed entirely to realize the critical import of the "color of law" element—and its lack thereof—in this case, and as consequence failed to challenge it in a timely manner such that it would have led to a different result.  Counsel failed to competently represent Mr. Davis during voir dire, allowing biased and death-leaning jurors to be seated, and then failed to even inquire when several jurors manifested signs of external influence and bias during trial.  During the Government's case, counsel dropped the ball during cross-examinations and failed to challenge the plainly inadequate investigation of Ms. Groves' murder.  Finally, and as a whole, counsel presented a disorganized and ineffective theory of the case to the jury, throwing any inconsistent argument before the jury and giving short shrift to the theory that would have made a difference.

### *Background*

Curklin Atkins, an attorney with approximately three years experience in private practice, was contacted by Len Davis' girlfriend Shantrice McCormick on the evening of December 8,

1994.  SR 1316.  Ms. McCormick inquired as to whether he would be willing to represent Mr. Davis in both his murder prosecution and his drug conspiracy prosecution resulting from the FBI's Operation Shattered Shield.  *Id.*  Mr. Atkins agreed to represent Mr. Davis on both federal prosecutions.  *Id.*

On December 12, 1994, Mr. Atkins appeared in court on behalf of Mr. Davis and was substituted as counsel for John Craft, who was with the federal public defender's office.  SR 152-53.  The next day, December 13, 1994, Mr. Davis was indicted for conspiracy against rights with death resulting, under 18 U.S.C. § 241.  SR 133-34.  Under the recently-enacted Violent Crime Control and Law Enforcement Act, this was a capital crime; thus, at this point Mr. Davis was entitled to the assistance of two attorneys, with at least one qualified as lead counsel in capital cases.[30]  But instead, Mr. Davis continued to be represented by a single unqualified attorney, simultaneously handling both his death penalty eligible and drug conspiracy cases for the next four months.

On March 24, 1995, there was a hearing before a United States Magistrate Judge to determine counsel in this case, at which time the Government adamantly opposed the appointment of counsel for Mr. Davis.  SR. 366; 3/24/95 Tr. 3-9.  Mr. Atkins stated that he was "not able to provide effective assistance to Mr. Davis . . . based upon the retainer" that he had received.  3/24/95 Tr. 14.  He represented that he had received a total of $12,570 in fees, which was insufficient to cover the amount of hours he had spent working on the case up to that point.  3/24/95 Tr. 16-17.  When the judge recommended that he submit an itemization of his hours, Mr. Atkins protested, complaining that he did not want to lose his fees for hours spent but not

---

[30] *See In re Sterling-Suarez*, 306 F.3d 1170 (1st Cir. 2002) (granting mandamus in a death penalty case to compel the appointment of counsel learned in the law applicable to capital cases, and holding that the phrase "promptly" in § 3005 means "promptly after indictment, not . . . only after the Attorney General has made a determination to seek the death penalty.").

compensated by Mr. Davis: "Because I could have just as soon took them 100 and so or 200 hours and worked on something else that would have paid me. . . . I didn't just donate 200 and something hours to Len Davis." 3/24/95 Tr. 32. Ultimately, Mr. Davis was put under oath and examined about his financial condition, and the Court determined that he qualified for appointed counsel. 3/24/95 Tr. 37-46; SR 388-89.

The Court appointed Mr. Atkins as counsel on March 30, 1995, and apparently[31] appointed Milton Masinter on March 29, 1995. Mr. Atkins continued to represent Mr. Davis in the drug conspiracy case without co-counsel. There is no indication in the record that any judicial officer made any inquiry into either Mr. Atkins' or Mr. Masinter's qualifications as "learned in the law applicable to capital cases" as required by 18 U.S.C. § 3005.

Less than three months after appointment of counsel, on June 5, 1995, Mr. Davis wrote a letter directly to this Court that raised red flags about the quality of representation he was receiving. SR 620-22. In it, he stated that he "learned that [he had] no authority to 'fire' any one of [his] attorneys." He also asked this Court to "please pay [his] lawyer." SR 622.

Ten days later, the docket in the drug conspiracy case reflected the following entry:

MOTION by defendant Len E Davis and ORDER denying to withdraw Curklin Atkins as counsel of record; **This motion borders on bad faith**; The Court has never been asked by counsel "to ascertain funds" for counsel; The Court will happily see to it that counsel is paid whenever requested to do so; Meanwhile counsel will prepare this case for trial on his client's behalf, having volunteered to be appointed to represent him.

Judge Feldman also wrote a letter directly to Mr. Atkins regarding the "bad faith" motion and denied him permission to withdraw. Criminal Docket, *United States v. Davis, et al*, No. 2:94-cr-00368 (E.D.La.).

---

[31] The record does not contain an order appointing Mr. Masinter, although it does contain a letter from John Mulvehill to Mr. Masinter, dated March 29, 1995, advising him that he had been appointed. SR 384.

Shortly thereafter, Mr. Masinter began to sign the vast majority of the pleadings in this case.  Mr. Atkins' billing hours in this case steeply declined as he apparently shifted attention to more lucrative work at that time, preparing and filing lawsuits in *Riley v. Transamerica Ins.*, 923 F.Supp. 882 (E.D.La. 1996) (filed in July of 1995), *Sanders v. Schwegmann Supermarkets*, 696 So. 2d 264 (La. App. 4th Cir. 1997) (filed in August of 1995), and *Bell v. Holger*, 2:95-cv-03455 (E.D. La) (filed in October of 1995), among other cases.  He billed a total of 46.25 hours for the month of July, 17.5 hours for the month of August, and 44.5 hours for the month of September.  SR 1081, 1251.  Mr. Davis filed a disciplinary complaint against Mr. Atkins on August 21, 1995.  SR 1349.  The Office of Disciplinary Complaints ordered Mr. Atkins to file a response on October 3, 1995.  SR 1348.

Three days after Mr. Atkins filed a federal job discrimination lawsuit in *Craft v. Domino Sugar Co.*, 2:95-cv-03921 (E.D.La.), Mr. Davis sent a letter to Magistrate Judge Moore, alleging that:

> Mr. Atkins was only interested in the money he could make off of government, not in my best interest. I've been attempting to "fire" Mr. Atkins for past seven months but was told I had no power to do so. Mr. Atkins is very much ineffective and I feel you should know the truth about what type of attorney he is.

SR 1315.  Pat Fanning was temporarily appointed to represent Mr. Davis for the purpose of the issue with Mr. Atkins.  Mr. Fanning filed a motion for removal of Mr. Atkins, and attached an affidavit by Mr. Davis which stated that Mr. Atkins had failed to communicate with him and refused to file pre-trial motions.  SR 1340-49.

At the hearing to determine counsel on December 13, 1995, this Court acknowledged that the "relationship of trust and confidence by Mr. Davis towards Mr. Atkins has disintegrated to the point of being, I think, irrevocable."  12/13/95 Tr. 24.  Thus, during the critical pre-trial period of December 1994 to December 1995, Mr. Davis' lead counsel failed to communicate and

128

maintain a relationship with him. Instead, counsel concentrated on civil lawsuits that "would []
pa[y] [him]". *See* 3/24/95 Tr. 32.

Dwight Doskey was appointed to represent Mr. Davis after Mr. Atkins was removed
from the case, and assumed the position of lead counsel. *See* SR 1350-52. Less than four
months later, in April of 1996 the trial began, at which point, according to billing records,
counsel – not surprisingly given the short length of time between appointment and trial – had
spent little time investigating and preparing a defense against the death penalty.[32]

This claim is governed by the standard as set forth in *Strickland v. Washington*, 466 U.S.
668 (1984), and its progeny. The acts and omissions of counsel herein fell below prevailing
professional norms of capital defense practice. Absent these acts and omissions, whether
considered individually or collectively, there is a reasonable probability that Mr. Davis would
not have been convicted of the charged offenses or that he would have received a sentence less
than death.

*Strickland* directs a two-pronged approach to the assessment of ineffective assistance of
counsel claims. First, it requires a showing that counsel's performance fell below an objective
standard of reasonably effective representation. 466 U.S. at 687-88. Second, it must be shown
that prejudice resulted from the ineffectiveness. To prove prejudice, the defendant must show
that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of
the proceeding would have been different." A reasonable probability is one that is "sufficient to
undermine confidence in the outcome." *Id*. at 683. The reasonable probability standard under

---

[32] Billing records reflect that counsel spent almost no time investigating or preparing a mitigation case.
On April 21, 1996—well after trial had begun—billing records show that Doskey spent a few hours
"considering again whether or not to present case for mitigation, and how to do it." SR 2154.

*Strickland* is "*not* a sufficiency of evidence test." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (emphasis added); *Gonzales v. Quarterman*, 458 F.3d 384, 390 (5th Cir. 2006). Moreover, the standard is less than a preponderance of the evidence: "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the trial." *Strickland*, 466 U.S. at 693; *see also Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (O'Connor, J., concurring); *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

Counsel's performance may fall below an objective standard of reasonableness through his failure to litigate issues, as well as his failure to investigate. The duty that capital defense counsel has to conduct a thorough pre-trial investigation is well established. The "independent duty to investigate and prepare" is "[a]t the heart of effective representation," *Goodwin v. Balkcom*, 684 F.2d 794, 805 (11th Cir. 1982), and the adversarial system itself:

> Investigation is an essential component of the adversary process. "Because [the adversarial] testing process generally will not function properly unless counsel has done some investigation into prosecution's case and into various strategies . . . counsel has a duty to make reasonable investigations . . .'"

*Wade v. Armontrout*, 798 F.2d 304, 307 (8th Cir. 1986) (quoting *Kimmelman v. Morrison*, 477 U.S. 365 (1986) (quoting *Strickland*, 466 U.S. at 691).

The ABA Guidelines state that counsel has an obligation to conduct thorough and independent investigations into the issues of both guilt and penalty, and such investigation must "begin immediately upon counsel's entry into the case". THE AMERICAN BAR ASSOCIATION, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, Guideline 11.4.1 (1989) (hereinafter "ABA Guidelines (1989)"); ABA Guidelines (2003), at Guideline 10.7. This investigation must be thorough, "regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be

collected or presented." *Id*. Counsel should also investigate possible affirmative defenses to liability, such as insanity, and partial defenses that could bar a death sentence, such as the lack of guilt of the lesser-included offenses. *Id*. at 926.

### A. Counsel's Pretrial Performance was Constitutionally Inadequate and Prejudiced Mr. Davis

#### 1. Mr. Davis Received Ineffective Assistance of Counsel During the Critical Period Prior to Death Penalty Authorization

On April 4, 1995, less than four months after Mr. Davis was indicted for a death penalty eligible crime, and less than a week after Mr. Masinter was appointed as co-counsel for Mr. Davis along with Mr. Atkins, the two attorneys traveled to Washington, D.C. to make a presentation to the Department of Justice on the issue of whether the Attorney General should authorize the local U.S. Attorney's Office to seek the death penalty in Mr. Davis' case. Under the circumstances, it was impossible for counsel to be prepared adequately and to represent effectively Mr. Davis at this critical juncture in his case.

Department of Justice policy requires all government requests to seek the death penalty to be approved in writing by the Attorney General. UNITED STATES ATTORNEYS' MANUEL (USAM), at § 9-10.040. All death penalty eligible cases must undergo a review process at which defense counsel is given an opportunity to make a case against the death penalty at both the local and national level. USAM, at § 9-10.080. Defense counsel is provided an opportunity to submit to the local United States Attorney's Office reasons why the death penalty should not be sought. *Id.* After receiving this information, the U.S. Attorney's Office completes a file including the government's position, facts and background of the case and the defendant, and the defense submission. *Id.* These documents are forwarded to the main office of the Department of Justice. USAM, at § 9-10.120. The Review Committee examines the submissions and then holds a meeting with the local U.S. Attorney and defense counsel to hear arguments regarding whether

131

the death penalty should be sought. *Id.* After the presentations, the Committee meets to determine what to recommend to the Attorney General. *Id.* Finally, the Committee and the U.S. Attorney meet with the Attorney General to discuss the case and the Committee's recommendation. The Attorney General then signs a letter directing the U.S. Attorney whether to seek the death penalty. *Id.*

The Committee "must determine whether the statutory aggravating factors applicable to the offense and any nonstatutory aggravating factors sufficiently outweigh the mitigating factors applicable to the offense to justify a sentence of death, or, in the absence of any mitigating factor, justify a sentence of death." USAM, at § 9-10.130. The decision is not a foregone conclusion; indeed, the Attorney General did *not* authorize the death penalty in almost three-fourths of death eligible cases between 1995 and 2000. U.S. Dept. of Justice, *The Federal Death Penalty System: A Statistical Survey (1988-2000)* (2000), at 7.

It is imperative for defense counsel to competently and zealously prepare for, and participate in, the authorization process:

> One of defense counsel's most important functions is to present information first to the local United States Attorney and then to the Justice Department that would justify a lesser sentence. *Effective advocacy requires counsel to explore all of the issues that are likely to enter into the Attorney General's decision* whether to authorize a federal death penalty prosecution, including the nature and *strength of the federal interest*, the evidence of guilt, and the aggravating and mitigating factors. Although the written and oral presentations made to the Death Penalty Review Committee are not as detailed or comprehensive as a penalty phase presentation to a jury, *counsel must conduct a wide-ranging preliminary investigation of facts relevant to sentencing before the Justice Department makes the decision whether to file a notice seeking the death penalty, if it is to have an effect on the authorization process*.

Subcomm. on Fed. Death Penalty Cases, Comm. on Defender Servs., Judicial Conference of the United States, *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation* (hereinafter "Spencer Report") (1998) (emphasis added); *see*

*also* 1 ABA STANDARDS FOR CRIMINAL JUSTICE 44.1, commentary p. 4-55 (2d ed. 1982) ("The lawyer also has a substantial and important role to perform in raising mitigating factors both *to the prosecutor initially* and to the court at sentencing") (emphasis added).

Prior to making a presentation to the local U.S. Attorney and the Department of Justice regarding why the death penalty should not be authorized in this case, Mr. Atkins performed various duties and preparation, including reviewing files and meeting with Mr. Davis. He billed 44 total hours for the month of December of 1994, and 30.5 total hours for the month of January of 1995. SR 412-14.

Barely two months after enrolling in the case, Mr. Atkins had a one-hour meeting with Eddie Jordan (who was the U.S. Attorney for the district at the time) on January 30, 1995, regarding the issue of authorization of the death penalty. SR 414. For the next two months, the bulk of Mr. Atkins' time was spent listening to the government's wiretap tapes. He spent 37 hours working on this case in February 1995 and 107 hours in March 1995, the vast majority of which time was spent listening to tapes. *See* SR 414-17. Mr. Masinter was appointed on March 29, 1995, and his billing records indicate that he initally spent a few hours talking on the phone and meeting with the other defense counsel, and several hours reviewing the court record, tapes and documents. SR 597-98.

Less than a week after Mr. Masinter was appointed to represent Mr. Davis, Mr. Masinter and Mr. Atkins appeared for their presentation to the Death Penalty Review Committee. SR 609-10. It is apparent from the submitted billing hours that counsel did not prepare or submit any written documentation to the Review Committee or the U.S. Attorney prior to their arrival in Washington. Additionally, billing records show that the totality of preparation by counsel for the death authorization presentation was as follows: Mr. Atkins spent 6 hours performing legal

133

research regarding approval of imposition of the death penalty, 30 minutes reviewing materials on the death penalty, and 8 hours "study[ing] and prepar[ing] for the presentation to the Death Penalty Review Committee"; Mr. Masinter spent 2.3 hours reading and reviewing some material on the federal death penalty and  8 hours of "preparation & presentation to Attorney General against death penalty."

Given the *amount* of time counsel spent on this case in the less than four month period prior to their presentation to DOJ, and *how* that time was spent as reflected in counsels' billing records, it was impossible for counsel adequately to investigate and to prepare to represent Mr. Davis in his defense against death in the authorization process consistent with the prevailing standards for representation at this critical stage of a death eligible case as reflected in the Spencer Report.  There is no indication in the billing records that counsel explored all of the issues that were likely to enter into the U.S. Attorney's, and ultimately, the Attorney General's decision whether to authorize a federal death penalty prosecution, including the nature and strength of the federal interest, the evidence of guilt, and the aggravating and mitigating factors. Nor is there any evidence that counsel conducted a wide-ranging preliminary investigation of facts relevant to sentencing.  Additionally, there is no evidence that counsel attempted to delay the presentation in order to conduct the necessary investigation and preparation.  As a result, counsel was not in a position to provide the Attorney General with input and advocacy from Mr. Davis's perspective regarding critical factors in the determination of whether to authorize the death penalty.  For example, counsel should have investigated, prepared and presented, at both the local and national levels, the issues of the U.S. Attorney Office's conflict of interest, the Government's impermissible considerations of race, and the lack of a federal interest due to the

134

weakness of the under color of law essential element, all of which are discussed in more detail herein.

The federal death penalty authorization process "is undoubtedly a pivotal and enormously important moment in any criminal prosecution. The hearing can literally lead to a determination of life or death." *United States v. Pena-Gonzalez*, 62 F.Supp.2d 358, 364 (D.Puerto Rico 1999). Mr. Davis, who was entitled to the assistance of learned counsel as a death-penalty-eligible defendant, was denied the effective assistance of counsel during the death penalty authorization process in this case. But for counsel's deficiencies in connection with the death penalty authorization process, there is a reasonable probability that the Attorney General would not have authorized death in this case.

**2. Counsel Unreasonably Failed to Challenge the Federal Jurisdictional Requirement of "Color of Law" Prior to Trial, Which Irreparably Prejudiced the Defense**

The federal government's power to prosecute under 18 U.S.C. §§ 241 and 242 hinges upon whether the alleged actions were taken under "color of law." Private conduct alleged to violate an individual's rights, however grievous, does not fall under the Fourteenth Amendment and is left to the states to regulate. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). *See generally The Civil Rights Cases*, 109 U.S. 3 (1883). Absent sufficient state action, the federal government lacks authority to prosecute, and the prosecution must be dismissed. Mr. Davis' counsel failed to challenge this critical element before trial, either by asserting it as part of the death penalty authorization process or by pretrial litigation. Instead, counsel waited until the government had rested its case, at which time counsel asserted that there was insufficient evidence to prove color of state law, thus subjecting the government's case on this essential element to a far lower standard and irreparably prejudicing the defense.

135

One of the first pleadings Curklin Atkins filed after enrolling as counsel for Mr. Davis was a "Notice of defense based on public authority." SR 219-21. Mr. Atkins had been enrolled for about two weeks and had not performed any fact investigation whatsoever at the point he filed this pleading, which stated that "Defendant may claim a possible defense of actual or believed exercise of public authority on behalf of a law enforcement agency, the New Orleans Police Department." *See* SR 410, 419. Significantly, the Government responded with a denial that Mr. Davis was acting on the NOPD's behalf, while at the same time maintaining that he was acting under color of law. SR 270-71.

And that was the last time Mr. Davis' attorneys acknowledged any issue involving color of law until over a year later, when Mr. Doskey billed two hours for meeting with Mr. Masinter regarding a number of topics, among them, color of law. SR 2178. Nothing was done, however, until after the Government had rested its case at trial. At that point, counsel moved pursuant to Fed.R.Crim.P. Rule 29 for a judgment of acquittal, raising the issue of color of law as a sufficiency of the evidence matter. SR 2195. Ruling on the motion, this Court stated: "*I'm bothered by the color of law issue* but I will deny the motion." 4/19/96 Tr. 7 (emphasis added). Nothing more was argued to the courts regarding the essential element of color of law until the appeal.

Had counsel done a minimal amount of factual investigation and legal research, counsel would have found that under "color of law" is a jurisdictional factor, without which the Government has no power to prosecute in federal court. Had counsel raised the issue in a timely and appropriate manner, there is a reasonable probability that this case would have been dismissed on jurisdictional grounds or not prosecuted as a federal death penalty case. But due to counsel's failure to undertake those minimum steps, counsel prematurely committed to a "public

136

authority" defense (which was later abandoned) and never adequately explored the issue.  This failure contributed substantially to the prosecution continuing in federal court, which ultimately lead to a death sentence.

"Under 'color' of law means under 'pretense' of law. Thus, acts of officers in the ambit of their personal pursuits are plainly excluded."  *Screws v. United States*, 325 U.S. 91, 111 (1945)  (law enforcement officials, who beat a young man to death in the course of an arrest, *were acting pursuant to their duty under state law to make an arrest* and, upon the execution of the official duty, the breach of public trust or authority occurred).  In order to act under color of law, the actor must have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  *United States v. Classic*, 313 U.S. 299, 326 (1941) (election officials, who were charged with altering and falsely counting ballots in a primary election, were acting under color of law not only because they abused their positions by exceeding the scope of authority granted them, but they engaged in conduct *which would not have been possible but for* the state's grant of access and authority over the election ballots); *see also United States v. Price*, 383 U.S. 787 (1966) (law enforcement officials, in their official capacities, arrested, detained and then arranged a calculated release of their intended victims for the purpose of killing them, *an incident that would not have been possible but for* the defendants' controlled release of their intended victims from official police custody).

The principles set forth in the Supreme Court's *Classic/Screws/Price* trilogy of opinions have been followed in several instructive cases in this and other circuits.  For example, in *Martinez v. Colon*, 54 F.3d 980, 982-83 (1st Cir. 1995), an *on-duty* police officer was using his *service revolver* to harass another officer and ended up shooting the other officer *inside of the police station*.  The First Circuit ruled that summary judgment should be granted in favor of the

137

officer, holding that "a policeman's private conduct, outside the line of duty and unaided by any indicia of actual or ostensible state authority, is not conduct occurring under color of state law." *Id.* at 986-87. In *Gibson v. City of Chicago*, 910 F.2d 1510 (7th Cir. 1990), a police officer was placed *on medical leave* and prohibited from carrying out any police duties due to mental illness. The officer kept his *service revolver* and ammunition, however. *Id.* at 1512. Some time later, the officer encountered a citizen on the street, *identified himself as a police officer*, informed the citizen he was under arrest, and then shot and killed him with the service revolver. *Id.* at 1513. Although the victim surely perceived that a police officer was attempting to arrest him, and although the victim was shot with the officer's service revolver, the Seventh Circuit held that the fact that the officer was on medical leave at the time stripped him of all power and authority under state law. *Id.* at 1518-19. In *Delcambre v. Delcambre*, 635 F.2d 407, 408 (5th Cir. 1981) (per curiam), the Fifth Circuit held that restraint and assault of a citizen by a police chief, who was *on-duty* and *at the police station*, did not come under color of state law where they were motivated by "family and political matters" and where the victim was not arrested or threatened with arrest. *See also United States v. Tarpley*, 945 F.2d 806, 809 (5th Cir. 1991) (holding that police officer had acted under color of law where officer identified himself to victim as police officer and said he could kill him *because he was a cop*).

In this case, pursuant to the Government's own theory, Mr. Davis was acting as a rogue cop and *not on the NOPD's behalf*, when he allegedly arranged to have a civilian, Paul Hardy, kill Ms. Groves. Moreover, the Government made no allegation that Mr. Davis used his power as a police officer to compel Mr. Hardy to commit the murder of Ms. Groves, such as threatening him with arrest or other official action. Moreover, the only so-called "protection" Mr. Davis could offer Mr. Hardy, who apparently regularly committed crimes undetected without any help

138

from Mr. Davis, was that he, as a co-conspirator, would not turn him in.    Further, the Government's own wiretaps reflect that Mr. Davis was not acting in his capacity as a NOPD policeman.  *See, e.g.,* G.E. 29 (2005 trial) (wiretap of Mr. Davis stating ". . . they already took me off. I'm just there in uniform, 'cause I'm sure not the police no more.").   Also, while Mr. Davis had access to a police car, a police radio and the police station during the relevant time frame, none of these police-issued tools were essential, or even necessary, to his success in allegedly ordering the killing of Ms. Groves by Paul Hardy.    Finally, while it was the Government's theory that the alleged motive to arrange the killing of Ms. Groves arose out of a false complaint she made to IAD regarding Mr. Davis' conduct as a police officer.   However, the Supreme Court has made clear that the question is not *why* the conduct occurred, but *how*.

Here, in connection with his alleged arrangement for Mr. Hardy to kill Ms. Groves, Mr. Davis was not acting pursuant to his duties as a police officer under state law, was not acting upon the execution of those duties, was not exercising power possessed by virtue of state law and made possible only because he was clothed with the authority of state law, and was not engaged in conduct which would not have been possible but for the state's grant of authority to him. Moreover, the victim was never aware that Mr. Davis intended for her to suffer harm, and he never used his official authority to threaten her or abuse her.   The relevant action here—the killing of Kim Groves—was not made possible by virtue of Mr. Davis' official status.

All of the above facts and law were known to or ascertainable by defense counsel prior to trial.   Counsel could have, and should have, raised the issue pretrial by way of a motion to dismiss the indictment pursuant to Fed.R.Crim.P. Rule 12.   The Fifth Circuit recognizes the propriety of considering such a motion to dismiss the indictment in order to resolve pretrial a question of law based on a defense involving undisputed facts capable of determination without

139

the trial of the general issue. *United States v. Flores*, 404 F.3d 320, 324-325 (5th Cir. 2005) (citing *United States v. Korn*, 557 F.2d 1089, 1090 (5th Cir. 1977)); *see also Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir 1975) (noting that the district court should have decided the "color of law" issue as a matter of law, prior to trial). Moreover, the Fifth Circuit reviews a challenge to an indictment based on the legal sufficient of uncontested facts as an issue of law reviewed *de novo*. 404 F.3d at 326. Additionally, counsel could have, and should have, raised the issue in the context of a request for a specific jury instruction on the defense to the color of law essential element consistent with the trilogy of opinions in *Classic/Screws/Price* since a defendant is entitled to an instruction on a recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor. *See United States v. Mata*, 491 F.3d 237, 241(5th Cir. 2007).

Rather than present the under color of law issue pretrial, Mr. Davis' lawyers first essentially conceded that he had acted under color of law, then abandoned that theory but nevertheless failed to pursue a challenge to the color of law essential element either during the death penalty authorization process or pretrial. Instead, counsel waited until the Government had rested its case to argue that, as a matter of fact, the evidence was insufficient to support the color of law element. This put Mr. Davis at a serious handicap, as sufficiency of evidence claims must surmount a steep barrier, as evidenced by the Fifth Circuit majority opinion in the first appeal. *See United States v. Causey*, 185 F.3d 407, 414 (5th Cir. 1999) ("The verdicts must be sustained unless a reasonable trier of fact could not have found the "color of law" elements beyond a reasonable doubt").

Counsel's failures to investigate, present to the U.S. Attorney and Attorney General and litigate pretrial the critical and dispositive color of law issue constitutes ineffective assistance of counsel that prejudiced Mr. Davis. And, as revealed by this Court's remark that the issue was

140

troubling, and by Judge DeMoss' strong dissent in Mr. Davis' first appeal, the evidence supporting the color of law essential element was far from overwhelming in this case. *See United States v. Causey*, 185 F.3d 407 (5th Cir. 1999) (DeMoss, J., dissenting). As a result, there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

### B. Counsel's Trial Performance was Constitutionally Inadequate and Prejudiced Mr. Davis

#### 1. Counsel Failed to Challenge Inadmissible and Highly Prejudicial "Interpretation" Testimony

**I can get "P" to come do that 'ho now and then we handle the 30**.

This statement, taken from the government wiretaps, only meant "murder" because Sammie Williams said so:

> **Q. What does that mean, "we handle the 30"?**
>
> **A. Well, when he said it, he meant that he could get Paul Hardy to come kill her and we will handle the police report.**

4/17/96 (corrected Sammie Williams testimony) Tr. 39-40. Without Mr. Williams' testimony in this regard, the jury would not have been provided "expert testimony" as to what this statement meant, and would have been left to its own lay interpretations as to the meaning of this and other statements in the wiretaps. Counsel's failure to object to Mr. Williams' testimony interpreting wiretapped statements under Fed. R. Evid. 701 and 801 irreparably prejudiced the defense.

Pre-trial, counsel did nothing to limit the Government from introducing interpretations of statements contained in the wiretaps. Counsel filed a motion for a *James* hearing to determine the admissibility of co-conspirator statements, which this Court denied on grounds that the Government "has since indicated that it will not attempt to introduce such statements at trial." SR 1472. Contrary to the Government's representations, the Government did introduce such

statements.    On April 22, 1996—after the close of the evidence—this Court found that a conspiracy had been established and so the Government was retroactively allowed to introduce "the various out of court statements made in the course and scope of the conspiracy" against the defendants.    SR 1927.    Later, however, the Government vehemently disputed the fact that Sammie Williams had been held out to be a co-conspirator.    SR 2605-09 (asserting that Mr. Williams' interpretations were admissible under Fed. R. Evid. 701, not 801(d)(2)(E)).

It is now clear that the Government tread a thin line between arguing that Mr. Williams was a co-conspirator and presenting him as a kind of expert witness, without qualifying him as such.    When counsel for Mr. Hardy objected to Mr. Williams testifying as to what certain statements "meant," the Government cited *United States v. Flores*, a decision based on the fact that it was co-conspirators testifying about co-conspirator statements.    4/17/96 (corrected Sammie Williams testimony) Tr. 71; *Flores*, 63 F.3d 1342, 1359-60 (5th Cir. 1995) (reasoning that "the conspirators gained first hand knowledge of these conversations, which were admissible as co-conspirator statements in furtherance of the conspiracy").    This Court specifically found that Mr. Williams' interpretations would be admissible because "there is case law, I think, that says if you are alleged to be a conspirator, you can comment. Even if you are not there, you can comment on what the meaning is of other people's comments in the conspiracy."    4/17/96 Tr. 279.    Yet, after Mr. Williams was sentenced to a mere five years in prison pursuant to a 5K letter, the Government denied ever having considered Mr. Williams to be a co-conspirator.    SR 2607.

Counsel for Mr. Davis did not see beyond the Government's facade.    Indeed, Mr. Doskey asked at one point during trial, "I'm confused and maybe I'm way off base legally, and certainly I'm open to that possibility. Is the government alleging that he was a conspirator or not?"

142

4/17/96 Tr. 278.   The Government did not answer Mr. Doskey's question.   Instead, AUSA Michael McMahon vaguely stated that "Sammie Williams was in the middle of this thing." 4/17/96 Tr. 280.   Counsel for Mr. Hardy then offered, "He's an unnamed co-conspirator."   *Id.* No one from the Government spoke up to correct this characterization.  *See id.*  A few days later, during the defense case, Mr. Doskey noted on the record that "At some point or another we will ask the government to repeat on the record, that is for a stipulation, that Sammie Williams is an unindicted co-conspirator in the murder."  4/19/96 Tr. 137.  This Court replied, "See if you can get that worked out."  *Id.*  The Government remained silent.  *Id.*

Just after this exchange, the Government called Sammie Williams to the stand and was allowed to elicit testimony interpreting various statements made on the government wiretaps, and recounting other unrecorded conversations, some of which Mr. Williams was not a party to.  *See*, *e.g.*, 4/17/96 (corrected Sammie Williams testimony) Tr. 20 (interpreting "P.H. is the P."), 33 (interpreting "10-61" and "966"), 34 (interpreting "Code 4"), 51 (interpreting "We gonna pass over there right now" and "spot this fuck").  Not only did Mr. Williams define for the jury that "handle the 30" means "murder," the Government also asked Mr. Williams to tell the jury what he was "thinking about" as Mr. Davis used those terms:

> Q. Mr. Williams, what are you thinking about at this point? You are right there.
>
> A. Well, I'm thinking that he is expressing the entire feeling he had that day, since we started the shift, that he was real angry, and once he saw her -- once he saw Kim Groves and how she was acting, he just like blew up. So I knew he would be angry about it for a while and I knew he was serious when he was trying to call Paul and have Paul come kill her.

4/17/96 Tr. 40; *see also* 4/17/96 Tr. 59 ("Q. . . . What are you thinking about when you get off your shift? A. Well, at this time I'm about to get off and all day long Len has been planning -- calling Paul and asking him to come over there, handle and kill Kim for him").  Mr. Williams told the jury that he overheard one side of a conversation in which Mr. Davis used veiled

143

language to tell Mr. Hardy that he wanted him to kill Kim Groves:

> . . . he later started telling Paul in not so many words -- because he didn't quite say entire sentences like "I want you to kill her" or anything like that, but he was telling him "I want you to," "You know what I was talking about," "When it gets dark I want you to do" and apparently judging from the conversation Paul knew what he was talking about. I gathered that Paul was already -- well, Len had already talked to Paul about the twins, because judging from the conversation Paul was already aware of the situation that occurred the day before or a couple of days before with the twins, us getting into the chase and everything.

4/17/96 Tr. 42. Williams also interpreted telephone calls made shortly after Kim Groves was

shot to mean "murder":

> Q. What is "Signal 30"?
>
> A. That's a police code for murder.
>
> Q. What is NAT?
>
> A. That's a police code for necessary action taken.

4/17/96 Tr. 60.

> When I asked him, "How do you know it's a 10-7 thing," what I'm asking is how do you know she's dead; because he just told me she was murdered and he said he talked to people, meaning Paul Hardy.

4/17/96 Tr. 64.

> Q. What does it mean when he says, "Yeah, yeah, yeah, rock, rock-a-bye"? What does that mean?
>
> A. Well, he's expressing glee in the fact that Kim Groves was killed

4/17/96 Tr. 67.

> Q. Mr. Williams, the latter half of that conversation, Len Davis and Paul Hardy, they seem to be speaking in the third person talking about the event as if observed by somebody else. What was that all about?
>
> A. Well, like now, this is after the fact, not like before. They were a little more open with their conversation; however, they never did say exactly what it was. Here, now that she's dead, Len is being kind of coy with Paul in the fact that he is acting as if he has just heard about it. However, at the same time he is giving Paul information without actually saying certain things, like when he says -- he keeps repeating the fact that the individuals were in a burgundy Maxima. He keeps

144

telling this to Paul. They were in a blue Maxima. So he is really telling him the information.

4/17/96 Tr. 68. These and other interpretations had the unavoidable effect of *telling* the jury that Len Davis ordered Paul Hardy to kill Kim Groves, instead of allowing the jury to come to its own interpretations of the coded language.[33130] Counsel sat idly by as the jury was told by a Government witness, testifying to curry favor and cut his sentence to next to nothing, that what Mr. Davis said meant murder.

Mr. Williams' interpretation testimony should have been excluded at the guilt phase of the first trial. First, the Government was allowed to elicit this testimony only because this Court and defense counsel were under the impression that Williams was an unindicted co-conspirator. 4/17/96 Tr. 279-80; 4/22/96 Tr. 48-49. This impression turned out to be false, and consequently the evidentiary basis evaporated. Second, Mr. Williams' interpretations would not have even been admissible as general lay witness testimony under Article 701. A lay witness may only give interpretation testimony if it is within the realm of any lay person; additionally, it must be based upon personal knowledge. Fed. R. Evid. 602, 701; *United States v. Caldwell*, 586 F.3d 338, 348 (5th Cir. 2009) (acknowledging that the issue of lay witness interpretation testimony "turn[s] on whether the testimony falls within the realm of knowledge of the average lay

---

[33] *See also* 4/17/96 Tr. 58 "Q. Mr. Williams, Paul Hardy asked, 'What's up with home boys? They out there?' Davis responds, 'No. Fuck them if they ain't out there. Get that whore. Who's 'home boys'? A. He's referring to the twins, Nathaniel and Nathan Norwood."), 64 ("Q. Davis responds, 'I talked to the people.' Who's the people? A. Paul Hardy and – he's talking to Paul Hardy. When I asked him, 'How do you know it's a 10-7 thing,' what I'm asking is how do you know she's dead; because he just told me she was murdered and he said he talked to people, meaning Paul Hardy."), 67 ("Q. What does it mean when he says, 'Yeah, yeah, yeah, rock, rock-a-bye'? What does that mean? A. Well, he's expressing glee in the fact that Kim Groves was killed, and he is using an excerpt from a movie."), 77 ("Q. When Davis says, . . . 'NAT'd that little business for me. I'm a take care of that nigger tomorrow. Go ahead on and take care of the nigger,' to the best of your understanding, what did he mean by that? A. He is saying that Paul Hardy killed Kim Groves for him and that he is going to pay him tomorrow."), 80 ("Q. Mr. Williams, when Davis told you toward the end of that conversation, 'I'm about to take care of P now,' when he said that to you, what did you take that to mean? A. That he was about to pay Paul Hardy for killing Kim Groves with some of the money that we had received on the 14th.").

person"). In *United States v. Diaz*, 420 Fed. Appx. 456 (5th Cir. 2011), the Fifth Circuit recently addressed the issue of whether a co-conspirator should have been allowed to give testimony interpreting drug ledgers. The court found that, *as a co-conspirator*, the witness had the requisite personal knowledge to testify as to the codes and nicknames appearing in the drug ledger. *Id.* at 464. On the other hand, the court found that the interpretation testimony (largely consisting of simple mathematical calculations) was admissible because it was "familiar in everyday life" and "within the realm of knowledge of the ordinary lay person." *Id.* In this case, Williams was *not* a co-conspirator, and his testimony interpreting codes and what he claimed to be veiled references did *not* fall within the realm of any ordinary lay person. As to non-co-conspirator lay witnesses, the circuits are in agreement that it is error to admit testimony interpreting terms used by defendants. *See*, *e.g.*, *United States v. Smith*, 640 F.3d 358, 365-66 (D.C. Cir. 2011); *United States v. Johnson*, 617 F.3d 286 (4th Cir. 2010); *United States v. White*, 492 F.3d 380, 403-04 (6th Cir. 2007); *United States v. Garcia*, 413 F.3d 201, 215-16 (2d Cir. 2005); *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005).

Testimony interpreting police jargon, especially used in a slang capacity, clearly falls outside of the realm of knowledge of the ordinary lay person. Rule 701 "forbids the admission of expert testimony dressed in lay witness clothing."[34] *United States v. Perkins*, 470 F.3d 150, 156 (4th Cir. 2006). "[K]nowledge derived from previous professional experience falls squarely 'within the scope of Rule 702' and thus by definition outside of Rule 701." *Smith*, 640 F.3d at 365. Because Mr. Williams derived his purported knowledge of the terms used in the wiretapped

---

[34] The Advisory Committee Notes to Rule 701 state that the purpose of subsection (c) was "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing," as appears to have occurred in this case.

conversations from his experience as an NOPD officer, it was error to admit his testimony without first qualifying him as an expert under Rule 702. Further, several of his assessments were based upon listening to tape recordings of conversations to which he was not a party. These assessments formed narrative glosses telling the jury exactly what the Government sought to prove against Mr. Davis. For example, he told the jury that the conversation between Mr. Hardy and Mr. Davis discussing the facts surrounding the shooting of Kim Groves was meant to "be coy" and convey information without inculpating themselves. 4/17/96 Tr. 68. This was similarly inadmissible. In *United States v. Peoples*, 250 F.3d 630 (8th Cir. 2001), the Eighth Circuit found that the officer in question was erroneously permitted to give her opinion regarding the meaning of plain English words and phrases when she gave "a narrative gloss that consisted almost entirely of her personal opinions of what the conversations meant." *Id.* at 640; *see also United States v. Blakely*, 375 Fed. Appx. 565, 570 (6th Cir. 2010) (stating that FBI agent's testimony interpreting "vague and cryptic" conversations to which he was not a party was "likely improper").

It cannot be gainsaid that Sammie Williams' "interpretation" testimony, which was highly relevant both to guilt and to the color of law element, was devastating to the defense. What was unclear or ambiguous was rendered definite by Mr. Williams' testimony; without his interpretations, the jury would have been left to its own judgment as to the meaning of the wiretapped conversations. Mr. Williams' testimony enabled the Government to directly tell the jury what it was unable to prove beyond a reasonable doubt through evidence. And indeed, there is a reasonable probability that the Government would not have been able to prove that the taped conversations meant murder without Mr. Williams' inadmissible testimony, given that the FBI considered the taped conversations "as routine," as discussed herein. Counsel's failure to object

147

to the massive amount of inadmissible testimony given by Sammie Williams —and later failure to raise it on appeal—prejudiced the defense case at the guilt phase.

## 2. Counsel Failed to Challenge the Essential Element of "Color of Law"

Counsel did not investigate, develop, or present a consistent theory of defense at trial to the Government's case in support of the essential element of under "color of law" for purposes of counts 1 and 2 for conspiracy to deprive and deprivation of Kim Groves' civil rights in violation of 18 U.S.C. §§ 241 and 242.

As set forth more fully above, the essential element of under color of law means under pretense of law and requires that the actor, upon execution of an official duty, exercise a power possessed by virtue of state law and, while exceeding the scope of authority granted, engage in conduct which would not have been possible but for that authority. *United States v. Classic*, 313 U.S. 299, 326 (1941); *Screws v. United States*, 325 U.S. 91, 111 (1945); *United States v. Price*, 383 U.S. 787 (1966). In this regard, the Court instructed the jury as follows:

> The term "color of law" as used in these instructions means a power possessed by an officer by virtue of law, which invests him with authority to act. It means that the defendant acted in his official capacity or else claimed to do so, but abused or misused his power by going beyond the bounds of his lawful authority. A private person acts "under color of law" if that person participates in joint activity with someone that person knows to be a public official.

SR 1910-13.

The government witness who was critical to establishing the "color of law" essential element was cooperating witness Sammie Williams, who testified that when he learned in the early morning hours of October 13, 1994, that Kim Groves had filed a complaint with IAD against Len Davis. 4/17/96 Tr. 324-325. At that time, he told Mr. Davis "if IAD do decide to investigate, it would be unfounded on his part because he didn't hit the twin," and Mr. Williams did, "so there was nothing for him to worry about." 4/17/96 Tr. 324-325. According to Mr.

148

Williams, when he started his shift during the day on October 13, 1994, at 2:25 p.m., Mr. Davis started talking about how angry he was at Ms. Groves for having reported him to IAD and about how he did not like IAD.  4/17/96 Tr. 325-326.  Nevertheless, Mr. Williams explained, "you know, during the course of the day he would usually mellow out."  *Id.*

Then, at around 5:00 or so on October 13, 1994, a fortuitous event occurred according to Mr. Williams: he and Mr. Davis were in the police vehicle leaving the Lower Ninth Ward when, while stopped at a red light, they noticed Kim Groves in the back seat of a vehicle that had "pulled up right on the side" of them, with the twins and their mother in the car.  4/17/96 Tr. 326-327.  As they noticed each other, according to Mr. Williams, "Kim started pointing from the back of her car into our car saying – we would read her lips saying, 'That's them.  That's them.'" 4/17/96 Tr. 427.  Mr. Davis pointed back at her saying "I see you, too," and she then said some things they could not understand because the window was up before the two vehicles turned in different directions.  4/17/96 Tr. 427.  According to Mr. Williams, it was at this point that Mr. Davis "was real angry" and said "I could get Paul to do that whore and we could handle the 30," meaning, according to Williams,  "he could get Paul Hardy to come kill her and we will handle the police report, meaning that we will write the report whereby any evidence or any involvement with Paul Hardy would be eliminated."  4/17/96 Tr. 327-328.  Mr. Davis then used his cellular phone to page Paul Hardy on his beeper.  4/17/96 Tr. 328.

Mr. Williams also testified that Hardy, Damon Causey and two other guys arrived at the Fifth District Station a little after 7:00 p.m. because Mr. Davis was going to show them some gruesome pictures from an unrelated murder.  4/17/96 Tr. 336.  At that point, "Len then took them inside to one of the sergeants' offices and started showing them different pictures of different murder scenes, and they looked at them for a while and then came back out and stood

149

outside talking to them and had gave Paul his phone" and left.  4/17/96 Tr. 336.

Later, according to Williams, he and Mr. Davis drove in their police car, but did not see Ms. Groves.  4/17/96 Tr. 339.  They then drove to the Florida project to Morgan Ricks' house, where they found Paul Hardy.  4/17/96 Tr. 340.  Mr. Hardy, who had a 9mm gun on him, got into the police vehicle in the back seat.  4/17/96 Tr. 340.  They proceeded across the canal to the Lower Ninth Ward to locate Kim Groves and "let Paul know what she looks like so Paul could be familiar with the area that she frequents; *because we didn't know exactly where she lived or anything like that*, but we knew where we saw her at a lot" and "we had saw her on a couple of occasions in this same area" and "figured she at least hangs around that area."  4/17/96 Tr. 341.  However, they did not find her and drove back across the canal into the Florida project and dropped off Mr. Hardy.  4/17/96 Tr. 342.    According to Mr. Williams, after dropping Hardy off around 8:00, they did not hear from him again up until about 9:45 p.m.  4/17/96 Tr. 344.  They "went on to do normal police activities" and Mr. Davis was "getting kind of hyper, angry with Paul Hardy because he hadn't called him" and Mr. Davis called Mr. Hardy to express his anger, but Mr. Hardy calmed him down.  4/17/96 Tr. 344. Mr. Williams testified that they then went across the canal about 9:50 p.m. and saw Ms. Groves standing in the middle of Alabo Street talking to another individual.  4/17/96 Tr. 345.  At this point, Mr. Davis started beeping Mr. Hardy, saying *he did not want Kim Groves to see them passing in a police vehicle*.  4/17/96 Tr. 346.  When Mr. Hardy called to return the beep, according to Mr. Williams, Mr. Davis gave him "a pretty vivid picture of what she was wearing, a real good description of Kim Groves, and let him know she was standing right there in the middle of the street just talking" and told him to "get that whore."  4/17/96 Tr. 346-247.

By the time Mr. Williams got off his shift at 10:30 p.m., Mr. Hardy had not called and

150

Mr. Williams was thinking "throughout the day it was like Paul was procrastinating with the matter and he hadn't gone over there," so he was thinking "it's not going to actually happen tonight." 4/17/96 Tr. 347. Mr. Williams testified that, at 11:20 p.m., he received a call from Mr. Davis saying "Signal 30, NAT," meaning "necessary action taken." 4/17/96 Tr. 348-349. Mr. Williams testified that he was "shocked" and "astonished" because, "even though I knew this murder was being planned throughout the course of the day – but by the time I got off shift, I didn't think it was going to happen." 4/17/96 Tr. 349. According to Mr. Williams, thereafter, he met Mr. Davis at Flynn's Den, at which time Mr. Davis had his cellular phone in one hand and his police radio in the other and was talking to Gary Washington, a police officer assigned to the Fifth District, who happened to be the first officer on the scene of the murder and who confirmed that Kim Groves was killed. 4/17/96 Tr. 354-355. Officer Gary Washington, who was one of the first police officers on the crimes scene that night, testified that was contacted by Len Davis and spoke to him on a police radio at around 11:21 p.m., at which time he indicated that Kim Groves was the victim of the shooting. 4/17/96 Tr. 446-448.

On cross, counsel for Mr. Davis asked Mr. Williams a few questions about the impact of his cooperation plea agreement in the drug conspiracy case on his possible sentencing, but asked him nothing about whether he had any agreements with either the state or federal government regarding protection or immunity from prosecution for other crimes, including his involvement in the murder of Ms. Groves, as well as his involvement in crimes reflected on the wiretaps. 4/17/96 Tr. 375-377. Counsel also asked a few questions about Moses Green, who had escaped from prison earlier in the month of October 1994, but failed to follow up with any questions concerning the connection between Ms. Groves and Moses Green, who visited Ms. Groves after his escape, at which time she gave him clothing. 4/17/96 Tr. 378. Counsel also got Mr.

151

Williams to admit that, despite the statement by Mr. Davis, "I could get Paul to do that whore and we could handle the 30," they did not "handle" the Kim Groves murder scene, as she was shot after they were off duty, and neither of them went to the scene, nor did they try to alter the evidence or talk to or threaten any witnesses.  1/17/96 Tr. 385-386.  Mr. Williams also admitted on cross by counsel for Mr. Davis that, when they were riding around in the police car with Mr. Hardy "to see if he can locate Kim or the twins and get a picture of their faces or where they hang at," there was no plan for Mr. Hardy to shoot Ms. Groves and then jump in the police car and provide him with an alibi.  1/17/96 Tr. 397.  Beyond this, counsel failed to cross examine Mr. Williams either regarding his motivation to lie or his knowledge of the facts and circumstances supportive of a defense to color of law.

The first time that counsel raised the issue of under "color of law" in the trial was pursuant to a Rule 29 motion raised following the Government's case, which motion was denied by the district court.[35]  In the closing argument, counsel raised the color of law almost as an afterthought, noting that is satisfied only when the police chief beats him up while trying to arrest him, but not if the police chief gets mad at him and asks someone else to beat him up.  Counsel then argued that Mr. Davis did not act under color of law because, while he has the trappings of a police officer, when he is talking about Kim Groves or he is talking to Paul Hardy, you never hear him talk about anybody going to get anything, he's just mad at that woman.  4/22/96 Tr. 96.

Counsel's defense against the essential element of color of law was deficient in many significant respects.  For example, rather than make the "color of law" issue  a centerpiece of the

---

[35] In the opening statement, counsel for Mr. Davis did not address the issue of under color of law specifically, but noted that Mr. Davis was falsely charged with police misconduct by Ms. Groves, drove around in his police car looking for her, and had a police radio when he learned of her death.  4/15/96 Tr. 67-79.

defense against the Government's case for guilt, defense counsel relegated it to an afterthought both in connection with counsel's deficient cross-examination of Government witnesses and in the defense case and in argument to the jury.  As a result, counsel failed to make the case that Mr. Davis never asserted any actual or apparent authority granted him by the state in connection with the killing of Kim Groves, nor was he acting in the course of some official duty, such as by making or threatening an arrest or responding to the crime scene.  Further, counsel failed to argue or present evidence that Mr. Davis had no idea where Kim Groves lived and drove around the Lower Ninth Ward looking for her because that was where he had seen her, just as a private citizen could have done, even though, as a policeman, he could have gotten access to information available within the police department concerning her location.  Counsel also failed to argue or present evidence that driving around the Lower Ninth Ward in a highly visible police vehicle would have aroused suspicions and was more of a disadvantage than an advantage.  Counsel also failed to argue or present evidence that, when the Mr. Davis later came across Ms. Groves at around 10:00 that evening, it was again by happenstance as he drove around the Lower Ninth Ward and saw her in the middle of Alabo Street talking to another individual, not knowing that she had been placed in a "safe house" earlier that evening by IAD, which she had apparently left on her own accord.  Additionally, counsel failed to argue and present evidence that the dispute with Ms. Groves was, in fact, personal and ripened only when she happened to appear in the car next to Mr. Davis in the late afternoon of October 13th and gesture to him in such as manner as to support that all subsequent actions allegedly taken by Mr. Davis that night were motivated more by anger at her actions at that time, rather than the IAD complaint, which surfaced as early as October 11th.

Ultimately, counsel failed to argue or present evidence that Mr. Davis's actions on the

153

evening of October 13, 1994, in connection with the killing of Kim Groves – including the calls to Mr. Hardy on his phone and the driving around the Lower Ninth Ward looking for Ms. Groves – were nothing that a private citizen could not have done, that any motivation he might have had that evening arose as the result of a personal grudge, and that he did nothing in the course of his official duties, that is, he made no arrests, threatened arrests, did not "handle" the crime scene investigation, and the only protection possibly offered to Mr. Hardy would have been his willingness not to report him to police, nothing more than what a civilian co-conspirator could have done.

As the Fifth Circuit opinion reflects, the guilty verdicts on counts 1 and 2 for conspiracy to deprive and deprivation of Kim Groves' civil rights in violation of 18 U.S.C. §§ 241 and 242 were affirmed by a majority of the panel with a vigorous dissent. The majority affirmed on the basis that Mr. Davis misused or abused his official power to access the police station, the police car, and police radio to plan, execute, and cover up the murder. *United States v. Causey*, 185 F.3d 407, 414-416 (5th Cir. 1999). The majority also found a "nexus" between this "abuse of official power" and the crime based on his unique position to 'handle the thirty' and thus offer protection to Mr. Hardy from the consequences of the murder and on the basis that the motive for the crime arose from a complaint lodged by Mr. Groves against Davis in his official capacity and was facilitated by the ability of Mr. Davis to case the area in his police car without arousing suspicion and to offer assurance of police protection to his accomplices. 185 F.3d at 415-16.

In a dissent to the affirmance of Mr. Davis's convictions, Circuit Judge DeMoss argued that, with respect to the "color of law" essential element that provides the federal nexus required to turn a garden-variety state law murder into a federal offense punishable by the death penalty:

> The majority opinion impermissibly and inadvisably waters down this historical and statutory requirement by holding that state action existed in this case because

> an 'air of official authority pervaded the entire incident.' This ethereal and poorly defined test subverts the color of law inquiry, traditionally rooted in some assertion of actual or apparent official authority, and transforms every abuse of official position into conduct attributable to the state.

185 F.3d at 424.

The dissent emphasized that, under governing Supreme Court precedent, conduct is not committed under color of law "unless the conduct includes some assertion of actual or apparent authority granted by the state," and a simple abuse by Mr. Davis of his position as a police officer through his "fortuitous and dispensable use of the equipment [police pager, radio and patrol car] issued to him, rather than abuse in the course of some official duty," is insufficient. 185 F.3d at 424-425. The dissent concluded that, in contrast to the Supreme Court's *Classic/Screws/Price* trilogy of opinions:

> There is *no but for relationship* between Davis' status as a police officer and Groves' murder. Davis' conduct was not committed in the course of any ordinary police duty. Moreover, neither Davis nor any other defendant asserted any actual or apparent authority granted by the state as an initial or final justification for Groves' murder. Applying the principles established in *Classic, Screws* and *Price*, I find the theory that the defendants (a rogue police officer, a drug dealer, and the drug dealer's side kick) were in this case engaged in state action under color of state *to be nothing short of ridiculous.*

185 F.3d at 426 (emphasis added).

Despite the circumstance that under "color of law" was an essential element of the crimes charged in counts 1 and 2 pursuant to Sections 241 and 242, and for which the Government sought the death penalty, counsel for Mr. Davis utterly failed in their defense against this essential element. Under the circumstances, given concerns expressed by this Court about the issue of "color of law" and the divided Fifth Circuit, had defense counsel investigated, prepared and presented a consistent defense against the Government's case in support of the essential element of color of law there is a reasonable probability that the result would have been different, and Mr. Davis would not stand convicted of counts 1 and 2 and sentenced to death.

### 3.    Counsel Failed to Challenge the Government's Forensic Evidence

The two eyewitnesses to the shooting of Kim Groves on the evening of October 13, 1994, believed that the shooter looked like Ms. Groves' brutally abusive boyfriend, Jimmie Jones, and that the shooter got into a champagne-colored Maxima like one associated with Mr. Jones. Neither of these eyewitnesses ever identified Mr. Hardy as the shooter.  Given that this early reported eyewitness evidence contradicted the Government's theory that Mr. Hardy shot Groves at the direction of Davis, it was critical to the Government's case that it tie Hardy, who had an alibi along with Damon Causey, to the crime scene with objective evidence in addition to its "snitch" evidence.

In its effort to place Mr. Hardy at the crime scene, the Government relied extensively on expert forensic testimony, including expert firearms testimony that a cartridge case, or casing, reportedly found at the crime scene was shot from a 9mm Beretta owned by Mr. Hardy and found in the possession of Mr. Causey at the time that it was seized by law enforcement.  The Government's expert forensic testimony critically depended upon the reliability of the investigation at the crime scene as it related to the seizure of the casing.

Despite the critical nature of the Government's forensic evidence, defense counsel failed in critical respects to challenge this evidence, as set forth more fully below,[36] resulting in prejudice to Mr. Davis.

NOPD Officer Gary Washington and his partner Len Major received a call to Alabo

---

[36] In addition, for example, counsel failed to challenge the testimony of James Churchman, a forensic scientist with the state police crime lab, testified that the corroded barrel found in the Industrial Canal on November 28, 1995, while not subject to test firing, was a 9mm barrel that would fit on Mr. Hardy's 9mm pistol and exhibited the classic characteristics of six land and grooves and the right hand twist as did the bullet jacket in evidence (which he could not connect to the barrel on the 9mm at the time it was seized), something he testified he was able to make out *in spite of the corrosion*.  4/18/96 Tr. 151-152, 168. Counsel failed to cross examine Mr. Churchman, however, regarding his lab notes dated November 29, 1995, to the effect that, while the barrel from the canal is a Beretta-type, it cannot be tested or cleaned due to advanced damage, there is no chance the individual characteristics remain, and it is "not submitted."

Street at 10:58 p.m. on the evening of October 13, 1994 for an aggravated battery by shooting, after the first 911 call came in at 10:56 p.m., and Officer Washington arrived at the crime scene at approximately 11:01 p.m.  4/17/96 Tr. 437-38, 460-61.  According to Officer Washington, photos of the crime scene (G.E. 7-11) depicted it as when they arrived at the intersection of Alabo and North Villere.  *Id.* at 440.  Officer Washington testified that he typically "developed" a crime scene by cordoning off an area that he figured would possibly have evidence or some part of the crime within it.  *Id.* at 440.  He observed, when he came upon this crime scene, the body; blood seepage to the left side of the head and a little bit to the right side of the head, which was wrapped in a towel; and one casing "adjacent to the body, and basically that was it."  *Id.* at 441.  In "developing" this particular crime scene, Officer Washington testified that he did not use crime tape to cordon off the scene; rather, he and his partner "cordoned it off, basically, by body and command" and, at one point, "had to forcefully remove one female from the scene."  *Id*. at 441.   According to Officer Washington, Ms. Groves' body stayed on the scene "at most, approximately 10 minutes."  *Id*. at 441.  Officer Washington denied that anyone got near the casing after he arrived and claimed that it "was preserved until the crime lab technician could retrieve it," although he did not elaborate on how he and one other officer were able to do so under the circumstances.  *Id*. at 464.

Officer Washington admitted on cross-examination that he did not know how many people had been out to the body before he got there.  *Id*. at 453.  He also admitted on cross that he had to call for crowd control because there were only two officers there, and he had a family member about to charge the body, such that he had to grab her to prevent her from disturbing the crime scene.  *Id*. at 455.  Also on cross, Officer Washington admitted that he did not mark the casing in any way to identify it for future reference.  *Id*. at 465.

157

Jimmy Ducos, a 21 year veteran with the NOPD crime lab, testified that on October 13, 1994, he worked the 10:25 p.m. to 7:00 a.m. shift, and was informed of the Kim Groves murder at 11:45 p.m. while in his office. 4/15/96 Tr. 160-61. By the time he arrived at the crime scene at 12:05 a.m. on October 14, 1994, Ms. Groves' body had been removed. *Id*. at 162, 175. There were people around the scene, which was not taped off with yellow crime scene tape. *Id*. at 175.

According to Mr. Ducos, the head detective on the scene at that time, Detective Zenon, pointed out a casing near a large pool of blood, which casing Mr. Ducos covered with a cone to mark it and stop it from being kicked; Mr. Ducos then took a few photos of the scene, but none of the casing. *Id*. at 163-64; G.E. 9. Mr. Ducos picked up the casing, which he identified as a spent FC 9mm Luger casing, put it in an envelope, wrote the date, 10-14-94, and time, 12:25 a.m., on the envelope, and put the envelope in his pants pocket, and then delivered it to NOPD Central Evidence Property at 3:10 a.m.. *Id*. at 172-173; G.E. 6. Mr. Ducos also drew a rough diagram of the scene, which incorrectly identified the cross street and the block on Alabo. *Id*. at 168-69. A comparison of the diagram with the crime scene photograph shows that the cone which he claims to have placed over the casing is not in the location where the casing appears on the diagram. Altogether, Mr. Ducos spent less than one hour at the crime scene.

On cross-examination, defense counsel questioned Mr. Ducos a great deal about his mistakes on the diagram with respect to the streets, but did not question him about the inconsistency regarding the location of the casing on the diagram, which counsel simply had not noticed. While counsel also got Mr. Ducos to admit that he did not initial the casing and could not swear that the casing was the same one he seized, Mr. Ducos justified his failure in this regard by explaining that he did not want to handle the casing because it might mess up the fingerprint testing. *Id*. at 176-178.1

158

Once Mr. Ducos collected the casing at the scene, he turned it into the Central Evidence and Property room on October 14, 1994. On November 7, 1994, a spent FC 9mm Luger casing was received from the Central Evidence and Property room by Forensic Light Examiner Timothy M. Seuzeneau, whose test for fingerprints was negative. There is no indication that Seuzeneau marked the casing with his initials. According to an affidavit of FBI Agent Adams, she obtained a 9mm casing from NOPD on November 9, 1994, and arranged for its transportation to the FBI in Washington, D.C.

On November 10, 1994, the Latent Fingerprint Section of the FBI in Washington, D.C., received, among other items of evidence, eighteen cartridge cases. On cross-examination of Louis Gayle Hupp with the Latent Fingerprint section of the FBI, counsel for Mr. Davis elicited testimony that there were two different methods for identifying items, direct and indirect, with indirect consisting of marking the bag that the item is contained in and direct consisting of marking the item itself. 4/18/96 Tr. 61-62. While acknowledging that the casings he observed had felt tip markings on them, Mr. Hupp, when asked by defense counsel why a casing could not be marked with a felt tip pen at the scene by the person that seized it, responded that because a fingerprint is "a mere chance impression" and the "mere touching of a hard item by wiping your finger on a piece of cloth, or merely packaging it" can destroy fingerprints. *Id*. at 61-63. Counsel for Mr. Davis did not contradict this testimony, which it elicited from the Government's expert, with its own expert testimony to the contrary.

Had counsel for Mr. Davis consulted with an expert on crime scene investigation, they would have learned that the quality of the crime scene investigation in this case did not conform to local and national standards for crime scene investigations applicable at the time. *See* Affidavit of Ronald L. Singer. Critical to the administration of a crime scene is the objective

159

recognition, documentation, collection and preservation of physical evidence for further analysis. When properly accomplished, the crime scene analysis is a slow, methodical, systematic and orderly purposeful driven process that must involve protocols and methodology. *Id.*

A crime scene expert would have testified that the crime scene investigation of this major crime scene conducted by Mr. Ducos fell below applicable standards in several respects. *See id.* Processing a major crime scene involves observation, documentation, assessment, searching, analysis, collection, note taking and detailed reporting. Evidence must be documented with adequate video and photographs, measurement placement within the scene and in relation to any other item or person, collection and packaging procedures, forensic processing and analysis regarding its meaning, importance and relation to events. Evidence placards should be used at the scene to enable police to refer evidentiary items and their placement within a scene to others as evidence is often difficult to observe in photographs.

In this case, there was no scene video documentation at all, and the quality and quantity of the scene photography were woefully inadequate with no use of scales or evidence placards to mark the location of evidence in relation to anything. Rather, Mr. Ducos used a cone to cover a critical piece of evidence: the casing. The only documentation of the location of the casing in relation to anything else was found in a diagram indicating the placement of the casing vis-à-vis a pool of blood and a traffic island that is inconsistent with the few photographs that were taken.

Moreover, a crime scene expert also would have explained that, contrary to the testimony of Mr. Ducos and Mr. Hupp, there are numerous techniques available to mark a fired cartridge case without disturbing any fingerprints that might be present or compromising the ability to match the fired cartridge case to a suspect firearm. Affidavit of Ronald L. Singer. Thus, Mr. Ducos should have, and could have, without disturbing any fingerprint evidence, marked the

160

casing with his initials at the time that he collected it from the scene.  Significantly, because of his failure to do so, and since the cartridge case was in several locations before any firearms comparisons were made, it is not possible to establish, with any degree of certainty, that the cartridge case linked to the 9mm Beretta owned by Mr. Hardy was, in fact, the cartridge case that was allegedly collected at the Kim Groves crime scene.   Affidavit of Ronald L. Singer.

In closing argument, counsel for Mr. Davis, argued to the jury that Mr. Ducos, a man about to retire and obviously tired of what he is doing, drew a diagram that was off a whole block and then failed to take a photo of the casing, which he put in his pocket and "that's really protecting the evidence."  4/22/96 Tr. 85-87.  Counsel also argued that once police arrived, there was no yellow tape at the crime scene, just a bare scene, and when Mr. Ducos arrived, there was no body and no photographs of the body.  *Id.* at 93.  Counsel for Mr. Hardy argued that NOPD had Mr. Hardy's gun along with all the ammunition and casings for 2 months and now they supposedly found a casing at the crime scene that matches his gun, and the casing was taken from the evidence room 24 hours before it was turned over to the F.B.I.  "What happened during those 24 hours?  We don't know."  *Id.* at 112-113.

Without the assistance of a crime scene investigation expert, defense counsel could only suggest that the crime scene investigation was less than professional and that, as a result, the Government could not prove that the casing seized from the scene was the same casing identified as having been fired from Mr. Hardy's 9mm.  Worse yet, in attempting to make their case in this regard through cross of the Government's experts, counsel elicited testimony, which was not countered by any defense expert, that the crime scene investigation, including the seizure of the casing on the scene under the circumstances described by Mr. Ducos and Mr. Washington, was entirely proper.

161

Placing Mr. Hardy's gun, through the cartridge case, or casing, at the scene of the shooting of Kim Groves was critical to the Government's case. Defense counsels' deficient performance in failing to challenge the expert forensic evidence offered by the Government in order to make this connection prejudiced Mr. Davis, and there is a reasonable probability that, but for counsels' failures in this regard, the result of the trial would have been different.

### 4. Counsel Committed Numerous Unprofessional Errors in Challenging the Government's Case for Guilt

Counsels' trial investigation, preparation and presentation  in challenging the Government's case was deficient in many significant respects, in addition to those set forth above. For example, as set forth herein with respect to the issues of the Government's conflict of interest and the impermissible considerations of race in connection with the Government's investigation and prosecution of Mr. Davis, counsel for Mr. Davis failed to do anything more than hint at the possibility of these issues. Thus, in his closing, defense counsel argued only that the FBI was listening to everything that was said on October 13, 1994, including the "30," but did nothing through incompetency, lack of training, or carelessness, even though they knew what was happening. 4/22/96 Tr. 87, 97.

Counsel was also deficient in the cross-examination and impeachment of the Government's witnesses, including the key witness Sammie Williams, as set forth above.

In closing, counsel argued a myriad of inconsistent theories (Jimmie Jones did it, Mr. Ducos put the casing in his pocket, the crime is manslaughter, and there is no color of law) and, in the process, spoke disparagingly of his client (he is "pompous and loud and has no feelings"). 4/22/96 Tr. 82-96.

Counsels' many failures in the guilt phase of Mr. Davis at his first trial constitute deficient performance that prejudiced Mr. Davis' defense against guilt.

**5.   Counsel Failed to Competently Represent Mr. Davis Following the Guilt Phase and at the Penalty Phase of the First Trial**

The jury returned a verdict of guilty on April 24, 1996.  The following day, Mr. Davis stated in open court that he refused to be present for the penalty trial.  4/25/96 (a.m.) Tr. 4. Instead of conducting a full colloquy with Mr. Davis to determine whether he was knowingly, intelligently, and competently waiving his right to be present, the Court simply asked Mr. Doskey and Mr. Masinter if he was "knowingly and intelligently making this decision."  *Id*. At 8. Mr. Masinter quickly responded "Yes," without explanation.  *Id*.  Noting that Mr. Davis was "distraught," Mr. Doskey could not answer: "I can't do that as his attorney, I really can't," without more.  *Id.*  This Court then found that Mr. Davis had knowingly and intelligently waived his right to be present.  *Id*. at 9.

Concerned about Mr. Davis' mental competency, the Government asked for a "mental status exam."  4/25/96 (p.m.) Tr. 4.  Dr. Robert Whitney Davis was appointed to conduct the exam and spent approximately three minutes with Mr. Davis before determining that he was mentally competent to stand trial.  4/26/96 Tr. 8.  Counsel for Mr. Davis asked no questions of Dr. Davis when he gave the Court his report by phone.

When the Court questioned Mr. Davis outside the presence of the Government about his intent to forbid his mother and girlfriend from testifying on his behalf, Mr. Davis told the Court that "this is my life and this is the way that I want to go about it."  4/26/96 Tr. 11-12.  When the Court asked Mr. Doskey what he had told Mr. Davis about "the importance of the family," Mr. Doskey said, "I think that Mr. Davis has good points, most of which can be brought out absent the testimony of his mother and his fiancée."  4/26/96, Tr. 11.

Thereafter, counsel for Mr. Davis presented no evidence in the eligibility phase of the penalty trial.  Instead, the Government and the defense presented argument to the jury regarding

whether Mr. Davis had the requisite intent to be eligible for the death penalty.  Counsel failed to object, however, when the Government told the jury that it had already "found beyond a reasonable doubt that Len Davis and Paul Hardy together killed Kim Marie Groves with premeditation, that is, as a result of planning or deliberation."  4/25/96 Tr. 15.  Indeed, counsel conceded in the defense argument that "As to intent, I have no question, as to however mad you may have believed Len Davis was, that yesterday you found that he had the specific intent to kill."  4/25/96 Tr. 32.

During the second phase of the penalty trial, the defense mitigation presentation was abysmal.  In opening arguments, counsel told the jury:

> You will hear that Len Davis does not want us to present any evidence in his behalf. You will hear that Len Davis has instructed his nine year old daughter not to testify, Len Davis has told his fiancée not to testify, Len Davis has told her not to bring their infant son to court, you will hear that Len Davis has told his mother not to testify. You will hear that he has done everything that he can so I can't paint a face, so that I can't put a man in the empty chair. Len Davis knows that it would be easier for you to kill if you don't look at him.

4/26/96 Tr. 29.

The case for Len Davis' life consisted of three witnesses. First, a police custodian of records read Mr. Davis' commendations and was promptly destroyed on cross-examination with evidence of disciplinary action and falsification of commendation reports.  4/26/96 Tr. 86-111. Next, the owner and a D.J. of Flynn's bar testified that they "still like[d]" Mr. Davis.  *Id.* at 111-14, 115-16.  On cross-examination, however, the Government elicited testimony that Mr. Davis had fathered a child while incarcerated.  *Id.* at 117.  Finally, the defense put on an investigator who testified that Mr. Davis had prohibited his family from testifying on his behalf.  *Id.* at 117-119.  Not surprisingly, the jury returned a verdict of death.

Ultimately, counsels' deficient performance pretrial and at trial had a profound prejudicial impact on Mr. Davis and their relationship with him, as set forth above.  When that

164

prejudicial impact resulted in his taking the extreme measure of absenting himself from the courtroom and refusing to allow his counsel to present key witnesses in mitigation of death, counsels' performance in dealing with this development was equally deficient and prejudicial to Mr. Davis.

### 6.  Counsel Was Ineffective During Voir Dire

Counsel ignored numerous red flags during voir dire which should have alerted them to the danger that several jurors were biased, exposed to external influences, and incompetent to serve on this jury, and failed to follow up with these jurors.  Individually and cumulatively, these errors deprived Mr. Davis of his constitutional rights to an impartial jury and the intelligent use of his peremptory strikes, in violation of the Fifth, Sixth and Eighth Amendments, and prejudiced Mr. Davis, requiring that he be granted a new guilt phase trial. *See, e.g.*, *Virgil v. Dretke*, 446 F.3d 598, 614 (5th Cir. 2006) (reversing conviction because "the deficient performance of counsel [during voir dire] denied Virgil an impartial jury, leaving him with one that could not constitutionally convict, perforce establishing *Strickland* prejudice with its focus upon reliability").

By way of example, Juror No. 24 evinced a general sympathy for law enforcement employees, noting that they are "'tough guys with a tough job,'" and acknowledged that she found law enforcement work "interesting."  4/8/96 Tr. 248. But aside from asking about the various police departments to which the juror had applied for a job, defense counsel only asked Juror No. 24 if she would "impos[e] a harsher or easier standard on him at any point, just because he is a police officer," without delving further into her interest in police work. 4/8/96 Tr. 249.  Juror No. 28, whose sister was the victim of a car jacking for which the perpetrator was released and the police handled the situation "poorly," answered "disagree strongly" to the statement that it is better for society to let some guilty people go free than

to risk convicting an innocent person; however, counsel for Mr. Davis did not question this juror further regarding this statement to determine whether the juror could be fair and impartial as a result.  4/8/96 Tr.  261-272. Juror No. 94 indicated in her questionnaire that she not only worked as a legal secretary at a law firm, but she also worked at the Oakland Police Department along with her father and her sister; in response, defense counsel only asked her briefly about the nature of her police work.  4/10/96 Tr. 122.  Juror No. 107 indicated on the questionnaire that "too many people are getting away with a lot of crime" and "the system has to put its foot down."  Counsel for defendant asked if "juries" are letting too many people go, to which the juror responded that jurors do not have much to do with it; counsel failed to address in any more detail the issue raised by the questionnaire answer.  4/10/96 (p.m.) Tr. 40.  Juror No. 117 expressed the view that the NOPD needs "more discipline according to statistics in police brutality and our murder rate in the city," which counsel likewise failed to follow up on adequately.  4/10/96 Tr. 111-113.  Similarly, Juror No. 120 expressed concerns about the quality of the NOPD, with no follow-up questions from counsel on this issue.  Juror No. 158 disclosed that he had a brother who died of a cocaine overdose two years prior to the time of trial.  4/11/96 Tr. 80, 85, 90.  He admitted that he might wonder if the individuals on trial who were involved in drug trafficking had dealt drugs to his brother.[37]  4/11/96 Tr. 89.  Counsel did not probe any further on his feelings about drug dealing and drug addicts.  Counsel also did not ask about the fact that he was a victim and soon to be a witness in a criminal prosecution regarding a robbery, or about his service on an Orleans Parish criminal jury in which the jury found the

---

[37] Additionally, an unidentified juror was seen to comment "What difference does it make?" to another juror when the fact was brought out at trial that the victim had a crack pipe on her when she was found.  4/18/96 Tr. 2.  This Court denied Hardy's motion to disqualify the juror.  It is unclear who this juror was but quite possible that it was Juror No. 158.

166

defendant guilty, or about his response in the questionnaire that a friend or relative of his served time in jail—all of which were reported in his questionnaire.  Defense counsel's inadequate voir dire allowed a number of jurors to sit in judgment of Mr. Davis, even though their ability to be fair and impartial had never been determined.[38]

In addition to failing in their responsibility to conduct a thorough voir dire, defense counsel also failed to object to unconstitutional restrictions on the scope of voir dire.  In failing to object to significant restrictions on the permissible scope of voir dire, defense counsel insured that its minimal voir dire would occur within an unconstitutionally narrow framework. At the outset of voir dire, this Court stated that the jurors would only be sequestered after selection, and not during voir dire itself. 4/8/96 Tr. 13. Although the Court indicated that defense counsel would be allowed to "follow up on things in the questionnaire," the Court also stated that the attorneys could only ask questions that were "hitting on things that are really relevant as opposed to just exploring." 4/8/96 Tr. 15. Despite that position, the Court also informed defense counsel that voir dire should not be case-specific; instead, the Court explained, "what I think voir dire is appropriate for is sort of generic issues." *Id.* at 19. The Court also stated that it would tell the jurors that individual voir dire would occur in the courtroom, but that if there was any question that involved anything private or otherwise confidential, then "we'll go into a private discussion," because of the Court's opinion that "they can be advised of the right to be questioned privately, but it has to be asserted by them and it has to be question-specific." *Id.* at 25-26. Defense counsel did not object to the procedures outlined by the Court.

---

[38] Defense counsel also failed conduct a thorough capital voir dire, falling far short of the prevailing standards by failing to question jurors adequately about their views on the death penalty and by failing to probe jurors on their ability meaningfully to consider mitigation evidence.  As a result, Mr. Davis' jury was comprised of multiple jurors predisposed to sentence him to death.

167

Defense counsel's acquiescence to the Court's restrictive procedures ensured that Mr. Davis's capital voir dire would occur within an unconstitutional set of parameters. The 1989 ABA Guidelines made clear that defense counsel "should consider, along with potential legal challenges to the procedures for selecting the jury that would be available in any criminal case, whether any procedures have been instituted for selection of juries in capital cases that present potential legal bases for challenge." ABA Guidelines (1989), at Guideline 11.7.2(A). Defense counsel fell far short of that command. Although voir dire "is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion," that discretion is not unlimited. *Ristaino v. Ross*, 424 U.S. 589, 594 (1976) (quoting *Connors v. United States*, 158 U.S. 408, 413 (1895)). In order to withstand constitutional scrutiny, a trial court's voir dire must ensure that "[A] suitable inquiry is permissible in order to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried." *Mu'Min v. Virginia*, 500 U.S. 415, 422 (1991) (quoting *Connors*, 158 U.S. at 413) (alteration in original).

In not objecting to the Court's procedures, defense counsel ensured that the "suitable inquiry" could not occur. The Court's voir dire structure disallowed any meaningful questioning beyond what had already occurred in the questionnaire, rendering voir dire, and counsel, ineffective. Rather than object to this procedure and preserve Mr. Davis's right to adequate voir dire, defense counsel instead remained silent, thereby insuring that even the most vigorous voir dire within this scheme would be unconstitutionally insufficient. Defense counsel's failure to object to the curtailment of voir dire led to the deprivations of

168

Mr. Davis's Fifth, Sixth and Eighth Amendment rights to a reliable conviction and determination of punishment, resulting in prejudice to his case.

Finally, as set forth more fully regarding the challenge to the Government's racially discriminatory use of peremptory challenges under *Batson v. Kentucky*, counsel's performance in raising the *Batson* issue in the trial court was deficient and prejudiced Mr. Davis.

### 7. Counsel Was Ineffective On Appeal

Counsel's performance on appeal was deficient in several respects and prejudiced Mr. Davis. For example, as set forth more fully above, appellate counsel should have challenged the interpretation testimony of Sammie Williams regarding the wiretaps and the failure to do so prejudiced Mr. Davis. Additionally, as set forth more fully regarding the challenge to the Government's racially discriminatory use of peremptory challenges under *Batson v. Kentucky*, appellate counsel's performance in raising the *Batson* issue on appeal was deficient and prejudiced Mr. Davis.

> **CLAIM 12. NEW EVIDENCE CASTS LIGHT ON THE GOVERNMENT'S RACIALLY DISCRIMINATORY USE OF PEREMPTORY CHALLENGES AT MR. DAVIS' FIRST TRIAL AND PROVES THAT PETITIONER'S RIGHTS TO EQUAL PROTECTION AND DUE PROCESS UNDER BATSON V. KENTUCKY WERE VIOLATED BY THE GOVERNMENT'S EXCLUSION OF NUMEROUS QUALIFIED BLACK PROSPECTIVE JURORS ON THE BASIS OF THEIR RACE**

Although the Fifth Circuit Court of Appeals considered this issue on the direct appeal of Mr. Davis' first trial, Petitioner has compelling new evidence of racial discrimination that was not considered by the Fifth Circuit or the trial court. Mr. Davis now presents powerful evidence of the Government's systematic and intentional exclusion of blacks from juries in the Eastern District of Louisiana, which places the Government's use of peremptory challenges against

blacks at Mr. Davis' first trial, in a stark new light. Combined with the other evidence in the record suggestive of racial discrimination, this evidence now leaves no credible doubt that the Government intentionally excluded black jurors from his jury because of their race, and repeatedly violated Mr. Davis' fundamental constitutional rights to Equal Protection and Due Process.[39]

### *Introduction*

The Government racially discriminated against blacks in its use of peremptory challenges at Mr. Davis' 1996 trial. The Government used 11 of its 25 peremptory challenges to exclude 79% (11 of 14) of qualified black jurors, based on their race. In contrast, it peremptorily struck only 30% (47 of 61) of qualified white jurors. As the Government might have predicted, the defense struck two of the three remaining qualified African-American jurors who expressed strong pro-prosecution positions.[40] Only one black juror served on Mr. Davis' jury.

When the Government's race-based strikes were challenged by the defense, the Government proffered racially neutral reasons for striking the prospective black jurors.

---

[39] That this evidence was not before the district court at the time of the *Batson* hearing, does not bar the court from considering it. "In *Miller-El v. Dretke*, the Court made it clear that in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, *all of the circumstances that bear upon the issue of racial animosity must be consulted*." *Snyder*, 128 S. Ct. at 1208 (emphasis added). *See, e.g.*, *Harris v. Haeberlin*, 526 F.3d 903 (6th Cir. 2008) (remanding to district court for new *Batson* hearing on basis of videotaped evidence discovered after trial in state court); *Wilson v. Beard*, 426 F.3d 653 (3rd Cir. 2005) (affirming district court's grant of habeas relief based largely on videotape of petitioner's prosecutor in which he discuss various techniques for excluding minority jurors, even though tape surfaced years after petitioner's trial).

[40] Lionel Williams testified that he favored the death penalty for premeditated murder, 4/8/96 Tr. 320-21, 326; believed that people from housing projects were slightly more likely to commit crimes, *id.* at 318-19, 328; and thought that prisoners have a better quality of life than taxpayers, *id.* at 372-73. Elliot Partman, unsuccessfully challenged for cause by the defense, 4/10/96 a.m. Tr. 43, testified that he felt that if "you take somebody's life, you should give yours up," *id.* at 39, although, in response to the court's subsequent questioning, he agreed he could seriously consider both the death penalty and a life sentence, *id.* at 39-40. He also stated that when he heard portions of the tape recordings played on the media, he thought, "They got him on tape," *id.* at 40, and expressed a clear preference for hearing the defendants testify, *id.* at 41.

170

However, a proper review of the record as a whole reveals the implausibility of those reasons. The Government consistently treated blacks differently from whites. It struck blacks for alleged reasons that it did not apply to similarly situated white jurors, and it pursued distinct lines of questioning of blacks to generate potential race-neutral reasons for striking them. Moreover, these strikes must be viewed in the context of new evidence of the Government's pattern and practice of striking qualified black jurors in the Eastern District of Louisiana. This wider evidence of discrimination by the Government sheds new light on the use of peremptory strikes against blacks in this case, and when viewed in conjunction with the record on voir dire, compels only one conclusion; the Government intentionally struck blacks from Mr. Davis' jury based on their race, Mr. Davis' rights to Due Process and Equal Protection were violated repeatedly, and he is entitled to a new trial.

### *Procedural Background*

At Mr. Davis' 1996 trial, there were 14 black jurors in the pool of 61 qualified jurors from which the 12-member jury was selected. At the close of voir dire, each side exercised simultaneous blind strikes. The prosecution used 11 of its 25 peremptory challenges against African Americans. In doing so it excused 90% (9 of 10) of the qualified black women and 79% (11 of 14) of the qualified black jurors overall. Only one black person served on Mr. Davis jury.

The defense raised timely objections under *Batson v. Kentucky*, 476 U.S. 79 (1986). It initially argued that the Government used its peremptory challenges against black women on the basis of race and then expanded its objection to address the prosecution's removal of two black men as well. 4/15/96 Tr. 20-23 (RE 10). The trial court found no "racially based pattern of strikes by the Government," and no *prima facie* case of discrimination. *Id* 24. Given the Government's heavily disproportionate use of peremptory challenges against blacks, this finding was clearly erroneous. However, the trial court asked the prosecution to state its reasons for the

171

strikes "for the interest of keeping the record complete…" *Id.* 24, rendering the step one question moot.[41] The prosecution gave race-neutral reasons, and the defense contested them. *Id.* at 24-32. The court then ruled, stating only, "I find the reasons to be sufficient, so I'm going to deny the *Batson* challenges." 4/15/96 Tr. 32.

On appeal, Petitioner and his co-defendants challenged the court's ruling. The Court of Appeal denied relief, with minimal analysis: "the government's explanations were race-neutral and not outside the realm of credibility." Under its "'great deference' standard of review," it thus affirmed the district court's denial of relief. *United States v. Causey*, 185 F.3d 407, 413 (5th Cir. 1999).

Subsequent to the 1999 appeal decision, the Supreme Court decided two important *Batson* cases, which together reinvigorated *Batson* by emphasizing the exacting level of scrutiny courts must apply when assessing the credibility of the prosecution's asserted reasons for striking minorities, and underlining the broad range of evidence which courts must consider when assessing the prosecution's discriminatory intent. *Miller-El v. Dretke*, 545 U.S. 231 (2005) ("*Miller-El II*") (reversing Fifth Circuit's rejection of *Batson* claim in habeas proceedings, chastising court for failing to consider all relevant evidence in reviewing state court's rejection of

---

[41] In assessing whether there was a *prima facie* case of discrimination, the trial court apparently discounted strikes of black women explaining that "we ought to be looking at black males being excused by the government since the victim of this offense is a black female, and if there is going to be identification, it would seem that black females might as easily be identifying with a black female victim as a black male defendant." 4/15/96 Tr. 22. Yet the constitutional protections prohibiting the exclusion of jurors based on race or gender reflect a fundamental recognition that race or gender based assumptions about a juror's sympathies towards members of a similar race or gender are rooted in discrimination and may not be tolerated. Because the trial court went on to require the Government to provide its reasons for the strikes, the step one Batson enquiry is moot. *See Hernandez v. New York*, 500 U.S. 352, 360 (1991). However, the trial court's failure to consider all of the Government's strikes against black women, is relevant in determining the weight to be given to the trial court's ultimate decision at step three, because the trial court presumably incorrectly discounted pattern of strikes as evidence of racial discrimination at that stage too. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("*Miller-El I*") (evidence supporting *prima facie* case relevant in determining whether discrimination has been proven at third step of the *Batson* inquiry) (citation omitted).

claim of discrimination); *Snyder v. Louisiana*, 128 S.Ct. 1203 (2008) (granting relief under *Batson* on direct review after carefully scrutinizing voir dire and finding prosecution's asserted reasons to lack credibility); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("*Miller-El I*") (reversing Fifth Circuit's denial of COA on *Batson* claim and discussing the breadth of evidence of discrimination it is incumbent on courts to consider, whether or not it was specifically raised to the trial court when the *Batson* objection was made).

The Court held that if *Batson* is to have any teeth, it is incumbent upon the courts to consider more than the race neutrality of the prosecutions' proffered reasons. Courts must consider "all the relevant circumstances" including evidence from both inside and outside the trial record which might shed light on the presence or absence of discriminatory intent underlying a prosecutor's peremptory strikes. *Miller-El II,* 545 U.S. at 251-252 ("The rule in *Batson...* requires the judge to assess the plausibility of [the prosecutor's reasons] in light of all evidence with a bearing on it"); *Snyder v. Louisiana,* 128 S. Ct. 1203, 1208 (2008) ("in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted"); *See also*, *Batson v. Kentucky,* 476 U.S. 79, 93 (1986) (trial court must undertake "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available").

In accord with long established precedent, the Court emphasized the significance of historical evidence of racism by a prosecutor's office in proving the presence of discriminatory intent within an individual defendant's trial. *Miller El II,* 545 U.S. at 240-241; *Swain v. Alabama*, 380 U.S. 202 (1965). It likewise recognized that statistical disparities in the case at hand between the numbers of white and black jurors struck peremptorily by the State is evidence of discrimination. *Miller-El,* (concluding that "happenstance [was] unlikely to produce" the

173

prosecutors exclusion of 91% of the qualified blacks in the jury pool") *Id.* at 241. *See also,*

*Batson* 476 U.S. at 97 ("a 'pattern' of strikes against black jurors included in the particular venire

might give rise to an inference of discrimination"; *Batson,* 476 U.S. at 95-95 ("Proof of

systematic exclusion from the venire raises an inference of purposeful discrimination because the

"result bespeaks discrimination").

The Court similarly emphasized the importance of carefully scrutinizing the record of

*voir dire* in the particular case for evidence of pretext. In both *Miller-El* and *Sndyer,* the Court

placed significant weight on comparative juror analysis: side by side comparisons of prospective

jurors to determine whether the prosecution treated similarly situated white venire members the

same as black ones. "If a prosecutor's proffered reason for striking a black panelist applies just

as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to

prove purposeful discrimination to be considered at *Batson's* third step". *Miller-El II,* 545 U.S. at

241; *Snyder,* 128 S.Ct. at 1211-1212 (finding *Batson* violation in part because State did not

peremptorily strike similarly situated jurors); *accord, Reed v. Quarterman*, 2009 U.S. App.

LEXIS 579, *38 (5th Cir. 2009) (finding state's asserted race-based reasons were "spurious"

because "the State accepted several nonblack jurors who expressed a similar sentiment.").

Other factors the Court considered relevant included: (a) the prosecution's use of

"disparate questioning" where prosecutors pursue a distinct line of questioning with black venire

members, specifically designed to create bases for exclusion and race-neutral reasons to defend

their strikes of blacks; *Miller-El II,* 545 U.S. at 255; *Miller-El I,* 123 S.Ct. at 1037; (b) "the

[Government's] failure to engage in any meaningful voir dire examination on a subject the

[Government] alleges it is concerned, because that "suggest[s] that the explanation is a sham and

a pretext for discrimination." *Miller-El II,* 545 U.S. at 246 (citation omitted); *Snyder*, 128 S.Ct. at

1210 (noting that the prosecution "did not choose to question [excluded juror] more deeply about [the] matter" of their alleged concern); (c) a prosecutor's mischaracterization of the juror's testimony to justify a peremptory strike, *Miller-El II,* 545 U.S. at 243-244 (reasons based on mischaracterization of juror testimony indicate prosecutor's "ulterior reason"); *Snyder,* 128 S.Ct. at 1207-1208 (finding *Batson* error where the prosecutor's alleged reasons for concern were not borne out by the record, and were therefore "implausible," "unconvincing," and "suspicious"); *see also, Batson v. Kentucky*, 476 U.S. at 98 (the neutral explanation must be actually "related to the particular case to be tried"); (d) evidence that the black venire member "should have been an ideal juror in the eyes of a prosecutor seeking a death sentence." *Miller-El II,* 545, U.S. at 247; (e) questions concerning the legitimacy of strikes of other black jurors whether or not questions are sufficient to substantiate *Batson* claim as to those other jurors; *Snyder,* 128 S.Ct. at 1208-09; and (f) broader patterns of governmental action bearing on racial composition of the jury. *See e.g., Miller-El II,* 545 U.S. at 253 (state's exercise of jury shuffle in a way calculated to limit number of African-Americans on the panel, indicated race-based intent underlying subsequent peremptory strikes).

On Mr. Davis' direct appeal of his 2005 trial, the Court of Appeal declined to reconsider the *Batson* claim following *Snyder* and *Miller-El* finding that those cases did not constitute a "contrary decision of the applicable law" and that the law of the case doctrine therefore precluded further review. *United States v. Davis*, 609 F.3d 663, 694 (5th Cir. 2010). However, unquestionably *Miller-El* and *Snyder* are instructive to this Court's evaluation of the totality of evidence of discrimination, as it reconsiders the validity of the prosecutor's asserted race neutral reasons in light of the new evidence of discriminatory intent. Indeed, as Petitioner shows below,

175

virtually all categories of evidence of discrimination identified by the Supreme Court in *Miller-El* and *Snyder* are present in this case.

Now, on habeas review, Petitioner presents new data revealing that the Government in the Eastern District of Louisiana *systematically* excludes black people from sitting on juries. This casts the Governments actions in Mr. Davis' case in a startling new light and necessitates a re-evaluation of his *Batson* claims. This evidence, considered together with all other relevant evidence as *Miller-El* and *Snyder* clearly require, must leave the court with no doubt that intentional racial discrimination alone explains the vastly disproportionate use of peremptory challenges by the Government to exclude black citizens from Mr. Davis' jury.

The striking of one black juror for a racial reason will violate the Equal Protection Clause, even where other black jurors are seated, and even when valid reasons for the striking of some black jurors is shown. *See United States vs. David,* 803, F.2d 1567 (11th Cir. 1986); *Harrison vs. Ryan,* 909, F.2d 84 (3rd Cir. 1990); *United States vs. Battle,* 836 F.2d 1084 (8th Cir. 1987) [*check Miller-El and Snyder – note how many black jurors were seated in those cases*]. In this case Petitioner proves that the Government struck *seven* black jurors for pre-textual reasons. Nothing explains the exclusion of black jurors better than race.

## A. "Happenstance" Is Unlikely To Have Produced the Disproportionate Exercise Of Peremptory Challenges Against Black Jurors

In this case, all three defendants are black and the prosecution used a highly disproportionate number of peremptory challenges to remove members of their race. Ultimately, only one African-American juror served.

African-Americans comprised only 23% of the pool of qualified jurors (14 of 61). Had they struck white and black people proportionately to the pool's composition, they would have struck only three of the fourteen qualified African-Americans peremptorily. The prosecution

176

struck eleven. And they used 44% of their peremptory challenges (11 of 25) to do so. Their strikes excluded 90% (9 of 10) of the qualified African-American women and 79% (11 of 14) of the qualified African-American jurors overall.

In contrast, the prosecution used 56% of its peremptory challenges (14 of 25) to excuse white prospective jurors, a group that comprised 77% of the qualified pool (47 of 61). These strikes excluded 30% of the qualified white jurors. Blacks were thus 2.6 times more likely to be removed by the prosecution than white jurors.

These statistics alone create a strong inference of discrimination. *See, e.g.*, *Miller-El II*, 545 U.S., at 240 (noting that "happenstance" was unlikely to explain prosecutor's use of ten peremptory challenges to remove 91% of African Americans).

**B. The Government's Race-Based Peremptory Strikes Of 79% Of Qualified Black Jurors From The Venire In Petitioner's Venire Forms Part Of A Long Established And Consistent Practice By The Government Of Striking Black Potential Jurors In The Eastern District Of Louisiana, With Far Greater Frequency That It Strikes Whites**

Data from voir dire in other criminal cases reveals that the Government's disproportionate use of peremptory strikes against 79% of qualified black jurors in Mr. Davis' case is part of a pattern and practice of peremptorily striking blacks in criminal trials by the Government in the Eastern District of Louisiana.

Data collected by the Federal Public Defender's office of the Eastern District of Louisiana from all federal criminal trials in the six-year period between November 1, 2004 and September 7, 2010,[42] demonstrates that the Government in the Eastern District of Louisiana used its peremptory strikes to remove 32.9% (95 of 278) of black potential jurors in criminal trials.

---

[42] In fact Petitioner has excluded one case from his calculations [case before Judge Barbie 3/30/2009] because the available data was insufficient to determine all jurors struck.

That is 4.9 times the rate at which the Government struck potential white jurors in the same cases, 6.7% (65 of 970) of qualified whites. Ex. F. To remove this disproportionate number of blacks, they used 59% (95 of 160) of their peremptory strikes against members of a group comprising just 22.3% (278 of 1248) of venire members.



The Government's disproportionate use of strikes against blacks is further highlighted by considering what the figures would be if the strikes were exercised randomly. The Government struck 12.8% of the venire with peremptory challenges. If the Government's 160 total strikes were exercised on a random basis, the Government would only have struck 36 black venire members. Instead they struck 95, over two and a half times that amount.

## CHART A: ACTUAL DISTRIBUTION:

|  | Black | White & Other |
|---|---|---|
| Government Peremptory | 95 (32.9%) | 65 (6.7%) |
| Not Peremptorily struck by Government | 183 (68.1%) | 905 (93.3%) |

**CHART B: DISTRIBUTION WITH A 12.8% STRIKE RATE:**

|  | Black | White & Other |
|---|---|---|
| Government Peremptory | 36 (12.8%) | 124 (12.8%) |
| Not Peremptorily struck by Government | 242 (81.2%) | 846 (81.2%) |

**CHART C: GOVERNMENT PEREMPTORY STRIKES OF BLACK VENIRE MEMBERS IN CRIMINAL TRIALS IN ALL CASES HANDLED BY THE FEDERAL PUBLIC DEFENDERS OFFICE IN THE EASTERN DISTRICT OF LOUISIANA NOVEMBER 4, 2004 - SEPTEMBER 17, 2010**

| Defendant | Docket Number | Trial Date | Blacks on venire | Gov strikes used on blacks[43] | Blacks struck by Gov | Blacks on jury |
|---|---|---|---|---|---|---|
| McGinniss | 2:04-cr-00196 | 11/1/04 | 8/33 (24%) | 3/4 (75%) | 3/8 (38%) | 3 |
| Harris | 2:05-cr-00114 | 8/22/05 | 10/41 (24%) | 5/7 (71%) | 5/7 (71%) | 3 |
| Spencer | 2:04-cr-00162 | 1/30/06 | 7/42 (17%) | 1/5 (20%) | 1/7 (14%) | 4 |
| Jones | 2:05-cr-00231 | 2/6/06 | 10/51 (20%) | 3/3 (100%) | 3/10 (30%) | 2 |
| Caldwell | 2:06-cr-00023 | 5/15/06 | 7/34 (21%) | 3/5 (60%) | 3/7 (43%) | 2 |
| Bailey | 2:05-cr-00286 | 6/19/06 | 8/54 (15%) | 1/2 (50%) | 1/8 (13%) | 2 |
| Caldwell | 2:06-cr-00023 | 7/10/06 | 17/40 (43%) | 6/7 (86%) | 6/17 (35%) | 5 |
| Dixon | 2:05-cr-00120 | 8/21/06 | 11/41 (27%) | 3/6 (50%) | 3/11 (27%) | 3 |
| Clavo | 2:06-cr-00183 | 10/16/06 | 11/39 (28%) | 5/6 (83%) | 5/11 (45%) | 3 |
| Butler | 2:06-cr-00178 | 11/13/06 | 6/40 (15%) | 3/6 (50%) | 3/6 (50%) | 1 |
| Laurant | 2:05-cr-00275 | 1/16/07 | 4/37 (11%) | 3/5 (60%) | 3/5 (60%) | 1 |
| Lemoine | 2:06-cr-00209 | 2/26/07 | 9/35 (26%) | 4/4 (100%) | 4/9 (44%) | 1 |
| Sykes | 2:05-cr-00046 | 3/12/07 | 6/42 (14%) | 2/5 (40%) | 2/6 (30%) | 0 |
| Smith | 2:06-cr-00325 | 3/19/07 | 11/46 (24%) | 5/7 (71%) | 5/11 (45%) | 2 |

---

[43] All other strikes were used on white venire members.

| Defendant | Docket Number | Trial Date | Blacks on venire | Gov strikes used on blacks[43] | Blacks struck by Gov | Blacks on jury |
|---|---|---|---|---|---|---|
| Payne | 2:06-cr-00323 | 6/18/07 | 6/45 (13%) | 2/6 (33%) | 2/6 (30%) | 1 |
| Robinson | 2:07-cr-00003 | 6/25/07 | 11/35 (31%) | 4/5 (80%) | 4/11 (36%) | 2 |
| Jones | 2:05-cr-00231 | 7/16/07 | 11/45 (24%) | 5/6 (83%) | 5/11 (45%) | 3 |
| James | 2:06-cr-00055 | 7/23/07 | 10/49 (20%) | 3/6 (50%) | 3/10 (30%) | 2 |
| Williams Jr. | 2:07-cr-00035 | 8/13/07 | 11/35 (31%) | 3/5 (60%) | 3/11 (27%) | 4 |
| Carmouche et al | 2:04-cr-00378 | 10/1/07 | 19/70 (27%) | 3/14 (21%) | 3/19 (16%) | 8 |
| Cannon et al | 2:07-cr-00185 | 11/5/07 | 8/42 (19%) | 3/3 (100%) | 3/8 (38%) | 3 |
| Bailey | 2:07-cr-00282 | 1/14/08 | 9/37 (24%) | 2/6 (33%) | 2/9 (22%) | 3 |
| Veazie | 2:05-cr-00268 | 2/25/08 | 10/50 (20%) | 2/7 (29%) | 2/10 (20%) | ? |
| Daniels | 2:08-cr-00104 | 8/25/08 | 9/38 (24%) | 5/7 (71%) | 5/9 (56%) | 2 |
| Brown | 2:08-cr-00087 | 2/9/09 | 4/35 (11%) | 2/5 (10%) | 2/4 (50%) | 0 |
| Johnson | 2:08-cr-00144 | 2/17/09 | 6/35 (17%) | 2/6 (33%) | 2/6 (30%) | ? |
| McCann | 2:08-cr-00218 | 3/16/09 | 5/38 (13%) | 2/2 (100%) | 2/5 (40%) | ? |
| Melancon | 2:08-cr-00150 | 3/8/10 | 6/37 (16%) | 2/6 (33%) | 2/6 (30%) | ? |
| Valdez-Lopez | 2:09-cr-00327 | 4/12/10 | 16/42 (38%) | 4/4 (100%) | 4/16 (25%) | 6 |
| Mcclure | 2:10-cr-00028 | 10/7/10 | 12/40 (30%) | 4/7 (57%) | 4/12 (33%) | 5 |
| **Totals** | | | **278/1248 (22.3%)** | **95/160 (59%)** | **95/278 (34%)** | |

The dramatic and disproportionate difference in the Government's strike rates of whites and blacks over an extended period of time, across many trials in the same district, is powerful confirmation that happenchance was *not* responsible for the disproportionate exclusion of blacks at Mr. Davis' trial. *Miller-El*, 123 S.Ct. at 1044-45 (according weight to historical evidence of systematic exclusion, and noting that it "casts doubt on the legitimacy of the motives underlying the State's actions"); *See also Alexander v. Louisiana*, 405 U.S. 625, 630 (1972) (finding racial discrimination in selection of grand jurors, based on statistical improbability that exclusion of

blacks occurred chance, combined with procedures which provided a clear and easy opportunity for racial discrimination that jury commissioners knew race of prospective jurors).

**C. Examination Of The Record Of Voir Dire Reveals That The Prosecution's Proffered Reasons For Striking Seven African-American Jurors Were Pre-Textual Given The Government's Failure To Strike Similarly Situated White Jurors, And Other Classic Indicia Of Pretext**

Careful review of the prosecution's actions and statements during voir dire as a whole, as required by *Snyder,* and *Miller-El,* provides further confirmation that the race-neutral reasons offered by the Government to justify their disproportionate use of peremptory challenges against blacks lack trustworthiness, and that the real reason for the strikes was race. The pre-textual nature of their reasons is belied by the fact that the prosecutors failed to question jurors on the subject of asserted concern, their reasons lack support in the record or are otherwise implausible, many of the excluded black jurors were in ideal jurors for the Government; and invariably the prosecution failed to strike white jurors sharing the characteristics relied on to justify the challenges. These are all classic indicia of discrimination, identified by the Supreme Court.

**a. Prospective juror Green**

Prospective juror Green recently served on a state jury that returned a guilty verdict in an armed robbery case. *See* Q. 30. The Government asserted that it struck juror Green for two reasons; (1) on her questionnaire she indicated she disagreed with plea bargains, and the use of cooperating witnesses; and (2) "[s]he had one family member who is in jail for an armed robbery conviction." 4/15/96 Tr. 26.

However, even a cursory review of the record reveals the dubious reliability of the Government's asserted reasons. When the prosecutor and the court questioned Green about her questionnaire responses, she stated that she would not be concerned if the government presented testimony from people who had entered pleas to serious crimes and would not reject their

181

testimony simply because they had done so. 4/8/96 Tr. 164-65. Moreover, numerous white prospective jurors were accepted by the government even though they disfavored plea bargains and/or indicated they would view the testimony of cooperating witnesses with suspicion. *See* responses to Questions 48 and 49 of seated juror Plaisance and prospective jurors Crammond, Russell, Morgan, Ward, Zinni, Poché, Turner, Boudreaux, Marshall, and Scheyd. Many of these jurors were not even questioned about their positions by the government. *See, e.g.*4/9/96 a.m. Tr. 487 (prosecutor's questions of Morgan, who had written on his questionnaire that he was against plea bargains "most of the time," Q. 48; 4/9/96 p.m. Tr. 297-316 (voir dire of prospective juror Poché, who wrote on her questionnaire that she did not agree with plea bargains and did not know if she would believe a cooperating witnesses); 4/10/96 a.m. Tr. 69-91 (voir dire of prospective juror Turner, who wrote that he did not like plea bargains and would view the testimony of a cooperating witness "cautiously"). The government's "failure to engage in any meaningful voir dire examination on a subject [it] alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." *Miller-El,* 545 U.S., at 246 (internal citation omitted).

The prosecutor's claim that he struck Green because she had a family member with an armed robbery conviction, was equally specious. Neither the prosecutor nor anyone else questioned Green about this issue, disclosed in her answer to Question 27 on the questionnaire.[44] *See* 4/8/96 Tr. 161-69 (voir dire of Green). In fact, her related questionnaire responses suggested that it would not create problems for the prosecution.[45]  And again, the government failed to

---

[44] Question 27 asked whether the juror or her spouse, family member or close friend had been charged with a crime and the outcome of the case. Green responded that "Phillip Green" had been charged with armed robbery and was sentenced to prison.

[45] Green indicated that the case would not cause her to lean in favor of the defense or prosecution, Q. 29, that neither she, a family member or a close friend had been unjustly accused of doing something wrong,

182

strike numerous white prospective jurors who had family members or friends in jail, including one juror who, in contrast to Green, indicated that the experience would bias her. Prospective juror Irving had a brother who spent 12 years in prison for an armed robbery which involved a killing, *see* 4/8/96 Tr. 219-20, and indicated on her questionnaire that the experience would bias her based on her knowledge of "the effects my brother[']s conviction had on our family." Q. 29. Jury foreman Cloud and prospective juror Newman both indicated in their questionnaires they had friends or relatives who served prison time, but neither were questioned by the government, or subject to a government strike.[46] W. Williams had a friend who had been convicted of first degree murder, an uncle who had been convicted of attempted murder, and a cousin who had been convicted of robbery. Q. 27. Careful review of voir dire as a whole, shows that race best explains the Government's removal of Ms. Green.

### b. Prospective juror Butler

The government claimed that it struck Ms. Butler because she was an ordained minister[47], she was religious and forgiving, and "ambivalent" and "weak and contradictory" on the death penalty. Additionally, the prosecution noted that her drug abusing husband was murdered in 1985. 4/15/96 Tr. 30.

---

Q. 36, and that she felt that her friend or relative who had served time in jail had been fairly treated, Q. 37.

[46] Cloud indicated that an undisclosed friend or relative had served time in jail and he did not know if they had been treated fairly. Q. 37. Newman stated that his father had been convicted of two DUI's and served prison time, Q. 27; like Cloud, Newman was not questioned about this, *see* 4/9/96 p.m. Tr. 269-82. *See also* responses to Q. 37 of seated jurors Christopher, Bougnoyne and Rodrigue, indicating that an undisclosed friend or relative had served time in jail. The prosecutor did not question any of these jurors about this issue. *See* 4/8/96 Tr. 264-66 (Christopher); 4/11/96 a.m. Tr. 83-90 (Bourgoyne); 4/12/96 a.m. Tr. 25-36 (Rodrigue).

[47] Ms. Butler indicated on her questionnaire that her main occupation was as a certified nursing assistant, and that that she was therefore involved in community based church work and as ordained minister, apparently only in her spare time. Q. 12, 59.

However, the Government mischaracterized Ms. Butler's views in several respects, belying the pre-textual nature of those reasons. Ms. Butler's questionnaire response suggested that she was centrist on the death penalty, not "weak and contradictory" Q. 54,[48] and confirmed she could set aside any opposing views and vote to impose the death penalty based on the laws and facts in the case. During voir dire, she clearly stated that she could impose the death penalty if it was warranted by the facts of the case, that her religion did not determine her views or cause her to have any problems with judging others, and that her religious views would not interfere with her service as a juror in a capital case. *See* 4/11/96 a.m. Tr. 108-10. And although she said she could not commit either for *or against* the death penalty if the government proved an intentional killing, she confirmed on further questioning by the court she could seriously consider it and vote for it if the government proved beyond reasonable doubt it was the appropriate penalty. 4/11/96 a.m. Tr. 109-10.[49]

Equally damning to the veracity of the Government's asserted reasons, no one questioned Ms. Butler at all about her supposedly "forgiving nature." In fact her response to Question 44 on the jury questionnaire suggests the opposite, as she strongly disagreed with the concept that it is better to let some guilty people go free than to risk convicting the innocent. Q. 44.

Moreover, the Government failed to strike white jurors with comparable views and experiences as Ms. Butler. Just like Ms. Butler, both jury foreman Cloud and seated juror Cave initially indicated they didn't know if they could vote for the death penalty if the Government

---

[48] Question 54 on the questionnaire asked jurors to circle one or more of seven propositions about the death penalty that "most accurately" reflected the way the juror felt, ranging from the extremely pro-death penalty position in (a) to the extremely anti-death penalty position in (g).  Butler circled C (generally in favor) and D (generally opposed).

[49] Of course the Government was required to prove not only intent but at least one statutory aggravating factor before the defendants were eligible for the death. *See* 18 U.S.C. § 3591.

proved its case,[50] and just like Ms. Butler both went on to confirm on further questioning by the court they could in fact vote to impose the death penalty if presented with adequate proof. *See id.* at 161-62, 173-74. The Government also accepted several white jurors who disclosed ambivalence about the death penalty. *See, e.g.*, 4/10/96 p.m. Tr. 144, 147 (seated juror Prejean); *id.* at 214 (Boudreaux); 4/8/96 Tr. 178 (Cramond); 4/11/96 a.m. Tr. 35 (Marshall); 4/8/96 Tr. 265 (seated juror Christopher).

Likewise, the Government failed to strike white people who had comparable religious views and involvement, despite its assertion that it struck Ms. Butler on that basis. Numerous white jurors accepted by the prosecution had significant roles in their churches. Prospective jurors Marshal and W. Williams, were church deacons; seated juror Plaisance and prospective jurors Becnel and Poché were members of Catholic organizations; and prospective juror Lightfoot served as Sunday school president, was a counselor in a young men's group, and 1st counselor to the bishop in the Church of Jesus Christ of the Latter Day Saints. *See* jurors' responses to Q. 59.[51]

The prosecution's final rationale, that he struck Butler because her "drug abusing husband was murdered in 1985" is just as problematic. The prosecutors ask her no questions at all about her about her husband's drug addiction or death. In response to questions from the court and defense counsel she indicated that she was separated from her husband at the time and knew

---

[50] When Cloud was asked whether, "assuming again that we satisfied you and we satisfied the law, [could you] actually vote to recommend the death penalty," she responded, "Since this morning, I have given that some consideration, and the answer is I don't know if I could or not. If it came down to, I don't know if I could vote for the death penalty." 4/9/96 p.m. Tr. 160-61. Similarly, when Cave was asked by the prosecutor whether "if we prove our case up, would you be capable of sitting in that room of people think[ing] about voting to impose the death penalty if we satisfy the law as the Judge would instruct you, could you do that," she replied, "I think – I don't know." *Id.* at 172-73.

[51] The prosecutor did not ask Poché, Plaisance, or Williams any questions about their religious beliefs. *See* 4/9/96 p.m. Tr. 316, 4/12/96 a.m. Tr. 73-74, 4/12/96 p.m. Tr. 42-43.

limited details about the crime based on what she had read in the newspaper; gave clear assurances that her husband's death would not impact her ability to serve in this case, 4/11/96 a.m. Tr. 104, 114-16. Moreover, the fact that seated juror Bourgoyne's brother was addicted to crack and had died of an overdose apparently was insufficient to prompt any questions by the government during voir dire, or result in his removal. 4/11/96 a.m. Tr. 83-85.

It is hard to imagine that the fact that Butler's estranged husband had been murdered, standing alone, was genuinely objectionable to the government. Indeed, several white jurors had family members who had been victims of serious crimes were acceptable to the government, including those, who unlike Ms. Butler, indicated negative experiences in the criminal justice system.[52]

### c. Prospective juror Dabney

The government asserted that it struck Ms. Dabney because, she was a deputy sheriff, had applied to be a police officer and her boyfriend was a police officer for the Kenner Police department, and she was therefore a "super cop" who might be perceived as an expert regarding police codes and other police issues. To bolster that argument, they noted they'd struck two white females with JD degrees. 4/15/96 Tr. 28. They also noted that "research from our jury consultant indicated there are certain people who hold policemen in extreme high regard. It is quite obvious that Ms. Dabney would find it impossible or very difficult to convict a policeman." *Id.*

---

[52] Irvin's mother was the victim of an aggravated robbery and Irvin felt the court system had failed her mother as the perpetrator received probation. Q. 24; 4/8/96 Tr. 234-35. Seated juror Christopher thought the police handled her sister's carjacking poorly. 4/8/96 Tr. 268. Prospective juror Reggio, had several friends who were murdered and assaulted and as a result she leaned in favor of the government. *See* 4/10/96 a.m. Tr. 134, 136.

186

The pre-textual nature of the Government's reasons for striking this black juror is revealed by their absurdity and lack of support in the record, the Government's failure to strike similarly situated white jurors, and the fact that Ms. Dabney actually appeared an ideal juror for the Government.

Far from being a "super cop" of the type with "expert" knowledge relevant to the case, who would find it difficult to convict a policeman, she had never worked, or even applied to work, in street level law enforcement investigating crimes with the NOPD or any other law enforcement agency.  Rather, she worked as a liaison officer at the jail making sure that inmates had appropriate toiletries.[53]  Her only connection with any police agency was the fact her boyfriend had been an officer in a different jurisdiction for the preceding six months.

She favored the death penalty, *see* Q. 54, and testified that she could vote to impose it, 4/9/96 p.m. Tr. 135-36. She clearly gave little mitigating weight to a defendant's childhood deprivations, *Id.* at 144.[54]  In addition, Dabney had served on a criminal jury that returned a robbery conviction, Q. 30; she felt that the police had handled the robberies of herself and her mother "very well,"  Q. 24; she strongly disagreed that it is better to let some guilty people go free rather than risk convicting the innocent, Q. 44, strongly agreed that prisoners have a better quality of life than taxpayers, Q. 58(g), and did not believe she knew anyone who had been unjustly accused, Q. 36; 4/9/96 p.m. Tr. 141.

---

[53] In her questionnaire, she wrote that, in her capacity as Liaison Deputy, she "handle[s] all inmate property and accounts. Run[s] central control desk." Q. 12. During voir dire she explained that she did not work with NOPD, *id.* at 128; that she had sought employment with the Sheriff's Office "since it was a little better than working at Burger King," *id.* at 132; and that her main duties as a liaison officer were to "make sure that the inmates have clothes, towels [and] toothpaste," and did not involve work on the streets or making arrests, *id.* at 133. She also testified that she worked in the Community Correctional Center and was not one of Davis's jailors. *Id.* at 146-47. *See* Question 33.

[54] She initially indicated that she would not consider a defendant's childhood deprivations in mitigation, although she retreated from this position in response to the court's questions. *Id.*

She categorically stated that the fact that one of the defendants had been an active duty police officer at the time of the killing would *not* affect her ability to consider the evidence and come to a fair decision. *Id.* at 134, and in fact the government's jury consultant, Decision Quest, recommended "law & order types" as "desirable jurors." SR at 1650.

Had prosecutors been genuinely concerned about the law enforcement connections of prospective jurors, they would have sought the removal of numerous white jurors with equal or greater connections. Seated juror Hunt had worked for the Oakland Police Department for four years twenty years before and came from a family of police officers. 4/10/96 a.m. Tr. 120, Q. 33, 35. Prospective juror Irving had worked for the Kenner Police Department for about a year five years previously and testified that she had a somewhat favorable impression of Davis because he was a policeman and she had worked closely with police officers in the past and trusted them, 4/8/96 Tr. 217, 222, 229; she referred to alleged criminals as "perps," *id.* at 233, Q. 48, because that is "a term that we use in the police for 'perpetrator.'" 4/8/96 Tr. 233. Prospective juror Mansfield had been a reserve officer with the Gretna Police and had worked undercover for about a year developing drug cases. 4/8/96 Tr. 376, 379, 381-83. Prospective juror Russell had been a corrections officer at Hunt Correctional Center and his brother, like Dabney, worked as a sheriff's deputy for Sheriff Foti. 4/9/96 a.m. Tr. 469, 472. Seated juror Fayard was the godchild of a Causeway police officer and daughter of a security guard for a private business, Q. 33 and 34, while Prospective juror Becnel was married to a former NOPD officer (who was then working as a security officer in federal court), 4/9/96 p.m. Tr. 88, and was the mother of a

188

correctional supervisor for the Federal Bureau of Prisons in Oakdale, Louisiana, *id*. at 92, Q. 8, 33.[55]

Likewise, the Government failed to strike jurors who, in contrast to Dabney, admittedly were predisposed towards Davis because of his status as a cop. The Government accepted prospective jurors Becnel and Scheyd, who both testified it would be difficult to envision a police officer committing murder. 4/9/96 p.m. Tr. 85; 4/12/96 a.m. Tr. 106-07. It also accepted Irvin who testified that she had "a somewhat favorable impression of [Davis], him being a police officer. I worked so closely with them in the past and I trusted the ones . . . I have worked with . . . ." 4/8/96 Tr. 222.

Finally, although it is true the prosecutor struck the only two jurors who had law degrees, both of whom were white, this characteristic is quite different from a law-enforcement connection, and there were compelling, independent grounds to strike those two jurors.[56] Again, other white jurors with backgrounds more comparable to Dabney's were not stricken by the Government, despites its alleged concerns. Prospective juror Callahan trained as a paralegal and worked assisting battered women in obtaining restraining orders (and was married to a Slidell police officer). 4/8/96 Tr. 310, 314-15. Hunt, seated as a juror, had worked not only as a police officer, but as a legal secretary for six years. 4/10/96 a.m. Tr. 121.

No reason explains the Government's removal of Ms. Dabney, better than race.

---

[55] The government also contested the defense's successful cause challenge to Elaine Musso, 4/8/96 Tr. 360, even though her husband had been a police officer who had gotten into some sort of trouble with the federal government and "paid for what he did," *id.* at 350.

[56] Fendler believed that the criminal justice system was a farce, 4/9/96 p.m. Tr. 51-52; Kolb worked as an advocate for a civil rights law firm, Q. 12, and testified that the only purpose served by the death penalty was incapacitation, 4/9/96 p.m. Tr. 293.

### d.  Prospective juror F.Williams

The Government claimed that it struck F. Williams because (1) he was a Mason; (2) he believed his son's trial on federal drug charges was unfair and the prosecution did not believe his assurances that he would not let that effect his impartiality;[57] and (3) he agreed that the death penalty was unfairly applied against minorities.[58]  4/15/96 Tr. 27-28.    However, the Government's failure to strike similarly situated whites, belies the pre-textual nature of this race motivated strike.

The Government struck two black venire member because of their membership in the Masons; Rome and F. Williams. At the time of those strikes the Government alluded to an interchange with another prospective juror, Brignac, who was removed for cause after he expressed concerns that he might be unfair if he received secret masonic hand signals during the trial. *See* 4/10/96 a.m. Tr. 44-47; 4/15/96 Tr. 24-25. However, the Government's alleged concern did not extend to prospective juror Zini, who was also a Freemason, but white, and who the

---

[57] Although Williams advised that his son had been involved in drug trafficking and was serving federal prison time, *id.* at 386, 398, he indicated on the questionnaire that the experience would not cause him to lean in favor of either side, Q. 29, responded "N/A" to the question of whether he or a family member had been unjustly accused of something illegal, Q. 36, and stated that he felt that the friend/relative who had served time in jail had been treated fairly, Q. 37. When questioned about his son's situation during voir dire, Williams said he did not have strong feelings about drugs, although he was disappointed in his son, *id.* at 386; that, while at the time of his son's trial he felt it was not fair because his son was unable to present favorable evidence, *id.* at 390, he thought that he could separate the cases, *id.*, and, "[l]ooking back on it, knowing as much as I know now, well, let's say that the law served its purpose *id.* at 399. Whatever happened, he did," *id.*   He further stated that he had no feelings towards the prosecutors in this case "because I don't know any of them." *Id.*

[58] Williams was middle of the road on the death penalty, circling both C and D on the questionnaire.  Q. 54.  As he explained, "I don't believe in the death penalty, per se, all the time. I think, in certain cases, that I would agree to it, to the death penalty."  4/8/96 Tr. 392.  When the prosecutor attempted to get his commitment to a sentence of life without the possibility of parole, Williams testified that he did not think he would be more likely to choose that alternative to avoid imposing the death penalty.  *Id.* at 395.  He advised the  court that, if the facts justified the death penalty, he could vote to impose it.  *Id.* at 396. When asked if the binding nature of the jury's recommendation would alter his decision to impose the death penalty, he responded, "No, I think I would do my job.  I would do what would have to be done." *Id.*

Government accepted. *See* Q. 59.[59] The prosecution did not question any of these jurors about their status as Freemasons and its possible impact on the trial.

The prosecutor's remaining reasons for striking Williams – his views about his son' trial and about the death penalty – were not applied to similarly situated white prospective jurors either. Like Williams, Irving had a close family member, her brother, who had been convicted of a serious offense (armed robbery); unlike Williams, she stated on her questionnaire that her brother's conviction *would* impact her neutrality. Q. 29. Jury foreman Cloud and prospective jurors Newman and W. Williams had family members or close friends who had served jail time and/or been convicted of criminal offenses. Seated juror Plaisance responded on the questionnaire that she slightly agreed that the death penalty was unfairly applied to minorities. Q. 58 (e). All five were accepted by the Government.

### e. Prospective juror Bartholomew

The Government claimed that it struck Ms. Bartholomew because (a) her answers about imposing the death penalty were too qualified; (b( she opposed the death penalty for juveniles "but could on adults" and "therefore, defendants are deprived of adolescence, taking defendants out of death penalty consideration"; and (c) based on her questionnaire and voir dire responses she had an exaggerated sense of the rehabilitative potential of all individuals. In addition, the Government noted that she disagreed that the death penalty gave the criminal what he deserves, she agreed the death penalty was unfairly applied against minorities, and "seemed to display a little bit of anger at the Government questioning her, which was me. 4/15/96 Tr. 25-26.

---

[59] Notably, neither the court nor defense counsel seemed convinced by the alleged risks During the colloquy that followed Brignac's unusual revelation, the  court remarked that "[w]e have been through 88 jurors and we haven't had any try and sign," while defense counsel Markey expressed surprise at the juror's remarks. *Id.* at 48.

Illogical and incoherent at times, this "kitchen sink" litany of reasons, many of which are unsupported by the record, reeks of pre-text. *See, e.g.*, *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (*per curiam*) ("At [the third] stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.").

First, the record shows that AUSA McMahon conducted the voir dire questioning of Bartholomew, *see* 4/8/96 Tr. 110-13, but that Justice Department Attorney McCloskey provided the Government's race-neutral explanations for its peremptory challenges. The prosecutor's claim that the juror displayed anger at "me" is patently false. And unlike on other occasions where the Government pointedly placed observations about the demeanor of jurors on the record,[60] they mentioned nothing of the juror's alleged "anger" at the time, confirming its dubious validity. In any event, given the trial court's failure to comment on whether Bartholomew appeared "angry," this Court "cannot presume that the trial judge credited the prosecutor's assertion . . . ." *Snyder v. Louisiana*, 128 S. Ct. 1203, 1209 (2008), and it must be ignored, except to the extent that its contradiction by the record puts the validity of the strike in question.

Secondly, the government's argument that it struck Bartholomew because she testified she could not impose the death penalty on a juvenile offender and "therefore, defendants are deprived of adolescence, taking defendants out of death penalty consideration" is ridiculous, to the extent it is even coherent. As the court itself pointed out, none of the defendants was a juvenile[61] and, at the time of trial, the FDPA prohibited the death penalty for juvenile offenders,

---

[60] *See, e.g.*, 4/8/96 Tr. 95 (prosecutor noting that juror hesitated in responding to question); *id.* at 303 (prosecutor noting juror appeared "hesitant" about death penalty); 4/9/96 p.m. Tr. 253 (prosecutor noting that juror hesitated in responding to question).

[61] Both Davis and Hardy were around 30 years old at the time of the offense. *See* SR 4901; Hardy SR at 703.

*see* 18 U.S.C. 3591(b). More importantly, Bartholomew clearly stated she believed that death was *more* appropriate than a life sentence for adults, who unlike juveniles, she believed could not usually be rehabilitated most of the time, and are fully responsible for their own actions. 4/8/96 Tr. 110-12. She also expressed that death was *more* appropriate for a cold-blooded, premeditated murder than a life sentence. *Id.* She clearly did not have an "exaggerated sense of the rehabilitative potential of all individuals," as the Government asserted. Having learned about the crime in the media, she also indicated her belief that "in this case" the facts warranted the death penalty.

Third, the Government failed to strike white jurors who gave identical responses to questions in the jury questionnaire which the Government asserted it had issue with. For example, Bartholomew's view that she "did not agree that the death penalty gave the criminal what he deserved," was shared by seated white juror Rodrigue, white prospective juror Poché, and white alternate Wallace. *See* responses to Q. 58(a). Seated Juror Plaisance, moreover, believed the death penalty only applied to "some kind of heinous crime, somebody with no conscience, no morals, 4/12/96 A.M. Tr. 71 or who would go free and would be likely to do it again." 4/12/96 A.M. Tr. 71. And she also believed that the death penalty was unfairly applied to minorities. *See* response to Q. 58 (e). All were accepted by the Government. The prosecution's asserted reasons for striking Ms. Bartholomew are implausible; they are better explained by race.

### f. Prospective juror Alvis

The Government asserted that it struck juror Alvis because although she initially appeared to be a favorable juror for the Government, as questioning went on "her thoughts became muddled. She did not seem to have a coherent thought pattern. We felt that she answered the questioner the way she thought that the interrogator wanted her to answer on a range of

issues both pro and con to the government.  She said she could not give a first time offender a death penalty, and she responded very often "Uh-huh, Uh-huh" to many questions. So, we just felt that she did not exhibit a very concise pattern of thought." 4/15/96 Tr. 27.

However, her pro-prosecution stance could not have been clearer, more "coherent" or less "muddled". She strongly favored the death penalty for intentional murder, and advised the court that premeditation alone would alone make her want to impose it. 4/8/96 Tr. 284; *Id.* at 286. She explained that it would be "automatic" because "I'm sure the parents would feel that way.  If it was their child, they would feel the same way too." *Id.* at 284-85. While she confirmed she stated that she could consider a life sentence and mitigating factors when questioned by the prosecution, *Id.* at 286-87, she stated to defense counsel that she that she would expect them, as lawyers, to provide information to support a life sentence. *Id.* at 291.[62]

Despite the Government's assertion to the contrary, she did not appear to want to please whoever was questioning her because she repeatedly gave answers that were not what the questioner was looking for, as she steadfastly stuck to her pro-death stance. When the court explained that speculation about the parents' feelings was not a relevant sentencing consideration, Alvis persisted in her position and said she was "just saying [her] opinion." 4/8/96 Tr. 285.  Although the court had instructed her that jurors were required to give "serious consideration to life imprisonment," *id.*, Alvis continued to state that she would vote to impose the death penalty if the defendants were found guilty of intentional murder, *id.* at 286.  When questioned by Davis's counsel about whether she would expect the defense to prove something

---

[62] Alvis's questionnaire responses also indicate that she was a pro-government juror.  She disagreed strongly that it was better to let some guilty people go free rather than risk convicting an innocent person. Q. 44(a).  She agreed that the death penalty gives the criminal what he deserves and disagreed that the State cannot teach the sacredness of life by destroying it; she disagreed the death penalty is unfairly applied to minorities and agreed that prisoners have a better quality of life than taxpayers.  Q. 58.

194

before considering a life sentence, she indicated that she would. *Id*. at 291. When questioned by Causey's attorney about her feelings about gangs, she explained that she would likely think that those who hung with gangs were bad and that all gang members would be responsible for the gang's actions regardless of whether they participated. *Id.* at 295-96.

The record also flatly contradicts the prosecutor's proffered reason that they struck Alvis because she stated she would not impose the death penalty on a first time offender. In fact Alvis merely confirmed during her testimony that she would consider the fact that the crime was a first offense as a mitigating factor. 4/8/96 Tr. 291-92.

Finally, while the record does confirm that Alvis responded "uh-huh" to three questions, (hardly "very often" in the course of fifty pages of transcript her voir dire consumed), the Government did not strike whites jurors who said "uh-huh" as many times or more than Ms. Alvis did. Juror Irvin (three times), *see* 4/8/96 Tr. 221, 230, 240, Lightfoot (five times) *see* 4/11/96 p.m. Tr. 8, 10, 11, 13, 21; Juror Riggio (eight times), 4/10/96 a.m. Tr. 129, 130 (3 times), 131, 132, 133, 134. Again, the prosecutions actions and statements throughout voir dire undermines confidence in their asserted reasons, suggesting that race was the root.

### g.  Prospective juror Mogilles

The Government asserted that it struck Mogilles because (1) he got "extremely bad vibrations" because she seemed "very removed and somewhat disassociated," gave "monosyllabic" answers, appeared "testy with all lawyers" and "exhibited general discomfort, verging on animosity"; (2) the prosecutors "didn't think she would work well with other jurors"; and (3) in light of "her opinion about black defendants that 'Yes, however, it is important that the defendant is honest and his legal advisor is effective as a criminal attorney,' the prosecutors "perceived that if she felt that any defense attorney was falling down on the job, she would jump

195

in and save the day for the defendant. And that was something we felt might influence other jurors." 4/15/96 Tr. 29-30.

Yet again, a thorough review of the record reveals the implausibility of the asserted reasons. First, the record is completely silent regarding this juror's attitude during her examination. Given the prosecutor's failure to contemporaneously preserve the allegedly objectionable demeanor at the time of the answers were given, and the trial court's failure to substantiate this reason, this Court cannot credit the prosecutor's supposed "bad vibrations" as reason for the strike. *See Snyder*, 128 S. Ct. at 1209.

What is clear however, is that contrary to the Government's contention, Ms Mogilles, answered all the questions that were put to her and the brevity of many of her responses are readily explained by the form of the questions she answered.[63] Tellingly, the prosecutor did not comment about or object to this juror following questioning. *Id.* at 18-19. Neither did he strike white jurors who gave similarly brief responses. For instance, prospective juror Morgan was asked only "yes or no" questions by the prosecution and answered them monosyllabically. 4/9/96 a.m. Tr. 485. Likewise, Dubose, answered seven of eight questions from the prosecutor with "yes" or "no." *Id.* at 514-16.

The inconsistency in the prosecutor's reasons for striking Mogilles, raises further doubts about the race-neutrality of the strike. On the one hand, the prosecutor claimed that her

---

[63] The prosecutor asked her how she pronounced her name and six "yes or no" questions which she answered with "yes" or "no." 4/10/96 p.m. Tr. 13-15.[112] When asked questions by the court or defense counsel that called for additional information, she freely answered their questions. *See, e.g.*, *id.* at 10-11 (responding to court's questions about her knowledge of the case); *id.* at 13 (advising court that "I can accept the principle that a person does not have to actually testify in their own behalf and not pass judgment on that individual"); *id.* at 18 (answering defense counsel's questions about her educational background).

"withdrawn" and "disassociated" affect indicated that she would not "work well with other jurors"; on the other hand, the prosecutor suggested that Mogille's belief that it was important to the fairness of a black defendant's trial that the defendant be honest and his counsel effective (a questionnaire response about which the prosecution asked no questions) might influence other jurors because she might "jump in and save the day." *See, e.g.*, *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (*per curiam*) ("At [the third] stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.").

Overall, Ms. Mogilles was not a bad juror for the Government.[64]  When considered in light of the entire voir dire record, as *Miller-El II* and *Snyder* require, the prosecutor's reasons for striking Ms. Mogilles appear in a highly improbable light.

Considered individually and cumulative, the strikes of Ms. Mogille and those of the other jurors discussed above, "correlate with no fact as well as they correlate with race." *Miller-El II*, 545 U.S., at 266.

**D. The Compelling Evidence Of The Prosecutor's Discriminatory Intent Revealed By The Pre-Textual Nature Of The Prosecutor's Explanations Is Bolstered By Broader Patterns Of Discriminatory Practice In Jury Selection.**

As in *Miller-El II*, "[t]he case for discrimination goes beyond these comparisons to include broader patterns of practice during the jury selection" and are bolstered by the

---

[64] She held an MBA, Q. 12, which qualified her as a favorable prosecution juror according to the Government's own jury consultant. SR 1650. Although she had indicated on her questionnaire that she was generally opposed to the death penalty, *see* Q. 54, the Government offered no complaint in that regard and during voir dire she repeatedly confirmed that she could impose a death sentence if the government proved it was the appropriate punishment. 4/10/96 p.m. Tr. 10.  She believed that the criminal justice system was effective, Q. 39, and that black defendants received fair trials, Q. 40.  She disagreed strongly that it is better for society to let some guilty people go free rather than risk convicting an innocent person, Q. 44(a), and had no problems with the government's use of plea agreements and cooperating witnesses to convict the guilty, Q. 48, 49.  She slightly agreed that the death penalty gives the criminal what he deserves, disagreed that the state cannot teach the sacredness of life by destroying it, and disagreed that the death penalty is unfairly applied to minorities.  Q. (A), (b) and (e).

Governments disparate questioning of black and whites jurors, and the prosecution's actions near the end of the trial. *Miller-El II*, 545 U.S., at 253.

### a. The Prosecutor Engaged In Disparate Questioning Of White And Black Prospective Jurors

Yet further proof of the Government's intentional discrimination against black jurors is evidence that prosecutors questioned African-American jurors who indicated that they could vote for the death penalty differently than their white counterparts.

First, black jurors were far more likely to be asked by the Government whether the race of the defendants would bias their decision making – questions the prosecutors, for the most part, failed to link to anything the jurors had stated in voir dire or in their questionnaire responses. *See* 4/8/96 Tr. 74 (Rome), 112-13 (Bartholomew), 280-81 (Age); 4/10/96 a.m. Tr. 34-35 (Partman); 57 (B. Williams); 4/10/96 p.m. Tr. 111 (Magilles).[65] Only *one* white prospective juror, Webber, was asked a comparable question.[66] 4/8/96 Tr. 46-47. Underlying the prosecutor's question is an assumption that black jurors would be likely to sympathize with black defendants – an assumption that *Batson* makes clear may not operate in the jury selection process and an assumption that was not even raised by the facts of this case, given the black-on-black nature of the offense.

Secondly, assertions by black jurors that they could vote for the death penalty tended to be given far greater scrutiny by the Government, prompting follow-up questions rarely asked of comparable whites. Thus, blacks were more likely to be asked if they would be willing to sign a

---

[65] For instance, the prosecutor asked Rome whether "The fact that the defendants in this case are African-American, would that in any way cause you to sympathize or show any kind, of favoritism or anything along those lines, any bias in their favor?" 4/8/96 Tr. 74.

[66] Webber was asked whether the race of the defendants or the victim would impact him. 4/8/96 Tr. 46-47.

written recommendation for the death penalty or face their families after voting for it, or if the fact that the judge could not change the sentence would cause them to alter their views on the death penalty.[67] In the first two days of voir dire, black jurors Bartholomew, Goudy, L. Williams, F. Williams, and Dabney were asked such questions. *See* 4/8/96 Tr. 111, 247-48, 322, 395-96;4/9/96 p.m. Tr. 531-32.[68] During the same time period, only one white prospective juror, Alexander, the 43rd juror questioned, was asked similar questions.[69] 4/9/96 a.m. Tr. 533-35.

The prosecutor's disparate questioning appears designed to corral African-American prospective jurors into providing disqualifying answers (or answers that could be deployed against a *Batson* challenge) – even when the juror had expressed strongly pro-death penalty sentiments. *See, e.g.* 4/9/96 p.m. Tr. 135-36 (prosecutor's questioning of prospective juror Dabney). It is yet further evidence of the race-conscious exercise by the Government, of its peremptory strikes. *Cf. Miller-El II*, 545 U.S., at 260 (prosecutor's disparate use of a "graphic script" to describe execution appeared to be designed to "make a case for excluding black panel members opposed to or ambivalent about the death penalty").

---

[67] The disparities are most apparent in the first half of voir dire, and incorporated some of the questions the prosecution had directed primarily at black prospective jurors into the court's general questions to everyone.

[68] The prosecutor also attempted to ask African-American juror Green whether she would "be able to go home after voting to put someone to death, back to your family, and live comfortably with that, seeing that you're opposed to the death penalty?" but the court ruled the question inappropriate. 4/8/96 Tr. 165.

[69] Subsequently, beginning on April 10, 1996, the  court began routinely asking jurors whether they could "sign off" on a recommendation for the death penalty. *See, e.g.*, 4/10/96 a.m. Tr. 10, 26, 31, 34, 54, 110, 187, 231.

**h. The Prosecutor's Failure To Seek The Removal Of A Seated Juror Who, The Evening Before Selection Phase Deliberations Advised Marshals That He Was Not Sure He Could Impose The Death Penalty Provides Additional Evidence Of The Prosecutors' Discriminatory Intent In Striking African-American Jurors.**

Finally, the strength of the Government's race-based aversion to black jurors was underlined when it failed to take steps to remove a seated juror, who the evening before selection phase deliberations began, advised marshals that he was unsure if he could impose the death penalty. The first available alternate who would have replaced him if the Government had done so was a black female. On the morning of April 26, 1996 (the day Davis's selection phase ended and the jury left to deliberate), the court and counsel received a report from federal marshals that white male juror, Bourgoyne, had been "found within the [hotel] hallway very upset" about "his brother who died of a crack over dose" and was concerned that he "didn't think that Kim Groves would get justice and *he also didn't know that he would be able to take a life*."   4/26/96 Tr. 2 (emphasis added).

During the colloquy, the court and parties speculated that the juror Bourgoyne was sleep deprived (he'd been seen nodding off during trial) and "wigging out."  *Id.* at 2-3.  A prosecutor suggested that it "may be leading to a potential breakdown."  *Id.* at 3. The court noted there were four alternates and suggested waiting to see how the juror did. When the court asked whether anyone wanted to question Bourgoyne, the prosecution kept silent. *Id.* at 5.[70]

That on the eve of sentencing deliberations, the Government failed to seek to replace or even question a juror who appeared to be mentally unstable and who acknowledged he might be unable to return a death sentence is remarkable. While there may have been other reasons the

---

[70] Davis's counsel similarly declined to question the juror.

government chose not to seat the particular black alternate juror in this case, the desire to keep African Americans off the jury appears on this record to be the most apparent.

### E. Other Evidence That Race Plays A Part In The Administration Of Justice By The Government, Particularly In Capital Cases.

In this case, the Government focused its investigation on African American police officers. It prosecuted Mr. Davis in federal court, where the jury pool was composed of significantly fewer African Americans. It sought death for a civil rights violation, which it has only done in cases involving African American defendants—an interesting twist of fate considering that the civil rights statutes were initially enacted to protect African American citizens from violence perpetrated by white citizens.

Other race-based decision-making forms part of the totality of relevant circumstances that must be considered. *See Miller-El II,* 545 U.S. at 253-54 (State's exercise of discretion at other points in the jury-selection process which also limited the number of African-American jurors, relevant to determination that the State's subsequent peremptory strikes of African-Americans were racially motivated.)[71] *Alexander v. Louisiana,* 405 U.S. 625, 630 (1972) (finding racial discrimination in selection of grand jurors where Petitioner alleged a "consistent process of progressive and disproportionate reduction of the number of Negroes eligible to serve on the grand jury at each stage of the selection process until ultimately an all-white grand jury was selected to indict him"). Those decisions provide further powerful circumstantial evidence that the Government's actions when it struck 79% of qualified black jurors to get a nearly all-white jury, were motivated by race.

---

[71] In *Miller-El* the Court considered the State' use of "jury shuffles," a unique Texas procedure by which parties could randomly re-arrange the order in which potential jurors were called for questioning.

*Conclusion*

Careful consideration of all the evidence and record here presents overwhelming proof that the prosecution in Mr. Davis' first trial struck black prospective jurors on the basis of invidious discrimination. As in *Miller-El II*, it "blinks reality to deny" that the prosecutors' struck Green, Butler, Dabney, F. Williams, Bartholomew, Alvis, and Mogilles "because they were black. The strikes correlate with no fact as well as they correlate with race." *Miller-El II*, 545 U.S., at 266. The credibility of the Government's alleged race-neutral reasons are belied both by the record of voir dire, and evidence that intentional racism infects the administration of justice by the Government in the Eastern District of Louisiana. Petitioner's conviction must be reversed under *Batson* and its progeny. *Miller-El II,* 545 U.S. at 265 (Reversing capital conviction where, viewed cumulatively, the direction of the evidence was too powerful to conclude anything but discrimination.")

**CLAIM 13.    COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT THE SELECTION PHASE OF MR. DAVIS' 2005 TRIAL BY FAILING TO INVESTIGATE AND PRESENT MITIGATION, IN VIOLATION OF MR. DAVIS RIGHTS GUARANTEED BY THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNTIED STATES CONSTITUTION**

At Mr. Davis' sentencing trial in 2005, his attorney Carol Kolinchak was assigned the responsibility of preparing mitigation for the selection phase. Ex. S-B, Declaration of Carol A. Kolinchack, at 1 (filed under seal). She was aware of the requirement that she conduct mitigation investigation, and even spoke with a mitigation specialist, but then "dropped the ball." *Id.* at 1-2. She unreasonably failed to investigate and present mitigating evidence of *all* the factors that led to Kim Groves' death at the hands of Paul Hardy. As a result, none of the

202

extensive mitigation set out in this claim was investigated or presented to the jury that sentenced Mr. Davis to death.[72]

Had trial counsel investigated mitigation and used mitigation available to her at the time, she could have presented evidence to the sentencing jury that on October 13, 1994, Mr. Davis was caught up in the perfect storm of intersecting vulnerabilities which caused his life, and his actions, to spin out of control.[73]  As does a person addicted to drugs or alcohol, Mr. Davis started out small.  Starting out small, however, steadily increases to full-blown abuse of drugs or alcohol in people with a predisposition to addiction.  Mr. Davis' preexisting vulnerabilities, which developed from a childhood of failure and what appear to be symptoms of mental illness, drew him into the FBI's offer of power and importance in Operation Shattered Shield.  NOPD's lowered standards for applicants and poor training and supervision created the circumstances which allowed Mr. Davis to spin further and further out of control.  The FBI continued to expand Mr. Davis' role in Shattered Shield, increasing his responsibilities and power.  And then, at a minimum, the FBI failed to adequately monitor Mr. Davis' activities, even though it had complete capability to do so.  The removal of any one of these intersecting forces might have changed the course of events in 1994.

If trial counsel had conducted the appropriate investigation, substantial mitigation would have been put before the jury, to take into account when it considered the appropriate sentence to impose.  Instead, the only mitigation placed before the jury was not credible at all, and the jury did not find a single circumstance mitigating against a sentence of death.

---

[72] Undersigned counsel has not had any contact with Mr. Davis during the course of our representation; all mitigating evidence presented herein has been discovered without his assistance and was equally discoverable to counsel in 2005.

[73] In this claim, Mr. Davis' guilt is presumed, as it must be when a jury has found a defendant guilty and is tasked with determining the appropriate sentence to impose.

203

*Strickland v. Washington*, 466 U.S. 668 (1984), directs a two-pronged approach to the assessment of ineffective assistance of counsel claims.  First, it requires a showing that counsel's performance fell below an objective standard of reasonably effective representation. 466 U.S. at 687-88.  Second, it must be shown that prejudice resulted from the ineffectiveness.  To prove prejudice, the defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  A reasonable probability is one that is "sufficient to undermine confidence in the outcome."  *Id*. at 683.  The reasonable probability standard under *Strickland* is "*not* a sufficiency of evidence test."  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (emphasis added); *Gonzales v. Quarterman*, 458 F.3d 384, 390 (5th Cir. 2006).  Moreover, the standard is less than a preponderance of the evidence: "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the trial."  *Strickland*, 466 U.S. at 693; *see also Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (O'Connor, J., concurring); *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

Counsel's performance may fall below an objective standard of reasonableness through her failure to investigate and present mitigation. The "independent duty to investigate and prepare" is "[a]t the heart of effective representation," *Goodwin v. Balkcom*, 684 F.2d 794, 805 (11th Cir. 1982), and the adversarial system itself:

Investigation of mitigation is at the heart of capital representation.  The United States Supreme Court has repeatedly stressed the importance of a thorough mitigation investigation, citing the American Bar Association guidelines for capital defense work as "standards to which we long have referred as 'guides to determining what is reasonable.'"  *Wiggins v. Smith,* 539 U.S. 510, 524 (2003) (internal citations omitted).  The duty to investigate mitigation exists

204

"regardless of any . . . statement by the client that evidence bearing upon penalty is not to be collected or presented." ABA Guidelines (2003), at Guideline 10.7(A)(2). Regardless of a client's statements regarding mitigation, counsel must consider and investigate "'anything in the life of a defendant which might militate against the appropriateness of the death penalty for that defendant,'" which will "require[] extensive and generally unparalleled investigation." *Id.* at 1022 (Commentary, Guideline 10.7).

## A. Mr. Davis Endured a Childhood and Adolescence Marked By Failure and Invisibility

Had counsel investigated Mr. Davis' childhood, even without his and his family's participation, she would have found after interviewing many neighbors, teachers, and other Lower Ninth Ward community members, that no one knew Len Davis or his family, even though they lived in the same house in the Lower Ninth Ward from the time Len was one until he was 14. The Lower Ninth Ward was a close-knit community at that time, and Mr. Davis attended St. David School, part of the St. David Catholic Church, where the children and families were well-known to one another. He lived on Tennessee Street, also a close-knit community, where children played together and families socialized and looked out for one another. The Davis family's invisibility in and of itself is significant. Given the community ties, the fact that no one knew the Davis and his family suggests that they were extremely isolated.

The family's isolation during that time only becomes more alarming when Len's parents' roots are factored in. Counsel would have discovered that Len's father, Herbert Davis, grew up on Flood Street in the Lower Ninth Ward. Ex. G, Birth Certificate, Herbert Rudolph Davis. He married Velma Lee Brown, Len's mother, in 1954. Ex. H, Marriage Certificate, Herbert and Velma Brown. She was originally from Franklinton, Louisiana, but her family moved to the Florida Housing Development, and she was living there, with her family, when she met and

205

married Herbert Davis. Velma Brown was 17 years old when they were married. Herbert Davis was 18. *Id*. At some point after their marriage, the couple moved to Chicago, where Herbert worked as a shipping clerk. Len was born on August 6, 1964, while they were living in Chicago. Ex. I, Birth Certificate, Len Edwin Davis. They were married for 10 years before Len was born, and he was their only child. An extended family member has recently reported that Herbert Davis was not Len Davis' biological father.

When Len was one year old, the Davis family moved back to the Lower Ninth Ward, to Tennessee Street. Herbert Davis worked as a hair stylist and Sears salesman. *Polk Directory*, Employment Listing, 1968. Velma Davis worked as a house maid, nursing assistant, and cafeteria server.

Len's father beat him relentlessly. In those beatings, Herbert Davis would tie Len's hands behind his back and punch him in the face. Even so, when Len's father died a long, slow, painful death from cancer of the stomach, Len was devastated. Herbert Davis died in the Davis home four days before Christmas in 1976. Ex. J, Death Certificate, Herbert Davis. Len was 12 years old and presumably witnessed his father's death.

Len attended St. David School from kindergarten through second grade. He then attended Lawless Elementary and Lawless Junior High Schools through the eighth grade. Len suffered two head injuries as a child—one from a fall at St. David, requiring stitches, and one from being hit on the head with a pipe at Lawless, also requiring stitches. Len had some problems with fighting at Lawless Junior High School. He was never suspended, but was given extra work to do around the school.

After Len's father's death, his mother remarried and the family moved out of the Lower Ninth Ward and to New Orleans East when Len was 14 years old, in 1976.

206

Len attended St. Augustine High School from ninth through eleventh grade.  His records show that he did very poorly academically.  When Len left St. Augustine, he was ranked 194 out of 199 students for his three-year period of attendance.  Ex. K, St. Augustine Cumulative Records.  He Attended Abrahamson for his last year of high school.  His cumulative GPA was 1.6818 when he graduated from Abrahamson in 1982.  Ex. L, NOPS School Records.

Mr. Davis attended LSU in Baton Rouge from 1982 to 1983.  He had to take remedial courses in English and in Math.  He had wanted to study journalism, but did not complete the year.

According to NOPD records introduced at trial, Mr. Davis then returned to New Orleans and began working on his maternal uncle Leo Morris' candy truck from 1983-1986.  DE 53.  Also in 1983, Mr. Davis enrolled at UNO to study journalism.  He only completed one semester.

Mr. Davis was not insensitive to his repeated failures.  Records demonstrate that he exaggerated his accomplishments, indicating that he was ashamed of his failures.  When applying to NOPD, Mr. Davis claimed that while working on his Uncle's candy truck, his reported that his monthly salary was $1000, and said he was "head cashier, was in charge of entire store from stocking to selling of merchandise."  He also reported completing two years of college.  DE 53.

Had counsel performed a minimal investigation, and utilized records in her possession that she ignored at trial, because she had no context to place them in without investigation, she could have shown jurors that Mr. Davis' led an isolated life as child, suffered repeated failures, and was ashamed of those failures.  All of the information from his childhood was critical to understanding Mr. Davis' path at NOPD, and his vulnerability when the FBI entered his life and offered to make him the "big man" in what he believed to be a huge drug operation.

207

**B. Counsel Failed to Investigate and Present Mitigating Evidence of NOPD's Creation of a Culture Which Allowed for Kim Groves' Murder.**

Counsel unreasonably failed to investigate and present readily available evidence of NOPD's miserable state of affairs in 1994.   Had she done so, she could have shown jurors that NOPD hired unqualified officers, failed to train and supervise them, sent them into the equivalent of a war zone, where murder and violence were occurring on a daily basis, and actually encouraged them to engage in brutality.  All of NOPD's deficiencies while Mr. Davis was on the force allowed, even enabled, Mr. Davis to become the person he was the day Kim Groves was murdered.  While conditions on the police force do not by any means exempt Mr. Davis from responsibility for Ms. Groves' murder, they do mitigate against a sentence of death, and counsel should have presented the evidence to the jury.

The 1980's, when NOPD hired Mr. Davis, came to be known as a period of "binge" hiring" in metropolitan police forces across the country.  The crime rate was rising dramatically across the country, and police forces responded by dramatically increasing the number of police officers in a very short period of time.  Hand in hand with rapid hiring of larger numbers went a decline in standards for hiring.

> Within law enforcement circles, any discussion of the hazards of "binge" hiring begins with the experiences of Miami and Washington, D.C. In an effort to hire more officers in a short period of time, both departments lowered admission standards, expedited or haphazardly completed background checks, and cut corners on training in order to meet hiring goals and timetables. Large numbers of unprepared rookies were thus rushed into service. In both departments, the officers employed during periods of "binge" hiring were involved in criminal and corrupt behavior.

C. Mahtesian, *Big Blue Hiring Spree*, Governing, Vol. 9, Issue 4, 28-31 (January 1996).

This was true in New Orleans.  Standards were lowered to the extent that 30-50% of applicants to the force were hired.  A reasonable hiring rate, indicating appropriate screening, would have been under 10%.  Even applicants who were screened out by investigation, even

those with criminal histories including felonies, were being hired. *Report of the Police Reform Subcommittee*, September 6, 1995, at 5.

Len Davis passed the civil service exam and was employed by NOPD in February 1987. Four months later, in June 1987, the Director of the Police Academy recommended that Mr. Davis be dismissed, for academic deficiencies. Mr. Davis had failed three of the 12 module exams upon first sitting for them. On June 21, 1987, Mr. Davis was terminated from NOPD's employ. D.E. 53 (NOPD Personnel Records).

Unfortunately, during the days of Mr. Davis' employment by NOPD, there was little respect for the intellectual qualities that applicants should bring to the force:

> There seems to be a great deal of reluctance to raise the entry standards for individuals seeking to become New Orleans police officers. Some believe that increased standards might unfairly discriminate against some minority groups seeking entry into the department. Others believe that a 21 year old high school graduate with no major problems in his/her background is sufficient to be a police officer in New Orleans. Additionally, there are those who believe that there is no direct correlation between higher level civilian education and performing police duties in a society that is moving away from traditional policing techniques and toward community policing philosophies and/or strategies.

> … "[E]verything in policing is simple - but even the simplest things are difficult" considering the many uncertainties and resistance that police officers must now face in a society that has become very diverse, complex, and challenging in terms of maintaining order, providing public safety, and enforcing laws. Common sense dictates that new police officers must have high values, mature judgment, good communication skills, confidence, and professional competence that more education, not less, generally provides.

*Project Quality Force*, Report of the Louisiana Military Department, May 31, 1994, at 5-44 (citation omitted).

Somehow Mr. Davis came to be re-employed by NOPD. On November 18, 1987, he was reappointed pending the results of a background investigation. No investigation was ever completed—at least none that ever made its way into a report in Mr. Davis's personnel file.

209

Again and again, those who studied NOPD or worked in it in the 1990's voiced complaints about the complete lack of ongoing training supervision throughout the police force. The years preceding Kim Groves' murder were likely the worst, ever, in this regard.  When Arnesta Taylor took over as Superintendant of Police in 1991, the changes he implemented destroyed NOPD's chain of command:

> Arnesta Taylor has been characterized by many police officers, both black and white, as a nice person but totally unqualified for the position of SOP. Many credit him exclusively with the rapid decline of the NOPD to the status that the department finds itself in today. It was under his administration that wholesale transfers of police officers took place, destroying cohesion and morale, and all but eliminating the effectiveness of what remained of the NOPD chain of command. Taylor and the other four politically appointed ASOPs reportedly often fought among themselves and created enormous separations between bureaus, divisions, and districts as well as individuals. Moreover, it was during. his police administration that the greatest number of allegations and confirmed incidents of both police ethical and criminal corruption surfaced since the 1950s. His tenure as the SOP is considered by the vast majority of police officers interviewed as by far the worst in recent NOPD history.

*Project Quality Force*, Report of the Louisiana Military Department, May 31, 1994, at 5-6.  The NOPD districts became fiefdoms, worlds unto themselves, and there was no uniform system of accountability across the police department.  Performance standards were established by individual districts and randomly enforced.  Without "clearly articulated philosophies of command, leadership, management, or policing in practice" and without a "departmental long-range plan to provide vision and direction," *see id*. at 1, the NOPD had adopted a mission of protecting and serving itself and not the public: "The NOPD seems to be an inward-focused police subculture that dwells almost constantly upon protecting individual and collective NOPD interests over serving the public." *Id*. at 5-5.

Nowhere was this truer than in the Fifth District, where Mr. Davis worked from 1988 to 1994.  In the 1990s, when crime in the Fifth District was rampant, NOPD's response was to

210

assign officers who had been cast off from other districts due to poor performance or disciplinary problems.[74]    There was little accountability for cops on the beat.    They became "radio cops," without supervision in the field. *Report of the Police Reform Sub-Committee of the Human Relations Committee*, 5 (1995).    Pay was abysmally poor—so  poor that a whole culture of cops emerged who considered confiscated drug money to be "supplemental pay."  *Id*. at 4.  Corruption and violence went unchecked, and were even condoned.  In 1992, NOPD Superintendent Arnesta Taylor proclaimed: "Use of force, as unpleasant as it may be, will unfortunately be part and parcel of police work. . . .There will be those who speak only the language of violence and understand only the language of force."[75]

Had counsel investigated NOPD, and presented jurors with comprehensive information about it during the time Mr. Davis worked there, counsel could have placed his actions, in terms of police corruption, in context.  Mr. Davis became a cop, like almost all do, to serve the public—to do right by the public.  Over the course of his career at NOPD, he received satisfactory performance evaluations.  DE-53.  He was the kind of cop that was valued at the time, because he was not afraid to enter into dangerous situations and, with the exception of the one sustained brutality complaint, he didn't cause too much trouble.  The NOPD encouraged Mr. Davis in his career as a police officer.  Between 1989 and 1993, Mr. Davis received a total of nine commendations, including three Medals of Commendation (1989, 1990, 1992), a Purple Heart (1991), two Letters of Commendation (both in 1992), one Unit Citation for Achievement (1992), and two Medals of Merit (both in 1993).  But somewhere along the way, after signing up

---

[74] James Varney, *District Known for Bad Cops*, TIMES PICAYUNE, Dec. 9, 1994, at A1.

[75] Michael Perlstein, *Police Memo Snubs Study on Brutality*, TIMES PICAYUNE, July 24, 1993, at B1.

with the intention of doing good things and before becoming involved with Paul Hardy and Shattered Shield, things changed.

Mr. Davis did not create the circumstances that permeated the entire NOPD, and had been brewing for decades, if not generations, when he was first employed. The force was broken, and Mr. Davis was only one of many corrupt cops. Most went on to be fired as Superintendent Pennington came in and cleaned things up. That likely would have been the way of Len Davis had it not been for his particular vulnerability to becoming caught up in Shattered Shield.

**C. Counsel Failed to Investigate and Present Mitigating Evidence of Mr. Davis' Mental Illness.**

When Mr. Davis first applied to NOPD in 1985, one member of the Applicant Selection Review Board voted to reject his application. As a result, he was referred for psychological evaluation. Even then, the signs of symptoms of mental illness were present. Counsel was in possession of the evaluations prior to sentencing, but failed to present them as mitigation to the jury that sentenced Mr. Davis to death.

Psychological evaluation of Mr. Davis in 1985 revealed low scores in the areas of "impulse control," "stability/maturity," and "probable adjustment to organization." DE-53. The psychologist concluded that Mr. Davis "obtains test results similar to results of persons who are seen as having problems expressing anger in an appropriate, modulated manner. They may be immature, rebellious, and non-conforming and have a history of minor difficulties with societal limits. Some tendencies to blame others for problems is suggested." *Id.* The psychologist was unable to conclude whether Mr. Davis was a "good risk" or "poor risk" applicant. *Id.*

Mr. Davis' application sat dormant for over a year, so when he started the Police Academy in 1987, he was sent to be reevaluated by the same psychologist who evaluated him in

212

1985. Consistent with his previous psychological evaluation, Mr. Davis received low scores in the categories of "impulse control," "stability/maturity," and "probable adjustment to organization." The psychologist also identified an additional weak category: "tolerance/ openmindedness." The evaluation form required the psychologist to assess the risk resulting from hiring Mr. Davis as a police officer: poor risk, good risk, or need more information. The psychologist crossed out "good risk," and wrote instead, "fair risk." DE-53.

The sequence of events leading to the murder of Kim Groves, while never excusable, is perhaps less incomprehensible in light of Mr. Davis' symptoms of mental illness. According to psychiatrist George W. Woods, Jr., M.D., Diplomate of American Board of Psychology and Neurology, "Mr. Davis exhibits many symptoms consistent with significant mental dysfunction:"

> Mr. Davis exhibits many symptoms consistent with significant mental dysfunction. These symptoms are consistent with a history of exposure to trauma, as well as possible organic issues. The symptoms identified in the available documents include grandiosity, impaired judgment, poor understanding of context, occasional magical thinking, poor social understanding, impulsivity, and paranoid ideation. Mr. Davis' ability to attend to detail is a particular strength, which, in my professional opinion, was overrated, in terms of his overall functioning. Given his previous day to day functioning, it is doubtful Mr. Davis suffers from a Schizophreniform illness. However, Post traumatic Stress Disorder, Bipolar Disorder, and cognitive impairments must be included in a differential diagnosis.

Ex. S-C, Report of George W. Woods, Jr., M.D., at 2. The symptoms are consistent with a diagnosis of bipolar disorder. *Id*. at 3.

All of the symptoms seen in Mr. Davis since 1996 would have limited his ability to use good judgment as a police officer under the circumstances he faced at NOPD. His poor understanding of context and poor social understanding may have inhibited his judgment when it came to the culture of NOPD at the time. Many officers around Mr.

213

Davis were engaging in corruption. It is difficult to judge what is acceptable under those circumstances for those who are not impaired. Mr. Davis was impaired.

Over and over again, those who have known Mr. Davis during periods since 1996 describe his grandiosity. Mr. Davis had an exaggerated sense of his importance and power. These traits may well have made it exceedingly easy for Sammie Williams and the FBI to win him over and draw him into Shattered Shield.

Dr. Woods has been able to place recurring symptoms in context based on information provided by previous evaluations, available to defense in 2005, and observations of people who knew Mr. Davis at various points in his life. *Id*. Had counsel consulted an expert qualified to understand and interpret signs of mental disease, she could have offered explanations to the jury that mitigated Mr. Davis' behavior over the course of his police career as well as on the night Kim Groves was murdered.

### D. Counsel Failed to Investigate and Present Mitigating Evidence of the FBI's Complicity in Kim Groves' Murder

Counsel likewise, at trial, had access to a good bit of information about the progression of Operation Shattered Shield that should have been used as mitigation in Mr. Davis' case. Because failed to present the information, place it in context, and argue it to the jury, the jury never considered the FBI's complicity in Kim Groves' murder. Counsel would not have argued that the FBI was responsible for Ms. Groves' murder, but rather that its involvement in Mr. Davis' life tipped him over the edge.

Counsel should have pointed out that the whole Shattered Shield investigation did not begin with Len Davis. It was initiated because Sammie Williams was shaking down Terry Adams for drug money. Other officers were implicated in the shake-downs, but none of them were Len Davis. Williams pulled Davis into Shattered Shield, and the FBI found in Davis a man

214

who was easily impressed, having financial difficulties, horribly disillusioned with his job, and desperately in need of respect and power. Becoming point man on Shattered Shield gave him all that and more. Davis was placed in a position of power in the drug sting, unlike his usual role as a street cop. He was in charge of paying the hired "detail" officers as well as recruiting and managing them. DT (SW) 366. There were other perks as well. The undercover Agent Jackson took Williams and Davis to Biloxi, where they gambled at the casinos. He took them on a "pleasure trip" to Atlanta, where they frequented strip clubs and ate at nice restaurants. R 6099.

Had trial counsel put it all together, she could have explained to the jury that this kind of power and prestige was candy to a man disposed to grandiosity. He was juggling many balls in the air at once: a full-time job, several relationships, being a father, managing a large shift of workers, managing what he thought to be big-time drug dealer, and, as things progressed, trying to manage the violent activities of Paul Hardy. None of it paid off like the job working for "JJ," undercover Agent Jackson.

The flip side of all this was that the FBI recruited Mr. Davis into Operation Shattered Shield, gave him a huge amount of power, and then, apparently, didn't monitor his activities, even though agents were *supposed* to be monitoring his criminal activities. Or, the FBI monitored his activities, but didn't act to prevent them. This was enormously irresponsible on the part of the FBI, which has the ethical obligation, under the supervision of the U.S. Attorney's office, to consider "*the risk of physical danger to* law enforcement officers and *others*." ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION AND DEFENSE FUNCTION, Standard 2-2 Relating to the Prosecution Function (1993).

Counsel could have presented evidence that the FBI *knew* they were dealing with a department of corrupt police officers. The FBI *knew*, at the outset of Operation Shattered Shield,

215

that Sammie Williams was perpetrating violence in the Lower Ninth Ward, using his police badge and authority for profit. The FBI *knew* that NOPD was at that point in time composed of officers likely less qualified than ever before to be walking the streets with guns; that was a trend across the country. *See* C. Mahtesian, Big Blue Hiring Spree, Governing, Vol. 9, Issue 4, 28-31 (January 1996).[76]

There was evidence as well, never presented to the jury, that the FBI knew that Mr. Davis was protecting the drug activities of Paul Hardy in August, 2004. Ex. C (Affidavit of Kathleen Adams). It was *involved* in a sting operation designed to ferret out (if not create) corrupt police officers and it disregarded that important piece of information. Apparently, though it is hard to believe, the FBI didn't bother to monitor the activities of Len Davis and Paul Hardy together.

All of the facts supporting the FBI's irresponsible, and ultimately deadly, Shattered Shield investigation were available with investigation, or in the record of the case itself, for counsel to argue to the jury. None of the information was presented or argued to mitigate against a sentence of death.

In closing argument of the selection phase of Mr. Davis' penalty trial, the Government urged the jury to sentence Mr. Davis to death on behalf of the "500,000 victims, the people of the city of New Orleans." R. 6321. It argued that "Len Davis was not a cop who became a drug dealer and a murderer. He was a drug dealer and a murderer who became a cop." R. 6318. It labeled him "the Godfather on the street to a hit squad," R. 6293, and "evil and…rotten to his core." R. 6321. The jurors obviously accepted every bit of the Government's argument—they did not find any of the seven mitigating factors presented to them. SR. 5229-38. The mitigating

---

[76] *See also*, Keith A. Harriston and Mary Pat Flaherty, *DC Police Paying for Hiring Binge*, WASHINGTON POST, Aug. 28, 1994, at A1 (reporting high rates of arrest among recently hired police officers for crimes as serious as rape and murder in D.C. and large cities across the country).

216

factors proposed included: 1) that others, such as Sammie Williams, Steve Jackson, and Damon Causey, were equally or more culpable than Mr. Davis and would receive lesser sentences; 2) residual doubt; 3) that Mr. Davis was a highly decorated officer; 4) that Mr. Davis' behavior was negatively impacted by the stress of working in a high crime area and being shot at and actually shot on one occasion; 5) that Mr. Davis' behavior was negatively impacted by that of Sammie Williams; 6) that Mr. Davis posed no threat of future dangerousness in prison; and 7) that other factors in Mr. Davis' background or character mitigated against a sentence of death. *Id.* None of them really addressed the Government's closing arguments—that Mr. Davis was evil to the core, victimized the 500,000 citizens of New Orleans, and acted as Godfather to a hitman.

The mitigation presented herein, however, and readily available to counsel in 2005, addresses all of the Government's arguments, making them more difficult to accept out of hand. Len Davis didn't become who he was because he was evil. He experienced a childhood of failure and strove to do better when he joined NOPD. But he had symptoms of mental illness, even then, that were brushed aside in a period of binge hiring. Conditions on the police force were horrible, and Mr. Davis was surrounded by corrupt officers. At the same time, use of force was encouraged by no less an important man than the Superintendant of Police. Mr. Davis was not properly trained for his job and did not receive adequate supervision. He had symptoms of mania—of bipolar disorder—which causes those with the diagnosis to become reckless. And into this dangerous combination of circumstances came FBI undercover Agent Jackson, who fed Mr. Davis' mania, tempted him with money and power, rewarded him for criminal behavior, and emboldened him to disregard all he knew to be right. Had a jury been presented with the *full* picture, the complexity of Mr. Davis, his life, the forces that caused him to spin out of control, there is a reasonable probability that a single juror would have voted for life.

217

**CLAIM 14.  MR. DAVIS'S FIFTH, SIXTH AND EIGHTH AMENDMENT RIGHTS WERE VIOLATED BY COUNSEL'S FAILURE TO ADEQUATELY QUESTION THE VENIRE AND USE PEREMPTORY OR FOR-CAUSE CHALLENGES TO STRIKE BIASED OR UNQUALIFIED JURORS DURING THE VOIR DIRE FOR HIS 2005 TRIAL**

Our criminal justice system rests firmly on the proposition that before a person's liberty can be deprived, guilt must be found, beyond a reasonable doubt, by an impartial decisionmaker. The Sixth amendment provides in part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an *impartial jury* of the State and district wherein the crime shall have been committed." (Emphasis added).  Put simply, "[t]he right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see also Parker v. Gladden*, 385 U.S. 363, 366 (1966) (*per curiam*) (noting that a defendant is "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors").

Unfortunately, Mr. Davis did not receive the constitutional guarantee of a fair and impartial jury at his 2005 trial.  Indeed, throughout the voir dire, counsel failed to adequately follow up on comments by jurors which indicated they harbored preconceptions and biases that would have justified striking them for cause or which would have justified the use of a peremptory challenge.  Counsel's attempts to question the jurors were minimal at best, and rather than develop potential cause challenges during defense voir dire, counsel actually rehabilitated jurors who demonstrated bias and inability to follow the law.  "Absent the showing of a strategic decision, failure to request the removal of a biased juror can constitute ineffective assistance of counsel." *Johnson v. Armontrout*, 961 F.2d 748, 755 (8th Cir. 1992).  Here, counsel's failure to use peremptory or for-cause challenged to strike biased venirepersons violated Mr. Davis's right to an impartial jury.  *See Hughes v. United States*, 258 F.3d 453 (6th Cir. 2001).  Counsel's deficient performance prejudiced Mr. Davis because "[i]t is clearly established that the Supreme

218

Court views the denial of the right to an impartial decisionmaker to be such an error that taints any resulting conviction with constitutional infirmity." *Virgil v. Dretke*, 446 F.3d 598, 607 (5th Cir. 2006) (citing *Neder v. United States*, 527 U.S. 1, 8 (1999) (holding that the presence of a biased decisionmaker is structural error "subject to automatic reversal"); *Edwards v. Balisok*, 520 U.S. 641, 647 (1997) ("A criminal tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him."); *Johnson v. United States*, 520 U.S. 461, 469 (1997); *Rose v. Clark*, 478 U.S. 570 (1986); *Tumey v. Ohio*, 273 U.S. 510, 523 (1927)). Accordingly, Mr. Davis's sentence must be vacated and his case remanded for a new sentencing proceeding.

Mr. Murray and Ms. Kolinchak were responsible for conducting the defense voir dire at the 2005 trial, as Mr. Davis had elected to stay silent and allow counsel to conduct all questioning of jurors. *See* R 6366-6803. Indeed, prior to trial, Mr. Davis had agreed to stay ignorant as to the jurors' names; defense counsel would have access to the names during voir dire but would not disclose them to him. SR-SV 200-02. Accordingly, voir dire was the full responsibility of counsel. They had a Sixth and Eighth Amendment duty to conduct capital voir dire in an effective manner; that is, to identify jurors who are predisposed towards the death penalty, rehabilitate jurors whose stated opposition to the death penalty does not rise to the level required for a Government cause challenge, and to probe jurors' attitudes towards a variety of case-specific issues that bear upon a juror's ability to serve in a fair and unbiased manner. Here, counsel failed abysmally. There was not a single pleading filed regarding voir dire issues prior to trial. By the noon lunch break on the first day of voir dire, this Court had given the full opening instructions to the venire and the parties had individually questioned sixteen jurors, ten of whom were qualified and four of whom would ultimately serve on the jury. By *day two*, voir

219

dire was completed and a jury was selected.  This negligible representation during voir dire was insufficient to protect Mr. Davis' rights under the Fifth, Sixth, and Eighth Amendments.

**A. The Record Demonstrates that Numerous Selected Jurors Evinced Implied or Actual Biases**

Perusal of the voir dire and juror questionnaires reveals that several jurors harbored beliefs that should have resulted either in removal for cause or been struck peremptorily.[77] Numerous jurors' answers indicated that they were ineligible to serve pursuant to *Wainwright v. Witt,* 469 U.S. 412 (1985).  Others revealed past experiences that raise serious questions about the jurors' ability to fairly and impartially decide Mr. Davis' fate.  The jurors discussed below are referred to by their assigned juror numbers.

Juror 71 (selected as Juror 1) disclosed on her questionnaire that her husband had been arrested in 2003 and charged with battery on a police officer.  The charges were later dismissed.  The juror's personal experience was one that raised an inference of a potential bias against Mr. Davis; not only was her husband involved in some sort of violent altercation with a police officer, but then her husband was apparently arrested by the police and formally charged with being the aggressor in the incident, only to have that charge be later dismissed.  This juror may have believed that her husband had been harassed and mistreated by the police, both in the initial encounter, and then by being arrested and charged with an offense that was so unfounded that it

---

[77] The jury questionnaire contained an entire section devoted to probing potential jurors' attitudes towards, and involvement in, law enforcement.  As a result, several jurors' self-reported answers on the questionnaire raised red flags for counsel to follow up on during voir dire.  However, the questionnaire lacked a single question geared towards the mental health aspects of this case—a result no doubt of counsel's failure to submit any proposed questions dealing with mental health in the defense proposed questionnaire.  *See* SR 4023-38.   This failure was unacceptable in light of the fact that the entire mitigation case was focused on a single expert's opinion that Mr. Davis had symptoms consistent with "Police Trauma Syndrome."

was dismissed.    Counsel, however, failed to inquire into this serious potential bias.    The

complete defense voir dire for this juror was as follows:

MR. MURRAY:  I have no questions, Your Honor.

R 6430.  No questions were asked regarding this disclosure by the Government or this Court.

*See* R 6427-31.  Juror 71 ultimately served as the foreperson on Mr. Davis' jury.

Juror 69 (selected as Juror 2) disclosed on her questionnaire that a police officer used

ethnic slurs against a person she knows.  She also wrote on her questionnaire that "if someone

murders a person, I do believe in the death penalty."  During voir dire of Juror 69, this Court

explained to her that the Government would have to prove more than intentional killing in order

for a defendant to be eligible for the death penalty.  R 6446.  Juror 69 responded that she

understood but then clarified her position: "I was just meaning like if someone brutally murdered

somebody and they had evidence I would definitely believe in the death penalty; not just if

someone murdered somebody, I wasn't meaning that."  *Id.*  No further questions were asked by

this Court.  Then, the defense failed to adequately follow up either on the death penalty or the

fact that her friend had been insulted by a police officer.  Instead, the defense voir dire focused

on making sure her baby would have a baby sitter.  R 6446-47.  The defense's only questioning

regarding the death penalty was as follows:

Q:    You said if someone murders somebody and it's brutal, then you believe
in the death penalty.  I think in your questionnaire you cited the Lacy Peterson
case that got a lot of press coverage over the last couple months.

A:    Yes.

Q:    You would listen to the evidence and make a decision based on everything
you heard?

A:    Yes.

221

R 6447.  This questioning not only failed to probe her attitude that the death penalty should be automatic when a killing is "brutal" and "they have evidence," but it went further and actually validated her view.  Juror 69 was essentially told that it was appropriate to sentence someone to death solely because a murder was "brutal" as long as she listened to the evidence first.  "Brutal" could have meant an unprovoked point-blank shooting of a woman, just steps away from her children, but counsel failed to ask the simple question of what "brutal" meant to her.  As to her opinions on law enforcement, not a single question was asked about the friend who was insulted by a police officer, an issue which she had felt noteworthy enough to flag on her questionnaire.

Juror 127 (selected as Juror 3) wrote in his questionnaire that his stepmother had been convicted of second degree murder for killing his father.  His father was a police officer.  He also stated in his questionnaire that he was in favor of snitch witnesses if "it helps put another criminal behind bars," and quoted "an eye for an eye, a tooth for a tooth" where the questionnaire asked him to describe his feelings toward the death penalty.  The defense voir dire did not broach the subject of his father's murder or his attitudes towards police officers in light of his father's career.  Instead, the defense voir dire validated his opinion that the "eye for an eye" concept should be applied by a juror in a capital case:

> Q:     I noticed when you were asked your opinion regarding the death penalty you quoted "An eye for an eye, a tooth for a tooth."  Do you remember that quote?  I'm just interested in what that means.
>
> A:     I guess what I mean by that is the punishment should fit the crime.
>
> Q:     So then, you would look at all the evidence to determine whether or not death was appropriate?
>
> . . . .
>
> A:     Certainly.

R 6450-51.

Juror 156 (selected as Juror 5) stated that he and a friend were questioned, stopped, and verbally abused by a police officer.  The entire defense voir dire of this juror was:

Q:      As of this time, he has not been convicted of any offense for which he can get the death penalty.  Do you understand that?

. . . .

A:      Okay.

Q:      They have to prove beyond a reasonable doubt that it was intentional, they have to prove beyond a reasonable doubt that there was substantial planning that went into it, and they would have to prove beyond a reasonable doubt that there was substantial premeditation that went into it.  Would you require the govt to prove all of those factors before you would vote to go to the third stage?

A:      That's correct.

MR MURRAY:  No further questions, Your Honor.

R 6479.

Juror 142 (selected as Juror 6) appeared to believe in the automatic death penalty for "heinous" murders.  The Government questioned her about this belief, asking what "heinous" meant in her opinion, and she responded that "I'm sure [what heinous means] has a lot to do with the crime itself.  What we see on TV, the balance that you see just on the crime—somebody shooting somebody, unless somebody went up to them and 'I don't like you today.  I'm going to blow you away,' to me that would be, 'I don't know you.  I'm going to kill you.  I'm going to shoot you in the head right here.'"  R 6483-84.  In other words, she would consider the instant crime "heinous" based on the Government's allegations that Paul Hardy shot Kim Groves in the head without even knowing her, because Len Davis did not like her.  The defense should have conducted serious follow-up questioning of Juror 142 about those statements, but instead asked essentially one question, related to whether she could abide by the fact that she would have to find Mr. Davis eligible before considering the death penalty.  R 6485.  Juror 142 answered

223

"Yes," and then immediately asked why it had taken so long to sentence Mr. Davis after he was convicted in 1996. R 6485-86. Counsel asked no further questions after this Court responded.

Juror 177 (selected as Juror 7) disclosed on his questionnaire that he was in the military from 1960 to 1973. He had a daughter who was a legal assistant, and he served on a state murder trial that convicted the defendant. He was arrested for a DWI in 1979. The Government voir dire consisted of approximately two questions that garnered one-word responses. R 6488 ("Q. . . . [Y]ou're not coming into this process thinking for every murder it has to be the death penalty? A. No. Q, You could listen to the evidence from both sides, if it got to that second stage, and make a determination based on the evidence that you hear? A. Yes."). The only defense voir dire of this juror was two questions to make sure he understood that they have to conduct an eligibility phase, and two questions about his media exposure to the case. R 6489-90. The entire voir dire of this selected juror consisted of less than three transcript pages. R 6488-90.

Juror 68 (selected as Juror 8) wrote in her questionnaire that she was robbed at gunpoint and when she went to the police station to file a report, the officers were "belligerent and treated [her] like a criminal." She disclosed that she "was traumatized in that station and could not stop crying." Despite the obvious relevance to this case, where two officers were accused of killing Ms. Groves after one beat her nephew, the defense asked not a single question regarding this experience, and instead asked a total of three questions, all regarding reasonable doubt. *See* R 6601-02. No one asked how the experience influenced her feelings towards police officers.

Juror 48 (selected as Juror 9) responded to a defense question about the death penalty by saying "I guess I have mixed feelings about the death penalty. I guess if one person was convicted of murder and he was found guilty beyond a reasonable doubt, I would be in favor of it." R 6524. Despite this response indicating that he would automatically impose the death

224

penalty to Mr. Davis, counsel's next question put words in his mouth and misrepresented his stated feelings on the death penalty: "In other words, if and only if we got to the point that Mr. Davis was found death eligible – at this point, as I'm understanding your answer, you could consider the death penalty? You would want to hear all the evidence before you made a decision on it?" R 6523-24. After he answered in the affirmative, no further questions were asked by anyone. Defense counsel did not challenge this juror.

Juror 108 (selected as Juror 10) noted that she, or someone close to her, had been arrested or convicted of aggravated theft. She also was very unclear about her feelings on the death penalty. In response to defense questioning, she did say that not all murders need the death penalty. However, she also said she thought the death penalty is appropriate "where the jury agrees that he is guilty" and, in response to the government, she stated that "If it was unintentional murder, I wouldn't vote for the death penalty." R 6637, 6640. No one clarified for her that, if a homicide was unintentional, it would neither be murder nor death-eligible. Instead, when she referred to unspecified "qualifications to be able to even consider the death penalty," defense counsel responded "Right, if the evidence is proven." R 6639-40. Thus, this juror was accepted and served on this jury after stating her position that, while not all murders deserve the death penalty, intentional murders do call for the death penalty as long as the evidence proves guilt.

Juror 61 (selected as Juror 11) marked on her questionnaire that she agreed "somewhat" with the statement that police officers testify truthfully, and wrote in the comment section "not including Antoinette Frank," an NOPD officer on death row for, like Len Davis, murdering a civilian. She circled "agree strongly" as to the statement that federal agents testify truthfully. She also wrote that she "thought [Mr. Davis'] case was over but the punishment should fit the

225

crime."  Defense counsel did not ask a single question regarding any of this.  R 6643-44.  The totality of the defense voir dire was one question to make sure she understood that if she had a reasonable doubt as to guilt, they would not move to the selection phase.  *Id.*  This question was entirely irrelevant and unhelpful to the defense, as Mr. Davis had already been found guilty beyond a reasonable doubt, and the only issue for this jury was penalty.

Juror 131 (selected as Juror 12) gave one-word responses to all questions that might have disqualified him but gave no further explanation.  *See* R 6467.  His questionnaire was largely devoid of any meaningful disclosures, and the Government's voir dire lasted less than one transcript page.  R 6467-68.  Despite not knowing anything about this juror from the questionnaire or prior questioning by this Court, the defense asked not a single question of Juror 131 before selecting him to serve on this jury.  R 6468 ("Mr. Murray: No questions.").

**B.  Counsel's Failure to Adequately Question the Venire and Use Peremptory or Cause Challenges to Strike Biased Jurors Constituted Deficient Performance**

Throughout the voir dire, counsel failed to ask any meaningful questions of the jurors who were seated, despite obvious red flags that the jurors had biases or prejudices that would interfere with their ability to fairly and impartially decide Mr. Davis's case.  Moreover, trial counsel has admitted that this failure was not strategic but was a result, in part, of "not even hav[ing] time to review the juror questionnaires prior to voir dire…"  Exhibit S-B, Declaration of Carol A. Kolinchak (filed under seal), at ¶ 24.  When a venireperson provides an answer during voir dire that indicates potential bias, for counsel not to inquire further is simply a failure "to exercise the customary skill and diligence that a reasonably competent attorney would provide."  *Johnson v. Armontrout*, 961 F.2d 748, 754 (8th Cir. 1992); *see also id*. at 756 (holding that counsel's "failure to attempt to bar the seating of obviously biased jurors constituted ineffective assistance of counsel of a fundamental degree").

226

Moreover, defense counsel cannot refrain from striking a biased juror as a matter of sound trial strategy. As the Sixth Circuit has noted:

> The question of whether to seat a biased juror is not a discretionary or strategic decision. The seating of a biased juror who should have been dismissed for cause requires reversal of the conviction. *United States v. Martinez-Salazar*, 528 U.S. 304, 316, 145 L. Ed. 2d 792, 120 S. Ct. 774 (2000). "Failure to remove biased jurors taints the entire trial, and therefore . . . [the resulting] conviction must be overturned." *Wolfe* [*v. Brigano*], 232 F.3d [499] at 503 [(6th Cir. 2000)]. "A court must excuse a prospective juror if actual bias is discovered during voir dire." [*United States v.*] *Allsup*, 566 F.2d [68] at 71 [(9th Cir. 1977)]. "Actual bias is 'bias in fact'--the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997) (citing *United States v. Wood*, 299 U.S. 123, 133, 81 L. Ed. 78, 57 S. Ct. 177 (1936)).
>
> If counsel's decision not to challenge a biased venireperson could constitute sound trial strategy, then sound trial strategy would include counsel's decision to waive, in effect, a criminal defendant's right to an impartial jury. However, if counsel cannot waive a criminal defendant's basic Sixth Amendment right to trial by jury "without the fully informed and publicly acknowledged consent of the client," *Taylor v. Illinois*, 484 U.S. 400, 417 n. 24, 98 L. Ed. 2d 798, 108 S. Ct. 646 (1988), then counsel cannot so waive a criminal defendant's basic Sixth Amendment right to trial by an impartial jury. Indeed, given that the presence of a biased juror, like the presence of a biased judge, is a "structural defect in the constitution of the trial mechanism" that defies harmless error analysis, *Johnson*, 961 F.2d at 756 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991)), to argue sound trial strategy in support of creating such a structural defect seems brazen at best. We find that no sound trial strategy could support counsel's effective waiver of Petitioner's basic Sixth Amendment right to trial by impartial jury.

*Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001); *see also Biagas v. Valentine*, 265 Fed. App'x 166, 2008 WL 34158 (5th Cir. Feb. 6, 2008) (The court need not condone "unreasonable decisions" as strategy when no decision was made; thus, defense counsel's performance was deficient and prejudicial when he mistakenly failed to exercise a peremeptory challenge to strike a juror who stated that he was "going to believe" a testifying law enforcement officer over the defendant).

Indeed, when a venireperson has made statements in voir dire that indicate that he or she may be unable to serve in a fair or impartial manner, counsel must make the appropriate inquiry afforded to them by voir dire to identify any such bias on the record and then exercise a challenge to strike that juror. *See Virgil v. Dretke*, 446 F.3d 598, 610 (5th Cir. 2006) (veniremembers "unchallenged statements during voir dire that they could not be 'fair and impartial' obligated [petitioner's] counsel to use a peremptory or for-cause challenge on these jurors. Not doing so was deficient performance under *Strickland*") (footnote omitted); *Hughes v. United States*, 258 F.3d 453, 464 (6th Cir. 2001) ("when the court has failed to respond to a biased juror on voir dire, counsel who fails to respond in turn is no longer functioning as 'counsel' guaranteed the defendant by the Sixth Amendment") (citation omitted).

### C. Counsel's Assistance During Voir Dire was So Minimal that it Constituted a Sixth and Eighth Amendment Violation

Voir dire is not only a "critical stage of the criminal proceeding,"[78] *Gomez v. United States*, 490 U.S. 858, 873 (1989), but also may be "the most important aspect of the trial," *State v. Allen*, 00-0346 (La. App. 4 Cir. 10/17/01), 800 So. 2d 378, 386.   Counsel thus has the constitutional duty to not only be physically present during voir dire, but also to meaningfully participate in adversarial testing both of potential jurors' attitudes that may be unfavorable to the defense and of the prosecution's use of cause challenges to remove favorable jurors.   *See Burdine v. Johnson*, 262 F.3d 336, 345 (5th Cir. 2001).   Without meaningful defense representation at voir dire, the adversarial system fails to function within the dictates of the Sixth

---

[78] In *United States v. Cronic*, the Court considered which "circumstances . . . are so likely to prejudice the accused that" a petitioner need not prove actual prejudice when advancing an ineffective-assistance-of-counsel claim.   466 U.S. 648, 658 (1984).   The Court found that where counsel "fails to subject the prosecution's case to meaningful adversarial testing," prejudice to the defendant's Sixth Amendment right to counsel is presumed.   *Id.* at 659.   Likewise, where counsel is absent at a critical stage of the prosecution, no showing of actual prejudice is required.   *Id.*

Amendment. *See Knight v. State*, 839 S.W.2d 505, 511 (Tex. App. 1992) (finding a *Cronic* violation due to counsel's ineffective performance during voir dire).

Where it mattered most, counsel was functionally absent. Counsel either failed to ask obvious questions in light of concerning questionnaire responses, or entirely failed to question jurors altogether. Jurors who had not been asked a single question were selected and served on the jury, including the foreperson. Jurors who had made statements either in open court or on their questionnaires which would have made them challengeable for cause were nevertheless not challenged. These are circumstances that are so likely to prejudice the accused that a showing of actual prejudice is unnecessary, but in any event it is reasonably probable that the defense was prejudiced due to counsel's failure to question jurors with apparent biases against law enforcement and towards the death penalty. *See Strickland*, 466 U.S. at 668; *Cronic*, 466 U.S. at 658; *Knight*, 839 S.W.2d at 511 ("An examination of whether or not the result of the trial would have been different is mooted from the outset as appellant's right to a fair trial by an impartial adjudicator was stillborn."); *cf. Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (stating that "part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors.").

### D. Counsel's Failure to Adequately Question the Venire And Use Peremptory or For-Cause Challenges to Remove Biased Jurors Led to the Impaneling of a Biased Jury and Mr. Davis was Prejudiced as a Result

"Among the most essential responsibilities of defense counsel is [the responsibility] to protect his client's constitutional right to a fair and impartial jury by using voir dire to identify and ferret out jurors who are biased against the defense." *Miller v. Webb*, 385 F.3d 666, 672 (6th Cir. 2004). When counsel fails to fulfill those responsibilities, allowing biased individuals to sit on the defendant's jury unchallenged, the defendant is denied his right to effective assistance of counsel under *Strickland*. There is no reasonable strategic reason for an attorney to seat a juror

who may be biased against his client. "The decision whether to seat a biased juror cannot be a discretionary or strategic decision. . . . [T]here is no sound trial strategy that could support what is essentially a waiver of a defendant's basic Sixth Amendment right to trial by an impartial jury." *Id.* at 675-76 (internal citations omitted); *see* ABA Guideline 10.10.2 (2003); ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION (1993), Standard 4-7.2. As the Eighth Circuit noted in *Johnson v. Armontrout*, *supra*, "trying a defendant before a biased jury is akin to providing him no trial at all. It constitutes a fundamental defect in the trial mechanism itself." 961 F.2d at 755; *see also Hale v. Gibson*, 227 F.3d 1298, 1319 (10th Cir. 2000) (recognizing that prejudice results when defense counsel fails to attempt to remove from the jury a person who has been established on voir dire to be biased). Moreover, a defendant may obtain a new trial if an impaneled juror's honest responses to questions on voir dire would have given rise to a valid challenge for cause. *McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 556 (1984); *see also United States v. Sampson*, 2011 WL 5022335 (D. Mass. October 20, 2011) (in capital § 2255, granting sentencing relief on claim of juror misconduct after conducting evidentiary hearing and questioning trial jurors; over the course of three hearings, district judge determined that juror failed to disclose information during voir dire that was comparable in significant ways to evidence presented at trial and which called her ability to decided the case solely on the evidence into question, and that the concealed information, if it had been disclosed during voir dire, would have resulted in her excusal for cause).

Here, trial counsel made no efforts to meaningfully question members of the venire to ascertain potential biases, despite clear evidence that many of the jurors harbored biases or prejudices that would have warranted for-cause challenges. For example, Juror 68's questionnaire stated that she had a traumatic experience at the police station in which

230

"belligerent" officers treated her "like a criminal" even though she was actually the victim of a crime.  Juror 156's questionnaire described an incident in which he and a friend were detained and verbally abused by a police officer, and that he had filed a formal complaint against the officer.   Indeed, had counsel challenged these and other jurors for cause "the trial judge would have been forced to rule, a ruling that counsel could have objected to and pursued as error on direct appeal. There is little doubt that such an error would have been sustained [by the reviewing court]."  *Virgil*, 446. F.3d at 613; *see also United States v. Nell*, 526 F.2d 1223, 1230 (5th Cir. 1975) ("doubts about the existence of actual bias should be resolved against permitting the juror to serve").

Additionally, the prejudice to Mr. Davis stemmed not only from each individual juror's own biases, but from the likelihood that the rest of the jury was tainted by any expressions of the biases that these jurors potentially made in the jury room. *See Virgil*, 446 F.3d at 613 ("Furthermore, we cannot know the effect Sumlin's and Sim's bias had on the ability of the remaining ten jurors to consider and deliberate, fairly and impartially, upon the testimony and evidence presented at [the defendant's] trial").

In short, the "impaneling of a biased juror warrants a new trial. If an impaneled juror was actually biased, the conviction must be set aside. … The presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice." *Hughes*, *supra*, at 463 (internal citations and quotation marks omitted). Trial counsel here made no effort to meaningfully question jurors during voir dire, despite the fact that numerous responses from the jurors were either red flags of obvious biases and prejudices, or were so perfunctory as to be meaningless in the context of picking a capital jury absent further questioning.  As a result, Mr.

Davis was sentenced to death by a jury on which one or more jurors were biased, and a new sentencing hearing is required.

**E. Due to Counsel's Failure, the Jury was Unconstitutionally Predisposed Towards Death**

In a capital case, a meaningful voir dire is of utmost importance due to the danger that venire members may have opinions about the death penalty that would disqualify them as jurors. But without competent questioning by defense counsel, jurors who would automatically impose the death penalty pass undetected and violate the defendant's right to a fair and impartial jury and right not to be subjected to an arbitrary death sentence. Here, failure by defense counsel to inquire into potential jurors' attitudes regarding mental health mitigating evidence resulted in it being impossible to say whether or not Mr. Davis was subjected to sentencing by a jury which was "able to consider and give effect to all relevant mitigating evidence offered by petitioner." *Boyde v. California*, 494 U.S. 370, 377-78 (1990). More generally, counsel's failure to adequately voir dire jurors on the death penalty resulted in a voir dire that was inadequate to identify those prospective jurors who would always impose death following conviction. "[T]he starkest failures of capital voir dire are the failure to uncover jurors who will automatically impose the death penalty following a conviction or finding of the circumstances which make the defendant eligible for the death penalty." Comment, ABA Guidelines (2003), at Guideline 10.10.2. Counsel's performance here was undeniably stark. A number of answers given by several jurors indicate that they would automatically impose the death penalty under these circumstances; the lack of follow-up to these questions was clearly insufficient to detect whether that juror would be unable to follow the law in a capital case. *See Morgan*, 504 U.S. at 735 (finding that general questions about ability to follow the law are insufficient to identify challengeable jurors because "such jurors could in all truth and candor respond affirmatively,

232

personally confident that such dogmatic views are fair and impartial, while leaving the specific concern unprobed."); *Wainwright v. Witt*, 469 U.S. 412, 424-26 (1985).  At least three selected jurors who indicated that they might hold some bias or automatically vote for death in certain situations were asked only if they understood that they would have to find Mr. Davis eligible before the sentencing phase.  *See* R 6446-47, 6450-51, 6523-24.  Consequently, Mr. Davis' sentence was determined by a jury "uncommonly willing to condemn a man to die." *Witherspoon v. Illinois*, 391 U.S.  510, 521 (1968).  Moreover, without an adequate voir dire, Mr. Davis' right to a fair and reliable sentencing was violated above and beyond to his right to effective counsel.  *See Caldwell v. Mississippi*, 472 U.S. 320, 323 (1985).  This Court must reverse.

### CLAIM 15.   MR. DAVIS' RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS WERE VIOLATED WHEN COUNSEL FAILED TO OBJECT OR MOVE FOR A MISTRIAL AT CRITICAL POINTS DURING THE 2005 PENALTY RE-TRIAL

#### A. Counsel Failed to Object to Inadmissible and Prejudicial Evidence During the Eligibility Phase

##### 1. The Government Improperly Asked Steve Jackson "Who killed Kim Groves?"

Steve Jackson was a fact witness testifying pursuant to a plea deal; the Government used his testimony to illustrate its allegation that Jackson had driven Mr. Hardy and Mr. Causey to and from the scene of the crime, and that Hardy had confessed to killing Kim Groves as a favor for Mr. Davis.  Mr. Jackson did not claim to have seen the shooting, however, as he alleged he stayed in the car and did not even hear a gunshot.  R 5677.  Under no stretch of the imagination did he have any personal knowledge about the identity of the shooter who killed Kim Groves. Despite this, the Government directly asked him: "[W]ho killed Kim Groves?"  R 5686.  He answered, "Paul Hardy."  *Id.*

To be admissible under Fed. R. Evid. 701, a lay opinion "must be based on personal perception, must be one that a normal person would form from those perceptions, and must be helpful to the jury." *United States v. Riddle*, 103 F.3d 423, 428 (5th Cir. 1997).  The testimony of Steve Jackson failed all three requirements and invaded the province of the jury on issues of credibility and the ultimate issue at trial.  Personal perception must be "supported by sufficient evidence to support a finding that the witness has personal knowledge of the facts from which the opinion is derived. *United States v. Carlock*, 806 F.2d 535, 551 (5th Cir. 1986) (quoting *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.,* 630 F.2d 250, 263 (5th Cir. 1980)); *see* Fed. R. Evid. 701 advisory committee's note (stating that the condition that lay opinion testimony must be "rationally based on the perception of the witness" has historically required "first-hand knowledge or observation.").  Jackson's testimony contradicts the knowledge requirement since he allegedly stayed in his car with the radio on as Ms. Groves was killed.  *See* R 5677-79.  An inference of knowledge does not meet the requirement. Still, no inference of knowledge was available to Jackson since he drove Hardy and Causey to the scene of the crime. Because Jackson had no personal knowledge, the second requirement for admission of lay opinion testimony could not be met.  Finally, this testimony was not helpful to the jury, who had already been told that Mr. Davis was found guilty of this crime in a prior trial.  Through this question, the Government improperly presented Mr. Jackson as an expert, giving his opinion on a disputed factual matter of which he had no personal knowledge, which was more likely to confuse and prejudice than help the jury.  Counsel's failure to object allowed the Government to present direct evidence of a critical fact of which, in actuality, it lacked any direct evidence.

234

**2. The Government Improperly Elicited a Hearsay Alibi for Jimmie Jones from Norbert Zenon**

During the eligibility phase, the defense called Norbert Zenon, a former NOPD detective, to testify about eyewitness interviews he conducted immediately after Ms. Groves was killed, in which the eyewitnesses gave statements implicating Ms. Groves' boyfriend, Jimmie Jones, in the murder. *See* R. 5939-45. Ms. Groves was killed by her boyfriend Jimmie Jones. On cross-examination, the Government asked Zenon:

> Q. You're also aware, are you not, that the Federal Bureau of Investigation agents interviewed the woman with whom Jimmie Jones was living with on that night and that she had to -- when the phone call came in notifying her that Kim was killed, she had to wake up Jimmie Jones and she is the one who actually drove him to the murder scene, are you not?
>
> A. Yes.

R 5952. This leading question was clearly objectionable. Mr. Zenon's claimed knowledge of the FBI's interview of this woman was evidently based on double or triple hearsay and violated Mr. Davis' right to confrontation under the Sixth Amendment. The statement relies on the assertion by the interviewed woman that Jones was asleep instead of at the crime scene. The statement also relies on the assertion that the woman's conversation with the FBI actually took place. These statements violated the "principal vice of hearsay evidence" since there was "no opportunity to cross examine the declarant on the statement that establishes the declared fact." *United States v. Reyes*, 18 F.3d 65, 69 (2d Cir. 1994). The Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004). The out-of-court declarants were not identified or cross-examined at trial. "The admission of double level hearsay, however, creates far greater obstacles to the accused's right to confront the witnesses against him than does the admission of single level hearsay." *United States v. Daniels*, 572 F.2d 535, 539 (5th Cir. 1978).

The Government never presented any evidence of this encounter—at the first or second trial—making this question even more prejudicial because it resulted in the jury being slipped important information that could not otherwise be substantiated. Through this question, the Government was able to give Jimmie Jones an alibi without having to actually call Mr. Jones himself or even a witness to testify that Jones was with them at the time of the crime. Yet, counsel sat silent and failed to object. It was not until the selection phase of trial that counsel finally spoke up and asked this Court for an instruction to disregard that portion of Mr. Zenon's testimony. R 6227. This Court ultimately gave the instruction just before closing arguments in the second phase. R 6285. Counsel's objection was not made until long after the jury was directly informed that Mr. Jones could not have been the shooter, and the failure to object in a timely manner prejudiced the defense's case at the first phase. Similarly, appellate counsel's failure to raise this issue on appeal was prejudicially ineffective.

**B. Counsel Failed to Move for a Mistrial or an Evidentiary Hearing When Mr. Davis' Right to a Fair Trial By Jury Was Violated**

### 1. Sleeping Juror

A juror slept through opening statements and potentially other critical portions of trial. Mr. Davis brought this to the Court's attention, and a deputy clerk verified that he had seen the juror sleeping. R 5535-36. Counsel, however, failed to move for a mistrial, move for the juror to be removed, move for a hearing at which this juror and the others could have been questioned, or even object. This failure fell below objective standards of representation; Mr. Davis was constitutionally guaranteed twelve impartial jurors who could listen to all the evidence and make an informed decision as to punishment, thus counsel had a duty to move for a mistrial. *See United States v. Curry,* 471 F.2d 419, 422 (5th Cir. 1973). The failure of trial counsel to ensure as much denied him his right to a fair trial by jury. *See*, *e.g.*, *United States v. Canales*, slip op.

2012 WL 400585 (2d Cir. Feb 9, 2012) (holding that sleeping juror was properly removed without a hearing); *United States v. Bradley*, 173 F.3d 225, 230 (3d Cir. 1999) (observation of snoring juror by judge required dismissal from jury panel); *Church v. Massey*, 697 So. 2d 407, 413-14 (Miss. 1997) (stating that the "matter of the sleeping juror causes us great concern" but reversing on another ground).  Counsel should at a minimum have requested a hearing.  *See Judd v. State*, 951 So. 2d 103 (Fla. Dist. Ct. App. 2007) (Petitioner entitled to an evidentiary hearing on his claim that trial counsel was ineffective in failing to object to the presence of a sleeping juror); *Thompson v. State*, 873 So. 2d 481 (Fla. App. 2004) (Petitioner was entitled to an evidentiary hearing on his claim that trial counsel was ineffective for failing to notify the trial court that a juror was sleeping through "critical testimony").  Additionally, undersigned counsel requests the opportunity to conduct interviews of the jurors to determine the extent to which this juror slept through trial.

### 2.  Jury Hearing All Sidebars

After a contentious sidebar conference, counsel stated on the record that she "went over to where the jury was and [] could hear every word. At that level, at that volume, they can hear everything."  R 5798.  Fed. R. Evid. 103(D) requires a trial court to "conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means." Because inadmissible and prejudicial information was discussed during the numerous sidebar conferences during trial, counsel should have moved for a mistrial in light of the fact that the jury could hear "every word."  *See*, *e.g.*, R 5515 (During defense opening statement, Government states during sidebar "That's not true"); 5714-17 (During Government examination of Sammie Williams, discussion of drug case and Terry Adams).  However, counsel did not move for a mistrial or even object.  This was ineffective and prejudiced the defense.

237

### 3.  Government Closing Argument Misconduct

The Government's closing and rebuttal arguments were rife with improper and highly prejudicial comments, including references to facts not in evidence, misstatements of the evidence and the law, and an inflammatory call to impose a death sentence based on passion and prejudice.  Defense counsel failed to object to all but one of the Government's improper arguments, prejudicing the defense and allowing the last words the jury heard from the Government to be inciting and improper rhetoric aimed at obtaining a death sentence at any cost.

First, the Government told the jury that a life sentence would be no punishment at all; if the jury opted not to impose a death sentence, Len Davis would win "a free pass."  At the conclusion of his main argument, AUSA McMahon argued:

> He's already serving life for the cocaine conviction. If you don't return a sentence of death, you're giving him a free pass for killing Kim Marie Groves. Is that just? He won't be punished at all. And I want you to listen to what I'm saying. You give him life, you don't give him death, he  won't be punished at all for killing, executing Kim Marie Groves. He gets a free pass. Is that just? Huh? Life here is no punishment at all.
>
> . . . He gets life, he wins again. . . . [I]f you don't return a sentence of death, which is the only just sentence in this case, Len Davis will be celebrating again tonight. Don't let that happen.

SR 6296-97. In the rebuttal argument, AUSA Miller returned to this theme: "But more importantly, as Mr. McMahon told you, if you don't sentence him to death, this murder is a freebie. Don't do that."  SR 6318-19.  The Government's argument here was more than highly inflammatory; it was an improper misstatement of the law and should have been objected to.  *See Summer v. Shuman*, 483 U.S. 66, 83-84 (1987) (striking down a mandatory death penalty for murder by a life-sentenced inmate); *People v. Kuntu*, 752 N.E.2d 380, 403 (Ill. 2001) (stating that such argument is "neither an accurate statement of the law nor a reasonable inference from the evidence. Rather, it is simply an inflammatory statement with no basis in either law or fact; it

is tantamount to the conclusion that, as a matter of law, a person who kills more than two persons should be sentenced to death.").

Second, the Government exhorted jurors to do their civic duty by returning a death sentence, urged that only death could be appropriate for a crime like Davis's, and contended that returning a life verdict would be a lawless act of cowardice:

> You see, some crimes, some defendants deserve the death penalty. Let's get back to why we're here. This defendant deserves it. When a police officer murders a citizen in cold blood in retaliation for making a complaint against him, it always deserves the death penalty, period, without exception.

SR 6312-13.

> You are not killing Len Davis, you are enforcing the laws of the United States. You are bringing him to justice. That needs to occur. The government is confident you will not cower and you will not be intimidated.

SR 6312-13.

> Do not confuse mercy with weakness. You have an obligation to uphold the law and that takes courage.

SR 6319.

> Certain crimes, regardless of mitigation, deserve the death penalty. The act is so reprehensible it demands a sentence of death. You see, ladies and gentlemen, this crime not only involved one victim, but 500,000 victims, the people of the city of New Orleans. And it was an insult on our entire criminal justice system. Do not capitulate, be vigilant. Your response to his behavior cannot be tepid, it cannot be timid, it must be certain and it must be in kind and it must express our outrage and unyielding commitment to the rule of law.

SR 6320-31.

> [Len Davis] deserves justice and justice can only be had in this case if the death penalty is imposed. . . . [Y]ou are the dispensers of justice in this particular case. Jasmine Groves waits for you to give her justice. The citizens of the City of New Orleans wait for you to give them justice. And justice can only be had by sentencing Len Davis to death. For if not him, who? If not now, when? If a policeman killing a citizen using a drug dealer that he is protecting is not enough, then what is?

SR 6321-22.

239

These arguments were highly improper.  In *Viereck v. United States*, the Supreme Court found that a prosecutor's contention that the American people were relying on jurors to do their wartime duty in convicting the defendant was "an appeal wholly irrelevant to any facts or issues in the case, the purpose and effect of which could only have been to arouse passion and prejudice." *Viereck*, 318 U.S. 236, 247 (1943). The Court noted that such argument was "highly prejudicial, and . . . offensive to the dignity and good order with which all proceedings in court should be conducted." *Id.* at 248. The Court further observed that the prosecutor's argument was so improper that "the trial judge should have stopped counsel's discourse without waiting for an objection." *Id.*; *see also United States v. Young*, 470 U.S. 1, 18 (1985) (holding that prosecutor engaged in misconduct in exhorting a jury to "do its job" by convicting the defendant and observing that "that kind of pressure, whether by the prosecutor or defense counsel, has no place in the administration of criminal justice") (citing ABA STANDARDS FOR CRIMINAL JUSTICE 3-5.8(c) and 4-7.8(c)).

Third, the Government manufactured inflammatory facts seen nowhere in the evidence as a basis for the death penalty.  The prosecutors portrayed Mr. Davis as the leader of a murderous gang of drug dealers—"basically the Godfather on the street to a hit squad."  SR 6293.  There was no evidence supporting this portrayal.  The prosecutors also claimed that Mr. Davis had a long history of bad acts even prior to becoming a police officer, which meant that he deserved the death penalty for being a bad person:

> Len Davis was not a cop who became a drug dealer and a murderer. He was a drug dealer and a murderer who became a cop. Remember, he wanted to join JJ's organization. He was bad when he joined the force and nothing you have seen or heard in the last couple of weeks could lead you to believe that he is not still the same arrogant, cunning, manipulative criminal he was in 1994. Len Davis cannot and will not ever be rehabilitated.

SR 6318.  There was absolutely no evidence presented at trial regarding any misdeeds committed by Davis before he became a police officer or, for that matter, before his transfer to the Fifth District.

Prosecutors also personally vouched for their contention that Mr. Davis was the worst of the worst offenders.  In rebuttal argument, the prosecutor urged: "It is not an overstatement to say that Len Davis did more to hurt the NOPD than any officer whoever put on a uniform."  SR 6315-16.  This personal opinion insinuated special knowledge by the prosecutors, given their presumed expertise in criminal matters, and prejudiced the defense.  Counsel should not have allowed the Government to make these improper and highly prejudicial arguments unchecked.  Failure to move for a mistrial or even object to these arguments was highly likely to have prejudiced the jury against Mr. Davis especially in light of the fact that it was the last the jury heard from the Government before deliberations.

## C. Counsel Failed to Object to Inadmissible and Prejudicial Evidence During the Selection Phase

### 1. Crime Scene Photos of Another Victim

The Government introduced four photos showing Carlos Adams' body and the area in which he was shot; counsel only objected to one of them.  R 6106-07.  Any marginal relevance these photos may have had was far outweighed by the prejudicial effect on the jury of showing photos of a dead body in a completely unrelated murder in which Mr. Davis had no involvement.  Had counsel presented the argument that the FBI and NOPD knew what was happening but allowed Mr. Adams to be murdered by Mr. Hardy in the name of furthering the Shattered Shield investigation, the gruesome nature of these photos would have been mitigated by the argument that the Government bore some blame for his death.  However, counsel presented to such theory

and allowed the Government to present the photos to the jury with the implication that Mr. Davis was somehow responsible.  Counsel's failure to object to all four photos prejudiced the defense.

## 2.  Testimony of James Anderson and Leon Duncan

Counsel should have objected to the testimony of James Anderson in its entirety.  The Government called Anderson to testify to the fact that Paul Hardy was a suspect in the unrelated murder of Carlos Adams.  R 6104-09.  The Government did not allege that Mr. Davis had called a hit on Adams, or had any other involvement in his death.  Instead, Anderson's testimony essentially was used to establish a prior bad act of Paul Hardy—who was not on trial.  In light of counsel's failure to present an effective argument that the NOPD and FBI knew about this killing, counsel's failure to object to this testimony allowed the Government to place inadmissible bad acts testimony and prejudicial photographs before the jury with the implication that because Paul Hardy is a bad man, Len Davis is as well.

Likewise, counsel also should have objected when the Government began eliciting testimony from Leon Duncan about the irrelevant and prejudicial "bad blood" between Duncan and Hardy.  *See* R 6137.  After the Government asked Duncan whether there was bad blood between he him and Hardy, Duncan was allowed to testify that he asked Mr. Davis,

> What the fuck are you doing hanging out with a cold-blooded killer like Paul Hardy? And he said, man, Paul Hardy ain't never killed nobody that didn't deserve to die. Who the fuck are you or Paul Hardy to decide who lives or die? And he made the statement, well, Dunc, you just don't understand the game. I said, fuck the game, we talking about people's lives. And he said, you see, that's your problem now.

R 6138.  Due to counsel's failure to object, the Government was allowed to introduce more bad character evidence about Paul Hardy that was prejudicial to Mr. Davis.  Together, Anderson and Duncan's testimony was used to show that Paul Hardy was a bad person and by association, so

242

was Mr. Davis. This failure to recognize the well-established prohibition on character evidence fell below reasonable standards of representation and prejudiced the defense.

### CLAIM 16. COUNSEL FAILED TO PRESENT EXPERT TESTIMONY REGARDING FUTURE DANGEROUSNESS AT THE 2005 TRIAL, IN VIOLATION OF HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND A RELIABLE SENTENCING UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS

One of the aggravating factors used by the government in seeking the death penalty at the selection phase of the trial was that Mr. Davis posed a future danger based on the type of crime that he was accused of committing and his lack of remorse. R 5060-61. Defense counsel did not call an expert witness to rebut this allegation. The Fifth Circuit has acknowledged that determining whether a defendant poses a future danger is a difficult proposition that even psychiatrists cannot reliably predict. *Flores v. Johnson*, 210 F.3d 456 (5th Cir. 2000). The fact that predicting future dangerousness is not an exact science is precisely the reason why counsel should have retained an expert to discuss the research countering the assumption by many people that a person convicted of a violent crime will be violent in prison. Because there are experts who can explain recent research proving that past violence is not a reliable predictor of future violence, counsel had an obligation to have such an expert at the penalty phase. Also, an expert would have provided information regarding the capabilities of the Bureau of Prisons to adequately contain prisoners and that inmates like Mr. Davis, who do not have many infractions while in custody, are easily managed by BOP.

The Government's sole argument that Mr. Davis posed a future danger while imprisoned was "the evidence from the first phase, and his lack of remorse."[79] R 6061. The defense thus

---

[79] Similarly, the Government argued that the factor of "murder for the purpose of preventing the victim from providing information to law enforcement" was established by "again, the evidence at the initial portion." *Id.* The defense was ineffective for failing to object to the Government's use of the facts of the crime alone to establish that Mr. Davis deserved the death penalty.

243

had a golden opportunity to undermine the Government's "evidence" that Mr. Davis posed a future danger as clearly insufficient to constitute proof beyond a reasonable doubt. Instead, the defense presented no testimony regarding the lack of future dangerousness and instead merely introduced Mr. Davis' prison records immediately prior to closing arguments. R 6290. Then, during closing arguments, neither the defense nor the Government presented any argument regarding future dangerousness or lack thereof. *See* R 6291-6321. The jury likely found that the Government had established future dangerousness by default—because Mr. Davis was dangerous before being incarcerated, he would be dangerous while incarcerated.

But had the defense presented an expert on future dangerousness, the jury would have been presented with testimony explaining that there is actually no such correlation between the offense of conviction and prison violence; therefore, the Government's argument was based on mere conjecture and should not form the basis for a death sentence. *See generally* John Edens et al., *Predictions Of Future Dangerousness In Capital Murder Trials: Is It Time To "Disinvent The Wheel?,"* 26 LAW. & HUM. BEHAV. 59 (2005). Capital juries have an "alarmingly poor" predictive accuracy when faced with the aggravating factor of future dangerousness. Mark Cunningham et al., *Capital Jury Decision-Making*, 15 PSYCHOL., PUB. POL'Y, & LAW 223, 240 (2009). Indeed, "information *does not exist* that would equip a jury to identify the rare capital offender who will perpetrate serious violence in the future." *Id.* at 246 (emphasis in original). On the flip side, research has demonstrated that "juror *rejections* of this nonstatutory aggravating factor enjoy[] a high accuracy rate." *Id.* at 241 (emphasis in original). *See generally* Mark Cunningham et al., *Assertions Of "Future Dangerousness" At Federal Capital Sentencing: Rates And Correlates Of Subsequent Prison Misconduct And Violence*, 32 LAW & HUM. BEHAV. 46 (2008). Moreover, prison security measures are particularly relevant in determining whether

a prisoner commits violence while incarcerated; the defense should have presented evidence of the super-maximum security conditions under which Mr. Davis would be confined. *See* U.S. Dept. of Justice, *Fact Sheet: Security at the Department of Justice Bureau of Prisons Administrative Maximum Security Facility* (Feb.2007), *available at* http://www.justice.gov/opa/pr/2007/February/07_opa_104.html.

More specifically to this case, the defense should have pointed to the fact that the Government allowed Mr. Davis to remain on the streets for approximately six weeks *after* Ms. Groves was killed, when the Government believed without doubt that he was responsible for her death and furthermore that he posed a continuing danger to the lives of the Norwood twins. If the Government truly believed he posed such a threat of future harm while incarcerated even under super-maximum security conditions, it would not have allowed Mr. Davis to remain on the streets of New Orleans following Ms. Groves' death. The defense presented no such argument, focusing instead on the unbelievable and ineffective arguments that there was still residual doubt and that Mr. Davis was "a good police officer." *See* R 6300-03, 6310.

This failure was reasonably likely to have influenced the jury's verdict. Studies show that the perceived seriousness offense and perceptions of the defendant's lack of remorse have a significant impact on jurors' judgments of future dangerousness. *See* Stephen P. Garvey, *Aggravation And Mitigation In Capital Cases: What Do Jurors Think?,* 98 COLUM. L. REV. 1538, 1538-76 (1998). The jury found that Mr. Davis was a future danger, and unanimously found that the defense had not established the mitigating factor of "no future dangerousness." SR 5229-38. This undeniably influenced their decision to sentence him to death. Accordingly, reversal is required.

245

### CLAIM 17.    COUNSEL'S PRESENTATION OF DR. STREED'S TESTIMONY WAS INEPT AT THE SELECTION PHASE OF THE 2005 TRIAL, AND THE CONTENT WAS NOT INFORMED OR CREDIBLE

Counsel presented the testimony of only one witness in the selection phase of sentencing. Dr. Streed was qualified as an "expert in the field of police administration, police procedures, training, supervision and administration, with particular emphasis specifically focusing on the description and analysis of tress affecting law enforcement officers, and particularly officer-involved use of force cases." R. 6202.  He was an ex-San Diego cop who received a Ph.D in Human Behavior from the United States International University in San Diego in 1991.

Dr. Streed's testimony was an unmitigated disaster.  He forgot his glasses and therefore could not read defense exhibits.  R. 6216-17.  He missed a question during direct examination, and said he wasn't paying any attention.  R. 6256 ("That was my fault. I drifted and I'm sorry. I wasn't paying any attention to what you were saying. Could you please ask that again?")   This Court noted at one point that he was exhausted, and at another point offered him "another hit" of coffee.  R. 6224, 6264.  The Court wanted to speed up his testimony due to his exhaustion.  R. 6224.  Counsel has described Dr. Streed as "exhausted and confused" when he testified.  Ex. S-B, Declaration of Carol Kolinchak, at 5 (filed under seal).[80]

Dr. Streed read Mr. Davis' commendations into the record, 6219-22, 6230, 6233, 6237, 6239-40, testified to an unknown-in-the-literature disorder "police trauma syndrome," R. 6259-

---

[80] Prior to trial, counsel requested a continuance to allow more time for Dr. Streed to prepare to testify at trial.  He had surgery on July 17, 2005, and was told by his doctor that he needed a month to recuperate. He testified on August 8, 2005.   He reviewed almost 2500 pages of records and listened to audio tapes in between the time he had surgery and testifying.  The Court only granted a "partial" continuance from July 5, 2005 to July 25, 2005.  The grant of only a partial continuance did not allow sufficient time for counsel to prepare for this capital sentencing proceeding.  Appellate counsel failed to raise the Court's abuse of discretion in denying a full continuance on appeal.  Appellate counsel provided ineffective assistance of counsel when it failed to raise the claim, in violation of Mr. Davis' constitutional rights to counsel, a fair trial, due process, and a reliable sentencing proceeding under the Fourth, Fifth, and Eighth Amendments to the United States Constitution.

63, concluded that Mr. Davis' records indicated that he was in a stage of police trauma syndrome known as "burnout," 6263, police officers in high crime areas suffer stress, and are known to adopt the foul language of the people they arrest on the streets. R. 6251-52.

Dr. Streed had not examined Mr. Davis. He had only reviewed his police file, and had only spoken with Mr. Davis for five minutes the morning of he testified. Of course this point was brought out on cross-examination. R. 6268. The Government also successfully undermined Dr. Streed's credibility by pointing to a published case in which Dr. Streed's testimony about "agitated delirium" was found not credible by the court. R. 6268; *see also State v. Sharp*, 973 P.2d 1171 (Az. 1999). Dr. Streed said that the court in that case had confused his testimony with another expert's, but defense did not have transcripts available to support his version of the events, and so could not rehabilitate him on that point.

In closing argument at the selection phase, defense counsel did not even *mention* Dr. Streed's testimony—the testimony of its only witness. R. 6297-6312

Dr. Streed's testimony was presented in support of two mitigating factors presented to the jury: that Mr. Davis was a highly decorated officer; and that Mr. Davis' behavior was negatively impacted by the stress of working in a high crime area and being shot at and actually shot on one occasion. SR. 5229-38. The jury's verdict reflects that jurors did not credit anything he said. They found neither factor to be applicable in Mr. Davis' case. *Id*.

Counsel had a duty to investigate and adequately prepare for the sentencing phase of a capital trial. Counsel failed to do so. She presented testimony of only one witness, and apparently co-counsel, who made the final argument to the jury, thought so little of his testimony that he avoided it in oral argument. The non-credible testimony severely prejudiced Mr. Davis. When counsel presents testimony to a jury that is not credible, the jury loses confidence in other

247

evidence as well as the arguments of counsel.  Coupled with mitigating evidence that could have been presented to the jury but was not, counsel's inept presentation of Dr. Streed's testimony violated his constitutional rights.  A new sentencing phase of trial is required.

**CLAIM 18.   NO FEDERAL JURISDICTION EXISTS IN MR. DAVIS'S CASE BECAUSE,  IN LIGHT OF ALL THE EVIDENCE NOW KNOWN, NO RATIONAL FACT FINDER COULD CONCLUDE BEYOND A REASONABLE DOUBT THAT MR. DAVIS WAS ACTING UNDER COLOR OF LAW**

The federal government's power to prosecute under 18 U.S.C. §§ 241 and 242 hinges upon whether the alleged actions were taken under "color of law."  *Williams v. United States,* 179 F.2d 656 (5th Cir. 1950), *aff'd* 341 U.S. 97.   Private conduct alleged to violate an individual's rights, however grievous, does not fall under the Fourteenth Amendment and is left to the states to regulate.   *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999); *see generally The Civil Rights Cases*, 109 U.S. 3 (1883).  Absent sufficient evidence establishing action under color of law, no jurisdiction exists in federal court.

Jurisdictional claims can be examined for the first time in a habeas motion because "jurisdictional issues are never waived and can be raised on collateral attack."  *United States v. Cook,* 997 F.2d 1312, 1320 (10th Cir. 1993) (citing *Tooisgah v. United States,* 186 F.2d 93, 96 (10th Cir.1950)).  Moreover, the jurisdictional requirement that the murder be committed "under color of law" is an essential element of the violation and, therefore, the Government must prove that the murder occurred under color of law beyond a reasonable doubt.   *United States v. Tarpley*, 945 F.2d 806 (5th Cir. 1991).

On direct appeal from his initial conviction, Mr. Davis challenged the sufficiency of the evidence supporting the government's allegation that Mr. Davis was acting under color of law. In a fractured Fifth Circuit decision, the panel affirmed Mr. Davis's conviction, finding sufficient evidence was presented to the jury.  As the panel noted this determination entailed "first, whether

248

Davis misused or abused his official power, . . . second, whether there is a nexus between the victim, the improper conduct and Davis's performance of official duties . . ." *United States v Causey*, 185 F.3d 407 (5th Cir. 1999) (footnote and internal citations omitted).

However, the great weight of the evidence the panel relied upon was based on testimony of Mr. Davis's police partner, Sammie Williams, who was asked by the Government to "interpret" a taped statement of Mr. Davis.  "Williams testified that the statement meant that Davis would get Hardy to kill Groves, then Davis and Williams would respond to the murder scene and 'handle' any evidence that might link Hardy to the crime." *Id.* at 415.  Based upon Mr. Williams' interpretation, the panel majority found that Mr. Davis "misused or abused his official power to access the police station, the police car, and police radio to plan, execute, and cover up the murder." *Id.*  The panel also held that "evidence of a nexus between that abuse and the crime is likewise sufficient [because] Davis' status as a police officer put him in the unique position to 'handle the thirty' and thus offer protection to Hardy from the consequences of the murder." *Id.*  Absent Williams' "translation" of Mr. Davis's statement, the panel majority's analysis of the color of law issue could not be sustained.  As Judge Harold DeMoss noted in his vigorous dissent, "The majority finds great significance in Davis' statement that he could get Hardy to murder Groves and then handle the 'thirty.'" *Id.* at n.1 (DeMoss, J. dissenting).

The Government's post-trial disclosure of an FBI document reviewing the wiretapping of Mr. Davis undermines the evidence supporting jurisdiction in this case.  In its opinion, the Fifth Circuit panel relied on Mr. Williams' testimony to find color of law, presumably agreeing with the Government's assertion that the recordings were so transparent, that "common sense" led to the conclusion that Mr. Davis was discussing the murder of Kim Groves.  4/22/96 Tr. 67.  The FBI wiretap review memorandum casts grave doubt upon that assumption.  This memorandum

249

was created by the FBI after an internal investigation into why the wiretap monitor failed to intervene or alert anyone that a murder was being planned.  This report was not provided to the defense team until 2001 and only after dogged requests by counsel for Mr. Davis' co-defendant. According to the FBI's internal review, Mr. Williams's interpretation of Mr. Davis's conversation was so not so transparent as to be "common sense".  In fact, it was so unremarkable that no one understood it in the same manner as Williams would later testify at trial:

> This review process has also determined that based on Davis's historical language, involvement with IAD complaints, personal references, abusive language and use of the phone to conduct police business, **Davis' activity on the evening of 10/13 could be mistaken as routine**.

Ex. E (FBI Wiretap Review Memorandum) (emphasis added).

This admission by the Government's own investigative arm undermines Mr. Williams' trial testimony and casts doubt on their theory supporting a finding of color of law. Based on this previously undisclosed evidence, it cannot be concluded beyond a reasonable doubt that Mr. Davis was acting under color of law.  Because jurisdiction is absent in Mr. Davis's case, his conviction must be vacated.

### CLAIM 19.    THIS COURT'S FAILURE TO ENSURE THAT LEN DAVIS WAS APPOINTED COMPETENT COUNSEL DURING THE PRE-TRIAL PERIOD DENIED MR. DAVIS THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND UNFAIRLY CONTRIBUTED TO THE AUTHORIZATION OF THIS CASE AS CAPITAL

This Court failed to ensure that Mr. Davis was represented by "at least one" counsel "learned in the law applicable to capital cases" during the critical period from his indictment to the Attorney General's authorization of the death penalty for this case.  *See* 18 U.S.C. § 3005. This error caused Mr. Davis to be represented by a single unqualified and ineffective lawyer during the first four months after he was indicted, which prejudiced the defense immeasurably. When the magistrate judge eventually appointed a second lawyer, he did not establish that both

attorneys were qualified to represent a federal capital defendant and at least one was "learned in the law applicable to capital cases" under any meaningful construction of the rule. Six days after this Court appointed a second lawyer for Mr. Davis, counsel went to Washington and made the presentation to the Death Penalty Review Committee regarding authorization of this case as capital. There is no way that Mr. Davis' second lawyer was at all effective in this critical presentation. Thus, at the presentation Mr. Davis was represented essentially by one single incompetent and corrupt lawyer. This error requires reversal of Mr. Davis' conviction and death sentence.

### A. Mr. Davis was Entitled to Two Attorneys Qualified to Represent a Federal Capital Defendant

"[T]he first responsibility of the court in a federal death penalty case is to appoint well-trained, experienced and dedicated defense counsel." Spencer Report. Since the first Judiciary Act in 1789, federal law has required the appointment of "learned" counsel in a capital case. Under 18 U.S.C. § 3005, the court must promptly appoint two attorneys, upon request, to a defendant indicted for a capital crime. At least one must be "learned in the law applicable to capital cases." *Id.* Further, the second attorney must also be qualified to represent a federal defendant in a serious and complex case. It was this Court's responsibility to ensure that Mr. Davis' attorneys were appropriately qualified to represent him in this capital case, but this Court failed to do so.

Under the ABA Guidelines (1989), lead trial counsel assignments should only be given to attorneys who:

> i. are members of the bar admitted to practice in the jurisdiction or admitted to practice pro hac vice; and
>
> ii. are experienced and active trial practitioners with at least five years litigation experience in the field of criminal defense; and

iii. have prior experience as lead counsel in no fewer than nine jury trials of serious and complex cases which were tried to completion, as well as prior experience as lead counsel or co-counsel in at least one case in which the death penalty was sought. In addition, of the nine jury trials which were tried to completion, the attorney should have been lead counsel in at least three cases in which the charge was murder or aggravated murder; or alternatively, of the nine jury trials, at least one was a murder or aggravated murder trial and an additional five were felony jury trials; and

iv. are familiar with the practice and procedure of the criminal courts of the jurisdiction; and

v. are familiar with and experienced in the utilization of expert witnesses and evidence, including, but not limited to, psychiatric and forensic evidence; and

vi. have attended and successfully completed, within one year of their appointment, a training or educational program on criminal advocacy which focused on the trial of cases in which the death penalty is sought; and

vii. have demonstrated the necessary proficiency and commitment which exemplify the quality of representation appropriate to capital cases.

The ABA Guidelines further direct that a court should give second-chair assignments in capital

cases only to attorneys who:

i. are members of the bar admitted to practice in the jurisdiction or admitted to practice pro hac vice; and

ii. who qualify as lead counsel under paragraph (A) of this Guideline or meet the following requirements:

a. are experienced and active trial practitioners with at least three years litigation experience in the field of criminal defense; and

b. have prior experience as lead counsel or co-counsel in no fewer than three jury trials of serious and complex cases which were tried to completion, at least two of which were trials in which the charge was murder or aggravated murder; or alternatively, of the three jury trials, at least one was a murder or aggravated murder trial and one was a felony jury trial; and

c. are familiar with the practice and procedure of the criminal courts of the jurisdiction; and

d. have completed within one year of their appointment at least one training or educational program on criminal advocacy which focused on the trial of cases in which the death penalty is sought; and

e. have demonstrated the necessary proficiency and commitment which exemplify the quality of representation appropriate to capital cases.

Representing a defendant in a capital case is a tremendous responsibility, given the complexity of the issues and the stakes involved.  The irreversible nature of the death penalty affects every aspect of the case, from fact investigation to client relationships.  Unlike any other kind of criminal case, the capital defense attorney must simultaneously investigate facts and formulate a strategy for the guilt phase, thoroughly examine the client as a human being, investigating deep into his background, to plan a mitigation strategy, and develop an overall strategy that takes the penalty phase into account even in the guilt phase.  *See* James M. Doyle, *The Lawyers' Art: "Representation" in Capital Cases*, 8 YALE J. L. & HUMAN. 417, 430-31 (1996).  Federal capital cases "require knowledge of the extensive and complex body of law governing capital punishment *and* the intricacies of federal criminal practice and procedure." Spencer Report, at 27.  In a federal capital case, moreover, counsel is charged with the awesome responsibility of making the case for his client's life far in advance of trial, before the Capital Review Committee.  Under the United States Attorney General's "death penalty protocols," defense counsel must be provided a "reasonable opportunity" to present mitigating evidence to the United States Attorney before he makes a recommendation whether to seek the death penalty. UNITED STATES ATTORNEYS' MANUAL at § 9-10.050.  If the U.S. Attorney recommends seeking the death penalty, a committee appointed by the Attorney General also reviews the case and makes a recommendation.  *Id.* at § 9-10-120.  The Review Committee receives all materials from the U.S. Attorney and from defense counsel, and then meets with defense counsel, along with attorneys from the U.S. Attorney's Office.  During this meeting, defense counsel make a presentation as to why the Attorney General should not authorize the death penalty.  Thereafter,

253

the committee makes a recommendation to the Attorney General, who ultimately decides whether to seek the death penalty.

Although the review process seems to have been less critical in the years between the reinstatement of the federal death penalty in 1998 and the passage of the Federal Death Penalty Act in 1994, the FDPA changed the protocols such that defense counsel's involvement became much more substantial in the decision of whether or not the death penalty would be authorized in a given case. *See* U.S. DEPT. OF JUSTICE, THE FEDERAL DEATH PENALTY SYSTEM: A STATISTICAL SURVEY (1988-2000), at p. 1-5. Prior to Mr. Davis' indictment, defense counsel had no involvement and the Attorney General authorized the death penalty in almost all cases, but beginning January 27, 1995, the new death penalty protocols provided for a collaborative process involving four separate parties – the U.S. Attorney, the Review Committee, defense counsel, and the Attorney General.

Mr. Davis' case arose during the new federal death penalty authorization regime. A critical component of the pre-trial assistance rendered by his attorney should have therefore been preparation for, and participation in, the submissions and presentation to the Review Committee. Curklin Atkins was unqualified to render such advanced and sensitive assistance; and, as shown by his reported billing hours, he spent next to no time preparing for his presentation to the Review Committee. Milton Masinter, while marginally more experienced, could not possibly have been an effective advocate for Mr. Davis at the meeting because he had just been appointed to the case six days prior. The court's failure to ensure that Mr. Davis was equipped with effective counsel during this critical period prejudiced the defense.

### B. Curklin Atkins and Milton Masinter Were Not Qualified to Represent Mr. Davis

Curklin Atkins was admitted to the Louisiana bar in 1988. Following a one-year stint at the law firm of Sessions & Fishman, he was hired as a professor at Southern University Law

School.  He taught for only one year, however, due to an incident with a student which led to a

defamation lawsuit:

> Curklin Atkins was in his first year as a professor at Southern University Law School. He taught Theresa Smith Corporations and Administration of Criminal Justice. Professor Atkins continuously discussed his personal social/sex life in corporations class. Throughout the semester, he continuously made Theresa Smith and another female student the example in his hypotheticals or the butt of his comments. After the first occasion, Theresa Smith went to Professor Atkins after class and asked him to stop. He ignored her and continued to make her the butt of his comments throughout the semester. A number of the male students commented that they were embarrassed by the comments that Professor Atkins made and that his behavior was inappropriate in a law school setting and unprofessional.
>
> During the semester, Professor Atkins frequently told the class that he had seen Theresa Smith at a nightclub named "Whispers" in New Orleans over the weekend. On Monday, March 7, 1991, he publicly ridiculed and humiliated Theresa Smith by recounting an embarrassing moment that had happened to her the past weekend at "Whispers":
>
> On the night in question, Theresa Smith had a number of drinks. She left her seat and walked across the room to say hello to a friend. After the conversation, she walked back across the room to her seat. While sitting down, she missed the seat, landing on the floor. During class, Professor Atkins recounted this embarrassing moment to the entire class at Theresa's expense.
>
> On this particular occasion, Theresa determined that she would not sit quietly by and take it, but rather would attempt to verbally defend herself. She countered with "Why didn't you help me up?" He responded with either "I ain't pickin' no Slut up off the floo' " or an elaborate mock stage-whisper "Slut". Theresa Smith was mortified and humiliated, froze and left the room, whereupon she immediately became physically ill.
>
> Professor Atkins again called her a slut for a second time in the Administration of Criminal Justice class later that day.

*Smith v. Atkins*, 622 So. 2d 795 (La. App. 4 Cir 1993).   Following his failed attempt at being a

law school professor, Atkins went into private practice.

In the three years of legal experience Atkins had before being appointed to represent Mr.

Davis in both his capital case and his narcotics case, Atkins appeared as counsel in the following

federal criminal cases:

255

1.  United States v. Robinson, No. 2:93-cr-00269 (E.D.La. 1993)

2.  United States v. Valdez, No. 2:93-cr-00314 (E.D.La. 1993)

In *Robinson*, Atkins appeared as second chair or associate counsel to Randy Robinson, a nightclub owner charged with possession with intent to distribute one kilo of cocaine.  The case went to trial, and he was found guilty as charged.  In *Valdez*, Atkins appeared as third chair in a narcotics case.  His client pled guilty approximately one month after Atkins enrolled.  Atkins also represented a few defendants in state criminal cases, including one second-degree murder trial that resulted in a conviction for manslaughter[81] and one first-degree (non-capital) murder trial that resulted in a conviction for second-degree murder.  State v. Lamone Young, No. 351025 (Orleans Parish 1992); State v. Steven Bell, No. 365782 (Orleans Parish 1994).

Under the ABA Guidelines, Atkins did not qualify to be lead counsel.  Nor did he qualify to be co-counsel.  While he had barely enough experience—three years and two murder trials— he did not have the level of proficiency and competency required to represent a defendant facing both federal capital civil rights murder charges and charges related to a multi-defendant large-scale narcotics operation at once.[82]  Not only was Atkins charged with preparing for two separate trials in the capital case—guilt and penalty—he was also simultaneously charged with investigating and preparing for trial in the narcotics case.  But first and foremost should have been Atkins' obligation to advocate for Mr. Davis' life during the death penalty authorization process.

During the period between the indictment and the presentation to the Review Committee in Washington, D.C., Mr. Davis was entitled to two lawyers, at least one "learned" in capital

---

[81] Atkins enrolled as counsel two months prior to trial; trial took one day start to finish.

[82] Drug conspiracy cases and federal death penalty cases are the most time-consuming and expensive cases to defend. Spencer Report .

256

defense law.  Spencer Report.  Instead, Mr. Davis had one lawyer, who had apparently never represented a capital defendant, and who had minimal experience in federal criminal cases.  Six days before the presentation to the Review Committee, Milton Masinter was appointed as counsel for Mr. Davis.  SR 384.  Although Masinter appears to have had some experience in capital cases[83] and federal criminal cases, the record is not clear whether Masinter qualified as lead counsel under the prevailing standards. There was no inquiry by any judge in this case on the record as to his—or Atkins'—qualifications.  And although Magistrate Moore had indicated that the defense would have to arrange to delay the presentation in light of the new appointment, counsel for Mr. Davis apparently failed to do so.

Due to the bungling of the appointment process, Mr. Davis's case went before the Review Committee with minimal preparation by defense counsel.  One of his attorneys was out of his league and in over his head, and the other attorney—who had questionable proficiency himself—was appointed with plainly inadequate time to effectively represent Mr. Davis before the Review Committee.  To add to the prejudice, Mr. Davis continued to be represented by these attorneys for the next eight months.  Where less than sixteen months stood between arraignment and trial, this period was critical to the investigation and preparation of Mr. Davis' case.  *See*, *e.g.*, *Powell v. Alabama*, 287 U.S. 45, 57 (1932) (noting that the pretrial period is "perhaps the most critical period of the proceedings").  This court's error in failing to ensure that Mr. Davis was afforded the assistance of qualified counsel, proficient in capital defense representation, was harmful in this case.

---

[83] *See Kennedy v. Maggio*, 725 F.2d 269 (5th Cir. 1984) (holding that Masinter was ineffective for failing to advise client that the death penalty was not available in his case post-*Furman*, where client pled guilty in 1973 to aggravated rape but only did so because Masinter said he would get the death penalty if convicted at trial).

257

**CLAIM 20.    THE INFLUENCE OF RACE IN THE CONVICTION AND DEATH SENTENCE IMPOSED ON MR. DAVIS FOR AN OFFENSE UNDER 18 U.S.C. §§ 241 AND 242 VIOLATES THE EQUAL PROTECTION CLAUSE OF THE FIFTH AMENDMENT, ALONG WITH THE SIXTH AND EIGHTH AMENDMENTS**

The conviction and death sentence imposed on Mr. Davis, an African-American defendant, for violating 18 U.S.C. §§ 241 and 242 violates the Fifth, Sixth, and Eighth Amendments.  Of all the civil rights violations that have occurred in the post-Reconstruction history of the United States, the only defendants sentenced to death for violating another's civil rights have been African-American men. White defendants and perpetrators of civil rights violations have repeated received no or minimal punishment.

Indeed, the original case involving an allegation of civil rights violations of African-American citizens by white defendants resulted in no convictions.  *See United States v. Cruikshank*, 92 U.S. 542 (1876).  As the United States Supreme Court recently observed, in that case, white defendants were ultimately exonerated for federal civil rights violations:

> In that case, the Court reviewed convictions stemming from the infamous Colfax Massacre in Louisiana on Easter Sunday 1873. Dozens of blacks, many unarmed, were slaughtered by a rival band of armed white men. Cruikshank himself allegedly marched unarmed African-American prisoners through the streets and then had them summarily executed. Ninety-seven men were indicted for participating in the massacre, but only nine went to trial. Six of the nine were acquitted of all charges; the remaining three were acquitted of murder but convicted under the Enforcement Act of 1870, 16 Stat. 140, for banding and conspiring together to deprive their victims of various constitutional rights, including the right to bear arms.  The Court reversed all of the convictions, . . . .

*McDonald v. City of Chicago*, 130 S. Ct. 3020, 3030 (2010) (footnotes omitted).

Between 1995 and 2000, the Attorney General reviewed a total of six death-eligible cases under 18 U.S.C. § 241 and 9 death-eligible cases under 18 U.S.C. § 242.  The only cases authorized for death were those of two black men: Len Davis and Paul Hardy.  U.S. Dept. of Justice, *The Federal Death Penalty System: A Survey (1988-2000)* (2000), *available at*

258

http://www.justice.gov/dag/pubdoc/dpsurvey.html.  Mr. Davis is now the only man on death row for a civil rights violation.

At an evidentiary hearing counsel will present evidence that out of 51 potentially capital civil rights violations since 1996, Mr. Davis—an African-American man—is the only individual currently on death row, and only Mr. Davis and Mr. Hardy were actually capitally prosecuted. This includes at least 35 instances in which the defendant was a white man, and numerous instances either involving white police officers killing minority defendants or killings by white defendants of Jews or African-Americans based upon race, religion or ethnicity.

In the vast majority of these cases, the federal government chose not to even authorize the case for capital prosecution.  Joseph Pedersen, a white supremacist, was charged with civil rights violations for killing a Jewish man and number of African-American.  The federal Government chose not to seek death against Pederson.  White defendant Roy Ray Martin, and two co-defendants, in Lubbock Texas, committed several murders during a racially motivated crime spree; while the case was initially authorized as a death penalty case, the federal government ultimately withdrew the death penalty.  Kenneth Nemetz committed a civil rights motivated murder of an African-American citizen in Fairfield, California, and the federal government did not even ask for authorization.  Gary Eye and Steven Sandstrom were both prosecuted for the civil rights murder of a government witness.  The defendants are white; the victim was an African-American, targeted because of his race.  The federal Department of Justice did not seek the death penalty.

The pattern in this part of the country, of leniency in prosecuting white officers, continues to this day.  In recent Katrina prosecution of police officers for civil rights violations, the federal government did not authorize for capital prosecution a single white officer.  David Warren

Robert Gisevius, and Kenneth Bowen, for instance, in United States v. Bowen, No. 10-154 (E.D. La.) are white former police officers prosecuted non-capitally under § 241 for killing African-American citizens.

Prosecution and pursuit of the death penalty against African-American defendants rather than white defendants violates the equal protection clause of the Fifth Amendment. *See United States v. Jones*, 36 F. Supp. 2d 304, 309-10 (E.D.Va. 1999) ("Under the equal protection component of the Fifth Amendment's Due Process Clause, prosecutorial decisions may not be based on an arbitrary classification such as race." (quoting *Oyler v. Boles*, 368 U.S. 448 (1962))).

In this instance, it is significant to note that "nothing is more emphatic than zero." No white police officer—in Louisiana, the Deep South, or any other federal jurisdiction—has ever been sentenced to death for the killing of an African-American citizen.

### CLAIM 21. COUNSEL AT MR. DAVIS' INITIAL AUTHORIZATION PROCEEDINGS, FIRST TRIAL AND PENALTY RE-TRIAL PROVIDED INEFFECTIVE ASSISTANCE IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS FOR FAILING TO LITIGATE THE UNCONSTITUTIONAL INFLUENCE OF RACE ON THE DEATH SENTENCE IMPOSED IN THIS CASE

Trial counsel provided ineffective assistance of counsel, in violation of the Fifth, Sixth, and Eighth Amendments, by failing to litigate, address, and remediate the influence of race on the decision to seek the death penalty, and the penalty imposed in this case. Effective counsel would have known that a death sentence sought or imposed as a result of a defendant's race would be unconstitutional and invalid. *Cf. McCleskey v. Kemp,* 481 U.S. 279 (1986); 18 U.S.C. § 3593(f). However, counsel prior to and at trial, in sentencing, and on appeal failed completely to investigate and litigate these issues to ensure that race played no role in the imposition of the death penalty.

260

No evidence concerning the influence of race, and the history of the Federal Government's failure to address white perpetrators of racial violence, was presented to the Department of Justice and the authorization proceedings, to the Court pre-trial, or to the jury itself. While the issue of race may appear "historic" in the comfortable confines of a federal courthouse, it is essential that counsel investigate and understand the legacy of racism that informs the death penalty—particularly when the Government is seeking a death sentence against an African-American man for an alleged civil rights violation.

Sherilyn Ifill explains in *On the Courthouse Lawn: Confronting the Legacy of Lynching in the Twenty-First Century*,[84] how the presence of race exists in unspoken histories within a community. Race may also have a case-specific relevance. Effective counsel will thoroughly consider potential racial implications in the context of the exercise of discretion to seek the death penalty, prosecutorial recusal, jury selection, venue, selective prosecution, merits defenses and mitigation.[85]

Circumstances, effects and experiences of racism are admissible as mitigating factors under *United States v Webster* 162 F.3d 308 (5th Cir. 1998); *United States v Cuong Gia Le,* 327 F. Supp. 2d 601 (E.D.Va, 2004). They are also certainly appropriate as relevant to the Government's decision to prosecute a case capitally. Effective counsel would have raised the issue of how prior failures to redress civil rights violations committed by white police officers vitiates the validity of the Department of Justice's effort to secure a death sentence against an African-American defendant.

---

[84] SHERILYN A. IFILL, ON THE COURTHOUSE LAWN: CONFRONTING THE LEGACY OF LYNCHING IN THE TWENTY-FIRST CENTURY (2007).

[85] *Cf.* FDORC Litigation Guides, *Memorandum on Race and the Federal Death Penalty* (identifying minimum standards for defense counsel related to race and the federal death penalty), *available at* http://www.capdefnet.org/FDPRC/priv/privcontent.aspx?menu_id=144&id=112.

Regardless of whether this Court finds an outright violation of the Eighth Amendment, *see* Claim 21, *supra*, trial counsel's failure to litigate this issue permitted the arbitrary influence of race to permeate these proceedings in violation of *Furman v. Georgia*, 408 U.S. 238, 309–10 (1972).

### CLAIM 22.   THE DEATH SENTENCE IMPOSED IN THIS CASE VIOLATES THE PROHIBITION ON THE INFLUENCE OF RACE IN CAPITAL SENTENCING IMPOSED BY THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS

The United States Supreme Court has made clear that courts must guard against the influence of race and other arbitrary factors on capital sentencing schemes. *See Furman v. Georgia*, 408 U.S. 238, 245 (1972) (Douglas, J., concurring); *id.* at 364-65 (Marshall, J., concurring); *Turner v. Murray*, 476 U.S. 28, 33-35 (1986) ("In a capital sentencing proceeding before a jury, the jury is called upon to make a highly subjective, unique, individualized judgment regarding the punishment that a particular person deserves . . . . Because of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected.") (internal citations omitted).

Undersigned counsel incorporates the factual allegations in Claim 24,*supra*. Moreover, counsel notes that the Attorney General has authorized federal death penalty prosecutions against ten defendants within the Eastern District of Louisiana. All ten defendants authorized for federal capital prosecutions were charged with murders that occurred within the confines of Orleans Parish.  All ten are either black or Hispanic. Three defendants (out of the four whose cases proceeded to capital trials) received death sentences.  All three are African-American.

As interpreted, the FDPA passes constitutional muster only if it is interpreted absolutely to prohibit racial considerations in sentencing.  It should be uncontested that a death sentence sought or imposed as a result of a defendant's race would be unconstitutional and invalid.  *Cf.*

262

*McCleskey v. Kemp, supra*; 18 U.S.C. 3593(f).  The fact that no white person has ever been convicted and sentenced to death in the Eastern District of Louisiana is highly suspect.

The problems within the Eastern District of Louisiana are mirrored, to a large extent, throughout the federal jurisdictions.  *See, e.g.*, Kevin McNally, *Race and the Federal Death Penalty: A Nonexistent Problem Gets Worse*, 53 DEPAUL L. REV. 1615 (2004); *see also* Staff Of Sub-Comm. On Civil & Constitutional Rights Of The H. Comm. On The Judiciary, 103d Cong., Racial Disparities In Federal Death Penalty Prosecutions 1988-94, *reprinted in* 140 CONG. REC. S9588, 9588 (May 6, 1994) ("Race continues to plague the application of the death penalty in the United States. . . . On the federal level, cases selected have almost exclusively involved minority defendants.").

In 2001, then-Assistant Attorney General Holder examined the federal death penalty's racial demographics and expressed concern over the racial and ethnic disparities in its application.[86]  The numbers continue to reflect the same disparities that caused such concern ten years ago. Currently, 35 of the 58 defendants on federal death row are African-American or other minorities.[87]

As of April 5, 2011, according to an affidavit by Kevin McNally, 472 defendants were authorized for a federal capital prosecution.  Two hundred and forty-one (51%) were African-American; 123 (26%) were Caucasian; 87 (18%) were Hispanic; and 21 (5%) were other minorities.  Not only are African-Americans and minorities over-represented in the category of defendants authorized for federal capital prosecution, but African-Americans are over-represented in the category of defendants receiving the federal death penalty.  Minorities

---

[86] Marc Lacey & Raymond Bonner, *Reno Troubled by Death Penalty Statistics*, N.Y. TIMES, Sept. 12, 2000, at A17.

[87] *See* http://www.deathpenaltyinfo.org/federal-death-row-prisoners (last visited 3/18/2012).

constitute 60% of the inmates on federal death row.  Two of the three defendants executed under the federal death penalty were people of color.[88]

Especially given the fact that the Government is prosecuting Mr. Davis, an African-American man, under Civil Rights statutes, the overwhelming evidence that race plays a role in the administration of the federal capital scheme, vitiates the validity of the sentence imposed in this case.

### CLAIM 23.   COUNSEL AT MR. DAVIS' INITIAL TRIAL AND PENALTY RE-TRIAL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS BY FAILING TO REQUEST THAT THE VENIRE BE SELECTED FROM THE PARISH IN WHICH THE OFFENSE OCCURRED.

Trial counsel was ineffective at Mr. Davis' initial trial and at the penalty phase retrial for failing to request that the venire be selected from the parish in which the offense occurred.   This Court has previously held adversely to the defendant that that 18 U.S.C. 3235 does not authorize a defendant to secure a jury from the parish of offense.  *See United States v. Johnson*, 2010 U.S. Dist. LEXIS 42626 (E.D. La. Mar. 29, 2010).  Here, counsel failed to move prior to trial for a jury selected from the parish of offense, pursuant to 18 U.S.C. § 3235.[89]  This Court has held that the failure to raise this type of issue constitutes a waiver.   *See United States v. Johnson*, 2011 U.S. Dist. LEXIS 63601 (E.D. La. June 16, 2011) ("The Court construes the delayed failure to raise this specific issue constitutes a waiver by the defendant.").

---

[88] Timothy McVeigh is the only white person to have been executed under the federal death penalty in the modern era.

[89] In *Johnson*, this Court noted that the defense had failed to move for a jury selected solely from the county at issue, and observed that the Government "argues that the defendant is procedurally barred from raising this issue because no objection was made at the time of trial, thereby limiting the Court's review for plain error only." *Id.*

Nevertheless, counsel respectfully asks this Court to reconsider its ruling and suggests that it is ineffective assistance of counsel to fail to request the case be prosecuted in the county of the offense. The ABA Guidelines provide as a bare minimum that counsel, "Bearing in mind that the history of capital punishment in this country is intimately bound up with its history of race relations", in every case, should:

> [I]nvestigate whether minorities or women are underrepresented on the jury lists from which grand and petit juries are drawn, . . .

*Commentary*, ABA Guidelines (2003), at Guideline 10.10.2.

Had counsel been effective, and requested that the jury been selected from the county of offense, rather than the district at large, Mr. Davis would not have been sentenced to death.

### CLAIM 24. TRIAL COUNSEL AT MR. DAVIS' INITIAL TRIAL AND PENALTY RE-TRIAL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS BY FAILING TO CHALLENGE THE RACE-BASED DECISION TO TRANSFORM THE VENIRE FROM MAJORITY AFRICAN-AMERICAN TO MAJORITY WHITE

Trial counsel was ineffective at Mr. Davis' initial trial and at the penalty phase retrial for failing to object to the Government's transformation of the venire from majority-African-American to majority-white, through the inclusion of parishes within the Eastern District of Louisiana that intentionally limit the ability of African-Americans to participate in the jury process. This Court has previously held adversely to the defendant that that the decision to transform the venire from majority African-American to majority white does not deprive a defendant of a fair cross-section. *See United States v. Johnson*, 2010 U.S. Dist. LEXIS 42626 (E.D. La. Mar. 29, 2010). Counsel failed to move prior to trial to challenge the Government's decision to transform the jury venire from majority African-American to majority white.[90] This

---

[90] In *Johnson*, this Court noted that the defense had failed to move for a jury selected solely from the county at issue, and observed that the Government "argues that the defendant is procedurally barred from

Court has held that the failure to raise this type of issue constitutes a waiver.  *See United States v. Johnson*, 2011 U.S. Dist. LEXIS 63601 (E.D. La. June 16, 2011) ("The Court construes the delayed failure to raise this specific issue constitutes a waiver by the defendant.").

Nevertheless, counsel respectfully asks the Court to reconsider its ruling and suggests that it is ineffective assistance of counsel to fail to request the case be prosecuted in the county of the offense.  The ABA Guidelines provide as a bare minimum that counsel, "Bearing in mind that the history of capital punishment in this country is intimately bound up with its history of race relations", in every case, should:

> [I]nvestigate whether minorities or women are underrepresented on the jury lists from which grand and petit juries are drawn, . . .

*Commentary*, ABA Guidelines (2003), at Guideline 10.10.2.  Counsel's failure to litigate this issue deprived Mr. Davis of a fair trial, and a grand and petit jury selected from a fair cross-section of the community.

### CLAIM 25.  TRIAL COUNSEL AT MR. DAVIS' INITIAL TRIAL AND PENALTY PHASE RETRIAL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS BY FAILING TO CHALLENGE THE GRAND AND PETIT JURY VENIRE IN THIS CASE

Trial counsel was ineffective at Mr. Davis' initial trial and at the penalty phase retrial for failing to challenge the venire in this case.  The venire in this case was derived from a process in which African-Americans were intentionally excluded.  For instance, the venire was made up of, inter alia, the juror rolls from parishes such as St. Bernard Parish.  As this Court has found in separate civil context, the political body of St. Bernard Parish has exercised race-based decision making to prevent African-Americans from living in the community, and as such, participating

---

raising this issue because no objection was made at the time of trial, thereby limiting the Court's review for plain error only." *Id.*

266

enfranchisement.  The jury list used in this case was taken from the Voter Registration lists.  But African-Americans have been discriminated against and underrepresented on these lists for years, and continue to be.

Indeed, the Civil Rights Division of the Department of Justice itself has found that Louisiana has failed to comply with the National Voter Registration Act, and initiated suit against Louisiana for failing to ensure full voter registration.  Had counsel investigated this issue, counsel would have determined that African-Americans made up statistically significant less percentage of the jury venire than they made up the population at large, and that discrimination in housing and other civil rights reduced the presence of African-Americans in Louisiana.

As noted above, the ABA Guidelines should: "[I]nvestigate whether minorities or women are underrepresented on the jury lists from which grand and petit juries are drawn, . . ." *Commentary*, ABA Guidelines (2003), at Guideline 10.10.2.  Had counsel investigated and litigated this issue, counsel would have established that the venire in this case violated the Sixth Amendment's fair cross-section guarantee.

### CLAIM 26.   IN A CIVIL RIGHTS PROSECUTION, THE TRANSFORMATION OF THE VENIRE FROM MAJORITY AFRICAN-AMERICAN TO MAJORITY WHITE VIOLATES THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS

In *United States v. Johnson*, this Court held, adversely to the defendant, that the transformation of the venire from majority African-American to majority white through the Government's decision to prosecute federally and to expand the venire to the entire district rather than the county of offense, did not violate the defendant's Sixth Amendment rights.  *See United States v. Johnson*, 2010 U.S. Dist. LEXIS 42626 (E.D. La. Mar. 29, 2010).  However, that case did not involve, and thus this Court did not decide, whether the same was true under the circumstance of an allegation of a civil rights violation.

267

The choice of federal jurisdiction over state jurisdiction in an allegation of a civil rights violation alleged to have occurred in Orleans Parish results in a jury venire that significantly under-represents African Americans. The United States District Court for the Eastern District of Louisiana has jurisdiction over federal capital trials held in connection with crimes that occur in Orleans Parish. The prosecution of Orleans defendants in federal court results in a huge demographic change in the jury pool. Federal prosecutors are able to dilute minority-concentrated populations (obtaining far whiter jury pools) simply by prosecuting the same case in federal rather than state court. The Eastern District of Louisiana draws its jury pool from Assumption, Jefferson, Lafourche, Orleans, Plaquemines, St. Bernard, St. Charles, St. James, St. John the Baptist, St. Tammany, Tangipahoa, Terrebonne, and Washington Parishes. According to the 1990 Census, the last Census before Mr. Davis was tried in 1996, the Eastern District as a whole consisted of a population that was 65% white and 32% African American. In contrast, Orleans Parish, where Kim Groves was murdered, was 62% African American and 35% white. U.S. Census Bureau, *1990 Census of Population, General Population Characteristics, Louisiana*. Data from the 2000 Census, the last Census before Mr. Davis was tried in 2005, shows that the Eastern District population was 61% white and 34% African American, while Orleans Parish was 67% African American and 28% white. U.S. Census Bureau, *2000 Census of Population, General Population Characteristics, Louisiana*. In each instance, the census data under-reflects the actual percentage of Orleans Parish's African American population at the time of Mr. Davis' trials: the African American population in Orleans Parish steadily increased from 1990 through August 2005, when Katrina hit.

Orleans Parish juries have sentenced only one person to death in the past fourteen years, and the single death sentence was vacated and a new trial granted. This is not for lack of

268

opportunity: New Orleans consistently leads the nation in the infamous "most murders per capita" category. Comparing Orleans to Jefferson Parish (its neighbor and second most populous parish in the Eastern District) is telling. In Jefferson during the same period (1998–2011), 11 out of the 15 cases to proceed to a capital trial (73%) resulted in death sentences.

The parishes that expand outward from Orleans are not only predominantly white, but historically the parish populations have increased in times of "white flight." *See Snyder v. Louisiana*, Brief of Nine Jefferson Parish Ministers As *Amici Curiae* Supporting Petitioner, 2006 U.S. Briefs 10119; 2007 U.S. S. Ct. Briefs LEXIS 722 (herein after cited as *Snyder v. Louisiana*, Brief of Nine Ministers) (noting "Jefferson Parish grew immediately to the west of New Orleans as a 'primary destination for white flight,' particularly from 1960 to 1980. Once ensconced there, the white majority resorted to racial discrimination and segregation on numerous fronts" (citing *Citizens for a Better Gretna v. City of Gretna, La.*, 636 F. Supp. 1113, 1116 (E.D. La. 1986), *aff'd*, 834 F.2d 496 (5th Cir. 1987) ("The historical record of discrimination in the . . . Parish of Jefferson is undeniably clear, and the record suggests it has not ended even now.")).

The connection between race and the death penalty within the Eastern District of Louisiana cannot be overlooked. Not just Jefferson, but also parishes such as Tangipahoa, Assumption and St. Tammany—from which Mr. Davis' juries were drawn—have repeatedly imposed the death penalty on minority offenders. The racial implication of this disparity is stark. In capital cases that have arisen in the parishes outside of Orleans that make up the Eastern District of Louisiana, eighty percent of the defendants sentenced to death have been African-American or minority individuals.

While the correlation between race and verdict outcome may not be conscious—explaining the jury's certification that race played no role in the sentence—the high correlation

suggests sub-conscious, unconscious, or latent racial discrimination.  *See generally* Kim Taylor Thompson, *Empty Votes in Jury Deliberations*, 113 HARV. L. REV. 1261, 1276-77 (2000) (explaining the correlation between race, experience, and verdict outcomes).

An appearance of the influence of race in the administration of the capital punishment scheme has not gone unnoticed by prosecutors. *See, e.g., Snyder v. Louisiana*, Brief of Nine Ministers (citing eleven capital convictions, in Jefferson Parish alone, where an African-American defendant was sentenced to death by a jury containing one or fewer African-American jurors, and noting that, in these cases, Jefferson Parish prosecutors struck approximately 90% of the qualified African American venirepersons); *id.* at 13 ("During an interview with writer Ivan Solotaroff in 1995, [Jefferson Parish District Attorney] Jim Williams and another Jefferson Parish prosecutor joked about wanting to seat Nazis on capital juries [and also] showed off a tiny model electric chair holding cut-out faces of five African-American condemned men, every defendant against whom Williams had obtained a death sentence.").  In Mr. Davis' case, the prosecution extended its jurisdictional demographic advantage by using 11 of its 25 peremptory strikes to exclude all but three African Americans from the jury at the 1996 trial.  Between the blanching of the jury pool in federal court, and the discriminatory use of peremptory strikes, the prosecution – in an allegation of a Civil Rights violation -- managed to obtain a jury with only one African American juror in 1996.  Under the unique circumstances of this case, the transformation of the venire violates the Fifth, Sixth, and Eighth Amendments.

**CLAIM 27.    COUNSEL AT THE INITIAL TRIAL AND PENALTY RE-TRIAL WERE INEFFECTIVE FOR FAILING TO OBJECT TO THE DEATH QUALIFICATION OF THE JURY, AND THE CONCOMITANT RACIAL IMPACT OF DEATH QUALIFICATION, IN VIOLATION OF MR. DAVIS' FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS**

This Court has previously rejected a defendant's post-trial argument that death qualification of a jury deprives a defendant of an impartial jury in violation of the Sixth Amendment.  See *United States v. Johnson*, 2010 U.S. Dist. LEXIS 42618, 2-3 (E.D. La. Mar. 29, 2010).  In *Johnson*, this Court observed that:

> the defense argues that error was committed by the "unauthorized removal of jurors who opposed the death penalty." (Rec. Doc. 1331, p. 1). Three distinct and novel arguments are presented. First, the defendant argues that neither federal statute nor the common law provides for a "death qualified" jury, and that the Federal Death Penalty Act, 18 U.S.C. §§ 3591-3599 ("FDPA") itself does not require the imposition of the death sentence. Next, the defense argues that the United States Supreme Court opinions in *Witherspoon v. Illinois*, 390 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968), *Adams v. Texas*, 448 U.S. 38, 100 S. Ct. 2521, 65 L. Ed. 2d 581 (1980) and *Wainwright v. Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985), do not provide for a death qualified jury in a federal case because those cases focused on state statutes which so provided. n1 Third, the defense argues that because there is no underlying authorization for excluding jurors with anti-death penalty views in a federal capital prosecution, the defendant's right to an impartial jury under the Fifth, Sixth and Eighth amendments was violated, as reflected in emerging jurisprudence.

*Id.* While the Court describes the defense's argument as novel, the Court similarly notes that the United States Supreme Court has never expressly permitted death qualification in the federal context, where no statute provided for the removal of jurors based upon their moral or religious views.

Counsel respectfully suggests that trial counsel was ineffective for failing to challenge the government's effort to death qualify the jury, and that appellate counsel was ineffective for failing to raise the issue of the removal of qualified jurors and the denial of Mr. Davis' right to an impartial jury.    Death qualification of the jury has a significant impact on the number of

271

African-Americans in the venire. Polling data and other assessments indicate that African-Americans disapprove of the death penalty at higher rates than whites, and African-Americans were disproportionately removed for cause in this case. The ABA Guidelines provide that counsel, "Bearing in mind that the history of capital punishment in this country is intimately bound up with its history of race relations", in every case, should address how:

> Death qualification often results in the removal of more prospective jurors who are members of minority groups than those who are white, because minority jurors are more likely to express reservations about the death penalty.

*Commentary*, ABA Guidelines (2003), at Guideline 10.10.2. Prior to his retirement, Justice Stevens, in a concurring opinion, ultimately concluded that the death penalty was unconstitutional based in part upon the

> rules that deprive the defendant of a trial by jurors representing a fair cross section of the community. Litigation involving both challenges for cause and peremptory challenges has persuaded me that the process of obtaining a "death qualified jury" is really a procedure that has the purpose and effect of obtaining a jury that is biased in favor of conviction. The prosecutorial concern that death verdicts would rarely be returned by 12 randomly selected jurors should be viewed as objective evidence supporting the conclusion that the penalty is excessive.

*Baze v. Rees*, 553 U.S. 35, 84 (2008) (Stevens, J., concurring).

The failure of trial and appellate counsel to litigate these issues deprived Mr. Davis of a fair trial and a reliable determination of sentence in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution. Counsel, respectfully, believes that had these issues been raised prior to trial, that this Court would have taken action to ensure that Mr. Davis received a fair cross-section of the entire community in which the offense occurred, and to prevent the jury from becoming biased in favor of conviction and death sentence.

**CLAIM 28.  COUNSEL WAS INEFFECTIVE AT BOTH TRIALS FOR FAILURE TO FILE A MOTION TO RECUSE THE GOVERNMENT FROM PROSECUTING MR. DAVIS.**

The facts and legal argument in support of this claim are set out fully in Claim I, *supra*, regarding the Government's conflict of interest in prosecuting Mr. Davis.  Prosecutors had "an extraneous interest" in Mr. Davis' case that created "'the *appearance* of impropriety.'" *United States ex rel. SEC v. Carter*, 907 F.2d 484 (5th Cir. 1990) (quoting *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 806 (1987) (emphasis in original)).  Because maintaining public confidence in the integrity of the judicial system is so important that, a prosecutor should be recuse where there is the appearance of impropriety.  *Young v. United States ex rel. Vuitton*, 481 U.S. 787, 809-812 (1987) (plurality opinion).

The same facts that required the Government to recuse itself from proceeding against Mr. Davis were known to defense counsel at the time of both the 1996 and 2005 trials.  Counsel providing reasonable representation would have seen the Government's glaring conflict in Mr. Davis' case and filed a motion to recuse.  Given the Government's election to pursue the most extreme penalty possible in Mr. Davis' case, there is a probability sufficient to undermine confidence in the outcome of trial both at guilt and sentencing.  *Strickland v. Washington*, 466 U.S. 668 (1984).

**CLAIM 29.  THE CUMULATIVE EFFECT OF THE INEFFECTIVE ASSISTANCE OF COUNSEL AND THE GOVERNMENT'S *BRADY* VIOLATIONS UNDERMINED CONFIDENCE IN THE VERDICT AND DEATH SENTENCE AT MR. DAVIS'S TRIAL**

Even where individual error is insufficient to raise a probability that the outcome of a trial would have been different, the cumulative impact of *Brady* and *Strickland* error can suffice to warrant habeas relief.  *See Gonzales v. McKune*, 247 F.3d 1066 (10th Cir. 2001)(recognizing "clear authority holding that courts should consider *Strickland* and *Brady* errors cumulatively to

273

determine whether petitioner has demonstrated prejudice and materiality"); *Phillips v. Woodford*, 2001 WL 1230674 (9th Cir. 2001)(remanding for cumulative prejudice analysis of Brady and Strickland error).

Although each of the *Brady* and *Strickland* errors in Mr. Davis's case was sufficiently prejudicial to warrant habeas relief, taken together they undermine confidence in the verdict. Mr. Davis is entitled to habeas relief.

### CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, undersigned counsel on behalf of Petitioner Len Davis respectfully request that this Court:

1. Permit Petitioner to file a Memorandum of Law in Support of this Motion in accordance with a briefing schedule established by this Court;

2. Require Respondent to file an Answer to the Petition in the form prescribed by Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases in the United States District Court, identifying all proceedings conducted in Petitioner's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

3. Permit Petitioner to file a traverse to the Respondent's answer, responding to any affirmative defenses raised by the Answer;

4. Permit Petitioner to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his Petition, and refute any defenses thereto raised by the Respondent's Answer;

5. Permit Petitioner to Amend this Petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the

274

course of discovery, investigation, and litigation of this Petitioner, and, to allow the amendment to relate back to the date of the filing of his Section 2255 Motion;

6.  Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Petition, or by Petitioner's Response to any Affirmative Defenses raised by the Respondent. Because Petitioner has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

7.  Permit oral argument as appropriate and required;

8.  Vacate Petitioner's convictions and sentence and order that appropriate retrial and/or sentencing hearings be conducted; and

9.  Grant such further and additional relief as may be just.

DATED: March 20, 2012.

Respectfully submitted,

/s Sarah L. Ottinger___
Sarah L. Ottinger, La. Bar No. 24589
636 Baronne Street
New Orleans, LA 70113
(504) 529-5955
saraho@thejusticecenter.org

Rebecca L. Hudsmith, La. Bar No. 7052
Federal Public Defender for the
Middle and Western Districts of Louisiana
102 Versailles Blvd., Suite 816
Lafayette, LA 70501
(337) 262-6336
Rebecca_Hudsmith@fd.org

*Counsel for Len Davis*

**VERIFICATION**

The undersigned are appointed as standby counsel on behalf of Mr. Davis and are ethically obligated to sign and submit the foregoing § 2255 Motion on his behalf.  I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed this 20th day of March, 2012

/s Sarah Ottinger_____
Sarah Ottinger

## APPENDIX: LIST OF EXHIBITS

Exhibit A. Declaration of Monroe H. Freedman
Exhibit B. Hebert Dailies
Exhibit C. Affidavit of Kathleen Adams
Exhibit D. Excerpts from Wiretap Monitoring Log
Exhibit E. FBI Wiretap Review Memorandum
Exhibit F. EDLA Gov. Strikes 2005-2010
Exhibit G. Birth Certificate of Herbert Rudolph Davis
Exhibit H. Marriage Certificate of Herbert Davis and Velma Brown
Exhibit I. Birth Certificate of Len Edwin Davis
Exhibit J. Death Certificate of Herbert Rudolph Davis
Exhibit K. St. Augustine School Cumulative Records
Exhibit L. NOPS School Records
Exhibit M. Affidavit of Ron Singer

**CERTIFICATE OF SERVICE**

I hereby certify that a that a true and correct copy of the foregoing document has been filed with the Clerk of the Court by using the CM/ECF System which will send a notice of electronic filing to all counsel of record on this 20th day of March, 2012.

/s Sarah Ottinger_____
Sarah Ottinger