IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CASE NO. 2:94-cr-00381 |
| | * | |
| v. | * | |
| | * | SECTION "C" |
| LEN DAVIS | * | |
| | * | |

# EXHIBITS TO MOTION UNDER 28 U.S.C. § 2255

# FOR COLLATERAL RELIEF, TO VACATE, SET ASIDE, OR CORRECT SENTENCE, AND FOR A NEW TRIAL

# THIS IS A DEATH PENALTY CASE

INDEX OF EXHIBITS

A. Declaration of Monroe H. Freedman
B. Hebert Dailies
C. Affidavit of Kathleen Adams
D. Excerpts from Wiretap Monitoring Log
E. FBI Wiretap Review Memorandum
F. EDLA Gov. Strikes 2005-2010
G. Birth Certificate of Herbert Rudolph Davis
H. Marriage Certificate of Herbert Davis and Velma Brown
I. Birth Certificate of Len Edwin Davis
J. Death Certificate of Herbert Rudolph Davis
K. St. Augustine School Cumulative Records
L. NOPS School Records
M. Affidavit of Ron Singer

# Exhibit A

# Declaration of Monroe H. Freedman

<u>Declaration of Monroe H. Freedman</u>
<u>As an Expert Witness on Lawyers' Ethics</u>

Monroe H. Freedman states, on March 15, 2012, under penalty of perjury, that the following Declaration is true and correct.

1. My name is Monroe H. Freedman. I am a Professor of Law and the former Dean, at Hofstra University Law School, Hempstead NY 11550.

2. Sarah Ottinger, Esquire, has retained me on behalf of herself and her co-counsel, Rebecca Hudsmith, the Federal Public Defender for the Middle and Western Districts of Louisiana, to serve as an expert witness in *United States v. Len Davis*. My retainer includes the express understanding that I will not serve as an advocate on behalf of their client, but that I will offer my opinion, as a qualified expert, regarding issues of lawyers' ethics as they relate to the case.

3. My qualifications as an expert witness on lawyers' ethics are set forth more fully in Exhibit A to this affidavit. In addition, Exhibit B is a standard resume. My publications on lawyers' and judges' ethics are listed in Exhibit A, except for a list of my columns in the <u>Legal Times</u> from August 23, 1993 to April 1, 1996, which are

listed in Exhibit C. In brief:

(a) Honors that I have received include the Michael Franck Award, which is the highest honor given by the American Bar Association for Professional Responsibility. It was given in recognition of "outstanding contributions to the field of professional responsibility" and "a lifetime of original and influential scholarship" on lawyers' ethics.

(b) I have qualified as an expert witness on lawyers' and judges' ethics in numerous state and federal courts and before the Judiciary Committees of the United States Congress. I have also served as a consultant and expert witness on lawyers' ethics for the United States Department of Justice.

(c) I have concentrated on lawyers' ethics for forty-five years. I currently teach lawyers' ethics each semester at Hofstra Law School and as a Visiting Professor at Georgetown University Law Center. Also, for forty years I lectured on lawyers' ethics annually at Harvard Law School.

(d) My first ethics book, LAWYERS' ETHICS IN AN ADVERSARY SYSTEM (1975), received the American Bar Association's Gavel Award Certificate of Merit. About three dozen favorable reviews of the book have appeared. The *Harvard Civil Rights/ Civil Liberties Law Review* called it one of the few "monumental contributions to legal education in the past generation."

(e) My current book is UNDERSTANDING LAWYERS' ETHICS (4th ed., Matthew Bender, 2010) (with Professor Abbe Smith). *The Professional Lawyer*, published by the ABA Center for Professional Responsibility, called the first edition "thoughtful and eloquent," and "rich with practical examples."

(f) My testimony, books, and/or articles have been relied upon by numerous courts, including the Supreme Court of the

2

United States.

(g) An article in *The Journal of the Legal Profession* concludes:

> [Monroe Freedman's] thinking, writing and lectures ... have been the primary creative force in legal ethics today, both in the practice of law and in legal education.

Facts

4. In writing this Report, I have relied on the facts, set forth in paragraphs 5 and 6 below, which were provided to me by Sarah Ottinger, Esquire, and which I am assuming are true and correct.

5. Ms. Ottinger and Ms. Hudsmith are representing Len Davis in the current post-conviction proceeding. Their legal research has convinced them that Mr. Davis has meritorious claims for habeas corpus relief from his capital conviction and sentence of death.

6. In addition, based on their independent fact investigation, Ms. Ottinger and Ms. Hudsmith have concluded that Mr. Davis, due to mental illness and other factors, is not competent to represent himself at the present time.

Opinion

7. In brief, my opinion is that Ms. Ottinger and Ms. Hudsmith

3

are ethically required to file a 2255 motion and to seek to litigate what they conscientiously believe to be an erroneous grant of self-representation, and also to present to the Court the merits of Mr. Davis's habeas corpus claims, even though the court has ordered them, at the request of the prosecution, not to file pleadings without their client's consent.

8. The Supreme Court has held that whether a defendant is competent to represent himself requires a determination that he have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." Godinez v. Moran, 509 U.S. 389, 398, 400 (1993) (citing cases). Since counsel for Mr. Davis have not been able to communicate with Mr. Davis at all since their appointment, despite their diligent efforts, and because their fact investigation has convinced them that he is, indeed, incapable of consulting with them with a reasonable degree of rational understanding, and also that he is incapable of voluntarily and knowingly rejecting their services, counsel would be derelict in their ethical duty to the Court and to their client if they failed to inform the Court of these crucial facts in an appropriate motion. The fact that

4

counsel were appointed as standby counsel, with the understanding at the time that Mr. Davis was competent to stand trial and also that he would remain competent throughout these proceedings, does not affect counsels' duty to the Court and to their client to make the Court aware of Mr. Davis's present incompetence.

9. In addition, counsel for Mr. Davis are ethically required to raise "any and all conceivable issues" that might be in their client's interest. See Freedman, The Professional Responsibility to Raise Frivolous Issues in Death Penalty Cases, 31 Hofstra L. Rev. 1167, 1177-1178 (2003), quoting ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.8 (rev. ed. 2003).[1]

10. The Supreme Court has relied on the ABA Guidelines to define "prevailing professional standards" in considering whether a defendant has received competent representation under the Sixth Amendment. See, e.g., *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 2535 (2003); see also *Williams v. Taylor*, 529 U.S. 362, 369

---

[1]The Guidelines are set forth in 31 Hofstra L. Rev. 913 (2003). The word "should" is used as a mandatory term. Guideline 1.1(B)(1).

(2000), relying on the ABA Standards for Criminal Justice, Commentary to Standard 4-4.1, (2d ed. 1980). Since counsel for Mr. Davis have not been able to communicate with Mr. Davis at all despite their diligent efforts, and because their fact investigation has convinced them that he is, indeed, incapable of consulting with them with a reasonable degree of rational understanding, and also that he is incapable of voluntarily and knowingly rejecting their services, counsel would be derelict in their ethical duty to the Court and to their client if they failed to inform the Court of these crucial facts in an appropriate motion. Because the provisions of the current ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases are appropriate for the Court's consideration in Len Davis's case, they are quoted and discussed in paragraphs 11-14 below.

11. "Counsel at all stages of the case should engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case, such as: 1. the progress of and prospects for the factual investigation, and what assistance the client might provide to it; ... 4.

presentation of the defense case...." Guideline 10.5(C). This Guideline is of particular importance in Len Davis's case because counsel have not been able to engage in any dialogue with Mr. Davis whatsoever since their appointment. Moreover, on an earlier occasion, Mr. Davis represented himself with a different hybrid counsel for part of a hearing, and he then left the courtroom, leaving hybrid counsel to conduct the remainder of the hearing. Counsel in that hearing should have been, but were not, prepared to do so. Ms. Ottinger and Ms. Hudsmith are therefore required to comply with Guideline 10.5(C) regardless of their standby status.

12. Specifically with regard to "Counsel's Duties Respecting Uncooperative Clients," the Commentary to Guideline 10.5 requires counsel "to monitor the client's personal condition" and "to make a reasoned decision ... whether to assert the position that the client is not competent to waive further proceedings." This obligation applies to "all stages of the case," expressly including counsel's duties in the post-conviction stage.

13. Guidelines 10.7(A)(1) and (2) obligate counsel to conduct a thorough and independent investigation relating to both guilt and

7

penalty "regardless of any ... statement by the client that the evidence ... is not to be collected or presented." Moreover, Guideline 10.7(B)(2) provides that "Counsel at every stage have an obligation to satisfy themselves independently that the official record of the proceedings is complete and to supplement it as appropriate." Counsel for Mr. Davis are therefore ethically required to file appropriate motions with the Court regarding their professional assessment of Mr. Davis's incompetence and setting forth all conceivable issues that might be raised on his behalf.

14. Guideline 10.15.1 requires post-conviction counsel to "(C) ... seek to litigate all issues ... that are arguably meritorious under the standards applicable to high quality capital defense representation, including challenges to any overly restrictive procedural rules. Counsel should make every professionally appropriate effort to present issues in a manner that will preserve them for subsequent review." In addition, counsel are required by Guideline 10.15.1(E)(2) to "continually monitor the client's mental ... condition for effects on the client's legal position." Despite any procedural rulings to the contrary, therefore, counsel for Mr. Davis are ethically required to file

8

appropriate motions with the Court regarding their professional assessment of Mr. Davis's incompetence and setting forth all conceivable issues that might be raised on his behalf.

## Conclusion

15. Since counsel for Mr. Davis have not been able to communicate with Mr. Davis at all since their appointment, despite their diligent efforts to do so, and because their fact investigation has convinced them that he is, indeed, incapable of consulting with them with a reasonable degree of rational understanding, and also that he is incapable of voluntarily and knowingly rejecting their services, counsel would be derelict in their ethical duty to the Court and to their client if they failed to inform the Court of these crucial facts in an appropriate motion. Even though the court has ordered them not to file pleadings without their client's consent, therefore, Sarah Ottinger, Esquire, and Rebecca Hudsmith, Esquire, are ethically required to file a 2255 motion and to seek to litigate what they conscientiously believe to be improper self-representation by Mr. Davis. Moreover, it is critical that Ms. Ottinger and Ms. Hudsmith take this action to present Mr. Davis's habeas corpus claims to the

9

Court before a statute of limitations runs on the presentation of these

claims.

Respectfully submitted,

Monroe H. Freedman
Professor of Law
Hofstra University

320 West 38th Street
Suite 2523
New York NY 10018
212-564-8111

10

MONROE H. FREEDMAN

320 West 38th Street, #2523
New York, N.Y., 10018
212-564-8111

See also listings in WHO'S WHO IN AMERICA
WHO'S WHO IN AMERICAN LAW
WHO'S WHO IN THE WORLD

## EDUCATION

A.B., 1951, Harvard College (cum laude; honors thesis, magna cum laude)
LL.B., 1954, Harvard Law School
LL.M., 1956, Harvard Law School (Faculty Fellowship)

## FACULTY POSITIONS

Hofstra Law School, Dean, 1973-1977; Professor of Law, 1973-present
Hofstra Law School, Lichtenstein Distinguished Professor of Legal Ethics,
       1989-2003
Georgetown Law Center, Visiting Professor of Law, 2007-present
George Washington Law Center, Professor of Law, 1958-1973
Cleveland-Marshall Law School, Baker-Hostetler Professor of Law, 1992
Harvard Law School, Faculty Assistant and Faculty Fellow, 1954-1956
Harvard Law School, Lecturer on Legal Ethics and Trial Instructor, Trial
       Advocacy Workshop, 1978-2010

## GOVERNMENT POSITIONS

Executive Director, United States Holocaust Memorial Council, 1980-1982
              (Presidential appointment, under the chairmanship of The
       Honorable Elie Wiesel)
Consultant, United States Commission on Civil Rights, 1960-1964
Legislative Consultant, Senator John L. McClellan, 1959 (drafted major part of
       Landrum-Griffin Act)

[Continued]

## LAW PRACTICE AND PROFESSIONAL ACTIVITIES (SELECTED)

Qualified as an expert witness in state and federal court proceedings and before Judiciary Committees of United States Senate and House of Representatives
Expert on legal ethics for the United States Department of Justice, 1978
Senior Fact-Finder, Rochester Institute of Technology (to investigate and report on CIA involvement at RIT) (1991)
Reporter, American Lawyer's Code of Conduct, 1979-1981
Associate, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, 1956-1958
Director, Stern Community Law Firm, Washington, D.C., 1970-1971
Director, Criminal Trial Institute, D.C., 1965-1966
Special Litigation Counsel, ACLU, 1971-1973
Consultant (litigation), Neighborhood Legal Services Program, 1970
Consultant, Association of the Bar of the City of New York, Special Committee on Courtroom Conduct, 1972
Arbitrator, American Arbitration Association, 1964-present (Service Award, 1986)
Associate Director, Institute for the Study of Legal Ethics, 1995-present
Columnist ("Cases and Controversies"), American Lawyer newspapers, 1990-1996 (over 60 columns published)
Martindale Hubbell rating: a v
Television: CBS 60 Minutes, CNN Moneyline, C-Span, CNN Late Edition, CNN Burden of Proof, CBS News/Dan Rather, Donahue, Court TV, The O'Reilly Factor, Hannity & Colmes, Fox News Live, Powerplay

Bar Admissions (Selected)

  Massachusetts, 1954
  Pennsylvania, 1957
  District of Columbia, 1960
  New York, 1978
  United States Court of Appeals for the
   District of Columbia Circuit, 1960
  Second Circuit, 1968
  Ninth Circuit, 1982
  Eleventh Circuit, 1986
  Federal Circuit, 1987
  Supreme Court of the United States, 1960     [Continued]

**OFFICES IN PROFESSIONAL AND CIVIC ASSOCIATIONS (SELECTED)**

Governing Board, District of Columbia of Bar, 1972-1973 (resigned upon
  moving to New York)

Chairman, Legal Ethics Committee, D.C. Bar, 1974-1976; member, 1974-1980
Chairman, Committee on Professional Responsibility, Society of American
       Law Teachers, 1974-1980
Chairman, Committee on Professional Disciplinary Standards and Procedures,
       Federal Bar Association, 1969-1970
Vice Chairman, Ethical Considerations Committee, ABA Criminal Justice
       Section, 1987-1990
Co-Chair, Ethics Advisory Committee, National Association of Criminal
       Defense Lawyers, 1991-1993
National Board, American Civil Liberties Union, 1971-1980
National Advisory Council, American Civil Liberties Union, 1980-present
Committee on Professional Responsibility, Association of the Bar of the City
       of New York, 1986-1990
Committee on Professional and Judicial Ethics, Association of the Bar of the
       City of New York, 1991-1992
Ethics Committee, Criminal Justice Section, New York State Bar Association,
       1990-1992
Committee on Legal Education and Admission to the Bar, New York State Bar
       Association, 1987-1989
Committee on Model Rules of Professional Conduct, D.C. Bar, 1983-1986
Executive Committee and Governing Board, Society of American Law
       Teachers, 1976-1979
Associate Director, Institute for the Study of Legal Ethics, 1995-present
Ethics Advisory Committee, United States District Court for the Eastern District
       of New York, 1994-1996
Ethics Advisor to the Chair, ABA Criminal Justice Section, 1993-1995
Advisory Council, The Appleseed Foundation, 1996-present
Panel of Acadmic Contributors, Black's Law Dictionary, 2002-present
Members Consultative Group, ALI, Restatement of the Law Governing Lawyers,
       1989-1999
American Law Institute, (Elected) (Life Member)

[Continued]

## HONORS, GRANTS, AND LECTURESHIPS (SELECTED)

ABA Michael Franck Award for Professional Responsibility (1998), for
       "outstanding contributions to the field of professional
    responsibility" and "a lifetime of original and influential scholarship in the
    field of lawyers' ethics."

3

Howard Lichtenstein Distinguished Professor of Legal Ethics, Hofstra
University (1989-2003)

Martin Luther King Humanitarian Award (1986) (for "decades of work to
advance human dignity and social justice")

Lehman-Laguardia Award for Civic Achievement (1996)

Baker-Hostetler Chair in Law, Cleveland-Marshall Law School (1992)

Annual Award, Black Law Students Association (1987)

Award of Merit, District of Columbia Bar (1979) (for "exceptional
performance as a member of the Legal Ethics Committee")

First Annual Wickwire Lecturer on Legal Ethics and Professional
Responsibility, Dalhousie Law School, Canada (1992)

President's Commendation Award, National Association of Criminal Defense
Lawyers (1992)

Pope John XXIII Lecture, Catholic University Law School (1978)

Dedication of Symposium Issue of Hofstra Law Review, vol. 6, no. 3, part II
(1978)

Dedication of Crystal, Professional Responsibility (2d ed., 2000) (Aspen Law &
Business): "To Monroe Freedman, who has so often led the way."

Certificate of Merit, American Bar Association (1976) (for "distinguished
contribution to public understanding of the American legal system")

Certificate of Special Acknowledgment, Wisconsin Department of Justice (1988)

Ford Foundation grant to establish and direct the Criminal Trial Institute,
Washington, D.C. (1965-1966)

Stern Family Fund grant to establish and direct the Stern Community Law Firm, a
public interest law firm, Washington, D.C. (1970-1971)

Ford Foundation Research Fellowship in Legal Ethics (1973)

Life Fellow, American Bar Foundation

Honorary Fellow, American Board of Criminal Lawyers (2003–)

Faculty Fellowship, Harvard Law School (1954-1956)

[Continued]

4

**HONORS (Continued)**

New York State Bar Association Sanford D. Levy Award "in recognition of your extraordinary contribution to the field of professional ethics through a body of work that spans four decades" (2005)

New York State Bar Association Award for Dedication to Legal Scholarship and Public Service (1997)

New York State Bar Association Award for Outstanding Contributions to Criminal Law Education (2006)

Distinguished Faculty Award, Hofstra University (2007)

**PUBLICATIONS**

**Books**

LAWYERS' ETHICS IN AN ADVERSARY SYSTEM (1975) (ABA Gavel Award Certificate of Merit as an "outstanding" contribution to the field, 1976)

UNDERSTANDING LAWYERS' ETHICS (1st ed., 1990)

UNDERSTANDING LAWYERS' ETHICS (4th ed., 2010) (with Abbe Smith)

CONTRACTS (West Pub. Co., 1973)

TEACHER'S MANUAL, CONTRACTS (265 pp.) (West, 1978) (with Professor Alan Resnick)

CONTRACTS: AN INTRODUCTION TO LAW AND LAWYERING (photocopied)

GROUP DEFAMATION AND FREEDOM OF SPEECH (Greenwood, 1995) (ed., with Professor Eric Freedman)

**Articles Published In (Selected)**

ABA Journal

Georgetown Law Journal

George Washington Law Review

Hofstra Law Review

Journal of Legal Education

Journal of the Legal Profession

Michigan Law Review

NYU Law Review

Ohio State Law Review

Pennsylvania Law Review

Stanford Law Review

Texas Law Review

Yale Law Journal

**PEER EVALUATIONS**

Lawrence Fox, Email to the ABA Board of Governors (2008)

> Monroe Freedman [is] the conscience of our profession.
>
> [Continuered]

David Luban, THE GOOD LAWYER 10 (1984):

> [O]ne cannot emphasize too strongly [Freedman's] influence on discussions of legal ethics.

5

Ralph Temple, 13 Jour. of the Legal Profession 233 (1988):

> [Monroe Freedman's] thinking, writing and lectures ... have been the primary creative force in legal ethics today, both in the practice of law and in legal education.

William Simon, 27 Hofstra L. Rev. 1 (1998):

> Suppose you had to pick the two most influential events in the recent emergence of ethics as a subject of serious reflection by the bar. Most likely, you would name the Watergate affair of 1974 and the appearance a few years earlier of an article by Monroe Freedman.... Of the two events, Watergate is the most famous, but ... the least important.

Steven Lubet, 34 Hofstra L. Rev. 673 (2006):

> Monroe Freedman ... is one of the few people, maybe the only person, who has actually managed to change the entire discourse in a field of legal studies.

Alan Dershowitz, 34 Hofstra L. Rev. 748 (2006):

> I regard [Monroe Freedman] as the Holmes and Brandeis of Legal Ethics.

Frank H. Armani (lawyer in the Buried Bodies Case), The Professional Lawyer, 2007 Symposium Issue, 19, 25:

> [M]y guiding light and only ray of hope was the writings of Monroe Freedman. He was the only one that made any sense....

Ronald Rotunda, 34 Hofstra L. Rev. 1337 (2006):

If we had to pick the one person who first created modern legal ethics as a serious academic specialty, it would be Monroe Freedman.

QUALIFICATIONS OF MONROE H. FREEDMAN
AS AN EXPERT WITNESS ON LAWYERS' AND JUDGES' ETHICS

A.    My name is Monroe H. Freedman. I am a Professor of Law, and the former Dean, of Hofstra University School of Law, Hempstead, New York, 11550.

B.    My qualifications as an expert witness on lawyers' ethics are set forth more fully in paragraphs 3-34 below. In brief:

1.    I have qualified as an expert witness on lawyers' and - judges' ethics in state and federal courts and before the Judiciary Committees of the United States Congress, and have served as a consultant and expert witness on lawyers' ethics for the United States Department of Justice.

2.    Honors that I have received include the American Bar Association's Michael Franck Award for Professional Responsibility. This is the highest award conferred by the ABA for professional responsibility, and was given for "outstanding contributions to the field of professional responsibility" and "a lifetime of original and influential scholarship in the field of lawyers' ethics."

3.    For over a third of a century, I have taught and consulted on lawyers' and judges' professional responsibilities. I currently teach lawyers' ethics at Hofstra Law School and, since 1978, have lectured annually on lawyers' ethics at Harvard Law School. I have also been a Visiting Professor of Law at Georgetown Law Center since 2008.

4.    My earlier book, LAWYERS' ETHICS IN AN ADVERSARY SYSTEM (1975), received the American Bar Association's Gavel Award Certificate of Merit. The *Harvard Civil Rights/ Civil Liberties Law Review* called it one of the few "monumental contributions to legal education in the past generation."

5.    My current book is UNDERSTANDING LAWYERS' ETHICS (4th ed., 2010) (with Abbe Smith). *The Professional Lawyer*, published by the ABA's Center for Professional Responsibility, called the 1990 edition "thoughtful and eloquent," "rich with practical examples," and "idealistic in the best sense of the word."

6.    My testimony, books, and/or articles have been relied upon by numerous courts, including the United States Supreme Court.

7.    An article in *The Journal of the Legal Profession* concludes:

[Monroe Freedman's] thinking, writing and lectures ... have been the primary creative force in legal ethics today, both in the practice of law and in legal education.

Additional peer comments are in paragraph 34, below.

## QUALIFICATIONS AS AN EXPERT WITNESS

C.    My name is Monroe H. Freedman. I am a Professor of Law, and the former Dean, at Hofstra University School of Law, Hempstead, New York, 11550.

D.    I was Dean of the Hofstra University Law School from 1973-1977. From 1989 to 2003, I was the Lichtenstein Distinguished Professor of Legal Ethics at Hofstra Law School. I resigned the Lichtenstein Chair in 2003 so that my colleague in the ethics field could be appointed to it.

E.    I have qualified as an expert witness on lawyers' ethics in federal and state proceedings throughout the country; before a Judicial Investigative Committee of the Eighth Circuit Judicial Council; before a Disciplinary Hearing Board of the United States Air Force; and before the Judiciary Committees of the United States Senate and House of Representatives.

F.    I have served as a consultant and expert witness on lawyers' ethics for the United States Department of Justice.

G.    I was the first Chairman of the Legal Ethics Committee of the District of Columbia Bar. By unanimous vote of the members of the Committee, I served as Chairman for two terms.

H.    I have also been a member of the Committee on Legal Education and Admission to the Bar of the New York State Bar Association; a member of the Committee on Professional Responsibility of the Criminal Justice Section of the New York State Bar Association; Vice Chairman of the Ethical Considerations Committee of the ABA Section on Criminal Justice; Chairman of the Committee on Professional Responsibility of the Society of American Law Teachers (four terms); Chairman of the Committee on Professional Disciplinary Standards and

Procedures of the Federal Bar Association; Co-Chairman of the Ethics Advisory Committee of the National Association of Criminal Defense Lawyers; Ethics Adviser to the Chair of the ABA Section on Criminal Justice; a member of the Committee on Professional Responsibility of the Association of the Bar of the City of New York; a member of the Committee on Professional and Judicial Ethics of the Association of the Bar of the City of New York; and a member of the Board of Governors of the District of Columbia Bar.

I.    My first ethics book, LAWYERS' ETHICS IN AN ADVERSARY SYSTEM (1975), received the American Bar Association's Gavel Award Certificate of Merit. The ABA Certificate refers to the book as "outstanding" in its examination of "the most difficult ethical problems a lawyer faces." About three dozen favorable reviews of the book appeared, including those in the *ABA Journal* ("scholarly ... powerful"), *ABA Litigation* ("thorough and scholarly"), and the *George Washington Law Review* ("undoubtedly, the best book published in the field of legal ethics"). In the *Harvard Civil Rights/Civil Liberties Law Review*, Professor Norman Dorsen called the book one of the few "monumental contributions to legal education in the past generation."

J.    My current book is UNDERSTANDING LAWYERS' ETHICS (4th ed., 2010) (with Abbe Smith). It has been required reading at law schools including Harvard Law School, the University of California at Berkeley, and the Georgetown Law Center; is assigned and/or recommended at other law schools; has been used in training programs for the bar in Canada; and is being translated into Chinese. *The Professional Lawyer*, published by the ABA Center for Professional Responsibility, calls the book "thoughtful and eloquent" and "idealistic in the best sense of the word, pragmatic, but not cynical, and rich with practical examples." The *Massachusetts Law Review* adds that the book is "a 'must' for every desk, bench, and briefcase."

K.    Selections from my writings on lawyers' ethics are part of the assigned reading at most law schools in the United States and in law schools in Canada.

L.    My testimony, books and/or articles have been cited by numerous courts, including the Supreme Court of the United States, the New York Court of Appeals, the Supreme Courts of Alaska, Arizona, Colorado, Illinois, Maryland, and New Jersey, the Court of Appeals of New Mexico, the Court of Criminal Appeals of Texas, the District of Columbia Court of Appeals, the United States

District Court for the Southern District of New York, and the United States Courts of Appeals for the First, Eighth, and Ninth Circuits.

M.          My article on <u>The Professional Responsibility of the Criminal Defense Lawyer: The Three Hardest Questions</u> has been excerpted and reprinted over four dozen times.

N.      The following is a partial list of my articles on lawyers' professional responsibilities:

<u>The Professional Responsibility of the Criminal Defense Lawyer: The Three Hardest Questions</u>, 64 Mich. L. Rev. 1469 (1966)

<u>Reprint or excerpt permission requested</u>:

Hall & Kamisar, Modern Criminal Procedure (1966)
Hazard & Koniak, The Law and Ethics of Lawyering (1989)
Morgan & Rotunda, Professional Responsibility (all editions)
Schwartz & Wydick, Problems in Legal Ethics (1988)
Aronson, Devine & Fisch, Problems, Cases and Materials in
       Professional Responsibility (1985)
Kamisar, LaFave & Israel, Criminal Procedure (1980)
Countryman, Finman & Schneyer, The Law in Modern Society (1976)
Bishin & Stone, Law, Language, and Ethics (1972)
Kadish & Paulsen, Criminal Law and its Processes (1975)
Kaufman, Problems in Professional Responsibility (1976)
1 ABA Litigation 26 (Winter, 1975)
National Conference on Teaching Professional Responsibility (1977)
Kaplan, Criminal Justice (1978)
Tanford, The Trial Process (1983)
Lempert & Saltzburg, A Modern Approach to Evidence (1984)
Arthur & Shaw, Readings in Philosophy of Law (1984)
Berch, Introduction to Legal Method (1985)
Allen & Kuhns, Constitutional Criminal Procedure (1985)
Summers <u>et al.</u>, Law: Its Nature, Functions, and Limits (3d ed.,1986)
Elliston & Davis, Ethics and the Legal Profession (1986)
Delisle & Stuart, Learning Canadian Criminal Procedure
(1986)
Katsh, Taking Sides (1986)
Schroder, Ethics and the Practice of Law (1988)
Callahan, Ethical Issues in Professional Life (1988)

Sharpe, Canadian Civil Procedure: Cases and Materials (3d ed.,1988)

Shaw, Moral Issues in Business (1989)

Fairbanks, Fact, Value, Policy: Critical Thinking in Argument (1993)

Tuedio & Trujillo, Professional Ethics in a Free-Market System (1990)

The Legal Profession and Professional Responsibility (University of Pennsylvania Law School, Center on Professionalism, 1990)

D. Rhode, Professional Responsibility: Ethics by the Pervasive Method (1994)

Luban & Rhode, Legal Ethics (1995)

Zitrin & Langford, Legal Ethics in the Practice of Law (1995)

N. Crystal, Professional Responsibility in the Practice of Law (1995)

Wettick, Course Materials on Professional Responsibility (1997)

Swift, The Lawyer's Role in the American Legal System  (1997)

Acker & Brody, Criminal Procedure: A Contemporary Perspective (1998)

Avery & Konefsky, Introduction to Law and Perspectives (1998)

Hazard, Koniak, & Cramton, The Law and Ethics of Lawyering (3d ed., 1999)

May, Snow & Bolte, Legal Philosophy: Multiple Perspectives (2000)

Hatch, Arguing in Communities: Reading and Writing Arguments in Context (2002)

Kaufman & Wilkins, Problems in Professional Responsibility (4th ed., 2002)

Koniak & Cohen
    Moliterno, Cases and Materials on the Law Governing Lawyers (2d ed., 2003)

Holdstein, Challenging Perspectives (2005)

Coquillette, Real Ethics for Real Lawyers (2005)

Youngstown State Univ., Professional Ethics (2006)

Performances from "Oscar" Winning Litigators: Ethical Conundrums in Criminal Cases (N.Y. City Bar, 2007)

Moralnosc a Profesjonalizm (Morality and Professionalism), ed. Wlodzimierz Galewicz (Universitas Publishing House, Cracow, Poland, 2008)


Book Review: Carlin, Lawyers' Ethics: A Study of the New    York City Bar, 16 Amer. U.L. Rev. 177 (1966)

Professional Responsibility of the Prosecuting Attorney, 55 Geo. L. Jour.
1030 (1967)

Reprinted or excerpted:

3 Crim. L. Bull. 544 (1967)
Kaplan, Criminal Justice (1978)
Hall, Kamisar LaFave & Israel, Modern Criminal
Procedure

Professional Responsibility of the Civil Practitioner: Teaching Ethics in the
Contracts Course, 21 Jour. Legal Ed. 569 (1969)

Reprinted or excerpted:

41 U. Colo. L. Rev. 303 (1969)
Education in the Professional Responsibilities of the Lawyer (ed.,
    Weckstein) (1969)

Where the Bodies Are Buried:  The Adversary System and the Obligation of
Confidentiality, 10 Crim. L. Bull. 979 (1974)

Reprinted:

ABA, Adversarial Justice:  The American Approach to Adjudication
    (1988)
Shaw, Moral Issues in Business (1989)
Windt & Francis, Ethical Issues in the Professions (1989)
Shaw, Taking Sides: Clashing Views on Controversial Legal  Issues
    (1988)
J. Arthur & W.H. Shaw, Readings in Philosophy of Law  (1984)
Berman & Geiner, The Nature and Functions of Law (4th ed., 1980)

A Civil Libertarian Looks at Securities Regulation, 35 Ohio St. L. Jour. 280
(1974)

Reprinted or excerpted:

Schwartz, Lawyers and the Legal Profession
    (1979)

<u>Judge Frankel's Search for Truth</u>, 123 U. Pa. L. Rev.1060 (1975)

<u>Reprinted or excerpted</u>:

National Conference on Teaching Professional Responsibility (1977)
Morgan & Rotunda, Professional Responsibility (all editions)
Schroeder, Ethics and the Practice of Law (1988)
Luban & Rhode, Legal Ethics (1995)
Levine, Doernberg, & Nelken, A Civil Procedure Anthology (1998)
P.G. Haskell, Why Lawyers Behave As They Do (1997)

<u>Solicitation of Clients:  For the Poor, Not the Privileged</u>,  Juris Doctor (Apr., 1971)

<u>Advertising and Solicitation by Lawyers: A Proposed Redraft of Canon 2 of the Code of Professional Responsibility</u>, 4 Hofstra L. Rev. 183 (1976)

<u>Advertising and Solicitation:  The Professional Obligation to Chase Ambulances</u>, LAWYERS' ETHICS IN AN ADVERSARY SYSTEM (1975)

<u>Reprinted</u>:

Nader & Green,Verdicts on Lawyers (1976)
Callahan, Ethical Issues in Professional Life (1988)
Solomon, Martin, & Vaught, Ethics for Professionals (2009)
<u>Counseling the Client: Refreshing Recollection or Prompting  Perjury</u>? ABA Litigation 35 (Spring, 1976)

<u>Reprinted or excerpted</u>:

ABA, The Litigation Manual (all editions)
Tanford, The Trial Process (1983)
Twerski & Henderson, Products Liability:  Problems and Process (Teacher's Guide) (3d ed., 1997)
Berke, Professional Responsibility of Criminal Law (1999)

<u>Are There Public Interest Limits on Lawyers' Advocacy</u>?  11 Social Responsibility 31 (1976)

Reprinted:

2 Jour. Legal Prof. 47 (1977)

Prior Restraints on Freedom of Expression by Defendants and Defense Attorneys, 29 Stan. L. Rev. 608 (1977) (with Janet Starwood)

Revised and reprinted:

Criminal Defense Techniques (Matthew Bender) (with S. Kahan)

For a New Rule [on the former government lawyer's conflict of interest], 63 ABA Jour. 724 (1977)

Reprinted or excerpted:

Morgan & Rotunda, Professional Responsibility (1984)

The Loss of Idealism -- By Whom, And When? 53 N.Y.U. L. Rev. 658 (1978)

Personal Responsibility in a Professional System, 27 Cath. U.L. Rev. 191 (1978) (Pope John XXIII Lecture)

Reprinted or excerpted:

7 ABA Human Rights 28 (1978)
Roscoe Pound/ATLA Found., Ethics and Advocacy (1978)
Wolfman & Holden, Ethical Problems in Federal Tax Procedure (1981)
Pirsig & Kirwin, Professional Responsibility (1984)
Luban, The Ethics of Lawyers (1994)
Cochran & Collett, Cases and Materials on the Rules of the Legal Profession (1996)

Removal and Discipline of Federal Judges, 31 Mercer L. Rev. 681 (1980)

The Securities and Exchange Commission Enforcement Program, 38 Wash. & Lee L. Rev. 781 (1981) (with S. Sporkin)

The Kutak Model Rules vs. The American Lawyer's Code of Conduct, 26 Vill. L. Rev. 100 (1981)

Lawyer-Client Confidences and the Constitution, 90 Yale L. Jour. 1486 (1981)

    Reprinted or excerpted:

    Dorsen & Gillers, Regulation of Lawyers: Problems of Law and Ethics (1985)

Are the Model Rules Unconstitutional? 35 U. Miami L. Rev. 174 (1981)

Lawyer-Client Confidences -- The Model Rules' Radical Assault on Tradition, 68 ABA Jour. 428 (1982)

    Reprinted:

    26 Boston Bar Jour. 10 (April, 1982)

Arguing the Law in an Adversary System, 16 Ga. L. Rev. 821   (1982)

The Model Rules:  Improved but Unworthy of Adoption, 69 ABA Jour. 866 (1983)

    Reprinted:

    54 Okla. Bar Jour. 1681 (1983)

Confidentiality in the Lawyer-Client Relationship, The Neb. Humanist (Fall, 1984)

Lawyer-Client Confidences Under the Model Rules:  Ethical Rules Without Ethical Reason, 3 Crim. Justice Ethics 3 (Summer/Fall, 1984)

The Guilty Plea Problem, X Social Resp. 32, 37 (1984)

Undercover Operations Against Lawyers and Judges, 9 Jour. Legal Prof. 73 (1980)

Does Incrimination by Counsel Deny Effective Assistance?  ABA Barrister 13 (Fall, 1985)

Reprinted:

Nat'l L. Jour. 13 (11/4/85)

The Professional Responsibility of the Law Professor: Three Neglected Questions, 39 Vand. L. Rev. 275 (1986)

Reprinted or excerpted:

Student Law News 8 (11/87)
36 Law Rev. Dig. 26 (1986)
86 L.A. Daily Jour. Rpt. 16 (8/22/86)

The Ethics of Advocacy in the Advocacy of Ethics, 1 New L. Book Rev. 1 (1986)

The Aftermath of Nix v. Whiteside:  Slamming the Lid on Pandora's Box, 23 Crim. L. Bull. 25 (1987)

Reprinted or adapted:

__ Social Resp. (1986)
1 Hofstra L. Mag. 8 (1987)
Schwartz & Wydick, Problems in Legal Ethics (1988)

Advances in Prosecutors' Ethics, 1 ABA Crim. Just. __ (Winter, 1987)

Reprinted:

14 CACJ Forum 9 (July/Aug., 1987)

Legal Ethics and the Suffering Client, 36 Cath. U.L. Rev. 331 (1987)

Reprinted:

Paris & Taslitz, Introductory Constitutional Criminal Procedure: A Lawyering Perspctive (Foundation Press, 1997)

Two Fables for Lawyers, ABA Jour. 57 (May, 1, 1988)

Client Confidences and Client Perjury:  Some Unanswered Questions, 136 U. Pa. L. Rev. 1939 (1988)

Reprinted:

1 Crim Prac. L. Rev. ___ (1989)
J.G. Carr, Criminal Law Review--1990
Hazard & Koniak, The Law and Ethics of Lawyering (1990)

The Lawyer As Hired Gun, II Memphis Bar Forum 6 (1988)

Reprinted:

4 Wash. Lawyer 22 (Mar./Apr., 1990)
Ariz. Atty. 11 (Aug./Sept., 1990)
N.Y. State Bar Jour. 48 (Nov., 1990)
396 Laches 32 (Oakland Cty. Bar Assn., Mich. 1997)

The Need for a Rule 11 for Judges, 128 F.R.D. 437 (1990) (Delivered at the plenary session of the 1989 Federal Circuit Judicial Conference, Wash., D.C.)

Ethical Ends and Ethical Means, 41 Jour. Legal Education 55 (1991)

Excerpted:
J. Levy & J.E. Moliterno, Ethics of the Lawyer's Work    (1993)
J.E. Moliterno, Ethics of the Lawyer's Work (2003)

Law in the 21st Century, 60 Fordham L. Rev. 503 (1992)

Disqualification of Judges, 58 Brooklyn L. Rev. 1063, 1078 (1993)

Atticus Finch -- Right and Wrong, 45 Ala. L. Rev. 473 (1994)

Reprinted:

EBSCO (pub.), Critical Insights (2008)

Excerpted:

David R. Papke, et al., Law and Popular Culture (2007)

Quoted:

Malcolm Gladwell, The Courthouse Ring: Atticus Finch and the limits of Southern liberalism (Aug. 10, 2009)

Kaye Scholer -- Overzealous or Overblown? 35 S. Tex. L. Rev. 601 (1994)

John T. Noonan, Jr.:  Exemplar of Ethical Conduct, 11 Jour. of Law & Religion 1001 (1995)

But Only If You Know, Chapter 10 in R.J. Uphoff (ed.), Ethical Problems Facing the Criminal Defense Lawyer – Practical Answers to Tough Questions (ABA, 1995)

Reviewed, ABA Criminal Justice: "There exists no better choice of authority [than Monroe Freedman] to help you answer the ethical dilemma(s) surrounding client perjury, and he delivers in this book."

Translation into Japanese being prepared by the Japan Federation of Bar Associations for publication in Japan

The Lawyer's Moral Obligation of Justification, 74 Tex. L. Rev. 111 (1995)

Legal Ethics from a Jewish Perspective, 27 Tex. Tech. L. Rev. 1131 (1996)

Reprinted:

Baker & Floyd (eds.), Believing and Practicing: Meditations on Faith and the Law (1998)

The Life-Saving Exception to Confidentiality: Restating the Law Without the Was, the Will Be, or the Ought to Be, 29 Loyola (L.A.) L. Rev. 1631 (1996)

The Trouble with Postmodern Zeal, 38 Wm. & Mary L. Rev. 63 (1996)

The Threat to Judicial Independence by Criticism of Judges -- A Proposed Solution to the Real Problem, 25 Hofstra L. Rev. 729 (1997)

Religion Is Not Totally Irrelevant to Legal Ethics, 66 Fordham L. Rev. 1299 (1998)

The Ethical Danger of "Civility" and "Professionalism," 6 Crim. Justice Jour. 17 (1998)
          Reprinted:

          396 Laches 22 (1999)

Caveat Lector: Conflicts of Interest of ALI Members in Drafting the Restatements, 26 Hofstra L. Rev. 641 (1998)

Our Constitutionalized Adversary System, 1 Chapman L. Rev. 57  (1998)

Ethics, Truth, and Justice in Criminal Litigation, 68 Fordham L. Rev. 1371 (2000)

How Lawyers Act in the Interests of Justice, 70 Ford. L. Rev. 1717 (2002)

Professional Discipline of Prosecutors, 30 Hofstra L. Rev. 121 (2002)

The Professional Obligation to Raise Frivolous Issues in Death Penalty Cases, 31 Hofstra L. Rev. 1167 (2003)

          Excerpted:

          D.J. Meador, T.E. Baker, & J.E. Steinman,
          Appellate Courts – Structure, Function, Processes,          and
Personnel

Duck-Blind Justice: Justice Scalia's Memorandum in the *Cheney* Case, 18 Georgetown Jour. Legal Ed. 229 (2004)

An Ethical Manifesto for Public Defenders, 39 Valparaiso L. Rev. 911 (2005)

In Praise of Overzealous Representation – Lying to Judges, Deceiving Third Parties, and Other Ethical Conduct, 34 Hofstra L. Rev. 771 (2006)

Henry Lord Brougham – Written by Himself, 19 Georgetown Jour. Legal Eths. 1213 (2006)

Henry Lord Brougham and Zeal, 34 Hofstra L. Rev. 1319 (2006)

Erroneous Disclosure of Damaging Information, 14 Geo. Mason L. Rev. 179 (2006)

Judicial Impartiality in the Supreme Court – The Troubling Case of Justice Stephen Breyer, 30 Okla. City Univ. L. Rev. 513 [2007]

The Buried Bodies Case: Alive and Well after Thirty Years, ABA, The Professional Lawyer, 2007 Symposium Issue

Henry Lord Brougham – Advocating at the Edge for Human Rights, 36 Hofstra L. Rev. 311 (2007)

> Reprinted:
>
> Oregon Law Institute, Continuing Legal Education (2008)

Ethical Issues in Handling Veterans' Claims, 22 Vet. App. Reporter cxxvii (2008)

Getting Honest About Client Perjury, 21 Georgetown Jour. Legal Ethics 133 (2008)

> Reprinted:
> 14 Verdict 21 (October, 2008)
> Institute of Chartered Financial Analysts of India,
>     Prosecutorial Misconduct (ed., Dr. G. Radha
>     Kalyani) (2009)

What Ever Happened to the Search for Truth?, 60 Mercer L. Rev. 851 (2009)

Misunderstanding Lawyers' Ethics, 108 Mich. L. Rev. 925 (2010) (with Abbe Smith)

The Cooperating Witness Who Lies – A Challenge to Defense Lawyers, Prosecutors, and Judges, 2 Ohio State Jour. Crim. L. 739 (2010)

The Influence of the American Lawyers' Code of Conduct on ABA Rules and Standards, 38 Hofstra L. Rev. 927 (2010)

O.  . From 1990-1996, I wrote a monthly column, *Cases and Controversies*, in the Legal Times and several other newspapers throughout the country. Commenting in the Georgetown Journal of Legal Ethics, Professor Thomas Morgan called the columns "tough, imaginative essays." Columns have been reprinted or excerpted in Gellhorn, Byse, Strauss, Rakoff & Schotland, Cases and Materials on Administrative Law (9th ed., 1995); The Lawyer As Professional (Eds., Floyd & Newton, 1991); D. Rhode, Legal Ethics by the Pervasive Method (1993); T.D. Morgan & R. Rotunda, Problems and Materials on Professional Responsibility (6th ed., 1995; 7th ed., 2000) (two columns); N. Crystal, Professional Responsibility in the Practice of Law (1995); Cochran & Collett, Cases and Materials on the Rules of the Legal Profession (1996) (two columns); C.D. Johnson, Understanding to Kill a Mockingbird (1994); Zitrin & Langford, Legal Ethics in the Practice of Law (2d ed., 2001); and Rhode & Luban, Legal Ethics (3d ed., 2001) (two columns); and Professor Stephen Gillers has asked permission to reprint a column in Regulation of Lawyers: Problems of Law and Ethics. In addition, two of the columns have been the subject of the *At the Bar* column in the New York Times, another has been reprinted in the Congressional Record, one was appended to a Pennsylvania Bar Ethics Opinion, and others have been quoted or cited in law reviews, including the Yale Law Journal. Yale Professor Harold Bloom has reprinted one of my columns (on Atticus Finch) in his 2003 book on Harper Lee's To Kill a Mockingbird.

P.  For forty-five years, I lectured annually on lawyers' professional responsibilities at Harvard Law School, where I also served as an instructor on litigation skills.

Q.  I have taught a course and/or a seminar on lawyers' professional responsibilities for over 40 years, and am invited to speak several times each year on lawyers' and judges' ethics at bar association meetings, judicial conferences, and law schools throughout the United States and abroad. Judicial conferences include: the Federal Circuit Judicial Conference; the New York State Judicial Conference; the District of Columbia Judicial Conference; the Council of State Intermediate Appellate Court Chief Justices; the Annual Conference of Judges in

Tennessee; the Judicial Conference of the U.S. Court of Appeals for Veterans' Affairs, and the Annual Conference of Judges in Florida. I have also given the keynote address at several conferences, including an annual meeting of the National Organization of Bar Counsel, and have spoken innumerable times at American Bar Association conferences.

R.    The Wisconsin Department of Justice retained me to give a three and one-half hour lecture to 160 state prosecutors, including the Attorney General of Wisconsin, on prosecutors' ethical responsibilities. Also, the Office of the United States Attorney for the Southern District of Florida and the Office of the State Attorney for Dade County retained me to chair a two-hour ethics seminar for federal and state prosecutors.

S.    The Administrative Office of the Illinois Courts retained me to address (in two sessions) all 1,000 Illinois state judges, on judicial ethics.

T.    I have been a Consultant on professional responsibility to the Special Committee on Courtroom Conduct of the Association of the Bar of the City of New York; Consultant on professional responsibility to the United States Legal Services Corporation; and was awarded a Ford Foundation Travel-Study Grant to study lawyers' professional responsibilities in the United States, Canada, Scotland, and England.

U.    Although I had then been living in New York for ten years, I was appointed in 1983-1986 to serve on the District of Columbia Bar's Special Committee (the Jordan Committee) to make recommendations regarding adoption of the ABA's proposed Model Rules of Professional Conduct. I was also a member of the Committee's Subcommittee on Special Rules for Prosecutors. In 1997, I was invited to address the Supreme Judicial Court of Massachusetts on the state's proposed new rules on confidentiality.

V.    As Reporter to the Roscoe Pound Foundation, I was the principal draftsman of the American Lawyer's Code of Conduct. Parts of this code have been the basis for rules adopted in other codes, including the Rules of Professional Conduct in New York; the Rules of Professional Conduct in Washington, D.C., the ABA Standards Relating to the Prosecution Function, the ABA's Model Rules of Professional Conduct, and the ALI's Restatement of the Law Governing Lawyers.

W.    I held the Baker-Hostetler Chair in Law at Cleveland-Marshall Law School during the spring semester of 1992, teaching a course and giving lectures on lawyers' and judges' ethics.

X.     I delivered the Inaugural Annual Wickwire Lecture in Legal Ethics and Professional Responsibility at Dalhousie University, Nova Scotia, Canada, in 1992, and numerous bar lectures and keynote addresses throughout the United States.

Y.     I was the Director of the Criminal Trial Institute in Washington, D.C., in 1965-1966. In the Institute we used and developed techniques for training trial advocates that have since become standard in the National Institute for Trail Advocacy and similar programs.   The Institute was the first such program to include lawyers' ethics as part of the training program.

Z.     I have conducted trial and appellate litigation in several state and federal courts and before administrative agencies.

AA.     I have been admitted to the bars of New York, the District of Columbia, Massachusetts, Pennsylvania, the Interstate Commerce Commission, the United States District Court for the District of Columbia, the United States District Court for the Southern District of New York, the United States District Court for the Eastern District of New York, the United States Court of Appeals for the District of Columbia Circuit, the United States Court of Appeals for the Second Circuit, the United States Court of Appeals for the Ninth Circuit, the United States Court of Appeals for the Eleventh Circuit, the United States Court of Appeals for the Federal Circuit, and the Supreme Court of the United States.

BB.     I have been elected to membership in the American Law Institute, and served on its Consultative Group on the Law Governing Lawyers.

CC.     I served as an elected a Fellow of the American Bar Foundation.  A Fellow is one whose "public and private career has demonstrated outstanding dedication to the welfare of the community [and] the traditions of the profession."
DD.          I have been elected an Honorary Fellow of the American Board of Criminal Lawyers.

EE.     I have received the 2005 Sanford D. Levy Award from the New York State Bar Association "in recognition of your extraordinary contribution to the field of professional ethics through a body of work that spans four decades"; a New York State Bar Association Award for Dedication to Legal Scholarship and Public Service (1997); a New York State Bar Association Award for Outstanding Contributions to Criminal Law Education (2006); an Award of Merit from the

District of Columbia Bar; a President's Commendation Award from the National Association of Criminal Defense Lawyers; the Martin Luther King Humanitarian Award (1986); the Lehman-LaGuardia Award for Civic Achievement (1996); and the ABA's Michael Franck Award for Professional Responsibility (1998), which cited "outstanding contributions to the field of professional responsibility" and "a lifetime of original and influential scholarship in the field of lawyers' ethics."

FF.    I received an A.B., 1951, LL.B., 1954, and LL.M., 1956, at Harvard University.

GG.    I have been listed for many years in Who's Who in American Law, Who's Who in America, and Who's Who in the World.

HH.    Peer comments on my work in lawyers' and judges' ethics include the following:

Lawrence Fox, in an email to the ABA House of Delegates (2008):

> Monroe Freedman [is] the conscience of our profession.

Ralph Temple, 13 Jour. of the Legal Profession 233 (1988):

> [Monroe Freedman's] thinking, writing and lectures ... have been the primary creative force in legal ethics today, both in the practice of law and in legal education.

David Luban, THE GOOD LAWYER 10 (1984):

> [O]ne cannot emphasize too strongly [Freedman's] influence on discussions of legal ethics.

William Simon, 27 Hofstra L. Rev. 1 (1998):

> Suppose you had to pick the two most influential events in the recent emergence of ethics as a subject of serious reflection by the bar. Most likely, you would name the Watergate affair of 1974 and the appearance a few years earlier of an article by Monroe Freedman.... Of the two events, Watergate is the most famous, but ... the least important.

Steven Lubet, 34 Hofstra L. Rev. 673 (2006):

> Monroe Freedman ... is one of the few people, maybe the only person, who has actually managed to change the entire discourse in a field of legal studies.

Alan Dershowitz, 34 Hofstra L. Rev. 748 (2006):

> I regard [Monroe Freedman] as the Holmes and Brandeis of Legal Ethics.

Frank H. Armani (lawyer in the Buried Bodies Case), The Professional Lawyer, 2007 Symposium Issue, 19, 25:

> [M]y guiding light and only ray of hope was the writings of Monroe Freedman.  He was the only one that made any sense....

Ronald Rotunda, 34 Hofstra L. Rev. 1337 (2006):

If we had to pick the one person who first created modern legal ethics as a serious academic specialty, it would be Monroe Freedman.

# Exhibit B

# Hebert Dailies

94-671(c)

ACTION NOTES

PLANNING NOTES

10-11 - NOTIFIED BY C-6 & 7:00PM JIMMY BUSS

① CONTACTED C-50
② WENT TO SCENE
③ INTERVIEWED GROCERY OWNER
④ WENT TO J.E. SMITH HOSPITAL
⑤ MET ⊆ V/ + FAMILY
⑥ PHOTOS OF INJURY
⑦ INTERVIEWS
⑧ MRS. NORWOOD TO LOCATE OTHER V/
⑨ TRIP SHEETS

10-12 - CONTACTED MRS. NORWOOD - TO PICK UP V/ - TO MEET AT IAD
① INTERVIEW W/ #1, #2, #3
② CHECKED CRIMINAL HISTORY
③ SPOKE ⊆ C-50
④ RAN TRIP
⑤ PRINTOUTS

10-13 REQUESTED PHOTOS OF S/
① RECEIVED PHOTOS FROM CRIME LAB
② PA - MRS. NORWOOD CALLED OFFICE - STATES S#1 + S#2 FOLLOWED HER CAR ⊆ V/ + W#1 IN CAR TO WALGREEN'S ON ST. CLAUDE. SHE STATES S/ GOT PAINT ON REAR BUMPER OF CAR - SHE SAYS ABOUT A YR. AGO SHE ASKED HER FOR A DATE WHILE IN TRAFFIC COURT
③ SCHEDULED APPT. TO MEET ⊆ V/ + W/ TO VIEW PHOTO LINEUP
④ MET ⊆ V/, R/P, + W#1 TO VIEW PHOTO LINEUP.

cutive

GE 2

PREPARED BY

DATE

| ACTION NOTES | | PLANNING NOTES |
|---|---|---|

10-14-94 9:05AM - MRS. NORWOOD CALLED CRYING. W&I KILLED LAST NIGHT AT VILLERE & ALABO STS. PEOPLE SAY A BLACK MAXIMA PULLED UP TO 4 AND SHOT HER IN HEAD

① CHECKED ⊆ CIB - 11:21PM 14th BLK. ALABO ST. WAS SCENE   DET. TONY SMALL HANDLING

② NOTIFIED C-50

③ C-50 ADVISES WAIT UNTIL 10-17-94 TO GET ASSISTANCE FROM C-51

④ 12:10PM - CONTACTED MRS. NORWOOD - SHE SAYS A LITTLE BOY IN SCATTER SITE SAW MURDER. - TO GET MORE INFO

10-17-94 - CONTACTED C-51 WHO STATES C-50 HAS ADVISED HIM - CONTACT HIM LATER. C-51 LATER STATES HE'LL MEET AT ANOTHER TIME

10-18-94   NO CONTACT ⊆ ANYONE PRIOR TO 10PM

① CONTACTED MRS. NORWOOD SAID GRANDMA GEORGIA SAID THAT WHILE TV PEOPLE AT HOUSE SHE GOT A CALL FROM A MAN TO ASK IF "KIM" WAS TESTIFYING AGAINST SOMEONE. GRANDMA SAID "NO" AND HUNG UP.

CAR IS ALLEGEDLY A BLACK OR DARK BLUE MAXIMA

| TIME SCHEDULE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SUNDAY | | MONDAY | | TUESDAY | | WEDNESDAY | | THURSDAY | | FRIDAY | | SATURDAY | |
| MONTH | DATE | MONTH | DATE | MONTH | DATE | MONTH | DATE | MONTH | DATE | MONTH | DATE | MONTH | DATE |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

cutive

94-681 (2)

PREPARED BY

DATE

PLANNING NOTES

CTION NOTES

2. WORKS TOMORROW UNTIL 7:15PM

3. TRAFFIC COURT 11-9-94  3PM "C"

4. KIM ARRANGEMENTS FRI

10-19- CAPT. ASCHBACH WANTED INFO FOR

LT. ITALIANO - CONTACT LT. ZJACCAO

OR DET. TONY SMALL

10-19- CALLED MRS. NORWOOD - NO ANSWER

10-19- SPOKE ⇌ C-51 IN REGARDS TO

INVESTIGATION

10-20 - SPOKE ⇌ C-51 RE: STATUS OF INVESTIGATION

/ ASKED ABOUT LETTER. C-51 LANTS 105 ON

CASE - SPOKE ⇌ C-50 ALSO

10-21  8:34PM. SPOKE ⇌ DET. LENNON, CIB - HAD 2

W ON SCENE IDENTIFYING Y BOYFRIEND AS Y.

BOYFRIEND MAYBE INVOLVED IN DRUGS

10-21 - SPOKE ⇌ C-51 ABOUT INCIDENT.

10-21 4:50PM - REC'D CALL FROM MRS. NORWOOD - NATH.

ARRESTED AT SCHOOL FOR TRESPASSING + RESISTING

ARREST AFTER SCHOOL BY NOPD (PER NATANIEL BADLEY & LT

H. WILLIAMS) - ADVISED C-51 - MRS NORWOOD AND FAMILY

GOING TO FUNERAL TONIGHT

11/3/94

PREPARED BY

DATE

ACTION NOTES                    PLANNING NOTES

H's RELATIVE MAY HAVE SAW

GAIL SPOKE SPOKE TO HIM - HIM SAID
P/O SHE SAW BEST 4 WAS FOLLOWING HER. - 4 CHASED
HER FROM ALGIERS - 4 TOLD GAIL SHE MET ↙
ME IN ALGIERS, SHE PICKED ↙ OUT AND THIS IS
SAME P/O FOLLOWING HER.

4 AND GAIL MET LATER IN EVENING.
WHILE TALKING TO 4 THEY CIRCLED 4 CIRCLING
BLOCK 3-4 TIMES. GAIL SAID 4 TOLD HER
NAME OF S/ BUT SHE DIDN'T REMEMBER. GAIL
SAID SHE COULD ID S/ FROM PHOTO AND
WOULD RECOGNIZE NAME - GAIL SAID VERB.
TO 45 MIN. LATER 4 WAS DEAD.

TENANTS S/ - SYLVESTER JONES - 4 BOYFRIEND

ACCORDING TO 4 SON - 4 WAS VISITED BY ANNES
GREEN AFTER ESCAPING AND GOT CLOTHES. 4 SON
+ DAUGHTER KNOW MORE BUT NOT SAYING
ANYTHING.

☀ THERE IS A TWIN LIVING AT ▬▬▬▬▬▬
CAROLYN JOSEPH - MOM - CHRIS + CHRISTOPHER
948-4618

TWIN SHOT MIKE MINHJ - DWAYNE LeBLANC
N S/ - S/ IS IN SAN DIEGO AWAITING EXTRADITION.

LEN GREW UP AND LIVED IN 9TH WARD AREA - LEN
TO LAWLER + NICHOLLS.

PARKY?
NICK
TRIGG
ISIN

INTELLIGENCE INFO

X    94-681(c)

PREPARED BY

DATE

ACTION NOTES

PLANNING NOTES

11-7- Rec'd call from Zennon Re: meeting with parties involved in my case for info on Kim

11-8- Rec'd call from Zennon - Slack's sister gave him Ms. Norwood's name + number - He hasn't been able to contact her.

11-9- Rec'd call from Zennon- What date did he get copy of letter from Itallano - Advised I'll call him back- He's preparing another date in regards to S16 30 -

11-9-94- Rec'd call from Zennon- He located Norwoods and interviewed them. The statements by Len Davis is in regards to shooting of Michael Mims. Len + Mims are real good friends. Mims lives around corner from Tonga Amos. Len goes to Mims house on a regular basis. Norwood's and Amos are being cautious. He feels based on his info that Len is involved in S16 30 some way. His name keeps coming up. I told Slack's sister about Len Davis + Sammy Williams following them to drugstore.

cutive

# Exhibit C

# Affidavit of Kathleen Adams

## AFFIDAVIT

I, KATHLEEN A. ADAMS after being duly sworn, and deposed, state that I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) assigned to the New Orleans Division and have been so employed for 8-1/2 years. Affiant, in the course of her investigative responsibilities, has investigated violations of the federal law, including violations of Title 18, United States Code, Section 1962(c) and (d); Title 21, United States Code, Sections 841(a)(1) and 846; and Title 18, United States Code, Section 924(c). Affiant is currently investigating a violent narcotics trafficking group based in New Orleans, Louisiana. This organization is headed by **PAUL HARDY** and his associates.

On March 14, 1994, the New Orleans Division of the FBI began an extensive undercover investigation of police corruption by officers of the New Orleans Police Department (NOPD). During this same period of time, the New Orleans Division of the FBI also began an investigation into a group of individuals, headed by **PAUL HARDY**, who were involved in illegal drug trafficking and in several murders to protect their illegal drug trafficking turf.

On August 10, 1994, in the United States District Court, Eastern District of Louisiana, KEVIN YANCY pled guilty to charges stemming from his involvement in a very violent illegal drug trafficking organization. Yancy entered into a plea agreement, and as a result of this plea agreement, provided the following information to the undersigned affiant:

Yancy advised affiant that he was personally involved with PAUL HARDY, also know as (a/k/a) Cool, in illegal drug trafficking. Yancy described HARDY as a "killer" and has heard of HARDY being involved in numerous murders in order to protect his illegal drug trafficking turf. Yancy has personally observed and knows two of the associates of PAUL HARDY; DAMON, a/k/a "D," and Steve Jackson.

Yancy also advised affiant that PAUL HARDY, as well as his associates, are protected by officers of the NOPD. Yancy personally knows that these police officers are involved in supplying narcotics to these individuals in order to share the proceeds. Yancy knows that one of the NOPD police officers involved is LEN DAVIS.

Dwight Powell, formerly a NOPD Grounds Patrol Officer, pled guilty on August 3, 1994, and admitted to his involvement in selling drugs with the Yancy illegal drug organization. As a result of his plea agreement, Powell provided the following information to the affiant:

Powell informed affiant that he knew of PAUL HARDY through Powell's relationship with the Yancy drug trafficking organization. Powell has personally observed PAUL HARDY and his associates dealing drugs, specifically, "crack," and knew that one of HARDY's associates was Steve Jackson.

Beginning in May 1993, and continuing to the present, a confidential source, proven to be reliable, hereinafter referred to as CS-1, provided the following information:

CS-1 identified PAUL HARDY, a/k/a "Cool," as being a large scale narcotics dealer involved in numerous homicides. CS-1 has personal knowledge of his illegal drug trafficking.

CS-1 further identified one of HARDY's close associates as being Steve Jackson. CS-1 also

2

advised that **PAUL HARDY** has close connections with NOPD Officer **LEN DAVIS**, and also advised that **DAVIS** helps facilitate **HARDY**'s narcotics trafficking.

On October 12, 1994, at 10:20 p.m., Kim Marie Groves, residing at 1416 Alabo Street, New Orleans, Louisiana, appeared at the NOPD Internal Affairs Division, and provided an eight-page civil rights complaint against NOPD Officer **LEN DAVIS** and another NOPD Officer (unknown to her by name at that time but subsequently determined by affiant to be NOPD Officer Sammie Williams) for their brutal beating of an individual named Nathan Norwood at 6018 N. Claiborne Avenue, New Orleans, Louisiana, on October 11, 1994.

In her civil rights complaint, Groves stated that she witnessed **LEN DAVIS** hit a 17-year-old male, named Nathan Norwood, in the stomach and observed the other officer use the butt of his gun to hit Norwood in the back of his head for no reason. Groves stated she told the officers that she wanted to know what was going on but that the officers would not tell her and indicated that if she did not move on she would be getting into their car, i.e., she would be arrested. Groves stated that the officer then released Norwood and, as they walked, she observed that he was dizzy and blood was running down his face. (Affiant subsequently has determined that Nathan Norwood was admitted Jo Ellen Smith Hospital on October 11, 1994, for treatment of the aforementioned injuries.)

3

Groves stated that she heard Officer **DAVIS** asking Norwood "Where is it at?" and stating, "We know you know where it is at." Norwood responded he did not know what they were talking about and that is what prompted the beating.

Groves stated she knows Officer **LEN DAVIS** from the 9th Ward and described the other officer as being about **LEN DAVIS'** height, light complexion, with a short mustache and heavy-set. She stated that the reason she voluntarily went to file this complaint was because she feared the same brutality could be inflicted on her son or any other young person and that the youth's "civil rights" had been violated. Affiant learned that the cellular phone with telephone number (504) 451-4971 (hereinafter referred to as "**LEN DAVIS'** phone number") is currently used by NOPD Police Officer **LEN DAVIS**.

A reliable confidential source of information (hereinafter sometimes referred to as "CS-2") provided the following information which included what in affiant's experience relates to illegal drug trafficking conversations along with conversations of murder. CS-2 revealed the numerous conversations which follow below.

On October 13, 1994, a conversation occurred at 12:53 a.m. from **LEN DAVIS'** cellular telephone number (504) 451-4971 to telephone number (504) 246-6163. A check with South Central Bell indicates that telephone number (504) 246-6163 is a telephone listed to Sammie Williams, 10501 Curran Street, New Orleans,

4

Louisiana.  Affiant knows that Sammie Williams is a NOPD officer and is the partner of Police Officer **LEN DAVIS**.

In this conversation Sammie Williams and **LEN DAVIS** discussed the fact that they had "busted" one of the "twins" in the head yesterday.  Your affiant has now determined that they were discussing the aforementioned confrontation between the officer and Nathan Norwood which occurred on October 11, 1994.

**LEN DAVIS** says:

LEN, LEN DAVIS, uh, she call IAD and uh, told IAD about uh, I bust her lit, it ain't her real nephews either, she, they just call her auntie or whatever but uh, she told IAD that uh, I bust uh, her little nephew or whoever in the head and ... she talk to the commander in IAD and he say he tired of uh, hearing my name and he been wanting to get me.

Now, the whore, now I know the whore can't be lying about that because uh, for her to say the commander said this, uh, I don't know what commander she talking about, she probably just talked to a sergeant or something in IAD, one of them bitches that I don't, well I don't get along with none of 'em, but I say, he say yeah, uh, I been wanting to get him, I'm tired of hearing about LEN DAVIS, blah, blah, blah, blah, this.

So supposedly she went up to IAD today and uh, made some kind of complaint or whatever but, I asked 'em did the twins ... did any one of the twins go?  And he say he don't know what they did, he say (pause) he think she just going on the strength of them but that he don't  think that they went.

So I don't know what the play ... yeah, this battery about to go, I don't know if uh, (pause) oh Lord, I don't know if uh, he went, if any one of them went, I don't think none of them went, I think this whore just went (pause) by herself, awright, so uh, I don't know what the play is.

5

SAMMIE WILLIAMS:     ... she gonna be on file just for your part.

LEN DAVIS:          Yeah, but i'm just letting you know that uh, the motherfucker went up there

SAMMIE WILLIAMS:     Uh huh.

LEN DAVIS:          And I don't know if uh, what the play is and all that shit there but the motherfucker went up there (pause) so uh, be looking for something to come down.

SAMMIE WILLIAMS:     I already was.

LEN DAVIS:          Huh?

SAMMIE WILLIAMS:     I already was looking for

LEN DAVIS:          Yeah, well something gonna be coming most likely.

SAMMIE WILLIAMS:     Awright.

LEN DAVIS:          Awright then.

SAMMIE WILLIAMS:     Awright.

On October 13, 1994, at 5:10 p.m., a call was placed from **LEN DAVIS'** cellular phone number (504) 451-4971 to telephone number (504) 528-4443. After this number was dialed, **LEN DAVIS'** cellular telephone number (504) 451-4971 was dialed. Affiant knows from reviewing subscriber records from Radiofone that telephone number (504) 528-4443 is **PAUL HARDY'**s beeper. While this dialing was going on, **LEN DAVIS** said "I can get P to come do that whore now and then we handle the thirty, (pause) boy." Affiant knows that a "thirty" in NOPD terminology is in reference to a homicide. Thus, your affiant believes that **DAVIS** meant he could get "P" (**PAUL HARDY**) to "do" (murder) the woman and,

6

afterward, **DAVIS** and Williams would investigate the "thirty" (the homicide).

On October 13, 1994, at 6:14 p.m., an incoming call was received at **LEN DAVIS'** cellular telephone number (504) 451-4971. The conversation was between **LEN DAVIS** and **PAUL HARDY**.

| | |
|---|---|
| **LEN DAVIS** says: | Nigger I, I'm looking at that whore.  Went down there today. |
| PAUL HARDY: | Yeah. |
| LEN DAVIS: | The bitch got in the car with the twins. |
| PAUL HARDY: | Yeah. |
| LEN DAVIS: | The nigger that I was telling you about. |
| PAUL HARDY: | Yeah. |
| LEN DAVIS: | And uh, they might a been going up to IAD when I saw 'em cause they come speeding up on side of us so they can look at us and shit. But uh... |
| PAUL HARDY: | ... (**PAUL HARDY** seems to be talking to someone in the background.) |
| LEN DAVIS: | ... the bitch got light brown eyes, the bitch got on like a black sweat top with some faded like black jeans with a light brown ... I know the whore now.  When I see the bitch ... |
| PAUL HARDY: | Uh. |
| LEN DAVIS: | I know the fuck out that bitch.  But the whore hanging out down there now.  What you mean, nigger.  You know what I wanna do. |
| PAUL HARDY: | Well, bitch, you ain't say nothing. |
| LEN DAVIS: | (Stuttering) Well, you, I tell you what. When you come downtown call me cause, uh ... |
| PAUL HARDY: | I'm down town now. |
| LEN DAVIS: | Where you at? |

7

PAUL HARDY:        I'm by TONI's mama.    (Police radio heard in the background)

LEN DAVIS:         Yeah, well you got them with you though, huh?

PAUL HARDY:        Who?

LEN DAVIS:         Know what I was talking about?

PAUL HARDY:        What that?

LEN DAVIS:         Where you, what phone are you on?

PAUL HARDY:        I'm on TONI's mama.

LEN DAVIS:         Oh, okay, I was talking about when it get dark ...

PAUL HARDY:        Nigger, I know what's happening.

LEN DAVIS:         Yeah.  Okay, I tell you what.  Let me handle this and I'm gonna call you when I get back.

PAUL HARDY:        Well, bring that picture.  I wanna check it out.

LEN DAVIS:         Awright.

PAUL HARDY:        Awright, later.

On October 13, 1994, at 6:31 p.m., an incoming call was received at **LEN DAVIS'** cellular telephone number (504) 451-4971. A conversation occurred between **LEN DAVIS** and **DAMON**.  Affiant believes this to have been **DAMON CAUSEY**.  The conversation went as follows:

DAMON:             It's a beeper number?

LEN DAVIS:         Hello.

DAMON:             Yeah, what's up nigger?

LEN DAVIS:         Yeah, I was calling to tell your fucking ass uh,

DAMON:             This **DAMON**, man.

8

LEN DAVIS:          I know, I thought this was your voice.  I was calling to tell ya'll to meet me by the station

DAMON:             Uh huh

LEN DAVIS:          and uh, the nigger wanted to see the pictures, I could show him the pictures,

DAMON:             Yeah

LEN DAVIS:          Then I want to put you niggers in the, in the car,

DAMON:             Uh huh

LEN DAVIS:          and go across that canal and show you what I'm talking about.

DAMON:             Awright, where you at?

LEN DAVIS:          I'm about to go on that next street first and handle some bullshit

DAMON:             Uh huh.

LEN DAVIS:          and uh, ... I'm gonna put all one's in this beeper

DAMON:             Yeah

LEN DAVIS:          and that mean meet me at the 5th District station.

DAMON:             Awright.

LEN DAVIS:          Awright.

Shortly following this phone call, a call was placed from **LEN DAVIS'** cellular telephone number to **PAUL HARDY**'s beeper and all one's were dialed in.

On October 13, 1994, at 7:14 p.m., a call was placed from **LEN DAVIS'** cellular telephone number to (504) 283-4633. This conversation was between **PAUL HARDY** and an unknown female.

9

During the conversation, **PAUL HARDY** stated "I'm over here by on **LEN**'s phone."

On October 13, 1994, at 7:28 p.m., a call was placed from **LEN DAVIS**' cellular telephone to telephone number (504) 458-2922. Affiant knows that this telephone number is to a cellular phone used by SAMMIE WILLIAMS. The conversation went as follows:

| | |
|---|---|
| LEN DAVIS: | Hello. |
| PAUL HARDY: | Yeah, what's up, nigger? |
| LEN DAVIS: | We going pass over there now. And uh, see if we can spot this fuck. What ya'll gonna, what ya'll about to do? |
| PAUL HARDY: | Man, this motherfucker, Toni left in my fucking car, man. |
| LEN DAVIS: | She left in your car? |
| PAUL HARDY: | Yeah, she ... |
| LEN DAVIS: | Who car ya'll, who car ya'll was in? |
| PAUL HARDY: | We was in Steve's car. |
| LEN DAVIS: | Oh, Okay. I ... saying Maxima. I thought ya'll was in that white Maxima. |
| PAUL HARDY: | Fuck no. |
| LEN DAVIS: | ... where the fuck is that thing at? |
| PAUL HARDY: | Over at my house. |

On October 13, 1994, at 9:46 p.m., a call was placed from **LEN DAVIS**' cellular phone to telephone number (504) 528-4443 (**PAUL HARDY**'s beeper) and DAVIS' cellular telephone number was dialed in. Shortly thereafter at 9:49 p.m., an incoming call was received on **LEN DAVIS**' cellular telephone number (504) 451-4971,

10

and a conversation ensued between **LEN DAVIS** and **PAUL HARDY**.  The
conversation was as follows:

PAUL HARDY:            Shirroca (phonetic).  Them some ugly tennis.

LEN DAVIS:             Hello.

PAUL HARDY:            Shirroca.

LEN DAVIS:             ... bitch ya'll fucked over me.

PAUL HARDY:            What happened?

LEN DAVIS:             Ya'll ain't went and handled ya'll business.

PAUL HARDY:            Nigger, I just brought my kids home, I ...
                       go out there now, bitch.

LEN DAVIS:             Let me go pass, awright, ya'll going over
                       there now?

PAUL HARDY:            Yeah, nigger, I just drop my kids off.

LEN DAVIS:             I'm gonna go pass, see if I see that whore
                       too and I just uh, come at ya and let you
                       know.

PAUL HARDY:            Just hit me, nigger, I'm coming down now.

LEN DAVIS:             Awright.

PAUL HARDY:            Later.

On October 13, 1994, at 10:00 p.m., an outgoing call
was made from **LEN DAVIS'** cellular phone to **PAUL HARDY'**s beeper.
During the course of this dialing, **LEN DAVIS** said "Come get this
whore.  Oo, oo, I'm gonna 911 this fucking ...."  Immediately
following that call, another call was placed from **LEN DAVIS'**
cellular phone to **PAUL HARDY'**s beeper.  **DAVIS** entered his
cellular telephone number 451-4971 and added the number "911."
During this dialing **LEN DAVIS** said "... Don't go nowhere.

11

Please, baby, please baby.  I don't even want you to think of that."

On October 13, 1994, at 10:01 p.m., an incoming call was received by **LEN DAVIS'** cellular phone and a conversation occurred between **LEN DAVIS** and **PAUL HARDY**.  The conversation was as follows:

LEN DAVIS:          Hello.

PAUL HARDY:         Yeah, what's up, nigger?

LEN DAVIS:          Man, that whore's standing out there right now wid a black fucking coat on.  She got on some faded grey uh, black jeans ...

PAUL HARDY:         Uh huh.

LEN DAVIS:          ... with big white bleach stains in the front of 'em on the pants leg ...

PAUL HARDY:         Uh huh.

LEN DAVIS:          ... in front the same fucking house, black coat, wid her fucking hair...in that little bob like ... with fucking jeans on with big bleach stains on the front of it. Standing in the middle of the fucking street talking to one nigger.

PAUL HARDY:         What's up with home boys, they out there?

LEN DAVIS:          No, fuck them.  If they ain't out there, get that whore!

PAUL HARDY:         Awright, I'm on my way, my nigger.

LEN DAVIS:          Awright.

PAUL HARDY:         Later.

On October 13, 1994, at 10:43 p.m., an incoming call was received on **LEN DAVIS'** cellular telephone and a conversation occurred between **LEN DAVIS** and **PAUL HARDY**.  The following ensued:

12

| | |
|---|---|
| PAUL HARDY: | Oh, awright. Hello. |
| LEN DAVIS: | Yo. |
| PAUL HARDY: | Yeah nigger, we on our way. |
| LEN DAVIS: | ... Bitch if she still out there all this motherfucking time. |
| PAUL HARDY: | Yeah, ... Yeah, motherfuck you, I'm gonna tell you, look. |
| LEN DAVIS: | Look. |
| PAUL HARDY: | You just ... |
| LEN DAVIS: | Listen to me.  Listen to me. |
| PAUL HARDY: | What. |
| LEN DAVIS: | It's faded, it's black jeans. |
| PAUL HARDY: | Uh huh. |
| LEN DAVIS: | With big, white bleach stains ... |
| PAUL HARDY: | Okay. |
| LEN DAVIS: | ... on the front of the pants legs. |
| PAUL HARDY: | Right. |
| LEN DAVIS: | A black coat that come around to, round the thigh. |
| PAUL HARDY: | Awright. |
| LEN DAVIS: | A black coat, with faded jeans, with big bleach stains on the front of 'em, and the bitch brown skin with light brown eyes.  I got the phone on and the radio.  After it's done, go straight uptown and call me. |
| PAUL HARDY: | Later. |
| LEN DAVIS: | Awright. |

On October 13, 1994, at 11:10 p.m., a call was placed from **LEN DAVIS'** cellular telephone number to Sammie Williams'

13

cellular telephone number (504) 458-2922.  A conversation

occurred between Sammie Williams and **LEN DAVIS**.  The conversation

went as follows:

SAMMIE WILLIAMS:     Hello.

LEN DAVIS:           Signal ... the N A T.

SAMMIE WILLIAMS:     Signal what?

LEN DAVIS:           Signal 30.  N A T.

SAMMIE WILLIAMS:     You lie!  (pause)  When it came out?

                (Police radio traffic in the background)

LEN DAVIS:           Signal, ...  I

SAMMIE WILLIAMS:     Where you at?

LEN DAVIS:           I got the radio on right now.

SAMMIE WILLIAMS:     Where you at?

LEN DAVIS:           I'm at Flynn's.

SAMMIE WILLIAMS:     I'm coming over there!

LEN DAVIS:           Awright.

Your affiant knows that "NAT" is NOPD terminology for "necessary

action taken" and that "signal 30" is NOPD terminology for

"homicide."

On October 13, 1994, at 11:11 p.m., a call was placed

from **LEN DAVIS'** cellular telephone number to telephone number

(504) 941-4400.  This telephone number is listed to the 5th

District of the NOPD.  A conversation occurred between **LEN DAVIS**,

**PAUL HARDY**, and RICKEY HUNTER.  A portion of the conversation is

as follows:

14

LEN DAVIS:            Oh, Okay. What's up? What's up, motherfucker? They just had a thirty-four S, huh?

RICKEY HUNTER:       It's in the 1400 block of Alabo Street, it's a head shot.

LEN DAVIS:           So it's a 30, huh?

RICKEY HUNTER:       ... ambulance and a code 3 and now they got him going to Charity.

The conversation continued and then PAUL HARDY got on the line and said "What's up, nigger?"

LEN DAVIS:           What's up?

PAUL HARDY:          Sch, Schbock (phonetic), huh? (HARDY chuckles)

LEN DAVIS:           In uh, I know, I'm listening uh,

                     I'm listening right now, uh, it's definitely a thirty, huh?

PAUL HARDY:          Schbock (phonetic).

LEN DAVIS:           Call back in five minutes.

The conversation continued where LEN DAVIS tells PAUL HARDY he was checking on it and that he would call him back. On October 13, 1994, at 11:13 p.m., there was an incoming call on LEN DAVIS' cellular phone. The conversation was between LEN DAVIS and Sammie Williams and was as follows:

LEN DAVIS:           Hello.

SAMMIE WILLIAMS:     Yeah. That's ... that's who they code nine.

LEN DAVIS:           Yeah, they fucking code nineing this bitch, man. (DAVIS laughs) They code nine ...

SAMMIE WILLIAMS:     How you know it's a 10-7 thing?

LEN DAVIS:           Uh, I talked to them people, hear?

15

SAMMIE WILLIAMS:        Oh.

LEN DAVIS:              They say for sure, hear?  Now, I'm about to
                       confirm it. I just beeped Gary and told 'em
                       ... I put all five's in his beeper.  I'm
                       gonna see if he can tell me for sure, and
                       what's the name on the victim.  But ah, from
                       what I'm hearing from the people ...

SAMMIE WILLIAMS:        Uh huh.

LEN DAVIS:              ... it's definitely a done deal.  And uh,
                       I'm, the people gonna call me back in five
                       minutes.  But uh, they code nineing it right
                       now, but, uh ...

SAMMIE WILLIAMS:        I'm about, I'm about to come on shift right
                       now.

LEN DAVIS:              Awright.

Your affiant knows that "code nine" is NOPD terminology for

"police escort" and that a "10-7 thing" is understood by NOPD

officers to mean "out of service" or more commonly known as "a

dead subject."

          On October 13, 1994, at 11:22 p.m., an incoming call

was received on **LEN DAVIS'** cellular phone.  A conversation

occurred between **LEN DAVIS**, **PAUL HARDY**, and **GARY WASHINGTON**, a

New Orleans police officer, who was on his police radio.  The

conversation went as follows:

LEN DAVIS:              Hello.

PAUL HARDY:             What's up, nigger?

LEN DAVIS:              Hold on one second, hear?

PAUL HARDY:             Awright.

LEN DAVIS:              GARY, you there?  (Pause)  GARY, you there?
                       ... GARY go to five.  GARY, you on five?

16

*GARY WASHINGTON:     Yeah.  Go ahead, **LEN**.
(On radio)

LEN DAVIS:           That's looking like a thirty?

GARY WASHINGTON:     Ten-four.

LEN DAVIS:           Uh, male, female?

GARY WASHINGTON:     Female, black female.

LEN DAVIS:           You don't have a name, huh?

GARY WASHINGTON:     ...

LEN DAVIS:           Stand by, it's a thirty.

GARY WASHINGTON:     ... GROVES, G-R-O-V-E-S.

LEN DAVIS:           Yes!

SAMMIE WILLIAMS:     It's the whore!

LEN DAVIS:           Yes!

SAMMIE WILLIAMS:     Hello.

PAUL HARDY:          Yeah, what's happening?

SAMMIE WILLIAMS:     (laughing), It's confirmed, daddy.

PAUL HARDY:          It's handled?

SAMMIE WILLIAMS:     Huh?

PAUL HARDY:          It's handled, huh?

SAMMIE WILLIAMS:     Huh?

PAUL HARDY:          It's handled, right?


*(LEN was talking on the radio to GARY WASHINGTON, a police
officer (5th District) who was on the scene of the Groves'
homicide.)

17

| | |
|---|---|
| SAMMIE WILLIAMS: | ... hold on.  We gonna get back with you. |
| PAUL HARDY: | Good. |
| SAMMIE WILLIAMS: | Hold on, hold on, hold on. |
| PAUL HARDY: | Awright. |
| LEN DAVIS: | Hello.  Yeah, yeah, yeah, roc, rock-a-bye. |
| PAUL HARDY: | ... nigger? |
| LEN DAVIS: | Hold on, hold on, bro. |
| PAUL HARDY: | Go ahead. |
| LEN DAVIS: | Hello. |
| UNKNOWN FEMALE: | What you doing? |
| LEN DAVIS: | I'ma hit you right back.  Business.  I'ma hit you back. (Returns to PAUL HARDY) Hello. |
| PAUL HARDY: | Yeah. |
| LEN DAVIS: | Yeah, What it, what, say, bro. |
| PAUL HARDY: | Uh huh? |
| LEN DAVIS: | I heard somebody just got shot on Alabo Street. (laughing) Say she dead, too. |
| PAUL HARDY: | Oh yeah? |
| LEN DAVIS: | Yeah, bro, some bitch, I just had to have, happened to have the radio on. |
| PAUL HARDY: | Yeah. |
| LEN DAVIS: | Say it was three niggers in a champagne-colored ninety-three Maxima. |
| PAUL HARDY: | Oh, man, that's fucked up, a broad? |
| LEN DAVIS: | Oh, some broad, bro, got shot uh, say three niggers in a Maxima.  Fled up Robertson Street.  Three niggers in a champagne-colored Maxima. |
| PAUL HARDY: | Where you at? |

18

LEN DAVIS:            Huh?

PAUL HARDY:          Where you at?

LEN DAVIS:            I'm by Flynn's.

PAUL HARDY:          I'm gonna come through.

LEN DAVIS:            Come through.

PAUL HARDY:          Later.

On October 13, 1994, at 11:26 p.m., an incoming call was received on **LEN DAVIS'** cellular phone. A conversation occurred between **LEN DAVIS** and an unknown female and part of the conversation is as follows:

UNKNOWN FEMALE:      I know what side you staying on Alabo Street.

LEN DAVIS:            Oh yeah?

UNKNOWN FEMALE:      Uh huh.

LEN DAVIS:            Yeah?

UNKNOWN FEMALE:      . . .

LEN DAVIS:            Some bitch just got served out there.

UNKNOWN FEMALE:      . . .

LEN DAVIS:            Probably had it, probably had it coming.

UNKNOWN FEMALE:      . . .

LEN DAVIS:            . . . never can be too careful.

On October 17, 1994, at 8:58 p.m., **LEN DAVIS** received an incoming call from **PAUL HARDY**. **DAVIS** explained to **HARDY** that he thought that two individuals who might be witnesses for alleged complaints against him, one of whom was the young person reported by Kim Groves to have been beaten up by Officer **LEN DAVIS**, changed their stories, indicating that they were not going

19

to pursue the matter. DAVIS told HARDY that because they would not "lie" about him "like that whore" "he would let them go" meaning that HARDY would not have to "take care of them". DAVIS, however, also told HARDY that if he heard subsequently that the two would take action against him, then it would be "rock-a-bye baby." Your affiant believes that DAVIS was saying he would have them killed just like Kim Groves.

On October 19, 1994, at 10:27 p.m., LEN DAVIS called telephone number (504) 246-8272, which is a telephone listed to the residence of PAUL HARDY. A conversation occurred between LEN DAVIS, PAUL HARDY, and DAMON CAUSEY. The conversation concerned the homicide of Christopher Williams on Congress Street. LEN DAVIS asks DAMON CAUSEY, "Nigger, you handle something?" DAMON replies "No" and DAVIS explained to him that his name was being thrown around as being the shooter. LEN DAVIS explained that Williams had a gunshot wound to the stomach and that he (Williams) was saying that it was done by DAMON. They discussed where the homicide occurred and DAVIS told DAMON that he did not think that he came on that "black side," a term describing a certain area of the Florida Project, a public housing development.

LEN DAVIS:    I'm ready to get the fuck, nigger. Yeah, that's what it is. Its gonna be another DAMON. Cause I, when I say you ain't gonna be on this fucking side. Then they was up in that store.

DAMON:    And, my nigger, you know I ain't gonna leave no nigger ... motherfucking me.

20

| | |
|---|---|
| LEN DAVIS: | Yeah. And that's another thing. (Laughter) And that's another thing ... I told SAM ... I say, it's gonna be a head shot. It gonna be no stomach shot. |
| DAMON: | Yo, ... nigger got shot ... bitch's brains out .... |
| LEN DAVIS: | I sure would hope you all wouldn't slip like that. |
| DAMON: | I mean, you know us better than that, bro. |
| LEN DAVIS: | I would sure hope ... |

Your affiant reviewed records from the NOPD and learned that Kim Groves, date of birth January 10, 1962, living at 1416 Alabo, was killed as a result of a single gunshot wound to the head at 10:55 p.m. on October 13, 1994. Groves was killed in the 1400 block of Alabo Street in New Orleans.

As a result of a review of the homicide reports, your affiant learned that Gail Slack had been speaking with the victim, Kim Groves, on the day of Groves' death. Slack stated that Groves had told her of meeting with a Sergeant Davis[1] from the Internal Affairs Division regarding a complaint filed against **LEN DAVIS**. Groves told Slack that she had observed **LEN DAVIS** beat up a boy and that she had expressed concern because she was being followed by **LEN DAVIS** on the day of her death.

Slack stated that she met with Groves approximately 45 minutes prior to her murder and she (Slack) personally observed

---

[1]Please note that Sergeant Davis and **LEN DAVIS** are two different individuals.

21

**LEN DAVIS** circle the block where they were standing three to four times.

Two other witnesses stated they observed a black male flee the scene of the homicide and get into a champagne-colored Maxima occupied by two other black males.

Your affiant believes that the conversations referred to above, occurring on October 13, 1994, between **LEN DAVIS, PAUL HARDY, DAMON CAUSEY,** and Sammie Williams, are conversations related to the planned murder of Kim Groves. Affiant believes that **LEN DAVIS** provided the description and location of the victim and **PAUL HARDY** and his associates carried out the murder.

As a result of the ongoing investigation and the above-described information, eight separate search warrants were authorized by U.S. Magistrate Judge Lance M. Africk on November 1, 1994. All search warrants were executed by agents of the FBI on November 2, 1994. Of the eight search warrants, five were for locations and three were for vehicles. One of the vehicles was a 1991 Nissan Maxima, which belonged to Steve Jackson. Affiant believes that this vehicle is the Maxima used in the murder of Kim Groves.

One of the locations searched was 3930 Florida, Apartment B, the home of **DAMON CAUSEY.** Numerous pieces of evidence were seized from this residence, including a .9 millimeter Beretta pistol, serial number E48932Z, and a loaded 9 millimeter magazine. This weapon was found in a dresser drawer in **DAMON CAUSEY**'s bedroom. Also seized was a copy of a purchase

22

receipt dated February 22, 1994, in the name of **PAUL HARDY**, for the above-described Beretta.

This pistol, along with the weapon and ammunition, was forwarded by the affiant to FBI Headquarters on November 4, 1994, for latent fingerprint evaluation and ballistic testing.

On November 9, 1994, pursuant to a Federal Grand Jury Subpoena, evidence was obtained from the NOPD which was seized as a result of the NOPD homicide investigation of Kim Groves on October 13, 1994. Included in the evidence seized was one spent FC .9 millimeter Luger casing recovered at the homicide scene, numerous pieces of clothing worn by Kim Groves, and bullet fragments taken from the body of Kim Groves.

On November 10, 1994, the affiant forwarded the .9 millimeter casing, along with the bullet fragments, for fingerprint analysis and ballistic comparison with the previously-submitted weapons seized pursuant to a result of the previously-referred search warrants.

On November 11, 1994, your affiant was advised by FBI Headquarters, Firearms Unit, that the one spent .9 millimeter casing recovered at the scene of Kim Groves' murder was fired from the .9 millimeter pistol seized from the bedroom of **DAMON CAUSEY** at 3930 Florida Avenue, Apartment B.

Your affiant also observed the clothing worn by the victim Kim Groves at the time of her homicide and noted that it fit the description of the clothing described by **LEN DAVIS** to **PAUL HARDY** prior to Groves' murder.

23

**PAUL HARDY** is described as a black male, date of birth (DOB) October 14, 1967, 5'9", 150 pounds.

**DAMON CAUSEY** is described as a black male, DOB March 28, 1970, 5'6", 130 pounds.

**LEN DAVIS** is described as a black male, DOB August 6, 1964, 6'0", 190 pounds.

Based on the above information, your affiant believes probable cause exists that **LEN DAVIS, PAUL HARDY,** and **DAMON CAUSEY,** did willfully conspire to injure, oppress, threaten, and intimidate Kim Groves, an inhabitant of the State of Louisiana, in the free exercise and enjoyment of the right secured and protected by the Constitution of the United States to provide information to federal authorities and to be a witness in a federal proceeding, resulting in the death of Kim Groves, in violation of Title 18, United States Code, Section 241.

24

# Exhibit D

# Excerpts from Wiretap Monitoring Log

| | Time | Initial | OG | Act Recorded |
|---|---|---|---|---|
| | | | | 'll get there. (1906) |
| 1317 | 1929 | umt | O | 346 - 4599 beeps 451-4971-518. (1929) |
| 1310 | 1930 | umt | O | " " " " " . (1930) |
| 1379 | 1949 | umt | I | n/A |
| 1411 | 1951 | umt | O | 458-2922 Jam to Jerry - Call you bay. P.H. Jerry asks who's the victim? thinks it's a 30, on the p. (1952) |
| 463 | 1952 | umt | O | 548-4443 rings, hangs up. (1952) |
| 1481 | 1952 | umt | O | " " beeps 451-4971. (1953) |
| 1511 | 1954 | umt | I/O | busy/ beeps 451-4971-911. (1955) |
| 561 | 1956 | umt | O | 548-4443 beeps 451-4971-30. (1956) |
| 597 | 1956 | umt | I/O | busy/ Jerry to U.M., asking when it'll be ready, call ringing busy - almost a murder - hello? hello? (ringing) - UF answers, Jerry says he keeped Paul - U.F. will bring the eggs. (1958) |
| 700 | | | | |
| 731 | 1959 | umt | O | asks Jerry where his car is on the interstate. they discuss shooting Jerry gonna make the runs with the ford |
| 264 | 2000 | umt | O | 341-3009 n/A |
| 293 | 2001 | umt | O | 458-2922 n/A ( ringing busy) |
| 722 | 2002 | umt | I/O | busy/ 824-1570, beeps, hangs up. (2002) |
| 848 | 2003 | umt | I/O | UM to Jerry - somebody just got killed - hold on (ringing), U.F. answers hello, hold on, hello? - to UM - they ran to your function car followed niggers to your driveway, Jam saw the whole thing, ran to the maroon cutlass, Jam in the Niagara, was gonna start blazing realize the plate. See me tonite at. / hello |

Log _____ Page 3
Day 24 Date 9/30/94
Cellular phone
(504) 451-4971
EDLA 165

Employee's Name
Ninette M. Brunn
P.H. 2003

Date Stamp

FBI/DI

| # | Time | Initial | IC OG | Act | Recorded |
|---|------|---------|-------|-----|----------|
| | | | | | UF - where you at? Jenny gonna run to his house for the food for playground. UF going to the park. A powell & Benefit - I.W. just got killed in the Florida. (2006) |
| 2010 | 2207 | hm | O | | 824-1520 beep 145 1-4971. (2008) |
| 236 | 2008 | hm | I | | Sam To Jenny and Jenny asks - Mitchell's tryin to put it off, Jenny tells Jam about last conversation. (2010) |
| 098 | 2018 | hm | I | | N/A |
| 115 | 2104 | hm | I | | N/A |
| 145 | 2212 | hm | I | | N/A |
| 169 | 2254 | hm | O | | 242-5433 Jenny to Shantrice - she has $58 left. She wants him to check her outfit. (2255) |
| 105 | 2258 | hm | O | | 241-0403 Jenny tells UF to open the door. Awright. (2258) |
| 221 | 2305 | hm | O | | 244-0769 Dukes asks Jenny where a Sam at. He said he was comin to get Dukes. Jenny says beep the bitch, if he don't come, Shantrice will come pick him up. |
| 271 | 2306 | hm | O | | 242-5433 Jenny to Shantrice - he's gonna (2306) pull up by the gate where his car got stole from - meet him there. (2305) |
| 325 | 2345 | hm | O→ | | 945-6311 Jenny to UM - where you at? By Flynn's - meet me somewhere. (2347) |
| 390 | 2347 | hm | O→ | | 947-4690 UM to UF - he's still out shooting pool. |
| 417 | 2348 | hm | | | TAPE TURNED TO SIDE B |
| | | | → | | He'll come get her later. (2348) |
| 152 | 2349 | hm | O | | 949-3714 Jenny UM to UF - he'll be late - will |

Log _____ Page 4
Day 24 Date 9/30/94
Cellular phone
(504) 451-4971
EDLA 165

Employee's Name hm
Annette M. Briero
2347 P.H.
2345

Date Stamp

FD-297 (Rev. 3-31-81)

Counter

| # | Time | Initial | IC OG | Activity Recorded |
|---|------|---------|-------|-------------------|
| | | | | Jen asks about Keisha & her friend came in. Flynn's looking for Jen. Lenny asks Jen to get an item, 38714, for him, + so, Jemella Brockett at Brad's Republic. Lenny off next Tues + Wed; asks why Flynn's closed early last night. It was slow. Lenny asks her if anyone likes new Chief. Hewlett gonna be deputy, + Doucet + Johnson are deputy chiefs — others going back to 4th or 7th. O'Steele gonna be there till he retires, they invented a position for him. Jen don't care as long as he ain't chief — New dude'll need maps to get to his fuckin house. Jen says we gonna walk her to car. They gonna find him stickin out on Almonester. (2146) |
| 3586 | 2146 | line | O | 508-4444 3 beeps no. (2146) |
| 3614 | 2146 | line | O | " 4 beeps 451-4971 |
| 3643 | 2149 | line | I | flip to Jen — hes to get his kids, coming down now. (2150) |
| 3681 | 2200 | line | O | 508-4443 beeps 451-4971. (2200) |
| 3714 | 2200 | line | O | " " " 451-4971-91. (2201) |
| 3744 | 2201 | line | I | UM to Jen — who's standing out there (describe what she's wearin) out in the street talkin to 1 nigger — UM asks if Homeboy there? No. UM going — later (2202) |
| 3793 | 2243 | line | I | UM to Jen — UM on his way. Jen describes female's attire again — after it's done, go |

Day 37  Date 10/13/94

Cellular phone
(504) 451-4971
EDLA 165

Employee's Name

Nineta M-B nene

O = just Us,
* = old

v = new + old

Date Stamp

FBI/DI

FD-297 (Rev. 3-31-81)

| | Time | Initial | IC OG | Activity Recorded |
|---|---|---|---|---|
| | | | | straight uptown + call me. later - (2243) |
| 3840 | 2:40 | ww | O | 458-2922 Jen to Sam - by code 9 - you lyin. (Call me back) (2314) |
| 3875 | 2311 | | | 941-4400 Jen to 7th Dist. Ricky Conte - what's up? so I an alibi it, head shooty over on 1400 block |
| | | ww | I | Cori Un to Jen - Definitely a So. Call back in 5 min. |
| | | | | beeper # 572-4744 is Kelly Washington's beeper. |
| | | ww | O | Beeps all 5's. |
| | | ww | O | Beeps all 5's. (2313) |
| 3997 | 2313 | ww | I | Sam to Jen - code 9 - Jen talked to the people definitely a done deal, gonna call back in 5 min. but it's a code 9. (2314) |
| 045 | 2317 | ww | O | 949-3714 Sam to Angie - he's at Flynn's talkin to his boy, later. (2318) |
| 078 | 2319 | ww | O | 528-4443 beeps 451-4971. (2319) |
| 106 | 2320 | ww | O | 947-7147 Jen for June - Jen heard somebody just got shot 1000 block of Alabo, a woman - dead. He's off say, but, Sam - will foller at him. (2321) |
| 4161 | 2322 | ww | I | Un to Jen - hold on. I'm talk to Sam. hold on |
| | | ww | I | Cori fa Jen - right bac |
| | 2324 | ww | | back to Un - so woman shot on Alabo? niggers in champagne Maynese. We will come through. |
| 271 | 2325 | ww | O | Jen to Prentice (2325) (2326) |

Employee's Name

Ninette M. Briere

P.H. 23:22 But not say is it Handle

Date Stamp

# Exhibit E

# FBI Wiretap Review Memorandum

03/02/01 FRI 08:46 FAX 504 589 2643        HELEN BERRIGAN USDC                        95894510    P.03
21-2000 00:22 FROM                                    TO



The following information is being provided regarding the law enforcement corruption Group 1 Undercover Operation "Shattered Shield" being conducted by the New Orleans Division.

It has been learned that Kim Groves was the victim of a homicide which occurred on 10/13/94. As part of an undercover scenario which was being conducted between 10/12 and 10/13/94, two Title III's were being monitored during this time period. One Title III involves a microphone which is in a van being utilized by subject police officers to guard a warehouse where cocaine is stored. The other Title III is on the cellular phone of Officer Len Davis one of the main subjects in this case. During the course of the monitoring on 10/13/94, numerous conversations were intercepted which implicate Davis and a drug dealer by the name of Paul Hardy in the murder of Groves. The pertinence of these conversations was not determined by the individual monitoring the Title III on 10/13/94 nor were the conversations determined to be pertinent by the agent who reviewed the tape on 10/14/94.

On 10/21/94, the single NOPD IAD officer who is aware of this investigation reported to the case agent that he had heard that a girl who had filed a complaint against Davis had been murdered. The IAD officer indicated that the murder took place on 10/13/94 and asked if anything relevant had been picked up on the wire. Thereafter, the tapes of 10/13/94 were reviewed with a concentration on any information which might be relevant to the homicide. It was during this review that the specific information relative to the murder was discovered.

An independent review of the transcripts, logs and activity of 10/13/94 has been conducted. Based on this review it is believed that the murder of Groves could not have been prevented. While there are pertinent conversations which were intercepted prior to the murder, there is no specific data available relative to the victim, or more importantly the location of the activity which would have enabled agents to get on scene to stymie Davis' efforts.

This review process has also determined that based on Davis' historical language, involvement with IAD complaints, personal references, abusive language and use of the phone to conduct police business, Davis' activity on the evening of 10/13 could be mistaken as routine. Given the fact that the review process the next day was focused on conversations relevant to the undercover scenario coupled with the historical factors cited above, it is understandable that the conversations and statements relative to the murder were not noted as relevant during this review.

Upon learning of the murder from the IAD officer, a review of the Title III interceptions for 10/13/94 was conducted. During the course of these reviews numerous interceptions were

03/02/01  FRI 08:47 FAX 504 589 2643    HELEN BERRIGAN USDC    95894510    P.04
TO

identified which have been deemed to be relevant to the murder of Kim Groves. Based on the information developed from the Title III and other informant information, a search warrant affidavit was prepared and filed under seal. The searches of six locations and three vehicles was conducted on 11/2/94. These searches produced ten weapons, including a 9 millimeter Beretta and a .223 long weapon. Both of these weapons are significant due to the fact that Kim Groves was killed with a 9 millimeter and two males were killed on 10/12/94 with a .223 weapon. Hardy and his associates are the primary suspects in both of these murders. Photo and document evidence was also recovered which positively links Davis and Hardy.

Discussions are ongoing with the Chief of the New Orleans PD in an effort to obtain from the Department all of the physical evidence recovered from the two separate murder scenes. This evidence, once secured by the FBI will be immediately flown to the FBI laboratory along with the weapons recovered from the 11/2/94 search for analysis and comparison. All efforts at this time are being directed toward gathering all available evidence, documenting investigative activity and drafting indictments against the police officers and drug dealers identified through this investigation.

# Exhibit F

# EDLA Gov. Strikes 2005-2010

**EXHIBIT F**

**GOVERNMENT PEREMPTORY STRIKES OF BLACK VENIRE MEMBERS IN CRIMINAL JURY TRIALS IN THE EASTERN DISTRICT OF LOUISIANA FROM NOVEMBER 4, 2004 - SEPTEMBER 17, 2010**

| Defendant | Docket Number | Trial Date | Blacks in venire/Total venire (% of venire members who are black) | Proportion of Government strikes used on black | Proportion of blacks struck by Government | AA on the jury | Race of struck nonblack venire members |
|---|---|---|---|---|---|---|---|
| Alfred Mcginniss | 2:04-cr-00196-KDE | November 1,2004 | 8/33 (24%) | 3/4 (75%) | 3/8 (38%) | 3 | 1 white |
| Harold Harris | 2:05-cr-00114-CJB-ALC | August 22, 2005 | 10/41 (24%) | 5/7 (71%) | 5/7 (71%) | 3 | 2 white |
| Mervin Spencer | 2:04-cr-00162-HGB-JCW | January 30, 2006 | 7/42 (17%) | 1/5 (20%) | 1/7 (14%) | 4 | 4 white |
| Nyron Jones | 2:05-cr-00231-LMA-ALC | February 6, 2006 | 10/51 (20%) | 3/3 (100%) | 3/10 (30%) | 2 | NA |
| IsrealCaldwell | 2:06-cr-00023-KDE-DEK | May 15, 2006 | 7/34 (21%) | 3/5 (60%) | 3/7 (43%) | 2 | 2 white |
| Wendell Bailey | 2:05-cr-00286-MVL-ALC | June 19, 2006 | 8/54 (15%) | 1/2 (50%) | 1/8 (13%) | 2 | 1 white |
| Isreal Caldwell | 2:06-cr-00023-KDE-DEK | July 10, 2006 | 17/40 (43%) | 6/7 (86%) | 6/17 (35%) | 5 | 1 white |
| Timothy Dixon | 2:05-cr-00120-MLCF-JCW | August 21, 2006 | 11/41 (27%) | 3/6 (50%) | 3/11 (27%) | 3 | 3 white |

## EXHIBIT F
## GOVERNMENT PEREMPTORY STRIKES OF BLACK VENIRE MEMBERS IN CRIMINAL JURY TRIALS IN THE EASTERN DISTRICT OF LOUISIANA FROM NOVEMBER 4, 2004 - SEPTEMBER 17, 2010

| Defendant | Docket Number | Trial Date | Blacks in venire/Total venire (% of venire members who are black) | Proportion of Government strikes used on black | Proportion of blacks struck by Government | AA on the jury | Race of struck nonblack venire members |
|---|---|---|---|---|---|---|---|
| Jerel Clavo | 2:06-cr-00183-CJB-DEK | October 16, 2006 | 11/39 (28%) | 5/6 (83%) | 5/11 (45%) | 3 | 1 white |
| Adam Butler | 2:06-cr-00178-SRD-ALC | November 13, 2006 | 6/40 (15%) | 3/6 (50%) | 3/6 (50%) | 1 | 3 white |
| Trenton Laurant | 2:05-cr-00275-EEF-DEK | January 16, 2007 | 4/37 (11%) | 3/5 (60%) | 3/5 (60%) | 1 | 2 white |
| Scott Lemoine | 2:06-cr-00209-JCZ-ALC | February 26, 2007 | 9/35 (26%) | 4/4 (100%) | 4/9 (44%) | 1 | NA |
| Charles Sykes | 2:05-cr-00046-LMA-SS | March 12, 2007 | 6/42 (14%) | 2/5 (40%) | 2/6 (30%) | 0 | 3 white |
| Devaghan Smith | 2:06-cr-00325-CJB-KWR | March 19, 2007 | 11/46 (24%) | 5/7 (71%) | 5/11 (45%) | 2 | 2 white |
| Joseph Payne | 2:06-cr-00323-HGB-JCW | June 18, 2007 | 6/45 (13%) | 2/6 (33%) | 2/6 (30%) | 1 | 4 white |
| Cedric Robinson | 2:07-cr-00003-ILRL-JCW | June 25, 2007 | 11/35 (31%) | 4/5 (80%) | 4/11 (36%) | 2 | 1 white |

**GOVERNMENT PEREMPTORY STRIKES OF BLACK VENIRE MEMBERS IN CRIMINAL JURY TRIALS IN THE EASTERN DISTRICT OF LOUISIANA FROM NOVEMBER 4, 2004 - SEPTEMBER 17, 2010**

| Defendant | Docket Number | Trial Date | Blacks in venire/Total venire (% of venire members who are black) | Proportion of Government strikes used on black | Proportion of blacks struck by Government | AA on the jury | Race of struck nonblack venire members |
|---|---|---|---|---|---|---|---|
| Nyron Jones | 2:05-cr-00231-LMA-ALC | July 16, 2007 | 11/45 (24%) | 5/6 (83%) | 5/11 (45%) | 3 | 1 white |
| Chad James | 2:06-cr-00055-MLCF-JCW | July 23, 2007 | 10/49 (20%) | 3/6 (50%) | 3/10 (30%) | 2 | 3 white |
| Peter Williams Jr. | 2:07-cr-00035-MLCF-KWR | August 13, 2007 | 11/35 (31%) | 3/5 (60%) | 3/11 (27%) | 4 | 2 white |
| Lillie Carmouche, Drena Clay, Willie Moore, Walter Tardy, Noble Garner, Debra Harrison | 2:04-cr-00378-SRD-ALC | October 1, 2007 | 19/70 (27%) | 3/14 (21%) | 3/19 (16%) | 8 | 11 white |
| Larry Cannon and Gregory Morgan | 2:07-cr-00185-EEF-ALC | November 5, 2007 | 8/42 (19%) | 3/3 (100%) | 3/8 (38%) | 3 | NA |
| Shaun Bailey | 2:07-cr-00282-MLCF-SS | January 14, 2008 | 9/37 (24%) | 2/6 (33%) | 2/9 (22%) | 3 | 4 white |
| Ryan Veazie | 2:05-cr-00268- | February 25, 2008 | 10/50 (20%) | 2/7 (29%) | 2/10 (20%) | ? | 5 white |

**EXHIBIT F**
**GOVERNMENT PEREMPTORY STRIKES OF BLACK VENIRE MEMBERS IN CRIMINAL JURY TRIALS IN THE EASTERN DISTRICT OF LOUISIANA FROM NOVEMBER 4, 2004 - SEPTEMBER 17, 2010**

| Defendant | Docket Number | Trial Date | Blacks in venire/Total venire (% of venire members who are black) | Proportion of Government strikes used on black | Proportion of blacks struck by Government | AA on the jury | Race of struck nonblack venire members |
|---|---|---|---|---|---|---|---|
| | ILRL-SS | | | | | | |
| Jefferson Daniels | 2:08-cr-00104-SSV-ALC | August 25, 2008 | 9/38 (24%) | 5/7 (71%) | 5/9 (56%) | 2 | 2 white |
| Dorneilius Brown | 2:08-cr-00087-MLCF-JCW | Febrary 9, 2009 | 4/35 (11%) | 2/5 (10%) | 2/4 (50%) | 0 | 3 white |
| Anthony Johnson | 2:08-cr-00144-JCZ-ALC | February 17, 2009 | 6/35 (17%) | 2/6 (33%) | 2/6 (30%) | ? | 4 white |
| Chris Lamonte McCann | 2:08-cr-00218-EEF-DEK | March 16, 2009 | 5/38 (13%) | 2/2 (100%) | 2/5 (40%) | ? | NA |
| David and Michael Melancon | 2:08-cr-00150-MLCF-DEK | March 8, 2010 | 6/37 (16%) | 2/6 (33%) | 2/6 (30%) | ? | 4 White |
| Fernando Valdez-Lopez | 2:09-cr-00327-LMA-ALC | April 12, 2010 | 16/42 (38%) | 4/4 (100%) | 4/16 (25%) | 6 | NA |
| Quentin Mcclure | 2:10-cr-00028-HGB-ALC | September 7, 2010 | 12/40 (30%) | 4/7 (57%) | 4/12 (33%) | 5 | 3 white |

**EXHIBIT F**

**GOVERNMENT PEREMPTORY STRIKES OF BLACK VENIRE MEMBERS IN CRIMINAL JURY TRIALS IN THE EASTERN DISTRICT OF LOUISIANA FROM NOVEMBER 4, 2004 - SEPTEMBER 17, 2010**

| Defendant | Docket Number | Trial Date | Blacks in venire/Total venire (% of venire members who are black) | Proportion of Government strikes used on black | Proportion of blacks struck by Government | AA on the jury | Race of struck nonblack venire members |
|---|---|---|---|---|---|---|---|
| Totals | | | 278/1248 (22.3%) | 95/160 (59%) | 95/278 (34%) | | |

# Exhibit G

# Birth Certificate of Herbert Rudolph Davis

# STATE OF LOUISIANA

## THIS RECORD IS VALID FOR BIRTH ONLY

1964784

1169

**Be it Remembered,** *That on this day to wit: the* **FIFTEENTH OF MAY** *in the year of our Lord, One Thousand, Nine Hundred and* **THIRTY SIX** *and the One Hundred and* **60** *of the Independence of the United States of America, before me,* ~~Wm. H. Robin, M.D.~~, **J. M. BATCHELOR, M.D.,** **Chairman of the Board of Health and Ex-Officio Recorder of Births, Deaths and Marriages,** *in and for the Parish of Orleans, and the City of New Orleans, personally appeared*

**ELIJAH DAVIS** *native of* **LA.** *residing* **1513 FLOOD STREET** *who hereby declares that on* **THE FOURTEENTH DAY OF MAY THIS YEAR (14TH OF MAY 1936) AT HIS RESIDENCE** *was born a* **MALE** *child, named* **HERBERT RUDOLPH DAVIS** (**COLORED**) **LAWFUL** *issue of* **ELIJAH DAVIS** *a native of* **LA.** *aged* **22** *years, occupation* **LABORER** *and* **LEANORA CARTER** *a native of* **LA.** *aged* **17** *years.*

*Thus done at New Orleans, in the presence of the aforesaid* **ELIJAH DAVIS** *as also in that of* **P. H. Lanauze and W. J. Prudhomme** *both of this city, witnesses by me requested so to be, who have hereunto set their hands together with me, after due reading hereof the day, month and year first above written.*

*Jno Batchelor M.D.*
*Chairman Board of Health and Ex-Officio Recorder.*

*Elijah Davis*

*Sworn to and subscribed before me, this* **15TH** *day of* **MAY** *193* **5**

*P. Henry Lanauze* Witness. *P. Henry Lanauze*
*W. J. Prudhomme.*

*Deputy Recorder.*

JUL 12 2001



I CERTIFY THAT THIS IS A TRUE AND CORRECT COPY OF A CERTIFICATE OR DOCUMENT REGISTERED WITH THE VITAL RECORDS REGISTRY OF THE STATE OF LOUISIANA, PURSUANT TO LSA — R.S. 40:32, ET SEQ.

*William H Barlow*

STATE REGISTRAR

# Exhibit H

# Marriage Certificate of Herbert Davis and Velma Brown

Case 2:94-ct-00381-ILRL-MBN   Document 2265-1   Filed 03/20/12   Page 87 of 114

LICENSE No. _____

**LOUISIANA STATE DEPARTMENT OF HEALTH AND THE CITY OF NEW ORLEANS DEPT. OF HEALTH**

# CERTIFICATE OF MARRIAGE

CITY FILE No. 3261

| | | | |
|---|---|---|---|
| **GROOM** | 1a. Last Name of Groom — Davis | 1b. First Name — Herbert | 1c. Second Name — Rudolph |
| | | 2. Present Occupation — Pantry Man | |
| | 3. Date of Birth (Month-Day-Year) — 5/14/1936 (18) | 4. Place of Birth (City and State) — New Orleans, Louisiana | 5. Color or Race — Negro |
| | 6. Usual Residence—City or Town (If outside city or town write RURAL) — 1515 Flood St., N.O., La. | | 7. Number of Times Widowed / Divorced / Marriage Annulled |
| | 8. Date Preceding Marriage Terminated — Single | 9. Place of Divorce (or Annulment) | 10. Name of Father — Elijah Davis, Jr. |
| | 11. Father's Birthplace (State or Foreign Country) — La. | 12. Maiden Name of Mother — Lenora Carter | 13. Mother's Birthplace (State or Foreign Country) — N.O., La. |

| | | | |
|---|---|---|---|
| **BRIDE** | 14a. Maiden Name — Brown | 14b. First Name — Velma | 14c. Second Name — Lee |
| | | 15. Present Occupation — Bus Girl | |
| | 16. Date of Birth (Month-Day-Year) — 5/17/1937 (17) | 17. Place of Birth (City and State) — Franklinton, Louisiana | 18. Color or Race — Negro |
| | 19. Usual Residence—City or Town (If outside city or town write RURAL) — 2426 Piety St., N.O., La. | | 20. Number of Times Widowed / Divorced / Marriage Annulled |
| | 21. Date Preceding Marriage Terminated — Single | 22. Place of Divorce (or Annulment) | 23. Name of Father — Walter Brown |
| | 24. Father's Birthplace (State or Foreign Country) — La. | 25. Maiden Name of Mother — Cleo Bickham | 26. Mother's Birthplace (State or Foreign Country) — La. |

| | | | | |
|---|---|---|---|---|
| **PLACE OF ISSUE OF CERTIFICATE** | 27. Parish — Orleans | 28. City or Town — New Orleans | 29. Date of Issue (Month-Day-Year) — 11/3/1954 | 30. Relation of Bride to Groom — None |

**MARRIAGE CERTIFICATION**

31. I, Rev. A. Meyers, a duly authorized Minister of the Baptist Church, or religious order of that name hereby certify that _Herbert Davis_ (Groom) and _Velma Lee Brown_ (Bride) were joined in marriage by me in the City or Town of _New Orleans_ Parish of _Orleans_ State of Louisiana, their consent having been first obtained, in the presence of the three undersigned competent witnesses, in accordance with the law of said State, this ___ day of _November_ 19_54_ at _6:30_ M.

| | |
|---|---|
| 32. Signature of Witness ▶ _Eugene Costello_ | 33. Signature of Groom ▶ _Herbert Davis_ |
| 34. Signature of Witness ▶ _Alma Morris_ | 35. Signature of Bride ▶ _Velma Lee Brown_ |
| 36. Signature of Witness ▶ _____ Griffin_ | 37. Signature of Officiant ▶ _Rev. A. Meyers_ |
| | 38. Address of Officiant _2224 N. Anthony_ |
| 39. Local Recording Officer's Signature ▶ _Naomi M. Drake_ | 40. Title — Dept. Reg. | 41. Date Recorded (Month-Day-Year) — NOV 15 1954 |

5M sets 1-53 BVR-14

In Cooperation with U. S. Public Health Service—National Office of Vital Statistics

McN   HH 90

CERTIFIED
TRUE COPY

Dec 12    2011

Beth Davis

ARCHIVES RESEARCH

Case 2:94-cr-00381-ILRL-MBN   Document 2265-1   Filed 03/20/12   Page 89 of 114

THIS CERTIFICATE NOT VALID UNTIL
THE EXPIRATION OF 72 HOURS FROM
TIME STAMPED HEREON

Witnesses: *Eugene Costello 901 Deol onde*

*Alma Morris 2424 Piety St.*

GROOM'S MOTHER SIGNATURE *Lenora Davis*

CITY OF NEW ORLEANS HEALTH DEPARTMENT

BRIDE'S MOTHER SIGNATURE *Pella Brown*

STATE OF LOUISIANA, PARISH OF ORLEANS                BUREAU OF VITAL RECORDS

## APPLICANT'S AFFIDAVIT

Before me, the undersigned, personally came and appeared **Herbert Rudolph Davis**, applicant for the within marriage license, who, having been duly sworn, deposes and says that the information given on the reverse hereof is true and correct.

Sworn to and subscribed before me, this **3** day of

**Nov.**, 19**54**.

► *Herbert Davis*
Applicant

► *Naomi M. Drake*
Deputy Registrar, Bureau of Vital Records

## OFFICIANT'S AUTHORIZATION

To any Minister of the Gospel, Judge or Justice of the Peace or to any other officer authorized to celebrate marriage in the State of Louisiana:

You are hereby authorized and empowered to celebrate marriage between Mr. **Herbert Rudolph Davis**

and M **Velma Lee Brown** according to the laws and customs of this City and State.

Given under my hand and Seal of office this **3** day of **Nov., 1954**, 19

► *Naomi M. Drake*
Deputy Registrar, Bureau of Vital Records

O'NEIL

CERTIFIED
TRUE COPY

Dec  12   ·  20 11

_Beth Davis_
ARCHIVES RESEARCH

# Exhibit I

# Birth Certificate of Len Edwin Davis

**CERTIFICATION OF VITAL RECORD**

# STATE OF ILLINOIS

DEPARTMENT OF PUBLIC HEALTH - DIVISION OF VITAL RECORDS

FILL IN THIS FORM WITH TYPEWRITER OR LEGIBLE PRINTING          **ORIGINAL**

## STATE OF ILLINOIS
## CERTIFICATE OF LIVE BIRTH

Registration District No. 16.10    Registered Number

Child's Birth Number  **112- 64-670955**

| | | | |
|---|---|---|---|
| 1. Place of Birth A. State **Illinois** | B. County **COOK** | 2. Usual Residence of Mother (Where does mother live?) A. State **Illinois** | B. County **Cook** |
| C. ☒ Inside corporate limits and in **CHICAGO** City, Village, or incorporated Town | | C. ☒ Inside corporate limits and in **Chicago** City, Village, or incorporated Town | |
| D. ☐ Outside corporate limits and in | | D. ☐ Outside corporate limits and in | |
| Township, or Road District No. | | Township, or Road District No. | |
| E. Name of Hospital or Institution | | E. Residence address (Street & No. or R.F.D. and Post Office) | |
| F. If not in hospital or institution, give Street & No. or R.F.D. and Post Office | | F. Does mother reside on a farm?   Yes ☐   No ☐ | |

| 3. Child's Name A. (First) **LEN** | B. (Middle) **EDWIN** | C. (Last) **DAVIS** | 4. Sex **Male** |
|---|---|---|---|
| 5A. This Birth was  Single ☒  Twin ☐  Triplet ☐  Quad ☐ | 5B. If Multiple, Child Born 1st ☐ 2nd ☐ 3rd ☐ 4th ☐ | 6. Date of Birth (Hour) **3:22 P.M.** (Month) **August** (Day) **6,** (Year) **1964** | |
| 7. Father's Full Name A. (First) **Herbert** | B. (Middle) **R.** | C. (Last) **Davis** | 8. His Race **Negro** |
| 9. His Age **28** Years | 10. His Birthplace (City and State or Country) **New Orleans, Louisiana** | 11A. His Usual Occupation **Shipping Clerk**   11B. Kind of Business or Industry | |
| 12. Mother's Full Maiden Name A. (First) **Velma** | B. (Middle) **L.** | C. (Last) **Brown** | 13. Her Race **Negro** |
| 14. Her Age **27** Years | 15. Her Birthplace (City and State or Country) **New Orleans, Louisiana** | 16. Mother's Mailing Address | |
| 17. Informant (Signature) | | | |

I hereby certify that this child was born alive on the date stated above.

18A. Signature **Fritz Michel**
18C. Address **Chicago, Illinois**

18B. Attendant at Birth  M.D. ☒  D.O. ☐  Midwife ☐  Other (Specify)
18D. Date Signed **August 6, 1964**
18E. Illinois License Number **39008**

19. Received for Filing on **August 10, 1964**    (Signed) **Samuel L. Andelman, M.D.**   Local Register

BUREAU OF STATISTICS - ILLINOIS DEPARTMENT OF PUBLIC HEALTH - SPRINGFIELD

034739

This is to certify that this is a true and correct copy of the official record filed with the Illinois Department of Public Health.

DATE ISSUED
June 29, 2001

STEVEN L. PERRY
DEPUTY STATE REGISTRAR

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

# Exhibit J

# Death Certificate of Herbert Rudolph Davis

# STATE OF LOUISIANA

## THIS RECORD IS VALID FOR DEATH ONLY

3615204

| | STATE OF LOUISIANA | STATE | |
|---|---|---|---|
| BIRTH NO. | CERTIFICATE OF DEATH | FILE NO. 117 | 32 4451 |

| 1A. LAST NAME OF DECEASED | 1B. FIRST NAME | 1C. SECOND NAME | 2A. MONTH DAY YEAR | 2B. HOUR |
|---|---|---|---|---|
| DAVIS | HERBERT | R | DATE OF DEATH DEC 21 1976 | 7:45 P.M |

| 3. SEX—MALE OR FEMALE | 4. COLOR OR RACE | 5. Married ☒ Never Married ☐ Widowed ☐ Divorced ☐ | 6. NAME OF HUSBAND OR WIFE |
|---|---|---|---|
| MALE | NEGRO | | VELMA BROWN |

| 7. DATE OF BIRTH OF DECEASED | 8. AGE OF DECEASED YEARS MONTHS DAYS HOURS MIN UNDER 24 HOURS | 9A. BIRTHPLACE (CITY AND STATE) | 9B. CITIZEN OF WHAT COUNTRY |
|---|---|---|---|
| MAY 14, 1937 | 38  7  7 | NEW ORLEANS, La | U.S.A. |

| 10A. USUAL OCCUPATION (GIVE KIND OF WORK DONE DURING MOST OF WORKING LIFE EVEN IF RETIRED) | 10B. KIND OF BUSINESS OR INDUSTRY | 11. SOCIAL SECURITY NUMBER |
|---|---|---|
| PORTER | | |

| 12A. CITY, TOWN, OR LOCATION OF DEATH | 12B. PARISH OF DEATH |
|---|---|
| NEW ORLEANS | ORLEANS |

| 12C. NAME OF HOSPITAL OR INSTITUTION (IF NOT IN HOSPITAL OR INSTITUTION GIVE STREET ADDRESS OR LOCATION) | 12D. IS PLACE OF DEATH INSIDE CITY LIMITS? Yes ☒ No ☐ |
|---|---|
| RESIDENCE 2626 TENNESSE ST | |

| 13A. CITY OR TOWN | 13B. PARISH | 13C. STATE |
|---|---|---|
| NEW ORLEANS | ORLEANS | |

| 13D. STREET ADDRESS—(IF RURAL GIVE LOCATION) | 13E. IS RESIDENCE INSIDE CITY LIMITS? Yes ☒ No ☐ |
|---|---|
| 2626 TENNESSE ST | |

| 14. FATHER'S NAME LAST FIRST MIDDLE | 15. MOTHER'S MAIDEN NAME LAST FIRST MIDDLE |
|---|---|
| DAVIS ELIJAH | CARTER LENORA |

| I certify that the above stated information is true and correct to the best of my knowledge. | 15A. SIGNATURE OF INFORMANT ► Velma L. Davis | 15B. DATE OF SIGNATURE 22 DEC 1976 |
|---|---|---|

**PART I.   DEATH WAS CAUSED BY**   ENTER ONLY ONE CAUSE PER LINE FOR (A), (B), AND (C)   APPROXIMATE INTERVAL BETWEEN ONSET AND DEATH

17. 1519

Conditions, if any, which gave rise to immediate cause (a), stating the underlying cause last

IMMEDIATE CAUSE
(a) leiomyisarcoma of stomach
DUE TO, OR AS A CONSEQUENCE OF

(b)
DUE TO, OR AS A CONSEQUENCE OF

(c)

**PART II.** OTHER SIGNIFICANT CONDITIONS  CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN PART I (A)

| 18A. AUTOPSY Yes ☐ No ☒ | 18B. IF YES WERE FINDINGS CONSIDERED IN DETERMINING CAUSE OF DEATH? Yes ☐ No ☐ |
|---|---|

| 19A. ACCIDENT  SUICIDE  HOMICIDE ☐  ☐  ☐ | 19B. DESCRIBE HOW INJURY OCCURRED (ENTER NATURE OF INJURY IN PART I OR PART II OF ITEM 17.) |
|---|---|

| 19C. TIME OF INJURY HOUR MONTH DAY YEAR   M. | | | |
|---|---|---|---|

| 19D. INJURY OCCURRED WHILE AT ☐ NOT WHILE ☐ WORK AT WORK | 19E. PLACE OF INJURY AT HOME, FARM, STREET, FACTORY, OFFICE BLDG., ETC (SPECIFY) | 19F. CITY, TOWN, OR LOCATION | PARISH | STATE |
|---|---|---|---|---|

DEC 28 1976

| 20. I CERTIFY THAT I ATTENDED THE DECEASED From 1974 To 1976 | and that death occurred on the date and hour stated above. | 21A. SIGNATURE OF PHYSICIAN | 21B. DATE OF SIGNATURE 12/23/76 |
|---|---|---|---|

| 22A. Burial....... Cremation... Removal..... ☒ | DATE THEREOF 12-24-76 | 22B. NAME AND LOCATION OF CEMETERY OR CREMATORY ST LOUIS #3 CEMETERY NEW ORLEANS LA | 23. SIGNATURE AND ADDRESS OF FUNERAL DIRECTOR ALEXANDER & ELUM FUNR CO 165 7222 S CLAIBORNE |
|---|---|---|---|

| 24. BURIAL TRANSIT PERMIT NUMBER 18669 | 25. PARISH OF ISSUE Orleans | 26. DATE OF ISSUE 12-23-76 | 27. SIGNATURE OF LOCAL REGISTRAR Waymon Parker |
|---|---|---|---|

LHHRA, Division of Health, Office of Vital Records

JUL 12 2001

THIS IS A TRUE AND CORRECT COPY OF A CERTIFICATE OR DOCUMENT REGISTERED WITH THE VITAL RECORDS REGISTRY OF THE STATE OF LOUISIANA, PURSUANT TO LSA—R.S. 40:32, ET SEQ.

Norma W. Bordelon

ACTING STATE REGISTRAR

WARNING: it is illegal to alter or counterfeit this copy

# Exhibit K

# St. Augustine School Cumulative Records

## ST. AUGUSTINE HIGH SCHOOL
2600, LONDON AVENUE
NEW ORLEANS, LA. 70119

JOSEPHITE SOCIETY

70129
ZIP CODE

| SOCIAL SECURITY NO. | | | | ADDRESS | | |
|---|---|---|---|---|---|---|

NAME (LAST): *Davis*    (FIRST): *Len*    (MIDDLE): *Edwin*

PARENTS' NAMES: *Herbert & Velma Davis*
PLACE OF BIRTH: *Chicago, Illinois*

ADDRESS: *8-6-64*
DATE OF BIRTH

ZIP CODE
*254-3956*
TEL. NO.

| DATE OF ADMISSION | GRADE | SCHOOL | ADDRESS OF SCHOOL | DAYS PRESENT | DAYS ABSENT | TIMES TARDY | WITHDRAWALS DATE | REASON |
|---|---|---|---|---|---|---|---|---|
| 8-17 | 8 | Lawless | 5300 Law | | — | — | 5-78 | Transferred |
| 8-21-78 | 9 | St. Augustine | 2600 London | 4 | 3 | | 5/25/79 | Promoted |
| 8/17/79 | 10 | " | " | 9 | 3 | | 5/30/80 | " |
| 8/25/80 | 11 | " | " | 11 | 4 | | 5/29/81 | " |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | DATE GRADUATED | |

### FIRST YEAR 1978-1979

| SUBJECT | QUINT | NO. WKS | MIN WK | 1ST SEM | 2ND SEM | AV | UNITS |
|---|---|---|---|---|---|---|---|
| RELIGION | 5 | 18 | 250 | 88 | 74 | 81 | .5 |
| ENGLISH I | 5 | 36 | " | 75 | 67 | 71 | 1 |
| SOC. STUDY Civics | 5 | 11 | " | 72 | 72 | 72 | 1 |
| MATH. Alg. I | 5 | 11 | " | 68 | 71 | 70 | 1 |
| SCIENCE Gen. | 5 | 11 | " | 71 | 73 | 72 | 1 |
| FOR. LANG. | | | | | | | |
| MUSIC Band | 5 | 11 | " | 92 | 92 | 92 | 1 |
| PHYS. ED. | 5 | 18 | | 90 | 90 | 90 | .5 |
| TOTAL UNITS | | | | | | | 6 |

Conduct _____ B.
H.R. TEACHER _Mr. Bennett_

### SECOND YEAR 1979-1980

| SUBJECT | QUINT | NO. WKS | MIN WK | 1ST SEM | 2ND SEM | AV | UNITS |
|---|---|---|---|---|---|---|---|
| RELIGION | 5 | 18 | 250 | 87 | — | 87 | .5 |
| ENGLISH II | 5 | 36 | " | 75 | 75 | 75 | 1 |
| BAND | 5 | " | " | 70 | 70 | 70 | 1 |
| MATH. Geom. | 5 | " | " | 70 | 72 | 71 | 1 |
| SCIENCE Biology | 5 | " | 300 | 76 | 75 | 76 | 1 |
| Reading II | 5 | " | 250 | 75 | 69 | 72 | 1 |
| MUSIC Instrum. | 5 | " | " | 84 | 70 | 77 | 1 |
| PHYS. ED. | 5 | 18 | " | — | 87 | 87 | .5 |
| TOTAL UNITS | | | | | | | 7 |

Conduct _____ 5
H.R. TEACHER _Mr. O'Brien_

### THIRD YEAR 1980-1981

| SUBJECT | QUINT | NO. WKS | MIN WK | 1ST SEM | 2ND SEM | AV | UNITS |
|---|---|---|---|---|---|---|---|
| RELIGION | 5 | 18 | 250 | 83 | — | 83 | .5 |
| ENGLISH III | 5 | 36 | " | 73 | 92 | 83 | 1 |
| SOC. STUDY Am. Hist. | 5 | " | " | 67 | 73 | 70 | 1 |
| MATH. Algebra II | 5 | " | | 74 | 70 | 72 | 1 |
| SCIENCE | | | | | | | |
| FOR. LANG. Span. I | 5 | " | | 71 | 72 | 72 | 1 |
| Health | 5 | " | | 88 | 87 | 87 | 1 |
| PHYS. ED. | 5 | 18 | | — | 87 | 87 | .5 |
| TOTAL UNITS | | | | | | | 6 |

Conduct _____
H.R. TEACHER _Mr. Allen_

### FOURTH YEAR 19-19

| SUBJECT | QUINT | NO. WKS | MIN WK | 1ST SEM | 2ND SEM | AV | UNITS |
|---|---|---|---|---|---|---|---|
| RELIGION | | | | | | | |
| ENGLISH | | | | | | | |
| SOC. STUDY | | | | | | | |
| MATH. | | | | | | | |
| SCIENCE | | | | | | | |
| FOR. LANG. | | | | | | | |
| MUSIC | | | | | | | |
| PHYS. ED. | | | | | | | |
| TOTAL UNITS | | | | | | | |

Conduct _____
H.R. TEACHER _____

### SUMMER SCHOOL OR SUPPLEMENTARY WORK

RECEIVED

### RANK WITHIN QUINTILE

| | | |
|---|---|---|
| 1st Yr. Avg. _____ | Rank_____ of_____ |
| 2nd Yr. Avg. _____ | Rank_____ of_____ |
| 3rd Yr. Avg. 79.1 | Rank 15 of 31 |
| 4th Yr. Avg. _____ | Rank_____ of_____ |

GRADE REPEATED 19___-19___

H.R. TEACHER

### RANK IN CLASS

3 Yr. Avg. 77.75
3 Yr. Rank 194 of 199
4 Yr. Avg. _____
4 Yr. Rank _____ of _____

All classes are 50 min., 5 times per week, 36 wks. per year.
All lab sciences are 60 min.
Students in each academic class are divided into five groups and are ranked by quintiles.

This student was in ___ 1st quintile (Honors); ___ 2nd; ___ 3rd; ___ 4th; ___ 5th quintile (Academic)

*St. Augustine was approved by the Southern Association of Colleges and Secondary Schools in 1957, and was reevaluated and given Member status in 1964 & 1975.*

## ST. AUGUSTINE IS AN EQUAL OPPORTUNITY SCHOOL

| Number | Letter | Points |
|---|---|---|
| 93 - 100 | A | 4—Superior Achievement |
| 84 - 92 | B | 3—Honor Roll |
| 76 - 83 | C | 2—Average |
| 70 - 75 | D | 1—Passing |
| Below 70 | F | 0—Failure—Course must be repeated |

The passing grade is 70.
The College Recommending grade is 75.

1.5882

| TEST | | | | | | | | | PRESSCORE® DAVISL EN | | NON-PUBLIC PCTLE | | | | | | | SPECIAL NORMS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

SRA ASSESSMENT SURVEY

DAVISL EN  04-79  9 2  DATE GRADE SEM

NON-PUBLIC PCTLE: 9 24 6 11 29 39 17  SPEC

| | COMPOSITE | READING | LANG ARTS | MATH | SOC STU | SCIENCE | SOURCES | NAT PCTLE SRA |
|---|---|---|---|---|---|---|---|---|
| | 21 | 39 | 15 | 19 | 43 | 49 | 28 | |

| SOC STU | SCIENCE | SOURCES | STEA |
|---|---|---|---|
| 12 | 14 | 9 | QUO 95 |

| DATE, GR. SEM. | | COMPOSITE | | READING | | | LANGUAGE ARTS | | | MATHEMATICS | | | SOC STU | SCIENCE | SOURCES | STEA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0479 | SS/ILE | 9 | 12 | 11 | 11 | 6 | 11 | 8 | | | 8 | | 12 | 14 | 9 | QUO |
| 9 2 | GSV | 389 | SRA | | 383 | | | 315 | | | 344 | | 412 | 384 | 365 | STA 4 |
| I TED LEVEL | NAT PCTLE 3Rs | 21 | 45 COMPRE | 34 VOCAB | 39 TOTAL | 7 USAGE | 31 SPELLING | 15 TOTAL | ACH CONC | ACH COMPU | 19 TOTAL | 43 TOTAL | 49 TOTAL | 28 TOTAL | NAT PCTLE 28 |

NAME  DAVIS LEN  PRESSCORE®

OPT. SCORE  SCHOOL LOC

| | FORM | DATE | QUO. | SCORES | COMP | TOTAL SCORES: | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 3-81 | 99 | GR. EQUIV. | 9-8 | 10-3 | 8-4 | 10-9 | 9-1 | 9-1 | 11-9 | 10-9 |
| ID GRID | H | GRD 11 | ILE 30 | NTL %ILE 28 | | 32 | 24 | 39 | 25 | 24 | 51 | 38 |
| | LEV. | SEM. 2 | STA 4 EAS | STA OR OPT 26 SRA | 31 RDG | 20 MATH | 42 LANG ART | 16 REF MAT | 22 SOC STU | 58 SCIENCE | 34 SAS |

GUMMED LABELS HERE

### SCHOLASTIC HIGH SCHOOL PLACEMENT TEST (STS BENSENVILLE, ILL. 60106)

| STUDENT'S NAME | ABILITY MEASURES | | | | SKILL & ACHIEVEMENT MEASURES | | | | | | | COMPO-SITE SCORE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | VERBAL | QUANT. | TOTAL ABILITY | | READING | | ARITHMETIC | | LANGUAGE | | OPTION | |
| | %-ILE | %-ILE | %-ILE | I.Q. | %-ILE | GR. EQ | %-ILE | GR. EQ | %-ILE | GR. EQ | %-ILE | %-ILE |
| DAVIS LEN H | 25 | 01 | 03 | 82 | 54 | 8.8 | 11 | 6.5 | 21 | 7.3 | | 18 |

| NAME OF PUPIL | GRADE—SEM. | COMPOSITE | ABILITY | EXPECTED COMP. | 1. ENG. USAGE | 2. MATH. USAGE | 3. SOC. STUD. READING | 4. NAT. SCI. READING | 5. WORD USAGE |
|---|---|---|---|---|---|---|---|---|---|
| DAVISLENE | 09-2 | 28 | 25 | 24 | 22-28 | 28 | 25 | 27 | 25 | 42 | 27 | 34 | 26 | 11 | 23 |
| | | PCTLE. | S.S. | S.S. | SCORE RANGE | PCTLE. | S.S. | PCTLE. | S.S. | PCTLE. | S.S. | PCTLE. | S.S. | PCTLE. | S.S. |

SRA NATIONAL EDUCATIONAL DEVELOPMENT TESTS—  PRESSCORE ®

| STUDENT NAME | | YEAR | GRADE | VERBAL | MATH | SELECTION INDEX | VERBAL %ILE | MATH %ILE | SEL. IND. %ILE |
|---|---|---|---|---|---|---|---|---|---|
| DAVIS LEN | E | 79 | SO | 27 | 27 | 081* | 38 NATIONAL SAMPLE | 11 | 04 COLLEGE BOUND |

PSAT/NMSQT SCHOOL COPY

| NAME OF PUPIL | GRADE—SEM. | COMPOSITE | ABILITY | EXPECTED COMP. | 1. ENG. USAGE | 2. MATH. USAGE | 3. SOC. STUD. READING | 4. NAT. SCI. READING | 5. WORD USAGE |
|---|---|---|---|---|---|---|---|---|---|
| AVIS LEN E | 10-2 | 15 | 25 | 27 | 25-30 | 21 | 25 | 04 | 20 | 32 | 27 | 07 | 23 | 41 | 28 |
| | | PCTLE. | S.S. | S.S. | SCORE RANGE | PCTLE. | S.S. | PCTLE. | S.S. | PCTLE. | S.S. | PCTLE. | S.S. | PCTLE. | S.S. |

SRA NATIONAL EDUCATIONAL DEVELOPMENT TESTS—  PRESSCORE ®

| STUDENT NAME | | YEAR | GRADE | VERBAL | MATH | SELECTION INDEX | VERBAL %ILE | MATH %ILE | SEL. IND. %ILE |
|---|---|---|---|---|---|---|---|---|---|
| DAVIS LEN | E | 80 | JR | 37 | 29 | 103 | 61 NATIONAL SAMPLE | 18 | 21 COLLEGE BOUND |

PSAT/NMSQT SCHOOL COPY

TRANSCRIPT SENT TO:

*Abramson*

9/18/81

DATE

PHOTO

DATE

DATE

DATE

DATE

DATE

# Exhibit L

# NOPS School Records

RESPECT
LIFE
FOR PROPERTY
& LEARNING
WORKING TOGETHER TO BUILD
New Orleans Public Schools

Case 2:94-cr-00381-ILRL-MBN   Document 2265-1   Filed 03/20/12   Page 99 of 114

```
S10767   07/06/95    12:19                     STUDENT RECORDS                                          PAGE      1
                                               *** S E A R C H ***
                                             CUMULATIVE HISTORY FILE


         INPUT***              008526650

 ***     ROOT SEGMENT ----------
             008526650 092682 36 500 070577
 ***     YEAR SEGMENT ----------
             197576
 ***     SCHOOL SEGMENT ---------
             36 350 E1 082775     000000 DAVIS LEN EDWIN         06 B M 080664 ALFRED LAWLESS
 ***     YEAR SEGMENT ----------
             197677
 ***     SCHOOL SEGMENT ----------
             96 516 E1 082576     000000 DAVIS LEN EDWIN         07 B M 080664 ALFRED LAWLESS JR.
 ***     YEAR SEGMENT ----------
             197778
 ***     SCHOOL SEGMENT ----------
             96 516 E1 082477     000000 DAVIS LEN EDWIN         08 B M 080664 ALFRED LAWLESS JR.
 ***     YEAR SEGMENT ----------
             197879
 ***     SCHOOL SEGMENT ----------
             36 500 E1 083181     000000 DAVIS LEN EDWIN         12 B M 080664 MARION ABRAMSON          110281
 ***     COURSE SEGMENT ---------
             1
 ***     COURSE SEGMENT ---------
             209902 TOUCH FOOTBALL                   .50  .00 0179  00        B      X
 ***     SUBMIT SEGMENT ---------
             ST AUGUSTINE         NEW LONDON LA
 ***     COURSE SEGMENT ---------
             211198 SP STD GRAMMAR                   .50  .00 0179  00        D      X
 ***     SUBMIT SEGMENT ---------
             ST AUGUSTINE         NEW LONDON LA
 ***     COURSE SEGMENT ---------
             222231 ALGEBRA I S1                     .50  .00 0179  00        D      X
 ***     SUBMIT SEGMENT ---------
             ST AUGUSTINE         NEW LONDON LA
 ***     COURSE SEGMENT ---------
             232173 GEN SC S1                        .50  .00 0179  00        D      X
 ***     SUBMIT SEGMENT ---------
             ST AUGUSTINE         NEW LONDON LA
 ***     COURSE SEGMENT ---------
             242131 CIVICS S1                        .50  .00 0179  00        D      X
 ***     SUBMIT SEGMENT ---------
             ST AUGUSTINE         NEW LONDON LA
 ***     COURSE SEGMENT ---------
             290640 BAND I                           .50  .00 0179  00        B      X
 ***     SUBMIT SEGMENT ---------
             ST AUGUSTINE         NEW LONDON LA
 ***     COURSE SEGMENT ---------
             2
 ***     COURSE SEGMENT ---------
             3
 ***     COURSE SEGMENT ---------
             404250 RELIGION I                       .50  .00 0679  00        C      X
 ***     SUBMIT SEGMENT ---------
             ST AUGUSTINE         NEW LONDON LA
 ***     COURSE SEGMENT ---------
             411710 ACTION/ADVENT                    .50  .00 0679  00        F      X
 ***     SUBMIT SEGMENT ---------
             ST AUGUSTINE         NEW LONDON LA
```

OBARIA 101/94

Case 2:94-cr-00381-ILRL-MBN   Document 2265-1   Filed 03/20/12   Page 100 of 114

WORKING TOGETHER TO BUILD
RESPECT FOR LIFE & LEARNING
PROPERTY

New Orleans Public Schools

GBAR1A (01/94)

S10767   07/06/95   12:19

STUDENT RECORDS
*** S E A R C H ***
CUMULATIVE HISTORY FILE

PAGE   2

```
*** COURSE SEGMENT ---------
         422233 ALGEBRA I S2                    .50   .00 0679   OO         O    X
*** SUBMIT SEGMENT ---------
         ST AUGUSTINE          NEW LONDON LA
*** COURSE SEGMENT ---------
         432172 GEN SC S2                       .50   .00 0679   OO         D    X
*** SUBMIT SEGMENT ---------
         ST AUGUSTINE          NEW LONDON LA
*** COURSE SEGMENT ---------
         442133 CIVICS S2                       .50   .00 0679   OO         D    X
*** SUBMIT SEGMENT ---------
         ST AUGUSTINE          NEW LONDON LA
*** COURSE SEGMENT ---------
         490640 BAND I                          .50   .00 0679   OO         B    X
*** SUBMIT SEGMENT ---------
         ST AUGUSTINE          NEW LONDON LA
*** COURSE SEGMENT ---------
         4
*** YEAR SEGMENT ---------
         197980
*** SCHOOL SEGMENT ---------
         36 500 E1 083181    OOOOOO DAVIS LEN EDWIN        12 8 M 080664 MARION ABRAMSON       032682
*** COURSE SEGMENT ---------
         1
*** COURSE SEGMENT ---------
         209830 HEALTH SEM 1                     .50   .00 0180   OO         B    X
*** SUBMIT SEGMENT ---------
         ST AUGUSTINE          NEW LONDON LA
*** COURSE SEGMENT ---------
         211570 COMPOSITION                      .50   .00 0180   OO         D    X
*** SUBMIT SEGMENT ---------
         ST AUGUSTINE          NEW LONDON LA
*** COURSE SEGMENT ---------
         218301 R.E.A.D.I                        .50   .00 0180 F OO              X
*** SUBMIT SEGMENT ---------
         ST AUGUSTINE          NEW LONDON LA
*** COURSE SEGMENT ---------
         223131 GEOM OPT I  S1                    .50   .00 0180   OO         D    X
*** SUBMIT SEGMENT ---------
         ST AUGUSTINE          NEW LONDON LA
*** COURSE SEGMENT ---------
         233171 BIOL I S1                         .50   .00 0180   OO         D    X
*** SUBMIT SEGMENT ---------
         ST AUGUSTINE          NEW LONDON LA
*** COURSE SEGMENT ---------
         290640 BAND I                            .50   .00 0180   OO         D    X
*** SUBMIT SEGMENT ---------
         ST AUGUSTINE          NEW ORLEANS LA
*** COURSE SEGMENT ---------
         290660 BAND II                           .50   .00 0180   OO         D    X
*** SUBMIT SEGMENT ---------
         ST AUGUSTINE          NEW LONDON LA
*** COURSE SEGMENT ---------
         2
*** COURSE SEGMENT ---------
         3
*** COURSE SEGMENT ---------
         404250 RELIGION I                        .50   .00 0680   OO         B    X
*** SUBMIT SEGMENT ---------
         ST AUGUSTINE          NEW LONDON LA
```

Case 2:94-cr-00381-ILRL-MBN  Document 2165-8  Filed 03/20/12  Page 101 of 114

RESPECT  FOR  LIFE  PROPERTY  & LEARNING    New Orleans Public Schools

```
***   COURSE SEGMENT ----------
         411726 TYPES OF LIT                       .50   .00 0680    00           D         X
***   SUBMIT SEGMENT ----------
         ST AUGUSTINE          NEW LONDON LA
***   COURSE SEGMENT ----------
         418301 R.E.A.D.I                         1.00   .00 0680    00           D         X
***   SUBMIT SEGMENT ----------
         ST AUGUSTINE          NEW ORLEANS LA
***   COURSE SEGMENT ----------
         423133 GEOM OPT I  S2                      .50   .00 0680    00           D         X
***   SUBMIT SEGMENT ----------
         ST AUGUSTINE          NEW LONDON LA
***   COURSE SEGMENT ----------
         433173 BIOL I S2                           .50   .00 0680    00           C         X
***   SUBMIT SEGMENT ----------
         ST AUGUSTINE          NEW LONDON LA
***   COURSE SEGMENT ----------
         490640 BAND I                              .50   .00 0680    00           C         X
***   SUBMIT SEGMENT ----------
         ST AUGUSTINE          NEW ORLEANS LA
***   COURSE SEGMENT ----------
         490660 BAND II                             .50   .00 0680    00           D         X
***   SUBMIT SEGMENT ----------
         ST AUGUSTINE          NEW LONDON LA
***   COURSE SEGMENT ----------
         4
***   YEAR SEGMENT ----------
         108081
***   SCHOOL SEGMENT ----------
         36 500 E1 083181     000000 DAVIS LEN EDWIN          12 B M 080664 MARION ABRAMSON        110281
***   COURSE SEGMENT ----------
         1
***   COURSE SEGMENT ----------
         209902 TOUCH FOOTBALL                      .50   .00 0181    00           B         X
***   SUBMIT SEGMENT ----------
         ST AUGUSTINE          NEW LONDON LA
***   COURSE SEGMENT ----------
         212936 REV LANG SKILS                      .50   .00 0181    00           B         X
***   SUBMIT SEGMENT ----------
         ST AUGUSTINE          NEW LONDON LA
***   COURSE SEGMENT ----------
         222231 ALGEBRA I S1                        .50   .00 0181    00           D         X
***   SUBMIT SEGMENT ----------
         ST AUGUSTINE          NEW LONDON LA
***   COURSE SEGMENT ----------
         243260 US HIST S1                          .50   .00 0181    00           D         X
***   SUBMIT SEGMENT ----------
         ST AUGUSTINE          NEW LONDON LA
***   COURSE SEGMENT ----------
         251331 SPANISH I S1                        .50   .00 0181    00           D         X
***   SUBMIT SEGMENT ----------
         ST AUGUSTINE          NEW LONDON LA
***   COURSE SEGMENT ----------
         2
***   COURSE SEGMENT ----------
         9
***   COURSE SEGMENT ----------
         404260 RELIGION III                        .50   .00 0681    00           C         X
***   SUBMIT SEGMENT ----------
         ST AUGUSTINE          NEW LONDON LA
```

```
***    COURSE SEGMENT ---------
          409730 DRIVER ED                          1.00  .00 0681   00         B     X
***    SUBMIT SEGMENT ---------
          ST AUGUSTINE          NEW LONDON LA
***    COURSE SEGMENT ---------
          412181 SH SURV AM LIT                      .50  .00 0681   00         C     X
***    SUBMIT SEGMENT ---------
          ST AUGUSTINE          NEW LONDON LA
***    COURSE SEGMENT ---------
          422233 ALGEBRA I S2                        .50  .00 0681   00         D     X
***    SUBMIT SEGMENT ---------
          ST AUGUSTINE          NEW LONDON LA
***    COURSE SEGMENT ---------
          443261 US HIST S2                          .50  .00 0681   00         D     X
***    SUBMIT SEGMENT ---------
          ST AUGUSTINE          NEW LONDON LA
***    COURSE SEGMENT ---------
          451333 SPANISH I S2                        .50  .00 0681   00         D     X
***    SUBMIT SEGMENT ---------
          ST AUGUSTINE          NEW LONDON LA
***    COURSE SEGMENT ---------
          4
***    YEAR SEGMENT -----------
          198182
***    SCHOOL SEGMENT ---------
          36 500 E1 083181 D9 012082 DAVIS LEN EDWIN          12 B M 080664 MARION ABRAMSON
***    ATTEND SEGMENT ---------
          B182 1 44 00.0 42 00.0  2 00.0  0 00.0
***    COURSE SEGMENT ---------
          1
***    COURSE SEGMENT ---------
          205431 INTRO TO ART   LEPAGE L        .50  .00 0182   05         F  0303
***    COURSE SEGMENT ---------
          212942 RSRCH IN WRTNG  NEWPORT M      .50  .00 0182   041   C    C  0202
***    COURSE SEGMENT ---------
          214168 JOURN NEWSP S1  PICOU S        .50  .00 0182   05         B  0505
***    COURSE SEGMENT ---------
          224341 MATH II S-1     HILLBURN G     .50  .00 0182   04         C  0606
***    COURSE SEGMENT ---------
          245531 FREE ENTRPRISE  KERR M         .50  .00 0182   05         B  0101
***    COURSE SEGMENT ---------
          297301 GEN MUSIC I S1  CHISSELL B     .50  .00 0182   060        A  0404
***    COURSE SEGMENT ---------
          2
***    COURSE SEGMENT ---------
          3
***    COURSE SEGMENT ---------
          4
STUDENT*008526650 ** NO MORE SEGMENTS FOUND **

        ** EOJ S10767 **
```

Case 2:02-cv-00594-HH-LRL-MBN   Document 220-1   Filed 03/20/12   Page 102 of 114

RESPECT

WORKING TOGETHER TO BUILD
FOR LIFE
PROPERTY
& LEARNING

New Orleans Public Schools

GB-AR1-A (01/94)

Case 2:94-cr-00381-ILRL-MBN

Document 2765-10 Filed 03/20/12   Page 103 of 114

RESPECT

LIFE
PROPERTY
& LEARNING
FOR

New Orleans Public Schools

GBARIA (01/94)

```
SYNCSORT DOS REL 2.0G MAINT=G US PATENT 4210961 COPYRIGHT SYNCSORT INC 1981  DATE = 07/06/95  TIME = 12:14:36
  SORT FIELDS=(1,9,BI,A),WORK=1                                   000016
  RECORD TYPE=F,LENGTH=80                                         000017
  INPFIL SYSIPT                                                   000018
  OUTFIL BLKSIZE=80                                               000019
  END                                                            000020


   WER029I  **END PHASE 0 NO ERRORS DETECTED**

   WER221I  B =        107
   WER222I  G =       2037
   WER227I  RCD IN        1, OUT           1
   WER225I  *** END SORT PHASE ***
   WER226A  END SYNCSORT (JS10012B), RECORD=        1, INCORE

 BEGIN S1076704/06/9511.29.15
```

Case 2:94-cr-00381-ILRL-MBN   Document 2265-1   Filed 03/20/12   Page 104 of 114

New Orleans Public Schools    RESPECT FOR PROPERTY & LEARNING

GBARIA (01/94)

DAVIS

```
 SSSSSSSSSS          11       0000000000     0000000000          11       2222222222     9999999999          11
 SSSSSSSSSSSS        111       000000000000   000000000000       111      22222222222    999999999999        111
 SS        SS       1111       00        00   00        00       1111     22        22   99        99        1111
 SS                 1111       00     00 00   00     00 00       1111               22   99        99        1111
 SS                   11       00        00   00        00         11               22   99        99          11
 SSSSSSSSSS           11       00    00   00  00    00   00        11       2222222222   999999999999          11
 SSSSSSSSSSSS         11       00    00   00  00    00   00        11       22222222222  9999999999            11
         SS           11       00 00      00  00 00      00        11       22                   99            11
         SS           11       00 0       00  00 0       00        11       22                   99            11
 SS      SS           11       00        00   00        00         11       22           99        99          11
 SSSSSSSSSSSS       111111      000000000000   000000000000       111111    22222222222   999999999999        111111
 SSSSSSSSSS         111111      0000000000     0000000000         111111    2222222222     9999999999          111111


    11        0000000000                           555555555555   9999999999    8888888888    0000000000
   111        000000000000                         555555555555   999999999999  888888888888  000000000000
  1111        00       00 00                        55            99        99  88        88  00        00
  1111        00       00 00                        55            99        99  88        88  00     00 00
    11        00    00   00                         555555555555  999999999999  888888888888  00    00   00
    11        00    00   00                         555555555555  9999999999    888888888888  00    00   00
    11        00 00      00                                   55  99        99  88        88  00 00      00
    11        00 0       00                                   55  99        99  88        88  00 0       00
    11        00        00                          55       55   99        99  88        88  00        00
 111111        000000000000                         555555555555  999999999999  888888888888  000000000000
 111111        0000000000                           5555555555    9999999999    8888888888    0000000000
```

NODE:              USER:             ORG NODE:              ORG USER: USP      EXEC.NODE:            ORG JOB-NO: 05980
DEV : OOB          FNO : XERX        FCB     : $$BFCB       LINES   : 00000258  CLASS    : R

```
************ F5 ***     END  SI001291   05980   ONLY   WALTER WILLIAMS   06 JUL 95   13.41.53   ** VSE/POWER V2.3 **
************ F5 ***     END  SI001291   05980   ONLY   WALTER WILLIAMS   06 JUL 95   13.41.53   ** VSE/POWER V2.3 **
************ F5 ***     END  SI001291   05980   ONLY   WALTER WILLIAMS   06 JUL 95   13.41.53   ** VSE/POWER V2.3 **
************ F5 ***     END  SI001291   05980   ONLY   WALTER WILLIAMS   06 JUL 95   13.41.53   ** VSE/POWER V2.3 **
```

Case 2:94-cr-00381-LRL-MBN Document 2005-1 Filed 03/20/12 Page 105 of 114

RESPECT

WORKING TOGETHER

FOR | LIFE | PROPERTY | FOR LEARNING

New Orleans Public Schools

```
SSSSSSSSSS       11     0000000000   0000000000      11    2222222222  9999999999     11
SSSSSSSSSSSS     111   000000000000 000000000000    111   222222222222 999999999999   111
SS       SS     1111   00      00   00        00   1111   22        22 99         99  1111
SS             1111    00      00 00          00 00 1111           22 99         99  1111
SS              11    00      00   00         00 00   11   22        22 99         99    11
SSSSSSSSSS       11    00  00  00   00    00  00      11   2222222222   999999999999    11
 SSSSSSSSSS      11    00  00  00  00    00   00      11   222222222    99999999999     11
        SS       11    00 00   00  00 00     00       11   22                      99    11
        SS       11    00 0    00  00 0      00       11   22                      99    11
SS      SS       11    00      00   00        00      11   22           99         99    11
SSSSSSSSSSSS  111111  000000000000 000000000000   111111  222222222222 999999999999 111111
 SSSSSSSSSS   111111   0000000000   0000000000    111111  222222222222  9999999999  111111
```

```
 11    0000000000                 555555555555   9999999999   8888888888   0000000000
111    000000000000               555555555555  999999999999 8888888888888 000000000000
1111   00        00                55           99        99  88        88 00        00
1111   00      00  00              55            99        99  88        88 00    00  00
 11    00      00  00              55             99        99  88        88 00   00  00
 11    00  00  00               555555555555   999999999999  8888888888  00    00  00
 11    00  00  00               555555555555    999999999999  8888888888  00    00  00
 11    00 00   00                          55           99  88        88 00 00     00
 11    00 0    00                          55           99  88        88 00 0      00
 11    00      00               55      55  99        99  88        88 00        00
111111 000000000000            555555555555  999999999999 888888888888 000000000000
111111  0000000000              5555555555    9999999999   8888888888   0000000000
```

| NODE: | USER: | ORG NODE: | ORG USER: USP | EXEC.NODE: | ORG JOB-NO: 05980 |
|---|---|---|---|---|---|
| DEV : OOB | FNO : XERX | FCB : $$BFCB | LINES : 00000258 | CLASS : R | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ********** | F5 | *** | END | S1001291 | 05980 | ONLY | WALTER WILLIAMS | 06 JUL 95 | 13.41.53 | ** VSE/POWER V2.3 ** |
| ********** | F5 | *** | END | S1001291 | 05980 | ONLY | WALTER WILLIAMS | 06 JUL 95 | 13.41.53 | ** VSE/POWER V2.3 ** |
| ********** | F5 | *** | END | S1001291 | 05980 | ONLY | WALTER WILLIAMS | 06 JUL 95 | 13.41.53 | ** VSE/POWER V2.3 ** |
| ********** | F5 | *** | END | S1001291 | 05980 | ONLY | WALTER WILLIAMS | 06 JUL 95 | 13.41.53 | ** VSE/POWER V2.3 ** |
| ********** | F5 | *** | END | S1001291 | 05980 | ONLY | WALTER WILLIAMS | 06 JUL 95 | 13.41.53 | ** VSE/POWER V2.3 ** |
| ********** | F5 | *** | END | S1001291 | 05980 | ONLY | WALTER WILLIAMS | 06 JUL 95 | 13.41.53 | ** VSE/POWER V2.3 ** |
| ********** | F5 | *** | END | S1001291 | 05980 | ONLY | WALTER WILLIAMS | 06 JUL 95 | 13.41.53 | ** VSE/POWER V2.3 ** |
| ********** | F5 | *** | END | S1001291 | 05980 | ONLY | WALTER WILLIAMS | 06 JUL 95 | 13.41.53 | ** VSE/POWER V2.3 ** |

GBAR1A (01/9-1)

Case 2:04-cr-00081-HRL-MBN Document 2265-1 Filed 03/20/12 Page 106 of 114

```
SSSSSSSSSS           11      0000000000   0000000000        11    2222222222   9999999999        11
SSSSSSSSSSSS         111     000000000000 000000000000     111    222222222222 999999999999      111
SS        SS        1111     00      00 00        00      1111    22        22 99        99     1111
SS                  1111     00    00 00  00    00 00     1111              22 99        99     1111
SS                    11     00   00 00   00   00. 00       11              22 99        99       11
SSSSSSSSSS            11     00  00   00   00  00   00       11    2222222222 999999999999        11
 SSSSSSSSSS          11     00  00   00   00 00    00       11    22222222222  99999999999       11
        SS           11     00 00    00   00 00    00       11    22                   99        11
        SS           11     00 0     00   00 0     00       11    22                   99        11
SS      SS           11     00       00   00       00       11    22           99      99        11
SSSSSSSSSSSS       111111    000000000000 000000000000    111111  222222222222 999999999999   111111
 SSSSSSSSSS        111111     0000000000   0000000000     111111  222222222222  9999999999    111111

   11      0000000000                     555555555555  9999999999   8888888888  0000000000
  111     000000000000                    555555555555  999999999999 8888888888  000000000000
 1111     00        00                    55          99        99 88        88 00        00
 1111     00      00 00                    55          99        99 88        88 00      00 00
   11     00     00  00                     55          99        99 88        88 00     00  00
   11     00    00   00                    55555555555  999999999999 8888888888 00    00   00
   11     00   00    00                    555555555555 999999999999  8888888888 00   00    00
   11     00 00      00                             55          99 88        88 00 00      00
   11     00.0       00                             55          99 88        88 00 0       00
   11     00         00                    55      55 99        99 88        88 00         00
 111111   000000000000                    555555555555 999999999999 888888888888 000000000000
 111111    0000000000                       5555555555   9999999999   8888888888  0000000000
```

NODE:            USER:          ORG NODE:            ORG USER: USP    EXEC.NODE:          ORG JOB-NO: 05980
DEV : OOB        FNO : XERX     FCB     : $$BFCB     LINES  : 00000258 CLASS    : R

*********** F5 *** START S1001291 05980 ONLY WALTER WILLIAMS 06 JUL 95 13.41.49 ** VSE/POWER V2.3 **
*********** F5 *** START S1001291 05980 ONLY WALTER WILLIAMS 06 JUL 95 13.41.49 ** VSE/POWER V2.3 **
*********** F5 *** START S1001291 05980 ONLY WALTER WILLIAMS 06 JUL 95 13.41.49 ** VSE/POWER V2.3 **
*********** F5 *** START S1001291 05980 ONLY WALTER WILLIAMS 06 JUL 95 13.41.49 ** VSE/POWER V2.3 **

Case 2:94-cr-00381-ILRL-MBN   Document 2265-1   Filed 03/20/12   Page 107 of 114

```
SSSSSSSSSS        11      0000000000    0000000000     11      2222222222    9999999999       11
SSSSSSSSSSS       111     000000000000  000000000000   111     222222222222  999999999999     111
SS        SS      1111    00        00  00        00   1111    22        22  99        99     1111
SS                1111    00    00  00  00    00  00   1111              22  99        99     1111
SS                 11     00      00    00      00     11                22  99        99      11
SSSSSSSSSS         11     00      00    00      00     11      2222222222    999999999999      11
 SSSSSSSSSS        11     00  00  00    00  00  00     11      22222222222    99999999999      11
         SS        11     00 00    00   00 00    00    11      22                        99    11
         SS        11     00 0     00   00 0     00    11      22                        99    11
SS       SS        11     00        00  00        00   11      22            99        99      11
SSSSSSSSSSSS      111111  000000000000  000000000000   111111  222222222222  999999999999    111111
 SSSSSSSSSS       111111  0000000000    0000000000     111111  222222222222  9999999999      111111
```

```
   11        0000000000                 555555555555  9999999999   8888888888    0000000000
  111        000000000000               555555555555  999999999999 888888888888  000000000000
 1111        00        00               55            99        99 88        88  00        00
 1111        00    00  00               55            99        99 88        88  00    00  00
  11         00      00                 55            99        99 88        88  00        00
  11         00    00    00             555555555555  999999999999 8888888888    00    00  00
  11         00 00       00             555555555555  99999999999  8888888888    00    00  00
  11         00 00    00                          55           99 88        88  00 00       00
  11         0Q 0     00                          55           99 88        88  00 0        00
  11         00        00               55      55  99        99 88        88  00        00
111111       000000000000               555555555555 999999999999 888888888888  000000000000
111111       0000000000                  5555555555   9999999999   8888888888    0000000000
```

```
NODE:          USER:           ORG NODE:           ORG USER: USP      EXEC.NODE:          ORG JOB-NO: O5980
DEV : OOB      FNO : XERX      FCB     : $$BFCB     LINES   : 00000258 CLASS     : R
```

```
************   F5 ***   START   S1001291   05980   ONLY   WALTER WILLIAMS   06 JUL 95   13.41.47   ** VSE/POWER V2.3 **
************   F5 ***   START   S1001291   05980   ONLY   WALTER WILLIAMS   06 JUL 95   13.41.47   ** VSE/POWER V2.3 **
************   F5 ***   START   S1001291   05980   ONLY   WALTER WILLIAMS   06 JUL 95   13.41.47   ** VSE/POWER V2.3 **
************   F5 ***   START   S1001291   05980   ONLY   WALTER WILLIAMS   06 JUL 95   13.41.47   ** VSE/POWER V2.3 **
************   F5 ***   START   S1001291   05980   ONLY   WALTER WILLIAMS   06 JUL 95   13.41.47   ** VSE/POWER V2.3 **
************   F5 ***   START   S1001291   05980   ONLY   WALTER WILLIAMS   06 JUL 95   13.41.47   ** VSE/POWER V2.3 **
************   F5 ***   START   S1001291   05980   ONLY   WALTER WILLIAMS   06 JUL 95   13.41.47   ** VSE/POWER V2.3 **
************   F5 ***   START   S1001291   05980   ONLY   WALTER WILLIAMS   06 JUL 95   13.41.47   ** VSE/POWER V2.3 **
```

DAVIS LEN EDWIN — STUDENT    12 GRADE    MARION ABRAMSON — SCHOOL OF DISTRIBUTION

# NEW ORLEANS PUBLIC SCHOOLS
## CUMULATIVE RECORD

DATE OF PRINTING: 06/21/82    SEMESTER END    MID-TERM GRADUATE    PAGE: 1

| STUDENT | STUDENT ID | GRADE | ETH | SEX | HOMEROOM TEACHER | ROOM NO. | LATEST SCHOOL OF ENROLLMENT |
|---|---|---|---|---|---|---|---|
| DAVIS LEN EDWIN | 008526650 | 12 | B | M | NEWPORT M | | |

| STREET NO. | NAME | APT. NO. | DATE OF BIRTH | | COUNSELOR | | ROOM NO. | SCHOOL ID | SCHOOL | GRADE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 08/06/64 | | | | | 500 | MARION ABRAMSON | 12 |

| CITY | ZIP | HOME TELEPHONE | | | | | ADDRESS |
|---|---|---|---|---|---|---|---|
| NEW ORLEANS LA | 70129 | (504)254-3956 | | | | | 5552 READ RD |

| PARENT/GUARDIAN | RELATIONSHIP | OCCUPATION | MOTHER'S MAIDEN NAME | PRINCIPAL'S NAME | SCHOOL TELEPHONE |
|---|---|---|---|---|---|
| DAVIS VELMA LEE | MOTHR | SCHOOL BD | DAVIS V BROWN | O J TOURNILLON | 242-4830 |

## STUDENT ATTENDANCE SUMMARY BY SESSION
### (FULL DAY PRESENCE/ABSENCE)

SESSION:

PRESENT:
ABSENT:

ENTERING SCHOOL NEXT SESSION

| SCHOOL ID | SCHOOL | GRADE |
|---|---|---|
| | | |

| ADDRESS |
|---|
| |

| PRINCIPAL'S NAME | SCHOOL TELEPHONE |
|---|---|
| | |

GPA & RANK IN CLASS ARE CALCULATED ON FINAL GRADES ONLY.
DATA IS AS OF: 01/18/82

## ACADEMIC SUMMARY

CREDIT EARNED TO DATE: 21.00

MINIMUM NEEDED TO GRADUATE: 20.00

DIFFERENCE: 1.00

OVERALL GRADE POINT AVERAGE: 1.6818

RANK: 369    IN A CLASS OF: 566

### ACHIEVEMENT TEST SCORES

TEST NAME:    DATE TAKEN:

SUBJECT    SCALE/STANINE    NORM GROUP

1.
2.

### CREDIT EARNED MEETING MINIMUM GRADUATION REQUIREMENTS

| SUBJECT | REQUIRED | EARNED | DIFF. |
|---|---|---|---|
| ENGLISH | 3.00 | 3.00 | 0.00 |
| MATHEMATICS | 2.00 | 3.50 | 1.50 |
| SOCIAL STUDIES | 2.50 | 2.50 | 0.00 |
| SCIENCE | 2.00 | 2.00 | 0.00 |
| HEALTH & P.E. | 2.00 | 2.50 | 0.50 |
| ELECTIVES | 8.50 | 7.50 | -1.00 |
| TOTALS | 20.00 | 21.00 | 1.00 |

THE SCHOOL MAY MAKE FURTHER ADJUSTMENTS IN RANK AND GPA.

| DEPARTMENT NAME | COURSE NO. | COURSE NAME | CLASS WEIGHT | MK | SEM GRADE | FINAL GRADE | CREDIT EARNED | DATE COMPLETED | MK PD. | SCHOOL OF ISSUANCE | LOCATION | CHANGE FLAG |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **** E N G L I S H **** | | | | | | | | | | | | |
| NGLISH | 11198 | SP STD GRAMMAR | | 00 | | D | .50 | 79/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| NGLISH | 11710 | ACTION/ADVENT | | 00 | | F | .00 | 79/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| NGLISH | 11570 | COMPOSITION | | 00 | | D | .50 | 80/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| NGLISH | 11726 | TYPES OF LIT | | 00 | | D | .50 | 80/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| NGLISH | 12936 | REV LANG SKILS | | 00 | | B | .50 | 81/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| NGLISH | 12181 | SH SURV AM LIT | | 00 | | C | .50 | 81/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| NGLISH | 12942 | RSRCH IN WRTNG | | 04 | C | C | .50 | 82/01 | 2 | MARION ABRAMSON | NEW ORLEANS, LA. | |
| **** M A T H E M A T I C S **** | | | | | | | | | | | | |
| MATH | 22231 | ALGEBRA I S1 | | 00 | | D | .50 | 79/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| MATH | 22233 | ALGEBRA I S2 | | 00 | | D | .50 | 79/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| MATH | 23131 | GEOM OPT I S1 | | 00 | | D | .50 | 80/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| MATH | 23133 | GEOM OPT I S2 | | 00 | | D | .50 | 80/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| MATH | 22231 | ALGEBRA I S1 | | 00 | | D | .50 | 81/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| MATH | 22233 | ALGEBRA I S2 | | 00 | | D | .50 | 81/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| MATH | 24341 | MATH II-S-1 | | 04 | | C | .50 | 82/01 | 2 | MARION ABRAMSON | NEW ORLEANS, LA. | |
| **** S O C I A L S T U D I E S **** | | | | | | | | | | | | |
| OC STUD | 42131 | CIVICS S1 | | 00 | | D | .50 | 79/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| OC STUD | 42133 | CIVICS S2 | | 00 | | D | .50 | 79/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| OC STUD | 43260 | US HIST S1 | | 00 | | D | .50 | 81/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| OC STUD | 43261 | US HIST S2 | | 00 | | D | .50 | 81/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| OC STUD | 45531 | FREE ENTRPRISE | | 05 | | B | .50 | 82/01 | 2 | MARION ABRAMSON | NEW ORLEANS, LA. | |
| **** S C I E N C E **** | | | | | | | | | | | | |
| CIENCE | 32173 | GEN SC S1 | | 00 | | D | .50 | 79/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| CIENCE | 32172 | GEN SC S2 | | 00 | | D | .50 | 79/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| CIENCE | 33171 | BIOL I S1 | | 00 | | D | .50 | 80/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| CIENCE | 33173 | BIOL I S2 | | 00 | | C | .50 | 80/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| **** H E A L T H & P . E . **** | | | | | | | | | | | | |
| LTH/PE | 09902 | TOUCH FOOTBALL | | 00 | | B | .50 | 79/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| LTH/PE | 09830 | HEALTH SEM 1 | | 00 | | B | .50 | 80/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| LTH/PE | 09902 | TOUCH FOOTBALL | | 00 | | B | .50 | 81/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| AFETY | 09730 | DRIVER ED | | 00 | | B | 1.00 | 81/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| **** E L E C T I V E S **** | | | | | | | | | | | | |
| USIC | 90640 | BAND I | | 00 | | B | .50 | 79/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| USIC | 90640 | BAND I | | 00 | | B | .50 | 79/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| IS ELEC | 04250 | RELIGION I | | 00 | | C | .50 | 79/06 | 4 | ST AUGUSTINE | NEW ORLEANS LA | ** |
| USIC | 90640 | BAND I | | 00 | | D | .50 | 80/01 | 2 | ST AUGUSTINE | NEW ORLEANS LA | ** |
| USIC | 90660 | BAND II | | 00 | | C | .50 | 80/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| USIC | 90640 | BAND I | | 00 | | B | .50 | 80/06 | 4 | ST AUGUSTINE | NEW ORLEANS LA | ** |
| USIC | 90660 | BAND II | | 00 | | B | .50 | 80/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| IS ELEC | 04250 | RELIGION I | | 00 | | D | 1.00 | 80/06 | 4 | ST AUGUSTINE | NEW ORLEANS LA | ** |
| EADING | 18301 | R.E.A.D.I | | 00 | | D | .50 | 81/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| JR LANG | 51331 | SPANISH I S1 | | 00 | | D | .50 | 81/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| IS ELEC | 04260 | RELIGION III | | 00 | | D | .50 | 82/01 | 2 | MARION ABRAMSON | NEW ORLEANS, LA. | |
| JR LANG | 51333 | SPANISH I S2 | | 06 | | A | .50 | 82/01 | 2 | MARION ABRAMSON | NEW ORLEANS, LA. | |
| USIC | 97301 | GEN MUSIC I S1 | | 05 | | E | .00 | 82/01 | 2 | MARION ABRAMSON | NEW ORLEANS, LA. | |
| RT | 05431 | INTRO TO ART | | 05 | | B | .50 | 82/01 | 2 | MARION ABRAMSON | NEW ORLEANS, LA. | |
| OURNAL | 14168 | JOURN NEWSP S1 | | | | | | | | | | |

MAY 27 1982

LSW 10/13/82 RS

MARKING PERIOD "2" REPRESENTS SUMMER SCHOOL.
ASTERISKS INDICATE A CHANGE SINCE THE LAST CUMULATIVE RECORD WAS PRINTED.

PERMANENT FILE

CERTIFICATE
OF
GH SCHOOL CREDITS

**STATE OF LOUISIANA**
**DEPARTMENT OF EDUCATION**
BATON ROUGE, LOUISIANA
STATE-APPROVED HIGH SCHOOLS

DATE
PRINTED: 02/26/82

PAGE 1

| F OF STUDENT (LAST, FIRST, MIDDLE) | | | | DATE OF BIRTH: | SEX: | ETHNIC: | DATE OF GRADUATION: |
|---|---|---|---|---|---|---|---|
| DAVIS LEN EDWIN | | 008526650 | | 08/06/64 | M | B | 01/18/82 |
| ʼOL 500 | PARISH: | | ADDRESS: 5552 READ RD | | | | SCHOOL PHONE NO. AC 504 |
| MARION ABRAMSON | ORLEANS | | NEW ORLEANS, LA | | | | 242-4830 |

INSTRUCTIONS FOR COMPLETING WHEN NOT PRINTED BY COMPUTER

**TO THE PRINCIPAL:** Make for each applicant for graduation duplicate certificates (one white, one pink). Seven days prior to graduation, forward both copies to the State Director of Secondary Education. After approval, one copy will be returned. **Please use typewriter.**

| DISCIPLINE | SUBJECT NAME | YEAR CREDIT EARNED | NO. OF WEEKS | MINUTES PER WEEK | MARK RECEIVED | UNIT CREDIT | REMARKS: ENTER THE NAMES OF SCHOOLS IN WHICH OUTSIDE CREDITS WERE EARNED |
|---|---|---|---|---|---|---|---|
| NGLISH | ENGLISH I | 79/80 | 36 | 300 | DD | 1.00 | ST AUGUSTINE |
| | ENGLISH II | 80/81 | 36 | 300 | DB | 1.00 | ST AUGUSTINE |
| | ENGLISH III | 81/82 | 36 | 300 | CC | 1.00 | |
| | ENGLISH IV | | | | | | |
| | Reading I | 79/80 | 36 | 300 | D | 1.00 | St. Augustine |
| EE ENTERPRISE | FREE ENTERPRISE | 81/82 | 18 | 300 | B | 0.50 | |
| THEMATICS | ALGEBRA I | 78/79 | 36 | 300 | DD | 1.00 | ST AUGUSTINE |
| | GEOMETRY | 79/80 | 36 | 300 | DD | 1.00 | ST AUGUSTINE |
| | MATHEMATICS II | 81/82 | 18 | 300 | C | 0.50 | |
| | ALGEBRA II | 80/81 | 36 | 300 | DD | 1.00 | |
| CIAL STUDIES | CIVICS | 78/79 | 36 | 300 | DD | 1.00 | ST AUGUSTINE |
| | AMERICAN HISTORY | 80/81 | 36 | 300 | DD | 1.00 | ST AUGUSTINE |
| CIENCE | GENERAL SCIENCE | 78/79 | 36 | 300 | DD | 1.00 | ST AUGUSTINE |
| | BIOLOGY I | 79/80 | 36 | 300 | DC | 1.00 | ST AUGUSTINE |
| ALTH & PHY ED | HEALTH & P E I | 79/80 | 36 | 300 | BB | 1.00 | ST AUGUSTINE |
| | HEALTH & P E II | 80/81 | 36 | 300 | BB | 1.00 | ST AUGUSTINE |
| | Health & P.E. III | 80/81 | 18 | 300 | B | .50 | St. AUGUSTINE |
| REIGN LANGUAGE | SPANISH I | 80/81 | 36 | 300 | DD | 1.00 | ST AUGUSTINE |
| JURNALISM | JOURNALISM I | 81/82 | 18 | 300 | B | 0.50 | |
| SIC | BAND I | 78/79 | 36 | 300 | BB | 1.00 | ST AUGUSTINE |
| | BAND II | 79/80 | 36 | 300 | DD | 1.00 | ST AUGUSTINE |
| | GEN MUSIC I | 81/82 | 18 | 300 | A | 0.50 | |
| | Instr. Music | 79/80 | 36 | 300 | DC | 1.00 | St. Augustine |
| SC ELECTIVES | RELIGION I | 79/80 | 36 | 300 | CB | 1.00 | ST AUGUSTINE |
| | RELIGION III | 80/81 | 18 | 300 | C | 0.50 | ST AUGUSTINE |

**TOTAL UNITS** 21.00

The State Director of Secondary Education:

I hereby certify that the above-named student has successfully completed the high school work shown above, and that he has complied with all the requirements prescribed by the State Board of Elementary and Secondary Education for graduation from a State-Approved High School, and that there is now in my office on file a complete record of this student's work, including a cumulative record of attendance and scholarship.

SCRIBED TO THIS 26 DAY OF FEBRUARY 1982 AT N.O. LA

DIRECTOR OF SECONDARY EDUCATION    SIGNATURE OF SCHOOL PRINCIPAL   O J DILLON

# NEW ORLEANS PUBLIC SCHOOLS
## CUMULATIVE RECORD

DATE OF PRINTING: 06/21/82 — SEMESTER END — MID-TERM GRADUATE — PAGE: 1

| STUDENT | STUDENT ID | GRADE | 6TH | SEX | HOMEROOM TEACHER | ROOM NO. |
|---|---|---|---|---|---|---|
| DAVIS LEN EDWIN | 008526650 | 12 | 8 | M | NEWPORT M | |
| SHEET NO. NAME | APT. NO. | DATE OF BIRTH | | | COUNSELOR | ROOM NO. |
| | | 08/06/64 | | | | |

CITY: NEW ORLEANS LA — ZIP: 70129 — HOME TELEPHONE

PARENT/GUARDIAN: DAVIS VELMA LEE — RELATIONSHIP: MOTHR — OCCUPATION: SCHOOL BD — MOTHER'S MAIDEN NAME: DAVIS V BROWN

### LATEST SCHOOL OF ENROLLMENT

SCHOOL ID: 500 — SCHOOL: MARION ABRAMSON — GRADE: 12

ADDRESS: 5552 READ RD

PRINCIPAL'S NAME: J J TOURNILLON — SCHOOL TELEPHONE: 242-4830

### ENTERING SCHOOL NEXT SESSION
SCHOOL ID | SCHOOL | GRADE
ADDRESS
PRINCIPAL'S NAME | SCHOOL TELEPHONE

## STUDENT ATTENDANCE SUMMARY BY SESSION
(FULL DAY PRESENCE/ABSENCE)

SESSION:
PRESENT:
ABSENT:

GPA & RANK IN CLASS ARE CALCULATED ON FINAL GRADES ONLY.
DATA IS AS OF: 01/18/82

## ACADEMIC SUMMARY

CREDIT EARNED TO DATE: 21.00
MINIMUM NEEDED TO GRADUATE: 20.00
DIFFERENCE: 1.00
OVERALL GRADE POINT AVERAGE: 1.6818
RANK: 369 — IN A CLASS OF: 566

### ACHIEVEMENT TEST SCORES
TEST NAME:  — DATE TAKEN:
SUBJECT — %ILE/STANINE — NORM GROUP

1,
2,

### CREDIT EARNED MEETING MINIMUM GRADUATION REQUIREMENTS

| SUBJECT | REQUIRED | EARNED | DIFF. |
|---|---|---|---|
| ENGLISH | 3.00 | 3.00 | 0.00 |
| MATHEMATICS | 2.00 | 3.50 | 1.50 |
| SOCIAL STUDIES | 2.50 | 2.50 | 0.00 |
| SCIENCE | 2.00 | 2.00 | 0.00 |
| HEALTH & P.E. | 2.00 | 2.50 | 0.50 |
| ELECTIVES | 8.50 | 7.50 | -1.00 |
| TOTALS | 20.00 | 21.00 | 1.00 |

THE SCHOOL MAY MAKE FURTHER ADJUSTMENTS IN RANK AND GPA.

| DEPARTMENT NAME | COURSE NO. | COURSE NAME | CLASS WEIGHT | MRK | B | SEM GRADE | FINAL GRADE | CREDIT EARNED | DATE COMPLETED | MK PD | SCHOOL OF ISSUANCE | LOCATION | CHANGE FLAG |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **** ENGLISH | 11198 | SP STD GRAMMAR | | DD | | | D | .50 | 79/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| ENGLISH | 11710 | ACTION/ADVENT | | 00 | | | F | .00 | 79/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| ENGLISH | 11570 | COMPOSITION | | 00 | | | D | .50 | 80/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| ENGLISH | 11726 | TYPES OF LIT | | 00 | | | D | .50 | 80/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| ENGLISH | 12936 | REV LANG SKILS | | 00 | | | C | .50 | 81/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| ENGLISH | 12181 | SH SURV AM LIT | | 00 | | | C | .50 | 81/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| ENGLISH | 12942 | RSRCH IN WRTNG | | 04 | C | | C | .50 | 82/01 | 2 | MARION ABRAMSON | NEW ORLEANS, LA. | |
| **** MATH | 22231 | ALGEBRA I S1 | | 00 | | | D | .50 | 79/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| MATH | 22233 | ALGEBRA I S2 | | 00 | | | D | .50 | 79/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| MATH | 23131 | GEOM OPT I S1 | | 00 | | | D | .50 | 80/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| MATH | 23133 | GEOM OPT I S2 | | 00 | | | D | .50 | 80/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| MATH | 22231 | ALGEBRA I S1 | | 00 | | | D | .50 | 81/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| MATH | 22233 | ALGEBRA I S2 | | 00 | | | D | .50 | 81/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| MATH | 24341 | MATH II-5-1 | | 04 | | | C | .50 | 82/01 | 2 | MARION ABRAMSON | NEW ORLEANS, LA. | |
| **** SOC STUD | 42131 | CIVICS S1 | | 00 | | | D | .50 | 79/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| SOC STUD | 42133 | CIVICS S2 | | 00 | | | D | .50 | 79/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| SOC STUD | 43260 | US HIST S1 | | 00 | | | D | .50 | 81/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| SOC STUD | 43261 | US HIST S2 | | 00 | | | D | .50 | 81/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| SOC STUD | 45531 | FREE ENTRPRISE | | 05 | | | R | .50 | 82/01 | 2 | MARION ABRAMSON | NEW ORLEANS, LA. | |
| **** SCIENCE | 52173 | GEN SC S1 | | 00 | | | D | .50 | 79/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| SCIENCE | 52172 | GEN SC S2 | | 00 | | | D | .50 | 79/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| SCIENCE | 33171 | BIOL I S1 | | 00 | | | D | .50 | 80/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| SCIENCE | 33173 | BIOL I S2 | | DD | | | C | .50 | 80/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| **** HLTH/PE | 09902 | TOUCH FOOTBALL | | 00 | | | B | .50 | 79/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| HLTH/PE | 09830 | HEALTH SEM I | | 00 | | | B | .50 | 80/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| HLTH/PE | 09902 | TOUCH FOOTBALL | | 00 | | | B | .50 | 81/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| SAFETY | 09730 | DRIVER ED | | 00 | | | B | 1.00 | 81/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| **** MUSIC | 90640 | BAND I | | 00 | | | B | .50 | 79/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| MUSIC | 90640 | BAND I | | 00 | | | B | .50 | 79/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| HIS ELEC | 04250 | RELIGION I | | 00 | | | C | .50 | 79/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| MUSIC | 90640 | BAND I | | 00 | | | D | .50 | 80/01 | 2 | ST AUGUSTINE | NEW ORLEANS LA | ** |
| MUSIC | 90660 | BAND II | | 00 | | | D | .50 | 80/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| MUSIC | 90640 | BAND I | | 00 | | | C | .50 | 80/06 | 4 | ST AUGUSTINE | NEW ORLEANS LA | ** |
| MUSIC | 90660 | BAND II | | 00 | | | D | .50 | 80/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| HIS ELEC | 04250 | RELIGION I | | 00 | | | B | .50 | 80/06 | 4 | ST AUGUSTINE | NEW LONDON LA | ** |
| READING | 18301 | R.E.A.D.I | | 00 | | | D | 1.00 | 80/06 | 4 | ST AUGUSTINE | NEW ORLEANS LA | ** |
| FOR LANG | 51331 | SPANISH I S1 | | 00 | | | C | .50 | 81/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| HIS ELEC | 04260 | RELIGION III | | 00 | | | D | .50 | 81/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| FOR LANG | 51333 | SPANISH I S2 | | 06 | | | A | .50 | 82/01 | 2 | ST AUGUSTINE | NEW LONDON LA | ** |
| MUSIC | 97301 | GEN MUSIC I S1 | | 05 | | | | .00 | 82/01 | 2 | MARION ABRAMSON | NEW ORLEANS, LA. | |
| ART | 05431 | INTRO TO ART | | 05 | | | B | .50 | 82/01 | 2 | MARION ABRAMSON | NEW ORLEANS, LA. | |
| JOURNAL | 14168 | JOURN NEWSP S1 | | | | | | | | | MARION ABRAMSON | NEW ORLEANS, LA. | |

MAY 27 1982

LSW 10/13/82 RS

* MARKING PERIOD "S" REPRESENTS SUMMER SCHOOL
** ASTERISKS INDICATE A CHANGE SINCE THE LAST CUMULATIVE RECORD WAS PRINTED.

PERMANENT FILE

# Exhibit M

# Affidavit of Ron Singer

# AFFIDAVIT

STATE OF TEXAS

COUNTY OF TARRANT

Before me, the undersigned authority, came and appeared RONALD L. SINGER, who, after being sworn, deposed and said:

1. My name is Ronald L. Singer; I am over 18 years of age, of sound mind, capable of making this Affidavit, and personally acquainted with the facts herein stated. I am the Technical and Administrative Director for the Tarrant County Medical Examiner's Office in Fort Worth, Texas, a National Association of Medical Examiners accredited office. Prior to my promotion, I served as Crime Laboratory Director for the Tarrant County Medical Examiner's Crime Laboratory, an ASCLD/LAB accredited crime laboratory, for twenty years. From 1972 until 1988 I was employed by the Jefferson Parish Sheriff's Office Crime Laboratory in Metairie, Louisiana, as a Criminalist and as the Laboratory Director. I am experienced in the scientific testing, evaluation, and proper handling of physical evidence. By way of Background, I am a Past President of the International Association of Forensic Sciences; a Distinguished Fellow, and Past President of the American Academy of Forensic Sciences; a Distinguished Member and Past President of the Association of Firearm and Tool Mark Examiners; and an Emeritus Member of the American Society of Crime Laboratory Directors. I have been qualified as a forensic science expert and given expert testimony in Federal, State and Local courts in Texas, Louisiana, Oklahoma, Georgia, Missouri, Mississippi, Colorado and Kansas.

2. Rebecca L. Hudsmith, Esquire, has retained me on behalf of herself and co-counsel, Sarah Ottinger, to serve as an expert forensic scientist consultant in the case of *United States v. Len Davis*.

3. In writing this report, I have relied on the following information:

   a. Five color copies of photographs

   b. Various crime scene reports, evidence/property cards and chains of custody relating to incident number J-21871-94

   c. FBI laboratory reports, dated December 15, 1994 and January 23, 1995 relating to "Shattered Shield; CSLPO - LE" with accompanying bench notes

   d. Louisiana State Police laboratory reports dated February 02, 1996 and March 21, 1996 with accompanying bench notes

   e. Testimonies of Officer Jimmy Ducos, James Churchman, Susan Garcia, Gary Washington and Lester Rome described as being from the 1996 trial of Mr. Davis.

4. Officer Ducos, a 21 year veteran with the New Orleans Police Department crime lab, testified that on October 13, 1994, he worked the 10:25 p.m. to 7:00 a.m. shift, and was informed of the Kim Groves murder at 11:45 p.m. while in his office. April 15, 1996 Tr. 160-161. By the time he arrived at the crime scene at 12:05 a.m. on October 14, 1994, Ms. Groves' body had been removed. *Id.* at 162, 175. There were people around the scene, which was not taped off with crime scene tape. *Id.* at 175.

Page 1 of 3

According to Officer Ducos, the head detective on the scene at that time, Detective Zenon, pointed out a fired cartridge case, or "casing", near a large pool of blood. Officer Ducos testified he covered the casing with a cone to mark it and stop it from being kicked; he then took a few photos of the scene, but none of the casing. *Id.* at 163-164; GE 9. Officer Ducos picked up the casing, which he identified as a spent FC 9mm Luger casing, put it in an envelope, wrote the date, 10-14-94, and time, 12:25 a.m., on the envelope, put the envelope in his pants pocket, and then delivered it to NOPD Central Evidence Property at 3:10 a.m.. *Id.* at 172-173; GE 6. Officer Ducos also drew a rough diagram of the scene, which incorrectly identified the cross street and the block on Alabo. *Id.* at 168-169. Altogether, Officer Ducos spent less than one hour at the crime scene. On cross-examination, Officer Ducos acknowledged that he made some mistakes on the diagram with respect to the streets and also admitted that he did not initial the casing and could not swear that the casing was the same one he seized, but he justified his failure in this regard by explaining that he did not want to handle the casing because it might mess up the fingerprint testing. *Id.* at 176-178.

5. Once officer Ducos collected the casing at the scene, he turned it into the Central Evidence and Property room on October 14, 1994. On November 7, 1994, a spent FC 9mm Luger casing was received from the Central Evidence and Property room by Forensic Light Examiner Timothy M. Seuzeneau, whose test for fingerprints was negative. There is no indication that Seuzeneau marked the casing with his initials. According to an affidavit of FBI Agent Adams, she obtained a 9mm casing from NOPD on November 9, 1994, and arranged for its transportation to the FBI in Washington, D.C.

6. James Churchman, a forensic scientist with the Louisiana State Police Crime Lab, who concluded that the casing he examined was fired from the 9mm Berretta pistol connected to defendant Paul Hardy, to the exclusion of any other weapon, testified that he had his laboratory number inscribed inside the mouth of the casing and his initials. *Id.* at 129. He acknowledged that there were also the initials J.C., for the FBI examiner James Cadigan, on the outside of the casing and the marking Q73. Churchman acknowledged that there were no markings on the casing to indicate that it was the same one seized by Officer Ducos at the crime scene. *Id.* at 175. He also could not say whether the casing he tested was or was not one of the casings that was produced in April of 1994 when the same 9mm Berretta owned by Hardy was seized and tested by NOPD. *Id.* at 175.

7. In my expert opinion, the quality of the crime scene investigation in this case did not conform to scientifically acceptable standards for crime scene investigations applicable at the time. Processing a major crime scene involves observation, documentation, assessment, searching, analysis, collection, note taking and detailed reporting. Evidence must be documented with photographs and accurate measurements placing the evidence within the scene in relation to any other item or person. The evidence must be properly identified, packaged, documented and collected so as to maintain a strict chain of custody and to preserve its value for subsequent analytical processes. When photographed, placards or other reference materials should be included with the evidence to enable police to refer evidentiary items and their placement within a scene to others, as evidence may be difficult to observe in photographs.

In this case, the quality and quantity of the scene photography were woefully inadequate with no use of scales or evidence placards to mark the location of evidence in relation to

Page 2 of 3

anything.  Rather, Officer Ducos used a cone to cover the cartridge case before photographing it. No photograph of the cartridge case itself in place exists.  This cartridge case became a critical piece of evidence in the trial, as it is the only item that links the seized gun to the scene.  In addition, the photographs that do exist are inadequate to determine the position of the cone in relation to the pool of blood at the scene, and since no photographs exist of the body at the scene, it is not possible to determine the relative positions of the body, the blood pool and the cartridge case.  If the sketch drawn by Officer Ducos is compared to the few photographs taken, there appears to be an inconsistency between the drawn position of the cartridge case and the photographs of the cone.

8. There are numerous techniques available to mark a fired cartridge case without disturbing any fingerprints that might be present or compromising the ability to match the fired cartridge case to a suspect firearm.  Because this cartridge case was in several locations before any firearms comparisons were made, it is no longer possible to establish, with any degree of certainty, that the cartridge case linked to the Beretta owned by Hardy is in fact the cartridge case that was allegedly collected at the Kim Groves crime scene.



Signature: Ronald L. Singer

SWORN AND SUBSCRIBED before me on this ___16th___ day of _March_, 2012

My commission expires: ___1/17/2014___

_____
Notary Public's Signature, State of Texas

Notary Public's printed name:

ANDREA CORDER
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 01-17-2014

Page 3 of 3