**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF LOUISIANA**

---

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | \* | **CASE NO. 2:94-cr-00381** |
| | \* | |
| **v.** | \* | |
| | \* | **SECTION "C"** |
| **LEN DAVIS** | \* | |
| | \* | **THIS IS A DEATH CASE** |

---

## MEMORANDUM IN SUPPORT OF MOTION
## FOR LEAVE TO CONDUCT DISCOVERY

NOW COMES Len Davis, through undersigned counsel, who respectfully submits this

*Memorandum* in support of his *Motion for Leave to Conduct Discovery*.

### I. APPLICABLE LAW

#### A. Habeas Rule 6 and Good Cause

The rule governing discovery in § 2255 proceedings provides, in part, that:

(a) Leave of Court Required. A judge may, for good cause, authorize a party to
conduct discovery under the Federal Rules of Criminal Procedure or Civil
Procedure, or in accordance with the practices and principles of law. If necessary
for effective discovery, the judge must appoint an attorney for a moving party who
qualifies to have counsel appointed under 18 U.S.C. § 3006A.

(b) Requesting Discovery.  A party requesting discovery must provide reasons for
the request. The request must also include any proposed interrogatories and
requests for admission, and must specify any requested documents.

Rules Governing Section 2255 Proceedings, Rule 6.

Habeas Rule 6(a) incorporates the Supreme Court's directive that a federal habeas corpus

petitioner is "'entitled to careful consideration and plenary processing of [his claims,] including

full opportunity for presentation of the relevant facts.'" *Harris v. Nelson*, 394 U.S. 286, 298 (1969); *see also Blackledge v. Allison*, 431 U.S. 63, 82-83 (1977).  The Court may grant leave to conduct discovery when "good cause" for doing so is shown.  "Good cause" for discovery in habeas corpus proceedings is established "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief."  *Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997).

The *Bracy* decision is illustrative of not only "good cause," but also the purpose of discovery in a case like Mr. Davis's.  In *Bracy*, the defendant was convicted and sentenced to death in proceedings conducted by Cook County Circuit Judge Thomas J. Maloney.  *Bracy v. Gramley*, 81 F.3d 684, 687 (7th Cir. 1995) (hereinafter "*Bracy I*"), *rev'd*, 520 U.S. 899 (1997) (hereinafter "*Bracy II*").  Subsequently, Judge Maloney was found guilty of accepting bribes from criminal defendants in his court, and in return for the bribes arranging for the defendants to be acquitted or convicted of lower-grade offenses.  *Bracy II*, 520 U.S. 906-08; *see also United States v. Maloney*, 71 F.3d 645 (7th Cir. 1995) (upholding Maloney's federal conviction on racketeering, extortion, and obstruction of justice charges), *cert. denied*, 519 U.S. 927 (1996).  Bracy did not bribe Judge Maloney.his habeas petition, he alleged "that Judge Maloney came down hard on criminal defendants in cases in which he was not bribed, to avoid suspicion that he was on the take, to cancel any bad impression that his acquittals might make on the voters-maybe even to make defendants desperate to bribe him, fearing he would punish them with adverse rulings if they did not."  *Bracy I*, 81 F.3d at 688.  Bracy asked for discovery under Habeas Rule 6(a) "so that [he] can try to find out whether there was actual bias by Judge Maloney at their trial."  *Id*. at 690.  Bracy requested access to documents revealing the disposition of cases before Judge Maloney, depositions of persons who could describe the judge's behavior in the cases

where he did not receive bribes, and for evidence from the federal prosecution of Judge Maloney that would indicate Judge Maloney's behavior in non-bribery cases.  The district court denied the discovery requests.

The Seventh Circuit affirmed the denial of discovery, describing Bracy's theory of "compensatory bias" as speculation.  *See Bracy I* at 690.  The Seventh Circuit theorized that the "compensatory bias" theory might be incorrect because, the jury, not Maloney, convicted Bracy and sentenced him to death.  *Id*.  The Seventh Circuit speculated further, noting that even assuming Maloney did rule harshly for the state in non-bribery cases while ruling conspicuously for the defendant in bribery cases, a pattern of compensatory bias might actually "create a pattern of inconsistent rulings that would lead people to suspect he was on the take." *Id*.  On the other hand, the Seventh Circuit considered that Maloney might have followed a policy of always being lenient towards defendants in order to generate consistent rulings, but by doing so would risk being voted out of office by a crime-weary public.  *Id*.  The appellate court went back-and-forth with the possibilities regarding Bracy's compensatory bias claim.  The Seventh Circuit freely acknowledged that it was "speculating about the likely impact of Maloney's corruption on the rulings that he made at the trial of these petitioners." *Id*.  The appellate court justified its speculation because the "defendants are speculating too." *Id*. at 690.  Because of all of the possibilities that Bracy's claims were not proper, the court denied Bracy's request as a "fishing expedition" that might reveal a pattern of compensatory bias, but which might "not show that he [Maloney] followed the practice in this case."

Seventh Circuit Judge Ilana Diamond Rovner wrote a detailed dissent pointing out the flaws of the majority's reasoning.  Judge Rovner noted that Bracy had actually presented evidence, which was utterly ignored by the majority, that Judge Maloney did in fact rule harshly

against defendants who did not bribe him.  *Id*. at 697 (citing transcript of Maloney's trial).  She

agreed that it was possible that the majority's speculative theory that Judge Maloney would not

have been harsher to defendants in non-bribery cases might be true.  However, she stressed, the

time for such speculation is "after an evidentiary hearing on the matter, when the petitioners have

had the opportunity to find and present whatever evidence there may be to establish any practice

Maloney may have followed."  *Id*.  "Without giving Bracy and Collins [Bracy's co-defendant] the

opportunity to present that evidence," Judge Rovner continued, "their claim of conflict can only

be resolved on the basis of speculation, as my colleagues agree."  *Id*.  Judge Rovner put the point

precisely:

> We cannot simply assume that the "probability is slight" that discovery will yield
> Bracy and Collins anything.  Let them try.  If their discovery proves fruitless, we can
> at least take comfort in the knowledge that we have given them every opportunity to
> prove that Maloney's corruption deprived them of a fair trial.  We cannot, after all,
> have it both ways:  we cannot criticize Bracy and Collins for speculation and at the
> same time deprive them of the chance to render their theory anything more.

*Id.*

On certiorari review, the Supreme Court concluded that discovery was warranted

because, although the compensatory bias claim may be speculative, Bracy provided sufficient

information supporting his claim at the early stage and the need for discovery to further the

prosecution of the claim.  Applying the governing law to the facts, the Court explained the proper

application of Habeas Rule 6:

> In <u>Harris</u> [<u>v. Nelson</u>, 394 U.S. 286 (1969)], we stated that "where specific allegations
> before the court show reason to believe that the petitioner may, if the facts are fully
> developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the
> court to provide the necessary facilities and procedures for an adequate inquiry." 394
> U.S., at 300.  Habeas Corpus Rule 6 is meant to be "consistent" with <u>Harris. . . .</u>  It
> may well be, as the Court of Appeals predicted, that petitioner will be unable to
> obtain evidence sufficient to . . . [prove his claim], but we hold that he has made a
> sufficient showing, as required by Habeas Corpus Rule 6(a), to establish "good

cause" for discovery.

*Bracy II*, 520 U.S. at 908-09.

Although *Bracy II* did not lower the threshold for obtaining discovery, the analysis clearly shows that courts should not stifle the discovery process based on the possibilities that dispute the movant's claims.  Instead, *Bracy II* sets out a clear, straightforward framework for considering habeas petitioners' discovery requests.  A court should first determine whether the petitioner has alleged the elements of the claim he wishes to prove, then determine whether he has made any "specific allegations" that support the particular discovery request.  If the petitioner has properly alleged the claim and asked for probative evidence, he has shown "good cause" for discovery and the court has a duty to permit it.

Thus, a movant has established good cause and discovery should be ordered when he has (1) made specific allegations warranting relief, (2) shown why the requested information is essential to the adequate factual development of his claims, and (3) demonstrated that the requested information is likely in the hands of the party from whom discovery is sought and cannot be obtained through other means.  *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994) (movant must first set out specific allegations of fact supporting his claims for relief) (citing *Willie v. Maggio*, 737 F.2d 1372 (5th Cir.), *cert. denied*, 469 U.S. 1002 (1984));  *Kirkpatrick v. Whitley*, 992 F.2d 491, 496 (5th Cir. 1993) (movant must have some reason to believe that the requested information exists);  *See, e.g., Murphy v. Johnson*, 205 F.3d 809, 813-814 (5th Cir. 2000) (good cause may be found where a prima facie case is made; also "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he [is] entitled to relief, it is the *duty* of the courts to provide the necessary facilities and procedures for an adequate inquiry") (internal quotation

marks omitted; citation omitted; emphasis added); *see also East v. Scott*, 55 F.3d 996 (5th Cir. 1995) (although a "district court generally has discretion to grant or deny discovery requests under Rule 6, a court's blanket denial of discovery is an abuse of discretion if discovery is indispensable to a fair, rounded, development of the material facts") (internal quotation marks omitted).

**B.  Necessity of discovery to satisfy requirements of habeas proceedings**

Federal habeas petitioners are required to bring all claims in one proceeding.  When the window is open, the petitioner must fully investigate and present the court with all claims in the initial proceeding, or he will be barred from bringing the claims in a subsequent proceeding. *McCleskey v. Zant*, 499 U.S. 467, 489 (1991) (in order to overcome the abuse of writ, the petitioner must show cause and prejudice for his actions, or demonstrate that failure to decide his claim will constitute a "fundamental miscarriage of justice.").  In deciding whether a habeas petitioner has abused the writ by not presenting all claims in the initial proceeding, "the question is whether petitioner possessed, or by reasonable means could have obtained, a sufficient basis to allege a claim in the first petition and pursue the matter through the habeas process, *see* 28 U.S.C. §2254 Rule 6 (Discovery); Rule 7 (Expansion of Record); Rule 8 (Evidentiary Hearing)." *Id.* at 497.  The prohibition on raising claims in a subsequent proceeding is also codified in the AEDPA, which sets forth that claims not raised in an initial petition must be certified by the Circuit Court as either based upon newly discovered evidence establishing innocence or based upon a new rule of constitutional law that was previously unavailable.  *See* 28 U.S.C. §2255.

The AEDPA expands upon the limitations set forth in McCleskey concerning the litigation of new claims in second or successive habeas corpus petitions, thereby underscoring the necessity of raising all possible claims in the first petition.  With that necessity, therefore, comes

a corollary duty on the part of the federal judiciary to provide habeas petitioners the means for discovering, developing and presenting all such claims and their factual bases through the recognized and available tools of claim/fact development, including discovery.  The reasons for ensuring a complete investigation, including the discovery process, are even stronger in capital cases because the "finality" of death and its "qualitative differen[ce] from a sentence of imprisonment, however long," magnifies the "need for reliability" and, accordingly, the need for reliable fact-determination procedures.  *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *McFarland, v. Scott,* 512 U.S. 849, 855 (1994).

Mr. Davis now seeks to make a reasonable investigation into all claims or potential claims for which he has a good faith basis to believe exist in his case, and to "pursue the matter through the habeas process" of discovery under Rule 6.  Having placed an affirmative duty upon those seeking habeas relief to raise all claims in their initial petition, *McCleskey* and the AEDPA essentially place a concomitant duty upon the federal courts to provide petitioners with the necessary tools to meet this obligation, including discovery.  Because this is Mr. Davis's first §2255 motion and he sets forth below a sufficient basis for alleging possible deprivations of his constitutional rights, he is entitled to conduct discovery to further develop and prosecute his claims.

## II.  DISCOVERY REQUESTS

Mr. Davis requests the process of this Court to order the production of the following evidence and information in support of his § 2255 claims:

**A.**    **Requests for discovery in support of Mr. Davis's conflict of interest claims**

Mr. Davis requests that this Court order the Government to produce any and all records, documents, and tangible things in the possession of the Federal Bureau of Investigation,

Department of Justice, and the Office of the U.S. Attorney for the Eastern District of Louisiana pertaining to Operation Shattered Shield, the investigation of Paul Hardy, recordings of Paul Hardy, Damon Causey, and their associates, documents pertaining to DOJ investigation into the recordings of murders while monitoring Operation Shattered Shield wiretaps, documents pertaining to the review of those wiretaps, and documents pertaining to the investigation of murders that occurred while the FBI monitored the recordings of Operation Shattered Shield.

As set forth fully in Mr. Davis's § 2255 motion, several New Orleans Police Department officers were the subject of an encompassing sting operation by the Federal Bureau of Investigation dubbed "Operation Shattered Shield."   Operation Shattered Shield centered around an undercover FBI agent enlisting various NOPD officers to engage in drug trafficking, including guarding buildings where purported drug deals were taking place.  Mr. Davis and his partner, Sammie Williams, were in charge of recruiting other officers to join the operation and were paid handsomely for their endeavors.  All the while, the FBI was monitoring wiretaps of the officers involved.  Hundreds of hours of activity were recorded by the FBI, including countless incidents of criminal activity.  Not only the drug activity which formed the basis of the investigation, but also several murders.  The U.S. Department of Justice and the Office of the U.S. Attorney for the Eastern District of Louisiana were heavily involved in the Shattered Shield investigation.

There is no dispute that the FBI heard the details of various murders while listening to the wiretaps:

*Murder of Carlos Adams:*  On September 30, 1994, the FBI listened as Sammie Williams called Mr. Davis and told him "call your boy...PH."  Sammie Williams explained that there had just been a "30" and, while laughing, told Mr. Davis to call Paul Hardy because he saw him running from the shooting with a gun.  GE-1, 1996.  Sammie Williams explained that he

heard gunfire and saw men running toward a car he knew belonged to Paul Hardy.  Mr. Davis spoke with Paul Hardy on the phone.  Hardy initially denied any involvement in the murder but then acknowledged he was there, and remembered seeing Sammie's car.  Paul Hardy killed 19 year-old Carlos Adams that night.  The FBI was listening, taking notes in their log on exactly what was transpiring as it happened. There was no misunderstanding that they had just heard exactly who committed a murder and who posed a danger to the Ninth Ward, Paul Hardy.  The FBI did nothing, and Hardy went on to commit other murders.

*Murder of Shawn King and 16 year-old:* On October 12, 1994, the FBI intercepted a conversation between Paul Hardy and Len Davis about a man named Shawn King, who had been shot and killed the night before, along with a 16 year-old boy who was with him who wasn't the intended victim.  The FBI believed Paul Hardy and Damon Causey had committed the murder because at a preliminary hearing on December 12, 1994, FBI Agent McArthur testified that the wiretaps "indicated that Paul Hardy and Damon Causey were involved in the homicide."  Drug Tr. 25, Dec. 12, 1994.

*Murder of Kim Groves*: The Government's case against Mr. Davis centered on their argument that the wiretap conversations between Mr. Davis and others clearly showed that he engaged in a day-long plan to have Kim Groves murdered.  The Government maintained that the tapes were so clear, that it only took common sense to understand what was meant in the conversations.  Despite that clarity, there is no dispute that the FBI listened to the conversations as they unfolded and did nothing to stop the murder of Kim Groves.  Instead, the FBI sat idly by so that Operation Shattered Shield could continue without interruption.

*Murder of Christopher Williams*: On October 19, 1994, Christopher Williams was shot and said the name "Damon" as he was struggling to survive.  Sammie Williams and Mr. Davis

responded to the police call.  The FBI listened as Mr. Davis contacted Paul Hardy to determine whether Hardy had committed the murder.

*October 20, 1994 murder discussion*: During the calls on October 20, 1994 Paul Hardy was heard planning, with specificity, the murder of someone called "Poonie".  The location of the murder was discussed, as was the fact that Hardy would wear a mask and wait for the area to clear of an ambulance prior to the attack.  Meanwhile, the FBI listened and did nothing.

The FBI listened to these discussions in real time, without any concern for the citizens of the Ninth Ward.  There was no inclination on the part of the FBI to stop its investigation and prevent the death and/or injury to citizens.  And, the above murders were just from conversations that the FBI listened to discussing murder over a one-month period.  The FBI listened to hundreds of hours of other wiretap recordings.  The FBI and U.S. Attorney did not shut down Operation Shattered Shield until November 16, 1994, when they learned that some of the NOPD police involved in illicit drug activity began "arranging for a third party, without the knowledge of Len Davis or Sammie Williams, to rip off the warehouse or one of the drug couriers."  Drug Tr. 38, Dec. 12, 1994.  The investigation was not called off until the FBI became worried that the operation would endanger its undercover officers.

As alleged in the § 2255 motion, the prosecution was laboring under a conflict of two competing interests: (1) to maintain the secrecy of its undercover sting operation; and (2) to protect the safety of the public. Here, the government sacrificed the latter interest for the former, and both enabled the circumstances leading up to the murder of Kim Groves, as well as failed to intervene to stop the murder as not to jeopardize its ongoing undercover operation. Thus, the government was complicit in the murder for which it attributed sole responsibility to Mr. Davis. The FBI and U.S. Attorney were aware of past and future murders, and the enormous threat to

the health and safety of the people in the neighborhood where Paul Hardy ran free.  In order to force attention away from its inaction, the Government prosecuted Mr. Davis more vigorously than it has prosecuted any civil rights violator before or since.

These specific factual allegations establish that Mr. Davis may, with additional facts fully developed through the discovery process, be able to demonstrate a conflict of interest and due process violation.  "The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980). Although the facts discussed above establish the foundation for Mr. Davis's due process violation by way of conflict of interest, in order to investigate this claim and to fully apprise the Court of the claim, it is necessary that Mr. Davis have full disclosure of the documents requested.

Specifically, it is necessary to review and analyze the following documents directly related to the facts that support the conflict claim: Operation Shattered Shield (including but not limited to the operational plan and any and all reports and documents related to the operation from its inception to present date); the investigation of Paul Hardy (including but not limited to FBI 302s, internal reports, incident reports); all tapes and recordings of monitoring of Paul Hardy, Damon Causey, and any other associates of Paul Hardy; any and all reports or documents pertaining to the DOJ investigation of the wiretap recordings of the murders of Carlos Adams, Christopher Woods, Shawn King, Kim Groves, and any other murders or attempted murders taped in connection the wiretap monitoring in Operational Shattered Shield); any and all reports or documents of any and all wiretap recordings pertaining to the murders of Carlos Adams, Christopher Woods, Shawn King, Kim Groves, and any other murders or attempted murders taped in connection the wiretap monitoring in Operational Shattered Shield; any and all reports

or documents pertaining to the investigation of the murders of Carlos Adams, Christopher

Woods, Shawn King, Kim Groves, and any other murders or attempted murders taped in

connection the wiretap monitoring in Operational Shattered Shield.  To prove his claim that his

due process rights were violated by the conflict of interest, Mr. Davis should be permitted to

explore the nature and extent of the requested documents.  Because Mr. Davis has provided good

cause, the Court should order the government to produce the requested information.

**B.      Request for all documents reflecting the decision to seek death and to prosecute in federal rather than state court**

In the accompanying §2255 motion Mr. Davis has alleged that he was denied equal

protection and due process when the Government operated under a conflict of interest, and that

the Government improperly exercised its discretion to seek death in this case.  Mr. Davis has

alleged that there is a pattern of leniency in prosecuting white officers for civil rights violations

in the Eastern District of Louisiana, and that the decision to seek the death penalty for Mr. Davis

and prosecute him in federal court were impermissibly race-based.   In order to prove these

claims, Mr. Davis needs access to documents and information solely in the possession of the

Government.

Mr. Davis seeks access to all documents and materials and other information in the

possession of the government reflecting the process whereby both the local U.S. Attorney's

office, as well as the Department of Justice in Washington, determined to certify his (and his co-

defendant's) case as a death penalty case, as well as all such information concerning the process

whereby it was determined that his case would be prosecuted in federal rather than state court.

Such documents include, but are not limited to, any items within the local U.S. Attorney's file

concerning their request for death certification from the Department of Justice and the reasons

therefore, any items at the Department of Justice concerning same, and any documents or information in the possession of the Court concerning the same.

The appearance of discrimination based upon race is particularly odious in the administration of the criminal justice system.  *See Rose v. Mitchell*, 443 U.S. 545, 555 (1979) ("Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice."); *United States v. Jones*, 36 F. Supp. 2d 304, 309-10 (E.D. Va. 1999) ("Under the equal protection component of the Fifth Amendment's Due Process Clause, prosecutorial decisions may not be based on an arbitrary classification such as race." (quoting *Oyler v. Boles*, 368 U.S. 448 (1962)).  It is not absolutely necessary that discriminatory intent be proven by direct evidence; instead it may be "inferred from the totality of relevant facts . . . ." *Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 266 (1976).  The Supreme Court has identified several relevant factors to consider: "the impact of the official action," "the historical background of the decision particularly if it reveals a series of official action taken for invidious purposes," "departures from the normal procedural sequence," "substantive departures . . . especially if the factors usually considered important by the decision maker strongly favor a decision contrary to the one reached," and "contemporary statements by members of the decision-making body." *Arlington Heights*, 429 U.S. at 266-68.

In United States v. Jones, 159 F.3d 969 (6th Cir. 1998), a case concerning discovery in a criminal proceeding, and following  United States v. Armstrong, 517 U.S. 456 (1996), a black defendant claimed that the government's decision to prosecute him in federal court instead of state court was discriminatory.  The court recognized that "[o]bviously, a defendant need not prove his case in order to justify discovery on an issue." *Id.* at 978.  Instead, the Court held, that a defendant need only produce "some evidence" of discriminatory prosecution in order to obtain

discovery. *See id.* This standard reflects two competing considerations:

> Forcing the defendant to come forward with some evidence to support a charge of selective prosecution protects the interests in open and frank discussions within prosecutorial offices; protects the government from harassment or delay by criminal defendants; and frees the judicial system of criminal trials [from] irrelevant massive discovery. At the same time, the relatively low burden recognizes that "most of the relevant proof in selective prosecution claims will normally be in the Government's hands. (citations omitted).

United States v. Heidecke, 900 F.2d 1155, 1158 (7th Cir. 1990) (*quoting* Wayte, 470 U.S. at 624

(Marshall, J., dissenting)).

Mr. Davis has set forth the pattern of leniency in prosecuting white officers in the Eastern

District of Louisiana. Further, Mr. Davis has established that between 1995 and 2000, the

Attorney General reviewed a total of six death-eligible cases under 18 U.S.C. § 241 and nine

death-eligible cases under 18 U.S.C. § 242. The only cases authorized for death were those of

two black men: Mr. Davis and Mr. Hardy. U.S. DEPARTMENT OF JUSTICE, THE FEDERAL DEATH

PENALTY SYSTEM: A SURVEY (1988-2000) (2000), *available at*

http://www.justice.gov/dag/pubdoc/dpsurvey.html (last visited Mar. 13, 2012). Mr. Davis is now

the only man on death row for a civil rights violation.

These factual allegations show that with additional facts developed through discovery,

Mr. Davis is entitled to relief. The only way for Mr. Davis to prove his claim, however, is with

documents and information in the sole possession of the Government. Considering this, and that

Mr. Davis has set forth a solid foundation for his claim that impermissible considerations of race

infected the government's investigation and prosecution of Mr. Davis in violation of his rights

under the Fifth and Fourteenth Amendments to the U.S. Constitution, he has shown good cause

for conducting discovery.

**C.      Requests relating to Mr. Davis's *Brady* claims**

Mr. Davis has asserted that the Government's key witness against him, Sammie Williams, was given immunity, money, and/or promises concerning his prosecution for criminal behavior, in exchange for his testimony against Mr. Davis.  As set forth in the § 2255, under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and *Giglio v. United States*, 405 U.S. 153-155 (1972), the nondisclosure by the prosecution of requested impeachment evidence of an agreement entered into or understanding reached with a key witness where the witness's credibility is at issue violates due process where the evidence is material either to guilt or punishment.  *See also Napue v. Illinois*, 360 U.S. 264 (1959) (Supreme Court reversed a petitioner's conviction where an attorney had "promised" the key testifying witness consideration in exchange for his testimony, and the witness lied about this promise before the jury).  Here, Williams received a 5k motion regarding his sentence in connection with his federal charges, witness protection, and money from the government in exchange for his testimony.  Mr. Davis alleges that this was not the totality of the agreement between Williams and the Government, and the failure of the Government to provide the defense with the full extent of Williams's deals violated *Brady, Giglio,* and *Napue.*

To fully develop his allegations in support of this claim, Mr. Davis needs to ascertain what information Government representatives possessed about Williams at the time he testified against Mr. Davis in 1996 and 2005.  It is indisputable that the government knew that Williams was a criminal guilty of numerous crimes.  Mr. Williams testified in the trial of Leon Duncan, that as a police officer, he forced a known drug dealer to give him money in order to avoid going to jail.  He also extorted money from the drug dealer as payment for protection that Mr. Williams provided.  Further, Mr. Williams testified that he and other police officers were involved in

various insurance fraud schemes wherein the officers would fabricate events so that individuals could make insurance claims and collect insurance funds.  Mr. Williams readily told all of this information to the Government during the hundreds of hours he spent debriefing.  Mr. Williams was not charged by state or federal officials with any of these crimes.  *See U.S. v. Leon Duncan*, E.D. La. Criminal Action No. 97-217, Trial Transcript May 1, 1998, pps. 116-121.  It is essential that Mr. Davis establish what information was in the Government's possession regarding the other criminal activity to which Williams had testified to engaging in, in order to explore the inducements provided to Williams in exchange for that testimony.  Given these facts, it is also essential that Mr. Davis be permitted to inquire into the parameters of the Government's awareness of any criminal conduct  committed by Williams, or with regard to which he was a suspect.

Mr. Davis should also be permitted to develop information about any contacts between Government prosecutors and any state prosecutors in Louisiana or elsewhere who would have had jurisdiction over any state charges that could have been brought against Williams in connection with any of the criminal conduct he admitted to the Government during his debriefings.  For example, Williams testified that he never faced any state charges in Louisiana resulting from any of his criminal activity, even though that testimony explained that he was engaged in insurance fraud and robbery.  If Williams did not suffer the consequences of that criminal activity, it is possible that the reason for the state's leniency was, at least in part, based on communication between the Government prosecutors and their state counterparts in Louisiana.

Based on the foregoing, Mr. Davis has provided good cause for conducting discovery into the *Brady* violations concerning Sammie Williams.

**D.** **Requests relating to Mr. Davis's claim of ineffective assistance of counsel regarding forensic evidence**

Mr. Davis has asserted that he was denied the effective assistance of counsel, when he proceeded to trial in 1996 without the assistance of a crime scene expert. The assistance of such an expert was necessary to establish that there could be no faith in the validity of the crime scene investigation, and the casing seized as a result, because the investigation was conducted so unprofessionally. Given the disputed expert testimony regarding whether the casing was definitely fired from the seized Hardy 9mm Luger and the lack of any expert testimony that the bullet fragments retrieved from Ms. Groves' body were fired from that gun, Mr. Davis maintains that defense counsel rendered ineffective assistance of counsel by not hiring an expert and having that expert examine all of the forensic evidence.

The foregoing establishes a prima facie *Strickland* claim. Defense counsel was aware that the government had an expert witness that would testify regarding the crime scene investigation and because that expert had access to all forensic evidence. In order to challenge that expert and to prove a plausible theory of defense, counsel was required under the standards of the profession to engage the services of an expert witness to testify at the 1996 trial.

In order to further investigate this claim and provide the Court with a complete record to decide the claim upon, Mr. Davis must have access to all forensic evidence so that an expert can assess the evidence and render an opinion. The foregoing establishes good cause for Mr. Davis's discovery requests.

**E.** **Requests relating to Mr. Davis's claim of racial discrimination in jury venires**

Mr. Davis has alleged that he received ineffective assistance of counsel when trial counsel at Mr. Davis's initial trial and at the penalty phase retrial failed to challenge the grand

and petite jury venire.  As set forth in the § 2255, the venire in this case was derived from a process in which African-Americans were intentionally excluded.  In order to fully investigate this claim, Mr. Davis requires access to the following information:  demographic information pertaining to the venire for the grand jury who indicted Mr. Davis in both indictments in 1996; demographic information pertaining to the petite jury venire at the 1996 trial; demographic information pertaining to the petite jury venire at the 2005 trial.  Although Mr. Davis has clearly set forth specific allegations substantiating his claim, this is the type of claim that necessarily involves obtaining information in the Government's possession in order to fully present the claim to the Court.  Accordingly, Mr. Davis has shown good cause for this discovery request.

### III.  CONCLUSION

Mr. Davis requests leave to conduct the requested discovery, including production of records and evidence, which will enable him to fully investigate, develop, and present any and all relevant constitutional claims.  Mr. Davis has established  "good cause" for discovery.  By making this request at this time, Mr. Davis does not waive his right to seek additional discovery in the future, in the form of further requests for access to relevant documents and records, as well as depositions of relevant witnesses that come to light through the disclosure of such relevant documents and records.

For all the reasons set forth above and in his accompanying §2255 motion, incorporated herein by express reference, Mr. Davis respectfully requests that this Court grant him leave to propound the attached Requests for Production, order the requested discovery and other relief set forth in this motion.

Respectfully submitted,


/s Sarah L. Ottinger____
Sarah L. Ottinger, La. Bar No. 24589
636 Baronne Street
New Orleans, LA 70113
(504) 529-5955
saraho@thejusticecenter.org


Rebecca L. Hudsmith, La. Bar No. 7052
Federal Public Defender for the
Middle and Western Districts of Louisiana
102 Versailles Blvd., Suite 816
Lafayette, LA 70501
(337) 262-6336
Rebecca_Hudsmith@fd.org


## CERTIFICATE OF SERVICE

I hereby certify that a that a true and correct copy of the foregoing document has been filed

with the Clerk of the Court by using the CM/ECF System which will send a notice of electronic

filing to all counsel of record on this 20th day of March, 2012.


/s Sarah Ottinger_____
Sarah Ottinger