**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CASE NO. 2:94-cr-00381** |
| | * | |
| **v.** | * | |
| | * | **SECTION "C"** |
| **LEN DAVIS** | * | |
| | * | |

**MEMORANDUM IN SUPPORT OF MOTION TO INTERVIEW JURORS**

NOW COMES Len Davis, through counsel, and asserts that good cause exists for permitting counsel or their agents to interview the jurors and alternates who sat during the trial proceedings of this matter. In support of his Motion to Interview Jurors, the undersigned respectfully submit the following Memorandum of Law.

A.     **Local Rules**

The Local Criminal Rules of this Court place no prohibition on juror interviews by attorneys and parties in criminal cases. Although Local Rule of Civil Procedure 47.5 states that "[e]xcept by leave of court granted upon motion for good cause shown, no attorney or party to an action or anyone acting on their behalf may examine or interview any juror," there is no rule making local civil rules applicable to criminal cases, and therefore Local Civil Rule 47.5 does not govern here.[1] Nevertheless, the undersigned submit the present Motion to Interview Jurors out of an abundance of caution.

---

[1] It should also be noted that at the 1996 trial, this Court instructed the jurors and alternates upon discharge that they might be contacted by attorneys after trial, and that "It's entirely up to you whether you want to talk to anybody about that case." 4/26/96 Tr. 159; 5/1/96 Tr. 301, 304, 305.

1

Due to the record-based indicia of juror misconduct summarized below, Mr. Davis respectfully submits that "good cause" exists to allow counsel or their agents to interview jurors from the trial proceedings.  Mr. Davis requests this Court's leave to interview the jurors who decided this case for purposes of requesting information relating to potential extraneous prejudicial matters and improper outside influences that may have been brought to bear on the members of the jury. The only source for determining whether this extraneous prejudicial information was before one or more of the jurors are the jurors themselves. If a juror confirms the existence of the extraneous prejudicial information, that juror will be competent to provide that information to this Court. See Federal Rule of Evidence Rule 606 (b).

**B.      Factual and Legal Bases for Request**

The Sixth Amendment forbids a juror from being exposed to external influences on its deliberations and verdict.  *Remmer v. United States*, 347 U.S. 227, 229 (1954).  The Supreme Court has held that external influences on a jury, including "private communication, contact, or tampering," are presumptively prejudicial.  *Id.*

At multiple points during Mr. Davis's 1996 trial, issues arose regarding jurors' contacts with outside sources, exposure to extraneous information, and their ability to serve in an attentive and unbiased manner. Trial counsel, however, neither investigated these issues nor requested that these jurors be questioned about these matters to determine whether they should be removed from the jury and replaced with alternates. The extant 1996 trial record indicates, at the very least, that three jurors may have had improper extrajudicial contacts that tainted the trial proceedings in this case. Additionally, the record evidence from the 2005 trial suggests that numerous jurors who were seated had implied or actual biases that were not fully disclosed during voir dire, and that would have prevented them from serving impartially. Furthermore,

2

there is a reasonable likelihood that such jurors exposed other members of the jury to these biases and extraneous information about personal experiences, thus tainting the jury's deliberations.

The following discussion of the record-indicia of juror misconduct is not intended to convey that these were the only instances of juror misconduct, or to otherwise limit the scope of Mr. Davis's habeas claim. Rather, the following facts merely illustrate that Mr. Davis has a good faith basis for alleging this claim in his § 2255 motion and good cause for requesting juror interviews to develop additional facts in support of this claim.

### 1.   Juror Daniel Walker (1999 trial)

Juror Daniel Walker had contacts with his mother during the trial.  On one occasion, when she ostensibly came to bring him clothing, she also brought him a Bible and advised him to consult it as part of his deliberations in this case.  4/15/96 Tr. 138-46.  After his mother spoke with him, Juror Walker complained to FBI Agent Karen Jenkins—a Government witness—that he had problems with his job, severe work conflicts, and threatened that if he stayed on the case he would have "major problems."  4/15/96 Tr. 188-92. On its face, the trial record with respect to Juror Walker raises a number of issues that require further investigation, as these facts, if true, would form the basis of cognizable habeas claims entitling Mr. Davis to relief.

### a.   Religion as extraneous evidence

The record evidence establishes that Juror Walker's mother provided him with a Bible during the trial and apparently encouraged him to consult it as part of his service as a juror in Mr. Davis's case. The record, however, is silent as to Juror Walker's use of the Bible, or the extent to which he made the Bible available for use by other jurors during the trial and/or the jury's deliberations. Further inquiry into this matter is necessary, as any such use or consulting of the

3

Bible would form the basis of a cognizable habeas claim entitling Mr. Davis to relief. *See Oliver v. Quarterman*, 541 F.3d 329, 340 (5th Cir. 2008) (holding that use of Bible constitutes external influence on jury); *McNair v. Campbell*, 416 F.3d 1291, 1307-08 (11th Cir. 2005) (holding that the jury's use of the Bible was presumptively prejudicial); *Romine v. Head*, 253 F.3d 1349 (11th Cir. 2001) (death sentence reversed in habeas where religion permeated sentencing; court relies, in part, on jurors' use of Bible during deliberations in finding sentencing proceeding to be fundamentally unfair).

At the very least, the record evidence establishes that Mr. Davis is entitled to further investigation of this claim to identify whether facts exists that support a claim that the jury's deliberations were improperly influenced by its exposure to or use of a Bible. *See United States v. Lara-Ramirez*, 519 F.3d 76, 88 (1st Cir. 2008) (holding that the district court had a duty to investigate whether the Bible tainted the jury's deliberations); *Gapen v. Bobby*, 2011 WL 5166566 (S.D. Ohio October 31, 2011) (slip opinion) (in capital habeas cases, district court reverses magistrate judge's decision denying petitioner's access to jurors where jurors were alleged to have considered Biblical scripture and other religious materials during guilt and sentencing proceedings).

### b.       Improper communications with third parties

Juror Walker had extrajudicial contact with at least two different people during the course of the trial in which his service as a juror was discussed – his mother and FBI Agent Karen Jenkins, a government witness. It is axiomatic that any extrajudicial contact with a juror is presumptively prejudicial. *Remmer v. United States*, 347 U.S. at 229. The nature and extent to which the contact tainted the verdict is a factual matter which must be determined on a case-by-case basis. *See United States v. Tucker*, 137 F.3d 1016, 1032-33 (8th Cir. 1998) (remanding for

a hearing on the extent of extrajudicial contacts between a juror and the juror's husband);; *Fullwood v. Lee*, 290 F.3d 663 (4th Cir. 2002) (evidentiary hearing required in capital habeas case, following submission of affidavit obtained by defense counsel through juror interview, to determine whether juror's deliberations were influenced by her spouse's views; hearing also considered whether jury considered extraneous evidence that defendant had previously been sentenced to death for the offense by a different jury); *United States v. Maree*, 934 F.2d 196, 202 (9th Cir. 1991) (holding that there was actual prejudice where a juror was subjected to prejudicial comments about the case by her friends).

Juror Walker's extrajudicial contact was particularly pernicious in this case because it also occurred with a prosecution witness. *See Caliendo v. Warden*, 365 F.3d 691 (9th Cir. 2004) (granting habeas relief where three jurors were overheard talking to police officer, who was a prosecution witness, during recess in deliberations); *United States v. Strickland*, 935 F.2d 822 (7th Cir. 1991) (noting that juror acted improperly when he asked question of FBI agent, who was a government witness, outside courtroom).

Additionally, the record indicates that FBI Agent Kathleen Adams had contacts with the jury to an unknown extent, including bringing them drinks and "appearing to be trying to bond with the jury." 4/17/96 Tr. 500. As noted above, such contact is presumptively prejudicial, and further inquiry is necessary.

### c. Conflicts leading to rushed verdict/premature deliberations.

Juror Walker made comments to FBI Agent Jenkins implying that his continued service on the jury was interfering with his work obligations and was creating "major problems" for him. Such comments raise the inference that Juror Walker was laboring under a conflict of interest – i.e., that he would rush his verdict or engage in premature deliberations in order to avoid "major

5

problems" on account of his absence from work while serving on the jury. This constituted juror misconduct, and at the very least, required further inquiry of Juror Walker to ascertain whether his work obligations were interfering with his duty to serve as a fair and impartial juror. *See Oswald v. Bertrand*, 374 F.3d 475, 480 (7th Cir. 2004) (affirming grant of new trial relief where trial court failed to conduct adequate investigation into juror misconduct after it was brought to trial court's attention, including comments by one juror that: "I will more than likely be so concerned about my work that I'd not give in trial all the attention it should receive to the point that I might just vote either way just to end it.").

### 2.    Juror Wallace Rodrigue (1996 trial)

Juror Wallace Rodrigue was contacted by the U.S. Marshals to inform him that his wife was receiving intimidating phone calls during trial.  4/18/96 Tr. 2.  She was apparently distressed enough by these calls that the marshal felt the need to tell Juror Rodrigue about the problem. 4/18/96 Tr. 3.

The marshal's contact with Juror Rodrigue concerning his wife, and the effect that communication had on the juror, must be explored.  In such a high-profile case, where Mr. Davis stood accused of ordering the murder of a citizen, information that a juror's wife was receiving suspicious phone calls reasonably could have had a prejudicial influence on the juror's verdict. *See United State v. Brande*, 329 F.3d 1173, 1177 (9th Cir. 2003) (remanding for hearing where juror had extrajudicial contact with court clerk and noting that "a juror is more susceptible to improper influence from a court officer than from spectators or parties to the case"). Further inquiry is also necessary to determine whether Juror Rodrigue shared this information with the other jurors, and if so, whether it had a prejudicial influence on their deliberations. *See State v. Bailey*, 713 So.2d 588, 608-609 (La. Ct. App. 1998) (remanding for evidentiary hearing to

6

determine whether jury impartiality was affected by juror telling the other jurors that his wife received call from woman with defendant's last name who asked for juror's daughter's telephone number); *United States v. Smith*, 26 F.3d 739 (7th Cir. 1994) (jurors statement to other jurors that she had visitor on night before she was excused from jury, together with another juror's expression of concern for her safety, required further inquiry by trial judge beyond merely interrogating excused juror; case remanded).

### 3.       Juror John Bourgoyne (1996 trial)

Juror John Bourgoyne had a brother who had recently died of a crack overdose at the time that he served as a juror.  4/11/96 Tr. 80, 85, 90.  During the trial, Juror Bourgoyne began to decompensate and was characterized by counsel for the government as "wigging out." 4/26/96 Tr. 3. A marshal found Juror Bourgoune in the hallway of the courthouse one day, and the juror was observed to be very upset about his brother, who had recently overdosed on crack cocaine and died, and expressed concerned that the decedent in this case, Kim Groves, would not get justice because she too was a crack addict. 4/26/96 Tr. 2. Juror Bourgoyne also stated that his mother-in-law was ill and dying, and he was afraid that if she died during the trial, he would be unable to attend her funeral.  4/26/96 Tr. 2.

Juror Bourgoyne also told a marshal that he was up all night worrying about this trial and other personal crises, and that as a result, he was not sleeping well at night, and consequently having trouble staying awake during the trial proceedings. 4/26/96 Tr. 2. Indeed, other jurors had also indicated to a marshal that they had observed Juror Bourgoyne sleeping during the proceedings, id., and even the trial court noted about Juror Bourgoyne during a bench conference: "This is the one that I was concerned about earlier, who seemed to have his eyes closed. And that is why he was told to stand up, he was told several times to stand up, he was

told to stand up when he felt that he was sleepy. He says that he is okay. My inclination is to go forward and see if he stays awake, my problem is that if he has a hard time staying awake when he gets a full night's sleep on other nights, whether we are going to have a problem with someone who is not realy (sic) paying attention." Id. at 2-3.

### a.    Sleeping during proceedings.

Sleeping during the proceedings in a capital trial proceeding is obvious misconduct warranting relief. *See Dimas-Marinez v. State*, 2011 Ark. 515, 2011 Ark. LEXI 593, *9-*11 (Ar. 2011) (reversing murder conviction and remanding for new trial where record evidence demonstrated that juror was sleeping during portions of the trial and admitted it to court personnel; "[C]ontrary to the State's position at oral argument of this matter, it is not acceptable for a juror to doze off, as long as the juror hears the 'vast majority' of the evidence."); *People v. South*, 177 A.D.2d 607, 608 (N.Y. App. Div. 1991) (new trial required where trial court failed to investigate timely allegation the juror slept through portions of the trial and jury charge; juror who has not heard all of the evidence and the court's instructions "is grossly unqualified to render a verdict"); *State v. Majid*, 914 N.E.2d 1113, 1117 (Ohio App. 2009) (in capital murder case resulting in sentence of term of years, plain error is found requiring reversal of the convictions due to extensive evidence on the record that at least one of the jurors slept through numerous portions of the trial, and that it was brought to the trial court's attention during the trial; "[T]he numerous instances of jurors' sleeping deprived the defendant of his right to have 12 attentive jurors decide his fate and violated his right to due process").

At the very least, Mr. Davis is entitled to a hearing where the jurors can be questioned on this matter. *See Judd v. State*, 951 So.2d 103 (Fla. Dist. Ct. App. 2007) (Petitioner entitled to an evidentiary hearing on his claim that trial counsel was ineffective in failing to object to the

presence of a sleeping juror); *Thompson v. State*, 873 So.2d 481 (Fla. App. 2004) (Petitioner was entitled to an evidentiary hearing on his claim that trial counsel was ineffective for failing to notify the trial court that a juror was sleeping through "critical testimony"); *Commonwealth v. Braun*, 905 N.E.2d 124 (Mass. App. 2009) (defendant in drug case was denied a fair trial by trial court's failure to question a juror who appeared to have been sleeping through trial; contemporaneous observations from a court officer, defense counsel, and the judge himself alerted the judge that the juror might have been sleeping during the trial and instructions from the judge; by failing to conduct a voir dire, the judge prevented himself from obtaining the information necessary to a proper exercise of discretion).

<b>b.      Improper communications with court personnel.</b>

The record indicates that Juror Bourgoyne was discussing his service as a juror with a marshal. Such extra-judicial contact is presumptively prejudicial, especially considering that it was with someone who could fairly be considered to be court personnel. *See United State v. Brande*, 329 F.3d 1173, 1177 (9th Cir. 2003) (remanding for hearing where juror had extrajudicial contact with court clerk and noting that "a juror is more susceptible to improper influence from a court officer than from spectators or parties to the case"). Further inquiry is necessary to determine the extent of Juror Bourgoyne's conversations with this marshal, whether anything the marshal told him exerted a prejudicial influence on Juror Bourgoyne's deliberations, and whether Juror Bourgoyne shared his conversation with the other jurors.

<b>c.      Implied or actual bias stemming from similar, relevant<br>experience/Failure to fully discuss bias during voir dire.</b>

Juror Bourgoyne's decompensation during trial and his subsequent comments sympathizing with the decedent based on the fact that his recently deceased brother was also a crack addict, and expressing his fear that the decedent would be denied justice because of her

9

addition, potentially give rise to a claim of implied or actual bias stemming from similar, relevant experiences. That is, his brother's crack overdose appeared to compromise Juror Bourgoyne's ability to be impartial in light of the decedent's crack addiction. If true, such bias would entitle Mr. Davis to relief. *See Burton v. Johnson*, 948 F/2d 1150 (10th Cir. 1991) (murder conviction reversed in habeas where juror, who failed to acknowledge own sexual abuse in voir dire, discussed own experiences with other jurors as it related to evidence at trial regarding battering and abuse); *Fields v. Woodford*, 309 F.3d 1095 (9th Cir. 2002) (in kidnapping/rape case, evidentiary hearing required where counsel submitted juror affidavits stating that other juror had shared during deliberations that wife had been kidnapped and raped and perpetrator had never been found). Further inquiry into the extent to which Juror Bourgoyne's personal crises affected his verdict in this case is necessary, as well as whether Juror Bourgoyne tainted the jury's deliberations by expressing his personal biases to the other members of the jury.

### 4.   Juror 71/7 (2005 trial)

Juror 71/7 stated during voir dire that her husband, an attorney, had been arrested in 2003 and charged with, among other things, battery on a police officer. The charges were later dismissed. The juror's personal experience was one that raised an inference of a potential bias against Mr. Davis; not only was her husband involved in some sort of violent altercation with a police officer, but then her husband was apparently arrested by the police and formally charged with being the aggressor in the incident, only to have that charge be later dismissed. In other words, there is a reasonable likelihood that the juror believed that her husband had been harassed and mistreated by the police, both in the initial encounter, and then by being arrested and charged with an offense that was so unfounded that it was dismissed. It is unclear, however, if this juror

10

was entirely forthcoming about her potential biases, and there is a reasonable likelihood that she did not disclose her bias in order to serve on the jury.

A biased juror's presence on a jury violates the defendant's Sixth Amendment right to a fair and impartial jury. If a juror conceals information during voir dire which impacts his or her ability to serve in an impartial manner, courts may assume bias. *See United States v. Scott*, 854 F.2d 697, 699 (5th Cir. 1988) (presuming bias where juror failed to disclose that his brother worked in sheriff's office); *Green v. White*, 232 F.3d 671, 678 (9th Cir. 2000) (recognizing "implied bias" where juror lied about felony convictions). If a situation arises during trial which causes a juror to be biased, likewise, the verdict cannot stand. *See Rushen v. Spain*, 464 U.S. 114, 121 & n.5 (1983) (stating that a juror may testify regarding mental bias to determine whether extraneous information tainted the verdict). At the very least, Mr. Davis is entitled to a hearing where the juror can be questioned about whether this juror failed to disclose relevant information that would have indicated a bias, or other information that would have resulted in her excusal for cause. *See United States v. Sampson*, 2011 WL 5022335 (D. Mass. October 20, 2011) (in capital § 2255, granting sentencing relief on claim of juror misconduct after conducting evidentiary hearing and questioning trial jurors; over the course of three hearings, district judge determined that juror failed to disclose information during voir dire that was comparable in significant ways to evidence presented at trial and which called her ability to decided the case solely on the evidence into question, and that the concealed information, if it had been disclosed during voir dire, would have resulted in her excusal for cause).

### 5.    Juror 156/27 (2005 trial)

Juror 156/27 stated during voir dire that he and a friend had previously been stopped, questioned and verbally abused by a police officer. The incident was apparently significant

enough that they filed a formal complaint against the officer. Considering that Mr. Davis's case involved allegations that a citizen was murdered by a police officer after making a complaint against that officer, there is a reasonable likelihood that Juror 156/27's personal experiences would have led him to have an implied or actual bias against Mr. Davis given that Juror 156/27 was himself subjected to what he believed to be abusive conduct by a police officer. Further inquiry is warranted to determine whether Juror 156/27's potential biases prejudicially influenced his deliberations, and/or whether Juror 156/27 shared his personal experience with other jurors, thus tainting the deliberations. At the very least, Mr. Davis is entitled to a hearing where the juror can be questioned about whether this juror failed to disclose relevant information that would have indicated a bias, or other information that would have resulted in his excusal for cause. *See United States v. Sampson*, 2011 WL 5022335 (D. Mass. October 20, 2011).

### 6. Juror 68/38 (2005 trial)

Juror 68/38 stated during voir dire that after being robbed at gunpoint, she went to the police station to file a report. The officers that took her report, however, were "belligerent and treated [her] like a criminal." The juror also stated that she "was traumatized in that station and could not stop crying." There is a reasonable likelihood that Juror 68/38's personal experiences would have led her to have an implied or actual bias against Mr. Davis given that Juror 68/38 was herself subjected to "belligerent" and "traumatic" conduct by a police officer. Further inquiry is warranted to determine whether Juror 68/38's potential biases prejudicially influenced her deliberations, and/or whether Juror 68/38 shared her personal experience with other jurors, thus tainting the deliberations. At the very least, Mr. Davis is entitled to a hearing where the juror can be questioned about whether this juror failed to disclose relevant information that would

have indicated a bias, or other information that would have resulted in her excusal for cause. *See United States v. Sampson*, 2011 WL 5022335 (D. Mass. October 20, 2011).

### C.    Post-conviction Counsel's Duty to Investigate and Interview Jurors

Undersigned counsel have a duty to fully investigate all issues and claims pertaining to the constitutionality of Mr. Davis's convictions and sentences. Guided by the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines"), it is clear that, where permitted, post-conviction counsel have a duty to interview jurors:[2]

> Collateral counsel cannot rely on the previously compiled record but must conduct a thorough, independent investigation...[T]he trial record is unlikely to provide a complete or accurate picture of the facts and issues in the case.  That may be because...of juror misconduct.

ABA Guidelines, commentary to Guideline 10.15.1.  In addition, the rules advise that,

> Counsel investigating a capital case should be particularly alert to the possibility that, notwithstanding surface appearances, one or more jurors were unqualified to sit at either phase of the trial and make every effort to develop the relevant facts, whether by interviewing jurors or otherwise.  Such inquiries can be 'critical in discovering constitutional errors.'

ABA Guidelines, n. 260, citing Hertz & Liebman, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE, 4TH EDITION, at 489, n. 40.[3]  Further the Guidelines state, "Counsel *must* investigate

---

[2] The ABA Guidelines have repeatedly been cited by the Supreme Court as a measure of counsel's performance. *Rompilla v. Beard*, 125 S.Ct. 2456, 2466 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003). In addition, the Court has given implicit approval of post-verdict juror interviews. *Williams v. Taylor*, 529 U.S. 420, 440-43 (2000) (explaining that because state post-conviction counsel made a reasonable effort to investigate possibility that a juror concealed on voir dire a relationship that would have disqualified her from sitting at the guilt phase, petitioner was entitled to pursue the claim on federal habeas corpus); *see also, Fullwood v. Lee*, 290 F.3d 663, 681-84 (4th Cir. 2002) (relying on affidavit from juror obtained during state post-conviction proceedings to order evidentiary hearing on federal habeas corpus claim that extraneous influences prejudiced jury at penalty phase).

[3] Hertz and Liebman state: "Although post-trial inquiries of jurors are not favored . . . they occasionally are critical in discovering constitutional errors."

the possibility that the defendant was judged at either the guilt or penalty phases by one or more jurors who were not impartial." ABA Guidelines, n. 197 (emphasis added).

The opportunity to contact jurors after trial may be an integral part of the attorney's duty to ascertain whether the verdict is subject to challenge on legal grounds.  ABA Model Code of Professional Responsibility, Ethical Canon 7-29 (1983); *see also* EC 7-30, 7-32; Directory Rule 7-108.  The ABA Model Code of Professional Responsibility, published in 1983, indicated that juror interviews are a part of counsel's duties:

> To safeguard the impartiality that is essential to the judicial process, veniremen and jurors should be protected against extraneous influences...After the trial, communication by a lawyer with jurors is permitted so long as he refrains from asking questions or making comments that tend to harass or embarrass the juror or to influence actions of the juror in future cases. Were a lawyer to be prohibited from communicating after trial with a juror, he could not ascertain if the verdict might be subject to legal challenge, in which event the invalidity of a verdict might go undetected.  When an extrajudicial communication by a lawyer with a juror is permitted by law, it should be made considerately and with deference to the personal feelings of the juror.

ABA Model Code of Professional Responsibility, Ethical Canon 7-29 (1983).

Rules against allowing juror interviews without prior permission are intended to protect jurors from harassment. Undersigned counsel would conduct any such interviews with the utmost decorum and respect, allowing jurors to decline any requests for interviews and ceasing such interviews upon request of the juror. Counsel and their employees are mindful of the type of issues that could be of significance in juror interviews, and how to communicate with former jurors in a respectful and lawful manner.

### D.    Conclusion

The law concerning improper contact with jurors is well established. Any private communication, contact, or tampering, either directly or indirectly with a juror is presumptively prejudicial and the government bears the burden of establishing the contact was harmless.

14

*Remmer v. United States*, 347 U.S. 227, 229 (1954). Contact that has the effect of influencing or disturbing a juror's free exercise of his or her judgment as a juror requires a new trial. *Remmer* v. *United States*, 350 U.S. 377, 382 (1956). The importance of close scrutiny of any extrinsic contact with jurors is heightened when a sensational case results in an emotionally charged, highly publicized trial. *See Sheppard v. Maxwell*, 484 U.S. 333, 351(1966) (quoting *Patterson v. State of Colorado*, 205 U.S. 454, 462 (1907)). The same forces were operating in this case. Mr. Davis was the target of a widely publicized sting operation conducted by federal law enforcement to identify rogue police officers participating in a drug trafficking enterprise in New Orleans, and the allegation against him was that he used his position as a police officer to order the murder of a citizen who had filed a police brutality complaint against him and his partner . The details of the case were highly publicized, as were the details of the government's Operation Shattered Shield operation. All of these factors increase the risk of prejudice from extrinsic contact that impacted the attention of one or more of the jurors.

This is not an instance in which a defendant is attempting to determine if a juror made a clerical mistake on one of the counts of conviction or if general publicity about an unrelated case may have influenced deliberations. *Compare United States v. Booker*, 334 F.3d 406, 416-417 (5th Cir. 2003) (no allegation of external influence; sought to determine if jury mismarked the verdict form since evidence of guilt on one count was weak); *United States v. Davila*, 704 F.2d at 754-755 (no preliminary showing of improper influence on jury from publicity surrounding not guilty verdict in John Hinkley prosecution). This is not the sort of generalized "fishing expedition" rejected by the Fifth Circuit in *Davila*. By the same token, this case is not before the Court on a fully developed factual record, complete with an examination of the affected juror or jurors in the presence of counsel and the accused. *Compare United States v. Sotelo*, 97 F.3d 782,

15

794-797 (5th Cir. 1996) (jury misconduct claim arising from racial pressure exerted during deliberations).

Counsel have presented all of the facts currently known to them from their review of the extant record. The facts are sufficient to warrant this Court's granting permission for counsel to interview the jurors. Further investigation is necessary for counsel to discharge their obligation of effective representation to their respective clients and to provide this Court will all evidence relevant to their claims for relief. As demonstrated by the recent decision in *United States v. Sampson*, 2011 WL 5022335 (D. Mass. October 20, 2011)[4], where a capital § 2255 movant was granted relief on the basis of a juror misconduct claim, such misconduct claims can rarely, if ever, be litigated on the extant record; they require additional investigation and inquiry into extra-record facts that only the jurors themselves possess. Indeed, the *Sampson* decisionaptly illustrates that juror misconduct is a significant, cognizable habeas claim that cannot be properly developed absent access to the jurors themselves. It is respectfully submitted that Mr. Davis must be given access to jurors to investigate and develop evidence in support of his claim, otherwise he will not only be effectively precluded from litigating a cognizable habeas claim, but it would potentially give rise to an Equal Protection violation, in that Mr. Davis is being prohibited from pursuing a claim that other capital habeas litigants are routinely permitted to pursue, and which

---

[4] In *Sampson*, the district court granted sentencing relief based on a juror's failure to answer voir dire questions accurately. After facts emerged over the course of three hearings in the § 2255 proceedings, the district judge determined that one of the jurors who was questioned during the hearings repeatedly answered voir dire questions dishonestly to avoid disclosure of certain personal information related to her relationship with her ex-husband, whose violent, threatening behavior and substance abuse led to their divorce, and to her daughter's drug abuse and incarceration. The district court found that Sampson established under *McDonough Power Equipment Inc. v. Greenwood*, 464 U.S. 548 (1985), that the juror's failure to disclose this information, which was comparable in significant ways to evidence presented at trial, called her ability to decide the case solely on the evidence into question, and that the concealed information would have resulted in her excusal for cause.

he would otherwise be permitted to develop if he were litigating his § 2255 motion in a different jurisdiction.

The right to a trial before an impartial jury is at the heart of the protections afforded by the Constitution. Claims implicating the right to trial before an impartial jury are appropriately raised on habeas corpus. *United States v. Smith*, 62 F.3d 641, 650 n.5 (4th Cir.1995). Extraneous influences on a jury clearly can establish constitutional violations that demand a new trial. *Tanner v. United States*, 483 U.S. 107 (1987).[3] Due to the record-based indicia of extrajudicial contacts with the jury and possible juror bias, Mr. Davis respectfully asserts that "good cause" exists in this case sufficient to allow counsel or their agent to interview jurors and alternates from his trial proceedings. Moreover, this is a capital case, and it is imperative to ensure that the conviction was not tainted by juror bias, extrajudicial influences, or ineffective assistance of counsel.

Counsel for Mr. Davis will not conduct any interviews of jurors who do not consent to be interviewed, and will confine the inquiry to evidence of extraneous contacts, influences, or tampering, and to evidence of juror bias which was not disclosed or inquired into at trial.

---

[3] Though there are restrictions on the admissibility of a juror's testimony in post-conviction, a juror "may testify on the question whether...any outside influence was improperly brought to bear upon any juror." Fed.R.Evid. 606(b).

WHEREFORE, Mr. Davis respectfully moves this Court for leave to interview jurors and alternates from the trial proceedings of this matter.

Respectfully submitted,

/s Sarah L. Ottinger___
Sarah L. Ottinger, La. Bar No. 24589
636 Baronne Street
New Orleans, LA 70113
(504) 529-5955
saraho@thejusticecenter.org


Rebecca L. Hudsmith, La. Bar No. 7052
Federal Public Defender for the
Middle and Western Districts of Louisiana
102 Versailles Blvd., Suite 816
Lafayette, LA 70501
(337) 262-6336
Rebecca_Hudsmith@fd.org

*Counsel for Len Davis*


## CERTIFICATE OF SERVICE

I hereby certify that a that a true and correct copy of the foregoing document has been filed with the Clerk of the Court by using the CM/ECF System which will send a notice of electronic filing to all counsel of record on this 20th day of March, 2012.



/s Sarah Ottinger_____
Sarah Ottinger

18