UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL DOCKET NO.  94-381 |
| v. | * | SECTION: "C" |
| LEN DAVIS | * | |

* * *

**GOVERNMENT'S OPPOSITION TO MOTION TO VIDEOTAPE
COMPETENCY EVALUATION (DOC. 2284)**

The United States opposes Len Davis's motion to videotape his court-ordered mental competency examination:  Dr. Ned Masbaum, whom the court appointed to conduct the assessment, and the Bureau of Prisons, in whose custody Davis is now confined, both oppose such a taping.  Additionally, the court, with its extensive experience in mental health issues in capital litigation, did not impose a taping condition in its order.  And, because this will be *at least* Davis's fourth competency exam (Davis himself counts *six*), taping would unnecessarily complicate a neutral, non-adversarial examination.

After Davis's standby counsel filed their motion, I contacted both Dr. Masbaum and Ms. Katherine Siereveld, attorney-advisor at the penitentiary in Terre Haute, for each's opinion regarding the videotaping request and both oppose it:

-2-

Dr. Masbaum opposes the taping because it would violate his long-standing practice.  He has practiced psychiatry since 1967 and in that nearly half-century has conducted many hundreds of mental status exams; he has never previously videotaped such a session.   The doctor feels that taping is an unwelcome intrusion into the doctor - patient relationship that inhibits the unfettered communication essential for a meaningful evaluation.   He asserted that the presence of recording equipment inhibits candor, since the subject will, unconsciously or not, "play to the camera." Recording equipment would inject an alien presence into the situation, again interfering with the confidential nature of the proceeding; the recording device will assume the vicarious presence of Davis's counsel at the exam, again distorting the process.  And, while some of his peers may allow videotaping on occasion, those instances usually occur in pedagogical settings.  The majority view in the profession discourages recording of what, ideally, should be a confidential session.

The psychiatrist also objects because the taping would  invade the sanctity of his work product: he does not want his professional method memorialized and disseminated to outsiders. (A "protective order" would not allay this concern: there are ways to circumvent any order, if it suits standby counsel's purpose, as they have already shown in this case by their blatant disregard of the court's May 16, 2011 order, which is still subject to the government's motion to strike and for sanctions.)

In Dr. Masbaum's opinion, it is he, the examining expert, not Davis or his counsel, who should control the process.  Dr.  Masbaum feels that Davis's request, as intrusive as it is, would cede control to the defendant and his agents, but away from the examining physician, where it should remain.

-3-

And, while Davis presumes that such taping requests are routinely granted at the penitentiary, I solicited input from Ms. Siereveld, counsel at Terre Haute's death row, who advised me that, as a matter of present policy, the warden cannot agree to Davis's motion. The concerns are obvious: Terre Haute houses the nation's only federal death row, which is a maximum security component. Such an unjustified intrusion into the policy and operations of the facility is, according to the Bureau of Prisons, an unacceptable compromise of well-established security procedures. Ms. Siereveld apprised me that she could recall only one instance where a psychiatrist examination was taped, but only after both the doctor and the government requested it. That inquiry, furthermore, was far more involved and implicated other, more complex issues, than does the straightforward question of Davis's competency. Also, Ms. Siereveld informed me that it was the first such evaluation of that inmate, in contrast to Davis having been examined for competency on several prior occasions.

This latest inquiry into Davis's present mental status is not an extraordinary situation. Indeed, this will be at least the fourth such competency evaluation of Davis conducted during this litigation (Davis, in his most recent letter to the Court (Doc. 2293), counts six others), with the last one being Dr. Mancuso's comprehensive exam a mere 15 months ago; in every prior instance, he has been found competent.

Davis's mental status should by now be beyond question. Accordingly, this is not a case with circumstances special enough to justify videotaping, and the amorphous, oblique accusation that Davis has been misquoted in previous evaluations rings hollow. Davis's motion, apart from a bald conclusion, never explains precisely how he has been misrepresented or, more relevantly, how such purported distortions prejudiced him: has he been misquoted in all prior exams?; in

-4-

some of those?; or even in Dr. Mancuso's May 2011 evaluation report? Davis does not specify any inaccuracy, nor has he ever filed an objection to anything in prior competency reports. Furthermore, he has never disputed the consistent finding that he is competent, well aware of his legal position, and well capable of deciding his strategy in representing himself.

Surely, this court recognizes that Davis is an aggressive, and at times, savvy litigant, one who would not allow assertions about which he disagreed to go unchallenged. Yet, he has never complained about any prior competency finding. In fact, because Davis himself has always maintained that he is competent throughout the litigation, does standby counsel's oblique attack on previous competency reports now suggest he is in anything but? Based on everything Davis has related, this can hardly be true. To the contrary, Davis has amply shown that he is able to decide his legal strategy for himself and nothing in the several mental status exams he has undergone suggests otherwise.

Davis points to several cases that purportedly support his motion, but his citations are misleading since no case compels videotaping and no case he cites matches our factual context. Several points may be derived from Davis's incondite analysis:

- ♦ there is no constitutional right to a videotape examination, especially when the examination, like Dr. Masbaum's would be, is non-adversarial and conducted solely to determine the competency to make the limited choice of which issues to advance in a *habeas* proceeding. (*See Estelle v. Smith.*);

- ♦ a number of Davis's cited cases are taken out of context and relate solely to taped witness interviews and not psychiatric examinations;

-5-

♦ Davis's motion makes stronger statements than the cases actually support: for example (Doc. 2284-1, at 5), he does not finish a quotation from a state case, *Commissioners v. Baldwin*, 686 N.E.2d 1001, 1005 n.4 (Mass. 1977): Davis wrote, "recognizing that videotaping may both be intrusive and produce a more complete record of psychiatric interviews as compared to audio-taping, considerations that should be taken into account by a judge in the exercise of discretionary judgment...," but he deceptively omitted the continuation of the quote: "Given our holding, *infra*, that a defendant has no constitutional right to the less intrusive audio-taping, our conclusion also applies to potentially more intrusive video recording." Thus, Davis's *Baldwin* quote, as truncated as it is, misleads, since, in full, it does not mean what his motion claims it does;

♦ the motion implies that, in certain cases, the court came to a competency conclusion based on the cases, when, in fact, a court only ruled on whether or not to tape an examination; and

♦ *Hardy* and *Smith* differ greatly from the instant case, since they concerned *Atkins* determinations when there were widely opposing expert views.

A more critical reading of the cited cases exposes Davis's misapprehensions: neither the Fifth nor Sixth Amendment would be implicated by Dr. Masbaum's neutral, court-ordered exam, since noting Davis may relate could be used against him, either to lead to a finding of guilt or support his sentence. So, the only way Davis can make his case citations relevant is to distort their contexts, since every one of his citations addressed starkly distinguished facts:

-6-

In fact, *Estelle v. Smith*, 451 U.S. 454, 465, (1981), involved the abuse of a psychiatric evaluation ordered "for the limited, neutral purpose of determining competency to stand trial," a parallel to this court's order for the similarly "limited, neutral purpose" of determining (for at least the *fourth* time) whether Davis is competent to waive certain habeas issues. But, the results of Smith's inquiry were used for " a much broader objective" when the doctor testified that the defendant was not only competent, but posed a significant risk of future dangerousness, and this testimony was "plainly adverse to respondent," since it led to a death sentence. The defendant's Fifth and Sixth Amendment rights were violated when the doctor who performed the examination did not apprise the defendant of his right to remain silent and the state did not notify the defense in advance about the psychiatric examiner testifying at the sentencing phase. The Court distinguished this examination, which the state court ordered but was used adversely against the defendant, and other mental examinations, as Davis's own would be, that are routine or undertaken in response to a defendant's insanity defense. Under circumstances such as those in *Estelle*, where the prosecution uses the examination against the defendant, the Fifth Amendment is implicated. There is, however, no similar constitutional protection for a routine psychiatric examination aimed at determining whether the defendant is competent to understand his legal situation and assist in his own defense. The Court observed that, had the application of the psychiatrist's findings "been confined to serving that [limited] function, no Fifth Amendment issue would have arisen." Dr. Masbaum's evaluation will in no way be adversely used against Davis, nor will it extend beyond the limited purpose ordered by the court.

-7-

In addition, *Estelle* did not find any constitutional right to have counsel present during the examination: to the contrary, the Court "recognized that an attorney present during the psychiatric interview could contribute little and might seriously disrupt the examination,'" which is echoed in Dr. Masbaum's objection to videotaping his own session with Davis.

Neither *Satterwhite v. Texas*, 486 U.S. 249 (1988), nor *Powell v. Texas*, 492 U.S. 680 (1989), impose the right to counsel during Davis's latest competency exam: Satterwhite's counsel was not notified before the psychiatric examination, after which the doctor testified to competence and future danger, leading the jury to recommend death.  The Court found that the *Chapman* harmless error standard applied to the Sixth Amendment right established by *Estelle*; the case was remanded, however, to determine the extent to which the doctor's testimony contributed to the death sentence.

Following *Satterwhite*, the Supreme Court also remanded *Powell* for further proceedings: the state ordered multiple psychiatric examinations to determine future dangerousness, but failed to notify defense counsel or inform the defendant of his right to remain silent.

The examiners then testified that the defendant would be a future danger to society and the jury voted for the death penalty.   The Court rejected the appellate court's holding that the defendant's use of the insanity defense at trial was a waiver of his Fifth and Sixth Amendment objections: while there was some support for the holding regarding the Fifth Amendment waiver in *Estelle*, it did not extend to the Sixth Amendment.  The Court remanded based on *Satterwhite's* Sixth Amendment holding.

Finally, there is no support for Davis's suggestion that videotaping the competency examinations is the "good practice" that must be used in every capital case: his counsel

-8-

misapplies *Panetti v. Quarterman*, 551 U.S. 930 (2007):  the Supreme Court held that Texas's

judicial procedures to determine mental competence were constitutionally insufficient.  The

Texas court had denied the defendant any of evidentiary hearing to determine his mental

competency.  Specifically, the defendant had made a substantial showing of incompetency, but he

had not raised the issue until after his trial and after his first habeas petition was filed.   After

finding that an incompetency claim may have had merit, the federal district court ordered an

execution stay to give the state court reasonable time to determine the defendant's mental status.

The court appointed two mental health experts who concluded that the defendant was mentally

competent; the defense subsequently submitted multiple objections and renewed their motions

for another mental health examination and evidentiary hearing.  In response, the court closed the

defendant's case.  The Supreme Court averred that once a defendant has made a substantial

showing of insanity, the defendant is entitled to submit his own psychiatric evidence and

arguments based on this evidence.

♦ Davis's motion also cites Justice Thomas's dissent where he noted the denial of
defendant's motion to videotape the psychiatric examination.   From the opinion,
it does not seem that the lack of videotaping led to the court's ruling, as the
majority did not even mention the videotape motion.  Rather, the state court's
egregious denial of defendant's attempt to produce its own evidence and
arguments led to the Supreme Court's holding.   Moreover, it should be noted that
Justice Thomas's dissent stated, "There is likewise *no right* to transcribed court
proceedings, videotaped  examinations, or any other specific protocols for
conducting competency evaluations." [Emphasis added.] Cf. Motion to Videotape

-9-

All Competency Examinations of Scott Panetti Conducted by Court-Appointed

Mental Health Experts in Cause No. 3310 (Feb. 19, 2004).  551 U.S. at n.9.

And, Davis never suggests that Dr. Manbaum will distort any information or would be

otherwise untrustworthy.   Indeed, the insinuation that the court needs to "see for itself the

methodology employed by Dr. Manbaum instead of having to only rely on his own self-

reporting" is an insulting, gratuitous cheap shot that the court should dismiss.   Indeed, standby

counsel never point to *a single* inaccuracy in *any* of the several competency evaluations of Davis.

So, *Hardy's* observation of the "usefulness" of videotaping so that the court could make its own

credibility determination does not apply here: the initial cite, 762 F. Supp. 2d at 887,  referred to

the taped interviews of Hardy's adaptive informants, especially his girlfriend, and discussed the

usefulness of the tapes in assessing witness credibility, a concern that does not presently exist.

The second cite, 762  F. Supp. 2d at. n. 181, recommended to "future judges" the usefulness of

taped interviews "on both sides," implying an adversarial situation where separate defense and

government experts espouse opposite opinions.  We assume that this court, having presided over

both *Hardy* and *Smith*, would have ordered a taping if it felt the need to do so.

Davis's claim that "[a]s a mater of policy, this Court has opined that videotaping

interviews 'provide[s] the Court advantage of direct assessment of credibility as well as

additional helpful information, unfiltered by [the expert]'''" is taken out of context.   His

superficial invocation of the court's consideration of the hotly -contested retardation question in

*Hardy* and *Smith* has no application to the issue at hand: that statement, quoted out of context,

referred to recorded witness interviews.   The *Hardy* opinion itself makes it clear that this court

did not espouse a general policy principle regarding all taped interviews.   The court ordered

-10-

videotaping, but that necessity arose from very specific circumstances not at play here: namely, two diametrically opposed expert opinions regarding Hardy's adaptive functioning, including divergent views of witness testimony.   The court thus ordered the taping to aid in sorting out the widely different expert views.

In *Smith*, the court passed through four expert opinions to come to a conclusion about the defendant's mental capabilities.  As in *Hardy*, experts disagreed whether the defendant reached the *Atkins* threshold to be ineligible for execution.   The court used videotaping assessments to reach its *Atkins* determination, and it relied on its own observation of the recording in coming to its conclusion.

Certainly, this experienced court would have, "as a matter of policy," ordered videotaping if it deemed it essential to, yet again, assess Davis's competence.   Because the court did not order taping only proves it would be an unnecessary complication injected into a neutral, non-adversarial procedure.

WHEREFORE, the United States prays that Davis's motion to videotape his upcoming competency examination is DENIED

Respectfully submitted,

JIM LETTEN
UNITED STATES ATTORNEY


s/ Michael E. McMahon
MICHAEL E. McMAHON
Louisiana Bar Roll Number 10095
650 Poydras Street, Suite 1600
New Orleans, Louisiana  70130
(504) 680-3027

-11-

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2012, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all defense counsel of record. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to Len Davis Inmate No. 24325-034, FCC Terre Haute, U.S. Penitentiary, P.O. Box 33, Terre Haute, IN 47808-0033

s/ Michael E. McMahon
MICHAEL E. MCMAHON
Assistant United States Attorney