**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CASE NO. 2:94-cr-00381** |
| | * | |
| **v.** | * | |
| | * | **SECTION "C"** |
| **LEN DAVIS** | * | |
| | * | |

**REPLY TO GOVERNMENT'S OPPOSITION
TO MOTION TO VIDEOTAPE COMPETENCY EVALUATION**

The Government's *Opposition to Motion to Videotape Competency Evaluation* oversimplifies the complex and difficult issues before this Court. *See* Doc. No. 2304 (hereinafter "Opposition"). This Court has ordered that Mr. Davis' competency be evaluated, presumably due to concerns regarding competency raised in the § 2255 Motion filed by standby counsel. Mr. Davis has requested that that evaluation be videotaped because in the past, his evaluator did not accurately relay Mr. Davis' statements during the evaluation. Additionally, as Mr. Davis noted in his *Memorandum in Support of Motion to Videotape Competency Evaluation*, videotaping "provide[s] the Court the advantage of direct assessment of credibility as well as additional helpful information, unfiltered by [the expert]." *United States v. Hardy*, 762 F. Supp. 849, 917 (E.D. La. 2010). *See* Doc. 2284-1, at 1 (hereinafter "Memorandum").

The Government's Opposition fails to identify legitimate obstacles to videotaping. It does, however, inadvertently raise issues that must be addressed in the course of determining competency. First, the parameters of this competency determination must be defined. The

1

Court's order does not identify its purpose. Second, following completion of the evaluation and report, this Court must conduct an adversarial hearing to determine competency.[1]

The Government's opposition to videotaping Mr. Davis' competency evaluation and its suggestion that there need not be an adversarial hearing to determine competency supports an overriding issue pled in the § 2255 Motion. *See* Doc. 2265 at 34-47, Claim I (conflict of interest). From the outset of the prosecution of this case, and to this day, the Office of the United States Attorney has not litigated Mr. Davis' case from the impartial stance of an arm of government laying all the facts before the decisionmaker so that the just result can be determined. It has an overriding interest in maintaining Mr. Davis' conviction and killing him, with minimal inquiry into the circumstances surrounding Mr. Davis' two trials, in 1996 and 2005. The Government repeatedly appeals to this Court to simplify proceedings and abandon due process not for the sake of justice, but because transparent proceedings will reveal the extent to which the Government covered up its failure to protect Kim Groves and other citizens of the Lower Ninth Ward in 1994. This Court should grant videotaping to ensure that the competency evaluation, unlike other vital past decisions in the prosecution of Mr. Davis, can be fully scrutinized.

**A. This Court Should Reject the Government's Arguments Against Videotaping the Competency Evaluation.**

The Government's arguments against videotaping the competency evaluation are unpersuasive.

---

[1] Separate counsel must be appointed for the competency hearing, because Mr. Davis maintains he is competent to self-represent and waive habeas claims. *See United States v. Hammer*, No. 96-00239 (M.D. Pa. March 6, 2003) (in capital § 2255 proceeding, separate counsel appointed for purpose of litigating competency and habeas defense counsel ordered to continue to prepare for habeas evidentiary hearing). While undersigned standby counsel filed the *Motion to Videotape* at Mr. Davis' request, and they are unable to represent him as to his competency proceedings. *See* Doc. No. 2286.

**1. USP Terre Haute regularly facilitates videotaping of evaluations of death row prisoners pursuant to court orders.**

Videotaping evaluations at USP Terre Haute has not constituted a security threat in the past and certainly should not constitute one in Mr. Davis' case—he is a model prisoner. According to Michael Stephens, Unit Manager of USP Terre Haute's death row, several evaluations of death row prisoners have been videotaped in the past two years.[2] Mr. Stephens told undersigned counsel Ottinger that in fact, more often than not, evaluations of death row inmates are videotaped. He said the procedure is simple. The court sends the order for a videotaped evaluation and the evaluator brings the video equipment to the prison. The evaluator must submit a list of equipment he will bring into the prison in advance of the evaluation, and the equipment must be approved by the Warden. Mr. Stephens is not aware that there has ever been a problem with the Warden approving video equipment, and when the evaluation spans over a two-day period, he has made arrangements in the past to secure the video equipment in the prison overnight. The videotaped evaluation is conducted either in an attorney visit room or the video-conferencing room on death row. Clearly if this Court orders that the competency evaluation be videotaped, USP Terre Haute will accommodate the order, unless the standard procedures for doing so have changed in the course of Mr. McMahon's phone calls to the prison.

---

[2] Many other federal district courts have ordered recording of a Government mental evaluation in capital proceedings. *See*, *e.g.*, *Brumfield v. Cain*, No. 04-787, 2012 WL 602163 (M.D.La. Feb. 23, 2012); *United States v. Bourgeois*, 2:02-CR-00216 (S.D. Tex); *United States v. O'Reilly*, 2010 WL 653188 at *4–5 (E.D. Mich. Feb. 19, 2010); *United States v. Johnson*, 362 F.Supp.2d 1043, 1089–90 (N.D. Iowa 2005); *United States v. Hammer*, 404 F.Supp.2d 676 (M.D. Pa. 2005); *United States v. Sampson*, 335 F.Supp.2d 166, 246–48 (D. Mass. 2004). *See also United States v. Minerd*, 197 F. Supp. 2d 272, 276 (W.D. Pa. 2002) (prohibiting government from audio- or video-taping its examination of the defendant absent express written consent of defense counsel).

**2. If he opposes videotaping, Dr. Masbaum may not be the best choice of psychiatrist to conduct the competency evaluation.**

It may well be that Dr. Masbaum is not the doctor for the task at hand. According to the Government, Dr. Masbaum views videotaping as intrusive to the doctor-patient relationship and the "confidential nature" of the evaluation. The doctor is concerned that Mr. Davis will "play to the camera" and that the camera introduces defense counsel's vicarious presence at the evaluation which will distort the evaluation process. The doctor also claims that the "majority view" in the profession discourages recording a competency assessment.[3] Finally, according to the Government, Dr. Masbaum is concerned that "taping would invade the sanctity of his work product" if the videotape is disseminated to "outsiders." Opposition, at 2.

Dr. Masbaum, if he has expressed himself as the Government represents, appears to have a minimal understanding of the circumstances of a court-ordered evaluation and the circumstances of this case in particular. The only ethical way in which to approach the evaluation is to notify Mr. Davis at the outset that *nothing* he says is confidential. Any and all of his statements may be quoted in Dr. Masbaum's report and discussed at the competency hearing. Mr. Davis should also be advised that by speaking with the doctor, he is waiving his Fifth Amendment right to remain silent. Anything Mr. Davis says in the evaluation can be used against him at a new trial, should this Court grant habeas relief. A court-ordered evaluation simply does not contemplate confidentiality.

---

[3] Mr. Davis notes that there is far from a consensus as to the harm of videotaping mental evaluations. For example, a recent article notes that, "[i]n a recent survey of 160 forensic practitioners, approximately 75% reported having conducted a criminal forensic psychological evaluation with a third party present . . . ." Randy K. Otto & Daniel A. Krauss, Contemplating the Presence of Third Party Observers and Facilitators in Psychological Evaluation, ASSESSMENT (Dec. 2009), *available at* http://www.iapsych.com/iqmr/otto2009.pdf.

The government asserts that the presence of a video camera creates a unique incentive for Mr. Davis to "play to the camera." This concern is not only misguided, but it essentially calls into question the reliability of any evaluation. That is, the problem that Dr. Masbaum purportedly identifies is not intrinsic to the use of a recording device, but rather is concerned with an examinee's incentives to perform for an audience. Under Dr. Masbaum's logic, the very fact that the court-ordered evaluation is not confidential already creates an incentive to "play to an audience" because the examinee is aware that any statements made will be shared with the Court, the government, standby counsel, etc. Indeed, Mr. Davis is of course aware that the results of the evaluation will be shared with him, the Court, and the Government. Whether the evaluation is videotaped or not, Mr. Davis will have an audience to whom he is "playing," if he so desires. Videotaping would not add to the pre-existing temptation to perform for an audience.[4]

Nor is there a legitimate concern regarding "the vicarious presence of Davis's counsel at the exam." Opposition, at 2. Dr. Masbaum does not appear to be aware of the fact that defense counsel in this case *is* Mr. Davis; he will be present, regardless of whether the exam is videotaped.

Furthermore, if, as the Government represents, Dr. Masbaum is concerned that the sanctity of his work product would be invaded by dissemination of the videotape to outsiders, Mr. Davis and standby counsel suggest that this Court order that the Government and standby counsel only view the videotape in some location at the courthouse, that the original never be copied, and that it remain under seal in the possession of the Clerk of Court. This simple solution should alleviate the Government's fear of mass distribution.

---

[4] Mental health evaluations regularly address whether prisoners are malingering. The pervasive concern about malingering in itself illustrates that prisoners in the criminal justice system are already aware that their behavior and the substance of what they say will be subject to scrutiny by others.

Finally, the Government represents that Dr. Masbaum believes he should control the process of the examination, and not Mr. Davis.  Unfortunately, it appears that the Government's communication with Dr. Masbaum,[5] or Dr. Masbaum's predisposition in undertaking evaluations, somehow has resulted in pitting Dr. Masbaum against Mr. Davis in a battle of wills.  Perhaps Dr. Masbaum has not been fully informed of the circumstances surrounding this court-ordered evaluation.  It is *the Court* that controls its circumstances.  It is *the Court* that is tasked with the weighty decision of determining competency.  Mr. Davis has *requested* that the evaluation be videotaped, and it will be up to *the Court*, in its discretion, to decide whether videotaping the evaluation will be helpful to its competency determination.

Dr. Masbaum's concerns regarding videotaping are unfounded in the circumstances of Mr. Davis' case.  There are other psychiatrists who do not object to videotaping and who even welcome it.  Mr. Davis would be happy to provide the Court with names of psychiatrists in the Terre Haute area who would not object to videotaping if that would be of assistance to the Court.

**3. In his Motion to Videotape Competency Evaluation, Mr. Davis cited law discussing the advantages and disadvantages of videotaping, and argued that the advantages are significant, as this Court has recognized in the past.**

Mr. Davis has never asserted that there is a constitutional right to have a competency evaluation videotaped, contrary to the Government's interpretation.  *See* Opposition, at 4.  He noted that the Fifth and Sixth Amendments are implicated any time a defendant is compelled to submit to a mental examination, and suggested that videotaping the examination would serve as a safeguard against violation of his constitutional rights.  Memorandum, at 4.  Additionally, he argued, appropriately citing case law in support, that "video recording of an interview conducted

---

[5] Mr. Davis will be filing a *Motion for Discovery*, asking the Court to order the Government to turn over to defense all communications with him, oral or otherwise.

by a mental health expert is a valuable tool for both parties and this Court." *Motion to Videotape Competency Evaluation*, at 2. Indeed, as the Government is well aware, this Court has found videotaping extremely useful in assessing expert opinions following expert evaluations.

In Paul Hardy's case, the defense requested videotaping of all examinations (defense, Government, or court-ordered) conducted on Mr. Hardy. The Government, while not objecting to videotaping *defense* examinations, opposed videotaping Government examinations on the grounds that "persons often act differently when they are aware that they are being recorded." *United States v. Hardy*, No. 94-381, Doc. No. 1773 (3/5/08). The Government also opposed videotaping of the psychological portions of the examination because of "potential dissemination" problems. *Id.* This Court ordered that all examinations and interviews by the Government's experts be videotaped, subject to a confidentiality order. *United States v. Hardy*, No. 94-381, Doc. No. 1808 (4/10/08). This Court also granted the Government's motion for a court-ordered evaluation of Mr. Hardy and ordered that the evaluation to be videotaped. *United States v. Hardy*, No. 94-381, Doc. No. 1810 (4/14/08).

Ultimately, this Court found the videotapes to be valuable in evaluating Mr. Hardy's *Atkins* claim. For example, while the defense expert testified that Mr. Hardy could not count backwards by sevens, the Government expert testified that he was able to do so. *Hardy*, 762 F.Supp.2d at 872. This Court used the videotape of the Government examination to determine that the Government expert had allowed Mr. Hardy to count on his fingers, while the defense expert had told Mr. Hardy that he had to count in his head. *Id.* Thus instead of being evidence of malingering, the discrepancy between the two examinations was shown by the videotape to be evidence of mental retardation. *Id.* at 873. More generally, this Court noted that the videotape

of the Government expert's clinical interview of Mr. Hardy was "helpful to the overall decision to be made."[6] *Id.* at 895.

The Government distinguishes this case from Paul Hardy's by arguing that *Atkins* determinations "differ[] greatly" from competency determinations, and that this Court's observations in the *Hardy* opinion regarding the usefulness of videotaping interviews were only applicable when there are "diametrically opposed expert opinions." *Opposition*, at 5, 9-10. Although an evaluation assessing mental retardation is different from an evaluation assessing competency, they are, in essence, the same endeavor. Both are based upon interviews with the subject and may involve interpretations of demeanor and other non-verbal communications or gestures. Different assessment tools may be used by different practitioners evaluating mental retardation and competency. In the criminal competency context, at least twelve different testing instruments may be administered, or in some instances, no structured testing may be conducted at all.[7] In the *Atkins* context, there are varied definitions of mental retardation depending on the jurisdiction and the official source, and while scores on adaptive and IQ testing are essential features of the evaluation, there are different evaluations and test variants, not to mention differences in test scoring.[8] In both contexts, subtle differences in test administration may lead

---

[6] In a Texas death penalty case a video of a State evaluation revealed significant errors in scoring and other violations of testing protocols that would not have been revealed absent videotaping. *See Ex parte Daniel Angel Plata*, 2008 WL 151296 (Tex. Crim. App. Jan. 16, 2008). The psychologist who conducted the examination has since been reprimanded and may not conduct any further evaluations in criminal. Brandy Grissom, *Psychologist Who Cleared Death Row Inmates is Reprimanded*, N.Y. TIMES, April 14, 2011, at A19, *available at* http://www.nytimes.com/2011/04/15/us/15ttpsychologist.html.

[7] *See* Gianni Pirelli, William Gottdiener, and Patricia Zapf, *A Meta-Analytic Review Of Competency To Stand Trial Research*, 17 PSYCHOL. PUB. POL. & L. 1, 3 (Feb. 2011); Patricia Zapf and Ronald Roesch, *An Investigation of the Construct of Competence: A Comparison of the FIT, the MacCAT-CA, and the MacCAT-T*, 29 LAW & HUM. BEHAV. 229, 235-36 (April 2005).

[8] *See Akins v. Virginia*, 536 U.S. 304, 317 (2002). *See also generally* John Matthew Fabian, *Life, Death, and IQ: It's Much More Than Just a Score: Understanding And Utilizing Forensic Psychological And*

to different results, and a videotaped record of the evaluation is invaluable to ultimate resolution of the mental status at issue.

Each determination, particularly in a capital case, is a critical to the constitutionality of a conviction and sentence. The issue of whether a defendant is mentally retarded is one of life or death. The issue of competency, however, may impact not only whether a defendant is competent to be executed, but also whether he is competent to waive certain rights, to stand trial, or even to participate in habeas corpus proceedings.[9] Indeed, competency evaluations are the "most significant mental health inquiry pursued in the system of criminal law." Pirelli, *supra*, at 3. In the end, there is no principled distinction between the critical nature of competency and mental retardation determinations in capital cases.[10]

---

*Neuropsychological Evaluations In Atkins Intellectual Disability/Mental Retardation Cases*, 59 CLEV. ST. L. REV. 399 (2011).

[9] The Supreme Court has recently granted certiorari in two cases on the issue of whether a habeas petitioner has a right to competency. *Ryan v. Gonzales*, 132 S. Ct. 1738 (March 19, 2012); *Tibbals v. Carter*, 132 S.Ct. 1738 (March 19, 2012). The United States Government has filed an amicus brief indicating that a federal § 2255 petitioner may have a right to competency. *See Ryan v. Gonzales* and *Tibbals v. Carter*, Nos. 10-930 and 11-218, Brief of the United States as Supporting Petitioners, *available at* http://www.americanbar.org/content/dam/aba/publications/supreme_court_preview/briefs/10-930_petitoineramcuusa.authcheckdam.pdf.

[10] The orders of state courts for videotaped competency evaluations likewise rebut the Government's assertion that competency evaluations somehow differ from evaluations for mental retardation in such a way that videotaping is not necessary. *See Grattan v. Commonwealth,* No. 1614–07–3, 2008 WL 4974867 (Va.App. Nov. 25, 2008); *People v Camara*, No. 5758/11, slip op. (N.Y. Sup. 2012); *People v. Wilhelm*, 34 A.D.3d 40 (N.Y.App.Div. 2006). In *Maraman v. State*, a Florida court of appeals went further, holding that "a person who is required to submit to a mental examination in an adversarial proceeding or setting is entitled to have the examination attended by her attorney and a court reporter or videographer." 980 So. 2d 1096, 1099 (Fla. Dist. Ct. App. 2008).

**4. The Government's position that videotaping is not appropriate is undercut by its own position in two other recent capital § 2255 cases.**

The Government's stated position in this case is incompatible with its position in other cases. In *United States v. David Lee Jackson* in the Eastern District of Texas, the Government requested to videotape the evaluation of a capital § 2255 petitioner by its own expert. In its pleadings, the Government aptly observed that

> The minimally invasive disturbance caused by a video camera during the interview portion is substantially outweighed by the probative value of affording the Court with the opportunity to have a first hand view of the Petitioner during the interview, rather than relying only on [the expert's] account

*United States v. Jackson*, No. 09-01039, Doc. No. 98, at pp. 6-7 (filed 6/10/11) (E.D.Tex.). The court granted the Government's request. *Id.* at Doc. No. 101. In another capital § 2255 case, *United States v. Keith Nelson*, the Government moved to require videotaping of a forensic mental health evaluation. The Government reasoned that

> [T]he ultimate decision regarding [the defendant's] mental health will need to be made by this Court, or, in the future, another court of law that does not have the same level of expertise as the hired doctors. Having the ability to review the audio- or video-taped examination will allow the record in this case to be more complete.

*United States v. Nelson*, No. 04-8005, Doc. No. 144, at p. 5 (filed 5/14/10) (W.D.Mo.). The Government went on to state that recording a mental health evaluation would "*facilitate constitutional protections without impairing the interview process.*" *Id.* (emphasis added) (citing *United States v. Byars*, 740 F.2d 1104, 1172 (D.C.Cir. 1984) (Bazelon, J., dissenting) and *United States v. Kaczynski*, 1997 WL 668395, at 3 (E.D.Cal.1997)). Mr. Davis agrees.

**5. Mr. Davis has right to remain silent under the Fifth Amendment and not participate in the competency evaluation.**

Mr. Davis' concerns about the Fifth Amendment implications of a competency evaluation are well-founded. *See* Memorandum, at 4. As the Government acknowledges, Opposition, at 6,

under *Estelle v. Smith*, 451 U.S. 454 (1965), Mr. Davis must be advised of his right to remain silent prior to the evaluation and waive it, unless the evaluation is only to be used for the limited purpose of determining competency. No such limitation has been placed upon the evaluation's use, and should this Court order habeas relief, statements Mr. Davis makes in the course of the evaluation could be used against him. Mr. Davis has cited, as an additional reason for videotaping his competency evaluation, his concern that statements he makes will be misquoted, or that statements he does not make will be attributed to him. In his most recent competency evaluation, such mistakes were made and alleged statements of Mr. Davis could be interpreted as an admission of guilt. *See infra*, § B. Mr. Davis is willing to waive his Fifth Amendment right to silence, but merely requests that his statements be videotaped or recorded so that he does not, in the future, find himself in the position of defending against statements he did not make.

> **6. Concerns as to the techniques employed for determining competency are based upon the law governing admissibility of expert testimony and the weight given it, and do not constitute an insult or personal affront to experts.**

Any technique employed to assess competency must have been tested, subjected to peer review, governed by standards controlling its operation, and generally accepted within the scientific community. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 593-94 (1993); Memorandum, at 3. Experts who testify in court regularly undergo cross-examination on whether their testing meets *Daubert* criteria, and if the results of testing are admitted, on the credibility of conclusions reached. Videotaping Mr. Davis' competency evaluation would aid the Court in its assessment of both issues. The Government's suggestion that videotaping is "insulting," *see* Opposition, at 9, fails to recognize basic law governing decision-making involving expert testimony.

**B. Mr. Davis Alerted the Court to Mistakes in the Last Competency Evaluation in Open Court with the Government Present and the Mistakes Were Significant.**

On May 16, 2011, when Mr. Davis appeared before the Court with the Government to waive his right to counsel in habeas proceedings, he made clear to the Court, on the record, that he objected to inaccuracies in the Report of Dr. Mancuso, May 11, 2011 (filed under seal) (hereinafter "2011 Mancuso Report"). The Minute Entry correctly documents that "Deft advised the court that there are discrepancies in pages 4, 6, 7, 8 and 9 of the report." Doc. 2231, at 1.[11] So the record is clear, Mr. Davis did not make the following statements in the way they were reported in the 2011 Mancuso Evaluation:

- Page 4, ¶ 1: Mr. Davis is quoted saying he refused a job serving trays. Mr. Davis never would have said that because prisoners do not serve trays—only correctional officers are allowed to serve trays.

- Page 6, ¶ 4: Mr. Davis is quoted as saying that he was miles away at a barroom drinking and a civilian committed the murder, as if that is his version of what occurred. Mr. Davis, however, told Dr. Mancuso that *it was the government's theory* that he was miles away at a barroom drinking and a civilian committed the murder. The difference in what he said and what was reported as a direct quote from him is significant.

- Page 6, ¶ 5: It is reported that Mr. Davis said witnesses testify to what they know. Mr. Davis did not say that. He said that witnesses testify to what they *claim* they know. The difference in what he said and what is reported is significant.

- Page 7, ¶ 2, line 1: It is reported that Mr. Davis said that a plea of guilty means "you did it." Mr. Davis was never asked about a plea of guilty. He was asked about a guilty verdict. And he never said a guilty verdict means "you did it." In fact what he said, which is omitted from the report, is that 200 people have been released from prison in the past quarter century because they were found guilty, but were innocent. Their innocence was discovered because the real perpetrator was apprehended, because of DNA testing, or because witnesses lied, or because the conviction was based on prosecutor or law enforcement misconduct. Mr. Davis would *never* say that a finding of guilt means "you did it." The inaccuracy, as well as the omission of a lengthy explanation, is significant.

---

[11] Mr. Davis did not order the transcript of the May 18, 2012 proceedings, but the Government appeared to quote from a transcript of the proceedings in a subsequent in-chambers conference on April 17, 2012.

- Page 7, ¶ 2, line 5: It is reported that Mr. Davis acknowledged that guilt meant that a person did the crime.  Mr. Davis never said such a thing, nor would he say such a thing.  Mr. Davis understands that our system of justice in America is not based on if you are innocent or guilty but upon whether you can be proven guilty beyond a reasonable doubt by the state.   The difference between what Mr. Davis said and what is reported is significant.

- Page 7, ¶ 6: For the second time, it is reported that Mr. Davis said he was in a barroom when a civilian (in quotes attributed to Mr. Davis) shot the "addict" (in quotes attributed to Mr. Davis).  Mr. Davis never said that that was his memory of what occurred, as the report states.  He said it was *the government's theory of what occurred*.  Mr. Davis never used the word addict.  The difference between what he said and what was reported as what he said, using a word he never said as a direct quote from him, is significant.

- Page 8, ¶ 5, line 6: Mr. Davis is quoted as saying that he and Archie Creech did the appeal brief in Judge Berrigan's court.  Mr. Davis did not say that and would not say it because it is wrong.

- Page 8, ¶ 5, line 8: It is reported that Mr. Davis said that in 2000, there was another sentencing hearing on the civil rights violation.  Mr. Davis did not say that.  He would not say it because there was no sentencing hearing in 2000.  The hearing was in 2005.

- Page 8, ¶ 5, line 11: It is reported that Mr. Davis said Judge Berrigan stopped him from cross-examining, as a direct quote.  This is not a direct quote as it is represented in the report.  Mr. Davis explained his statement fully and discussed in detail the ways in which the Government and the Court worked together to systematically stop him from putting on any defense.  The Court made him look like a liar by preventing him from introducing audiotapes that would have proven Sammie Williams to be a perjurer and by preventing him from proving facts he promised the jurors he would prove.  Mr. Davis explained all this in the evaluation, but his explanations are relayed very selectively, and therefore inaccurately.

- Page 8, ¶ 6: Mr. Davis is quoted as saying that everyone knows he didn't abuse his authority as a police officer in the death of the addict.  Mr. Davis did not say that.  First, he never described the victim as an addict.  But also, he actually said that everyone knows *according to what the government calls the facts of this case*, that abuse of authority played no role in the murder. The difference in what Mr. Davis actually said and what was reported as a direct quote from him is significant.

- Page 9, ¶ 2: Mr. Davis is quoted as saying that he has filed numerous motions since 2005.  He never said that because it is untrue.  At that time, Mr. Davis had filed almost nothing since 2005.

- Page 9, ¶ 3: Mr. Davis is quoted as saying he has been representing himself pro se since March 17, 2011.  Mr. Davis did not say that because it is incorrect.  He has been

13

      representing himself pro se since August of 2000, and that is what he said in the evaluation.

- Page 9, ¶ 4: It is reported that Mr. Davis said that all defense attorneys would take the approach that he is guilty.  Mr. Davis does not believe that and never said it.  He did, however, say that people are in the penitentiary due to dirty judges and prosecutors.

Overall, the evaluator only selectively reported Mr. Davis' statements to her during the evaluation, placed quotes around statements Mr. Davis did not—and would not—make, and apparently misunderstood several of his explanations, so inaccurately reported them.  Some of the statements attributed to Mr. Davis could be read as admissions of guilt.  For precisely this reason, it is critical that the evaluation of his competency be videotaped.

**C.  This Court Has Not Identified the Purpose of the Competency Evaluation.**

      In its June 27, 2012 order appointing Dr. Ned P. Masbaum, M.D., the court directed him "to conduct an evaluation and provide an expert report and opinion regarding the defendant's competency." Doc. 2283.   The Court ordered that Dr. Masbaum be provided, by the Government, with extremely limited background information concerning Mr. Davis: the psychiatric records of USP Terre Haute, which concern the approximate years of 1999-2000 and 2005-2011 and which are all generated by prison personnel, presumably based upon observations in prison.[12]  Doc. 2283.

      A competency evaluation can be conducted for numerous purposes: competency to stand trial which implicates the constitutional rights to due process and fair and reliable capital

---

[12] Neither Mr. Davis nor standby counsel has been provided with these records.  However, based on a review of the 2011 Mancuso Report, it appears that the records refer to a history of alcohol abuse.  Mr. Davis himself denies such a history, and denied it in May 2011; he has requested that the Court be so informed.  While Mr. Davis admits to drinking quantities of beer, daily, prior to his arrest in 1994, he maintains that has never abused liquor.  This is but one of the inaccuracies in the 2011 Mancuso Report, all addressed *supra*, and is based not on Mr. Davis' self-report, but on records that Mr. Davis has never laid eyes upon.

sentencing proceedings; competency to self-represent, which implicates the constitutional rights to due process, counsel, and fair and reliable capital sentencing proceedings; and competency to waive the litigation of claims on appeal, which also implicates the constitutional rights to due process, counsel, and fair and reliable capital sentencing proceedings.[13]  *See* Doc. 2265, at 72-75; 80-83.  Clarity regarding the purpose of this competency evaluation is essential to ensuring a fair assessment of competency in the context in which it is assessed, as well as to providing Mr. Davis notice and opportunity to be heard regarding the competency determination.[14]

**D. The Government Asserts That Videotaping Would Compromise  A Purportedly "Neutral, Non-Adversarial Examination," But a Competency Determination is an Inherently Adversarial Process and Any Finding The Court Makes Regarding Competency Can Be Reached Only After an Adversarial Hearing.**

The competency evaluation ordered by this Court is not a "neutral, non-adversarial examination," as the Government contends.  Opposition, at 1.[15]  Non-adversarial procedures

---

[13] Pending before this Court is the issue of whether there exists a constitutional right to self-representation under the Sixth Amendment in habeas proceedings.  *See* Doc. 2266-1.

[14] In addition to Mr. Davis, the Government appears confused as to the purpose of the competency evaluation.  It asserts that four prior competency evaluations have already been conducted in the course of this litigation.  Opposition, at 3.  The Government does not specify three of the four evaluations to which it refers, and so some guesswork is required in responding.  But if the first "competency evaluation" to which the Government refers is an evaluation and report completed by Dr. Osborne prior to trial in 1996, it was an evaluation at the request of defense counsel to prepare for the selection phase of Mr. Davis' first trial in 1996, not a competency evaluation.  If the second is the evaluation conducted at the request of the Court in 1996, by Dr. Robert Davis, it was to determine Mr. Davis' competency to leave the courtroom and not participate in the sentencing phase of his trial.  Doc. 2265, at 68-70.  If the third is the evaluation conducted by Dr. Mancuso at the request of the Court in 2005, it too was conducted to determine Mr. Davis' competency to leave the courtroom and not participate in the sentencing phase of his trial, although Dr. Mancuso did conclude that Mr. Davis was competent to stand trial.  *Id.* at 70-71.  And the Government makes clear that the last evaluation to which it refers is Dr. Mancuso's 2011 evaluation, Opposition, at 3, in which she assessed Mr. Davis' competency to self-represent, concluding that Mr. Davis was competent based upon a one-hour-and-ten-minute interview of Mr. Davis, court orders, *Faretta v. California*, and USP Terre Haute Psychology Data System records from July 1999 through April 2011, minus any entries from July 2000 through December 2005.  *See* 2011 Mancuso Report, at 2, 5.

[15] The Government's assumes that Dr. Masbaum will find Mr. Davis competent.  While Mr. Davis himself welcomes the finding, it cannot be a foregone conclusion.  If this proceeding does later involve opposing experts, a videotape of Dr. Masbaum's evaluation will be even more critical to the Court's

15

aimed at determining a defendant's competency are unconstitutional.[16]   Decades of clearly

established Supreme Court jurisprudence hold that when a defendant's competency is in

question, the court must provide minimum constitutional safeguards, including the right to be

heard in opposition and the right to challenge the conclusions of the court-appointed or

government expert. *See Panetti v. Quarterman*, 551 U.S. 930, 949 (2007).   In order to satisfy the

constitutional minimums set out in *Panetti*, as well as in *Ford v. Wainwright*, 477 U.S. 399

(1986), a court must allow the defense the opportunity to challenge the court-appointed and/or

government experts, and to present its own evidence in opposition.   The best way—and,

according to many jurisdictions, the only way—to safeguard a defendant's rights during

competency proceedings is to hold an adversarial hearing at which the defendant has the right to

cross-examine experts and present his own witnesses.[17]   *See Hull v. Kyler*, 190 F.3d 88, 111 (3d

Cir. 1999) (holding that "a criminal defendant is entitled to adequate procedures, including the

opportunity to present evidence and to cross-examine government witnesses, when his

assessment of Mr. Davis' competency.   *See Maraman v. State*, 980 So. 2d 1096, 1099 (Fla. Dist. Ct. App. 2008) (referring to "the *potentially* adversarial nature of a court-ordered mental examination in a criminal case" and holding that the defendant was entitled to have his evaluation videotaped).

[16] A defendant cannot represent himself at a hearing to determine competency.  *United States v. Klat*, 180 F.3d 264, *5 (5th Cir. 1999) (defendant cannot waive counsel before competency resolved); *United States v. Purnett*, 910 F.2d 51 (2d Cir. 1990) (*Faretta* rights not implicated in competency proceedings); *People v. Lightsey*, No. 048440, 2012 WL 2685249 at *20 (Cal. July 9, 2012) (reversed due to self-representation during competency proceedings).  Mr. Davis' desires to be found competent, but counsel has received the opinion of an expert that questions Mr. Davis' competency.  Because counsel must pursue Mr. Davis' goals in habeas litigation, this Court must appoint a different lawyer to scrutinize Dr. Masbaum's evaluation and represent Mr. Davis in a valid, adversarial determination of competency conducted independently of representing Mr. Davis' desire to be found competent. *See* Doc. 2286, at 3-5; *United States v. Hammer*, No. 96-00239 (M.D. Pa. March 6, 2003) (separate counsel appointed for purpose of litigating competency and habeas defense counsel ordered to continue preparing for habeas evidentiary hearing).

[17] Federal law provides that when a criminal defendant's competency is in question, the court "*shall*" grant a hearing at which the defendant "*shall* be afforded an opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing." 18 U.S.C. §§ 4241, 4247(d) (emphasis added).

competency is at issue."); *Reynolds v. Norris*, 86 F.3d 796, 800 (8th Cir. 1996) ("To safeguard this due process guarantee [of competence to stand trial], the Supreme Court has established a separate procedural due process right to a competency hearing."); *United States v. Caldwell*, 543 F.2d 1333, 1348 (D.C.Cir. 1974) ("'[A]s a minimum we think the [competency] inquiry must be of record and both parties must be given the opportunity to examine all witnesses who testify,' and the decision on competence must have rational support in the evidence."). *Cf. Seals v. State*, 00-2738 (La. 10/25/02), 831 So. 2d 828 (holding that, where the trial court had ordered a sanity determination pre-trial (but where the record was devoid of any indications that the defendant was in fact incompetent), "reasonable grounds" had nevertheless existed to doubt the defendant's competency to proceed and the failure to conduct a competency determination required reversal of the defendant's conviction and death sentence). Thus the Government's unsupported characterization of the competency proceedings in this case as "non-adversarial" fails to take into account the statutory and constitutional safeguards with which this Court must comply.

For all the foregoing reasons, and those asserted in the *Motion to Videotape Competency Evaluation* and supporting Memorandum, Mr. Davis urges the Court to order that his competency evaluation be videotaped.

Respectfully submitted,


/s Sarah L. Ottinger____
Sarah L. Ottinger, La. Bar No. 24589
636 Baronne Street
New Orleans, LA 70113
(504) 529-5955
saraho@thejusticecenter.org

Rebecca L. Hudsmith, La. Bar No. 7052
Federal Public Defender for the
Middle and Western Districts of Louisiana
102 Versailles Blvd., Suite 816
Lafayette, LA 70501
(337) 262-6336
Rebecca_Hudsmith@fd.org

Len Davis, 24325034
P.O. Box 33
Terre Haute, IN 47808

*Counsel for Len Davis*


## CERTIFICATE OF SERVICE

I hereby certify that a that a true and correct copy of the foregoing document has been filed with the Clerk of the Court by using the CM/ECF System which will send a notice of electronic filing to all counsel of record on this 23rd day of August, 2012.


/s Sarah Ottinger_____
Sarah Ottinger

18