```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA
                         NEW ORLEANS

UNITED STATES OF AMERICA      :    CRIMINAL ACTION 94-381 "C"
                              :
VERSUS                        :
                              :    New Orleans, Louisiana
LEN DAVIS                     :    May 16, 2011
                              :    9:00 a.m.
: : : : : : : : : : : : : : : :
```

**FARETTA HEARING**
**BEFORE THE HONORABLE HELEN G. BERRIGAN**
**UNITED STATES DISTRICT JUDGE**

**APPEARANCES:**

For the Government:     U.S. Attorney's Office
                        BY:  MICHAEL EDWARD McMAHON
                        Assistant U.S. Attorney
                        500 Poydras Street, Room B210
                        New Orleans, Louisiana  70130


For the Defendant:      Len Davis
                        Pro Se




Reported By:            Arlene Movahed, CCR
                        OFFICIAL COURT REPORTER
                        500 Poydras Street, Room 406
                        New Orleans, Louisiana  70130
                        (504)  589-7777


        Proceedings recorded by mechanical stenography;
transcript produced by dictation.

2

# P R O C E E D I N G S

**MORNING SESSION**

**(May 16, 2011)**

(The following is a transcript of the Faretta Hearing taken on May 16, 2011.)

(Open court.)

THE COURT:   Have a seat, please.

THE CLERK:   Criminal Action No. 94-381 "C," United States of America versus Len Davis.

MR. MCMAHON:   Your Honor, Michael McMahon for the United States.

THE COURT:   Mr. Davis.

THE DEFENDANT:   Yes, Len Davis, pro se.

THE COURT:   All right.  There was a motion that was filed by Mr. Davis that was actually, I guess signed on May 2nd, although we didn't receive it until May 10th.  It was a motion requesting that a Faretta Hearing be held by video conferencing.

Obviously, first of all, we didn't receive it in time to consider it, so that is denied.

We have the original of Dr. Mancuso's report which concludes that Mr. Davis is competent to waive his right to counsel.  I am going to put that in the record.  Is there any particular request as to whether it be under seal or not under seal?

**3**

THE DEFENDANT:  Your Honor, the only thing I would request, for the record, is that it would be noted, and I don't really need to go into details about it, but I just want it noted for the record that that 11-page report, Pages 4, 6, 7, 8, 9, I have some problems, some discrepancies in what was said and the way it was said, but nothing major. But I just wanted to note it for the record.

THE COURT:  Would you want to have it under seal so other people don't have access to it?  It's up to you and Mr. McMahon.  Mr. McMahon, do you have any  --

We had Dr. Mancuso, I don't know if you remember, Mr. Davis, but she was the one who did the competency hearing back in 2000, whatever.

THE DEFENDANT:  Yes.

THE COURT:  And that document is not under seal.

THE DEFENDANT:  You don't have to put it under seal.

THE COURT:  Mr. McMahon, does it matter to you whether it's under seal or not?

MR. MCMAHON:  Your Honor, I think that if Mr. Davis wants it under seal, I don't have any problem.  If he doesn't have any problem with it, then neither do I, so I think it's really his call.

THE COURT:  So under seal or not under seal?

THE DEFENDANT:  Put it under seal.

**4**

THE COURT:   So that's going to be admitted under seal.   The next thing we need to do, there's a whole list of prior counsel in this case that are still showing on the records, people that were involved with earlier proceedings, people that were involved with the appeal.   I need to terminate all prior counsel as of today.   Is that enough, Kim, to get it done, or do I need to name all the names?

THE CLERK:   You can name them.

THE COURT:   This is specifically, Julian Murray, Laurie Anne White and Marcia Widder.   Everybody else has previously been terminated.

Mr. Davis, would you come on up to the podium because I do need to ask you some questions in order to  -- we're basically doing our Faretta Hearing again that we did similar to a few years ago, though it is a little bit different because the circumstances are different.   I need to have you sworn, first of all, so to the extent you can raise your right hand, would you do so.

**LEN DAVIS, DEFENDANT, SWORN**

THE COURT:   Mr. Davis, I understand that you wish to proceed without representation by counsel.   Is that correct?

THE DEFENDANT:   That's correct.

THE COURT:   In 2000, you may recall that we had a hearing, similar hearing on your decision to waive your right

**5**

to counsel during the re-trial of the penalty phase.  I think at that time I advised you that a number of the issues that you were trying to raise at that re-trial of the penalty phase were issues that would be more appropriately raised in a post-conviction habeas petition.  I don't know if you recall that.  But I just want to remind you that we had that conversation then.  We're now at that stage, obviously, of the habeas post-conviction petition.

The jury did return a verdict of death at the last penalty phase.  And, once again, Mr. Davis, I need to advise you that this is an extremely serious decision.  This is, in effect, your last opportunity for judicial review of the process that is commencing, well, actually commenced a couple of months ago, but it's in the process now.

Before I can decide whether I am going to permit you to proceed without counsel, I have to ask you certain questions.  And I need to insure that you're entering the decision voluntarily, knowingly, intelligently with a full understanding of the possible adverse consequences.  So if there is any question that I ask you that you don't understand, please say I don't understand, okay?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Also, because you are now under oath, it is important that you be truthful with me, not that I would think this would happen, but conceivably if you said

6

something that wasn't truthful, it could result in a prosecution later for perjury or something along those lines.

All right, sir.  How old are you?

THE DEFENDANT:   46.

THE COURT:   And how much schooling have you had?

THE DEFENDANT:   High school, twelfth grade, a year and a half of college.

THE COURT:   I assume you know how to read?

THE DEFENDANT:   Yes.

THE COURT:   Are you now, or have you recently been under the care of a doctor or a psychiatrist?

THE DEFENDANT:   No.

THE COURT:   Are you taking any kind of medication?

THE DEFENDANT:   No.

THE COURT:   I did order that you be examined by a psychiatrist, Dr. Donna Mancuso, in order to determine whether you were competent to make a waiver and represent yourself.  The report is extensive, as you know, you have seen it and I do find that you are competent to make this decision.

Mr. Davis, the Sixth Amendment of the Constitution gives you the right to counsel and I have to determine that your decision to waive counsel is, as I said, voluntary, knowingly, and intelligently made.

You do have a right to waive counsel and represent

yourself provided that your decision is knowing and voluntary and provided that you're able and willing to abide by the rules of procedure and the courtroom protocol.

In addition, I am required to caution you about the dangers of such a course of action to insure that you know what you are doing and that your choice is made with your eyes wide open.

The first issue I want to address with you is the voluntariness of your decision.  And I would like to ask you why you have decided to waive counsel?

THE DEFENDANT:  Absolutely no trust or faith in the attorneys period.  That's the simplest most concise answer I can give you.  I haven't been happy with representation on appeal at any level going all the way back to 1996.

THE COURT:  Let me ask you this.  Mr. Murray was appointed as standby counsel for you before the last re-trial of the penalty phase.  Were you satisfied with the way he worked with you?

THE DEFENDANT:  I was satisfied with the way he assisted me, especially by hiring Mary Costa, paralegal, who it was pretty much she and I that carried the heavy load of what we did go through in those five years.  So as far as his assistance, yes, I was happy with his assistance but I wouldn't go any further than that.

THE COURT:  Okay.  So that was a good experience with Mr. Murray and Ms. Costa?

THE DEFENDANT:  Yeah, I mean, yeah, I am not saying I dislike the attorneys.  Me and Julian got along fine, I liked him.  But it's just my experience.  And Dr. Mancuso kind of touched on it in the report.  Even the decent to good lawyers, the problem with them are they're stretched too thin, they have too much on their plate and they can't put the time in to each individual case that it warrants and it deserves.  And so those were the best out of the three.  The first group, and that was the second group, and then there was a third group and the second group, you know, are the best out of the three.  And that's the biggest problem, no one really has time to put into a case because, I mean, you have to respect that they are trying to make money and so they have got different cases they're doing, they're stretched too thin is what I am saying.

THE COURT:  Well, you know, I mean, Mr. Murray, his appointment, for example, he was being paid by the government, so it was not costing him, it was not a problem for him to be representing you.  And the attorneys that I have attempted to appoint for you likewise are, you know, public defenders and have the time and the resources to commit to it.  You're aware of that?

THE DEFENDANT:  Yes.

THE COURT: All right. Has anyone threatened you to waive your right to counsel, to cause you to waive your right to counsel?

THE DEFENDANT: No, Your Honor.

THE COURT: Has anyone promised you anything --

THE DEFENDANT: No.

THE COURT: -- to cause you to waive your right to counsel?

THE DEFENDANT: No, Your Honor.

THE COURT: I want to get into a little bit about whether the waiver is knowingly and intelligently made. I have to ask you again some questions about your understanding of the nature of the proceedings, the sentence, possible argument for purposes of post-conviction relief.

I assume you still have somewhere a copy of the Indictment, the original Indictment?

THE DEFENDANT: Yes.

THE COURT: And I assume you have read it probably numerous times?

THE DEFENDANT: Yes.

THE COURT: Do you understand that you have been convicted on Counts 1 and 2?

THE DEFENDANT: Yes, 18 U.S.C., 241, conspiracy and 18 U.S.C., 242, deprivation against rights.

THE COURT: And you understand that you have been

sentenced to death?

THE DEFENDANT:   Yes.

THE COURT:   You understand that you have been sentenced to death after you previously waived your right to counsel?

THE DEFENDANT:   Yes.

THE COURT:   You understand that you cannot have the sentence overturned in post-conviction proceedings because you are unrepresented by counsel if you voluntarily, knowingly and intelligently waive the right to counsel?

THE DEFENDANT:   Yes.

THE COURT:   Do you understand that unless you're pardoned by the President of the United States that you would be executed if you do not succeed in your post-conviction proceedings?

THE DEFENDANT:   Yes.

THE COURT:   Under Article 28, United States Code 2255 provides as follows:

A prisoner in custody under sentence of a Court established by act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the Court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral

attack, may move the Court which imposed the sentence to vacate, set aside, or correct the sentence.

That's what 2255(a) says.  All right.  You understand that you are entitled to representation by counsel during these proceedings and you're also entitled to conduct an investigation and you're entitled to discovery in an effort to locate evidence in support of your claims for relief?

THE DEFENDANT:  Yes.

THE COURT:  I want to advise you of several more things.  Under 28 U.S. Code 2255, you're allowed to ask for Court review of the entire proceedings, including the guilt phase.  You understand that?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that in this proceeding you are not restricted to the trial Court record, but you can in essence start over and raise issues that were not raised in any prior proceeding?  You understand that?

THE DEFENDANT:  Yes.

THE COURT:  There is a one year period of limitation for filing and it runs from the date on which the judgment of conviction is final.  And in your case that period has already begun to run.  You understand that?

THE DEFENDANT:  March 21st of this year, yes.

THE COURT:  Thank you.  Any preparation of any

12

post-conviction challenge would be limited by your confinement in prison regardless of whether you're represented by counsel or not.  Do you understand that?

THE DEFENDANT:   Yes.

THE COURT:   If you proceed unrepresented, any resources provided by the prison would be shared with other inmates according to prison regulations, thereby also limiting your ability to represent yourself.  Do you understand that?

THE DEFENDANT:   Yes.

THE COURT:   Some of the specific ways in which your case could be adversely affected if you proceeded unrepresented while in prison and subject to the Bureau of Prisons regulations are as follows:

First, your ability to contact by telephone any potential witnesses, investigators, experts, agencies, institutions, or individuals would be limited by prison regulations.

I understand, for example, that the prison at Terre Haute requires legal calls to be initiated by an attorney, for an example.  Non legal calls are monitored, as I understand it, and are limited to a certain number of hours per month.  And then you would also have to compete with other inmates on death row for access to the phones.  Do you understand that?

**13**

THE DEFENDANT:   Yes.

THE COURT:   I understand also that e-mail access is restricted and monitored with the recipients first having to agree to accept e-mail from a prisoner before the prisoner can contact them.  And, again, you would also have to compete with other prisoners for access to the limited computers that are available.  Do you understand that?

THE DEFENDANT:   Yes.

THE COURT:   I understand also that the storage areas where you're housed are limited to basically what you can fit under your bed.  Obviously, your case involves a lot of materials.  Any more space provided to you would have to be approved by the prison officials.  You understand that?

THE DEFENDANT:   Yes.

THE COURT:   Accessing discovery would be difficult because of prison regulations as to what kinds of documents you're allowed to have.  If you're prevented from accessing certain records, that decision could be appealed but the statute of limitations would continue to run and could expire before the process is completed.

I understand also that prisoners have limited access to the prison law library for research purposes.  Do you understand that?

THE DEFENDANT:   Yes.

THE COURT:   Although you would be entitled to

**14**

funding with regard to preparation of your motion, you would be required to file appropriate motions for investigators, experts, and specialists, along with their attended expenses. There would be significant delay and possible expense as a result which would be reduced if represented by counsel.  Do you understand that?

THE DEFENDANT:   Yes.

THE COURT:   And a good example, actually, Mr. Davis, is this motion that you filed which you signed on May 2nd which we didn't receive until May 10th because it just didn't get to a mailbox before then.  So if you had counsel, if you had counsel, you could call counsel and say get this thing filed, instruct them what you want them to do, whatever.  You wouldn't have like these ten-day, eight-day delays occurring which is what happens when you are representing yourself.  You understand that?

THE DEFENDANT:   Yes.

THE COURT:   If the issue of potential juror misconduct was to be examined, it would require significant investigative work and litigation that could not realistically be conducted from prison without counsel.  You understand that?

THE DEFENDANT:   Yes.

THE COURT:   Any Brady issue involving undisclosed evidence in your favor requires also discovery and could be

delayed, would be delayed and limited in your access to this information if you proceeded without counsel. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Now, Mr. Davis, I must advise you that I do not think that it's in your best interest to proceed as your own attorney in post-conviction proceedings. You are entitled to counsel because it is such an important proceeding. These are legal proceedings and you're a layman who could benefit from legal representation. That's my opinion. It's important that you understand that you will be able to challenge the constitutionality of both the underlying convictions in the guilt phase and the death sentence and post-conviction proceedings. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Mr. Davis, let me ask you one more time again. Do you fully understand the consequences of your decision to proceed without counsel?

THE DEFENDANT: Yes, I do.

THE COURT: Do you still wish to proceed without counsel?

THE DEFENDANT: Yes, I do.

THE COURT: Are you deciding to proceed without counsel voluntarily and of your own free will?

**16**

THE DEFENDANT:  Yes.

THE COURT:  Based upon the testimony received, I find that Mr. Davis has clearly and unequivocally requested to proceed pro se and without legal representation.  I find that Mr. Davis understands the consequences of proceeding without counsel and is waiving his right to counsel voluntarily, knowingly, and intelligently, therefore, I grant the motion of Mr. Davis to represent himself during post-conviction proceedings.

Mr. Davis, your right to proceed without counsel is not absolute.  I may terminate your right to self-representation if you're not willing or able to abide by the rules of procedure and courtroom protocol.  And I am also going to order that Rebecca Hudsmith and Sarah Ottinger be appointed as standby counsel in the event you wish to utilize their services.  To a large extent they can be your legs on the outside in gathering information that you need more quickly to gather.  So I would recommend that you do utilize them in any kind of capacity you feel is appropriate, but particularly because this is such a time pressure situation, you need to get information quickly from the outside, so I do recommend that you take advantage of them in whatever way you want to utilize them to at least expedite the process for you.

THE DEFENDANT:  I have a question about that,

Judge.

THE COURT:   Sure.

THE DEFENDANT:   You say standby counsel.  You're not saying that they have the ability to do anything on their own?

THE COURT:   No.

THE DEFENDANT:   Okay.

THE COURT:   No.  No, just basically the same relation, that's why I was asking you about Mr. Murray. Basically the same relationship that you had with Mr. Murray because you are confined and because you're confined in a place that's apparently pretty durn restrictive I don't want you not filing because you run out of time, okay.  I mean, it's available.  They can provide, as I say, the legs to expedite the things that you want and need in order to prepare your petition.  But, no, they would not.  They might tell you they think it's not a good idea or something like that and you can tell them to go blow smoke.  But, no, you would be in charge of your representation just like you were with Mr. Murray, as I understand the relationship you all had.

There is a question I think perhaps from the government as to whether or not it's appropriate for me to appoint standby counsel and since I have appointed Ms. Ottinger and Ms. Hudsmith as standby counsel, if either party

wishes to file memos.

I mean, Mr. McMahon, do you want to pursue the question about whether standby counsel is appropriate, because I think you wanted to raise the issue about it?  You raised it, I think, before, when we did it before, but whether or not you want to raise that.  We need to have memos if we're going to take it up as an issue.

MR. MCMAHON:  Your Honor, if the Court wasn't going to raise it now, then I was.  As the Court will recall when the first mandate was issued March 17 of '01, the Court appointed Laurie White as so-called independent counsel and then a second mandamus issued on March 11, '02.

THE COURT:  I am not doing that, no.

MR. MCMAHON:  What I was going to bring up today was, is that this issue of standby counsel and, again, you know making sure that the Court or anybody else is not trampling Mr. Davis' Sixth Amendment right.  And I understand this is a serious case and I have heard that moniker, death is stiffer, for the last 15 years.  But the point is, though, Mr. Davis, who is competent and intelligent and actually I think his description of lawyers in that motion filed May 10th was pretty accurate, but the thing --

THE COURT:  Not prosecutors, though?

MR. MCMAHON:  Huh?

THE COURT:  Not prosecutors, though?

MR. MCMAHON:  No way.  But the thing is that he does have this right and I just want to make it clear that Mr. Davis understands that this so-called standby counsel is not going to impinge on that right, you know, and that's the beauty of our Constitution.  I mean  --

THE COURT:  Mr. McMahon, my only question is whether or not you want to file, if you want to challenge my appointing standby counsel.  Laurie White I appointed as independent counsel to represent the public interests and that was  a rather novel thing to try to do and I got slapped down by the Fifth Circuit for that.  This is essentially what happened when I appointed Julian Murray to assist him and I frankly don't recall if you objected to that at that time. We're not talking about independent counsel, we're not talking about forcing counsel on Mr. Davis.  I'm just providing him standby counsel that he can utilize because of the time issues involved.  Frankly, I am more concerned about time than anything else.  I think standby counsel can gather things that he wants them to gather faster than he can from being inside the prison.

THE DEFENDANT:  Right.  But just as long as Mr. Davis, that his wishes are carried out and that so-called standby counsel does not impinge.  It's either  --  and, again, I think what we argued before was this hybrid, either he represents himself or he doesn't.

THE COURT:   Right.

MR. MCMAHON:   So I just want to make sure that this standby counsel is not some back door way of diluting his wishes here, that's all.

THE COURT:   I don't think Mr. Davis is capable of being deluded at this point.  I think he knows.  I think if there was any interference by his counsel of what he wanted to do, we would hear about it very quickly.

MR. MCMAHON:   No, not delude, dilute.

THE COURT:   Dilute, okay.  Either one.

MR. MCMAHON:   Okay.

THE COURT:   So you're not interested in filing a memo then?

MR. MCMAHON:   No, if Mr. Davis doesn't have any problem with it.  I think, again, ultimately under Faretta it's his call.

THE COURT:   Right.  Okay.

MR. MCMAHON:   I just want to make sure that this is not some, you know, some back door way  --

THE COURT:   No.

MR. MCMAHON:   -- of going against his informed desire here, that's all.

THE COURT:   No.  Okay.  All right.  Then we don't need memos after all on that.  And that concludes the hearing.

Mr. Davis, if you want to spend a little bit of time talking to them, since this is probably the only time you will be able to see them, just to establish your own protocol with them as to what  --  you know, I think that you clearly, when you talked with them a few weeks ago or a month or so ago, made it pretty clear how you feel.

But, again, I think it's an opportunity to have legs on the outside of the prison that can help you gather the things that you might need.  That's my main, frankly, my main purpose.

THE DEFENDANT:  I continue to stand where I stood, Your Honor.  I have no interest in speaking to lawyers, period.

THE COURT:  Okay.  Well, I mean, they're here.

THE DEFENDANT:  I can respect that but, I mean, we went through this at Terre Haute.  I made it clear I didn't want any visits and I told the counselor that and I got a visit up there anyway.  I didn't mean to have her sit out there like that but I told them I wasn't accepting visits and they came on their own, so.

I'm not interested in speaking to lawyers over the telephone.  I am not interested in having visitations with lawyers, doing any correspondence with lawyers.  If that changes, I told the Court I would notify the Court.

THE COURT:  Let me ask you this.  Do you still

have your contact information for Ms. Hudsmith and Ms. Ottinger?

THE DEFENDANT:   Yes.  I have some paperwork with their addresses.

THE COURT:   And their phone numbers?

THE DEFENDANT:   And phone numbers, that's correct.

THE COURT:   In that case, please, if you find that you need something, they are appointed so they are there for you.  So if you find that you need something in a hurry in particular or if you're having difficulty gathering something from the outside that you want, by all means contact them. And, as I say, let them be your legs.

They're not your attorneys as you're representing yourself, but they can certainly provide and get you material faster than I think you can get it on your own.  That's my main thought.

THE DEFENDANT:   Just so I'm clear, they don't have any power to file anything without my permission, correct?

THE COURT:   That's correct.

THE DEFENDANT:   Okay.

THE COURT:   Totally correct.

THE DEFENDANT:   As long as that's clear, I don't have a problem.

THE COURT:   All right.  Ms. Hudsmith, Ms. Ottinger, he doesn't want to talk with you.  Do you want to

just turn around and see how they look, see who they are? That's Ms. Ottinger on the left and that's Ms. Hudsmith on the right.

MS. HUDSMITH:   On the left.

THE COURT:   And so use them, okay.   All right. Anything else from anybody?

MR. MCMAHON:   No, Your Honor.

THE COURT:   Good luck, Mr. Davis.

(End of proceedings.)

### REPORTER'S CERTIFICATE

I, Arlene Movahed, Official Court Reporter, for the United States District Court for the Eastern District of Louisiana, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a full, true and correct transcript of proceedings had in the within-entitled and numbered cause on the date herein before set forth and I do further certify that the foregoing transcript has been prepared by me or under my direction.

s/   Arlene Movahed
ARLENE MOVAHED, CCR
Official Court Reporter
United States District Court
Eastern District of Louisiana