**UNITED STATED DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL DOCKET NO. 94-381** |
| **v.** | * | |
| | | **SECTION: "C"** |
| **LEN DAVIS** | * | |

\* \* \*

**GOVERNMENT'S OPPOSITION TO MOTION FOR LEAVE
TO CONDUCT DISCOVERY (DOC. 2267)**

**I.     Standby Counsels' Discovery Motion Re-Hashes Requests Already Raised And Decided; It Is Also An Application For A "Fishing Expedition"**

Rehashing previous requests, standby counsels' discovery motion should be denied for several reasons: first, it is a regurgitation of requests during the course of this 19-year-old litigation that were raised, considered, and decided; indeed, this case has been marked by vigorous motion practice and it is hard to conceive of a motion *not* made in the blizzard of pleadings that have marked its seemingly interminable course. Second, even assuming for argument's sake that the requests are original, Davis's motion, by its own terms, is a "fishing expedition" that alleges no specific grounds to justify discovery, and thus fails to show good cause. Third, habeas corpus is reserved for serious violations of constitutional magnitude that result in a miscarriage of justice; it is not a substitute for appeal. And, since habeas litigation may not do service for appeal, it certainly cannot be an excuse for a re-do of nearly two decades' worth of motion practice.

But, a disturbing element to the motion must be confronted at the outset: while standby counsel have proven themselves undeterred by Court orders if it means advancing their agenda, they have reached a new low here. They accuse, in the basest fashion, the FBI and the

prosecution of, quoting *verbatim*, being "… complicit in the murder for which [they] attributed sole responsibility to Mr. Davis." Going lower, they dare to compare us to a thoroughly corrupt Chicago judge who routinely fixed murder cases for money and was convicted of that corruption in federal court.

Frankly, it is difficult to maintain a civil tone when addressing this rubbish. It is one thing to file motions in good faith, based on fact and for good cause, but it is quite another to make gross, baseless accusations that accuse, in a public document, the prosecution team of committing a crime.[1] Prosecutors are expected to strike hard, yet fair, blows; standby counsel do not subscribe to that standard. With them, anything goes, no matter how palpably incredible and foul. And, that tired "death is different" saw from *Woodson v. North Carolina*, trotted out so often in this case, is not license to concoct baseless accusations.

Shamelessly, standby counsel dare to compare the prosecution team with Maloney, the corrupt judge discussed in *Bracy v. Gramley*, 520 U.S. 899 (1997). Defendant Bracy was convicted and sentenced to death in Maloney's court for his role in a triple murder. Maloney routinely took bribes to fix cases, including prosecutions of organized crime figures in Chicago, although he was not bribed to fix Bracy's trial. Several years after Bracy's conviction, Maloney achieved the dubious distinction of being the first Illinois judge convicted of taking bribes in murder cases.

Shortly after Maloney's trial, Bracy filed a habeas petition claiming that he was denied a fair trial because, in order to cover up the fact that Maloney accepted bribes from some defendants, the judge leaned toward the prosecution in other cases in order to compensate for his

---

[1] Since Davis's counsel are unable to control their libelous urges, is it too much to ask the Court to rein in Davis's counsel, at least for the sake of professionalism and decorum?

corruption, and Bracy sought discovery in support of that claim. Both the district and Seventh Circuit courts concluded that Bracy's claim of "compensatory bias" was too speculative to justify discovery in his habeas action. But, even though the Court of Appeals rejected the discovery request, it conceded, in contrast to Davis's motion, that Bracy's theory was plausible, but not "sufficiently compelling [an] empirical proposition" to justify presuming actual judicial bias. 520 U.S. at 903. The Supreme Court, however, reversed and held that Bracy had shown good cause for his request.

Standby counsels' invocation of *Bracy* follows the pattern they have set in other motions: they latch onto a case that presents an attractive theory, such as *Bracy's* "compensatory judicial bias," and then shoe-horn those facts and that theory, as incongruous as they may be, to accommodate Davis's own theory. It is the equivalent of reverse-engineering. But *Bracy's* facts cannot be made to fit here and analogizing them to this case is, mixing metaphors, banging an square peg into a round hole. Taking their analogy lower, they befoul themselves with their *ad hominem* attack on the prosecution. But character assassination cannot compensate for lack of facts.

*Bracy's* factual backdrop does not remotely parallel this case: at least with *Bracy*, there was a solid record, including a trial transcript, that documented Maloney's corrupt practices, leaving no doubt that he fixed cases and retaliated against defendants who would not bribe him. In fact, the Supreme Court relied on the testimony of an attorney named Swano, who said that Maloney retaliated against one of his clients when Swano failed to offer Maloney a bribe; and, in bribe negotiations in a different case, Maloney's bag man Magee also admitted as much. *Id* at n. 5. Davis offers no factual support, no specific allegation, for the preposterous accusation that the

government allowed Davis and Hardy to commit murder to protect the integrity of Operation Shattered Shield and then prosecuted Davis "too vigorously" for Kim Groves's murder to compensate for that purported corruption.

Just think for a moment about the illogic of standby counsels' accusation, which is matched only by its offensiveness: can anyone outside Lewis Carroll's Wonderland believe that the government allowed murders to take place in order to snare a few corrupt cops? That scabrous suggestion, apart from its total lack of factual support, is conclusory, conjectural, and a figment of counsels' imagination: after the 19 years since the investigation of Davis ended, standby counsel point to no trial transcript, no witness testimony or statement, or any other specific allegation that the government allowed the defendants to commit mayhem on New Orleans's streets. Failing to allege specific allegations, counsel therefore fail to show good cause for discovery.

And, although Davis's standby counsel phrase it in cruder terms, their request is a regurgitation of a motion filed previously by Hardy, although Hardy's pleading was a bit softer around the edges: in Document 757, Hardy requested access to the FBI internal investigation that followed Ms. Groves's murder. Hardy there claimed that the government's decision to seek death penalty authorization was to "compensate, or somehow make amends," for the FBI's purported failure to stop the murder. The government responded in Document 814 and the court granted Hardy's motion in an order filed March 2, 2001. (Doc. 862.) This request was satisfied 13 years ago.

But Davis's re-warming of previously-filed motions does not stop with the request for the FBI report. Their motion to conduct discovery is redundant: every request comprising Davis's

˅4˅

motion has been made before, in one form or the other: Davis has already moved for production of documentation, including NOPD reports, regarding the Carlos Adams, Shawn King/Troy Watts, and Christopher Williams incidents, as well as the October 20, 1994 "Poonie" call, and the Court has ruled on these requests. Additionally, the defendants also received every conversation recorded during the Title III intercepts.

We also point out that standby counsels' perfervid accusation that the government aided and abetted the Watts, *et al.*, homicides ignores the fact that the conversations in which Davis and Hardy discussed the incidents took place *after* they occurred. So, the question lingers: how could government complicity be gleaned from after-the-fact conversations that amounted to nothing more than project gossip, particularly regarding the King/Watts killings. In that call, an example of the criminal intimacy between street thug and his police patron, Hardy and Davis marvel at the number of shots fired into the victims, but that conversation does not implicate Hardy or his crew in the assault. And, furthermore, the government *never* attributed those shootings to either Hardy or Davis.

Davis has also made oft-repeated, insistent requests centering on a supposed "plea agreement" with Sammie Williams. That topic has been beaten to death. Even after the evidentiary hearing held on the subject in May 2001, the same motions were re-urged again and again. There is nothing more to "discover" in that vein.

Which begs the question: since these latest requests re-hash others made before, Davis's counsel cannot, as they must, outline exactly what more they hope to "discovery," over and above what they have received already. Indeed, this entire exercise is moot; it is nothing more than a transparent, temporizing tactic. Davis has received, in the 19 years' worth of motion

practice since he was indicted, everything his redundant motion asks for: instead of "good cause," the motion merely concludes, speculates, and guesses; it lacks the requisite specificity to permit further "discovery."

Here is a non-exhaustive chronology of those prior motions, re-warmed by standby counsel:[2] Document 763: Davis motion to exclude testimony from Sammie Williams; Document 774: government's response to Davis bill of particulars and discovery (regarding non-statutory aggravating factors including the incidents of violence that Davis lists in his discovery motion) (Doc. 753); Document 795: Court rules Davis motion for bill of particulars and discovery regarding non-statutory aggravating factors satisfied; Document 757: Hardy motion for discovery regarding the alleged "FBI's failure to take action" [to prevent Ms. Groves's murder]; Document 814: government's response to same; Document 862: Hardy's request granted; Document 829: Davis motion for new trial on newly discovered evidence regarding testimony of Sammie Williams; Document 854: Court denies motion on February 20, 2001; Document 830: Davis motion for newly discovered evidence alleging Sammie Williams as an unindicted co-conspirator, denied as moot in Document 854; Document 856: Court's order regarding return on subpoena duces tecum for NOPD records of the murders noted in the notice of non-statutory aggravating factors, which are repeated in the instant motion to conduct discovery.

Continuing the non-exhaustive case chronology: Document 862: Court notes that the government provided *in-camera* the documentation requested in Document 757 regarding the FBI's alleged failure to act to prevent Ms. Groves murder; Document 878: Davis motion regarding Sammie Williams alleged "previously denied plea agreement"; Document 900: Court's

---

[2] The documents enumerated go back no further than 2000; between the 1994 original indictment and 2000, even more of these pleadings were duplicated.

order that FBI special agents Lester Tomashiro and Kathleen Adams must appear to testify at the May 2001 hearing regarding Sammie Williams's alleged plea agreement.

And, after those persistent, but empty queries, also regurgitated here, an evidentiary hearing was held on May 16, 2001, to explore, and finally put to rest, any questions about the alleged Sammie Williams "plea agreement"; the Court ruled that the motion was "satisfied" in Document 936, seemingly putting that issue, finally, to rest.

But, no such luck: less than two months after that hearing, Davis filed Document 945, yet another motion "based on newly-discovered evidence that Sammie Williams had a plea agreement," which was, once more, denied in Document 956; in Document 1058 Davis filed a motion for reconsideration of the refusal to overturn his conviction based on Sammie Williams's alleged "false testimony," which was denied in Document 1079.

In Document 1141, Davis filed a motion for disclosure of the government's death penalty submission to the Attorney General, which Davis's standby counsel parrots here: it was denied on April 12, 2005, in Document 1159; in Document 1146, Davis filed a motion for discovery regarding application of the federal death penalty in this district and nationwide and that, too, was denied in Document 1174; the Court ordered in Document 1159 that the government provide all FBI 302s regarding Sammie Williams and Larry Smith; in Document 1166, Davis filed a motion to issue a Rule 17(c) subpoena to FBI experts, which was denied in Document 1192; in Document 1199, the Court ordered the authorization to pay the services of a forensic expert, yet another redundant request included in the instant motion; Document 1520: Davis motion for a Rule 29 judgment of acquittal, yet again alleging a plea agreement with Sammie Williams, which was denied in Document 1527.

## II.   Davis Fails to Establish Any Predicate Regarding Selective Prosecution

A person making a selective prosecution claim must establish: (1) the federal prosecutorial policy had a discriminatory effect and (2) it was motivated by a discriminatory purpose.  *See United States v. Armstrong*, 517 U.S. 456, 465 (1996); *see also United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006).  To establish a discriminatory effect, a defendant must make a "credible showing" that similarly-situated individuals of a different race were not selected for capital prosecution.  *Id.* at 469-70.  Defendants are similarly situated when their circumstances present "no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them."  *United States v. Taylor*, 608 F. Supp.2d 1263, 1266 (D.N.M. 2009) (*quoting United States v. Hastings*, 126 F.3d 310, 313 (4th Cir. 1997)).  To show discriminatory purpose, Davis must show that discriminatory intent was a "motivating factor in the decision" to seek the death penalty against him.  *Alcaraz-Arellano*, 441 F.3d at 1264.

Davis requests, again without providing specific allegations, discovery regarding the decision to seek the death penalty against him. He claims, again with no proof, that he was selected for capital punishment because of his race. Again, standby counsel fail to make the threshold showing of discriminatory purpose or intent to support their discovery request. For this reason alone, the Court should deny Davis's motion.  *See Taylor*, 608 F. Supp.2d 1263, 1266 (D.N.M. 2009) (noting that defendant must meet both prongs of the *Armstrong* test to support his motion for discovery); *see also United States v. Holloway*, 29 F. Supp.2d 435, 442 (M.D. Tenn. 1998) (denying motion for discovery where defendant did not produce any evidence tending to show the existence of discrinatory intent).

The standard of proof for a selective prosecution claim is a "demanding" one, *Armstrong*, 517 U.S. at 463, because a claimant is asking the judiciary to exercise power over a "special province" of the executive branch, *id.* at 464, and judicial review of prosecutorial decisions could "chill law enforcement by subjecting the prosecutor's motives and decision making to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Id.* at 465.   *Alcaraz-Arellano*, 441 F.3d at 1264.

In fact, the procedure used to determine when capital punishment is sought demonstrates the absence of discriminatory intent.  Decisions to seek the death penalty within the federal system are made pursuant to the so-called "Death Penalty Protocol," promulgated by the Department of Justice shortly after enactment of the Federal Death Penalty Act), and now which appears in Title 9, Section 10, of the U.S. Attorneys' Manual.  Under the Protocol, a U.S. Attorney must decide first whether to charge a defendant in his district with a capital-eligible offense. Once a defendant is so charged, the U.S. Attorney makes a detailed submission to DOJ that includes a recommendation for or against seeking the death penalty.  *See* USAM § 9-10.040. The submission is reviewed by the Attorney General's Review Committee on Capital Cases, which makes its own recommendation, but not before providing defense counsel an opportunity to present to the Committee reasons against the death penalty.  *Id.* § 9-10.120.  The Attorney General then makes the final decision whether or not to seek capital punishment, based on standards that track the factors a jury is required to consider under the FDPA.  *See id.* §§ 9-10.120, 9-10.130.  The Protocol provides that bias for or against an individual based upon characteristics such as race or ethnic origin cannot play any role in the decision to seek the death penalty.  *Id.* § 9-10.030.  In fact, in most cases, DOJ's decision-makers (i.e. the Review

˘9˘

Committee and Attorney General) are not even made aware of the race of the defendant or the victim.

The same justifications supporting the "rigorous standard" to prove a selective prosecution claim also require a correspondingly "rigorous standard" to obtain discovery in aid of such a claim.   *Taylor*, 608 F. Supp.2d at 1265 (quoting *Armstrong*, 517 U.S. at 468).   The Tenth Circuit has cautioned against treating *Armstrong's* "some evidence tending to show" standard lightly. *See United States v. James*, 257 F.3d 1173, 1178 (10th Cir. 2001).   The court held that, given the heavy burden that discovery can impose on the government, the showing necessary to obtain discovery for a selective prosecution claim must "itself be a significant barrier to the litigation of insubstantial claims."   *Id*. (quoting *Armstrong*, 517 U.S. at 464 (noting that a significant barrier to discovery is necessary because discovery "imposes many of the costs present when the government must respond to a prima facie case of selective prosecution").)

Those rigorous standards have equal application in this case.   *See United States v. Bass*, 536 U.S. 862 (2002), where a federal capital defendant moved to dismiss the notice of intent to seek the death penalty on the grounds that the government was seeking the death penalty against him because he was black.   536 U.S. at 862.   In the alternative, just as Davis does here, Bass sought discovery of the government's charging practices.   The district court granted the motion for discovery, and dismissed the death notice after the government refused to obey the discovery order.   *Id*. at 863.   The Sixth Circuit affirmed, finding that DOJ statements and other statistical evidence met the *Armstrong* requirements of demonstrating both a discriminatory effect and a discriminatory purpose. Of course, Davis does not present a shred of such evidence.   *United States v. Bass*, 266 F.3d 532, 536 (6th Cir. 2001). The Supreme Court, *per curiam*, reversed,

holding that the defendant failed to show evidence of discriminatory effect.    536 U.S. at 863-64:

> Even assuming that the Armstrong requirement can be satisfied by a
> nationwide showing (as opposed to a showing regarding the record of the
> decision-makers in respondent's case), raw statistics regarding overall
> charges say nothing about charges brought against *similarly situated*
> *defendants*.

The Court concluded that "[t]he Sixth Circuit's decision is contrary to *Armstrong* and threatens the performance of 'a core executive constitutional function.'"    *Id*.    Thus, the framework for adjudicating selective prosecution claims set out in *Armstrong* controls capital discovery motions.

Accordingly, in order to meet the standard for discovery set forth in *Armstrong* and *Bass*, Davis must point to instances where the Government elected not to seek the death penalty against non-Caucasian men who were former police officers who ordered violent drug dealers to kill black women in retaliation for their reporting abuse on the part of the cops.    Alternatively, he must point to instances where the Government did not seek the death penalty against white male former cops who killed Caucasian women for the same reason.    He must also show that these men had similar personal backgrounds or social histories, similar criminal records, and similar motivations for killing their victims.    *See Taylor*, 608 F. Supp.2d at 1266 (indicating defendants are similarly situated when their circumstances present "*no distinguishable legitimate prosecutorial factors* that might justify making different prosecutorial decisions"). Davis fails on all counts to make the required showing.

Davis meekly attempts to meet this rigorous standard by incorrectly asserting that he has presented "very specific evidence of similarly situated federal death penalty eligible defendants"

whose cases did not ultimately go forward to a capital trial. He has, however, neglected to explain what that "specific evidence" is or how it supports his claim.

### III.    Concomitantly, Davis Is Not Entitled To The Death Penalty Submission To The Attorney General

Davis, additionally, is not entitled to discovery of the USAO submission. There is no authority, constitutional, statutory, or otherwise, for ordering its production; indeed, the USAM and the caselaw make clear that defendants have no right to its disclosure.  That evaluative document is internal work product that pertains only to the exercise of prosecutorial discretion. It is also subject to protection under the deliberative process privilege, and its discovery would tend only to impede that process, depriving the Attorney General of the ability to obtain a full and candid assessment of the case from the USAO.

The Supreme Court has held that "'there is no general constitutional right to discovery in a criminal case, and *Brady* [*v. Maryland*, 373 U.S. 83 (1963)],' which addressed only exculpatory evidence, 'did not create one.'"   *Gray v. Netherland*, 518 U.S. 152, 168 (1996) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).)   Moreover, there is no discovery right in the charging phase.   The prosecutor is not required to present exculpatory evidence to the grand jury, *United States v. Williams*, 504 U.S. 36, 51 (1992), nor does a defendant have a right to discovery of evidence before indictment.

The prosecutorial decision "whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in [the prosecutor's discretion]," so long as it is supported by probable cause. *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). *See also Armstrong*, 517 U.S. at 464 (1996) (decision whether to prosecute rests in government's

discretion unless premised on constitutionally prohibited criteria). By mandating a court-ordered procedure, enforced through a preclusive sanction, the district court's order intrudes on this discretion.

Furthermore, no statute or rule confers a right to disclosure of the USAO submission. Federal Rule of Criminal Procedure 16 cannot support such an order; indeed, the rule "does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by the attorney for the government or any other government agent investigating or prosecuting the case." *See* Fed. R. Crim. P. 16(a)(2), advisory committee note (1974) ("the work product of the government attorney is protected"); *United States v. Amlani*, 111 F.3d 705, 713 (9th Cir. 1997) (Rule 16(a)(2) bars discovery of evidence logs). Thus, the Supreme Court has held that "under Rule 16(a)(2), [a defendant] may not examine Government work product in connection with his case." *Armstrong*, 517 U.S. at 463.

Similar to the work product rule embodied in Rule 16(a)(2) is the deliberative process privilege. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150-54 (1975) (describing deliberative process privilege that is covered by 5 U.S.C. § 552(b)(5).) That privilege protects communications received by the decisionmaker before a decision is made. 421 U.S. at 151. During discussion from an inferior to a superior regarding a particular decision, "[c]andor is at a premium in these communications," warranting invocation of the privilege. *Maricopa Audubon Society v. United States Forest Serv.*, 108 F.3d 1089, 1095 (9th Cir. 1997). The USAO submission, made to the Attorney General's Committee before the final decision on whether to seek the death penalty, is also subject to the deliberative process privilege.

Finally, the USAM itself does not create a discovery right. The USAM expressly disclaims

ˇ13ˇ

the creation of any "substantive or procedural" right in a defendant in any matter. USAM § 1-1.000. Indeed, the USAM does not limit the "otherwise lawful litigative prerogatives of the Department of Justice."

District courts that have considered similar requests for the USAO submission have agreed that it is not discoverable, because the USAM does not create enforceable rights and because the government is entitled to make its prosecutorial decisions in an unrestrained manner. *United States v. Frank*, 8 F. Supp. 2d 253, 284 (S.D.N.Y. 1998) ("[t]here are strong policy reasons in favor of keeping confidential the internal deliberative process through which the Government decides whether to use its prosecutorial power to seek the most severe punishment possible"); *United States v. Boyd*, 931 F. Supp. 968, 973 (D.R.I. 1996) ("[t]he procedures outlined by the protocol do not contemplate an adversary proceeding" so as to warrant discovery); *United States v. Roman*, 931 F. Supp. 960, 964 (D.R.I. 1996) ("[s]ince the [USAM] protocol does not create, or sustain, an enforceable right, [defendant's] motion to compel the Government to reveal the Death Penalty Evaluation Form and other information relevant to the decision to seek the death penalty is denied"). Similarly, district courts have refused to order similar discovery or to strike death penalty notices for alleged violations of the USAM procedure. *United States v. Feliciano*, 998 F. Supp. 166, 175-76 (D. Conn. 1998) (denying request for information relating to whether there was a substantial interest in federal, as opposed to state, prosecution, because USAM "does not create any substantive rights and does not entitle defendants to any specific discovery" and issue is "entirely a matter of prosecutorial discretion"); *United States v. McVeigh*, 944 F. Supp. 1478, 1483-84 (D. Colo. 1996) (USAM "Protocol did not create any individual right or entitlement subject to the due process protections

˘14˘

applicable to an adjudicative or quasi-adjudicative governmental action").

## IV.   Habeas Litigation Is Not A Surrogate For Appeal And Davis's Challenge To Composition of The Jury Venires Is Out-Of-Time

Standby counsel, devoid of any factual support, speculate that "the venire in this case was derived from a process in which African-Americans were intentionally excluded." To support such an assertion, a defendant must present "[s]tatistical evidence establishing the disparity between a group's representation in the jury pool and the percentage of the community composed of the groups allegedly underrepresented in the jury pool." *United States v. Weaver*, 267 F.3d 231, 240 (3rd Cir. 2001). The statistical evidence should be based upon "an examination of jury selection practices in a district over a prolonged period of time." *Id.* Not surprising, Davis produces no such data; he merely states a conclusion, with nothing in support.

But, more to the point, Davis's request, made 17 years after the conclusion of his original trial, and after resolution of his direct appeal, is long out-of-time. The appropriate time for challenging the composition of a jury pool in a criminal trial is "before the voir dire examination begins or within seven days after the defendant discovered or could have discovered, by the exercise of due diligence, the grounds therefore, whichever is earlier …." 28 U.S.C. § 1867(a), (e). *See United States v. Hawkins*, 566 F.2d 1006, 1013 (5th Cir. 1978); and   *United States v. Ramos*, 310 Fed. App'x. 681, 2009 WL 405869 (C.A. 5 (Tex.)) (citing *Hawkins*). Davis never objected to the method by which either the grand or petit juries were selected. He may not, therefore, raise that objection in this habeas action.

Davis neither objected at trial, nor raised on appeal any question regarding the composition

of the jury venires.[3] His standby counsel are treating habeas as a surrogate for appeal, and this they cannot do. Any question about alleged discrimination in the makeup of the grand and petit jury venires should have been raised on appeal, not here. Since Davis failed to raise this available claim during direct review, the doctrine of procedural default bars its consideration in a § 2255 motion. In fact, a district court may *sua sponte* invoke the procedural default and then apply that default as a bar to a movant's claims. *United States v. Willis*, 273 F.3d 592, 595-96 (5th Cir. 2001); *United States v. Shaid*, 937 F.2d 228, 231-32 (5th Cir. 1991) (*en banc*). This rule is subject to two exceptions, and Davis meets neither one: where a movant can satisfy the "cause and prejudice" test of *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), and where a defendant can show a fundamental miscarriage of justice. *Sawyer v. Whitley*, 503 U.S. 333, 339 (1992).

Under the first exception, a defendant has to show that failure to present a given issue previously was the result of circumstances outside his control ("cause") and that the errors about which he complains created actual and substantial disadvantage, such that his entire trial was tainted with error of constitutional proportions ("prejudice"). *See Coleman v. Thompson*, 501 U.S. 722, 753 (1991); *United States v. Frady*, 456 U.S. 152, 170 (1982).

Conclusory allegations of cause and prejudice are not enough; the burden can be satisfied only by a specific showing of their existence. Here, Davis gives no explanation of either his failure to object to the venires' make-up in 1996, or why he failed to argue the issue on appeal. But the explanation for those failures is obvious: there would have been no merit in the claim. No other case tried in the spring of 1996 spawned any such litigation. And, counsel is not ineffective for refusing to argue a meritless claim on appeal or for raising every conceivable issue. *See Engle v.*

---

[3] Davis, however, claimed a *Batson* violation on direct appeal, and the argument was considered and rejected by the Fifth Circuit.

*Isaac*, 456 U.S. 107, 133-34 (1982).

Davis fails, as well, to meet the second prong. The "fundamental miscarriage of justice" element applies only to situations where a movant can show he is actually innocent. Davis cannot meet that burden either; there is no doubt, reasonable or not, about his guilt: even Fifth Circuit Judge DeMoss, who dissented in the affirmance of Davis's conviction, observed: "The facts of this case are chilling. Davis and Hardy deserve the death penalty for their part in the premeditated murder of Kim Groves." *United Sates v. Causey*, 185 F.3d 407, 428 (5th Cir. 1999). And the majority noted the "ample evidence" marshaled against Davis and the thugs he protected under the aegis of his badge. *Id.* at 416.

## V.    Conclusion

For the reasons set forth above, the Government respectfully requests that the Court deny the defendant's motion without a hearing.

Respectfully Submitted,

KENNETH ALLEN POLITE, JR.
UNITED STATES ATTORNEY


/s/ Michael E. McMahon
MICHAEL E. MCMAHON
Assistant United States Attorney
Louisiana Bar Roll No. 10095
650 Poydras Street, Suite 1600
New Orleans, Louisiana    70130
Telephone: (504) 680-3027

## CERTIFICATE OF SERVICE

I hereby certify that on November 27, 2013, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all defense counsel of record, and by mailing the same to Len Davis, properly addressed and postage prepaid.

s/Michael E. McMahon
MICHAEL E. McMAHON
Assistant United States Attorney