**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 94-381** |
| **v.** | * | **SECTION: "C" (5)** |
| **LEN DAVIS** | * | |

\* \* \*

**GOVERNMENT'S RESPONSE TO GUILT-RELATED ISSUES**
**ADOPTED BY DEFENDANT FROM MOTION UNDER**
**28 U.S.C. § 2255 FOR COLLATERAL RELIEF (DOC. 2265)**

Standby counsels' issues are regurgitations of earlier motions already raised, considered, and decided, both by this Court and the appellate court. Those issues are undeserving of discussion. Standby counsel have demonstrated the propensity to file baseless and duplicative motions, as if repetition alone will produce different results. Instances of this practice as described below merit summary dismissal as the law of the case.

Relief under § 2255 is limited to situations where a conviction or sentence is founded in an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice. A grant of a § 2255 is the rare exception, not the general rule. *See Prewitt v. United States*, 83 F.3d 812, 816 (7th Cir. 1996). And, reviewing a § 2255 motion, this Court must review the record and draw all reasonable inferences in favor of the government. *See Carmine v. United States*, 974 F.2d, 974, 928 (7th Cir. 1992).

As one court observed, it is a "judicial commonplace" that the writ of habeas corpus will not be allowed to serve as an appeal. *Sosa v. United States*, 550 F.2d 244, 246 (5th Cir. 1977). To obtain collateral relief pursuant to 28 U.S.C. § 2255, Davis "must clear a significantly higher hurdle" than the standard controlling direct appeal. *United States v. Frady*, 456 U.S. 152, 166(1982). When a defendant has been convicted and his conviction upheld on direct appeal,

there is a presumption that his conviction is fair and final. *United States v. Cervantes*, 132 F.3d 1106, 1109 (5th Cir. 1998). And, "mere conclusory allegations on a critical issue are insufficient to raise a constitutional issue." *United States v. Pineda*, 988 F.2d 22, 23 (5th Cir. 1993); *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983) ("Absent evidence in the record, a court cannot consider a habeas petitioner's bold assertions on a critical issue…to be of probative evidentiary value").

Standby counsels' habeas petition is voluminous, but its prolixity resides in tautology. The 19 guilt-related issues confected by standby counsel and adopted by Len Davis are disorganized and craftily redundant, with some repeating themselves under different titular mascots or under different numbers: For instance, the "color of law argument" is repeated three separate times, and twice under the same heading (ineffective assistance of counsel). Other arguments are foreclosed by the "law of the case" doctrine; still others comprise general pronouncements on policy lifted from monographs or reports that do not even describe a claim at all. Finally, two of the issues have already been raised, and opposed by the United States in other motions.

So, to make some sense out of that welter and provide a more coherent response, these issues will not be addressed *seriatim*, as numbered by standby counsel. That would lead to inefficient repetition. Rather, they will be catalogued according to topic, combining the same issues under one response:

I.  **Issues 1, 8(A), 8(B), and 28: these overlapping issues accuse the FBI and the prosecutors of having advance knowledge of Ms. Groves murder yet refusing to intercede, all to ensnare more corrupt cops; of "suppressing" information about an after-the-fact report on why the FBI monitor misinterpreted the October 13 calls; of "suppressing" when the government first realized Davis's involvement in Ms. Groves murder; and of only prosecuting Davis to "compensate" for ignoring his violent propensities, all while laboring under a conflict of interest.**

2

The first issue presented is a repetition of Davis's motion for discovery (Doc. 2267). In that motion, Davis scabrously accuses the government of a "conflict" in prosecuting Davis and Hardy in order to "compensate" for allowing Davis to unleash Hardy upon an unsuspecting public. We previously addressed this argument in our response to that motion. (Doc. 2346).

Standbys also have a penchant for playing fast-and-loose with facts. A case-in-point is their first claim, an execrable fantasy echoing their discovery motion (Doc. 2267), that the government allowed Davis to murder Kim Groves, ignoring the risk to public safety posed by a delayed arrest, in order to maintain Operation Shattered Shield and ensnare more corrupt cops. This benthic accusation flows from events taken out of context and distorted into the false assumptions that comprise their conclusion.

Standbys theorize that: in August 1994, FBI Special Agent Kathleen Adams, then assigned to the violent crime squad, interviewed a subject who described the criminal association between Davis and Hardy. Counsel then falsely assume that the information was transmitted to Special Agent Stan Hadden, the case agent on Shattered Shield. In truth, Special Agent Hadden was assigned to a separate squad that focused on public corruption and was investigating Davis and the other corrupt police cohorts who were protecting drug dealers. The agents' respective squads and cases were separate and unrelated: neither were aware of the details of the other.

At that time, Special Agent Hadden's investigation included a wiretap on Davis's cell phone. That phone was never monitored by anyone from Special Agent Adams's violent crime squad. Once again counsel falsely assumes that Special Agents Adams and Hadden were aware of each other's cases and shared information, and that the intercepted calls among Davis, Hardy and Sammie Williams on September 30, 1994, ensuing the murder of Carlos Adams by Hardy's crew, put the FBI on notice that Hardy was a killer and Davis was protecting him. Special Agent

Adams never monitored any of Davis's calls. She was neither aware of Shattered Shield, nor the details of that investigation such as the phone taps. Concomitantly, Special Agent Hadden was not aware, prior to September 30, of Special Agent Adams's August interview.  The agents' respective responsibilities did not overlap; only after Davis's involvement in the Groves murder became known did a review of intercepted calls put events into context.

Operation Shattered Shield was, up to that time, the most significant, and promising, investigation into New Orleans police corruption and, as Davis's standby counsel concede, it was conducted with "utmost secrecy."  (Doc. 2265 at 36.)  It was critically important to keep the investigation as confidential as possible to maintain "operational security"; it functioned on a strict need-to-know basis.  The fewer people who knew about it, including other agents on other squads, such as Special Agent Adams, the better.  Indeed, only one NOPD investigator knew of Shattered Shield and even he did not apprise his supervisors of its existence.  Such compartmentalization meant that the Shattered Shield agents could not have been aware on September 30 that Hardy was a killer and Davis was protecting him.  Special Agent Hadden did not know of the August de-briefing and, conversely, Special Agent Adams did not know of the wiretap.  Standbys' assumption is, therefore, false.

The September 30 conversations were not exactly models of clarity: after Sammie Williams stumbled on the aftermath of the Carlos Adams murder, he called Davis and the following ensued:

SW:       Hello.
LD:       Yeah.
SW:       Call your boy.
LD:       Who?
SW:       "PH".
LD:       And tell him what?
SW:       And ask him.
LD:       Oh, okay, who that is?  Who the victim?

SW:        A nigger name "IU"    (Phonetic).
LD:        "IU"
SW:        And "PH" is the "P".
LD:        They saying that out there?
SW:        No, I,  (laughing)  (pause)  no…
LD:        No, huh?
SW:        Yeah, yeah, cause I almost   (unintelligible)…
LD:        Yeah, cause I'm right here now.  It's a thirty?
SW:        Huh?
LD:        It's a thirty?
SW:        Yeah, looks that way.  I ain't look at him but I think it is.

(Gov. Ex. LD-2)


Davis then connected with Hardy and, once again, their discussion was obtuse:


LD:        What up, nigger, you just beeped me?
SW:        Yeah, somebody just got killed just here.
                              *    *    *
LD:        Sam followed two niggers and said one of the niggers ran to the maroon Cutlass.
           Sam saw, Sam was out there.  See we got off early.
                              *    *    *
LD:        Sam in the Maxima and, uh, he was right there and was gonna start blazin' and
           then he realized the play.
PH:        Yeah.
LD:        Right, but nigger I told you, always let 34, put 34 or somethin', bro.

 (Gov. Ex. LD-4)


Counsel unreasonably suggests that those conversations obviously defined the cover-up

of the Carlos Adams murder and Davis's admonition to Hardy to be more careful in his future

violent acts.  The talk, however, was cryptic; it featured a personal argot used by Williams,

Davis, and Hardy to camouflage talk of violence.  More realistically, to an outsider the calls

would sound like street gossip about just another project murder in the most violent police

district in New Orleans, in the most violent year in the city's history.

Things were no clearer to the lay, non-agent monitor on the evening of October 13. The conversations between Davis and Hardy before Kim Groves execution were opaque at best. Standbys concede, moreover, that those conversations were "laced with slang." (Doc. 2265 at 97.) And contrary to counsels' assertion, these conversations did in fact, "occur in a vacuum" (*Id* at 40). On October 13, neither the monitor nor anyone else connected to Shattered Shield knew of the September 30 calls and, thus, could not put them into context.

But, standbys, comfortably observing the facts from their retrospective perch, are pharisaical with their scabrous assumptions. It is one thing for counsel, oblivious to the truth, to take pot-shots at the monitor so long after the fact. It is quite another to dismiss the reality that a listener in a corruption investigation which, up to that point, gave no indication Davis was protecting a killer, could have missed the meaning of the calls as they occurred in real time. Until October 13, Shattered Shield was strictly an investigation of corrupt cops, not violent street thugs. Thus, there was no reason for the monitor to know that police codes such as "34S" or "30" corresponded to shootings. Under the circumstances, how could the monitor be expected to decipher coded references, recorded over a period of several hours and interspersed in the middle of other calls, such as: "I could get 'P' to come do that 'ho now. And then we handle the thirty," (Gov. Ex LD-8); or "What you mean, nigger? You know what I wanna do!" (Gov. Ex. LD-9) (which started off as a conversation about car insurance); or "…the people gonna call me back in five minutes, but, uh, they code-nining it right now" and "How you know it's a ten-seven thing?" (Gov. Ex LD-17.)

The language of obfuscation deepened between Davis and Hardy when, toward the end of a conversation that began at 11:22 pm, Davis distanced himself from involvement in the murder, feigning that he just happened to hear about it, with Hardy playing along:

LD:              I heard somebody just got shot on Alabo Street.  Say she dead, too.
PH:             Oh yeah?
LD:              Yeah, bro, some bitch, I just had to have, happened to have the radio on.
PH:             Yeah.
LD:              Say it was three niggers in a champagne-colored ninety-three Maxima.
PH:             Oh, man, that's fucked up, a broad?

(Gov. EX LD-18)

That exchange between Davis and Hardy would be dismissed as unremarkable street gossip, especially to a monitor uninitiated in Davis's cant, listening in real time.  While the meaning of the calls intercepted on the night of October 13 are clear now, in retrospect, in context, and with the facts marshalled, standbys' retrospective accusations are unjustified and unrealistic.

Contrary to standbys' smug omniscience, the monitor heard these calls in a vacuum; it was virtually impossible for the Groves murder to have been averted.  The unfounded accusation that a statistics-driven FBI turned a blind eye to Ms. Groves murder just to net a few bad cops, and then colluded with a "conflicted" United States Attorney who indicted Davis merely to "compensate for" that murder is illogical, baseless, and vile.  There was no "conflict" afflicting the FBI or the United States Attorney in Davis's prosecution.

In another display of overheated rhetoric, standbys exaggerate the significance of an FBI internal report commissioned to examine the wiretap monitor's inability to stop Ms. Groves' murder.  They label the report "exculpatory", insinuating that the FBI ultimately found that the calls were innocuous and did not actually describe a murder.  That is a blatant, and absurd, distortion of the report's purpose and the FBI's conclusion that the October 13 calls betokened homicide.  This report addressed why the monitor did not catch the calls; it did not evaluate the quality of the evidence.  And, it concluded that "…based on Davis's historical language,

7

involvement with IAD complaints, personal references, abusive language and use of the phone … Davis's activity on the evening of 10/13 could be mistaken as routine."

The report, then, did not conclude that the calls were innocent, as counsel insinuates. Indeed, suggesting that the FBI viewed the calls as innocent is preposterous; the Bureau merely recognized how easily the monitor could have missed the import of the calls, as they occurred in real time. Counsel then tendentiously contort the reality of the calls' misinterpretation into the absurdist notion that the FBI concluded, after all, that the calls were innocuous.

While the FBI reasonably understood that the monitor could have honestly missed the calls' import, counsel replace reason with razzle-dazzle when they say the report would have altered Davis's trial strategy and that, without it, he was precluded from arguing that the conversations meant something, anything, other than what the prosecution proved. This report would not have changed Davis's trial strategy, nor placed the case in such "a different light as to undermine confidence in the verdict." In fact, Davis argued at trial that the tapes did not mean what they so obviously did: he argued, alternatively, that Ms. Grove's boyfriend killed her or that she was murdered in a drug deal gone bad. The record never suggests that the absence of the FBI report either did or could have hamstrung Davis's defense in any way.

Counsel attribute to the FBI internal report a significance far beyond its real worth. They distort its purpose and conclusion, imagining it could support a speculative Davis argument. That argument might characterize the calls as "just strange conversation," not indications of murder; it might suggest the FBI "chose to ignore" the calls, and were "negligent in failing to stop the murder" and thus sought the death penalty to "make up for their negligence". The argument would then spin into the tale that the government "relied upon the report" to seek the death penalty, a contradiction in itself since a report supposedly "suppressed" to obscure governmental

8

negligence could not support death penalty authorization.  But any of these putative arguments were apparent, and made by Davis who referenced the tapes themselves, which were available to him from the start of the prosecution.  Standbys therefore conflate the report into the tapes: Davis was always able to make those same purportedly suppressed arguments.

Further, the FBI's assessment of the monitor's performance was irrelevant and, hence, inadmissible under F.R.E. 403.  The taped recordings spoke for themselves and were compelling proof of Davis's guilt.  As the Fifth Circuit repeatedly observed, the evidence against the defendants was "overwhelming" and a monitor's failure to realize the tapes' import in real time did not alter this fact.  Neither the monitor's failure to react nor the FBI's conclusion on the issue, interpreted the calls' meaning or otherwise resolved the question.  Counsel's claim that the report was exculpatory is hyperbole; it was not this "vital piece of information" that "established" Davis's conversations with Hardy were "historical and routine."  The calls were overwhelming evidence of guilt and, with or without Sammie Williams, they spoke for themselves.

Standby counsel exaggerate Sammie Williams's supposed "interpretation" of the calls between Davis and Hardy.  They point to his explanation of police terms such as "30" (homicide) and "NAT" (necessary action taken).  Williams did not have exclusive domain over those coded definitions.  Any other police witness could have, if necessary, supplied the meanings of such codes.  Viewed in context, the conversations' import is clear.  They are not so recondite, as standbys suggest, that Williams, alone was qualified to "interpret" them.  Any street-smart agent or cop could explain the calls and Sammie Williams, while useful to the government as Davis's partner who knew his burning animus toward Ms. Groves, was not indispensable.

9

Unbelievably, Davis's counsel also claim that the government "suppressed" the date when it finally realized the October 13 calls described the murder. According to this bizarre theory, the government "covered up," as they put, a belief "that Len Davis was [not] such a risk," "allowing him to remain free and on the police force for weeks." (Doc. 2265 at 103.)

This argument is so illogical that it almost defies response. It insinuates that the government knew of Davis's involvement in the Groves' murder the next day, instead of a week later (which is the fact). Standbys then accuse the prosecutor of creating a conflict by not arresting Davis for six weeks, believing that, to use standbys' words, it was not a " a risk . . . allowing him to remain free." Using magical thinking, they surmise that a "less conflicted prosecution" would not have sought the death penalty and would have "urged the Attorney General to seek life only." This argument is incomprehensibly outlandish. The interregnum between the Groves murder and Davis's arrest did not mean the government thought he was no danger; it, rather, marked the time during which the evidence was developed to support the indictment.

Dovetailing into the monitor-related claim, Davis's standbys alternatively argue that even if the FBI did not realize the calls' significance as they took place, the point when they finally recognized their meaning was "exculpatory" and somehow "suppressed."

This argument betrays counsels' ignorance of the reality of criminal investigation: Davis and Hardy were not allowed to "run loose" unmonitored on the streets, nor was their dangerousness ignored. Rather, time was needed to gather enough evidence (also derived from the continuing wiretap) for probable cause for the search warrants executed in early November of 1994. These warrants ultimately produced the murder weapon.

Davis naïvely suggests that arrests should have been made immediately. Such a precipitant reaction though, would have made indictment much more difficult, by denying the government the opportunity to develop the evidence. Once the FBI realized that Davis orchestrated Ms. Groves murder, they relied on the wiretap to monitor Davis's contacts with Hardy and, if necessary, to thwart any further violence by the defendants.

There was no "suppression" of information here. The date of Ms. Groves' murder and the chronology of events culminating in the indictment were public knowledge. The time required to develop evidence did not create a "conflict of interest". Davis was free to argue any inferences regarding the chronology. In light of the "overwhelming" evidence against Davis, the outcome would have remained unchanged.

Again, standbys falsely claim the FBI knew the day after Ms. Groves' execution that Davis and Hardy were responsible. The truth is that after the IAD investigator suspected Davis had Ms. Groves killed in retaliation for her complaint, the wiretaps were then reviewed. That process took days. In fact, the late Al Winters, co-prosecutor in the drug investigation dubbed Operation Shattered Shield, called the undersigned at home on Saturday, October 22, 1994, nine days after the murder, to report that Davis, the focus of a corruption investigation, may have been involved in a homicide. I reviewed the calls beginning on October 24. Once it became clear that the October 13 calls directed Ms. Groves murder, the investigation shifted to gathering evidence against Davis and Hardy. This process also included analysis of all the previously-intercepted conversations (including the September 30 series of calls between Davis and Hardy in the aftermath of the Carlos Adams murder by Hardy's crew). Monitoring continued in order to gather the evidence that undergirded the search warrants executed in early November.

Furthermore, counsels' accusation that it "behooved" the government to suppress information about Ms. Groves' murder, allowing Davis to run wild until his arrest, is nonsense. Contrary to their reckless claim, nobody was hurt by Davis or Hardy in the period between October 13 and their arrests, nor do they indicate as much.

The chronology of this investigation is irrelevant. That trial counsel did not argue standbys' absurd theory to the jury shows good judgment, for to do otherwise would have undermined their credibility with the jury.

**II.     The following seven issues, some overlapping, have already been decided against Davis in previous court decisions and are foreclosed from further review under the "law of the case doctrine":**

**Issue 4:  that prosecution under 18 U.S.C. §§ 241 and 242 can only apply when a white defendant, acting under color of law, targets a victim because of race;**

**Issue 10:   that Davis's convictions for violation of §§ 241 and 242 violated the Double Jeopardy Clause;**

**Issues 11(A) (2), 11(B) (2), and 18:  that the "color of law" jurisdictional element in §§ 241 and 242 was not met;**

**Issue 8(C):  that Sammie Williams had an undisclosed deal with the government; and**

**Amendment:  that the indictment was insufficient to support either a death sentence or life imprisonment.**

Under the "law of the case" doctrine "an issue of fact or law decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal." *United States v. Williams*, 517 F.3d 801, 807 (5th Cir. 2008); accord *United States v. Cervantes-Blanco*, 504 F.3d 576, 587 (5th Cir. 2007); *United States v. Becerra*, 155 F.3d 740, 752 (5th Cir. 1998), abrogated on other grounds as stated in *United States v. Farias*, 481 F.3d 289, 292 (5th Cir. 2007).  "This prohibition covers issues decided both expressly and by

necessary implication, and reflects the jurisprudential policy that once an issue is litigated and decided, that should be the end of the matter." *United States v. Pineiro*, 470 F.3d 200, 205 (5th Cir. 2006) (internal quotation marks omitted). "This rule is essential to the orderly administration of justice, as it is aimed at preventing obstinate litigants from repeatedly reasserting the same arguments and at discouraging opportunistic litigants from appealing repeatedly in the hope of acquiring a more favorable appellate panel." *Ibid*.

Repeating yet again a claim that has been beaten to death during this litigation, standby counsel alleges that Sammie Williams got favorable, undisclosed treatment for his testimony. This claim has been repeatedly urged by Davis over the years and it was fully aired in an evidentiary hearing conducted on May 16, 2001 (Doc. 910).

Furthermore, this claim was considered, and dismissed, by the Fifth Circuit in *United States v. Davis*, 609 F.3d 663, 695 (5th Cir. 2010) (*Davis III*) and so the law of the case doctrine proscribes further review. The Fifth Circuit held that the Sammie Williams issue failed under both the *Brady* and *Giglio* standards. Recalling the May 2001 evidentiary hearing on one of the previous motions on this question, the court decided "there was no plea agreement in place when Williams testified in 1996." (*Id*. at 696.)

Even if an undisclosed agreement were in place – such as the offer of witness protection to Williams and his family – Davis still fails to show a reasonable probability that disclosure would have resulted in a different result. (In fact, Davis's trial counsel, Dwight Doskey, was aware before trial that Williams was in the Witness Security Program, but chose not to question him about it. This decision was reasonable since to do so might have led the jury to "assume[] that Williams needed protection from Davis, who allegedly had Groves killed for filing a complaint against him." (*Id*). Additionally, Williams's denial of any promises "could not" (to

13

use the Fifth Circuit's words) have affected the trial's outcome "in light of the overwhelming evidence against Davis." (*Id.* quoting *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004).)

The "Sammie Williams undisclosed plea agreement" argument, raised and rejected so often before, is but one example of the redundant issues that is foreclosed as "law of the case." Davis's argument that the evidence fell short in proving the "color of law" elements of both counts of conviction for §§ 241 and 242 has been rejected twice before:  in Davis's first appeal, *Causey*, 185 F.3d at 413-16, and in the appeal affirming the second death sentence and convictions, *Davis*, 609 F.3d at 697.  (Davis duplicated the "color of law" argument in issues 11.B.2, falling under ineffective assistance of counsel for "failing to raise the claim," when, of course, counsel can never be ineffective by advancing meritless issues; Davis also raised the same "color of law" challenge in issue 18.)

In disregard of the record, standbys wrongly assert that prior counsel "failed to raise" a double jeopardy objection to Davis's prosecution.  Had counsel so objected they maintain, "Davis would have been granted relief from at least one of his convictions."  The argument is frivolous.  The double jeopardy issue was raised before, and rejected by, the Fifth Circuit in *Davis III*, so it is the "law of the case."  *Davis III* at 697-98.  Furthermore, the supposedly "controlling law" standby counsel cite, *United States v. Gibson*, 820 F.2d 692, 699 (5th Cir. 1987), is unpersuasive: that decision construed the double jeopardy implications of the robbery statutes 18 U.S.C. §§ 2111 and 2114, and had nothing to do with §§ 241 and 242.  Davis's former counsel could never be ineffective for failing to advance a frivolous argument.

Standby counsels' issue 10, also couched in the catch-all of "ineffective assistance," suggests that the Double Jeopardy Clause precluded convictions for violating both 18 U.S.C. §§ 241 and 242.  This issue was put to rest in *Causey*, 185 F.3d at 413-6, noted as well in *Davis*,

14

609 F.3d at 697-98, when the court invoked the "law of the case doctrine" and refused to readdress the issue.

Resuscitating a long-moribund pitch, standbys argue that the violation of the criminal civil rights statutes, §§ 241 and 242, arises only when the offender deprives a victim of her rights because of race, color, or alienage. Thus, they assert, Davis, a black man, should not have been prosecuted since Ms. Groves was not racially targeted. Standby counsel misread the laws.

*United States v. Classic*, 313 U.S. 299(1941), held that the statutes authorized punishment for different offenses, one willfully depriving any inhabitant to deprivation of a right secured by the Constitution; the other willfully subjecting any inhabitant to different punishments on account of color or race. *See also*, *Miller v. United States*, 404 F.2d 611, 612 (5th Cir. 1968), where the appellant made the same argument, and failed.

In obstinate disregard of the "law of the case" doctrine, Davis and Hardy have, between themselves, challenged the sufficiency of the indictment for capital sentencing purposes (with the latest version being Davis's "amendment" filed on May 12, 2014 (Doc. 2353)) four times. Since the Fifth Circuit has thrice rejected this argument, Davis's fourth effort cannot be entertained in his habeas petition.

After the Court blocked the death penalty as to Davis and Hardy, the Fifth Circuit, relying on *United States v. Robinson*, 367 F.3d 278, 285 (5th Cir. 2004), reversed in *United States v. Davis and Hardy*, 380 F.3d 821, 829 (5th Cir. 2004), *(Davis I)* holding that any indictment error was harmless.

On direct appeal of his death sentence, Davis also raised the indictment sufficiency issue. Noting Davis's "acknowledgement" that the issue was resolved against him in *Davis I*, the Fifth Circuit held: "Davis does not and cannot argue that this issue falls within the exceptions to the

law of the case doctrine; therefore, review is foreclosed." *United States v. Davis*, 609 F.3d 663, 697 (5th Cir. 2010) (*Davis II*).

Undeterred by *Davis I* and *II*, Hardy again challenged the indictment.  He attacked its sufficiency to even support his life sentence.  Finding Hardy's argument "puzzling [ ] to say the least," and wondering how "harmless error for imposition of the death penalty can suddenly become reversible error for a lesser sanction," the Fifth Circuit barred consideration of Hardy's challenge.  *United States v. Hardy*, 499 Fed. Appx. 388 (5th Cir. 2012).

Facing three prior failures, Davis's standbys try again.  This time, they imagine the Supreme Court will sail to the rescue.  In their words: "Hardy's counsel raised the claim in the correct manner, and the Supreme Court has ordered the Government to respond to the claim".  Their hope is that, "If Mr. Hardy is ultimately successful, he will be set free while Mr. Davis is potentially executed based upon the same invalid indictment."  (Doc. 2353 at 9-10.)

Davis's "amendment," filed May 12, 2014, however, is outdated and his faith in the Supreme Court has been dashed: counsel failed to update their pleading because the Court denied *certiorari* to Hardy on October 7, 2013.  (Doc. 2342.)  Standby's fourth attack on this score sinks at the feet of "law of the case".

**III.   Davis's standbys accuse both trial and appellate counsel of ineffective assistance. Their meritless arguments fail to rise to constitutional status, resemble paranoid ramblings, and are littered with legal mis-statements.  A federal prisoner cannot assert a non-constitutional claim on collateral attack if he did not raise it on appeal. *Davis v. United States*, 417 U.S. 333, 345-46 n. 15 (1974).  Unlike direct appeals, motions under § 2255 reach only errors of constitutional or jurisdictional magnitude. *United States v. Capua*, 656 F.2d 1033, 1037 (5th Cir. 1981).**

Standby counsels' olio of cookie-cutter assignments of error follow the same pattern. First, they accuse prior counsel of error, but never show how that error deviated from accepted practice.  Second and most critical, they never show prejudice, i.e., how the jury's verdict would

16

have been different, absent those errors.  The reason they don't show prejudice is because they cannot.

All of Davis's contentions, although parroting the rhetoric of "ineffective assistance of counsel," could have been raised on direct appeal. He not only failed to appeal those issues or even explain his failure to do so; he has also failed to show he was actually prejudiced by his attorney's actions.  His petition is merely a warmed-over appeal.

Standbys pile empty claim upon empty claim as if, by magnitude alone, they can prevail. Trial counsel's performance was able, vigorous and thorough, albeit in the face of overwhelming evidence.  There is nothing Davis's lawyers could have done at trial to alter the correct guilty verdicts.  The public will remain confident the outcome was reliable and just.

To obtain habeas corpus relief based on ineffective assistance of counsel, a petitioner must prove both deficiency and prejudice. *Strickland v. Washington,* 466 U.S. 668(1984)*.*  A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a judgment has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing errors so serious that the defendant was deprived of the "counsel" guaranteed by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  To establish prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding," *Strickland*, 466 U.S. at 693; rather, he must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.  In deciding an ineffectiveness claim, the court need not address both prongs of the conjunctive *Strickland* standard, but may dispose of it based solely on a

17

petitioner's failure to meet either prong of the test.  *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994).

The prejudice requirement under *Strickland* is rigorous.  To establish prejudice, Davis must show a reasonable probability that, absent counsel's errors, the result of the proceeding would have been different, meaning here that Davis would have been acquitted of conspiring to murder Kim Groves in violation of her civil rights.  *Strickland* makes clear that, in assessing prejudice, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel had acted differently.  Rather, *Strickland* asks whether it is reasonably likely the result would have been different.  This does not require a showing that counsel's actions more likely than not altered the outcome, but "the difference between *Strickland's* prejudice and a more-probable-than-not standard is slight and matters only in the 'rarest case'."  In other words, "the likelihood of a different result must be substantial, not just conceivable."  *See Clark v. Thaler*, 673 F.3d 410, 422-23 (5th Cir. 2010).

The strength of the government's case also factors into the ineffectiveness equation:  the stronger the case against the defendant, the higher the obstacle he must overcome to prove the significance of counsel's purported errors.  The Fifth Circuit repeatedly observed the evidence against Davis was "overwhelming": testimony…not sufficient to render the trial unfair, relative to the overwhelming evidence against Davis."  609 F.3d at 684); ("…[Sammie] Williams's denial of any promises could not have affected the jury's judgment, or change the outcome of the trial, in light of the overwhelming evidence against Davis."  *Id*. at 696); ("any error…does not require reversal due to the overwhelming evidence of Davis's guilt and the negligible prejudicial affect (sic) of the remarks in the context of this case."  185 F.3d at 418).  And even Circuit Judge

18

DeMoss, who dissented from the affirming opinion on federalism grounds, recognized: "The facts of this case are chilling. Davis and Hardy deserve the death penalty for their part in the premeditated murder of Kim Groves." *Id*. at 428.

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it is proved unsuccessful, to conclude that a particular act or admission was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate hindsight, to reconstruct the circumstances of the challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

Davis also fails to identify, as he must, specific acts or omissions. General statements and conclusional charges will not suffice. Any particular failure by counsel must be pleaded and proven. *Knighten v. Maggio*, 740 F.2d 1344, 1349 (5th Cir. 1984). *Also see Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983) ("Mere conclusory allegations do not raise a constitutional issue in habeas proceeding.")

Counsel is not ineffective for failing to pursue a tactic that would be unsupported by law or evidence. *Hernandez v. Johnson*, 108 F.3d 554, 564 (5th Cir. 1997). "An attorney's failure to raise a meritless argument cannot form the basis of an ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue." *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999); *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998) ("[F]ailure to make a frivolous objection does not cause counsel's performance to fall below an objective level of reasonableness…").

Following their template, standbys assert a conclusion but do not prove prejudice.  They argue counsel was ineffective for allegedly failing to challenge the government's forensic evidence.[1]  The crime scene was as simple as it gets, comprising of a single shell casing and the puddle of blood in which Ms. Groves lay as she died.  Processing that scene amounted to collecting the shell and taking a few photographs.  Yet, standbys still faulted this process, relying on the affidavit of Ronald L. Singer, a hired hand paid to criticize the processing of the crime scene.

Singer generally cautioned that crime scene analysis is "a slow, methodical, systematic, and orderly purposeful driven process that must involve protocols and methodology."  He recommended that evidence "must be documented with adequate video. . .[along with] evidence placards."  Singer went on to criticize the fact "there was no scene video documentation at all, and the quality and quantity of the scene photography were woefully inadequate with no use of scales or evidence placards."  He also found fault that Jimmy Ducos, the NOPD crime scene technician, "only" spent an hour on the scene.

Officer Gary Washington testified that he preserved the scene until it was processed by Mr. Ducos, who marked the shell casing with a cone, and secured and sealed the casing in a marked envelope.  Smugly omniscient, standbys criticize the process because the casing itself was not "etched."  They are forced to concede, however, the two ways to secure casing evidence: indirectly, as here, by placing the casing in a bag and sealing it, or directly, by marking the casing itself.  As to the crucial issue of whether the casing was recovered at Ms. Groves' murder scene was not the one introduced at trial standbys offer no dispute.

---

[1] Davis's trial counsel was certainly effective when he "got Mr. Ducos to admit that he did not initial the casing and could not swear that the casing was the same one he seized."  Doc. 2265 at 158.

They also fail to suggest how videotaping the scene would have made any difference in the trial. Despite the stark reality that Kim Groves was murdered at the intersection of Alabo and Villere Streets, counsel quibble about Ducos's non-scale "rough diagram of the scene" which incorrectly identified the cross street. Is there any doubt that Ms. Groves was killed at the intersection of Alabo and Villere Streets? This trivial, insubstantial complaint comes nowhere close to describing ineffective trial performance.

The testimony of Sammie Williams and Steve Jackson, complemented by the chilling taped conversations between Davis and Hardy, made out a compelling case of, as the Fifth Circuit repeatedly observed, "overwhelming guilt." Counsels' labored attempt to find deficiencies in the absence of a video-taped, sticker-wrapped, placard-strewn crime scene is a sad distraction from the truth.

**IV.   Issues 2, 3, 4, and 20:[2] Although three issues 2, 3, and 4 overlap under an "ineffective assistance of counsel" heading, they assert Davis's prosecution violated the Equal Protection Clause because he was singled out as a black man, and they argue that §§ 241 and 242 could not apply to him because Kim Groves was not murdered on account of her race. Additionally, a variant of the same topic is repeated in issue 20, which does not state a claim, but, rather, cites a monograph and statistics in a general discussion about equal protection.**

Although couched in the language of "ineffective assistance," issues 2, 3, 4, and 20, are really generalized ruminations criticizing the fact that Davis, as a black man, was prosecuted under 18 U.S.C. §§ 241 and 242. They criticize Davis's counsel for allegedly failing to "investigate, raise, and mitigate," the bogus issue that Davis was prosecuted under §§ 241 and 242 for offenses "unrelated to the race of the victim." They argue that, because Ms. Groves was not targeted because of her race, §§ 241 and 242 could not apply. This same claim, is included under issue 2 (which summarize their equal protection argument) and issue 4 which suggests that a deprivation

---

[2] These are redundant and were essentially addressed in Part II, above.

21

of civil rights under color of law can only occur on account of the race of the victim. Additionally, standby counsel cite pre-1994 cases of police officers who did not face the death penalty for homicide of black victims, but ignore that the Violent Crime Control and Law Enforcement Act of 1994, which capitalized fatal violations of the civil rights statutes, was not signed into law until September 13, 1994.

Issue 2 is an equal protection challenge to the indictment which should have been more properly presented as a motion to quash the indictment, but was couched inappropriately in the rubric of ineffective assistance of counsel. It also duplicates Davis's motion to conduct discovery (Doc. 2267), to which the United States has already responded (Doc. 2346). This claim posits that the government targeted Davis because he was black, in violation of equal protection, "continuing," as he puts it, "a long history of ignoring corruption and brutality perpetrated by white police officers."

Issue 3 claims ineffective assistance for not challenging the constitutionality of the application of §§ 241 and 242 to a black defendant, implying that such a prosecution could only be initiated when the defendant is white and the victim is black. Similarly, issue 4 parrots the contention that the law could only be applied when a victim such as Ms. Groves is targeted because of her race.

## V.   Issues 11(A)(1) and 19:  Davis's counsel was ineffective during the pre-trial period leading up to death penalty authorization by the Attorney General.

While standbys reserve accusations of criminal conduct for the prosecution team, they also launch an *ad hominem* attack on Davis's first lawyer, Curklin Atkins, who represented him during the death penalty authorization stage. In a flimsy ineffectiveness of counsel attack, standbys point to alleged questionable behavior by Mr. Atkins toward his former student. Never

22

explained, however, is how that student's complaint links up to Mr. Atkin's role as Davis's counsel. It is an utter factual and logical *non sequitur.*

That personal bashing of Mr. Atkins does not describe any deficiency by counsel or prejudice that resulted during the capital authorization process. Standbys fail to allege what then-counsel did wrong. They fail to allege what they should have done, but didn't. They fail to allege what should have been done to argue against the Attorney General's decision to seek the death penalty against Davis. Falling far short of explaining what, if anything, could have been done by counsel to dissuade the Attorney General from seeking the death penalty, standbys thus woefully fall short of meeting *Strickland.* Simply stated, their suggestions are meritless.

Counsel implausibly suggests that Davis's lawyers "would have discovered" that "similarly situated" (to use standbys' term) white officers escaped the death penalty. They cite eight examples of police homicides by the NOPD from 1968 to 1990. But this recitation of police misconduct exposes counsel's ignorance of the law. Violations of 18 U.S.C. §§ 241 and 242, when death results, only became capital offenses in the Violent Crime Control and Law Enforcement Act of 1994 (HR 3355) (103rd Congress, § 60006), which President Clinton signed into law on September 13, 1994, exactly one month before Davis and Hardy murdered Kim Groves. Had Davis killed Ms. Groves a month earlier, he too would have joined the list of cops who previously escaped the death penalty for their homicides. Applying their own standards, however, standbys' would have to adjudge themselves "ineffective" for relying on examples of police misconduct that could never have described death-eligible offenses.

Standby counsel go on to accuse original counsel of failing to notify the Department of Justice of "this history of race based decision making," (as if the Department was ignorant of such a history) implausibly claiming that, had this information been fronted, there would have

been "a reasonable probability that the prosecution would not have proceeded with capital punishment." (Doc. 2265 at 51.)  This contention is empty; they cite no support whatsoever for it.  Like many of their absurd contentions, this one is speculative, conclusory, and devoid of support.  The list of items "counsel would have discovered" comprise information they already knew.

A selective prosecution claim must establish:  (1) the federal prosecutorial policy had a discriminatory effect and (2) it was motivated by a discriminatory purpose.  *See United States v. Armstrong*, 517 U.S. 456, 465 (1996); *see also United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006).  To establish a discriminatory effect, Davis must make a "credible showing" that similarly-situated individuals of a different race were not selected for capital prosecution.  *Id*. at 469-70.  Defendants are similarly situated when their circumstances present "no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them."  *United States v. Taylor*, 608 F. Supp.2d 1263, 1266 (D.N.M. 2009) (*quoting United States v. Hastings*, 126 F.3d 310, 313 (4th Cir. 1997)).  To show discriminatory purpose, Davis must show that discriminatory intent was a "motivating factor in the decision" to seek the death penalty against him.  *Alcaraz-Arellano*, 441 F.3d at 1264.

The standard of proof for a selective prosecution claim is a "demanding" one, *Armstrong*, 517 U.S. at 463, because a claimant is asking the judiciary to exercise power over a "special province" of the executive branch, *id*, at 464, and judicial review of prosecutorial decisions could "chill law enforcement by subjecting the prosecutor's motives and decision making to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy."  *Id*. at 465.  *Alcaraz-Arellano*, 441 F.3d at 1264.

24

In fact, the procedure used to determine when capital punishment is sought demonstrates the absence of discriminatory intent. Decisions to seek the death penalty within the federal system are made pursuant to the so-called "Death Penalty Protocol." This Protocol was promulgated by the Department of Justice shortly after enactment of the Federal Death Penalty Act (FDPA), and now appears in Title 9, Section 10, of the U.S. Attorney's Manual.

Under the Protocol, a U.S. Attorney must decide first whether to charge a defendant in his district with a capital-eligible offense. Once a defendant is so charged, the U.S. Attorney makes a detailed submission to DOJ that includes a recommendation for or against the death penalty. *See* USAM § 9-10.040. The submission is reviewed by the Attorney General's Review Committee on Capital Cases, which makes its own recommendation, but not before providing defense counsel an opportunity to argue against the death penalty. *Id* § 9-10.120. The Attorney General then decides whether or not to seek capital punishment, based on the standards that track the factors a jury is required to consider under the FDPA. *See id.* §§ 9-10.120, 9-10.130.

The Protocol provides that bias for or against an individual based upon characteristics such as race or ethnic origin cannot play any role in the decision to seek the death penalty. *Id.* § 9-10.030. In fact, in most cases, DOJ's decision-makers (i.e. the Review Committee and Attorney General) are not even made aware of the race of the defendant or the victim.

To meet the *Armstrong* standard, Davis must point to instances where the Government elected not to seek the death penalty against Caucasian police officers who ordered violent drug dealers to kill black women in retaliation for their reporting abuse on the part of the cops. Alternatively, he must provide examples where the Government did not seek the death penalty against white male former cops who killed Caucasian women for the same reason. He must also show that these men had similar personal backgrounds or social histories, similar criminal

25

records, and similar motivations for killing their victims. *See Taylor*, 608 F.Supp.2d at 1266 (indicating defendants are similarly situated when their circumstances present "*no distinguishable legitimate prosecutorial factors* that might justify making different prosecutorial decisions"). Davis fails on all counts to make the required showing.

This claim is also repeated in Issue 20, under the caption: "The Influence of Race in the Conviction and Death Sentence Imposed on Mr. Davis for an Offense Under 18 U.S.C. §§ 241 and 242 Violates the Equal Protection Clause of the Fifth Amendment, Along With the Sixth and Eighth Amendments." Issue 20 also mentions civil rights prosecutions since 1996, including that of the Danziger Bridge cops, in which the death penalty was not sought, implying that race played into that decision. The facts of cases following Davis's prosecution are irrelevant. Although assuming that capital punishment was not sought because of discrimination in favor of whites, standby counsel should know that the death penalty is only possible when the requisite intent and statutory aggravating factors set out in the FDPA are present. Those factors did not obtain in the Danziger case, so the death penalty was not an option, despite the fact that several of the Danziger cops were non-white.

\*　　\*　　\*

**Issue 9:  This unsupported accusation of juror misconduct has already been raised in standby counsel's motion to interview jurors (Doc. 2268), to which the government responded.  (Doc. 2347.)**

Once more speculating, standbys accused trial counsel of "ignor[ing] numerous red flags during voir dire which should have alerted them to the danger that several jurors were biased, exposed to external influences, and incompetent to serve." Doc. 2265 at 165. As putative support for this conclusion, standbys' petition cherry-picks a series of innocuous answers given

26

by prospective jurors, pulled out of context, to suggest bias.  They fall far short of the standard for proving juror bias.

Standby counsels' Issue 9 is yet another unsupported assertion of juror misconduct about which; they also concede the "record [is] silent."   (Doc. 2265 at 111.)   This scattershot contention heaps surmise upon surmise, but never describes any juror misconduct.  Issue 9 merely re-heats the motion to interview jurors, and, in the face of a concededly "silent record," counsel can only conjure (*Id*. at 109) "improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment…" continuing a long litany of other, unsupported accusations, all of which are devoid of record support.  Like the motion to interview jurors, this compendium of imagined improprieties is pure supposition and conjecture, untinctured by fact.

So, in the face of a "silent record" on this score, how could counsel on appeal be ineffective for failing to explore a non-existent, speculative claim?

Davis does not, indeed cannot, point to any juror misconduct.  Prior life experiences, however, such as elements implicated in the trivial trial anecdotes he describes in his motion, relate to a juror's internal decision-making processes.  And prior experiences, even if discussed in the jury room, are not "'extrinsic' evidence that requires a new trial."  *Arreola v. Choudry*, 533 F.3d 601, 606 (5th Cir. 2008) (collecting cases from other circuits).  Standbys renew their vague hope that juror interviews might lead to evidence of misconduct.  But, conclusory statements expressing their hope do not establish specific information. *See Aldridge v. United States,* 2007 WL 1289684 (W.D. Mo.)) *2.

To obtain a new trial for juror bias, Davis must have met the *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556 (1984) test:  "A party must first demonstrate

27

that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *United States v. Doke*, 171 F.3d 240, 246-47 (5th Cir. 1999). Davis failed to demonstrate that any of those jurors was actually or fundamentally incompetent. *United States v. Soto-Silva*, 129 F.3d 340, 343 (5th Cir. 1997).

Actual bias exists when a juror fails to answer a material question accurately because he is biased. Davis had to demonstrate bias through admission or factual proof. *United States v. Scott*, 854 F.2d 697, 699 (5th Cir. 1988). Bias can only be implied or presumed in extreme circumstances, including when the juror is employed by the prosecuting agency, is a close relative of a participant in the trial, or is somehow involved in the transaction that is the subject of the trial. *Id.*

Standbys' selective quotes from the voir dire does not establish juror bias or misconduct. It is easy to extract from the transcript of days-long jury selection aspects of a potential juror's life that can be distorted, as standbys do here, into a false accusation. Prior life experiences, reflected in the trivial anecdotes described in the petition are not extrinsic evidence that requires a new trial. *Arreola v. Choudry*, 533 F.3d 601, 606 (5th Cir. 2008) (collecting cases from other circuits). Counsel was not ineffective.

**VI.     Issues 23, 24, 25, and 26:  Although separately numbered, these make out the same claim under the ineffective assistance of counsel rubric, challenging the composition of Davis's jury venire.  Counsel concede that the issue has already been decided adversely against Davis in a prior decision by this Court.**

Standby counsel concede that issues 23-26, again couched under "ineffective assistance of counsel" for failing to challenge the venire's racial makeup, have been decided by the court against him. Therefore, in light of that concession, they cannot be considered.

Those issues, while differently numbered, are the same: a generalized speculation that the composition of Davis's jury venire violated equal protection because it was not majority black and that it should have been drawn solely from Orleans Parish, not from the 13 parishes that comprise [comprising] the Eastern District.  Since Davis concedes that this Court has "previously held adversely to the defendant" on similar venire challenges (Doc. 2265 at 264, 265 and 267), standby counsel should not have included them at all.

These perfunctory arguments are also incongruous: counsel allude three times to "the county of the offense", in the discussion of Issues 23 (Doc. 2265 at 265); 24 (Doc. 2265 at 266); and Issue 26 (Doc. 2265 at 267).  Louisiana is the only state that has parishes, not counties. Those out-of-place references suggest that these issues are "canned," *pro forma* pleadings, lifted from some capital defense playbook, and filed in every capital case, whether applicable or not. Since issues 23-26 do not make out cognizable claims to Davis's case, as counsel concede, they do not support habeas relief.

## CONCLUSION

In light of the foregoing argument and jurisprudence, the United States prays that Davis's application for relief is denied.

Respectfully Submitted,

KENNETH ALLEN POLITE, JR.
UNITED STATES ATTORNEY


/s/ Michael E. McMahon
MICHAEL E. MCMAHON
Assistant United States Attorney
Louisiana Bar Roll No. 10095
650 Poydras Street, Suite 1600
New Orleans, Louisiana  70130
Telephone: (504) 680-3027

29

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2014, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all defense counsel of record, and by mailing the same to Len Davis, properly addressed and postage prepaid.

s/Michael E. McMahon
MICHAEL E. McMAHON
Assistant United States Attorney
