**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CASE NO. 2:94-cr-00381** |
| | * | |
| **v.** | * | |
| | * | **SECTION "B"** |
| **LEN DAVIS** | * | |
| | * | **THIS IS A CAPITAL CASE** |

## MEMORANDUM IN SUPPORT OF GRANTING EVIDENTIARY HEARING

Pursuant to this Court's order, Rec. Doc. 2449, Mr. Davis submits the following memorandum in support of granting an evidentiary hearing on claims asserted in his § 2255 Motion for Collateral Relief (§ 2255 Motion).

**I. An Evidentiary Hearing Is Mandated Whenever the Four Corners of the Record Do Not *Conclusively* Establish that the Petitioner Is Not Entitled to Relief.**

Section 2255 requires that the district court "grant a prompt hearing" on a § 2255 motion when "the motion and the files and records of the case *conclusively* show that the prisoner is entitled to *no* relief." 28 U.S.C. § 2255(b) (emphasis added); *United States v. Martinez*, 181 F.3d 627, 628 (5th Cir. 1999); *United States v. Rivas-Lopez*, 678 F.3d 353, 358 (5th Cir. 2012) ("A district court must hold an evidentiary hearing '[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'") A conclusive showing is a high bar, which the government has not met in this case. *See United States v. Briggs*, 939 F.2d 222, 228 (5th Cir. 1991) ("Where…the allegations in the §2255 motion are not negated by the record, the district court must hold an evidentiary hearing"); *United States v. Auten*, 632 F.2d 478, 482 (5th Cir. 1980) (documents suggesting, but not proving, that government had failed to

disclose all impeachment information about its witness were sufficient to require a hearing). If "the specific and detailed factual assertions of the petitioner, while improbable, cannot at this juncture be said to be incredible," and, if true, would entitle him to relief, "the function of 28 U.S.C. § 2255 can be served…only by affording the hearing which its provisions require." *Machibroda v. United States*, 368 U.S. 487, 495-96 (1962). Section 2255 thus creates a robust presumption that a petitioner will have an opportunity to prove his extra-record allegations in a hearing. *United States v. Briggs*, 939 F.2d 222, 228 (5th Cir. 1991) ("Where . . . the allegations in the § 2255 motion are not negated by the record, the district court must hold an evidentiary hearing").

When claims concern events that took place outside the district court's presence and that do not appear on the trial record, only an evidentiary hearing can ensure a fair and reliable determination of the underlying facts. *Machibroda,* 368 U.S. at 494-95 (hearing necessary where movant's allegations primarily concern "occurrences outside the courtroom and upon which the record [can], therefore, cast no real light"); *United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004) (same); *Armienti v. United States*, 234 F.3d 820, 825 (2nd Cir. 2000) (a hearing is ordinarily required where the movant's claims depend on "actions taken by counsel outside the [trial judge's] presence").

The high bar for denying evidentiary hearings is intrinsically related to the fact that evidentiary hearings enhance just outcomes in habeas proceedings. When evidence pertaining to a constitutional violation is taken in open court, the record becomes richer and more detailed. The court is better-informed of the circumstances surrounding an alleged constitutional violation. This creates the factual basis of a court's eventual decision that goes beyond the simple facts originally pled in the § 2255 motion.

Evidentiary hearings better inform a court's decision in many ways. Witness demeanor provides an added dimension to credibility determinations—one that is completely absent when a court views the claims "on paper." Moreover, the power to subpoena witnesses to testify in open court means that witnesses who may have previously refused to speak with counsel or an investigator can be compelled to provide relevant testimony. An evidentiary hearing may reveal entirely new information, previously unavailable, that is relevant to claims. And particularly with respect to claims involving a showing of prejudice (ineffective-assistance-of-counsel claims, conflict claims, juror bias claims) or materiality (exculpatory evidence *Brady* claims), an evidentiary hearing can be indispensable to assessing how a particular error deprived a petitioner of his constitutional rights. *See Massaro v. United States*, 538 U.S. 505 (2003) ("additional factual development" in federal district court may be necessary for the appellate court "to ascertain whether the alleged error was prejudicial"); *Davis v. Lambert*, 388 F.3d 1052, 1059 (7th Cir. 2004) ("An adequate record is imperative to properly evaluate ineffective assistance claims"); *Marshall v. Hendricks*, 307 F.3d 36, 115 (3d Cir. 2002) ("a sufficient record to probe the claimed ineffectiveness" is "an essential aspect of any *Strickland* ruling).

A "fully-developed-record" does not simply mean that the record now contains evidence of whatever factual allegations the petitioner was able to make as a result of his own investigation of the case; it also means that the record contains a *complete* accounting of *all* the facts relevant to the petitioner's claims for relief. Only such a fully developed record can support a reliable disposition that protects and enforces the underlying constitutional rights at stake.

Mr. Davis has raised *Strickland* and *Brady* claims that can only be resolved through the taking of evidence. He has raised claims supported by jurors' post-trial statements that can only be resolved by hearing their testimony. And he has raised a conflict-of-interest claim that can

only be resolved through broader discovery than was available prior to trial and the taking of evidence. This Court should grant an evidentiary hearing.

**II. Mr. Davis is Entitled to an Evidentiary Hearing on his Claims of Ineffective Assistance of Trial Counsel in Connection with his 1996 Trial. (Section 2255 Motion, Claims 2, 3, 9, 10, 11, 19, 21, 23, 24, 25, 27, 28, and 29, Rec. Doc. 2340)**

As alleged in Mr. Davis's federal habeas petition, at every stage of his capital prosecution, including the pre-authorization stage through the trial in 1996, Mr. Davis's counsel were ineffective in violation of the Sixth Amendment. To prevail on this claim, Mr. Davis must show that his counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish prejudice, Mr. Davis must show a reasonable probability that the result of the proceedings would have been different but for counsel's unprofessional errors. *Id.* As discussed more fully below, Mr. Davis is entitled to an evidentiary hearing since the record of the case does not conclusively show that Mr. Davis is entitled to no relief on this claim.

During the pre-authorization period following the filing of the indictment in December of 1994, through the filing of the Government's notice of intent to seek the death penalty in July of 1995, there is no evidence that counsel for Mr. Davis investigated, litigated or argued, among other issues, the weaknesses of the "color of law" element, necessary to establish federal jurisdiction over what is otherwise a state crime, in the review process by which the Attorney General ultimately decides whether to authorize the death penalty. In this regard, "under color of law" excludes acts of officers in the ambit of their personal pursuits, *Screws v. United States*, 325 U.S. 91, 111 (1945), and requires that the actor must have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *United States v. Classic*, 313 U.S. 299, 326 (1941).

At the critical, pre-authorization stage of a death-eligible prosecution, effective advocacy requires that defense counsel explore all issues that are likely to enter into the Attorney General's decision whether to authorize a federal death penalty prosecution, including the nature and strength of the federal interest, the evidence of guilt, and the aggravating and mitigating factors. Mr. Curklin Atkins enrolled in the case on behalf of Mr. Davis in December of 1994, and Mr. Milton Masinter was appointed as co-counsel for Mr. Davis on March 29, 1995.  Less than a week later, Mr. Atkins and Mr. Masinter were traveling to Washington, D.C. to make a presentation to the Department of Justice on the issue of whether the Attorney General should authorize the case as a death penalty case.  It is apparent from the billing of counsel that they did not prepare any written submission on the issue of the appropriateness of the death penalty or on the issue of "color of law" at this stage, or any other issue challenging the federal death penalty prosecution of an African American based upon the use of Reconstruction-era legislation designed to protect the rights of newly-emancipated slaves.  Their failure to do so constitutes deficient performance under prevailing standards of performance, as set forth more fully in Mr. Davis's petition.

Moreover, during the pretrial period after the March 1995 presentation in Washington D.C., which was followed by the Government's July 1995 filing of notice of intent to seek death, until the trial in April of 1996, counsel for Mr. Davis did not litigate pretrial the "color of law" issue, or any other issue relative to the Government's use of the Reconstruction-era legislation. Mr. Dwight Doskey, who was appointed to represent Mr. Davis in December of 1995, after the removal of Mr. Atkins, does not recall any discussion or consideration of filing a pretrial motion challenging the federal death penalty prosecution of Mr. Davis on the "color of law" basis, even though, as noted in the Fifth Circuit opinion on appeal, "it was not until September of 1994 that

the death penalty became an available sanction, and this case appears to be the first case in which the death penalty has been imposed upon defendants charged with a deprivation of civil rights in violation of these Civil War reconstruction statutes." *United States v. Causey, et al.*, 185 F.3d 407, 427 (5th Cir. 1999), DeMoss, J., dissenting. *See* Ex. A, Affidavit of Dwight Doskey, at 1.[1] Mr. Doskey also denies that there was any strategic reason for not pursing a pretrial motion challenging federal jurisdiction on this basis. *Id*. at 1.

With respect to trial preparation and the trial itself, which began on April 8, 1996, Mr. Doskey confirms what is evident from the trial transcript:  that trial counsel did not conduct an investigation into the "color of law" element in order to challenge the Government's evidence and theory that Mr. Davis misused or abused his official power and that there was a nexus between the victim, the improper conduct, and Mr. Davis's performance of his official duties. Had counsel done so, they would have discovered, as Mr. Davis has alleged in his § 2255 Motion, that any motivation that Mr. Davis had arose as the result of a personal grudge,  based on Mr. Davis's prior knowledge of Ms. Groves. Rec. Doc. 2340 at 153. Investigation has produced witnesses and other evidence that will establish the personal relationship at an evidentiary hearing. Mr. Doskey denies that there was any strategic reason for not conducting such an investigation.  *See* Ex. A. at 1-2.

Counsel's failure to advocate, litigate and investigate issues relative to a key element of the Government's case in support of guilt, the "color of law" element, constitutes a violation of capital defense counsel's duty to conduct a thorough and independent investigation into the issue of guilt.  *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in

---

[1] With the exception of Mr. Doskey's affidavit, only obtained recently, Petitioner has previously provided the government with all declarations and statements attached as exhibits to this Memorandum.

Death Penalty Cases, Guideline 11.4.1 (1989).  The performance of trial counsel was deficient in this critical regard.

Moreover, trial counsel's failures to investigate, present to the U.S. Attorney and Attorney General and litigate pretrial and at trial the critical and dispositive issue of color of law, as well as related issues concerning the federal prosecution of an African-American pursuant to these Reconstruction-era provisions, constitutes ineffective assistance that prejudiced Mr. Davis. As revealed by the district court's remark at trial that the color of law issue was "troubling," and as evidenced by Judge Demoss's strong dissent in Mr. Davis's first appeal, the evidence supporting the color of law essential element in particular was far from overwhelming in this case. *See United States v. Causey*, 185 F.3d 407 (5th Cir. 1999) (DeMoss, J., dissenting).  As a result, there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

Notably, the ineffective assistance of counsel claim regarding counsel's deficiencies in investigating and presenting a defense to the "color of law" element was not raised on Mr. Davis's appeal.  Instead, the claim raised on appeal was the insufficiency of the trial record evidence to support that element.  The appeal issue is not substantially the same as the present ineffective assistance of counsel issue.  As a result, and in light of the additional, different evidence alleged, and to be presented at an evidentiary hearing, in support of this ineffectiveness claim, there is no "law of the case" on this issue, contrary to the argument of the Government. *See, e.g., United States v. Goudeau*, 512 Fed.Appx. 390, 393-394 (5th Cir. 2013) (where defendant unsuccessfully argued on appeal that his guilty plea was unknowing and involuntary because his attorney gave him erroneous assurances about the calculation of drug amounts for guidelines purposes, and then filed a Section 2255 motion alleging again that his counsel gave

7

him erroneous assurances about the calculation of the drug amounts and was ineffective as a result, the issue of the attorney allegedly misinforming the defendant about the drug amounts for sentencing purposes "is substantially the same issue" that defendant raised on direct appeal and constitutes "law of the case" unless the  defendant presents "different evidence or a change in the law since the earlier decision" or the court concludes that the earlier decision is clearly erroneous and would work a manifest injustice).

Furthermore, as set forth more fully in Mr. Davis's petition, trial counsel was ineffective in several other respects in connection with the 1996 trial.  Trial counsel's deficiencies include as well the failure to investigate and challenge inadmissible and highly prejudicial "interpretation" testimony from key Government witness Sammie Williams; the failure to cross examine Mr. Williams with in an effort to challenge the "color of law" element; and the failure to challenge the Government's forensic evidence.   Counsel's deficiencies also include the failure to investigate and challenge the federal prosecution as unconstitutional in violation of the Equal Protection Clause, as racially discriminatory and as contrary to the language and intent of 18 U.S.C. Sections 241 and 242.  Moreover, with respect to the jury claim, trial counsel was aware of some of the jury misconduct and extraneous influences on jurors, but failed to explore them even when offered the opportunity.   Recent investigation has revealed, and Mr. Davis will establish at an evidentiary hearing, that jurors were more severely impacted by these extraneous influences, which would have surfaced if counsel had allowed a more thorough inquiry.

### III. Mr. Davis is Entitled to an Evidentiary Hearing on his Claims of *Brady/Giglio* Violations in Connection with his 1996 Trial. (Section 2255 Motion, Claim 8, Rec. Doc. 2340 at 97-108)

Prior to and during the 1996 trial, the Government withheld evidence of its internal investigation into the failure of the FBI to act on the Title III wiretap of conversations of Mr. Davis overheard contemporaneously by the FBI on the date of the killing of Ms. Groves.  This

investigation revealed that both the individual monitoring the conversations and the FBI agent who reviewed the tapes the following day did not determine the conversations to be relevant and concluded that they "could be mistaken as routine."  Nevertheless, at trial the Government argued that there was no mistaking what the conversations meant and relied on the testimony of Mr. Davis's partner, Sammie Williams, to confirm the Government's interpretation of these conversations as ordering the killing of Ms. Groves.  According to Mr. Doskey, had he been made aware of this FBI investigation, he would have used it to raise the issue pretrial of the Government's conflict of interest, an issue that he did not consider raising pretrial or investigating at the time of trial.  He would have also used the information during trial to challenge the Government's case regarding the proper interpretation of these conversations, a critical issue at trial.  *See* Ex. A at 2.

In addition, the Government withheld the unredacted FBI 302s of interviews of key government witness Sammie Williams on December 28, 1994, and January 3, 1995 until they were recently produced to undersigned counsel. *See* Ex. B, Sammie Williams Redacted 302s Provided Prior to Trial. *Compare* Ex. C, Sammie Williams Unredacted 302s Provided in 2017. Despite the Government's insistence for over 23 years that these 302s do not contain any *Brady*/Giglio material, these 302s reflect important inconsistencies with Mr. Williams's trial testimony in April of 1996 relevant to the issue of "color of law," as well as to Mr. Williams's bias, credibility and motivation to lie.  As a result, Mr. Davis will be seeking discovery of any outstanding 302s of Mr. Williams that have not yet been produced.

As trial counsel Mr. Doskey explains in his affidavit, had he been made aware of the complete, unredacted 302s of Sammie Williams he would have used the information in them both to challenge the credibility of Mr. Williams and to inform the theory of defense against the

charges, particularly with regard to the under color of law element.  In particular, if the defense had been given the 302s and had focused on the elements of a color of law prosecution, counsel would have used the 302s to cross Mr. Williams on the factual bases for the Fifth Circuit majority's fact-intensive conclusion that Mr. Davis did act under color of law. *See* Ex. A at 2. Thus, for example, the 302s could have been used to emphasize that there was no connection between the events leading to Ms. Groves' death and Mr. Davis's status as a police officer -- the meeting at the police station was only to look at gory crime scene photos; Mr. Davis's driving around in the police car with Hardy in full view of the public did not facilitate a crime that could only have been made possible by use of a police car; Mr. Davis's use of his police radio while off-duty and after the fact was only to confirm that Ms. Groves was dead, not to commit or cover up the crime; the failure of the killing to occur at a time that Mr. Davis could arrive at the crime scene and cover it up, and the lack of any evidence that Mr. Davis could or would protect Mr. Hardy in his capacity as a police officer as opposed to a co-conspirator.  *See* Ex. C.

The record supports that these *Brady/Giglio* violations were material and prejudiced Mr. Davis's defense in that there is a reasonable probability that, had the evidence been disclosed at trial, the result of the proceeding would have been different.  *See Kyles v.* Whitley, 514 U.S. 491, 434 (1995).  The Fifth Circuit majority based its fact-intensive analysis and conclusion that the color of law element had been satisfied on trial evidence – provided by key Government witness Mr. Williams -- that Mr. Davis's motive for conspiring to kill Ms. Groves was her filing an internal affairs complaint against him, his holding a meeting of the co-conspirators at the police station, his use of his police car to show the co-conspirator the victim, his communication with the police radio, his plan to cover up the murder by investigating the crime scene and his protection offered the co-conspirators.  185 F.3d at 415-16. As previously noted, the evidence in

support of the "color of law" element is by no means overwhelming.  As Judge DeMoss put it in his dissent, the theory that the defendants, a rouge police officer, a drug dealer and a drug dealer's side kick were engaged in state action under color of state law is "nothing short of ridiculous."  185 F.3d at 426.  As the dissent also noted, a defendant is not acting under "color of law" when he or she is pursuing private aims and not acting by virtue of state authority.  *Id.* at 424-25.  Had they had access to the complete, unredacted 302s of Sammie Williams, trial counsel could have challenged Mr. Williams's testimony in this and other critical respects.

For example, there is no indication in the 302s that Mr. Davis did not know Ms. Groves, as Mr. Williams testified under oath.  To the contrary, the 302s suggest that Mr. Davis did know Ms. Groves, was able to recognize and describe her and knew where she hung out.  This is consistent with information resulting from the current investigation, as will be established at an evidentiary hearing.  Additionally, the 302s are inconsistent with Mr. Williams's testimony regarding the motivation for the killing of Ms. Groves, the alleged alibi arrangements between Mr. Davis and Mr. Hardy, Hardy's alleged practice of changing barrels, the circumstances of the trip with Mr. Hardy in the police car, Mr. Williams's knowledge of Steve Jackson, the circumstances of the meeting at the police station, and the alleged cover up if Mr. Davis and Mr. Williams were to work the murder scene as police officers on duty.  *See* Ex. C.  The materiality of the information in these unredacted 302s to the trial defense and the credibility of Mr. Williams – and the resulting prejudice to Mr. Davis -- will be fully established at an evidentiary hearing.

**IV. This Court Must Conduct an Evidentiary Hearing to Assess Juror Bias Resulting from Multiple Instances of External Influences and Misconduct. (Section 2255 Motion, Claim 9(A), Rec. Doc. 2340 at 111-119)**

Based on both the record of this case and statements of jurors Petitioner has been able to interview, improper influences and jury misconduct ran rampant during Mr. Davis' first trial.

One juror could not remain alert enough to listen to long days of what he considered repetitive evidence, and so "dozed off." He does not remember much of the evidence at trial.[2] Trial counsel was unaware of the extent of this juror's non-participation at trial. Ex. A at 2. Unbeknownst to trial counsel, the same juror's wife attended trial each day and was invited by U.S. Attorney Eddie Jordan, who she knew personally, to sit with him and other members of his office. She did so.[3] Likewise unbeknownst to trial counsel, jurors were subjected to unnecessarily severe security measures that communicated the need to fear Mr. Davis, destroying the presumption of innocence.[4]

The wife of one juror described the level of fear communicated by the marshals to her when she dropped off her husband's clothes after he was selected as a juror:

> The martials [sic] took me in and met with me while they went through the clothes I brought. They had me write down my regular schedule. They wanted to know my routine to make sure something didn't happen to me. They said that Len Davis was a police officer and knows people and his reach goes far. Half of NOPD was crooked then and I was scared. At night when I went home I would pull my husband's recliner up against the front door.[5]

After the guilty verdict, "they sent a marshal to my house that night to protect me. They were very worried about my safety.[6]

---

[2] Ex. D, Declaration of John Bourgoyne, at 2; Ex. E, Declaration of Alice Deroche, at 13; Ex. F, Declaration of Emma Jane Bourgoyne, at 6.

[3] Ex. F, Declaration of Emma Jane Bourgoyne, at 3-4.

[4] Ex. D, Declaration of John Bourgoyne, at 3 (jurors transported in bus with windows covered and a marshal was stationed outside every juror's hotel room at night); Ex. E, Declaration of Alice Deroche, at 3-4, 9, 11 (jurors transported in van "with the windows taped up," 5-6 marshals were with jurors at all times, marshals on both sides of jurors anywhere they went, when a man accidentally got off elevator on jurors' floor of the hotel, "the marshals got in his face with guns"); Ex. F, Declaration of Emma Jane Bourgoyne, at 4 (jurors escorted in court by "line of marshals," some marshals were from out of state "because there were so many of them").

[5] Ex. F, Declaration of Emma Jane Bourgoyne, at 2-3.

[6] *Id*. at 6-7.

While contact with family members was supervised by the marshals, they apparently did not see the need to keep their concern for safety out of the ambit of jurors. When a marshal placed a call to Mrs. Bourgoyne on her husband's behalf, he would make sure she was safe prior to handing the phone to her husband.[7] When the wife of a different juror reported she was receiving intimidating phone calls, a marshal passed that information along to the juror. Rec. Doc. 688 at 2-3.[8]

The Sixth Amendment prohibits the intrusion of external influences that affect jury deliberations and its verdict. *Remmer v. United States*, 347 U.S. 227, 229 (1954). "The integrity of jury proceedings must not be jeopardized by unauthorized invasions." *Id*. Where such an invasion is alleged, a court must "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Id*. at 230; *accord Smith v. Phillips*, 455 U.S. 209, 217 (1982) (determination of impact of external influence "may properly be made at a hearing"); *United States v. Olano*, 507 U.S. 725, 738. If, after a hearing, the incident is found to be harmful, a new trial must be granted. 347 U.S. at 230.

Generally, the only way to assess the impact of external influences on jurors and the jury as a whole is to conduct an evidentiary hearing.

> Determining whether a juror is biased or has prejudged a case is difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it. The problem may be compounded when a charge of bias arises from juror misconduct, and not simply from attempts of third parties to influence a juror.

---

[7] *Id*. at 5.

[8] Other instances of extraneous influence and misconduct are set out fully in the § 2255 Motion, and included: one juror's contact with his mother, who brought him a bible, and with a government witness, Rec. Doc. 2340 at 111, another government witness' attempts "to bond with the jury," *id*. at 113, the mental/emotional decomposition of a juror, *id*. at 118.

> Nevertheless, I believe that in most instances a postconviction hearing will be adequate to determine whether a juror is biased. A hearing permits counsel to probe the juror's memory, his reasons for acting as he did, and his understanding of the consequences of his actions. A hearing also permits the trial judge to observe the juror's demeanor under cross-examination and to evaluate his answers in light of the particular circumstances of the case.

*Smith v. Phillips*, 455 U.S. 209, 221-22 (O'Connor, J., concurring) (observing that "in certain instances a hearing may be inadequate for uncovering a juror's biases" where bias can be inferred, and that "the Sixth Amendment right to an impartial jury should not allow a verdict to stand" under those circumstances). *See also*, *Marion v. United States*, 1999 U.S. Dist. LEXIS 4266, *6 (N.D. Miss. 1999) ("even bald accusations of the [un]truthfulness of certain jurors warrants and evidentiary hearing" in § 2255 proceedings); *United States v. Hall*, 455 F.3d 508, 513 (5th Cir. 2006) (district court conducted evidentiary hearing in § 2255 proceedings addressing jury issues); *United States v. Gross*, 614 F.2d 365, 367 (3d Cir. 1980) (case previously remanded to conduct a more extensive evidentiary hearing where first hearing only addressed a portion of the juror misconduct claims).

In its Response to the § 2255 Motion, the government erroneously asserts that all that is at issue in Petitioner's jury claims is "[p]rior life experiences, reflected in…trivial anecdotes." Rec. Doc. 2369 at 28. It ignores the multiple allegations of external influences and of jury misconduct, and focuses instead on the truthfulness of jurors' answers to voir dire questions. *Id*. It correctly asserts, however, that Petitioner must demonstrate bias through admission or actual proof. *Id*. An evidentiary hearing is the long-established vehicle for Petitioner to do so.

## V. Mr. Davis is Entitled to an Evidentiary Hearing on his Claim that the Government Was Laboring Under a Conflict of Interest in Prosecuting Him. (Section 2255 Motion, Claim 1, Rec. Doc. 2240 at 34-46.

Mr. Davis has pled that the government had a conflict of interest in prosecuting the case against him in federal court due to its recklessness in sacrificing lives to reach the culmination of

14

Operation Shattered Shield investigation. Rec. Doc. 2240 at 34-46. By its own admission, the government came to believe *at some point* that Hardy was killing people in the Ninth Ward and that both Williams and Mr. Davis were turning a blind eye to it—indeed making sure police did not respond to murders in time to catch the culprits.[9] The government has protested in the strongest terms that it was unaware of these ongoing murders prior to the murder of Kim Groves. It has claimed it was unaware of the significance of conversations recorded on the day Kim Groves was murdered until October 21, 1994, eight days after Kim Groves was killed. And it has claimed that it was not reckless to leave Mr. Davis and Hardy on the streets for an additional six weeks once it did learn of the murders Hardy was committing.

New evidence establishes that the assertion is simply untrue. According to then-NOPD-Sergeant Paul Hebert, the NOPD liaison to Operation Shattered Shield was informed of the possible link between Mr. Davis and the murder *on the day following the murder*. The NOPD liaison was instructed by an NOPD Lieutenant to relay the information to the FBI. Ex. G, Signed Summary of Joseph Hebert Interview, at 1.

In addition, Mr. Davis would produce evidence at an evidentiary hearing from an expert in FBI undercover operations confirming the recklessness of proceeding with an undercover operation when the lives of citizens are threatened. The government was fully aware in principle that such recklessness would be unconscionable. It made repeated assertions to the media, after Mr. Davis was arrested, that Operation Shattered Shield was shut down to protect innocent citizens. *See* Michael Perlstein and Walt Philbin, *Cop, 2 Others Charged in Death*, TIMES PICAYUNE, Dec. 6, 1994, at A1 (investigation ended prematurely due to Kim Groves' murder).

---

[9] The non-redacted 302s of interviews of Sammie Williams, not provided prior to trial, establish that the government was fully aware that Williams allowed Hardy to escape arrest when he came upon a homicide scene on October 30, 1994 (prior to the murder of Kim Groves) and saw Paul Hardy and others running from the area of the homicide. *See* Ex. C.

The fact that innocent citizens had been killed during the pendency of Shattered Shield, while FBI agents monitored wiretaps, casts doubt on such assertions and underscores the conflicted position the Government found itself in.

Recently-provided discovery also indicates that there was an ongoing investigation into NOPD officers protecting drug rings—like the Hardy drug ring. It again throws into doubt the government's repeated assertion that the arm of the FBI/US Attorney's Office conducting Operation Shattered Shield did not communicate with the arm of the FBI/US Attorney's office conducting NOPD corruption investigation.

Mr. Davis is entitled to further discovery regarding the government's knowledge of Hardy murders protected by Mr. Davis prior to Kim Groves' death. At the very least, it cannot be said conclusively that Mr. Davis is entitled to no relief. This Court should grant an evidentiary hearing on the conflict claim.

Respectfully submitted,

/s Sarah L. Ottinger___
Sarah L. Ottinger, La. Bar No. 24589
Attorney at Law
P.O. Box 19741
New Orleans, LA 70179
(504) 258-6537
sottinger1010@gmail.com

Rebecca L. Hudsmith, La. Bar No. 7052
Federal Public Defender for the
Middle and Western Districts of Louisiana
102 Versailles Blvd., Suite 816
Lafayette, LA 70501
(337) 262-6336
Rebecca_Hudsmith@fd.org

*Counsel for Len Davis*

## CERTIFICATE OF SERVICE

I hereby certify that a that a true and correct copy of the foregoing document has been filed with the Clerk of the Court by using the CM/ECF System which will send a notice of electronic filing to all counsel of record on this 20th day of December, 2017.


/s Sarah Ottinger_____
Sarah Ottinger

17